UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

MEDICAL & CHIROPRACTIC CLINIC,    )
INC.,                             )
                                  )
        Plaintiff,                )
                                  )  Case No.
        vs.                       )  8:16-cv-01477-
                                  )  CEH-TBM
DAVID M. OPPENHEIM, an            )
individual, and BOCK LAW FIRM,    )
LLC d/b/a BOCK, HATCH, LEWIS, &   )
OPPENHEIM, LLC,                   )
                                  )
        Defendants.               )

        The videotaped deposition of ROSS M. GOOD,

called for examination pursuant to the Rules of

Civil Procedure for the United States District

Courts pertaining to the taking of depositions,

taken before Layli Phillips, Certified Shorthand

Reporter of the State of Illinois, at 321 North

Clark Street, Suite 2800, Chicago, Illinois, on

November 13, 2017, at 9:17 a.m.

Reported by:  Layli Phillips, CSR, RPR, CRR

License No.:  084.003900

Page 2

1    APPEARANCES:

2    For the Plaintiff:
           FOLEY & LARDNER LLP
3          MS. LAUREN M. LOEW
           321 North Clark Street, Suite 2800
4          Chicago, Illinois  60654
           (312) 832-5393
5          lloew@foley.com

6    For the Defendant David M. Oppenheim:
           BLONIEN LEGAL COUNSEL
7          MR. BARRY J. BLONIEN
           1718 Adams Street
8          Madison, Wisconsin  53711
           (608) 620-5357
9          barry@blonienlegal.com

10
     For the Defendant Bock Law Firm, LLC:
11         BOCK & HATCH, LLC
           MR. DANIEL COHEN
12         134 North LaSalle Street, Suite 1000
           10th Floor
13         Chicago, Illinois  60602
           (312) 658 5500
14         danieljaycohen209@gmail.com

15
     ALSO PRESENT:  MR. STEPHEN GOETHALS, VIDEOGRAPHER
16                  MR. DAVID M. OPPENHEIM

17

18

19

20

21

22

23

24

1                              I N D E X

2

3     Examinations                                    Page

4

5      By Mr. Blonien                                    5

6      By Mr. Cohen                                    204

7

8                           E X H I B I T S

9

10     Number              Description                 Page

11

12    Exhibit 1      Retention Agreement          112

13    Exhibit 2      Term Sheet                   163

14    Exhibit 3      Email Chain                  169

15    Exhibit 4      MC 4784 to MC 4797           175

16    Exhibit 5      MC 3574 to MC 3579           179

17    Exhibit 6      Bates Number MC 4416 to 17   193

18    Exhibit 7      Proposed Claim Form For the  259

19                   Technology Training Settlement

20

21

22

23

24

1           THE VIDEOGRAPHER:  Here begins the

2    videotaped deposition of Ross Good, Tape 1, Volume

3    1, in the matter of Medical & Chiropractic Clinic

4    versus Oppenheim, Case Number

5    8:16-cv-01477-CEH-TBM.

6           Today's date is November 13th, 2017, and

7    the time on the video monitor is 9:18.

8           My name is Stephen Goethals, and the

9    court reporter is Layli Phillips of Thompson Court

10   Reporters.

11          Today's deposition is taking place at

12   Foley & Lardner LLP, Chicago, Illinois.

13          Would counsel please introduce

14   themselves and state whom they represent.

15          MR. BLONIEN:  This is Barry Blonien with

16   Blonien Legal Counsel on behalf of David M.

17   Oppenheim.

18          MR. COHEN:  Dan Cohen with Bock Law

19   Firm, LLC, on behalf of Bock Law Firm, LLC.

20          MS. LOEW:  Lauren Loew on behalf of

21   Medical & Chiropractic Clinic, Inc., and Ross

22   Good.

23          THE VIDEOGRAPHER:  Will the court

24   reporter please swear in the witness.

                          ROSS M. GOOD

1              the deponent herein, called as a

2     witness, after having been first duly sworn, was

3     examined and testified as follows:

4                          EXAMINATION

5     BY MR. BLONIEN:

6          Q.    Good morning, sir.  Could you state your

7     name for the record, please?

8          A.    Ross Good.

9          Q.    And is there a middle initial, Ross?

10         A.    M.

11         Q.    Have you been deposed before?

12         A.    Yes.

13         Q.    How many times?

14         A.    Approximately four.

15         Q.    Let's just go over some of the basic

16    ground rules if we can.  First, if we can avoid

17    interrupting each other and talking over each

18    other, it would help the court reporter to make

19    sure that she can get everything down that we say.

20             If you don't understand my question,

21    please ask.  Otherwise I will assume you

22    understood my question and answered it truthfully

23    and fully; is that fair?

1      A.    Yes.

2      Q.    And if you need a break, please ask.

3  Okay?

4      A.    Yes.

5      Q.    Mr. Good, what is your email address?

6      A.    Rgood@andersonwanca.com.

7      Q.    Mr. Good, did you receive a subpoena for

8  today's deposition?

9      A.    Yes.

10      Q.    And did that subpoena also request

11  documents?

12      A.    Yes.

13      Q.    Have you produced any documents in

14  response to that subpoena?

15      A.    I compiled documents and provided it to

16  my counsel, and I believe my counsel did produce

17  documents responsive to that subpoena.

18      Q.    Okay.  How many documents approximately

19  did you produce?

20      A.    Are you asking how many I provided to my

21  counsel or how many my counsel produced to you?

22      Q.    Whatever is in your knowledge.  I'm

23  ultimately interested in the latter, but if you

24  don't know that, then the former.

1      A.     I know how many documents I provided, or

2   I know approximately how many documents I provided

3   to my counsel.  I do not recall how many documents

4   my counsel provided to you.

5      Q.     Okay.  And how many did you provide to

6   counsel?

7      A.     Approximately 9,000 emails.

8      Q.     And when did you provide those?

9      A.     Approximately two to two and a half

10  weeks ago.

11     Q.     And do you know how the materials that

12  were produced to us were organized, that is, which

13  of those documents belonged to you?

14     A.     I know how I compiled the emails and

15  provided them to my counsel.

16     Q.     Okay.  How did you provide those emails?

17     A.     I started by looking at my own calendar

18  for the -- the time line of this matter.  And then

19  I am an administrator at -- on Anderson Wanca's

20  email server, and specifically the back end

21  support system for that server that downloads and

22  retains a backup copy of all inbound and outbound

23  email traffic for all @andersonwanca.com emails.

24          And I performed searches on those

1    emails, downloaded all of the emails that came up

2    as matches to those searches, and provided those

3    thousands and thousands of emails to my counsel.

4        Q.    Did you do any searches of those emails

5    or any other documents that you had before two and

6    a half weeks ago?

7        A.    Yes.

8        Q.    Okay.  Describe that process to me,

9    please.

10       A.    After David Oppenheim's resignation and

11   the Bock Hatch Firm filed their copycat competing

12   case, I was asked to perform email searches

13   specific to emails Oppenheim sent and received

14   related to the Buccaneers case.

15       Q.    And how many emails did you turn up in

16   that search?

17       A.    I don't remember.

18       Q.    How many emails did you produce to your

19   counsel as a result of that search?

20       A.    I know I produced all of them, but I

21   don't remember how many.

22       Q.    Do you have an approximation?

23       A.    I know I used a download link, so it was

24   more than 25 megabytes worth; but I don't know

1     beyond that.

2          Q.     Are you represented for today's

3     deposition?

4          A.     Yes.

5          Q.     By whom?

6          A.     Lauren Loew.

7          Q.     Did you meet with Ms. Loew before

8     today's deposition?

9          A.     No.

10         Q.     Did you prepare for today's deposition?

11         A.     Yes.

12         Q.     How did you prepare?

13         A.     I met with another attorney, Jeffrey

14    Soble.

15         Q.     When did you meet with Mr. Soble?

16         A.     On Friday.

17         Q.     For how long?

18         A.     Approximately 90 minutes.

19         Q.     Was anyone else in attendance?

20         A.     For part of it, another attorney named

21    Pat McMahon was for -- there.

22         Q.     Anyone else?

23         A.     No.

24         Q.     Did you do anything else to prepare for

1    this deposition, apart from the 90-minute

2    preparation session you just described?

3        A.    Yes.

4        Q.    What's that?

5        A.    I reviewed the 11th Circuit Court of

6    Appeals decision, the false police report filed by

7    David Oppenheim, and written discovery responses

8    of Medical & Chiro, written discovery response

9    supplements of Medical & Chiro, and some emails

10   that were produced by Oppenheim; and then those

11   emails were produced and marked, Bates labeled by

12   Oppenheim and then reproduced by the Foley

13   attorneys and also Bates labeled, so they had two

14   Bates labels on them.

15       Q.    Anything else?

16       A.    Not that I recall.

17       Q.    Okay.  I think I heard you say that you

18   reviewed the false police report; did I understand

19   that correctly?

20       A.    Yes.

21       Q.    Okay.  What gives you the indication

22   that that police report is false?

23       A.    I do not believe that the laptop was

24   stolen.

1        Q.    All right.  What do you believe,

2   Mr. Ross?

3        A.    I believe that it was not stolen.

4        Q.    Okay.  And what gives you that

5   impression?  What gives you that belief?

6        A.    I was aware of the letter sent to, I

7   believe, you from Anderson Wanca stating that if

8   the laptop -- the contents, rather, were not

9   returned within 21 days, a lawsuit would be filed.

10  And I believe this happened on day 19 of 21.

11       Q.    Okay.  And what facts do you have that

12  support your belief, Mr. Ross?

13       A.    I just answered that.

14             MR. COHEN:  Mr. Good.

15  BY MR. BLONIEN:

16       Q.    Or Mr. Good.  I apologize.

17       A.    I just answered that.  It was 19 days in

18  the 21 days, and I don't think anybody -- well,

19  strike -- nobody asked me.

20       Q.    Nobody asked you what?

21       A.    Nobody accused me of stealing it.

22       Q.    All right.  I'm not accusing you of

23  stealing it.  What I'm trying to understand is

24  that you stated that you reviewed a false police

1    report.  You understand that's a pretty serious

2    accusation to lie to the police, correct?

3         A.    Yes.

4         Q.    Okay.  Did you report to the police that

5    you believed that Mr. Oppenheim made a false

6    representation to the police?

7         A.    I did not.

8         Q.    Who have you informed that you believe

9    Mr. Oppenheim made a false police report?

10        A.    My counsel.

11        Q.    Anyone else?

12        A.    I believe I said it to Mr. Wanca.  Just

13   give me a second.

14              I can't think of anybody else.

15        Q.    Okay.  So that I understand you

16   correctly, the basis for you stating that

17   Mr. Oppenheim lied to the police was that he

18   reported his laptop stolen 19 days out of 21 days

19   in connection with some correspondence that you

20   referred to by Mr. Wanca; is that correct?

21        A.    Yes.

22        Q.    Okay.  Is there any other fact that you

23   possess that would support such a bold and

24   aggressive allegation, Mr. Good?

1          MS. LOEW:  Objection to form.

2      A.    I believe I answered that already, but I

3  wasn't accused of stealing it.

4          MR. BLONIEN:  Okay.  What's the basis

5  for the objection to form, Ms. Loew?

6          MS. LOEW:  Your characterization of bold

7  and aggressive.

8  BY MR. BLONIEN:

9      Q.    Okay.  Do you think that accusing

10 someone of lying to the police is bold, Mr. Good?

11     A.    No.

12     Q.    Do you think that accusing someone of

13 lying to the police is aggressive, Mr. Good?

14     A.    No.

15     Q.    Okay.  Do you have any other facts that

16 support Mr. Oppenheim lied to the police, apart

17 from this timing issue that you identified?

18     A.    The fact that I wasn't accused.

19     Q.    That you weren't accused?

20     A.    Correct.

21     Q.    That you weren't accused supports your

22 accusation of Mr. Oppenheim that he lied to the

23 police?

24     A.    Correct.

1    Q.    Can you explain what you mean by that?

2    A.    I don't know anybody who would have

3  wanted those documents back more than me.

4    Q.    Why would you want those documents back

5  more than anyone else?

6    A.    Because he stole them from a system that

7  I set up.

8    Q.    And how did he steal them, Mr. Good?

9    A.    He -- he went to Abt Electronics and

10  instructed them to copy them off a laptop I set up

11  for him and is still holding them, actually still

12  holding a copy of them.

13    Q.    Okay.  And were those documents, did

14  they belong to you?

15    A.    No.

16    Q.    Who did they belong to?

17    A.    Anderson Wanca and clients.

18    Q.    Okay.  In reviewing the documents that

19  you possess, did you provide any contracts that

20  Mr. Oppenheim had with Anderson & Wanca regarding

21  these documents?

22    A.    I don't have access to any such

23  contracts.

24    Q.    Okay.  So what gives you the knowledge

1   or belief that these documents belonged to

2   Anderson & Wanca and not to Mr. Oppenheim?

3          A.    The fact that I set up his computer.

4          Q.    The fact that you set up his computer.

5   When did you set up his computer, Mr. Good?

6          A.    Approximately two years before he left,

7   so that would be the middle of 2014 approximately.

8          Q.    All right.  So you set up his computer

9   in 2014, and that gives you reason to believe that

10  everything on his computer belonged to Anderson &

11  Wanca?

12         A.    Correct.

13         Q.    Okay.  Is there anything else that gives

14  you that belief, Mr. Good?

15         A.    I also set up his email account.

16         Q.    Okay.  Anything else?

17         A.    Nothing that I can think of.

18         Q.    Did you review Mr. Oppenheim's contract

19  of employment with Anderson & Wanca?

20         A.    No.

21         Q.    Did you review any other agreements that

22  would give you a basis to believe that these

23  documents belonged to Anderson & Wanca and not to

24  Mr. Oppenheim?

1     A.    I did not review any agreements related

2   to Mr. Oppenheim.

3     Q.    Did you review the law?

4     A.    What law?

5     Q.    The law that exists in books and cases.

6     A.    I attended law school, yes.

7     Q.    Okay.  Did you review the law with

8   respect to the possession of client materials?

9     A.    I don't know what law you're referring

10  to.

11    Q.    The law in Illinois, let's start there.

12    A.    I have reviewed laws of the State of

13  Illinois, yes.

14    Q.    Okay.  Have you reviewed the laws of the

15  State of Illinois with respect to the possession

16  of documents that belong to clients?

17    A.    I have reviewed Illinois Rules of

18  Professional Conduct.  I don't believe I've

19  reviewed any -- I don't believe -- I'm not aware

20  of any Illinois laws on that subject.

21    Q.    Okay.  Did you look for any?

22    A.    I looked at the Illinois Rules of

23  Professional Conduct.

24    Q.    Okay.  And in your view, what do those

1    rules say with respect to the possession of client

2    materials?

3         A.    That the client has an interest in them,

4    and the law firm has a duty to protect those

5    materials.

6         Q.    Okay.  And do you have any understanding

7    as to whether those rules also pertain to an

8    attorney, not simply the law firm?

9         A.    Can you repeat the question?

10        Q.    Do you have an understanding of the law

11   as to whether or not those same rules apply to an

12   attorney as compared to a law firm?

13        A.    I do not have an understanding on that.

14        Q.    Okay.  But you're willing to say that

15   Mr. Oppenheim stole documents from a law firm

16   without having an understanding of the law?

17             MS. LOEW:  Objection to --

18        A.    Yes.

19             MS. LOEW:  -- form.

20   BY MR. BLONIEN:

21        Q.    Okay.

22             THE REPORTER:  Let her finish before

23   you -- thanks.

24             THE WITNESS:  I apologize.

1          THE REPORTER:  No problem.

2     BY MR. BLONIEN:

3          Q.    And your answer was yes, correct?

4          A.    Correct.

5          Q.    Do you personally have a contract with

6     Ms. Loew and Foley & Lardner?

7          A.    I do not recall ever signing a contract

8     with Ms. Loew or Foley & Lardner.

9          Q.    Do you know who's paying your attorneys'

10    fees for today?

11         A.    I believe that will be up to the court

12    at the end of this litigation.

13         Q.    And why do you say that?

14         A.    Because I think Medical & Chiro is going

15    to win this litigation, and I think the defendants

16    are going to be ordered to pay.

17         Q.    Ordered to pay what?

18         A.    All of the attorneys' fees.

19         Q.    All of your attorneys' fees?

20         A.    All of Medical & Chiro's attorneys'

21    fees.

22         Q.    Okay.  And do you consider your time in

23    attendance for today's deposition a part of the

24    attorneys' fees that Medical & Chiropractic would

1    be entitled to seek in this litigation?

2         A.    Can you repeat the question?

3         Q.    Are you seeking your fees in connection

4    with this case?

5         A.    I'm not seeking anything in this case.

6         Q.    Are you seeking your time for attending

7    today's deposition in this case?

8         A.    I'm not seeking anything in this case.

9         Q.    Okay.  Who is paying your attorneys'

10   fees for today?

11        A.    As I said before, I think the court will

12   determine that at the end of the litigation.

13        Q.    All right.  You said that before; and I

14   don't understand what you mean by that, Mr. Good.

15   So I'm trying to understand through questions and

16   your responses what you mean by that.

17        A.    Okay.

18        Q.    Do you think that the court is going to

19   order Mr. Oppenheim to pay for your attorney for

20   today's deposition; is that what you're

21   contending?

22        A.    Defendants, plural --

23        Q.    Okay.

24        A.    -- I believe will be ordered by the

1    court to pay for attorneys' fees.

2         Q.    And do you think that your attorneys'

3    fees would also be part of that?

4         A.    Yes.

5         Q.    All right.  How much are you paying your

6    attorney for today?

7         A.    I'm not paying anything.

8         Q.    How much is your attorney being paid for

9    today?

10        A.    I do not know.

11        Q.    Who would know?

12        A.    My attorney.

13        Q.    Anyone else?

14        A.    I can't speculate.  I don't know.

15        Q.    You don't know how much your attorney is

16   being paid?

17        A.    Correct.

18        Q.    Do you know what the scope of your

19   representation with your attorney is?

20        A.    I know it's in relation to today's

21   deposition.

22        Q.    Is there anything else that you know?

23        A.    I know they also represent Medical &

24   Chiro in this litigation, and they represent

1    Anderson Wanca in separate litigation pending in

2    Cook County.

3         Q.    And they also represent Anderson & Wanca

4    for purposes of the depositions, like today?

5         A.    I don't know.

6         Q.    Is Foley & Lardner acting as your

7    attorney today?

8         A.    Mine, yes, today.

9         Q.    Okay.  And is Foley & Lardner acting as

10   the attorney for you law firm today?

11        A.    In what matter?

12        Q.    Your deposition today that your

13   appearance and the depositions that are occurring

14   in connection with this case.  And when I say this

15   case, I mean the accusations that Medical &

16   Chiropractic has made against Mr. Oppenheim and

17   Bock Law Firm; do you understand that?

18        A.    Yes, and I understand -- yes, I do.

19        Q.    Okay.  So in connection with this case,

20   is it your understanding that Foley & Lardner

21   represents your law firm as well?

22        A.    I think so, but I don't know for

23   certain.

24        Q.    Okay.  And what gives you the basis to

Page 22

1  think so?

2      A.    I believe that a retainer agreement

3  exists that is signed by Foley & Lardner, Medical

4  & Chiro, and Anderson Wanca.

5      Q.    And is your representation falling under

6  that -- that retainer agreement based on your

7  understanding?

8      A.    I have no understanding as to that.

9      Q.    Did you speak with your attorneys about

10  any potential conflicts of interest in connection

11  with representing you and Medical & Chiropractic

12  and Mr. Addison and your law firm in connection

13  with this case?

14      A.    I --

15          MS. LOEW:  Objection to the extent this

16  is calling for attorney-client communications.  I

17  advise you not to answer.

18  BY MR. BLONIEN:

19      Q.    Are you going to follow that advice?

20      A.    Yes.

21      Q.    Do you know who is paying Foley &

22  Lardner's fees generally?

23      A.    I believe that the court will be able to

24  rule on who will pay the attorneys' fees at the

1    end of the litigation.

2         Q.    Have you seen the retainer agreement

3    with Foley & Lardner?

4         A.    I think -- I think I did.

5         Q.    Okay.  And what do you recall that

6    document saying?

7         A.    I recall it having large redactions on

8    it.  I don't recall any of the language at all.

9         Q.    Do you recall the small portion among

10   redacted text saying that Anderson & Wanca agrees

11   to pay all of the costs and expenses associated

12   with this representation?

13        A.    I do not recall that.

14        Q.    And do you agree the portion where -- or

15   that there is a portion that says that in no

16   circumstance will Medical & Chiropractic be

17   responsible for any fees and costs associated with

18   this litigation?

19        A.    I don't recall the language of such an

20   agreement.

21        Q.    But you didn't sign any agreement,

22   correct?

23        A.    Correct.

24        Q.    And that includes any representation for

Page 24

1   today's deposition?

2       A.    Correct.

3       Q.    Did you talk with anyone else, apart

4   from your attorneys, in preparation for today's

5   deposition, Mr. Good?

6       A.    Not to prepare for today's deposition.

7       Q.    Did you talk with anyone about the fact

8   that you were being deposed today, apart from your

9   counsel?

10      A.    There are other people that I told I was

11  being deposed today.

12      Q.    Okay.  And who did you tell that you

13  were being deposed today?

14      A.    Ryan Kelly; Michael Addison; Michelle

15  Zakzrewski; Greg Williams; I believe the

16  paralegal, Sue Fitzgerald, at my office; Rita

17  Hernandez, an assistant at my office; my wife.

18          I cannot think of anybody else.

19      Q.    Okay.  When did you have a conversation

20  with Mr. Addison about today's deposition?

21      A.    Approx -- strike that.

22          After I received the subpoena -- no.

23  Strike that.  It was before that.

24          When we were scheduling -- when the

1    Foley counsel was scheduling depositions with

2    yourself and Mr. Cohen, there was a discussion

3    about all of our availabilities for depositions.

4    I was sort of the point person on that, and I got

5    everybody's dates that they were available; and I

6    confirmed them with everybody and provided them to

7    the Foley & Lardner attorneys.

8         Q.    Okay.  And how does the conversation

9    with Mr. Addison fit into that?

10        A.    He was one of the people that you sought

11   to depose, and I was the one that contacted him to

12   ask him about his availability for deposition.

13        Q.    Okay.  And did you discuss the substance

14   of any questions and answers in that conversation

15   with Mr. Addison?

16        A.    No.

17        Q.    And did you have any other conversations

18   with Mr. Addison about the deposition?

19        A.    I believe I sent him the subpoena that

20   was signed by one of defense counsel.

21        Q.    Okay.  Did you discuss the substance of

22   the depositions, either his deposition or yours?

23        A.    No.

24        Q.    At any point in time?

1      A.    I'm sorry for not letting you finish.

2    No.

3      Q.    And what about Ms. Zakzrewski, did you

4    talk with her about the substance of the

5    depositions?

6      A.    No.

7      Q.    Did you talk with Mr. Williams about the

8    substance of the depositions?

9      A.    No.

10      Q.    What about Mr. Kelly?

11      A.    No.

12      Q.    What about Mr. Wanca?

13      A.    No.

14      Q.    In preparing for today's deposition, you

15    did not speak with Mr. Wanca about what questions

16    or answers you were likely to be asked or the

17    answers you were likely to provide?

18      A.    That is correct.

19      Q.    And that's the same as for everyone that

20    I listed in the -- in that list?

21      A.    Correct.

22      Q.    How would you describe M & C's claims

23    against Mr. Oppenheim and Bock Law Firm --

24      A.    I'm sorry for interrupting you.

1   Incredibly strong.

2       Q.    Okay.  Apart from your characterization

3   about the likelihood of success, Mr. Good, can you

4   describe in basic terms what you believe the

5   allegations to be?

6       A.    That Mr. Oppenheim breached his

7   fiduciary duty owed to M & C and that Bock, Hatch,

8   Lewis & Oppenheim aided and abetted that breach.

9       Q.    And what specifically, what conduct do

10  you allege Mr. Oppenheim did that breached his

11  fiduciary duty?

12      A.    He stole emails related to the

13  representation of M & C, the mediation,

14  mediations, plural, and he breached the mediation

15  privilege to help Bock, Hatch, Lewis & Oppenheim

16  file and pursue a settlement with the defendant in

17  the underlying action, the Cin-Q and Medical &

18  Chiro v. Buccaneers.

19      Q.    Anything else?

20      A.    Off the top of my head, I can't think of

21  anything else.

22      Q.    Okay.  So largely as you understand it,

23  this case involves that -- the allegation that

24  Mr. Oppenheim stole emails and that he breached a

1    mediation privilege?

2         A.    I believe he admitted to all of those.

3         Q.    Okay.  Where did he admit to all of

4    those?

5         A.    Correspondence from yourself as to him

6    retaining copies of the emails he stole.  And I

7    believe somewhere in his testimony, he admitted

8    that an email to Mr. Bock was, in fact, a breach

9    of the mediation privilege.

10        Q.    Okay.  And can you be more specific

11   about what you're referring to when you say

12   somewhere in his testimony, he admitted that an

13   email to Mr. Bock, in fact, was a breach of the

14   mediation privilege?

15        A.    I don't remember which testimony it was;

16   but I recall reading in a transcript that

17   Mr. Oppenheim did, in fact, admit that he breached

18   the mediation privilege by disclosing something to

19   Mr. Bock.

20        Q.    And what was the something that he

21   disclosed?

22        A.    The impression of the mediator from the

23   mediation, and I'm specifically referring to the

24   second mediation.

1       Q.     The impression of the mediator from the

2    mediation, can you be any more specific than that?

3       A.     I know it was in an email.

4       Q.     And the mediator was Mr. Anderson,

5    correct?

6       A.     Yes, retired judge Wayne Anderson.

7       Q.     And what impression of Mr. Anderson did

8    Mr. Oppenheim share in your view?

9       A.     It's not my view.  It's -- you can read

10   the document.  And it was something about the

11   settlement position of the parties.

12      Q.     And what was the settlement position of

13   the parties that Mr. Oppenheim disclosed?

14      A.     That this case was going to have to

15   settle.

16      Q.     That this case was going to have to

17   settle?

18      A.     It was something along those lines.  I'm

19   paraphrasing.

20      Q.     Okay.  Can you be any more specific?

21      A.     Not without the document in front of me.

22      Q.     Do you remember when the document was

23   approximately?

24      A.     Approximately the end of April 2016.

1       Q.     Anything else that you recall?

2       A.     It was approximately three weeks after

3    David Oppenheim resigned from Anderson Wanca and

4    approximately one week before Bock, Hatch, Lewis &

5    Oppenheim filed their first copycat class action

6    case against the Buccaneers in state court.

7       Q.     Okay.  And it's your testimony that

8    Mr. Oppenheim admitted that he breached the

9    mediation agreement by this April 2016 email?

10      A.     That's my best recollection, yes.

11      Q.     Anything else that constitutes a breach

12   of the privilege in your view, Mr. Good, apart

13   from that email?

14      A.     I believe his new firm's representation

15   of a client with an adverse interest to Medical &

16   Chiro also constitutes breach.

17      Q.     All right.  Who has an adverse interest,

18   Mr. Good?

19      A.     Technology Training.

20      Q.     With whom?

21      A.     Medical & Chiro.

22      Q.     How is their interest adverse?

23      A.     The 11th Circuit Court of Appeals

24   decision, I believe, answers that in some detail.

1    Q.    Okay.  Can you be more specific?

2    A.    It was a reverse auction, and reverse

3  auctions are bad.

4    Q.    Okay.  What's your understanding of the

5  term reverse auction, Mr. Good?

6    A.    When a party with no leverage whatsoever

7  is used as a stooge to pay less money than a party

8  that had been working on litigation for years and

9  has standing, you have a reverse auction.

10    Q.    You used the word stooge.  What does

11  that word mean in your mind, Mr. Good?

12    A.    Somebody without standing who has no

13  control of anything.

14    Q.    And when you use the term standing, what

15  does that term mean to you, Mr. Good?

16    A.    That means they have the ability to

17  pursue a case.

18    Q.    Okay.  Is it your contention that

19  Technology Training has no interest in the class

20  action?

21    A.    It is my position that Technology

22  Training missed the statute of limitations and,

23  therefore, has no standing.

24    Q.    That's not my question.  My question was

Page 32

1    whether they have any interest in the litigation.

2        A.    I don't know.

3        Q.    You don't know whether they have any

4    interest in the litigation?

5        A.    Correct.

6        Q.    Okay.  What about others who are in the

7    same position as Technology Training Associates

8    with respect to timing of their claims?

9        A.    They can file claims -- or strike that.

10   I apologize.

11             I would like to correct my answer.  They

12   can file individual cases against the Buccaneers.

13                   (Enter Mr. Oppenheim.)

14   BY MR. BLONIEN:

15       Q.    But not a class action in your position?

16       A.    Correct.  Ewing Industries v. Bob Wines.

17       Q.    When did Medical & Chiropractic receive

18   its faxes?

19       A.    In 2009 or 2010.

20       Q.    Is there any difference in legal

21   significance between 2009 and 2010 in your view?

22       A.    Yes.

23       Q.    And what's that?

24       A.    The Cin-Q action was filed in 2009; and

1    subsequent to the Cin-Q action being filed, the

2    defendants in the underlying action, that is, the

3    Buccaneers, sent more faxes.  And the fact that

4    they were in litigation at the time they continued

5    sending faxes is legally significant to me.

6        Q.    Okay.  Do you know whether Medical &

7    Chiropractic received any faxes in 2009?

8        A.    I don't remember whether it was 2009 or

9    2010.  You would have to see the complaint.

10       Q.    Okay.  And is it your contention that

11   whether it was 2009 or 2010, anyone who received

12   faxes in that time frame that their claims were

13   valid from a statute of limitations perspective?

14            THE WITNESS:  I'm sorry.

15            MS. LOEW:  Objection to form.

16            THE WITNESS:  Can you repeat the

17   question back?

18                     (Whereupon, record was read as

19                      requested.)

20       A.    It's my understanding that their --

21   they -- the statute of limitations that was

22   applicable was four years from the date of which

23   they received a fax.

24       Q.    Okay.  So if Medical & Chiropractic

Page 34

1    received its faxes in 2009, when would the statute

2    of limitations have run?

3        A.    In 2013.

4        Q.    Okay.  And when in 2009 is it alleged in

5    the Buccaneers class action litigation that faxes

6    were sent?

7        A.    To the best of my recollection, sometime

8    in the late summer of 2009 and then the early

9    summer of 2010.

10       Q.    Okay.  Late summer being July or August?

11       A.    Correct.

12       Q.    And when was it, Mr. Good, that M & C

13   sought to participate in the Buccaneers class

14   action litigation as a named class representative?

15       A.    I believe it was 2013.

16       Q.    Okay.  Would it have been October 11th,

17   2013?  Does that refresh your recollection?

18       A.    It does not.

19       Q.    Okay.  If it were October 11th, 2013,

20   you would agree with me that that is more than

21   four years after late summer 2009, right?

22       A.    Yes.

23       Q.    All right.  So that would be outside the

24   statute of limitation?

1     A.    If the only fax they received was in --

2  yes.

3     Q.    Okay.  And the class that -- the class

4  action against the Tampa Bay Buccaneers, the Cin-Q

5  litigation, does involve class members who only

6  received faxes in 2009, right?  There are members

7  of the class who only received faxes then?

8     A.    I believe that is correct.  But without

9  reviewing the records, I couldn't be sure.

10     Q.    Okay.  So is it your position that

11  anyone who received faxes in 2009 should be barred

12  from pursuing their claims against the Tampa Bay

13  Buccaneers?

14     A.    No.  I believe they should be able to

15  pursue their claims if they want to individually

16  as individual cases against the Buccaneers.

17     Q.    Okay.  But it's your contention that

18  anyone who received faxes in 2009 and only 2009

19  would not be appropriate class members?

20     A.    No, that is not correct.  They would be

21  appropriate class members.  They could not file

22  in -- they could not file separate class actions.

23     Q.    Okay.  But they could intervene to join

24  in an existing class action in your view, right?

1          A.    I'm not familiar with the law on that

2    specific subject.

3          Q.    You don't know whether or not an

4    intervention of someone -- a class member who

5    received faxes in 2009 would be appropriate?

6          A.    I don't know how the statute of

7    limitations applies to interveners.

8          Q.    Is it your position that M & C has a

9    valid non-time barred claim?

10         A.    Yes.

11         Q.    Is it your position that TTA has a

12   barred claim?

13         A.    I don't think that's precisely correct.

14   Can I explain?

15         Q.    Please do.

16         A.    I believe TTA has a valid individual

17   claim.

18         Q.    Okay.  And when you say valid individual

19   claim, what I'm trying to understand is whether

20   you believe that they have a valid class claim.

21         A.    No.

22         Q.    Do they serve as an appropriate class

23   representative?

24         A.    No.

1        Q.    Do you have any understanding as to

2   whether or not your law firm sought to represent

3   Technology Training as an absent class member?

4              THE WITNESS:  Can you repeat the

5   question?

6                    (Whereupon, record was read as

7                     requested.)

8        A.    My law firm sought to represent all

9   recipients of the faxes allegedly sent by the

10  Buccaneers in one class action that was Cin-Q and

11  Medical & Chiro v. Buccaneers.

12       Q.    Do you have an understanding as to

13  whether or not Technology Training was an absent

14  class member?

15       A.    I'm aware that they allege in their

16  complaint that they would be; but I have no

17  independent knowledge, nor do I recall looking

18  that up.

19       Q.    Do you have any reason to dispute that

20  to be the case?

21       A.    As I sit here today, I have no reason to

22  dispute that.

23       Q.    Okay.  Can you assume for my next

24  question that they are, in fact, an absent class

Page 38

1    member?

2        A.    I will take your hypothetical for the

3    next question.

4        Q.    Okay.  Assuming that they are an absent

5    class member, would your law firm be representing

6    them in connection with the Tampa Bay Buccaneers

7    class action litigation?

8        A.    We would seek to be certified as class

9    counsel, and yes.

10       Q.    Okay.  So explain to me all of the ways

11   that you believe Technology Training is adverse to

12   M & C.

13       A.    I believe they had no leverage in

14   regards to settlement with the Buccaneers and took

15   an offer that was forced upon them because they

16   had no leverage, and that was adverse to the

17   interests of M & C and the rest of the class.

18       Q.    Anything else?

19       A.    I believe that due to Mr. Oppenheim's

20   role as former counsel for M & C and his new role

21   as part of Bock Hatch, there was a conflict of

22   interest.

23       Q.    Anything else?

24       A.    Nothing else I can think of.

1      Q.    Do you believe that in order to have a

2   reverse auction, as you used that term, that there

3   has to be a difference in the amount that's

4   settled?

5      A.    No.

6      Q.    Please explain.

7      A.    You could make the claim process

8   unbelievably burdensome so nobody is able to claim

9   in where the dollar amount on the top is actually

10  the same.  And I believe that it would still

11  constitute a reverse auction.

12     Q.    Okay.  Do you believe that you need to

13  look at the terms of the actual settlement in

14  order to evaluate whether or not a reverse auction

15  occurred?

16     A.    I think that's a good idea; but, no, I

17  don't think you have to do that.

18     Q.    You don't think it's necessary to review

19  the terms of the settlement itself in order to

20  establish a reverse auction?

21          THE WITNESS:  Can you repeat the

22  question back?

23                  (Whereupon, record was read as

24                    requested.)

1    A.    I think it would depend on the

2    circumstances.

3    Q.    How so?

4    A.    Well, if the circumstances were such

5    that hypothetically, the class was getting

6    complete and total relief, there was no claim form

7    at all, literally everybody was getting a check

8    for the maximum amount, then I don't think you

9    could ever claim that it was a reverse auction.

10    Q.    Okay.  But if you -- or anything short

11    of a hundred percent recovery, then you believe

12    the terms of the agreement would not be necessary

13    to establish a reverse auction?

14    A.    I'm not sure.  It would depend on the

15    circumstances.  What I just gave you was one

16    example.

17    Q.    I appreciate that, and I offered another

18    example.  I want to know whether that would

19    constitute a reverse auction.

20    A.    Can you give me the example again?

21    Q.    Sure.  Instead of a hundred percent

22    recovery, you have 99 percent recovery.  Would

23    that instance allow for a reverse auction theory

24    in your mind, Mr. Good?

1       A.    You could allege a reverse auction, yes.

2       Q.    Do you think you could establish a

3  reverse auction under such circumstances?

4       A.    It would depend on the circumstances

5  surrounding it.  And in that case, you would --

6  yeah.  You would have to look at the

7  circumstances.

8       Q.    Do you believe it necessary to look at

9  the terms of the underlying settlement in this

10  case in order to establish a reverse auction?

11      A.    By this case, you mean the hypothetical?

12      Q.    In this case, I mean the suit by your

13  client, Medical & Chiropractic, against my client,

14  Mr. Oppenheim, and against the law firm of Bock

15  Law Firm for breach of fiduciary duty and aiding

16  and abetting that breach.

17           THE WITNESS:  I'm sorry.  Can you repeat

18  the question?

19                    (Whereupon, record was read as

20                     requested.)

21      A.    I'm sorry.  I don't understand your

22  question.  If you -- are you asking whether or not

23  you have to look at the terms of the settlement to

24  determine whether or not a breach of fiduciary

Page 42

1    duty has taken place?

2        Q.    You have asserted that a reverse auction

3    occurred in connection with the settlement that

4    Technology Training reached with the Tampa Bay

5    Buccaneers, correct?

6        A.    Correct.

7        Q.    And I'm trying to establish what your

8    knowledge and basis is for making such an

9    accusation in this case.  Do you understand?

10       A.    Yes.

11       Q.    Okay.  And my question to you is whether

12   or not it's necessary to actually review the terms

13   of the settlement in order to establish a reverse

14   auction, and I believe that you said that it's not

15   necessary in a circumstance where there's a

16   hundred percent recovery.

17       A.    Correct.

18       Q.    And I'm asking in this case, is it

19   necessary to review the terms of the settlement in

20   order to establish that there was, in fact, a

21   reverse auction in connection with the TTA

22   settlement with the Buccaneers?

23       A.    I think it would be a good idea to look

24   at that.  I'm not sure that it's necessary.

1        Q.    Why not?

2        A.    I would have to review all of the prongs

3    of analysis for a reverse auction.  I believe

4    there is a published guide for what to look for as

5    the indicia of a reverse auction.

6        Q.    And what are those prongs that you

7    recall?

8        A.    I don't recall off the top of my head.

9    I know that they are in one of the Cin-Q and

10   Medical & Chiro briefs.

11       Q.    Do you recall any of the prongs?

12       A.    I recall one of them is whether or not

13   the parties have standing.

14       Q.    What does that term mean again,

15   standing, in your mind, Mr. Good?

16       A.    If they have the ability to pursue a

17   case on behalf of a class.

18       Q.    Can you recall any other prongs?

19       A.    The amount of time the settling

20   attorneys put into the case relative to other

21   competing cases.

22       Q.    Okay.  And what legal case or standard

23   or statute establishes that as a relevant factor?

24       A.    I believe it's case law.  I don't

 1    recall.  It's in a brief.

 2         Q.    Okay.  What other prongs do you recall?

 3         A.    Those are the only ones I recall.

 4         Q.    So is it your contention that it is not

 5    necessary or that it is necessary in this case to

 6    review the terms of the settlement in order to

 7    establish a reverse auction?

 8         A.    I believe it is not necessary.

 9         Q.    And why is it not necessary in your

10    view?

11         A.    Because TTA lacks standing to pursue a

12    class claim.

13         Q.    Anything else?

14         A.    That's -- no.

15         Q.    In formulating your belief that there is

16    a reverse auction in this case, did you consider

17    the actual amount that was settled for?

18         A.    Are you asking me personally?

19         Q.    Well, do you have a belief as to whether

20    or not there was a reverse auction in this case?

21         A.    Yes, I have a belief.

22         Q.    Did you share that belief with anybody?

23         A.    Yes.

24         Q.    Who did you share that belief with?

1      A.     Attorneys at Anderson Wanca.

2      Q.     Anyone else?

3      A.     Medical & Chiro, Cin-Q, Michael Addison.

4      Q.     When did you share that belief with

5  Medical & Chiropractic?

6      A.     Within a -- I believe almost immediately

7  after the first TTA case was filed, that's the one

8  in state court, and there were subsequent

9  discussions after that.

10      Q.     When was that case filed?

11      A.     Early May 2016.

12      Q.     So immediately or almost immediately

13  after that case was filed in state court, you told

14  Medical & Chiropractic, I think this is a reverse

15  auction?

16          THE WITNESS:  I -- can -- can I answer?

17          MS. LOEW:  To the extent that you're

18  talking about an attorney-client -- the provision

19  of legal advice, then no.  If you're talking about

20  some other context.

21      A.     It would violate attorney-client

22  privilege.

23      Q.     Okay.  Do you contend that you represent

24  Medical & Chiropractic in connection with this

Page 46

1    case?

2         A.    No.

3         Q.    You do not represent Medical &

4    Chiropractic in connection with this case?

5         A.    By this case, you mean Medical & Chiro

6    v. Oppenheim and Bock, Hatch, Lewis & Oppenheim,

7    right?

8         Q.    Correct, and --

9         A.    I do not represent them in this case.

10        Q.    Okay.  And what facts did you

11   communicate in early May to Medical & Chiropractic

12   when you spoke with them almost immediately after

13   the TTA case was filed in state court?

14             MS. LOEW:  And to the extent that this

15   is requesting attorney-client privileged

16   communications, I advise you not to answer.

17             MR. BLONIEN:  I think that there's a

18   severe misunderstanding of the law as to how the

19   attorney-client privilege is being asserted in all

20   of these depositions.  We may have to present this

21   issue to the court ultimately.

22             But my question specifically and very

23   directly asked what facts, and just to be clear in

24   this case, f-a-c-t-s, Mr. Good conveyed to Medical

1    & Chiropractic in connection with the case that he

2    just said he does not represent the client in

3    connection with.

4    BY MR. BLONIEN:

5        Q.    So, again, my question is:  What facts

6    did you convey, facts, only facts, I don't want

7    advice, did you convey to Medical & Chiropractic

8    in the conversation that you testified that you

9    had almost immediately after the TTA case was

10   filed in state court?

11           MS. LOEW:  And to the extent that you

12   are talking about communications with a client

13   that involved the provision of legal advice, I am

14   advising him not to answer.

15   BY MR. BLONIEN:

16       Q.    And are you accepting that advice?

17       A.    Yes.

18       Q.    Are you willing to testify as to any

19   facts that you communicated with Medical &

20   Chiropractic, or am I going to experience the same

21   objection?

22       A.    I think it depends.  For example,

23   scheduling and when a case was filed, I don't

24   believe that there's going to be any privilege

1   issue there.

2          But in terms of the strategy and

3   decisions made, I'm not answering attorney-client

4   privilege questions absent an order from the

5   court.

6      Q.    I don't want any strategy or decisions

7   or advice, Mr. Good.  What I want to know is

8   whether or not you told Medical & Chiropractic any

9   facts, any facts, and that's it, just the facts,

10  and that's all I want.

11         MS. LOEW:  Mr. Blonien -- and

12  Mr. Blonien, I'm going to reiterate my objection

13  because you are asking -- by asking about the

14  facts that he conveyed, you are trying to invade

15  the strategy and the discussions about the

16  provision of legal advice to his client.

17         And we will reiterate our objection.

18  You're welcome to take this up with the court at a

19  later date.  But that -- that is the advice that I

20  am providing to Mr. Good.

21  BY MR. BLONIEN:

22     Q.    Are you following that advice, Mr. Good?

23     A.    Yes.

24     Q.    Okay.  I don't know that I can be any

1    clearer.  But just as an effort to do so, without

2    revealing any sort of communications that involve

3    the provision of advice that falls under the scope

4    of the attorney-client relationship that you had

5    with M & C, can you describe any facts that you

6    communicated to M & C regarding this litigation?

7            MS. LOEW:  I provide the same advice.

8    BY MR. BLONIEN:

9        Q.    Are you going to follow your

10   instruction -- the advice of your counsel?

11       A.    Yes.

12           MR. BLONIEN:  Okay.  Let's take a short

13   break, if we could, please.

14           THE WITNESS:  Great.

15           THE VIDEOGRAPHER:  Off the record.  The

16   time is 10:03.

17                        (Whereupon, a short break was

18                         taken.)

19           THE VIDEOGRAPHER:  We are back on the

20   record.  The time is 10:13.

21   BY MR. BLONIEN:

22       Q.    Mr. Good, I want to return to your

23   earlier testimony that Mr. Oppenheim filed a false

24   police report lying to the police in connection

1  with the stolen laptop.  Did you share that belief

2  of yours with anyone else?

3       A.    Yes.

4       Q.    With whom?

5       A.    Brian Wanca, Ryan Kelly -- actually,

6  strike that.  I don't remember if I told Ryan

7  Kelly.

8            Definitely Brian Wanca, Michael Addison,

9  Sue Fitzgerald, Rita Hernandez, Mike, I said

10 Michael Addison.

11           I also -- I wanted to clarify, earlier,

12 I did not mention Stephanie Stewart or Scott

13 Tozian.  I did speak to both of them as well.

14      Q.    Are all of those people Anderson & Wanca

15 attorneys?

16      A.    The last two are not.

17      Q.    Who are the last two?

18      A.    Stephanie Stewart works at a law firm.

19 I think it's called Meyer Lex.

20           And Scott Tozian, I believe his law firm

21 is called Smith Tozian.

22      Q.    And what relationship do they have to

23 the Buccaneers litigation?

24      A.    Ethics counsel.

1      Q.    And who retained them as ethics counsel?

2      A.    I don't recall what their retainer

3  agreements say, or I don't recall what -- yeah.  I

4  don't recall what the retainer agreements say.

5      Q.    Okay.  Excepting that you don't recall

6  what the retainer agreements say, do you have any

7  understanding as to who they represent?

8      A.    I believe they represent Medical &

9  Chiro.

10     Q.    And what gives you that belief?

11     A.    My communications with them were solely

12  related to the underlying Buccaneers case and

13  the -- this matter.

14     Q.    Okay.  And did you convey your belief

15  that Mr. Oppenheim lied to the police to Medical &

16  Chiropractic?

17          MS. LOEW:  Are you asking whether he

18  conveyed to Medical?  What's the question?

19          MR. BLONIEN:  I'm asking if he conveyed

20  to Medical & Chiropractic his belief that

21  Mr. Oppenheim lied to the police.

22          MS. LOEW:  So to the extent that this is

23  in the provision of legal advice, I'll advise you

24  not to answer.  To the extent it was not in the

Page 52

1    provision of legal advice, you can answer.

2         A.    I recall providing to Medical & Chiro

3    the police report.

4         Q.    When did you do that?

5         A.    Almost immediately after receiving it.

6         Q.    Why did you do that?

7         A.    Medical & Chiro had previously been

8    provided one or more of the correspondences

9    between Anderson Wanca and yourself, and this was

10   subsequent to that.

11        Q.    And did you tell Medical & Chiropractic

12   that you believed Mr. Oppenheim lied to the

13   police?

14              MS. LOEW:  And to the extent it was in

15   the provision of legal advice, I'll advise you not

16   to answer.  To the extent it was not in the

17   provision of legal advice, you can answer.

18        A.    I think this is covered by

19   attorney-client privilege.

20        Q.    So you're refusing to answer the

21   question whether or not you told Medical &

22   Chiropractic that you believed Mr. Oppenheim lied

23   to the police?

24        A.    Yes.

1       Q.    After Mr. Oppenheim left Anderson &

2    Wanca, did you talk with Medical & Chiropractic

3    about his leaving?

4       A.    Can you be more specific about the time

5    that you're referring to?

6       Q.    When did Mr. Oppenheim leave Anderson &

7    Wanca?

8       A.    April 8th, 2016.

9       Q.    After April 8th, 2016, did you call

10   Medical & Chiropractic and inform them that

11   Mr. Oppenheim left the firm?

12           MS. LOEW:  And I'll provide the same

13   advice, which is to the extent that it was

14   provided for legal advice, I'll advise you not to

15   answer.  If it was provided for another purpose,

16   you can answer.

17      A.    As I've already stated, I believe they

18   were provided copies of correspondence between

19   Anderson Wanca and yourself.

20      Q.    Did you inform Medical & Chiropractic

21   that Mr. Oppenheim left the firm after April 8th?

22      A.    I believe that my last answer answered

23   that question.

24      Q.    I don't.  I disagree.

1       My question is whether or not you told

2   Medical & Chiropractic that Mr. Oppenheim left the

3   firm after April 8th.  I didn't ask you anything

4   about correspondence.  I asked you whether or not

5   you used your verbal skills to tell Medical &

6   Chiropractic that Mr. Oppenheim left the firm.

7       MS. LOEW:  Objection --

8   BY MR. BLONIEN:

9       Q.    You can answer, or you can refuse to

10  answer on the basis of privilege for your client

11  of -- of your attorney here.

12      MS. LOEW:  Objection; argumentative,

13  badgering the witness.

14      To the extent that you provided

15  information to Medical & Chiropractic in the

16  provision of legal advice, I'll advise you not to

17  answer.  To the extent you provided it for another

18  purpose, you can answer the question.

19      A.    I don't recall specifically telling

20  Medical & Chiro that.

21      Q.    Okay.  Do you recall a conversation

22  shortly after Mr. Oppenheim left his employment

23  with Anderson & Wanca?

24      A.    Can you be more specific as to

1  "shortly"?  I'd like to get the answer to this

2  question correct.

3      Q.    Okay.  I'm eventually going to be

4  interested in every conversation --

5      A.    Okay.

6      Q.    -- you had with Anderson & -- or Medical

7  & Chiropractic after the date Mr. Oppenheim left

8  the firm.

9          When is the first conversation that you

10  recall having after Mr. Oppenheim left the firm

11  with Medical & Chiropractic?

12      A.    Almost immediately after Technology

13  Training v. Buccaneers mediation email was sent to

14  Michael Addison.

15      Q.    How do you know that the mediation email

16  was sent to Michael Addison?

17      A.    He made me aware of it.

18      Q.    How?

19      A.    I don't recall if it was email or phone,

20  but it was definitely one of the two.

21      Q.    Do you recall when?

22      A.    It was definitely the day that he

23  received it.  I don't recall specifically what

24  time of day.

Page 56

1    Q.    And what do you recall that

2    communication saying?

3    A.    I believe he forwarded the email itself.

4    Q.    Okay.  And do you recall talking with

5    Mr. Addison about that email?

6    A.    I'm sure there were discussions; but,

7    no, I do not recall them specifically.

8    Q.    Okay.  In your search in production of

9    materials, did you include the conversation with

10   Michael Addison that you just referred to?

11   A.    I'm sure it would have been included in

12   the thousands and thousands of emails.

13   Q.    Are you asserting any privilege over

14   that conversation?

15   A.    I know we're not asserting privilege

16   over the email from the mediator's office to

17   Mr. Addison.

18         I don't recall what's in the email, so I

19   don't know how to answer that question.  I hope

20   that makes sense.

21   Q.    I think so, although I -- I mean, I'm

22   sort of working in the dark to the extent that you

23   are asserting a privilege and I'm trying to

24   understand the scope of any.

Page 57

1           With respect to the -- so if I

2    understand correctly, almost immediately after

3    learning of the filing of the TTA action in state

4    court, you also received some sort of

5    communication from Michael Addison.

6       A.    I actually think it's the other way

7    around.  I don't think we knew about the state

8    court action until receiving that communication.

9       Q.    And that communication being that

10   communication from Michael Addison?

11      A.    No, the communication from the mediator

12   to Michael Addison.

13      Q.    Which you learned about through Michael

14   Addison.

15      A.    Correct.

16      Q.    In a conversation or email with Michael

17   Addison.

18      A.    Correct.

19      Q.    Okay.  So the -- from -- if I understand

20   the time line from your point of view correctly,

21   Mr. Oppenheim left in early April of 2016; is that

22   right?

23      A.    April 8th, 2016.

24      Q.    Okay.  And at some point after that,

Page 58

1    there was an email that you received from Michael

2    Addison indicating that there was another

3    mediation scheduled.

4         A.    That is correct.

5         Q.    And you spoke with Michael Addison or

6    exchanged emails with Michael Addison about that,

7    correct?

8         A.    Correct.

9         Q.    And you don't recall anything about what

10   those emails or conversations said?

11        A.    I recall they were about that issue, but

12   I don't recall the specifics of the conversation

13   or email correspondence.

14        Q.    Okay.  But you're not asserting any

15   privilege over that conversation.

16        A.    I don't know the content of it, so I

17   can't answer that question without knowing it.

18        Q.    And then after receiving the email or

19   phone call from Michael Addison, you contacted

20   Medical & Chiropractic.

21        A.    Yes.

22        Q.    Okay.  And what facts did you share with

23   Medical & Chiropractic in that call?

24             MS. LOEW:  And I will continue to advise

Page 59

1    Mr. Good not to answer to the extent he was

2    providing a legal advice to Medical &

3    Chiropractic.

4            I'm happy to go through every

5    communication the same way.  We're going to assert

6    the same -- the same objection.  If it is in the

7    provision of legal advice, I will advise him not

8    to answer.

9            MR. BLONIEN:  I'm not asking for legal

10   advice --

11           MS. LOEW:  You can take it up with the

12   court.

13           MR. BLONIEN:  I'm asking for facts.  It

14   is lawyering 101 that facts conveyed by a lawyer

15   or to a lawyer are not covered by the privilege

16   but only the provision of legal advice.

17           I think that it's a big mistake to be

18   asserting such a broad privilege.  We will be

19   taking it up.  I'm simply preserving it for the

20   record.

21   BY MR. BLONIEN:

22       Q.   Mr. Good, are you following your

23   client -- your attorney's advice?

24           MS. LOEW:  And I want to put also on the

Page 60

1    record that under your view, the fact section of

2    any legal memorandum that we do would be

3    discoverable because you would be asking all of

4    the facts that are the basis of legal advice as

5    they are communicated.

6           That is not the view that we have of

7    attorney-client privilege, and we're not going to

8    waive it without the court telling us we need to.

9    BY MR. BLONIEN:

10        Q.    Are you following your attorney's

11   advice, Mr. Good?

12        A.    Yes.

13        Q.    Okay.  Are you going to be sharing any

14   details about conversations that you had with

15   Medical & Chiropractic even so far as they relate

16   to facts that you told M & C that pertain to this

17   lawsuit?  Are you refusing to answer those

18   questions because I can save a whole bunch of

19   questions if that's the case.

20           MS. LOEW:  Only -- and I'll advise you,

21   you know, to the extent that my -- my advice to

22   you is to the extent a -- a fact is provided in

23   the course of legal advice and is the basis for

24   legal advice to the client that I will advise you

1    not to answer the content of those communications

2    with your client.

3              To the extent there are other purposes

4    for your communications, you can answer questions.

5         A.    I plan on following the advice of my

6    counsel.

7         Q.    How did Medical & Chiropractic learn

8    about the laptop being stolen, Mr. Good?

9         A.    I believe Medical & Chiro reviewed

10   correspondence between Anderson Wanca and

11   yourself.

12        Q.    And who sent those correspondences?

13        A.    Me.

14        Q.    And what did those correspondences say?

15        A.    I would have to review the

16   correspondence.  Do you want my summary of the

17   correspondences?

18        Q.    Sure.

19        A.    Anderson Wanca became aware that David

20   Oppenheim stole documents, including but not

21   limited to those that related to his former

22   representation of Medical & Chiro.

23              Anderson Wanca demanded them back.  You

24   delayed for a very long time.

1          Our office, Anderson Wanca, said we were

2    going to file a lawsuit within 21 days.  And

3    19 days later, the laptop was allegedly stolen.

4          Q.    Okay.  And did you share all of that

5    information to Medical & Chiropractic?

6          A.    I recall sharing the correspondence with

7    Medical & Chiro.  I would have to review the

8    correspondence to be able to answer your question.

9          Q.    And did you share with Medical &

10   Chiropractic your view that Mr. Oppenheim lied to

11   the police?

12          MS. LOEW:  I will continue to advise

13   Mr. Good, to the extent that it was in the

14   provision of legal advice, I will advise you not

15   to answer.

16          A.    I'm following the advice of counsel.

17          Q.    Did you share that view with anyone that

18   wasn't within Anderson & Wanca, apart from the

19   ethics counsel that apparently were hired for

20   Medical & Chiropractic's benefit?

21          A.    I don't recall anybody else.

22          Q.    And you won't answer whether or not you

23   shared that view with Medical & Chiropractic?

24          A.    I will follow the advice of counsel.

1      Q.    Did you share that view with

2   Mr. Addison?

3      A.    Yes.

4      Q.    Did Mr. Addison respond?

5      A.    I'm sure he did.

6      Q.    Okay.  So when you told Mr. Addison, I

7   think Mr. Oppenheim lied to the police, what did

8   Mr. Addison say?

9      A.    I don't recall.  I do know that I shared

10  the correspondence, again, between Anderson Wanca

11  and yourself with Mr. Addison.

12     Q.    Okay.  That's not my question though.

13           My question is:  When you told

14  Mr. Addison, I think Mr. Oppenheim lied to the

15  police, do you recall any substance of the

16  response?

17     A.    I do not.

18     Q.    So we talked about the bases of the

19  claims as in your view relating to the stealing of

20  information, to use your term, and the breaching

21  of the mediation privilege.

22           I'd like to review all of the facts that

23  you have personal knowledge of that support those

24  claims.

1            So with respect to stealing a laptop,

2    please identify for me every fact that you have

3    personal knowledge of that you believe supports

4    that claim.

5        A.    I set up Mr. Oppenheim's laptop.  I set

6    up the email account for Mr. Oppenheim.  He asked

7    me where to go to purchase a personal laptop.  I

8    told him to go to Abt Electronics.

9            It is my understanding that he

10   subsequently went to Abt Electronics, purchased a

11   laptop, and then copied Anderson Wanca information

12   and client materials from his Anderson Wanca

13   laptop to that laptop prior to his resignation on

14   April 8th, 2016.

15       Q.    And what Anderson & Wanca information do

16   you believe that Mr. Oppenheim copied?

17       A.    Emails and documents, based on

18   correspondence with you.

19       Q.    Do you have any understanding as to the

20   duration of emails that Mr. Oppenheim may have had

21   in his possession?

22       A.    I do not know.

23       Q.    Do you have any understanding as to the

24   scope of documents that Mr. Oppenheim may have had

Page 65

1    in his possession?

2        A.    You provided a list, I believe.

3        Q.    Did you review the list?

4        A.    I did at the time that it was received.

5        Q.    Did you determine anything else that

6    Mr. Oppenheim may have had in his possession that

7    wasn't reflected on the list?

8        A.    I don't know how I could review that.

9        Q.    Well, I believe that you testified that

10   you have administrative privileges with respect to

11   the email server for Anderson & Wanca, correct?

12       A.    Correct.

13       Q.    So you're sort of the techie guy at the

14   law firm, fair enough?

15       A.    That is correct.

16       Q.    So after Mr. Oppenheim left, you

17   searched the files with respect to what Anderson &

18   Wanca had on its server, right?

19       A.    The email server.

20       Q.    Right.

21       A.    Yes, correct.

22       Q.    And did you identify any material that

23   Mr. Oppenheim may have had in his possession that

24   he did not disclose to Anderson & Wanca?

1    A.    I recall in correspondence from you that

2    you would not disclose all of the cases that were

3    related to by all of the emails Mr. Oppenheim

4    took.

5    Q.    You recall a list of all of the matters

6    on which Mr. Oppenheim retained materials, right?

7    A.    No.  I recall a list of matters in which

8    Oppenheim had documents separate and apart from

9    the emails.

10    Q.    You have access to all of the emails

11    that were transmitted through the Anderson & Wanca

12    server, correct?

13    A.    Correct.

14    Q.    And the server maintains a backup copy?

15    A.    Correct.

16    Q.    So you would and were able to obtain all

17    of the emails that Mr. Oppenheim either sent or

18    received in the preceding year, correct?

19    A.    I would be able to do that, correct.

20    Q.    And Mr. Oppenheim surrendered his laptop

21    at the time that he retired from Anderson & Wanca

22    on April 8th, correct?

23    A.    Correct.

24         MS. LOEW:  Objection to form.

1    BY MR. BLONIEN:

2         Q.    And you reviewed that laptop for the

3    information that was contained on it, correct?

4         A.    No.

5         Q.    Why not?

6         A.    I turned the laptop -- strike that.  Let

7    me go back.

8              I was the first person that David

9    Oppenheim told that he was resigning from Anderson

10   Wanca.  He then told Brian Wanca.  Brian Wanca

11   then made the decision not to keep him on for the

12   two days that he offered to stay on.

13             And at that point, I was given the

14   laptop by Mr. Oppenheim.  I took the laptop.  I

15   turned the laptop off, and I gave it to a support

16   staff person who put it in a locked file cabinet.

17        Q.    And is that laptop still in the

18   possession of Anderson & Wanca?

19        A.    I don't believe so.

20        Q.    What happened to that laptop?

21        A.    It was provided to Foley Lardner.

22        Q.    When was that laptop provided to Foley &

23   Lardner?

24        A.    Within about a day of them requesting

1  it.

2      Q.    When did they request it?

3      A.    I believe it was around the initiation

4  of this lawsuit.

5      Q.    So at the initiation of this lawsuit,

6  you provided to Foley & Lardner the copy of the

7  laptop that Mr. Oppenheim used in his employment

8  at Anderson & Wanca.

9      A.    I provided the original.

10      Q.    Right, containing all of the information

11  that Mr. Oppenheim copied onto the second laptop.

12      A.    I do not know that to be true or false.

13      Q.    Do you have any reason to believe that

14  that's false?

15      A.    Yes.

16      Q.    Okay.  What is your basis for stating

17  that that's false?

18      A.    My understanding of the email system,

19  which, again, I'm an administrator of, was that

20  the emails would only be retained for a certain

21  amount of time.

22      So, for example, if Mr. Oppenheim were

23  to go to Abt Electronics and request that they

24  copy the emails and documents that then existed

1    on, for example, April 2nd of 2016, and then he

2    would resign again on April 8th, 2016, there would

3    be six days of email, even though I'm not sure

4    exactly when the emails were -- how long they were

5    retained, that were no longer there.

6            Did that make sense?

7       Q.    No.

8       A.    Okay.

9       Q.    Can you try again?

10      A.    Yeah.  Let me try again.

11           MS. LOEW:  What was the original

12   question?

13                   (Whereupon, record was read as

14                    requested.)

15      A.    Okay.  When you're ready, I'll try

16   again.

17      Q.    Please continue.

18      A.    Okay.  My understanding of the way that

19   the email server was configured was that emails

20   would be retained on the user's computer for a

21   specified period of time.

22           After that amount of time, they would

23   have to access the email server's backup component

24   to access the emails.

1          My understanding is that Mr. Oppenheim

2     copied the emails and documents prior to his

3     resignation from Anderson Wanca.

4          During the time between the copying and

5     the time at which he resigned, the computer was

6     turned off and stored in the support staff's

7     locked cabinet, some of the emails were no longer

8     retained on the laptop.

9          Q.    But Anderson & Wanca had a backup copy

10    on its server.

11         A.    Correct.

12         Q.    So there's -- you're not suggesting in

13    any way that Mr. Oppenheim actually destroyed any

14    sort of material that would make it difficult for

15    Anderson & Wanca to locate, correct?

16         A.    No, that is not correct.  I am

17    suggesting that specific for emails.

18         Q.    Okay.  Is there anything else that gives

19    you the impression that Mr. Oppenheim did not act,

20    adequately disclose the material that he had in

21    his possession from his employment with Anderson &

22    Wanca?

23         A.    Can you repeat the question?

24

1          (Whereupon, record was read as

2                requested.)

3      A.    It's my understanding that there is no

4  dispute that yourself on behalf of Mr. Oppenheim

5  did not identify everything Mr. Oppenheim took.

6      Q.    Okay.  And what's the basis for making

7  that assertion here today, Mr. Good?

8      A.    Your statements that he won't identify

9  all the emails.

10     Q.    So it's with respect to emails in

11 particular?

12     A.    Emails is one specific -- yes, emails.

13     Q.    Is there anything else, apart from

14 emails in particular, that he --

15     A.    He took -- I'm sorry for not letting --

16     Q.    -- that you suggest indicate that

17 Mr. Oppenheim did not adequately disclose the

18 materials that he had in his possession?

19          You do understand Mr. Oppenheim in those

20 correspondences stated he had a year's worth of

21 emails, right?

22     A.    Yes.

23     Q.    And he identified the dates of that

24 particular year, right?

1        A.    Yes.

2        Q.    Okay.  And I'm asking you:  Do you have

3   any information to suggest that Mr. Oppenheim did

4   not adequately disclose the material that he had

5   from his time with Anderson & Wanca?

6        A.    I do not believe he adequately disclosed

7   it.

8        Q.    And what is the basis for you making

9   that assertion today?

10       A.    He did not --

11            MS. LOEW:  Asked and answered.

12   Objection, asked and answered.

13       A.    He did not return everything.  He did

14   not disclose it at the time of his resignation.

15       Q.    Okay.  And do you have any understanding

16   as to whether or not the law requires that he

17   disclose at the time of his resignation all of the

18   materials --

19            THE REPORTER:  Can you slow down?

20            MR. BLONIEN:  Sure.

21            THE REPORTER:  Thanks.

22   BY MR. BLONIEN:

23       Q.    Do you have any understanding as to

24   whether or not the law requires disclosure under

1    those circumstances?

2         A.    It is my understanding that there are

3    many laws, Rules of Professional Conduct,

4    mediation agreements, et cetera, that govern what

5    has to be returned when an attorney leaves

6    representation of a client and resigns.

7         Q.    And what is your understanding of the

8    law on that front, Mr. Good?

9         A.    My understanding is that it's

10   complicated and specific to each case.

11        Q.    Do you have any other understanding of

12   the law in that regard?

13        A.    It is my understanding that there are

14   certain mediation agreements that when a lawyer

15   leaves representation, they have to return all of

16   the mediation privileged materials that they have.

17        Q.    No matter what?

18        A.    I don't understand what "no matter what"

19   means.

20        Q.    Under every circumstance, the statement

21   that you said you believe to be true under the

22   law?

23        A.    I can't think of any circumstance that

24   is an exception for that, correct.

1     Q.    So your contention is that when a lawyer

2  leaves a firm, he's got to return all of the

3  materials that he had from his employment?

4     A.    No.

5     Q.    All right.  Please clarify.

6     A.    If a lawyer has mediation privileged

7  materials and the lawyer leaves the representation

8  of a party to that mediation, if that mediation

9  agreement specifics the return of mediation

10  privileged materials, then that lawyer has to

11  return those materials.

12     Q.    And did you review the mediation

13  agreement in connection with the Cin-Q litigation,

14  Mr. Good?

15     A.    No.

16     Q.    Do you know whether or not the mediation

17  agreement required such return in this instance?

18     A.    In this instance, I do not.

19

20

21

**REDACTED**

22

23

24

**REDACTED**

Q.    And what can you tell me about that
case?  How do you know that case?  Where did that
come from?

A.    It was a case that -- strike that.

Of the documents that you returned to my
office, a copy of which I believe you still have a
copy, one of them is a mediation privileged
document for a case that has now concluded that
Mr. Oppenheim is still holding a document from and
has not returned.

Q.    But that was included in the documents
returned.

A.    No.  You only gave us a copy.  You
didn't return it.

Q.    Do you know of any single document
whatsoever, email, memo, anything that
Mr. Oppenheim took the original copy of?

A.    I do not.

Q.    Do you know any document whatsoever
where Mr. Oppenheim took something and Anderson &
Wanca did not retain a copy?

Page 76

1        A.     I do not.

2        Q.     Do you know of any intellectual property

3    that Mr. Oppenheim took?

4        A.     Do you mean -- yes.

5        Q.     Okay.  What intellectual property did

6    Mr. Oppenheim take?

7        A.     Client lists.

8        Q.     Can you be more specific?

9        A.     Anderson & Wanca client lists.

10       Q.     Can you be more specific?

11       A.     No.

12       Q.     So just client lists generally from

13   Anderson & Wanca is all that you can say with

14   respect to the intellectual property that

15   Mr. Oppenheim took?

16       A.     I don't know how to be more specific

17   than that, so yes.

18       Q.     The list of all clients that Anderson &

19   Wanca had as a firm, all of them or --

20       A.     I believe they were just subsets.

21       Q.     Okay.  And what subset or subsets were

22   they?

23       A.     Subsets that Mr. Oppenheim asked me to

24   prepare in connection with other litigation.

1        Q.     Okay.  And can you describe the subsets?

2    How were they categorized?

3        A.     Potential additional class

4    representatives.

5        Q.     Anything else?

6        A.     Off the top of my head, nothing else I

7    can be certain of.

8        Q.     So when you say that Mr. Oppenheim took

9    intellectual property that was Anderson client

10   lists, you're referring to a list of -- of

11   potential additional class representatives.

12       A.     Lists, plural.

13       Q.     Okay.  And were they for particular

14   cases?

15       A.     Yes.

16       Q.     What cases were they?

17       A.     Off the top of my head, I do not recall.

18   But I believe one of them was Fauley v. Heska.

19       Q.     Fauley?

20       A.     F-a-u-l-e-y.  Heska is H-e-s-k-a.

21       Q.     And is there any other case that you can

22   recall apart from Fauley versus Heska that --

23       A.     Off the -- I'm sorry.

24       Q.     -- that Mr. Oppenheim allegedly took a

Page 78

1    subset of client lists involving the potential

2    additional class representatives?

3        A.    Off the top of my head, I cannot recall.

4        Q.    Are there any lists, apart from

5    potential additional class representatives, that

6    you contend Mr. Oppenheim took?

7        A.    I would have to check the records; but

8    off the top of my head, I'm not aware of any.

9        Q.    Okay.  So in your -- the best of your

10   recollection sitting here today, the only

11   intellectual property that you can recall

12   Mr. Oppenheim taking is potential additional class

13   representatives related to the case Fauley versus

14   Heska?

15       A.    I believe there were others; but I

16   cannot name the other cases, correct.

17       Q.    How many others do you believe there

18   were?

19       A.    Probably one for just about every

20   mediation conducted by Mr. Oppenheim.

21       Q.    And when you say potential additional

22   class representatives and that there's a list, how

23   did this list come to be?

24       A.    I created it.

1        Q.    Okay.  And where did --

2        A.    Or created them.  I'm sorry.



REDACTED





**REDACTED**

```
11        Q.    And what do you contend that

12   Mr. Oppenheim did with this information?

13        A.    He took it.

14        Q.    He took it?

15        A.    Correct.

16        Q.    What did he do with it in your

17   contention?

18        A.    I don't think I could speculate on that.

19        Q.    So you don't have any knowledge

20   whatsoever as to what Mr. Oppenheim did with any

21   of the information that he received?

22        A.    I believe he gave it to you, and I

23   believe there is an attorney at his -- strike

24   that.
```

```
1              I believe there is -- he gave it to you;
2      and I believe at one point, at least some of what
3      he took was given to an employee of Bock Hatch by
4      the name of Jorge Labarga (phonetic).
5          Q.    Anything else?
6          A.    I couldn't speculate.
7          Q.    I don't want you to speculate.  I want
8      you to testify about what your personal knowledge
9      is.
10         A.    That is my personal knowledge.
11         Q.    Okay.  So that I make sure that I
12     understand, you contend that Mr. Oppenheim lied to
13     the police, right?
14         A.    Yes.
15               MS. LOEW:  Objection, asked and
16     answered.
17     BY MR. BLONIEN:
18         Q.    And you contend that Mr. Oppenheim lied
19     to his former employer as to the information that
20     he retained from his former employment?
21         A.    Me.
22         Q.    He lied to you?
23         A.    Yes.
24         Q.    Okay.  And how?
```

Page 83

1      A.     Well, when he asked me about getting a

2   computer, he didn't say that he was going to copy

3   stuff from the Anderson Wanca computer.

4          And when he turned in the laptop, he

5   said he wasn't taking anything and that he would

6   ask me to take things for him and email it to him,

7   which I did.

8      Q.     What did you email to him?

9      A.     Personal materials that were left on the

10   laptop.

11      Q.     Can you be more specific?

12      A.     There was something called Diamond Mine

13   Baseball, personal emails relating to some type of

14   youth league, fantasy sports.

15          I think that's all the specifics I'm --

16   yeah.  I'm not aware of any further specifics than

17   those.

18      Q.     All right.  So your contention is that

19   because he asked you for these materials that he

20   lied to you when he copied the material on his

21   laptop?

22      A.     No.  My -- my statement that he lied

23   reflects him saying he wasn't taking anything from

24   the laptop and him asking me if I would be able to

1    forward him personal materials on the laptop at a

2    later date, to which I said yes.

3        Q.    When did that conversation occur?

4        A.    At the time that he left on April 8th,

5    2016, prior to him telling Brian Wanca he was

6    resigning.

7        Q.    And was anyone else present for that

8    conversation?

9        A.    The paralegal, the former paralegal Tina

10   Natally (phonetic) was outside the door.  I

11   don't -- she was not participating in the

12   conversation.

13       Q.    Anyone else?

14       A.    No.

15       Q.    Is there any written recordation of the

16   conversation?

17       A.    There are written records of me

18   following through and sending him Dropbox links to

19   download the Diamond Mine Baseball, the youth

20   baseball, the fantasy stuff, and forwarding the

21   emails.

22       Q.    Anything else?

23       A.    I believe there were subsequent

24   discussions about documents that Mr. Oppenheim

Page 85

1    requested from the laptop that were made to me in

2    writing.

3        Q.    Apart from the Diamond Mine Baseball,

4    the personal emails, the fantasy sport?

5        A.    I think he asked for some brief for a

6    case.  I don't recall the case name.

7              But I do recall there was one work

8    related thing on a joint case that he asked for as

9    well.

10       Q.    There was one joint related case that

11   Mr. Oppenheim maintained?

12       A.    No, no, no, that he asked me to get for

13   him from his laptop.

14       Q.    Okay.  There was one joint related case

15   that Mr. Oppenheim maintained that he asked you to

16   get from his laptop.

17       A.    Let me clarify.  I believe Mr. Oppenheim

18   in writing requested that I get something from his

19   laptop that I subsequently provided to him.

20       Q.    Do you recall what case that was?

21       A.    I do not.  I recall it was a joint case.

22       Q.    Do you recall when that was?

23       A.    I believe it would have been between

24   April 8th and when the first TTA action was filed

1    in state court or when we first became aware of

2    the TTA action filed in state court.

3        Q.    How many joint cases did Mr. Oppenheim

4    maintain after his departure from Anderson &

5    Wanca?

6        A.    He has not disclosed the contents of the

7    emails.  Therefore, I cannot answer that question.

8        Q.    I'm sorry.  I don't understand what you

9    mean by that.  Can you repeat that?

10       A.    My understanding of your question was:

11   How many files for joint cases did Mr. Oppenheim

12   retain after leaving Anderson Wanca.

13       Q.    No, it wasn't.

14       A.    Oh, I'm sorry.

15       Q.    I appreciate you clarifying.

16             How many joint cases did Mr. Oppenheim

17   participate in?  Setting aside the files for a

18   second, how many joint cases did Mr. Oppenheim

19   work on after his departure?

20       A.    I do not know.

21       Q.    Was it more than one?

22       A.    Yes.

23       Q.    Was it more than ten?

24       A.    I don't know.

1     Q.    Is it more than five?

2     A.    Yes.

3     Q.    Okay.  So what are the cases that you

4  recall off the top of your head where there

5  were -- Mr. Oppenheim continued to work on them

6  after his departure on April 8th?

7     A.    There were three in Michigan, two in

8  Florida, and at least one in Illinois.

9     Q.    All right.  What were the three in

10  Michigan?

11    A.    I think we called them the Cox cases.  I

12  don't recall their names.  C-o-x, that's the

13  judge's name for all three, I believe.

14    Q.    And that's all you recall of those three

15  cases?

16    A.    I think one of the defendants in one of

17  them was called Larbev, L-a-r-b-e-v.

18          I don't recall the other two names.

19    Q.    Of the two cases in Florida, do you

20  recall any of the case names?

21    A.    I do not.

22    Q.    Or any other identifying information?

23    A.    Actually, I take that back.  One of the

24  plaintiffs or defendants was European Tile, I want

Page 88

1    to say.

2         Q.    Anything else that you recall?

3         A.    I do not.

4         Q.    The one case in Illinois, do you recall

5    that case name?

6         A.    Yes, Physicians Healthsource versus

7    Allscripts.

8         Q.    Apart from the three cases in Michigan,

9    the two cases in Florida, and the one case in

10   Illinois that you testified to already, do you

11   recall any other cases where Oppenheim continued

12   to work on them after his departure from Anderson

13   & Wanca?

14        A.    Yes.

15        Q.    Please identify them.

16        A.    In Ohio, there was a case.  One of the

17   party's name is Beachwood.

18        Q.    Anything else, Mr. Good?

19        A.    Give me a second.

20              Yes.  There's a case in Massachusetts.

21   One of the party's name is Locks & Keys, and the

22   and is an ampersand.

23              Just give me a second.  Let me --

24        Q.    Please, take your time.

1     A.    Yes.   I actually recall two others.   In

2  Florida, there's another matter which I believe

3  has since settled and has gotten final approval

4  called Daisy v. Pollo -- or no, no.   That's not

5  it.   It's Dewar v. Dough Boy, D-e-w-a-r v. Dough

6  Boy, D-o-u-g-h B-o-y.

7          And there was a case in Michigan called

8  Global Biz Dimensions, yeah, I think.

9     Q.    Anything else that you can recall

10 sitting here today?

11    A.    Yes.   There's another case in Michigan,

12 separate and apart, I believe, from the three

13 cases that I can't really identify much for, which

14 is called Bridging Communities v. Top Flite.   And

15 the Flite is F-l-i-t-e.

16    Q.    Anything else?

17    A.    Not that I recall at this time.   If you

18 told me names, I could tell you probably.

19    Q.    Do you know how many cases Anderson &

20 Wanca worked on collaboratively with Bock Law

21 Firm?

22    A.    Through what time frame?

23    Q.    Through any time frame.

24    A.    More than a hundred and 50.

1        Q.    At the time of Mr. Oppenheim's departure

2   in April of 2016, do you have an understanding of

3   how many cases were pending at that point in time

4   that -- where Anderson & Wanca and Bock Law Firm

5   were collaborating?

6        A.    Other than the ones I just identified to

7   you, no.

8        Q.    As to the more than 150 cases where

9   Anderson & Wanca and Bock Law Firm worked

10  together, do you have an understanding as to how

11  the division of labor worked?

12       A.    I believe it was case specific.

13       Q.    Do you have an understanding of who

14  prepared the settlement term sheets that were used

15  by both firms in collaborative cases?

16       A.    I believe that was a collaborative

17  process and remains one.

18       Q.    So when you say collaborative process,

19  you mean both Anderson & Wanca and Bock Law Firm

20  contributed to the words that were being used in

21  those settlement term sheets?

22       A.    Correct.  My understanding is there was

23  a -- basically a template, and then the law firms

24  would collaborate to alter the template for case

1   specific, and that would be used.

2       Q.    Okay.  So the TCPA claims are pretty

3   standard across cases as to their core elements,

4   right?

5       A.    Frequently, yes.

6       Q.    And so complaints are often used as a

7   model for the next case that the -- that is

8   brought, right?

9       A.    Correct.

10      Q.    And is it also true with respect to the

11  complaints that it was a collaborative process, or

12  did Anderson & Wanca generate all of the

13  complaints?

14      A.    I -- I -- I don't know.

15      Q.    As to the strategy and tactics used in

16  mediation, was there a general strategy and tactic

17  that was used across the TCPA cases?

18          MS. LOEW:  Objection.  To the extent

19  that's seeking, I guess, work product in cases

20  that are not this case, in mediations that are not

21  this case, I'll advise you not to answer.

22      A.    Generally, the same materials were in

23  dispute in most of the joint cases.  So generally,

24  the same issues relative to position would be

1   discussed.

2       Q.    Okay.  Do you have an understanding as

3   to whether or not Anderson & Wanca is asserting a

4   proprietary interest in any of the settlement term

5   sheets?

6       A.    In the Medical & Chiro v. -- the Cin-Q

7   and Medical & Chiro v. Buccaneers action, is that

8   what you're asking?

9       Q.    Certainly, start there, sure.

10           MS. LOEW:  Objection to foundation.

11      A.    It's my understanding that those

12  documents could be covered by one or more of work

13  product, attorney-client privilege, or mediation

14  privilege.

15      Q.    Okay.  Do you remember my question?

16      A.    Yes.  Your question was whether or not

17  there was a privilege related to the actual term

18  sheets.

19      Q.    I appreciate you clarifying.  The word I

20  used was proprietary interest on behalf of the law

21  firm.

22      A.    I don't understand that question.

23      Q.    Does Anderson & Wanca based on your

24  understanding assert a proprietary interest?  Do

Page 93

1  you know what I mean by proprietary interest?

2       A.    I mean, the word that's coming to my

3  mind is copyright.

4       Q.    Okay.  That might work.

5            Do they claim that they own in any

6  meaningful sense those settlement term sheets that

7  were involved in the Medical & Chiropractic

8  litigation?

9            MS. LOEW:  Objection, foundation.

10      A.    I don't understand the question.

11      Q.    So you understand attorneys work for

12  clients.

13      A.    Yes.

14      Q.    And the clients have certain interests

15  related to the litigation.

16      A.    Yes.

17      Q.    And that the law firm may in some

18  instances claim their own interest.

19      A.    In what?

20      Q.    In the materials that were prepared for

21  a client.

22      A.    I'm not aware.

23      Q.    Okay.  So Anderson & Wanca is not

24  asserting any interest, apart from its clients

1    interests, over the settlement term sheets in

2    Medical & Chiropractic, fair?

3              MS. LOEW:  Objection to foundation.

4        A.    I am not aware.

5        Q.    All right.  So you don't know of any

6    interests that Anderson & Wanca is asserting

7    uniquely, apart from the interests of the client,

8    over the settlement term sheets involved in M & C?

9        A.    Correct.

10             MS. LOEW:  Objection, foundation.

11       A.    Correct.

12       Q.    Do you know who prepared the settlement

13   term sheets in connection with the M & C action?

14       A.    There were a lot of them prepared.

15       Q.    Okay.

16       A.    Some were by myself and Mr. Oppenheim

17   and Mr. Addison.

18       Q.    With respect to the settlement term

19   sheets that you prepared, did you use a standard

20   settlement term sheet that had been prepared in

21   earlier litigation?

22       A.    Yes.

23       Q.    Do you know who originally prepared the

24   settlement term sheet?

1      A.     No.

2      Q.     How much of the settlement term sheet

3   did you change for the M & C case?

4      A.     I inserted information relative to the

5   discovery done to date and performed calculations.

6      Q.     Okay.  So it's just the raw numbers was

7   pretty much all that changed?

8      A.     And some sentences about the discovery

9   to date.

10

11

12

13

14

15                          **REDACTED**

16

17

18

19

20

21      Q.     How are those client lists proprietary

22   in your mind, Mr. Good?

23      A.     We don't share them with anybody, and

24   they are ours; and we guard against people having

1    access to them.

2            People, for example, have requested

3    access that are not part of Anderson Wanca; and we

4    have denied them access to that.

5        Q.    Who requested access?

6        A.    Co-counsels.

7        Q.    Which co-counsels?

8        A.    Max Margulis has requested access in the

9    past.  I can't think of anybody else that's

10   requested access in the past.

11       Q.    Okay.  You've identified a few instances

12   where you believe Mr. Oppenheim had lied today --

13       A.    Yes.

14       Q.    -- right?

15           Apart from the instances you've already

16   described, identify for me any other instance

17   where you believe that Mr. Oppenheim was lying.

18       A.    I believe Mr. Oppenheim stated after his

19   resignation from Anderson Wanca that he provided

20   two weeks' notice.  That is not accurate.

21       Q.    And what's the basis for you saying so?

22       A.    His statement to me that he felt bad

23   only providing two days' notice and that he knew

24   that put me in a tough position because of an

1    upcoming mediation in a case called Bunch v.

2    La-Z-Boy.  And that's L-a, dash, Z, dash, B-o-y.

3       Q.    Okay.  Were you present for the

4    conversation between Mr. Wanca and Mr. Oppenheim

5    as to his resignation?

6       A.    No.  I was present before that

7    conversation.

8       Q.    And your contention is that

9    Mr. Oppenheim told you before he resigned that he

10   was not providing two weeks' notice?

11      A.    That is correct.

12      Q.    And when did that conversation occur?

13      A.    That occurred on April 8th immediately

14   after I returned from lunch before even I went to

15   my desk, which was really accidental as I was

16   intending to speak to the person in the office

17   next to Mr. Oppenheim.

18      Q.    Okay.  And how long did that

19   conversation last?

20      A.    About five minutes.

21      Q.    Was there anyone else present?

22      A.    As I stated before, Tina Natally was

23   outside the office at her desk, which is only a

24   few feet away from the door to where Mr. Oppenheim

1    used to work; and she was there, but she was not

2    participating in the conversation.

3        Q.    Okay.  So as to the conversation where

4    Mr. Oppenheim spoke with the boss, which would be

5    Mr. Wanca, right?

6        A.    Yes.

7        Q.    You don't know what actually was said in

8    that conversation.

9        A.    I spoke -- as I said, I spoke to

10   Mr. Oppenheim before that conversation, and I

11   subsequently spoke to Mr. Wanca.

12       Q.    Okay.  What did Mr. Wanca say?

13       A.    He said that Mr. Oppenheim had offered

14   two days' notice so that he could go with me to a

15   mediation in North Carolina for the case of Bunch

16   v. La-Z-Boy.

17            He said that Mr. Oppenheim had been

18   offered partnership, substantially more money, and

19   his name on the door, and that he had taken an

20   offer from Mr. Bock.

21            I responded that I did not believe it

22   was a good idea to allow Mr. Oppenheim continued

23   access to Anderson Wanca materials, including but

24   not limited to the laptop and emails, for any

```
 1    period of time.
 2           Mr. Wanca agreed with me that we should
 3    let him go immediately, and I told Mr. Oppenheim
 4    this.  And I called it my going-away present.
 5        Q.    Why did you call it that?
 6        A.    Because he didn't want to stay the two
 7    days.  He told me he was doing it for me.
 8        Q.    And you rejected that offer?
 9        A.    I thought I was being nice.
10        Q.    Okay.  So you contend that Mr. Oppenheim
11    lied by saying that he gave two weeks when he only
12    gave two days, but it was you that rejected the
13    two-day offer that he made.  Did I get that
14    correct?
15        A.    Correct, that is correct.
16        Q.    Okay.  So even if he offered two weeks,
17    you would have rejected that?
18        A.    It's still a lie.
19           MS. LOEW:  Objection --
20    BY MR. BLONIEN:
21        Q.    That wasn't my question.
22        A.    Oh.
23           MS. LOEW:  -- speculation.
24
```

Page 100

1    BY MR. BLONIEN:

2        Q.    My question was whether you still would

3    have rejected that.

4              THE REPORTER:  One at a time.

5        A.    Yes, I still would have rejected that.

6        Q.    Okay.  Is there any other instance where

7    you believe Mr. Oppenheim was lying?

8        A.    Just give me a second.

9              Oh, he said he was being made a partner.

10       Q.    When did he say that?

11       A.    To me before resigning.

12       Q.    In that same conversation you just

13   referred to?

14       A.    Correct.

15       Q.    Anything else?

16       A.    No.  That's it.

17       Q.    Were you upset that Mr. Oppenheim left

18   the firm?

19       A.    No.  I was the first one to congratulate

20   him.

21       Q.    Do you have any factual basis to believe

22   that Mr. Oppenheim shared any of the information

23   that he had with Bock Law Firm?

24       A.    Yes.

1       Q.    And what's the basis for that?

2       A.    Emails produced.

3       Q.    All right.  And what in particular are

4    you referring to, Mr. Good?

5       A.    Mr. Oppenheim's sharing of the

6    mediator's impression from the mediation with

7    Mr. Bock.

8       Q.    In the April emails you were referring

9    to earlier?

10      A.    Yes.

11      Q.    Any other information that you believe

12   that you possess?

13      A.    I'm sorry.  Can you repeat what the

14   question was before that question?

15      Q.    As to -- that Mr. Oppenheim used any

16   information that he had and shared it with Bock

17   Law Firm.

18            And you said --

19      A.    The fact --

20      Q.    -- the emails produced sharing the

21   mediator information was one such instance.

22            And I'm asking:  What else?

23      A.    Some of the emails produced by you that

24   were Bates labeled with the OPP give the name at

1    the top Jorge Labarga, which indicates to me that

2    those emails were at some point provided to Bock,

3    Hatch, Lewis, Oppenheim employee Jorge Labarga.

4            I would also like to go back if that's

5    okay at some point.  There's one more lie I would

6    like to bring up.

7        Q.    Sure, go right ahead.

8        A.    Mr. Oppenheim also emailed to

9    Mr. Addison an email that was -- I was either a

10   part of or subsequently a part of in which

11   Mr. Oppenheim claimed to have never shared any

12   information about the Cin-Q and Medical & Chiro

13   action with Mr. Bock.

14       Q.    Okay.  And what's your basis for

15   asserting that that's false?

16       A.    The email I just mentioned to you where

17   Mr. Oppenheim shared the mediator's impressions

18   with Mr. Bock.

19       Q.    Okay.  Apart from those emails, do you

20   have any information to demonstrate that

21   Mr. Oppenheim shared information with Bock Law

22   Firm relating to M & C?

23       A.    Just those emails and the fact that

24   Jorge Labarga's name is on a bunch of documents.

1    Q.    Anything else?

2    A.    No.

3    Q.    Do you believe that you were harmed by

4    Mr. Oppenheim's conduct?

5    A.    Yes.

6    Q.    How?

7    A.    I'm the one that set up the security on

8    Mr. Oppenheim and everybody else's computers.  And

9    it was quite embarrassing for me for my security,

10   which Mr. Oppenheim was aware of, to be used

11   against the firm and its clients.

12   Q.    How was it used against the firm and its

13   clients?

14   A.    If I had put more security on

15   Mr. Oppenheim's laptop, I would have known when

16   the stuff was taken almost immediately.

17   Q.    So you feel embarrassed that your tech

18   savvy fell short in this instance and that you

19   weren't able to discern that Mr. Oppenheim copied

20   information from the laptop?

21   A.    No.  I feel embarrassed that I told

22   Mr. Oppenheim about the security.

23   Q.    What did you tell him about the

24   security?

1      A.      I told him what security was on the

2   laptop relative to the server and support staff

3   computers at Anderson Wanca.

4      Q.      Okay.  Were you harmed in any other way,

5   aside from your embarrassment, Mr. Good?

6      A.      I did a lot of work on the Medical &

7   Chiro and Cin-Q action which has now been delayed

8   over 17 months as a result of Mr. Oppenheim.

9      Q.      So you did a lot of work that's been

10  delayed?

11     A.      Correct.

12     Q.      Is there any other way that you believe

13  you have been injured by Mr. Oppenheim's conduct?

14     A.      Not that I can think of.

15     Q.      Do you know how much work you did on the

16  M & C case before it was delayed by Mr. Oppenheim

17  in your view?

18     A.      Hundreds and hundreds of hours.

19     Q.      Hundreds and hundreds?

20     A.      Yes.

21     Q.      Can you be any more specific?

22     A.      No.  Well, strike that.

23             I -- if I could look at my billing

24  records, I could be more specific.  But as I sit

1    here today, I cannot be more specific.

2         Q.    Are you seeking to recover in this

3    litigation, M & C's litigation, against

4    Mr. Oppenheim and Bock Law Firm any of the

5    hundreds and hundreds of hours that you spent?

6         A.    No.

7         Q.    Are you seeking to recover for the

8    embarrassment that you suffered?

9         A.    I don't believe that would be possible.

10        Q.    Are you seeking to recover anything in

11   connection with this case?

12        A.    No.  This is M & C's case.

13        Q.    Have you spoken to M & C about this

14   case?

15        A.    I discussed the scheduling of matters in

16   this case.

17        Q.    Anything else, any other conversations

18   about this case with M & C?

19        A.    The discussions only related to

20   scheduling and things that related to the Cin-Q

21   and Medical & Chiro v. Buccaneers case.

22        Q.    Did you discuss M & C's potential claims

23   with M & C?

24        A.    You mean the claims at issue in this

1   case or --

2       Q.    (Nodding head.)

3       A.    You're --

4       Q.    Yes.

5       A.    -- nodding your head yes.

6       Q.    I mean, the claims at issue in this

7   case.  Did you discuss the breach of fiduciary

8   duty or aiding and abetting claims with M & C at

9   any point?

10      A.    As I was their main contact person, I --

11  I believe I did.  I do not have a specific

12  recollection.

13      Q.    Do you recall when those conversations

14  may have occurred?

15      A.    I believe it would have been in May or

16  June of 2016.

17      Q.    And do you recall anything about the

18  substance of those discussions?

19      A.    I do not.

20            MS. LOEW:  To the extent -- that's fine.

21  BY MR. BLONIEN:

22      Q.    Do you have a copy of your engagement

23  agreement with M & C?

24      A.    Do you mean Anderson Wanca's?

1        Q.    Do you have an agreement with M & C?

2        A.    No.

3        Q.    Do you have -- are you aware of any

4    agreement that would likely apply to you?

5        A.    Yes.

6        Q.    Okay.  What agreement is that?

7        A.    The retainer agreement that is signed by

8    Brian Wanca and M & C.

9        Q.    Okay.  Have you reviewed that in

10   preparation for today's deposition?

11       A.    Not in preparation for today's

12   deposition, but, yes, I have reviewed it in the

13   past.

14       Q.    When did you review it?

15       A.    I -- I specifically recall reviewing it

16   at the time that I pulled it for the -- per the

17   request of the Foley attorneys.  I don't have a

18   specific recollection of reviewing it, that

19   agreement, since then.

20       Q.    Okay.  What about before then?

21       A.    I believe I reviewed it and the Cin-Q

22   retainer before one of the depositions I handled

23   in the Buccaneers litigation.

24       Q.    Do you know whether Anderson & Wanca

1  signed the Cin-Q retention agreement?

2      A.    I assume they did.  I do not have a

3  specific recollection of it though.

4      Q.    Okay.  I don't want you to assume.

5      A.    Okay.

6      Q.    You said that you did review the Cin-Q

7  representation agreement --

8      A.    Yeah.

9      Q.    -- before one of the depositions in that

10 class action, right?

11     A.    Correct.

12     Q.    Do you recall in your review whether or

13 not Addison, Anderson & Wanca was listed as

14 counsel for Cin-Q?

15     A.    I do not have a specific recollection.

16     Q.    Do you recall who was listed as counsel

17 for M & C in the retention agreement that you

18 referred to?

19     A.    I believe it was Anderson Wanca and

20 Michael Addison.

21     Q.    Okay.  And did both Mr. Addison and

22 Mr. Wanca sign the agreement?

23     A.    I believe they both did.

24     Q.    And did M & C sign the agreement?

1    A.    I believe Michelle Zakzrewski on behalf

2    of M & C did.

3    Q.    Okay.  And do you know when that

4    agreement was entered?

5    A.    I think it was 2013.

6    Q.    Do you know whether there were any other

7    representation agreements signed with M & C before

8    that point?

9    A.    For other cases, there were.

10   Q.    Okay.  Have you reviewed those other

11   cases' representation agreements?

12   A.    I may have at the time they were signed.

13   I do not recall any review in years.

14   Q.    Did you search for those representation

15   agreements in responding to the subpoena request

16   that you received?

17   A.    And I just want to make sure I

18   understand your question.  Are you asking if I

19   recall review -- can you repeat the question?

20   Q.    I -- let me do a different question --

21   A.    Yes.

22   Q.    -- for you.

23        M & C was represented by Anderson &

24   Wanca in other cases; is that your understanding?

1      A.    Yes.

2      Q.    And were written agreements signed as to

3   those cases?

4      A.    Yes.

5      Q.    Do you know whether they were produced

6   in this litigation?

7      A.    I do not know.

8      Q.    Did you review and produce those

9   documents?

10     A.    I definitely did not review those

11   documents.  I may have produced them to the Foley

12   attorneys.  I do not recall.

13     Q.    Do you know whether M & C made any

14   request of Anderson & Wanca to search for

15   responsive documents in this case?

16     A.    I believe they did.

17     Q.    Before receiving your subpoenas?

18     A.    Yes, I believe they did.

19     Q.    Okay.  And do you know what the scope of

20   Anderson & Wanca's search for documents was at

21   that time before the subpoenas?

22     A.    I do not recall.

23     Q.    You don't recall?

24           Do you know who performed that search?

```
 1      A.    I did.

 2      Q.    You did.

 3      A.    Yes.

 4      Q.    But you don't recall what you searched

 5   for?

 6      A.    I do not.

 7      Q.    Do you recall the instructions that M &

 8   C provided to you as to what to search for?

 9      A.    No.

10      Q.    At what time did Foley & Lardner begin

11   to represent you?

12      A.    I believe shortly before the subpoena,

13   it was discussed; and the decision was made that

14   we agreed they would represent me.

15                    (Whereupon Deposition Exhibit

16                     No. 1 was marked for

17                     identification by the court

18                     reporter.)

19   BY MR. BLONIEN:

20

21

22                  REDACTED

23

24
```

Page 112



**REDACTED**



**REDACTED**



**REDACTED**

23      Q.    And you're not aware of any other

24   agreement that was signed by Ms. Zakzrewski

1   covering the terms of her representation in

2   connection with the Tampa Bay Buccaneers

3   litigation, right?

4        A.    Correct.

5        Q.    Did Mr. Addison represent M & C under

6   your understanding?

7        A.    Yes.

8        Q.    In what capacity did Mr. Addison,

9   Mr. Addison, represent M & C?

10        A.    Attorney of record in the Buccaneers

11   litigation.

12        Q.    Do you know when that relationship

13   purportedly began?

14        A.    I believe it was either 2012 or 2013.

15        Q.    Okay.  Is there a particular event that

16   you recall that started the relationship with

17   Mr. Addison and M & C?

18        A.    I believe there was either an M & C

19   intervening or the case is -- they became

20   co-plaintiffs, M & C and Cin-Q.  I believe that's

21   the event.

22        Q.    Is there anyone else who also

23   represented M & C, apart from Anderson & Wanca

24   and, according to your testimony, Mr. Addison?

1      A.    The ethics counsel.

2      Q.    I appreciate that.  The ethics counsel

3  didn't represent M & C in connection with the

4  Tampa Bay Buccaneers litigation, did they?

5      A.    No.

6      Q.    Okay.  With respect to the Tampa Bay

7  Buccaneers litigation, are there other attorneys

8  who represented M & C apart from Anderson & Wanca,

9  according to this retention agreement, and

10  Mr. Addison, according to your testimony?

11      A.    I'm not sure.

12      Q.    Do you know what the financial terms of

13  Mr. Addison's representation of M & C were in

14  connection with the Tampa Bay Buccaneers

15  litigation?

16           THE WITNESS:  I'm sorry.  Can you repeat

17  the question?

18               (Whereupon, record was read as

19                requested.)

20      A.    I do not.

21      Q.    Do you know whether there were any terms

22  that were agreed to?

23      A.    I do not know.

24      Q.    You would agree that those terms are not

Page 117

1    listed in the document that I handed you, correct?

2        A.    That is correct.



REDACTED



REDACTED

23      Q.    And when did you convey to M & C the

24   offer that Mr. Siprut received from the Tampa Bay

1   Buccaneers?

2        A.    Shortly after a discussion between

3   myself, David Oppenheim, and Brian Wanca.

4        Q.    And when would the conversation have

5   occurred?

6        A.    Immediately after Joe Siprut called.

7        Q.    Joe Siprut did not represent M & C,

8   correct?

9        A.    Correct.

10       Q.    Joe Siprut represented other class

11   plaintiffs in the Tampa Bay Buccaneers class

12   action?

13       A.    Two of them, but correct.

14       Q.    Just two?

15       A.    There were two other class actions.  One

16   of them, I believe, only had one plaintiff.  The

17   other, I believe, had approximately six.

18       Q.    Okay.  And Mr. Siprut represented all of

19   those class representatives?

20       A.    Correct.

21

22

23                    **REDACTED**

24

Page 120



REDACTED



Page 122



REDACTED



Page 124

**REDACTED**

Q.   Did you keep track of hours?

A.   Yes.

Q.   You wrote down all the hours that you worked on this case?

A.   I typed them in, but yes.

Q.   Okay.  Do you know whether other co-counsel did the same?

A.   I believe they did.

Q.   And do you know whether the terms of payment in any way related to the hours that were being kept?

A.   I do not know.

Q.   Did you anticipate that you would have to submit your hours in order to seek compensation for the time that you spent in the Tampa Bay Buccaneers litigation?

A.   That is not why I kept my hours.

Q.   Why did you keep your hours?

A.   All Anderson Wanca attorneys were instructed to keep hours for all activities, whether it related for a pending action, a future action, or CLEs.

1      Q.    So to the extent that we were to request

2  how many hours Anderson & Wanca has spent on the

3  Tampa Bay Buccaneers litigation, the general

4  practice and policy of the firm would allow us

5  access to that information?

6      A.    It would -- you would be able to pull

7  that from our case management system, correct.

8      Q.    Okay.  But apart from hundreds and

9  hundreds of hours, sitting here today, you don't

10  have an estimate?

11      A.    No.

12      Q.    Have you gone back to look at how much

13  time you spent?

14      A.    I have not.

15      Q.    When did the attorney-client

16  relationship begin with Anderson & Wanca and M &

17  C?

18      A.    I believe prior to their first case with

19  Anderson Wanca.

20      Q.    When did the relationship begin with

21  respect to the Tampa Bay Buccaneers litigation

22  between M & C and Anderson & Wanca?

23      A.    I don't recall.

24      Q.    Do you know if it's ongoing?

Page 126

1      A.    Yes.

2      Q.    What is the scope of that relationship?

3      A.    With regards to the Buccaneers?

4      Q.    Mm-hmm, yes.

5      A.    To pursue claims against the Buccaneers

6  on behalf of M & C and the putative class.

7      Q.    And the scope of that representation is

8  limited to the litigation involving the Tampa Bay

9  Buccaneers, correct?

10      A.    Correct.

11      Q.    The scope of that relationship with M &

12  C does not extend to this case, correct?

13      A.    Anderson Wanca is not counsel of record

14  in this case.

15      Q.    Okay.  Well, there's counsel of record

16  and then there's counsel.  Is Anderson & Wanca in

17  any way providing legal services in connection

18  with this case?

19      A.    We responded to subpoenas in this case.

20  Is that responsive to your question?

21      Q.    I don't think so.

22      A.    Okay.  Can you -- can you give me an

23  example of what you're looking for me to provide?

24  I don't know how to answer your question.

1    Q.    In connection with legal services,

2   oftentimes there's an agreement that reflects the

3   scope of the arrangement, right?

4    A.    Yes.

5    Q.    So oftentimes, the scope of an

6   attorney-client relationship is limited, right?

7    A.    I believe in all times, but yes.

8    Q.    Okay.  And the scope of Anderson &

9   Wanca's representation of M & C, recognizing there

10   are other class actions that are out there.

11    A.    Yes.

12    Q.    But the retention agreement says it's

13   limited to the Buccaneers litigation, correct?

14    A.    Correct.

15    Q.    You understand that M & C has sued my

16   client?

17    A.    Yes.

18    Q.    And Bock Law Firm?

19    A.    Yes.

20    Q.    And in connection with that lawsuit,

21   Anderson & Wanca is not not only attorney of

22   record, it is not an attorney in connection with

23   this case representing Medical & Chiropractic,

24   correct?

1    A.    I do not know the terms of the agreement

2   between Foley, Anderson Wanca, and Medical &

3   Chiro; so I cannot answer that question.

4    Q.    Do you have any understanding as to

5   whether or not Anderson & Wanca is providing legal

6   services in connection with this case, this case

7   being the breach of fiduciary duty action that M &

8   C has brought against Mr. Oppenheim and Bock Law

9   Firm?

10   A.    I do not know.

11   Q.    So you don't know of any way in which

12  Anderson & Wanca is providing legal services in

13  this case?

14   A.    Correct.

15   Q.    Okay.  And you're not aware of any

16  agreement that would set up such a relationship,

17  right?

18   A.    I'm aware of an agreement between

19  Medical & Chiro, the Foley attorneys, and Anderson

20  Wanca; and I am not aware of the terms of said

21  agreement.

22   Q.    So you don't know in that agreement

23  whether or not Anderson & Wanca and M & C have an

24  attorney-client relationship?

Page 129

1    A.    That is correct.

2         MR. BLONIEN:  Is it the contention of

3    Foley & Lardner that that relationship is one of

4    attorney and client?

5         MS. LOEW:  I mean, for -- what are --

6    what are you asking me?

7         MR. BLONIEN:  I'm trying to understand

8    what role Anderson & Wanca has in this case,

9    whether they serve any role as an attorney.  The

10   witness just said that the agreement, which is

11   heavily redacted apart from the fees, may contain

12   information that suggests that Anderson & Wanca

13   represents M & C in this case, in this case.

14        MS. LOEW:  I mean, I'm not -- Ross is

15   here to testify.  To the extent you ask about

16   legal advice that they have provided to M & C,

17   then, you know, that would be covered by their

18   attorney-client relationship with M & C.

19        MR. COHEN:  Legal advice they provide in

20   this case?

21        MS. LOEW:  I don't know if they provided

22   legal advice in this case.  You'll have to ask

23   Ross.

24

Page 130

1   BY MR. BLONIEN:

2       Q.    Have you provided any legal advice in

3   this case, Mr. Good?

4       A.    No.

5       Q.    Has anyone at Anderson & Wanca provided

6   legal advice to M & C in connection with this

7   case?

8       A.    I don't believe so, no.

9       Q.    Okay.  But you have no facts to suggest

10  that, in fact, that is the case?

11      A.    That is correct.

12      Q.    Okay.  What duties do you and Anderson &

13  Wanca owe to Medical & Chiropractic in connection

14  with your representation of them in the Tampa Bay

15  Buccaneers litigation?

16      A.    I believe the same duties that any

17  attorney owes under the Florida Rules of

18  Professional Conduct and, additionally, the

19  Illinois Rules of Professional Conduct.

20      Q.    Okay.  That's not an answer to my

21  question.  It's just a punt.

22            MS. LOEW:  Objection to counsel's

23  characterization of the witness's statement.

24

1    BY MR. BLONIEN:

2        Q.    What duties do you owe and your firm owe

3    to M & C in connection with the Tampa Bay

4    Buccaneers litigation?

5        A.    We have agreed to pursue Medical &

6    Chiro's claim as well as the putative class

7    against the Buccaneers.

8        Q.    So you've pursued a class action on

9    behalf of M & C.

10       A.    Correct.

11       Q.    You haven't pursued any individual

12   claims on behalf of M & C, correct?

13       A.    Are you saying ever?

14       Q.    In connection with the Tampa Bay

15   Buccaneers.

16       A.    Then correct.

17       Q.    At all times, you were representing the

18   class, right?

19       A.    Again, relation to the Buccaneers.

20       Q.    This line of questions is --

21       A.    Yeah.  Okay.

22       Q.    -- specific to the Tampa Bay Buccaneers

23   litigation, and I appreciate that clarification.

24             So in connection with the Tampa Bay

1    Buccaneers litigation --

2         A.    Mm-hmm.

3         Q.    -- you represented the class.

4         A.    We -- we -- putative class, we would

5    like to, yes.

6         Q.    You sought to represent the class.

7         A.    We did.

8         Q.    And only the class.

9         A.    No.

10         Q.    At no time did you advance the

11    individual claims in this case, correct?

12         A.    That is not --

13               MS. LOEW:  Objection, form.

14         A.    I apologize.

15               That is not correct.

16         Q.    All right.  You understand that the

17    duties in a class action are owed to the class

18    itself, correct?

19               MS. LOEW:  Objection to form.

20         A.    Yes.

21         Q.    And that you didn't have any sort of

22    special relationship with the class representative

23    in this case, correct?

24         A.    We had this retainer agreement.

1      Q.    I understand that.  But certainly you

2   didn't offer M -- M & C any promises with respect

3   to the litigation, right?

4      A.    Correct.

5      Q.    And you didn't offer them any special

6   treatment, right?

7      A.    Correct.

8      Q.    And you didn't offer them any sort of

9   award, apart from what the class members would

10  ordinarily receive, correct?

11     A.    Correct.

12     Q.    And understanding that in some

13  circumstances, judges award class representatives

14  an incentive award, you didn't promise M & C that

15  they would receive an incentive award, correct?

16     A.    Correct.

17     Q.    Is there any other way in which M & C

18  was treated special or different than any other

19  member of the class from your perspective?

20     A.    Yes.

21     Q.    What would that be?

22     A.    The Buccaneers requested that a court

23  allow briefing on summary judgment related to the

24  individual claim prior to class certification.

1    Plaintiff's counsel briefed summary judgment and

2    defeated defendant's motion for summary judgment

3    of M & C's individual claim.

4        Q.    What was the basis for Tampa Bay

5    Buccaneers' argument on summary judgment?

6        A.    I don't remember.  You know, give me a

7    minute.  Let me think about this one.

8        Q.    Sure.  I need to use the restroom

9    anyway.  We can make it a really short break if

10   you want to just think on it for a second.

11       A.    That would be great.  Thank you.

12       Q.    Sure.

13           THE VIDEOGRAPHER:  Off the record.  The

14   time is 11:37.

15                       (Whereupon, a lunch break was

16                        taken.)

17                       (Whereupon, record was read as

18                        requested.)

19           THE VIDEOGRAPHER:  We are back on the

20   record.  The time is 2:30.

21   BY MR. BLONIEN:

22       Q.    Mr. Good, before the break, I had asked

23   you:  What was the basis for Tampa Bay's summary

24   judgment motion against Medical & Chiropractic; do

1    you remember that?

2         A.    I remember you asking the question, yes.

3         Q.    Did you have an opportunity to consider

4    that question?

5         A.    I have thought about it, yes.

6         Q.    Okay.  Please answer.

7         A.    I don't remember the specifics, but I do

8    remember in the hearing leading up to the briefing

9    schedule being entered, the defense counsel said

10   individualized issues that would serve as a final

11   motion for summary judgment; and they repeatedly

12   made that point that it would be a final motion

13   for summary judgment.

14        Q.    And do you know whether any of the other

15   class members, apart from Medical & Chiropractic,

16   shared of -- any of the defects as from Tampa

17   Bay's perspective they raised in the summary

18   judgment motion?

19        A.    I don't recall.

20        Q.    Do you recall anything else about the

21   summary judgment motion?

22        A.    Can you be more specific?

23        Q.    With respect to the individual claims of

24   M & C, which is how the question came up --

1     A.    Mm-hmm.

2     Q.    -- do you recall anything else about the

3     nature of the summary judgment that would help us

4     understand the individualized nature of the claim

5     as compared to the class allegations that were

6     made in that case?

7     A.    No.

8     Q.    Thank you.

9           Have you ever represented M & C in any

10    capacity outside of the Tampa Bay Buccaneers

11    litigation?

12    A.    Yes.

13    Q.    In what matters?

14    A.    Medical & Chiro v. EClinicalWorks and

15    Medical & Chiro v. KMH.  There might be others,

16    but those are the two that I recall.

17    Q.    And you don't recall anything else

18    sitting here today?

19    A.    I believe there was something earlier,

20    but I don't recall what it was.

21    Q.    Do you have an estimation of when?

22    A.    No.

23    Q.    Or any other information that you can

24    share today, Mr. Good?

1      A.     I think it was against a health care

2    company, but I don't recall the name of it.

3      Q.     Do you remember the jurisdiction?

4      A.     I -- I can't guess.

5      Q.     Have you represented Medical &

6    Chiropractic in connection with this matter, the

7    breach of fiduciary action?

8      A.     I have been a part of discussions

9    related to the breach of fiduciary duty as it

10   relates to the Buccaneers case.

11     Q.     As it relates to the class action?

12     A.     The putative class action, correct.

13     Q.     Putative because the court hasn't

14   approved any certification of the class, correct?

15     A.     No.  Putative because initially, the

16   Bock Hatch preliminary approval was granted.

17     Q.     Was certification granted in the Tampa

18   Bay Buccaneers litigation that M & C pursued?

19     A.     Not yet.

20     Q.     And was Medical & Chiropractic at any

21   point designated with the imprimatur of the court

22   as the class representative?

23     A.     Not yet.

24     Q.     Okay.  So is the litigation that M & C

1  brought against Tampa Bay Buccaneers, is that

2  appropriately called a putative class action or a

3  certified class action or something else?

4      A.    It's listed as Cin-Q and Medical &

5  Chiro, individually and on behalf of similarly

6  situated people.  I refer to it as a putative

7  class action.

8      Q.    Right.  That's the same language you

9  always see in class actions, right?

10     A.    Yes.

11     Q.    How long have you been practicing,

12  Mr. Good?

13     A.    I became an attorney on October 31st,

14  2013.

15     Q.    Okay.  And have you done exclusively

16  class actions in that time frame?

17     A.    Every case I've worked on has started

18  out as a class action.

19     Q.    Okay.  And every case that started out

20  as a class action has the same language,

21  individually and as a representative for the

22  class, right?

23     A.    I believe so.

24     Q.    Have you talked with M & C about this

1    litigation?

2         A.    Yes.

3         Q.    And you do not represent M & C in this

4    litigation.

5         A.    I represent M & C in the Buccaneers

6    litigation, and there are many things that overlap

7    related to the two cases.

8         Q.    Okay.  But you don't represent M & C in

9    this case, correct?

10        A.    As I stated before when this came up,

11   there are three parties to the agreement.  There

12   is Anderson Wanca, Foley Lardner, and M & C.  I

13   work for Anderson Wanca, which is one of the

14   parties to that agreement.

15        Q.    Mm-hmm.  Do you have an understanding as

16   to what the nature of their relationship is in

17   that contract?

18        A.    Who is the they you are referring to?

19        Q.    Anderson & Wanca, the Foley & Lardner,

20   and M & C.

21        A.    I have some understanding, yes.

22        Q.    Okay.  Is Anderson & Wanca listed in

23   that agreement in any way as an attorney?

24        A.    I don't know.

1      Q.    Is it -- do you have any understanding

2    that would suggest that Anderson & Wanca is acting

3    as an attorney in this litigation?

4      A.    I have had discussions that relate to

5    this litigation in as far they relate to, for

6    example, the conflict of interest hearing

7    conducted in Buccaneers litigation.

8      Q.    Right, but that's not my question.

9          My question is trying to understand what

10   the scope of M & C's relationship is with Anderson

11   & Wanca as it pertains to this case.

12     A.    I understand that.  I'm trying to answer

13   your question, but I cannot think of any

14   discussions that I have had or could have had that

15   relate exclusively to this litigation that are not

16   in some way part of the Buccaneers litigation; and

17   that's why I don't know how to answer your

18   question.

19     Q.    But those aren't my questions; and you

20   understand and agree that the judge is ultimately

21   the arbiter of whether or not a privilege applies

22   in this case, right?

23     A.    I -- yes.

24     Q.    Okay.  And I'm trying to understand the

1    scope of representation of Anderson & Wanca as it

2    relates to this case.  And by this case, it's the

3    M & C breach of fiduciary duty action against

4    Mr. Oppenheim and aiding and abetting against the

5    Bock Law Firm.  Okay?

6         A.    Okay.

7         Q.    Do you know of any agreement that

8    Anderson & Wanca has as an attorney to represent M

9    & C in this case?

10        A.    I am aware of only one agreement.  I do

11   not know the specifics in the agreement.

12        Q.    Okay.  Do you believe sitting here

13   today, Mr. Good, that you are acting as an

14   attorney for M & C in this litigation?

15        A.    I don't understand the question.

16        Q.    Really?

17        A.    Correct.

18        Q.    Okay.  What additional facts can I offer

19   to you, Mr. Good, in order to help understand my

20   question?

21        A.    I suppose if you could give me an

22   example of anything that I could have done for M &

23   C that was exclusively for this litigation that

24   did not in any way impact Anderson Wanca's

1    representation of M & C in the M & C v. Buccaneers

2    litigation, I could understand the distinction

3    that you are trying to make.

4         Q.    Okay.   Starting from the point that the

5    TTA action was brought in state court, can you

6    identify for me all of the conversations that you

7    had with Medical & Chiropractic after that point?

8         A.    I don't think I could -- off the top of

9    my head, I don't think I could identify all of

10   them.

11        Q.    Okay.   Approximately how many

12   conversations have you had with M & C after that

13   point?

14        A.    Would this be exclusively related to the

15   Buccaneers litigation and this instant litigation

16   or in any case whatsoever?

17        Q.    In any case whatsoever.

18        A.    I've discussed, I believe, three cases

19   with M & C since the TTA case was filed at various

20   times.

21             My first discussion after the TTA case

22   with M & C was almost immediately after being made

23   aware of Bock, Hatch, Lewis & Oppenheim's attempt

24   to mediate their first TTA case.

1          Subsequent to that, I recall discussions

2     regarding the -- the third mediation in the M & C

3     v. Buccaneers case that was to take place in

4     Chicago.  I believe the mediator's name for the

5     third one was Bobrick.

6          I recall discussions leading up to that

7     mediation.  I recall discussions specifically the

8     night before that mediation, briefly at that

9     mediation or lack thereof.

10         Subsequent to that, I recall discussions

11    before both the conflict of interest hearing and

12    the preliminary injunction hearing.

13         There were discussions immediately after

14    receiving the 11th Circuit Court of Appeals

15    decision.

16         Off the top of my head, those are the

17    only discussions that I can think of at this time.

18    Q.   Okay.  Can you tell me when the

19    discussions were that you had with M & C before

20    the preliminary injunction hearing?

21    A.   I believe it was the day of or the day

22    before.

23    Q.   And where did those conversations occur?

24    A.   At the office of Foley & Lardner.

1       Q.      In Tampa?

2       A.      Correct.

3       Q.      You're a Chicago lawyer, right?

4       A.      I'm both an Illinois and Florida

5    licensed attorney.

6       Q.      Okay.  And did you fly down to Tampa for

7    that preliminary injunction hearing?

8       A.      I believe I was already there, but I

9    stayed for the hearing and flew back after it.

10      Q.      And did you meet with the Foley &

11   Lardner attorneys along with M & C in preparation

12   for the preliminary injunction hearing?

13      A.      I don't -- to the best of my

14   recollection, I arrived at the end of their

15   preparation; and then we went to the preliminary

16   injunction hearing together.

17      Q.      How long were you there for the

18   preparation session?

19      A.      It was a very short amount of time.  I

20   don't recall exactly how long.

21      Q.      Okay.  Maybe you and I have different

22   ideas of what's short.  Can you give me an

23   approximation?

24      A.      Definitely less than an hour.

1      Q.    Less than an hour.

2      A.    Yes.

3      Q.    Who else was there with you at that

4  time?

5      A.    Lauren Loew, I believe Jeff Soble, and

6  there was another attorney that was in the Tampa

7  office.

8      Q.    Could it have been Christopher Griffin?

9      A.    That sounds correct.  I'm not a hundred

10 percent, but that sounds correct.

11     Q.    But someone from the Tampa office?

12     A.    Yes.

13     Q.    Anyone else?

14     A.    Michelle Zakzrewski.

15     Q.    Anyone else?

16     A.    At some point, we met up with Mike

17 Addison.  I do not recall at what point.

18     Q.    Anyone else?

19     A.    Not that I recall.

20     Q.    Do you know when you met up with Mike

21 Addison or where?

22     A.    I know it was before the hearing.  It

23 might have been in the hallway right in front of

24 the court.  I don't recall.

1      Q.    Were you present for any substantive

2   discussions about the case in which Mike Addison

3   was also present at the preliminary injunction

4   hearing?

5      A.    No.

6      Q.    How about outside the preliminary

7   injunction hearing at any point, were you present

8   with Mike Addison when discussions about this case

9   happened?

10     A.    I believe there were discussions about

11  this case prior to retaining Foley & Lardner.

12     Q.    Okay.  Were those in person or by phone?

13     A.    By phone.

14     Q.    And who all was attending by phone?

15     A.    I believe it would have been myself,

16  Brian Wanca, and Michael Addison.

17     Q.    Do you know how many conversations

18  occurred?

19     A.    I know there were several, but I do not

20  know exactly how many.

21     Q.    Do you know how long they lasted?

22     A.    I don't recall.

23     Q.    What do you recall was said at those

24  conversations?

1          MS. LOEW:  And I will object to the

2    extent that this is seeking work-product

3    information or similar mental impressions from

4    counsel.  I'll advise you not to answer.

5    BY MR. BLONIEN:

6          Q.    Are you taking your client's or -- or

7    your attorney's advice?

8          A.    Yes.

9          Q.    Do you have any response that you can

10   offer with respect to the question I asked you?

11         A.    No.

12         Q.    So you can't tell me anything about what

13   was said in conversations with yourself, with Mike

14   Addison, and with Brian Wanca regarding this case?

15         A.    Correct.

16         Q.    Okay.  Do you recall any facts that were

17   shared in connection with that conversation?  And

18   provide an opportunity for your attorney to object

19   and advise you not to answer, please.

20         MS. LOEW:  What was your question?

21   BY MR. BLONIEN:

22         Q.    Do you recall any facts that were shared

23   in that conversation?  And please allow your

24   attorney an opportunity to object.

1           MS. LOEW:  I will make the same

2    objection to the extent it was a work-product

3    discussion.  I'll advise you not to answer.

4    BY MR. BLONIEN:

5        Q.    Are you following your attorney's

6    advice?

7        A.    Yes.

8        Q.    So you will not identify for me any

9    facts that you learned in conversations with Mike

10   Addison?

11       A.    I already told you when the conversation

12   started taking place.  I -- beyond that, I am

13   taking the advice of counsel.

14       Q.    Okay.  So apart from when the

15   conversation occurred, you're not answering my

16   questions about those conversations.

17       A.    Correct.

18       Q.    Okay.  Do you personally stand to

19   benefit from a judgment for M & C in this case?

20       A.    No.

21       Q.    Does your law firm stand to benefit from

22   a judgment for M & C in this case?

23       A.    I -- I don't know.

24       Q.    Do you have any understanding as to

1    whether or not Anderson & Wanca is paying for the

2    litigation fees and expenses in this case in order

3    to receive a benefit for the law firm?

4         A.    It is my under -- strike that.

5              Can you split up the question?  I'm

6    trying to -- can you like split it up?  Do you

7    understand what I mean?

8         Q.    I don't, but feel free to split it up in

9    your answer.

10        A.     Okay.

11        Q.     Maybe we can do it that way.

12             MS. LOEW:  Maybe I should object to a

13   compound question.

14        A.     It is my understanding that Anderson

15   Wanca is paying the fees for this litigation.  I

16   have no understanding that Anderson Wanca expects

17   to get a benefit out of the result of this

18   litigation.

19             However, it is also my understanding

20   that the judge can award fees at the conclusion of

21   this litigation; and I believe the judge is going

22   to award attorneys' fees.

23        Q.     And how much?

24        A.     All of them.

1      Q.    And all of them, what?  I -- I'm not

2    unsure what pool you're including there.

3      A.    All of Foley & Lardner's fees.

4      Q.    All of Foley & Lardner's fees, including

5    the time that it spent representing you in today's

6    litigation, in today's deposition?

7      A.    I don't know, but I hope they ask for

8    it.

9      Q.    Okay.  And do you have any understanding

10   about what the basis would be to seek such fees?

11     A.    The breach of fiduciary duty.

12     Q.    Is there any agreement that you're aware

13   of that M & C is in any way at any time

14   responsible for those fees?

15     A.    I do not believe M & C is responsible

16   for those fees.

17     Q.    Do you know whether M & C ever received

18   an invoice for Foley & Lardner's time?

19     A.    I do not know.

20     Q.    Do you know whether they received an

21   invoice for any expenses?

22     A.    I do not know.

23     Q.    Do you know whether there's any right or

24   agreement that establishes the ability of your

1   firm, Anderson & Wanca, to recoup any costs or

2   fees in this litigation?

3        A.    I'm not aware of any.

4        Q.    Do you receive a salary?

5        A.    Yes.

6        Q.    Do you receive a bonus?

7        A.    Sometimes.

8        Q.    What factors go into the bonus amount

9   that you receive?

10       A.    They are solely on the whims of Brian

11   Wanca.

12       Q.    Does it relate to the performance of the

13   firm?

14       A.    I don't know.

15       Q.    If the firm received a judgment in the

16   Tampa Bay class action favorably and received

17   attorneys' fees, would you receive a bonus

18   including that amount?

19       A.    Doubtful.

20       Q.    What do you mean "doubtful?"

21       A.    When I say the bonuses are based on

22   Brian Wanca's whims, I truly mean that.

23       Q.    How are your duties to M & C different

24   than those Mr. Oppenheim may have had to M & C?

1       A.    I don't believe there was any

2   difference.

3       Q.    You think they are identical?

4       A.    Up until his resignation, yes.

5       Q.    Did you attend the first mediation?

6       A.    Yes.

7       Q.    What happened at the first mediation?

8            MS. LOEW:  And I will advise the witness

9   to the extent it's seeking specific communications

10  or offers or demands within the mediation, I'll

11  advise you not to answer.  But to the extent you

12  can provide general information that would not

13  breach the mediation privilege, you can answer.

14      A.    The first mediation did not result in a

15  settlement.

16      Q.    Did M & C make a demand?

17      A.    Yes.

18      Q.    What was that demand amount for?

19           MS. LOEW:  And I will advise the witness

20  not to answer on the basis of mediation privilege.

21  BY MR. BLONIEN:

22      Q.    Are you following your attorney's

23  advice?

24      A.    Yes.

1    Q.    Is there anything else that you can tell

2  me what happened in the first mediation, aside

3  from that there was not a deal made?

4    A.    I think the mediation went about a half

5  day.

6    Q.    Anything else?

7    A.    It was attended by myself, David

8  Oppenheim, Michael Addison, Craig Cinque, and

9  Michelle Zakzrewski.  The mediator was Rodney Max,

10  and it was conducted at his office.

11    Q.    Anything else?

12    A.    Nothing else.

13    Q.    Did Anderson & Wanca have an

14  understanding as to what the case was worth at

15  that point?

16    A.    I don't recall.

17    Q.    Did you have an understanding of what

18  the case was worth?

19    A.    I would have to check my notes for a

20  couple things that came from the discovery in that

21  case.  I don't recall when we had completed all of

22  the discovery.

23    Q.    Okay.  Do you have an understanding

24  sitting here today what the case is worth, the

1   Tampa Bay Buccaneers class action litigation?

2        A.   I have an understanding of what a

3   judgment would be, yes.

4        Q.   Okay.  And what is your understanding as

5   to what the case is worth?

6        A.   At $500 a fax, it's worth approximately

7   $165 million.  If it was trebled, it would be

8   almost half a billion dollars.

9        Q.   Okay.  And did you seek or demand

10  $165 million in the mediation?

11            MS. LOEW:  And I will advise the witness

12  not to answer on the basis of mediation privilege.

13  BY MR. BLONIEN:

14       Q.   And are you following your attorney's

15  advice?

16       A.   Yes.

17       Q.   Do you have an understanding as to what

18  happened at the second mediation?

19       A.   Yes.

20       Q.   Can you please describe for me what

21  happened at the second mediation?

22            MS. LOEW:  And I will interpose the same

23  advice to the deponent not to breach the mediation

24  privilege.  But to the extent you can provide

1   general information without doing so, go ahead.

2        A.    Second mediation was attended by myself,

3   David Oppenheim, Michael Addison.  I don't recall

4   whether or not Michelle Zakzrewski was there in

5   person or by phone.

6             For the defendant, Mark Mester, Kate

7   Lally, and Buccaneers general counsel, David

8   Cohen.

9             It was mediated by Judge Wayne Anderson,

10  and it was at the end of August 2015.  I believe

11  it went most of the day.  That's all I have to

12  answer that question.

13            I wanted to go back and say in addition

14  for the first mediation, it was also attended by

15  defense counsel at the time Barry Postman and

16  general counsel for the Buccaneers, David Cohen.

17       Q.    Was Mr. Wanca at either of the mediation

18  sessions?

19       A.    He was definitely not at the first one.

20  He might have been at the second one.  I don't

21  recall.

22       Q.    Okay.  Anything else that you can or

23  will share today about the mediations?

24       A.    The second mediation did not result in a

Page 156

1    settlement.

2         Q.    Anything else?

3         A.    Mediation discussions continued after

4    that mediation.

5         Q.    Okay.  Can you tell me about those

6    mediation discussions?

7              MS. LOEW:  And I will advise the witness

8    not to answer specific information about the

9    discussions in the mediation on the basis of

10   mediation privilege.

11        A.    It is my understanding -- it is my

12   understanding the mediation communications

13   continued until approximately the Technology

14   Training action was filed.

15        Q.    Mediation discussions continued until

16   the Technology Training action was filed; did I

17   get that right?

18        A.    Yes.

19        Q.    All the way through?

20        A.    I don't know the exact dates, but

21   approximately.

22        Q.    And the mediation discussions did not

23   cease at any point in time before the TTA action;

24   is that your testimony?

1    A.    They might have within a couple days of

2    it, but it was very close.

3    Q.    Do you have an understanding as to

4    whether or not the mediator in the Tampa Bay

5    Buccaneers class action litigation declared an

6    impasse?

7    A.    I believe he either -- I believe he did.

8    Q.    When do you believe he did?

9    A.    Either the last week of April 2016 or

10   the first week of May 2016.

11   Q.    Did you have an understanding as to the

12   value of the class action at the time that the

13   second mediation was going on?

14   A.    By that point, we had all the records;

15   and it was 165 million approximately if you did

16   $500 per, or at $1,500 per, approximately 495

17   million.

18   Q.    Okay.  And when you're giving me those

19   numbers, is that a hundred percent recovery in

20   your view?

21   A.    That would -- yes, in my view, that

22   would be a hundred percent.

23   Q.    Is 165, and then 300 percent recovery is

24   the 495, right?

1      A.     No.  I think the 100 percent is the 495.

2      Q.     Okay.  And did you identify any risks

3   that the case may not, in fact, yield a judgment

4   in favor of Medical & Chiropractic in the class?

5      A.     I believe that would be covered by

6   attorney-client work-product privilege.

7      Q.     Okay.  Are you not answering the

8   question on that basis?

9      A.     Yes.

10      Q.     Did you have any internal discussions

11   about settlement?

12      A.     Yes.

13      Q.     With whom?

14      A.     David Oppenheim, Michael Addison, Brian

15   Wanca, and -- yeah, and that's it.

16      Q.     Did you have a clarification question?

17      A.     No.  I think I understood it.

18      Q.     How many times did you have internal

19   discussions about settlement?

20      A.     Before each of the two mediations and

21   subsequent discussions after the second mediation.

22      Q.     Okay.  And tell me the sum and substance

23   of those discussions, please.

24           MS. LOEW:  Which you can respond to the

1    extent it doesn't reveal an actual mediation

2    communication or -- yes, an actual mediation

3    communication.

4         A.    We discussed what we would be

5    comfortable bringing to a court for preliminary

6    and final approval in terms of the substance of

7    the relief that the putative class would receive.

8         Q.    Okay.  And what was that?

9         A.    We were not going to accept coupons.

10        Q.    And was there an amount that you were

11   looking for to present to the court?

12        A.    We didn't come up with a specific

13   amount.  The thrust of the discussions was whether

14   or not we would consider accepting coupons.

15        Q.    Okay.  Any other internal discussions

16   about the settlement before or after the

17   mediations?

18        A.    There were discussions relative to the

19   dollar amount based on the records that had been

20   obtained and that we had taken the discovery in

21   order to get authenticated and explain for the

22   court, as well as the expert report of Robert

23   Biggerstaff.

24        Q.    Okay.  And in that discussion, did you

```
 1     come up with a number that you believed would be

 2     acceptable to propose to the defendants?

 3          A.    I know we -- I know that we made a

 4     mediation statement to the mediator for each of

 5     the mediations.

 6          Q.    Okay.  And did the mediation statement

 7     contain a proposed amount to resolve the case?

 8          A.    I believe they both did.

 9          Q.    And what was that amount?

10                MS. LOEW:  I will advise you not to

11     answer on the basis of mediation privilege.

12     BY MR. BLONIEN:

13          Q.    And are you going to follow your

14     attorney's advice?

15          A.    Yes.

16

17

18

19

20                       REDACTED

21

22

23

24
```









Page 165



Page 166





**REDACTED**

1    Q.    Okay.  Were you ever involved in any

2    discussions where mediation communications were

3    shared outside of the people who attended the

4    mediation?

5             THE WITNESS:  Can you repeat the

6    question?

7                    (Whereupon, record was read as

8                     requested.)

9    A.    I'm not aware of any.

10    Q.    Did you ever have any conversations with

11    Mr. Siprut about the mediation?

12    A.    Yes.

13    Q.    Was Mr. Siprut in attendance?

14    A.    No.

15    Q.    Did Mr. Siprut sign the mediation

16    agreement?

17    A.    No.

18             MR. BLONIEN:  Mark what's Exhibit

19    Number 3.

20                    (Whereupon Deposition Exhibit

21                     No. 3 was marked for

22                     identification by the court

23                     reporter.)

24

1    BY MR. BLONIEN:



REDACTED



**REDACTED**

Page 171



Page 172









REDACTED





**REDACTED**





**REDACTED**

Page 180



REDACTED



Page 182



REDACTED



REDACTED



**REDACTED**

Page 185



REDACTED





REDACTED



**REDACTED**







Page 192



Page 193





**REDACTED**

Page 195



REDACTED



REDACTED







REDACTED



Page 201



Page 202



REDACTED



REDACTED

15    Q.    Okay.  Have you agreed to pay for any of

16  the costs of litigation in this case?

17    A.    No.

18    Q.    Have you agreed to pay for Foley &

19  Lardner's attorneys' fees in this case?

20    A.    No.

21    Q.    And that includes for the time that

22  Foley & Lardner spent representing you today,

23  correct?

24    A.    Correct.

Page 204

1      Q.    It's your understanding that you are not

2   responsible for any of the fees and costs

3   associated with your appearance today?

4      A.    Correct.

5           MR. BLONIEN:  Those are all the

6   questions that I have.  I'm going to hand the

7   witness over to Mr. Cohen.  Thank you.

8                       EXAMINATION

9   BY MR. COHEN:

10     Q.    Given your view of the nature of the

11  relationship that exists between a class action

12  attorney who is prosecuting a putative class

13  action and the named plaintiff putative class rep

14  whose name is in the style of the case that that

15  class action attorney is prosecuting, given your

16  understanding of the nature of that relationship,

17  would it be incumbent upon such an attorney to

18  share with and explain to the client potential

19  risks, weaknesses, concerns associated with

20  prosecuting the case through to disposition on the

21  merits versus settlement?

22     A.    Can you repeat the question back.

23                   (Whereupon, record was read as

24                     requested.)

1      A.    Yes.

2      Q.    You indicated earlier that you became an

3   attorney on October 31st, 2013?

4      A.    Correct.

5      Q.    So we are in mid November 2017.  You've

6   been a practicing attorney for just over four

7   years?

8      A.    Correct.

9      Q.    In your just over four years as a

10  practicing attorney, how many civil trials have

11  you tried to verdict as a first-chair attorney?

12     A.    One.

13     Q.    When was that?

14     A.    I believe it was last year.

15     Q.    What case was that?

16     A.    I don't recall the case name.

17     Q.    Your very first actual trial to verdict

18  and you're telling us you can't remember the case

19  name?

20           MS. LOEW:  Objection, asked and

21  answered.

22     A.    Correct.

23     Q.    What was the defendant's name?

24     A.    I don't recall.

1    Q.    What was the plaintiff's name?

2    A.    I don't recall.

3    Q.    What was the nature of the case?

4    A.    It was a TCPA action pending in McHenry

5   County, Illinois.

6    Q.    To the best of your recollection, when

7   did that proceed to trial and verdict?

8    A.    Last year.

9    Q.    Yes, I understand, 2016.  Can you help

10  us out with a month?

11   A.    No.

12   Q.    Can you help us out with a winter,

13  spring, summer, or fall?

14   A.    I don't remember.  Just say it was a

15  very short trial.

16   Q.    Was that a trial on behalf of a

17  certified class, or was that an individual case?

18   A.    Individual.

19   Q.    Was that before a jury?

20   A.    No.

21   Q.    Bench trial?

22   A.    Correct.

23         And I remember the name.  I believe it

24  was G.M. Sign v. Swiderski.

1    Q.    And what was the result?

2    A.    The plaintiff prevailed.

3    Q.    And how much was the plaintiff awarded?

4    A.    I don't recall.

5    Q.    Was the plaintiff seeking actual damages

6    or statutory damages?

7    A.    Statutory damages.

8    Q.    So it could only be, correct me if I'm

9    wrong, $500 or treble to 1,500, correct?

10    A.    Per fax, but that is the statute.

11    Q.    Okay.  So this plaintiff had received

12    more than one fax?

13    A.    I don't recall.

14    Q.    Did the trial court as to one or any of

15    the faxes the plaintiff received, if there was

16    more than one, treble damages?

17    A.    I don't recall.

18    Q.    Why did you try this case, this TCPA

19    case, as an individual claim?

20    A.    The plaintiff lost the class

21    certification.

22    Q.    That was your only first-chair trial to

23    verdict in your four years, correct?

24    A.    Correct.

1      Q.    What about any other civil trials to

2  verdict in your four years practicing law where

3  you may not have been the first-chair trial

4  lawyer, you may have been second or third chair?

5      A.    None.

6      Q.    You stated repeatedly in your early

7  testimony responding to Mr. Blonien's questions

8  that because in your estimation the statute of

9  limitations applicable to the Buccaneers fax that

10  Technology Training had received had expired that

11  Technology Training had, quote, no standing,

12  closed quote.

13          Do you recall that?

14      A.    Yes.

15      Q.    Is statute of limitations a condition

16  precedent to recovery under the TCPA, or is it an

17  affirmative defense that can be raised or waived

18  by the defendant, which?

19      A.    I don't know.

20      Q.    Do you know what difference that would

21  make in terms of whether the expiration of the

22  statute of limitations affects jurisdictional

23  standing?

24      A.    I'm aware that the case on point is

1    Ewing Industry v. Bob Wines.  Beyond that, I do

2    not know.

3         Q.    Well, did you participate -- were you

4    involved in Anderson Wanca's filings in front of

5    Judge Porcelli related to whether you would be

6    allowed to intervene, whether Anderson Wanca would

7    be allowed to intervene, for its named plaintiffs?

8         A.    Yes.

9         Q.    And so you would have read the briefings

10   that your firm filed, that Bock Law Firm filed?

11        A.    Yes.

12        Q.    And you would have read Judge Porcelli's

13   order of preliminary approval of class settlement

14   and denial of intervention.

15        A.    Yes.

16        Q.    So you would recall that Judge Porcelli

17   distinguished between federal statutes that

18   incorporate within themselves the statute of

19   limitations as a condition precedent to recovery

20   so that it can create a problem of standing if the

21   statute of limitations is expired versus a statute

22   of limitations borrowed from another federal

23   statute where it is an affirmative defense that

24   can be raised or waived and creates no standing

Page 210

1    issue.  You would recall Judge Porcelli addressed

2    that.

3         A.    I believe it was approximately a 50-page

4    opinion, and I do not recall that.

5         Q.    Let me ask you to -- if any of this

6    rings a bell.  I'm reading from Judge Porcelli's

7    March 31st, 2017, order at Star 7.  "Cin-Q

8    plaintiffs assert that plaintiffs lack standing in

9    this instance because plaintiffs' claims were

10   filed after the statute of limitations applicable

11   to the TCPA claims had run and that equitable

12   tolling is inapplicable.  That argument is

13   misplaced, however."

14              Do you recall that?

15        A.    No.

16        Q.    "Although Cin-Q plaintiffs as nonparties

17   to this action contend that the statute of

18   limitations constitutes a jurisdictional issue,

19   not subject to waiver, such argument misses the

20   mark.  Namely, the Federal Rules of Civil

21   Procedure, as well as numerous courts, indicate

22   that the statute of limitations is an affirmative

23   defense that a party may waive."

24              Does that ring a bell?

1      A.     No.

2      Q.     "Neither the text nor the context of

3   such time prescription located in a separate

4   catch-all statute indicates that the statute of

5   limitations operates as a jurisdictional bar to

6   suit."

7          Does that ring a bell?

8      A.     No.

9      Q.     "If a right created by a statute is in

10  one act and the limitations period is in another

11  act, then the limitations period is presumed not

12  to be an integral part of the right itself.  The

13  limitations period is said to be only a procedural

14  limit on the remedy and not a substantive limit on

15  the right."

16          Does that ring a bell?

17     A.     No.

18     Q.     And Judge Porcelli was quoting there.

19          He then says, "As such, the statute of

20  limitations related to TCPA claims does not act as

21  a jurisdictional bar to suit but is rather more

22  appropriately considered only a procedural limit

23  or an affirmative defense subject to waiver."

24          And he concluded at Star 10, "In sum,

Page 212

1    plaintiffs established Article 3 standing.  The

2    timeliness of plaintiffs' claims does not present

3    a jurisdictional bar to suit."

4              Do you recall that from his order?

5         A.   No.

6         Q.   As we sit here today, with your four

7    years of experience, is it your testimony that

8    everything I just read from Judge Porcelli's order

9    is legally wrong?

10             MS. LOEW:  Objection, calls for a legal

11   conclusion.

12        A.   I don't know.

13        Q.   You spent quite a bit of time in

14   answering Mr. Blonien's questions during the

15   morning session in which you gave your inferences

16   and opinions regarding conduct by Mr. Oppenheim

17   and Bock Law Firm and your assessment of the

18   strength of M & C's claims in the pending

19   litigation; do you recall that?

20        A.    I recall part of it.  I don't recall

21   much discussion about M & C's strengths.  The

22   other part I recall.

23        Q.    And just I -- I'm not a court reporter.

24   I can't just pull something up, and I wouldn't

1   send her on a mission to go back four hours.

2           But I've got it written down that you

3   said you believe M & C's claims in this action

4   are, quote, incredibly strong.

5       A.    Correct.

6       Q.    I just want to get an understanding of

7   what is at the heart of your assessment in that

8   regard.

9           Do you have a view that it is improper

10  or impermissible to file a competing class action?

11      A.    I have a view.

12      Q.    And what is your view?

13      A.    That the mere filing of a competing case

14  is not impermissible.

15      Q.    Do you have a view that the mere filing

16  of a competing case when the original or first

17  filed case remains pending automatically raises an

18  inference of a reverse auction?

19      A.    Not automatically.

20      Q.    If Bock Law Firm had never hired David

21  Oppenheim, but nevertheless, at the same time that

22  it did, it proceeded to file the Technology

23  Training class action, putative class action, and

24  then engage in the mediations and reach a

1   settlement with the Buccaneers on the exact same

2   terms that the proposed settlement contains, would

3   your view be either that that is or that that

4   creates a strong influence of a reverse auction?

5           MS. LOEW:  Objection, speculation.

6       A.    My view is that it would be a reverse

7   auction.

8       Q.    And why is that?

9       A.    On the basis of the mediation privilege,

10  I cannot answer.

11      Q.    If David Oppenheim had left Anderson

12  Wanca, opened up his own firm all by himself, got

13  himself a putative class representative, filed a

14  case, and negotiated a settlement, would that

15  involve conflict of interest and breach of

16  fiduciary duty?

17          MS. LOEW:  Objection to form.

18      A.    Yes.

19      Q.    And am I correct you expressed that view

20  because you perceive that having been at Anderson

21  Wanca, having had some assigned responsibility for

22  the Cin-Q case, including Medical & Chiropractic

23  as a named plaintiff, that he had extra duties

24  running to those named plaintiffs, including

Page 215

1   Medical & Chiropractic, and that it would be a

2   conflict of interest and a breach of fiduciary

3   duty to those named plaintiffs to leave Anderson &

4   Wanca, leave those plaintiffs in that case behind,

5   find a different or substitute or alternative

6   named plaintiff, and pursue and obtain a

7   settlement on behalf of the class?

8       A.   Yes.

9            Can you let me know when we have a good

10  minute to take a break?  I just want to run to the

11  bathroom.

12           MR. COHEN:  This is fine.

13           THE VIDEOGRAPHER:  Off the record.  The

14  time is 4:13.

15                     (Whereupon, a short break was

16                      taken.)

17           THE VIDEOGRAPHER:  We are back on the

18  record.  The time is 4:16.

19  BY MR. COHEN:

20      Q.   Will you agree that the duty of class

21  counsel or potential class counsel above all is to

22  the class members as a whole as opposed to any

23  particular named plaintiff?

24      A.   No.

Page 216

1      Q.    Would you agree that the duty owed to

2   class clients differs significantly from the duty

3   owed in an individual representation case?

4            THE WITNESS:  Can you repeat the

5   question?

6                      (Whereupon, record was read as

7                       requested.)

8      A.    No.

9      Q.    Would you agree that the duty that

10   Mr. Oppenheim -- strike that.

11            Would you agree that Mr. Oppenheim had a

12   fiduciary duty to the entire putative Buccaneers

13   class including named plaintiffs when he worked

14   for Anderson Wanca, but that duty was not

15   dependent on the special desire of the named

16   plaintiff or any individual plaintiffs?

17      A.    No, I do not agree.

18      Q.    As of May 2016, taking account of the

19   fact that the Buccaneers faxed broadcasts were in

20   2009 and 2010, correct?

21      A.    Correct.

22      Q.    Except to the extent that tolling could

23   apply to a new plaintiff or new plaintiff claim by

24   virtue of intervention in an existing timely case

1  or through waiver by the Buccaneers of a statute

2  of limitations defense, the statutes of

3  limitations for plaintiffs other absent class

4  members to bring a class action would be expired.

5      A.    Correct.

6      Q.    And just because that was a long

7  question, I don't want you to have said something

8  and look back and say that question got me

9  confused.

10          A class member who wants to be a class

11  representative in that situation could intervene

12  and might obtain the benefit of the tolling from

13  the existing action, correct?

14     A.    Correct.

15     Q.    Or as part of the settlement with the

16  Buccaneers on the class basis could obtain a

17  statute of limitations waiver.

18     A.    I don't believe so.

19     Q.    You don't believe it can happen?

20     A.    Not in the 11th Circuit.

21     Q.    So your view is outside of intervention

22  in the existing timely action, pretty much the

23  entire absent class, approximately 131,000 class

24  members, have no ability to pursue a claim for the

1    benefit of the class.

2         A.    Actions, plural, but yes.

3         Q.    Can you clarify because I don't even

4    know which time I used the word action that you're

5    making plural.

6         A.    At the beginning, you said intervene in

7    this action.  But there's Siprut's two cases too

8    which were filed within the statute of

9    limitations, so there are three cases filed within

10   the statute of limitations.  And I believe

11   intervention in any of the three would allow an

12   intervenor to seek to represent the class.

13        Q.    And Siprut's class -- putative class

14   actions remain pending?

15        A.    I believe so.

16        Q.    So you agree with what I said.  You just

17   clarified the plurality of the word actions.

18        A.    Correct, any of those three, not just

19   one.

20        Q.    Okay.  Is there any reason -- and I ask

21   you this as putative class counsel in the Cin-Q

22   case.  Is there any reason to believe that if the

23   Technology Training plaintiffs and their counsel

24   had come to your firm with the Technology Training

1    settlement signed and said, we want to now

2    intervene in the Cin-Q case and propose this

3    settlement to Judge Porcelli, that you would have

4    said, we think it's a terrible settlement and

5    we're going to oppose it, but we have no

6    opposition to your intervening.  Do you think

7    there's any chance of that?

8              MS. LOEW:  Objection to form.

9         A.    I don't -- I think we would have opposed

10   the intervention.

11        Q.    So what I'm getting at is:  In your

12   view, except for intervention in one or more

13   timely filed actions after the statute of

14   limitations has otherwise expired, it's your view

15   that any undertaking by any absent class member to

16   file a putative class action, reach a settlement

17   with the Buccaneers defendant, and then seek to

18   proceed and have that approved is, number one,

19   untimely under the statute of limitations and,

20   number two, a reverse auction because of the weak

21   position of those class members by reason of the

22   statute of limitations problem.

23        A.    No.

24        Q.    What did I get wrong?

Page 220

1      A.    Well, number two would be a specific

2   inquiry.

3            And as for number one, I'm referring to

4   my understanding of the 11th Circuit Court of

5   Appeals decision, which is binding in the 11th

6   Circuit, and Ewing Industries v. Bob Wines.

7      Q.    And I wasn't disagreeing for purposes of

8   that question.  I was accepting your

9   interpretation of that case --

10      A.    Okay.

11      Q.    -- that it's your view that except by

12   way of intervention in a timely filed action, no

13   absent class member has the ability to initiate a

14   new putative class action and reach a settlement

15   and benefit the class, correct?

16      A.    Correct.

17      Q.    And so in that situation, the wellbeing

18   and interests of the entire class of 131,000 class

19   members are left in the sole and exclusive control

20   of existing putative class counsel in the timely

21   filed claims?

22      A.    No.

23      Q.    How not?

24      A.    Intervention.

Page 221

1      Q.    Which you would oppose.

2      A.    Correct, but we're not the judge.

3            Can I clarify?  When I said we would

4    oppose, I was specifying to your hypothetical.  I

5    was not saying we would oppose all attempts to

6    intervene.

7      Q.    Would you agree that it would be

8    unethical, unprofessional, and a breach of

9    fiduciary duty for putative class counsel to hold

10   the class hostage by requiring an unnecessarily

11   large settlement fund that only serves to inflate

12   the attorneys' fees and is vastly more actual

13   money than necessary to pay any reasonably

14   anticipated claim rate?

15           MS. LOEW:  Objection to form.

16     A.    Can you explain what you mean by "hold

17   hostage?"

18     Q.    Kind of what we have just discussed that

19   under your view, nobody else is going to be able

20   to represent the class, so you have complete

21   control.

22     A.    Actually, you previously asked about

23   duties to the class representative as plaintiff.

24   And I said that there is a duty owed, and one of

1    those duties is to relay settlement offers.

2          If the defendant makes a settlement

3    offer, it is my position, and I believe this is

4    pretty clear, that counsel has to relay that

5    settlement offer to the class representative.  And

6    should the class representative accept, I believe

7    the counsel would be duty bound to allow them to

8    accept that offer.  Whether or not that's approved

9    by a court later on, I don't know.  But that goes

10   to your question about hold hostage.

11         If you are suggesting that a plaintiff's

12   counsel could withhold a settlement offer from

13   being heard by the class representative or

14   putative class representative, I would say no, a

15   class counsel could not do that.

16     Q.    What is the retainer agreement?  What

17   exhibit number is that?

18     A.    1.

19

20

21

22                     **REDACTED**

23

24





**REDACTED**



REDACTED

1      **REDACTED**

2      ethically present it at preliminary approval.

3              At that point, I assume the attorney

4      should withdraw, or I would recommend seeking

5      ethics counsel's input on what to do in that

6      situation.  I don't have knowledge of that

7      specific situation happening to me.

8      Q.    Or under your contract, you could just

9      throw the client overboard, correct?

10             MS. LOEW:  Objection to form.

11     A.    I don't know.

12     Q.    So let's take out the hyperbole that you

13     didn't like from my last question, the hostage

14     part.

15             You would agree that it would be

16     unethical and unprofessional and a breach of

17     fiduciary duty for putative class counsel in

18     negotiating with the putative class defendant to

19     insist upon an unnecessarily large settlement fund

20     far beyond that which could possibly be exhausted

21     based upon any reasonable projected claim rate

22     when that extraordinarily large fund only would

23     serve to inflate the attorneys' fees utilizing a

24     25 percent or so contingent fee model; you would

1   agree that would be unethical, unprofessional, and

2   a breach of fiduciary duty.

3            MS. LOEW:  Objection to form.

4            THE WITNESS:  Can you repeat the

5   question back?

6                      (Whereupon, record was read as

7                       requested.)

8       A.    I don't know what a reasonable claims

9   rate would be.  If you would add that to your

10  hypothetical, I think I might be able to answer.

11      Q.    What are the information or experience

12  sources from which an experienced TCPA class

13  action law firm such as Anderson & Wanca can

14  develop a sufficient information base or anecdotal

15  evidence in order to project likely claim rates in

16  a given settlement?

17      A.    I'm aware that a certain claims

18  administrator known as KCC, who I believe TTA has

19  contemplated using in their class action,

20  publishes such a list.

21      Q.    What kind of list?  What are you talking

22  about?

23      A.    A list of claims rates for TCPA cases.

24      Q.    And are you aware of what those claim

1   rates range between in TCPA class action

2   settlements?

3       A.    Yes, or I'm aware of what KCC's list

4   ranges between.

5       Q.    And what does it range between?

6       A.    About half a percent and around

7   35 percent.

8       Q.    So the half percent is the lowest they

9   have encountered, and 35 percent is the highest

10  they have encountered?

11      A.    That they published.

12      Q.    That they published.

13           And I always get this wrong.  I've never

14  fully understood -- and even every time I ever do

15  figure it out, it only sticks in my head for about

16  half a day -- the difference between mean and

17  median.

18           But one of them is where the actual

19  majority collects at a point the majority of

20  events that -- or information triggers that form

21  the aggregation.  What is in KCC's list the actual

22  majority range?

23      A.    Not to build the suspense, I do not

24  know.  And I can tell you having looked at the

1   list, they did not say.

2           I do know, you know, math; and you could

3   add it up and divide or however to figure out the

4   mean and median.  I did not.

5       Q.    What's the highest claim rate that

6   you've seen on any Anderson & Wanca TCPA class

7   settlement?

8       A.    30 percent.

9       Q.    Which case was that?

10      A.    I believe it was called Nack v.

11  LexisNexis.

12      Q.    Is that K-n-a-c-k?

13      A.    No.  It's N-a-c-k, I believe.

14      Q.    What is the average range or the average

15  or the average range for the claim rates on

16  Anderson & Wanca TCPA class settlements that you

17  have seen?

18      A.    It varies greatly depending on a number

19  of factors.  Sometimes we try to predict them,

20  never with a lot of success.

21      Q.    Do you view them as relevant enough to

22  the settlement negotiation with an opposing

23  defendant class counsel to incorporate projections

24  for a low and a high into your term sheets?

1    A.    No.  However, we have in the past

2    circulated KCC's publication, which is how I'm

3    aware of it.

4    Q.    Isn't it true that in the negotiations

5    with the Buccaneers, on your internal analysis of

6    trying to figure out what you wanted, how much,

7    and what the likely claim rate would be against a

8    given fund that you were using five percent claim

9    rate as a low and ten percent claim rate as the

10   high?

11   A.    I don't recall.

12   Q.    In the Buccaneers class action, with a

13   reasonably good robust notice plan on a

14   settlement, what would you anticipate to be the

15   range of likely claim rates?

16   A.    Up to 30 percent.

17   Q.    So the highest you've ever seen is the

18   top of the range that you would predict?

19   A.    KCC had some that were up to 35.  But,

20   yes, to be safe, I would predict a range of 0 to

21   30.

22   Q.    Are you aware of any internal

23   communications at Anderson & Wanca or between

24   Anderson & Wanca and its co-counsel in the Cin-Q

1   case in developing your internal position as to

2   settlement where anything over ten percent was

3   ever mentioned as the high end of a claim rate

4   range?

5        A.    I don't recall.

6        Q.    Little bit of a segue way, Mr. Blonien

7   had some questions for you earlier.  I -- because

8   my focus isn't going to be on exactly what he was

9   focused on, but I want to get to what you were

10  saying, and I want to explore what you meant by

11  that.

12           I think he was asking you about

13  communications you had, and you kept saying, do

14  you mean specific to this case and not overlapping

15  with the Cin-Q case; do you recall that?

16       A.    Generally, yes.

17       Q.    And it was because you were invoking

18  privilege in one situation, which you might not

19  invoke in the other.  And what you said, you --

20  you said something to the effect, there is an

21  interrelatedness between this action, the M & C

22  versus Oppenheim and Bock action, and the Cin-Q

23  action.

24       A.    I believe I was referring to my role as

1    being overlapping.

2         Q.    Fair enough.

3              And I'm not seeking communications --

4    I'm not seeking any communications, privileged or

5    not.  How do you see your role as being,

6    quote-unquote, overlapping between this M & C

7    litigation and the Cin-Q putative class action?

8         A.    I suppose there are a number of ways.

9    The first one that comes to mind is testimony

10   provided by Mr. Bock and Mr. Oppenheim in the two

11   matters in front of the two judges are related.

12        Q.    Okay.  You said in a number of ways.

13   That's number one.

14        A.    Yeah.  In addition to that, Medical &

15   Chiro's appeal in the TTA action was related to

16   both the alleged breach of fiduciary duty, as well

17   as the allegations about reverse auction and

18   everything else that was attached to the motion to

19   intervene, and also relates to the breach of

20   fiduciary duty action.

21              In addition to that, I am basically the

22   contact person for Medical & Chiro.

23        Q.    Even in M & C's communications to and

24   from Foley?

1      A.    Not specifically those communications.

2   But in terms of gathering of documents and things

3   of that nature, I was the point person on that.

4      Q.    Gathering of documents and information

5   for purposes -- for purposes of M & C's compliance

6   with discovery obligations in the M & C action?

7      A.    Correct.

8      Q.    Do you see any other overlapping aspect?

9      A.    Not right this second, no.

10     Q.    You indicated you are aware that

11  Anderson & Wanca has agreed to pay all of Foley's

12  attorneys' fees and litigation expenses incurred

13  in the prosecution of this M & C action.

14     A.    Yes.

15     Q.    And the question came up by Mr. Blonien,

16  who is paying your attorney representing you

17  today.

18         And I think two or three times, you said

19  something about the judge will decide that.

20         You're not under the impression that

21  Foley is working on a contingent basis.

22     A.    That is correct.

23     Q.    Okay.  And you are not under the

24  impression that Foley is waiting to be paid until

1    a judge decides whether M & C wins and, if so,

2    whether M & C gets attorneys' fees.

3         A.    That is correct.

4         Q.    So I don't know what Mr. Blonien meant

5    by his question.  I'll be more clear.

6              I'm not asking who you think will

7    ultimately in the end be out of pocket to the tune

8    of Foley's attorneys' fees.  As you understand it,

9    who is paying Foley now to be sitting in here as

10   your attorney for this deposition?

11        A.    Anderson Wanca.

12        Q.    We have had a copy of the contract, the

13   Foley, Anderson Wanca, M & C retention or

14   engagement letter produced to us heavily redacted.

15   Have you seen the heavily redacted version?

16        A.    Yes.

17        Q.    Have you seen an unredacted version?

18        A.    I don't recall seeing one.

19        Q.    So I'm assuming the Foley engagement

20   letter was redacted for purposes of production to

21   us in the M & C case.

22              If you never saw an unredacted version,

23   and the only one you ever saw is the redacted

24   version, is it fair to say you never saw any

1    version of the Foley engagement letter until it

2    was produced to us in this action?

3         A.    I don't recall seeing it other than the

4    redacted one.

5         Q.    Okay.  Did you know before you had the

6    opportunity to see that redacted Foley engagement

7    letter that Anderson & Wanca had agreed to be

8    responsible for and pay all of Foley's attorneys'

9    fees and expenses?  Did you know that before you

10   saw the redacted engagement letter?

11        A.    Yes.

12        Q.    Did you know that at the time that

13   Anderson & Wanca entered into the engagement

14   letter?

15        A.    Yes.

16        Q.    And to the extent that Anderson & Wanca

17   has -- and since I don't get to see the unredacted

18   letter, I don't know.

19             But in the event and to the extent that

20   Anderson & Wanca has any roles, responsibilities,

21   duties, or obligations under that engagement

22   letter with Foley, other than Brian Wanca paying

23   the fees and expenses, am I correct you have been

24   part of the Anderson Wanca group that has

Page 236

 1   participated in fulfilling Anderson & Wanca's
 2   responsibility and role?
 3            MS. LOEW:  Objection to form.
 4       A.    If there are any, it would be me.
 5       Q.    You said something, it was this
 6   afternoon, but it was in response to one of
 7   Mr. Blonien's questions.  You said something about
 8   the preliminary approval class certification in
 9   the Technology Training case.  And you said,
10   quote, initially, closed quote, class
11   certification was granted in the Technology
12   Training case.
13       A.    I recall stating that I was aware the
14   preliminary approval had been granted.  I don't
15   recall using the word initially.
16       Q.    All right.  You understand that for
17   purposes -- I'm really having trouble with that
18   word today.
19            MR. BLONIEN:  Purposeseses.
20            MR. COHEN:  Probably a late oncoming
21   lisp.
22   BY MR. COHEN:
23       Q.    You are aware that for purposes of
24   Technology Training's motion for preliminary

1    approval of class settlement, Judge Porcelli

2    certified the class.

3         A.    I -- yes.

4         Q.    Okay.  And maybe I misheard you, maybe I

5    didn't, when I wrote down initially.

6              You're not operating under some

7    understanding that the order of class

8    certification in the preliminary approval order

9    has been vacated.

10        A.    Not yet.

11        Q.    20 percent claims rate.

12        A.    Was that a question?

13        Q.    Would you agree that it would be

14   unethical and unprofessional and a breach of

15   fiduciary duty for putative class counsel in a

16   putative class action in negotiating with the

17   opposing party to require an unnecessarily large

18   fund as a settlement fund one which far exceeds a

19   reasonable claim rate such as 5 percent, 10

20   percent, even up to 20 percent claim rate, far

21   exceeds that, and the only benefit therefor that

22   it could possibly serve the class -- well, the

23   only benefit it could possibly serve is class

24   counsel by creating a larger fund and thereby

1   larger attorneys' fees under a contingent fee?

2          MS. LOEW:   Objection to form.

3      A.    I'd like to make sure that I understand

4   the question --

5      Q.    Sure.

6      A.    -- before answering the question.

7            You're saying, if hypothetically a

8   defendant were to offer a class-wide settlement

9   that was at 20 percent the claims -- 20 percent

10   would be an expected claims rate, so the top-line

11   number would be based on that, would it be

12   unreasonable to refuse that offer; is that your

13   question?

14      Q.    No.

15      A.    Okay.   Then please let me know what your

16   question is.

17      Q.    A settlement fund that after deduction

18   for attorneys' fees and litigation expenses is

19   sufficient to pay at full value under the terms of

20   the settlement, in other words, whatever the

21   settlement provided as the per claiming class

22   member or per fax compensation, after deduction

23   for attorneys' fees and litigation expenses, the

24   residual fund is enough to cover up to 20 percent

1    full value on claiming class members, you would

2    agree that insisting upon a settlement fund far

3    larger than that serves no purpose or benefit to

4    the class and only increases the fund in order to

5    generate larger attorneys' fees.

6           MS. LOEW:  Objection to form.

7      A.    I still do not understand the question.

8    Are you saying in this hypothetical -- or what are

9    you saying would be the claim -- I'm sorry.  Let

10   me start over.

11          I understand you're saying the claims

12   rate would be 20 percent.

13     Q.    No.  I didn't say it would be

14   20 percent.

15     A.    Okay.

16     Q.    I'm speaking to what the fund is

17   sufficient to cover.

18     A.    Okay.  So a fund that is sufficient to

19   cover 20 percent, what would the dollar amount

20   that the claimants get?

21     Q.    We'll talk about -- that's a separate

22   issue.  The issue of whether the per claimant or

23   per fax compensation is sufficient is separate and

24   distinct from whether the fund is sufficient to

1    cover the provisions of compensation under the

2    settlement.

3           I'm asking you --

4    A.    If I assume that everybody is getting

5    the maximum recovery --

6    Q.    Mm-hmm.

7    A.    -- then under that assumption, in most

8    circumstances or -- I don't want to say most

9    circumstances.  Hold on.

10          I would have to know more to say whether

11   or not it was unreasonable.

12   Q.    What do you need to know more?

13   A.    What are the people getting?  What are

14   the claimants getting?

15   Q.    What do you want them to get?

16   A.    Maximum relief.

17   Q.    Are you saying 500 or 1,500?

18   A.    1,500.

19   Q.    Yeah.  How many times have you gotten

20   that?

21   A.    Not many.

22   Q.    Yeah.  How many?

23   A.    I don't know the specific number.

24   Q.    Give me one.  Give me one class

Page 241

1  settlement where you got --

2      A.    I believe the case is G.M. Sign v. MFG.

3  It might instead be G.M. Sign v. 400 Freight.  I

4  get the two cases confused.

5      Q.    These were class settlements, one or the

6  other --

7      A.    No.  We won.  They were judgments.

8      Q.    Ah.  I'm sorry.  You -- and I guess you

9  won on summary judgment?

10     A.    That is correct.

11     Q.    Okay.  And you're saying in one of those

12 two cases, the judge trebled the statutory

13 damages.

14     A.    That is also correct.

15     Q.    I -- and I -- I appreciate that.  But it

16 ends up, sometimes this happens, we -- there's a

17 segue way away from the focus.

18         I'm talking about settlements.

19     A.    Okay.

20     Q.    You tell me a TCPA class action

21 settlement that Anderson Wanca has been a part of

22 where the settlement terms involved $1,500 trebled

23 per fax.

24     A.    Off the top of my head, I cannot think

1  of one.

2      Q.    Can you think of one you've ever read

3  about anywhere in the country where a TCPA class

4  action settlement provided for 1,500 treble

5  damages per fax?

6      A.    I don't recall.

7      Q.    So let's say for purposes of trying to

8  fill in the compensation gap you think is

9  important, let's say that it would be $500 --

10     A.    Okay.

11     Q.    -- per fax.

12     A.    Okay.

13     Q.    Okay.  A settlement, a class settlement

14  in a TCPA context at $500 per fax with no

15  reduction pro rata unless the fund is exhausted,

16  and the fund after deduction for attorneys' fees

17  and litigation expenses is sufficient to cover up

18  to approximately a 20 percent claim rate before

19  any pro rata reduction is necessary, in general,

20  in your experience, is that a sufficient fund for

21  a reasonable settlement?

22          MS. LOEW:  Objection to form.

23     A.    It could be.

24     Q.    Okay.  Is there any reason you can think

1    of why a plaintiff's counsel representing that

2    putative class could justify seeking more than

3    four times that size fund and refuse to go below

4    it except his own self interest to generate larger

5    fees off a larger fund?

6         A.    Yes.

7         Q.    Do share.

8         A.    The claims process, the notice process,

9    those are the only two reasons I can think of at

10   this time.

11        Q.    And I didn't know what you meant at

12   first.  I was going to ask you to explain what you

13   meant.  But I -- I think I got it.

14              You mean what we talked about so far

15   could be right and reasonable and it would be hard

16   for class counsel to justify why there's standing

17   on a fund that's more than four times that, except

18   to line their own pockets, unless the reason

19   relates to continuing disagreement between the

20   parties over a reasonable claims process or

21   continuing disagreement between the parties over a

22   reasonable notice process?

23        A.    That is correct.

24        Q.    And actually that segue ways to your

1    discussion with Mr. Blonien about reverse auction

2    and what it is proven by or demonstrated by.

3         A.    Yes.

4         Q.    And my notes aren't good.  But I've got

5    something that seems to say a reverse auction can

6    also be shown through, and I think some of this is

7    my language, a dissuading or unduly burdensome

8    claim form.

9         A.    That is my understanding is one of the

10   ways.

11        Q.    Okay.  Are you familiar with the

12   proposed settlement and the proposed claim form in

13   the Technology Training case?

14        A.    Generally, I am.

15        Q.    Okay.  Based upon your general

16   familiarity with it, do you have a view as to

17   whether that claim form suffers from this reverse

18   auction concern of being excessively dissuading or

19   unduly burdensome?

20        A.    Yes.

21        Q.    And what is your assessment or opinion

22   and why?

23        A.    Is there any chance you'll let me look

24   at it and show it to you or just from memory?

1        Q.    If I have it, I'd probably be happy to

2    do it.

3        A.    I would appreciate it if that's

4    something --

5              MR. OPPENHEIM:  Got it electronically if

6    you want to let them print it.

7              THE WITNESS:  We can email iprice -- or

8    if she's still here.

9              MS. LOEW:  Yeah.

10              MR. COHEN:  How about this:  We'll segue

11    way to something else.  When Barry comes back

12    because he's got that ability to like yank out

13    some specific pages from a PDF, I don't do that,

14    and then maybe he can email it to you?

15              MS. LOEW:  (Nodding head.)

16              THE WITNESS:  Thank you.

17    BY MR. COHEN:

18        Q.    You testified earlier in response to

19    some of Mr. Blonien's questions that you were the

20    person at Anderson & Wanca that performed the

21    search of Anderson & Wanca's files, its electronic

22    data, its servers to locate documents that M & C

23    was ordered to produce in this action, correct?

24        A.    Yes.

1      Q.    And as I understood, what you've located

2    that you deemed responsive, you provided to Foley.

3      A.    Everything I located, I provided to

4    Foley.

5      Q.    Okay.  But when you say everything, it's

6    everything you searched for, correct?

7      A.    Correct.

8      Q.    What did you search for?

9      A.    Whatever -- or I recall some of the

10   things I searched for were all emails to and from

11   David Oppenheim regarding Buccaneers, Cin-Q,

12   Medical & Chiro, Mester, Anderson.

13         I also recall producing to them all

14   communications between Oppenheim and Phil Bock, to

15   and from, I don't recall the time period for that,

16   and anything else they would have requested.

17     Q.    Are you aware of Judge McKown's

18   (phonetic) discovery order where he found some

19   at-issue waivers of privilege or work-product

20   protection, he found others still intact, and he

21   ordered M & C's supplementation consistent with

22   his ruling?

23     A.    I'm aware of it.  I've never read it.

24     Q.    Even as of today?

1      A.    No.

2      Q.    Okay.  And what I'm wondering is:  Did

3   somebody tell you what the scope of the ruling was

4   so that you could utilize it in doing your search

5   of Anderson & Wanca's data, or was your search so

6   broad, it would cover anything and everything,

7   even if it's privileged under Judge McKown's

8   order, you're still giving the universe of

9   everything to Foley, and you're letting them make

10  the decisions?

11     A.    It's the second.

12     Q.    Suppose Bock Law Firm never filed a

13  competing case, never settled it.  The Cin-Q

14  action proceeded on class certification hearing.

15     A.    Okay.

16     Q.    Class certification was denied.

17     A.    Okay.

18     Q.    And the 11th Circuit on a PLA either

19  denied the PLA or accepted the PLA and then upheld

20  the denial of class certification.

21     A.    Mm-hmm.

22     Q.    Would that outcome serve the best

23  interest of the class?

24          MS. LOEW:  Objection to form.

1      A.      I would -- it's not over yet, so I

2  wouldn't know how to answer that question.

3      Q.      In the scenario I just described, it's

4  over, right?

5      A.      No.

6      Q.      What's left?

7      A.      Summary judgment, and then an appeal of

8  the entirety.

9      Q.      Unless they took the PLA and upheld the

10  verdict because that would be law of the case.

11  And by verdict, I mean the noncertification.

12      A.      It would be law of the case.  We could

13  still appeal the final judgment at the end.

14      Q.      Okay.  How far do we have to take it

15  with the class getting nothing before you would

16  agree that's not a good outcome for the class?

17          MS. LOEW:  Objection to form.

18      A.      The class getting nothing would be a bad

19  outcome for the class.

20      Q.      You agree that's possible?

21      A.      Anything is possible, yes.

22      Q.      But -- strike that.

23          Do you know why the Buccaneers waived

24  the statute of limitations in the Technology

1   Training case?

2       A.    They could not have had a settlement

3   even allegedly without one.

4       Q.    Well, no.  We've already talked about

5   the fact that intervention would have been an

6   option in the existing Cin-Q case, right?

7       A.    Intervention, I suppose, would have been

8   an option; but there's no guarantee that they

9   would have been able to intervene.

10      Q.    True.  And that just circles back to my

11  original question.  And it's kind of one of those

12  where you can't have personal knowledge.

13          But I just want to ask:  Do you have

14  personal knowledge as to why the Buccaneers agreed

15  to waive statute of limitations as part of the

16  Technology Training settlement?

17      A.    I do not have personal knowledge.

18      Q.    When did Anderson & Wanca -- strike

19  that.

20          You worked for Anderson & Wanca before

21  you became an attorney, correct?

22      A.    Yes.

23      Q.    How long -- when did you start with

24  Anderson & Wanca, even in an early nonattorney

1  role?

2      A.    I believe September of 2005, give or

3  take one month.

4      Q.    Okay.  As of September 2005 when you

5  started, give or take a month, did you become

6  aware shortly after joining the firm that Phil

7  Bock and Brian Wanca were working TCPA class

8  actions together?

9      A.    Not -- approximately one year.

10     Q.    Later?

11     A.    Yes.

12     Q.    Okay.  And when you say approximately

13  one year later, which would put us fall of 2006, I

14  don't know if you're saying that's when they

15  started doing it or that's when you became aware

16  of it.

17     A.    I can be a little bit more specific.  It

18  was September -- or not September.  It was summer

19  of 2006 that I became aware of it.

20     Q.    And just to clarify, when you became

21  aware of it, did you become aware that it had

22  actually been going on previously, you just then

23  became aware, or was it something that is you

24  understand it actually started right then around

1  summer 2006?

2      A.    I was aware that it had been going --

3  going on for some period of time, but it seemed

4  incredibly short to me.

5      Q.    And were you aware that for some number

6  of years thereafter, Phil Bock's firm and Brian

7  Wanca's firm co-counseled on pretty much all of

8  their TCPA class actions?

9      A.    I was not aware of which cases --

10  actually, I was not aware of which cases the --

11  Mr. Bock's firm was on.  My role had nothing to do

12  with the cases themselves at that time.

13      Q.    What was your role?

14      A.    Researching prior to filing cases.

15      Q.    Okay.  At what point would your

16  involvement have grown, developed, shifted,

17  whatever so that you became more aware of the

18  interrelated or interrelationship and co-counsel

19  relationship between Bock Law Firm and Wanca?

20      A.    I think that would probably be sometime

21  around 2008.

22      Q.    Okay.  And I'm not focusing on any

23  specific day.  I'm not focusing on any specific

24  event that was a revelation to you.

1          I'm just talking about this general time

2    period around 2008 when you by virtue of changing

3    situation, you become more aware of things, at

4    that point in time, did you become aware that, in

5    general, Bock and Wanca were co-counseling on all

6    of their TCPA class actions?

7          A.    No.

8          Q.    What did I say that is inaccurate?  And

9    I understand the no, but in what way was your

10   awareness a no?

11         A.    In approximately 2008, I became involved

12   in researching a large group of cases that was to

13   be filed jointly between Anderson Wanca and Bock

14   Hatch.  And those cases were so numerous, I feel

15   that it answers your question.

16         Q.    Were those the B2B cases?

17         A.    Correct.

18               THE REPORTER:  The what?

19               MR. COHEN:  B2B, capital B, number 2,

20   capital B.

21   BY MR. COHEN:

22         Q.    Was it your understanding that the Bock

23   and Wanca co-counsel arrangement or understanding

24   was limited to the B2B cases?

1      A.    I didn't know the limits.  But as I just

2   said, I knew that for those cases, a hundred

3   percent of them were to be Bock Hatch and Anderson

4   Wanca.

5      Q.    As of 2008, as you became aware of those

6   B2B cases, were you aware of other TCPA class

7   actions that Wanca was working without Bock?

8      A.    I don't know.

9      Q.    What about 2009 and 2010, are you aware

10   of any TCPA class actions that Wanca was working

11   without Bock?

12      A.    I don't know.

13      Q.    2011?

14      A.    I don't know.

15      Q.    When is the first time you became aware

16   that you can recall as you sit here today that

17   Wanca was filing TCPA putative class actions

18   without Bock?

19      A.    I have no knowledge as to that.  Again,

20   before I was an attorney, that wasn't my role.

21      Q.    Has Brian Wanca ever explained to you or

22   shared with you the nature of his arrangement or

23   agreement with Phil Bock relating to co-counseling

24   on TCPA cases, when it started, when it ended, if

1    it ended, to which cases it did and didn't apply?

2        A.    I specifically recall being told

3    relative to the B2B cases that every single one of

4    them would be filed jointly, and I was

5    specifically involved with the research and

6    preparation for that.

7             As to a broader agreement, I do not

8    recall any such discussion with Brian Wanca or

9    anybody else about such agreement to the extent it

10   exists.

11       Q.    And I want to make sure I understand

12   what you're saying.  To your recollection, other

13   than Brian Wanca specifically communicating to you

14   that all the B2B cases would be jointly

15   prosecuted, he never said or communicated in any

16   way, shape, or form to you anything at all one way

17   or another relating to which cases the two firms

18   would work together, which ones they wouldn't, and

19   why?

20       A.    Not -- there was no discussion about a

21   broad agreement.  I do recall a couple specific

22   discussions about specific cases that Bock

23   Hatch -- or let me say Bock's firm and Anderson

24   Wanca worked on together.

1    Q.    You keep answering -- that's the second

2    time you've answered my question by saying

3    something to the effect there was no broad

4    agreement.  My question doesn't ask whether there

5    was a broad agreement.

6         My question seeks any information or

7    understanding you've ever received at any time in

8    any way from Brian Wanca in any way relating to

9    anything about which cases the two firms worked

10   together, which ones they don't, why, why not.

11   A.    The only discussions I had with Brian

12   Wanca were case specific.  There are at least some

13   cases where Brian Wanca expressly told me, "Phil

14   Bock and his firm were involved on this case."

15   Q.    Were there cases that Brian Wanca

16   specifically told you, Phil Bock and his firm are

17   not on this case?

18   A.    I recall being told at some point after

19   2010 of the way to tell the difference between

20   cases that were shared with Bock Hatch and cases

21   that were not.  I do not believe that information

22   came from Brian Wanca.

23   Q.    From whom did it come?

24   A.    I believe it came from Tina Natally.

1      Q.    And what was the way to tell the case

2   that was shared versus the case that were not?

3      A.    In the filing system, if it had a pound

4   sign, that is, the number sign, at the beginning

5   of the case name, it was not shared.

6      Q.    Did anyone at Anderson & Wanca ever

7   explain to you why the not shared cases were not

8   shared?

9      A.    No.

10      Q.    You've never asked Brian Wanca ever as

11   to any one case ever that was not shared why Bock

12   wasn't included.

13      A.    I have actually asked that specific

14   question, and I recall one case.

15      Q.    And what case?

16      A.    Sandusky v. Wagner Wellness.

17      Q.    And what was the answer?

18      A.    The answer was, "We filed it with

19   another co-counsel."

20      Q.    Whose client was Sandusky, yours or the

21   co-counsel?

22      A.    The co-counsel.

23      Q.    You're aware in the past of co-counsel

24   bringing the potential named plaintiff to Anderson

1    & Wanca and Anderson & Wanca including Bock in the

2    case.

3        A.    I am aware of at least one situation

4    where that happened, yes.

5        Q.    So why was that not done, for example,

6    in Sandusky versus Wagner Wellness?

7        A.    That was not part of the discussion.

8        Q.    Outside of the one time you asked Brian

9    Wanca about Sandusky versus Wagner Wellness and

10   him telling you what he told you, you have never

11   at any other time asked, nor have you from Wanca

12   or anyone else ever received, any information in

13   any way relating to why Wanca has not been

14   including Bock in TCPA class actions as co-counsel

15   in the last few years.

16       A.    As I sit here today, I do not recall any

17   discussion with Mr. Wanca or Mr. -- or with

18   Mr. Wanca or anybody else regarding prospective

19   cases and Mr. Bock's not being involved in them.

20       Q.    Have you ever asked Brian Wanca why Phil

21   Bock wasn't included in the Buccaneers litigation?

22       A.    No.

23             Actually, I'm sorry, can you restate --

24   can you repeat the question?

1                    (Whereupon, record was read as

2                     requested.)

3            MR. COHEN:  I'm not sure that's

4    accurate.

5            THE REPORTER:  Can you restate it?

6            MR. COHEN:  Sure.

7        A.   Can you restate the question?  I want to

8    make sure I got that one right, and I might have

9    gotten it wrong.

10       Q.   Have you ever asked or have you ever

11   received information from Wanca or anyone else

12   about why Phil Bock was not included in the

13   Buccaneers class action?

14       A.   I apologize.  That was your last

15   question.  The answer to that question is yes.

16       Q.   And what were you told?

17       A.   Mike Addison told me he only asked Brian

18   to join the case.

19       Q.   Did you ever ask Brian why he didn't

20   insist that Phil be included?

21       A.   No.

22            MR. COHEN:  Can we take a break?

23            MS. LOEW:  Mm-hmm.

24            THE VIDEOGRAPHER:  Off the record.  The

Page 259

1    time is 5:21.

2                          (Whereupon, a short break was

3                          taken.)

4                          (Whereupon Deposition Exhibit

5                          No. 7 was marked for

6                          identification by the court

7                          reporter.)

8          THE VIDEOGRAPHER:  We are back on the

9    record.  The time is 5:31.

10   BY MR. COHEN:

11      Q.    So we took a break.  We're back.

12            One of the things we did was with the

13   assistance of Ms. Loew, we got some copies of the

14   proposed claim form for the Technology Training

15   settlement.  We've marked that as Exhibit 7.

16            It's my understanding you have that in

17   front of you, correct?

18      A.    Correct.

19      Q.    We had chatted about this and then segue

20   wayed away because we didn't have a printed copy

21   of it, and you had asked if it would be okay for

22   us to get you one.

23            And what we were talking about at the

24   time was your previous testimony that in your

1    view, a reverse auction can be shown not only

2    through insufficient compensation and insufficient

3    fund but also through an excessively dissuading or

4    unduly burdensome claim form that could impede

5    otherwise reasonable claim rates, correct?

6         A.    I also said notice, but yes.

7         Q.    Right.  I didn't mean to exclude that.

8    I was just trying to get us to this claim form.

9         A.    Then yes, correct.

10        Q.    So we have the claim form that's been

11   proposed.  Do you take the position that there is

12   anything about this claim form that is excessively

13   dissuading or unduly burdensome within the context

14   that we were discussing?

15        A.    Yes.

16        Q.    And please share.

17        A.    The penalty of perjury statement, I

18   don't believe it to be necessary; and it seems

19   confusing.

20             And in Section 1, the statement, "If you

21   believe you received more than one fax to the

22   number, parenthesis, S, closed parenthesis, listed

23   above, you may indicate how many you believe you

24   received at each number in parenthesis next to

1    each number."

2              And, again, that's just my quick review

3    of the document sitting here right now.

4         Q.    All right.  Well, let's get to the

5    penalty of perjury part last.  Okay?

6         A.    Okay.

7         Q.    And where is the thing you said, "If you

8    believe you received more than one?"

9         A.    (Indicating.)

10        Q.    Okay.  So let's just start with Number

11   1, fax number with a parenthetical S for plural.

12   And it seeks a ten-digit number, correct?

13        A.    Yes.

14        Q.    Presumably an area code and the -- I'll

15   bet there's a specific term for the --

16        A.    Prefix.

17        Q.    The area code is the prefix, right?  Oh

18   the prefix is the rest.

19             MR. OPPENHEIM:  The middle three

20   numbers.

21   BY MR. COHEN:

22        Q.    Okay.  So it goes area code and then

23   prefix and then the last four?

24        A.    Correct.

1      Q.     Is there a funky term for the last four

2   too?

3      A.     There probably is.

4             MR. BLONIEN:  Suffix.

5             MR. COHEN:  It could be.

6   BY MR. COHEN:

7      Q.     Anything unacceptable, unduly burdensome

8   about expecting a claiming class member to

9   identify their fax number?

10     A.     No.

11     Q.     Okay.  So then below that, it says,

12  "List all numbers on which you may have received

13  faxes sent by or on behalf of BLP.  Attach an

14  additional sheet if necessary."

15            So would you agree that what it's saying

16  is:  Fill in the fax number in the blanks on

17  question Number 1, but if you had maybe more than

18  one fax number that meets that description, attach

19  another page, and list any other fax numbers.

20  That's what it's asking them to do.

21     A.     I understand that.

22     Q.     Okay.  Anything unacceptable, unduly

23  burdensome about saying if there may be other

24  numbers on which you may have received faxes sent

Page 263

1    by or on behalf of BLP, attach another page, and

2    list those numbers?

3         A.    I -- as I sit here today, no.

4         Q.    Okay.  It says, "The settlement

5    administrator will verify that the fax number,

6    paren, S, appears in the existing records related

7    to the case before approving your claim."

8              Anything inappropriate about a term

9    provision of the claim form, a provision of the

10   settlement administration where the claims

11   administrator or settlement administrator will

12   compare a claimant's identified fax number to the

13   transmission log records to make sure that it's a

14   valid claim?

15        A.    As I sit here right now, no.

16        Q.    "If you believe you received more than

17   one fax to the number, apostrophe, S, listed

18   above -- not apostrophe, S -- paren, S, listed

19   above, you may indicate how many you believe you

20   received at each numbers in parenthesis next to

21   each number."

22             Now, in this case, there are

23   transmission logs for the Buccaneers' broadcast,

24   correct?

1      A.     Yes.

2      Q.     For all of them, right?

3      A.     I think that misstates the discovery I

4  did in this case.

5      Q.     How so?

6      A.     For the records that related to

7  Slingshot, we have transmission logs.

8          For the records related to -- for the

9  records related to 127 High Street, we have the

10 target lists, and then we have the exception

11 reports.  So you have the complete list that was

12 attempted, and then you have the list that failed.

13 So if you subtract one from the other, what you're

14 left with are the ones that were successful.

15         But technically, to the technical term

16 of transmission logs, the answer would still be

17 no.

18     Q.     Fair enough.

19         For the Slingshot, you've got true

20 transmission logs.  For the 127 High Street,

21 you've got the effective equivalent, as long as

22 you do the deduction and subtraction correctly.

23     A.     Correct.

24     Q.     Okay.  So there is a viable means in a

1    settlement of the Buccaneers class action to

2    compare any claiming class member who identifies

3    one or more fax numbers on their claim form to the

4    transmission logs and/or target lists minus

5    exception report and confirm or refute whether

6    their fax number is in the class.

7         A.    Correct.

8         Q.    And if I understand correctly, as to

9    both the Slingshot and the 127 High Street, it

10   will indicate whether that fax number received

11   only one fax transmission or more and if more, how

12   many more.

13        A.    That is also correct.

14        Q.    So although Section 1 provides if you

15   believe you received more than one fax to the

16   numbers listed above, you can indicate how many

17   you believe you received at each number, the

18   objective data is going to allow a settlement

19   administrator to confirm and know how many fax

20   transmissions of Bucs advertising faxes any

21   claiming class member received.

22        A.    Correct.

23        Q.    Section 2, "You must provide your

24   contact information, name, company, address, city,

1    state, zip code."

2            All of that reasonable?

3        A.    As I sit here today, yes.

4        Q.    Number 3, "Requested information if the

5    settlement administrator needs to contact you:

6    Daytime phone number and email address."

7            Reasonable?

8        A.    I don't know why it's necessary, but

9    okay.

10       Q.    Would you as we sit here today express

11   the position that it is unduly burdensome and

12   excessively dissuading to a potentially claiming

13   class member to provide that information?

14       A.    No.

15       Q.    Number 4 says, "You must verify

16   ownership of the fax number, parenthesis, S,

17   listed in Number 1 above.  Select A or B and sign

18   your name."

19            Did I read that right?

20       A.    Yes.

21       Q.    A, the fax number, parenthesis, S,

22   identified above or attached to this proof of

23   claim was, slash, were registered to me or a

24   company I owned or operated in 2009 or 2010."

1           And there's a place to sign your name,

2    correct?

3        A.    I see that, yes.

4        Q.    And it goes on to say, "Or B, the fax

5    number, parenthesis, S, identified in Number 1

6    above or attached to this proof of claim was not,

7    slash, were not registered to me or a company I

8    owned or operated throughout 2009 and 2010,

9    period."

10           And it goes on to say, "Explain when you

11    obtained the fax number, parenthesis, S,

12    identified in Number 1 above and how you received

13    the faxes at issue."

14           And it's got a line for information and

15    then, "Sign your name here."

16           Correct?

17        A.    I see that, yes.

18        Q.    And so Section 4 with Subparts A and B

19    is designed to seek clarification or confirmation

20    from a claiming class member that not only is

21    their fax number that they apparently have now or

22    had at some point in the past included in the

23    objective data that the settlement administrator

24    will have of numbers to which faxes were

1    successfully transmitted, but also to confirm one

2    way or another whether the claiming class member

3    owned or operated that fax number in 2009 or 2010,

4    correct?

5        A.    Section 4 does not make sense to me.

6        Q.    Why not?

7        A.    If you look at 4A, it says, "In 2009 or

8    2010."

9        Q.    Mm-hmm.

10       A.    So in my opinion, it is possible that

11   both A and B could be true simultaneously,

12   which...

13            Can the record reflect that everybody

14   agrees with me in the room?

15            MR. OPPENHEIM:  No.

16            THE WITNESS:  Okay.

17   BY MR. COHEN:

18       Q.    Well, let's explore it.

19       A.    Okay.

20       Q.    Subparagraph A uses an "or" between

21   2009, 2010, correct?

22       A.    Correct.

23       Q.    So to sign for A, the class member is

24   not stating whether it was 2009 versus 2010 versus

1    both.  If the claiming class member owned or

2    operated the fax number in question in either 2009

3    or 2010 or both, the claiming class member could

4    sign A.

5         A.    Correct.

6         Q.    Okay.  Subparagraph B says, "The fax

7    number," and I'm just going to go with the

8    singular for the example here, "was not registered

9    to me or a company I owned or operated throughout

10   2009 and 2010."

11              So Subsection B uses an "and" and calls

12   upon the class member to sign -- or at least this

13   is what I'm inferring you're suggesting, calls

14   upon the class member to sign that if they

15   operate -- owned and operated that number in 2009

16   but not 2010, owned and operated that number in

17   2010 but not 2009, or didn't own and operate that

18   number in 2009 or 2010, correct?

19        A.    Correct.

20        Q.    And if I'm understanding your

21   interpretation of this language, a class member --

22   a claiming class member who signed Part A because

23   they owned and operated the number in 2009 but not

24   2010 would then also need to sign B because they

1    didn't own it in 2009 and 2010.  They only owned

2    it in 2009.

3         A.    Correct.

4         Q.    And if that claiming class member signed

5    A and B, B says, "Explain when you obtained the

6    fax number and how you received the faxes at

7    issue."

8         A.    I see that.

9         Q.    And the class member could write, I

10   obtained it X date through the end of 2009, which

11   would reflect they didn't own it in 2010.

12        A.    That is something they could write.

13        Q.    I understand you don't think this is

14   clear.

15        A.    Correct.

16        Q.    Do you see a difference between clear

17   versus unduly burdensome?

18        A.    I believe this is unduly burdensome as I

19   am a class action attorney who has done a lot of

20   work in TCPA, and I don't understand it.

21        Q.    Well, is difficulty understanding the

22   same as unduly burdensome?

23        A.    I think for your average class member,

24   me having difficulty understanding might be

1     indicative of a class member being put under an

2     unduly burdensome situation for no reason other

3     than to depress the claims rate.

4         Q.    And I want to make sure I understand.

5     It's your contention then that the phrasing of

6     Section 4, Parts A and B, is intentionally

7     designed to suppress claims rates.

8         A.    No, that is not correct.

9         Q.    And why is it not correct?

10         A.    I don't presume to know why it was

11     designed this way.

12         Q.    You're just speaking of a risk or a

13     potential to depress claims rates.

14         A.    I was referring to a potential effect of

15     it, yes.

16         Q.    Going down to paragraph or Section 5,

17     and I think this is the part where you talked

18     about "under penalty of perjury" is unnecessary

19     and can be confusing.  Those are my notes of what

20     you said.

21         A.    Yeah, yes.

22         Q.    Okay.  And it reads, "Pursuant to 28

23     U.S.C. Section 1746, I hereby state under penalty

24     of perjury that I, slash, my company owned and,

1   slash, or used the fax number, paren, S, specified

2   above.  I further state that the information in

3   this claim form is true and correct."

4          Did I read that correctly?

5      A.    You did.

6      Q.    What part of this is confusing of

7   Paragraph 5?

8      A.    The effect of a class member filling out

9   this form, providing the number of faxes they

10  believe they received, and then being accused of

11  perjury because the objective data used to verify

12  those records says that they are incorrect.

13     Q.    I just want to make certain I understand

14  what you're suggesting is to the extent Section 1

15  uses the term "may have received faxes" and speaks

16  of whether the claiming class member believes he

17  or she received more than one fax, they would be

18  concerned in answering about may and their belief

19  because of a certification under penalty of

20  perjury.

21     A.    Correct.

22     Q.    Do you have any empirical data to

23  support that concept, that -- that assertion?

24     A.    No.

1    Q.   Now, I asked because I was just using

2    your words.  You had said that section, the

3    penalty of perjury section, was unnecessary.  I

4    haven't asked you about that yet.  And you said

5    confusing.

6    A.   Yes.

7    Q.   When I asked about confusing, you talked

8    about your concern that a claiming class member

9    would be concerned about swearing under penalty of

10   perjury to what they were called upon to provide

11   in response to Section 1, correct?

12   A.   That's most of it, yes.

13   Q.   I'm not seeing that -- and I don't mean

14   to argue with you.  I want to make sure we're

15   communicating.

16   A.   Mm-hmm.

17   Q.   I don't see that so much as an issue of,

18   quote-unquote, confusion as opposed to -- and

19   while I don't agree with you, I'm still hearing

20   you say it's an issue of intimidation that could

21   depress the claim rate.

22   A.   I do agree with that too.

23   Q.   Okay.  But where is -- you used the term

24   confusing.

1      A.    Yes.

2      Q.    Were you just meaning the intimidation

3  factor I just put out?

4      A.    No.

5      Q.    What are you saying is confusing?

6      A.    I don't understand why they have to say

7  how many faxes they received.

8            And, again, as the deponent, I am the

9  one that did the work compiling the transmission

10  logs, the target list, and the exception reports.

11  I got a hundred percent of them.  Why is the class

12  member being asked to identify how many they

13  received under penalty of perjury?

14            And if I were a class member, knowing

15  that the plaintiff's counsel and defendant's

16  counsel and class administrator have that, I

17  believe that it would be confusing to the class

18  member as to why they are being asked that

19  question.

20      Q.    Where are you getting the impression the

21  class member is being told -- so the confusion

22  that you're proffering is that Section 1 seems to

23  tell the class member that the settlement

24  administrator already has fax numbers for the

1   transmissions in existing records.  If that's

2   true, why does the class member need to specify

3   how many faxes he may have received or believes he

4   may have received, and then why does the class

5   member need to attest to his belief under penalty

6   of perjury?

7        A.    Correct.

8        Q.    You find that confusing, and you find it

9   intimidating.

10       A.    Yes.

11       Q.    Okay.  Why do you find it unnecessary?

12       A.    Because I did a really good job getting

13   all the transmission logs and records.

14       Q.    What is the source of proof that you're

15   assuming, not as to whether we know the fax

16   numbers to which the faxes were transmitted in

17   2009 and 2010, but that the person or entity to

18   whom that number has been traced for a hard

19   address look up or the person or entity who owns

20   or operates the number now if fax notice were

21   going to be used, what is the basis for your

22   apparent assumption that the claim form is going

23   to the right person, whether by fax or hard mail?

24       A.    Well, if Section 4 were worded properly,

1    I believe that would be Section 4A.

2        Q.    So they would still be verifying

3    something.

4        A.    Correct.

5        Q.    And assume they -- whatever your concern

6    with 4A and 4B is, I'm assuming -- I'm assuming

7    you would agree that what you view to be confusing

8    or internally inconsistent about 4A and B, you

9    could see a way to rephrase in a way that would

10   get the information even you agree is necessary:

11   Did you own this or operate this fax number at the

12   time of the broadcast in question.

13       A.    I believe it could be worded to not be

14   confusing, yes.

15       Q.    And you believe that and you agree that

16   is -- worded properly in your estimation, that is

17   information which is appropriate to the claims

18   administration process.

19       A.    If worded properly, yes.

20       Q.    So just assume I'm -- without conceding,

21   I'm taking at face value everything you say about

22   everything before we get to the certification

23   under penalty of perjury, do you think it's

24   unreasonable to expect somebody who is the sole

1    provider of that piece of information, in other

2    words, the claims administrator is not going to

3    know whether this person who is saying, not only

4    is that my fax number today or not only was that

5    my fax number at some point in the past, but it

6    was my fax number in 2009 and 2010, meaning, I got

7    the fax, they are the sole provider or source of

8    that information, do you think it's unreasonable

9    and unduly burdensome and unfairly intimidating to

10   look at a class member who may receive a good bit

11   of money on their claim to say, that's under

12   penalty of perjury?

13        MS. LOEW:  Objection to form.

14   A.    I don't think it's necessary to do that.

15   But, again, in this case, that's not the only

16   thing under penalty of perjury.

17   Q.    That goes back up to your concern about

18   Paragraph 1.

19   A.    Correct.

20   Q.    And I just want to make certain, and I

21   don't mean to divorce A from B from C or 1 from 4

22   from 5 and make you think I'm trying to get you to

23   acknowledge something you see as interrelated.

24        I'm saying, in a situation where you

1    don't have a concern about the other provisions of

2    a claim form, you don't find it unduly burdensome

3    or unacceptably intimidating so as to unfairly

4    depress claims rates to simply require that the

5    claimant sign under penalty of perjury, correct?

6         A.    I don't know.

7         Q.    Have you at Anderson & Wanca utilized

8    claim forms as part of accomplished TCPA class

9    settlements --

10        A.    Yes.

11        Q.    -- that have --

12        A.    Sorry.

13        Q.    -- that have the claiming class members

14   sign under penalty of perjury?

15        A.    I don't recall any.

16        Q.    Are you familiar with Sandusky versus

17   Heel?

18        A.    Yes.

19        Q.    H-e-e-l?

20        A.    I am.

21        Q.    That's a TCPA class settlement, correct?

22        A.    Yes.

23        Q.    Didn't that contain a catch-all penalty

24   of perjury signature that everything on the form

1    was true?

2         A.   I don't recall offhand.  I believe that

3    was several years ago.

4         Q.   Has Mr. Wanca taken the position in any

5    communications with you at any time that under no

6    circumstances will "under penalty of perjury"

7    signatures be agreed to in TCPA class settlement

8    claim forms?

9         A.   I do not recall any such discussion.

10        Q.   You also indicated the notice plan can

11   be a separate and independent or a contributing

12   feature of why a class settlement may be accused

13   of being a reverse auction because of the way it

14   might depress claim rates?

15        A.   Yes.

16        Q.   Do you have a view or a position as to

17   whether the proposed notice plan in this case

18   falls into that category?

19        A.   I don't believe you've provided the

20   notice plan.

21        Q.   To whom?

22        A.   To Judge Porcelli.

23             If I can further answer, I believe it

24   was due the day after the 11th Circuit Court of

Page 280

1    Appeals decision, maybe two days after, but I
2    think one.
3        Q.    You do understand he issued a stay.
4        A.    Yes, right before it was due.  But I
5    believe it was on that day that it was due, and
6    then the stay was entered.
7        Q.    And you do understand a stay stays any
8    and all things that need to be filed.
9        A.    Yes, I am aware.
10       Q.    What are you aware of about the
11   contemplated notice plan in the Technology
12   Training settlement?
13       A.    I am aware that representations were
14   made to the court regarding the content of
15   databases belonging to some combination of KCC, a
16   company called Pack West, I believe Info USA, and
17   another company called Class Settlements.
18       Q.    Are you familiar with any of those
19   companies?
20       A.    Yes.
21       Q.    Have you used any of them?
22       A.    Yes.
23       Q.    Which ones?
24       A.    KCC, Info USA, and Class Settlements.

1      Q.    You actually consulted with

2   classsettlement.com in regard to a possible notice

3   plan in the Cin-Q case, correct?

4      A.    Yes.

5      Q.    And I appreciate your identification of

6   participating vendors that have been involved in

7   the development of a notice plan in this case.

8            But at a more basic fundamental level,

9   do you have any understanding of the nature or

10  type of notice that is contemplated by the parties

11  in their settlement agreement?

12     A.    I understand representations were made

13  to the court about the databases of the companies

14  I just identified.

15     Q.    So you haven't a clue whether we're

16  talking about fax notice, hard mail notice, purely

17  a publication notice; you don't have a clue.

18     A.    I know that part of it includes hard

19  mail notice and none of it includes fax notice.

20     Q.    See, that's what I was getting at.  I'm

21  not certain why we're pulling teeth at the end of

22  the deposition.

23     A.    The representations made to the court I

24  am aware of.

1      Q.    Do you have a position or a view on the

2   sufficiency or adequacy of a hard mail notice with

3   no fax notice but backed up by a publication

4   notice?

5      A.    The representations made to the court

6   about the propriety or the content of the

7   databases is not accurate.  I believe --

8      Q.    How so?

9      A.    I believe that fax notice should be a

10   component of the notice.

11      Q.    What exactly and in particular about the

12   representations to the court about the vendors,

13   the databases, and the work product that can be

14   generated by those vendors for purposes of hard

15   mail notice do you believe to be inaccurate?

16      A.    I believe none of the vendors have

17   information provided from the telephone carrier

18   about who owned the fax number at the time.  And I

19   believe that representation that they did have

20   that information was made to the court when, in

21   fact, those vendors in my experience -- and,

22   again, I do not have experience with Pack West --

23   do not have that information and instead only have

24   information about when it was added and subtracted

1    from their proprietary databases.

2        Q.    Were you on any of the calls when -- was

3    this during telephone conferences with the court?

4        A.    Correct, it was.

5        Q.    Were you on any of those calls?

6        A.    No, I was not.

7        Q.    Have you seen transcripts of any of

8    those calls?

9        A.    Yes.  I ordered and reviewed

10   transcripts.

11       Q.    Are you able to identify which date this

12   representation you're describing was made?

13       A.    I believe it was either the most recent

14   or second two most recent calls.

15       Q.    And do you recall as you're sitting here

16   today who made that representation?

17       A.    I believe you did.

18       Q.    So I'm looking at my notes, and I'm

19   going to need you to help me out.  It was that a

20   representation was made that the vendors have

21   information from telephone --

22       A.    That's not what I said, but the next

23   word would be carriers; but that's not what I

24   said.

1      Q.    Carriers.  Okay.  But you referenced

2   telephone carriers.

3      A.    Correct.  They do not have telephone

4   carriers' records.  They only know when they put

5   it in their database.

6      Q.    So you've had the benefit of not just

7   being on the line but actually carefully reviewing

8   a transcript of a telephonic conference call with

9   the court to allow you to say that I referenced

10   telephone carriers to Judge Porcelli.

11      A.    No.  You referenced that their database

12   was accurate.  It is not.

13      Q.    What's the error rate?

14      A.    Is that the whole question?

15      Q.    Yeah.

16      A.    The error rate of what?

17      Q.    Using the types of databases these

18   vendors have to reverse look up hard mail

19   addresses and utilize the querying methods of when

20   numbers were added to or removed from the database

21   as correlating to a certain owner or operator in

22   order to confirm ownership or operation in

23   2009-2010 or approximate a window around that,

24   what's the error rate in that kind of information?

1    A.    What do you define as error?

2    Q.    Right versus wrong.

3    A.    By right, do you mean the actual

4 subscriber?  Do you mean what the telephone

5 carrier would have versus what the database would

6 have?

7    Q.    Sure.

8    A.    I don't know.  The only way to tell

9 would be to find out from the carrier.

10    Q.    How would utilizing fax notice avoid or

11 cure the problem of the ownership or operation

12 control of a fax number having been transferred

13 after 2009-2010?

14    A.    It would not cure it.

15    Q.    What's the statistical incidence of

16 transfer of fax numbers on an annual basis, 2009

17 through now?

18    A.    I recall seeing a document published by

19 the FCC that estimated that to be, I believe,

20 between two and three percent.

21    Q.    Per year?

22    A.    Yes.

23    Q.    Do you have any more detailed

24 information identifying that FCC document?

1      A.    I do not.

2      Q.    Do you have a copy of that document

3    somewhere at your office or on your computer?

4      A.    Probably at my office.  Definitely not

5    on my computer.

6      Q.    How would you get the telephone carrier

7    information about who owned the numbers at the

8    time?

9      A.    Subpoena.

10      Q.    Subpoena whom?

11      A.    The telephone carriers.

12      Q.    How many are there?

13      A.    In the southwestern Florida area, very

14    few.

15      Q.    Have you ever done that?

16      A.    Yes.

17      Q.    What case?

18      A.    Physicians Healthsource versus Stryker,

19    S-t-r-y-k-e-r.

20      Q.    What was the size of that class?

21      A.    I want to say it was around 20,000, but

22    it was scattered around the entire country; so the

23    quantity of telephone carriers was extremely high.

24      Q.    But you subpoenaed them all?

1    A.    We did.

2    Q.    What did you get?

3    A.    In terms of success?  Well above

4 90 percent.

5    Q.    How far back were you going in time?

6    A.    Several years.

7    Q.    Several.  I learned a couple is two, a

8 few is three, and several is four or more.  What

9 are you talking about?

10    A.    I'm talking about approximately four.

11          And if I can go back and clarify, that's

12 the only case I remember off the top of my head.

13 I know we've done it before, but I remember very

14 clearly in that case because of the quantity of

15 subpoenas to telephone carriers.

16    Q.    Did the carrier -- did any of the

17 carriers object?

18    A.    There were a couple carriers that

19 requested a specific court order allowing them to

20 release the information per their state's privacy

21 statutes, which we did.

22    Q.    Did any of the carriers object to the

23 burden?

24    A.    No.

1           Actually, I had to clarify it.  There

2    was one carrier that asked for more time, and we

3    provided it and notified the court.

4        Q.    Why did you do that in Stryker?

5        A.    The judge asked us to.

6        Q.    How many -- strike that.

7              Let me clarify and make sure I

8    understand something.  In Stryker, you went ahead

9    and issued the notice?

10       A.    After doing the subpoenas and getting

11   the results, we did issue the notice, yes.

12       Q.    And did you issue the notice by fax or

13   by hard mail?

14       A.    I don't recall.

15       Q.    When was that?

16       A.    Well, Mr. Oppenheim handled it; so it

17   was before 2016.  I would like to say early 2015

18   or sometime in 2014.

19       Q.    How about we take a short break.  I'm

20   probably pretty close to done.

21       A.    Great.

22             THE VIDEOGRAPHER:  Off the record.  The

23   time is 6:13.

24                       (Whereupon, a short break was

1           taken.)

2           THE VIDEOGRAPHER:  We are back on the

3    record.  The time is 6:17.

4    BY MR. COHEN:

5       Q.    While at Wanca, at Wanca's firm, have

6    any class settlements included a notice plan that

7    did not have a fax component?

8       A.    Off the top of my head, I can't think of

9    any; but it's possible.

10      Q.    And other than the Stryker case that you

11   mentioned, are you aware of any other case in

12   which Wanca's firm subpoenaed the telephone

13   carriers for the purpose of the notice plan?

14      A.    Off the top of my head, I can't think of

15   any others.

16      Q.    Were you involved in the Stryker case as

17   it pertained to how it arose that all these

18   subpoenas would be sent to these telephone

19   carriers?

20      A.    I reviewed the court's order that

21   necessitated that.

22      Q.    And that's kind of what I was getting

23   at.  The court was the participant to the

24   settlement process that insisted that the

1    telephone carriers be subpoenaed, correct?

2        A.    No.  It was, my best recollection, not

3    part of the settlement process.  We won class

4    certification.

5        Q.    I don't see how that's inconsistent with

6    what I said.

7        A.    You used the word "settlement."  It was

8    after the class had been certified.  There was no

9    settlement.  It was contested.

10       Q.    I understand what you're saying now.  I

11   apologize.  So fully appreciate what you were

12   saying.

13           The court was the participant in the

14   notice process for certification purposes in

15   insisting on the subpoenas to the telephone

16   carriers, correct?

17       A.    I don't recall what the respective

18   positions of the parties was, but I do recall that

19   was in the court order.

20       Q.    Mr. Oppenheim was more involved in that

21   and would have more hands-on knowledge of how and

22   why it came about that the court ended up

23   including in its order the telephone carriers be

24   subpoenaed, correct?

Page 291

1      A.    No.

2      Q.    What do you mean "no?"

3      A.    My understanding was Mr. Oppenheim's

4  involvement in the Stryker matter was limited to

5  settlement when he was unable -- I don't want to

6  make it sound like Mr. Oppenheim was unable to

7  reach settlement.

8           A settlement was not happening.  The

9  class certification briefing I do not believe

10 Mr. Oppenheim had any role in, nor with the

11 proposed notice plans.  His role in that case,

12 it's my understanding, was limited to attempting

13 to bring about a settlement.

14     Q.    Whatever his knowledge is or isn't, as

15 we sit here today, you don't have detailed

16 recollection of how it came about and why it came

17 about that the court ended up including in its

18 certification order that the notice plan would

19 require subpoenas to the telephone carriers,

20 correct?

21     A.    It was not part of the class

22 certification order, but correct as to everything

23 else.  It was a separate order.

24     Q.    Were you involved in the Clement case

Page 292

1    that led to obtaining the hard drive?

2         A.    The hard -- excuse me.

3         Q.    For the Buccaneers broadcast?

4         A.    The hard drive was not obtained in the

5    Clement case.  It was obtained in the Cin-Q and

6    Medical & Chiro v. Buccaneers case.  I was

7    involved in obtaining the hard drive.  I was at

8    the deposition of the deponent that produced said

9    hard drive.

10        Q.    Which deponent was that?

11        A.    His name is Gerald Nelson.

12        Q.    And so this is the Cin-Q case pending in

13   federal court in front of Judge Porcelli?

14        A.    Correct.

15        Q.    And this is after Medical & Chiropractic

16   joined?

17        A.    To the best of my recollection, yes.  I

18   know it occurred before October 31st, 2013,

19   because I was not yet an attorney.  Actually, it

20   might have been after.  I don't know.

21             I know it occurred immediately or almost

22   immediately after the deposition of Gerald Nelson

23   that was conducted in the Ottawa Airport.  I do

24   not recall exactly when that deposition took

1  place.

2      Q.    Did the hard drive that was obtained

3  that we've been talking about, did it contain data

4  including transmission logs for fax broadcasts

5  other than the Buccaneers broadcast?

6      A.    Again, if we could use another word

7  other than transmission logs, like effective

8  transmission logs or --

9      Q.    Transmission logs or the equivalent.

10     A.    Yes, it did.

11     Q.    And has the Wanca law firm prosecuted or

12 initiated TCPA class actions that have evidentiary

13 support in the transmission logs or effective

14 equivalents found on that hard drive?

15     A.    No.

16     Q.    On the notice plan, based on what you

17 know of it as you sit here today, not ignoring

18 anything you've identified so far, is there

19 anything else you know or think you know about the

20 notice plan that you believe is inadequate,

21 unreasonable, unfair, or fails to meet

22 constitutional due process?

23     A.    Not doing fax notices done purposeful to

24 depress the claims rate.

1      Q.    Because you've gotten such a great

2   claims rate with fax notice?

3      A.    Better than you got addresses in this

4   case.

5      Q.    Wouldn't we know that better after we

6   did it and we got the claims?

7      A.    Yes.  If you did two different -- you

8   know, a control group and an experimental group,

9   you could run the scientific method out, correct.

10     Q.    Have you done that?

11     A.    Have I run the scientific method on a

12   group of unsuspecting putative class members?

13     Q.    Yeah.

14     A.    No, I have not.  I believe doing so

15   would be highly unethical.

16     Q.    So you're not suggesting we do it

17   either.

18     A.    I'm suggesting you should send fax

19   notice.

20     Q.    I know you are.  But you're not

21   suggesting we should do some kind of a test

22   control group with both and compare resulting

23   claim rates, correct?

24     A.    That is correct.

1    Q.    Did you think that you were going to get

2    a settlement, a class settlement, of the

3    Buccaneers case?

4    A.    Yes.

5    Q.    When, when did you think that?  I'm not

6    asking for details about what you thought it would

7    look like.  I'm just asking:  When, over what

8    period of time was that your genuine belief as

9    putative class counsel at Wanca law firm?

10    A.    The second half of April 2016.

11    Q.    And I'm not asking about a communication

12    you received from defendant, or if it was, I'm

13    certainly not asking for the content as we sit

14    here today.  And I'm not asking for a number as

15    we -- at least in this question I'm positing to

16    you right now.

17         In general, as of April 2016, why did

18    you genuinely believe you were going to be able to

19    reach a settlement with the Bucs?

20    A.    Without going into specific detail,

21    being broad, there was a communication that gave

22    me the optimism you describe.

23    Q.    And without asking for the content, a

24    communication from whom?

1            MS. LOEW:  You can say that.

2      A.    The mediator.

3      Q.    Do you recall if this was early April,

4   mid-April, late April?

5      A.    I recall it was after Mr. Oppenheim's

6   departure.

7      Q.    Okay.  That tells us April 8th, after

8   April 8th.

9      A.    It was after April 8th.

10     Q.    April 15th, April 25th, any ability

11   to...

12     A.    I don't want to guess.  I believe it was

13   approximately April 18th.

14            Can we go off the record for a second?

15     Q.    Sure.

16            THE VIDEOGRAPHER:  Off the record.  The

17   time is 6:28.

18                    (Whereupon, a short break was

19                    taken.)

20            THE VIDEOGRAPHER:  We are back on the

21   record.  The time is 6:30.

22   BY MR. COHEN:

23     Q.    Assuming that -- strike that.

24            To the extent your prior testimony has

1   been that a notice plan in a settlement with the

2   Buccaneers should have, needs to have, must have a

3   fax component to every number with follow-up for

4   failures, and possibly -- we didn't discuss it,

5   but possibly a publication plan backup, what basis

6   do you have to believe the Buccaneers would ever

7   agree to a settlement that contained that?

8        A.    I believe answering that question would

9   violate the -- or not the -- the mediation

10  privilege; and, therefore, I will not answer.

11       Q.    And I want to be clear what you're

12  essentially communicating is that whatever basis,

13  if any, that you have for believing the Buccaneers

14  would be willing to do fax notice as part of a

15  settlement was communicated in the course of

16  mediation.

17       A.    That --

18            MS. LOEW:  That is saying -- he's asking

19  the basis, right, not the specific communication?

20  You can answer.

21       A.    That is correct.

22       Q.    And during what period of time did you

23  have this or develop this confidence that the

24  Buccaneers would be willing to do faxing as a

1    component of a notice plan if -- if you were able

2    to reach a settlement with them?

3         A.   It would be on or after the second

4    mediation.

5         Q.   Which was August 31 of 2015.

6         A.   Correct.

7         Q.   I asked you before about you having a

8    genuine belief that you would ever be able to

9    reach a settlement with the Buccaneers.

10             And not holding you to more than you

11   actually said, just trying to get us back to the

12   general gist of it, it was in April.  Did I hear

13   you it was a call from the mediator?

14        A.   It was an email communication from the

15   mediator.

16        Q.   And I'm not holding you to the date.  So

17   without meaning to say you know for certain it was

18   that day, the day you threw out as an estimate or

19   approximation was April 18th, 2016.

20        A.   Yes.  I can state I am positive that

21   this communication occurred after Mr. Oppenheim's

22   departure, and the best recollection I have was it

23   was approximately April 18th.

24        Q.   How do you go from the level of

1    confidence that a call from the mediator gives you

2    to the best of your recollection on or about

3    April 18th, 2016, to insisting the mediator

4    declare an impasse on May 2nd, 2016?

5         A.    The clarity of that first communication

6    relative to the lack of clarity of subsequent

7    communications.  I cannot state more than that

8    without breaching the mediation privilege.

9         Q.    Fair enough.

10        The confidence that you had that you

11   could and the confidence you had that you would be

12   able to reach a settlement based upon this

13   communication you received from the mediator on or

14   about April 18th, 2016, in light of what you just

15   said in response to my last question, is it fair

16   to say you didn't have that confidence any longer

17   when the impasse was declared?

18        A.    I still had that confidence in the

19   mediator.  I would describe my feeling at the time

20   on the -- the May 2nd, which is the date you

21   represent and I accept, as unbelievably

22   frustrated, but not with the mediator.

23        Q.    The amount of the compensation in the

24   settlement in the Technology Training case, you

1     have an understanding of how the compensation is

2     set forth?

3          A.    I have an understanding as to the top

4     line number.

5          Q.    Which is?

6          A.    I believe it's 19.5.

7          Q.    That's the fund, right?

8          A.    Correct.

9          Q.    Okay.  What about the compensation for

10    claiming class members, do you have an

11    understanding of whether it's per claimant versus

12    per fax?

13         A.    I understand it's a certain amount per

14    fax and then a lesser amount for subsequent faxes.

15         Q.    And the first fax?

16         A.    Off the top of my head, I think it was

17    either 250 or $300.  I don't have the -- I don't

18    remember exactly.

19         Q.    Do you have a position that you've

20    reached as to whether the per claimant, per fax

21    compensation set forth in the Technology Training

22    settlement in and of itself, we're not talking

23    about the claim form, we're not talking about the

24    sufficiency of the notice plan, if all of those

1   were fine and if the fund is, in fact, large

2   enough to cover claims without pro rata reduction

3   below that which is set forth for each claiming

4   class member per fax in the settlement, do you

5   have a position you've reached as to whether the

6   per claimant and per fax compensation is

7   reasonable?

8       A.    I don't know if I can answer that

9   question without violating the mediation

10  privilege.  I'd like to confer with my counsel to

11  determine if I can answer that question.  Is that

12  okay?

13      Q.    Give me one second.

14      A.    That's fine.

15      Q.    Go ahead.

16      A.    Thank you.  This will be very quick.

17          THE VIDEOGRAPHER:  Off the record.  It

18  is 6:39.

19                  (Whereupon, a short break was

20                   taken.)

21          THE VIDEOGRAPHER:  We are back on the

22  record.  The time is 6:40.

23  BY MR. COHEN:

24      Q.    Do you recall the question?

1      A.    Yes.

2      Q.    And what is the answer?

3      A.    It is not reasonable.

4      Q.    And what about it is not reasonable?

5      A.    I believe the question related to the

6   compensation and the compensation is not

7   reasonable.

8      Q.    Which aspect of the compensation?

9      A.    I believe answering that question

10   further would require divulgence of mediation

11   privileged communications.

12      Q.    Well, I'm not asking you what you

13   demanded or what somebody else or what the Bucs

14   offered at any point in time in your mediation

15   negotiations.

16           I'm just asking, for example, is it that

17   the first fax for 350 is too low, or maybe that

18   could be reasonable, but the amount for subsequent

19   faxes being lower on a per fax basis you believe

20   to be unreasonable?  And you might hold those

21   beliefs irrespective of anything that was demanded

22   or offered in mediation.  And I'm not, you know,

23   getting quippy with anybody.

24           But the fact that it's hypothetically

1   possible that some aspect of mediation

2   communications informs the reason you think 350 is

3   or isn't enough, maybe depending on what my

4   follow-up questions might be, you would say, I

5   can't answer that because of mediation.

6            But I'm just asking you:  Do you think

7   the -- do you think the 350 is too low?  Do you

8   think that's maybe okay, but the numbers after it

9   are too low?

10       A.    Separate and apart from mediation

11  communications, which I cannot go into, I believe

12  the faxes should be treated equally regardless of

13  whether there's one, more than one, and that the

14  class members should get at least $500 per.

15           And to the extent there is going to be a

16  difference, I think what should be differentiated

17  is faxes sent before the initiation of the Cin-Q

18  lawsuit and faxes sent after the initiation of the

19  Cin-Q lawsuit.

20           And by initiation, I mean when the

21  defendants became aware that they were being sued

22  for violations of the TCPA.

23       Q.    So 500 per fax every fax minimum, and

24  possibly more for some faxes?

Page 304

1      A.    Correct.

2      Q.    Anything less than that, unreasonable?

3      A.    I think if you're asking me if somebody

4    got $499.99 for everything sent before the

5    initiation of the lawsuit and $1,500 for

6    everything sent after, I -- I would still think

7    that would be a good result.

8           But I think -- I cannot answer more

9    without violating the mediation privilege.

10     Q.    Am I hearing you say that your position

11   is that for faxes sent after the initiation of the

12   first Cin-Q lawsuit that that second year of faxes

13   is 1,500 apiece?

14     A.    No.  What I was saying is to the extent

15   you're going to differentiate one from another and

16   the dollar amount, the only basis that makes sense

17   to me to differentiate them is those sent before

18   the initiation of the lawsuit and those sent

19   after.

20     Q.    Do you think they have to -- to be

21   reasonable, they have to be differentiated with

22   the 2010 wave receiving greater compensation than

23   the 2009 wave?

24     A.    No.

1      Q.    Any other aspect of the proposed

2   Technology Training settlement that you believe

3   indicates or is evidence of a reverse auction that

4   we have not talked about in this lengthy

5   deposition?

6      A.    I believe we've covered everything.

7            MR. COHEN:  I have nothing further.

8            MS. LOEW:  I have no questions.

9            THE REPORTER:  Signature?

10           MS. LOEW:  Yes, please.

11           THE VIDEOGRAPHER:  This concludes

12   today's deposition.  The time is 6:44.

13           THE REPORTER:  Are you ordering?

14           MR. COHEN:  We'll take PTX, full size

15   and mini with exhibits.  Can we get email

16   transmission also?

17           MS. LOEW:  I'll take a copy.

18                   (Whereupon the deposition

19                    adjourned.)

20

21

22

23

24

Page 306

1    STATE OF ILLINOIS   )

2                        ) SS

3    COUNTY OF C O O K   )

4

5

6    I,_____,

7    do hereby certify that I have read the foregoing

8    transcript of my deposition consisting of pages

9    ____ through ___, inclusive; and I find it is a

10   true and correct transcript of my deposition so

11   given as aforesaid.

12

13

14   _____

15

16

17   Subscribed and sworn to

18   before me this ____ day

19   of _____, 2017.

20

21   _____

22   Notary Public

23

24

1    IN RE THE CASE OF:  MEDICAL & CHIROPRACTIC CLINIC,

2    INC., vs. DAVID M. OPPENHEIM, et al.

3    taken on:  November 13, 2017

4

5    PAGE      LINE           REASON AND CHANGE

6    _____

7

8    _____

9

10   _____

11

12   _____

13

14   _____

15

16   _____

17

18   _____

19

20   _____

21

22   _____

23

24   _____

1  STATE OF ILLINOIS  )
                      )  SS:
2  COUNTY OF C O O K  )

3

4

5                I, Layli Phillips, RPR, CRR,
   CSR, in and for the County of Cook and State of
   Illinois, do hereby certify that ROSS M. GOOD on
6  November 13, 2017, was by me first duly sworn to
   testify to the truth, the whole truth, and nothing
7  but the truth, and that the above deposition was
   recorded stenographically by me and transcribed by
8  me.

9                I FURTHER CERTIFY that the foregoing
   transcript of said deposition is a true, correct,
10 and complete transcript of the testimony given by
   the said witness at the time and place specified.

11

12                I FURTHER CERTIFY that I am not a
   relative or employee or attorney or employee of
   such attorney or counsel, or financially
13 interested directly or indirectly in this action.

14                IN WITNESS WHEREOF, I have set my hand.

15

16        _Layli Phillips_ (signature)

17 _____
   Layli Phillips
   Registered Professional Reporter
18 Certified Realtime Reporter
   Certified Shorthand Reporter
19 Certificate No. 084.003900

20

21

22

23

24

**A**

**a.m** 1:18
**abetted** 27:8
**abetting** 41:16
  106:8 141:4
**abide** 225:3
**ability** 31:16 43:16
  150:24 217:24
  220:13 245:12
  296:10
**able** 22:23 35:14
  39:8 62:8 66:16
  66:19 83:24
  103:19 125:6
  170:16 221:19
  227:10 249:9
  283:11 295:18
  298:1,8 299:12
**above** 215:21
  260:23 263:18,19
  265:16 266:17,22
  267:6,12 272:2
  287:3 308:7
**absent** 37:3,13,24
  38:4 48:4 217:3
  217:23 219:15
  220:13
**Abt** 14:9 64:8,10
  68:23
**accept** 159:9 161:13
  161:15 164:19
  177:17 222:6,8
  225:15 299:21
**acceptable** 160:2
**accepted** 247:19
**accepting** 47:16
  159:14 161:12,19
  164:20 220:8
**access** 14:22 66:10
  69:23,24 96:1,3,4
  96:5,8,10 98:23
  125:5
**accidental** 97:15
**accomplished** 278:8
**according** 115:24
  116:9,10 198:20
  198:23
**accordingly** 163:17
**account** 15:15 64:6
  216:18
**accounting** 182:2
**accurate** 96:20
  195:11 224:4
  258:4 282:7
  284:12
**accurately** 170:22

**199:3 200:5
accusation** 12:2
  13:22 42:9
**accusations** 21:15
**accused** 11:21 13:3
  13:18,19,21
  272:10 279:12
**accusing** 11:22 13:9
  13:12
**acknowledge**
  277:23
**across** 91:3,17
**act** 70:19 211:10,11
  211:20
**acting** 21:6,9 140:2
  141:13
**actions** 35:22
  119:15 127:10
  138:9,16 191:8,17
  191:22,23 218:2
  218:14,17 219:13
  250:8 251:8 252:6
  253:7,10,17
  257:14 293:12
**actively** 180:12
**activities** 124:22
**actual** 39:13 44:17
  92:17 159:1,2
  164:2 195:21
  205:17 207:5
  221:12 228:18,21
  285:3
**Adams** 2:7
**add** 187:4 195:8
  227:9 229:3
**added** 282:24
  284:20
**Addison's** 113:14
  113:15 116:13
**addition** 155:13
  232:14,21
**additional** 77:3,11
  78:2,5,12,21
  95:12 141:18
  224:14,20 262:14
**additionally** 130:18
**address** 6:5 265:24
  266:6 275:19
**addressed** 210:1
**addresses** 284:19
  294:3
**adequacy** 282:2
**adequately** 70:20
  71:17 72:4,6
**adjourned** 305:19
**administration**

**263:10 276:18
administrative**
  65:10
**administrator** 7:19
  68:19 227:18
  263:5,11,11
  265:19 266:5
  267:23 274:16,24
  277:2
**admissible** 79:7
  80:3
**admit** 28:3,17
**admitted** 28:2,7,12
  30:8
**advance** 132:10
**adverse** 30:15,17,22
  38:11,16
**advertisements**
  199:12
**advertising** 265:20
**advising** 47:14
**advocating** 171:18
**affects** 208:22
**affiliate** 114:6
**affiliation** 114:8
**affirmative** 208:17
  209:23 210:22
  211:23
**aforesaid** 306:11
**afternoon** 236:6
**again** 40:20 43:14
  47:5 63:10 68:19
  69:2,9,10,16
  117:3 131:19
  180:14 195:18
  197:22 199:5
  253:19 261:2
  274:8 277:15
  282:22 293:6
**aggregation** 228:21
**aggressive** 12:24
  13:7,13
**ago** 7:10 8:6 112:5
  185:16 279:3
**agreed** 99:2 111:14
  116:22 131:5
  173:8 181:24
  203:15,18 233:11
  235:7 249:14
  279:7
**agreements** 15:21
  16:1 51:3,4,6 73:4
  73:14 109:7,11,15
  110:2 112:15
  121:19,22,23
  165:15 180:21,23

**agrees** 23:10 114:5
  223:9 268:14
**Ah** 241:8
**ahead** 79:24 102:7
  155:1 194:13
  288:8 301:15
**aided** 27:8
**aiding** 41:15 106:8
  141:4
**Airport** 292:23
**al** 307:2
**allegation** 12:24
  27:23
**allegations** 27:5
  136:5 232:17
**allege** 27:10 37:15
  41:1
**alleged** 34:4 232:16
**allegedly** 37:9 62:3
  77:24 249:3
**allow** 40:23 80:15
  98:22 125:4
  133:23 147:23
  173:8 218:11
  222:7 265:18
  284:9
**allowed** 181:9 209:6
  209:7
**allowing** 186:1
  287:19
**Allscripts** 88:7
**almost** 45:6,12
  46:12 47:9 52:5
  55:12 57:2 103:16
  142:22 154:8
  292:21
**along** 29:18 144:11
  175:22 196:4
**already** 13:2 53:17
  88:10 96:15 144:8
  148:11 198:12
  249:4 274:24
**alter** 90:24
**alternative** 215:5
**although** 56:21
  118:6 210:16
  265:14
**always** 138:9
  228:13
**amazing** 180:9
**among** 23:9 117:9
  117:10 119:21
  122:17
**amounts** 160:16
  162:18,20
**ampersand** 88:22

**analysis** 43:3 230:5
**analyzing** 195:18
**and/or** 265:4
**andersonwanca.c...**
  7:23
**anecdotal** 227:14
**angry** 186:6
**annual** 285:16
**another** 9:13,20
  40:17 53:15 54:17
  58:2 89:2,11
  117:22,22 118:8
  145:6 184:22
  195:1 209:22
  211:10 254:17
  256:19 262:19
  263:1 268:2
  280:17 293:6
  304:15
**answered** 5:23
  11:13,17 13:12
  53:22 72:11,12
  82:16 205:21
  255:2
**answering** 48:3
  148:15 158:7
  167:19 197:19
  212:14 238:6
  255:1 272:18
  297:8 302:9
**answers** 25:14
  26:16,17 30:24
  193:14 252:15
**anticipate** 124:15
  230:14
**anticipated** 123:9
  123:10 221:14
**anybody** 11:18
  12:14 14:2 24:18
  44:22 62:21 95:23
  96:9 254:9 257:18
  302:23
**anyway** 134:9
  225:14
**anywhere** 242:3
**apiece** 304:13
**apologize** 11:16
  17:24 32:10
  132:14 190:5
  258:14 290:11
**apostrophe** 263:17
  263:18
**apparent** 275:22
**apparently** 62:19
  267:21
**appeal** 232:15

248:7,13
**Appeals** 10:6 30:23
  143:14 220:5
  280:1
**appearance** 21:13
  204:3
**APPEARANCES**
  2:1
**appears** 182:22
  263:6
**applicable** 33:22
  208:9 210:10
**applies** 36:7 140:21
**apply** 17:11 107:4
  216:23 254:1
**appreciate** 40:17
  86:15 92:19 116:2
  131:23 241:15
  245:3 281:5
  290:11
**appropriate** 35:19
  35:21 36:5,22
  79:8 161:3 165:19
  165:23 225:5
  276:17
**appropriately** 138:2
  211:22
**approval** 89:3
  137:16 159:6
  209:13 223:12
  226:2 236:8,14
  237:1,8
**approved** 137:14
  219:18 222:8
  224:12
**approving** 263:7
**Approx** 24:21
**approximate**
  284:23
**approximation** 8:22
  144:23 298:19
**arbiter** 140:21
**area** 261:14,17,22
  286:13
**aren't** 140:19 244:4
**argue** 273:14
**argument** 134:5
  210:12,19
**argumentative**
  54:12
**arose** 173:3 289:17
**around** 57:7 68:3
  228:6 250:24
  251:21 252:2
  284:23 286:21,22
**arrangement** 127:3

252:23 253:22
**arrived** 144:14
**Article** 212:1
**aside** 86:17 104:5
  153:2
**ask** 5:22 6:2 25:12
  54:3 80:8 83:6
  129:15,22 150:7
  169:3 184:10
  187:24 210:5
  218:20 243:12
  249:13 255:4
  258:19
**aspect** 233:8 302:8
  303:1 305:1
**assert** 59:5 92:24
  210:8
**asserted** 42:2 46:19
**asserting** 56:13,15
  56:23 58:14 59:18
  74:19 92:3 93:24
  94:6 95:11,17
  102:15
**assertion** 71:7 72:9
  166:19 272:23
**assessment** 200:6
  212:17 213:7
  244:21
**assigned** 214:21
**assignment** 177:6
**assist** 114:6
**assistance** 259:13
**assistant** 24:17
**associate** 121:1
**associated** 23:11,17
  204:3,19
**Associates** 32:7
**assume** 5:22 37:23
  108:2,4 191:10
  199:2 226:3 240:4
  276:5,20
**assumed** 195:5
**assuming** 38:4
  234:19 275:15
  276:6,6 296:23
**assumption** 191:13
  240:7 275:22
**assurances** 186:8
**at-issue** 246:19
**attach** 262:13,18
  263:1
**attached** 232:18
  266:22 267:6
**attempt** 142:23
**attempted** 194:15
  196:21 264:12

**attempting** 291:12
**attempts** 221:5
**attend** 152:5
**attendance** 9:19
  18:23 168:13
**attended** 16:6 153:7
  155:2,14 168:3
  178:18
**attending** 19:6
  146:14
**attention** 222:20
  223:1
**attest** 275:5
**attorney's** 59:23
  60:10 114:9 147:7
  148:5 152:22
  154:14 160:14
  189:14 197:16,20
**attorney-client**
  22:16 45:18,21
  46:15,19 48:3
  49:4 52:19 60:7
  92:13 125:15
  127:6 128:24
  129:18 158:6
  166:12
**attorneys** 10:13
  22:9 24:4 25:7
  43:20 45:1 50:15
  93:11 107:17
  110:12 114:5
  116:7 121:19
  124:21 128:19
  144:11 181:6
**attorneys'** 18:9,18
  18:19,20,24 19:9
  20:1,2 22:24
  149:22 151:17
  203:19 221:12
  226:23 233:12
  234:2,8 235:8
  238:1,18,23 239:5
  242:16
**auctions** 31:3
**August** 34:10 122:7
  155:10 185:11
  190:11 194:19,23
  194:24 196:3
  199:24 298:5
**authenticated**
  159:21 198:13,13
**automatically**
  213:17,19
**availabilities** 25:3
**availability** 25:12
**available** 25:5 80:20

81:8,10 161:17,20
  186:5
**average** 229:14,14
  229:15 270:23
**avert** 185:21
**averted** 185:8,10
  190:10
**avoid** 5:17 170:18
  171:1 285:10
**AW** 169:14
**award** 133:9,13,14
  133:15 149:20,22
**awarded** 207:3
**awareness** 252:10
**away** 97:24 241:17
  259:20

———————
**B**
**B** 3:8 252:19,20
  266:17 267:4,18
  268:11 269:6,11
  269:24 270:5,5
  271:6 276:8
  277:21
**B-o-y** 89:6 97:2
**B2B** 252:16,19,24
  253:6 254:3,14
**backed** 282:3
**backup** 7:22 66:14
  69:23 70:9 297:5
**bad** 31:3 96:22
  248:18
**badgering** 54:13
**bar** 211:5,21 212:3
**barred** 35:11 36:9
  36:12
**Barry** 2:7 4:15
  79:12 80:9 155:15
  245:11
**barry@blonienle...**
  2:9
**base** 227:14
**baseball** 83:13
  84:19,20 85:3
**based** 22:6 64:17
  92:23 151:21
  159:19 161:16
  163:19 226:21
  238:11 244:15
  293:16 299:12
**bases** 63:18
**basic** 5:16 27:4
  281:8
**basically** 90:23
  171:9 232:21
**Bates** 3:17 10:11,13

10:14 101:24
  169:14 193:11
  196:6,14 222:22
  223:1
**bathroom** 215:11
**Bay's** 134:23
  135:17
**Beachwood** 88:17
**bear** 224:24
**beat** 167:1,2
**became** 61:19 86:1
  115:19 138:13
  205:2 249:21
  250:15,19,20,23
  251:17 252:11
  253:5,15 303:21
**become** 250:5,21
  252:3,4
**began** 115:13
**begin** 111:10
  125:16,20
**beginning** 218:6
  256:4
**begins** 4:1
**behalf** 4:16,19,20
  43:17 71:4 92:20
  109:1 126:6 131:9
  131:12 138:5
  206:16 215:7
  225:15 262:13
  263:1
**behind** 215:4
**belief** 11:5,12 15:1
  15:14 44:15,19,21
  44:22,24 45:4
  50:1 51:10,14,20
  272:18 275:5
  295:8 298:8
**beliefs** 302:21
**believed** 12:5 52:12
  52:22 160:1
  161:16 165:22
  196:7
**believes** 224:11
  225:5,11 272:16
  275:3
**believing** 297:13
**bell** 210:6,24 211:7
  211:16
**belong** 14:14,16
  16:16
**belonged** 7:13 15:1
  15:10,23
**belonging** 280:15
**below** 225:10 243:3
  262:11 301:3

**Bench** 206:21
**beneficial** 225:24
**benefit** 62:20
  148:19,21 149:3
  149:17 217:12
  218:1 220:15
  237:21,23 239:3
  284:6
**best** 30:10 34:7 78:9
  122:10 144:13
  161:18,20 162:19
  206:6 247:22
  290:2 292:17
  298:22 299:2
**bet** 261:15
**better** 294:3,5
**beyond** 9:1 148:12
  209:1 226:20
**big** 59:17
**Biggerstaff** 159:23
**billing** 104:23
**billion** 154:8
**binding** 220:5
**bit** 212:13 231:6
  250:17 277:10
**Biz** 89:8
**blanks** 262:16
**Blonien's** 208:7
  212:14 236:7
  245:19
**BLP** 262:13 263:1
**Bob** 32:16 209:1
  220:6
**Bobrick** 143:5
**Bock's** 251:6,11
  254:23 257:19
**bold** 12:23 13:6,10
**bolded** 223:3
**bonus** 151:6,8,17
**bonuses** 151:21
**books** 16:5
**borrowed** 209:22
**boss** 98:4 164:17
**both** 50:13 90:15,19
  108:21,23 113:1
  143:11 144:4
  160:8 178:7
  232:16 265:9
  268:11 269:1,3
  294:22
**bottom** 114:4 177:1
**bound** 222:7
**Boy** 89:5,6
**breach** 27:8 28:8,13
  30:11,16 41:15,16
  41:24 106:7 128:7

137:7,9 141:3
150:11 152:13
154:23 180:16
214:15 215:2
221:8 226:16
227:2 232:16,19
237:14
**breached** 27:6,10
  27:14,24 28:17
  30:8
**breaching** 63:20
  299:8
**break** 6:2 49:13,17
  134:9,15,22
  166:22 192:17,21
  193:22 215:10,15
  258:22 259:2,11
  288:19,24 296:18
  301:19
**Bridging** 89:14
**brief** 44:1 85:5
**briefed** 134:1
**briefing** 133:23
  135:8 186:13
  291:9
**briefings** 209:9
**briefly** 143:8
**briefs** 43:10
**bring** 102:6 217:4
  291:13
**bringing** 159:5
  224:24 256:24
**broad** 59:18 191:20
  247:6 254:21
  255:3,5 295:21
**broadcast** 263:23
  276:12 292:3
  293:5
**broadcasts** 216:19
  293:4
**broader** 254:7
**brought** 91:8 128:8
  138:1 142:5
**Buccaneers'** 134:5
  263:23
**Bucs** 265:20 295:19
  302:13
**build** 228:23
**bunch** 60:18 97:1
  98:15 102:24
**burden** 287:23
**burdensome** 39:8
  244:7,19 260:4,13
  262:7,23 266:11
  270:17,18,22
  271:2 277:9 278:2

| | **C** | |
**C's** 26:22 105:3,12
  105:22 134:3
  140:10 212:18,21
  213:3 232:23
  233:5 246:21
**C-o-x** 87:12
**cabinet** 67:16 70:7
**calculate** 165:8
**calculations** 95:5
**calendar** 7:17
**call** 53:9 58:19,23
  99:5 169:20 172:1
  172:4,8,12,14,18
  173:1,2 190:10
  284:8 298:13
  299:1
**call-in** 172:5
**called** 1:12 5:2
  50:19,21 83:12
  87:11,17 89:4,7
  89:14 97:1 99:4
  119:6 138:2
  183:24 229:10
  273:10 280:16,17
**calling** 22:16 181:18
  185:14
**calls** 179:17 212:10
  269:11,13 283:2,5
  283:8,14
**calm** 185:24
**calmed** 185:23
  186:2
**came** 8:1 135:24
  139:10 153:20
  233:15 255:22,24
  290:22 291:16,16
**camera** 225:8
**can't** 12:14 20:14
  27:20 58:17 73:23
  89:13 96:9 137:4
  147:12 162:11,12
  194:15 205:18
  212:24 249:12
  289:8,14 303:5
**cannot** 24:18 78:3
  78:16 86:7 95:19
  105:1 128:3
  140:13 166:10
  203:1,11 214:10
  224:12 241:24
  299:7 303:11
  304:8
**capacity** 115:8
  136:10 223:10
**capital** 167:1,3,6,9

252:19,20
**care** 123:6 137:1
  177:21
**carefully** 284:7
**Carolina** 98:15
**carrier** 282:17
  285:5,9 286:6
  287:16 288:2
**carriers** 283:23
  284:1,2,10 286:11
  286:23 287:15,17
  287:18,22 289:13
  289:19 290:1,16
  290:23 291:16
**carriers'** 284:4
**cases'** 109:11
**catch-all** 211:4
  278:23
**categorized** 77:2
**category** 279:18
**cease** 156:23
**CEH-TBM** 1:6
**cert** 186:13
**certain** 21:23 68:20
  73:14 77:7 81:9
  93:14 201:17
  227:17 272:13
  277:20 281:21
  284:21 298:17
  300:13
**certainly** 92:9
  114:20 133:1
  189:21 295:13
**Certificate** 308:19
**certification** 133:24
  137:14,17 207:21
  236:8,11 237:8
  247:14,16,20
  272:19 276:22
  290:4,14 291:9,18
  291:22
**certified** 1:15 38:8
  138:3 206:17
  237:2 290:8
  308:18,18
**certify** 306:7 308:5
  308:9,11
**cetera** 73:4 186:13
**chain** 3:14 163:10
  169:7 172:16
  194:21
**chair** 208:4
**chance** 169:2 219:7
  244:23
**change** 95:3 190:12
  307:5

**changed** 95:7
  112:15
**changing** 252:2
**characterization**
  13:6 27:2 130:23
  182:11
**chatted** 259:19
**check** 40:7 78:7
  153:19
**Chicago** 1:17 2:4,13
  4:12 143:4 144:3
**Chiro's** 18:20 131:6
  232:15
**Chiropractic's**
  62:20
**choice** 177:20
**choose** 162:12,14
**chosen** 177:13
**Christopher** 145:8
**Cinque** 153:8
**circles** 207:10
**Circuit** 10:5 30:23
  143:14 217:20
  220:4,6 247:18
  279:24
**circulated** 230:2
**circumstance** 23:16
  42:15 73:20,23
**circumstances** 40:2
  40:4,15 41:3,4,7
  73:1 133:13 240:8
  240:9 279:6
**city** 265:24
**civil** 1:13 205:10
  208:1 210:20
**claimant** 239:22
  278:5 300:11,20
  301:6
**claimant's** 263:12
**claimants** 81:1
  239:20 240:14
**claimed** 102:11
**claiming** 238:21
  239:1 262:8 265:2
  265:21 266:12
  267:20 268:2
  269:1,3,22 270:4
  272:16 273:8
  278:13 300:10
  301:3
**clarification** 131:23
  158:16 267:19
**clarified** 218:17
**clarify** 50:11 74:5
  85:17 178:3 180:6
  218:3 221:3

250:20 287:11
288:1,7
clarifying 86:15
92:19
clarity 299:5,6
Clark 1:17 2:3
class-wide 118:18
238:8
classsettlement.com
281:2
clear 46:23 80:5
182:6 196:17
222:4 234:5
270:14,16 297:11
clearer 49:1
clearly 267:4
Clement 291:24
292:5
CLEs 124:24
client's 114:12
117:11 147:6
clients 14:17 16:16
76:18 93:12,14,24
103:11,13 118:16
118:17 122:14
123:17 165:16
180:22 181:7
187:16 216:2
Clinic 1:3 4:3,21
307:1
close 157:2 288:20
closed 208:12
223:14 236:10
260:22
clue 281:15,17
co-counsel 123:14
124:9 180:9
196:14 230:24
251:18 252:23
256:19,21,22,23
257:14
co-counseled 251:7
co-counseling 252:5
253:23
co-counsels 96:6,7
co-plaintiffs 115:20
code 261:14,17,22
266:1
collaborate 90:24
collaborating 90:5
collaborative 90:15
90:16,18 91:11
collaboratively
89:20
collects 228:19
combination 280:15

come 75:6 78:23
159:12 160:1
174:13 218:24
255:23
comes 232:9 245:11
comfortable 159:5
coming 93:2
common 199:18
communicate 46:11
communicated
47:19 49:6 60:5
163:23 254:15
297:15
communicates
175:21
communicating
254:13 273:15
297:12
communication
56:2 57:5,8,9,10
57:11 59:5 159:2
159:3 195:22
295:11,21,24
297:19 298:14,21
299:5,13
Communities 89:14
companies 280:19
281:13
company 137:2
265:24 266:24
267:7 269:9
271:24 280:16,17
compare 263:12
265:2 294:22
compared 17:12
136:5
compensation
124:16 238:22
239:23 240:1
242:8 260:2
299:23 300:1,9,21
301:6 302:6,6,8
304:22
competing 8:11
43:21 213:10,13
213:16 247:13
compiled 6:15 7:14
compiling 274:9
complain 185:22
complaint 33:9
37:16
complaints 91:6,11
91:13
complete 40:6 167:4
167:5 221:20
264:11 308:10

completed 153:21
compliance 233:5
complicated 73:10
component 69:23
282:10 289:7
297:3 298:1
comports 224:1
compound 149:13
computer 15:3,4,5,8
15:10 69:20 70:5
83:2,3 286:3,5
computers 103:8
104:3
concealed 180:12
conceding 276:20
concept 272:23
concern 183:18
244:18 273:8
276:5 277:17
278:1
concerned 272:18
273:9
concerns 204:19
concluded 75:11
211:24
concludes 305:11
conclusion 149:20
212:11
condition 208:15
209:19
conduct 16:18,23
27:9 73:3 103:4
104:13 130:18,19
212:16
conducted 78:20
140:7 153:10
292:23
confer 162:6 301:10
conference 172:1
284:8
conferences 283:3
confidence 297:23
299:1,10,11,16,18
confidential 79:5
81:2,10 182:4
configured 69:19
confirm 190:14
265:5,19 268:1
284:22
confirmation
267:19
confirmed 25:6
confirms 190:17
conflict 38:21 140:6
143:11 214:15
215:2

conflicts 22:10
confused 217:9
241:4
confusing 260:19
271:19 272:6
273:5,7,24 274:5
274:17 275:8
276:7,14
confusion 273:18
274:21
congratulate
100:19
consent 114:13,19
117:11
consider 18:22
44:16 135:3
159:14 162:10
166:6,14
considered 165:10
211:22
consistent 164:20
197:6 246:21
consisting 306:8
constitute 39:11
40:19
constitutes 30:11,16
210:18
constitutional
293:22
consulted 281:1
contact 106:10
232:22 265:24
266:5
contacted 25:11
58:19 118:7
contain 129:11
160:7 278:23
293:3
contained 67:3
163:10 297:7
containing 68:10
contains 214:2
contemplate 202:17
contemplated
227:19 280:11
281:10
contend 45:23 78:6
81:11 82:12,18
99:10 210:17
contending 19:21
content 58:16 61:1
280:14 282:6
295:13,23
contention 31:18
33:10 35:17 44:4
74:1 81:17 83:18

97:8 129:2 271:5
contents 11:8 86:6
contested 290:9
context 45:20 211:2
242:14 260:13
contingent 187:8
226:24 233:21
238:1
continue 58:24
62:12 69:17 123:3
223:9,18
continued 33:4 87:5
88:11 98:22 156:3
156:13,15
continues 195:13
continuing 243:19
243:21
continuity 223:8
contract 15:18 18:5
18:7 139:17
223:17 226:8
234:12
contracts 14:19,23
contributed 90:20
contributing 279:11
control 31:13
220:19 221:21
285:12 294:8,22
controls 113:22
conversations 25:17
58:10 60:14
105:17 106:13
142:6,12 143:23
146:17,24 147:13
148:9,16 168:10
convey 47:6,7 51:14
118:23 165:13
225:2,13,19
conveyed 46:24
48:14 51:18,19
59:14 118:11,12
165:12 197:12
203:3
conveying 195:21
225:19
convince 177:22
convinced 177:17
Cook 21:2 308:5
copied 64:11,16
68:11 70:2 83:20
103:19 182:15,17
182:23 183:2
copies 28:6 53:18
259:13
copy 7:22 14:10,12
66:14 68:6,24

70:9 75:9,10,16
75:20,24 83:2
106:22 234:12
259:20 286:2
305:17
**copycat** 8:11 30:5
**copying** 70:4
**copyright** 93:3
**core** 91:3
**correctly** 10:19
12:16 57:2,20
114:14 169:22
170:20 180:17
182:8 195:16
197:4,4,24 223:15
264:22 265:8
272:4
**correlating** 284:21
**correspondence**
12:19 28:5 53:18
54:4 58:13 61:10
61:16 62:6,8
63:10 64:18 66:1
**correspondences**
52:8 61:12,14,17
71:20
**costs** 23:11,17
117:10 151:1
203:16 204:2
**couldn't** 35:9 82:6
183:19 191:23
**counsel's** 130:22
226:5
**counsels** 191:9
192:2
**country** 242:3
286:22
**County** 21:2 206:5
306:3 308:2,5
**couple** 153:20 157:1
183:9 185:16
254:21 287:7,18
**coupon** 160:22
166:14
**coupons** 118:22
159:9,14 161:9
164:19,21 165:7,8
165:9
**course** 60:23 297:15
**court's** 289:20
**courts** 1:14 210:21
**cover** 238:24 239:17
239:19 240:1
242:17 247:6
301:2
**covered** 52:18 59:15

92:12 129:17
158:5 166:11
305:6
**covering** 115:1
**covers** 112:11
**Cox** 87:11
**Craig** 153:8
**crashing** 179:20
**create** 209:20
**created** 78:24 79:2
211:9
**creates** 209:24
214:4
**creating** 237:24
**creation** 166:1
**crisis** 185:8,9,21
190:10
**cross-reference**
80:16
**CRR** 1:21 308:4
**CSR** 1:21 308:5
**cure** 285:11,14
**cy** 195:15

**D**

**D** 3:1
**D-e-w-a-r** 89:5
**D-o-u-g-h** 89:6
**d/b/a** 1:8
**Daisy** 89:4
**damages** 207:5,6,7
207:16 241:13
242:5
**Dan** 4:18
**DANIEL** 2:11
**danieljaycohen20...**
2:14
**dark** 56:22
**dash** 97:2,2
**data** 245:22 247:5
265:18 267:23
272:11,22 293:3
**database** 284:5,11
284:20 285:5
**databases** 80:15
280:15 281:13
282:7,13 283:1
**date** 4:6 33:22
48:19 55:7 84:2
95:5,9 186:5
270:10 283:11
298:16 299:20
**dated** 194:19
**dates** 25:5 71:23
156:20

**Dave** 170:15 184:2
184:23
**David** 1:7 2:6,16
4:16 8:10 10:7
30:3 61:19 67:8
118:7 119:3 123:4
153:7 155:3,7,16
158:14 213:20
214:11 246:11
307:2
**day** 11:10 55:22,24
67:24 143:21,21
153:5 155:11
164:10 228:16
251:23 279:24
280:5 298:18,18
306:18
**days** 11:9,17,18
12:18,18 62:2,3
67:12 69:3 99:7
99:12 157:1 183:9
280:1
**days'** 96:23 98:14
**Daytime** 266:6
**deal** 153:3 184:23
**dealings** 170:8
**decide** 233:19
**decided** 173:1
200:22,23 201:5,6
202:18
**decides** 234:1
**decision** 10:6 30:24
67:11 111:13
143:15 176:6
220:5 225:4 280:1
**decisions** 48:3,6
183:8 247:10
**declare** 299:4
**declared** 157:5
299:17
**deduction** 238:17
238:22 242:16
264:22
**deem** 223:21
**deemed** 223:12
224:9 246:2
**defeated** 134:2
**defects** 135:16
**defendant** 2:6,10
27:16 118:11
155:6 170:10
208:18 219:17
222:2 225:9
226:18 229:23
238:8 295:12
**defendant's** 134:2

203:4 205:23
274:15
**defendants** 1:9
18:15 19:22 33:2
87:16,24 160:2
303:21
**defense** 25:20 135:9
155:15 184:14
208:17 209:23
210:23 211:23
217:2
**define** 285:1
**definitely** 50:8
55:20,22 110:10
122:6 144:24
155:19 286:4
**delayed** 61:24 104:7
104:10,16
**demand** 152:16,18
154:9 162:22
163:21,23 164:2
198:16 201:13
**demanded** 61:23
195:14 198:19
302:13,21
**demands** 152:10
**demonstrate** 102:20
**demonstrated** 244:2
**denial** 209:14
247:20
**denied** 96:4 247:16
247:19
**departure** 86:4,19
87:6 88:12 90:1
296:6 298:22
**depend** 40:1,14
41:4 191:16
225:22
**dependent** 216:15
**depending** 229:18
303:3
**depends** 47:22
**deponent** 5:2
154:23 198:11
274:8 292:8,10
**depose** 25:11
**deposed** 5:12 24:8
24:11,13
**depositions** 1:14
21:4,13 25:1,3,22
26:5,8 46:20
107:22 108:9
187:16
**depress** 271:3,13
273:21 278:4
279:14 293:24

**describe** 8:8 26:22
27:4 49:5 77:1
154:20 295:22
299:19
**described** 10:2
96:16 248:3
**describing** 283:12
**description** 3:10
262:18
**designated** 137:21
**designed** 267:19
271:7,11
**desire** 216:15
**desk** 97:15,23
**despite** 180:11
**destroyed** 70:13
**detail** 30:24 295:20
**detailed** 285:23
291:15
**details** 60:14 295:6
**determine** 19:12
41:24 65:5 162:20
195:19 301:11
**determined** 172:19
**develop** 227:14
297:23
**developed** 251:16
**developing** 231:1
**development** 281:7
**developments**
169:18 170:2
186:10,12
**Dewar** 89:5
**dialogue** 183:11
**Diamond** 83:12
84:19 85:3
**difference** 32:20
39:3 152:2 177:24
208:20 228:16
255:19 270:16
303:16
**different** 109:20
133:18 144:21
151:23 215:5
294:7
**differentiate** 304:15
304:17
**differentiated**
303:16 304:21
**differs** 216:2
**difficult** 70:14
**difficulty** 270:21,24
**Dimensions** 89:8
**directly** 46:23
308:13
**disagree** 53:24

177:10
disagreed 171:5
disagreeing 220:7
disagreement 243:19,21
disappointed 176:20
discern 103:19
disclose 65:24 66:2 70:20 71:17 72:4 72:14,17
disclosed 28:21 29:13 72:6 86:6
disclosing 28:18
disclosure 72:24
discoverable 60:3
discovery 10:7,8 79:8 95:5,8 123:3 153:20,22 159:20 186:13 233:6 246:18 264:3
discrepancy 199:13
discuss 25:13,21 105:22 106:7 162:1 165:18,21 187:24 297:4
discussed 92:1 105:15 111:13 117:16,18,19,20 117:21 142:18 159:4 160:17,21 201:3,12 221:18
discussing 164:6,9 181:19 260:14
dismissed 182:3
disposition 204:20
dispute 37:19,22 71:4 91:23 175:16
disrespectful 180:15
dissuading 244:7,18 260:3,13 266:12
distinct 239:24
distinction 142:2
distinguished 209:17
distribution 187:19
District 1:1,1,13
divide 229:3
division 1:2 90:11 117:9 119:22 121:5 122:17 123:1 173:4
divorce 277:21
divulge 167:20
divulgence 302:10

doesn't 159:1 199:3 255:4
doing 99:7 155:1 247:4 250:15 288:10 293:23 294:14
dollar 39:9 159:19 164:24 165:2,5,8 239:19 304:16
dollars 118:22 154:8 161:8 165:9
done 95:5 138:15 141:22 257:5 270:19 286:15 287:13 288:20 293:23 294:10
door 84:10 97:24 98:19
doubt 113:10
doubtful 151:19,20
Dough 89:5,5
down 5:20 72:19 124:5 144:6 185:23,24 186:3 213:2 225:10 237:5 271:16
download 8:23 84:19
downloaded 8:1
downloads 7:21
draft 123:7
drawing 222:20 223:1
drive 292:1,4,7,9 293:2,14
Dropbox 84:18
due 38:19 197:23 279:24 280:4,5 293:22
duly 5:3 308:6
duration 64:20
during 70:4 167:20 212:14 283:3 297:22
duties 130:12,16 131:2 132:17 151:23 214:23 221:23 222:1 235:21
_____
**E**
E 3:1,8
each 5:18,18 73:10 123:22 158:20 160:4 187:18 260:24 261:1

263:20,21 265:17 301:3
earlier 49:23 50:11 94:21 101:9 122:8 136:19 205:2 231:7 245:18
early 34:8 45:11 46:11 57:21 200:2 208:6 249:24 288:17 296:3
EClinicalWorks 136:14
effect 231:20 255:3 271:14 272:8
effective 171:4 264:21 293:7,13
effort 49:1
efforts 123:3
either 25:22 66:17 102:9 115:14,18 122:5 155:17 157:7,9 172:15 173:1 178:8 189:4 214:3 247:18 269:2 283:13 294:17 300:17
electronic 245:21
electronically 245:5
Electronics 14:9 64:8,10 68:23
elements 91:3
else's 103:8
emailed 102:8
embarrassed 103:17,21
embarrassing 103:9
embarrassment 104:5 105:8
empirical 272:22
employee 82:3 102:3 120:23 308:12,12
employer 82:19
employment 15:19 54:22 68:7 70:21 74:3 82:20
encountered 228:9 228:10
end 7:20 18:12 19:12 23:1 29:24 144:14 155:10 164:10 231:3 234:7 248:13 270:10 281:21
ended 190:10 253:24 254:1

290:22 291:17
endorsement 177:6
ends 241:16
engage 213:24
engagement 106:22 234:14,19 235:1,6 235:10,13,21
enough 65:14 229:21 232:2 238:24 264:18 299:9 301:2 303:3
Enter 32:13
entered 109:4 123:14 135:9 235:13 280:6
entire 80:17 216:12 217:23 220:18 223:11 286:22
entirety 248:8
entitled 19:1
entity 275:17,19
equally 303:12
equitable 210:11
equivalent 264:21 293:9
equivalents 293:14
error 284:13,16,24 285:1
essentially 120:15 297:12
establish 39:20 40:13 41:2,10 42:7,13,20 44:7
established 212:1
establishes 43:23 150:24
estimate 125:10 298:18
estimated 285:19
estimation 136:21 208:8 276:16
et 73:4 186:13 307:2
ethically 226:2
ethics 50:24 51:1 62:19 116:1,2 226:5
European 87:24
evaluate 39:14
evaluated 188:5,7
even 60:15 69:3 97:14 99:16 186:4 218:3 225:16 228:14 232:23 237:20 246:24 247:7 249:3,24 276:10

event 115:15,21 235:19 251:24
events 228:20
eventually 55:3
every 55:4 59:4 64:2 73:20 78:19 138:17,19 179:19 228:14 254:3 297:3 303:23
everybody 25:6 40:7 103:8 240:4 268:13
everybody's 25:5
everyone 26:19 177:4
everything 5:20 15:10 71:5 72:13 200:1 212:8 232:18 246:3,5,6 247:6,9 276:21,22 278:24 291:22 304:4,6 305:6
evidence 79:7 227:15 305:3
evidentiary 293:12
Ewing 32:16 209:1 220:6
exact 118:21 156:20 187:6 214:1
exactly 69:4 144:20 146:20 187:1 231:8 282:11 292:24 300:18
examination 1:12 5:5 204:8
Examinations 3:3
examined 5:4
example 40:16,18 40:20 47:22 68:22 69:1 96:2 126:23 140:6 141:22 225:1 257:5 269:8 302:16
exceeds 237:18,21
Excel 80:14
except 177:4 216:22 219:12 220:11 243:4,17
Excepting 51:5
exception 73:24 264:10 265:5 274:10
excessively 244:18 260:3,12 266:12
exchange 175:13 179:13

exchanged 58:6
exclude 260:7
exclusive 220:19
exclusively 138:15
  140:15 141:23
  142:14
excuse 224:22 292:2
exhausted 226:20
  242:15
exhibits 305:15
existed 68:24
existing 35:24
  216:24 217:13,22
  220:20 249:6
  263:6 275:1
exists 16:5 22:3
  204:11 254:10
expand 198:6
expect 276:24
expected 123:11,16
  186:22 187:3,12
  238:10
expecting 186:15
  262:8
expects 149:16
expenses 23:11
  149:2 150:21
  233:12 235:9,23
  238:18,23 242:17
experience 47:20
  212:7 227:11
  242:20 282:21,22
experienced 227:12
experimental 294:8
expert 159:22
expiration 208:21
expired 208:10
  209:21 217:4
  219:14
explain 14:1 36:14
  38:10 39:6 159:21
  171:8 191:19
  204:18 221:16
  243:12 256:7
  267:10 270:5
explained 253:21
explains 224:18
explanation 179:18
  195:9
explore 231:10
  268:18
export 80:17
express 266:10
expressed 214:19
expressly 255:13
extend 126:12

extra 214:23
extraordinarily
  226:22
extremely 286:23

### F

f-a-c-t-s 46:24
F-a-u-l-e-y 77:20
F-l-i-t-e 89:15
face 276:21
facilitate 225:17
facsimiles 163:19
factor 43:23 274:3
factors 151:8
  229:19
facts 11:11 13:15
  46:10,23 47:5,6,6
  47:19 48:9,9,9,14
  49:5 58:22 59:13
  59:14 60:4,16
  63:22 130:9
  141:18 147:16,22
  148:9
factual 100:21
failed 161:18
  173:21 180:10
  264:12
fails 293:21
failures 297:4
fair 5:24 65:14 94:2
  232:2 234:24
  264:18 299:9,15
fall 206:13 250:13
falling 22:5
falls 49:3 279:18
false 10:6,18,22
  11:24 12:5,9
  49:23 68:12,14,17
  102:15 167:13,18
familiar 36:1 80:14
  163:9 244:11
  278:16 280:18
familiarity 244:16
fantasy 83:14 84:20
  85:4
far 60:15 140:5
  186:7 225:10
  226:20 237:18,20
  239:2 243:14
  248:14 287:5
  293:18
Fauley 77:18,19,22
  78:13 80:22 95:15
favor 158:4
favorably 151:16
faxed 216:19

faxing 297:24
FCC 285:19,24
feature 279:12
federal 209:17,22
  210:20 292:13
fee 195:15 199:16
  199:18 226:24
  238:1
feel 103:17,21 149:8
  252:14
feeling 299:19
feet 97:24
fell 103:18
felt 96:22
few 96:11 97:24
  257:15 286:14
  287:8
fiduciary 27:7,11
  41:15,24 106:7
  128:7 137:7,9
  141:3 150:11
  214:16 215:2
  216:12 221:9
  226:17 227:2
  232:16,20 237:15
figure 164:6 228:15
  229:3 230:6
figures 201:4,6,8
  202:17
file 27:16 32:9,12
  35:21,22 62:2
  67:16 213:10,22
  219:16
files 65:17 86:11,17
  245:21
filing 57:3 213:13
  213:15 251:14
  253:17 256:3
filings 209:4
fill 242:8 262:16
filling 272:8
final 89:3 135:10,12
  159:6 193:2
  248:13
finally 183:5
financial 116:12
financially 308:12
find 171:3 191:2
  215:5 224:14,18
  275:8,8,11 278:2
  285:9 306:9
finding 190:23
fine 106:20 193:19
  215:12 301:1,14
finish 17:22 26:1
  190:6

firing 170:15
firm's 30:14
firms 90:15,23
  114:6 181:7
  187:18 254:17
  255:9
first-chair 205:11
  207:22 208:3
fit 25:9
fits 195:6
Fitzgerald 24:16
  50:9
five 87:1 97:20
  169:20 230:8
flew 144:9
Flite 89:14,15
floor 2:12 195:15
Florida 1:1 87:8,19
  88:9 89:2 130:17
  144:4 286:13
fly 144:6
focus 231:8 241:17
focused 231:9
focuses 224:8
focusing 251:22,23
Foley's 233:11
  234:8 235:8
follow 22:19 49:9
  62:24 160:13
  176:12
follow-up 297:3
  303:4
following 48:22
  59:22 60:10 61:5
  62:16 84:18 148:5
  152:22 154:14
  172:4 189:14
  194:9
follows 5:4
forced 38:15
foregoing 306:7
  308:9
formally 121:20
former 6:24 38:20
  61:21 82:19,20
  84:9
formerly 121:1
forms 278:8 279:8
formulas 80:14
formulating 44:15
forth 300:2,21
  301:3
forward 84:1
forwarded 56:3
forwarding 84:20
found 113:19

175:10 199:8
  246:18,20 293:14
foundation 92:10
  93:9 94:3,10
  178:16
four 5:15 33:22
  34:21 120:17
  205:6,9 207:23
  208:2 212:6 213:1
  243:3,17 261:23
  262:1 287:8,10
frame 33:12 89:22
  89:23 138:16
  178:3
Frankly 176:23
free 149:8
freestanding 117:7
Freight 241:3
frequently 80:21
  91:5
Friday 9:16 176:10
friend 174:14,16,18
front 29:21 73:8
  145:23 187:22
  209:4 232:11
  259:17 292:13
frustrated 299:22
frustration 186:1
fulfilling 236:1
full 238:19 239:1
  305:14
fully 5:24 228:14
  290:11
fund 195:14 221:11
  226:19,22 230:8
  237:18,18,24
  238:17,24 239:2,4
  239:16,18,24
  242:15,16,20
  243:3,5,17 260:3
  300:7 301:1
fundamental 281:8
funky 262:1
further 83:16
  172:24 187:13
  224:17 272:2
  279:23 302:10
  305:7 308:9,11
future 124:23 186:9

### G

G.M 206:24 241:2,3
gap 242:8
gathering 233:2,4
gave 40:15 67:15
  75:16 81:22 82:1

99:11,12 165:7
187:23 212:15
295:21
**general** 91:16 125:3
152:12 155:1,7,16
166:3 242:19
244:15 252:1,5
295:17 298:12
**generally** 22:22
76:12 91:22,23
162:5 181:1,2
231:16 244:14
**generate** 91:12
239:5 243:4
**generated** 282:14
**Gents** 169:17
**genuine** 295:8 298:8
**genuinely** 295:18
**Gerald** 292:11,22
**gets** 234:2
**getting** 40:5,7 83:1
219:11 240:4,13
240:14 248:15,18
274:20 275:12
281:20 288:10
289:22 302:23
**gist** 298:12
**give** 12:13 15:22
40:20 88:19,23
100:8 101:24
118:6 126:22
134:6 141:21
144:22 169:11
191:20 240:24,24
250:2,5 301:13
**given** 67:13 82:3
204:10,15 227:16
230:8 306:11
308:10
**gives** 10:21 11:4,5
14:24 15:9,13
21:24 51:10 70:18
176:11 177:5
299:1
**giving** 157:18 247:8
**Global** 89:8
**goes** 180:15 222:9
261:22 267:4,10
277:17
**Goethals** 2:15 4:8
**going-away** 99:4
**gone** 125:12
**got** 25:4 74:2 167:4
213:2 214:12
217:8 225:16
241:1 243:13

244:4 245:5,12
258:8 259:13
264:19,21 267:14
274:11 277:6
294:3,6 304:4
**gotten** 89:3 240:19
258:9 294:1
**govern** 73:4
**granted** 137:16,17
236:11,14
**great** 49:14 134:11
288:21 294:1
**greater** 304:22
**greatly** 229:18
**Greg** 24:15
**Griffin** 145:8
**ground** 5:17
**grounds** 201:11
**group** 235:24
252:12 294:8,8,12
294:22
**grown** 251:16
**guarantee** 249:8
**guard** 95:24
**guess** 91:19 121:10
137:4 191:2 241:8
296:12
**guide** 43:4
**guy** 65:13

**H**

**H** 3:8
**H-e-e-l** 278:19
**H-e-s-k-a** 77:20
**half** 7:9 8:6 153:4
154:8 228:6,8,16
295:10
**hallway** 145:23
**hand** 204:6 308:14
**handed** 117:1
169:13
**handing** 163:6
**handle** 181:24
**handled** 107:22
288:16
**hands-on** 290:21
**happen** 114:16
217:19
**happened** 11:10
67:20 117:13
146:9 152:7 153:2
154:18,21 173:14
173:20 176:8
178:15 185:2
197:7 199:3,7
257:4

**happening** 183:10
226:7 291:8
**happens** 241:16
**happy** 59:4 190:15
245:1
**hard** 243:15 275:18
275:23 281:16,18
282:2,14 284:18
288:13 292:1,2,4
292:7,9 293:2,14
**harmed** 103:3 104:4
**harmful** 225:24
**hasn't** 137:13
**Hatch** 1:8 2:11 8:11
27:7,15 30:4
38:21 46:6 82:3
102:3 137:16
142:23 252:14
253:3 254:23
255:20
**haven't** 131:11
273:4 281:15
**having** 5:3 17:16
23:7 55:10 95:24
114:17 164:15
189:17 202:19
214:20,21 228:24
236:17 270:24
285:12 298:7
**he'll** 183:24
**he's** 74:2 79:14
172:16 188:19
245:12 297:18
**head** 27:20 43:8
77:6,17 78:3,8
87:4 106:2,5
121:12 142:9
143:16 195:12
228:15 241:24
245:15 287:12
289:8,14 300:16
**heads-up** 169:19
**health** 81:5 95:14
137:1
**Healthsource** 88:6
286:18
**hear** 176:13 298:12
**heard** 10:17 186:2
222:13
**hearing** 135:8 140:6
143:11,12,20
144:7,9,12,16
145:22 146:4,7
247:14 273:19
304:10
**heart** 213:7

**heavily** 129:11
234:14,15
**Heel** 278:17
**help** 5:19 27:15
136:3 141:19
184:23 206:9,12
283:19
**her** 17:22 26:4
97:23 115:1 213:1
**hereby** 271:23
306:7 308:5
**herein** 5:2
**Hernandez** 24:17
50:9
**Heska** 77:18,20,22
78:14 80:22 95:15
**high** 177:5 225:8
229:24 230:10
231:3 264:9,20
265:9 286:23
**higher** 167:6 197:22
198:17 200:15,22
**highest** 228:9 229:5
230:17
**highly** 294:15
**himself** 214:12,13
**hired** 62:19 213:20
**hold** 221:9,16
222:10 240:9
302:20
**holding** 14:11,12
75:12 298:10,16
**hope** 56:19 150:7
**hostage** 221:10,17
222:10 226:13
**hour** 144:24 145:1
**hours** 104:18 105:5
124:3,5,12,16,19
124:20,22 125:2,9
213:1
**however** 149:19
210:13 229:3
230:1
**hundred** 40:11,21
42:16 89:24 145:9
157:19,22 187:5
253:2 274:11
**hundreds** 104:18,18
104:19,19 105:5,5
125:8,9
**hyperbole** 226:12
**hypothetical** 38:2
41:11 221:4
227:10 239:8
**hypothetically** 40:5
191:21 238:7

302:24

**I**

**I'd** 55:1 63:22 81:4
193:13 238:3
245:1 301:10
**I'll** 51:23 52:15
53:12,14 54:16
60:20 69:15 91:21
147:4 148:3
152:10 164:2
175:10 176:12
189:12 194:2,8
195:17 196:23
234:5 261:14
305:17
**I've** 16:18 53:17
138:17 142:18
164:23 175:11
213:2 228:13
244:4 246:23
**idea** 39:16 42:23
98:22
**ideas** 144:22
**identical** 152:3
**identification**
111:17 163:3
168:22 175:3
179:4 193:7 259:6
281:5
**identified** 13:17
71:23 90:6 96:11
185:15 196:13
263:12 266:22
267:5,12 281:14
293:18
**identifies** 265:2
**identify** 64:2 65:22
71:5,8 88:15
89:13 96:16
113:13 142:6,9
148:8 158:2 203:2
224:20 262:9
274:12 283:11
**identifying** 87:22
196:5 285:24
**ignoring** 293:17
**Illinois** 1:16,17 2:4
2:13 4:12 16:11
16:13,15,17,20,22
87:8 88:4,10
130:19 144:4
206:5 306:1 308:1
308:5
**immediately** 45:6
45:12,12 46:12

47:9 52:5 55:12
57:2 97:13 99:3
103:16 119:6
142:22 143:13
173:12 292:21,22
**impact** 141:24
**impasse** 157:6
299:4,17
**impede** 260:4
**impermissible**
213:10,14
**important** 242:9
**impression** 11:5
28:22 29:1,7
70:19 101:6
233:20,24 274:20
**impressions** 102:17
147:3 202:3
**imprimatur** 137:21
**improper** 213:9
223:13,22 224:9
**inaccurate** 252:8
282:15
**inadequate** 224:19
293:20
**inapplicable** 210:12
**inappropriate**
191:13 263:8
**inbound** 7:22
**Inc** 1:4 4:21 307:2
**incentive** 133:14,15
**incidence** 285:15
**include** 56:9
**included** 56:11
75:14 162:22
172:8,13 173:9,12
256:12 257:21
258:12,20 267:22
289:6
**includes** 23:24
203:21 281:18,19
**including** 61:20
98:23 150:2,4
151:18 214:22,24
216:13 257:1,14
290:23 291:17
293:4
**inclusive** 306:9
**inconsistent** 276:8
290:5
**incorporate** 209:18
229:23
**incorrect** 272:12
**increases** 239:4
**incredibly** 27:1
213:4 251:4

**incumbent** 204:17
**incurred** 233:12
**independent** 37:17
279:11
**indicate** 71:16
188:3 210:21
260:23 263:19
265:10,16
**indicated** 205:2
233:10 279:10
**indicates** 102:1
211:4 305:3
**indicating** 58:2
196:9 225:7,10
261:9
**indication** 10:21
**indicative** 271:1
**indicia** 43:5
**indirectly** 308:13
**individual** 1:7 32:12
35:16 36:16,18
131:11 132:11
133:24 134:3
135:23 206:17,18
207:19 216:3,16
**individualized**
135:10 136:4
**individually** 35:15
138:5,21 181:20
181:21
**Industries** 32:16
220:6
**Industry** 209:1
**inference** 213:18
**inferences** 212:15
**inferring** 269:13
**inflate** 221:11
226:23
**influence** 214:4
**Info** 280:16,24
**inform** 53:10,20
**informed** 12:8
184:6,19
**informs** 303:2
**initial** 5:10 123:7
163:21
**initially** 137:15
184:8 236:10,15
237:5
**initiate** 220:13
**initiated** 180:12
293:12
**initiation** 18:3,5
303:17,18,20
304:5,11,18
**injunction** 143:12

143:20 144:7,12
144:16 146:3,7
**injured** 104:13
**input** 226:5
**inquiry** 220:2
**inserted** 95:4
**insist** 167:8 226:19
258:20
**insisted** 289:24
**insisting** 239:2
290:15 299:3
**instance** 40:23
74:17,18,20 75:1
75:2 96:16 100:6
101:21 103:18
114:16 117:14
210:9
**instances** 93:18
96:11,15
**instant** 142:15
**instead** 40:21 188:6
241:3 282:23
**instruct** 79:15
**instructed** 14:10
124:22
**instructing** 79:17
79:20,21
**instruction** 49:10
**instructions** 111:7
**insufficient** 260:2,2
**intact** 246:20
**integral** 211:12
**intellectual** 76:2,5
76:14 77:9 78:11
95:11,17
**intending** 97:16
**intention** 179:20
**intentional** 195:20
**intentionally** 271:6
**interest** 17:3 22:10
30:15,17,22 31:19
32:1,4 38:22 92:4
92:20,24 93:1,18
93:24 140:6
143:11 214:15
215:2 243:4
247:23
**interested** 6:23 55:4
308:13
**interests** 38:17
93:14 94:1,6,7
220:18
**internal** 158:10,18
159:15 160:17
161:24 163:13
166:17 198:3

203:5 230:5,22
231:1
**internally** 276:8
**interpose** 154:22
195:17 196:24
197:10
**interpretation**
220:9 269:21
**interrelated** 251:18
277:23
**interrelatedness**
231:21
**interrelationship**
251:18
**interrupting** 5:18
26:24 123:24
**intervene** 35:23
209:6,7 217:11
218:6 219:2 221:6
224:15 232:19
249:9
**interveners** 36:7
**intervening** 115:19
219:6
**intervenor** 218:12
**intervention** 36:4
209:14 216:24
217:21 218:11
219:10,12 220:12
220:24 249:5,7
**intimidating** 275:9
277:9 278:3
**intimidation** 273:20
274:2
**into** 25:9 43:20
124:1 151:8 194:3
201:4 229:24
235:13 279:18
295:20 303:11
**introduce** 4:13
**invade** 48:14
**invoice** 150:18,21
**invoke** 231:19
**invoking** 231:17
**involve** 35:5 49:2
214:15
**involved** 47:13 93:7
94:8 122:21 166:4
168:1 191:18
209:4 241:22
252:11 254:5
255:14 257:19
281:6 289:16
290:20 291:24
292:7
**involvement** 251:16

291:4
**involves** 27:23
**involving** 78:1
126:8
**iprice** 245:7
**irrespective** 302:21
**Ismael** 120:22,23,24
172:13 192:14
**isn't** 165:2 230:4
231:8 291:14
303:3
**issue** 13:17 46:21
48:1 58:11 105:24
106:6 181:14
210:1,18 239:22
239:22 267:13
270:7 273:17,20
288:11,12
**issued** 280:3 288:9
**issues** 91:24 135:10
173:3
**iterations** 162:21
**its** 32:18 34:1 65:18
70:10 93:24
103:11,12 181:6
196:7 209:7
230:24 245:21,22
290:23 291:17
**itself** 39:19 56:3
132:18 180:11
211:12 300:22

------

**J**

**J** 2:7
**James** 120:20
175:22
**Jeff** 145:5
**Jeffrey** 9:13
**Jim** 120:20 192:11
**job** 275:12
**Joe** 118:8,16,17,19
119:6,7,10 120:23
122:14 160:22
165:11,12,13,16
170:3,7,14 171:9
174:6 179:16
185:14
**join** 35:23 258:18
**joined** 292:16
**joining** 250:6
**joint** 85:8,10,14,21
86:3,11,16,18
91:23
**jointly** 252:13 254:2
254:14
**joke** 160:23

**Jorge** 82:4 102:1,3
102:24
**Joseph** 175:22
176:15
**JPA** 180:16,19
**judge's** 87:13
**judges** 133:13
232:11
**judgment** 133:23
134:1,2,5,24
135:11,13,18,21
136:3 148:19,22
151:15 154:3
158:3 167:5 241:9
248:7,13
**judgments** 241:7
**July** 34:10 176:10
176:15
**June** 106:16
**jurisdiction** 137:3
199:19
**jurisdictional**
208:22 210:18
211:5,21 212:3
**jury** 206:19
**justify** 243:2,16

**K**

**K** 306:3 308:2
**K-n-a-c-k** 229:12
**Kate** 155:6
**KCC** 227:18 230:19
280:15,24
**KCC's** 228:3,21
230:2
**keep** 67:11 124:3,20
124:22 179:21
180:10 186:9
255:1
**Kelly** 24:14 26:10
50:5,7 175:23
**kept** 124:13,19
231:13
**Keys** 88:21
**kind** 221:18 225:8
227:21 249:11
284:24 289:22
294:21
**KMH** 136:15
**knew** 57:7 96:23
171:11 253:2
**knowing** 58:17
274:14
**knowledge** 6:22
14:24 37:17 42:8
63:23 64:3 81:19

82:8,10 191:17
226:6 249:12,14
249:17 253:19
290:21 291:14
**known** 103:15
227:18

**L**

**L-a** 97:2
**L-a-r-b-e-v** 87:17
**La-Z-Boy** 97:2
98:16
**Labarga** 82:4 102:1
102:3
**Labarga's** 102:24
**labeled** 10:11,13
101:24
**labels** 10:14
**labor** 90:11 123:1
**lack** 143:9 210:8
299:6
**lacks** 44:11
**laid** 121:22
**Lally** 155:7
**language** 23:8,19
138:8,20 244:7
269:21
**Larbev** 87:17
**Lardner** 2:2 4:12
18:6,8 21:6,9,20
22:3 23:3 25:7
67:21,23 68:6
111:10 129:3
139:12,19 143:24
144:11 146:11
203:22
**Lardner's** 22:22
150:3,4,18 203:19
**large** 23:7 221:11
226:19,22 237:17
252:12 301:1
**largely** 27:22
**larger** 237:24 238:1
239:3,5 243:4,5
**LaSalle** 2:12
**last** 50:16,17 53:22
97:19 157:9
187:22 195:13
205:14 206:8
223:2 226:13
257:15 258:14
261:5,23 262:1
299:15
**lasted** 146:21
**late** 34:8,10,21
122:9 236:20

296:4
**later** 48:19 62:3
84:2 222:9 250:10
250:13
**latter** 6:23
**Lauren** 2:3 4:20 9:6
145:5
**laws** 16:12,14,20
73:3
**lawsuit** 11:9 60:17
62:2 68:4,5 79:6
127:20 303:18,19
304:5,12,18
**lawyer** 59:14,15
73:14 74:1,6,7,10
144:3 208:4
**lawyering** 59:14
**Layli** 1:15,21 4:9
308:4,17
**lead** 80:3 123:5
**leading** 123:3 135:8
143:6
**league** 83:14
**learn** 61:7 173:23
178:12
**learned** 57:13 148:9
287:7
**learning** 57:3
**least** 74:24 82:2
87:8 123:6 255:12
257:3 269:12
295:15 303:14
**leave** 53:6 199:24
215:3,4 224:20
**leaves** 73:5,15 74:2
74:7
**leaving** 53:3 86:12
**led** 292:1
**left** 15:6 53:1,11,21
54:2,6,22 55:7,10
57:21 65:16 83:9
84:4 100:17
214:11 220:19
248:6 264:14
**legally** 33:5 212:9
**lengthy** 305:4
**less** 31:7 144:24
145:1 167:9,12,17
304:2
**lesser** 300:14
**let** 17:22 67:6 69:10
85:17 88:23 99:3
109:20 111:23
134:7 169:3 175:7
175:10 179:9
182:5 185:22

193:11 210:5
215:9 224:23
238:15 239:9
244:23 245:6
254:23 288:7
**let's** 5:16 16:11
49:12 178:9
226:12 242:7,9
261:4,10 268:18
**letter** 11:6 196:4
234:14,20 235:1,7
235:10,14,18,22
**letting** 26:1 71:15
247:9
**level** 281:8 298:24
**leverage** 31:6 38:13
38:16
**Lewis** 1:8 27:8,15
30:4 46:6 102:3
142:23
**Lex** 50:19
**LexisNexis** 229:11
**License** 1:22
**licensed** 144:5
**lie** 12:2 99:18 102:5
51:15,21 52:12,22
62:10 63:7,14
82:12,18,22 83:20
83:22 96:12 99:11
**light** 166:18 299:14
**like** 21:4 32:11 55:1
63:22 81:4 102:4
102:6 118:22
132:5 149:6
180:13 185:6
193:13 194:10,14
198:6 226:13
238:3 245:12
288:17 291:6
293:7 295:7
301:10
**liked** 171:10,11,12
**likelihood** 27:3
**likely** 26:16,17
107:4 113:17
176:7 227:15
230:7,15
**limit** 211:14,14,22
**limitation** 34:24
**limited** 61:21 98:24
126:8 127:6,13
252:24 291:4,12
**limits** 253:1
**line** 7:18 57:20
131:20 163:21

243:18 267:14
284:7 300:4 307:5
**lines** 29:18
**link** 8:23
**links** 84:18
**lisp** 236:21
**listed** 26:20 108:13
108:16 117:1
138:4 139:22
175:17 190:1
260:22 263:17,18
265:16 266:17
**lists** 76:7,9,12 77:10
77:12 78:1,4
95:12,12,21
264:10 265:4
**literally** 40:7
**little** 231:6 250:17
**LLC** 1:8,8 2:10,11
4:19,19
**lloew@foley.com**
2:5
**LLP** 2:2 4:12
**local** 120:9,18
**locate** 70:15 245:22
**located** 113:14
211:3 246:1,3
**locked** 67:16 70:7
**Locks** 88:21
**log** 263:13
**logs** 167:5 263:23
264:7,16,20 265:4
274:10 275:13
293:4,7,8,9,13
**long** 9:17 61:24
69:4 97:18 138:11
144:17,20 146:21
170:9 185:22
217:6 249:23
264:21
**longer** 69:5 70:7
299:16
**looked** 16:22 191:6
228:24
**looking** 7:17 37:17
126:23 159:11
166:22 189:20
283:18
**looks** 163:9 194:10
194:14
**loop** 180:10 186:9
**lost** 207:20
**lot** 94:14 104:6,9
229:20 270:19
**low** 229:24 230:9
302:17 303:7,9

lower 302:19
lowest 228:8
lucky 222:19
lump 188:5,13
lunch 97:14 134:15
lying 13:10,13
   49:24 96:17 100:7

_____

**M**

MA 169:14
Madison 2:8
mail 161:17,20
   275:23 281:16,19
   282:2,15 284:18
   288:13
main 106:10
maintain 86:4
maintained 85:11
   85:15
maintains 66:14
majority 228:19,19
   228:22
makes 56:20 177:23
   222:2 304:16
making 42:8 71:6
   72:8 80:6 218:5
management 125:7
March 210:7
Margulis 96:8
mark 155:6 168:18
   170:6,8,10 171:11
   210:20
marked 10:11
   111:16 163:2,6
   166:1 168:21
   169:13 170:14
   175:2 179:3,7
   193:6,10 194:18
   195:7 259:5,15
marking 111:20
   175:6
marks 177:5
Massachusetts
   88:20
matches 8:2
matching 80:18
material 65:22
   70:14,20 72:4
   83:20 95:16
materials 7:11 16:8
   17:2,5 56:9 64:12
   66:6 71:18 72:18
   73:16 74:3,7,10
   74:11,24 83:9,19
   84:1 91:22 93:20
   98:23

math 229:2
matter 4:3 7:18
   21:11 51:13 73:17
   73:18 79:6 81:3
   89:2 137:6 181:19
   291:4
matters 66:5,7
   105:15 136:13
   232:11
Max 96:8 153:9
   178:7,9,15
maximum 40:8
   240:5,16
maybe 144:21
   149:11,12 191:23
   192:16 237:4,4
   245:14 262:17
   280:1 302:17
   303:3,8
MC 3:15,15,16,16
   3:17 112:18 175:7
   175:7 179:8,8
   193:11
McHenry 206:4
McKesson 81:6
   95:15
McKown's 246:17
   247:7
McMahon 9:21
meaning 274:2
   277:6 298:17
meaningful 93:6
means 31:16 73:19
   161:20 264:24
meant 231:10 234:4
   243:11,13
Measer 184:10,13
median 228:17
   229:4
mediate 142:24
   191:14
mediated 155:9
   177:3
mediation-specific
   189:11
mediations 27:14
   91:20 155:23
   158:20 159:17
   160:5 178:5 182:4
   192:5,8 213:24
mediator 28:22
   29:1,4 57:11
   101:21 153:9
   157:4 160:4
   170:18 171:2,4
   172:20 176:4,21

177:11,23 178:10
296:2 298:13,15
299:1,3,13,19,22
mediator's 56:16
   101:6 102:17
   143:4
mediators 175:24
meet 9:7,15 144:10
   293:21
meets 262:18
megabytes 8:24
members 35:5,6,19
   35:21 133:9
   135:15 215:22
   217:4,24 219:21
   220:19 239:1
   278:13 294:12
   300:10 303:14
memo 75:19
memorable 179:24
memorandum 60:2
memory 244:24
mental 147:3 202:3
mention 50:12
mentioned 102:16
   231:3 289:11
mere 213:13,15
merits 204:21
Mester 155:6 170:6
   170:8,10 171:11
   171:16 176:12,17
   176:19,24 183:24
   184:14,15 246:12
met 9:13 145:16,20
   174:21
method 294:9,11
methods 284:19
Meyer 50:19
MFG 241:2
Michael 24:14 45:3
   50:8,10 55:14,16
   56:10 57:5,10,12
   57:13,16 58:1,5,6
   58:19 108:20
   146:16 153:8
   155:3 158:14
   175:21
Michelle 24:14
   109:1 117:19
   118:12 145:14
   153:9 155:4
Michigan 87:7,10
   88:8 89:7,11
mid 205:5
mid-April 296:4
middle 1:1 5:10

15:7 117:6 261:19
might 93:4 136:15
   145:23 155:20
   157:1 164:16
   166:5 217:12
   227:10 231:18
   241:3 258:8
   270:24 279:14
   292:20 302:20
   303:4
Mike 50:9 123:4
   145:16,20 146:2,8
   147:13 148:9
   182:17 183:2
   258:17
million 118:22
   154:7,10 157:15
   157:17 160:22
   161:5 163:22
   164:7 165:9
   167:17 195:14
   198:20,24
mind 31:11 40:24
   43:15 93:3 95:22
   167:14 175:10
   203:9 232:9
Mine 21:8 83:12
   84:19 85:3
mini 305:15
minimum 303:23
minus 265:4
minute 112:5 134:7
   193:13 215:10
minutes 9:18 97:20
   169:21 185:16
misheard 237:4
misplaced 210:13
missed 31:22
misses 210:19
mission 213:1
misstates 264:3
mistake 59:17
mistakenly 174:8
misunderstanding
   46:18
Mm-hmm 114:11
   117:4 126:4 132:2
   136:1 139:15
   240:6 247:21
   258:23 268:9
   273:16
model 91:7 226:24
modified 121:24
moment 111:21
Monday 179:19
monetary 183:6

money 31:7 98:18
   183:16 184:6
   221:13 277:11
monitor 4:7
month 206:10 250:3
   250:5
months 104:8
   196:11
morning 5:7 212:15
most 91:23 155:11
   240:7,8 273:12
   283:13,14
motion 134:2,24
   135:11,12,18,21
   232:18 236:24
much 20:5,8,15
   89:13 95:2,7
   104:15 125:12
   149:23 171:10,11
   177:24 186:14
   201:8 202:22
   203:8 207:3
   212:21 217:22
   230:6 251:7
   273:17
multiple 191:21
must 265:23 266:15
   297:2
myself 94:16 118:6
   119:3 123:4
   146:15 153:7
   155:2

_____

**N**

N 3:1
N-a-c-k 229:13
Nack 229:10
named 9:20 34:14
   204:13 209:7
   214:23,24 215:3,6
   215:23 216:13,15
   256:24
Namely 210:20
names 87:12,18,20
   89:18
narrative 80:7
Natally 84:10 97:22
   255:24
nature 136:3,4
   139:16 204:10,16
   206:3 233:3
   253:22 281:9
necessary 39:18
   40:12 41:8 42:12
   42:15,19,24 44:5
   44:5,8,9 194:9

221:13 242:19
260:18 262:14
266:8 276:10
277:14
**necessitated** 289:21
**need** 6:2 39:12 60:8
134:8 176:12
183:7 187:24
194:3,16 223:7
240:12 269:24
275:2,5 280:8
283:19
**needs** 266:5 297:2
**negotiated** 214:14
**negotiating** 226:18
237:16
**negotiation** 229:22
**negotiations** 230:4
302:15
**Neither** 211:2
**Nelson** 292:11,22
**never** 102:11 175:9
180:13 189:5
213:20 228:13
229:20 234:22,24
246:23 247:12,13
254:15 256:10
257:10
**nevertheless** 213:21
**new** 30:14 38:20
175:9 216:23,23
220:14
**news** 169:21
**next** 37:23 38:3
91:7 97:17 223:2
260:24 263:20
283:22
**nice** 99:9
**night** 143:8
**nine** 201:4,6,8
202:17
**nobody** 11:19,20,21
39:8 221:19
**nodding** 106:2,5
245:15
**non-time** 36:9
**nonattorney** 249:24
**noncertification**
248:11
**none** 208:5 281:19
282:16
**nonparties** 210:16
**nor** 37:17 211:2
257:11 291:10
**North** 1:16 2:3,12
98:15

**Notary** 306:22
**note** 195:17 196:3
**notes** 153:19 244:4
271:19 283:18
**nothing** 15:17 38:24
77:6 123:20
153:12 161:23
166:20 177:5
248:15,18 251:11
305:7 308:6
**notices** 293:23
**notified** 288:3
**notify** 114:7 161:18
**November** 1:18 4:6
205:5 307:3 308:6
**now** 75:11 104:7
176:13 197:23
219:1 234:9 261:3
263:15,22 267:21
273:1 275:20
285:17 290:10
295:16
**nowhere** 113:19
**numbers** 95:6
157:19 162:1
195:7 261:20
262:12,19,24
263:2,20 265:3,16
267:24 274:24
275:16 284:20
285:16 286:7
303:8
**numerous** 210:21
252:14

**O**

**O** 306:3,3 308:2,2
**object** 147:1,18,24
149:12 287:17,22
**objected** 176:3
**objecting** 79:18
**objections** 79:14
80:2,6,7
**objective** 265:18
267:23 272:11
**obligations** 233:6
235:21
**obtain** 66:16 114:12
215:6 217:12,16
**obtained** 159:20
267:11 270:5,10
292:4,5 293:2
**obtaining** 292:1,7
**Obviously** 170:16
**occasion** 185:3
**occur** 84:3 97:12

143:23 185:11
**occurred** 39:15 42:3
97:13 106:14
119:5 122:4
146:18 148:15
176:7 292:18,21
298:21
**occurring** 21:13
**October** 34:16,19
112:15 113:2,7
138:13 205:3
292:18
**offered** 40:17 67:12
98:13,18 99:16
165:11 302:14,22
**offers** 152:10
178:20,22 222:1
**offhand** 279:2
**office** 24:16,17
56:16 62:1 75:9
97:16,23 143:24
145:7,11 153:10
286:3,4
**often** 91:6
**oftentimes** 127:2,5
**Oh** 86:14 99:22
100:9 175:9
261:17
**Ohio** 88:16
**oncoming** 236:20
**ones** 44:3 90:6
254:18 255:10
264:14 280:23
**ongoing** 125:24
**onto** 68:11
**opened** 214:12
**operate** 269:15,17
276:11
**operated** 266:24
267:8 268:3 269:2
269:9,15,16,23
**operates** 211:5
275:20
**operating** 237:6
**operation** 284:22
285:11
**operator** 284:21
**opinion** 177:12
210:4 244:21
268:10
**opinions** 212:16
**OPP** 101:24
**Oppenheim's** 8:10
15:18 38:19 64:5
90:1 101:5 103:4
103:15 104:13

142:23 199:14
291:3 296:5
298:21
**opportunity** 135:3
147:18,24 235:6
**oppose** 219:5 221:1
221:4,5
**opposed** 215:22
219:9 273:18
**opposing** 229:22
237:17
**opposition** 164:20
219:6
**optimism** 295:22
**optimistic** 170:16
**option** 249:6,8
**ordered** 18:16,17
19:24 196:22
245:23 246:21
283:9
**ordering** 305:13
**ordinarily** 133:10
**organized** 7:12
**original** 68:9 69:11
75:20 213:16
249:11
**originally** 94:23
**others** 32:6 78:15
78:17 89:1 95:20
136:15 246:20
289:15
**otherwise** 5:22
219:14 260:5
**Ottawa** 292:23
**our** 25:3 48:17 62:1
125:7 164:20
180:16 181:23
200:1
**ours** 95:24
**outbound** 7:22
**outcome** 247:22
248:16,19
**outside** 34:23 79:7
84:10 97:23
136:10 146:6
168:3 193:14
217:21 257:8
**over** 5:16,18 56:13
56:16 58:15 94:1
94:8 95:11,18
104:8 170:7
202:16 203:3
204:7 205:6,9
225:16 231:2
239:10 243:20,21
248:1,4 295:7

**overall** 186:23
**overboard** 226:9
**overlap** 139:6
**overlapping** 191:9
231:14 232:1,6
233:8
**overpowering**
179:21
**owe** 130:13 131:2,2
**owed** 27:7 132:17
216:1,3 221:24
**owes** 130:17
**own** 7:17 93:5,18
214:12 243:4,18
269:17 270:1,11
276:11
**owned** 266:24 267:8
268:3 269:1,9,15
269:16,23 270:1
271:24 282:18
286:7
**owner** 284:21
**ownership** 266:16
284:22 285:11
**owns** 275:19

**P**

**Pack** 280:16 282:22
**page** 3:3,10 113:13
113:17 117:7
169:17 170:14
172:3 175:20
176:10 181:16,23
190:18 223:2
262:19 263:1
307:5
**pages** 222:22
245:13 306:8
**paid** 20:8,16 182:1
186:15 233:24
**paragraph** 117:5
177:1 180:2,8
195:6 199:12
223:2,4 271:16
272:7 277:18
**paragraphs** 117:5
**paralegal** 24:16
84:9,9
**paraphrasing** 29:19
**paren** 263:6,18
272:1
**parenthesis** 260:22
260:22,24 263:20
266:16,21 267:5
267:11
**parenthetical**

261:11
**participant** 289:23
  290:13
**participate** 34:13
  86:17 182:4
  183:20 184:23
  209:3
**participated** 165:24
  173:16 236:1
**participating** 84:11
  98:2 223:19 281:6
**particular** 71:11,14
  71:24 77:13 101:3
  115:15 117:20
  215:23 225:6
  282:11
**particularly** 171:3
  196:13
**parties** 29:11,13
  43:13 120:15
  139:11,14 243:20
  243:21 281:10
  290:18
**partner** 100:9
**partnership** 98:18
**Parts** 271:6
**party** 31:6,7 74:8
  120:24 123:22
  210:23 237:17
**party's** 88:17,21
**past** 96:9,10 107:13
  170:7 171:4
  196:11 230:1
  256:23 267:22
  277:5
**Pat** 9:21
**pay** 18:16,17 19:19
  20:1 22:24 23:11
  31:7 182:1 203:15
  203:18 221:13
  233:11 235:8
  238:19
**paying** 18:9 19:9
  20:5,7 22:21
  149:1,15 233:16
  234:9 235:22
**payment** 124:12
**PC** 121:2
**PDF** 245:13
**penalty** 260:17
  261:5 271:18,23
  272:19 273:3,9
  274:13 275:5
  276:23 277:12,16
  278:5,14,23 279:6
**pending** 21:1 90:3

124:23 191:22
  206:4 212:18
  213:17 218:14
  225:6 292:12
**people** 24:10 25:10
  50:14 95:24 96:2
  121:20 138:6
  168:3 181:20
  240:13
**perceive** 214:20
**percentage** 186:17
  187:17 199:16
**perform** 8:12
  123:12
**performance**
  151:12
**performed** 7:24
  95:5 110:24
  187:20 245:20
**perhaps** 183:19
**period** 69:21 99:1
  211:10,11,13
  246:15 251:3
  252:2 267:9 295:8
  297:22
**perjury** 260:17
  261:5 271:18,24
  272:11,20 273:3
  273:10 274:13
  275:6 276:23
  277:12,16 278:5
  278:14,24 279:6
**person** 25:4 67:8,16
  97:16 106:10
  146:12 155:5
  177:4,8 183:7
  232:22 233:3
  245:20 275:17,19
  275:23 277:3
**personal** 63:23 64:3
  64:7 82:8,10 83:9
  83:13 84:1 85:4
  249:12,14,17
**personally** 18:5
  44:18 148:18
  179:17 181:19
**perspective** 33:13
  133:19 135:17
**pertain** 17:7 60:16
**pertained** 289:17
**pertaining** 1:14
**pertains** 140:11
**Phil** 246:14 250:6
  251:6 253:23
  255:13,16 257:20
  258:12,20

**Phillips** 1:15,21 4:9
  308:4,17
**phone** 55:19 58:19
  146:12,13,14
  155:5 266:6
**phonetic** 82:4 84:10
  246:18
**phrasing** 271:5
**physically** 179:20
**Physicians** 88:6
  286:18
**piece** 277:1
**PLA** 247:18,19,19
  248:9
**place** 4:11 42:1
  143:3 148:12
  194:11 203:7
  267:1 293:1
  308:10
**plaintiff** 1:5 2:2
  117:22 119:16
  182:2 191:22
  204:13 207:2,3,5
  207:11,15,20
  214:23 215:6,23
  216:16,23,23
  221:23 223:8
  224:18,20 256:24
**plaintiff's** 114:5
  117:8 134:1
  178:13 206:1
  222:11 223:13
  224:9,11,13,19
  243:1 274:15
**plaintiffs** 87:24
  119:11 181:23
  209:7 210:8,8,16
  212:1 214:24
  215:3,4 216:13,16
  217:3 218:23
**plaintiffs'** 210:9
  212:2
**plan** 61:5 230:13
  279:10,17,20
  280:11 281:3,7
  289:6,13 291:18
  293:16,20 297:1,5
  298:1 300:24
**plans** 291:11
**pleadings** 123:7
**plural** 19:22 27:14
  77:12 218:2,5
  261:11
**plurality** 218:17
**pocket** 234:7
**pockets** 243:18

**pointing** 225:8
**points** 199:10
**police** 10:6,18,22
  11:24 12:2,4,6,9
  12:17 13:10,13,16
  13:23 49:24,24
  51:15,21 52:3,13
  52:23 62:11 63:7
  63:15 82:13
**policy** 125:4
**Pollo** 89:4
**pool** 150:2
**Porcelli** 209:5,16
  210:1 211:18
  219:3 237:1
  279:22 284:10
  292:13
**Porcelli's** 209:12
  210:6 212:8
**portion** 23:9,14,15
  200:9
**positing** 295:15
**position** 29:11,12
  31:21 32:7,15
  35:10 36:8,11
  91:24 96:24 203:5
  219:21 222:3
  223:8 231:1
  260:11 266:11
  279:4,16 282:1
  300:19 301:5
  304:10
**positions** 290:18
**positive** 298:20
**possess** 12:23 14:19
  101:12
**possession** 16:8,15
  17:1 64:21 65:1,6
  65:23 67:18 70:21
  71:18
**possibility** 225:23
**possible** 105:9
  172:11 200:2
  224:17 248:20,21
  268:10 281:2
  289:9 303:1
**possibly** 226:20
  237:22,23 297:4,5
  303:24
**Postman** 155:15
  170:17
**Postman's** 170:15
**potential** 22:10 77:3
  77:11 78:1,5,12
  78:21 80:16 81:1
  95:12 105:22

176:3 204:18
  215:21 224:14
  256:24 271:13,14
**potentially** 266:12
**pound** 256:3
**practice** 125:4
**practicing** 138:11
  205:6,10 208:2
**precedent** 208:16
  209:19
**preceding** 66:18
  180:2
**precisely** 36:13
**predict** 229:19
  230:18,20
**prefix** 261:16,17,18
  261:23
**preliminary** 137:16
  143:12,20 144:7
  144:12,15 146:3,6
  159:5 209:13
  226:2 236:8,14,24
  237:8
**preparation** 10:2
  24:4 107:10,11
  144:11,15,18
  254:6
**prepare** 9:10,12,24
  24:6 76:24
**prepared** 90:14
  93:20 94:12,14,19
  94:20,23
**preparing** 26:14
  169:10
**pres** 195:15
**prescription** 211:3
**present** 2:15 46:20
  84:7 97:3,6,21
  99:4 146:1,3,7
  159:11 212:2
  226:2
**preserve** 195:22
  197:1
**preserved** 196:1,12
**preserving** 59:19
**presumably** 189:23
  261:14
**presume** 271:10
**presumed** 211:11
**pretty** 12:1 80:5
  91:2 95:7 217:22
  222:4 251:7
  288:20
**prevailed** 207:2
**previous** 259:24
**previously** 52:7

250:22
**print** 245:6
**printed** 259:20
**prior** 64:13 70:2
84:5 120:11,13,14
120:14 125:18
133:24 146:11
251:14 296:24
**privacy** 287:20
**privileged** 46:15
73:16 74:6,10,21
74:24 75:10 194:4
195:20 232:4
247:7 302:11
**privileges** 65:10
**pro** 242:15,19 301:2
**probably** 78:19
89:18 183:24
236:20 245:1
251:20 262:3
286:4 288:20
**problem** 18:1 196:9
209:20 219:22
285:11
**procedural** 211:13
211:22
**Procedure** 1:13
210:21
**proceed** 206:7
219:18
**proceeded** 213:22
247:14
**proceeds** 186:23
**process** 8:8 39:7
90:17,18 91:11
161:12,14 180:11
182:7 243:8,8,20
243:22 276:18
289:24 290:3,14
293:22
**produce** 6:16,19
8:18 110:8 121:16
245:23
**produced** 6:13,21
7:12 8:20 10:10
10:11 101:2,20,23
110:5,11 198:12
234:14 235:2
292:8
**producing** 121:18
123:17 187:16
246:13
**product** 91:19
92:13 166:12
200:8 202:3,6
282:13

**production** 56:8
196:10 234:20
**Professional** 16:18
16:23 73:3 130:18
130:19 308:17
**proffering** 274:22
**project** 227:15
**projected** 226:21
**projections** 229:23
**promise** 133:14
**promises** 133:2
**prongs** 43:2,6,11,18
44:2
**proof** 266:22 267:6
275:14
**properly** 275:24
276:16,19
**property** 76:2,5,14
77:9 78:11 95:11
95:18
**proposal** 189:1,3
**propose** 160:2
219:2
**proposed** 3:18
160:7 162:2,21
173:23 175:23
186:11 188:4,20
188:22 214:2
244:12,12 259:14
260:11 279:17
291:11 305:1
**proposing** 202:17
**proprietary** 92:4,20
92:24 93:1 95:21
283:1
**propriety** 282:6
**prosecuted** 254:15
293:11
**prosecuting** 204:12
204:15,20
**prosecution** 233:13
**prospective** 257:18
**protect** 17:4
**protected** 184:11
**protection** 196:1
246:20
**proven** 244:2
**provide** 7:5,8,16
14:19 26:17 49:7
53:12 114:8
126:23 129:19
147:18 152:12
154:24 224:19
265:23 266:13
273:10
**provider** 277:1,7

**provides** 265:14
**providing** 48:20
52:2 59:2 80:7
96:23 97:10
126:17 128:5,12
272:9
**provision** 45:18
47:13 48:16 49:3
51:23 52:1,15,17
54:16 59:7,16
62:14 263:9,9
**provisions** 240:1
278:1
**PTX** 305:14
**public** 81:1 306:22
**publication** 230:2
281:17 282:3
297:5
**publicly** 80:20 81:8
81:10
**published** 43:4
228:11,12 285:18
**publishes** 227:20
**pull** 125:6 185:5
212:24
**pulled** 107:16
**pulling** 281:21
**punt** 130:21
**purchase** 64:7
**purchased** 64:10
**purely** 281:16
**purportedly** 115:13
**purports** 113:11
**purpose** 53:15
54:18 239:3
289:13
**purposeful** 293:23
**purposes** 21:4 61:3
220:7 233:5,5
234:20 236:17,23
242:7 282:14
290:14
**Purposeseses**
236:19
**pursuant** 1:12
271:22
**pursue** 27:16 31:17
35:15 43:16 44:11
126:5 131:5 215:6
217:24
**pursued** 131:8,11
137:18
**pursuing** 35:12
**put** 43:20 59:24
67:16 96:24
103:14 124:1

183:16 184:6,19
194:2 250:13
271:1 274:3 284:4

_____

**Q**

**qualify** 80:6
**quantity** 286:23
287:14
**querying** 284:19
**quick** 261:2 301:16
**quippy** 302:23
**quite** 103:9 212:13
**quote** 208:11,12
213:4 223:14
236:10,10
**quote-unquote**
232:6 273:18
**quoting** 181:16
211:18

_____

**R**

**raise** 80:2 197:12
**raised** 135:17
181:15 183:18
208:17 209:24
**raises** 213:17
**range** 161:2 162:9
166:8 225:6 228:1
228:5,22 229:14
229:15 230:15,18
230:20 231:4
**ranges** 228:4
**rata** 242:15,19
301:2
**rate** 221:14 226:21
227:9 229:5 230:7
230:9,9 231:3
237:11,19,20
238:10 239:12
242:18 271:3
273:21 284:13,16
284:24 293:24
294:2
**rates** 227:15,23
228:1 229:15
230:15 260:5
271:7,13 278:4
279:14 294:23
**rather** 11:8 203:5
211:21
**raw** 95:6
**RE** 307:1
**reach** 170:17
173:21 178:18
213:24 219:16
220:14 291:7

295:19 298:2,9
299:12
**reached** 42:4
300:20 301:5
**reading** 28:16 210:6
**reads** 117:8 271:22
**ready** 69:15 111:23
112:1 175:7 179:9
193:12
**real** 224:24
**really** 89:13 97:15
134:9 141:16
236:17 275:12
**Realtime** 308:18
**reason** 15:9 37:19
37:21 68:13 113:4
113:8,10 175:16
179:18 199:2
218:20,22 219:21
224:13 242:24
243:18 271:2
303:2 307:5
**reasonable** 192:1
202:9,13 203:8
226:21 227:8
237:19 242:21
243:15,20,22
260:5 266:2,7
301:7 302:3,4,7
302:18 304:21
**reasonably** 221:13
230:13
**reasons** 243:9
**receive** 6:7 32:17
123:22 133:10,15
149:3 151:4,6,9
151:17 159:7
186:22 187:3
277:10
**receiving** 52:5 57:8
58:18 110:17
143:14 169:24
304:22
**recent** 169:18 188:3
283:13,14
**recipients** 37:9
188:6
**recognizing** 127:9
**recommend** 226:4
**record-breaking**
167:13
**recordation** 84:15
**recorded** 308:7
**records** 35:9 78:7
84:17 104:24
157:14 159:19

161:17 163:19
198:11 200:2
263:6,13 264:6,8
264:9 272:12
275:1,13 284:4
**recoup** 151:1
**recover** 105:2,7,10
**recovered** 121:6
**recovery** 40:11,22
40:22 42:16
157:19,23 208:16
209:19 240:5
**redacted** 23:10
129:11 234:14,15
234:20,23 235:4,6
235:10
**redaction** 194:10,15
195:20
**redactions** 23:7
**reduction** 242:15,19
301:2
**refer** 80:19 138:6
**referenced** 284:1,9
284:11
**referencing** 196:24
**referred** 12:20
56:10 100:13
108:18
**referring** 16:9 28:11
28:23 53:5 77:10
101:4,8 112:5
139:18 180:20
185:4 188:19
195:4 198:9 220:3
231:24 271:14
**reflect** 170:22 200:5
268:13 270:11
**reflected** 65:7
**reflects** 83:23 127:2
189:21
**refresh** 34:17
163:12 190:12
198:2
**refuse** 54:9 167:21
200:7 201:10,15
238:12 243:3
**refuses** 167:12
**refusing** 52:20
60:17
**refute** 265:5
**regard** 73:12 213:8
281:2
**regarding** 14:20
49:6 143:2 147:14
161:11 163:13
164:18 173:10

186:12 189:24
192:5 212:16
246:11 257:18
280:14
**regardless** 303:12
**regards** 38:14 126:3
**registered** 266:23
267:7 269:8
308:17
**regular** 173:10
**reiterate** 48:12,17
**rejected** 99:8,12,17
100:3,5
**rejection** 176:20
**relate** 60:15 140:4,5
140:15 151:12
181:5
**relates** 137:10,11
141:2 232:19
243:19
**relating** 63:19 83:13
102:22 160:17
253:23 254:17
255:8 257:13
**relation** 20:20
131:19
**relationship** 49:4
50:22 115:12,16
123:23 125:16,20
126:2,11 127:6
128:16,24 129:3
129:18 132:22
139:16 140:10
171:15 182:11
191:12 204:11,16
251:19
**relative** 43:20 91:24
95:4 104:2 159:18
191:17 254:3
299:6 308:12
**relay** 222:1,4
**relayed** 176:19
**release** 287:20
**relevance** 80:3
**relevant** 43:23
229:21
**relief** 40:6 159:7
240:16
**remain** 218:14
**remainder** 187:9
**remains** 90:17
213:17
**remarked** 167:4
**remedy** 211:14
**removed** 284:20
**rep** 204:13

**repeat** 17:9 19:2
33:16 37:4 39:21
41:17 70:23 86:9
101:13 109:19
116:16 119:24
168:5 201:20,22
204:22 216:4
227:4 257:24
**repeatedly** 135:11
208:6
**rephrase** 120:4
276:9
**report** 10:6,18,22
12:1,4,9 49:24
52:3 159:22
176:13 265:5
**reported** 1:21 12:18
**reporter** 1:16 4:9,24
5:19 17:22 18:1
72:19,21 100:4
111:18 163:4
168:23 175:4
179:5 193:8
212:23 252:18
258:5 259:7 305:9
305:13 308:17,18
308:18
**Reporters** 4:10
**reports** 176:16
264:11 274:10
**representations**
280:13 281:12,23
282:5,12
**representative's**
225:4
**representatives**
77:4,11 78:2,5,13
78:22 95:13
119:19 133:13
224:15
**represented** 9:2
109:23 115:23
116:8 119:10,18
121:20 132:3
136:9 137:5
190:21
**representing** 22:11
38:5 127:23
131:17 150:5
181:7 203:22
233:16 243:1
**represents** 21:21
129:13
**reproduced** 10:12
**request** 6:10 68:2
68:23 107:17

109:15 110:14
125:1
**requesting** 46:15
67:24
**require** 167:19
237:17 278:4
291:19 302:10
**required** 74:17
**requires** 72:16,24
**requiring** 221:10
**research** 191:2
254:5
**researching** 251:14
252:12
**residual** 238:24
**resign** 69:2
**resignation** 8:10
64:13 70:3 72:14
72:17 96:19 97:5
152:4
**resigned** 30:3 70:5
97:9
**resigning** 67:9 84:6
100:11
**resigns** 73:6
**resolution** 186:16
**resolve** 160:7
**resolved** 181:17
223:11
**resolves** 182:5
**respect** 16:8,15 17:1
32:8 57:1 64:1
65:10,17 71:10
76:14 91:10 94:18
116:6 125:21
133:2 135:23
147:10 196:2
201:17
**respective** 290:17
**respond** 63:4
158:24 182:21
**responded** 98:21
126:19 181:22
183:23 184:2
196:8
**responding** 109:15
190:11 208:7
**responds** 79:15
188:2
**response** 6:14 10:8
63:16 147:9
182:23 183:3,5
190:13 197:21
199:23 236:6
245:18 273:11
299:15

**responses** 10:7
19:16
**responsibilities**
173:5 235:20
**responsibility**
214:21 236:2
**responsible** 23:17
150:14,15 204:2
235:8
**responsive** 6:17
110:15 126:20
246:2
**rest** 38:17 261:18
**restate** 257:23
258:5,7
**restroom** 134:8
**result** 8:19 104:8
149:17 152:14
155:24 171:24
186:11 207:1
304:7
**resulting** 294:22
**results** 80:18 288:11
**retain** 75:24 86:12
**retained** 51:1 66:6
68:20 69:5,20
70:8 82:20
**retainer** 22:2,6 23:2
51:2,4,6 107:7,22
114:10 121:19,22
122:11,13 132:24
165:15 180:21
181:8 191:4,6
222:16,21
**retaining** 28:6
146:11
**retains** 7:22
**retention** 3:12
108:1,17 112:4,7
112:10 114:13,19
116:9 127:12
234:13
**retired** 29:6 66:21
**return** 49:22 72:13
73:15 74:2,9,11
74:17,20,23 75:17
**returned** 11:9 73:5
75:8,13,15 97:14
**reveal** 159:1
**revealing** 49:2
**revelation** 251:24
**reviewed** 10:5,18
11:24 16:12,14,17
16:19 61:9 67:2
107:9,12,21
109:10 169:6

175:11 179:11
201:14 283:9
289:20
reviewing 14:18
  35:9 107:15,18
  284:7
revise 163:16 194:9
Rgood@anderson...
  6:6
ring 210:24 211:7
  211:16
rings 210:6
risk 271:12
risks 158:2 204:19
Rita 24:16 50:9
Robert 159:22
robust 230:13
Rodney 153:9
role 38:20,20
  123:16 129:8,9
  187:15 231:24
  232:5 236:2 250:1
  251:11,13 253:20
  291:10,11
roles 235:20
room 179:22 268:14
Ross 1:11 4:2,21 5:1
  5:9,10 11:2,12
  129:14,23 308:5
roughly 187:7,8
RPR 1:21 308:4
rule 22:24
rules 1:12 5:17
  16:17,22 17:1,7
  17:11 73:3 130:17
  130:19 210:20
ruling 246:22 247:3
run 34:2 173:8
  210:11 215:10
  294:9,11
running 192:16
  214:24
Ryan 24:14 50:5,6
  175:23

—————————
        S
—————————
S 3:8 260:22 261:11
  263:6,17,18,18
  266:16,21 267:5
  267:11 272:1
S-t-r-y-k-e-r 286:19
safe 230:20
Salam 120:22
  172:13 175:21
  181:10 192:14
salary 151:4

Sandusky 256:16
  256:20 257:6,9
  278:16
save 60:18
savvy 103:18
saw 234:22,23,24
  235:10
says 23:15 113:3
  117:6 127:12
  179:16 180:8
  188:20 198:23
  199:1 211:19
  223:5 262:11
  263:4 266:15
  268:7 269:6 270:5
  272:12
scattered 286:22
scenario 248:3
schedule 135:9
scheduled 58:3
  172:1
scheduling 24:24
  25:1 47:23 105:15
  105:20
school 16:6
scientific 294:9,11
scope 20:18 49:3
  56:24 64:24 79:7
  110:19 113:23
  126:2,7,11 127:3
  127:5,8 140:10
  141:1 247:3
Scott 50:12,20
Scrip 75:3
search 8:16,19 56:8
  109:14 110:14,20
  110:24 111:8
  245:21 246:8
  247:4,5
searched 65:17
  111:4 246:6,10
searches 7:24 8:2,4
  8:12
section 60:1 223:3,4
  260:20 265:14,23
  267:18 268:5
  271:6,16,23
  272:14 273:2,3,11
  274:22 275:24
  276:1
security 103:7,9,14
  103:22,24 104:1
seeing 121:13
  234:18 235:3
  273:13 285:18
seek 19:1 38:8

124:16 150:10
  154:9 173:13
  218:12 219:17
  224:14 267:19
seeking 19:3,5,6,8
  79:5 91:19 105:2
  105:7,10 147:2
  152:9 164:2
  188:16 189:11
  197:11 199:17,21
  202:2,4 207:5
  226:4 232:3,4
  243:2
seeks 255:6 261:12
seemed 251:3
seems 80:5 244:5
  260:18 274:22
seen 23:2 112:2
  163:7 169:7
  180:13 229:6,17
  230:17 234:15,17
  283:7
segue 231:6 241:17
  243:24 245:10
  259:19
Select 266:17
self 243:4
send 213:1 294:18
sending 33:5 84:18
sense 56:20 69:6
  93:6 268:5 304:16
sent 8:13 11:6 25:19
  33:3 34:6 37:9
  55:13,16 61:12
  66:17 161:6 169:8
  170:10 196:4
  262:13,24 289:18
  303:17,18 304:4,6
  304:11,17,18
sentence 117:7
sentences 95:8
separate 21:1 35:22
  66:8 89:12 191:8
  211:3 239:21,23
  279:11 291:23
  303:10
September 182:14
  185:12 188:1
  250:2,4,18,18
serious 12:1
serve 36:22 129:9
  135:10 226:23
  237:22,23 247:22
server 7:20,21
  65:11,18,19 66:12
  66:14 69:19 70:10

104:2
server's 69:23
servers 245:22
serves 221:11 239:3
services 123:12
  126:17 127:1
  128:6,12
session 10:2 144:18
  178:15 197:8
  212:15
sessions 155:18
set 14:7,10 15:3,4,5
  15:8,15 64:5,5
  103:7 122:18
  128:16 167:4
  300:2,21 301:3
  308:14
Setting 86:17
settle 29:15,17
  161:3 164:11
  165:19,23 167:12
  167:17 225:9
settled 39:4 44:17
  89:3 164:16 170:8
  247:13
settlements 228:2
  229:16 241:5,18
  278:9 280:17,24
  289:6
settling 43:19
several 95:14
  146:19 194:22
  279:3 287:6,7,8
severe 46:18
shall 114:7,8,12
  117:10
shape 254:16
shared 62:23 63:9
  100:22 101:16
  102:11,17,21
  135:16 147:17,22
  168:3 174:5
  253:22 255:20
  256:2,5,7,8,11
sharing 60:13 62:6
  101:5,20
she 5:20 84:11 98:1
  98:17 272:17
she's 245:8
sheet 3:13 94:20,24
  95:2 162:21 163:7
  262:14
sheets 90:14,21 92:5
  92:18 93:6 94:1,8
  94:13,19 229:24
shifted 251:16

short 40:10 49:12
  49:17 103:18
  134:9 144:19,22
  183:6 192:21
  193:22 206:15
  215:15 251:4
  259:2 288:19,24
  296:18 301:19
Shorthand 1:15
  308:18
shortly 54:22 55:1
  111:12 119:2
  122:1 165:15
  196:8 250:6
should 35:11,14
  99:2 149:12
  173:11 179:18
  184:5 188:4
  193:17 195:12
  198:16 202:16,20
  222:6 226:4 282:9
  294:18,21 297:2
  303:12,14,16
Shouldn't 169:20
show 122:11 179:7
  179:19 190:15
  193:3 244:24
shown 244:6 260:1
shows 200:1
sic 169:14
sign 23:21 108:22
  108:24 168:15
  181:8 206:24
  241:2,3 256:4,4
  266:17 267:1,15
  268:23 269:4,12
  269:14,24 278:5
  278:14
signature 112:20,23
  113:14,15 278:24
  305:9
signatures 279:7
signed 22:3 25:20
  107:7 108:1 109:7
  109:12 110:2
  112:15 113:1,7,11
  113:11,16 114:24
  165:16 180:22
  181:3,6,7 219:1
  269:22 270:4
significance 32:21
significant 33:5
  186:10,12
significantly 167:6
  216:2
signing 18:7

similar 80:15 147:3
181:2
similarly 138:5
simply 17:8 59:19
278:4
simultaneously
268:11
since 89:3 107:19
142:19 198:13
235:17
single 75:18 254:3
singular 269:8
Siprut's 118:16,17
120:23 121:4
122:14 165:16
187:15 218:7,13
sir 5:7 185:13
sit 37:21 95:19
104:24 212:6
253:16 257:16
263:3,15 266:3,10
291:15 293:17
295:13
sitting 78:10 89:10
125:9 136:18
141:12 153:24
234:9 261:3
283:15
situated 138:6
situation 161:21
184:24 217:11
220:17 226:6,7
231:18 252:3
257:3 271:2
277:24
six 69:3 119:17
size 243:3 286:20
305:14
skills 54:5
slash 266:23 267:7
271:24 272:1
Slingshot 197:23
198:9,11 264:7,19
265:9
slow 72:19
small 23:9
Smith 50:21
Soble 9:14,15 145:5
sole 220:19 276:24
277:7
solely 51:11 120:10
121:20 151:10
201:14
solves 190:16
somebody 31:12
247:3 276:24

302:13 304:3
someone 13:10,12
36:4 145:11
167:11,16
sometime 34:7
118:5 176:7
251:20 288:18
sometimes 80:21
151:7 229:19
241:16
somewhere 28:7,12
286:3
soon 173:1,2
sorry 26:1,24 33:14
41:17,21 71:15
77:23 79:2 86:8
86:14 101:13
116:16 119:24
123:24 172:24
174:5 201:21
239:9 241:8
257:23 278:12
sort 25:4 49:2 56:22
57:4 65:13 70:14
132:21 133:8
171:7
sought 25:10 34:13
37:2,8 132:6
sound 291:6
sounds 145:9,10
source 275:14 277:7
sources 227:12
southwestern
286:13
speak 32:9 26:15
50:13 97:16
speaking 80:7 162:5
239:16 271:12
speaks 272:15
special 132:22
133:5,18 216:15
specifically 7:20
27:9 28:23 46:22
54:19 55:23 56:7
107:15 143:7
166:11 180:4,24
185:3 233:1 254:2
254:5,13 255:16
specifics 58:12 74:9
83:15,16 135:7
141:11 166:15
specified 69:21
272:1 308:10
specify 275:2
specifying 221:4
speculate 20:14

81:18 82:6,7
speculation 99:23
214:5
spelled 121:11,14
spent 105:5 124:17
125:2,13 150:5
203:22 212:13
split 120:7 149:5,6,8
spoke 46:12 58:5
98:4,9,9,11 174:6
spoken 105:13
sport 85:4
sports 83:14
spring 206:13
SS 306:2 308:1
staff 67:16 104:2
123:6
staff's 70:6
stand 79:13,14
148:18,21
standard 43:22
91:3 94:19
standing 31:9,12,14
31:23 43:13,15
44:11 208:11,23
209:20,24 210:8
212:1 243:16
Star 210:7 211:24
start 16:11 92:9
178:9 183:10
197:22 239:10
249:23 261:10
started 7:17 115:16
138:17,19 148:12
250:5,15,24
253:24
Starting 142:4
state 1:16 4:14 5:7
16:12,15 30:6
45:8,13 46:13
47:10 57:3,7 86:1
86:2 142:5 195:24
199:3 266:1
271:23 272:2
298:20 299:7
306:1 308:1,5
state's 287:20
stated 11:24 53:17
71:20 96:18 97:22
139:10 202:15
208:6
statement 73:20
83:22 96:22
130:23 160:4,6
166:13 167:18
197:4 260:17,20

statements 71:8
states 1:1,13 114:4
176:23 187:23
stating 11:7 12:16
68:16 236:13
268:24
statistical 285:15
status 173:10
statutes 209:17
217:2 287:21
statutory 207:6,7
241:12
stay 67:12 99:6
198:16 200:23
201:6 280:3,6,7
stayed 144:9
stays 280:7
steal 14:8
stealing 11:21,23
13:3 63:19 64:1
stenographically
308:7
Stephanie 50:12,18
Stephen 2:15 4:8
Stewart 50:12,18
sticks 195:12
228:15
still 14:11,11 39:10
67:17 75:9,12
99:18 100:2,5
176:2 192:1 239:7
245:8 246:20
247:8 248:13
264:16 273:19
276:2 299:18
304:6
stole 14:6 17:15
27:12,24 28:6
61:20
stolen 10:24 11:3
12:18 50:1 61:8
62:3
stooge 31:7,10
stop 80:8
stored 70:6
strategy 48:2,6,15
91:15,16
Street 1:17 2:3,7,12
264:9,20 265:9
strength 212:18
strengths 212:21
strike 11:19 24:21
24:23 32:9 50:6
67:6 75:7 81:23
104:22 149:4
172:23 216:10

248:22 249:18
288:6 296:23
strong 27:1 213:4
214:4
Stryker 286:18
288:4,8 289:10,16
291:4
stuff 83:3 84:20
103:16
style 204:14
subject 16:20 36:2
79:6 117:11 162:4
177:12 210:19
211:23 223:11
submission 161:20
201:15
submit 124:16
Subparagraph
268:20 269:6
Subparts 267:18
subpoena 6:7,10,14
6:17 24:22 25:19
109:15 111:12
121:17 286:9,10
subpoenaed 286:24
289:12 290:1,24
subpoenas 110:17
110:21 126:19
287:15 288:10
289:18 290:15
291:19
Subscribed 306:17
subscriber 285:4
Subsection 269:11
subsequent 33:1
45:8 52:10 84:23
143:1,10 158:21
200:19 299:6
300:14 302:18
subsequently 64:10
85:19 98:11
102:10 118:12
121:21
subset 76:21 78:1
subsets 76:20,21,23
77:1
substance 25:13,21
26:4,8 63:15
106:18 158:22
159:6
substantially 98:18
substantive 123:7
146:1 192:4,7,10
192:13 211:14
substitute 215:5
subtract 264:13

subtracted 282:24
subtraction 264:22
success 27:3 229:20
  287:3
successful 186:15
  195:1 264:14
successfully 268:1
Sue 24:16 50:9
sued 127:15 303:21
suffered 105:8
suffers 244:17
sufficiency 282:2
  300:24
sufficient 227:14
  238:19 239:17,18
  239:23,24 242:17
  242:20
Suffix 262:4
suggest 71:16 72:3
  130:9 140:2
suggesting 70:12,17
  222:11 269:13
  272:14 294:16,18
  294:21
suggestions 170:19
suggests 129:12
suit 41:12 211:6,21
  212:3
Suite 1:17 2:3,12
sum 158:22 188:5
  188:13 211:24
summary 61:16
  133:23 134:1,2,5
  134:23 135:11,13
  135:17,21 136:3
  241:9 248:7
summer 34:8,9,10
  34:21 122:8
  206:13 250:18
  251:1
supplementation
  246:21
supplements 10:9
support 7:21 11:12
  12:23 13:16 63:23
  67:15 70:6 104:2
  272:23 293:13
supports 13:21 64:3
suppose 141:21
  232:8 247:12
  249:7
suppress 271:7
surrendered 66:20
surrounding 41:5
suspense 228:23
swear 4:24

swearing 273:9
Swiderski 206:24
sworn 5:3 306:17
  308:6
system 7:21 14:6
  68:18 125:7 256:3

———————
T

T 3:8
table 183:16 184:7
  184:20
tactic 91:16
tactics 91:15
taken 1:15 42:1
  49:18 98:19
  103:16 134:16
  159:20 192:22
  193:23 215:16
  259:3 279:4 289:1
  296:19 301:20
  307:3
taking 1:14 4:11
  59:19 78:12 83:5
  83:23 147:6
  148:12,13 170:6
  197:16,20 216:18
  276:21
talk 24:3,7 26:4,7
  53:2 183:9 193:14
  239:21
talked 63:18 138:24
  243:14 249:4
  271:17 273:7
  305:4
talking 5:18 45:18
  45:19 47:12 56:4
  227:21 241:18
  252:1 259:23
  281:16 287:9,10
  293:3 300:22,23
Tape 4:2
target 264:10 265:4
  274:10
tech 103:17
techie 65:13
technical 264:15
technically 264:15
teeth 281:21
telephone 282:17
  283:3,21 284:2,3
  284:10 285:4
  286:6,11,23
  287:15 289:12,18
  290:1,15,23
  291:19
telephonic 284:8

telling 54:19 60:8
  84:5 205:18
tells 296:7
template 90:23,24
ten 86:23 230:9
  231:2
ten-digit 261:12
terrible 219:4
test 294:21
testified 5:4 47:8
  65:9 88:10 191:11
  245:18
testify 47:18 82:8
  129:15 166:9
  308:6
testimony 28:7,12
  28:15 30:7 49:23
  112:5 115:24
  116:10 156:24
  208:7 212:7 232:9
  259:24 296:24
  308:10
text 23:10 211:2
Thank 111:22
  134:11 136:8
  175:10 204:7
  245:16 301:16
thanks 17:23 72:21
  192:17
themselves 4:14
  209:18 251:12
theory 40:23
there's 42:15 46:17
  47:24 70:12 78:22
  88:20 89:2,11
  102:5 117:7
  126:15,16 127:2
  150:23 179:14
  196:1 218:7 219:7
  241:16 243:16
  249:8 261:15
  267:1 303:13
thereafter 173:2
  196:8 251:6
thereby 237:24
therefor 237:21
therefore 31:23
  86:7 167:21
  297:10
thereof 143:9
these 14:21 15:1,22
  46:20 83:19
  112:16 122:21
  175:18 176:7
  199:21 241:5

284:17 289:17,18
thing 85:8 261:7
  277:16
things 83:6 105:20
  139:6 153:20
  164:23 199:6
  233:2 246:10
  252:3 259:12
  280:8
third 143:2,5 208:4
Thomas 119:18,19
  121:21 172:10
  175:22 181:9
  190:21 191:12
  192:11
Thomas's 121:4
Thompson 4:9
though 63:12 69:3
  108:3 162:5
thought 81:4 99:9
  135:5 160:23
  161:3 173:11
  184:5 295:6
thousands 8:3,3
  56:12,12
three 30:2 87:7,9,13
  87:14 88:8 89:12
  120:15 139:11
  142:18 187:4
  218:9,11,18
  233:18 261:19
  285:20 287:8
threw 298:18
through 19:15
  57:13 59:4 66:11
  84:18 89:22,23
  156:19 204:20
  217:1 222:22
  244:6 260:2,3
  270:10 285:17
  306:9
throughout 267:8
  269:9
throw 226:9
thrust 159:13
thus 186:7
tie 79:11
Tile 87:24
timeliness 212:2
timely 216:24
  217:22 219:13
  220:12,20
times 5:14 127:7
  131:17 142:20
  158:18 161:5
  188:6 233:18

240:19 243:3,17
timing 13:17 32:8
Tina 84:9 97:22
  255:24
today's 4:6,11 6:8
  9:2,8,10 18:23
  19:7,20 20:20
  24:1,4,6,20 26:14
  107:10,11 150:5,6
  169:11 172:3
  305:12
together 90:10
  144:16 187:4,24
  250:8 254:18,24
  255:10
tolling 210:12
  216:22 217:12
too 180:3 182:23
  218:7 262:2
  273:22 302:17
  303:7,9
took 38:14 66:4
  67:14 71:5,15
  75:20,23 76:3,15
  77:8,24 78:6
  81:13,14 82:3
  198:10 203:7
  248:9 259:11
  292:24
top 27:20 39:9 43:8
  77:6,17 78:3,8
  87:4 89:14 102:1
  121:12 142:8
  143:16 163:21
  230:18 241:24
  287:12 289:8,14
  300:3,16
top-line 238:10
total 40:6 195:5
tough 96:24
Tozian 50:13,20,21
traced 275:18
track 124:3
traffic 7:23
Training's 236:24
transcribed 308:7
transcript 28:16
  284:8 306:8,10
  308:9,10
transcripts 283:7
  283:10
transfer 285:16
transferred 285:12
transmission 167:5
  263:13,23 264:7
  264:16,20 265:4

265:11 274:9
275:13 293:4,7,8
293:9,13 305:16
**transmissions**
265:20 275:1
**transmitted** 66:11
268:1 275:16
**transom** 203:4
**treated** 133:18
186:6 303:12
**treatment** 133:6
**treble** 207:9,16
242:4
**trebled** 154:7
241:12,22
**trial** 205:17 206:7
206:15,16,21
207:14,22 208:3
**trials** 205:10 208:1
**tried** 205:11
**tries** 179:21
**triggers** 228:20
**trouble** 236:17
**true** 68:12 73:21
81:5 91:10 95:14
167:18 230:4
249:10 264:19
268:11 272:3
275:2 279:1
306:10 308:9
**truly** 151:22 162:18
**truth** 308:6,6,7
**truthfully** 5:23
**try** 69:9,10,15
207:18 229:19
**trying** 11:23 19:15
36:19 42:7 48:14
56:23 129:7 140:9
140:12,24 142:3
149:6 191:20
230:6 242:7 260:8
277:22 298:11
**TTA** 36:11,16 42:21
44:11 45:7 46:13
47:9 57:3 85:24
86:2 142:5,19,21
142:24 156:23
227:18 232:15
**tune** 234:7
**turn** 8:15
**turned** 67:6,15 70:6
83:4
**two-day** 99:13
**type** 83:13 188:4,20
188:22 281:10
**typed** 124:7

**types** 284:17

---

**U**

**U.S.C** 271:23
**ultimately** 6:23
46:21 140:20
171:21 177:13
185:8 200:22
201:12 202:18
234:7
**unable** 291:5,6
**unacceptable** 262:7
262:22
**unacceptably** 278:3
**unbelievably** 39:8
299:21
**underlying** 27:17
33:2 41:9 51:12
**understands** 223:5
223:7
**understood** 5:23
158:17 228:14
246:1
**undertaking** 219:15
**unduly** 244:7,19
260:4,13 262:7,22
266:11 270:17,18
270:22 271:2
277:9 278:2
**unethical** 221:8
226:16 227:1
237:14 294:15
**unfair** 293:21
**unfairly** 277:9
278:3
**Unfortunately**
183:7
**Union** 170:11
**uniquely** 94:7
**United** 1:1,13
**universe** 247:8
**unless** 79:15 179:16
242:15 243:18
248:9
**unlikely** 180:14
**unnecessarily**
221:10 226:19
237:17
**unnecessary** 271:18
273:3 275:11
**unprofessional**
180:15 221:8
226:16 227:1
237:14
**unreasonable**
238:12 240:11

276:24 277:8
293:21 302:20
304:2
**unredacted** 234:17
234:22 235:17
**unsolicited** 163:18
199:11
**unsure** 150:2
**unsuspecting**
294:12
**until** 57:8 152:4
156:13,15 223:10
223:20 233:24
235:1
**untimely** 219:19
**unwilling** 166:14
167:17 182:3
**upcoming** 97:1
**updated** 170:15
**updates** 173:10,11
**upheld** 247:19
248:9
**upon** 38:15 173:12
204:17 226:19,21
239:2 244:15
269:12,14 273:10
299:12
**upset** 100:17 173:9
**us** 7:12 60:8 75:16
118:11 122:12
125:4 136:3
165:12 170:13
173:8 180:10
205:18 206:10,12
225:12 234:14,21
235:2 250:13
259:22 260:8
288:5 296:7
298:11
**USA** 280:16,24
**use** 31:14 63:20
94:19 134:8 176:6
177:10 293:6
**user** 80:15
**user's** 69:20
**uses** 268:20 269:11
272:15
**using** 170:18 171:1
172:4 227:19
230:8 236:15
273:1 284:17
**utilize** 247:4 284:19
**utilized** 278:7
**utilizing** 226:23
285:10

**V**

**vacated** 237:9
**valid** 33:13 36:9,16
36:18,20 263:14
**value** 157:12 225:5
238:19 239:1
276:21
**varies** 229:18
**various** 142:19
**vastly** 221:12
**vendors** 281:6
282:12,14,16,21
283:20 284:18
**vent** 186:1
**verbal** 54:5
**verdict** 205:11,17
206:7 207:23
208:2 248:10,11
**verify** 263:5 266:15
272:11
**verifying** 276:2
**version** 234:15,17
234:22,24 235:1
**versus** 4:4 77:22
78:13 80:22 88:6
95:15,15 204:21
209:21 231:22
256:2 257:6,9
268:24,24 270:17
278:16 285:2,5
286:18 300:11
**very** 46:22 61:24
144:19 157:2
163:9 166:11
173:1 185:22
205:17 206:15
225:23,24 286:13
287:13 301:16
**via** 161:19
**viable** 264:24
**video** 4:7
**VIDEOGRAPHER**
2:15 4:1,23 49:15
49:19 134:13,19
192:19,23 193:17
193:20,24 215:13
215:17 258:24
259:8 288:22
289:2 296:16,20
301:17,21 305:11
**videotaped** 1:11 4:2
**violate** 45:21 203:12
297:9
**violating** 301:9
304:9
**violations** 303:22

**virtue** 216:24 252:2
**Volume** 4:2
**vs** 1:6 307:2

---

**W**

**Wagner** 256:16
257:6,9
**waiting** 233:24
**waive** 60:8 196:21
210:23 249:15
**waived** 196:7,18,20
199:8 208:17
209:24 248:23
**waiver** 210:19
211:23 217:1,17
**waivers** 246:19
**Wanca's** 7:19 80:17
106:24 110:20
112:23 123:6
127:9 141:24
151:22 174:15
182:10 209:4
236:1 245:21
247:5 251:7 289:5
289:12
**wanted** 14:3 50:11
155:13 161:16
167:1,2 170:3
182:7 230:6
**wants** 170:18
217:10 225:15
**wasn't** 13:3,18
62:18 65:7 83:5
83:23 86:13 99:21
113:8 171:10
183:8,19 185:18
220:7 253:20
256:12 257:21
**wave** 304:22,23
**wayed** 259:20
**Wayne** 29:6 155:9
170:18 171:2,10
171:11 176:3
178:24
**ways** 38:10 232:8
232:12 243:24
244:10
**we'll** 195:22 239:21
245:10 305:14
**we're** 56:15 59:5
60:7 172:4 184:10
189:20 190:18
219:5 221:2
259:11 273:14
281:15,21 300:22
300:23

we've 177:3 192:16
  249:4 259:15
  287:13 293:3
  305:6
weak 219:20
weakness 200:2
weaknesses 201:17
  204:19
web 161:19
week 30:4 157:9,10
weeks 7:10 8:6 30:2
  99:11,16
weeks' 96:20 97:10
welcome 48:18
wellbeing 220:17
Wellness 256:16
  257:6,9
went 14:9 64:10
  97:14 144:15
  153:4 155:11
  288:8
weren't 13:19,21
  103:19 120:12
West 280:16 282:22
Western 170:11
what's 10:4 13:4
  31:4 32:23 51:18
  56:18 71:6 96:21
  101:1 102:14
  144:22 163:6
  166:1 168:18
  179:7 195:6 224:2
  224:5 229:5 248:6
  284:13,24 285:15
whatever 6:22
  238:20 246:9
  251:17 276:5
  291:14 297:12
whatsoever 31:6
  75:19,22 81:20
  142:16,17
WHEREOF 308:14
while 192:16 273:19
  289:5
whims 151:10,22
who's 18:9
whoever 120:9
whole 60:18 215:22
  284:14 308:6
whom 4:14 9:5
  30:20 50:4 117:18
  158:13 255:23
  275:18 279:21
  286:10 295:24
whose 118:8 204:14
  256:20

wife 24:17
Wilder 75:3
Williams 24:15 26:7
willing 17:14 47:18
  161:15 162:10
  164:11 166:5,8,18
  167:8 297:14,24
win 18:15
window 284:23
Wines 32:16 209:1
  220:6
wins 234:1
winter 206:12
Wisconsin 2:8
withdraw 226:4
withhold 222:12
within 11:9 45:6
  62:2,18 67:24
  152:10 157:1
  209:18 218:8,9
  260:13
without 17:16 29:21
  31:12 35:8 49:1
  58:17 60:8 155:1
  170:17 180:16
  249:3 253:7,11,18
  276:20 295:20,23
  298:17 299:8
  301:2,9 304:9
witness's 130:23
won 241:7,9 290:3
won't 62:22 71:8
wondering 247:2
word 31:10,11
  92:19 93:2 218:4
  218:17 236:15,18
  283:23 290:7
  293:6
worded 275:24
  276:13,16,19
words 90:20 238:20
  273:2 277:2
work-product 147:2
  148:2 158:6
  246:19
worked 89:20 90:9
  90:11 120:24
  124:6 138:17
  174:18 216:13
  249:20 254:24
  255:1
working 31:8 56:22
  192:3 233:21
  250:7 253:7,10
works 50:18 224:24
world 224:24

worth 8:24 71:20
  153:14,18,24
  154:5,6 225:12
wouldn't 191:15
  212:24 248:2
  254:18 294:5
write 170:14 270:9
  270:12
writes 169:17
  176:11
writing 85:2,18
  117:10,17 121:11
  121:13,16
written 10:7,8 84:15
  84:17 110:2
  114:12,19 117:11
  213:2 223:24
  224:2,4,5
wrong 207:9 212:9
  219:24 228:13
  258:9 285:2
wrote 124:5 182:15
  194:24 237:5

_____
        X
_____
X 3:1,8 270:10

_____
        Y
_____
yank 245:12
yeah 41:6 51:3
  69:10 83:16 89:8
  108:8 131:21
  158:15 171:9
  174:11 183:17
  232:14 240:19,22
  245:9 271:21
  284:15 294:13
year 66:18 71:24
  118:6 122:4
  205:14 206:8
  250:9,13 285:21
  304:12
year's 71:20
years 15:6 31:8
  33:22 34:21
  109:13 205:7,9
  207:23 208:2
  212:7 251:6
  257:15 279:3
  287:6
yesterday 182:19
yet 137:19,23
  198:13 237:10
  248:1 273:4
  292:19
yield 158:3

you'll 129:22
  244:23
you've 96:11,15
  131:8 166:19
  169:2 205:5 229:6
  230:17 242:2
  246:1 255:2,7
  256:10 264:19,21
  279:19 284:6
  293:18 294:1
  300:19 301:5
yours 25:22 50:2
  256:20
yourself 25:2 28:5
  52:9 53:19 61:11
  63:11 71:4 147:13
youth 83:14 84:19

_____
        Z
_____
Z 97:2
Zakrzewski 24:15
  26:3 109:1 114:24
  117:19,23,24
  118:12 145:14
  153:9 155:4
Zakrzewski's
  112:20
zip 266:1

_____
        0
_____
0 230:20
084.003900 1:22
  308:19

_____
        1
_____
1 3:12 4:2,3 111:16
  111:20 160:22
  195:6 199:12
  222:18,20 260:20
  261:11 262:17
  265:14 266:17
  267:5,12 272:14
  273:11 274:22
  277:18,21
1,500 157:16 161:5
  207:9 240:17,18
  241:22 242:4
  304:5,13
10 211:24 237:19
10:03 49:16
10:13 49:20
100 158:1
1000 2:12
101 59:14
10th 2:12 176:10
11:37 134:14

112 3:12
11th 10:5 30:23
  34:16,19 143:14
  217:20 220:4,5
  247:18 279:24
127 264:9,20 265:9
13 1:18 307:3 308:6
131,000 217:23
  220:18
132,351 195:1
134 2:12
13th 4:6
150 90:8
15th 176:15 296:10
16 186:19 187:7
163 3:13
165 154:7,10 157:15
  157:23
169 3:14
17 3:17 104:8
  193:11
1718 2:7
1746 271:23
175 3:15
179 3:16
188 222:22
189 114:4 117:3
  223:2
18th 296:13 298:19
  298:23 299:3,14
19 11:10,17 12:18
  62:3
19.5 300:6
190 112:18
193 3:17
195 222:22
1st 182:14 185:12

_____
        2
_____
2 3:13 163:2,7,11
  166:1 195:7
  199:10 252:19
  265:23
2:30 134:20
20 195:15 237:11,20
  238:9,9,24 239:12
  239:14,19 242:18
20,000 286:21
2005 250:2,4
2006 250:13,19
  251:1
2008 251:21 252:2
  252:11 253:5
2009-2010 284:23
  285:13
2011 253:13

**2012** 115:14
**2013** 34:3,15,17,19
    109:5 113:2
    115:14 138:14
    205:3 292:18
**2014** 15:7,9 118:5
    122:5,9 288:18
**2015** 122:5,7,9
    155:10 182:14
    185:12 190:11
    194:19 199:24
    288:17 298:5
**2016** 29:24 30:9
    45:11 53:8,9
    57:21,23 64:14
    69:1,2 84:5 90:2
    106:16 157:9,10
    206:9 216:18
    288:17 295:10,17
    298:19 299:3,4,14
**2017** 1:18 4:6 196:3
    205:5 210:7
    306:19 307:3
    308:6
**204** 3:6
**206,196** 195:2
**21** 11:9,10,18 12:18
    62:2
**21st** 194:19,23,24
    199:24
**23rd** 196:3
**25** 8:24 195:15
    199:19,21 226:24
**250** 300:17
**259** 3:18
**25th** 296:10
**28** 271:22
**2800** 1:17 2:3
**28th** 185:11 190:11
**2nd** 69:1 188:1
    299:4,20

_____
**3**

**3** 3:14 168:19,21
    212:1 266:4
**3:32** 192:20
**3:40** 192:24 193:21
**3:43** 194:1
**30** 229:8 230:16,21
**300** 157:23 188:5,13
    189:6,8 300:17
**31** 298:5
**312** 2:4,13
**31st** 138:13 205:3
    210:7 292:18
**321** 1:16 2:3

**330,000** 161:6
**335** 169:14 172:3
**338** 170:14
**340** 169:17
**340,000** 188:6
**342** 169:15
**343,122** 163:18
    195:10 199:12
**35** 228:7,9 230:19
**350** 302:17 303:2,7
**350,000** 163:20
**3574** 3:16 179:8
**3577** 181:23
**3578** 181:16
**3579** 3:16 179:8

_____
**4**

**4** 3:15 175:2,6
    266:15 267:18
    268:5 271:6
    275:24 277:21
**4:13** 215:14
**4:16** 215:18
**400** 241:3
**4416** 3:17 193:11
**4784** 3:15 175:7
**4785** 176:10
**4787** 175:20
**4797** 3:15 175:7
**495** 157:16,24 158:1
    161:5
**499.99** 304:4
**4A** 268:7 276:1,6,8
**4B** 276:6

_____
**5**

**5** 3:5,16 179:3,8,11
    187:23 237:19
    271:16 272:7
    277:22
**5:21** 259:1
**5:31** 259:9
**50** 89:24 186:24
    187:8
**50-page** 210:3
**500** 154:6 157:16
    207:9 240:17
    242:9,14 303:14
    303:23
**53711** 2:8
**5500** 2:13

_____
**6**

**6** 3:17 193:6,10
    194:19
**6:13** 288:23

**6:17** 289:3
**6:28** 296:17
**6:30** 296:21
**6:39** 301:18
**6:40** 301:22
**6:44** 305:12
**60602** 2:13
**60654** 2:4
**608** 2:8
**620-5357** 2:8
**658** 2:13

_____
**7**

**7** 3:18 169:14 210:7
    259:5,15
**75** 167:17

_____
**8**

**8:16-cv-01477-C...**
    4:5
**8:16-cv-01477** 1:6
**832-5393** 2:4
**8th** 53:8,9,21 54:3
    57:23 64:14 66:22
    69:2 84:4 85:24
    87:6 97:13 296:7
    296:8,9

_____
**9**

**9,000** 7:7
**9:17** 1:18
**9:18** 4:7
**90** 9:18 287:4
**90-minute** 10:1
**92** 163:22 164:7
**99** 40:22 195:14
    198:20,24
**9th** 112:15 113:2,7