# EXHIBIT 1

1

UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF FLORIDA

TAMPA DIVISION

MEDICAL &  )
CHIROPRACTIC CLINIC,  )
INC.,  )
 )
    Plaintiff,  )
 )  Case No.
         vs.  )  16-cv-1477
 )
DAVID M. OPPENHEIM,  )
an individual and  )
BOCK LAW FIRM, LLC  )
d/b/a BOCK, HATCH,  )
LEWIS & OPPENHEIM,  )
LLC,  )
 )
    Defendants.  )

        The videotaped deposition of
DAVID M. OPPENHEIM, called by the
Plaintiff for examination, pursuant to
Notice, and pursuant to the Rules of
Civil Procedure for the United States
District Courts, taken before Renee E.
Brass, CSR and Notary Public in and for
the County of Cook and State of
Illinois, at 321 North Clark Street,
28th Floor, Chicago, Illinois, on
August 15, 2017, at the hour of
9:44 a.m.


Reported By:
Renee E. Brass
Job No: 51441

6

OPPENHEIM
1
2    THE VIDEOGRAPHER: Will the
3  court reporter please swear in the
4  witness.
5         DAVID M. OPPENHEIM,
6  having been first duly sworn, was
7  examined and testified as follows:
8         EXAMINATION
9  BY MS. LOEW:
10     Q.   Good morning, Mr. Oppenheim.
11  Is it Oppenheim?
12     A.   Oppenheim.
13     Q.   Could you please state your
14  full name for the record.
15     A.   David Max Oppenheim.
16     Q.   And Mr. Oppenheim, are you an
17  attorney?
18     A.   Yes.
19         (Oppenheim Exhibit
20          No. 1 marked for
21          identification.)
22  BY MS. LOEW:
23     Q.   Okay.  We have noticed your
24  deposition today.  Just going to -- we've
25  marked this as Exhibit 1.  This is --

7

OPPENHEIM
1
2  yeah.  Here we go -- which is just the
3  deposition notice for today's deposition.
4         So how long have you been
5  practicing law?
6     A.   Since 2002, so nearly 15
7  years.
8     Q.   Where did you go to law
9  school?
10     A.   Harvard.
11     Q.   And what -- what was your
12  undergraduate degree?
13     A.   I have a bachelor's degree
14  from Yale University.
15     Q.   And what did you study there?
16     A.   I double majored in political
17  science and economics.
18     Q.   Did you go straight from
19  undergraduate to law school?
20     A.   Yes, I did.
21     Q.   Do you have any other degrees
22  other than your bachelor's degree and
23  your degree from Harvard?
24     A.   No.
25     Q.   So what was your first

8

OPPENHEIM
1
2  position out of law school?
3     A.   I worked for Wildman, Harold,
4  Allen & Dixon, which isn't around
5  anymore, as an associate.
6     Q.   Did you have a particular area
7  of specialty there?
8     A.   It was sort of general
9  litigation, but based on who I worked
10  with and what experience I gained, I sort
11  of ended up with a concentration in
12  insurance defense and class action
13  defense.
14     Q.   How long were you at -- what
15  was the name at the time?
16     A.   Wildman, Harold, Allen &
17  Dixon.
18     Q.   Wildman --
19     A.   They went by WHAD.
20     Q.   How long were you at Wildman?
21     A.   Seven years.  Well, nearly
22  seven years.
23     Q.   So you -- does that mean you
24  left there in around 2009?
25     A.   Exactly, April -- well, June

9

OPPENHEIM
1
2  of 2009.
3     Q.   And what did you do next?
4     A.   I went to work for Anderson &
5  Wanca.
6     Q.   What did you -- what was your
7  position at Anderson & Wanca?
8     A.   Never really gave us titles.
9  I was one of the attorneys.
10     Q.   Were you an employee?
11     A.   Yes.
12     Q.   When you were at Wildman, were
13  you an associate the whole time that you
14  were there?
15     A.   I was.
16     Q.   How did you learn about
17  Anderson & Wanca?
18     A.   A friend of mine at Wildman
19  had a case opposite Brian Wanca.  I was
20  looking to get out of Wildman.  I was
21  entertaining the possibility of jumping
22  the fence, so -- so to speak, between the
23  defense side and plaintiff's side, and my
24  friend was in court with Brian, and Brian
25  was talking about how much work he's got

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123 1.800.642.1099



10

OPPENHEIM
1
2  and how busy he is.
3          And so my friend is like, hey,
4  maybe -- there's a guy at my office maybe
5  you should talk to, and then he went back
6  and talked to me about it.
7      Q.   Did you know Brian Wanca
8  before that?
9      A.   No.
10     Q.   Had you ever litigated against
11 him?
12     A.   No.
13     Q.   Before you joined Anderson &
14 Wanca, did you do any plaintiff's side
15 class action work?
16     A.   No.
17     Q.   While you were at Anderson &
18 Wanca, what type of work did you do?
19     A.   It was almost entirely
20 Telephone Consumer Protection Act class
21 actions, and most of what I did, other
22 than working on settling those cases, was
23 I litigated insurance coverage cases that
24 stemmed out of the TCPA class actions.
25         A lot of the cases, the only

11

OPPENHEIM
1
2  chance of recovery was against the
3  defendant's insurance company, usually a
4  general liability insurer, sometimes a
5  professional liability or director and
6  officer type policy, and oftentimes the
7  insurers contested coverage, and then we
8  would have to litigate that case
9  separately.
10     Q.   Did you do any nonclass action
11 work at Anderson & Wanca?
12     A.   Well, the coverage cases, I
13 guess, technically are -- were on behalf
14 of the underlying classes, but were not
15 class actions themselves.  They were
16 typically declaratory judgment actions.
17         But with that caveat aside,
18 the only one that I can remember is that
19 we took on a pro bono defense for one of
20 the firms regular class plaintiffs.  Guy
21 named Bob Hinman and I took that case
22 over to handle an appeal in the Illinois
23 Appellate Court.
24     Q.   So other than the TCPA and the
25 insurance coverage cases or covered

12

OPPENHEIM
1
2  cases, did you work on any other types of
3  class actions?
4      A.   There were a handful of FACTA
5  class actions, Fair and Accurate Credit
6  Transaction Acts, which I touched at
7  certain times.
8          Near the end of my stay there,
9  I know that there was an effort to try
10 and broaden the focus of the firm into
11 some other areas, so I looked into
12 certain other things, but never --
13 they -- at least while I was there, they
14 didn't get off the ground.
15     Q.   Did you know any attorneys --
16 I asked you if you know Anderson -- Brian
17 Wanca.  Did you know any other attorneys
18 at Anderson & Wanca before you joined the
19 firm?
20     A.   No.
21     Q.   At that -- at Anderson &
22 Wanca, were there partners in the firm?
23     A.   As far as I know, it was only
24 ever Brian Wanca.  I don't even know who
25 Anderson is.

13

OPPENHEIM
1
2      Q.   You never -- you never worked
3  with anyone named Anderson --
4      A.   No.
5      Q.   -- there?
6          MR. BLONIEN:  Just to clarify,
7  was your question did he ever work
8  with an Anderson there?
9          MS. LOEW:  Yes.
10         MR. BLONIEN:  Okay.  Thank
11 you.
12         MS. LOEW:  Yes.
13         THE WITNESS:  Yeah.  There was
14 a partner named Anderson at
15 Wildman, just for what it's worth.
16 BY MS. LOEW:
17     Q.   Okay.  But not -- I was asking
18 about Anderson & Wanca.
19     A.   Okay.
20     Q.   And so when did you leave
21 Anderson & Wanca?
22     A.   April of 2016, last year.
23     Q.   So you were there for
24 approximately seven years?
25     A.   Right.

4  (Pages 10 to 13)



14

OPPENHEIM

Q.   When you were at Anderson &
Wanca, did your responsibilities change
over time?

A.   I think so, yes.  When I first
got there, I was mostly writing briefs
for appeals and for coverage cases, which
I continued to do, but a year or two in,
maybe three, I started picking up the
niche of doing negotiations and
settlements.

Q.   Did you have any role in
bringing in business at Anderson & Wanca?

A.   No.

Q.   How did the cases come in?

A.   People would send in piles of
faxes that they had received and then a
group of interns would sift through them,
and somebody would figure out which ones
they thought would make for good cases,
and then the cases would be filed.

Q.   When you were leaving Wildman,
did you look at any other opportunities
other than Anderson & Wanca?

A.   I did.

15

OPPENHEIM

Q.   Where else were you looking?

A.   Primarily the runner-up in my
little personal search was a place called
KamberEdelson, working for a class action
attorney in the city named Jay Edelson
who has since gone through, I think, two
or three other partners since Kamber.

Q.   So were you only exploring
really the -- the plaintiff's side class
action at that time?

A.   It's what I wanted to do.

Q.   Why did you want to make that
switch?

A.   I got a little bit tired of
being sort of boxed in in a defense side
firm where everything was all about the
billable hour and everything was all
about the sort of clickish office
politics relationships.

I -- it appealed to me to go
to a practice where you got paid if you
won.

Q.   At Anderson Wanca, so when you
started, you said you were primarily

16

OPPENHEIM

writing briefs, those types of things?

