UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF FLORIDA

TAMPA DIVISION

| | | |
|---|---|---|
| MEDICAL & CHIROPRACTIC CLINIC, INC., | ) ) ) ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) | Case No. 16-cv-1477 |
| DAVID M. OPPENHEIM, an individual and BOCK LAW FIRM, LLC d/b/a BOCK, HATCH, LEWIS & OPPENHEIM, LLC, | ) ) ) ) ) ) | |
| Defendants. | ) | |

      The videotaped deposition of
PHILLIP BOCK, called by the Plaintiff
for examination, pursuant to Notice,
and pursuant to the Rules of Civil
Procedure for the United States
District Courts, taken before Renee E.
Brass, CSR and Notary Public in and for
the County of Cook and State of
Illinois, at 321 North Clark Street,
28th Floor, Chicago, Illinois, on
August 17, 2017, at the hour of
10:18 a.m.

Reported By:
Renee E. Brass
Job No: 51463

2

```
 1
 2    PRESENT:
 3    on behalf of the
      Plaintiff;
 4       FOLEY & LARDNER, LLP
         321 North Clark Street
 5       28th Floor
         Chicago, Illinois 60654
 6       BY: LAUREN M. LOEW, ESQ.
            lloew@foley.com
 7
 8    on behalf of Defendant
      Oppenheim;
 9
      BLONIEN LEGAL COUNSEL
10       1718 Adams Street
         Madison, Wisconsin 53711-2142
11       BY: BARRY J. BLONIEN, ESQ.
            barry@blonienlegal.com
12
13    on behalf of Defendant Bock
      Law Firm.
14
         BOCK & HATCH, LLC
15       132 North LaSalle Street
         Suite 1000
16       Chicago, Illinois 60602
         BY: DANIEL J. COHEN, ESQ.
17          danieljaycohen209@gmail.com
18
19
20
21
22
23
24
25
```

4

```
 1
 2           E X H I B I T S
 3    NO.   DESCRIPTION        PAGE
 4    Exhibit 1  Notice of        8
                 Deposition
 5    Exhibit 2  Email Chain     63
      Exhibit 3  Email Chain     70
 6    Exhibit 4  Email Chain     75
      Exhibit 5  Email Chain     77
 7    Exhibit 6  Email Chain     79
      Exhibit 7  Email Chain     90
 8    Exhibit 8  Email Chain     98
      Exhibit 9  Email Chain    107
 9    Exhibit 10 Answers        117
      Exhibit 11 Text Messages  121
10    Exhibit 12 Text Messages  128
      Exhibit 13 Email Chain    131
11    Exhibit 14 Email Chain    138
      Exhibit 15 Text Messages  147
12    Exhibit 16 Email Chain    149
      Exhibit 17 Letter         160
13    Exhibit 18 Negotiation Notes 164
      Exhibit 19 Text Messages  170
14    Exhibit 20 Text Messages  173
      Exhibit 21 Email Chain    188
15    Exhibit 22 Email Chain    200
      Exhibit 23 Text Messages  203
16    Exhibit 24 Email Chain    219
      Exhibit 25 Text Messages  220
17    Exhibit 26 Email Chain    223
      Exhibit 27 Email          229
18    Exhibit 28 Email Chain    233
      Exhibit 29 Letter         241
19    Exhibit 30 Privilege Log  252
      Exhibit 31 Email Chain    254
20
21
22
23
24
25
```

3

```
 1              BOCK
 2           I N D E X
 3    EXAMINATIONS           PAGE
 4    MS. LOEW          6
      MR. COHEN       259
 5    MS. LOEW        265
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

5

```
 1              BOCK
 2       THE VIDEOGRAPHER:  We are now
 3    on the record.
 4       This marks the beginning of
 5    media No. 1 in the deposition of
 6    Phillip Bock in the matter of
 7    Medical & Chiropractic Clinic,
 8    Inc., versus Oppenheim, et al, in
 9    the U.S. District Court for the
10    Middle District of Florida, Tampa
11    Division.
12       This deposition is being held
13    at 321 North Clark Street, Chicago,
14    Illinois, on August, 17, 2017, and
15    the time is now 10:18 a.m.
16       Will the attorneys please
17    identify themselves.
18       MS. LOEW:  Lauren Loew on
19    behalf of Medical & Chiropractic
20    Clinic, Inc.
21       MR. COHEN:  Dan Cohen on
22    behalf of Bock Law Firm, LLC.
23       MR. BLONIEN:  Barry Blonien
24    with Blonien Legal Counsel on
25    behalf of David M. Oppenheim.
```

2 (Pages 2 to 5)

6

BOCK

1       THE VIDEOGRAPHER:  Will the
2 court reporter please swear in the
3 witness.
4
5       PHILLIP BOCK,
6 having been first duly sworn, was
7 examined and testified as follows:
8       EXAMINATION
9 BY MS. LOEW:
10      Q.   Good morning, Mr. Bock.  Will
11 you please state your full name.
12      A.   Phillip Andrew Bock.
13      Q.   And have you ever given a
14 deposition before?
15      A.   Yes.
16      Q.   On how many occasions?
17      A.   Couple, three.
18      Q.   And what were the context --
19 what types of cases were those
20 depositions in?
21      A.   I had a deposition in a case
22 in St. Clair County, Illinois between my
23 firm and Freed & Weiss Law Firm, and I
24 gave a deposition in my divorce case.
25 I -- I can't remember another one right

7

BOCK

1 now.
2      Q.   And have you taken depositions
3 before?
4      A.   I have.
5      Q.   And how many approximately?
6      A.   Like, I don't know.  I
7 couldn't guess.
8      Q.   Would you say more than 10?
9      A.   Yes.
10      Q.   So that you are familiar with
11 how a deposition goes, the rules of
12 depositions.  I'm going to ask you
13 questions today.  To the extent you don't
14 understand any of my questions, please
15 let me know.
16      A.   All right.
17      Q.   If you need a break at any
18 time, just let us know, as long as
19 there's not a question pending.
20      We have water, coffee, drinks,
21 and I guess to the extent unless your
22 attorney instructs you not to answer,
23 we'll ask you to answer the question.
24      We have a videographer here

8

BOCK

1 today and a court reporter.  They are
2 taking down everything we say, so I ask
3 that we don't speak at the same time.
4      A.   Okay.  And could I ask you to
5 speak loud, a little bit louder because I
6 can't hear very well.
7      Q.   Okay.  I will do that.
8      A.   Thank you.
9      Q.   And I'm a quiet talker, so if
10 that comes up again, please let me know.
11 Okay.
12      So first step, first exhibit
13 we'll mark is just the notice of your
14 deposition for today.
15          (Bock Exhibit 1
16           marked for
17           identification.)
18 BY MS. LOEW:
19      Q.   And Mr. Bock, are you an
20 attorney?
21      A.   Yes.
22      Q.   Where are you licensed to
23 practice?
24      A.   States of Illinois and

9

BOCK

1 Florida, and then I'm admitted to both
2 the U.S. Supreme Court bar, most of the
3 federal circuits and too many district
4 courts, I don't know, around 10 district
5 courts.
6      Q.   How long have you been
7 licensed to practice in Illinois?
8      A.   Since 1994.
9      Q.   And how long have you been
10 licensed to practice in Florida?
11      A.   I don't remember.  I -- if I
12 was going to guess, 2003, but I don't
13 remember.
14      Q.   When did you graduate from law
15 school?
16      A.   1994.
17      Q.   Where did you go to school?
18      A.   The law school?
19      Q.   Yes.
20      A.   University of Virginia in
21 Charlottesville, Virginia.
22      Q.   And did you -- where did you
23 go to undergrad?
24      A.   I started at the university

3 (Pages 6 to 9)

10

BOCK

1  of -- Indiana University in Bloomington,
2  and I graduated from Augustana College in
3  Rock Island, Illinois.
4      Q.   When did you graduate?
5      A.   1989.
6      Q.   And what was your degree?
7      A.   Bachelor, it was either an AB
8  or BA in both business and in political
9  science.
10     Q.   Did you go straight to law
11 school after undergrad?
12     A.   No.
13     Q.   What did you do before law
14 school?
15     A.   You mean -- well, I went to
16 graduate school.
17     Q.   Where did you go to graduate
18 school?
19     A.   University of Illinois
20 Urbana-Champaign.
21     Q.   What did you study?
22     A.   Political science.
23     Q.   Did you obtain a degree?
24     A.   I did.

11

BOCK

1      Q.   And what degree was that?
2      A.   I believe it's an MA.
3      Q.   What year did you obtain that
4  degree?
5      A.   1991.
6      Q.   And then did you go to law
7  school from there?
8      A.   That was my next -- I mean, it
9  was the summer intervening, but yes.
10     Q.   Since graduating from law
11 school -- I'm going to go through your
12 employment history.
13          Where did you work immediately
14 after law school?
15     A.   I worked for the Public
16 Interest Law Initiative during the summer
17 of 1994 while I was preparing for the bar
18 exam.
19     Q.   And where was that?
20     A.   Northwestern University Legal
21 Clinic.
22     Q.   And how long did you work
23 there?
24     A.   I also clerked for Judge

12

BOCK

1  Steven Walters.
2          Well, no.  I take that back.
3  Let me think.  That was the year before.
4  Sorry.
5              (Mr. Bock entered
6              the deposition
7              proceedings.)
8      Q.   So after -- how long did you
9  do the PILI portion?
10     A.   Just until the end of the
11 summer.  I don't remember the month, but
12 while I studied for the bar exam, I
13 worked for PILI, and then I took the bar
14 exam and I went to work for Lord, Bissell
15 & Brook.
16     Q.   What was your position there?
17     A.   Associate attorney.
18     Q.   Were you -- what type of law
19 were you practicing there?
20     A.   Litigation.
21     Q.   Was there any -- any
22 specialty, just general litigation?
23     A.   No, just -- well, the
24 department I was in was called

13

BOCK

1  professional liability, I think, but I
2  worked on insurance coverage litigation,
3  and I worked on some other kinds of tort
4  litigation, general litigation.
5      Q.   How long were you at Lord
6  Bissell?
7      A.   Till some time in 1996, but I
8  don't remember the month that I left
9  there.
10     Q.   And where did you go next for
11 employment?
12     A.   I went to a law firm called
13 Lovell, White, Durrant in Chicago.
14     Q.   What was your position there?
15     A.   Associate attorney.
16     Q.   And what type of law did you
17 practice?
18     A.   Class action defense and
19 reinsurance litigation.
20     Q.   How long were you at Lovell?
21     A.   Lovell, White, Durrant, until
22 the next job, so '94 to '96.  Well, I was
23 there approximately two years, give or
24 take, and then I went to a different

4 (Pages 10 to 13)

14

BOCK

1  litigation firm called Stein, Ray &
2  Conway.
3       Q.   What kind of litigation did
4  they do?
5       A.   Construction litigation.
6       Q.   Why did you switch to
7  construction litigation?
8       A.   Well, I was at the beginning
9  of my career learning to be a litigator
10 and looking for a type of litigation that
11 was interesting to me.
12      Q.   How long were you at that
13 firm?
14      A.   A little -- a year or a little
15 over a year maybe.
16      Q.   Where did you go next?
17      A.   Then I went to Freed, Weiss &
18 Flaum, LLC.
19      Q.   Is that in approximately 1999?
20      A.   Yes.
21      Q.   And what was your position
22 there?
23      A.   Well, I was an income partner.
24      Q.   And what type of law did you

15

BOCK

1  practice?
2       A.   Plaintiff's side class action
3  litigation.
4       Q.   Did the firm handle other
5  types of matters besides plaintiff's side
6  class action?
7       A.   Not that I remember, no.
8       Q.   What types of class actions
9  were you handling there?
10      A.   Consumer, general consumer
11 plaintiff's class actions.
12      Q.   So when you were at Freed
13 Weiss, was that the first time that you
14 were handling a plaintiff's side class
15 action?
16      A.   Yes.
17      Q.   Why did you switch over from
18 defense side to plaintiff's side?
19      A.   Well, I decided to change
20 firms.  Well, I mean, I didn't like
21 defending class action litigation, which
22 was as an associate it was usually
23 working on 50-state survey to argue why
24 you couldn't certify a class in this case

16

BOCK

1  or that case, defending big corporations
2  who didn't seem to be doing nice things
3  to people, so that wasn't fun to me.
4       Then I did construction
5  litigation, which was actually fun as far
6  as litigation goes, but after I got
7  there, I learned that the firm was a very
8  small firm that had very large cases, and
9  a couple, two or three of their large
10 cases were resolved at the same time, and
11 that's when the rumors start circulating
12 about is it first in, last out, last in,
13 first out, one of those things, and so
14 after being reassured by one of the
15 partners that I was a star and I was
16 going no where, he left and a different
17 partner came in my office and said don't
18 believe anything you heard.  That's not
19 how it works.
20      So a friend of mine in Chicago
21 knew this Freed, Weiss, Flaum people were
22 opening a law firm in Chicago doing
23 plaintiff's side class actions, so I said
24 that's interesting.

17

BOCK

1       I talked to a couple of the
2  people who were opening the firm, and
3  they offered me a lot of money, and so
4  that's what I did.
5       Q.   Were you a partner at Freed
6  Weiss?
7       A.   Income partner, small P
8  partner.
9       Q.   How long were you at Freed
10 Weiss?
11      A.   So if I started there in 1999,
12 I would say until 2001 approximately, but
13 I don't -- I really remember the dates of
14 my employment.
15      Q.   What did you do next?
16      A.   I went to work with some
17 friends at a law firm called Macey, Chern
18 & Diab.
19      Q.   What type of work did Macey
20 Chern do?
21      A.   Well, Macey Chern -- in terms
22 of the name of the law firm or the
23 people?
24      Q.   The name of the law firm, the

5 (Pages 14 to 17)

18

BOCK
1     firm itself.
2        A.   So we were doing plaintiff's
3     side class action litigation, myself,
4     Malik Diab and Robert Hatch, but the rest
5     of Macey, Chern & Diab was some kind of
6     name registered to Legal Helpers, which
7     was some kind of bankruptcy firm that we
8     didn't have anything to do with.
9        Q.   What was your -- what was your
10    position with Macey Chern, the firm?
11       A.   Well, I was -- I don't know.
12    I was hired as a partner, but later found
13    out I was a W2 employee.
14             Right around then is when I
15    realized what a W2 employee is.  That's
16    not somebody who owns the place.  They
17    didn't teach me that in law school,
18    so --
19       Q.   How long were you at that
20    firm?
21       A.   So we were there until
22    2003-ish, and then we -- then we moved
23    the practice and we changed the name to
24    Diab, Macey & Bock, and we moved to the

19

BOCK
1     Civic Opera House in around 2003.
2        Q.   What kind of work did you do
3     at Diab, Macey, Bock?
4        A.   Plaintiff's -- plaintiff's
5     class actions.  Since Freed & Weiss I
6     have only done plaintiff's class action
7     or since starting at Freed Weiss.
8        Q.   Were there any other attorneys
9     that were part of the firm when you
10    started it?
11       A.   Where?
12       Q.   Diab, Macey & Bock.
13       A.   Well, so the firm, when we
14    started working, we were calling
15    ourselves Macey, Chern & Diab.
16       Q.   Macey, Chern & Diab?
17       A.   Yeah.
18       Q.   Okay.
19       A.   And then --
20       Q.   No.  Apologize if I --
21       A.   And then we learned that Macey
22    was paying us all as his W2 employees, so
23    then we moved our practice and kept doing
24    the same consumer litigation, fax

20

BOCK
1     litigation, for example.
2        Q.   Was it just the three of you,
3     Diab, Macey and Bock?
4        A.   Well, it was never Macey.
5     Macey didn't practice with us.  Macey was
6     the -- decided not to practice with us,
7     and he was the one putting up the money,
8     and so it was Bock, Diab, Robert Hatch.
9              There was a person named Joel
10    Feldman at some point.  There was a
11    person named Linda Hogan in and around
12    that time.  Those are the attorneys that
13    I remember at the -- in and around 2003.
14       Q.   And how long did you practice
15    with that firm?
16       A.   So in 2005 Malik Diab and I
17    withdrew from our partnership with Tom
18    Macey, which called -- caused a
19    dissolution and winding up of that
20    partnership, and this is in 2005.
21             And in 2005 Malik Diab and I
22    created professional corporations that
23    created an LLC called Diab & Bock, LLC, I
24    think.

21

BOCK
1        Q.   That was in 2005?
2        A.   2005, yeah.
3        Q.   How long did you practice with
4     Diab & Bock, LLC?
5        A.   So that's -- that's the --
6     that's where I still work.  It's had name
7     changes.
8              I still work for that company,
9     though.
10             Well, I don't work for that
11    company.  I'm assigned to work at that
12    company by my professional corporation,
13    which is my employer.
14       Q.   So Diab & Bock, LLC was a
15    predecessor to Bock Law Firm, LLC?
16       A.   Yes.
17       Q.   Who are the members of Bock
18    Law Firm, LLC?
19       A.   Phillip A. Bock, PC is the
20    member.
21       Q.   The only member?
22       A.   Single member LLC.
23       Q.   When did Diab cease to be --
24       A.   He withdrew in 2007-ish.

6 (Pages 18 to 21)



22

BOCK
1
2    Q.   And why did he withdraw?
3    A.   Why did he withdraw?  I know
4  that he got divorced and moved overseas,
5  so it was in connection with that.  I
6  think he moved to Dubai.
7    Q.   When did you first start doing
8  work on TCPA class actions?
9    A.   I believe it was in 2003.
10   Q.   And does your firm handle any
11  other types of class actions?
12   A.   Yes.
13   Q.   What other types?
14   A.   We handle all types except
15  securities, anti-trust, medical products.
16      A few of those, the ones that
17  tend to be handled by giant class action
18  firms with giant MDL proceedings, we tend
19  to stay out of those, but once in a while
20  we're in those too.
21   Q.   Who would you consider kind of
22  the peer competing firms with Bock Law
23  Firm, LLC?
24   A.   I don't know that I
25  consider -- that I have that

23

BOCK
1
2  consideration.
3    Q.   Are there other firms that
4  compete in the same space of the types of
5  class actions your firm does?
6    A.   Today there are other firms
7  that do TCPA litigation, certainly.
8    Q.   Is Anderson & Wanca one of
9  those firms?
10   A.   Anderson & Wanca is a firm
11  that does TCPA litigation, yes, so I
12  would say, yeah, they are a competitor of
13  ours.  I wouldn't say they're our peer.
14   Q.   Why wouldn't you say they're
15  your peer?
16   A.   Because I don't think they are
17  our peer, you know.
18      It's like Foley & Lardner is a
19  defense litigation firm, but every other
20  defense litigation firm isn't your peer.
21  You probably consider yourselves
22  something above that because of where you
23  went to school, your experience, your
24  intellect and all those things, and so I
25  don't compare my firm to Anderson & Wanca

24

BOCK
1
2  except that they can compete with us in
3  the sense that they know companies that
4  receive junk faxes.
5      And anybody can file a junk
6  fax class action lawsuit if they have a
7  law degree and a law license I would say,
8  but that doesn't make them your peer.  It
9  just makes them a competitor.
10   Q.   Do you think -- so it sounds
11  like you would consider Bock Law Firm,
12  LLC kind of superior to Anderson & Wanca
13  as far as firms go?
14   A.   As far as lawyers go.
15   Q.   And what is that based on?
16   A.   It's based on the experience
17  and the work that we have done since
18  2003, and I know that -- I know their
19  experience and the work they have done
20  since 2003.
21   Q.   Did you hold the same view of
22  Anderson & Wanca before Mr. Oppenheim
23  left the firm?
24   A.   Yes.  I mean, except that I
25  know Dave -- I have known and work --

25

BOCK
1
2  known and worked with Mr. Oppenheim a
3  long time.  I know he's a smart person
4  with great credentials.
5    Q.   When did you first -- when did
6  you first meet Brian Wanca?
7    A.   Let me think.  2001-ish.
8    Q.   And how did you meet him?
9    A.   He walked in the office.  When
10  I got to Macey, Chern & Diab, I believe
11  they had filed a couple of class actions
12  with Brian Wanca as the co-counsel.
13   Q.   He was not actually a part of
14  the firm at that time?
15   A.   What firm?
16   Q.   The Macey Chern.
17   A.   No, Brian Wanca was never part
18  of that.  He was -- he was Anderson &
19  Wanca in Rolling Meadows, and he was
20  their co-counsel, meaning there was two
21  firms on a couple of cases, Bouchard
22  versus Cingular Wireless and PJ's
23  Concrete versus Nextel Communications, I
24  believe those were the two.
25   Q.   Did you work on those cases?

7 (Pages 22 to 25)

26

BOCK

1  A.   I did, yeah.  I think I argued
2  every substantive motion and wrote or
3  co-authored with Robert Hatch and Malik
4  Diab every substantive brief.
5     **Q.   Did you continue working with**
6  **Mr. Wanca once you changed from Macey**
7  **Chern to Diab, Macey & Bock?**
8     A.   We had -- by the time the firm
9  changed to Diab, Macey & Bock, we had
10 many TCPA class actions pending with
11 Brian Wanca's firm as our co-counsel.
12    **Q.   And why -- why did you**
13 **co-counsel with Brian Wanca's firm?**
14    A.   Me personally?
15    **Q.   Yes.**
16    A.   I mean, so I didn't personally
17 co-counsel with him at all.
18       It was a law firm decision.  I
19 got to the law firm.  They had two cases
20 with him, and I stepped up and handled
21 those two cases, and because he was the
22 referring counsel/co-counsel who had
23 found PJ's Concrete and Gary Bouchard,
24 the named plaintiffs, and had identified

*(Line numbers 1-25 shown, line 2 starts at "A.")*

27

BOCK

1  these cases from somebody else doing them
2  somewhere else, settled somewhere against
3  AT&T, these were about municipal taxes,
4  he brought it to them.
5        I think him and Tom Macey
6  were -- met each other through Greg
7  Ellis, I think, some guy from Chicago, so
8  I got there.  They already had these
9  cases with him.
10       And when I came up with the
11 idea of filing TCPA class actions, I
12 mentioned it to him, and Brian Wanca at
13 the time was somebody doing contingency
14 commercial collections cases or something
15 like that, so he knew the owners of small
16 companies, small businesses receiving
17 junk faxes.
18    **Q.   And when did you mention that**
19 **to him?**
20    A.   I don't remember the year.  I
21 had a big pile of junk -- I had a home --
22 I had an -- in my bedroom I had a fax
23 machine in 2003.  Prior to that actually,
24 1999, I think.

28

BOCK

1        When I went to Freed & Weiss,
2  I put a fax machine in our bedroom.  We
3  used to get faxes at 4 in the morning,
4  that sort of thing.
5        I saved them all and looked up
6  the statute, realized I couldn't sue in
7  my own name, that sort of thing.
8     **Q.   And at some point in time, did**
9  **you and Mr. Wanca come to, I guess, some**
10 **sort of an agreement about how to pursue**
11 **TCPA class actions together?**
12    A.   I don't know what you mean by
13 that.
14    **Q.   I have seen reference in some**
15 **of the documents, which we can go**
16 **through, to you referring to a joint**
17 **venture.**
18    A.   Okay.
19    **Q.   With Mr. Wanca.**
20    A.   Okay.
21    **Q.   What -- what is that?**
22    A.   That was we had agreed to do
23 all of our junk fax cases together.
24    **Q.   Was there any sort of a**

29

BOCK

1  **written agreement between you?**
2     A.   A written agreement, like a
3  contract that was signed by the parties?
4  I don't remember a whole lot of retainer
5  agreements.
6        He sent me at least one email
7  about our joint venture, reimburse 50
8  percent of his expenses that he was
9  having on all his cases, that sort of
10 thing.
11    **Q.   What were the terms of your**
12 **joint venture together?**
13    A.   That we would share the fees
14 50/50.
15    **Q.   Were there any other terms?**
16    A.   I would have to think about
17 it.  I don't know.
18       I mean, the terms would have
19 been, yes, we're going to work together.
20 We're going to pursue these together.
21       Typically he had the named
22 plaintiffs.  Typically we did the work.
23 He would -- he would do the -- the copy
24 and paste of a complaint and get it on

8  (Pages 26 to 29)

30

BOCK
1  file.
2
3       My office did all the
4  substantive briefing.  I did all the
5  arguing.
6       Q.   And would you -- would you
7  call those co-counselling those cases?
8       A.   I would say co-counseling when
9  both firms are working a case together or
10 have agreed to work a case together or
11 there's a lot -- and class action
12 litigation isn't handled in the same way
13 other kinds of litigation are handled,
14 because typically multiple firms will
15 work on a case to share the risk and
16 share the reward if there is any.
17      Q.   When you said that you agreed
18 to share your fees 50/50, what -- was
19 that limited to certain cases?
20      A.   No.  That was every case.
21      Q.   Every case that your firm
22 worked on, you would share the fees with
23 Brian Wanca or with Anderson & Wanca
24 50/50?
25      A.   After paying other co-counsel,

31

BOCK
1
2  that sort of thing.  Whatever was to be
3  had by Anderson & Wanca or my firm was
4  shared 50/50.  Sometimes there's a third
5  or fourth firm, fifth firm, but we shared
6  ours equally.
7       So 50/50, I mean equally I
8  should say.  Sometimes if we have a case
9  with the Max Margulis law firm, we shared
10 it in thirds.  Brian's firm and my firm
11 shared equally.
12      Q.   Were all of the cases that
13 were part of this joint venture TCPA
14 cases?
15      A.   No.
16      Q.   Did the same agreement apply
17 to Anderson & Wanca, to fees that
18 Anderson & Wanca received?
19      A.   What does that mean?
20      Q.   Did Anderson & Wanca agree to
21 share its attorney fees 50/50 with Bock
22 Law Firm?
23      MR. COHEN:  Before you answer,
24 I'll object to the form of the
25 question and it mischaracterizes

32

BOCK
1
2  testimony so far.
3       Subject to that, if you
4  understand, go ahead.
5       THE WITNESS:  Well, the fees,
6  I don't know of a case where the
7  Court awarded fees to Anderson &
8  Wanca and separately awarded fees
9  to my firm, so we shared the fees,
10 so he wasn't sharing his fees with
11 me and I wasn't sharing my fees
12 with him.
13      We were sharing our fees
14 received as a joint venture, so the
15 terms of the joint venture are we
16 shared the fees equally.
17 BY MS. LOEW:
18      Q.   Was -- at that -- at that time
19 was Anderson & Wanca pursuing cases
20 independently of cases that -- on which
21 it was co-counseling with Bock Law Firm?
22      MR. COHEN:  Before you answer,
23 I object.  I don't know what "at
24 that time" means.
25      Subject to that, if you do, go

33

BOCK
1
2  ahead.
3       THE WITNESS:  Yeah, I would
4  have to -- yeah.  It would help if
5  you -- it has been a long
6  relationship, so it would probably
7  be helpful to know.
8       When I first started working
9  with Anderson & Wanca on those two
10 class actions, Brian Wanca was
11 still doing this other kind of
12 litigation.  We didn't work on that
13 or anything.  Litigation to go
14 chase somebody who didn't pay a
15 construction firm or whatever, we
16 didn't work on any of that.  We do
17 class actions.
18 BY MS. LOEW:
19      Q.   So you -- you said that, I
20 think, you guys reached this agreement
21 that we've referred to as the joint
22 venture.  When did you reach that
23 agreement?
24      A.   I don't remember.
25      Q.   And did it terminate at some

9  (Pages 30 to 33)

34

BOCK

1  point in time?
2  A.  No.
3  Q.  But you don't know if there
4  was actually a written -- a written
5  document documenting this?
6  MR. COHEN:  Objection, asked
7  and answered.
8  You can answer again.
9  THE WITNESS:  Yeah.  There is
10  probably lots of documents
11  evidencing this or there are lots
12  of documents evidencing this.
13  BY MS. LOEW:
14  Q.  Is there --
15  A.  But there's no written
16  contract.  We didn't have a lawyer sit
17  down and put together a joint venture
18  agreement in writing, but you don't need
19  one.
20  I also didn't have a written
21  partnership agreement with Tom Macey and
22  Malik Diab.  We just had a general
23  partnership with no written partnership
24  agreement.

35

BOCK

1  Q.  Did -- was there a -- a
2  registered entity for the joint venture?
3  A.  Not that I know of, no.  There
4  wasn't.  There wasn't.
5  Q.  Is Bock Law Firm, LLC still
6  sharing 50 percent of its fees with
7  Anderson & Wanca?
8  A.  Well, I already told you that
9  that doesn't make any sense to me.
10  Q.  You -- I have asked you -- you
11  told me the terms of the joint venture
12  which were --
13  A.  I told you I don't -- I don't
14  share my fees with Brian Wanca.  We share
15  the fees that we receive in cases.
16  Q.  So any fees that are awarded
17  to Bock Law Firm, LLC, are those fees
18  shared 50/50 with Anderson & Wanca?
19  MR. COHEN:  Objection,
20  continues to mischaracterize his
21  testimony, assumes facts not in
22  evidence.
23  MS. LOEW:  Dan, you can limit
24  your objections to form, not

36

BOCK

1  speaking objections.
2  MR. COHEN:  Actually there's
3  case law in Florida that says a
4  form objection is meaningless and
5  preserves nothing, so I'll make my
6  objections the way I see fit.
7  Thank you.
8  MS. LOEW:  To the extent I
9  think you're coaching the witness,
10  I would ask you to stop coaching
11  the witness.
12  MR. COHEN:
13  Mischaracterization of the
14  testimony is not coaching.  Assumes
15  facts not in evidence and lack of
16  foundation is not coaching.
17  And you have asked this
18  witness three times the same flawed
19  premise question.  Either you don't
20  get it and you need to have him
21  explain it to you again or stop
22  playing game with your words.
23  MS. LOEW:  I will continue to
24  ask the question because I don't

37

BOCK

1  believe that he has answered it.
2  MR. COHEN:  He's answered it
3  three times.
4  Go ahead.  Do it again.
5  THE WITNESS:  I would have to
6  hear the question again.
7  BY MS. LOEW:
8  Q.  The fees that Bock Law Firm,
9  LLC is awarded in litigation, is Bock Law
10  Firm, LLC currently sharing those fees
11  50/50 with Anderson & Wanca?
12  MR. COHEN:  Same objections.
13  THE WITNESS:  And I don't
14  understand the question.
15  BY MS. LOEW:
16  Q.  What portion of the question
17  don't you understand?
18  A.  What -- what fees are you
19  talking about?
20  Q.  Fees that Bock Law Firm, LLC
21  is awarded in litigation.
22  A.  Where, when, which case?  What
23  are you talking about?
24  Q.  Is there a distinction between

10  (Pages 34 to 37)

38

BOCK
1
2  cases?
3     A.  Yes.
4     Q.   What is the distinction?
5     A.   Well, I said that a Court
6  doesn't award my firm fees except in a
7  case where my firm is the only class
8  counsel, so if we're the only class
9  counsel in a case, if I was awarded -- if
10  I had a case today and a judge entered an
11  order awarding fees to class counsel, and
12  class counsel is only Bock Law Firm, and
13  Anderson & Wanca had no involvement with
14  that case, and they are not part of the
15  case and say -- say -- because what you
16  are asking me is some kind of
17  hypothetical.
18          Sometimes the fees are awarded
19  to my firm.  If a case was -- let's say a
20  case was filed -- if my firm filed a
21  class actions in 2016 without Brian
22  Wanca's firm involved, and then we
23  settled it, and the Court awarded fees to
24  my firm, no, we would not share those
25  fees with Brian Wanca's firm.

39

BOCK
1
2     Q.   Is --
3     A.   But we have lots of joint
4  cases still, and the fees are shared
5  50/50, and so you are asking me sort of
6  a -- for an answer to something that has
7  lots of parameters and permutations.
8     Q.   And I'm trying to understand
9  what those parameters and permutations
10  are.
11     A.   Okay.  That's why I'm giving
12  you more of an answer than I think the
13  question deserves, is I'm trying to
14  educate you about what this -- what this
15  is so that you can ask me the questions
16  that you are wanting answers to, I guess.
17     Q.   The -- so I -- originally I
18  had asked you were there cases that Bock
19  Law Firm, LLC was filing under -- after
20  you had reached this joint venture with
21  Mr. Wanca, were there cases that Bock Law
22  Firm was filing that did not involve
23  Anderson & Wanca?
24          MR. BLONIEN:  Objection, vague
25  as to time frame.

40

BOCK
1
2          MR. COHEN:  Join.
3          THE WITNESS:  Yes, because we
4  were doing cases with other firms
5  that weren't TCPA cases, for
6  example.
7          My firm had 100 cases with
8  Lakeland Law Firm and Freed &
9  Weiss.  Brian Wanca had nothing to
10  do with those.  He knew that we did
11  them.  It wasn't part of the deal.
12  That's not what we were doing.
13  BY MS. LOEW:
14     Q.   So were there any TCPA cases
15  after you and Brian Wanca reached this
16  agreement about a joint venture for which
17  Bock Law Firm, LLC was awarded fees as
18  class counsel and those were not shared
19  50/50 with Anderson & Wanca?
20          MR. COHEN:  Objection.  All
21  the same objections to
22  mischaracterization and assumes
23  facts not in evidence.
24          Subject to that, you can
25  answer.

41

BOCK
1
2          THE WITNESS:  There -- yes.
3  BY MS. LOEW:
4     Q.   When you refer to the
5  agreement between Bock Law Firm, LLC and
6  Anderson & Wanca, the joint venture, was
7  that before 2009 that the parties entered
8  into that?
9     A.   Yes, but I don't remember
10  saying it was an agreement.  I don't
11  know.  The agreement.  I don't know.
12          Brian Wanca and I agreed to do
13  junk fax cases together and share the
14  fees 50/50, and we would do all our junk
15  fax cases together, because I drafted the
16  complaint.  I drafted the briefs.  I did
17  a whole bunch of stuff.
18     Q.   And when you say junk fax
19  cases, are you referring to TCPA cases?
20     A.   Well, TCPA covers things other
21  than faxes, and we were primarily or
22  exclusively doing junk fax cases.
23          I don't remember doing cell
24  phone cases, robo call cases.  I think we
25  did a couple of those, though.

11 (Pages 38 to 41)

42

BOCK

I guess they would be part of
the same thing though.  I refer to them
as junk fax cases because that's 99
percent of what we did together was junk
fax cases, after we stopped doing
recording fee cases against title
companies together and sharing those fees
50/50 and after we had done those
municipal tax cases together and shared
those fees 50/50.

Q.   Does the agreement that you
just described, would you consider those
to be contracts?

A.   No.  I don't know.  I don't
know what an -- I don't know what a
difference between an agreement and a
contract is.  I'm not trying to be cute.

I wouldn't consider them
written contracts, because it was a joint
venture.

Q.   Do you have an understanding
of what a contract is?

A.   Yes.

Q.   And what -- what is a

43

BOCK

contract?

A.   An agreement between one or
between two or more parties could be a
contract.

Q.   So would you consider the
joint venture with Anderson & Wanca to be
an agreement between two parties?

MR. COHEN:  Objection, calls
for a legal conclusion.

You can answer.

THE WITNESS:  I would say it
was an agreement between two
parties, yes.

BY MS. LOEW:

Q.   So would you then consider it
a contract?

MR. COHEN:  Objection, asked
and answered.

You can answer again.

THE WITNESS:  I -- I don't
know if -- I wouldn't -- I don't
know if I would consider it a
contract or not.

BY MS. LOEW:

44

BOCK

Q.   The joint -- this agreement to
share certain fees 50/50, is there still
an agreement between Anderson & Wanca and
Bock Law Firm regarding the sharing of
fees?

A.   I'm not sure.  I thought there
was, but then I found out Brian Wanca was
filing cases, TCPA fax cases without my
firm, so you have to ask him what -- if
he thinks there is an agreement.

But I know we have pending
joint cases that my firm is doing almost
all of the work on, and we have been
sharing those 50/50 unless there was more
than two firms involved.

Q.   How many cases do you
currently have pending with Anderson &
Wanca?

A.   I heard David Oppenheim say 57
yesterday, so he would know better than
me because that's his -- his team handles
in the first instance the joint cases,
and so I know he has -- and David
Oppenheim is somebody who maintains to do

45

BOCK

lists and lists of things that he's
working on and what needs to be done and
everything else, so I know he -- if he
said 57, that's because he counted them.

Q.   So you don't know one way or
the other if 57 is the -- the actual
number of pending cases?

A.   Correct.  I mean, pending
cases in which both firms have made an
appearance is probably how David defined
it, but I didn't hear -- I didn't hear
him define it.

Q.   At any point in time over --
sorry.

(Off the record.)
(Record read as
requested.)

BY MS. LOEW:

Q.   At any point in time since you
met Brian Wanca, were you guys -- did you
consider that you guys were friends?

A.   No.  We're friendly.  We were
business partners in a joint venture.

Q.   And when you use the term

12 (Pages 42 to 45)

46

**BOCK**

1    business partners, you are not referring
2    to an actual partnership agreement?
3        A.   Joint venture is a
4    partnership.
5        Q.   All right.  How many matters
6    over the years have you worked on -- and
7    has Bock Law Firm, LLC worked on with
8    Anderson & Wanca?
9        A.   I don't -- I don't know, you
10   know.  I don't remember right now.  I
11   couldn't tell you how many.  A lot.
12       Q.   Would you say more than 100?
13       A.   I would -- I would guess more
14   than 100 based on David saying 57.  Yeah,
15   I would say more than 100.
16       Q.   And have all of these cases
17   been TCPA cases?
18       A.   Well, I said they weren't.
19       Q.   What other types of cases have
20   you worked on with Anderson & Wanca?
21       A.   Municipal tax cases, recording
22   fee cases, some other miscellaneous cases
23   that I don't remember even right now.
24       Q.   What are courting fee cases,

47

**BOCK**

1    what is that?
2        A.   Who?
3            MR. COHEN:  Recording.
4            THE WITNESS:  Recording.
5    BY MS. LOEW:
6        Q.   Recording.
7        A.   Sorry.  I -- I'm sorry if I
8    mumble.
9        Q.   The -- would you say the
10   majority of the cases that you have
11   worked on with Anderson & Wanca have been
12   TCPA cases?
13       A.   If you include insurance
14   coverage cases related to TCPA cases, I'd
15   say yes.
16       Q.   Did you ever have, I guess, a
17   falling out with Brian Wanca?
18       A.   No.  What is a falling out, I
19   guess I should say?  I'm just guessing
20   what you mean, so you tell me what you
21   mean by a falling out and I'll tell you
22   yes or no; how about that?
23       Q.   Did the nature of your
24   relationship with Brian Wanca change over

48

**BOCK**

1    time?
2        A.   Nature of my -- what is the
3    nature of my relationship with Brian
4    Wanca?
5        Q.   I guess your personal opinion
6    of him.
7        A.   Well, it's not a relationship,
8    right?
9        Q.   Your personal relationship
10   with him.
11       A.   I don't have a personal
12   relationship with him.  We worked
13   together on lots and lots of cases.
14           I don't talk to him as much on
15   the phone, is that what you mean?
16       Q.   Was there -- have you guys had
17   any conflicts over the course of your
18   relationship, you and Brian Wanca?
19       A.   Not that I remember.
20       Q.   You --
21       A.   Like, I don't think Brian
22   Wanca and I have ever argued with each
23   other.  That would be a conflict.  We've
24   never had a fistfight.  That would be a

49

**BOCK**

1    conflict, but we're in this litigation
2    that he's funding, so that would be a
3    conflict, so I would say yes, but he's
4    not here.
5            I haven't seen him on the
6    case.  I haven't seen him do anything on
7    this case.
8        Q.   The -- do you like him?  Do
9    you like Brian Wanca?
10       A.   What does that mean?  He is a
11   lawyer.  I do -- I do -- I work for a
12   living.  I don't sit around and like
13   people.
14       Q.   Do you have a view on his
15   competence?
16       A.   Competence as a lawyer?
17       Q.   Yes.
18       A.   Yes, probably.
19       Q.   And what is that view?
20       A.   Of all the lawyers I have
21   worked with in my career, he's not very
22   high up the list in terms of competence
23   as a litigator.
24       Q.   The -- have you -- when did

13 (Pages 46 to 49)

50

BOCK

1  you form that view of him?
2      A.   It kind of developed over
3  time, but the first time I met him was
4  in -- in and around 1999.
5          He came in and he had
6  photogray glasses and he didn't cut his
7  fingernails and wore gym shoes with his
8  suits, stuff like that.  I didn't have a
9  very high opinion of that.
10         And then he didn't have really
11 have anything useful to say about
12 litigating a class action because he had
13 never done a class action.  He didn't
14 know anything about it.
15         And so he would go with me to
16 court in Waukegan, for example, and I
17 would do all the arguments, and he would
18 stand over there and watch, and that
19 didn't -- to me didn't seem very
20 competent, but I treated him like an
21 equal partner and brought him along.
22         He -- that doesn't make you a
23 competent attorney, that you can walk
24 around with a competent attorney.

51

BOCK

1      Q.   Why did you co-counsel with
2  him after forming that view?
3      A.   Because he was -- seemed to be
4  a go getter, and when I said we should do
5  those cases about junk faxes, he started
6  going and getting his contacts from small
7  businesses to keep the faxes, and we
8  filed cases together.
9      Q.   So was that -- was your
10 relationship, the motivation for filing
11 the co-counsel cases primarily monetary?
12     A.   Yes.  It's a business.
13 That's -- that's why I go to work.
14     Q.   In the cases in which Bock Law
15 Firm and Anderson & Wanca co-counselled,
16 did you rely on Anderson & Wanca to do
17 any of the substantive work?
18     A.   What do you mean by
19 substantive work?
20     Q.   Other than bringing in the
21 plaintiff.
22     A.   They would initiate the
23 written discovery, so that would be
24 substantive work, sending out the written

52

BOCK

1  discovery and they took lots of
2  depositions, and that's substantive work,
3  so yeah, they did substantive work.
4      Q.   What about negotiating
5  settlements, did they do that?
6      A.   No, not -- not Brian Wanca.
7      Q.   Would the attorneys at
8  Anderson & Wanca do that work?
9      A.   Only David Oppenheim, the only
10 person.  I mean, Brian Wanca was in the
11 room with me when I negotiated class
12 settlement, but then David came along in
13 some -- at some point in time, and I
14 think he came along for a few with Brian,
15 and then Brian disappeared and David did
16 it.
17     Q.   How long -- when did you first
18 meet David Oppenheim?
19     A.   Well, he reminded me yesterday
20 that it was at my class certification
21 hearing in the Cy's Crab House case.  I
22 think that's the first time we met.
23         We might have spoken on the
24 phone or in emails or something before he

53

BOCK

1  came to that, but pretty sure I remember
2  him introducing himself.
3          Judge Kennelly scheduled an
4  oral argument on class certification
5  mostly, I think, because he was -- I
6  think he was teaching a class or doing
7  something with one of the law schools,
8  and so he announced we're going to have a
9  class certification argument in, like,
10 the ceremonial courtroom and there's 100
11 law students all sitting there, so I
12 remember that occasion, and I remember
13 David coming for it.
14     Q.   Did you think that David
15 Oppenheim did good work on the cases in
16 which you worked together?
17     A.   Yes.
18     Q.   And was that, the question I
19 just asked, that was including the time
20 that he was at Anderson & Wanca?
21     A.   Yes.
22     Q.   When did you first meet Ross
23 Good?
24     A.   A long time ago, and I don't

14 (Pages 50 to 53)

54

BOCK

1  remember.  When he was still in high
2  school.
3
4      Q.   How did you meet him when he
5  was in high school?
6      A.   We had -- we had a case, if
7  I'm -- I remember working with Ross Good
8  and some of his friends and his brothers,
9  I think two brothers on a case called
10  Hager versus ATG, and it was a recording
11  fee case.
12          And we went to -- we had to
13  go to -- so it's a recording fee class
14  action.  I think it was certified, and I
15  wanted to get an expert opinion about
16  the -- this is -- I'm trying to remember.
17  It's a long time ago -- the -- the class
18  wide damages because it was a class of
19  people.
20          Do you know what a recording
21  fee is on real estate transaction?
22      Q.   Yes.
23      A.   Okay.  The -- their dollar
24  amounts vary because the type of case
25  that it was, and the number -- you know,

55

BOCK

1
2  the recording fee varies by the number of
3  pages and what county you're filing in,
4  and the title companies were collecting
5  estimated fees at closings.
6          Say they would collect $100,
7  and then they would record the document
8  with the Cook County recorder, for
9  example.  They would pay $72 and keep the
10  change on the $28, either treating it as
11  a liability or just washing it through as
12  a profit, and so we had -- so my firm had
13  some class actions independent of Brian
14  Wanca's firm, and I told him about that.
15          And he found some other people
16  who had recording fees and we said -- we
17  filed some cases, and he was involved in
18  the Hager versus ATG case.  We needed an
19  expert.  I needed an expert to calculate
20  damages on a class-wide basis.
21          Say the company owes $6
22  million, for example, on some number in
23  the aggregate, and the way to do that was
24  to go do a giant sampling of their files,
25  and so me and five or six people from my

56

BOCK

1
2  office -- my mother worked for me, my
3  younger brother worked for me, I had some
4  paralegals -- we all loaded up in a car.
5  And Ross Good and his brothers and a
6  couple other guys, high school kids
7  loaded up in a van, and we all drove down
8  to Champaign, Illinois and spent, I don't
9  know, about a week randomly sampling.
10          And I had to come up with a
11  whole strategy with the expert of how to
12  pull -- I don't remember what it was --
13  every 20th file or, sorry, every 20th
14  file or something like.  And Ross Good
15  was there and that's what he did.
16      Q.   Was he working for Anderson &
17  Wanca at that time?
18      A.   I think so.  I never saw his
19  paycheck, but --
20      Q.   Was -- was that case a case
21  that you were working with Anderson &
22  Wanca?
23      A.   Yes.
24      Q.   Did you ever have a friendship
25  with Ross Good?

57

BOCK

1
2      A.   No.  His father is friends
3  with -- I'm remembering his father is
4  Neal Good, is friends or acquaintances
5  somehow with Brian Wanca, and that had
6  something to do with Ross going to work
7  with Brian.
8      Q.   Did you prepare for your
9  deposition today?
10      A.   A little bit.
11      Q.   And what did you do to
12  prepare?
13      A.   I read my testimony from the
14  hearing in front of Judge Honeywell and
15  the hearing in front of Judge Porcelli.
16      Q.   And did you meet with anyone
17  to prepare?
18      A.   I did not meet with anybody to
19  prepare, but I had -- I had breakfast
20  with Dan Cohen this morning.
21      Q.   Other than reviewing your
22  testimony, did you review any other
23  materials?
24      A.   I reviewed my company's
25  interrogatory answers, I think it was the

15  (Pages 54 to 57)



58

BOCK

1    first -- the first amended
2    interrogatories or something like that.
3           Other than that, I didn't -- I
4    had big plans to review a whole bunch of
5    things and here we are.  I don't know.
6    Life is busy.
7        Q.    The -- before the Buccaneers
8    case, I'm going to refer to the
9    Technology Training versus Buccaneers,
10   okay, I'll refer to that case.
11       A.    Which one?
12       Q.    Before the Technology Training
13   versus Buccaneers case had --
14       A.    Which one are you talking
15   about?
16       Q.    The Technology Training.
17       A.    There were two.
18       Q.    The -- the pending Technology
19   Training versus Buccaneers case.
20       A.    Okay.  I got you.
21       Q.    Before the pending Technology
22   Training versus Buccaneers case, had you
23   ever filed a class action covering a
24   class on which there was already another

59

BOCK

1    class action filed?
2        A.    Did I ever file a case that
3    had a punitive class that overlapped with
4    a punitive class in another case?
5        Q.    That was previously on file.
6        A.    Probably, but I don't
7    remember.  I mean, I would say certainly.
8        Q.    Why would you say certainly?
9        A.    Because I could file a case
10   today and find out that somebody else had
11   already filed the same kind of case three
12   weeks ago, and I know that's happened.  I
13   have had overlapping cases with lots of
14   firms.
15       Q.    Have you ever -- have you ever
16   settled a case for a punitive class on
17   which there was a previously filed class
18   action covering the same class other than
19   the Technology Training versus Buccaneers
20   case?
21       A.    Yes.
22       Q.    And what cases or case, case
23   or cases did you do that?
24       A.    I can't remember them all.  I

60

BOCK

1    can remember working on a case called
2    Chin versus Chicago Title, probably in
3    the year 2000 or 2001.  That overlapped
4    with punitive class actions filed by
5    other class action lawyers.
6           Before that I'm sure I worked
7    on them at Freed & Weiss.
8           There's -- kind of routine.  I
9    was -- my firm had one of the -- we filed
10   a complaint against Volkswagen related to
11   those diesel engines, and we were part --
12   we got sucked up in this giant MDL.  I
13   think there was more than 2500 lawyers in
14   the thing.  I mean, hundreds of law
15   firms.
16       Q.    When did you first meet Mike
17   Addison?
18       A.    I don't remember.
19       Q.    Do you know how you met him?
20       A.    Well, I mean, I would have met
21   him in the -- well, assuming I didn't
22   meet him outside of the working on some
23   cases with him, I met him in some case.
24   And I think my firm has had less than 10,

61

BOCK

1    I don't know.  I'm just guessing.
2           We have had cases where he was
3    the local counsel on a TCPA class action
4    or coverage litigation with Anderson &
5    Wanca, and so I met him I believe in the
6    context of one of those.
7        Q.    How long have you known him?
8        A.    I don't -- I don't really know
9    him.  I have met him.  I think I have
10   seen him in person I would guess around
11   five times maybe.
12          I would recognize -- well, I
13   have seen him in the context of this
14   stuff.  Now he shows up, but before that,
15   in terms of how many times I have talked
16   to him, I have talked to him five times
17   or less probably.  I don't -- I don't
18   remember.
19       Q.    When did you first start
20   working with him on cases?
21       A.    I don't really work with him
22   on cases.  He's our co -- he's our local
23   counsel.
24       Q.    When did he first start acting

16  (Pages 58 to 61)

62

BOCK

1  as local counsel?
2  A.  I don't remember.  I've --
3  I've never seen him argue anything.  I
4  don't -- I think -- I think he's done
5  some of that, but not when I was there.
6  Q.  When did you first become
7  aware of the Medical & Chiropractic
8  Clinic versus Buccaneers case?
9  A.  I'm aware of the Cin-Q versus
10 Buccaneers case.
11 Q.  Okay.
12 A.  And I don't know, I don't
13 remember the first time hearing something
14 called Medical & Chiropractic.
15 Probably -- I think the first
16 time I heard the words Medical &
17 Chiropractic was around -- Medical &
18 Chiropractic versus Buccaneers was in
19 around probably after we filed the --
20 TTA Buccaneers case in Tampa state court.
21 I knew it was Cin -- the Cin-Q case, that
22 was how I knew it.
23 Q.  So the Cin-Q case, when did
24 you first learn of that case?

63

BOCK

1  A.  I don't remember.  Years ago.
2  Q.  And how did you learn of it?
3  A.  I don't remember.  Might have
4  been through a Law 360 alert.  It might
5  have been -- I don't remember.  I'd just
6  be guessing.
7  I remember reading Judge
8  Porcelli's summary judgment opinion in
9  that case, and that was in and around the
10 time we were working on the Palm Beach
11 Sarris I believe, but I -- I think I knew
12 about it before then.
13 (Bock Exhibit 2
14 marked for
15 identification.)
16 MR. COHEN:  If you are about
17 to start on something new, we've
18 been going about an hour.  Take a
19 five-minute break?
20 MS. LOEW:  Sure.
21 THE VIDEOGRAPHER:  Going off
22 the record.  The time is 11:19 a.m.
23 (A recess was had.)
24 THE VIDEOGRAPHER:  Going on

64

BOCK

1  the record.  This marks the
2  beginning of media No. 2.  The time
3  is now 11:29 a.m.
4  BY MS. LOEW:
5  Q.  I have handed you what we've
6  marked Exhibit 2, which is BLF 000052,
7  and this is from Brian Wanca to Mike
8  Addison, and it copies you and Brian
9  Kelly.  Do you see that?
10 A.  Yes.
11 Q.  The date of this is Tuesday,
12 September 1 of 2009; is that right?
13 A.  Yes.
14 Q.  Are you familiar with this
15 document?
16 A.  Yes, I have seen it before.
17 Q.  The subject of this is Tampa
18 Bay Buccaneers TCPA suit.  And before I
19 go into that, who is Ryan Kelly?
20 A.  Ryan Kelly here is an attorney
21 at Anderson & Wanca.
22 Q.  Is he still at Anderson &
23 Wanca?
24 A.  I don't know.  Yeah, I think

65

BOCK

1  so.
2  Q.  The body of the email states,
3  we have a plaintiff, but I understand you
4  filed on Friday.  Let me know if your
5  plaintiff has a defect or cold feet and
6  we can work something out.
7  Do you know what Brian Wanca
8  is referring to here?
9  A.  Where?
10 Q.  In this email.
11 A.  Referring to, what do you
12 mean?
13 Q.  When he says we have a
14 plaintiff --
15 A.  Okay.
16 Q.  -- who is we?
17 A.  Brian Wanca's firm and Phil
18 Bock's firm.
19 Q.  And what plaintiff is he
20 referring to?
21 A.  I don't remember.
22 Q.  Did you discuss filing a TCPA
23 suit against the Tampa Bay Buccaneers
24 with Brian Wanca?

17 (Pages 62 to 65)

66

BOCK

1
2     A.   Yes.
3     Q.   And when did you discuss that?
4     A.   I don't remember.
5     Q.   Do you know if it would have
6  been before this email?
7     A.   I don't remember.  I'd have
8  to -- I can't remember right now.
9     Q.   What were your discussions
10 with Mr. Wanca about pursuing a TCPA case
11 against the Tampa Bay Buccaneers?
12    A.   I don't know.  I would be
13 putting words in my own mouth.
14         Here's a big one we should
15 file, something like that.
16    Q.   Who initiated that
17 conversation?
18    A.   I -- I used to talk Brian
19 Wanca several times a day sometimes for
20 hours, so usually he called me on my cell
21 phone.  I can't remember who initiated
22 the conversation.
23    Q.   Who first raised the idea of
24 suing the Tampa Bay Buccaneers?
25    A.   What do you mean?

67

BOCK

1
2     Q.   Between you and Brian Wanca.
3     A.   I don't remember.  Probably
4  Brian if I was guessing.
5     Q.   And what was your response?
6     A.   I don't remember the
7  conversation.
8     Q.   But you do remember that there
9  was a conversation?
10    A.   I do remember talking to Brian
11 Wanca about suing the Tampa Bay
12 Buccaneers for sending junk faxes, but I
13 don't remember when that was or the -- I
14 don't have a transcript or anything.
15    Q.   Did you talk to him on more
16 than one occasion about it?
17    A.   On more than one occasion we
18 spoke about filing a case or having a
19 case against the Tampa Bay Buccaneers,
20 enough times that when I found out years
21 later that there was a case filed and my
22 firm wasn't on it, I was very surprised.
23         I wasn't surprised to find out
24 that there was a case.  I was surprised
25 to find out that my firm wasn't on it.

68

BOCK

1
2     Q.   Okay.  And why were you
3  surprised?
4     A.   Because we were doing all of
5  our junk fax cases together.
6     Q.   Did you raise that with
7  Mr. Wanca?
8     A.   I don't remember.
9     Q.   Did you talk to anybody else
10 about it?
11    A.   What does that mean?
12    Q.   About the fact that you were
13 surprised that Anderson & Wanca had filed
14 a TCPA suit against the Tampa Bay
15 Buccaneers.
16    A.   I have talked about it with
17 other people since 2009.
18    Q.   And when did you talk to other
19 people about it?
20    A.   I don't remember the dates.
21    Q.   Was it before Mr. Oppenheim
22 joined Bock Law Firm?
23    A.   Certainly.
24    Q.   Do you remember who you spoke
25 with about that?

69

BOCK

1
2     A.   I remember some of the who.
3     Q.   Who?
4     A.   I remember speaking to Todd
5  Lewis about it.  He's an attorney at our
6  firm.  I remember speaking to Jim Smith
7  about it.  He's at our firm.  I -- I
8  remember -- I don't know.
9         Probably spoke to Robert Hatch
10 about it, but I don't have any specific
11 recollections of these conversations.  I
12 just remember talking to them about it.
13    Q.   Do you remember generally what
14 the substance of the conversations was
15 without knowing the words themselves?
16    A.   Generally?  I don't know what
17 you mean.
18    Q.   Do you have any general
19 recollection of what the conversation
20 was?
21    A.   Not really.  I haven't thought
22 about it in a long time.
23    Q.   Were you part of -- after --
24 after this email that's in front of you
25 was sent, were you part of any

18 (Pages 66 to 69)

70

BOCK

1
2  discussions with Mike Addison about
3  filing the case against the Buccaneers?
4      A.   I don't remember.  You mean a
5  conversation, right?  I think there was
6  other emails than this.
7      Q.   Okay.
8      A.   And I can't remember whether
9  we had -- whether I had a conversation,
10 like a face-to-face conversation.
11          I don't think I've ever talked
12 to Mike Addison on the telephone, for
13 example, I don't remember one, but I have
14 spoken to him the few times I have seen
15 him in person.
16          (Bock Exhibit 3
17           marked for
18           identification.)
19 BY MS. LOEW:
20     Q.   Handing you what we've marked
21 as Exhibit 3, which is BLF 00053, and
22 this is an email, and it says from Brian
23 J. Wanca to Sue Fitzgerald, cc Mike --
24 Michael Addison and Phil Bock, and the
25 date is Thursday, November 5 of 2009.

71

BOCK

1
2      Do you see that?
3      A.   I see that.  What's -- Sue
4  Fitzgerald, yep, I see that.
5      Q.   And who is Sue Fitzgerald?
6      A.   She's a woman who works at
7  Anderson & Wanca.
8      Q.   The -- the body of this email
9  says, please send Mike a Word version of
10 one of our recent complaints as he needs
11 to amend his suit against the Tampa Bay
12 Buccaneers and will be retaining us as
13 additional counsel.
14     Do you see that?
15     A.   Yes.
16     Q.   Do you remember this email?
17     A.   Yes.
18     Q.   Had you spoken with Mr. Wanca
19 prior to this about being additional
20 counsel on a case against the Tampa Bay
21 Buccaneers?
22     A.   I don't remember.  Yeah.  I
23 don't remember the words additional
24 counsel.
25     To me he's saying we would be

72

BOCK

1
2  co-counsel, so I think the last email was
3  Mike Addison had already filed the
4  complaint and this is we're going to join
5  his case.
6      And Sue Fitzgerald is a
7  secretary.  She is going to send one of
8  our recent complaints.  That would be me
9  and Brian.  Ryan Kelly is not on this
10 time.
11          Our recent complaints, that
12 for the most part I drafted the complaint
13 they were using in 2009, template.
14     Q.   And then what happened with it
15 after this?
16     A.   What does that mean?
17     Q.   Did you join a suit against
18 the Tampa Bay Buccaneers?
19     A.   I don't know what that means.
20     Q.   Were you part of filing any
21 case against the Tampa Bay Buccaneers
22 with Brian Wanca and Mike Addison?
23     A.   I was not named on a complaint
24 as far as I can tell.  My firm wasn't
25 included.  We were -- we had hundreds and

73

BOCK

1
2  hundreds of cases.
3      Q.   Did you follow what happened
4  after this, whether there was a suit
5  filed with Anderson & Wanca and Mike
6  Addison against the Tampa Bay Buccaneers?
7      A.   I don't know what that means.
8  Did I follow it?  There were hundreds of
9  cases, hundreds of cases.
10     Q.   So you were not --
11     A.   I'm not sitting
12 around following a case.  I don't know
13 what that means.
14     Q.   Do you recall any further
15 discussions after this email about filing
16 a case with Anderson & Wanca against the
17 Tampa Bay Buccaneers?
18     A.   I don't.  I'd have to think
19 about that.  I haven't thought about it
20 in a long time.
21          November 2009.  Probably.  I
22 don't know.  I can't remember right now.
23          I can tell you we never had a
24 discussion where I was not going to be
25 included.  Nobody ever told me that.

19 (Pages 70 to 73)

74

BOCK

1    Q.   Were you surprised when you
2    ultimately found out that there was a
3    suit against the Tampa Bay Buccaneers by
4    Anderson & Wanca?
5          MR. COHEN:  Objection, asked
6    and answered.        You can
7    answer.
8          THE WITNESS:  I don't know
9    that there was a suit by Anderson &
10   Wanca.
11         I was surprised to learn that
12   they were included in one, that my
13   firm wasn't included in one.  Be
14   interested to hear about that.
15   BY MS. LOEW:
16   Q.   And did you discuss that with
17   Brian Wanca?
18   A.   I know that my firm reimbursed
19   50 percent of their expenses on all their
20   cases at that time, so my name -- we
21   weren't named on the case, I guess, but I
22   don't know why.
23   Q.   Did you raise that with Brian
24   Wanca?

75

BOCK

1          MR. COHEN:  Objection, asked
2    and answered.
3          You can answer.
4          THE WITNESS:  Yeah.  I don't
5    remember raising something with
6    Brian Wanca like that.
7          (Bock Exhibit 4
8                marked for
9                identification.)
10   BY MS. LOEW:
11   Q.   I'm handing you what I have
12   marked as Exhibit 4, which is BLF 000001
13   through 2, and this is an email from
14   Brian Wanca to Mike Addison and Phil
15   Bock, cc Phil Bock, subject, forward
16   Tampa Chiro versus NFL.
17         Do you see that?
18   A.   I do.
19   Q.   And the attachment, it looks
20   like, is a fax from the Tampa Bay
21   Buccaneers.  Do you see that?
22   A.   Tampa Bay Buccaneers group
23   tickets on sale now, I see that.
24   Q.   Have you seen this email

76

BOCK

1    before?
2    A.   Yes.
3    Q.   Do you recall receiving it at
4    the time?
5    A.   What does that mean?  Do I
6    remember receiving this email in August
7    4, 2010?
8    Q.   Yes.
9    A.   I don't really remember August
10   4, 2010.
11   Q.   When it says, "Look what was
12   sent to me.  Are you game to sue the NFL
13   with us," do you know what Brian is
14   referring to there?
15   A.   I think he -- I'm guessing
16   he's -- he's referring to the attachment
17   from scanner@andersonwanca.com.
18   Q.   Did you have any further
19   discussions after this email about filing
20   a case with Anderson & Wanca against the
21   Tampa Bay Buccaneers?
22   A.   Are those -- is that connected
23   to this thing?  This is -- he's talking
24   about suing the NFL.

77

BOCK

1    Q.   Did you have any discussions
2    with Brian Wanca about suing the NFL?
3    A.   Not about -- no.  I don't
4    remember ever talking about suing the NFL
5    with Brian Wanca, but I'm certain that he
6    mentioned we were going to sue the
7    Buccaneers.
8          (Bock Exhibit 5
9                marked for
10               identification.)
11   BY MS. LOEW:
12   Q.   The court reporter is handing
13   you what has been marked as Exhibit 5,
14   BLF 000056.  This email is dated August
15   4, 2010, again, from Brian Wanca to Mike
16   Addison and Phil Bock, cc Phil Bock,
17   excuse me.  And this is an -- it looks
18   like it's further emails after the email
19   that's Exhibit 4.
20         Do you see that?
21   A.   What am I seeing?
22   Q.   Is this further email chain
23   from what was marked Exhibit 4?
24   A.   Oh, okay.  It appears to be.

20  (Pages 74 to 77)

78

BOCK
1
2     Q.   The email from -- the second
3 email in the chain here from Mike Addison
4 to Brian Wanca --
5     A.   It would be the third, I
6 guess.
7     Q.   The -- it says, "Yes, it is --
8 is it the NFL of simply the Bucs?  I
9 already have a case pending against the
10 Bucs from last year.  Is Tampa Chiro not
11 an EBR or season ticket subscriber with
12 the Bucs."
13        Do you know what Tampa Chiro
14 is?
15     A.   I don't.  Tampa Chiro, I don't
16 recognize that name today.
17     Q.   The Mike Addison reference to
18 "I already have a case pending against
19 the Bucs from last year," makes it sound
20 like at this point in time he hadn't
21 amended the complaint to add additional
22 counsel.
23        Do you know if that's true?
24     MR. COHEN:  Objection, object
25 to the counsel's interpretation as

79

BOCK
1
2 a predicate to a question.
3        Subject to that, you can
4 answer.
5     THE WITNESS:  Can you read the
6 question back.
7        (Record read as
8 requested.)
9     THE WITNESS:  I don't, and I
10 have no idea.
11 BY MS. LOEW:
12     Q.   Did Mike Addison ever tell you
13 that he was going to file a case against
14 the Buccaneers and add the Bock Law Firm,
15 LLC or any of its attorneys as
16 co-counsel?
17     A.   I don't remember.
18        (Bock Exhibit 6
19        marked for
20        identification.)
21 BY MS. LOEW:
22     Q.   We've handed you what we've
23 marked as Exhibit 6, BLF 000057.  This
24 email is dated Wednesday, February 6,
25 2013, and the top email is from Phil Bock

80

BOCK
1
2 to Jim Smith.  And it's re Medical versus
3 Michael Wayne Clement.  It has a series
4 of emails contained within this document.
5        Who is Jim Smith?
6     MR. BLONIEN:  Lauren, if I may
7 just clarify, it appears the
8 document is BLF 57 and 58; is that
9 correct?
10     MS. LOEW:  Correct.  Yes,
11 thank you.
12     THE WITNESS:  Jim Smith is an
13 attorney at our firm.
14 BY MS. LOEW:
15     Q.   Do you recall this email
16 exchange?
17     A.   Not really.
18     Q.   The email, the bottom email
19 from James Smith to you says, "I was
20 looking to see what cases we have pending
21 in Florida Federal Court and stumbled on
22 this Wanca case filed in March 2012.  Did
23 you know about this case?"
24        Do you see that?
25     A.   I see that.

81

BOCK
1
2     Q.   And then you respond strange
3 --
4     A.   Well, he said other things.
5     Q.   Yes.
6     A.   And then I respond, okay.
7     Q.   "Strange, I remember Brian
8 saying we were going to file a case
9 against Tampa Bay.  Not sure what
10 happened to that, but this seems related
11 to it somehow."
12     A.   Yeah.
13     Q.   At that point in time did you
14 reach out to Mr. Wanca and ask him what
15 had happened?
16     A.   I don't remember.  2013.  I
17 don't remember.
18     Q.   And above that there's a
19 further email from you to Mr. Smith.  It
20 says, "Found this when I looked up our
21 Tampa local Mike Addison.  Since I wrote
22 many of the paragraphs in this complaint,
23 I recognize them."
24        What did you mean by that?
25     A.   By what?

21 (Pages 78 to 81)

82

BOCK

1  Q.   "Since I wrote many of the
2  paragraphs in this complaint, I recognize
3  them."
4  A.   I don't remember.  "Found this
5  when I looked up our Tampa local," I
6  don't know what that's -- I don't know
7  what this is.
8  MR. COHEN:  She was directing
9  you to specific words, asking you
10  about those specific words.
11  THE WITNESS:  Okay.  I don't
12  remember.
13  BY MS. LOEW:
14  Q.   Did you draft any of the
15  complaints against the Tampa Bay
16  Buccaneers?
17  A.   What does that mean?  Yes.
18  Q.   You did?
19  A.   Yeah.
20  Q.   What portions did you draft?
21  A.   Well, I know I revised and
22  filed one in 2016.
23  Q.   Other than the case you filed,
24  two cases that you filed in 2016 against

83

BOCK

1  the Tampa Bay Buccaneers, did you draft
2  any other complaints against the Tampa
3  Bay Buccaneers that were filed?
4  A.   I don't remember.
5  Q.   Did you draft --
6  A.   I would -- I would -- I'm sure
7  that I drafted paragraphs that are used
8  by Wanca's firm in the complaints they
9  file, but I don't remember drafting a
10  complaint in its entirety against the
11  Buccaneers for a case with Wanca.
12  Q.   Did you draft a complaint
13  against Michael Wayne Clement?
14  A.   I don't remember.
15  Q.   Do you know who that is?
16  A.   I only -- I think it's --
17  yeah.  I have an -- I have an
18  understanding of who it is.
19  Q.   Who is it?
20  A.   It was the guy who was
21  bamboozling the Buccaneers or something
22  with -- it was like a list provider I
23  think in Texas, using some alias, but I
24  don't know the person or anything.

84

BOCK

1  Q.   When you found this case or
2  when Mr. Smith brought this case to your
3  attention, did you do anything to try
4  to -- to get involved in the case?
5  A.   Can you break that down a
6  little bit?
7  I don't know that I found this
8  case, and I don't remember -- in 2013, I
9  don't remember doing something to get
10  involved in a Buccaneers case.
11  Q.   After you had -- had that --
12  found that -- found out that Anderson &
13  Wanca had filed a case against the
14  Buccaneers that Bock Law Firm was not
15  named on, did you take any steps to try
16  to get involved in the case?
17  A.   I don't remember.
18  Q.   At that point in time in 2013
19  was Bock Law Firm filing TCPA cases on
20  which Anderson & Wanca was not named?
21  A.   I don't remember.
22  Q.   Was Anderson & Wanca -- other
23  than the -- the case that we are talking
24  about now, was Anderson & Wanca filing

85

BOCK

1  any other TCPA cases at that time on
2  which Bock Law Firm was not named as
3  counsel?
4  A.   I don't remember the date.
5  Q.   Was there a point in time that
6  Bock Law Firm started pursuing cases
7  without Anderson & Wanca?
8  A.   We started -- started pursuing
9  cases without -- without Anderson &
10  Wanca.
11  Q.   Was there a time that Bock Law
12  Firm started pursuing TCPA cases without
13  Anderson & Wanca?
14  A.   Yes.
15  Q.   When was that?
16  A.   I don't remember.
17  Q.   The fact that the -- Anderson
18  & Wanca had filed a case without -- a
19  TCPA case without naming Bock Law Firm as
20  additional counsel, did you consider that
21  a violation of your joint venture that
22  you described earlier?
23  A.   Did I consider that?  I don't
24  remember.

22  (Pages 82 to 85)

86

BOCK

1
2      Q.   Do you think it is now?
3      A.   Yes, I guess, yeah.  At some
4  point Brian Wanca started stealing from
5  the joint venture.  I don't remember
6  when.
7           This would not have been the
8  first time that there was complaints
9  filed that my firm wasn't named on, and
10 so I don't know how -- if I -- I don't
11 know if I said something or not.
12          He did this years earlier with
13 Max Margulis, and his explanation was
14 that they were going to add us later and
15 they didn't want to have too many firms
16 named or something like that, and so we
17 had a discussion about it and we
18 got added to the complaints.
19          I don't remember if I had a
20 discussion with him in 2013 like that or
21 not.  This discussion with the Max
22 Margulis cases was years earlier.
23     Q.   When you say he was stealing
24 from the joint venture, what do you mean?
25     A.   That he was taking business

87

BOCK

1
2  opportunities and work product of mine
3  that I contributed to the joint venture
4  and using it for his own personal gain to
5  the detriment of the joint venture, for
6  example.
7      Q.   And did you raise that issue
8  with him?
9      A.   Yes, I don't know.  I don't
10 remember.
11     Q.   Did you ever --
12     A.   I think so.  I think in
13 emails.  Like I said, I don't think we've
14 ever had an argument orally.
15     Q.   Did you resolve the issue that
16 you describe as stealing from the joint
17 venture?
18     A.   No, not that I know of.
19     Q.   Did he know that you thought
20 he was stealing from the joint venture?
21     A.   I don't know what he knows.
22     Q.   Did you tell him?
23     A.   I would think he knows he was
24 stealing from the joint venture if --
25 when I found out, I guess he knew that I

88

BOCK

1
2  knew.
3      Q.   Did you talk to him about it?
4      A.   Not that I remember.  Maybe in
5  emails.  We have had emails about it.
6      Q.   When --
7      A.   About the joint venture.  He
8  sent me emails about our joint venture.
9      Q.   And when did you determine
10 that you thought he was stealing from the
11 joint venture?
12     A.   I don't remember a date.
13     Q.   Was it before 2013?
14     A.   I don't remember.
15     Q.   Would you consider the Tampa
16 Bay Buccaneers or the Cin-Q versus Tampa
17 Bay case to be a case which you described
18 as stealing from joint venture was a
19 product of that?
20     A.   Well, Cin-Q versus Buccaneers
21 case was filed by Mike Addison without
22 either Anderson & Wanca or Bock & Hatch,
23 I think, so I never thought Mike Addison
24 was stealing from me, but I'm not sure.
25          Mike Addison -- I have

89

BOCK

1
2  reimbursed 50 percent of lots of -- of
3  thousands of dollars of retainers that
4  were paid to Mike Addison because he was
5  local counsel, and I haven't received an
6  accounting on those yet.
7      Q.   Do you know if Bock Law
8  Firm paid -- when you say we paid, do you
9  mean you personally?
10     A.   I mean my law firm, yeah.
11     Q.   Do you know if Bock Law Firm
12 paid expenses for the Cin-Q action
13 against the Buccaneers?
14     A.   I don't know.  That's hard
15 to -- for?  Related to?
16     Q.   Sure, related to.
17     A.   Sure, yeah.
18     Q.   You -- Bock Law Firm was paid
19 expenses pertaining to that?
20     A.   Yeah, pretty sure, yeah.
21          I remember there was -- and I
22 saw this in my testimony, I think, before
23 Judge Honeywell that I looked at one of
24 giant -- Brian's giant expense
25 spreadsheets, and there was an entry for

23 (Pages 86 to 89)

90

BOCK

1  one of these Clement cases, so my firm
2  reimbursed 50 percent of whatever that
3  was.
4      But we've reimbursed lots of
5  other things, 50 percent of lots of
6  subpoenas and depositions and all, so
7  we'll have to get all -- through all that
8  at some point I guess, find out exactly
9  what happened.
10     Q.  Was there more than one case
11 against Michael Clement?
12     A.  I don't know.  I think there
13 was two, but I would just be guessing.
14 The guy might have been sued 100 times
15 for all I know.
16     Q.  Okay.
17         (Bock Exhibit 7
18          marked for
19          identification.)
20 BY MS. LOEW:
21     Q.  The court reporter is handing
22 you what is marked as Exhibit 7, BLF
23 000063.
24     A.  Do you want me to have these

91

BOCK

1  in front of me, the pile?
2      Q.  Sure.
3      A.  Okay.
4      Q.  Exhibit 7, do you see that
5  one?
6      A.  One second.  Yes, I see that.
7      Q.  It says, from Jim Smith to
8  Phil Bock, Todd Lewis on Thursday, March
9  13 of 2014, an email chain.  The subject
10 at the top is re Forbes Nelson is the
11 source of some hard drive Wanca has.
12     Do you see that?
13     A.  Yes.
14     Q.  And the email at the bottom is
15 from Phil Bock to Phil Bock, Todd Lewis
16 and Jim Smith, again, subject, Forbes
17 Nelson is the source of some hard drive
18 Wanca has, and the body says, "Addison
19 says he's using it for the Tampa Bay
20 Buccaneers case."
21     What are you referring to
22 here?
23     A.  I'm not sure.
24     Q.  What's Forbes Nelson?

92

BOCK

1      A.  Forbes Nelson I'm pretty
2  sure -- I would have to guess.  I can't
3  guess what Forbes Nelson is.
4      According to me, Forbes Nelson
5  is the source of some hard drive Wanca
6  has, so what that tells me, I don't know.
7      I have a memory of Mike
8  Addison -- I don't know.  I would have to
9  guess.  I would have to guess that this
10 is a time when Mike Addison was talking
11 about something in front of me, and I
12 sent a note to the people at my office
13 about it, not that Mike Addison was
14 saying, hey, Phil Bock, I'm using Forbes
15 Nelson for the Tampa Bay Buccaneers case,
16 but he was talking about it in front of
17 me.
18     Q.  Who else was there?
19     A.  I don't remember.  I guess
20 Mike Addison was there.
21     Q.  Anybody else that you
22 remember?
23     A.  Maybe Dave Oppenheim.  I'm not
24 sure.  This could have been in a

93

BOCK

1  mediation in Tampa, but I don't remember
2  the dates, so I remember -- I remember
3  sending an email, but I don't remember
4  that it was this email, and I don't
5  remember it was about Forbes Nelson,
6  but...
7      Q.  What is Forbes Nelson?  I
8  mean, do you know?
9      A.  I have no idea.
10     Q.  This name doesn't mean
11 anything to you?
12     A.  I don't remember.  If I ever
13 did, I don't know today.  I don't
14 remember what it is, Forbes Nelson.
15     Q.  Have you ever learned what
16 this source of the fax records is for the
17 Tampa Bay case that Mike Addison filed?
18     A.  What does that mean?
19     Q.  Did you ever confirm where the
20 records came from?
21     A.  What records?
22     Q.  Fax records.
23     A.  What fax records?
24     MR. COHEN:  Objection, vague

94

```
1              BOCK
2      and ambiguous.
3    BY MS. LOEW:
4        Q.   What is the source of the
5    records for the TCPA case against the
6    Tampa Bay Buccaneers?
7            MR. COHEN:  Same objection,
8        only now it's more vague by taking
9        out the word fax, overbroad, vague
10       and ambiguous.
11           You can answer if you can.
12           THE WITNESS:  I really don't
13       know what you mean.
14   BY MS. LOEW:
15       Q.   Do you have any understanding
16   of records and fax transmissions being a
17   basis of a TCPA case against the Tampa
18   Bay Buccaneers?
19       A.   I don't, no.  I don't know
20   that fax records were the basis of a TCPA
21   case.
22       Q.   So is there any proof of
23   transmission of faxes by the Tampa Bay
24   Buccaneers or an affiliate of the Tampa
25   Bay Buccaneers that are the basis of a
```

95

```
1              BOCK
2    TCPA case?
3            MR. COHEN:  Same objection.
4        You can answer.
5            THE WITNESS:  I have read
6        Robert Biggerstaff's report, and he
7        references records that underlie
8        his report about fax transmissions.
9    BY MS. LOEW:
10       Q.   And the source of the records
11   that underlie his report?
12           MR. COHEN:  Same objection.
13           THE WITNESS:  I don't know.
14       Yeah.  I don't -- I don't remember.
15       I think it was Rocket somebody or
16       another.  I don't remember today.
17   BY MS. LOEW:
18       Q.   In Dave Oppenheim's deposition
19   he talked about a hard drive and cases
20   that were filed by Anderson & Wanca and
21   Bock Law Firm based on the information on
22   a hard drive.
23           Do you know what he was
24   referring to?
25       A.   I don't remember hearing him
```

96

```
1              BOCK
2    saying that so...
3        Q.   Was there a hard drive that
4    Bock Law Firm obtained with Anderson &
5    Wanca?
6        A.   No.
7        Q.   Was there a hard drive --
8        A.   What does that mean?  I don't
9    know what that means really.  Obtained a
10   hard drive with Anderson & Wanca, like we
11   were all in a car or something, went and
12   picked it up?  What does that mean?
13       Q.   Has there ever been a hard
14   drive that Bock Law firm and Anderson &
15   Wanca used to file TCPA cases?
16           (Mr. Oppenheim exited
17           the deposition
18           proceedings.)
19       A.   My firm was listed on TCPA
20   cases filed by Anderson & Wanca.  I don't
21   remember filing any of the complaints
22   that used data from a hard drive a lawyer
23   produced in -- I don't know, I don't
24   remember, 2009.
25       Q.   And was the production part of
```

97

```
1              BOCK
2    a litigation?
3        A.   Yes.  Well, part of several
4    litigations, I think.
5        Q.   Did Bock Law Firm fund that
6    litigation?
7        A.   Indirectly.
8        Q.   What do you mean by
9    indirectly?
10       A.   By reimbursing 50 percent of
11   whatever Wanca's expenses were.
12       Q.   Is that the same as the hard
13   drive described in Exhibit 7?
14       A.   I have no idea.  I -- no, it's
15   not.  I don't know what hard drive
16   Exhibit 7 is referring to.  That's why I
17   said some hard drive.  It wasn't the hard
18   drive that I was just mentioning
19   though --
20       Q.   What was --
21       A.   -- as far as I know.
22       Q.   What was the name of the party
23   that produced that hard drive to you?
24       A.   Nobody produced the hard drive
25   to me.
```

25  (Pages 94 to 97)

98

BOCK

Q.   What was the name of the party that produced the hard drive in the litigation that you were referring to?

A.   I don't remember his name. Washington D.C. lawyer.

Q.   How do you -- how would you refer to that hard drive?  Do you have a name for it?

A.   The B to B hard drive.

Q.   B to B?

A.   Not my name.  It's what it's been called, I think, by courts.

(Mr. Oppenheim re-entered the deposition proceedings.)

(Bock Exhibit 8 marked for identification.)

BY MS. LOEW:

Q.   The court reporter is handing you what we've marked as Exhibit H -- 8, excuse me, which is BLF 000059.  And this is an email from Todd Lewis to Phil Bock,

99

BOCK

cc to Smith and Todd Lewis dated Sunday, June 23, 2013.

Do you see that?

A.   I see that.

Q.   And there's an email at the bottom here.  It says Phil Bock wrote. Do you see that?

A.   I see where it says wrote, yeah.

Q.   "I assume Wanca is in this without us.  I think they filed a case last year and then dropped -- dropped it or something."

What are you referring to there?

A.   I don't remember.  I -- well, I don't know if I was forwarding something.  I can read below that.

It says unwanted faxes could create, so that's probably the "this" in the email, but I don't remember this email.

Q.   The subject of the email is Tampa Bay Buccaneers junk fax case.  Does

100

BOCK

that refresh your recollection?

A.   No.

Q.   And then the email from Todd Lewis to Phil Bock says, "hopefully they will screw it up."

Do you know what he was referring to here?

A.   No.

Q.   Did you hope that Anderson & Wanca would screw up the Tampa Bay Buccaneers TCPA case?

A.   No.  Todd didn't either, I'm sure.

Q.   Did you talk to him about what he meant in this email?

A.   Not -- I don't remember, but I have known Todd Lewis for years.  He doesn't hope anybody screws up a class action, but I'm sure he felt some level of betrayal from not -- from our firm not being included in the case.

Q.   Why do you say that?

A.   Because I have talked to him about that.

101

BOCK

Todd Lewis is one of several, five or more lawyers at my law firm who have spent a lot of time and effort and sweat equity bailing out the Anderson & Wanca firm for screwing something up, so when he says hopefully they would screw it up, I would guess he means they'll probably screw it up and we won't be there to solve the problem, but he doesn't really hope for that.

He's not somebody that hopes bad things happen for anybody.

Q.   But nonetheless what he said here was hopefully?

A.   It's private conversation. Private conversation, people say flippant things.  That doesn't mean they mean them, you know.

Q.   But you haven't talked to him about what he meant by this?

A.   I don't -- I said I don't remember.

Q.   Is there anything that would refresh your recollection?

26 (Pages 98 to 101)

102

BOCK

1    A.    Probably.  I don't know.
2    Q.    What -- what would refresh
3  your recollection?
4    A.    I don't -- I don't know.
5    Q.    Is Todd Lewis still with the
6  Bock Law Firm?
7    A.    Yes.
8    Q.    And what is his position?
9    A.    Attorney.
10   Q.    Is he an employee?
11   A.    Yes.
12   Q.    Did Anderson & Wanca reach out
13 to the Bock Law Firm for help on the
14 Tampa Bay Buccaneers TCPA class action?
15        MR. COHEN:  Object, vague and
16 ambiguous.
17        But go ahead.
18        THE WITNESS:  I don't know.
19 BY MS. LOEW:
20   Q.    Did anyone ever reach out to
21 you for help on it?
22   A.    I don't know.
23   Q.    What don't you know?  What do
24 you mean by you don't know?  You don't

103

BOCK

1  know what the TCPA class action is that
2  I'm referring to?
3    A.    No.  I don't know whether we
4  did work for them to help them on some
5  aspect of the case, not knowing what case
6  it was for.
7        They could have issued
8  subpoenas or something in a Chicago case.
9  There has been cases where they issued,
10 you know, 20 subpoenas before dropping
11 the case.  Probably somebody from my
12 office had to go over to court or
13 something on like that.  I don't know.
14 That's what I meant.
15   Q.    Have you gone through and
16 analyzed the firm's records to determine
17 whether Bock Law Firm did perform any
18 work on the TCPA class action against the
19 Buccaneers before the Technology Training
20 action?
21        MR. COHEN:  Objection.  In
22 light of his last answer, that's a
23 meaningless question.
24        Subject to that, you can

104

BOCK

1  answer.
2        THE WITNESS:  I don't -- I
3  don't remember.
4  BY MS. LOEW:
5    Q.    You don't remember if you
6  determined whether the firm did any work
7  on the case?
8    A.    Is that -- was that your
9  question?
10   Q.    Yes.
11        MR. COHEN:  No, it wasn't.
12        MS. LOEW:  And I would object
13 to counsel's --
14        MR. COHEN:  Well, you're not
15 going to mislead the witness about
16 what your last question that he
17 just answered was and then expect
18 him to answer based on a
19 misrepresentation and a lie.
20        Your last question was did he
21 go back and do anything to
22 determine whether our firm had done
23 any work on the Wanca firm's Bucs
24 TCPA case, and then you asked him

105

BOCK

1  something else, and he said was
2  that your last question?  And you
3  said yes, and that hadn't been your
4  last question.
5        So you're going to have to
6  make certain you are honest with
7  the witness or you are going to get
8  called on it.
9        MS. LOEW:  And I will object
10 to your repeated inappropriate
11 objections and interspersing
12 comments into this witness's
13 testimony.
14        MR. COHEN:  Go for it.
15 BY MS. LOEW:
16   Q.    Did you go back to determine
17 whether your firm has performed any work
18 on the TCPA class action filed by
19 Anderson & Wanca and Mike Addison?
20        MR. COHEN:  Same objection and
21 asked and answered.
22        You can go ahead.
23        THE WITNESS:  I don't
24 remember.

27  (Pages 102 to 105)

106

BOCK

1  BY MS. LOEW:
2      Q.   So the -- closest you can
3  get now is you may have done work on it?
4      A.   I said I don't remember.
5      Q.   How would you go about
6  determining that?
7          MR. COHEN:  Objection, asked
8  and answered.
9          THE WITNESS:  I won't be.  I
10  won't be going about determining
11  that.  That sounds like a waste of
12  my time.
13  BY MS. LOEW:
14     Q.   I didn't ask if you were going
15  to.  I have asked how would you determine
16  that?
17     A.   I don't know how I would do
18  things that I am not going to do.
19     Q.   Does your firm keep records of
20  time entries?
21     A.   Some, yeah.  I don't know if
22  we keep records -- records of things that
23  we didn't do or something.  I'm not sure
24  what you're even asking me to go look

107

BOCK

1  for, but I won't be going to look for
2  anything.
3      Q.   Did -- when your firm records
4  time -- when attorneys at your firm
5  record time, do they record it to
6  specific matters?
7      A.   Yes.
8      Q.   Was there a matter at Bock Law
9  Firm before the existence of the
10  Technology Training action that was a
11  TCPA against the Buccaneers?
12     A.   No.
13          (Bock Exhibit 9
14          marked for
15          identification.)
16  BY MS. LOEW:
17     Q.   The court reporter is handing
18  you what we have marked Exhibit 9, BLF
19  000073, an email from Ryan Kelly to Phil
20  Bock, forward Cin-Q versus Buccaneers.
21          Do you see that?
22     A.   Yes.
23     Q.   The bottom email is -- the
24  body of the email says "order:

108

BOCK

1  Defendant's MOSJ is denied and
2  plaintiff's MOSJ is denied."
3          Do you see that?
4      A.   Yes.
5      Q.   Do you know what this is
6  referring to?
7      A.   No.
8      Q.   At the time of the Cin-Q
9  versus Buccaneers case, were you aware
10  that there was a summary judgment decided
11  in the Cin-Q versus Buccaneers case?
12     A.   I'm going to answer the
13  question that you asked at the end.  I am
14  aware of summary judgment opinion in the
15  Cin-Q versus Buccaneers case.
16     Q.   And when did you first learn
17  of that opinion?
18     A.   I don't remember.
19     Q.   How did you learn of it?
20     A.   I don't remember.
21     Q.   Do you know if it was from the
22  email from Ryan Kelly?
23     A.   I don't remember.
24     Q.   Did you review the opinion in

109

BOCK

1  the -- this summary judgment opinion in
2  the Cin-Q versus Buccaneers case?
3      A.   Yes.
4      Q.   And when did you review it?
5      A.   I don't remember that.
6      Q.   Why did you review it?
7      A.   I don't remember.
8      Q.   Have you used the opinion in
9  other cases?
10     A.   Used the opinion --
11          MR. COHEN:  Object to vague
12  and ambiguous.
13          But you can go ahead.
14          THE WITNESS:  I don't know
15  what that means.
16  BY MS. LOEW:
17     Q.   Have you relied on it or cited
18  to it in any other cases?
19     A.   I don't remember.  I don't
20  remember citing it.  I don't know that I
21  would.  I don't remember.
22          I think I remember other
23  people citing it, defendants citing it,
24  but I don't remember having specific

28  (Pages 106 to 109)

110

BOCK
1
2  memories of that.
3      Q.   Do you know why Ryan Kelly
4  forwarded this email to you?
5      A.   No.  I don't remember if I
6  did.
7      Q.   Do you recognize the email?
8      A.   Yes.
9      Q.   Did -- did you follow the
10 filings in the Cin-Q versus Buccaneers
11 action over time?
12     MR. COHEN:  Objection.  That
13 was asked and answered.
14     THE WITNESS:  Yeah.  I don't
15 remember doing that, no.  Yeah.
16          (Mr. Blonien exited
17          the deposition
18          proceedings.)
19 BY MS. LOEW:
20     Q.   Did you discuss the case
21 with -- the developments in the case with
22 anyone at Anderson & Wanca?
23     A.   Pardon me?
24     Q.   Did you discuss case
25 developments in the Cin-Q versus

111

BOCK
1
2  Buccaneers case with anyone at Anderson &
3  Wanca?
4      A.   I don't remember.
5      Q.   Prior to David Oppenheim
6  joining Bock Law Firm, did you discuss
7  the Cin-Q versus Buccaneers case with
8  David Oppenheim?
9      A.   No.
10     Q.   Did you know that he was
11 working on the Cin-Q versus Buccaneers
12 case?
13     A.   I don't think so, no.  Not --
14 I don't -- I don't remember, but I don't
15 think so.
16          I knew that there was such a
17 case, but I don't know that I remember --
18 I don't remember that David worked on it
19 or something like that.
20          And him and I spent a lot of
21 time in mediations on these joint cases,
22 and I specifically did not bring up cases
23 that I knew they were doing and my firm
24 wasn't on.  That would be a conversation
25 to have with Brian Wanca, not with Dave

112

BOCK
1
2  Oppenheim.
3      Q.   What -- what was your view of
4  Mr. Oppenheim's abilities at Anderson --
5  when he was at Anderson & Wanca?
6      A.   Could you -- can we ask them
7  to move because I can -- I have a hard
8  time hearing in some environments, like a
9  courtroom, unfortunately, and I can hear
10 them whispering or something outside the
11 door.
12     Q.   Sure.
13     A.   And it's a little distracting.
14     Q.   Okay.
15     A.   So I'm sorry.  Could you tell
16 me the question again?
17     MR. COHEN:  Wait, wait until
18 he takes care of it.
19     MS. LOEW:  We'll just wait.
20     THE WITNESS:  Thank you.
21 BY MS. LOEW:
22     Q.   My question was what was your
23 view of David Oppenheim's abilities and I
24 mean legal abilities while he was at
25 Anderson & Wanca?

113

BOCK
1
2      A.   High.
3      Q.   Do you think he was a good
4  lawyer?
5      A.   Yes, yeah, definitely.
6      Q.   And did you have a personal
7  relationship with him?
8      A.   Not really.
9      Q.   Were you friends?
10     A.   Work friends.  I don't think
11 we've ever gotten together outside the
12 context of work, you know, so, yes, we're
13 friends, but I've, you know, I've been in
14 a lot of firms.
15          I was friends with people.  I
16 went to lunch with them every day, and I
17 haven't talked to them, you know, since
18 1999.
19          Nobody got into an argument.
20 The friendship didn't break up or
21 anything like that.  It was just we were
22 friends in the context of working
23 together.
24     Q.   When did you first consider --
25 consider hiring Mr. Oppenheim?

29 (Pages 110 to 113)

114

BOCK

1    A.   I don't remember that.  I
2  mean, first consider?  I mean, the guy is
3  a rock star, right.  Yale undergrad,
4  Harvard law school.
5          And he can run really fast in
6  the legal work.  I mean, that guy can
7  crank out an amazing appellate brief in a
8  day, which is what I heard Judge
9  Easterbrook can do, so the first time I
10  saw the guy's work, I was like good work,
11  and then there's another one, there's
12  another one, there's another one.
13          I don't remember when that
14  was.  Long time ago.
15      Q.   Did you ever talk to him about
16  hiring him before March of 2016?
17      A.   I -- not really.  A couple
18  times I said things like -- and this
19  would have been years ago.
20          I said things like, sure could
21  use some other -- need another lawyer at
22  our office.  Do you know anybody good?
23  You know, can you recommend one of your
24  friends?
25

115

BOCK

1
2          And he would never -- he never
3  recommended anybody, but I would have
4  been happy for him to say, yeah, how
5  about me?  But he didn't.
6          And, you know, it was one of
7  those things.  We worked together on all
8  these joint cases.  And he's a smart guy,
9  but he's really fast, really sharp, and
10  so I would have loved to have hired him,
11  but we didn't talk about it.
12          He worked for -- he worked for
13  my co-counsel, my joint venturer.  I
14  didn't hire people and that sort of thing
15  from Brian Wanca's office.
16      Q.   So then what changed?
17      A.   I must have -- my view of
18  hiring David Oppenheim must have changed
19  in -- around the time I decided to hire
20  him.
21      Q.   Did you have any concern about
22  the impact it would -- it would have on
23  the relationship that Bock Law Firm and
24  Anderson & Wanca had?
25      A.   What is the "it"?

116

BOCK

1
2      Q.   Hiring David Oppenheim.
3      A.   I did.  If I offered David a
4  job and he accepted and came over, I did
5  not -- I had no concern about how it
6  would impact my firm's relationship with
7  Anderson & Wanca.
8          If I offered him a job and he
9  said no and then told Brian Wanca, I
10  would have been concerned about how that
11  would impact the relationship because at
12  the time David -- yeah, I would have been
13  concerned about it.
14      Q.   Did you think it was going to
15  have a negative impact if he left
16  Anderson & Wanca and came to Bock Law
17  Firm?
18      A.   No.
19      Q.   Did you have any concerns
20  about what Brian Wanca's reaction would
21  be?
22      A.   None.  And, in fact, his --
23  his reaction was only positive.
24      Q.   And you say his -- sorry.
25  What did you just say?  His reaction, who

117

BOCK

1
2  is his?
3      A.   I never heard a negative
4  reaction from Brian about David coming to
5  our firm.
6              (Bock Exhibit 10
7              marked for
8              identification.)
9  BY MS. LOEW:
10      Q.   I'm handing you what we marked
11  Exhibit 10, which is defendant Bock Law
12  Firm, LLC's first supplemental answers
13  and objections to plaintiff's first set
14  of interrogatories.
15          Have you reviewed this
16  document before?
17      A.   I don't remember.  Yes,
18  probably.  Let me look.
19      Q.   If you'll turn to page 4.
20      A.   Yes, I have.
21      Q.   You have reviewed it?
22      A.   Yes.
23      Q.   If you turn to page 4.
24      A.   Okay.
25      Q.   Top of the page says, "on

30 (Pages 114 to 117)

118

BOCK

1          **BOCK**
2     **multiple occasions over multiple years,**
3     **the possibility of Mr. Oppenheim coming**
4     **to work for Bock Law Firm came up in**
5     **conversations between Mr. Oppenheim and**
6     **Phillip A. Bock."**
7          **Do you see that?**
8     A.   Yes.
9     **Q.   Okay.  When did those**
10    **discussions start?**
11    A.   I don't -- I just barely
12    remember them.  I don't know.  I don't
13    remember when they started.
14         What I remember is sure would
15    be nice to work together or something
16    like that, you know.  That would be the
17    possibility of coming to work.
18    **Q.   And what was Mr. Oppenheim's**
19    **reaction?**
20    A.   I think those were his words.
21    MR. COHEN:  Okay.
22    BY MS. LOEW:
23    **Q.   Those were Mr. Oppenheim's**
24    **words to you --**
25    A.   Yeah.

119

1          **BOCK**
2     **Q.   -- is what you described?**
3     A.   Yes.
4     **Q.   And then what was your**
5     **response?**
6     A.   I don't remember.  Something
7     like, hey, you know, hey, let's go get
8     some lunch, because I wasn't looking to
9     hire somebody from Brian Wanca's firm.
10    **Q.   Prior to approaching**
11    **Mr. Oppenheim about -- pardon me?**
12    A.   Can we take a break real
13    quick?
14    **Q.   Do you want to take a lunch**
15    **break now?**
16    A.   No.  It's your deposition.
17    **Q.   It's 12:30.**
18    A.   I just would like to take a
19    quick break.
20         MR. COHEN:  Here's the thing,
21    if we are going to take a lunch,
22    this may as well be the time we do
23    it.
24         THE WITNESS:  I'll be back in
25    two minutes if you --

120

BOCK

1          **BOCK**
2     MR. COHEN:  I understand.
3     THE WITNESS:  Okay.
4     MR. COHEN:  But if we're not
5     taking a lunch and we are just
6     going straight through, then fine,
7     take a two-minute break, but --
8     MR. BLONIEN:  Counsel, is it
9     all right if we go off the record?
10    MS. LOEW:  Yes.
11    THE VIDEOGRAPHER:  Going off
12    the record at 12:30 p.m.
13         (A recess was had.)
14    THE VIDEOGRAPHER:  Going on
15    the record.  This marks the
16    beginning of media No. 3.  The time
17    is 12:39 p.m.
18    BY MS. LOEW:
19    **Q.   Before you approached**
20    **Mr. Oppenheim on March 31, did you**
21    **discuss the possibility of hiring**
22    **Mr. Oppenheim with anyone else?**
23    A.   I don't remember.
24         (Bock Exhibit 11
25    marked for

121

1          **BOCK**
2     identification.)
3     BY MS. LOEW:
4     **Q.   I'm handing you what we've**
5     **marked as Exhibit 11, which is emails --**
6     **actually let me -- can I see your exhibit**
7     **really fast?  Looks like yours is**
8     **different than mine.  Bates labeled BLF**
9     **131 through 135.  These are text messages**
10    **that have been produced in this case.**
11         **Who is this text chain with?**
12    A.   I'm not sure.
13    **Q.   Do you recognize these text**
14    **messages?**
15    A.   Let me take a look at them
16    real quick.  Probably -- probably Dan
17    Cohen.
18    **Q.   And I see the date on BLF**
19    **00132 of March 26 of 2016.  Do you see**
20    **that?**
21    A.   Yes.
22    **Q.   So do you remember exchanging**
23    **these text messages that are dated before**
24    **March 31 of 2016 with Mr. Cohen?**
25    A.   Yes.

31 (Pages 118 to 121)

122

BOCK

1  Q.   Why did you -- why were you
2  talking to Mr. Cohen about whether to
3  hire Mr. Oppenheim?
4      A.   Well, because frankly Dan
5  Cohen is one of the smartest people I've
6  ever met.  He works -- happens -- I'm
7  lucky enough to have him work for me, and
8  so I would trust his opinion with
9  something like making a job offer to
10  somebody like Dave Oppenheim.
11      Q.   Other than Mr. Cohen, did you
12  discuss hiring Mr. Oppenheim with anybody
13  else?
14      A.   Yes.  I believe I talked to --
15  I did talk to somebody else, yes.
16      Q.   Who was it?
17      A.   I think I talked to Todd
18  Lewis.  Whoever I talked to other than
19  Dan, I talked to them after I had met
20  with Dave to tell them that I had made
21  Dave a job offer and he had accepted, but
22  hold, you know, let's hold our breath and
23  see if he comes.
24      Q.   So other than Mr. Cohen, you

123

BOCK

1  don't recall talking to else anybody
2  about whether to hire Dave Oppenheim?
3      A.   Right.
4      Q.   Why did you want to hire Dave
5  Oppenheim at that point, March 31 of
6  2016?
7      A.   Because I was -- couple of
8  different reasons I'm sure.  First of
9  all, like I said, I think he's a great
10  lawyer.  He works really hard,
11  efficiently, fast, smarter than the
12  people on the other side, that sort of
13  thing.
14      At that particular time I
15  really just needed help with the work
16  that we were doing, so to -- to date I
17  don't know somebody else I would rather
18  hire than Dave Oppenheim, outside of our
19  firm of the other people I already have,
20  I can't think of somebody else I would
21  want to hire to do TCPA fax cases, for
22  example.
23      So we were just really busy,
24  and the other thing is Dave and I were

124

BOCK

1  the ones going to the mediations on the
2  joint cases.  We were -- he and I were
3  the -- the ones doing the mediations on
4  the joint cases with Wanca's office, and
5  Wanca was leveraging -- was using Dave to
6  sort of run me ragged on where the money
7  would go, because for the entire
8  relationship, the defendant, after the
9  Court entered the order approving and
10  awarding fees, the money would go to my
11  firm, and I would send Wanca his half,
12  his firm's half.
13      And then Brian started having
14  Dave change that, and I would have a
15  conflict with Dave about it.  And Dave
16  would say, talk to Brian.  Then I'd have
17  to go talk to Brian.  Brian would back
18  down.
19      It was a whole thing.  I was
20  getting older, you know.  I had a lot of
21  work to do, and I don't have time to be
22  interacting with my co-counsel that way.
23      So had the added benefit of
24  now Dave can come work on all the joint

125

BOCK

1  cases at my firm, which is what he does.
2      There is probably other
3  reasons, but those are the reasons I --
4  that stick out in my mind.
5      Q.   Can you think of any other
6  reasons right now?
7      A.   Can you give me an example?  I
8  don't know.  He's a great lawyer, very
9  experienced at TCPA and insurance
10  coverage litigation, already working with
11  him, super busy.
12      No, not right now I can't
13  think of any other.
14      Q.   Did you -- did you want to --
15  were you motivated at all by wanting
16  Brian Wanca not to have Dave Oppenheim
17  working for him?
18      A.   A little bit, probably, yeah,
19  a little bit.  I was motivated by not --
20  yeah, a little bit.
21      Q.   And why did you want Brian
22  Wanca not to have Dave Oppenheim working
23  for him?
24      A.   Because, like I just said,

32 (Pages 122 to 125)

126

BOCK

1    Brian was using Dave's work against me a
2    little bit.
3         In the past I always drafted
4    all the settlement documents, for
5    example.  All of a sudden Brian had David
6    drafting them, and David could draft the
7    documents on the way home from the
8    mediation.  And they'd plunk their name
9    in there that the money is going in
10   there.
11        Then I had to say no, no, it's
12   not going there.  You are not getting the
13   money, Mr. Wanca, because I don't trust
14   you to give me my share.
15        Q.   If you turn to BLF 00135.
16        A.   135.
17        Q.   And there's a text.  It
18   said -- that says, "I love to have him
19   and I would also love Brian not to have
20   him."
21        Do you see that?
22        A.   Yes.
23        Q.   Is that a text from you?
24        A.   Sounds like me.  These look

127

BOCK

1    like dictated texts, yes.
2        Q.   At the time -- did you know
3    that before you approached Dave Oppenheim
4    on March 31, did you know that he was
5    considering leaving Anderson & Wanca?
6        MR. COHEN:  Objection, assume
7    facts not in evidence.
8        You can answer.
9        THE WITNESS:  No, I don't
10   think I did.
11   BY MS. LOEW:
12       Q.   So how did you -- how did you
13   approach Dave Oppenheim about coming to
14   work at Bock Law Firm?
15       A.   Either a phone call or a text
16   message probably.
17       Q.   What did you say?
18       A.   I don't remember.
19       Q.   Do you remember his response?
20       A.   I remember inviting him to
21   come down to Florida.
22       Q.   Did you talk to him before you
23   invited him to come down to Florida?
24       A.   I think I talked to him on the

128

BOCK

1    phone, but I don't remember the phone
2    call and I don't -- I don't remember.
3        (Bock Exhibit 12
4         marked for
5         identification.)
6    BY MS. LOEW:
7        Q.   The court reporter is handing
8    you what's marked as Exhibit 12, which is
9    BLF 82 through 86.  Is that what you
10   have?
11       MR. COHEN:  I'm sorry.  What
12   exhibit?
13       MS. LOEW:  12.
14       MR. COHEN:  Okay.
15   BY MS. LOEW:
16       Q.   Do we have the same Bates
17   numbers?
18       A.   Yes.
19       Q.   It looks like another text
20   chain.  At the top it says David.  Is
21   that Dave Oppenheim?
22       A.   Probably.  I don't know.
23       Q.   Was this a text with you?
24       A.   Probably, yes.

129

BOCK

1        Q.   In this text, it looks like
2    you're inviting Dave Oppenheim and his
3    family to come down to Miami; is that
4    right?
5        A.   Where are you talking about?
6        Q.   On BLF 83.
7        A.   Yeah.  "Throw everybody on a
8    plane and come to Miami."
9        Q.   Have you ever done that
10   before?
11       A.   Done what?
12       MR. BLONIEN:  Objection,
13   vague.
14   BY MS. LOEW:
15       Q.   Invite Dave Oppenheim's family
16   to come down to Florida.
17       A.   I don't think so.
18       Q.   Have you met his family
19   before?
20       A.   Yes.
21       Q.   At the point that you're
22   exchanging these test messages with Dave
23   Oppenheim, had you already asked him
24   about coming to work at Bock Law Firm?

33 (Pages 126 to 129)

130

BOCK

1    A.   I don't remember, but yes,
2 probably.  Otherwise it's kind of creepy.
3    Q.   It would have been out of the
4 blue if you were asking him before you
5 had given him the offer?
6    A.   No.  I didn't give him an
7 offer, but we must have talked on the
8 phone about me wanting to make him an
9 offer or something like that.  I don't --
10 I don't remember.  Must have, yeah.
11    Q.   And when did you actually
12 discuss terms of employment with Dave
13 Oppenheim?
14    A.   The dollar amount, it -- it
15 was a Sunday night at some restaurant
16 that he recommended.  I don't remember
17 the name of the restaurant.
18    Q.   Was it in Chicago?
19    A.   Yes, or some really close
20 northern suburb.  I think it was Chicago,
21 yeah.  Rogers Park or something like
22 that.
23    Q.   Between -- okay.  Actually if
24 you can turn back to Exhibit 10.

131

BOCK

1    A.   Okay.
2    Q.   Turn to page 4, at the top of
3 this page it says, "on or about March 31,
4 2016, Mr. Bock contacted Mr. Oppenheim
5 and offered him a position of employment
6 and then subsequently on April 3 of 2016,
7 Mr. Oppenheim met with Mr. Bock and
8 agreed to the terms of Mr. Oppenheim's at
9 will employment at Bock Law Firm."
10    Do you see that?
11    A.   Yes.
12    Q.   Is that correct?
13    A.   Yes.
14    Q.   Did you have any discussions
15 with Mr. Oppenheim between March 31 and
16 April 3?
17    MR. COHEN:  Related to this or
18 about anything?
19 BY MS. LOEW:
20    Q.   About anything.
21    A.   I don't remember.
22       (Bock Exhibit 13
23        marked for
24        identification.)

132

BOCK

1 BY MS. LOEW:
2    Q.   Handing you what we have
3 marked as Exhibit 13, which is BLF 133
4 through 137.
5    Do you see that?
6    A.   They're two sided, I guess.
7    Q.   Yeah.  Do you see that?
8    A.   Yeah.
9    MR. OPPENHEIM:  This overlaps.
10    MS. LOEW:  There's a couple
11 pages that overlap, but I'm leaving
12 them because they're double sided.
13 BY MS. LOEW:
14    Q.   Okay.
15    A.   Yes.
16    Q.   If you turn to BLF 136.
17    A.   136, okay.
18    Q.   This email at the top -- or
19 I'm sorry, text message at the top, it
20 says, "you know the back story obviously.
21 I'm willing to pay him more than Brian
22 probably."
23    Do you see that?
24    A.   Yes.

133

BOCK

1    Q.   Is that a text from you?
2    A.   Yes.
3    Q.   And is this to Dan Cohen?
4    A.   Probably, yeah, it must be.
5    Q.   What -- what's the back story
6 that you are referring to?
7    A.   I don't remember.  Take a
8 look.
9    Q.   Is there a back story?
10    A.   Is there a back story?
11    Q.   Yes.
12    A.   It sounds like it, but I don't
13 remember what the back story -- I don't
14 know what I meant by the word back story
15 in that text message.
16    I don't know if I'm -- I don't
17 know what I meant at that time.  Nothing
18 about the Tampa Bay Buccaneers.
19    The back story is probably the
20 back story of my -- I don't know.  I
21 don't know.  I'd have to guess.  I don't
22 even know if I could guess.
23    Q.   At the time that you hired
24 Dave Oppenheim, did you know what the

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123 1.800.642.1099

134

BOCK

1  status of the Cin-Q versus Buccaneers
2  **status of the Cin-Q versus Buccaneers**
3  **case was?**
4      A.   I don't remember.
5      **Q.   Did you check the docket of**
6  **the Cin-Q Buccaneers case before you**
7  **hired Dave Oppenheim?**
8          MR. BLONIEN:  Objection, vague
9  as to time frame.
10         MR. COHEN:  Join.
11         THE WITNESS:  I don't
12  remember.
13         MS. LOEW:  I don't know if
14  this is something that you -- this
15  is an email chain.
16         I don't know if this is
17  something you want Dave Oppenheim
18  in here for or not.
19         MR. COHEN:  Give me a moment
20  to read it.
21         MS. LOEW:  The question is
22  whether it's attorney's eyes only
23  excluding Mr. Oppenheim.
24         MR. COHEN:  Okay.  I guess let
25  me -- let me read it perhaps.

*(Note: line 1 shows "BOCK" heading, line 2 begins bold text)*

136

BOCK

1          MR. COHEN:  But the fact we
2  let David see it won't be --
3          MR. OPPENHEIM:  Won't mean
4  that --
5          MR. COHEN:  Right.
6          MR. OPPENHEIM:  And if it's
7  easier, I can just leave too.
8          MR. COHEN:  Okay.  I don't
9  think it's a problem with him
10  seeing it, do you?
11         THE WITNESS:  I can't -- I
12  can't anticipate the problem, so I
13  would say no.
14         MR. COHEN:  No, he can't stay?
15         THE WITNESS:  No, I would say,
16  no, I -- I don't -- I don't know
17  what a problem -- what the problem
18  would be, so I would say there's no
19  problem.
20         MR. COHEN:  Okay.  So that's
21  my copy.  She is going to hand you
22  yours.
23         MS. LOEW:  I would ask counsel
24  if the entire is email marked as

135

BOCK

1          MS. LOEW:  No, I'm not saying
2  his feelings.  I'm not talking
3  about his feelings.  I'm talking
4  about logistically.
5          MR. COHEN:  Sure.
6          MR. BLONIEN:  Should I be
7  looking at this?
8          MR. COHEN:  No, it's
9  attorney's eyes only so you can see
10  it.
11         (Off the record.)
12         MR. COHEN:  The question is
13  whether for any reason attorney's
14  eyes only should keep David from
15  seeing that.
16         I don't see why it should as
17  long as nobody is going to take the
18  position that letting Oppenheim see
19  it waives the attorney's eyes only
20  as to the rest of the world.
21         MS. LOEW:  No.  And we, of
22  course, don't waive our -- make an
23  objection to attorney's eyes only.
24  That's just --

137

BOCK

1  attorney's eyes only or only
2  portions of it.
3          MR. COHEN:  The entire email.
4  If you wanted to take off the many
5  redundant signature blocks of me
6  that comprise --
7          THE WITNESS:  I mean --
8          MR. COHEN:  -- the last three
9  pages, we can say those aren't
10  attorney's eyes only.
11         MS. LOEW:  But the emails at
12  the --
13         THE WITNESS:  I would -- would
14  have objected that this is
15  attorney-client privilege, but I
16  guess we produced it.
17         MR. COHEN:  We did.
18         THE WITNESS:  Okay.
19         MS. LOEW:  The emails on the
20  first page, BLF 00210, you are also
21  marking attorney's eyes only?
22         MR. COHEN:  210, 211 and 212.
23         (Off the record.)
24         (Bock Exhibit 14

35 (Pages 134 to 137)

138

BOCK

1    marked for
2    identification.)
3  BY MS. LOEW:
4      Q.   Exhibit -- so Exhibit 14, BLF
5  00210 through 215.
6          This is an email chain between
7  Dan Cohen and yourself; is that correct?
8      A.   Yes.
9      Q.   At the bottom email, Dan Cohen
10  is laying out it looks like a potential
11  compensation structure for David
12  Oppenheim; is that right?
13      A.   What -- what page are you
14  talking about?
15      Q.   BLF 211 to 212.
16      A.   You are saying on 212 now?
17      Q.   The bottom of 211.
18      A.   Oh, okay.
19      Q.   And 212.
20      A.   Okay.  So what's the question?
21  Dan Cohen is --
22      Q.   Is this a potential
23  compensation structure for Dave
24  Oppenheim?
25

139

BOCK

1      A.   Yes.
2      Q.   What are non-firm cases?
3      A.   Where are you talking about?
4      Q.   On page 212, firm cases and
5  non-firm cases.
6      A.   Non-firm cases, I'm not sure.
7  It sounds like maybe -- I'm not sure.
8  Non-firm cases.  I don't know.
9      Q.   Do you know what firm cases
10  means?
11      A.   Well, firm cases would be
12  cases that our law firm has, has filed or
13  on.  I can -- I would only be guessing
14  what non-firm cases would be.
15      Q.   Is that not a term that you
16  use?
17      A.   This is Dan's term, I think.
18      Q.   Do you use the term non-firm
19  cases yourself?
20      A.   Non-firm, not really, but I
21  understand that if there's firm cases,
22  there's something that's non-firm cases.
23      Q.   When it says here, "Wanca
24  transfers, if any, and Oppenheim

140

BOCK

1  originals," do you know what that means?
2      A.   I would guess that Wanca -- I
3  would -- I would -- I was assuming that
4  when Dave came to our firm, referring
5  lawyers would come -- would send cases to
6  us.
7      Q.   Did you think that he was
8  going to bring any cases with him?
9      A.   No.  Well, I don't know.  I
10  hoped.
11      Q.   Were there specific cases you
12  thought he would bring with him?
13      A.   Not specific cases, but I had
14  hoped that Max Margulis would start
15  including us in some of his cases because
16  he had excluded us from them.
17          After a long time of having
18  three firms together, our firm was no
19  longer included, and I know Max -- well,
20  I believe Max shares my opinion about
21  David's abilities, so I assumed hiring
22  David would have some residual benefit of
23  other co-counsel would say, well,
24  wherever Dave Oppenheim is going, we
25

141

BOCK

1  want -- we want to work with him.
2      Q.   Did you think he was going to
3  take the Cin-Q versus Buccaneers case
4  with him?
5      A.   No, absolutely not.  I didn't
6  think he was going to take any cases.  I
7  thought the cases would follow him.
8          I thought -- there's a guy
9  named John Lawry who has some plaintiff
10  called Physician's Health Source, and I
11  know Brian was making a lot of money on
12  cases with that plaintiff, which was a
13  joint plaintiff at the beginning, and I
14  figured that guy knew who was making the
15  money for him and that follow -- he would
16  start sending us cases.
17      Q.   Since Mr. Oppenheim has joined
18  Bock Law Firm, has he brought in work of
19  his own?
20      A.   Not that I know of, no.
21      Q.   Have the -- so your hope about
22  Max Margulis, I think you said was his
23  name, sending -- referring cases over,
24  has that happened?

36 (Pages 138 to 141)



142

BOCK

1 A. No. We are still on cases
2 with Max Margulis. We've joined cases
3 with -- it's three firms, but we haven't
4 gotten any new ones.
5 I thought Max would have
6 included us in new ones because he wanted
7 to work with David instead of whoever was
8 at Brian's offices.
9 Q. Have any other attorneys
10 referred work directly to Dave at Bock
11 Law Firm?
12 A. No.
13 Q. If you turn to BLF 210.
14 A. Okay.
15 Q. Do you recall this series of
16 emails, this exchange with Mr. Cohen?
17 A. Vaguely, I remember having
18 emails.
19 Q. And these emails were between
20 the time that you originally had talked
21 to Dave about coming to work at Bock Law
22 Firm and when you actually finalized the
23 terms of him coming over; is that right?
24 A. Can you say that again?
25

143

BOCK

1 Q. These emails, were these in
2 between, I guess, the discussion with
3 Dave on March 31 about potentially coming
4 to work at Bock Law Firm and then before
5 you actually gave him an offer on what
6 his compensation would be?
7 A. Yes.
8 Q. The email that is April 2,
9 2016, at 5:28 p.m. from Dan Cohen, it's
10 at the bottom of BLF 210, do you see
11 that?
12 A. Yes.
13 Q. The second paragraph of that
14 email says a -- at the bottom of it, it
15 says, "you and/or David may want to check
16 on Illinois law in that regard before he
17 gives notice, and assuming he is either
18 permitted or required to make such
19 communications to the client, make sure
20 David gets what he needs from the firm to
21 do that before he gives notice, along
22 with whatever else you and David think he
23 should bring."
24 Do you see that?
25

144

BOCK

1 A. I see that.
2 Q. Did you check on Illinois law
3 with respect to giving notice?
4 A. No. This is -- this is Dan's
5 recommendation, I think. I don't
6 remember even reading this, but this
7 isn't what we did.
8 Q. Did you consult the ethical
9 rules at all before Dave came over about
10 a departing employee or someone switching
11 firms?
12 A. After this email I did not
13 consult any ethical rules about David
14 joining our firm.
15 Q. Did you before this email?
16 A. Not in regards to David
17 Oppenheim.
18 Q. And was there anything that
19 you thought David should bring with him?
20 A. No. David -- David is a --
21 David is a confrontational litigator
22 attorney. He's not a confrontational
23 person.
24 He was happy to escape and
25

145

BOCK

1 come work with me because we got along.
2 We have a good time working together. I
3 think we have a mutual respect and that
4 sort of thing.
5 There was no bring some cases,
6 grab some cases, do any of that stuff. I
7 was hoping some of these referring
8 lawyers would follow David.
9 Q. Did you discuss with David
10 whether he should bring any materials
11 from his employment at Anderson & Wanca
12 with him?
13 A. No, and he shouldn't. I don't
14 need any materials.
15 Q. Did you know that David was
16 going to copy materials, including the
17 Medical & Chiropractic related materials
18 before he joined the firm?
19 A. No.
20 Q. Did he tell you that he had
21 copied the materials?
22 A. I don't think he told me that.
23 I think Dan Cohen told me that during
24 this litigation.
25

37 (Pages 142 to 145)

146

BOCK

1
2     Q.   So the first time you learned
3  that he had copied materials and brought
4  them over to the firm was during the
5  course of this litigation?
6          MR. COHEN:  Object to the
7      assuming facts not in evidence that
8      he brought them, quote, unquote, to
9      the firm.
10         Subject to that, you can
11     answer.
12         THE WITNESS:  I was going to
13     say the same thing.
14         I didn't ask him to bring,
15     take, bring anything.  As far as I
16     know, he didn't bring anything.
17 BY MS. LOEW:
18     Q.   Did you provide Mr. Oppenheim
19  with a laptop for Bock Law Firm?
20     A.   Yes, not the one he lost, the
21  more expensive fancy one that's in his
22  office.
23     Q.   So --
24     A.   Or it's here.
25     Q.   So the -- the laptop --

147

BOCK

1
2         (Bock Exhibit 15
3          marked for
4          identification.)
5  BY MS. LOEW:
6      Q.   I am handing you what we've
7  marked as BLF 91 through 94.
8      A.   Okay.
9      Q.   This is Exhibit 15.  This is a
10  series of text messages.  Are these test
11  messages between you and Dave Oppenheim?
12     A.   Yes.
13     Q.   If you turn to BLF 93 to 94 --
14  94, it starts on 93, "did I give you a
15  few hundred bucks or did I give it to the
16  Uber driver?"
17     A.   Yes.
18     Q.   Is that a text from you to
19  David?
20     A.   Yes.
21     Q.   And the next page, it's, "you
22  gave it to me to buy a computer."
23         Do you see that?
24     A.   Uh-huh.
25     Q.   Did you give David Oppenheim

148

BOCK

1
2  money to buy a computer?
3      A.   I guess.
4      Q.   And do you know if he did buy
5  a computer?
6      A.   I -- yes, apparently.
7      Q.   Was that computer used in his
8  work at Bock Law Firm?
9      A.   I don't know.  I would
10  be -- not on personal knowledge, but he
11  did have two laptops at some point, so
12  I had forgotten -- you know, I have a
13  money clip, and I have several hundred
14  dollars on it.  He must have said he
15  needs a laptop to get started.
16         Like I said, the guy is a fast
17  runner.  If you hire him for a big pile
18  of money, you want him to start running
19  as soon as he gets there.
20         And so I gave him a few
21  hundred dollars off my money clip, and I
22  was wondering.  I took a Uber from
23  Chicago out to my parents house where I
24  was sleeping, and I was like, did I give
25  the guy the tip or what did I do?

149

BOCK

1
2         And -- but then after this, I
3  think, then I had our computer guy buy
4  him that laptop.  I had forgotten again.
5      Q.   And when did you have your
6  computer guy buy the laptop that he's
7  using now?
8      A.   Some time between when he said
9  he was going to come and when he came.
10         I think I was still expecting
11  Brian to match our offer or something and
12  David wouldn't come.  That's -- okay --
13  that's --
14     Q.   Sorry.  What did you say?
15     A.   That brings back memories, you
16  know.  That's when I told Todd Lewis, oh,
17  by the way, offered Dave a job and he
18  accepted.  He's like, is he coming?  I
19  says, I don't know.
20         That's when you make that
21  face, that emoji with your teeth,
22  hopefully.
23         (Bock Exhibit 16
24          marked for
25          identification.)

150

BOCK
BY MS. LOEW:
Q.   I have handed you what's
marked Exhibit 15, which is BLF 00224, an
email, April 3 of 2016.  It's an email
exchange between Todd Lewis, Phil Bock
and Dan Cohen.
        Do you see that?
A.   Yes.
Q.   Do you recognize this email
exchange?
A.   I don't.
Q.   The bottom email, it says,
Phil Bock wrote, this is April 3, 2016,
at 2:22 p.m.  "Is there a conflict if
Dave comes over and we have a case on
file that competes with a case that Brian
has on file?"
        Do you see that?
A.   I see that.
Q.   "Dave already worked on that
case.  It's just a punitive class action
with no class cert order and we have got
one going too.  Is Dave conflicted out of
working for the new client?"

151

BOCK
        Did you have concerns at that
time about potential conflicts of
interest with Dave Oppenheim switching
firms?
A.   I'm not sure.  We did -- at
the time he came, we had some, couple,
three cases where we filed and Brian
filed or Brian filed and we filed, and so
I think just to be over, you know,
abundance of caution thing, not looking
to give our competitor some argument.
Q.   Other than this email exchange
with Todd Lewis, did you consult with
anybody else before hiring Dave Oppenheim
about whether there would be a conflict?
A.   Before hiring?  I talked --
no.  I mean, this is -- is this before
hiring?  This is -- this is April 3.  I
don't think so.  I don't know.  I don't
remember.
Q.   The Cin-Q versus Buccaneers
case at that point in time was just a
punitive class action with no class cert
order.  Is that right?

152

BOCK
A.   Are you saying that in
reference to this email because we didn't
have one going to?
Q.   I'm asking --
A.   So I don't know.
Q.   -- about the status.
A.   Cin-Q, Bucs, did I know
that at the time?  I don't know that I
was thinking about the Buccaneers case.
Q.   So at the time you sent this
email, were you referring to any cases in
particular?
A.   The ones that I just told you,
the three or so cases that we already
filed, and Brian -- I think Brian sent me
an email, like, you filed over me and you
agreed not to do that or something like
that.
        And I said, no, we didn't,
that kind of thing.  This was not in
reference to the Buccaneers case.
Q.   Was Dave ethically screened
off of the cases that were already on
file that you are referring to?

153

BOCK
A.   I don't know.  Ethically
screened off?  I think we set up a
Chinese wall where David doesn't have
anything to do with those two or three or
four cases.
        I don't know if it was -- it
was an abundance of caution.  Why bother?
Q.   Were there any other cases
other than the ones that you already
referred to for which you set up a
Chinese wall for David Oppenheim?
        MR. COHEN:  I just want to be
clear, you mean up through the
present time?
        MS. LOEW:  Yes.
        THE WITNESS:  Can you say that
again?  Ask that again.
BY MS. LOEW:
Q.   Other than the cases that you
referred to that were already on file
that compete with a case Brian has on
file, did you set up a Chinese wall on
any other cases for David Oppenheim?
A.   Well, we did set up one on the

39 (Pages 150 to 153)

154

BOCK

1 Buccaneers litigation, but I don't
2 remember. I think we have actually done
3 it on a couple new cases, but I don't
4 remember.
5 I think we went with any case
6 that was on file at their office before
7 David left, David shouldn't work on it or
8 David is not going to work on it.
9 **Q. So cases that fall into that**
10 **category, there's a Chinese wall up for**
11 **David?**
12 A. Right.
13 MS. LOEW: I think this is a
14 good time to take a lunch break.
15 THE VIDEOGRAPHER: Going off
16 the record at 1:23 p.m.
17 (Whereupon, the
18 deposition in
19 the above-entitled
20 cause was recessed
21 to 2:12 p.m. this
22 date.)

155

BOCK

1 AFTERNOON SESSION
2 EXAMINATION (Resumed)
3 THE VIDEOGRAPHER: Going on
4 the record. This marks the
5 beginning of media No. 4. The time
6 is now 2:12 p.m.
7 BY MS. LOEW:
8 **Q. Mr. Bock, we're back from**
9 **lunch now. Did you have a chance to eat?**
10 A. Yes.
11 **Q. Okay. What -- do you have an**
12 **actual title at Bock Law Firm?**
13 A. President.
14 **Q. President?**
15 A. Manager. I'm sorry.
16 **Q. And what is -- what is David**
17 **Oppenheim's title?**
18 A. Attorney.
19 **Q. What responsibilities does**
20 **Dave Oppenheim have at the firm?**
21 A. To work hard and ethically on
22 our cases and to be courteous and polite
23 to judges and opposing counsel.
24 **Q. Does he have any supervisory**

156

BOCK

1 **responsibilities?**
2 A. Well, younger attorneys work
3 with him. I don't know if he supervises
4 them or I would say no. He works on a
5 team.
6 **Q. Are you involved with every**
7 **case that Mr. Oppenheim handles at the**
8 **firm?**
9 A. Yes.
10 **Q. Are you involved with every**
11 **case that the firm handles?**
12 A. Yes.
13 **Q. And as manager, what are your**
14 **responsibilities?**
15 A. Everything.
16 **Q. Do you oversee HR functions,**
17 **human resources?**
18 A. Yes, uh-huh, yes.
19 **Q. Do you oversee payroll?**
20 A. Yes.
21 **Q. Does your firm perform**
22 **performance reviews?**
23 A. No.
24 **Q. Have you done any reviews of**

157

BOCK

1 Mr. Oppenheim since he's joined the firm?
2 A. Reviews? What do you mean?
3 **Q. Any, I guess, feedback on his**
4 **performance.**
5 A. Have I given him any feedback?
6 **Q. Yes.**
7 A. Yeah, I'm sure I have. I red
8 line things. I -- yeah, I have.
9 **Q. And do you think he's doing a**
10 **good job so far?**
11 A. What does that mean? He's not
12 doing a bad job.
13 **Q. Is he performing to your**
14 **expectations?**
15 A. Yes.
16 **Q. Earlier this year,**
17 **Mr. Oppenheim's compensation was reduced;**
18 **is that right?**
19 A. It was changed.
20 **Q. It was changed. The exhibit**
21 **that is the interrogatory answers, I**
22 **believe it's Exhibit 10. Can you grab**
23 **that?**
24 A. Okay.

40 (Pages 154 to 157)

158

BOCK

1    Q.   If you turn to page 5.
2    A.   Okay.
3    Q.   The -- at the bottom of the
4  page, it says, "Mr. Oppenheim responded
5  proposing increases to the following
6  details."  And it details, "$100,000
7  starting bonus, plus $400,000 annualized
8  salary, plus 10 percent in excess of 2.5
9  million to 6 million and 20 percent in
10  excess of 6 million of the fees the firm
11  collects and keeps for itself during his
12  at will W2 employment in 2016."
13    Do you see that?
14    A.   I see that.
15    Q.   Is that an accurate
16  description of Mr. Oppenheim's
17  compensation in 2016?
18    A.   The -- that -- those words are
19  accurate, yes.
20    Q.   And then on the next page,
21  page 6, it says, "on February 26, 2017,
22  Mr. Bock reduced Mr. Oppenheim's
23  compensation package as follows:
24  Remaining an at will W2 employee,

159

BOCK

1  $300,000 annual salary going forward
2  basis, plus 7.5 percent in excess of $3
3  million to $6 million and 10 percent in
4  excess of $6 million of the fees the
5  firms collects and keeps for itself
6  during his employment in 2017."
7    Is that accurate?
8    A.   Yes.
9    Q.   That's an accurate description
10  of his current compensation,
11  Mr. Oppenheim's?
12    A.   Well, I should back up.  I
13  know in 2016 I actually paid for some
14  other things.  I don't remember what they
15  were, so that was -- that was the --
16  yeah.
17    You know, I know I paid for --
18  I think I paid Mary Robinson's fees for
19  defending his or dealing with his ARDC
20  thing that Wanca filed, but this is --
21  this is accurate.
22    Q.   Why was Mr. Oppenheim's
23  compensation package reduced on February
24  26 of 2017?

160

BOCK

1    A.   Because I decided that it
2  needed to be reduced.
3    Q.   What were the reasons that you
4  decided it needed to be reduced?
5    A.   It was -- I don't remember all
6  the reasons, but one of them was it was
7  just too much money to pay because I have
8  got -- you know, it's a contingency
9  practice, and I have, I think, 17
10  employees right now and all their
11  families and everything and I said, look,
12  I can't afford to pay you this much
13  because it doesn't leave enough for
14  everybody else.
15    Q.   Were the fees that the firm
16  brought in last year less than you
17  expected?
18    A.   No.  I don't know if I
19  expected.  I don't really expect fees
20  until -- until they clear in the bank
21  account frankly.
22    (Bock Exhibit 17
23    marked for
24    identification.)

161

BOCK

1  BY MS. LOEW:
2    Q.   We've handed you what we've
3  marked as Exhibit 17.
4    A.   Okay.
5    Q.   Which is labeled OPP 009551
6  through 9555.  Do you see that?
7    A.   Yeah.  Let's see.
8    Q.   Have you seen this document
9  before?
10    A.   Yes, I have.
11    Q.   The second paragraph on the
12  first page of this talks about what
13  Mr. Oppenheim was paid in 2016.  It says
14  he was paid $940,093.19; is that correct?
15    A.   Say that again.
16    Q.   He was paid 940,000.93 --
17  excuse me, 940,093.19 in 2016; is that
18  correct?
19    A.   I see that.
20    Q.   And then it lists, "in 2016
21  the firm also paid your individual share
22  of your health insurance premiums, paid
23  Mary Robinson for legal services rendered
24  in your ARDC matter regarding the

41 (Pages 158 to 161)

162

BOCK

1
2    Buccaneers litigation and paid Barry
3    Blonien's final statement for legal
4    services rendered in the Medical v.
5    Oppenheim, et al, litigation."
6            Do you see that?
7        A.   Yes.
8        Q.   Is that correct?  Is that
9    accurate?
10       A.   Yes.
11           MR. BLONIEN:  Ms. Loew.
12           MS. LOEW:  Yes.
13           MR. BLONIEN:  Excuse me.  If I
14   could just indicate for the record
15   that it appears these are
16   attorney's eyes documents and the
17   deposition testimony should be so
18   designated as well.
19           MS. LOEW:  Okay.
20           MR. BLONIEN:  So we have that
21   on the record.  Thanks.
22           MS. LOEW:  Yeah.  Thank you.
23   BY MS. LOEW:
24       Q.   If you turn to 9555, is the
25   amount that Bock Law Firm paid to Mary

163

BOCK

1
2    Robinson or Mr. Blonien reflected on the
3    W2?
4        A.   No.
5        Q.   Was it reported to the IRS by
6    Bock Law Firm?
7        A.   Yes.
8        Q.   And how was it reported to the
9    IRS?
10       A.   What does that mean?
11       Q.   How was it communicated to the
12   IRS?
13           MR. COHEN:  Still don't know
14   what that means.
15           But go ahead.
16           THE WITNESS:  Electronically
17   probably.
18   BY MS. LOEW:
19       Q.   What was the form that was
20   used?
21       A.   I don't know.
22       Q.   Did the firm withhold taxes on
23   the amounts that it paid Mary Robinson or
24   Barry Blonien?
25       A.   Withhold taxes?  No.

164

BOCK

1
2        Q.   Was it reported to the IRS as
3    income to Mr. Oppenheim?
4        A.   Not by the law firm.
5        Q.   Do you know if it was reported
6    by Mr. Oppenheim?
7        A.   No.
8            MR. BLONIEN:  Objection, calls
9    for speculation.
10           THE WITNESS:  No, I don't.
11   BY MS. LOEW:
12       Q.   Do you have a view as to
13   whether it should be reported as income
14   to the IRS?
15           MR. COHEN:  Objection,
16   foundation, speculation.
17           You can answer.
18           THE WITNESS:  No, I don't.
19           (Bock Exhibit 18
20           marked for
21           identification.)
22   BY MS. LOEW:
23       Q.   We have handed you what we've
24   marked as Exhibit 18.
25       A.   Okay.

165

BOCK

1
2        Q.   Which is BLF 00345 through
3    347.  Have you seen this document before?
4        A.   Yes.
5        Q.   What is this?
6        A.   I would characterize this as
7    my negotiation notes to go meet with
8    David.
9        Q.   Did you take this with you
10   when you met with him?
11       A.   Yes, I think so.
12       Q.   On the second page there are
13   notes on the page.  Is that your
14   handwriting?
15       A.   The handwriting is mine.
16       Q.   And did you -- did you write
17   that down when you were actually talking
18   to Mr. Oppenheim about his compensation?
19       A.   I don't remember.  Some of it
20   is -- I don't remember.
21       Q.   The -- on the very first page
22   it says what he's looking for.  Where did
23   this information come from?
24       A.   Me brainstorming what I
25   thought he would like, probably by my,

42 (Pages 162 to 165)

166

BOCK

1  you know, me coming up with what I think
2  he wants or what he would want in life
3  probably.
4      Q.  Under what I am not looking
5  for, it says, "I'm not looking to start a
6  fight with Brian."
7          Were you concerned that hiring
8  Dave Oppenheim was going to lead to a
9  fight with Brian Wanca?
10     A.  No.  I said earlier I wasn't.
11     Q.  The last page, BLF 00347, says
12 "other details that could come up, at
13 will employment other than," and then the
14 last two are scratched out.
15          Why are those scratched out?
16     A.  I don't -- those were probably
17 things that I would have -- if we had had
18 a written employment contract, things
19 that I would have wanted in them.
20          This is just my brainstorming,
21 you know, or some of it was in
22 conjunction with Mr. Cohen.
23     Q.  At some point in time did you
24 decide whether Mr. Oppenheim's

167

BOCK

1  compensation would be impacted by fees
2  brought in by the Technology Training
3  versus Buccaneers action?
4      A.  Can you ask that again?
5      Q.  It's a long way to ask a
6  simple question.
7          Is Mr. Oppenheim's
8  compensation tied to the Technology
9  Training versus Buccaneers action?
10     A.  No.
11     Q.  Would he receive any fees from
12 that case if Bock Law Firm is awarded
13 fees?
14     A.  No.
15     Q.  And how will you ensure that
16 he doesn't receive those fees?
17     A.  Ensure that he won't?  I won't
18 -- I won't pay them.
19     Q.  So will you -- is your
20 bonus -- is the bonus structure tied to
21 specific cases?
22     A.  No.  It's tied to -- I don't
23 have it in front of me, but it's -- he's
24 not going to be compensated if we recover

168

BOCK

1  money on cases from which he's been
2  excluded.  He won't be compensated.
3      Q.  So the -- although the
4  interrogatory says that there are
5  percentages of fees the firm collects and
6  keeps for itself, that doesn't include
7  certain categories of cases?
8      A.  What does that mean?
9      Q.  So if you turn back to Exhibit
10 10, page 5.
11     A.  Okay.
12     Q.  At the bottom of page 5 where
13 it gives the terms that Mr. Oppenheim
14 proposed.
15     A.  Okay.
16     Q.  The -- the percentages are
17 listed as of the fees the firms collects
18 and keeps for itself.  Do you see that?
19     A.  Yeah.
20     Q.  So does that -- are there
21 exceptions to this structure?
22     A.  Yes.
23     Q.  And what are those exceptions?
24     A.  Well, he's not going to

169

BOCK

1  receive any fees from cases from which
2  he's been excluded.
3      Q.  Are there cases other than the
4  Buccaneers litigation that he's been
5  excluded from?
6      A.  Yeah.  Earlier I said he was.
7  I don't -- yeah.  It was his 2016.  There
8  wasn't any, so there's no exclusions in
9  2016, but --
10     Q.  And -- and does this same rule
11 apply to 2017 compensation?
12     A.  Yes.
13     Q.  When did you pay Mr. Oppenheim
14 his starting bonus?
15     A.  What are you talking about?
16     Q.  The $100,000 starting bonus.
17     A.  I gave him two $50,000 checks
18 that Sunday night when we met about
19 whether he wanted to come work for the
20 firm.  I don't remember the date.
21     Q.  And how quickly did that money
22 come out of your account?
23     A.  No idea.  Well, some idea.  It
24 was on hold or something, but other than

43 (Pages 166 to 169)

170

BOCK

1  that, I don't know.
2  THE WITNESS:  Can we take a
3  two-second break.
4  THE VIDEOGRAPHER:  Off the
5  record at 2:34 p.m.
6  (A recess was had.)
7  THE VIDEOGRAPHER:  Going on
8  the record.  The time is 2:37 p.m.
9  (Bock Exhibit 19
10  marked for
11  identification.)
12  BY MS. LOEW:
13  Q.   We have handed what we've
14  marked as Exhibit 19.
15  A.   Okay.
16  Q.   Which is BLF 98 through 102.
17  A.   Okay.
18  Q.   Do you recognize these text
19  messages?
20  A.   Let me take a look.  Yeah.
21  Okay.  I don't remember these, but --
22  Q.   Okay.  So this text -- is this
23  a text from you to David Oppenheim, the
24  first string?

171

BOCK

1  A.   Yes.
2  Q.   And it says here, money is
3  gone from my account, April 4.  Do you
4  see that?
5  A.   Yeah.
6  Q.   Do you have any reason to
7  believe that's not true?
8  A.   No.
9  Q.   Was there a reason that
10  Mr. Oppenheim needed the money
11  immediately?
12  A.   Yes.
13  Q.   What was that?
14  A.   He -- I mean, I hate to say
15  when he's not sitting here, but he had
16  borrowed from his mother who had a
17  mortgage on his house and he was excited
18  to pay her back, and I think he had paid
19  her back and then something must have
20  come up about the check.  I don't know.
21  That was why he wanted -- that's why he
22  wanted the money to clear or whatever.  I
23  think.  I don't know.  He might have
24  already written her the check or

172

BOCK

1  something like that.
2  Q.   If you turn to BLF 00100.
3  A.   Yeah.
4  Q.   It says, "can you send me the
5  model number of your new laptop because I
6  want to make sure I get the right docking
7  station or docking setup for it."
8  Do you see that?
9  A.   Yeah.
10  Q.   I think it's I5-5300U.  Do you
11  see that?
12  A.   Yes.
13  Q.   Is that the firm-provided
14  laptop?
15  A.   I don't know.  I don't
16  remember.
17  Q.   Do you know if this is the
18  laptop that he purchased with the money
19  that you gave him?
20  MR. COHEN:  Objection, asked
21  and answered.
22  THE WITNESS:  I don't
23  remember.
24  MR. COHEN:  You can answer.

173

BOCK

1  BY MS. LOEW:
2  Q.   When you told Mr. Cohen about
3  the compensation package that you agreed
4  to with Mr. Oppenheim, what was his
5  reaction?
6  A.   His reaction, that I had
7  agreed to pay too much I think.
8  More text messages.
9  Q.   You do like to text a lot.
10  (Bock Exhibit 20
11  marked for
12  identification.)
13  BY MS. LOEW:
14  Q.   Sir, I have handed you what we
15  have marked as Exhibit 20, which is text
16  messages produced as BLF 00157 through
17  170.
18  Do you recognize these text
19  messages?
20  A.   May I take a look real quick?
21  MR. COHEN:  While he's
22  reading --
23  (Off the record.)
24  THE WITNESS:  Okay.  I read

44 (Pages 170 to 173)

174

```
1            BOCK
2   it.
3   BY MS. LOEW:
4       Q.   Okay.
5       A.   Thank you.
6       Q.   Do you recognize these text
7   messages?
8       A.   I don't really remember them,
9   but yeah.
10      Q.   Were these between you and Dan
11  Cohen?
12      A.   Yes.
13      Q.   And on BLF 00158, is this
14  compensation package you list there at
15  the top, the compensation package that
16  you agreed to with Dave Oppenheim?
17      A.   I don't remember.  It's just
18  probably some -- I don't remember.
19      Q.   In response to the -- your
20  text, it says, "doesn't like sound that's
21  what he wants.  Sounds like that's what
22  you agreed to."
23           Do you see that?
24      A.   Uh-huh.
25      Q.   And then it says, hello.  Are
```

175

```
1            BOCK
2   these texts from Dan?
3       A.   Yes.
4       Q.   And then your response is,
5   you're right; do you see that?
6       A.   Yeah.
7       Q.   The -- if you turn to 161.
8       A.   Okay.
9       Q.   It says at the top, "you're
10  wrong, but that's understandable for a
11  person who has gone through what you have
12  gone through.  I have called the police
13  and they will be there shortly.  I told
14  them to bring a rape trauma kit."
15      A.   Okay.
16      Q.   What is -- do you know what
17  Dan is referring to when he says, "that's
18  understandable for a person who has gone
19  through what you have gone through"?
20      A.   I don't.
21      Q.   And your response is
22  "exactly"?
23      A.   Uh-huh.
24      Q.   "I'm the guy with blood
25  dripping from his back side."  What are
```

176

```
1            BOCK
2   you referring to there?
3       A.   I don't know.  I'm referring
4   to the disappointment of my friend and
5   attorney who is -- thinks I should be a
6   tougher negotiator than I am.
7       Q.   Were you talking about the
8   compensation you agreed to with
9   Mr. Oppenheim?
10      A.   Not -- in general, you know.
11      Q.   Did you think that you agreed
12  to too much -- too high of compensation
13  for him?
14      A.   I did not.
15      Q.   When -- on BLF 00165 it
16  says -- your text is, "good point.  I'm
17  at a low spot, so I'm a little
18  susceptible.  I'm hoping some of these
19  moves will make me happier."
20           Do you see that?
21      A.   Uh-huh.
22      Q.   And the response is "a little
23  susceptible.  He butt raped you.  He's
24  not your friend."
25           Do you see that?
```

177

```
1            BOCK
2       A.   Uh-huh.
3       Q.   Do you know who "he" is here?
4       A.   That's -- you mean Dan is
5   probably referring to David or he is.
6       Q.   Did anyone else at the Bock
7   Law Firm know what Mr. Oppenheim's
8   compensation package was?
9       A.   At this time?
10      Q.   Yes.
11           MR. COHEN:  When you say "this
12  time," do you mean at the time that
13  that's --
14           THE WITNESS:  Yes, that's what
15  I am wondering.
16           Anybody else at the firm, I
17  don't think so.
18  BY MS. LOEW:
19      Q.   Did you -- other than
20  Mr. Cohen, did you consult with anybody
21  else before deciding what the
22  compensation will be?
23      A.   I don't think so.  David
24  obviously.
25      Q.   Other than David?
```

45 (Pages 174 to 177)

178

BOCK

1    A.   David and Dan, I think, was
2 all I remember talking to, yeah.
3    Q.   Once -- when did you -- when
4 did Dave Oppenheim actually join the
5 firm?
6    A.   I don't remember exactly. I
7 think April 11 was his first day if that
8 was a Monday. I think he was on vacation
9 or something, Costa Rica maybe.
10   Q.   When Mr. Oppenheim gave --
11 after Mr. Oppenheim gave notice, did
12 anyone from Anderson & Wanca reach out to
13 you?
14   A.   What -- what time frame are
15 you talking about?
16   Q.   I guess after Mr. Oppenheim
17 joined the firm, or after Mr. Oppenheim
18 gave notice at Anderson & Wanca and
19 before you filed the Technology Training
20 action.
21   A.   I don't remember.
22   Q.   Did you talk to Brian about
23 the fact that Oppenheim was joining the
24 firm?
25

179

BOCK

1    A.   No.
2    Q.   Between the time that
3 Mr. Oppenheim joined Bock Law Firm and
4 before you filed the Technology Training
5 action against the Buccaneers, were
6 Anderson & Wanca and Bock Law Firm
7 continuing to work together?
8    A.   Before he came to the firm?
9    Q.   After he gave notice and
10 before you filed the action.
11   A.   Okay. Yes, I think so.
12   Q.   Did you have any
13 communications between the time that
14 Mr. Oppenheim gave notice and when you
15 filed the Technology Training action with
16 anyone at Anderson & Wanca about the
17 Buccaneers litigation?
18   A.   I don't remember.
19   Q.   Did you have -- did you
20 communicate with Mike Addison about the
21 Buccaneers litigation between the time
22 that Mr. Oppenheim gave notice and before
23 you filed the Technology Training action?
24
25   MR. COHEN: I'll object to

180

BOCK

1 ambiguity what the Buccaneers
2 litigation is. There are two
3 cases.
4    But subject to that, go ahead
5 and answer.
6    THE WITNESS: After David
7 joined the firm, after he came to
8 work for my firm, Mike Addison
9 communicated with me about the
10 Buccaneers litigation.
11 BY MS. LOEW:
12   Q.   And when was that?
13   A.   That was in the hallway before
14 the summary judgment argument on the
15 Florida first term provider case.
16   Q.   And what -- what date was
17 that?
18   A.   I -- April -- April, I don't
19 know, April 18.
20   Q.   April 18, 2016?
21   A.   Yeah, I think so, yes.
22   Q.   And what -- what did Mr.
23 Addison say to you?
24
25   A.   Well, let's see. He said

181

BOCK

1 something about -- so I'm sitting in the
2 hallway getting ready to argue this $20
3 million or something like that summary
4 judgment in a certified class.
5    And he comes up and says
6 something about he's nervous about the
7 Buccaneers litigation or maybe he didn't
8 say he was nervous. He -- I don't
9 remember. I don't remember.
10   Something about "Brian is
11 holding out for a bigger fund so we can
12 get bigger fees," and he was -- looked
13 like he was, you know, like I should care
14 about that.
15   And I said -- I don't know if
16 he said what should I do? I don't
17 remember.
18   I remember saying, "I don't
19 know, Mike. I'm not in that case," and
20 then he said, so David -- "David came to
21 join your firm," or something like that.
22 What's -- what's going on there or
23 something like that. But that was it
24 about the Buccaneers case.
25

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123 1.800.642.1099

182

BOCK
1
2      I don't know why, you know,
3  why he was mentioning it to me, but he
4  did.  I told him I wasn't in the case.
5      Q.   Other than that conversation
6  that you just described, in that
7  conversation, did he provide any monetary
8  details as far as what the offers or
9  demands were?
10      A.   I'm trying to remember the
11  conversation.  He -- I don't think he
12  did.
13          I think he brought it up sort
14  of out of the blue standing there when
15  I'm sitting in this plastic chair in the
16  hallway, and I said, "I don't know, Mike.
17  I'm not in that case."
18          And I think it seemed to me
19  that he could understand that I was
20  not -- that I was not interested in
21  talking about that case to him and
22  whether he was going to get lots of fees
23  or not going to get lots of fees, because
24  I'm not in that case, but I was supposed
25  to have been.

183

BOCK
1
2      Q.   Other than that conversation
3  and the emails that we looked at earlier
4  where Mike Addison was on them, have you
5  -- did you have any other communications
6  with Mr. Addison about litigation against
7  the Buccaneers before you filed the
8  Technology Training action?
9      A.   I remember receiving some
10  email about some other case, I don't
11  remember the name of the case, where part
12  of the email chain was Mike Addison
13  saying the Buccaneers aren't going to
14  play ball or something like that, aren't
15  getting serious about this case.
16          I remember him bringing it up
17  at a mediation, and I think it was at
18  Peter Grilli's office, which is a -- like
19  an old house in the Tampa area, because
20  if I'm remembering -- yeah.  I don't
21  remember if he brought it up.
22          I remember being in a room.
23  I'm pretty sure it was Grilli's office,
24  and Addison and David and I and a -- and
25  an -- I don't remember if somebody else

184

BOCK
1
2  was there other than the main plaintiff
3  negotiating a settlement, I don't
4  remember which case.  He brought it up
5  there.
6          I can't remember whether he
7  brought it up at any other hearings that
8  I saw him at.  I can't remember other
9  than that.  I can't remember right now.
10      Q.   Other than that conversation
11  with Mr. Addison, did you speak with
12  anyone outside of Bock Law Firm about the
13  status of settlement discussions in the
14  Buccaneers litigation before filing the
15  Technology Training action?
16          MR. BLONIEN:  Objection,
17  mischaracterizes previous
18  testimony.
19          MR. COHEN:  I just don't even
20  understand what the question means.
21          But go ahead.
22          THE WITNESS:  Can you ask it
23  back.
24  BY MS. LOEW:
25      Q.   The -- so other than the

185

BOCK
1
2  discussion with Mr. Addison that you just
3  referenced, before filing the Technology
4  Training action, did you talk about the
5  status of mediation or settlement with
6  anyone else outside of Bock Law Firm in
7  the Buccaneers litigation?
8      A.   What was the --
9          MR. COHEN:  I'm just going to
10  ask for clarification.  There were
11  two filings of the Technology
12  Training case, and I can't tell --
13  it's a chronology issue in your
14  question.
15          I can't tell whether you are
16  focused on the first filing, second
17  filing.  I'm not sure it will make
18  a difference in the answer, but it
19  makes a difference in the calendar.
20  BY MS. LOEW:
21      Q.   When was the first Technology
22  Training action filed?
23      A.   May 6, I think.
24      Q.   So we'll use that as the date.
25      A.   Okay.

47 (Pages 182 to 185)

186

BOCK

1   Q.   May 6, before May 6, other
2   than this discussion with Mr. Addison on
3   April 18, did you talk about the status
4   of settlement or mediation in the
5   Buccaneers litigation with anyone else
6   outside of the firm?
7        A.   I don't -- I don't remember if
8   I -- I didn't -- I don't remember.
9        The only person I'm trying to
10  remember is did I -- did I talk to Brian
11  about it ever?  Other than that, I just
12  remember Mike Addison's comment.  I can't
13  remember anybody else's.
14       Q.   Why did you decide to file the
15  first Technology Training action?
16       A.   Because I wanted to negotiate,
17  attempt to negotiate a class settlement
18  with the Buccaneers.
19       Q.   When was the first time you
20  considered filing a class action against
21  the Buccaneers?
22       A.   I don't remember.  I don't
23  remember.  When I found out that Brian
24  was litigating a case that should have

187

BOCK

1   been -- I should have been in, I remember
2   thinking I wish I had a plaintiff, and
3   that was something we watched for at our
4   office, because we had Florida plaintiffs
5   sending us junk faxes, 2014, 2015.
6        We just didn't see anybody who
7   had one.
8        Q.   Were you considering filing a
9   case against the Buccaneers when you
10  hired Mr. Oppenheim?
11       A.   No.
12       Q.   So what changed after
13  Mr. Oppenheim joined the firm?
14       A.   I don't know what that means.
15  Did he work there?  What changed?
16       Q.   What changed in your -- in
17  whether you wanted to file a class action
18  against the Buccaneers?
19       A.   I don't know what that means.
20  I always wanted to, but not every day and
21  not every moment of every day.
22       It was -- when I found out
23  there was a case that I was supposed to
24  be in and I wasn't in it, I wanted to.  I

188

BOCK

1   wish I had a plaintiff.  I would file
2   one.
3        Q.   Was there any event that
4   triggered you to file the case against
5   the Buccaneers?
6        A.   Event that triggered it?  I
7   don't know.  Not really.
8        I mean, Mike Addison told me
9   that they were holding out for fees.
10  That sounded about right to me, and I
11  don't remember.
12            (Bock Exhibit 21
13            marked for
14            identification.)
15  BY MS. LOEW:
16       Q.   I have handed you what we have
17  marked as Exhibit 21, which is BLF 00007
18  through 14.
19       A.   Okay.
20       MR. BLONIEN:  What number are
21  we on?
22       MS. LOEW:  21.
23  BY MS. LOEW:
24       Q.   Do you recognize this email

189

BOCK

1   chain?
2        A.   Let me take a look.  Yes.
3        THE WITNESS:  Can we take a
4   break for just a second?
5        THE VIDEOGRAPHER:  Off the
6   record at 3:03 p.m.
7            (A recess was had.)
8        THE VIDEOGRAPHER:  Going on
9   the record.  This marks the
10  beginning of media No. 5.  The time
11  is now 3:08 p.m.
12  BY MS. LOEW:
13       Q.   So right before the break, I
14  handed you Exhibit 21.  Do you see that?
15       A.   Yes.
16       Q.   Are you familiar with this
17  email chain?
18       A.   I -- I recognize most of it.
19       Q.   And the -- this is an email
20  chain, the first through BLF 9 from --
21  BLF 7 through BLF 9 is an email chain
22  between you and David Oppenheim; is that
23  right?
24       A.   Yes.

48 (Pages 186 to 189)

190

BOCK
1
2  Q.   What is Rogan?
3  A.   Rogan is a shoe store, shoe
4  company, Rogan Shoes.
5  Q.   Was it a pending case that you
6  had?
7  A.   No.  Now?
8  Q.   That you had at the time.
9  A.   Oh, I can't hear you.  I
10 thought you said have.
11       No.  It was a pending case at
12 the time of these emails.
13 Q.   So there's an email on the top
14 of BLF 10.  It says, "Brian had an issue
15 with Anderson."
16       Do you see that?
17 A.   Yes.
18 Q.   Is this referring --
19 A.   Yeah.
20 Q.   Is this referring to Judge
21 Anderson, Wayne Anderson?
22 A.   Yes.  I think so, yeah.
23 Q.   And then the email above that
24 is from you to David Oppenheim.  It says,
25 "I will laugh if the issue is that he had

191

BOCK
1
2  a mediation with him since you left and
3  couldn't get the deal settled and he's
4  blaming it on the mediator."
5       Do you see that?
6  A.   Yes.
7  Q.   And then David's response is,
8  "could be, but it's more likely that
9  Brian doesn't like how the Tampa Bucs
10 mediation process went and resents
11 Anderson's continued efforts."
12       Do you see that?
13 A.   Yeah.
14 Q.   Did you know that he -- that
15 Wayne Anderson was the mediator in the
16 Buccaneers litigation before that?
17 A.   I don't remember.
18 Q.   And then above that, it says
19 from Phil Bock to David Oppenheim, "good.
20 I hope he takes that case to trial
21 because I'm sure you and Judge Anderson
22 already offered him more than he could
23 ever get.  LOL."
24       Do you see that?
25 A.   Yes.

192

BOCK
1
2  Q.   This is on Friday, April 29 of
3  2016, that's this email chain?
4  A.   Yes.
5  Q.   Above that, David's response
6  to you is, "yeah, he wants to set a
7  record above the Capital One $75 million
8  settlement.  The magistrate judge that
9  it's in front of is squeamish and is
10 giving the defendants a broad shot at
11 disproving on behalf of, sort of like
12 Sarris.  Class cert is fully briefed."
13       Do you see that?
14 A.   I see that.
15 Q.   Okay.  When it says "he wants
16 to set a record above Capital One $75
17 million settlement," do you know what
18 he's referring to here?
19       MR. BLONIEN:  Objection, calls
20 for speculation.
21       THE WITNESS:  Not really.
22       MR. COHEN:  I'll join.
23 BY MS. LOEW:
24 Q.   Before you received this
25 email, did you believe that Brian Wanca

193

BOCK
1
2  was trying to set a record above the
3  Capital One $75 million settlement?
4  A.   I don't remember whether -- I
5  don't remember.
6        I remember -- I remember Brian
7  gloating to me about the Buc's case at
8  some point.
9  Q.   What did Brian say to you?
10 A.   I don't remember.
11 Q.   When you say gloating, what do
12 you mean?
13 A.   I don't remember.  I can't
14 remember.
15       I'm going to take that back.
16 It might have been Mike Addison.  I
17 remember somebody, you know, talking
18 about how big the case was or something,
19 but Capital One is probably a TCPA
20 settlement.  I don't know if it was a
21 junk fax case.
22       I don't know if it was a
23 record or not.  Class cert wasn't fully
24 briefed, and I was well aware of the on
25 behalf of issue.

49 (Pages 190 to 193)

194

BOCK

1    Q.    The -- so did you -- did you
2   have any understanding of whether Brian
3   Wanca had a goal of besting the Capital
4   One $75 million settlement?
5        A.    I had an idea from Addison
6   telling me that they were holding -- he
7   was holding out for a big fund to get
8   more fees.
9        Q.    Did you know what dollar
10  amount he was looking for?
11       A.    I still don't.  No, I don't,
12  didn't and don't.
13       Q.    The response -- your response
14  says, "I love it, all of a sudden I'm a
15  Tampa Bay Buccaneers fan.  Another case
16  based on a hard drive and work leading up
17  to it that I paid 50 percent of and
18  involving clients that were solicited
19  through marketing efforts I paid 50
20  percent of."
21           Do you see that?
22       A.    Uh-huh, I see that.
23       Q.    What do you mean by "all of a
24  sudden I'm a Tampa Bay Buccaneers fan"?

195

BOCK

1        A.    I think I was just being -- I
2   think it was just reflecting to some kind
3   of frustration.  Still not a Tampa Bay
4   Buccaneers fan, for example.
5        Q.    Were you rooting for the Tampa
6   Bay Buccaneers in the -- in any
7   negotiations with Anderson & Wanca?
8        A.    No.
9        Q.    So what did you mean -- mean
10  by that statement?
11           MR. COHEN:  Objection, asked
12       and answered.
13           THE WITNESS:  Yeah, that's
14       what I meant.  This is just
15       something I was -- I think I was
16       just dictating this in my cell
17       phone at the end of a Friday.
18       That's just reflecting frustration.
19       I'm not a Tampa Bay Buccaneers fan.
20  BY MS. LOEW:
21       Q.    The "another case based on a
22  hard drive and work leading up to it that
23  I paid 50 percent of," what is that
24  referring to?

196

BOCK

1        A.    That was referring to the fact
2   that Brian Wanca's firm had been doing --
3   I found out that they had been doing junk
4   fax cases using work product of the joint
5   venture.
6        Q.    And did you believe that
7   that -- the Tampa Bay Buccaneers case was
8   one of those?
9        A.    I think I was just guessing,
10  so, you know.  I wasn't sure.  We had
11  actually put efforts into figuring that
12  out.
13       Q.    Did you figure that out?
14       A.    I still don't know.  Some kind
15  of goofiness.
16       Q.    So then you -- David Oppenheim
17  responds and says, "something about pigs
18  and hogs come to mind."  Do you know what
19  he meant by that?
20       A.    That's the pigs get fat and
21  the hogs get slaughtered idea of being
22  greedy, which is the same thing Mike
23  Addison had told me, I don't know, not
24  too long before, a week.

197

BOCK

1        Q.    On the next page, on BLF
2   000007 is an email from you to David
3   Oppenheim dated April 29, 2016, at 4:43
4   p.m.
5        A.    Oh, yeah.  Okay.
6        Q.    So you -- you state in this,
7   couple sentences in, "I'm not saying you
8   would do it, but you could come forward
9   with another class member and settle that
10  case over the objections of your former
11  employer and also over the objections of
12  your former individual client."
13       A.    I see that.
14       Q.    Were you suggesting here that
15  Mr. Oppenheim find a client and file a
16  case against the Buccaneers?
17       A.    No, I wasn't suggesting that
18  he should do that.
19       Q.    And then Mr. Oppenheim
20  responds and says, "they actually bought
21  in Mark Mester with Latham & Watkins
22  after having jamoke named Barry Postman
23  for much of the case."
24           And above that your response

50 (Pages 194 to 197)

198

BOCK

1    BOCK
2    is "Mester is a settler."
3        Do you see that?
4    A.   I see that.
5    Q.   At the top it says, "that was
6    Anderson's read from David Oppenheim to
7    you"?
8    A.   I see that.
9    Q.   Is that referring to Wayne
10   Anderson?
11   A.   Probably, yeah.
12   Q.   Other than this email exchange
13   with Mr. Oppenheim, before filing the
14   first Technology Training action, did you
15   have any other correspondence with him
16   between the time that you gave him the
17   offer and this email exchange about the
18   Technology Training action or about
19   litigation against the Buccaneers?
20   A.   I don't think so.
21   Q.   So this email exchange is the
22   only communication that you and
23   Mr. Oppenheim had between giving him an
24   offer and the filing of the first
25   Technology Training action that pertained

199

1    to a case against the Buccaneers?
2        MR. COHEN:  And just to be
3    clear, and you know this, I just
4    want to make sure we're all on the
5    same page.  This same -- 90
6    percent, the same email chain, then
7    splits off and there's a little bit
8    of different content between
9    Mr. Bock and Mr. Oppenheim.
10       I assume you are just focusing
11   on this one exhibit, you meant both
12   of those email chains together?
13       MS. LOEW:  Correct.
14       MR. COHEN:  Okay.  Go ahead.
15       THE WITNESS:  Yeah.  I don't
16   remember any other, but you -- I
17   don't remember any other.
18   BY MS. LOEW:
19   Q.   Were there any verbal
20   discussions?
21   A.   No, not that I remember.
22   Q.   Were you and -- were you in
23   April of 2016 -- do you typically work in
24   the same office as Mr. Oppenheim?

200

1    BOCK
2    A.   No.
3    Q.   Do you talk to him on the
4    phone?
5    A.   Occasionally.  Not very often.
6    I'm hard to get a hold of, caller ID.
7    Otherwise I would be on the phone all
8    day.
9    Q.   Where do you work?
10   A.   In my residence in Florida.
11   Q.   In Florida?
12   A.   Don't tell anybody.
13            (Bock Exhibit 22
14            marked for
15            identification.)
16   BY MS. LOEW:
17   Q.   Handing you what we have
18   marked as Exhibit 22, which is BLF 15
19   through 26.
20       Do you see that?
21   A.   Yes.
22   Q.   And this email includes a
23   portion of the chain that we just saw,
24   and it is then sent by you to Todd Lewis,
25   Jim Smith and Dan Cohen.

201

BOCK

1    BOCK
2    A.   Okay.
3    Q.   Subject, Tampa Bay Buccaneers
4    case.  Do you see that?
5    A.   Yes.
6    Q.   And you say here, "hmm, Brian
7    holding out for a record settlement in a
8    uncertified case, not that the latter
9    part is so relevant.  You could find a
10   plaintiff and approach the defendant
11   about settling? LOL."
12       Is that the first time that
13   you had discussed finding a plaintiff to
14   sue the Tampa Bay Buccaneers with Mr.
15   Lewis, Mr. Smith and Mr. Cohen?
16   A.   Yes, I think with those three,
17   but I had previously talked about it with
18   Jim Smith certainly and probably Todd
19   too.
20       I don't know about Dan.  I
21   don't think Dan, just over the years,
22   looking for a plaintiff.
23   Q.   Had you spoken to them about
24   it in 2016 before this email?
25   A.   Probably, but I don't -- I

51 (Pages 198 to 201)

202

BOCK
1  don't remember right now.
2  **Q.   Had you spoken to them about**
3  **it since Mr. Oppenheim had joined the**
4  **firm and before you sent this email?**
5  A.   I -- I'm pretty sure that I
6  talked to Todd Lewis about -- I don't
7  remember.  I don't -- I might have called
8  Todd Lewis after that term provider
9  hearing and been talking about that case
10 that he worked on the briefs and told him
11 what Addison said, but I don't -- I can't
12 remember for sure right now.
13 **Q.   How soon after you sent this**
14 **email did you sign up a plaintiff to sue**
15 **the Buccaneers?**
16 A.   I don't remember.
17     MR. COHEN:  Can you read that
18 question back.
19     (Record read as
20 requested.)
21 BY MS. LOEW:
22 **Q.   Was it after this email?**
23 A.   After this email, that a
24 plaintiff signed up to file a Buccaneers

203

BOCK
1  case, yes.
2  **Q.   Were you soliciting plaintiffs**
3  **before that email?**
4      MR. BLONIEN:  Objection,
5  vague.
6  BY MS. LOEW:
7  **Q.   To sue the Buccaneers.**
8  A.   I don't -- I don't remember.
9  Not -- not specifically.
10     We did send marketing letters
11 throughout the Tampa area or Florida
12 actually.  And like I said, I was always
13 hoping to find somebody who had those
14 faxes.
15     (Off the record.)
16     (Bock Exhibit 23
17     marked for
18     identification.)
19     MR. COHEN:  Is this
20 Exhibit 23?
21 BY MS. LOEW:
22 **Q.   This is Exhibit 23, which is**
23 **labeled BLF 179 through 199.  First text**
24 **on this dated Wednesday May 4 at 4:57**

204

BOCK
1  **p.m. says, "signed up a Bucs plaintiff.**
2  **Discuss amongst yourself."**
3      **Was that a text from you?**
4  A.   Are these all the same chain
5  or something?
6  **Q.   Well --**
7  A.   The first one --
8  **Q.   They have been produced**
9  **together in order.**
10 A.   Okay.  The -- the first page,
11 179, that sounds like me, signed up a
12 Bucs plaintiff, discuss among yourselves
13 within an emoji.
14 **Q.   And were you saying this to**
15 **Dan Cohen?**
16 A.   I don't remember.  It seems
17 like I would have been saying it to -- I
18 don't -- using the plural.  I don't
19 usually refer to Dan as a plural, so I
20 don't know.  I could have been just being
21 funny.
22 **Q.   Do you know who you were**
23 **texting?**
24 A.   I did at the time, but I don't

205

BOCK
1  remember right now.  "Signed up a Bucs
2  plaintiff, discuss amongst yourselves."
3  Seems like -- I don't know.
4  **Q.   Is this -- is May 4 the day**
5  **that you signed up a Bucs plaintiff?**
6  A.   It must be.
7  **Q.   Who are -- who are you**
8  **referring to here?**
9  A.   May 4, May 4?  I don't
10 remember if that was Technology Training
11 or if that was Dr. Schwanke.
12     MR. COHEN:  Have you read the
13 whole thing?
14     THE WITNESS:  One second.
15 Okay.  Let me take a look at this
16 thing.
17     Okay.
18 BY MS. LOEW:
19 **Q.   So I'll ask again, do you know**
20 **which Bucs plaintiff this is referring**
21 **to?**
22 A.   I don't.
23 **Q.   If you turn to BLF 190.**
24 A.   Okay.

52 (Pages 202 to 205)

206

```
 1              BOCK
 2      Q.   On May 5, there's a text that
 3  says, "any further word from
 4  accountants?"  Do you see that?
 5      A.   Yes.
 6      Q.   And then the response is, "not
 7  yet.  I will follow-up right now.  Two
 8  companies, one a chiropractor and the
 9  other a computer technology company have
10  signed retainers to sue the Tampa Bay
11  Buccaneers."
12      A.   I see that.
13      Q.   And who are those two
14  companies?
15      A.   Dr. Schwanke and Technology
16  Training Associates.
17      Q.   And those were the two
18  punitive class representatives named in
19  the Technology Training action that you
20  filed on May 6?
21      A.   I don't think so.  I don't
22  remember.  I thought there was only one
23  named plaintiff on that first filing, but
24  I don't remember.
25      Q.   Were they the two punitive
```

207

```
 1              BOCK
 2  class reps for the action you filed in
 3  Federal Court?
 4      A.   I don't remember.  Yeah, I
 5  think, yeah, yeah.
 6      Q.   The -- so the email with David
 7  Oppenheim on April 29, did that have any
 8  impact on you filing a case against the
 9  Tampa Bay Buccaneers?
10      A.   Please say that again.  Ask
11  that again.
12          MS. LOEW:  Can you read it
13      back.
14          (Record read as
15      requested.)
16          THE WITNESS:  Which email?
17  BY MS. LOEW:
18      Q.   The email that's contained
19  within Exhibits 21 and 22.
20      A.   But which one?
21      Q.   Any of those emails.
22      A.   If I was going to say which
23  one impacted me in any way, it would be
24  the one that I wrote because that was me
25  venting and articulating the situation in
```

208

```
 1              BOCK
 2  my mind, dictating it.
 3          And I hung up the phone and
 4  kept thinking and seemed like, all right,
 5  well, now is as good as time as any.
 6          I had been watching for a
 7  couple of years.  I don't know how many
 8  times people had to -- you know, people
 9  at the office were always kind of rooting
10  for me to stand up for myself with the
11  whole Brian Wanca thing.
12          I says, I got all these people
13  to support.  Let's just keep working on
14  the joint cases and do our own thing and
15  argue with him later.  Kind of a
16  confrontational thing you can tell.
17      Q.   When you say you hung up the
18  phone, what do you mean?
19      A.   Well, because I was dictating
20  my emails -- or was it emails?  Yeah.
21  Dictating.  That's why there's misspelled
22  words and stuff.
23      Q.   And if you can pull out
24  Exhibit 22.
25      A.   Okay.
```

209

```
 1              BOCK
 2      Q.   And you said your email was
 3  what -- was what impacted it.  Which one
 4  are you referring to?
 5      A.   Yeah, the one where I said --
 6  so I wrote the one to David where I was
 7  kind of being rude to David and saying,
 8  you know, if he -- if he could have
 9  settled the case in a way that was fair,
10  reasonable and adequate, in the best
11  interests of the class and he didn't
12  because his boss wants more money for
13  fees, and now the guy works for me, so I
14  feel comfortable yelling at him a little
15  bit, so articulating that to him made me
16  say, yeah, well.
17          Then I guess, what, 45 minutes
18  later I sent that on to Todd, Jim and
19  Dan.
20          The intervening 45 minutes was
21  probably me, you know, ranting and raving
22  to myself or something.  I don't know.
23      Q.   The information that Dave
24  shared about Brian Wanca says he wants to
25  set a record above the Capital One $75
```

53 (Pages 206 to 209)

210

BOCK

1    BOCK
2    million settlement, did that have an
3    impact on you filing a case against the
4    Buccaneers?
5        A.   I don't -- I don't think so.
6    I don't know.  No.  I'm not sure.
7        It made me -- it made me --
8    talking about it.  I don't think it --
9    the number means nothing to me.
10       Brian wants to set a record in
11   some big case, and I remember Brian
12   saying something about it being a big
13   case or something like that, because at
14   some point Brian was filing cases behind
15   my back and being sneaky, and then at
16   some point everybody kind of knew it, and
17   he kind of felt comfortable saying it in
18   front of me, stuff like that, the few
19   times that I saw him.
20       So bigger impact was Mike
21   Addison saying something because that
22   made it sound like they weren't getting
23   the deal done and wasn't going to happen.
24       Q.   When you say the bigger
25   impact, that's indicating that there's

211

1    BOCK
2    some impact from this email exchange?
3        A.   I don't think there was, but
4    probably don't believe me.  I don't know.
5        There was -- the impact was
6    that it made me start yelling at David
7    about -- about the situation, you know.
8        Q.   Did you have actual
9    communications with David about it?
10       A.   I mean, yelling into my phone.
11   I was dictating this whole long winded,
12   blah, blah, blah with typos and
13   everything.
14       Q.   So you are talking about your
15   email responses within this email chain?
16       A.   Just my -- just this long one
17   that will probably be taped up on
18   somebody's wall some day, you know.  I'm
19   kind of ranting and raving.  Just kind of
20   making -- you know, speaking from the
21   heart a little bit.
22       Q.   The --
23       A.   But the other thing is, you
24   know, somebody tells you they're holding
25   out for a giant fund to get more fees and

212

1    BOCK
2    then they don't get the deal done, then
3    it's time for somebody else to put on a
4    cape and come and get a deal gone.
5        Q.   And is that what happened
6    here?
7        A.   That's what I think happened.
8    We'll find out if Judge Porcelli and the
9    class like the settlement.
10       Q.   In Exhibit 22 on that first
11   page, the email you're referring to, it
12   says, "to make it even more
13   Machiavellian, perhaps it would be easy
14   to get other people on the side of the
15   class such as local attorney Michael
16   Addison."
17       Do you see that?
18       A.   Yes.
19       Q.   Did you -- did you try to get
20   Michael Addison to work with you on the
21   Buccaneers case?
22       A.   I think I -- no.  I tried to
23   get him on the side of the class and
24   tried to invite him to mediate with us.
25       He had been working on the

213

1    BOCK
2    case.  He mentioned it to me before.
3        Brian was the one who should
4    have included my firm on the case, not
5    Mike Addison.  I didn't have any
6    agreement with Mike Addison about joint
7    venture, anything else.
8        Q.   When you say you invited him
9    to mediate, when did you do that?
10       A.   I had -- I instructed Dan
11   Cohen and I think Todd Lewis -- I can't
12   remember -- couple people call Mike
13   Addison to do so, and they did.
14       They called me back and
15   somebody called or emailed me and told me
16   what he said, and that was it.
17       Q.   What did he say?
18       A.   Like I don't have anything to
19   say to Phil Bock or something like that.
20   I wasn't on the call.  No, I think was
21   the --
22       Q.   Was this after --
23       A.   -- summer.
24       Q.   -- the original Technology
25   Training action was filed in state court?

54 (Pages 210 to 213)

214

BOCK

1    A.   Yes.  This -- this being the
2    phone call?  Yeah.
3        Q.   Before you filed the
4    Technology Training action in state court
5    on May 6 --
6        A.   Yeah.
7        Q.   -- did you consult with any
8    attorneys about whether David Oppenheim
9    could work on the case?
10       A.   Yes, I think so.
11       Q.   Who did you consult with?
12       A.   I think I -- well, I talked
13   internally -- I can't remember the date.
14   Let me think.
15       I think before I filed it, I
16   spoke only to or communicated with --
17   only with probably Dan, Todd, Jim, maybe
18   Robert Hatch, but attorneys in my office,
19   not including David Oppenheim.
20       Your question was before the
21   first case was filed?
22       Q.   Right.
23       A.   Yeah.
24       Q.   Did you consult externally

215

BOCK

1    with any attorneys?
2        A.   Afterwards?  In -- in
3    particular for this particular case?  If
4    I remember correctly, it was afterwards.
5        Q.   Before you filed the case, did
6    you come to any conclusion as to whether
7    Mr. Oppenheim could work on it?
8        A.   I mean, could work on it, from
9    whose perspective?  It was more of a did
10   it make -- was it the smart thing to do,
11   not does he have some kind of conflict.
12   He doesn't.  He doesn't.  So could he
13   work on it?  Yes.  Would it make it --
14   would it make it more of a problem, would
15   we have some kind of big side show?  Yes.
16   Here we are.
17       But, you know, we'll see if
18   Judge Porcelli approves the settlement.
19   If the class and Judge Porcelli like the
20   settlement, then that's great.
21       Q.   The email exchange that we
22   were referring to earlier in Exhibit 22
23   between you and David Oppenheim, if any
24   of that information is learned by

216

BOCK

1    Mr. Oppenheim in the mediation, do you
2    have concerns about him having shared
3    that with you?
4        A.   Which information?
5        Q.   Exhibit 22.
6        A.   No, I don't have any concerns.
7    Personally I don't think there should be
8    mediation confidentiality in class
9    actions.  I don't think it's a secret,
10   but nobody asked me my opinion, so --
11   other than you.
12       Q.   Are you familiar with the
13   mediation privilege?
14       A.   Generally.  Different in
15   different states, yeah.
16       Q.   Are you familiar with the
17   mediation privilege in Florida?
18       A.   Not really the privilege, but
19   I'm generally familiar with the -- the
20   Florida rule about mediation not being
21   able to be revealed in court, but I have
22   seen it done anyway.
23       Q.   Do you know if under Florida
24   law mediation communications are supposed

217

BOCK

1    to be shared with third parties not part
2    of the mediation?
3        A.   I don't know if they should be
4    or not.
5        Q.   You don't know if there's a
6    rule about that?
7        A.   Well, I don't know the rule.
8    In my mind I'm not -- if I have a
9    mediation, I'm not allowed to reveal what
10   the other guy offered me, but I could
11   always reveal what I demanded.  It's mine
12   to reveal.
13       Q.   Do you know if that is the law
14   in Florida?
15       A.   No.  I said I don't.  I think
16   it is.  I don't know.
17       Q.   So do you have any view as to
18   whether Mr. Oppenheim violated any
19   privilege through this email chain?
20       MR. COHEN:  Before you answer,
21   I'll object to the fact assumes
22   facts not in evidence, that was
23   mediation privilege information.
24       But you can go ahead.

55 (Pages 214 to 217)

218

BOCK

1
2        THE WITNESS:  I don't think he
3    did anything wrong.  I don't think
4    he revealed anything he shouldn't
5    have revealed.
6        I think Brian Wanca -- when
7    I -- when I said I thought we liked
8    Wayne Anderson, Brian Wanca emailed
9    me and said, give me a call.
10        I think if I called him, he
11    would have said -- told me the same
12    thing.
13    BY MS. LOEW:
14        Q.   But what did he tell you?
15        A.   I didn't call him.  Why did he
16    ask me to call him?  To talk about his
17    mediation with Judge Anderson?  Doesn't
18    he know that Lauren Loew says he
19    shouldn't.  I mean, I don't know.
20        Q.   Do you know what he was going
21    to say to you?
22        A.   He was going -- I don't know
23    what he was going to say in particular,
24    but he told me that he was going to tell
25    me why he doesn't like Judge Anderson, I

219

BOCK

1
2    guess.  He didn't want to put it in an
3    email.
4        (Bock Exhibit 24
5         marked for
6         identification.)
7    BY MS. LOEW:
8        Q.   Handing you what we've marked
9    as Exhibit 24, which is BLF 000027.
10        A.   Okay.
11        Q.   This is on Saturday, May 7,
12    2016.  Do you recognize this email?
13        A.   Yes.
14        Q.   And is this an email you sent
15    on Saturday, May 7 of 2016?
16        A.   I think so, yeah.
17        Q.    Is this relating to the
18    Chinese wall that you described
19    implementing in this case?
20        A.   A little bit, yeah.  The
21    Chinese wall was more implemented by Jim
22    Smith.  This is just an email that I
23    wrote.
24        Q.   At the point in time that you
25    sent this email, were you intending to

220

BOCK

1
2    exclude David Oppenheim from the
3    Buccaneers litigation?
4        A.   Yes.
5             (Bock Exhibit 25
6              marked for
7              identification.)
8    BY MS. LOEW:
9        Q.   I have handed what you what we
10    marked as Exhibit 25, which is BLF 000127
11    through 130.  This is an email -- or
12    excuse me -- text message exchange
13    between you and David Oppenheim?
14        A.   Yes.  Text message, yeah.
15        Q.   When did you text him about
16    having filed the Buccaneers case?
17        A.   I don't remember.  Probably --
18    this is probably on Saturday.  Could have
19    been on Friday.  I don't remember.
20        Q.   The -- so there's text here,
21    says, "filed case against Buccaneers and
22    asked everybody to leave you out.  If
23    everybody is staring at you like you're
24    infected, that's what it is.  Please keep
25    confidential."

221

BOCK

1
2        Is that from you?
3        A.   Yes.
4        Q.   And then there's a redaction?
5        A.   I guess it's after the email
6    to everybody, but --
7        Q.   And then there's a series of
8    redactions after that.
9        A.   Okay.
10        Q.   Do you know what the basis of
11    those redactions is?
12        A.   I don't.
13        Q.   When you say, "please keep
14    confidential," why are you asking him to
15    keep it confidential?
16        A.   Because I didn't want him
17    to -- I don't remember.  Please keep it
18    confidential.  I don't remember why.  I
19    just didn't want him to mention it to
20    anybody.
21        My plan was to negotiate with
22    the Buccaneers and see if we could get to
23    a settlement that we thought was -- that
24    I thought was one the class should be
25    offered an opportunity to accept.

56 (Pages 218 to 221)

222

BOCK

1
2       And if we got there, we got
3   there.  And if we didn't, we didn't.
4       Q.   Did you need to have a case on
5   file against the Buccaneers to enter into
6   settlement negotiations?
7           MR. BLONIEN:  Objection, calls
8       for a legal conclusion.
9           MR. COHEN:  Join.
10          THE WITNESS:  No, I don't
11      think so.
12  BY MS. LOEW:
13      Q.   When did you first reach out
14  to obtain an outside opinion about
15  whether Mr. Oppenheim could work on the
16  Buccaneers litigation?
17      A.   I don't remember the exact
18  date.  Can I -- can you give me the
19  question again?  Sorry.  When did I reach
20  out to somebody what?
21      Q.   Outside -- when did you reach
22  out externally, outside of the firm to
23  consult with someone about whether David
24  Oppenheim could work on the Buccaneers
25  litigation?

223

BOCK

1
2       A.   I -- I don't remember that I
3   did consult with somebody about whether
4   he could work on the litigation.
5           (Mr. Blonien exited
6           the deposition
7           proceedings.)
8           (Bock Exhibit 26
9           marked for
10          identification.)
11  BY MS. LOEW:
12      Q.   Hand you what we've marked as
13  Exhibit 26, which is BLF 279 through 286.
14      A.   Okay.
15      Q.   The very -- I guess on to page
16  285.
17      A.   Before you ask a question, can
18  I take a look at this real quick?
19      Q.   Oh, yes, absolutely.
20      A.   Okay.
21          (Mr. Blonien
22          re-entered the
23          deposition
24          proceedings.)
25      Q.   It's an email at the bottom of

224

BOCK

1
2   285.
3       A.   Okay.
4       Q.   From you to Mary Robinson on
5   May 7 of 2016.  Do you see that?
6       A.   Yes.
7       Q.   Was that the first time you
8   had reached out about an ethics issue
9   pertaining to the Buccaneers litigation
10  to someone outside of the Bock Law Firm?
11      A.   I wouldn't say the ethics
12  issue.  I would say wanting to know if --
13  if there is an ethics issue, but that was
14  the first time on this particular
15  litigation that I asked anybody outside
16  the firm what they thought.
17      Q.   And then on BLF 280, on the
18  5-10-2016 email, emails between -- an
19  email from you to Mary Robinson that
20  says, "okay.  Thanks.  I'll call at 1."
21      A.   Okay.
22      Q.   I guess if you go to the first
23  page, 279, the Thursday, May 12, 2016, at
24  12:07 p.m., an email from you to Mary
25  Robinson.

225

BOCK

1
2       A.   Okay.
3       Q.   It says, "Mary, thanks again
4   for your help."  Do you see that?
5       A.   Yes.
6       Q.   What was her advice?
7       A.   She said there's no problem.
8   Don't worry about it, but since you said
9   the case is in Florida, why don't you
10  talk to somebody in Florida.
11      Q.   Did she advise implementing a
12  Chinese wall?
13      A.   No.  I don't think so.  I
14  don't think so.  I think I told her that
15  I was already doing that or had done
16  that.  I don't think anybody advised that
17  I do it except the people inside
18  internally agreed it made sense, but I
19  don't remember.
20      Q.   Did she -- did Mary Robinson
21  think that Mr. Oppenheim could work on
22  the Buccaneers litigation?
23      A.   That's a good question.  I
24  don't remember.  I think she said that
25  there was no problem and this thing

57 (Pages 222 to 225)

226

BOCK

1  refreshes my memory.
2        I mean, you said did I ask
3  anybody if he could work on it.  I see my
4  little hypothetical says, is the lawyer
5  disqualified from working on it, so...
6      Q.   It says -- your email says,
7  "you mentioned a Florida ethics expert."
8      Did you reach out to someone
9  in Florida?
10     A.   Yes.
11     Q.   Who did you reach out to?
12     A.   I think his name was John,
13  John Weiss, Jack Weiss.
14     Q.   And did he provide you advice
15  about how to go about with the Buccaneers
16  litigation?
17     A.   No.
18     Q.   Did you end up consulting with
19  him?
20     A.   Yes.  Did he give me advice
21  about how to go about litigating the
22  Buccaneers action?
23     Q.   Did he give you any advice
24  pertaining to ethical issues that would

227

BOCK

1  arise from the Buccaneers litigation?
2      A.   Ethical issues that would
3  arise, no.
4      Q.   What did he give you advice
5  about?
6      A.   I asked him a similar thing
7  to -- to Mary, about whether there was an
8  ethical issue.  And he said he didn't see
9  one, and he gave me the name of Professor
10  Tim Chinaris.
11        He said, if you want to get a
12  formal written opinion to use in
13  litigation, I'm very busy doing bar --
14  bar defense, bar work, and Chinaris had
15  worked for him or with him.  And then I
16  later talked to him.
17     Q.   Did Mary Robinson provide a
18  formal written opinion to you?
19     A.   I don't -- I don't think so.
20  Written opinion, no.
21     Q.   Did you have written
22  communications with John Weiss?
23     A.   On this particular issue, this
24  particular Buccaneers stuff, I don't -- I

228

BOCK

1  can't remember.  I don't think -- I don't
2  think I emailed with the guy about it.  I
3  think I called him and --
4        MR. COHEN:  And just for the
5  record, because Chinaris is and
6  ended up being an expert in this
7  case on a retained basis, we would
8  assert work product as to details
9  of the interaction with Chinaris.
10        MS. LOEW:  I think you did --
11  you submitted a declaration or
12  opinion from him in the preliminary
13  injunction hearing.
14        MR. COHEN:  True, but
15  submitting that doesn't waive work
16  product under federal rules as to
17  your confidentiality interaction
18  with a retained expert.
19        THE WITNESS:  Would you mind
20  if I grab a water?
21        MS. LOEW:  Go ahead.
22        (Off the record.)
23        (Bock Exhibit 27
24  marked for

229

BOCK

1        identification.)
2  BY MS. LOEW:
3      Q.   Handing you what we've marked
4  as Exhibit 27, which is BLF 338 to 339.
5  This is an email from you to Professor
6  Chinaris on May 12, 2016.  Do you see
7  that?
8      A.   May 12?  Yeah.
9        MR. BLONIEN:  Lauren, I'm
10  sorry.  What number exhibit is
11  this?
12        MS. LOEW:  27.
13        THE WITNESS:  Can I take a
14  look at it now?
15  BY MS. LOEW:
16     Q.   Yes.
17        MR. COHEN:  My understanding
18  of the federal rule as it relates
19  to the work product protection as
20  to retained experts is that the
21  information you provide to them is
22  not protected, and I think this
23  Exhibit 27 falls within that.
24        It's the information you

58 (Pages 226 to 229)

230

BOCK

1  provide the expert, the expert's
2  ultimate opinion, which is
3  Chinaris's report, I don't think
4  that's protected, especially after
5  we produced it.  Strategic
6  communications with the expert I
7  believe remain protected.
8       MS. LOEW:  Okay.  So I think
9  we'll just -- we'll just do it
10  officially for the record.  I'll
11  ask the question, you can respond.
12  Okay.
13       MR. COHEN:  That's fine.
14       THE WITNESS:  Okay.
15  BY MS. LOEW:
16      Q.   Who referred you to Professor
17  Chinaris?
18      A.   Jack Weiss.
19      Q.   And is this email from -- from
20  you to Professor Chinaris?
21      A.   Yes.
22      Q.   Do you recognize this
23  document?
24      A.   Yes.

231

BOCK

1      Q.   And as a result of this email,
2  did Professor Chinaris provide you any
3  advice pertaining to the questions that
4  you laid out in here?
5       MR. BLONIEN:  I'm going to
6  object on the ground that the work
7  product protection afforded under
8  Rule 26 covers communications
9  between an expert and an attorney,
10  to the extent that they're not
11  relaying information to the expert
12  necessary to form his opinion.
13       Maybe I misunderstood your
14  question, but it sounded like
15  you're calling for the expert's
16  communications back to Mr. Bock,
17  and I believe those are protected
18  by the rule.
19       MR. COHEN:  I join and
20  instruct the witness that final
21  opinions contained in a report
22  produced from Chinaris in this case
23  you can discuss, but strategic
24  developmental discussions with the

232

BOCK

1  witness that you may have
2  participated in or are aware of,
3  you are instructed not to answer.
4  BY MS. LOEW:
5      Q.   Are you going to follow your
6  attorney's instruction?
7      A.   Yes.
8       MR. COHEN:  If he said no, I'm
9  leaving.
10       (Off the record.)
11  BY MS. LOEW:
12      Q.   And Professor Chinaris
13  provided a written opinion that was
14  submitted at the preliminary injunction
15  hearing.
16       Are you familiar with that?
17      A.   I'm familiar with the fact
18  that he submitted one, but I don't think
19  I worked with that much.  I don't
20  remember it very much.  There was other
21  people involved.
22      Q.   Did you receive that
23  opinion -- when did you receive that
24  opinion?

233

BOCK

1      A.   I don't remember.
2      Q.   Did you rely on Professor
3  Chinaris' opinion in your -- in how you
4  treated Dave Oppenheim's involvement in
5  the Buccaneers litigation, the written
6  opinion?
7      A.   I don't remember.
8       (Bock Exhibit 28
9       marked for
10       identification.)
11  BY MS. LOEW:
12      Q.   I'm handing you what we've
13  marked as Exhibit 28.  Sorry.  Let me
14  just make sure -- okay.  Yes.  Labeled
15  BLF 329 through 333.
16      A.   Okay.
17      Q.   And the top email here on BLF
18  329 is an email between Robert Hatch and
19  Phil Bock, you, on Thursday, May 12, 2016
20  at 3:41 p.m.  Do you see that?
21      A.   Yes.
22      Q.   And who is Robert Hatch?
23      A.   Excuse me.  Robert Hatch is an
24  attorney at our law firm.

59 (Pages 230 to 233)

234

BOCK

1                BOCK
2     Q.   Are you familiar with this
3  email chain?  Have you seen it before?
4     A.   Well, I've probably seen it
5  before because I see my name on it, but I
6  don't recognize it.
7       Can I take a look at it real
8  quick?
9     Q.   Yes.
10    A.   Okay.  I still don't remember
11  it, but I've read it.
12    Q.   Okay.  And the email from you
13  to Robert Hatch, May 12, 2016 at 2:58
14  p.m., do you see that?
15    A.   Yes.
16    Q.   You say in here, "he hasn't
17  revealed any confidential mediation
18  stuff."
19       Do you see that?
20    A.   Yes.
21    Q.   Do you still believe that's
22  true even after reviewing that email
23  chain that we just went through that was
24  Exhibits 21 and 22?
25    A.   Yes.

235

BOCK

1                BOCK
2     Q.   Your email above that says,
3  "FYI, David did meet one of the class
4  reps at the first mediation they had in
5  Miami."
6       Do you see that?
7    A.   I see that.
8    Q.   How did you learn that
9  information?
10    A.   I don't -- I don't know.  I
11  don't remember.
12    Q.   Did you discuss with David his
13  involvement in the mediations?
14    A.   Not that I remember, no.
15  Involvement at the mediations?
16       I heard him testify about it a
17  few times, but I don't remember talking
18  to him about meeting the class reps at
19  the first mediation.  I don't remember
20  that.
21    Q.   You don't know where you got
22  that information?
23    A.   I don't, no.
24    Q.   Did anyone else tell you that
25  Mr. Oppenheim met the class

236

BOCK

1                BOCK
2  representatives?
3    A.   Anybody else other than just
4  myself, you mean?  Who is the anybody
5  else?
6       I don't know that anybody told
7  me that.  I don't know where that comes
8  from.
9       For your information, David
10  did meet Wanca's class reps at the first
11  mediation they had in Miami.
12       I heard David say that he met
13  them for dinner or something like that,
14  so I don't think David told me he met
15  them at the mediation.  I don't know
16  where I got that.
17    Q.   Before you sent this email,
18  had David Oppenheim told you that he had
19  met him the class representatives in the
20  Buccaneers case?
21      MR. COHEN:  For the record,
22  asked and answered.
23      But you can go ahead.
24      THE WITNESS:  Not that I
25  remember.  I don't remember him

237

BOCK

1                BOCK
2  telling me that he had met Cin-Q or
3  Medical & Chiropractic before May
4  12.  I don't know why it would even
5  come up.
6  BY MS. LOEW:
7    Q.   Did you attend the mediation
8  that's referenced here?
9    A.   No, I didn't.  I mean, Mike
10  Addison might have told me.  I have no
11  idea.  I don't know why David would have
12  told me.  We didn't talk about it.
13    Q.   Did Mike Addison reach out to
14  you about Dave Oppenheim's involvement in
15  the Cin-Q versus Buccaneers action?
16    A.   I don't know what that means.
17    Q.   On May 12 of 2016, did you --
18  did Mike Addison correspond with you
19  about Dave Oppenheim's involvement in the
20  Cin-Q versus Buccaneers mediation?
21    A.   I don't -- I don't remember.
22    Q.   Why were you sending that
23  piece of information to Robert Hatch?
24    A.   I don't remember.
25    Q.   Given that you did not attend

60 (Pages 234 to 237)

238

BOCK

1    the mediation, you would have had to
2    **learn that information from someone else,**
3    **right?**
4        MR. BLONIEN:  Objection,
5    argumentative.
6        MR. COHEN:  Join.  You can go
7    ahead and answer.
8        THE WITNESS:  I guess.  I
9    mean, I guess, yeah.  I wouldn't
10   lie to Robert, so somebody must
11   have told me, but by this point I
12   believe Dan and John Piper had
13   talked to Mark Mester, and so I
14   don't know.  I don't know where I
15   got this.
16       I think -- I think I could
17   have gotten it from anybody in the
18   world other than David because this
19   is -- this is after I already sent
20   David a thing that says we are not
21   talking about the thing.
22       I don't know why he would have
23   said, oh, yeah, let me just tell
24   you I met the people at the

239

BOCK

1    mediation.
2    BY MS. LOEW:
3        Q.   **You referenced a Chinese --**
4        A.   I wouldn't -- sorry.
5        Q.   **Go ahead.**
6        A.   No, never mind.
7        Q.   **You referenced a Chinese wall**
8    **a couple of times.  What is a Chinese**
9    **wall?**
10       A.   I don't know.  Hopefully it's
11   not a pejorative term.
12       I think it means you build the
13   Great Wall of China around or between
14   something and an attorney.  It's a
15   screen.
16       Q.   **And what steps did your firm**
17   **do to implement a Chinese wall around**
18   **Mr. Oppenheim?**
19       A.   It was more probably around
20   the file, stamps on the paper file,
21   indications on the electronic, you know,
22   David Oppenheim cannot have access to
23   this file, nobody can talk about it.  We
24   sent the email.

240

BOCK

1        I think Jim Smith talked to
2    people in the office, told them not to
3    talk to David about it.  I told David not
4    to talk to anybody about it.  I don't
5    remember the rest today.
6        Q.   **How did you find the plaintiff**
7    **in the Technology Training -- how did you**
8    **find both the punitive class**
9    **representatives in the Technology**
10   **Training action filed in Federal Court?**
11       A.   I sent them marketing letters,
12   so that's how I met them, I guess.
13       Q.   **When did you --**
14       A.   How did I find them?  They
15   must have been on some marketing list.
16       Q.   **When did you send them**
17   **marketing letters?**
18       A.   I don't remember.  Let me
19   think.  I don't remember.  April 11.  I
20   can't remember.
21       Q.   **And was it before or after**
22   **David Oppenheim joined the firm?**
23       A.   The letters were sent before,
24   I think, yeah.  I don't know if we

241

BOCK

1    produced the letters or they did.
2        MR. COHEN:  Which letters?
3        THE WITNESS:  The letters
4    that -- that TTA and Dr. Schwanke
5    returned saying, yes, please
6    contact us about junk faxes.
7        MR. COHEN:  We produced.
8        THE WITNESS:  So whatever the
9    date is on that.
10       (Bock Exhibit 29
11       marked for
12       identification.)
13   BY MS. LOEW:
14       Q.   **Handing you what we've marked**
15   **as Exhibit 29.**
16       A.   Okay.
17       Q.   **Which is BLF 000006, dated**
18   **March 22 of 2016.  Is this a letter that**
19   **you were referring to, that you were just**
20   **referring to?**
21       A.   That's the one that I meant.
22       Q.   **The marketing letter.**
23       A.   It's a marketing letter.  They
24   were sent -- they responded to different

61 (Pages 238 to 241)

242

BOCK
1
2  marketing letters.
3      Q.   **Technology Training and Larry**
4  **Schwanke?**
5      A.   Yeah.  Apparently we spelled
6  his name wrong, which is rude.
7      Q.   **The date at the top here,**
8  **April 22nd of 2016, do you see that, very**
9  **top?**
10     A.   March 22?
11     Q.   **At the very top.**
12     A.   The fax header?
13     Q.   **Yeah.**
14     A.   I don't, no.  Okay.  I see
15  that.  I don't know what that means.
16     Q.   **Do you know what date that**
17  **corresponds to?**
18     A.   What does that mean?
19         MR. COHEN:  Which date are you
20  talking about?
21  BY MS. LOEW:
22     Q.   **April 22nd, 2016.**
23     A.   Fax header.  It might
24  correspond to the date that -- I have no
25  idea.

243

BOCK
1
2        I mean, maybe the guy faxed it
3  back to me, but I -- I don't remember.
4  April 22.  I don't remember.
5      Q.   **Did you file the Technology**
6  **Training action in Federal Court on**
7  **behalf of Larry Schwanke and Technology**
8  **Training both individually and as**
9  **punitive class representative?**
10     A.   In the Florida state court?
11     Q.   **In Federal Court.**
12     A.   I think the caption is both of
13  those companies acting on behalf of the
14  class.
15     Q.   **Do you represent Technology**
16  **Training individually?**
17     A.   Individually, no.  I don't
18  know.  No.  What does that mean?  As
19  opposed to the class?  Absolutely not.
20     Q.   **Do you represent Technology**
21  **Training both individually and as**
22  **punitive class representative?**
23     A.   Not really, no.  That's the
24  nomenclature used in the caption.
25        It should probably say on

244

BOCK
1
2  behalf of themselves and all other
3  members of the proposed class or
4  something, but I don't know where that
5  language came from.
6        It's one of those things where
7  it just kind of follows through.
8        It's a class action.  I'm not
9  representing them individually.
10     Q.   **Do you have a retainer**
11  **agreement with Technology Training**
12  **Associates?**
13     A.   Yes.
14     Q.   **And is the retainer with them**
15  **individually?**
16     A.   No.
17     Q.   **So they're -- you represent**
18  **them under the retainer agreement solely**
19  **as a punitive class representative?**
20     A.   Yes, I think so.
21     Q.   **Do you have any authority to**
22  **negotiate an individual settlement?**
23     A.   Authority, no.  I don't know.
24  Do I have any authority to negotiate an
25  individual settlement?  I don't know what

245

BOCK
1
2  that means.
3      Q.   **On behalf of Technology**
4  **Training Associates.**
5      A.   I don't think their retainer
6  agreement authorizes me to negotiate an
7  individual settlement on their behalf.
8      Q.   **If class certification is**
9  **denied in the case, does the case**
10  **continue on an individual basis for the**
11  **named class representatives?**
12     A.   I'm not sure.  It depends.
13     Q.   **If the case is not dismissed**
14  **at that phase, would it continue as an**
15  **individual lawsuit?**
16     A.   Why was class certification
17  denied?
18     Q.   **Pardon?**
19     A.   Why was class certification
20  denied?
21     Q.   **Any reason.**
22     A.   Okay.  If it was denied
23  because they were inadequate, then no.
24  It's still a class action.  I'm just
25  going to come in with somebody new.

62 (Pages 242 to 245)

246

BOCK

1  Q.   If -- is there any
2  circumstance under which the lawsuit
3  would continue on an individual basis?
4       MR. BLONIEN:  Objection, calls
5       for a legal conclusion.
6       THE WITNESS:  I don't -- you
7       would have to give me an example.
8  BY MS. LOEW:
9  Q.   Can you provide an example?
10  A.   You want me to -- is there any
11 possible way that something can happen?
12 I don't -- what -- what do you mean?
13 Q.   How long have you been
14 practicing class action law?
15 A.   A long time.
16 Q.   Have you ever seen a
17 circumstance in which class certification
18 was denied and the case continued on an
19 individual basis?
20 A.   Probably, but I can't -- I'm a
21 class action guy.
22      I'm not interested in
23 representing individual plaintiffs on a
24 contingency basis with a statutory damage

247

BOCK

1 cap of $1,500 and no fee shifting.
2      So, yeah, I guess after class
3 certification is denied, it's possible.
4 Q.   Have you ever represented an
5 individual plaintiff after class
6 certification was denied?
7 A.   I don't know what that means.
8 Individual -- have I ever represented an
9 individual plaintiff?  Have I ever gotten
10 the named plaintiff some kind of recovery
11 after the class certification was denied
12 or arbitration was compelled, that kind
13 of thing?  Probably.
14      But so what?  What's the
15 point?  It's a class action.  That's what
16 we're doing.  Everybody thinks that.
17 Q.   Everybody thinks what?
18 A.   Everybody thinks it's a class
19 action.  The plaintiffs think that's
20 what's happening.  That's -- that's what
21 the retainer agreement would say.
22      That's what your retainer
23 agreement -- that's what's Medical &
24 Chiropractic retainer agreement says.  I

248

BOCK

1 read it.
2      It says if the attorneys
3 decide they are not adequate, they can be
4 tossed off the case.  Says it right on
5 the retainer agreement.  I don't know.
6      I'm not trying to argue with
7 you.  I'm just trying to understand
8 what -- feel like we're splitting hairs
9 for some reason.
10 Q.   I'm trying to understand if
11 there's individual representation of the
12 punitive class representatives --
13 A.   As opposed to the class?
14 Q.   -- in addition to their role
15 as punitive class representative.
16      MR. BLONIEN:  Objection, vague
17      as to time frame, calls for a legal
18      conclusion, asked and answered,
19      badgering the witness.
20      MR. COHEN:  I'll join.
21      THE WITNESS:  No, I'm not
22      sure.
23 BY MS. LOEW:
24 Q.   Are you aware that

249

BOCK

1 Mr. Oppenheim's laptop was stolen?
2 A.   Mr. Oppenheim told me that.
3 Q.   The laptop that was stolen,
4 was that a Bock Law Firm laptop?
5 A.   I don't think so.
6 Q.   Was it Mr. Oppenheim's
7 personal laptop?
8 A.   I have no idea.  I gave him
9 $300 or something and he bought a laptop.
10 I bought him another -- I
11 bought him a laptop for use at the
12 office.  I don't know.
13 Q.   Do you know if there are
14 any -- was the laptop used for official
15 firm business?
16      MR. COHEN:  Which laptop?
17 BY MS. LOEW:
18 Q.   That was stolen.
19      MR. BLONIEN:  What was the
20      question?  I'm sorry.  I didn't
21      hear.
22 BY MS. LOEW:
23 Q.   Was the laptop that was stolen
24 used for official firm business?

63 (Pages 246 to 249)

250

BOCK

1    MR. BLONIEN:  Objection, calls
2    for speculation.
3         MR. COHEN:  Join.
4         You can answer.
5         THE WITNESS:  I don't know.  I
6    don't know that he told me that.  I
7    have no idea.
8  BY MS. LOEW:
9       Q.   Did you ever see him using it?
10      A.   Not that I remember.  Him and
11   I don't spend a lot of time together
12   because he's doing his work and I'm doing
13   my work.
14        We used to spend a lot of time
15   together.  I hired him.  Now he does it
16   solo.
17      Q.   On law firms that Bock Law
18   Firm owns --
19      A.   Laptops.
20      Q.   Laptops, excuse me.  On
21   laptops that Bock Law Firm owns, is there
22   any automatic backup?
23      A.   Not that I know of.  Laptops
24   that -- no.  Not that I know of.

251

BOCK

1         I'm thinking about my own
2    laptop, which is a firm laptop, I guess,
3    because I bought it with the firm's
4    money.  There's no backing it up
5    anywhere.
6       Q.   Is there the ability to
7    externally wipe a firm laptop?
8       A.   I'm not sure.  I think so,
9    because I have an Apple and MacBook.  I
10   think I can do something like that, but I
11   never looked into it.  I think I can do
12   it with my phone too.
13      Q.   Have you ever been convicted
14   of a crime?
15      A.   Not a crime.  I think I had a
16   speeding ticket one time.  I think I
17   plead guilty to get court supervision.  I
18   have never been arrested.
19        MR. COHEN:  Anything else you
20   want to share?
21        THE WITNESS:  No.  I was just
22   trying to think.  I don't know if
23   that's a crime.  It's illegal to
24   speed.

252

BOCK

1  BY MS. LOEW:
2       Q.   Other than a speeding ticket?
3       A.   It wasn't a felony or a crime
4    involving moral turpitude or whatever the
5    rule would be.
6       Q.   Okay.
7       A.   Hopefully there's not a text
8    message that says there was.
9         MR. COHEN:  Just while counsel
10   is looking at a new exhibit, it's
11   just about 4:30 p.m.  Just wanted
12   the record to reflect we had talked
13   about a hard 5 p.m. stop.
14        MS. LOEW:  Yes.
15        MR. COHEN:  Are we on 30?
16        MS. LOEW:  Yes.
17        (Bock Exhibit 30
18        marked for
19        identification.)
20   BY MS. LOEW:
21      Q.   So we handed you Exhibit 30,
22   which is Defendant Bock Law Firm, LLC's
23   privilege log.
24      A.   Yes.

253

BOCK

1       Q.   Second entry on here says,
2    "unsolicited oral communication by
3    Mr. Oppenheim to Mr. Bock, on or about
4    May 18, 2016, seemingly -- seemingly
5    pertaining -- pertaining to settlement
6    negotiations in the Cin-Q action,
7    referenced in Bock Law Firm, LLC's
8    supplemental answer to M&C interrogatory
9    No. 4."
10        Do you see that?
11      A.   I see that.
12      Q.   Do you know what communication
13   that's referring to?
14      A.   Yes.
15      Q.   I'll ask the question for the
16   record.  What did Mr. Oppenheim tell you?
17        MR. COHEN:  And I'll object,
18   invoking attorney-client work
19   product doctrine and the joint
20   defense privilege, and on that
21   basis, for the same reason given in
22   the privilege log and in our answer
23   to interrogatory No. 4, I'll
24   instruct the witness not to answer.

64 (Pages 250 to 253)

254

```
 1           BOCK
 2  BY MS. LOEW:
 3      Q.   Are you following your
 4  counsel's instruction?
 5      A.   Yes.
 6      Q.   I saw reference in the text
 7  messages to Brian Wanca having you on the
 8  ropes a couple years ago.  Do you
 9  remember seeing that?
10      A.   No, but I get kind of -- I
11  exaggerate for effect if you haven't
12  noticed.
13      Q.   And what -- what were you
14  referring to?
15      A.   I don't -- if you could show
16  me the email or whatever you are talking
17  about, maybe it would refresh my memory,
18  but...
19           (Bock Exhibit 31
20           marked for
21           identification.)
22        THE WITNESS:  One second.
23     I'll take a look.
24  BY MS. LOEW:
25      Q.   I don't know if I said it for
```

255

```
 1           BOCK
 2  the record, I handed you Exhibit 31,
 3  which is BLF 142 to 144.
 4      A.   Okay.
 5      Q.   Is this an email exchange
 6  between you and Dan Cohen?
 7      A.   Yes.
 8      Q.   On the first page it says, "I
 9  guess what I am saying is Wanca had me on
10  the ropes a couple years ago and should
11  have cut off my head, but he didn't, and
12  he wasn't able to and you helped me
13  through that."
14           Do you see that?
15      A.   Yes.
16      Q.   What are you referring to
17  here?
18      A.   I think I'm referring to the
19  fact that -- I think this is about the
20  fact that I had figured out Brian was
21  filing all these cases behind my back,
22  joint venture cases.  And my firm had
23  spent a lot of time on this whole Ashford
24  Gear thing, defending and then litigating
25  all those, saving all those cases and
```

256

```
 1           BOCK
 2  then litigating all those cases while
 3  Brian was running around filing new
 4  cases, and so he's making money hand over
 5  fist and then messing around with me on
 6  the money on the joint cases, and that
 7  was a stressful kind of thing.
 8           It's a contingency practice,
 9  and so on the ropes is, you know, he's
10  kind of abusing me a little bit.
11      Q.   The next page, it says --
12      A.   Or a lot of bit.
13      Q.   Next page it says, "now I feel
14  like I have mustered enough resources to
15  make a move to get back some of my honor
16  and make some more money, and if that can
17  involve causing pain to him, then that's
18  all the better."
19           Do you see that?
20      A.   Yes.
21      Q.   And are you referring here to
22  hiring David Oppenheim?
23      A.   I don't remember, but I think
24  so, just because of the first paragraph
25  on the first -- on page 142, he wants a
```

257

```
 1           BOCK
 2  really big number.
 3           I think I'm talking about
 4  David, and I don't know if that -- that
 5  text comes before or after that next one,
 6  but probably before, I guess.  So it's
 7  probably about David.
 8      Q.   Since the filing of the first
 9  Technology Training action, have you had
10  any communications with anyone at
11  Anderson & Wanca about the Buccaneers
12  litigation?
13      A.   I don't remember.  If I did,
14  it would have been with Brian Wanca.
15           Since filing the first TCPA
16  case, somebody sent me an email saying
17  David has a conflict and you have to
18  withdraw or something like that.  I don't
19  know if that was Mike Addison or Brian
20  Wanca.
21           And other than that, I don't
22  think I talked to Brian, and I wouldn't
23  have talked to anybody else at Anderson &
24  Wanca.
25      Q.   And other than the email with
```

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123 1.800.642.1099



258

BOCK
1
2  Mike Addison that you are referring to or
3  whoever it was with --
4      A.   Yeah.
5      Q.   -- did you have any
6  discussions with Mike Addison about the
7  Buccaneers litigation?
8          MR. BLONIEN:  Objection, vague
9  as to time frame.
10  BY MS. LOEW:
11      Q.   After the filing of the first
12  Technology Training action.
13      A.   Well, me personally?  Because
14  I told you about Dan calling him with
15  somebody else.
16      Q.   Right.
17      A.   I -- I don't know.  I don't
18  think so.  Probably said hello at one of
19  these hearings, something like that, but
20  nothing of substance.
21          MS. LOEW:  Okay.  Let's take a
22  minute to go through my notes.
23          MR. COHEN:  Can I use the
24  restroom real quick?  Thank you.
25          THE VIDEOGRAPHER:  Off the

259

BOCK
1
2  record.  The time is 4:38 p.m.
3          (A recess was had.)
4          THE VIDEOGRAPHER:  Going on
5  the record.  The time is now
6  4:44 p.m.
7          MS. LOEW:  I have no further
8  questions.
9          MR. COHEN:  I just have a few.
10          EXAMINATION
11  BY MR. COHEN:
12      Q.   Going back hours and hours to
13  an earlier discussion you had with Ms.
14  Loew about the way fees on class actions
15  jointly worked by Bock Law Firm and
16  Anderson & Wanca, are treated on those
17  joint cases, and she kept asking you when
18  you get Bock Law Firm's fees and you
19  share those fees with Wanca, and I
20  objected and you repeatedly answered.
21          Just to be clear, was Bock Law
22  Firm sharing its fees with Wanca?
23      A.   No.
24      Q.   Okay.  It's just that whatever
25  fees there were on jointly worked cases

260

BOCK
1
2  were then divided between the two firms?
3      A.   Yeah, yes.
4      Q.   There was a text message or an
5  email in one of the plaintiff's exhibits
6  where there's a paragraph where you're
7  saying something about I wrote these
8  paragraphs, and it's in regard to the
9  Cin-Q or the Medical & Chiropractic
10  Buccaneers class action.
11          Do you recall that discussion
12  some time ago?
13      A.   Yes.
14      Q.   And there was a question where
15  she said what do you mean I wrote these
16  paragraphs?  And if I recall, your
17  response was that you didn't recall what
18  you meant.
19          When you look at the Wanca
20  firm's complaint in the Buccaneers class
21  action and you read the paragraphs, are
22  those template paragraphs that you
23  drafted originally in the past for other
24  class actions?
25      A.   Yes.

261

BOCK
1
2      Q.   Do you recall at some point
3  Ms. Loew talked to you at some length
4  about your interaction with David
5  Oppenheim from March 31 of 2016 to April
6  3 of 2016 when you met with him in person
7  to negotiate an employment arrangement?
8      A.   Yes.
9      Q.   And at one point she asked you
10  if you spoke with Mr. Oppenheim on March
11  31 or whether it was just by text or
12  email.  And I believe you indicated you
13  didn't know if you spoke with him.
14          Would you take a look at
15  Exhibit 11.
16      A.   I thought I said I talked to
17  him on the phone, by the way, but okay.
18      Q.   Do you see on Exhibit 11, page
19  1 it says, "I'm thinking about calling
20  Oppenheimer."
21      A.   Yeah, that's -- that's auto
22  correct.
23      Q.   Right.  And then if you will
24  jump to Bates label 133 of Exhibit 11.
25      A.   Okay.

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123 1.800.642.1099

262

BOCK

1  Q.   Do you see March 31, 2016,
2  12:01 p.m., "I talked to Oppenheim
3  today."
4      A.   Yes.
5      Q.   Whether -- maybe I
6  misunderstood your answer earlier in the
7  deposition, but based on Exhibit 11 and
8  that language, can you tell us whether
9  you actually spoke with Mr. Oppenheim on
10 March 31 about the employment issue?
11     A.   Yeah, yes.  I remember talking
12 to him on the phone because I would have
13 first called him to get -- take his
14 temperature on the thing.  Not going to
15 send somebody a text message and they are
16 offended by it or something, what do you
17 mean come work for you, you know.
18     Q.   And Exhibit 10 is Bock Law
19 Firm's interrogatory answers.
20     A.   Okay.
21     Q.   First supplemental
22 interrogatory answers.
23     A.   Okay.
24     Q.   I just want the record to be

263

BOCK

1  clear on this:  Do you see page 2,
2  interrogatory No. 2 requests
3  communications you had with Oppenheim
4  regarding leaving Anderson & Wanca and
5  joining Bock Hatch.
6      A.   Yes.
7      Q.   And do you see at page 4, Bock
8  Law Firm's original answer, and this is a
9  little more than halfway down the page.
10     A.   Excuse me.
11     Q.   Maybe right at halfway down
12 the page, all the way to the right, the
13 sentence starting at.
14     A.   Yeah.
15     Q.   "At the time such terms were
16 negotiated, Bock Law Firm had decided to
17 pursue -- had not decided to pursue a new
18 Buccaneers class action.  When Bock Law
19 Firm decided to do so and decided that
20 Mr. Oppenheim would be walled off from
21 such litigation, Bock Law Firm also
22 decided that Mr. Oppenheim would not
23 receive any portion of any fees from the
24 Buccaneers litigation."

264

BOCK

1  Did I read that correctly?
2      A.   Yeah, yes.
3      Q.   And was that an accurate
4  statement at that time?
5      A.   Yes.
6      Q.   Now, the first supplemental
7  answer on page 5 describes the original
8  agreement and also on page 6 describes a
9  reduction in Mr. Oppenheim's compensation
10 page effective February 26, 2017,
11 correct?
12     A.   Yes.
13     Q.   Irrespective of whether the
14 supplemental answer mentions it or not,
15 is the fact that Mr. Oppenheim is not
16 receiving any portion of any fees earned
17 or to be earned on the Technology
18 Training case still true?
19     A.   Yes, on the Buccaneers.
20     Q.   Yes.  Yes.  Thank you for the
21 clarification.
22           MR. COHEN:  I don't have
23 anything further.
24           MR. BLONIEN:  I have no

265

BOCK

1  questions.  Thank you.
2           MS. LOEW:  I have one.
3           EXAMINATION (further)
4  BY MS. LOEW:
5      Q.   I see you took some notes
6  during this.
7      A.   No, it's -- it's not notes.
8  It's doodling.
9      Q.   Okay.  All right.  Can we
10 just -- can I look at it?
11     A.   Of course.
12     Q.   We can mark it.
13     A.   Sometimes I -- moving a pen
14 around on a page helps me focus on what's
15 being asked.
16     Q.   Okay.  All right.
17           MR. COHEN:  Sure you don't
18 want to mark that?
19           MS. LOEW:  Don't need to mark
20 that.
21           (Off the record.)
22           MS. LOEW:  I have no
23 questions, no further questions.
24           MR. COHEN:  It occurs to me --

67 (Pages 262 to 265)

266

BOCK

THE VIDEOGRAPHER: Going off the record?

MR. COHEN: No. That we will need to make attorney's eyes only designations as to -- because you requested that we do specific pages because of your position that we have not been specific enough, but you're recognizing the breadth of the attorney's eyes only until we narrow, which we will do.

And we'll also designate when the transcripts come through those portions which are attorney's eyes only.

MS. LOEW: Okay.

MR. COHEN: It occurred to us after we left Mr. Oppenheim's deposition, I don't recall any issue of whether signature was waived, which my understanding is it's not waived, it's reserved, so I'm assuming it's being treated as Mr. Oppenheim having reserved

267

BOCK

signature, and Mr. Bock will as well.

MS. LOEW: Right, yes. I think the protective order provides 14 days for those designations on confidentiality.

MR. COHEN: Okay. Understood. Thank you.

THE VIDEOGRAPHER: Going off the record. The time is 4:54 p.m.

FURTHER DEPONENT SAITH NOT

(Which were all the proceedings had or offered at said hearing of the above-entitled cause at 4:54 p.m.)

268

STATE OF ______________ )
) :ss
COUNTY OF ______________)

I, PHILLIP BOCK, the witness herein, having read the foregoing testimony of the pages of this deposition, do hereby certify it to be a true and correct transcript, subject to the corrections, if any, shown on the attached page.

______________________
PHILLIP BOCK

Sworn and subscribed to before me, this ________ day of __________, 2017.

______________________________
Notary Public

269

BOCK

STATE OF ILLINOIS )
) SS:
COUNTY OF COOK )

I, Renee E. Brass, Certified Shorthand Reporter of the State of Illinois, CSR No. 084-004119, do hereby certify that said witness was duly sworn by me to testify the truth; that the said deposition was taken at the time and place aforesaid; that the testimony given by said witness was reduced to writing by means of shorthand and thereafter transcribed into typewritten form; and that the foregoing is a true, correct, and complete transcript of my shorthand notes so taken as aforesaid.

I further certify that there were present at the taking of the said deposition the persons and parties as indicated on the appearance page made a part of this deposition transcript.

I further certify the signature of the witness to the foregoing deposition was not waived by

270

```
1            BOCK
2    agreement of counsel; and that I am not
3    counsel for nor in any way related to
4    any of the parties to this suit, nor am
5    I in any way interested in the outcome
6    thereof.
7          IN WITNESS WHEREOF, I have
8    hereunto set my hand this 23rd day of
9    August 2017.
10
11
12
13
14
15          Notary Public, Cook
16            County, Illinois
17
18
19
20
21
22
23
24
25
```

271

```
1         INSTRUCTIONS TO WITNESS
2
3      Please read your deposition over carefully
4    and make any necessary corrections. You should state
5    the reason in the appropriate space on the errata
6    sheet for any corrections that are made.
7      After doing so, please sign the errata sheet
8    and date it.
9      You are signing same subject to the changes
10    you have noted on the errata sheet, which will be
11    attached to your deposition.
12      It is imperative that you return the original
13    errata sheet to the deposing attorney within thirty
14    (30) days of receipt of the deposition transcript by
15    you. If you fail to do so, the deposition transcript
16    may be deemed to be accurate and may be used in court.
17
18
19
20
21
22
23
24
25
```

272

```
1              E R R A T A
2
3
4
5      I wish to make the following changes,
6    for the following reasons:
7
8    PAGE LINE
9    ___ ___ CHANGE:_____
10   REASON:_____
11   ___ ___ CHANGE:_____
12   REASON:_____
13   ___ ___ CHANGE:_____
14   REASON:_____
15   ___ ___ CHANGE: _____
16   REASON:_____
17   ___ ___ CHANGE: _____
18   REASON:_____
19   ___ ___ CHANGE: _____
20   REASON:_____
21
22   _____  _____
23    WITNESS' SIGNATURE        DATE
24
25
```

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123 1.800.642.1099

**A**

**AB** 10:8
**abilities**
112:4,23,24
140:22
**ability** 251:7
**able** 216:22
255:12
**above-entit...**
154:20
267:15
**absolutely**
141:6
223:19
243:19
**abundance**
151:11
153:8
**abusing**
256:10
**accept** 221:25
**accepted**
116:4
122:22
149:18
**access** 239:23
**account**
160:22
169:23
171:4
**accountants**
206:4
**accounting**
89:6
**accurate**
158:16,20
159:8,10,22
162:9 264:4
271:16
**acquaintan...**
57:4
**acting** 61:25
243:13
**action** 13:19
15:3,7,16
15:22 18:4
19:7 22:17
24:6 30:11

50:13,14
54:14 58:24
59:2,19
60:6 61:4
89:12
100:20
102:15
103:2,19,21
105:19
107:11
110:11
150:22
151:24
167:4,10
178:21
179:6,11,16
179:24
183:8
184:15
185:4,22
186:16,21
187:18
198:14,18
198:25
206:19
207:2
213:25
214:5
226:23
237:15
240:11
243:6 244:8
245:24
246:15,22
247:16,20
253:7 257:9
258:12
260:10,21
263:19
**actions** 15:9
15:12 16:24
19:6 22:8
22:11 23:5
25:11 26:11
27:12 28:12
33:10,17
38:21 55:13
60:5 216:10

259:14
260:24
**actual** 45:7
46:3 155:13
211:8
**Adams** 2:10
**add** 78:21
79:14 86:14
**added** 86:18
124:24
**Addison**
60:18 64:9
70:2,12,24
72:3,22
73:6 75:15
77:17 78:3
78:17 79:12
81:21 88:21
88:23,25
89:4 91:19
92:9,11,14
92:21 93:18
105:20
179:21
180:9,24
183:4,6,12
183:24
184:11
185:2 186:3
188:9
193:16
194:6
196:24
202:12
210:21
212:16,20
213:5,6,13
237:10,13
237:18
257:19
258:2,6
**Addison's**
186:13
**addition**
248:15
**additional**
71:13,19,23
78:21 85:21

**adequate**
209:10
248:4
**admitted** 9:2
**advice** 225:6
226:15,21
226:24
227:5 231:4
**advise** 225:11
**advised**
225:16
**affiliate**
94:24
**afford** 160:13
**afforded**
231:8
**aforesaid**
269:10,17
**aggregate**
55:23
**ago** 53:25
54:17 59:13
63:2 114:15
114:20
254:8
255:10
260:12
**agree** 31:20
**agreed** 28:23
30:10,17
41:12 131:9
152:18
173:4,8
174:16,22
176:8,11
225:18
**agreement**
28:11 29:2
29:3 31:16
33:20,23
34:19,22,25
40:16 41:5
41:10,11
42:12,17
43:3,8,13
44:2,4,11
46:3 213:6
244:11,18

245:6
247:22,24
247:25
248:6 264:9
270:2
**agreements**
29:6
**ahead** 32:4
33:2 37:5
102:18
105:23
109:14
163:15
180:5
184:21
199:15
217:25
228:22
236:23
238:8 239:6
**al** 5:8 162:5
**alert** 63:5
**alias** 83:24
**allowed**
217:10
**amazing**
114:8
**ambiguity**
180:2
**ambiguous**
94:2,10
102:17
109:13
**amend** 71:11
**amended**
58:2 78:21
**amount**
130:15
162:25
194:11
**amounts**
54:24
163:23
**analyzed**
103:17
**Anderson**
23:8,10,25
24:12,22

25:18 30:23
31:3,17,18
31:20 32:7
32:19 33:9
35:8,19
37:12 38:13
39:23 40:19
41:6 43:7
44:4,18
46:9,21
47:12 51:16
51:17 52:9
53:21 56:16
56:21 61:5
64:22,23
68:13 71:7
73:5,16
74:5,10
76:21 84:13
84:21,23,25
85:8,10,14
85:18 88:22
95:20 96:4
96:10,14,20
100:10
101:5
102:13
105:20
110:22
111:2 112:4
112:5,25
115:24
116:7,16
127:6
145:12
178:13,19
179:7,17
190:15,21
190:21
191:15,21
195:8
198:10
218:8,17,25
257:11,23
259:16
263:5
**Anderson's**
191:11

198:6
**Andrew** 6:12
**and/or**
143:16
**announced**
53:9
**annual** 159:2
**annualized**
158:8
**answer** 7:23
7:24 31:23
32:22 34:9
39:6,12
40:25 43:11
43:20 74:8
75:4 79:4
94:11 95:4
103:23
104:2,19
108:13
127:9
146:11
164:17
172:25
180:6
185:18
217:21
232:4 238:8
250:5 253:9
253:23,25
262:7 263:9
264:8,15
**answered**
34:8 37:2,3
43:19 74:7
75:3 104:18
105:22
106:9
110:13
172:22
195:13
236:22
248:19
259:20
**answers** 4:9
39:16 57:25
117:12
157:22

262:20,23
**anticipate**
136:13
**anti-trust**
22:15
**anybody** 24:5
57:18 68:9
92:22
100:19
101:13
114:23
115:3
122:13
123:2
151:15
177:16,20
186:14
187:7
200:12
221:20
224:15
225:16
226:4 236:3
236:4,6
238:18
240:5
257:23
**anyway**
216:23
**Apologize**
19:21
**apparently**
148:6 242:5
**appearance**
45:11
269:21
**appears**
77:25 80:7
162:15
**appellate**
114:8
**Apple** 251:10
**apply** 31:16
169:12
**approach**
127:14
201:10
**approached**

120:19
127:4
**approaching**
119:10
**appropriate**
271:5
**approves**
215:19
**approving**
124:10
**approxima...**
7:6 13:24
14:20 17:13
**April** 131:7
131:17
143:9 150:5
150:14
151:19
171:4 178:8
180:19,19
180:20,21
186:4 192:2
197:4
199:24
207:7
240:20
242:8,22
243:4 261:5
**arbitration**
247:13
**ARDC**
159:20
161:25
**area** 183:19
203:12
**argue** 15:24
62:4 181:3
208:15
248:7
**argued** 26:2
48:23
**arguing** 30:5
**argument**
53:5,10
87:14
113:19
151:12
180:15

**argumenta...**
238:6
**arguments**
50:18
**arrangement**
261:7
**arrested**
251:19
**articulating**
207:25
209:15
**Ashford**
255:23
**asked** 34:7
35:11 36:18
39:18 43:18
53:20 74:6
75:2 104:25
105:22
106:8,16
108:14
110:13
129:24
172:21
195:12
216:11
220:22
224:15
227:7
236:22
248:19
261:9
265:16
**asking** 38:16
39:5 82:10
106:25
130:5 152:5
221:14
259:17
**aspect** 103:6
**assert** 228:9
**assigned**
21:12
**associate**
12:18 13:16
15:23
**Associates**
206:16

244:12
245:4
**assume** 99:11
127:7
199:11
**assumed**
140:22
**assumes**
35:22 36:15
40:22
217:22
**assuming**
60:22 140:4
143:18
146:7
266:24
**ATG** 54:10
55:18
**attached**
268:12
271:11
**attachment**
75:20 76:17
**attempt**
186:18
**attend** 237:7
237:25
**attention**
84:4
**attorney** 7:23
8:21 12:18
13:16 31:21
50:24,25
64:21 69:5
80:13
102:10
144:23
155:19
176:5
212:15
231:10
233:25
239:15
271:13
**attorneys**
5:16 19:9
20:13 52:8
79:15 107:5

142:10
156:3 214:9
214:19
215:2 248:3
**attorney's**
134:22
135:10,14
135:20,24
137:2,11,22
162:16
232:7 266:5
266:11,15
**attorney-cl...**
137:16
253:19
**AT&T** 27:4
**August** 1:18
5:14 76:7
76:10 77:15
270:9
**Augustana**
10:3
**authority**
244:21,23
244:24
**authorizes**
245:6
**auto** 261:21
**automatic**
250:23
**award** 38:6
**awarded** 32:7
32:8 35:17
37:10,22
38:9,18,23
40:17
167:13
**awarding**
38:11
124:11
**aware** 62:8
62:10
108:10,15
193:24
232:3
248:25
**a.m** 1:18 5:15
63:23 64:4

**B**

**B** 4:2 98:10
98:10,11,11
**BA** 10:9
**Bachelor**
10:8
**back** 12:3
79:6 104:22
105:17
119:24
124:18
130:25
132:21
133:6,10,11
133:14,15
133:20,21
149:15
155:9
159:13
168:10
171:19,20
175:25
184:23
193:15
202:19
207:13
210:15
213:14
231:17
243:3
255:21
256:15
259:12
**backing**
251:5
**backup**
250:23
**bad** 101:13
157:13
**badgering**
248:20
**bailing** 101:5
**ball** 183:14
**bamboozling**
83:22
**bank** 160:21
**bankruptcy**
18:8

**bar** 9:3 11:18
12:13,14
227:14,15
227:15
**barely** 118:11
**Barry** 2:11
5:23 162:2
163:24
197:23
**barry@blo...**
2:11
**based** 24:15
24:16 46:15
95:21
104:19
194:17
195:22
262:8
**basis** 55:20
94:17,20,25
159:3
221:10
228:8
245:10
246:4,20,25
253:22
**Bates** 121:8
128:17
261:24
**Bay** 64:19
65:24 66:11
66:24 67:11
67:19 68:14
71:11,20
72:18,21
73:6,17
74:4 75:21
75:23 76:22
81:9 82:16
83:2,4
88:16,17
91:20 92:16
93:18 94:6
94:18,23,25
99:25
100:11
102:15
133:19

194:16,25
195:4,7,20
196:8 201:3
201:14
206:10
207:9
**Beach** 63:11
**bedroom**
27:23 28:3
**beginning** 5:4
14:9 64:3
120:16
141:14
155:6
189:11
**behalf** 2:3,8
2:13 5:19
5:22,25
192:11
193:25
243:7,13
244:2 245:3
245:7
**believe** 11:3
16:19 22:9
25:10,24
37:2 61:6
63:12
122:15
140:21
157:23
171:8
192:25
196:7 211:4
230:8
231:18
234:21
238:13
261:12
**benefit**
124:24
140:23
**best** 209:10
**besting** 194:4
**betrayal**
100:21
**better** 44:21
256:18

**big** 16:2
27:22 58:5
66:14
148:17
193:18
194:8
210:11,12
215:16
257:2
**bigger** 181:12
181:13
210:20,24
**Biggerstaff's**
95:6
**Bissell** 12:15
13:7
**bit** 8:6 57:10
84:7 125:19
125:20,21
126:3 199:8
209:15
211:21
219:20
256:10,12
**blah** 211:12
211:12,12
**blaming**
191:4
**BLF** 64:7
70:21 75:13
77:15 79:23
80:8 90:23
98:24
107:19
121:8,18
126:16
128:10
129:7 132:4
132:17
137:21
138:5,16
142:14
143:11
147:7,13
150:4 165:2
166:12
170:17
172:3

173:17
174:13
176:15
188:18
189:21,22
189:22
190:14
197:2
200:18
203:24
205:24
219:9
220:10
223:13
224:17
229:5
233:16,18
241:18
255:3
**blocks** 137:6
**Blonien** 2:9
2:11 5:23
5:23,24
39:24 80:6
110:16
120:8
129:13
134:8 135:7
162:11,13
162:20
163:2,24
164:8
184:16
188:21
192:19
203:5 222:7
223:5,21
229:10
231:6 238:5
246:5
248:17
249:20
250:2 258:8
264:25
**Blonien's**
162:3
**blood** 175:24
**Bloomington**

10:2
**blue** 130:5
182:14
**Bock** 1:9,9,13
2:13,14 3:1
5:1,6,22 6:1
6:5,10,12
7:1 8:1,16
8:20 9:1
10:1 11:1
12:1,6 13:1
14:1 15:1
16:1 17:1
18:1,25
19:1,4,13
20:1,4,9,24
21:1,5,15
21:16,18,20
22:1,22
23:1 24:1
24:11 25:1
26:1,8,10
27:1 28:1
29:1 30:1
31:1,21
32:1,21
33:1 34:1
35:1,6,18
36:1 37:1,9
37:10,21
38:1,12
39:1,18,21
40:1,17
41:1,5 42:1
43:1 44:1,5
45:1 46:1,8
47:1 48:1
49:1 50:1
51:1,15
52:1 53:1
54:1 55:1
56:1 57:1
58:1 59:1
60:1 61:1
62:1 63:1
63:14 64:1
65:1 66:1
67:1 68:1

68:22 69:1
70:1,16,24
71:1 72:1
73:1 74:1
75:1,8,16
75:16 76:1
77:1,9,17
77:17 78:1
79:1,14,18
79:25 80:1
81:1 82:1
83:1 84:1
84:15,20
85:1,3,7,12
85:20 86:1
87:1 88:1
88:22 89:1
89:7,11,18
90:1,18
91:1,9,16
91:16 92:1
92:15 93:1
94:1 95:1
95:21 96:1
96:4,14
97:1,5 98:1
98:18,25
99:1,7
100:1,5
101:1 102:1
102:7,14
103:1,18
104:1 105:1
106:1 107:1
107:9,14,21
108:1 109:1
110:1 111:1
111:6 112:1
113:1 114:1
115:1,23
116:1,16
117:1,6,11
118:1,4,6
119:1 120:1
120:24
121:1 122:1
123:1 124:1
125:1 126:1

127:1,15
128:1,4
129:1,25
130:1 131:1
131:5,8,10
131:23
132:1 133:1
134:1 135:1
136:1 137:1
137:25
138:1 139:1
140:1 141:1
141:19
142:1,11,22
143:1,5
144:1 145:1
146:1,19
147:1,2
148:1,8
149:1,23
150:1,6,14
151:1 152:1
153:1 154:1
155:1,9,13
156:1 157:1
158:1,23
159:1 160:1
160:23
161:1 162:1
162:25
163:1,6
164:1,19
165:1 166:1
167:1,13
168:1 169:1
170:1,10
171:1 172:1
173:1,11
174:1 175:1
176:1 177:1
177:6 178:1
179:1,4,7
180:1 181:1
182:1 183:1
184:1,12
185:1,6
186:1 187:1
188:1,13

189:1 190:1
191:1,19
192:1 193:1
194:1 195:1
196:1 197:1
198:1 199:1
199:10
200:1,13
201:1 202:1
203:1,17
204:1 205:1
206:1 207:1
208:1 209:1
210:1 211:1
212:1 213:1
213:19
214:1 215:1
216:1 217:1
218:1 219:1
219:4 220:1
220:5 221:1
222:1 223:1
223:8 224:1
224:10
225:1 226:1
227:1 228:1
228:24
229:1 230:1
231:1,17
232:1 233:1
233:9,20
234:1 235:1
236:1 237:1
238:1 239:1
240:1 241:1
241:11
242:1 243:1
244:1 245:1
246:1 247:1
248:1 249:1
249:5 250:1
250:18,22
251:1 252:1
252:18,23
253:1,4,8
254:1,19
255:1 256:1
257:1 258:1

259:1,15,18
259:21
260:1 261:1
262:1,19
263:1,6,8
263:17,19
263:22
264:1 265:1
266:1 267:1
267:2 268:7
268:16
269:1 270:1
**Bock's** 65:19
**body** 65:3
71:8 91:19
107:25
**bonus** 158:8
167:21,21
169:15,17
**borrowed**
171:17
**boss** 209:12
**bother** 153:8
**bottom** 80:18
91:15 99:7
107:24
138:10,18
143:11,15
150:13
158:4
168:13
223:25
**Bouchard**
25:21 26:24
**bought**
197:21
249:10,11
249:12
251:4
**brainstorm...**
165:24
166:21
**Brass** 1:16,21
269:4
**breadth**
266:10
**break** 7:18
63:20 84:6

113:20
119:12,15
119:19
120:7
154:15
170:4 189:5
189:14
**breakfast**
57:19
**breath**
122:23
**Brian** 25:6,12
25:17 26:12
26:14 27:13
30:23 33:10
35:15 38:21
38:25 40:9
40:15 41:12
44:8 45:21
47:18,25
48:4,19,22
49:10 52:7
52:11,15,16
55:13 57:5
57:7 64:8,9
65:8,18,25
66:18 67:2
67:4,10
70:22 72:9
72:22 74:18
74:24 75:7
75:15 76:14
77:3,6,16
78:4 81:7
86:4 111:25
115:15
116:9,20
117:4 119:9
124:14,17
124:18,18
125:17,22
126:2,6,20
132:22
141:12
149:11
150:17
151:8,9
152:16,16

153:22
166:7,10
178:23
181:11
186:11,24
190:14
191:9
192:25
193:6,9
194:3 196:3
201:6
208:11
209:24
210:10,11
210:14
213:3 218:6
218:8 254:7
255:20
256:3
257:14,19
257:22
**Brian's** 31:10
89:24 142:9
**brief** 26:5
114:8
**briefed**
192:12
193:24
**briefing** 30:4
**briefs** 41:16
202:11
**bring** 111:22
140:9,13
143:24
144:20
145:6,11
146:14,15
146:16
175:14
**bringing**
51:21
183:16
**brings** 149:15
**broad** 192:10
**Brook** 12:16
**brother** 56:3
**brothers** 54:8
54:9 56:5

**brought** 27:5
50:22 84:3
141:19
146:3,8
160:17
167:3
182:13
183:21
184:4,7
**Buccaneers**
58:8,10,14
58:20,23
59:20 62:9
62:11,19,21
64:19 65:24
66:11,24
67:12,19
68:15 70:3
71:12,21
72:18,21
73:6,17
74:4 75:22
75:23 76:22
77:8 79:14
82:17 83:2
83:4,12,22
84:11,15
88:16,20
89:13 91:21
92:16 94:6
94:18,24,25
99:25
100:12
102:15
103:20
107:12,21
108:10,12
108:16
109:3
110:10
111:2,7,11
133:19
134:2,6
141:4
151:22
152:10,22
154:2 162:2
167:4,10

169:5 179:6
179:18,22
180:2,11
181:8,25
183:7,13
184:14
185:7 186:6
186:19,22
187:10,19
188:6
191:16
194:16,25
195:5,7,20
196:8
197:17
198:19
199:2 201:3
201:14
202:16,25
203:8
206:11
207:9 210:4
212:21
220:3,16,21
221:22
222:5,16,24
224:9
225:22
226:16,23
227:2,25
233:6
236:20
237:15,20
257:11
258:7
260:10,20
263:19,25
264:20
**bucks** 147:15
**Bucs** 78:8,10
78:12,19
104:24
152:8 191:9
204:2,13
205:2,6,21
**Buc's** 193:7
**build** 239:13
**bunch** 41:17

58:5
**business** 10:9
45:24 46:2
51:13 86:25
249:16,25
**businesses**
27:17 51:8
**busy** 58:7
123:24
125:12
227:14
**butt** 176:23
**buy** 147:22
148:2,4
149:3,6

_____

**C**

**calculate**
55:19
**calendar**
185:19
**call** 30:7
41:24
127:16
128:3
213:12,20
214:3 218:9
218:15,16
224:20
**called** 1:13
12:25 13:13
14:2 17:18
20:19,24
54:9 60:2
62:15 66:20
98:13 105:9
141:11
175:12
202:8
213:14,15
218:10
228:4
262:14
**caller** 200:6
**calling** 19:15
231:16
258:14
261:19

**calls** 43:9
164:8
192:19
222:7 246:5
248:18
250:2
**cap** 247:2
**cape** 212:4
**Capital** 192:7
192:16
193:3,19
194:4
209:25
**caption**
243:12,24
**car** 56:4
96:11
**care** 112:18
181:14
**career** 14:10
49:22
**carefully**
271:3
**case** 1:6 6:21
6:24 15:25
16:2 30:9
30:10,15,20
30:21 31:8
32:6 36:4
37:23 38:7
38:9,10,14
38:15,19,20
49:7,8
52:22 54:6
54:9,11,24
55:18 56:20
56:20 58:9
58:11,14,20
58:23 59:3
59:5,10,12
59:17,21,23
59:23 60:2
60:24 62:9
62:11,21,22
62:24,25
63:10 66:10
67:18,19,21
67:24 70:3

71:20 72:5
72:21 73:12
73:16 74:22
76:21 78:9
78:18 79:13
80:22,23
81:8 82:24
83:12 84:2
84:3,5,9,11
84:14,17,24
85:19,20
88:17,17,21
90:11 91:21
92:16 93:18
94:5,17,21
95:2 99:12
99:25
100:12,22
103:6,6,9
103:12
104:8,25
108:10,12
108:16
109:3
110:20,21
110:24
111:2,7,12
111:17
121:10
134:3,6
141:4
150:16,17
150:22
151:23
152:10,22
153:22
154:6 156:8
156:12
167:13
180:16
181:20,25
182:4,17,21
182:24
183:10,11
183:15
184:4
185:12
186:25

187:10,24
188:5 190:5
190:11
191:20
193:7,18,21
194:16
195:22
196:8
197:11,17
197:24
199:2 201:4
201:8
202:10
203:2 207:8
209:9 210:3
210:11,13
212:21
213:2,4
214:10,22
215:4,6
219:19
220:16,21
222:4 225:9
228:8
231:23
236:20
245:9,9,13
246:19
248:5
257:16
264:19
**cases** 6:19
16:9,11
25:21,25
26:20,22
27:2,10,15
28:24 29:10
30:7,19
31:12,14
32:19,20
35:16 38:2
39:4,18,21
40:4,5,7,14
41:13,15,19
41:19,22,24
41:24 42:4
42:6,7,10
44:9,9,13

44:17,23
45:8,10
46:17,18,20
46:22,23,23
46:25 47:11
47:13,15,15
48:14 51:6
51:9,12,15
53:16 55:17
59:14,23,24
60:24 61:3
61:21,23
68:5 73:2,9
73:9 74:21
80:20 82:25
84:20 85:2
85:7,10,13
86:22 90:2
95:19 96:15
96:20
103:10
109:10,19
111:21,22
115:8
123:22
124:3,5
125:2 139:3
139:5,6,7,9
139:10,12
139:13,15
139:20,22
139:23
140:6,9,12
140:14,16
141:7,8,13
141:17,24
142:2,3
145:6,7
151:8
152:12,15
152:24
153:6,9,20
153:24
154:4,10
155:23
167:22
168:2,8
169:2,4

180:4 196:5
208:14
210:14
255:21,22
255:25
256:2,4,6
259:17,25
**categories**
168:8
**category**
154:11
**cause** 154:21
267:15
**caused** 20:19
**causing**
256:17
**caution**
151:11
153:8
**cc** 70:23
75:16 77:17
99:2
**cease** 21:24
**cell** 41:23
66:20
195:17
**ceremonial**
53:11
**cert** 150:23
151:24
192:12
193:23
**certain** 30:19
44:3 77:6
105:7 168:8
**certainly**
23:7 59:8,9
68:23
201:18
**certification**
52:21 53:5
53:10 245:8
245:16,19
246:18
247:4,7,12
**certified**
54:14 181:5
269:4

**certify** 15:25
268:10
269:7,18,23
**chain** 4:5,5,6
4:6,7,7,8,8
4:10,11,12
4:14,15,16
4:17,18,19
77:23 78:3
91:10
121:11
128:21
134:15
138:7
183:12
189:2,18,21
189:22
192:3 199:7
200:23
204:5
211:15
217:20
234:3,23
**chains** 199:13
**chair** 182:15
**Champaign**
56:8
**chance**
155:10
**change** 15:20
47:25 55:10
124:15
272:9,11,13
272:15,17
272:19
**changed**
18:24 26:7
26:10
115:16,18
157:20,21
187:13,16
187:17
**changes** 21:8
271:9 272:5
**characterize**
165:6
**Charlottes...**
9:22

**chase** 33:14
**check** 134:5
143:16
144:3
171:21,25
**checks**
169:18
**Chern** 17:18
17:21,22
18:6,11
19:16,17
25:10,16
26:8
**Chicago** 1:17
2:5,16 5:13
13:14 16:21
16:23 27:8
60:3 103:9
130:19,21
148:23
**Chin** 60:3
**China** 239:14
**Chinaris**
227:11,15
228:6,10
229:7
230:18,21
231:3,23
232:13
233:4
**Chinaris's**
230:4
**Chinese**
153:4,12,23
154:11
219:18,21
225:12
239:4,8,9
239:18
**Chiro** 75:17
78:10,13,15
**Chiropractic**
1:4 5:7,19
62:8,15,18
62:19
145:18
237:3
247:25

260:9
**chiropractor**
206:8
**chronology**
185:13
**Cin** 62:22
**Cingular**
25:22
**Cin-Q** 62:10
62:22,24
88:16,20
89:12
107:21
108:9,12,16
109:3
110:10,25
111:7,11
134:2,6
141:4
151:22
152:8 237:2
237:15,20
253:7 260:9
**circuits** 9:4
**circulating**
16:12
**circumstance**
246:3,18
**cited** 109:18
**citing** 109:21
109:24,24
**Civic** 19:2
**Civil** 1:14
**Clair** 6:22
**clarification**
185:10
264:22
**clarify** 80:7
**Clark** 1:17
2:4 5:13
**class** 13:19
15:3,7,9,12
15:15,22,25
16:24 18:4
19:6,7 22:8
22:11,17
23:5 24:6
25:11 26:11

27:12 28:12
30:11 33:10
33:17 38:7
38:8,11,12
38:21 40:18
50:13,14
52:12,21
53:5,7,10
54:13,17,18
55:13 58:24
58:25 59:2
59:4,5,17
59:18,19
60:5,6 61:4
100:19
102:15
103:2,19
105:19
150:22,23
151:24,24
181:5
186:18,21
187:18
192:12
193:23
197:10
206:18
207:2
209:11
212:9,15,23
215:20
216:9
221:24
235:3,18,25
236:10,19
240:9 243:9
243:14,19
243:22
244:3,8,19
245:8,11,16
245:19,24
246:15,18
246:22
247:3,6,12
247:16,19
248:13,14
248:16
259:14

260:10,20
260:24
263:19
**class-wide**
55:20
**clear** 153:14
160:21
171:23
199:4
259:21
263:2
**Clement** 80:3
83:14 90:2
90:12
**clerked** 11:25
**client** 143:20
150:25
197:13,16
**clients** 194:19
**Clinic** 1:4 5:7
5:20 11:22
62:9
**clip** 148:13
148:21
**close** 130:20
**closest** 106:3
**closings** 55:5
**coaching**
36:10,11,15
36:17
**coffee** 7:21
**Cohen** 2:16
3:4 5:21,21
31:23 32:22
34:7 35:20
36:3,13
37:3,13
40:2,20
43:9,18
47:4 57:20
63:17 74:6
75:2 78:24
82:9 93:25
94:7 95:3
95:12
102:16
103:22
104:12,15

105:15,21
106:8
109:12
110:12
112:17
118:21
119:20
120:2,4
121:17,24
122:3,6,12
122:25
127:7
128:12,15
131:18
133:4
134:10,19
134:24
135:6,9,13
136:2,6,9
136:15,21
137:4,9,18
137:23
138:8,10,22
142:17
143:10
145:24
146:6 150:7
153:13
163:13
164:15
166:23
172:21,25
173:3,22
174:11
177:11,20
179:25
184:19
185:9
192:22
195:12
199:3,15
200:25
201:15
202:18
203:20
204:16
205:13
213:11

217:21
222:9 228:5
228:15
229:18
230:14
231:20
232:9
236:21
238:7 241:3
241:8
242:19
248:21
249:17
250:4
251:20
252:10,16
253:18
255:6
258:23
259:9,11
264:23
265:18,25
266:4,18
267:8
**cold** 65:6
**collect** 55:6
**collecting**
55:4
**collections**
27:15
**collects**
158:12
159:6 168:6
168:18
**College** 10:3
**come** 28:10
56:10
124:25
127:22,24
129:4,9,17
140:6 145:2
149:9,12
165:23
166:13
169:20,23
171:21
196:19
197:9 212:4

215:7 237:5
245:25
262:18
266:14
**comes** 8:11
122:24
150:16
181:6 236:7
257:5
**comfortable**
209:14
210:17
**coming** 53:14
117:4 118:3
118:17
127:14
129:25
142:22,24
143:4
149:18
166:2
**comment**
186:13
**comments**
105:13
**commercial**
27:15
**communica...**
179:21
**communica...**
163:11
180:10
214:17
**communica...**
198:22
253:3,13
**communica...**
25:23
143:20
179:14
183:5 211:9
216:25
227:23
230:7 231:9
231:17
257:10
263:4
**companies**

24:3 27:17
42:8 55:4
206:8,14
243:13
**company**
21:9,12,13
55:21 190:4
206:9
**company's**
57:24
**compare**
23:25
**compelled**
247:13
**compensated**
167:25
168:3
**compensati...**
138:12,24
143:7
157:18
158:18,24
159:11,24
165:18
167:2,9
169:12
173:4
174:14,15
176:8,12
177:8,22
264:10
**compete** 23:4
24:2 153:22
**competence**
49:16,17,23
**competent**
50:21,24,25
**competes**
150:17
**competing**
22:22
**competitor**
23:12 24:9
151:12
**complaint**
29:25 41:16
60:11 72:4
72:12,23

78:21 81:22
82:3 83:11
83:13
260:20
**complaints**
71:10 72:8
72:11 82:16
83:3,9 86:8
86:18 96:21
**complete**
269:16
**comprise**
137:7
**computer**
147:22
148:2,5,7
149:3,6
206:9
**concern**
115:21
116:5
**concerned**
116:10,13
166:8
**concerns**
116:19
151:2 216:3
216:7
**conclusion**
43:10 215:7
222:8 246:6
248:19
**Concrete**
25:23 26:24
**confidential**
220:25
221:14,15
221:18
234:17
**confidentia...**
216:9
228:18
267:7
**confirm**
93:20
**conflict** 48:24
49:2,4
124:16

150:15
151:16
215:12
257:17
**conflicted**
150:24
**conflicts**
48:18 151:3
**confrontati...**
144:22,23
208:16
**conjunction**
166:23
**connected**
76:23
**connection**
22:5
**consider**
22:21,25
23:21 24:11
42:13,19
43:6,16,23
45:22 85:21
85:24 88:15
113:24,25
114:3
**considerati...**
23:2
**considered**
186:21
**considering**
127:6 187:9
**construction**
14:6,8 16:5
33:15
**consult** 144:9
144:14
151:14
177:20
214:8,12,25
222:23
223:3
**consulting**
226:19
**consumer**
15:11,11
19:25
**contact** 241:7

**contacted**
131:5
**contacts** 51:7
**contained**
80:4 207:18
231:22
**content** 199:9
**context** 6:18
61:7,14
113:12,22
**contingency**
27:14 160:9
246:25
256:8
**continue** 26:6
36:24
245:10,14
246:4
**continued**
191:11
246:19
**continues**
35:21
**continuing**
179:8
**contract** 29:4
34:17 42:18
42:23 43:2
43:5,17,24
166:19
**contracts**
42:14,20
**contributed**
87:3
**conversation**
66:17,22
67:7,9
69:19 70:5
70:9,10
101:16,17
111:24
182:5,7,11
183:2
184:10
**conversatio...**
69:11,14
118:5
**convicted**

251:14
**Conway** 14:3
**Cook** 1:16
55:8 269:3
270:15
**copied**
145:22
146:3
**copies** 64:9
**copy** 29:24
136:22
145:17
**corporation**
21:13
**corporations**
16:2 20:23
270:16
**correct** 45:9
80:9,10
131:13
138:8
161:15,19
162:8
199:14
261:22
264:12
268:11
269:15
**corrections**
268:12
271:4,6
**correctly**
215:5 264:2
**correspond**
237:18
242:24
**correspond...**
198:15
**corresponds**
242:17
**Costa** 178:10
**counsel** 2:9
5:24 38:8,9
38:11,12
40:18 61:4
61:24 62:2
71:13,20,24
78:22 85:4
85:21 89:5

120:8
136:24
155:24
252:10
270:2,3
**counsel's**
78:25
104:14
254:4
**counsel/co-...**
26:23
**counted** 45:5
**county** 1:16
6:22 55:3,8
268:4 269:3
270:16
**couple** 6:17
16:10 17:2
25:11,21
41:25 56:6
114:18
123:8
132:11
151:7 154:4
197:8 208:7
213:12
239:9 254:8
255:10
**course** 48:18
135:23
146:5
265:12
**court** 1:1 5:9
6:3 8:2 9:3
32:7 38:5
38:23 50:17
62:21 77:13
80:21 90:22
98:22
103:13
107:18
124:10
128:8 207:3
213:25
214:5
216:22
240:11
243:6,10,11

251:18
271:16
**courteous**
155:23
**courting**
46:25
**courtroom**
53:11 112:9
**courts** 1:15
9:5,6 98:13
**coverage**
13:3 47:15
61:5 125:11
**covering**
58:24 59:19
**covers** 41:20
231:9
**co-authored**
26:4
**co-counsel**
25:12,20
26:12,14,18
30:25 51:2
51:12 72:2
79:16
115:13
124:23
140:24
**co-counseli...**
30:8 32:21
**co-counsell...**
51:16
**co-counsell...**
30:7
**Crab** 52:22
**crank** 114:8
**create** 99:21
**created** 20:23
20:24
**credentials**
25:4
**creepy** 130:3
**crime** 251:15
251:16,24
252:4
**CSR** 1:16
269:6
**current**

159:11
**currently**
37:11 44:18
**cut** 50:7
255:11
**cute** 42:18
**Cy's** 52:22

_____

**D**

**D** 3:2
**damage**
246:25
**damages**
54:18 55:20
**Dan** 5:21
35:24 57:20
121:16
122:5,20
133:4 138:8
138:10,22
143:10
145:24
150:7
174:10
175:2,17
177:4 178:2
200:25
201:20,21
204:16,20
209:19
213:10
214:18
238:13
255:6
258:14
**DANIEL**
2:16
**danieljayco...**
2:17
**Dan's** 139:18
144:5
**data** 96:22
**date** 64:12
70:25 85:5
88:12
121:18
123:17
154:23

169:21
180:17
185:24
214:14
222:18
241:10
242:7,16,19
242:24
271:8
272:23
**dated** 77:15
79:24 99:2
121:23
197:4
203:25
241:18
**dates** 17:14
68:20 93:3
**Dave** 24:25
92:24 95:18
111:25
122:11,21
122:22
123:3,5,19
123:25
124:6,15,16
124:16,25
125:17,23
127:4,14
128:22
129:3,16,23
130:13
133:25
134:7,17
138:24
140:5,25
142:11,22
143:4
144:10
147:11
149:17
150:16,21
150:24
151:4,15
152:23
155:21
166:9
174:16

178:5
209:23
233:5
237:14,19
**Dave's** 126:2
**David** 1:8
5:25 44:20
44:24 45:11
46:15 52:10
52:13,16,19
53:14,15
111:5,8,18
112:23
115:18
116:2,3,12
117:4 126:6
126:7
128:21
135:15
136:3
138:12
140:23
142:8
143:16,21
143:23
144:14,17
144:20,21
144:21,22
145:9,10,16
147:19,25
149:12
153:4,12,24
154:8,8,9
154:12
155:17
165:8
170:24
177:5,23,25
178:2 180:7
181:21,21
183:24
189:23
190:24
191:19
196:17
197:3 198:6
207:6 209:6
209:7 211:6

211:9 214:9
214:20
215:24
220:2,13
222:23
235:3,12
236:9,12,14
236:18
237:11
238:19,21
239:23
240:4,4,23
256:22
257:4,7,17
261:4
**David's**
140:22
191:7 192:5
**day** 66:19
113:16
114:9 178:8
187:21,22
200:8 205:5
211:18
268:21
270:8
**days** 267:6
271:14
**deal** 40:11
191:3
210:23
212:2,4
**dealing**
159:20
**decide** 166:25
186:15
248:4
**decided**
15:20 20:7
108:11
115:19
160:2,5
263:17,18
263:20,20
263:23
**deciding**
177:21
**decision**

26:19
**declaration**
228:12
**deemed**
271:16
**defect** 65:6
**defendant**
2:8,13
117:11
124:9
201:10
252:23
**defendants**
1:11 109:24
192:10
**Defendant's**
108:2
**defending**
15:22 16:2
159:20
255:24
**defense** 13:19
15:19 23:19
23:20
227:15
253:21
**define** 45:13
**defined** 45:11
**definitely**
113:5
**degree** 10:7
10:24 11:2
11:5 24:7
**demanded**
217:12
**demands**
182:9
**denied** 108:2
108:3 245:9
245:17,20
245:22
246:19
247:4,7,12
**departing**
144:11
**department**
12:25
**depends**

245:12
**DEPONENT**
267:12
**deposing**
271:13
**deposition**
1:13 4:4 5:5
5:12 6:14
6:21,24
7:12 8:15
12:7 57:9
95:18 96:17
98:16
110:17
119:16
154:19
162:17
223:6,23
262:8
266:20
268:9 269:9
269:20,22
269:25
271:3,11,14
271:15
**depositions**
6:20 7:3,13
52:3 90:7
**describe**
87:16
**described**
42:13 85:23
88:17 97:13
119:2 182:6
219:18
**describes**
264:8,9
**description**
4:3 158:17
159:10
**deserves**
39:13
**designate**
266:13
**designated**
162:18
**designations**
266:6 267:6

**details** 158:7
158:7
166:13
182:8 228:9
**determine**
88:9 103:17
104:23
105:17
106:16
**determined**
104:7
**determining**
106:7,11
**detriment**
87:5
**developed**
50:3
**developme...**
231:25
**developme...**
110:21,25
**Diab** 17:19
18:5,6,25
19:4,13,16
19:17 20:4
20:9,17,22
20:24 21:5
21:15,24
25:10 26:5
26:8,10
34:23
**dictated**
127:2
**dictating**
195:17
208:2,19,21
211:11
**diesel** 60:12
**difference**
42:17
185:18,19
**different**
13:25 16:17
121:8 123:9
199:9
216:15,16
241:25
**dinner**

236:13
**directing**
82:9
**directly**
142:11
**disappeared**
52:16
**disappoint...**
176:4
**discovery**
51:24 52:2
**discuss** 65:23
66:3 74:17
110:20,24
111:6
120:21
122:13
130:13
145:10
204:3,13
205:3
231:24
235:12
**discussed**
201:13
**discussion**
73:24 86:17
86:20,21
143:3 185:2
186:3
259:13
260:11
**discussions**
66:9 70:2
73:15 76:20
77:2 118:10
131:15
184:13
199:21
231:25
258:6
**dismissed**
245:13
**disproving**
192:11
**disqualified**
226:6
**dissolution**

20:20
**distinction**
37:25 38:4
**distracting**
112:13
**district** 1:1,2
1:15 5:9,10
9:4,5
**divided** 260:2
**Division** 1:3
5:11
**divorce** 6:24
**divorced** 22:4
**docket** 134:5
**docking**
172:7,8
**doctrine**
253:20
**document**
34:6 55:7
64:16 80:4
80:8 117:16
161:9 165:3
230:24
**documenting**
34:6
**documents**
28:16 34:11
34:13 126:5
126:8
162:16
**doing** 16:3,23
18:3 19:24
22:7 27:2
27:14 33:11
40:4,12
41:22,23
42:6 44:13
53:7 68:4
84:10
110:15
111:23
123:17
124:4
157:10,13
196:3,4
225:15
227:14

247:17
250:13,13
271:7
**dollar** 54:23
130:15
194:10
**dollars** 89:3
148:14,21
**doodling**
265:9
**door** 112:11
**double**
132:13
**Dr** 205:12
206:15
241:5
**draft** 82:15
82:21 83:2
83:6,13
126:7
**drafted** 41:15
41:16 72:12
83:8 126:4
260:23
**drafting**
83:10 126:7
**drinks** 7:21
**dripping**
175:25
**drive** 91:12
91:18 92:6
95:19,22
96:3,7,10
96:14,22
97:13,15,17
97:18,23,24
98:3,8,10
194:17
195:23
**driver** 147:16
**dropped**
99:13,13
**dropping**
103:11
**drove** 56:7
**Dubai** 22:6
**duly** 6:6
269:7

**Durrant**
13:14,22
**D.C** 98:6
**d/b/a** 1:9

**E**
**E** 1:15,21 3:2
4:2 155:2,2
269:4 272:1
**earlier** 85:23
86:12,22
157:17
166:11
169:7 183:3
215:23
259:13
262:7
**earned**
264:17,18
**easier** 136:8
**Easterbrook**
114:10
**easy** 212:13
**eat** 155:10
**EBR** 78:11
**educate**
39:14
**effect** 254:11
**effective**
264:11
**efficiently**
123:12
**effort** 101:4
**efforts**
191:11
194:20
196:12
**either** 10:8
36:20 55:10
88:22
100:13
127:16
143:18
**electronic**
239:22
**Electronica...**
163:16
**Ellis** 27:8

**else's** 186:14
**email** 4:5,5,6
4:6,7,7,8,8
4:10,11,12
4:14,15,16
4:17,17,18
4:19 29:7
65:3,11
66:6 69:24
70:22 71:8
71:16 72:2
73:15 75:14
75:25 76:7
76:20 77:15
77:19,23
78:2,3
79:24,25
80:15,18,18
81:19 91:10
91:15 93:4
93:5 98:25
99:6,22,23
99:24 100:4
100:16
107:20,24
107:25
108:23
110:4,7
132:19
134:15
136:25
137:4 138:7
138:10
143:9,15
144:13,16
150:5,5,10
150:13
151:13
152:3,12,17
183:10,12
188:25
189:18,20
189:22
190:13,23
192:3,25
197:3
198:12,17
198:21

199:7,13
200:22
201:24
202:5,15,23
202:24
203:4 207:6
207:16,18
209:2 211:2
211:15,15
212:11
215:22
217:20
219:3,12,14
219:22,25
220:11
221:5
223:25
224:18,19
224:24
226:7 229:6
230:20
231:2
233:18,19
234:3,12,22
235:2
236:17
239:25
254:16
255:5
257:16,25
260:5
261:12
**emailed**
213:15
218:8 228:3
**emails** 52:25
70:6 77:19
80:4 87:13
88:5,5,8
121:5
137:12,20
142:17,19
142:20
143:2 183:3
190:12
207:21
208:20,20
224:18

204:14
**employee**
18:14,16
102:11
144:11
158:25
**employees**
19:23
160:11
**employer**
21:14
197:12
**employment**
11:13 13:12
17:15
130:13
131:6,10
145:12
158:13
159:7
166:14,19
261:7
262:11
**ended** 228:7
**engines** 60:12
**ensure**
167:16,18
**enter** 222:5
**entered** 12:6
38:10 41:7
124:10
**entire** 124:8
136:25
137:4
**entirety**
83:11
**entity** 35:3
**entries**
106:21
**entry** 89:25
253:2
**environme...**
112:8
**equal** 50:22
**equally** 31:6
31:7,11
32:16
**equity** 101:5

**errata** 271:5
271:7,10,13
**escape**
144:25
**especially**
230:5
**ESQ** 2:6,11
2:16
**estate** 54:21
**estimated**
55:5
**et** 5:8 162:5
**ethical** 144:9
144:14
226:25
227:3,9
**ethically**
152:23
153:2
155:22
**ethics** 224:8
224:11,13
226:8
**event** 188:4,7
**everybody**
129:8
160:15
210:16
220:22,23
221:6
247:17,18
247:19
**evidence**
35:23 36:16
40:23 127:8
146:7
217:23
**evidencing**
34:12,13
**exact** 222:17
**exactly** 90:9
175:22
178:7
**exaggerate**
254:11
**exam** 11:19
12:13,15
**examination**

1:14 6:8
155:3
259:10
265:4
**EXAMINA...**
3:3
**examined** 6:7
**example** 20:2
40:6 50:17
55:9,22
70:13 87:6
123:23
125:8 126:6
195:5 246:8
246:10
**exceptions**
168:22,24
**excess** 158:9
158:11
159:3,5
**exchange**
80:16
142:17
150:6,11
151:13
198:12,17
198:21
211:2
215:22
220:12
255:5
**exchanging**
121:22
129:23
**excited**
171:18
**exclude** 220:2
**excluded**
140:17
168:3 169:3
169:6
**excluding**
134:23
**exclusions**
169:9
**exclusively**
41:22
**excuse** 77:18

98:24
161:18
162:13
220:12
233:24
250:21
263:11
**exhibit** 4:4,5
4:5,6,6,7,7
4:8,8,9,9,10
4:10,11,11
4:12,12,13
4:13,14,14
4:15,15,16
4:16,17,17
4:18,18,19
4:19 8:13
8:16 63:14
64:7 70:16
70:21 75:8
75:13 77:9
77:14,20,24
79:18,23
90:18,23
91:5 97:13
97:16 98:18
98:23
107:14,19
117:6,11
120:24
121:5,6
128:4,9,13
130:25
131:23
132:4
137:25
138:5,5
147:2,9
149:23
150:4
157:21,23
160:23
161:4
164:19,24
168:10
170:10,15
173:11,16
188:13,18

189:15
199:12
200:13,18
203:17,21
203:23
208:24
212:10
215:23
216:6 219:4
219:9 220:5
220:10
223:8,13
228:24
229:5,11,24
233:9,14
241:11,16
252:11,18
252:22
254:19
255:2
261:15,18
261:24
262:8,19
**exhibits**
207:19
234:24
260:5
**existence**
107:10
**exited** 96:16
110:16
223:5
**expect** 104:18
160:20
**expectations**
157:15
**expected**
160:18,20
**expecting**
149:10
**expense**
89:24
**expenses** 29:9
74:20 89:12
89:19 97:11
**expensive**
146:21
**experience**

23:23 24:16
24:19
**experienced**
125:10
**expert** 54:15
55:19,19
56:11 226:8
228:7,19
230:2,7
231:10,12
**experts**
229:21
**expert's**
230:2
231:16
**explain** 36:22
**explanation**
86:13
**extent** 7:14
7:22 36:9
231:11
**externally**
214:25
222:22
251:8
**eyes** 134:22
135:10,15
135:20,24
137:2,11,22
162:16
266:5,11,15

**F**

**F** 155:2
**face** 149:21
**face-to-face**
70:10
**fact** 68:12
85:18
116:22
136:2
178:24
196:2
217:22
232:18
255:19,20
264:16
**facts** 35:22

36:16 40:23
127:8 146:7
217:23
**fail** 271:15
**fair** 209:9
**fall** 154:10
**falling** 47:18
47:19,22
**falls** 229:24
**familiar** 7:11
64:15
189:17
216:13,17
216:20
232:17,18
234:2
**families**
160:12
**family** 129:4
129:16,19
**fan** 194:16,25
195:5,20
**fancy** 146:21
**far** 16:6
24:13,14
32:2 72:24
97:21
146:15
157:11
182:8
**fast** 114:6
115:9 121:7
123:12
148:16
**fat** 196:21
**father** 57:2,3
**fax** 19:25
24:6 27:23
28:3,24
41:13,15,18
41:22 42:4
42:6 44:9
68:5 75:21
93:17,23,24
94:9,16,20
95:8 99:25
123:22
193:21

196:5
242:12,23
**faxed** 243:2
**faxes** 24:4
27:18 28:4
41:21 51:6
51:8 67:12
94:23 99:20
187:6
203:15
241:7
**February**
79:24
158:22
159:24
264:11
**federal** 9:4
80:21 207:3
228:17
229:19
240:11
243:6,11
**fee** 42:7
46:23,25
54:11,13,21
55:2 247:2
**feedback**
157:4,6
**feel** 209:14
248:9
256:13
**feelings** 135:3
135:4
**fees** 29:14
30:18,22
31:17,21
32:5,7,8,9
32:10,11,13
32:16 35:7
35:15,16,17
35:18 37:9
37:11,19,21
38:6,11,18
38:23,25
39:4 40:17
41:14 42:8
42:11 44:3
44:6 55:5

55:16
124:11
158:11
159:5,19
160:16,20
167:2,12,14
167:17
168:6,18
169:2
181:13
182:22,23
188:10
194:9
209:13
211:25
259:14,18
259:19,22
259:25
263:24
264:17
**feet** 65:6
**Feldman**
20:11
**felony** 252:4
**felt** 100:20
210:17
**fifth** 31:5
**fight** 166:7
166:10
**figure** 196:14
**figured**
141:15
255:20
**figuring**
196:12
**file** 24:5 30:2
56:13,14
59:3,6,10
66:15 79:13
81:8 83:10
96:15
150:17,18
152:25
153:21,23
154:7
186:15
187:18
188:2,5

197:16
202:25
222:5
239:21,21
239:24
243:5
**filed** 25:11
38:20,20
51:9 55:17
58:24 59:2
59:12,18
60:5,10
62:20 65:5
67:21 68:13
72:3 73:5
80:22 82:23
82:24,25
83:4 84:14
85:19 86:9
88:21 93:18
95:20 96:20
99:12
105:19
139:13
151:8,9,9,9
152:16,17
159:21
178:20
179:5,11,16
179:24
183:7
185:22
206:20
207:2
213:25
214:4,16,22
215:6
220:16,21
240:11
**files** 55:24
**filing** 27:12
39:19,22
44:9 51:11
55:3 65:23
67:18 70:3
72:20 73:15
76:20 84:20
84:25 96:21

184:14
185:3,16,17
186:21
187:9
198:13,24
206:23
207:8 210:3
210:14
255:21
256:3 257:8
257:15
258:11
**filings** 110:10
185:11
**final** 162:3
231:21
**finalized**
142:23
**find** 59:11
67:23,25
90:9 197:16
201:9
203:14
212:8 240:7
240:9,15
**finding**
201:13
**fine** 120:6
230:14
**fingernails**
50:8
**firm** 1:9 2:13
5:22 6:23
6:23 13:13
14:2,14
15:5 16:8,9
16:23 17:3
17:18,23,25
18:2,8,11
18:21 19:10
19:14 20:16
21:16,19
22:10,23
23:5,10,19
23:20,25
24:11,23
25:14,15
26:9,12,14

26:19,20
30:21 31:3
31:5,5,9,10
31:10,22
32:9,21
33:15 35:6
35:18 37:9
37:11,21
38:6,7,12
38:19,20,22
38:24,25
39:19,22
40:7,8,17
41:5 44:5
44:10,13
46:8 51:16
55:12,14
60:10,25
65:18,19
67:22,25
68:22 69:6
69:7 72:24
74:14,19
79:14 80:13
83:9 84:15
84:20 85:3
85:7,13,20
86:9 89:8
89:10,11,18
90:2 95:21
96:4,14,19
97:5 100:21
101:3,6
102:7,14
103:18
104:7,23
105:18
106:20
107:4,5,10
111:6,23
115:23
116:17
117:5,12
118:4 119:9
123:20
124:12
125:2
127:15

| | | | | | |
|---|---|---|---|---|---|
| 129:25 | **firms** 15:21 | 170:25 | 187:5 | **forming** 51:3 | 113:9,10,13 |
| 131:10 | 22:18,22 | 178:8 | 200:10,11 | **forward** | 113:15,22 |
| 139:5,10,12 | 23:3,6,9 | 180:16 | 203:12 | 75:16 | 114:25 |
| 139:13,22 | 24:13 25:21 | 185:16,21 | 216:18,21 | 107:21 | **friendship** |
| 140:5,19 | 30:9,14 | 186:16,20 | 216:24 | 159:2 197:9 | 56:24 |
| 141:19 | 40:4 44:16 | 189:21 | 217:15 | **forwarded** | 113:20 |
| 142:12,23 | 45:10 59:15 | 198:14,24 | 225:9,10 | 110:4 | **front** 57:14 |
| 143:5,21 | 60:16 86:15 | 201:12 | 226:8,10 | **forwarding** | 57:15 69:24 |
| 144:15 | 113:14 | 203:24 | 243:10 | 99:18 | 91:2 92:12 |
| 145:19 | 140:19 | 204:8,11 | **focus** 265:15 | **found** 18:13 | 92:17 |
| 146:4,9,19 | 142:4 | 206:23 | **focused** | 26:24 44:8 | 167:24 |
| 148:8 | 144:12 | 212:10 | 185:16 | 55:15 67:20 | 192:9 |
| 155:13,21 | 151:5 159:6 | 214:22 | **focusing** | 74:3 81:20 | 210:18 |
| 156:9,12,22 | 168:18 | 222:13 | 199:11 | 82:5 84:2,8 | **frustration** |
| 157:2 | 250:18 | 224:7,14,22 | **Foley** 2:4 | 84:13,13 | 195:4,19 |
| 158:11 | 260:2 | 235:4,19 | 23:18 | 87:25 | **full** 6:11 |
| 160:16 | **firm's** 103:17 | 236:10 | **follow** 73:3,8 | 186:24 | **fully** 192:12 |
| 161:22 | 104:24 | 255:8 | 110:9 141:8 | 187:23 | 193:23 |
| 162:25 | 116:6 | 256:24,25 | 141:16 | 196:4 | **fun** 16:4,6 |
| 163:6,22 | 124:13 | 257:8,15 | 145:9 232:6 | **foundation** | **functions** |
| 164:4 | 251:4 | 258:11 | **following** | 36:17 | 156:17 |
| 167:13 | 259:18 | 262:14,22 | 73:12 158:6 | 164:16 | **fund** 97:5 |
| 168:6 | 260:20 | 264:7 | 254:3 272:5 | **four** 153:6 | 181:12 |
| 169:21 | 262:20 | **fist** 256:5 | 272:6 | **fourth** 31:5 | 194:8 |
| 177:7,16 | 263:9 | **fistfight** | **follows** 6:7 | **frame** 39:25 | 211:25 |
| 178:6,18,25 | **firm-provi...** | 48:25 | 158:24 | 134:9 | **funding** 49:3 |
| 179:4,7,9 | 172:14 | **fit** 36:7 | 244:7 | 178:15 | **funny** 204:22 |
| 180:8,9 | **first** 6:6 8:13 | **Fitzgerald** | **follow-up** | 248:18 | **further** 73:14 |
| 181:22 | 8:13 15:14 | 70:23 71:4 | 206:7 | 258:9 | 76:19 77:19 |
| 184:12 | 16:13,14 | 71:5 72:6 | **Forbes** 91:11 | **frankly** 122:5 | 77:23 81:19 |
| 185:6 186:7 | 22:7 25:5,6 | **five** 55:25 | 91:17,25 | 160:22 | 206:3 259:7 |
| 187:14 | 33:8 44:23 | 61:12,17 | 92:2,4,5,15 | **Freed** 6:23 | 264:24 |
| 196:3 202:5 | 50:4 52:18 | 101:3 | 93:6,8,15 | 14:18 15:13 | 265:4,24 |
| 213:4 | 52:23 53:23 | **five-minute** | **foregoing** | 16:22 17:6 | 267:12 |
| 222:22 | 58:2,2 | 63:20 | 268:8 | 17:10 19:6 | 269:18,23 |
| 224:10,16 | 60:17 61:20 | **Flaum** 14:19 | 269:15,25 | 19:8 28:2 | **FYI** 235:3 |
| 233:25 | 61:25 62:7 | 16:22 | **forgotten** | 40:8 60:8 | |
| 239:17 | 62:14,16,25 | **flawed** 36:19 | 148:12 | **Friday** 65:5 | **G** |
| 240:23 | 66:23 86:8 | **flippant** | 149:4 | 192:2 | **gain** 87:4 |
| 249:5,16,25 | 108:17 | 101:17 | **form** 31:24 | 195:18 | **game** 36:23 |
| 250:19,22 | 113:24 | **Floor** 1:17 | 35:25 36:5 | 220:19 | 76:13 |
| 251:3,8 | 114:3,10 | 2:5 | 50:2 163:19 | **friend** 16:21 | **Gary** 26:24 |
| 252:23 | 117:12,13 | **Florida** 1:2 | 231:13 | 176:4,24 | **Gear** 255:24 |
| 253:8 | 123:9 | 5:10 9:2,11 | 269:14 | **friendly** | **general** 12:23 |
| 255:22 | 137:21 | 36:4 80:21 | **formal** | 45:23 | 13:5 15:11 |
| 259:15,22 | 146:2 | 127:22,24 | 227:13,19 | **friends** 17:18 | 34:23 69:18 |
| 263:17,20 | 161:13 | 129:17 | **former** | 45:22 54:8 | 176:10 |
| 263:22 | 165:21 | 180:16 | 197:11,13 | 57:2,4 | **generally** |

69:13,16
216:15,20
**getter** 51:5
**getting** 51:7
124:21
126:13
181:3
183:15
210:22
**giant** 22:17
22:18 55:24
60:13 89:24
89:24
211:25
**give** 13:24
125:8
126:15
130:7
134:19
147:14,15
147:25
148:24
151:12
218:9
222:18
226:21,24
227:5 246:8
**given** 6:13
130:6 157:6
237:25
253:22
269:11
**gives** 143:18
143:22
168:14
**giving** 39:11
144:4
192:10
198:23
**glasses** 50:7
**gloating**
193:7,11
**go** 9:18,24
10:11,18
11:7,12
13:11 14:17
24:13,14
28:16 32:4

32:25 33:13
37:5 50:16
51:5,14
54:13 55:24
64:20
102:18
103:13
104:22
105:15,17
105:23
106:6,25
109:14
119:7 120:9
124:8,11,18
163:15
165:7 180:5
184:21
199:15
217:25
224:22
226:16,22
228:22
236:23
238:7 239:6
258:22
**goal** 194:4
**goes** 7:12
16:7
**going** 7:13
9:13 11:12
16:17 29:20
29:21 51:7
53:9 57:6
58:9 63:19
63:22,25
72:4,7
73:24 77:7
79:13 81:8
86:14
104:16
105:6,8
106:11,15
106:19
107:2
108:13
116:14
119:21
120:6,11,14

124:2
126:10,13
135:18
136:22
140:9,25
141:3,7
145:17
146:12
149:9
150:24
152:4 154:9
154:16
155:4 159:2
166:9
167:25
168:25
170:8
181:23
182:22,23
183:13
185:9 189:9
193:15
207:22
210:23
218:20,22
218:23,24
231:6 232:6
245:25
259:4,12
262:15
266:2
267:10
**good** 6:10
53:16,24
54:7 56:5
56:14,25
57:4 113:3
114:11,23
145:3
154:15
157:11
176:16
191:19
208:5
225:23
**goofiness**
196:16
**gotten** 113:11

142:5
238:18
247:10
**grab** 145:7
157:23
228:21
**graduate**
9:15 10:5
10:17,18
**graduated**
10:3
**graduating**
11:11
**great** 25:4
123:10
125:9
215:21
239:14
**greedy**
196:23
**Greg** 27:7
**Grilli's**
183:18,23
**ground** 231:7
**group** 75:23
**guess** 7:8,22
9:13 28:10
39:16 42:2
46:14 47:17
47:20 48:6
61:11 74:22
78:6 86:3
87:25 90:9
92:3,4,10
92:10,20
101:8 132:7
133:22,23
134:24
137:17
140:3 143:3
148:3 157:4
178:17
209:17
219:2 221:5
223:15
224:22
238:9,10
240:13

247:3 251:3
255:9 257:6
**guessing**
47:20 61:2
63:7 67:4
76:16 90:14
139:14
196:10
**guilty** 251:18
**guy** 27:8
83:21 90:15
114:3,7
115:8 141:9
141:15
148:16,25
149:3,6
175:24
209:13
217:11
228:3 243:2
246:22
**guys** 33:20
45:21,22
48:17 56:6
**guy's** 114:11
**gym** 50:8

―――――――
**H**
**H** 4:2 98:23
**Hager** 54:10
55:18
**hairs** 248:9
**half** 124:12
124:13
**halfway**
263:10,12
**hallway**
180:14
181:3
182:16
**hand** 136:22
223:12
256:4 270:8
**handed** 64:6
79:22 150:3
161:3
164:23
170:14

173:15
188:17
189:15
220:9
252:22
255:2
**handing**
70:20 75:12
77:13 90:22
98:22
107:18
117:10
121:4 128:8
132:3 147:6
200:17
219:8 229:4
233:13
241:15
**handle** 15:5
22:10,14
**handled**
22:17 26:21
30:12,13
**handles**
44:22 156:8
156:12
**handling**
15:10,15
**handwriting**
165:14,15
**happen**
101:13
210:23
246:12
**happened**
59:13 72:14
73:3 81:10
81:15 90:10
141:25
212:5,7
**happening**
247:21
**happens**
122:7
**happier**
176:19
**happy** 115:4
144:25

**hard** 89:14
91:12,18
92:6 95:19
95:22 96:3
96:7,10,13
96:22 97:12
97:15,17,17
97:23,24
98:3,8,10
112:7
123:11
155:22
194:17
195:23
200:6
252:14
**Harvard**
114:5
**Hatch** 1:9
2:14 18:5
20:9 26:4
69:9 88:22
214:19
233:19,23
233:24
234:13
237:23
263:6
**hate** 171:15
**head** 255:11
**header**
242:12,23
**health** 141:11
161:23
**hear** 8:7 37:7
45:12,12
74:15 112:9
190:9
249:22
**heard** 16:19
44:20 62:17
114:9 117:3
235:16
236:12
**hearing**
52:22 57:14
57:15 62:14
95:25 112:8

202:10
228:14
232:16
267:15
**hearings**
184:7
258:19
**heart** 211:21
**held** 5:12
**hello** 174:25
258:18
**help** 33:4
102:14,22
103:5
123:16
225:4
**helped**
255:12
**Helpers** 18:7
**helpful** 33:7
**helps** 265:15
**hereunto**
270:8
**hey** 92:15
119:7,7
**high** 49:23
50:10 54:2
54:5 56:6
113:2
176:12
**hire** 115:14
115:19
119:9 122:4
123:3,5,19
123:22
148:17
**hired** 18:13
115:10
133:24
134:7
187:11
250:16
**hiring** 113:25
114:17
115:18
116:2
120:21
122:13

140:22
151:15,17
151:19
166:8
256:22
**history** 11:13
**hmm** 201:6
**Hogan** 20:12
**hogs** 196:19
196:22
**hold** 24:21
122:23,23
169:25
200:6
**holding**
181:12
188:10
194:7,8
201:7
211:24
**home** 27:22
126:8
**honest** 105:7
**Honeywell**
57:14 89:23
**honor** 256:15
**hope** 100:10
100:19
101:11
141:22
191:20
**hoped** 140:11
140:15
**hopefully**
100:5 101:7
101:15
149:22
239:11
252:8
**hopes** 101:12
**hoping** 145:8
176:18
203:14
**hour** 1:18
63:19
**hours** 66:20
259:12,12
**house** 19:2

52:22
148:23
171:18
183:19
**HR** 156:17
**human**
156:18
**hundred**
147:15
148:13,21
**hundreds**
60:15 72:25
73:2,8,9
**hung** 208:3
208:17
**hypothetical**
38:17 226:5

**I**

**ID** 200:6
**idea** 27:12
66:23 79:10
93:10 97:14
169:24,24
194:6
196:22
237:11
242:25
249:9 250:8
**identification**
8:18 63:16
70:18 75:10
77:11 79:20
90:20 98:20
107:16
117:8 121:2
128:6
131:25
138:3 147:4
149:25
160:25
164:21
170:12
173:13
188:15
200:15
203:19
219:6 220:7

223:10
229:2
233:11
241:13
252:20
254:21
**identified**
26:25
**identify** 5:17
**illegal** 251:24
**Illinois** 1:17
1:17 2:5,16
5:14 6:22
8:25 9:8
10:4,20
56:8 143:17
144:3 269:2
269:6
270:16
**immediately**
11:14
171:12
**impact**
115:22
116:6,11,15
207:8 210:3
210:20,25
211:2,5
**impacted**
167:2
207:23
209:3
**imperative**
271:12
**implement**
239:18
**implemented**
219:21
**implementi...**
219:19
225:11
**inadequate**
245:23
**inappropri...**
105:11
**include** 47:14
168:7
**included**

72:25 73:25
74:13,14
100:22
140:20
142:7 213:4
**includes**
200:22
**including**
53:20
140:16
145:17
214:20
**income** 14:24
17:8 164:3
164:13
**increases**
158:6
**independent**
55:13
**independen...**
32:20
**Indiana** 10:2
**indicate**
162:14
**indicated**
261:12
269:21
**indicating**
210:25
**indications**
239:22
**indirectly**
97:7,9
**individual**
1:8 161:22
197:13
244:22,25
245:7,10,15
246:4,20,24
247:6,9,10
248:12
**individually**
243:8,16,17
243:21
244:9,15
**infected**
220:24
**information**

95:21
165:23
209:23
215:25
216:5
217:24
229:22,25
231:12
235:9,22
236:9
237:23
238:3
**initiate** 51:23
**initiated**
66:16,21
**Initiative**
11:17
**injunction**
228:14
232:15
**inside** 225:17
**instance**
44:23
**instruct**
231:21
253:25
**instructed**
213:10
232:4
**instruction**
232:7 254:4
**INSTRUC...**
271:1
**instructs** 7:23
**insurance**
13:3 47:14
125:10
161:23
**intellect**
23:24
**intending**
219:25
**interacting**
124:23
**interaction**
228:10,18
261:4
**interest** 11:17

151:4
**interested**
74:15
182:20
246:23
270:5
**interesting**
14:12 16:25
**interests**
209:11
**internally**
214:14
225:18
**interpretat...**
78:25
**interrogato...**
58:3 117:14
**interrogato...**
57:25
157:22
168:5 253:9
253:24
262:20,23
263:3
**interspersing**
105:12
**intervening**
11:10
209:20
**introducing**
53:3
**invite** 129:16
212:24
**invited**
127:24
213:8
**inviting**
127:21
129:3
**invoking**
253:19
**involve** 39:22
256:17
**involved**
38:22 44:16
55:17 84:5
84:11,17
156:7,11

232:22
**involvement**
38:13 233:5
235:13,15
237:14,19
**involving**
194:19
252:5
**Irrespective**
264:14
**IRS** 163:5,9
163:12
164:2,14
**Island** 10:4
**issue** 87:7,15
185:13
190:14,25
193:25
224:8,12,13
227:9,24
262:11
266:21
**issued** 103:8
103:10
**issues** 226:25
227:3
**I5-5300U**
172:11

────────
**J**
**J** 2:11,16
70:23
**Jack** 226:14
230:19
**James** 80:19
**jamoke**
197:23
**Jim** 69:6 80:2
80:5,12
91:8,17
200:25
201:18
209:18
214:18
219:21
240:2
**job** 1:22
13:23 116:4

116:8
122:10,22
149:17
157:11,13
**Joel** 20:10
**John** 141:10
226:13,14
227:23
238:13
**join** 40:2 72:4
72:17
134:10
178:5
181:22
192:22
222:9
231:20
238:7
248:21
250:4
**joined** 68:22
141:18
142:3
145:19
157:2
178:18
179:4 180:8
187:14
202:4
240:23
**joining** 111:6
144:15
178:24
263:6
**joint** 28:17
29:8,13
31:13 32:14
32:15 33:21
34:18 35:3
35:12 39:3
39:20 40:16
41:6 42:20
43:7 44:2
44:13,23
45:24 46:4
85:22 86:5
86:24 87:3
87:5,16,20

87:24 88:7
88:8,11,18
111:21
115:8,13
124:3,5,25
141:14
196:5
208:14
213:6
253:20
255:22
256:6
259:17
**jointly**
259:15,25
**judge** 11:25
38:10 53:4
57:14,15
63:8 89:23
114:9
190:20
191:21
192:8 212:8
215:19,20
218:17,25
**judges**
155:24
**judgment**
63:9 108:11
108:15
109:2
180:15
181:5
**jump** 261:24
**June** 99:3
**junk** 24:4,5
27:18,22
28:24 41:13
41:14,18,22
42:4,5 51:6
67:12 68:5
99:25 187:6
193:21
196:4 241:7

────────
**K**
**keep** 51:8
55:9 106:20

106:23
135:15
208:13
220:24
221:13,15
221:17
**keeps** 158:12
159:6 168:7
168:19
**Kelly** 64:10
64:20,21
72:9 107:20
108:23
110:3
**Kennelly**
53:4
**kept** 19:24
208:4
259:17
**kids** 56:6
**kind** 14:4
18:6,8 19:3
22:21 24:12
33:11 38:16
50:3 59:12
60:9 130:3
152:21
195:3
196:15
208:9,15
209:7
210:16,17
211:19,19
215:12,16
244:7
247:11,13
254:10
256:7,10
**kinds** 13:4
30:13
**kit** 175:14
**knew** 16:22
27:16 40:10
62:22,23
63:12 87:25
88:2 111:16
111:23
141:15

210:16
**know** 7:7,16
7:19 8:11
9:5 18:12
22:3,24
23:17 24:3
24:18,18,25
25:3 28:13
29:18 32:6
32:23 33:7
34:4 35:4
41:11,11
42:15,16,16
43:22,23
44:12,21,24
45:4,6
46:10,11
50:15 54:20
54:25 56:9
58:6 59:13
60:20 61:2
61:9 62:13
64:25 65:5
65:8 66:5
66:12 69:8
69:16 72:19
73:7,12,22
74:9,19,23
76:14 78:13
78:23 80:23
82:7,7,22
83:16,25
84:8 86:10
86:11 87:9
87:18,19,21
89:7,11,14
90:13,16
92:7,9 93:9
93:14 94:13
94:19 95:13
95:23 96:9
96:23 97:15
97:21 99:18
100:7
101:19
102:2,5,19
102:23,24
102:25

103:2,4,11
103:14
106:18,22
108:6,22
109:15,21
110:3
111:10,17
113:12,13
113:17
114:23,24
115:6
118:12,16
119:7
122:23
123:18
124:21
125:9 127:3
127:5
128:23
132:21
133:15,17
133:18,21
133:22,23
133:25
134:13,16
136:17
139:9,10
140:2,10,20
141:12,21
145:16
146:16
148:4,9,12
149:16,19
151:10,20
152:6,8,9
153:2,7
156:4
159:14,18
159:18
160:9,19
163:13,21
164:5 166:2
166:22
170:2
171:21,24
172:16,18
175:16
176:3,10

177:3,7
180:20
181:14,16
181:20
182:2,2,16
187:15,20
188:8
191:14
192:17
193:17,20
193:22
194:10
196:11,15
196:19,24
199:4
201:20
204:21,23
205:4,20
208:7,8
209:8,21,22
210:6 211:4
211:7,18,20
211:24
215:18
216:24
217:4,6,8
217:14,17
218:18,19
218:20,22
221:10
224:12
235:10,21
236:6,7,15
237:4,11,16
238:15,15
238:23
239:11,22
240:25
242:15,16
243:18
244:4,23,25
247:8 248:6
249:13,14
250:6,7,24
250:25
251:23
253:13
254:25

256:9 257:4
257:19
258:17
261:13
262:18
**knowing**
69:15 103:6
**knowledge**
148:10
**known** 24:25
25:2 61:8
100:18
**knows** 87:21
87:23

————
**L**
**label** 261:24
**labeled** 121:8
161:6
203:24
233:15
**lack** 36:16
**laid** 231:5
**Lakeland**
40:8
**language**
244:5 262:9
**laptop** 146:19
146:25
148:15
149:4,6
172:6,15,19
249:2,4,5,8
249:10,12
249:15,17
249:24
251:3,3,8
**laptops**
148:11
250:20,21
250:22,24
**Lardner** 2:4
23:18
**large** 16:9,10
**Larry** 242:3
243:7
**LaSalle** 2:15
**Latham**

197:22
**laugh** 190:25
**Lauren** 2:6
5:18 80:6
218:18
229:10
**law** 1:9 2:13
5:22 6:23
9:15,19
10:11,14
11:7,11,15
11:17 12:19
13:13,17
14:25 16:23
17:18,23,25
18:18 21:16
21:19 22:22
24:7,7,11
26:19,20
31:9,22
32:21 35:6
35:18 36:4
37:9,10,21
38:12 39:19
39:21 40:8
40:17 41:5
44:5 46:8
51:15 53:8
53:12 60:15
63:5 68:22
79:14 84:15
84:20 85:3
85:7,12,20
89:7,10,11
89:18 95:21
96:4,14
97:5 101:3
102:7,14
103:18
107:9 111:6
114:5
115:23
116:16
117:11
118:4
127:15
129:25
131:10

139:13
141:19
142:12,22
143:5,17
144:3
146:19
148:8
155:13
162:25
163:6 164:4
167:13
177:7 179:4
179:7
184:12
185:6
216:25
217:14
224:10
233:25
246:15
249:5
250:18,18
250:22
252:23
253:8
259:15,18
259:21
262:19
263:9,17,19
263:22
**Lawry**
141:10
**lawsuit** 24:6
245:15
246:3
**lawyer** 34:17
49:12,17
96:22 98:6
113:4
114:22
123:11
125:9 226:5
**lawyers**
24:14 49:21
60:6,14
101:3 140:6
145:9
**laying** 138:11

**lead** 166:9
**leading**
194:17
195:23
**learn** 62:25
63:3 74:12
108:17,20
235:8 238:3
**learned** 16:8
19:22 93:16
146:2
215:25
**learning**
14:10
**leave** 136:8
160:14
220:22
**leaving** 127:6
132:12
232:10
263:5
**left** 13:9
16:17 24:23
116:15
154:8 191:2
266:19
**legal** 2:9 5:24
11:21 18:7
43:10
112:24
114:7
161:24
162:3 222:8
246:6
248:18
**length** 261:3
**letter** 4:12,18
241:19,23
241:24
**letters** 203:11
240:12,18
240:24
241:2,3,4
242:2
**letting** 135:19
**let's** 38:19
119:7
122:23

161:8
180:25
208:13
258:21
**level** 100:20
**leveraging**
124:6
**Lewis** 1:10
69:5 91:9
91:16 98:25
99:2 100:5
100:18
101:2 102:6
122:19
149:16
150:6
151:14
200:24
201:15
202:7,9
213:11
**liability** 13:2
55:11
**license** 24:7
**licensed** 8:23
9:8,11
**lie** 104:20
238:11
**life** 58:7
166:3
**light** 103:23
**liked** 218:7
**limit** 35:24
**limited** 30:19
**Linda** 20:12
**line** 157:9
272:8
**list** 49:23
83:23
174:14
240:16
**listed** 96:19
168:18
**lists** 45:2,2
161:21
**litigating**
50:13
186:25

226:22
255:24
256:2
**litigation**
12:21,23
13:3,5,5,20
14:2,4,6,8
14:11 15:4
15:22 16:6
16:7 18:4
19:25 20:2
23:7,11,19
23:20 30:12
30:13 33:12
33:13 37:10
37:22 49:2
61:5 97:2,6
98:4 125:11
145:25
146:5 154:2
162:2,5
169:5
179:18,22
180:3,11
181:8 183:6
184:14
185:7 186:6
191:16
198:19
220:3
222:16,25
223:4 224:9
224:15
225:22
226:17
227:2,14
233:6
257:12
258:7
263:22,25
**litigations**
97:4
**litigator**
14:10 49:24
144:22
**little** 8:6
14:15,15
57:10 84:7

112:13
125:19,20
125:21
126:3
176:17,22
199:8
209:14
211:21
219:20
226:5
256:10
263:10
**living** 49:13
**LLC** 1:9,10
2:14 5:22
14:19 20:24
20:24 21:5
21:15,16,19
21:23 22:23
24:12 35:6
35:18 37:10
37:11,21
39:19 40:17
41:5 46:8
79:15
**LLC's** 117:12
252:23
253:8
**lloew@fole...**
2:6
**LLP** 2:4
**loaded** 56:4,7
**local** 61:4,23
62:2 81:21
82:6 89:5
212:15
**Loew** 2:6 3:4
3:5 5:18,18
6:9 8:19
32:17 33:18
34:14 35:24
36:9,24
37:8,16
40:13 41:3
43:15,25
45:19 47:6
63:21 64:5
70:19 74:16

75:11 77:12
79:11,21
80:10,14
82:14 90:21
94:3,14
95:9,17
98:21
102:20
104:5,13
105:10,16
106:2,14
107:17
109:17
110:19
112:19,21
117:9
118:22
120:10,18
121:3
127:12
128:7,14,16
129:15
131:20
132:2,11,14
134:13,21
135:2,22
136:24
137:12,20
138:4
146:17
147:5 150:2
153:16,19
154:14
155:8 161:2
162:11,12
162:19,22
162:23
163:18
164:11,22
170:13
173:2,14
174:3
177:18
180:12
184:24
185:20
188:16,23
188:24

189:13
192:23
195:21
199:14,19
200:16
202:22
203:7,22
205:19
207:12,17
218:13,18
219:7 220:8
222:12
223:11
228:11,22
229:3,13,16
230:9,16
232:5,12
233:12
237:6 239:3
241:14
242:21
246:9
248:24
249:18,23
250:9 252:2
252:15,17
252:21
254:2,24
258:10,21
259:7,14
261:3 265:3
265:5,20,23
266:17
267:4
**log** 4:19
252:24
253:23
**logistically**
135:5
**LOL** 191:23
201:11
**long** 7:19 9:7
9:10 11:23
12:9 13:6
13:21 14:13
17:10 18:20
20:15 21:4
25:3 33:5

52:18 53:25
54:17 61:8
69:22 73:20
114:15
135:18
140:18
167:6
196:25
211:11,16
246:14,16
**longer** 140:20
**look** 76:12
106:25
107:2
117:18
121:15
126:25
133:9
160:12
170:21
173:21
189:3
205:16
223:18
229:15
234:7
254:23
260:19
261:14
265:11
**looked** 28:6
81:20 82:6
89:23
181:13
183:3
251:12
**looking** 14:11
80:20 119:8
135:8
151:11
165:22
166:5,6
194:11
201:22
252:11
**looks** 75:20
77:18 121:7
128:20

129:2
138:11
**Lord** 12:15
13:6
**lost** 146:20
**lot** 17:4 29:5
30:11 46:12
101:4
111:20
113:14
124:21
141:12
173:10
250:12,15
255:23
256:12
**lots** 34:11,12
39:3,7
48:14,14
52:2 59:14
89:2 90:5,6
182:22,23
**loud** 8:6
**louder** 8:6
**love** 126:19
126:20
194:15
**loved** 115:10
**Lovell** 13:14
13:21,22
**low** 176:17
**lucky** 122:8
**lunch** 113:16
119:8,14,21
120:5
154:15
155:10

————————
**M**

**M** 1:8 2:6
5:25
**MA** 11:3
**MacBook**
251:10
**Macey** 17:18
17:20,22
18:6,11,25
19:4,13,16

19:17,22
20:4,5,6,6
20:19 25:10
25:16 26:7
26:8,10
27:6 34:22
**Machiavell...**
212:13
**machine**
27:24 28:3
**Madison** 2:10
**magistrate**
192:8
**main** 184:2
**maintains**
44:25
**majority**
47:11
**making**
122:10
141:12,15
211:20
256:4
**Malik** 18:5
20:17,22
26:4 34:23
**manager**
155:16
156:14
**March** 80:22
91:9 114:17
120:20
121:19,24
123:6 127:5
131:4,16
143:4
241:19
242:10
261:5,10
262:2,11
**Margulis**
31:9 86:13
86:22
140:15
141:23
142:3
**mark** 8:14
197:22

238:14
265:13,19
265:20
**marked** 8:17
63:15 64:7
70:17,20
75:9,13
77:10,14,24
79:19,23
90:19,23
98:19,23
107:15,19
117:7,10
120:25
121:5 128:5
128:9
131:24
132:4
136:25
138:2 147:3
147:7
149:24
150:4
160:24
161:4
164:20,24
170:11,15
173:12,16
188:14,18
200:14,18
203:18
219:5,8
220:6,10
223:9,12
228:25
229:4
233:10,14
241:12,15
252:19
254:20
**marketing**
194:20
203:11
240:12,16
240:18
241:23,24
242:2
**marking**

137:22
**marks** 5:4
64:2 120:15
155:5
189:10
**Mary** 159:19
161:24
162:25
163:23
224:4,19,24
225:3,20
227:8,18
**match** 149:11
**materials**
57:23
145:11,15
145:17,18
145:22
146:3
**matter** 5:6
107:9
161:25
**matters** 15:6
46:6 107:7
**Max** 31:9
86:13,21
140:15,20
140:21
141:23
142:3,6
**MDL** 22:18
60:13
**Meadows**
25:19
**mean** 10:16
11:9 15:21
24:24 26:17
28:13 29:19
31:7,19
45:9 47:21
47:22 48:16
49:11 51:19
52:11 59:8
60:15,21
65:13 66:25
68:11 69:17
70:4 72:16
76:6 81:24

82:18 86:24
89:9,10
93:9,11,19
94:13 96:8
96:12 97:8
101:18,18
102:25
112:24
114:3,3,7
136:4 137:8
151:18
153:14
157:3,12
163:10
168:9
171:15
177:4,12
188:9
193:12
194:24
195:10,10
208:18
211:10
215:9
218:19
226:3 236:4
237:9
238:10
242:18
243:2,18
246:13
260:15
262:18
**meaning**
25:20
**meaningless**
36:5 103:24
**means** 32:24
72:19 73:7
73:13 96:9
101:8
109:16
139:11
140:2
163:14
184:20
187:15,20
210:9

237:16
239:13
242:15
245:2 247:8
269:12
**meant** 100:16
101:21
103:15
133:15,18
195:15
196:20
199:12
241:22
260:18
**media** 5:5
64:3 120:16
155:6
189:11
**mediate**
212:24
213:9
**mediation**
93:2 126:9
183:17
185:5 186:5
191:2,10
216:2,9,14
216:18,21
216:25
217:3,10,24
218:17
234:17
235:4,19
236:11,15
237:7,20
238:2 239:2
**mediations**
111:21
124:2,4
235:13,15
**mediator**
191:4,15
**medical** 1:4
5:7,19
22:15 62:8
62:15,17,18
80:2 145:18
162:4 237:3

247:24
260:9
**meet** 25:6,8
52:19 53:23
54:4 57:16
57:18 60:17
60:23 165:7
235:3
236:10
**meeting**
235:18
**member**
21:21,22,23
197:10
**members**
21:18 244:3
**memories**
110:2
149:15
**memory** 92:8
226:2
254:17
**mention**
27:19
221:19
**mentioned**
27:13 77:7
213:2 226:8
**mentioning**
97:18 182:3
**mentions**
264:15
**message**
127:17
132:20
133:16
220:12,14
252:9 260:4
262:16
**messages** 4:9
4:10,11,13
4:14,15,16
121:9,14,23
129:23
147:10,11
170:20
173:9,17,20
174:7 254:7

**messing**
256:5
**Mester**
197:22
198:2
238:14
**met** 27:7
45:21 50:4
52:23 60:20
60:21,24
61:6,10
122:7,20
129:19
131:8
165:10
169:19
235:25
236:12,14
236:19
237:2
238:25
240:13
261:6
**Miami** 129:4
129:9 235:5
236:11
**Michael**
70:24 80:3
83:14 90:12
212:15,20
**Middle** 1:2
5:10
**Mike** 60:17
64:8 70:2
70:12,23
71:9 72:3
72:22 73:5
75:15 77:16
78:3,17
79:12 81:21
88:21,23,25
89:4 92:8
92:11,14,21
93:18
105:20
179:21
180:9
181:20

182:16
183:4,12
186:13
188:9
193:16
196:23
210:20
213:5,6,12
237:9,13,18
257:19
258:2,6
**million** 55:22
158:10,10
158:11
159:4,4,5
181:4 192:7
192:17
193:3 194:5
210:2
**mind** 125:5
196:19
208:2 217:9
228:20
239:7
**mine** 16:21
87:2 121:8
165:15
217:12
**minute**
258:22
**minutes**
119:25
209:17,20
**miscellane...**
46:23
**mischaract...**
36:14 40:22
**mischaract...**
35:21
**mischaract...**
31:25
184:17
**mislead**
104:16
**misreprese...**
104:20
**misspelled**
208:21

**misunderst...**
231:14
262:7
**model** 172:6
**moment**
134:19
187:22
**Monday**
178:9
**monetary**
51:12 182:7
**money** 17:4
20:8 124:7
124:11
126:10,14
141:12,16
148:2,13,18
148:21
160:8 168:2
169:22
171:3,11,23
172:19
209:12
251:5 256:4
256:6,16
**month** 12:12
13:9
**moral** 252:5
**morning** 6:10
28:4 57:20
**mortgage**
171:18
**MOSJ** 108:2
108:3
**mother** 56:2
171:17
**motion** 26:3
**motivated**
125:16,20
**motivation**
51:11
**mouth** 66:13
**move** 112:7
256:15
**moved** 18:23
18:25 19:24
22:4,6
**moves** 176:19

**moving**
265:14
**multiple**
30:14 118:2
118:2
**mumble** 47:9
**municipal**
27:4 42:10
46:22
**mustered**
256:14
**mutual** 145:4
**M&C** 253:9

**N**

**N** 3:2 155:2,2
155:2
**name** 6:11
17:23,25
18:7,24
21:7 28:8
74:21 78:16
93:11 97:22
98:2,5,9,12
126:9
130:18
141:24
183:11
226:13
227:10
234:5 242:6
**named** 20:10
20:12 26:25
29:22 72:23
74:22 84:16
84:21 85:3
86:9,16
141:10
197:23
206:18,23
245:11
247:11
**naming** 85:20
**narrow**
266:12
**nature** 47:24
48:3,4
**Neal** 57:4

**necessary**
231:13
271:4
**need** 7:18
34:19 36:21
114:22
145:15
222:4
265:20
266:5
**needed** 55:18
55:19
123:16
160:3,5
171:11
**needs** 45:3
71:10
143:21
148:15
**negative**
116:15
117:3
**negotiate**
186:17,18
221:21
244:22,24
245:6 261:7
**negotiated**
52:12
263:17
**negotiating**
52:5 184:3
**negotiation**
4:13 165:7
**negotiations**
195:8 222:6
253:7
**negotiator**
176:6
**Nelson** 91:11
91:18,25
92:2,4,5,16
93:6,8,15
**nervous**
181:7,9
**never** 20:5
25:17 48:25
50:14 56:18

62:4 73:23
88:23 115:2
115:2 117:3
239:7
251:12,19
**new** 63:18
142:5,7
150:25
154:4 172:6
245:25
252:11
256:3
263:18
**Nextel** 25:23
**NFL** 75:17
76:13,25
77:3,5 78:8
**nice** 16:3
118:15
**night** 130:16
169:19
**nomenclat...**
243:24
**non-firm**
139:3,6,7,9
139:15,19
139:21,23
**North** 1:17
2:4,15 5:13
**northern**
130:21
**Northweste...**
11:21
**Notary** 1:16
268:24
270:15
**note** 92:13
**noted** 271:10
**notes** 4:13
165:7,13
258:22
265:6,8
269:17
**notice** 1:14
4:4 8:14
143:18,22
144:4
178:12,19

179:10,15
179:23
**noticed**
254:12
**November**
70:25 73:21
**number** 45:8
54:25 55:2
55:22 172:6
188:21
210:9
229:11
257:2
**numbers**
128:18

_____

**O**

_____

**O** 155:2,2,2
**object** 31:24
32:23 78:24
102:16
104:13
105:10
109:12
146:6
179:25
217:22
231:7
253:18
**objected**
137:15
259:20
**objection**
34:7 35:20
36:5 39:24
40:20 43:9
43:18 74:6
75:2 78:24
93:25 94:7
95:3,12
103:22
105:21
106:8
110:12
127:7
129:13
134:8
135:24

164:8,15
172:21
184:16
192:19
195:12
203:5 222:7
238:5 246:5
248:17
250:2 258:8
**objections**
35:25 36:2
36:7 37:13
40:21
105:12
117:13
197:11,12
**obtain** 10:24
11:4 222:14
**obtained** 96:4
96:9
**obviously**
132:21
177:24
**occasion**
53:13 67:16
67:17
**Occasionally**
200:5
**occasions**
6:16 118:2
**occurred**
266:18
**occurs**
265:25
**offended**
262:17
**offer** 122:10
122:22
130:6,8,10
143:6
149:11
198:17,24
**offered** 17:4
116:3,8
131:6
149:17
191:22
217:11

221:25
267:14
**offers** 182:8
**office** 16:18
25:9 30:3
56:2 92:13
103:13
114:23
115:15
124:5
146:22
154:7
183:18,23
187:5
199:25
208:9
214:19
240:3
249:13
**offices** 142:9
**official**
249:15,25
**officially**
230:11
**oh** 77:25
138:19
149:16
190:9 197:6
223:19
238:24
**okay** 8:5,8,12
19:19 28:19
28:21 39:11
54:23 58:11
58:21 62:12
65:16 68:2
70:7 77:25
81:6 82:12
90:17 91:4
112:14
117:24
118:9,21
120:3
128:15
130:24
131:2
132:15,18
134:24

136:9,21
137:19
138:19,21
142:15
147:8
149:12
155:12
157:25
158:3 161:5
162:19
164:25
168:12,16
170:16,18
170:22,23
173:25
174:4 175:8
175:15
179:12
185:25
188:20
192:15
197:6
199:15
201:2
204:11
205:16,18
205:25
208:25
219:10
221:9
223:14,20
224:3,20,21
225:2 230:9
230:13,15
233:15,17
234:10,12
241:17
242:14
245:22
252:7 255:4
258:21
259:24
261:17,25
262:21,24
265:10,17
266:17
267:8
**old** 183:19

**older** 124:21
**once** 22:19
  26:7 178:4
**ones** 22:16
  124:2,4
  142:5,7
  152:14
  153:10
**opening**
  16:23 17:3
**Opera** 19:2
**opinion** 48:6
  50:10 54:15
  63:9 108:15
  108:18,25
  109:2,9,11
  122:9
  140:21
  216:11
  222:14
  227:13,19
  227:21
  228:13
  230:3
  231:13
  232:14,24
  232:25
  233:4,7
**opinions**
  231:22
**OPP** 161:6
**Oppenheim**
  1:8,10 2:8
  5:8,25
  24:22 25:2
  44:20,25
  52:10,19
  53:16 68:21
  92:24 96:16
  98:14 111:5
  111:8 112:2
  113:25
  115:18
  116:2 118:3
  118:5
  119:11
  120:20,22
  122:4,11,13

123:3,6,19
125:17,23
127:4,14
128:22
129:3,24
130:14
131:5,8,16
132:10
133:25
134:7,17,23
135:19
136:4,7
138:13,25
139:25
140:25
141:18
144:18
146:18
147:11,25
151:4,15
153:12,24
155:21
156:8 157:2
158:5
161:14
162:5 164:3
164:6
165:18
166:9
168:14
169:14
170:24
171:11
173:5
174:16
176:9 178:5
178:11,12
178:17,18
178:24
179:4,15,23
187:11,14
189:23
190:24
191:19
196:17
197:4,16,20
198:6,13,23
199:10,25

202:4 207:7
214:9,20
215:8,24
216:2
217:19
220:2,13
222:15,24
225:21
235:25
236:18
239:19,23
240:23
249:3 253:4
253:17
256:22
261:5,10
262:3,10
263:4,21,23
264:16
266:25
**Oppenhei...**
  261:20
**Oppenheim's**
  95:18 112:4
  112:23
  118:18,23
  129:16
  131:9
  155:18
  157:18
  158:17,23
  159:12,23
  166:25
  167:8 177:7
  233:5
  237:14,19
  249:2,7
  264:10
  266:19
**opportuniti...**
  87:2
**opportunity**
  221:25
**opposed**
  243:19
  248:14
**opposing**
  155:24

**oral** 53:5
  253:3
**orally** 87:14
**order** 38:11
  107:25
  124:10
  150:23
  151:25
  204:10
  267:5
**original**
  213:24
  263:9 264:8
  271:12
**originally**
  39:17
  142:21
  260:23
**originals**
  140:2
**outcome**
  270:5
**outside** 60:23
  112:10
  113:11
  123:19
  184:12
  185:6 186:7
  222:14,21
  222:22
  224:10,15
**overbroad**
  94:9
**overlap**
  132:12
**overlapped**
  59:4 60:4
**overlapping**
  59:14
**overlaps**
  132:10
**overseas** 22:4
**oversee**
  156:17,20
**owes** 55:21
**owners** 27:16
**owns** 18:17
  250:19,22

    **P**

**P** 17:8
**package**
  158:24
  159:24
  173:4
  174:14,15
  177:8
**page** 3:3 4:3
  117:19,23
  117:25
  131:3,4
  137:21
  138:14
  139:5
  147:21
  158:2,5,21
  158:22
  161:13
  165:12,13
  165:21
  166:12
  168:11,13
  197:2 199:6
  204:11
  212:11
  223:15
  224:23
  255:8
  256:11,13
  256:25
  261:18
  263:2,8,10
  263:13
  264:8,9,11
  265:15
  268:13
  269:21
  272:8
**pages** 55:3
  132:12
  137:10
  266:7 268:9
**paid** 89:4,8,8
  89:12,18
  159:14,18
  159:19
  161:14,15

161:17,22
161:23
162:2,25
163:23
171:19
194:18,20
195:24
**pain** 256:17
**Palm** 63:11
**paper** 239:21
**paragraph**
  143:14
  161:12
  256:24
  260:6
**paragraphs**
  81:22 82:3
  83:8 260:8
  260:16,21
  260:22
**paralegals**
  56:4
**parameters**
  39:7,9
**pardon**
  110:23
  119:11
  245:18
**parents**
  148:23
**Park** 130:22
**part** 19:10
  25:13,17
  31:13 38:14
  40:11 42:2
  60:12 69:23
  69:25 72:12
  72:20 96:25
  97:3 183:11
  201:9 217:2
  269:22
**participated**
  232:3
**particular**
  123:15
  152:13
  215:4,4
  218:23

224:14
227:24,25
**parties** 29:4
41:7 43:4,8
43:14 217:2
269:20
270:4
**partner**
14:24 16:18
17:6,8,9
18:13 50:22
**partners**
16:16 45:24
46:2
**partnership**
20:18,21
34:22,24,24
46:3,5
**party** 97:22
98:2
**paste** 29:25
**pay** 33:14
55:9 132:22
160:8,13
167:19
169:14
171:19
173:8
**paycheck**
56:19
**paying** 19:23
30:25
**payroll**
156:20
**PC** 21:20
**peer** 22:22
23:13,15,17
23:20 24:8
**pejorative**
239:12
**pen** 265:14
**pending** 7:20
26:11 44:12
44:18 45:8
45:9 58:19
58:22 78:9
78:18 80:20
190:5,11

**people** 16:4
16:22 17:3
17:24 49:14
54:19 55:15
55:25 68:17
68:19 92:13
101:17
109:24
113:15
115:14
122:6
123:13,20
208:8,8,12
212:14
213:12
225:17
232:22
238:25
240:3
**percent** 29:9
35:7 42:5
74:20 89:2
90:3,6
97:10 158:9
158:10
159:3,4
194:18,21
195:24
199:7
**percentages**
168:6,17
**perform**
103:18
156:22
**performance**
156:23
157:5
**performed**
105:18
**performing**
157:14
**permitted**
143:19
**permutatio...**
39:7,9
**person** 20:10
20:12 25:3
52:11 61:11

70:15 83:25
144:24
175:11,18
186:10
261:6
**personal** 48:6
48:10,12
87:4 113:6
148:10
249:8
**personally**
26:15,17
89:9 216:8
258:13
**persons**
269:20
**perspective**
215:10
**pertained**
198:25
**pertaining**
89:19 224:9
226:25
231:4 253:6
253:6
**Peter** 183:18
**phase** 245:14
**Phil** 65:18
70:24 75:15
75:16 77:17
77:17 79:25
91:9,16,16
92:15 98:25
99:7 100:5
107:20
150:6,14
191:19
213:19
233:20
**Phillip** 1:13
5:6 6:5,12
21:20 118:6
268:7,16
**phone** 41:24
48:16 52:25
66:21
127:16
128:2,2

130:9
195:18
200:4,7
208:3,18
211:10
214:3
251:13
261:17
262:13
**photogray**
50:7
**Physician's**
141:11
**picked** 96:12
**piece** 237:23
**pigs** 196:18
196:21
**pile** 27:22
91:2 148:17
**PILI** 12:10
12:14
**Piper** 238:13
**PJ's** 25:22
26:24
**place** 18:17
269:10
**plaintiff** 1:6
1:13 2:3
51:22 65:4
65:6,15,20
141:10,13
141:14
184:2 187:3
188:2
201:10,13
201:22
202:15,25
204:2,13
205:3,6,21
206:23
240:7 247:6
247:10,11
**plaintiffs**
26:25 29:23
187:5 203:3
246:24
247:20
**plaintiff's**

15:3,6,12
15:15,19
16:24 18:3
19:5,5,7
108:3
117:13
260:5
**plan** 221:21
**plane** 129:9
**plans** 58:5
**plastic**
182:15
**play** 183:14
**playing** 36:23
**plead** 251:18
**please** 5:16
6:3,11 7:15
8:11 71:9
207:10
220:24
221:13,17
241:6 271:3
271:7
**plunk** 126:9
**plural** 204:19
204:20
**plus** 158:8,9
159:3
**point** 20:11
28:9 34:2
45:14,20
52:14 78:20
81:13 84:19
85:6 86:4
90:9 123:6
129:22
148:11
151:23
166:24
176:16
193:8
210:14,16
219:24
238:12
247:16
261:2,9
**police** 175:12
**polite** 155:23

**political** 10:9
10:23
**Porcelli**
57:15 212:8
215:19,20
**Porcelli's**
63:9
**portion** 12:10
37:17
200:23
263:24
264:17
**portions**
82:21 137:3
266:15
**position**
12:17 13:15
14:22 18:11
102:9 131:6
135:19
266:8
**positive**
116:23
**possibility**
118:3,17
120:21
**possible**
246:12
247:4
**Postman**
197:23
**potential**
138:11,23
151:3
**potentially**
143:4
**practice** 8:24
9:8,11
13:18 15:2
18:24 19:24
20:6,7,15
21:4 160:10
256:8
**practicing**
12:20
246:15
**predecessor**
21:16

**predicate**
79:2
**preliminary**
228:13
232:15
**premise**
36:20
**premiums**
161:23
**prepare** 57:8
57:12,17,19
**preparing**
11:18
**present** 2:2
153:15
269:19
**preserves**
36:6
**President**
155:14,15
**pretty** 53:2
89:20 92:2
183:23
202:6
**previous**
184:17
**previously**
59:6,18
201:17
**primarily**
41:21 51:12
**prior** 27:24
71:19 111:5
119:10
**private**
101:16,17
**privilege** 4:19
137:16
216:14,18
216:19
217:20,24
252:24
253:21,23
**probably**
23:21 33:6
34:11 45:11
49:19 59:7
60:3 61:18

62:16,20
67:3 69:9
73:21 99:21
101:9 102:2
103:12
117:18
121:16,16
125:3,19
127:17
128:23,25
130:3
132:23
133:5,20
163:17
165:25
166:4,17
174:18
177:5
193:19
198:11
201:18,25
209:21
211:4,17
214:18
220:17,18
234:4
239:20
243:25
246:21
247:14
257:6,7
258:18
**problem**
101:10
136:10,13
136:18,18
136:20
215:15
225:7,25
**Procedure**
1:15
**proceedings**
12:8 22:18
96:18 98:17
110:18
223:7,24
267:14
**process**

191:10
**produced**
96:23 97:23
97:24 98:3
121:10
137:17
173:17
204:9 230:6
231:23
241:2,8
**product** 87:2
88:19 196:5
228:9,17
229:20
231:8
253:20
**production**
96:25
**products**
22:15
**professional**
13:2 20:23
21:13
**Professor**
227:10
229:6
230:17,21
231:3
232:13
233:3
**profit** 55:12
**proof** 94:22
**proposed**
168:15
244:3
**proposing**
158:6
**protected**
229:23
230:5,8
231:18
**protection**
229:20
231:8
**protective**
267:5
**provide**
146:18

182:7
226:15
227:18
229:22
230:2 231:3
246:10
**provided**
232:14
**provider**
83:23
180:16
202:9
**provides**
267:5
**Public** 1:16
11:16
268:24
270:15
**pull** 56:12
208:23
**punitive** 59:4
59:5,17
60:5 150:22
151:24
206:18,25
240:9 243:9
243:22
244:19
248:13,16
**purchased**
172:19
**pursuant**
1:14,14
**pursue** 28:11
29:21
263:18,18
**pursuing**
32:19 66:10
85:7,9,13
**put** 28:3
34:18
196:12
212:3 219:2
**putting** 20:8
66:13
**p.m** 120:12
120:17
143:10

150:15
154:17,22
155:7 170:6
170:9 189:7
189:12
197:5 204:2
224:24
233:21
234:14
252:12,14
259:2,6
262:3
267:11,16
_____
**Q**
**question** 7:20
7:24 31:25
36:20,25
37:7,15,17
39:13 53:19
79:2,6
103:24
104:10,17
104:21
105:3,5
108:14
112:16,22
134:21
135:13
138:21
167:7
184:20
185:14
202:19
214:21
222:19
223:17
225:23
230:12
231:15
249:21
253:16
260:14
**questions**
7:14,15
39:15 231:4
259:8 265:2
265:24,24

**quick** 119:13
119:19
121:16
173:21
223:18
234:8
258:24
**quickly**
169:22
**quiet** 8:10
**quote** 146:8
_____
**R**
**R** 155:2
272:1,1
**ragged** 124:7
**raise** 68:6
74:24 87:7
**raised** 66:23
**raising** 75:6
**randomly**
56:9
**ranting**
209:21
211:19
**rape** 175:14
**raped** 176:23
**raving**
209:21
211:19
**Ray** 14:2
**reach** 33:22
81:14
102:13,21
178:13
222:13,19
222:21
226:9,12
237:13
**reached**
33:20 39:20
40:15 224:8
**reaction**
116:20,23
116:25
117:4
118:19
173:6,7

**read** 45:17
57:13 79:5
79:7 95:5
99:19
134:20,25
173:25
198:6
202:18,20
205:13
207:12,14
234:11
248:2
260:21
264:2 268:8
271:3
**reading** 63:8
144:7
173:23
**ready** 181:3
**real** 54:21
119:12
121:16
173:21
223:18
234:7
258:24
**realized**
18:16 28:7
**really** 17:14
50:11 61:9
61:22 69:21
76:10 80:17
94:12 96:9
101:11
113:8 114:6
114:18
115:9,9
121:7
123:11,16
123:24
130:20
139:21
160:20
174:8 188:8
192:21
216:19
243:23
257:2

**reason**
135:14
171:7,10
245:21
248:10
253:22
271:5
272:10,12
272:14,16
272:18,20
**reasonable**
209:10
**reasons** 123:9
125:4,4,7
160:4,7
272:6
**reassured**
16:15
**recall** 73:14
76:4 80:15
123:2
142:16
260:11,16
260:17
261:2
266:20
**receipt**
271:14
**receive** 24:4
35:16
167:12,17
169:2
232:23,24
263:24
**received**
31:18 32:14
89:5 192:24
**receiving**
27:17 76:4
76:7 183:9
264:17
**recess** 63:24
120:13
170:7 189:8
259:3
**recessed**
154:21
**recognize**

61:13 78:16
81:23 82:3
110:7
121:13
150:10
170:19
173:19
174:6
188:25
189:19
219:12
230:23
234:6
**recognizing**
266:10
**recollection**
69:19 100:2
101:25
102:4
**recollections**
69:11
**recommend**
114:24
**recommen...**
144:6
**recommen...**
115:3
130:17
**record** 5:3
45:16,17
55:7 63:23
64:2 79:7
107:6,6
120:9,12,15
135:12
137:24
154:17
155:5
162:14,21
170:6,9
173:24
189:7,10
192:7,16
193:2,23
201:7
202:20
203:16
207:14

209:25
210:10
228:6,23
230:11
232:11
236:21
252:13
253:17
255:2 259:2
259:5
262:25
265:22
266:3
267:11
**recorder** 55:8
**recording**
42:7 46:22
47:4,5,7
54:10,13,20
55:2,16
**records** 93:17
93:21,22,23
93:24 94:5
94:16,20
95:7,10
103:17
106:20,23
106:23
107:4
**recover**
167:25
**recovery**
247:11
**red** 157:8
**redaction**
221:4
**redactions**
221:8,11
**reduced**
157:18
158:23
159:24
160:3,5
269:12
**reduction**
264:10
**redundant**
137:6

**refer** 41:4
42:3 58:9
58:11 98:8
204:20
**reference**
28:15 78:17
152:3,22
254:6
**referenced**
185:3 237:8
239:4,8
253:8
**references**
95:7
**referred**
33:21
142:11
153:11,21
230:17
**referring**
26:23 28:17
41:19 46:2
65:9,12,21
76:15,17
91:22 95:24
97:16 98:4
99:15 100:8
103:3 108:7
133:7 140:5
141:24
145:8
152:12,25
175:17
176:2,3
177:5
190:18,20
192:18
195:25
196:2 198:9
205:9,21
209:4
212:11
215:23
241:20,21
253:14
254:14
255:16,18
256:21

258:2
**reflect** 252:13
**reflected**
163:2
**reflecting**
195:3,19
**refresh** 100:2
101:25
102:3
254:17
**refreshes**
226:2
**regard**
143:17
260:8
**regarding**
44:5 161:25
263:5
**regards**
144:17
**registered**
18:7 35:3
**reimburse**
29:8
**reimbursed**
74:19 89:2
90:3,5
**reimbursing**
97:10
**reinsurance**
13:20
**related** 47:15
60:11 81:10
89:15,16
131:18
145:18
270:3
**relates**
229:19
**relating**
219:17
**relationship**
33:6 47:25
48:4,8,10
48:13,19
51:11 113:7
115:23
116:6,11

124:9
**relaying**
231:12
**relevant**
201:9
**relied** 109:18
**rely** 51:17
233:3
**remain** 230:8
**Remaining**
158:25
**remember**
6:25 9:12
9:14 12:12
13:9 15:8
17:14 20:14
27:21 29:5
33:24 41:9
41:23 46:11
46:24 48:20
53:2,13,13
54:2,7,16
56:12 59:8
59:25 60:2
60:19 61:19
62:3,14
63:2,4,6,8
65:22 66:4
66:7,8,21
67:3,6,8,10
67:13 68:8
68:20,24
69:2,4,6,8
69:12,13
70:4,8,13
71:16,22,23
73:22 75:6
76:7,10
77:5 79:17
81:7,16,17
82:5,13
83:5,10,15
84:9,10,18
84:22 85:5
85:17,25
86:5,19
87:10 88:4
88:12,14

89:21 92:20
92:23 93:2
93:3,3,4,6
93:13,15
95:14,16,25
96:21,24
98:5 99:17
99:22
100:17
101:23
104:4,6
105:25
106:5
108:19,21
108:24
109:6,8,20
109:21,22
109:23,25
110:5,15
111:4,14,17
111:18
114:2,14
117:17
118:12,13
118:14
119:6
120:23
121:22
127:19,20
127:21
128:2,3
130:2,11,17
131:22
133:8,14
134:4,12
142:18
144:7
151:21
154:3,5
159:15
160:6
165:19,20
169:21
170:22
172:17,24
174:8,17,18
178:3,7,22
179:19

181:10,10
181:18,19
182:10
183:9,11,16
183:21,22
183:25
184:4,6,8,9
186:8,9,11
186:13,14
186:23,24
187:2
188:12
191:17
193:4,5,6,6
193:10,13
193:14,17
199:17,18
199:22
202:2,8,13
202:17
203:9
204:17
205:2,11
206:22,24
207:4
210:11
213:12
214:14
215:5
220:17,19
221:17,18
222:17
223:2
225:19,24
228:2
232:21
233:2,8
234:10
235:11,14
235:17,19
236:25,25
237:21,24
240:6,19,20
240:21
243:3,4
250:11
254:9
256:23

257:13
262:12
**rememberi...**
57:3 183:20
**reminded**
52:20
**rendered**
161:24
162:4
**Renee** 1:15
1:21 269:4
**repeated**
105:11
**repeatedly**
259:20
**report** 95:6,8
95:11 230:4
231:22
**reported** 1:21
163:5,8
164:2,5,13
**reporter** 6:3
8:2 77:13
90:22 98:22
107:18
128:8 269:5
**represent**
243:15,20
244:17
**representat...**
248:12
**representat...**
243:9,22
244:19
248:16
**representat...**
206:18
236:2,19
240:10
245:11
248:13
**represented**
247:5,9
**representing**
244:9
246:24
**reps** 207:2
235:4,18

236:10
**requested**
45:18 79:8
202:21
207:15
266:7
**requests**
263:3
**required**
143:19
**resents**
191:10
**reserved**
266:23,25
**residence**
200:10
**residual**
140:23
**resolve** 87:15
**resolved**
16:11
164:2,5,13
**resources**
156:18
256:14
**respect** 144:4
145:4
**respond** 81:2
81:6 230:12
**responded**
158:5
241:25
**responds**
196:18
197:21
**response** 67:5
119:5
127:20
174:19
175:4,21
176:22
191:7 192:5
194:14,14
197:25
206:6
260:17
**responses**
211:15
**responsibil...**

155:20
156:2,15
**rest** 18:5
135:21
240:6
**restaurant**
130:16,18
**restroom**
258:24
**result** 231:2
**Resumed**
155:3
**retained**
228:8,19
229:21
**retainer** 29:5
244:10,14
244:18
245:5
247:22,23
247:25
248:6
**retainers**
89:3 206:10
**retaining**
71:12
**return**
271:12
**returned**
241:6
**reveal** 217:10
217:12,13
**revealed**
216:22
218:4,5
234:17
**review** 57:22
58:5 108:25
109:5,7
**reviewed**
57:24
117:15,21
**reviewing**
57:21
234:22
**reviews**
156:23,25
157:3

**revised** 82:22
**reward** 30:16
**re-entered**
  98:15
  223:22
**Rica** 178:10
**right** 6:25
  7:17 18:15
  46:6,11,24
  48:9 64:13
  66:8 70:5
  73:22 114:4
  120:9 123:4
  125:7,13
  129:5 136:6
  138:13
  142:24
  151:25
  154:13
  157:19
  160:11
  172:7 175:5
  184:9
  188:11
  189:14,24
  202:2,13
  205:2 206:7
  208:4
  214:23
  238:4 248:5
  258:16
  261:23
  263:12,13
  265:10,17
  267:4
**risk** 30:15
**Robert** 18:5
  20:9 26:4
  69:9 95:6
  214:19
  233:19,23
  233:24
  234:13
  237:23
  238:11
**Robinson**
  161:24
  163:2,23

224:4,19,25
225:20
227:18
**Robinson's**
  159:19
**robo** 41:24
**rock** 10:4
  114:4
**Rocket** 95:15
**Rogan** 190:2
  190:3,4
**Rogers**
  130:22
**role** 248:15
**Rolling** 25:19
**room** 52:12
  183:22
**rooting** 195:6
  208:9
**ropes** 254:8
  255:10
  256:9
**Ross** 53:23
  54:7 56:5
  56:14,25
  57:6
**routine** 60:9
**rude** 209:7
  242:6
**rule** 169:11
  216:21
  217:7,8
  229:19
  231:9,19
  252:6
**rules** 1:14
  7:12 144:10
  144:14
  228:17
**rumors** 16:12
**run** 114:6
  124:7
**runner**
  148:17
**running**
  148:18
  256:3
**Ryan** 64:20

64:21 72:9
107:20
108:23
110:3

──────
**S**

**S** 4:2 155:2,2
  155:2
**SAITH**
  267:12
**salary** 158:9
  159:2
**sale** 75:24
**sampling**
  55:24 56:9
**Sarris** 63:12
  192:12
**Saturday**
  219:11,15
  220:18
**saved** 28:6
**saving** 255:25
**saw** 56:18
  89:22
  114:11
  184:8
  200:23
  210:19
  254:6
**saying** 41:10
  46:15 71:25
  81:8 92:15
  96:2 135:2
  138:17
  152:2
  181:19
  183:13
  197:8
  204:15,18
  209:7
  210:12,17
  210:21
  241:6 255:9
  257:16
  260:7
**says** 36:4
  65:14 70:22
  71:9 76:12

78:7 80:19
81:20 91:8
91:19,20
99:7,9,20
100:5 101:7
107:25
117:25
126:19
128:21
131:4
132:21
139:24
143:15,16
149:19
150:13
158:5,22
161:14
165:22
166:6,12
168:5 171:3
172:5
174:20,25
175:9,17
176:16
181:6
190:14,24
191:18
192:15
194:15
196:18
197:21
198:5 204:2
206:3
208:12
209:24
212:12
218:18
220:21
224:20
225:3 226:5
226:7,7
235:2
238:21
247:25
248:3,5
252:9 253:2
255:8
256:11,13

261:19
**scanner@a...**
  76:18
**scheduled**
  53:4
**school** 9:16
  9:18,19
  10:12,15,17
  10:19 11:8
  11:12,15
  18:18 23:23
  54:3,5 56:6
  114:5
**schools** 53:8
**Schwanke**
  205:12
  206:15
  241:5 242:4
  243:7
**science** 10:10
  10:23
**scratched**
  166:15,16
**screen** 239:16
**screened**
  152:23
  153:3
**screw** 100:6
  100:11
  101:7,9
**screwing**
  101:6
**screws**
  100:19
**season** 78:11
**second** 78:2
  91:7 143:14
  161:12
  165:12
  185:16
  189:5
  205:15
  253:2
  254:22
**secret** 216:10
**secretary**
  72:7
**securities**

22:15
**see** 36:7
  64:10 71:2
  71:3,4,14
  75:18,22,24
  77:21 80:20
  80:24,25
  91:5,7,13
  99:4,5,8,9
  107:22
  108:4 118:7
  121:6,18,19
  122:24
  126:22
  131:11
  132:6,8,24
  135:10,17
  135:19
  136:3
  143:11,25
  144:2
  147:23
  150:8,19,20
  158:14,15
  161:7,8,20
  162:6
  168:19
  171:5 172:9
  172:12
  174:23
  175:5
  176:20,25
  180:25
  187:7
  189:15
  190:16
  191:5,12,24
  192:13,14
  194:22,23
  197:14
  198:3,4,8
  200:20
  201:4 206:4
  206:12
  212:17
  215:18
  221:22
  224:5 225:4

| | | | | | |
|---|---|---|---|---|---|
| 226:4 227:9 | 202:5,14 | 221:23 | **shows** 61:15 | 115:8 | **somebody's** |
| 229:7 | 209:18 | 222:6 | **side** 15:3,6,15 | 215:11 | 211:18 |
| 233:21 | 219:14,25 | 244:22,25 | 15:19,19 | **smarter** | **soon** 148:19 |
| 234:5,14,19 | 236:17 | 245:7 253:6 | 16:24 18:4 | 123:12 | 202:14 |
| 235:6,7 | 238:20 | **settlements** | 123:13 | **smartest** | **sorry** 12:5 |
| 242:8,14 | 239:25 | 52:6 | 175:25 | 122:6 | 45:15 47:8 |
| 250:10 | 240:12,24 | **settler** 198:2 | 212:14,23 | **Smith** 69:6 | 47:8 56:13 |
| 253:11,12 | 241:25 | **settling** | 215:16 | 80:2,5,12 | 112:15 |
| 255:14 | 257:16 | 201:11 | **sided** 132:7 | 80:19 81:19 | 116:24 |
| 256:19 | **sentence** | **setup** 172:8 | 132:13 | 84:3 91:8 | 128:12 |
| 261:18 | 263:14 | **share** 29:14 | **sign** 202:15 | 91:17 99:2 | 132:20 |
| 262:2 263:2 | **sentences** | 30:15,16,18 | 271:7 | 200:25 | 149:14 |
| 263:8 265:6 | 197:8 | 30:22 31:21 | **signature** | 201:15,18 | 155:16 |
| **seeing** 77:22 | **separately** | 35:15,15 | 137:6 | 219:22 | 222:19 |
| 135:16 | 32:8 | 38:24 41:13 | 266:21 | 240:2 | 229:11 |
| 136:11 | **September** | 44:3 126:15 | 267:2 | **sneaky** | 233:14 |
| 254:9 | 64:13 | 161:22 | 269:24 | 210:15 | 239:5 |
| **seemingly** | **series** 80:3 | 251:21 | 272:23 | **solely** 244:18 | 249:21 |
| 253:5,5 | 142:16 | 259:19 | **signed** 29:4 | **solicited** | **sort** 28:5,8,11 |
| **seen** 28:15 | 147:10 | **shared** 31:4,5 | 202:25 | 194:19 | 28:25 29:10 |
| 49:6,7 | 221:7 | 31:9,11 | 204:2,12 | **soliciting** | 31:2 39:5 |
| 61:11,14 | **serious** | 32:9,16 | 205:2,6 | 203:3 | 115:14 |
| 62:4 64:17 | 183:15 | 35:19 39:4 | 206:10 | **solo** 250:17 | 123:13 |
| 70:14 75:25 | **services** | 40:18 42:10 | **signing** 271:9 | **solve** 101:10 | 124:7 145:5 |
| 161:9 165:3 | 161:24 | 209:24 | **similar** 227:7 | **somebody** | 182:13 |
| 216:23 | 162:4 | 216:3 217:2 | **simple** 167:7 | 18:17 27:2 | 192:11 |
| 234:3,4 | **set** 117:13 | **shares** 140:21 | **simply** 78:8 | 27:14 33:14 | **sound** 78:19 |
| 246:17 | 153:3,11,23 | **sharing** 32:10 | **Single** 21:23 | 44:25 59:11 | 174:20 |
| **send** 71:9 | 153:25 | 32:11,13 | **Sir** 173:15 | 95:15 | 210:22 |
| 72:7 124:12 | 192:6,16 | 35:7 37:11 | **sit** 34:17 | 101:12 | **sounded** |
| 140:6 172:5 | 193:2 | 42:8 44:5 | 49:13 | 103:12 | 188:11 |
| 203:11 | 209:25 | 44:15 | **sitting** 53:12 | 119:9 | 231:15 |
| 240:17 | 210:10 | 259:22 | 73:11 | 122:11,16 | **sounds** 24:10 |
| 262:16 | 270:8 | **sharp** 115:9 | 171:16 | 123:18,21 | 106:12 |
| **sending** | **settle** 197:10 | **sheet** 271:6,7 | 181:2 | 183:25 | 126:25 |
| 51:25 67:12 | **settled** 27:3 | 271:10,13 | 182:15 | 193:17 | 133:13 |
| 93:4 141:17 | 38:23 59:17 | **shifting** 247:2 | **situation** | 203:14 | 139:8 |
| 141:24 | 191:3 209:9 | **shoe** 190:3,3 | 207:25 | 211:24 | 174:21 |
| 187:6 | **settlement** | **shoes** 50:8 | 211:7 | 212:3 | 204:12 |
| 237:22 | 52:13 126:5 | 190:4 | **six** 55:25 | 213:15 | **source** 91:12 |
| **sense** 24:3 | 184:3,13 | **shorthand** | **slaughtered** | 222:20 | 91:18 92:6 |
| 35:10 | 185:5 186:5 | 269:5,13,16 | 196:22 | 223:3 | 93:17 94:4 |
| 225:18 | 186:18 | **shortly** | **sleeping** | 225:10 | 95:10 |
| **sent** 29:7 | 192:8,17 | 175:13 | 148:24 | 238:11 | 141:11 |
| 69:25 76:13 | 193:3,20 | **shot** 192:10 | **small** 16:9 | 245:25 | **space** 23:4 |
| 88:8 92:13 | 194:5 201:7 | **show** 215:16 | 17:8 27:16 | 257:16 | 271:5 |
| 152:11,16 | 210:2 212:9 | 254:15 | 27:17 51:7 | 258:15 | **speak** 8:4,6 |
| 200:24 | 215:19,21 | **shown** 268:12 | **smart** 25:3 | 262:16 | 184:11 |

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123 1.800.642.1099

**speaking**
36:2 69:4,6
211:20
**specialty**
12:23
**specific** 69:10
82:10,11
107:7
109:25
140:12,14
167:22
266:7,9
**specifically**
111:22
203:10
**speculation**
164:9,16
192:20
250:3
**speed** 251:25
**speeding**
251:17
252:3
**spelled** 242:5
**spend** 250:12
250:15
**spent** 56:8
101:4
111:20
255:23
**splits** 199:8
**splitting**
248:9
**spoke** 67:18
68:24 69:9
214:17
261:10,13
262:10
**spoken** 52:24
70:14 71:18
201:23
202:3
**spot** 176:17
**spreadsheets**
89:25
**squeamish**
192:9
**ss** 268:3

269:2
**St** 6:22
**stamps**
239:21
**stand** 50:19
208:10
**standing**
182:14
**star** 16:16
114:4
**staring**
220:23
**start** 16:12
22:7 61:20
61:25 63:18
118:10
140:15
141:17
148:18
166:6 211:6
**started** 9:25
17:12 19:11
19:15 33:8
51:6 85:7,9
85:9,13
86:4 118:13
124:14
148:15
**starting** 19:8
158:8
169:15,17
263:14
**starts** 147:14
**state** 1:16
6:11 62:21
197:7
213:25
214:5
243:10
268:2 269:2
269:5 271:4
**statement**
162:3
195:11
264:5
**states** 1:1,15
8:25 65:3
216:16

**station** 172:8
**status** 134:2
152:7
184:13
185:5 186:4
**statute** 28:7
**statutory**
246:25
**stay** 22:19
136:15
**stealing** 86:4
86:23 87:16
87:20,24
88:10,18,24
**Stein** 14:2
**step** 8:13
**stepped**
26:21
**steps** 84:16
239:17
**Steven** 12:2
**stick** 125:5
**stolen** 249:2
249:4,19,24
**stop** 36:11,22
252:14
**stopped** 42:6
**store** 190:3
**story** 132:21
133:6,10,11
133:14,15
133:20,21
**straight**
10:11 120:6
**strange** 81:2
81:7
**strategic**
230:6
231:24
**strategy**
56:11
**Street** 1:17
2:4,10,15
5:13
**stressful**
256:7
**string** 170:25
**structure**

138:12,24
167:21
168:22
**students**
53:12
**studied** 12:13
**study** 10:22
**stuff** 41:17
50:9 61:15
145:7
208:22
210:18
227:25
234:18
**stumbled**
80:21
**subject** 32:3
32:25 40:24
64:18 75:16
79:3 91:10
91:17 99:24
103:25
146:10
180:5 201:3
268:11
271:9
**submitted**
228:12
232:15,19
**submitting**
228:16
**subpoenas**
90:7 103:9
103:11
**subscribed**
268:20
**subscriber**
78:11
**subsequently**
131:7
**substance**
69:14
258:20
**substantive**
26:3,5 30:4
51:18,20,25
52:3,4
**suburb**

130:21
**sucked** 60:13
**sudden** 126:6
194:15,25
**sue** 28:7
70:23 71:3
71:5 72:6
76:13 77:7
201:14
202:15
203:8
206:10
**sued** 90:15
**suggesting**
197:15,18
**suing** 66:24
67:11 76:25
77:3,5
**suit** 64:19
65:24 68:14
71:11 72:17
73:4 74:4
74:10 270:4
**Suite** 2:15
**suits** 50:9
**summary**
63:9 108:11
108:15
109:2
180:15
181:4
**summer**
11:10,17
12:12
213:23
**Sunday** 99:2
130:16
169:19
**super** 125:12
**superior**
24:12
**supervises**
156:4
**supervision**
251:18
**supervisory**
155:25
**supplement...**

117:12
253:9
262:22
264:7,15
**support**
208:13
**supposed**
182:24
187:24
216:25
**Supreme** 9:3
**sure** 44:7
53:2 60:7
63:21 81:9
83:7 88:24
89:16,17,20
91:3,24
92:3,25
100:14,20
106:24
112:12
114:21
118:14
121:12
123:9 135:6
139:7,8
143:20
151:6 157:8
172:7
183:23
185:17
191:21
196:11
199:5 202:6
202:13
210:6
233:15
245:12
248:23
251:9
265:18
**surprised**
67:22,23,24
68:3,13
74:2,12
**survey** 15:24
**susceptible**
176:18,23

**swear** 6:3
**sweat** 101:5
**switch** 14:7
    15:18
**switching**
    144:11
    151:4
**sworn** 6:6
    268:20
    269:8

**T**

**T** 4:2 155:2
    272:1
**take** 12:3
    13:25 63:19
    84:16
    119:12,14
    119:18,21
    120:7
    121:15
    133:8
    135:18
    137:5 141:4
    141:7
    146:15
    154:15
    165:9 170:3
    170:21
    173:21
    189:3,4
    193:15
    205:16
    223:18
    229:14
    234:7
    254:23
    258:21
    261:14
    262:14
**taken** 1:15
    7:3 269:9
    269:17
**takes** 112:18
    191:20
**talk** 48:15
    66:18 67:15
    68:9,18

88:3 100:15
114:16
115:11
122:16
124:17,18
127:23
178:23
185:4 186:4
186:11
200:3
218:16
225:10
237:12
239:24
240:4,5
**talked** 17:2
61:16,17
68:16 70:11
95:19
100:24
101:20
113:17
122:15,18
122:19,20
127:25
130:8
142:21
151:17
201:17
202:7
214:13
227:17
238:14
240:2
252:13
257:22,23
261:3,16
262:3
**talker** 8:10
**talking** 37:20
37:24 58:15
67:10 69:12
76:24 77:5
84:24 92:11
92:17 122:3
123:2 129:6
135:3,4
138:15

139:4
165:17
169:16
176:7 178:3
178:16
182:21
193:17
202:10
210:8
211:14
235:17
238:22
242:20
254:16
257:3
262:12
**talks** 161:13
**Tampa** 1:3
5:10 62:21
64:18 65:24
66:11,24
67:11,19
68:14 71:11
71:20 72:18
72:21 73:6
73:17 74:4
75:17,21,23
76:22 78:10
78:13,15
81:9,21
82:6,16
83:2,3
88:15,16
91:20 92:16
93:2,18
94:6,17,23
94:24 99:25
100:11
102:15
133:19
183:19
191:9
194:16,25
195:4,6,20
196:8 201:3
201:14
203:12
206:10

207:9
**taped** 211:17
**tax** 42:10
46:22
**taxes** 27:4
163:22,25
**TCPA** 22:8
23:7,11
26:11 27:12
28:12 31:13
40:5,14
41:19,20
44:9 46:18
47:13,15
61:4 64:19
65:23 66:10
68:14 84:20
85:2,13,20
94:5,17,20
95:2 96:15
96:19
100:12
102:15
103:2,19
104:25
105:19
107:12
123:22
125:10
193:19
257:15
**teach** 18:18
**teaching** 53:7
**team** 44:22
156:6
**technology**
58:10,13,17
58:19,22
59:20
103:20
107:11
167:3,9
178:20
179:5,16,24
183:8
184:15
185:3,11,21
186:16

198:14,18
198:25
205:11
206:9,15,19
213:24
214:5 240:8
240:10
242:3 243:5
243:7,15,20
244:11
245:3 257:9
258:12
264:18
**teeth** 149:21
**telephone**
70:12
**tell** 46:12
47:21,22
72:24 73:23
79:12 87:22
112:15
122:21
145:21
185:12,15
200:12
208:16
218:14,24
235:24
238:24
253:17
262:9
**telling** 194:7
237:2
**tells** 92:7
211:24
**temperature**
262:15
**template**
72:13
260:22
**tend** 22:17,18
**term** 45:25
139:16,18
139:19
180:16
202:9
239:12
**terminate**

33:25
**terms** 17:22
29:12,16,19
32:15 35:12
49:23 61:16
130:13
131:9
142:24
168:14
263:16
**test** 129:23
147:10
**testified** 6:7
**testify** 235:16
269:8
**testimony**
32:2 35:22
36:15 57:13
57:22 89:22
105:14
162:17
184:18
268:9
269:11
**Texas** 83:24
**text** 4:9,10,11
4:13,14,15
4:16 121:9
121:11,13
121:23
126:18,24
127:16
128:20,24
129:2
132:20
133:2,16
147:10,18
170:19,23
170:24
173:9,10,16
173:19
174:6,20
176:16
203:24
204:4 206:2
220:12,14
220:15,20
252:8 254:6

| | | | | | |
|---|---|---|---|---|---|
| 257:5 260:4 | **things** 16:3 | 130:21 | 225:13,14 | 165:25 | 72:10 73:20 |
| 261:11 | 16:14 23:24 | 136:10 | 225:14,16 | 190:10 | 74:21 76:5 |
| 262:16 | 41:20 45:2 | 139:18 | 225:21,24 | 206:22 | 78:20 81:13 |
| **texting** | 58:6 81:4 | 140:8 141:3 | 226:13 | 218:7 | 84:19 85:2 |
| 204:24 | 90:6 101:13 | 141:7,23 | 227:20 | 221:23,24 | 85:6,12 |
| **texts** 127:2 | 101:18 | 143:23 | 228:2,3,4 | 224:16 | 86:8 92:11 |
| 175:2 | 106:19,23 | 144:6 145:4 | 228:11 | 261:16 | 101:4 |
| **thank** 8:9 | 114:19,21 | 145:23,24 | 229:23 | **thousands** | 106:13,21 |
| 36:8 80:11 | 115:7 157:9 | 149:3,10 | 230:4,9 | 89:3 | 107:5,6 |
| 112:20 | 159:15 | 151:10,20 | 232:19 | **three** 6:17 | 108:9 |
| 162:22 | 166:18,19 | 152:16 | 236:14 | 16:10 20:3 | 110:11 |
| 174:5 | 244:6 | 153:3 154:3 | 238:17,17 | 36:19 37:4 | 111:21 |
| 258:24 | **think** 12:4 | 154:6,14 | 239:13 | 59:12 137:9 | 112:8 |
| 264:21 | 13:2 20:25 | 157:10 | 240:2,20,25 | 140:19 | 114:10,15 |
| 265:2 267:9 | 22:6 23:16 | 159:19 | 243:12 | 142:4 151:8 | 115:19 |
| **thanks** | 24:10 25:7 | 160:10 | 244:20 | 152:15 | 116:12 |
| 162:21 | 26:2 27:6,8 | 165:11 | 245:5 | 153:5 | 119:22 |
| 224:20 | 27:25 29:17 | 166:2 | 247:20 | 201:16 | 120:16 |
| 225:3 | 33:20 36:10 | 171:19,24 | 249:6 251:9 | **Throw** 129:8 | 123:15 |
| **thereof** 270:6 | 39:12 41:24 | 172:11 | 251:11,12 | **Thursday** | 124:22 |
| **they'd** 126:9 | 48:22 52:15 | 173:8 | 251:16,17 | 70:25 91:9 | 127:3 |
| **thing** 28:5,8 | 52:23 53:6 | 176:11 | 251:23 | 224:23 | 133:18,24 |
| 29:11 31:2 | 53:7,15 | 177:17,23 | 255:18,19 | 233:20 | 134:9 |
| 42:3 60:15 | 54:9,14 | 178:2,8,9 | 256:23 | **ticket** 78:11 | 140:18 |
| 76:24 | 56:18 57:25 | 179:12 | 257:3,22 | 251:17 | 142:21 |
| 115:14 | 60:14,25 | 180:22 | 258:18 | 252:3 | 145:3 146:2 |
| 119:20 | 61:10 62:5 | 182:11,13 | 267:5 | **tickets** 75:24 | 149:8 151:3 |
| 123:14,25 | 62:5,16 | 182:18 | **thinking** | **tied** 167:9,21 | 151:7,23 |
| 124:20 | 63:12 64:25 | 183:17 | 152:10 | 167:23 | 152:9,11 |
| 145:5 | 70:5,11 | 185:23 | 187:3 208:4 | **Till** 13:8 | 153:15 |
| 146:13 | 72:2 73:18 | 190:22 | 251:2 | **Tim** 227:11 | 154:15 |
| 151:11 | 76:16 83:17 | 195:2,3,16 | 261:19 | **time** 5:15 | 155:6 |
| 152:21 | 83:24 86:2 | 196:10 | **thinks** 44:11 | 7:19 8:4 | 166:24 |
| 159:21 | 87:12,12,13 | 198:20 | 176:5 | 13:8 15:14 | 170:9 177:9 |
| 196:23 | 87:23 88:23 | 201:16,21 | 247:17,18 | 16:11 20:13 | 177:12,12 |
| 205:14,17 | 89:22 90:13 | 206:21 | 247:19 | 25:3,14 | 178:15 |
| 208:11,14 | 95:15 97:4 | 207:5 210:5 | **third** 31:4 | 26:9 27:14 | 179:3,14,22 |
| 208:16 | 98:13 99:12 | 210:8 211:3 | 78:5 217:2 | 28:9 32:18 | 186:20 |
| 211:23 | 109:23 | 212:7,22 | **thirds** 31:10 | 32:24 34:2 | 189:11 |
| 215:11 | 111:13,15 | 213:11,20 | **thirty** 271:13 | 39:25 45:14 | 190:8,12 |
| 218:12 | 113:3,10 | 214:11,13 | **thought** 44:7 | 45:20 48:2 | 198:16 |
| 225:25 | 116:14 | 214:15,16 | 69:21 73:19 | 50:4,4 | 201:12 |
| 227:7 | 118:20 | 216:8,10 | 87:19 88:10 | 52:14,23 | 204:25 |
| 238:21,22 | 122:18 | 217:16 | 88:23 | 53:20,25 | 208:5 212:3 |
| 247:14 | 123:10,21 | 218:2,3,6 | 140:13 | 54:17 56:17 | 219:24 |
| 255:24 | 125:6,14 | 218:10 | 141:8,9 | 62:14,17 | 224:7,14 |
| 256:7 | 127:11,25 | 219:16 | 142:6 | 63:11,23 | 246:16 |
| 262:15 | 129:18 | 222:11 | 144:20 | 64:3 69:22 | 248:18 |

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123 1.800.642.1099

250:12,15
251:17
255:23
258:9 259:2
259:5
260:12
263:16
264:5
267:11
269:10
**times** 36:19
37:4 61:12
61:16,17
66:19 67:20
70:14 90:15
114:19
208:8
210:19
235:17
239:9
**tip** 148:25
**title** 42:7 55:4
60:3 155:13
155:18
**today** 7:14
8:2,15 23:6
38:10 57:9
59:11 78:16
93:14 95:16
240:6 262:4
**Todd** 69:4
91:9,16
98:25 99:2
100:4,13,18
101:2 102:6
122:18
149:16
150:6
151:14
200:24
201:18
202:7,9
209:18
213:11
214:18
**told** 35:9,12
35:14 55:14
73:25 116:9

145:23,24
149:16
152:14
173:3
175:13
182:4 188:9
196:24
202:11
213:15
218:11,24
225:14
236:6,14,18
237:10,12
238:12
240:3,4
249:3 250:7
258:14
**Tom** 20:18
27:6 34:22
**top** 79:25
91:11
117:25
128:21
131:3
132:19,20
174:15
175:9
190:13
198:5
233:18
242:7,9,11
**tort** 13:4
**tossed** 248:5
**tougher**
176:6
**Training**
58:10,13,17
58:20,23
59:20
103:20
107:11
167:3,10
178:20
179:5,16,24
183:8
184:15
185:4,12,22
186:16

198:14,18
198:25
205:11
206:16,19
213:25
214:5 240:8
240:11
242:3 243:6
243:8,16,21
244:11
245:4 257:9
258:12
264:19
**transaction**
54:21
**transcribed**
269:13
**transcript**
67:14
268:11
269:16,22
271:14,15
**transcripts**
266:14
**transfers**
139:25
**transmission**
94:23
**transmissio...**
94:16 95:8
**trauma**
175:14
**treated** 50:21
233:5
259:16
266:24
**treating**
55:10
**trial** 191:20
**tried** 212:22
212:24
**triggered**
188:5,7
**true** 78:23
171:8
228:15
234:22
264:19

268:10
269:15
**trust** 122:9
126:14
**truth** 269:8
**try** 84:4,16
212:19
**trying** 39:8
39:13 42:18
54:16
182:10
186:10
193:2 248:7
248:8,11
251:23
**TTA** 62:21
241:5
**Tuesday**
64:12
**turn** 117:19
117:23
126:16
130:25
131:3
132:17
142:14
147:13
158:2
162:24
168:10
172:3 175:7
205:24
**turpitude**
252:5
**two** 13:24
16:10 25:20
25:24 26:20
26:22 33:9
43:4,8,13
44:16 54:9
58:18 82:25
90:14
119:25
132:7
148:11
153:5
166:15
169:18

180:3
185:11
206:7,13,17
206:25
260:2
**two-minute**
120:7
**two-second**
170:4
**type** 12:19
13:17 14:11
14:25 17:20
54:24
**types** 6:19
15:6,9
22:11,13,14
23:4 46:20
**typewritten**
269:14
**typically**
29:22,23
30:14
199:24
**typos** 211:12
_____
**U**
_____
**Uber** 147:16
148:22
**uh-huh**
147:24
156:19
174:24
175:23
176:21
177:2
194:23
**ultimate**
230:3
**ultimately**
74:3
**uncertified**
201:8
**undergrad**
9:24 10:12
114:4
**underlie** 95:7
95:11
**understand**

7:15 32:4
37:15,18
39:8 65:4
120:2
139:22
182:19
184:20
248:8,11
**understand...**
175:10,18
**understand...**
42:22 83:19
94:15 194:3
229:18
266:22
**Understood**
267:8
**unfortunat...**
112:9
**United** 1:1,15
**university**
9:21,25
10:2,20
11:21
**unquote**
146:8
**unsolicited**
253:3
**unwanted**
99:20
**Urbana-Ch...**
10:21
**use** 45:25
114:22
139:17,19
185:24
227:13
249:12
258:23
**useful** 50:12
**usually** 15:23
66:20
204:20
**U.S** 5:9 9:3
_____
**V**
_____
**v** 162:4
**vacation**

| | | | | | |
|---|---|---|---|---|---|
| 178:9 | 108:16 | **walk** 50:24 | 74:5,11,18 | 26:12,14 | 55:11 |
| **vague** 39:24 | 109:3 | **walked** 25:9 | 74:25 75:7 | 38:22,25 | **Washington** |
| 93:25 94:8 | 110:10,25 | **wall** 153:4,12 | 75:15 76:21 | 55:14 65:18 | 98:6 |
| 94:9 102:16 | 111:7,11 | 153:23 | 77:3,6,16 | 83:9 97:11 | **wasn't** 16:4 |
| 109:12 | 134:2 141:4 | 154:11 | 78:4 80:22 | 115:15 | 32:10,11 |
| 129:14 | 151:22 | 211:18 | 81:14 83:12 | 116:20 | 35:5,5 |
| 134:8 203:6 | 167:4,10 | 219:18,21 | 84:14,21,23 | 119:9 124:5 | 40:11 67:22 |
| 248:17 | 237:15,20 | 225:12 | 84:25 85:8 | 196:3 | 67:23,25 |
| 258:8 | **videograph...** | 239:8,10,14 | 85:11,14,19 | 236:10 | 72:24 74:14 |
| **Vaguely** | 5:2 6:2 7:25 | 239:18 | 86:4 88:22 | **want** 86:15 | 86:9 97:17 |
| 142:18 | 63:22,25 | **walled** | 91:12,19 | 90:25 | 104:12 |
| **van** 56:7 | 120:11,14 | 263:21 | 92:6 95:20 | 119:14 | 111:24 |
| **varies** 55:2 | 154:16 | **Walters** 12:2 | 96:5,10,15 | 123:5,22 | 119:8 |
| **vary** 54:24 | 155:4 170:5 | **Wanca** 23:8 | 96:20 99:11 | 125:15,22 | 166:11 |
| **venting** | 170:8 189:6 | 23:10,25 | 100:11 | 134:17 | 169:9 182:4 |
| 207:25 | 189:9 | 24:12,22 | 101:6 | 141:2,2 | 187:25 |
| **venture** | 258:25 | 25:6,12,17 | 102:13 | 143:16 | 193:23 |
| 28:18 29:8 | 259:4 266:2 | 25:19 26:7 | 104:24 | 148:18 | 196:11 |
| 29:13 31:13 | 267:10 | 27:13 28:10 | 105:20 | 153:13 | 197:18 |
| 32:14,15 | **videotaped** | 28:20 30:23 | 110:22 | 166:3 172:7 | 210:23 |
| 33:22 34:18 | 1:13 | 30:23 31:3 | 111:3,25 | 199:5 219:2 | 213:20 |
| 35:3,12 | **view** 24:21 | 31:17,18,20 | 112:5,25 | 221:16,19 | 252:4 |
| 39:20 40:16 | 49:15,20 | 32:8,19 | 115:24 | 227:12 | 255:12 |
| 41:6 42:21 | 50:2 51:3 | 33:9,10 | 116:7,9,16 | 246:11 | **waste** 106:12 |
| 43:7 45:24 | 112:3,23 | 35:8,15,19 | 124:6,12 | 251:21 | **watch** 50:19 |
| 46:4 85:22 | 115:17 | 37:12 38:13 | 125:17,23 | 262:25 | **watched** |
| 86:5,24 | 164:12 | 39:21,23 | 126:14 | 265:19 | 187:4 |
| 87:3,5,17 | 217:18 | 40:9,15,19 | 127:6 | **wanted** 54:15 | **watching** |
| 87:20,24 | **violated** | 41:6,12 | 139:24 | 137:5 142:7 | 208:6 |
| 88:7,8,11 | 217:19 | 43:7 44:4,8 | 140:3 | 166:20 | **water** 7:21 |
| 88:18 196:6 | **violation** | 44:19 45:21 | 145:12 | 169:20 | 228:21 |
| 213:7 | 85:22 | 46:9,21 | 159:21 | 171:22,23 | **Watkins** |
| 255:22 | **Virginia** 9:21 | 47:12,18,25 | 166:10 | 186:17 | 197:22 |
| **venturer** | 9:22 | 48:5,19,23 | 178:13,19 | 187:18,21 | **Waukegan** |
| 115:13 | **Volkswagen** | 49:10 51:16 | 179:7,17 | 187:25 | 50:17 |
| **verbal** 199:20 | 60:11 | 51:17 52:7 | 192:25 | 252:12 | **way** 30:12 |
| **version** 71:9 | **vs** 1:7 | 52:9,11 | 194:4 195:8 | **wanting** | 36:7 45:6 |
| **versus** 5:8 | ———————— | 53:21 56:17 | 208:11 | 39:16 | 55:23 |
| 25:22,23 | **W** | 56:22 57:5 | 209:24 | 125:16 | 124:23 |
| 54:10 55:18 | **wait** 112:17 | 61:6 64:8 | 218:6,8 | 130:9 | 126:8 |
| 58:10,14,20 | 112:17,19 | 64:22,24 | 254:7 255:9 | 224:12 | 149:17 |
| 58:23 59:20 | **waive** 135:23 | 65:8,25 | 257:11,14 | **wants** 166:3 | 167:6 |
| 60:3 62:9 | 228:16 | 66:10,19 | 257:20,24 | 174:21 | 207:23 |
| 62:10,19 | **waived** | 67:2,11 | 259:16,19 | 192:6,15 | 209:9 |
| 75:17 80:2 | 266:22,23 | 68:7,13 | 259:22 | 209:12,24 | 246:12 |
| 88:16,20 | 269:25 | 70:23 71:7 | 260:19 | 210:10 | 259:14 |
| 107:21 | **waives** | 71:18 72:22 | 263:5 | 256:25 | 261:17 |
| 108:10,12 | 135:20 | 73:5,16 | **Wanca's** | **washing** | 263:13 |

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123 1.800.642.1099

270:3,5
**Wayne** 80:3
83:14
190:21
191:15
198:9 218:8
**Wednesday**
79:24
203:25
**week** 56:9
196:25
**weeks** 59:13
**Weiss** 6:23
14:18 15:14
16:22 17:7
17:11 19:6
19:8 28:2
40:9 60:8
226:14,14
227:23
230:19
**went** 10:16
12:15 13:13
13:25 14:18
17:17 23:23
28:2 54:12
96:11
113:16
154:6
191:10
234:23
**weren't** 40:5
46:19 74:22
210:22
**we'll** 7:24
8:14 90:8
112:19
185:24
212:8
215:18
230:10,10
266:13
**we're** 22:20
29:20,21
38:8 45:23
49:2 53:9
72:4 113:12
120:4 155:9

199:5
247:17
248:9
**we've** 33:21
48:24 63:18
64:6 70:20
79:22,22
87:13 90:5
98:23
113:11
121:4 142:3
147:6 161:3
161:3
164:23
170:14
219:8
223:12
229:4
233:13
241:15
**WHEREOF**
270:7
**whispering**
112:10
**White** 13:14
13:22
**wide** 54:18
**willing**
132:22
**winded**
211:11
**winding**
20:20
**wipe** 251:8
**Wireless**
25:22
**Wisconsin**
2:10
**wish** 187:3
188:2 272:5
**withdraw**
22:2,3
257:18
**withdrew**
20:18 21:25
**withhold**
163:22,25
**witness** 6:4

32:5 33:3
34:10 36:10
36:12,19
37:6,14
40:3 41:2
43:12,21
47:5 74:9
75:5 79:5,9
80:12 82:12
94:12 95:5
95:13
102:19
104:3,16
105:8,24
106:10
109:15
110:14
112:20
119:24
120:3
127:10
134:11
136:12,16
137:8,14,19
146:12
153:17
163:16
164:10,18
170:3
172:23
173:25
177:14
180:7
184:22
189:4
192:21
195:14
199:16
205:15
207:16
218:2
222:10
228:20
229:14
230:15
231:21
232:2
236:24

238:9 241:4
241:9 246:7
248:20,22
250:6
251:22
253:25
254:22
268:7 269:7
269:11,24
270:7 271:1
272:23
**witness's**
105:13
**woman** 71:6
**wondering**
148:22
177:15
**word** 71:9
94:9 133:15
206:3
**words** 36:23
62:17 66:13
69:15 71:23
82:10,11
118:20,24
158:19
208:22
**wore** 50:8
**work** 11:14
11:23 12:15
17:17,20
19:3 21:7,9
21:11,12
22:8 24:17
24:19,25
25:25 29:20
29:23 30:10
30:15 33:12
33:16 44:14
49:12 51:14
51:18,20,25
52:3,4,9
53:16 57:6
61:22 65:7
87:2 103:5
103:19
104:7,24
105:18

106:4
113:10,12
114:7,11,11
118:4,15,17
122:8
123:16
124:22,25
126:2
127:15
129:25
141:2,19
142:8,11,22
143:5 145:2
148:8 154:8
154:9
155:22
156:3
169:20
179:8 180:9
187:16
194:17
195:23
196:5
199:24
200:9
212:20
214:10
215:8,9,14
222:15,24
223:4
225:21
226:4
227:15
228:9,16
229:20
231:7
250:13,14
253:19
262:18
**worked** 11:16
12:14 13:3
13:4 25:2
30:22 46:7
46:8,21
47:12 48:13
49:22 53:17
56:2,3 60:7
111:18

115:7,12,12
150:21
202:11
227:16
232:20
259:15,25
**working**
15:24 19:15
26:6 30:9
33:8 45:3
54:7 56:16
56:21 60:2
60:23 61:21
63:11
111:11
113:22
125:11,18
125:23
145:3
150:25
208:13
212:25
226:6
**works** 16:20
71:6 122:7
123:11
156:5
209:13
**world** 135:21
238:19
**worry** 225:8
**wouldn't**
23:13,14
42:19 43:22
149:12
224:11
238:10
239:5
257:22
**write** 165:16
**writing** 34:19
269:12
**written** 29:2
29:3 34:5,5
34:16,21,24
42:20 51:24
51:25
166:19

171:25
227:13,19
227:21,22
232:14
233:6
**wrong** 175:10
218:3 242:6
**wrote** 26:3
81:21 82:2
99:7,9
150:14
207:24
209:6
219:23
260:7,15
**W2** 18:14,16
19:23
158:13,25
163:3

**X**

**X** 3:2 4:2

**Y**

**Yale** 114:4
**yeah** 19:18
21:3 23:12
26:2 33:3,4
34:10 46:15
52:4 64:25
71:22 75:5
81:12 82:20
83:18 86:3
89:10,17,20
89:20 95:14
99:10
106:22
110:14,15
113:5 115:4
116:12
118:25
125:19,21
129:8
130:11,22
132:8,9
133:5 157:8
157:9
159:17

161:8
162:22
168:20
169:7,8
170:21
171:6 172:4
172:10
174:9 175:6
178:3
180:22
183:20
190:19,22
191:13
192:6
195:14
197:6
198:11
199:16
207:4,5,5
208:20
209:5,16
214:3,7,24
216:16
219:16,20
220:14
229:9
238:10,24
240:25
242:5,13
247:3 258:4
260:3
261:21
262:12
263:15
264:3
**year** 11:4
12:4 14:15
14:16 27:21
60:4 78:10
78:19 99:13
157:17
160:17
**years** 13:24
46:7 63:2
67:20 86:12
86:22
100:18
114:20

118:2
201:21
208:7 254:8
255:10
**yelling**
209:14
211:6,10
**yep** 71:4
**yesterday**
44:21 52:20
**younger** 56:3
156:3

**$**

**$1,500** 247:2
138:6
**$100** 55:6
**$100,000**
158:7
169:17
**$20** 181:3
**$28** 55:10
**$3** 159:3
**$300** 249:10
**$300,000**
159:2
**$400,000**
158:8
**$50,000**
169:18
**$6** 55:21
159:4,5
**$72** 55:9
**$75** 192:7,16
193:3 194:5
209:25
**$940,093.19**
161:15

**0**

**000001** 75:13
**000006**
241:18
**000007** 197:3
**000027** 219:9
**000052** 64:7
**000056** 77:15
**000057** 79:23
**000059** 98:24

**000063** 90:24
**00007** 188:18
**000073**
107:20
**000127**
220:10
**00053** 70:21
**00100** 172:3
**00132** 121:19
**00135** 126:16
**00157** 173:17
**00158** 174:13
**00165** 176:15
**00210** 137:21
138:6
**00224** 150:4
**00345** 165:2
**00347** 166:12
**009551** 161:6
**084-004119**
269:6

**1**

**1** 4:4 5:5 8:16
64:13
224:20
261:19
**1:23** 154:17
**10** 4:9 7:9 9:5
60:25 117:6
117:11
130:25
157:23
158:9 159:4
168:11
190:14
262:19
**10:18** 1:18
5:15
**100** 40:7
46:13,15,16
53:11 90:15
**1000** 2:15
**102** 170:17
**107** 4:8
**11** 4:9 120:24
121:5 178:8
240:20

261:15,18
261:24
262:8
**11:19** 63:23
**11:29** 64:4
**117** 4:9
**12** 4:10 128:4
128:9,14
224:23
229:7,9
233:20
234:13
237:4,17
**12:01** 262:3
**12:07** 224:24
**12:30** 119:17
120:12
**12:39** 120:17
**121** 4:9
**128** 4:10
**13** 4:10 91:10
131:23
132:4
**130** 220:11
**131** 4:10
121:9
**132** 2:15
**133** 132:4
261:24
**135** 121:9
126:17
**136** 132:17
132:18
**137** 132:5
**138** 4:11
**14** 4:11
137:25
138:5
188:19
267:6
**142** 255:3
256:25
**144** 255:3
**147** 4:11
**149** 4:12
**15** 4:11 147:2
147:9 150:4
200:18

**16** 4:12
149:23
**16-cv-1477**
1:7
**160** 4:12
**161** 175:7
**164** 4:13
**17** 1:18 4:12
5:14 160:10
160:23
161:4
**170** 4:13
173:18
**1718** 2:10
**173** 4:14
**179** 203:24
204:12
**18** 4:13
164:19,24
180:20,21
186:4 253:5
**188** 4:14
**19** 4:13
170:10,15
**190** 205:24
**1989** 10:6
**199** 203:24
**1991** 11:6
**1994** 9:9,17
11:18
**1996** 13:8
**1999** 14:20
17:12 27:25
50:5 113:18

**2**

**2** 4:5 63:14
64:3,7
75:14 143:9
263:2,3
**2.5** 158:9
**2:12** 154:22
155:7
**2:22** 150:15
**2:34** 170:6
**2:37** 170:9
**2:58** 234:13
**20** 4:14

103:11
158:10
173:11,16
**20th** 56:13,13
**200** 4:15
**2000** 60:4
**2001** 17:13
  60:4
**2001-ish** 25:7
**2003** 9:13
  19:2 20:14
  22:9 24:18
  24:20 27:24
**2003-ish**
  18:23
**2005** 20:17
  20:21,22
  21:2,3
**2007-ish**
  21:25
**2009** 41:7
  64:13 68:17
  70:25 72:13
  73:21 96:24
**2010** 76:8,11
  77:16
**2012** 80:22
**2013** 79:25
  81:16 84:9
  84:19 86:20
  88:13 99:3
**2014** 91:10
  187:6
**2015** 187:6
**2016** 38:21
  82:23,25
  114:17
  121:19,24
  123:7 131:5
  131:7
  143:10
  150:5,14
  158:13,18
  159:14
  161:14,18
  161:21
  169:8,10
  180:21

192:3 197:4
199:24
201:24
219:12,15
224:5,23
229:7
233:20
234:13
237:17
241:19
242:8,22
253:5 261:5
261:6 262:2
**2017** 1:18
  5:14 158:22
159:7,25
169:12
264:11
268:21
270:9
**203** 4:15
**21** 4:14
  188:13,18
  188:23
  189:15
  207:19
  234:24
**210** 137:23
  142:14
  143:11
**211** 137:23
  138:16,18
**212** 137:23
  138:16,17
  138:20
  139:5
**215** 138:6
**219** 4:16
**22** 4:15
  200:13,18
  207:19
  208:24
  212:10
  215:23
  216:6
  234:24
  241:19
  242:10

243:4
**22nd** 242:8
  242:22
**220** 4:16
**223** 4:17
**229** 4:17
**23** 4:15 99:3
  203:17,21
  203:23
**23rd** 270:8
**233** 4:18
**24** 4:16 219:4
  219:9
**241** 4:18
**25** 4:16 220:5
  220:10
**2500** 60:14
**252** 4:19
**254** 4:19
**259** 3:4
**26** 4:17
  121:19
  158:22
  159:25
  200:19
  223:8,13
  231:9
  264:11
**265** 3:5
**27** 4:17
  228:24
  229:5,13,24
**279** 223:13
  224:23
**28** 4:18 233:9
  233:14
**28th** 1:17 2:5
**280** 224:17
**285** 223:16
  224:2
**286** 223:13
**29** 4:18 192:2
  197:4 207:7
  241:11,16

---
**3**
**3** 4:5 70:16
  70:21

120:16
131:7,17
150:5,14
151:19
261:6
**3:03** 189:7
**3:08** 189:12
**3:41** 233:21
**30** 4:19
  252:16,18
  252:22
  271:14
**31** 4:19
  120:20
  121:24
  123:6 127:5
  131:4,16
  143:4
  254:19
  255:2 261:5
  261:11
  262:2,11
**321** 1:17 2:4
  5:13
**329** 233:16
  233:19
**333** 233:16
**338** 229:5
**339** 229:5
**347** 165:3
**360** 63:5

---
**4**
**4** 4:6 28:4
  75:8,13
  76:8,11
  77:16,20,24
  117:19,23
  131:3 155:6
  171:4
  203:25
  205:5,10,10
  253:10,24
  263:8
**4:30** 252:12
**4:38** 259:2
**4:43** 197:4
**4:44** 259:6

**4:54** 267:11
  267:16
**4:57** 203:25
**45** 209:17,20

---
**5**
**5** 4:6 70:25
  77:9,14
  158:2
  168:11,13
  189:11
  206:2
  252:14
  264:8
**5-10-2016**
  224:18
**5:28** 143:10
**50** 29:8 35:7
  74:20 89:2
  90:3,6
  97:10
  194:18,20
  195:24
**50-state**
  15:24
**50/50** 29:15
  30:18,24
  31:4,7,21
  35:19 37:12
  39:5 40:19
  41:14 42:9
  42:11 44:3
  44:15
**51463** 1:22
**53711-2142**
  2:10
**57** 44:20 45:5
  45:7 46:15
  80:8
**58** 80:8

---
**6**
**6** 3:4 4:7
  79:18,23,24
  158:10,11
  158:22
  185:23
  186:2,2

206:20
214:6 264:9
**60602** 2:16
**60654** 2:5
**63** 4:5

---
**7**
**7** 4:7 90:18
  90:23 91:5
  97:13,16
  189:22
  219:11,15
  224:5
**7.5** 159:3
**70** 4:5
**75** 4:6
**77** 4:6
**79** 4:7

---
**8**
**8** 4:4,8 98:18
  98:23
**82** 128:10
**83** 129:7
**86** 128:10

---
**9**
**9** 4:8 107:14
  107:19
  189:21,22
**90** 4:7 199:6
**91** 147:7
**93** 147:13,14
**94** 13:23
  147:7,13,14
**940,000.93**
  161:17
**940,093.19**
  161:18
**9555** 161:7
  162:24
**96** 13:23
**98** 4:8 170:17
**99** 42:4