A.   I think so.

Q.   Where are you admitted to
practice law?

A.   Just in Illinois if we're
taking states, several federal district
and circuit courts as well.

Q.   So where -- I guess the early
stages of your practice at Anderson &
Wanca, where were your cases?

A.   All over the country.

Q.   So you have had kind of a
national practice since you went into
plaintiff's side class action work?

A.   Yes.

Q.   Did you interact with clients
at all at Anderson & Wanca?

A.   Very, very rarely.

Q.   On what types of occasions
would you interact with clients?

A.   Occasionally our client -- our
class representative would be deposed in
one of the coverage cases I would -- I
was handling and I would have to defend

17

OPPENHEIM

that deposition.

Occasionally the class
representative was obligated to or wanted
to attend a mediation, so they would be
in the room with me for that.

Q.   Did you take depositions at
all at Anderson Wanca?

A.   Yes.

Q.   And although I didn't go over
the typical deposition rules with you at
the beginning, as you being an attorney,
I will touch on those again right now.

So obviously I'm here asking
questions.  If you don't understand any
of my questions, please let me know.

If you need a break at any
time, please let me know.  As long as
there's not a question pending, we'll
take a break, be flexible today.

I'll hand you some exhibits.
I have copies for other counsel.  I know
there is a protective active order in the
case, so to the extent any of your
testimony is getting into areas that you

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123 1.800.642.1099

26

OPPENHEIM

1
2  Q.   How many times did you
3  actually appear in a case?
4     A.   Well, in state court the firm
5  makes the appearance, so are we talking
6  federal?
7     Q.   Yes.
8     A.   I don't know.
9     Q.   Would there be certain
10 situations in which you would not file an
11 appearance in a case?
12        MR. BLONIEN:  Objection,
13 confusing.
14        THE WITNESS:  I'm sure there
15 are cases in which, for example, I
16 negotiated a settlement or
17 unsuccessfully tried to and did not
18 formally appear.
19 BY MS. LOEW:
20    Q.   Why -- why would you appear in
21 some cases, but not others?
22    A.   If I needed to cover a hearing
23 in court, I would need to, of course,
24 have an appearance on file, same with
25 deposition.

27

OPPENHEIM

1
2        Any case that I was primarily
3  handling, I would put in an appearance at
4  the beginning of the case.
5     Q.   Did you file an appearance
6  in I'll call it the -- the Medical and
7  Chiropractic action, the M&C action,
8  which is the case where Medical and
9  Chiropractic was a punitive class
10 representative against the Buccaneers?
11    A.   I don't believe I did.
12    Q.   And why not?
13    A.   Again, the only involvement I
14 had was trying to negotiate a settlement.
15    Q.   So in cases where you were
16 focused on negotiating a settlement, you
17 typically would not file an appearance?
18    A.   I think that's fair.
19    Q.   The -- did you work with the
20 Bock Law Firm when you were at Anderson &
21 Wanca?
22    A.   Yes, extensively.
23    Q.   How many matters did you work
24 with the Bock Law Firm?
25        MR. BLONIEN:  Objection, vague

28

OPPENHEIM

1
2  as to time frame.
3  BY MS. LOEW:
4     Q.   When you were at Anderson &
5  Wanca.
6     A.   Easily hundreds.  Every case
7  that Anderson & Wanca had when I got
8  there in 2009 up until about 2012, 2013,
9  thereabouts, was a case that was joint
10 between Anderson & Wanca and the Bock Law
11 Firm.
12    Q.   When did you first meet Phil
13 Bock?
14    A.   I went in my first week to
15 Anderson & Wanca to watch a class
16 certification argument that he was
17 arguing in a case called CE Design versus
18 Cy's Crab House.
19        It was a argument ultimately
20 that he won, and I met him afterwards.
21    Q.   Was that a case in which the
22 Bock Law Firm and Anderson & Wanca were
23 co-counsel?
24    A.   Yes.
25    Q.   Did you understand whether

29

OPPENHEIM

1
2  there was any sort of formal relationship
3  between Anderson & Wanca and the Bock Law
4  Firm?
5        MR. BLONIEN:  Objection,
6  vague.
7        THE WITNESS:  As far as I
8  know, it was an implied
9  partnership.  I have never seen
10 anything in writing.
11 BY MS. LOEW:
12    Q.   Were there other firms that
13 Anderson & Wanca worked with as
14 extensively as the Bock Law Firm?
15    A.   No.
16    Q.   Were there other firms that
17 Anderson & Wanca worked with generally --
18    A.   Yes.
19    Q.   -- on more than one occasion?
20    A.   Yes.
21    Q.   And what were those firms?
22    A.   Well, the Margolis Law Group I
23 think is what it's called in St. Louis
24 has a number of cases both with Wanca and
25 with the Bock Law Firm and with both.

8  (Pages 26 to 29)

30

OPPENHEIM

1
2     There was later on a gentleman
3  named John Lawry and his firm in
4  Cleveland, Ohio that was an extensive --
5  had an extensive relationship with Wanca.
6     Beyond that there were people
7  that were used as local counsel, some on
8  multiple occasions.
9     Q.   Did you work with Mike Addison
10 on more than one matter?
11    A.   I did.  Still do.
12    Q.   And how many matters did you
13 work with Mike Addison on while you were
14 at Anderson & Wanca?
15    A.   I want to say -- well, and I
16 guess it depends on if you define a case
17 like the Superior Pharmacy case where
18 there was the underlying class action and
19 then there were two separate insurance
20 companies with coverage actions, does
21 that count as one or does that count as
22 three?
23    Each -- if you count it as
24 three, each individual matter as a
25 separate matter, probably 10.

31

OPPENHEIM

1
2     Q.   How did Mike Addison and
3  Anderson & Wanca come to work together?
4     MR. BLONIEN:  Objection, calls
5  for speculation.
6     THE WITNESS:  I don't know.
7  BY MS. LOEW:
8     Q.   The Medical and Chiropractic
9  action, how did that matter come to
10 Anderson & Wanca?
11    MR. BLONIEN:  Objection, calls
12 for speculation.
13    THE WITNESS:  I don't know.
14 BY MS. LOEW:
15    Q.   When did you first start
16 working on it?
17    A.   I think shortly before the
18 February 2015 scheduled mediation with
19 Rodney Max in Miami.
20    Q.   Were you aware of the matter
21 before that?
22    A.   I think so.
23    Q.   Who was working on the matter?
24    MR. BLONIEN:  Objection, calls
25 for speculation.

32

OPPENHEIM

1
2     THE WITNESS:  Well, the office
3  generally had kind of an assembly
4  line approach, so Brian Wanca
5  oversaw getting complaints put
6  together and filed, so I imagine he
7  did that in that case, although I
8  don't know for sure.
9     Ryan Kelly primarily took
10 depositions and did discovery along
11 with Ross Good, and I think both of
12 them did that -- fulfilled that
13 function in the Medical case.
14    I'm not sure if anyone else
15 would have been involved, but,
16 again, I wasn't until shortly
17 before the mediation.
18 BY MS. LOEW:
19    Q.   How long has Ross Good been an
20 attorney?
21    MR. BLONIEN:  Objection, calls
22 for speculation.
23    THE WITNESS:  It's a good
24 question.
25    He was there as an intern or,

33

OPPENHEIM

1
2  I guess, the head of the clerks
3  before that, and then he passed the
4  bar and became an attorney, I want
5  to say a couple of years ago.
6  BY MS. LOEW:
7     Q.   So he -- he was at the firm as
8  a non-attorney for a period of time?
9     A.   Right.
10    Q.   So what -- when you became
11 involved, what was your role with the M&C
12 action?
13    A.   Well, I had to put together a
14 mediation statement and then go down and
15 work the mediation, see if I could get a
16 class deal done.
17    Q.   And when you got involved in
18 the case, who did you understand was your
19 client?
20    A.   The class, and that's true of
21 pretty much every case.
22    MS. LOEW:  This is Exhibit 2.
23       (Oppenheim Exhibit
24       No. 2 marked for
25       identification.)

9  (Pages 30 to 33)

34

OPPENHEIM

1  BY MS. LOEW:
2      Q.   The court reporter has handed
3  you what we've marked as Exhibit 2, which
4  is entitled retainer agreement at the top
5  and is M&C 0000188 through 195, and I'll
6  note that this is confidential pursuant
7  to the protective order.
8          Have you seen this document
9  before?
10     A.   No, with the caveat that I was
11 aware that it was part of the document
12 production in this case.
13     Q.   When you were at Anderson &
14 Wanca, did you review retainer
15 agreements?
16     A.   I may have seen one or two
17 once or twice, but as a general practice,
18 no.
19     Q.   The -- if you look at this
20 retainer agreement, do you see Medical
21 and Chiropractic Clinic, Inc. listed as
22 the client at the top?
23     A.   In the capital letters?
24     Q.   Yes.

35

OPPENHEIM

1      A.   I see that.
2      Q.   Okay.  And that it says M&C,
3  Medical and Chiropractic Clinic, Inc.,
4  hereby retains Anderson & Wanca to
5  represent the client regarding any and
6  all claims that the client may have or
7  similarly situated individuals, the
8  class, in quotes.
9          Do you see that?
10     A.   I see that.
11     Q.   Okay.  May have against
12 Buccaneers Limited Partnership and any
13 related entities.
14         Did I read that correctly?
15     A.   I think so.
16     Q.   Okay.  And under the action,
17 it says, client understands and agrees
18 that this action will be brought on
19 behalf of the client, individually, and
20 also as a representative of a proposed
21 class of similarly-situated claimants
22 against the above defendants.
23         Did I read that correctly?
24     A.   I think so.

36

OPPENHEIM

1      Q.   Were you familiar with the
2  terms of the representation of Medical
3  and Chiropractic Clinic, Inc. between
4  Anderson & Wanca and M&C?
5      A.   No.
6      Q.   How did you go about
7  determining who was your client that you
8  were representing at the mediation?
9      A.   I was sent to negotiate a
10 class settlement and, therefore, I was
11 negotiating on behalf of the class.
12     Q.   How did you learn that you had
13 that authority?
14     A.   Brian Wanca told me.  Of
15 course, he would need to approve
16 anything.  That was always our
17 relationship.
18     Q.   If you turn to the second page
19 of this, the first -- the first paragraph
20 starts a new paragraph.  It says, in the
21 event that the class is not certified,
22 client agrees to pay attorney fees equal
23 to one-third of the total amount
24 recovered by clients on an individual

37

OPPENHEIM

1  basis.
2          Do you see that?
3      A.   I do.
4      Q.   Do you know if that -- if that
5  has ever come to pass with Medical and
6  Chiropractic Clinic, Inc.?
7      A.   I don't.
8      Q.   Have you had any clients in
9  class actions you worked on at Anderson &
10 Wanca that recovered on an individual
11 basis?
12     A.   Yes.
13     Q.   And --
14     A.   Well, I mean, the firm had
15 cases that settled that way.
16     Q.   And do you know if the firm
17 received fees from those cases where the
18 individual client settled?
19     A.   I believe so.
20     Q.   Have you had that circumstance
21 arise since you have been at the Bock Law
22 Firm?
23         MR. BLONIEN:  Objection,
24 vague.

10  (Pages 34 to 37)

38

OPPENHEIM

1
2    THE WITNESS:  What
3  circumstance?
4  BY MS. LOEW:
5    Q.   Where a punitive class
6  representative settles on an individual
7  basis.
8    A.   Yes.
9    Q.   And do you know if the
10  arrangement between the Bock Law Firm and
11  the punitive class representative
12  included an individual representation?
13    MR. BLONIEN:  I object on the
14    ground that this gets into
15    attorney-client privilege outside
16    the scope of this particular
17    litigation, to the extent that the
18    question calls for Mr. Oppenheim to
19    testify about the terms of
20    retention agreements with respect
21    to other clients.
22    MR. COHEN:  I join the
23    objection, and on behalf of Bock
24    Law Firm, speaking to an employee
25    of Bock Law Firm based on privilege

39

OPPENHEIM

1
2  in the case, I instruct him not to
3  answer.
4  BY MS. LOEW:
5    Q.   Okay.  Have you ever
6  negotiated a settlement on behalf of an
7  individual through a class action?
8    MR. COHEN:  Objection, vague
9    and ambiguous.
10    THE WITNESS:  They never start
11    out that way.
12    The only time that comes up is
13    if class certification has already
14    been litigated and lost or if the
15    defendant doesn't have enough money
16    to pay a class settlement.
17  BY MS. LOEW:
18    Q.   But have you actually
19  negotiated an individual settlement on
20  behalf of a client?
21    A.   I have negotiated individual
22  settlement, yes.
23    Q.   Did you engage in any
24  negotiations on behalf of Medical and
25  Chiropractic Clinic as an individual

40

OPPENHEIM

1
2  client?
3    A.   No.
4    Q.   Do you have an understanding
5  of whether Medical and Chiropractic
6  Clinic could have personal liability for
7  fees or costs in the class action against
8  the Buccaneers?
9    A.   I don't.  Yeah.  No, I don't.
10    Q.   Did you meet with
11  representatives from Medical and
12  Chiropractic Clinic?
13    A.   I had dinner with
14  Ms. Zakrzewski before the February
15  mediation, and she was present at that
16  mediation.  I think that's the sum total
17  of my face-to-faces with anybody at
18  Medical prior to today and other court
19  appearances in this case.
20    Q.   So you said you had dinner
21  with Ms. Zakrzewski?
22    A.   Right, me, her, Ryan Kelly and
23  Ross Good.
24    Q.   And then you attended the
25  mediation with Ms. Zakrzewski?

41

OPPENHEIM

1
2    A.   Right, the four of us, plus
3  Michael Addison and Craig Cinque, who was
4  the other potential named plaintiff in
5  that action.
6    Q.   So you actually attended the
7  mediation?
8    A.   Yes.
9    Q.   Other than those two
10  instances, did you have any
11  communications with Medical and
12  Chiropractic Clinic representatives?
13    A.   Not to my knowledge.  I may
14  have been on an email back and forth
15  between them and somebody else, but, no.
16    Q.   What was your understanding of
17  Medical and Chiropractic's role in the
18  M&C action?
19    A.   They were a class
20  representative.
21    Q.   What -- what obligations come
22  with being a class representative?
23    MR. BLONIEN:  Objection, calls
24    for a legal conclusion.
25    THE WITNESS:  Right.  I mean,

11  (Pages 38 to 41)

42

```
1              OPPENHEIM
2    there's lots and lots of case law
3    on that.
4         Essentially it's to stand in,
5    allow their individual claim to be
6    tested as a proxy for everybody's
7    claim in the class and at the same
8    time act as a fiduciary on behalf
9    of the class to make sure that they
10   and the attorneys don't do things
11   that benefit either the
12   representative or the attorneys at
13   the expense of the class.
14   BY MS. LOEW:
15       Q.   Did you have any duties to
16   Medical and Chiropractic Clinic?
17            MR. BLONIEN:  Objection, calls
18   for a legal conclusion.
19            MR. COHEN:  Join.
20            THE WITNESS:  As the -- a
21   member of a class that I was trying
22   to represent, certainly.  I had a
23   fiduciary duty as class counsel to
24   them as to any other class member.
25
```

43

```
1              OPPENHEIM
2    BY MS. LOEW:
3        Q.   So the -- the relationship
4    that you had with Medical and
5    Chiropractic was not distinct from any
6    other member of the class?
7        A.   I think that's fair.
8        Q.   That was your understanding of
9    the relationship?
10       A.   Yes.
11       Q.   Have you ever taken any ethics
12   courses specific to class litigation,
13   class action litigation?
14       A.   I don't think so.
15       Q.   Have you ever testified as an
16   expert on ethics?
17       A.   No.
18       Q.   Do you consider yourself to be
19   an expert in ethics?
20       A.   No.
21       Q.   How did you -- I guess on what
22   basis did you understand what your duties
23   were to Medical and Chiropractic?
24            MR. BLONIEN:  Objection, calls
25   for a legal conclusion and also
```

44

```
1              OPPENHEIM
2    potentially mediation privilege to
3    the extent that the answer would
4    divulge communications directly
5    related to the mediation.
6         THE WITNESS:  I understood
7    that we were trying to get a class
8    settlement or a class judgment in
9    the -- in the case and that if that
10   were to happen, that they would
11   stand to benefit.
12   BY MS. LOEW:
13       Q.   Did they -- did Medical and
14   Chiropractic as an -- as a punitive class
15   representative have anything to lose as
16   being a punitive class representative?
17       A.   I don't think so.  Obviously
18   you have to do some work, appear for a
19   deposition and which I believe happened,
20   participate in discovery and do so
21   honestly, which is something that
22   occasionally will trip up class
23   representatives, but apart from time and
24   effort, no.
25       Q.   Have you been involved in any
```

45

```
1              OPPENHEIM
2    cases where a punitive class
3    representative had a judgment or was
4    required to pay fees to the other side?
5            MR. BLONIEN:  Objection.
6    BY MS. LOEW:
7        Q.   As an individual client?
8            MR. BLONIEN:  Objection,
9    compound question.
10           THE WITNESS:  I don't think
11   so, no.
12   BY MS. LOEW:
13       Q.   Are you aware whether there's
14   any authority in TCPA law or case
15   law to assess fees or expenses against a
16   punitive class representative?
17           MR. BLONIEN:  Objection, calls
18   for a legal conclusion.
19           THE WITNESS:  Beyond the
20   general discovery sanction power of
21   any Court in any action, I don't
22   think that there is that
23   possibility.
24   BY MS. LOEW:
25       Q.   In preparing for the mediation
```

12  (Pages 42 to 45)



46

OPPENHEIM

1
2    in the Cin-Q action, did you review any
3    of the discovery in that case?  I'm
4    sorry, the M&C action.
5            MR. COHEN:  Can you repeat the
6        question?
7    BY MS. LOEW:
8        Q.   Did -- in preparing for the
9    mediation in the M&C action, did you
10   review any of the discovery in that case?
11           MR. COHEN:  I apologize.  I
12       don't know what the M&C action is
13       as opposed to this action.
14           MS. LOEW:  Certainly.
15   BY MS. LOEW:
16       Q.   So the M&C action is the
17   punitive class action against the
18   Buccaneers.
19       A.   I don't recall.  I might have.
20       Q.   Okay.  Do you know if Medical
21   and Chiropractic gave any depositions in
22   that case?
23       A.   I believe they did.
24       Q.   How did you go about preparing
25   for the mediation --

47

OPPENHEIM

1
2        A.   I --
3        Q.   -- the first mediation?
4        A.   -- looked at the numbers, I --
5    which I guess is discovery, so absolutely
6    I would have looked at that.
7            The numbers I'm referring
8    to would be the number of fax
9    transmissions, the number of fax
10   transmissions that were successful, the
11   dates of those transmissions.
12           I looked at -- well, to
13   confirm that they would be within the
14   statute of limitations and then, yeah,
15   actually now that -- that I am recalling,
16   I reviewed some of the discovery
17   responses provided by the Buccaneers in
18   terms of nailing down the main legal
19   question in the case, which was whether
20   the faxes that were sent were sent on
21   behalf of the Buccaneers.  That I knew
22   was going to be the major sticking point,
23   and so looked at that stuff and then put
24   together a mediation statement, which is
25   largely from a template.

48

OPPENHEIM

1
2        Q.   Who was representing the
3    Buccaneers at that point?
4        A.   Barry Postman was the lead
5    counsel.  I can't recall if he had
6    somebody else there with him.
7        Q.   At that point in time had the
8    class been certified?
9        A.   No.
10       Q.   Had there been a motion for
11   class certification?
12       A.   I don't believe so.  No, there
13   hadn't because Judge Porcelli wanted to
14   handle summary judgment before class
15   certification.
16       Q.   What was the outcome on
17   summary judgment?
18       A.   The motions were denied.  In
19   fact, I don't even recall -- I think it
20   was probably just the Buccaneers motion
21   that was in play, but it was denied, and
22   there's a fairly highly cited written
23   opinion talking about the standards for
24   when a fax is sent on behalf of a
25   particular defendant.

49

OPPENHEIM

1
2        Q.   Was the mediation, the first
3    mediation in you said February 2015, was
4    that mediation successful?
5        A.   No.
6        Q.   Was it adjourned?  Was it
7    terminated, I should say?
8            MR. COHEN:  I just object.  I
9        can't tell whether adjourned should
10       be part of terminated, in which
11       case it's vague and ambiguous.
12   BY MS. LOEW:
13       Q.   Do you understand my question?
14           MR. BLONIEN:  I'd also like to
15       interpose an objection on the
16       ground that this appears to call
17       for mediation-privileged
18       information.
19           To the extent that the
20       question is not withdrawn, you may
21       answer.
22   BY MS. LOEW:
23       Q.   The -- I'm asking about
24   whether the mediator, I guess, told the
25   Court that the mediation was at an

13 (Pages 46 to 49)

50

OPPENHEIM

1   impasse?
2      A.   I don't recall.
3      Q.   After the day of mediation,
4   the February 2015 mediation, when was
5   your next involvement in the Cin-Q case?
6      A.   There was talk about a second
7   attempt at mediation once the defendants
8   switched counsel.  The view was that
9   Mr. Postman wasn't interested in
10  settlement and that their new counsel
11  might well be, at which point I was
12  brought in the loop.
13     Q.   And when was that?
14     A.   It would have been in the
15  summer of 2016, probably July.  2015,
16  excuse me.
17     Q.   So without getting into what
18  actually was said at the mediation, what
19  was your role at the mediation, the first
20  mediation?
21     A.   To try and negotiate a class
22  settlement.
23     Q.   Did you communicate directly
24  with the Buccaneers counsel?

51

OPPENHEIM

1      A.   At one point during the
2   session and I -- I mean, how much do you
3   want me to get into what happened?
4      Q.   I'm just asking if you
5   communicated directly with the Buccaneers
6   counsel.
7      A.   At one point the mediator did
8   have a joint session.
9      Q.   Did you communicate directly
10  with the mediator?
11     A.   Yes.
12     Q.   Were there any further
13  negotiations after the day of the
14  mediation?
15        MR. BLONIEN:  Objection, calls
16     for mediation-privileged
17     information.
18        To the extent the question is
19     not withdrawn, you may answer.
20  BY MS. LOEW:
21     Q.   The -- I'm not asking about
22  the substance of the communication.  I'm
23  only asking if there were communications.
24     A.   I don't think so.  We're

52

OPPENHEIM

1   talking about February, right?
2      Q.   Yes.
3      A.   Yeah.  No, I don't think so.
4      Q.   So your -- when did you first
5   learn there was going to be a second
6   mediation?
7      A.   It would be in the emails in
8   the case, but some time during that
9   summer.
10        MS. LOEW:  We'll mark this as
11     the next exhibit.
12           (Oppenheim Exhibit
13           No. 3 marked for
14           identification.)
15        MR. BLONIEN:  I do have an
16     objection I want to interpose after
17     you describe the exhibit, please.
18  BY MS. LOEW:
19     Q.   So this is what we've marked
20  as Exhibit 3, Oppenheim 005968 to 005969,
21  entitled JAMS mediation agreement at the
22  top.
23        MR. BLONIEN:  The objection I
24     would like to interpose is that it

53

OPPENHEIM

1   appears this document is Bates
2   numbered with OPP 005968 and 5969,
3   although there are no other
4   designations of Bates numbers
5   listed on this document.
6        The production that
7   Mr. Oppenheim made was specifically
8   to M&C only as per the Court's
9   order, and then M&C determined
10  which of those materials would be
11  produced in this case by producing
12  it themselves with an M&C Bates
13  number.  I don't see an M&C Bates
14  number on this.
15        Therefore, I don't think it's
16  been properly produced in this
17  case.
18        MS. LOEW:  Okay.
19        MR. COHEN:  And for the
20  record, on behalf of Bock Law Firm,
21  who has no way of knowing what has
22  and hasn't been produced because
23  we're in the blind as to all of it,
24  we are not going to sit here and

14  (Pages 50 to 53)

58

OPPENHEIM

1
2  documents that you provided to us,
3  you have produced none of those
4  documents even if we did not assert
5  privilege over them to Bock Law
6  Firm?
7      MR. BLONIEN:  I would like to
8  move forward with the deposition
9  questioning of the witness who is
10  here today.
11      I have made the record as
12  plain as I can.
13      If you want further
14  clarification, perhaps we could do
15  this off the record at a break
16  because I would like to move this
17  deposition along.
18      MS. LOEW:  There will be a
19  couple other documents I have
20  questions about.  They're
21  compensation related.
22      I don't know if you also
23  withheld those, so for the time
24  being, we will not ask questions of
25  this witness about this document

59

OPPENHEIM

1
2  and --
3      MR. BLONIEN:  Just to be
4  clear -- and I'm sorry to
5  interrupt.
6      We didn't withhold anything.
7  Per the Court's order we provided
8  only M&C with the copy of the
9  documents that were relevant and
10  responsive, and then it was the
11  burden of M&C to identify which
12  documents would be then produced in
13  the litigation, that's certainly my
14  understanding so far at least.
15      MR. COHEN:  For the record,
16  that's what happened, and I also
17  have been candid with the Court and
18  with M&C's counsel about the snafu
19  with all of the Oppenheim documents
20  actually being facilitated through
21  Bock Hatch staff.
22      And as soon as we realized
23  that was not something we could
24  look at, which was on the first
25  page of the first document, that

60

OPPENHEIM

1
2  nobody has looked at any of those,
3  and we have not received any of it
4  from Mr. Oppenheim or from his
5  counsel.
6      MS. LOEW:  Okay.  I don't know
7  if we -- I'm looking to see if that
8  actually was produced by us in a
9  different format, but I don't know
10  that we have the same
11  interpretation of the Court's order
12  as to whether that such types of
13  documents were supposed to come
14  from us or from Mr. Oppenheim.
15      Nonetheless, we will withhold
16  or we will not ask questions about
17  that particular document.
18      If you can give it back to me
19  please.  All right.
20  BY MS. LOEW:
21      Q.   So are you -- Mr. Oppenheim,
22  are you familiar with the mediation
23  privilege in Florida?
24      A.   I think so, yes.
25      Q.   Okay.  And did you have any

61

OPPENHEIM

1
2  obligations to withhold or to -- to keep
3  mediation communications confidential
4  beyond just the mediation privilege in
5  Florida?
6      For example, were there any
7  other agreements that you had with
8  opposing counsel to keep communications
9  confidential?
10      MR. BLONIEN:  Objection, calls
11  for a legal conclusion, vague,
12  compound.
13      THE WITNESS:  I don't believe
14  in this case there was anything
15  additional with opposing counsel.
16  BY MS. LOEW:
17      Q.   Okay.  Were there any
18  protective orders in the Medical and
19  Chiropractic case?
20      A.   There may have been.
21      Q.   And what is your understanding
22  of your obligation to keep mediation
23  information confidential?
24      MR. BLONIEN:  Objection, calls
25  for a legal conclusion.

16  (Pages 58 to 61)

62

OPPENHEIM

1
2    THE WITNESS:  That information
3    about what goes on at a mediation
4    can't be introduced into evidence,
5    can't be shared with the Court and
6    shouldn't be shared with third
7    parties who could be adverse to
8    your side.
9  BY MS. LOEW:
10    Q.   And what -- okay.
11    MS. LOEW:  Can you read that
12    answer back, please.
13    (Record read as
14    requested.)
15    THE WITNESS:  I said third
16    parties.
17  BY MS. LOEW:
18    Q.   What do you mean by third
19  parties who could be adverse?
20    A.   Well, I guess if the defendant
21  in a lawsuit, had a bunch of employees
22  and one of them was a golfing buddy, I
23  really shouldn't be talking about the
24  mediation with him.
25    Q.   Can you share what happens at

63

OPPENHEIM

1
2  a mediation with other members of the
3  class?
4    A.   I think so.
5    MR. BLONIEN:  Objection, calls
6    for speculation.
7    THE WITNESS:  Sorry.
8    MR. BLONIEN:  Go ahead.
9    THE WITNESS:  I think so.
10  They're not -- they're part of who
11  is being represented.
12  BY MS. LOEW:
13    Q.   So the -- you attended a
14  second mediation in the M&C action?
15    A.   Yes.
16    Q.   And when was that mediation?
17    A.   I believe September 1 of 2015.
18    Q.   Who attended that mediation?
19    A.   For our side it was myself,
20  Brian Wanca and Mike Addison.  For the
21  Buccaneers there was definitely Mark
22  Mester, who was their new lead counsel.
23    I frankly am not sure who else
24  they had in the room because there was no
25  joint session.

64

OPPENHEIM

1
2    Q.   Did any representative of
3  Medical and Chiropractic Clinic
4  participate in that mediation?
5    A.   No.
6    Q.   Did you correspond with anyone
7  from Medical and Chiropractic Clinic
8  before the mediation about the mediation?
9    A.   I didn't personally.
10    Q.   Did other members of the firm?
11    MR. BLONIEN:  Objection, calls
12    for speculation.
13    THE WITNESS:  I don't know.
14  BY MS. LOEW:
15    Q.   And what was your role at
16  that -- at the second mediation?
17    A.   Well, because Mr. Wanca was
18  there, I was sort of junior to him, and
19  it just so happened at that mediation I
20  had a really bad -- I guess it was a cold
21  or something, but my throat was all
22  closed up, and I could barely speak, so
23  largely it was observing and sharing as
24  best I could my insights.
25    Q.   After the day of the

65

OPPENHEIM

1
2  mediation, did you have any further
3  involvement in the M&C action?
4    A.   I was on emails and involved
5  in putting together settlement proposals,
6  communicating, I think --
7    MR. BLONIEN:  I'm going to
8    interrupt on that score and as to
9    substantive communications with
10    respect to the mediation, I
11    instruct you not to answer about
12    specific substance.
13    Pardon my interruption.
14    MR. COHEN:  Based on?
15    MR. BLONIEN:  Based on the
16    mediation privilege as the Court
17    has ordered being placed in this
18    case.
19    THE WITNESS:  Okay.  And so
20    communicating with other members of
21    the firm, the Wanca firm and the
22    mediator.  I won't get into the
23    content.
24  BY MS. LOEW:
25    Q.   But about the mediation?

17 (Pages 62 to 65)

66

OPPENHEIM

1
2    A.   About settlement.
3         MS. LOEW:  Okay.  And so are
4    you asserting mediation privilege
5    over internal discussions about
6    settlement at Anderson & Wanca?
7         MR. BLONIEN:  No.
8         But my understanding, just to
9    be clear, so the record is clear,
10   M&C is asserting a mediation
11   privilege with respect to internal
12   discussions of settlement,
13   settlement offers and mediation
14   according to the August 2 letter
15   that we received from Foley &
16   Lardner, and to the extent that
17   these questions would ostensibly
18   invade that privilege, it's
19   certainly an issue that we will
20   bring up to the Court if necessary.
21        Our position in interpreting
22   the Court's order is that any
23   direct communications that involve
24   the substance of the mediation are
25   off limits for purposes of this

67

OPPENHEIM

1
2    case.
3         Is that consistent with
4    your -- at least as a minimum
5    threshold, would you agree that
6    communications to the mediator and
7    to opposing counsel are privilege?
8         MS. LOEW:  Yes.
9         MR. BLONIEN:  Okay.  Thank
10   you.
11        MS. LOEW:  We agree.
12   BY MS. LOEW:
13        Q.   Were you still engaging in
14   discussions about the mediation at the --
15   at the time that you left Anderson &
16   Wanca?
17        A.   It was still ongoing,
18   certainly.
19        Q.   When did you first meet Phil
20   Bock?
21        A.   I think as I testified
22   earlier, we met after I watched him argue
23   class certification in a case called CE
24   Design versus Cy's Crab house the week I
25   started with Anderson & Wanca in 2009.

68

OPPENHEIM

1
2        Q.   And do you consider Mr. Bock a
3    friend?
4        A.   Yes.
5        Q.   And when did that friendship
6    develop?
7        A.   As we worked together closely
8    over the years.
9        Q.   How frequently would you
10   communicate with Mr. Bock?
11        MR. BLONIEN:  Objection.
12   BY MS. LOEW:
13        Q.   At Anderson & Wanca?
14        MR. BLONIEN:  Vague as to time
15   frame.
16        THE WITNESS:  Fairly
17   frequently.  He was obviously
18   co-counsel on anything that I was
19   working on, at least in the early
20   range of time that I was at
21   Anderson & Wanca, and even on most
22   things even after Brian Wanca
23   decided to start filing cases on
24   his own, so, yeah, we talked
25   frequently.

69

OPPENHEIM

1
2        (Oppenheim Exhibit
3        No. 4 marked
4        for identification.)
5    BY MS. LOEW:
6        Q.   I have handed you what we've
7    marked Exhibit 4, which is BLF 00076
8    through 77.  And the top of this document
9    it says, forward Siding v. Alco.
10        Do you see that?
11        A.   Uh-huh.
12        Q.   Are you familiar with this
13   document?
14        A.   Yes, yes, I am familiar with
15   it.
16        MR. BLONIEN:  I'm sorry.  For
17   clarification, was your question
18   that was he familiar with Siding
19   versus Alco or familiar with this
20   document?
21   BY MS. LOEW:
22        Q.   This document.
23        A.   The answer is yes either way.
24        Q.   Okay.  And what is Siding
25   versus Alco?

18  (Pages 66 to 69)

70

OPPENHEIM

1    A.   It is a case that is being
2
3 litigated jointly by Anderson & Wanca and
4 the Bock Law Firm.  It is currently
5 pending in the Northern District of Ohio.
6        It was up to the 6th Circuit
7 after it -- there was a summary judgment
8 entered for -- in favor of the defendant.
9 The 6th Circuit reversed, and that's the
10 subject of this email.
11    Q.   Did you work on this case when
12 you were at Anderson & Wanca?
13    A.   I may have reviewed the
14 appellate brief.  Beyond that I don't
15 recall.
16    Q.   Okay.  Do you know why Mike
17 Anderson sent the email to you and
18 Mr. Bock?
19        MR. BLONIEN:  Objection, calls
20 for speculation.
21        MR. COHEN:  Join.
22        THE WITNESS:  No.
23 BY MS. LOEW:
24    Q.   So this Siding versus Alco
25 case, it's not a case in which you had a

71

OPPENHEIM

1
2 significant involvement at Anderson &
3 Wanca?
4    A.   I don't believe so, no.
5    Q.   Did you socialize with
6 Mr. Bock while you were at Anderson &
7 Wanca?
8    A.   Certainly we talked.  We often
9 traveled together.
10    Q.   And was that for -- for
11 business reasons?
12    A.   Yes.
13    Q.   Was there a, I guess, division
14 of responsibility on cases in which
15 Anderson & Wanca and the Bock Law Firm
16 were co-counsel between the two firms?
17    A.   Right, yeah.  Typically
18 Anderson & Wanca handled the discovery,
19 pretrial, pre-heavy lifting stuff and
20 then the Bock Firm did the briefing for
21 class certification and summary judgment
22 and the arguments.
23        That certainly was the
24 division before I got there.  As I
25 started doing some substantive stuff, it

72

OPPENHEIM

1
2 got blurred a little bit more.
3    Q.   And when you say there, are
4 you talking about at Anderson & Wanca?
5    A.   Yes.
6    Q.   Is there still a, I guess,
7 division of responsibilities between the
8 firms?
9        MR. BLONIEN:  Objection,
10 vague.
11        THE WITNESS:  It's an --
12 obviously the relationships have
13 been strained a bit mainly by this
14 lawsuit, but, yes, and now it's
15 more each firm takes the lead on
16 different matters.
17 BY MS. LOEW:
18    Q.   Are Bock Law Firm and Anderson
19 & Wanca still co-counsel on cases?
20    A.   Yes.
21    Q.   How many cases?
22    A.   I counted them up last night.
23 I believe the number is 57.
24    Q.   And were any of those cases
25 that you worked on before you left

73

OPPENHEIM

1
2 Anderson & Wanca?
3    A.   Yes.
4    Q.   When did you first consider
5 leaving Anderson & Wanca?
6    A.   I got a call from Phil Bock on
7 March 31 of last year asking if I would
8 consider making the jump and offering
9 significant -- significantly better
10 compensation.
11    Q.   March 31, is that what you
12 said?
13    A.   I believe so, yes.
14    Q.   So before March 31, were you
15 considering leaving Anderson & Wanca?
16    A.   Not seriously.  I think any
17 time you are working somewhere for a
18 number of years, there are days that you
19 feel like this isn't worth it.  Maybe I
20 should just go get a shack on the beach,
21 but no serious consideration.
22    Q.   So you weren't applying for
23 jobs?
24    A.   No.
25    Q.   Okay.  And so after the

19 (Pages 70 to 73)

74

```
1              OPPENHEIM
2    original communication on March 31, what
3    happened?
4           MR. BLONIEN:  Objection,
5    vague.
6           THE WITNESS:  We arranged to
7    meet over dinner.  I think we had
8    some back and forth about
9    scheduling and ultimately met that
10   following Sunday, which would have
11   been, I want to say, the 3rd.
12   BY MS. LOEW:
13       Q.   So April 3rd you met?
14       A.   Yes, assuming that's the date
15   of Sunday.  If my math is correct, it is.
16           (Oppenheim Exhibit
17            No. 5 marked
18            for identification.)
19   BY MS. LOEW:
20       Q.   So this is a document that's
21   been marked Exhibit 5, which is --
22           MR. COHEN:  You don't have to
23   read all the zeros.
24           MS. LOEW:  Okay.
25
```

75

```
1              OPPENHEIM
2    BY MS. LOEW:
3        Q.   BLF -- I will anyway --
4    0000091 through 94.  Have you seen this
5    document before?
6        A.   Yes.
7        Q.   What is this?
8        A.   This is a screen shot of a
9    text exchange between Phil Bock and
10   myself, I guess a series of exchanges
11   between Sunday, April 3 and Monday,
12   April 4.
13       Q.   And Sunday, April 3 is the day
14   that you actually met Mr. Bock in person?
15       A.   Yes.
16       Q.   Okay.  And what did you
17   discuss in that meeting?
18       A.   Terms of employment.
19       Q.   Did Mr. Bock give you an
20   offer?
21       A.   Yes.
22           MS. LOEW:  So are your
23   discovery responses attorney's eyes
24   only about compensation, your
25   written discovery responses?
```

76

```
1              OPPENHEIM
2    They are not marked, but --
3           MR. COHEN:  Anything that
4    speaks to his specific compensation
5    package.
6           MS. LOEW:  Have -- have your
7    written discovery responses been
8    shared with Mr. Blonien?
9           MR. COHEN:  I'm sure he's seen
10   them.
11           MS. LOEW:  Okay.  So I'm going
12   to give you the actual document.
13   Give it to the two of you for the
14   moment.
15           If you turn to page 5, I have
16   handed you Defendant Bock Law Firm,
17   LLC's first supplemental answers
18   and objections to plaintiff's first
19   set of interrogatories.
20           THE WITNESS:  I don't have
21   one.  Is that by design?
22   BY MS. LOEW:
23       Q.   Not yet.  Yes, by design.
24       A.   Okay.
25       Q.   Yes.
```

77

```
1              OPPENHEIM
2           MS. LOEW:  The information
3    that is listed on page 5, is this
4    information that is intended to be
5    shielded from Mr. Oppenheim?
6           MR. COHEN:  No.
7           MS. LOEW:  Okay.
8           MR. COHEN:  It is otherwise
9    attorney's eyes only.
10           MS. LOEW:  We will exclude you
11   guys at this point.
12           Just note for the record we
13   are excluding Ms. Zakrzewski and
14   Dr. Williams.
15           (Ms. Zakrzewski and
16            Dr. Williams exited
17            the deposition
18            proceedings.)
19           MS. LOEW:  Can you mark this
20   as the next exhibit.
21           THE WITNESS:  Should I put 5
22   away or are you coming back to it?
23   BY MS. LOEW:
24       Q.   You can hold on to it for now.
25       A.   Yes.
```

20  (Pages 74 to 77)

98

OPPENHEIM

1
2  checks?
3      A.   I imagine I wanted the funds.
4      Q.   Was there a particular reason
5  that you needed funds before the 14 days?
6      A.   Not that I recall.
7          MR. BLONIEN:  When you are
8  done with the exhibit, I could use
9  a short break when it is convenient
10  for you.
11         MS. LOEW:  We can take a break
12  now.
13         MR. O'CONNOR:  Okay.  Thank
14  you.
15         THE VIDEOGRAPHER:  Going off
16  the record.  The time is 11:55 a.m.
17             (Whereupon, the
18             deposition in
19             the above-entitled
20             cause was recessed
21             to 1:08 p.m. this
22             date.)
23
24
25

99

OPPENHEIM

1
2  A F T E R N O O N   S E S S I O N
3      EXAMINATION(Resumed)
4          THE VIDEOGRAPHER:  Going on
5  the record.  This marks the
6  beginning of media No. 3.  The time
7  is now 1:08 p.m.
8          MS. LOEW:  Mr. Oppenheim, we're
9  back from lunch now.
10         And Ms. Zakrzewski and
11  Dr. Williams are back in the room
12  as well, just for the record.
13 BY MS. LOEW:
14     Q.   So we talked about before we
15  broke that you accepted an offer on
16  April 3, correct?
17     A.   Yes.
18     Q.   And then what day was it that
19  you gave notice to Anderson & Wanca?
20     A.   I told Brian Wanca on the 7th.
21     Q.   Why did you wait until the 7th
22  to tell him?
23     A.   I think he was out of town.
24     Q.   Did you tell anybody at the
25  firm before you told Brian Wanca that you

100

OPPENHEIM

1
2  were leaving?
3      A.   No.
4      Q.   Before you left Anderson &
5  Wanca, did you consult with anybody about
6  how you should go about leaving the firm?
7      A.   No.
8      Q.   Did you take any steps to
9  prepare to leave Anderson & Wanca?
10         MR. BLONIEN:  Objection,
11  vague.
12 BY MS. LOEW:
13     Q.   Do you understand my question?
14     A.   Not really.  I'm sorry.
15     Q.   Okay.  So in -- in getting
16  ready to leave Anderson & Wanca, did you
17  do anything to get your files in order
18  before you left, for example?
19     A.   Yes.  I packed up my office.
20  I had a number of things in there over
21  the course of seven years, and I copied
22  my hard drive from my old computer to my
23  new one.
24     Q.   And what day did you do that?
25     A.   It would have been the day

101

OPPENHEIM

1
2  that I bought the new computer.
3      Q.   So either the 4th or the 5th?
4      A.   Yeah.
5      Q.   And why did you do that?
6      A.   Well, I mean, I knew where I
7  was going, that I would be substantially
8  working on the same matters, so I think I
9  wanted to have all of my personal stuff.
10         In addition, there were things
11  that were just personal related to my
12  own -- just to me.  Like I had a game,
13  Diamond Mind Baseball, with a whole bunch
14  of data that I didn't want to lose and,
15  yeah.  That's basically it.
16     Q.   How did you actually copy the
17  materials?
18     A.   I handed both laptops to a
19  tech professional at Abt Computing and
20  said, I want the contents of the hard
21  drive on the new one.
22     Q.   Why -- why was it at Abt?
23     A.   That's where I bought the
24  computer.
25     Q.   So was it at the same time you

26 (Pages 98 to 101)

102

OPPENHEIM

1
2  bought the computer?
3      A.  Yes.
4      Q.  Did you specify particular
5  folders to copy?
6      A.  No.
7      Q.  It was just the entire hard
8  drive?
9      A.  Yes.
10      Q.  And what kind of materials
11  were on your hard drive?
12      A.  I mean, I gave a detailed
13  accounting to your client, Mr. Wanca, but
14  strictly speaking or generally speaking,
15  I should say, there were, again, personal
16  things.
17          There were briefs and other
18  documents that I personally worked on.
19  There were pleading documents from
20  various cases, and then I copied a year's
21  worth of my emails so I would have those.
22      Q.  Did you -- did you copy all
23  emails that were on your hard drive?
24      A.  No.  I mean, well, no -- no
25  emails were ever on my hard drive till I

103

OPPENHEIM

1
2  did an Outlook backup.
3          What I did was I did an
4  Outlook backup creating a PST file of one
5  year's worth of inbox and sent items.
6      Q.  And was the PST backup also
7  copied to the new laptop?
8      A.  Yes.
9      Q.  And when did you copy that to
10  the new laptop?
11      A.  It was in the same process as
12  everything else.
13      Q.  When you -- you said that you
14  copied a year's worth of emails, was --
15  was it more than just that PST copy of
16  the copy of one year worth of emails?
17      A.  No, one year's worth.
18      Q.  So did you tell Anderson &
19  Wanca that you were copying those
20  materials?
21      A.  No.
22      Q.  Why not?
23      A.  I didn't think it was an
24  issue.  Again, where -- where -- when I
25  left and where I was going, it was

104

OPPENHEIM

1
2  largely a continuation of the same joint
3  practice.
4          In fact, that's what Mr. Wanca
5  told me on my way out the door, gave me a
6  hug and said, don't worry, we'll still be
7  working together.
8      Q.  But did you tell Bock --
9  anyone from Bock Law Firm that you were
10  copying the materials on to a laptop?
11      A.  No.
12      Q.  Before you copied the
13  materials, did you determine whether you
14  had any confidentiality obligations to
15  those materials?
16          MR. BLONIEN:  Before you
17      answer, I would like to interpose
18      an objection that Brian Wanca and,
19      in particular, Anderson & Wanca has
20      filed a complaint, as you're fully
21      aware, in the state court in Cook
22      County of Illinois allegedly to
23      pursue the interests of Mr. Wanca.
24          We do not think that it's
25      appropriate to use the discovery

105

OPPENHEIM

1
2      mechanisms in this case to order
3      advance interests in that case.
4          I have allowed for the leeway
5      that I believe is appropriate here
6      given the nature of this case, but
7      I caution that you move to
8      something else and not use this
9      discovery mechanism to advance your
10      own case.
11          MS. LOEW:  I can assure you
12      that's not what we are doing, but
13      we do have the right to explore
14      what materials he took from the
15      firm considering they included our
16      client's materials.
17          MR. BLONIEN:  So I suggest
18      that you limit your questions to
19      the client's materials and the
20      materials that are produced in the
21      litigation that are responsive and
22      relevant.
23          Mr. Soble made a statement on
24      the record to the Court that other
25      materials on Mr. Oppenheim's laptop

27 (Pages 102 to 105)

106

1              OPPENHEIM
2       that don't pertain to M&C are not
3       relevant to this case.
4              MS. LOEW:  Understood.  And we
5       are exploring the context of him
6       taking the materials from the
7       laptop and what he was doing with
8       them.
9       BY MS. LOEW:
10         Q.   So the -- did you ask M&C's
11      permission before you copied the files?
12         A.   No.
13         Q.   Did you ask any client's
14      permission?
15         A.   No.
16         Q.   Were you familiar with the
17      ethical rules about leaving a firm at
18      that point and what you needed to tell
19      clients?
20         A.   I think so.
21         Q.   Were there any -- any rules
22      that applied to retaining materials
23      pertaining to client representation?
24             MR. BLONIEN:  Objection, calls
25      for a legal conclusion, vague.

107

1              OPPENHEIM
2              THE WITNESS:  I think so, yes.
3       BY MS. LOEW:
4          Q.   And did you take any steps to
5       determine whether what you were doing
6       complied with those rules?
7          A.   I believe the only rule at
8       issue is one that governs physical
9       possessions of which there aren't
10      additional copies, in other words, worked
11      on a client's will and the original will
12      is the important thing.  You can't take
13      the original will.  That was essentially
14      my analysis.
15         Q.   So your interpretation was
16      that it didn't apply to the other
17      electronic materials that you were
18      taking?
19             MR. BLONIEN:  Objection,
20      mischaracterizes previous
21      testimony.
22             THE WITNESS:  My determination
23      was that anything I had was my own
24      intellectual property, non-client
25      materials, client materials from

108

1              OPPENHEIM
2       joint cases in which the client
3       remained -- relationship remained
4       the same and publically available
5       documents.
6       BY MS. LOEW:
7          Q.   Other than the copy that you
8       made on to your -- your new laptop, did
9       you make any other copies of materials
10      from your time at A&W, at Anderson &
11      Wanca?
12             MR. BLONIEN:  Objection, vague
13      and confusing as to other materials
14      related to your employment with
15      Anderson & Wanca.
16             As stated previously, any
17      materials that haven't been
18      produced in this litigation aren't
19      relevant, are outside the scope and
20      are an inappropriate use of this
21      discovery mechanism to advance the
22      interests in another case.
23             THE WITNESS:  Yeah, I just
24      took my laptop to Abt and had a
25      copy of what was on it.

109

1              OPPENHEIM
2
3       BY MS. LOEW:
4          Q.   Did you -- did you retain any
5       hard copy materials of your working on
6       the M&C case?
7          A.   No.
8          Q.   Did you take materials home
9       with you when you were working on cases
10      at Anderson & Wanca?
11         A.   Yes.
12         Q.   Did you retain any -- any
13      copies of those materials after you left
14      Anderson & Wanca?
15         A.   No.
16         Q.   Before you left, so in the --
17      in the period of time between April 3 and
18      April 7, did you perform any work on the
19      Medical and Chiropractic matter?
20         A.   I don't believe so.
21         Q.   Did you have any further
22      discussions with Mr. Bock about leaving
23      and joining his firm between April 3 and
24      April 7?
25         A.   I'm sure I must have.

28  (Pages 106 to 109)

138

```
1              OPPENHEIM
2    co-counsel in.  It was a case in which --
3    it was a FACTA case in which settlement
4    with the defendant was reached many years
5    ago, I want to say in 2009, and then ever
6    since, the fight was against the
7    insurance company to try and collect the
8    judgment that was entered.
9              And we ended up getting to a
10   point where we were talking settlement
11   with the insurance company, which was
12   Travelers, and trying to set up
13   mediation.  Ultimately the case did
14   settle.
15       Q.   The -- so if you look at the
16   page that's Bates labeled 8, the email at
17   the very bottom.
18       A.   8, I see it.
19       Q.   So this is an email from
20   Mr. Bock to you and he says, I love it.
21   All of a sudden I'm a Tampa Bay
22   Buccaneers fan.  Another case based on
23   hard drive and work leading up to it that
24   I paid 50 percent on involving clients
25   that were solicited through marketing
```

139

```
1              OPPENHEIM
2    efforts I paid 50 percent on.
3              Do you see that?
4        A.   I do.
5        Q.   Do you know what he's
6    referring to there?
7        A.   I do only because of dealing
8    with this litigation.  I can't say that I
9    knew what he was talking about at the
10   time the email was sent.
11       Q.   What -- what is he talking
12   about?
13            MR. BLONIEN:  Objection, calls
14       for speculation.
15            THE WITNESS:  As I understand
16       it, the records leading to the
17       Tampa Bay Buccaneers case came from
18       a fax broadcaster that was pursued
19       in another case, and this is,
20       again, information I learned from
21       Mr. Bock since this case was filed,
22       and that the subpoena process and
23       the pursuit of this evidentiary
24       material was in a joint case paid
25       half by Mr. Bock.  Likewise that
```

140

```
1              OPPENHEIM
2    the -- his understanding is that
3    the -- either the M&C
4    representation or the Cin-Q
5    representation or both came out of
6    a marketing -- a letter marketing
7    campaign that was supposed to be on
8    behalf of the joint enterprise.
9              But, again, I don't have
10   personal knowledge of any of that.
11   BY MS. LOEW:
12       Q.   Okay.  So do you know if, in
13   fact, this M&C action against the
14   Buccaneers was based on this hard drive
15   that's referred to here?
16       A.   I don't know.
17       Q.   His email is in response to an
18   email from you at the top of page 9.  It
19   says, yeah, he wants to set a record
20   above the Capital One $75 million
21   settlement.  The magistrate judge it's in
22   front of is squeamish and is giving the
23   defendants a broad shot at disproving on
24   behalf of, sort of like the Sarris class.
25   Cert is fully briefed.
```

141

```
1              OPPENHEIM
2        Do you see that?
3        A.   I do.
4        Q.   And what are you referring to
5    here?
6        A.   Well, a number of things.  I
7    guess going from back to front, it's --
8            MR COHEN:  You mean bottom to
9       top?
10           THE WITNESS:  Yeah, bottom to
11      top, sorry.
12           Class cert is fully briefed, I
13      mean, that's self explanatory.
14      It's the stage that the litigation
15      is in.
16           Sort of like Sarris means,
17      again, that's this on behalf of
18      liability question.
19           Sarris was our joint case, I
20      think argued by Phil Bock in the
21      11th Circuit in which the 11th
22      Circuit set down a standard for
23      establishing liability under the
24      TCPA.
25           And then the Buc's summary
```

36  (Pages 138 to 141)

142

OPPENHEIM

1
2  judgment ruling applied the Sarris
3  standards and sort of fashioned
4  their own little twist on it,
5  and -- okay.
6       Magistrate judge is squeamish
7  and giving defendants a broad shot
8  was my interpretation of the
9  summary judgment ruling itself, as
10  well as the acknowledgement that a
11  lot of times when these things go
12  to -- these cases go to juries,
13  they don't end up too well.
14       And finally, the he wants to
15  set a record is just Brian's
16  personal goals for amassing large
17  amounts of money.
18  BY MS. LOEW:
19       Q.  So the magistrate judge you
20  are referring to here is Porcelli?
21       A.  It is.
22       Q.  And he wants to set a record,
23  is that referring to Brian Wanca?
24       A.  Yes.
25       Q.  Were you referring to the M&C

143

OPPENHEIM

1
2  action in that statement?
3       A.  Yeah.
4       Q.  And where did you get that
5  information?
6       A.  Well, again, the Brian wants
7  to set a record is something that is his
8  general professional goal, which I think
9  was well-known by both Mr. Bock and
10  myself at this point.  That's -- yeah.
11       Q.  In giving this information to
12  Mr. Bock, did you think that you were
13  violating any of the mediation privilege
14  requirements?
15       A.  No.
16       Q.  Why not?
17       MR. BLONIEN:  Calls for a
18  legal conclusion, I object.
19       THE WITNESS:  I also think it
20  involves for getting into what was
21  actually going on in the mediation,
22  and I'm not sure I'm supposed to do
23  that.
24       MR. BLONIEN:  On the grounds
25  of the client indicating that the

144

OPPENHEIM

1
2  answer may well involve direct
3  communications relating to
4  mediation privilege, I instruct the
5  witness not to answer to the extent
6  that the Court has ordered us not
7  to get into mediation-privileged
8  communications.
9  BY MS. LOEW:
10       Q.  The -- and you are referring
11  specifically to communications with the
12  Buccaneers and the mediator?
13       A.  Right.
14       Q.  The April 29 of 2016 at
15  5:25 p.m., your response to Mr. Bock, it
16  says something about pigs and hogs comes
17  to mind?
18       A.  Oh, I see it, right.
19       Q.  What does that mean?
20       A.  It's a famous saying, pigs get
21  fat, hogs get slaughtered.
22       Q.  And who is the pig in this
23  situation?
24       A.  Not Mr. Wanca.
25       Q.  And who is the hog?

145

OPPENHEIM

1
2       A.  Mr. Wanca.
3       Q.  So then you -- this email
4  chain continues on with Mr. Bock
5  responding to you and a couple of more
6  emails.
7       Did you discuss this with
8  Mr. Bock outside of these emails?
9       A.  No.
10       Q.  In your top email here on the
11  very first page, you said that was
12  Anderson's read.
13       Do you see that?
14       A.  Yes.
15       Q.  What are you referring to
16  there?
17       A.  Judge Anderson, who is a
18  mediator that we've all used
19  frequently -- when I say all, is the
20  Wanca firm, myself, Mr. Bock -- had just
21  a personal sense that he works with
22  Mr. Mester a lot, and Mark Mester is
23  somebody who comes into cases to get them
24  settled.
25       Q.  And where did you learn that

37 (Pages 142 to 145)

146

OPPENHEIM

1
2  information about Judge Anderson?
3      A.   About Judge Anderson?
4      Q.   That he -- that that was his
5  read of Mark Mester.
6      A.   In conversations with Judge
7  Anderson.
8      Q.   And were those conversations
9  part of the mediation in the Buccaneers'
10 case?
11     A.   I think so, yeah.
12     Q.   The -- if you go down further
13 on this page, the email from Phil Bock to
14 you of 4:43 p.m., it's -- there's a lot
15 of stuff going on in this email, but if
16 you look at the last couple sentences of
17 the first paragraph, it says, to make it
18 even more Machiavellian, perhaps it would
19 be easy to get other people on the side
20 of the class, such as local attorney
21 Michael Addison.  It would be funny to
22 put a bug in his ear that somebody else
23 is secretly negotiating with the
24 Buccaneers in an uncertified class
25 action.

147

OPPENHEIM

1
2  Do you see that?
3      A.   Uh-huh.
4      Q.   Did you have any concern when
5  you read that?
6      A.   No.
7      Q.   Did you think that Bock Law
8  Firm was going to then file a class
9  action against the Buccaneers?
10     A.   No.
11          (Oppenheim Exhibit
12          No. 12 marked
13          for identification.)
14 BY MS. LOEW:
15     Q.   I have handed you a document
16 that we've marked as Exhibit 12, which is
17 BLF 15 through 26.
18          If you look at the top email
19 here, this is an email from Phil Bock to
20 Todd Lewis, Jim Smith and Dan Cohen on
21 Friday, April 29, 2016 at 5:31 p.m.
22          Do you see that?
23     A.   Yes.
24     Q.   Have you seen this email
25 before?

148

OPPENHEIM

1
2      A.   Only in the context of the
3  document production in this case.
4      Q.   And this email is sent shortly
5  after that email exchange between you and
6  Mr. Bock about the Buccaneers' case;
7  isn't that right?
8          MR. BLONIEN:  Objection, calls
9  for speculation.
10         THE WITNESS:  Based on the
11 timestamps on the printout, it
12 looks like 48 minutes, but I'm
13 trusting the accuracy of the
14 timestamps.
15 BY MS. LOEW:
16     Q.   So he says here, Brian is
17 holding out for a record settlement in an
18 uncertified case, not that the latter
19 part is so relevant.  We could find the
20 plaintiff and approach the defendant
21 about settling, question mark.  LOL.
22          Do you see that?
23     A.   Uh-huh yes.
24     Q.   And is that what, in fact,
25 happened?

149

OPPENHEIM

1
2      A.   I don't know.  You would have
3  to ask Mr. Bock.
4      Q.   The -- did anyone at Bock Law
5  Firm discuss with you that they were
6  looking for a plaintiff for the
7  Buccaneers' litigation?
8      A.   No.
9          MR. BLONIEN:  Ms. Loew, would
10 it be acceptable to take a truly
11 short break?
12         MS. LOEW:  Yes.
13         THE VIDEOGRAPHER:  Going off
14 the record.  The time is 2:04 p.m.
15         (A recess was had.)
16         THE VIDEOGRAPHER:  Going on
17 the record.  This marks the
18 beginning of media 4.
19         The time is now 2:14 p.m.
20         MS. LOEW:  Can you read the
21 last question and answer, please.
22         (Record read as
23         requested.)
24 BY MS. LOEW:
25     Q.   When was the first time you

38  (Pages 146 to 149)

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123 1.800.642.1099

170

OPPENHEIM

1  
2  after the emails of May 12, and it would
3  have been after Ross Good basically told
4  me that unless things got worked out,
5  that they were coming after me, so, yeah,
6  I think there was a fair anticipation of
7  something.
8      Q.   So Mr. -- so Ross Good told
9  you that basically they were going to sue
10 you?
11     A.   Yeah, in so many words, that
12 his -- I think the quote was this just
13 looks bad and the focus is going to be on
14 you, and I told him what I have said
15 today and what I have said before, which
16 is I don't have or didn't have anything
17 to do with the filing of the Technology
18 case and if -- whatever they're going to
19 do, they're going to do.
20           (Oppenheim Exhibit
21           No. 17 marked
22           for identification.)
23 BY MS. LOEW:
24     Q.   Handing you what we've marked
25 as Exhibit 17, which is David M.

171

OPPENHEIM

1  
2  Oppenheim's objections and responses to
3  plaintiff's first set of interrogatories.
4      If you turn to page 3 of 13,
5  question, identify all cases on which you
6  performed work where Medical and
7  Chiropractic was the client, and there's
8  an objection interspersed.
9          You said, Mr. Oppenheim worked
10 on the following cases in which Medical
11 and Chiropractic was involved in some
12 capacity.  The first one is the Cin-Q
13 Automobile, Inc. versus Buccaneers
14 Limited Partnership case and the second
15 is Medical and Chiropractic Clinic, Inc.
16 versus eclinicalworks, LLC.
17         Do you see that?
18     A.   Yes.
19     Q.   What is that case?
20     A.   It was another class action
21 against a defendant named eclinicalworks,
22 another TCPA case.
23     Q.   Is that case still pending?
24     A.   I believe it settled.
25     Q.   Were you involved in the

172

OPPENHEIM

1  
2  settlement of that case?
3      A.   Yes.
4      Q.   And did you -- did you speak
5  with Medical and Chiropractic Clinic
6  representatives during the course of that
7  case?
8      A.   I don't think so.  Don't
9  recall.
10     Q.   Do you remember if you
11 prepared mediation statements or anything
12 like that in that case?
13     A.   I would have.  I'm pretty sure
14 I did.
15     Q.   If you turn to page 11, the
16 response that's listed above No. 15, it
17 says, over the course of several years
18 working with Bock Hatch and co-counsel,
19 Mr. Oppenheim had discussed with Mr. Bock
20 the prospect of working at Bock Hatch,
21 but nothing specific was discussed before
22 late March 2016.
23         Do you see that?
24     A.   I do.
25     Q.   What were the discussions

173

OPPENHEIM

1  
2  before late March of 2016?
3      A.   I think they were in the
4  nature of times when there were
5  disagreements between myself and
6  Mr. Wanca or when was feeling underpaid
7  or underappreciated, the -- I would raise
8  the issue of, hey, wouldn't it be great
9  for me to come over and work for you
10 instead, but it would never be -- got
11 beyond that level.
12     Q.   Did he express an interest in
13 hiring you before that?
14     A.   I think that it was, whether
15 said in all seriousness or not, that that
16 would be great, but I can't afford you,
17 and since everything is a joint case
18 anyway, I'll take the benefit of your
19 services with Brian paying you.
20         MS. LOEW:  I'm going to get
21         into compensation information, so
22         for that reason, I'll ask -- you
23         guys can step out.  We'll let you
24         know when you can come back in.
25

44 (Pages 170 to 173)