IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION


MEDICAL & CHIROPRACTIC CLINIC,)
INC.,                         )
                              )
        Plaintiff,            )
                              )
    -vs-                      )No. 8:16-CV-01477-CEH-TBM
                              )
DAVID M. OPPENHEIM, et al,    )
                              )
        Defendants.           )
                              )



        The videotaped discovery deposition of

BRIAN WANCA, called by the Defendant for examination,

pursuant to notice and pursuant to the Federal

Rules of Civil Procedure for the United States

District Court pertaining to the taking of

depositions, taken before Kelly Ann Potts,

Certified Shorthand Reporter within and for

the County of Cook and State of Illinois, at

321 North Clark Street, Chicago, Illinois, on the

17th day of November, A.D., 2017, at 10:16 a.m.

## Page 2

1  APPEARANCES:
2
3  FOLEY & LARDNER, by
   MR. JEFFREY A. SOBLE
4  321 North Clark Street, Suite 2800
   Chicago, Illinois 60654
5  (312) 832-4500
   jsoble@foley.com
6
   Appeared on behalf of the
7  Plaintiff;
8
   BLONIEN LEGAL COUNSEL, by
9  MR. BARRY J. BLONIEN
   1718 Adams Street
10 Madison, Wisconsin 53711
   (608) 620-5357
11 barry@blonienlegal.com
12 Appeared on behalf of the
   Defendant, David M. Oppenheim;
13
14
   BOCK LAW FIRM, by
15 MR. DANIEL J. COHEN
   134 North LaSalle Street, Suite 1000
16 Chicago, Ilinois 60602
   (844) 786-7772
17 danieljaycohen209@gmail.com
18 Appeared on behalf of the
   Defendant, Bock Hatch Lewis &
19 Oppenheim.
20
21
22
23
24

## Page 3

1  ALSO PRESENT:  MR. PHILLIP A. BOCK
               MR. DAVID M. OPPENHEIM
2              MS. MOLLY S. GANTMAN
               MS. MARIE ANG
3
4
5
   MR. BRUCE WITTY, Videographer
6  THOMPSON COURT REPORTERS
   1017 West Washington Boulevard, Suite 2F
7  Chicago, Illinois 60607
   (312) 421-3377
8  bruce@thompsoncourtreporters.com
9
10
11
12        *        *        *
13
14
15
16
17
18
19
20
21
22
23
24

## Page 4

1              INDEX OF EXAMINATION
2
3                      PAGE
4  BRIAN WANCA
5
6  Examination by Mr. Cohen.................... 8
7  Examination by Mr. Blonien.................222
8
9
10            INDEX TO EXHIBITS
11
12 EXHIBIT                      PAGE
13
14 Exhibit 1    Subpoena...................... 9
15 Exhibit 2    Engagement Letter.............41
16 Exhibit 3    E-mail.......................54
17 Exhibit 4    E-mail.......................54
18 Exhibit 5    Retainer Agreement...........100
19 Exhibit 6    Motion For Class Cert.........113
20 Exhibit 7    Term Sheet...................120
21 Exhibit 8    Term Sheet...................120
22 Exhibit 9    Term Sheet...................120
23 Exhibit 10   Term Sheet...................120
24 Exhibit 11   Term Sheet...................120

## Page 5

1  Exhibit 12   Term Sheet...................120
2  Exhibit 13   Term Sheet...................120
3  Exhibit 14   Term Sheet...................120
4  Exhibit 15   Term Sheet...................120
5  Exhibit 16   E-mail.......................135
6  Exhibit 17   E-mail.......................136
7  Exhibit 18   E-mail.......................145
8  Exhibit 19   E-mail.......................146
9  Exhibit 20   E-mail.......................148
10 Exhibit 21   E-mail.......................149
11 Exhibit 22   E-mail.......................150
12 Exhibit 23   E-mail.......................152
13 Exhibit 24   E-mail.......................154
14 Exhibit 25   E-mail.......................155
15 Exhibit 26   E-mail.......................156
16 Exhibit 27   E-mail.......................157
17 Exhibit 28   E-mail.......................161
18 Exhibit 29   E-mail.......................162
19 Exhibit 30   E-mail.......................163
20 Exhibit 31   E-mail.......................163
21 Exhibit 32   E-mail.......................192
22 Exhibit 34   E-mail.......................165
23 Exhibit 35   E-mail.......................175
24 Exhibit 36   E-mail.......................175

Page 6

1    Exhibit 37    E-mail......................175
2    Exhibit 38    E-mail......................178
3    Exhibit 39    E-mail......................181
4    Exhibit 40    E-mail......................209
5
6
7    PORTION OF TRANSCRIPT
8    REQUESTED TO BE MARKED
9
10   *1*..........................................250
11
12              *         *         *
13
14
15
16
17
18
19
20
21
22
23
24

Page 7

1              THE VIDEOGRAPHER:  Here begins the
2    videotaped deposition of Brian Wanca in the matter
3    of Medical & Chiropractic, Incorporated, versus
4    David M. Oppenheim, et al, in the United States
5    District Court for the Northern District of
6    Illinois, Case No. 8:16-cv-01477.
7              Today's date is November 17th,
8    2017, and the time on the video monitor is
9    10:16 a.m.  My name is Bruce Witty, and the
10   court reporter is Kelly Potts from Thompson
11   Court Reporters.  Today's deposition is being taken
12   at 321 North Clark Street, Chicago, Illinois.
13              Would counsels please introduce
14   themselves, state whom they represent, beginning
15   with the noticing party?
16        MR. COHEN:  Dan Cohen, Bock Law Firm,
17   LLC, here on behalf of Defendant Bock Law Firm,
18   LLC, joined by Phillip A. Bock, and we also have
19   Molly Gantman, and we'll have Marie Ang here.
20        MR. BLONIEN:  Barry Blonien on behalf
21   of Blonien -- or from Blonien Legal Counsel on
22   behalf of David M. Oppenheim, who is present.
23        MR. SOBLE:  Jeff Soble of Foley &
24   Lardner on behalf of the Plaintiff.

Page 8

1              THE VIDEOGRAPHER:  Would the court
2    reporter please swear in the witness?
3              (Whereupon, witness sworn.)
4         MR. COHEN:  Please state your name.
5         THE WITNESS:  Brian Wanca.
6         MR. COHEN:  Mr. Wanca, we're here
7    today to take your deposition in connection with
8    the case styled Medical & Chiropractic Clinic,
9    Inc., versus David M. Oppenheim and Bock Law Firm.
10             Do you understand that?
11   WHEREUPON:
12             BRIAN WANCA
13   called as a witness herein, having been first duly
14   sworn, was examined upon oral interrogatories and
15   testified as follows:
16             EXAMINATION
17        By Mr. Cohen:
18
19        Q    What have you done, if anything, to
20   prepare yourself for today's testimony, including
21   to refresh your recollection of potentially
22   relevant information or facts?
23        **A    I reviewed the documents that were**
24   **produced pursuant to subpoena.**

Page 9

1         Q    Anything else?
2         **A    Met with my counsel.**
3         Q    Who's your counsel?
4         **A    Mr. Soble.**
5         Q    You say you reviewed documents
6    produced pursuant to subpoena.
7              I'm handing you what's been
8    marked as Exhibit 1.
9              (Whereupon, Exhibit No. 1 was
10             marked for identification.)
11             (Whereupon, document tendered.)
12   BY MR. COHEN:
13        Q    It's a subpoena in this case directed
14   to you commanding you to appear today at this
15   Foley & Lardner office location for deposition, and
16   there is a production requirement on Page 1.
17             Do you see that?
18        **A    Yes.**
19        Q    When you indicated a moment ago you
20   reviewed documents produced pursuant to subpoena,
21   is this the subpoena to which you were referring?
22        **A    Yes.**
23        Q    Before we get into those documents and
24   the subpoena further, you indicated you reviewed

3  (Pages 6 to 9)

Page 10

1   documents produced pursuant to subpoena. We now
2   know which subpoena and which documents you're
3   talking about.
4           You also said you met with your
5   counsel, Mr. Soble.
6           Did you do anything else or
7   review anything else in anticipation of or for
8   purposes of preparing for this deposition?
9       **A   No.**
10      Q    Do you have documents to produce today
11  in compliance with this subpoena?
12      **A   I have nothing additional.**
13      Q    I'm not certain what that means
14  because, to my knowledge, we haven't gotten
15  anything.
16          MR. SOBLE: They were part of the
17  other production. We didn't distinguish them
18  between the two. The production was made from
19  Anderson + Wanca.
20          MR. COHEN: I'm not following. Do you
21  mean the Addison production that was given to us
22  before his deposition? I don't know what --
23          MR. SOBLE: No. I thought the
24  production before Ross's deposition.

Page 11

1           MR. BLONIEN: That was before
2   Addison's deposition.
3           MR. COHEN: Okay.
4           MR. SOBLE: If that included all of
5   them, yes; but it's the same set of documents.
6           MR. COHEN: Okay.
7   BY MR. COHEN:
8       Q    How many documents -- Approximately
9   what volume of documents did you review that
10  comprised this documents produced pursuant to
11  subpoena?
12      **A   I didn't count them.**
13      Q    Give me a thickness: a half-inch,
14  one inch, five inches.
15      **A   I couldn't do that.**
16      Q    What can't you do?
17      **A   Measure something that I looked at**
18  **before this deposition.**
19      Q    Did you look at hard copies, or did
20  you only look at electronic copies?
21      **A   I looked at paper copies.**
22      Q    Okay. Were they all in front of you
23  at one time?
24      **A   Yes.**

Page 12

1       Q    Okay. So let's try that again:
2   Approximately how thick of a stack was it?
3       **A   I said I don't know.**
4       Q    Do you have any concern for your own
5   credibility?
6           MR. SOBLE: Objection. Argumentative.
7   BY MR. COHEN:
8       Q    Do you suffer any condition that makes
9   it difficult for you to tell the truth?
10          MR. SOBLE: Objection. Argumentative.
11  And if that's what you're going to do all day, then
12  we're going to need the Judge on the phone very
13  early.
14          MR. COHEN: We can start with this
15  gentleman trying to tell the Judge that he has no
16  ability to measure the thickness of a stack of
17  documents he just reviewed.
18  BY MR. COHEN:
19      Q    Is that what you'd like to do?
20          MR. SOBLE: Objection. Argumentative.
21  BY MR. COHEN:
22      Q    You can answer.
23          Is that what you would like to
24  do --

Page 13

1       **A   I --**
2       Q    -- tell the Judge that you cannot
3   estimate the approximate thickness of a stack of
4   documents you just looked at?
5           MR. SOBLE: Same objection.
6   BY MR. COHEN:
7       Q    You can answer.
8           Is that what you would like to
9   do?
10      **A   I've given you my answer.**
11      Q    The documents that you looked at, were
12  these all of the documents that you produced to
13  your counsel, or were these the limited, narrowed,
14  and redacted documents that were produced to us?
15          MR. SOBLE: Object to the form of the
16  question.
17  BY THE WITNESS:
18      **A   I reviewed the documents that were**
19  **Bates-labeled.**
20  BY MR. COHEN:
21      Q    And is it your understanding that
22  means those were the documents that were produced
23  to us?
24      **A   Yes.**

4 (Pages 10 to 13)

Page 14

1    Q    How many documents were actually
2  produced to your counsel?
3         MR. SOBLE: Objection. Foundation.
4  BY THE WITNESS:
5    A    I don't recall.
6  BY MR. COHEN:
7    Q    Did you produce them?
8    A    My firm did.
9    Q    Who in your firm actually did it?
10   A    Ross Good.
11   Q    Would you have any reason to doubt
12  Ross Good's numericals as to how many documents he
13  actually produced to counsel?
14   A    I have no reason to doubt what --
15  whatever he testified to.
16   Q    Did you have a contract with M&C or
17  anyone at M&C prior to 2013?
18        MR. SOBLE: Object to the form of the
19  question.
20  BY THE WITNESS:
21   A    I don't understand the question.
22  BY MR. COHEN:
23   Q    What part of it don't you understand?
24   A    What you mean by "contract."

Page 15

1    Q    Then let's start with your legal
2  education.
3         Where did you go to law school?
4    A    Indiana University.
5    Q    When did you graduate?
6    A    1979.
7    Q    Other than the college degree and the
8  Juris Doctorate, do you have any other degrees?
9    A    No.
10   Q    And walk me through your career from
11  1979 to now.
12   A    I was employed at a firm in Highland,
13  Indiana, Friedrich, Bomberger, Tweedle & Blackmun,
14  where I worked for two years. And I came up to
15  Chicago, was employed at Johnson & Bell, ultimately
16  became a partner there, left there approximately
17  1989, had my own practice for a few years, was of
18  counsel with Wilson & McIlvaine, and, again, went
19  out on my own in January of 1998.
20   Q    And you've been on your own since?
21   A    I've employed other lawyers.
22   Q    Do you own your firm, Anderson + Wanca?
23   A    Yes.
24   Q    Does anyone else have an ownership

Page 16

1  stake in Anderson + Wanca?
2    A    No.
3    Q    Has anyone else ever had an ownership
4  stake in Anderson + Wanca other than yourself?
5    A    No.
6    Q    What's the firm name -- Strike that.
7         When did you name your firm
8  Anderson + Wanca?
9    A    Around January of 1998.
10   Q    Has the firm name ever changed?
11   A    No.
12   Q    What kind of business organization is
13  it: sole proprietorship, LLC, LP? What is it?
14   A    It is a professional corp, I believe.
15   Q    Is Anderson + Wanca a d/b/a for a
16  professional corporation, or is Anderson + Wanca,
17  PC, the firm?
18   A    I'm sorry. I don't understand your
19  question.
20   Q    Do you personally own
21  Anderson + Wanca, or is there a corporation
22  or other business organization that owns
23  Anderson + Wanca?
24   A    It's an assumed name for

Page 17

1  Brian J. Wanca, JDPC.
2    Q    When was Brian J. Wanca, JDPC, formed?
3    A    I don't have the exact date,
4  approximately 2010.
5    Q    Am I correct in understanding that
6  from approximately 2010 to the present,
7  Brian J. Wanca, JDPC, has been the owner of the
8  Anderson + Wanca law firm?
9    A    I don't understand the question.
10   Q    What don't you understand?
11   A    Brian J. Wanca, JDPC, is a corporation
12  that has an assumed name of Anderson + Wanca, and I
13  own Brian J. Wanca, JDPC, which is what I testified
14  to.
15   Q    So Brian J. Wanca, JDPC, is a law
16  firm, and it operates under the assumed name of
17  Anderson + Wanca?
18   A    It's a professional corporation that
19  operates under the name Anderson + Wanca.
20   Q    Have you at all times been the sole
21  owner of Brian J. Wanca, JDPC?
22   A    Yes.
23   Q    Who or what owned Anderson + Wanca
24  from 1998 through to the time or up till the time

Page 18

1   it became an assumed-name PC?
2        **A    I did.**
3        Q    In your individual natural person
4   capacity or through another entity?
5        **A    In my personal capacity.**
6        Q    You said you were with a firm in
7   Highland, Indiana, for two years.
8        What firm was that?
9        MR. SOBLE:  Objection.  Asked and
10  answered.
11  BY THE WITNESS:
12       **A    I gave you that.**
13  BY MR. COHEN:
14       Q    Give it again.  What firm was it?
15       **A    She can read it back.**
16       Q    Sir, we're not going to do this.
17  We're following up on questions.
18       What firm was the first firm you
19  worked at?
20       MR. SOBLE:  Objection.  Asked and
21  answered.  Argumentative.
22       MR. COHEN:  You're not instructing him
23  not to answer, because you can; so please advise
24  your client that unless you instruct him not to

Page 19

1   answer, he should answer the question.
2        MR. SOBLE:  I'll tell you what, Dan.
3   You don't tell me how to do my job, and I won't
4   tell you how to do your job.
5        Keep asking the questions.
6        MR. COHEN:  You already have been
7   trying to tell me how to do my job.
8   BY MR. COHEN:
9        Q    Sir, are you refusing to answer that
10  question?
11       **A    No.  I've already answered it.  She**
12  **can read the answer back to you.**
13       Q    It happens that sometimes questions
14  overlap.  I'm following up on that.
15       What firm was it, sir?
16       THE WITNESS:  Can you read the answer
17  back?
18  BY MR. COHEN:
19       Q    You don't instruct the court reporter
20  what to do, sir.
21       Are you refusing to answer the
22  question?
23       **A    Friedrich, Bomberger, Tweedle &**
24  **Blackmun.**

Page 20

1        Q    What kind of a firm was that?  What
2   did they specialize in?  What kind of law did they
3   practice?
4        MR. SOBLE:  Objection.  Compound.
5   BY THE WITNESS:
6        **A    Civil litigation.**
7   BY MR. COHEN:
8        Q    What did you do in particular at that
9   firm?
10       **A    Civil litigation.**
11       Q    More specifically, what kind of civil
12  litigation?
13       MR. SOBLE:  Objection.  Asked and
14  answered.
15  BY THE WITNESS:
16       **A    Coverage work.**
17  BY MR. COHEN:
18       Q    Insurance coverage?
19       **A    Yes.**
20       Q    What else?
21       **A    Insurance defense work, railroad**
22  **defense work, general commercial litigation.**
23       Q    What kind of railroad defense?
24       **A    Injury cases.**

Page 21

1        Q    Injuries to whom?
2        **A    Persons.**
3        Q    Employees of railroads or
4   non-employees of railroads?
5        **A    Non-employees.**
6        Q    What railroads did you provide
7   railroad defense services to?
8        **A    The firm represented, I believe, all**
9   **of the railroads that passed through Northwest**
10  **Indiana with the exception of Conrail and -- there**
11  **was another one, but I don't remember.**
12       Q    Did you represent Union Pacific
13  Railroad?
14       **A    I don't know what it would have been**
15  **called between 1979 and 1981.**
16       Q    It would have been called
17  Union Pacific Railroad.
18       **A    I don't remember.**
19       Q    What about Norfolk Southern?
20       **A    I don't remember.**
21       Q    Norfolk Western?
22       **A    I don't remember.**
23       Q    CSX?
24       **A    I don't recall.**

6 (Pages 18 to 21)

Page 22

1  Q  Missouri Pacific?
2  A  I don't recall.
3  Q  Southern Pacific?
4  A  I don't recall.
5  Q  Kansas City Southern?
6  A  I don't recall.
7  Q  Illinois Central?
8  A  I don't recall.
9  Q  Did you leave that firm voluntarily or
10 were you fired?
11  A  I left voluntarily.
12  Q  And then do I have it right, you went
13 to Johnson & Bell and became a partner and left in
14 approximately 1989?
15  A  It was Johnson, Cusack & Bell at that
16 point in time. Today, it's known as Johnson &
17 Bell.
18  Q  What kind of law did you practice at
19 Johnson, Cusack & Bell?
20  A  Commercial litigation, civil
21 litigation, coverage work.
22  Q  Any more representation of railroads?
23  A  I don't recall.
24  Q  Did you leave Johnson & Bell

Page 23

1 voluntarily or were you fired?
2  A  I left voluntarily.
3  Q  You said you then opened your own
4 practice for approximately three years.
5  Where was that located?
6  A  It was located in Chicago.
7  Q  Did you have an office address?
8  A  Yes, I did.
9  Q  What was it?
10  A  It was on Wacker.
11  Q  Do you recall the address?
12  A  I think it was the -- the building
13 next to the 222 West Wacker building. Is that 205?
14 I don't remember the exact address.
15  Q  What was the name of your firm when
16 you opened the practice and did that for about
17 three years?
18  A  Just my name, attorney at law, I
19 think.
20  Q  Was it a sole proprietorship?
21  A  Yes.
22  Q  What kind of work did you do -- What
23 kind of law did you practice in that three years
24 that you had your own practice?

Page 24

1  A  Commercial litigation.
2  Q  So approximately when would it have
3 been that you started with Wilson & McIlvaine?
4  A  I can't tell you. I don't recall.
5  Q  Well, if you left Johnson & Bell in
6 approximately 1989 and you had your own practice
7 for approximately three years before going to
8 Wilson & McIlvaine, would you agree that, give or
9 take a year or so, you would have started at
10 Wilson & McIlvaine around 1992?
11  A  I don't know.
12  Q  Does the math that I just proposed to
13 you seem reasonable?
14  A  I can't answer the question because I
15 don't know exactly the timeline.
16  Q  I didn't ask for an exact timeline. I
17 asked for an approximate timeline.
18  You can't do that either?
19  A  It was sometime after '89 and before
20 '97, so within that framework.
21  Q  The best you can do for when you
22 started working at Wilson & McIlvaine is an
23 eight-year window?
24  A  Well, I was there in '96 and '95; but

Page 25

1 when exactly I started before that, I don't
2 remember.
3  Q  I'm just trying to make sure we have a
4 foundation here.
5  You can't measure, you can't tell
6 time and dates, and you don't know what a contract
7 is.
8  Is that the predicate that we're
9 starting this deposition with?
10  MR. SOBLE: Objection. Argumentative.
11 BY MR. COHEN:
12  Q  I'll take from your silence, you
13 agree.
14  MR. SOBLE: Object to the form,
15 misstates the non-testimony, and argumentative.
16 BY MR. COHEN:
17  Q  Why did you leave Wilson & McIlvaine?
18  A  Because the firm was falling apart
19 and it was likely to close; I also wanted to do work
20 for my own clients and control my own destiny.
21  Q  Did Wilson & McIlvaine close?
22  A  They ultimately merged, in order to
23 stay alive, with a Wisconsin firm.
24  Q  What firm is that?

7 (Pages 22 to 25)

Thompson Court Reporters, Inc
thompsonreporters.com

Page 26

1      A     Quarles & Brady.
2      Q     Did you leave voluntarily or were you
3  let go?
4      A     I left voluntarily.
5      Q     When did you leave?
6      A     The end of December of 1996 or '7.
7      Q     You said one of the reasons you left
8  Wilson & McIlvaine was because you wanted to work
9  for your own clients.
10            Who were your, quote/quote, "own
11 clients" when you left Wilson & McIlvaine?
12     A     Small businesses, some franchise
13 organizations.
14     Q     What kind of representation were you
15 providing to them, in regard to what type of
16 matters?
17     A     Franchise litigation, general
18 commercial litigation; I had a couple of banks, I
19 believe, or S&Ls.
20     Q     Have you ever been first-chair trial
21 counsel in a TCPA class action tried to verdict?
22            MR. SOBLE:  Objection.  Relevance.
23 BY THE WITNESS:
24     A     I don't believe so.

Page 27

1  BY MR. COHEN:
2      Q     What does that mean, "I don't believe
3  so"?  I didn't realize I was asking a question that
4  involved opinion or belief.  I was seeking a fact.
5            Have you ever first-chair tried a
6  TCPA class action to verdict?
7            MR. SOBLE:  Objection.  Argumentative.
8  BY THE WITNESS:
9      A     No.
10 BY MR. COHEN:
11     Q     Have you ever tried any type of class
12 action to verdict as the lead counsel?
13            MR. SOBLE:  Objection.  Relevance.
14 BY THE WITNESS:
15     A     No.
16 BY MR. COHEN:
17     Q     Have you ever been one of the
18 first-chair, second-chair, third-chair trials,
19 actually in the courtroom, through a TCPA class
20 action civil trial?
21            MR. SOBLE:  Relevance.
22 BY THE WITNESS:
23     A     No.
24

Page 28

1  BY MR. COHEN:
2      Q     Have you ever been lead counsel, first
3  chair, in a civil jury trial that went to verdict?
4            MR. SOBLE:  Same objection.
5  BY THE WITNESS:
6      A     I can't recall.
7  BY MR. COHEN:
8      Q     Do you consider yourself to be an
9  expert in the field of TCPA class action
10 litigation?
11            MR. SOBLE:  Same objection.
12 BY THE WITNESS:
13     A     I've handled a large number of them.
14 BY MR. COHEN:
15     Q     Do you consider yourself to be an
16 expert in the field?
17     A     It depends on --
18            MR. SOBLE:  Same objection.
19 BY THE WITNESS:
20     A     -- what you decide an expert is.
21 BY MR. COHEN:
22     Q     Well, it's not about what I think an
23 expert is.  It's about what you think an expert is.
24            Do you consider yourself to be an

Page 29

1  expert in the field of TCPA class action
2  litigation?
3            MR. SOBLE:  Same objection.
4  BY THE WITNESS:
5      A     I consider myself very experienced in
6  the area.
7  BY MR. COHEN:
8      Q     But you're not willing to describe
9  yourself as an expert?
10            MR. SOBLE:  Objection.  Argumentative.
11 BY THE WITNESS:
12     A     I would say I was an expert.
13 BY MR. COHEN:
14     Q     How many TCPA class action cases have
15 proceeded to jury trial in the United States with a
16 favorable verdict for the plaintiff class?
17            MR. SOBLE:  Objection to relevance.
18 BY THE WITNESS:
19     A     I don't recall.
20 BY MR. COHEN:
21     Q     Can you give an approximation?
22            MR. SOBLE:  Same objection.
23 BY THE WITNESS:
24     A     I don't know.

8 (Pages 26 to 29)

Page 30

BY MR. COHEN:
1
2       Q    Your firm has been class counsel,
3  class co-counsel, in TCPA class actions that have
4  proceeded to jury trial and verdict, correct?
5          MR. SOBLE:  Same objection.
6  BY THE WITNESS:
7       A    Yes.
8  BY MR. COHEN:
9       Q    Has any TCPA class action in which
10  your firm has participated as class counsel or
11  co-class counsel that has proceeded to civil jury
12  verdict -- has any of them been anything other than
13  a defense verdict?
14          MR. SOBLE:  Same objection.
15  BY THE WITNESS:
16       A    **Bridgeview versus Clark, I believe,**
17  **went to verdict.**
18  BY MR. COHEN:
19       Q    Yes.  My question was about a verdict
20  that wasn't a defense verdict.
21       A    **No.  I have to investigate.**
22       Q    And you know Bridgeview versus Clark
23  wasn't a jury trial, don't you?
24       A    **I don't recall.**

Page 31

1       Q    The bottom line is, as far as your
2  firm's own experience participating in TCPA class
3  action trials before juries, taking them to
4  verdict, your experience has been losing every one,
5  hasn't it?
6          MR. SOBLE:  Dan, what does this have
7  to do with Medical & Chiropractic versus Oppenheim
8  and Bock Hatch?
9          MR. COHEN:  Oh, don't you have an
10  allegation of a reverse auction, and doesn't a
11  reverse auction speak of the stooges and the lesser
12  counsel, so . . .
13          MR. SOBLE:  No.  It speaks to what the
14  Eleventh Circuit talked about.
15          MR. COHEN:  Oh, now you want to argue?
16  I'm going to get back to my deposition.  Thanks.
17          MR. SOBLE:  Well, we're not going to
18  do this all day.
19          MR. COHEN:  No.  You're right.  We're
20  not, but I'm getting back to my question.
21  BY MR. COHEN:
22       Q    Every one of them has been a defense
23  verdict, hasn't it?
24       A    **I don't know that.**

Page 32

1       Q    So how did you first get involved in
2  the TCPA business?
3       A    **I got faxes from clients of mine.**
4       Q    And?
5       A    **Filed the cases.**
6       Q    When you initially filed the cases,
7  were you filing class action cases, or were these
8  individual cases?
9       A    **I believe they were class action**
10  **cases.**
11       Q    Had you filed any TCPA class actions
12  before you met Phil Bock?
13       A    **I'm not sure.  I'd have to go back and**
14  **look.**
15       Q    Did you file any TCPA class actions
16  before you started filing them with Phil Bock on
17  the pleadings as co-counsel?
18       A    **I just answered that, so my answer to**
19  **the last question is the same; so I'd have to go**
20  **back and look.**
21       Q    When you started filing cases with
22  Phil Bock -- TCPA class action cases with Phil Bock
23  or his firm as co-counsel, what was the arrangement
24  or agreement as to investment of time, man-hours,

Page 33

1  distribution of work, responsibility for expenses,
2  and division of resulting fees?
3          MR. SOBLE:  Objection to relevance.
4          THE WITNESS:  It's outside the scope
5  of this deposition.
6          MR. SOBLE:  It is.  We're going to
7  stop it soon.
8  BY MR. COHEN:
9       Q    Yeah; you don't decide the scope of
10  this deposition.  You're just a witness.
11          What was the agreement?
12       A    **We had an arrangement on cases.  I got**
13  **the plaintiffs.  I handled the discovery, handled**
14  **the clients, did the -- did the depositions, and he**
15  **wrote the briefs.**
16       Q    You split the expenses evenly?
17       A    **We were supposed to split expenses.**
18       Q    And what about the fees; even split?
19       A    **Yes.**
20       Q    Was this arrangement as you just
21  described it ever reduced to writing?
22       A    **No.**
23       Q    To which cases was it understood this
24  arrangement would apply?

9 (Pages 30 to 33)

Page 34

```
 1        MR. SOBLE: Objection. Relevance.
 2   BY THE WITNESS:
 3        A    To those cases that we were jointly
 4   filing together.
 5   BY MR. COHEN:
 6        Q    And which cases were you jointly
 7   filing together to which this agreement applied?
 8        MR. SOBLE: Object to the form.
 9   BY THE WITNESS:
10        A    Those in which we had a retainer
11   agreement that lists both firms.
12   BY MR. COHEN:
13        Q    You said you got the cases, you
14   handled the clients.
15             So you would have been the one
16   interacting with the client to have them sign the
17   retainer agreement?
18        A    These were my clients, yes, early on.
19        Q    When you say "early on," did that --
20   what I just asked, did that change later?
21        A    All of the clients were people that I
22   knew or that had contacted me and sent me faxes.
23   There may have been a handful of clients that
24   Phil's firm knew through the years.
```

Page 35

```
 1        Q    If it sounded like there was a
 2   complexity to my question, I didn't intend it.
 3             The bottom line is, with very few
 4   exceptions, you got the cases, you handled the
 5   clients, the client were yours; then it would have
 6   been you and your firm that would have been
 7   interacting with the clients to have them sign the
 8   retainer agreement, correct?
 9        MR. SOBLE: Object to the form.
10   BY THE WITNESS:
11        A    I would say most of the time.
12   BY MR. COHEN:
13        Q    So I asked you what the arrangement
14   was and which cases this arrangement with Phil Bock
15   applied to. You said "to the cases we were jointly
16   filing together." And I said, "which cases were
17   those," and you said, "the ones where the retainer
18   agreement listed both firms," but it was you who
19   interacted with the clients to have them sign the
20   retainer agreement.
21             Which clients and cases did you
22   put Phil Bock on jointly with your firm on the
23   retainer agreement and which did you not and why?
24        MR. SOBLE: Objection. Compound and
```

Page 36

```
 1   irrelevant.
 2        THE WITNESS: What does this got to do
 3   with this case?
 4        MR. BLONIEN: I'm sorry. What was
 5   that? I didn't hear what you said.
 6   BY THE WITNESS:
 7        A    Can you read the question back,
 8   please?
 9        MR. BLONIEN: "What's that got to do
10   with the case"? Is that what the witness said?
11        THE REPORTER: Yes.
12        MR. BLONIEN: Okay. Thank you. I
13   couldn't hear.
14        Mr. Wanca, if you could speak up
15   to make sure that we could all hear, I'd appreciate
16   it.
17        THE WITNESS: Can you read back his
18   question that I'm supposed to answer?
19             (Whereupon, the record was
20             read as requested.)
21   BY THE WITNESS:
22        A    The cases that we had listed -- the
23   cases that we had filed together with both firms on
24   the pleadings were those that were on the retainer
```

Page 37

```
 1   agreements.
 2             There's other -- There's other
 3   clients that I did not want to file with him on.
 4   BY MR. COHEN:
 5        Q    Why?
 6        A    There came a point in time in the
 7   relationship where Phil refused and didn't pay for
 8   many years any of the expenses on the cases, and I
 9   was left holding all the expenses on cases.
10        Q    You said "there came a . . . time."
11             When was that time?
12        A    I'm not sure exactly the timeframe,
13   but there was an ongoing problem with getting
14   expenses paid on cases that hadn't settled or
15   resolved with the defendants paying the expenses
16   for, like, forever.
17        Q    Well, so at some point, it became
18   something that led you to stop putting Phil Bock on
19   the retainer agreements.
20             So when did it reach the point
21   that led you to stop putting him on the retainer
22   agreements?
23        A    I can't tell you exactly when that
24   was.
```

Thompson Court Reporters, Inc
thompsonreporters.com

Page 38

1      Q     Did you notify Phil Bock at any time
2  that you were no longer putting him on client
3  retainer agreements and would no longer be jointly
4  prosecuting TCPA -- new TCPA class actions with
5  him?
6      A     Yeah; he asked me several times, "Are
7  we filing any cases," "Are we proceeding and filing
8  cases together?"  And I responded to him.
9      Q     What did you say in that response to
10  him?
11     A     Probably not.
12     Q     Were any of those in writing?
13     A     I don't recall.  There may have been
14  e-mails.
15     Q     Approximately what timeframe do you
16  recall having those communications with Phil Bock?
17         MR. SOBLE:  Objection.  Asked and
18  answered.
19         MR. COHEN:  I don't think it's the
20  same question.
21         MR. SOBLE:  I think it is the same
22  question.
23         MR. COHEN:  Good for you.
24         MR. SOBLE:  Thank you.

Page 39

1  BY THE WITNESS:
2      A     Somewhere between 2009 and 2013; it
3  could have been earlier than that.
4  BY MR. COHEN:
5      Q     How many lawyers work for
6  Anderson + Wanca right now, like employees?
7      A     Including myself, seven.
8      Q     And I'm aware of Ryan Kelly,
9  Ross Good, Glenn O'Hara [sic], and yourself.
10         Who are the other three?
11     A     Wally Solberg, Jeff Berman.
12     Q     And the last one?
13     A     I'm sorry.  What names did you have?
14     Q     Ryan Kelly, Ross Good, Glenn O'Hara,
15  you, Wally Solberg --
16     A     It's Glenn Hara, not "O'Hara."
17     Q     Glenn Hara.
18     A     Wally Solberg, Patrick Solberg, and
19  Jeff Berman.
20     Q     How many attorneys did you have in
21  2009?
22     A     I don't know.
23     Q     Less?
24     A     I don't know.

Page 40

1      Q     What about 2010?
2      A     I don't know.
3      Q     '11?
4      A     I don't know.
5      Q     '12?
6      A     Same answer.
7      Q     '13?
8      A     Same answer.
9      Q     '14?
10     A     Same answer.
11     Q     '15?
12     A     I'm not sure of everybody's start
13  dates, so I can't give you an exact number.
14         MR. SOBLE:  Can we take a break,
15  please?
16         MR. COHEN:  Sure.
17         THE VIDEOGRAPHER:  Going off the
18  record at 11:01 a.m.
19         (Whereupon, a brief recess
20          was had.)
21         THE VIDEOGRAPHER:  Going back on the
22  record at 11:16 a.m.
23         Please proceed.
24

Page 41

1  BY MR. COHEN:
2      Q     Sir, you mentioned earlier that you
3  went to law school and graduated from the
4  University of Indiana Law School.
5         Which location?
6      A     Indiana University in Indianapolis.
7      Q     You talked earlier about having
8  reviewed documents pursuant to subpoena and meeting
9  with your counsel, Mr. Soble.
10         (Whereupon, Exhibit No. 2 was
11          marked for identification.)
12  BY MR. COHEN:
13     Q     I'm handing you what's been marked as
14  Exhibit 2.
15         (Whereupon, document tendered.)
16  BY MR. COHEN:
17     Q     Can you identify this as an engagement
18  letter agreement entered into by yourself on behalf
19  of your firm, Ms. Zakrzewski on behalf of Medical &
20  Chiropractic Clinic, Inc., and the Foley Lardner,
21  LLP, law firm?
22         (Whereupon, witness perusing
23          document.)
24

Thompson Court Reporters, Inc
thompsonreporters.com

Page 42

1    BY THE WITNESS:
2         A    Yes.  That's my signature.
3    BY MR. COHEN:
4         Q    Is Mr. Soble of the Foley Lardner law
5    firm representing you today as your attorney today
6    under the terms of this engagement letter
7    agreement, Exhibit 2?
8         A    Yes.
9         Q    In regard to what matter or subject
10   matter is the Foley Lardner law firm representing
11   you and your law firm?
12             MR. SOBLE:  Objection.  That's what
13   was redacted, I believe is privileged, and the
14   Judge approved the redactions.
15             MR. COHEN:  The Judge did not approve
16   the redactions.  The Judge has no idea what's
17   behind those redactions.
18             MR. SOBLE:  The Judge compelled us to
19   produce a specific portion of our retainer letter
20   and nothing else, and we've produced that specific
21   portion of the retainer letter and nothing else.
22             MR. COHEN:  And he made no
23   determination about anything in the retainer
24   agreement being privileged or not being privileged.

Page 43

1    He decided what we would get to see.  He's made no
2    determination of privilege whatsoever and, under
3    Florida law, engagement retainer agreements are not
4    privileged.  And I didn't ask him a question just
5    now about the engagement letter.  I asked him in
6    regard to what matter or subject matter is the
7    Foley Lardner firm providing representation to him.
8             MR. SOBLE:  So you moved to compel the
9    entire retainer letter, and we countered to produce
10   a redacted portion; and that motion was denied
11   except the redacted portion.
12             So I'm going to continue my
13   objection, but he can answer the question for you.
14   BY MR. COHEN:
15        Q    In regard to what subject matter --
16   Other than being your lawyer here today
17   representing you in your deposition, in regard to
18   what subject matter does the Foley Lardner firm
19   represent you and/or your law firm?
20        A    All claims against David Oppenheim and
21   the firm that he joined with respect to the claims
22   that we have against him and his firm for stealing
23   the computer information and providing confidential
24   information that he was party to as an attorney at

Page 44

1    my firm.
2         Q    You started by saying that Foley
3    represents -- and whether I say "you" or "your law
4    firm," I'm not trying to play a word game --
5    represents you in regard to all claims versus
6    David M. Oppenheim and his new law firm regarding
7    or with respect to claims we have for stealing and
8    providing confidential information that he had been
9    privy to.
10             So am I correct that what you've
11   just described that Foley represents you in regard
12   to as the subject matter is claims that you and/or
13   your firm have against Oppenheim and the Bock firm?
14             MR. SOBLE:  I'm going to object to the
15   form of the question because I do think the "you"
16   is confusing -- can you define it -- because he's
17   here pursuant to subpoena, and we are representing
18   him in response to that subpoena for this
19   deposition.
20             MR. COHEN:  That's always a given.  I
21   don't mean to be -- I mean, I kept throwing it in
22   there as an additional -- I'm not meaning to play a
23   game.  Of course, you're here representing him for
24   that.

Page 45

1              MR. SOBLE:  Yes.  I understand.  I
2    just think, for the record, we're going to have to
3    be clear because it's going to be confusing when
4    it's read later.
5              MR. COHEN:  Fair enough.  I'm going to
6    repeat that question, if I may.  It's unfortunate,
7    but it's a fair enough point.
8    BY MR. COHEN:
9         Q    You indicated that Foley represents
10   you regarding all claims against Mr. Oppenheim and
11   his new firm with respect to claims that you have
12   for stealing and providing confidential information
13   that Mr. Oppenheim was privy to, and I understand
14   Foley represents you here today for this
15   deposition; but other than that, am I correct in
16   understanding your last answer to be that Foley --
17   the subject matter for which Foley represents you
18   is claims that you or your law firm have.
19        A    And any clients that we have that
20   the -- his retention and use of confidential
21   information.
22        Q    Would that -- what you just said refer
23   to M&C?
24        A    Yes.

Thompson Court Reporters, Inc
thompsonreporters.com

Page 46

1    Q    Okay.  And I want to make sure I
2  understand:  I understand that Foley is counsel of
3  record for M&C in the M&C versus Oppenheim action.
4         You understand that too, right?
5    A    Yes.
6    Q    Is one of the subject matters for
7  which Foley represents you and your firm the claims
8  made by Foley on behalf of M&C?
9         MR. SOBLE:  Object to the form.
10 BY THE WITNESS:
11   A    **I don't understand the question.**
12        MR. SOBLE:  Are you talking about the
13 state court action?
14        MR. COHEN:  No.
15        MR. SOBLE:  Okay.
16 BY MR. COHEN:
17   Q    Do you have any interest in the claims
18 that M&C is asserting against Oppenheim and
19 Bock Law Firm?
20   A    **No.**
21   Q    On Page 4 of Exhibit 2, the Foley
22 engagement letter, Section 4, "Fees and Billing" --
23 Do you see that?
24   A    **Yes.**

Page 47

1    Q    -- [continuing] Subparagraph (a),
2  first sentence --
3         MR. SOBLE:  Before you read that into
4  the record, for purposes of the record, the
5  document is confidential and the testimony about
6  the specifics will also be confidential under the
7  protective order.
8  BY MR. COHEN:
9    Q    Subsection (a) starts, "It is agreed
10 that the Law Firm will compensate us for services,"
11 and it goes on to talk about how and the way that
12 compensation will be calculated.  But you
13 understand the, quote, "law firm," close quote, in
14 that sentence is Anderson Wanca?
15   A    **Yes.**
16   Q    And the "us" is Foley?
17   A    **Yes.**
18   Q    You agreed to compensate Foley for
19 services, correct?
20   A    **Yes.**
21   Q    And Subparagraph (b), I guess is
22 related, "The Law Firm will be responsible for
23 payment of the firm's invoices and expenses
24 incurred."

Page 48

1         You agreed that your firm would
2  be responsible for payment of all of Foley's
3  invoices and expenses, correct?
4    A    **Yes.**
5    Q    And if you flip to Page 5,
6  Subsection (f), quote, "In no event shall the
7  Clinic be responsible for any fees or expenses
8  billed on the matter."
9         Did I read that correctly?
10   A    **Yes.**
11   Q    What is "the matter"?
12        MR. SOBLE:  You can answer.
13 BY THE WITNESS:
14   A    **The case that we're here on today.**
15 BY MR. COHEN:
16   Q    M&C versus Oppenheim and Bock?
17   A    **Yes.**
18   Q    How much have you already paid Foley
19 law firm in attorneys' fees and litigation expenses
20 in the prosecution of the matter?
21   A    **I can't tell you an exact amount.**
22   Q    Approximately.
23   A    **More than a half-million.**
24   Q    And, sir, I'll represent to you that

Page 49

1  as of early 2017, February or March, invoices
2  showed that Foley had already invoiced to your firm
3  just under $400,000.
4         You would agree that with all of
5  the additional work and time and travel and
6  hearings and briefing and depositions that have
7  transpired since early 2017, Foley's total invoices
8  by now are well in excess of a half-million
9  dollars, correct?
10        MR. SOBLE:  Object to the form.
11 BY THE WITNESS:
12   A    **That was my answer.  I said in excess**
13 **of.**
14 BY MR. COHEN:
15   Q    Could it be as much as a million
16 dollars?
17        MR. SOBLE:  Object to the form.
18 BY THE WITNESS:
19   A    **I would have to speculate, and I'm not**
20 **going to speculate; but it's more than a**
21 **half-million.**
22 BY MR. COHEN:
23   Q    Why are you paying for the prosecution
24 by Foley of a claim on behalf of M&C in which you

13 (Pages 46 to 49)

## Page 50

1  and your firm have no interest?
2      A      Because it's the right thing to do
3  based on the conduct that took place in this case.
4      Q      When you say "the conduct that took
5  place in this case," which case?
6      A      The M&C case and the Buccaneers case,
7  the Technology case that was brought by you.
8      Q      And when you say "the conduct" --
9  well, yeah -- "based on the conduct that took
10  place," what conduct?
11      A      As outlined in the briefs that we
12  filed in all these cases.
13      Q      Can you be more specific, sir?
14      A      I think the briefs that we've brought
15  both to intervene in the Technology case that you
16  brought and the briefs that have been filed in this
17  case lay out the conduct.
18      Q      Sir, but I'm asking you, under oath,
19  testifying, what conduct took place that is the
20  reason you're agreeing to pay for the prosecution
21  of the M&C action?
22      A      As outlined in our briefs.
23      Q      Sir, I'm not asking you to refer me to
24  someplace I can go read and try to figure out what

## Page 51

1  you may be referring to.  I'm asking you to testify
2  and identify the conduct, so let's break it down.
3              What conduct in particular by
4  Mr. Oppenheim?
5      A      Mr. Oppenheim took confidential
6  information.  It took the information that he had
7  that was subject to privilege in this particular --
8  in the Cin-Q case with him and brought it to his
9  new law firm and decided to solicit and get clients
10  to bring a case which was time-barred and which was
11  nothing more than a reverse auction to try to
12  enrich himself and his firm.
13      Q      You indicated in that list of conduct
14  by Mr. Oppenheim that he brought the confidential
15  information that was subject to privilege in the
16  Cin-Q case -- that he brought it to the new law
17  firm which, I assume, is the Bock Law Firm.
18              What do you mean that he "brought
19  it to the law firm"?
20      A      He took a -- He had his computer
21  imaged without -- without request, without telling
22  us, and he also took with him the information that
23  he had in his head, since he was the primary person
24  through two mediations of that case, as to what the

## Page 52

1  case was about, what information we had, what our
2  settlement thoughts were, what the other side was
3  doing or not doing in the case.
4      Q      You knew that David Oppenheim had that
5  information in his head, correct?
6              MR. SOBLE:  Objection.  Vague.
7  BY THE WITNESS:
8      A      Yes.
9  BY MR. COHEN:
10      Q      You knew that he was carrying his head
11  loaded with that information with him when he went
12  to Bock Law Firm, correct?
13              MR. SOBLE:  Objection.  Argumentative.
14  BY THE WITNESS:
15      A      I knew he went to the firm.
16  BY MR. COHEN:
17      Q      Carrying in his head that information,
18  correct?
19      A      I knew he had the information, and he
20  went to the firm.
21      Q      Okay.  So when you say "he brought
22  that information to the new law firm," you knew the
23  information is in his head and he's going to the
24  new law firm.  So I'm trying to figure out if, by

## Page 53

1  your use of the words "he brought it to the new law
2  firm," if you're implying that he then disclosed or
3  shared the information.
4      A      I think that's pretty obvious.  He
5  also copied his -- his computer without our
6  knowledge and consent.  It was our computer --
7      Q      You had mentioned that.
8      A      -- that he left behind.  Yes.
9      Q      So bottom line, what you're
10  suggesting, implying, or just outright accusing is
11  that David Oppenheim not only took the confidential
12  information both in his head and on the computer,
13  but that he then shared that confidential
14  information with Bock Law Firm?
15      A      That's what I believe.
16      Q      What factual, direct evidence can you
17  point to or identify that proves that?
18      A      The way that the Technology Training
19  case was solicited when it was filed.
20      Q      Timing and inference; you're drawing
21  inferences, correct?
22              MR. SOBLE:  Object to the question,
23  form of the question.
24

Thompson Court Reporters, Inc
thompsonreporters.com

Page 54

```
 1   BY THE WITNESS:
 2       A    In part, yes.
 3   BY MR. COHEN:
 4       Q    Do you have any non-inferential
 5   evidence?
 6       A    I have the information that I gave
 7   you.
 8       Q    Okay.
 9                (Whereupon, Exhibit No. 3 and
10                Exhibit No. 4 were marked for
11                identification.)
12                (Whereupon, documents
13                tendered.)
14            MR. COHEN: I've marked them so you'd
15   know which is which, 3 and 4 at the bottom right.
16            MR. SOBLE: Oh, thank you.
17            Do you want him to look at both
18   exhibits at once?
19            MR. COHEN: Yeah.
20   BY MR. COHEN:
21       Q    Sir, what I'm going to ask you to do,
22   and -- if you'll start at the back -- I'll
23   represent to you that these are two interrelated
24   and partially, if not significantly, overlapping
```

Page 55

```
 1   e-mail chains from April 29th of 2016.
 2            As I'm sure you're aware, e-mail
 3   chains generally have to be read from the back to
 4   the front in order to follow the sequence of the
 5   communications, and the reason I'm going to ask you
 6   to start at the back is because I think you'll find
 7   both e-mail chains start at the back, and then
 8   there's a divergence as you get towards the front.
 9   So if you read one of them back to front, then on
10   the next one, you won't have to read the whole
11   thing.  You'll just find the point where they
12   diverge, and I'd like you to take the time and read
13   both of these all the way through so I can then ask
14   you some questions about them.
15                (Whereupon, witness perusing
16                documents.)
17            MR. BLONIEN: Mr. Wanca, I believe
18   Mr. Cohen may be waiting for you to tell him when
19   you're ready to have more questions, if I
20   understand correctly.
21   BY MR. COHEN:
22       Q    Have you concluded your review?
23       A    Yes.
24       Q    Of both e-mails?
```

Page 56

```
 1       A    Yes.
 2       Q    Had you seen Exhibits 3 and 4
 3   previously?
 4       A    I don't remember.
 5       Q    Had you come to be aware of the
 6   existence of these two e-mail chains and of the
 7   contents of the dialogue between Phil Bock and
 8   David Oppenheim in these e-mails regarding the
 9   Cin-Q case, even if you had not seen them?
10       A    I don't believe so.
11       Q    Is there any confidential information
12   subject to privilege in the Cin-Q case revealed by
13   David Oppenheim in either Exhibits 3 or 4?
14            And just to be clear, as you're
15   looking through them, if you find something that
16   would prompt a "yes" answer, please make a note of
17   it because I'm then going to ask you to tell me
18   exactly what you contend is confidential
19   information subject to privilege in the Cin-Q case
20   that is revealed by Mr. Oppenheim in either of
21   these e-mails.
22            MR. SOBLE: Objection.  Vague.
23                (Whereupon, witness perusing
24                documents.)
```

Page 57

```
 1   BY THE WITNESS:
 2       A    On BLF9, the April 29, 2016, 5:21
 3   e-mail from David.
 4   BY MR. COHEN:
 5       Q    And that would be the one that reads,
 6   again, at BLF9, "Yeah.  He wants to set a record
 7   above the Capital One $75 million settlement.  The
 8   magistrate judge it's in front of is squeamish and
 9   is giving the Defendants a broad shot at disproving
10   'on behalf of.'  Sort of like Sarris" --
11            MR. COHEN:  S-a-r-r-i-s.
12   BY MR. COHEN:
13       Q    -- "class cert is fully briefed?"
14            Did I read that correctly?
15       A    Yes.
16       Q    Okay.  And we'll come back to that in
17   a moment, but I'd like to just make sure we
18   identify any and all content in either of these
19   e-mails that you contend is confidential
20   information subject to privilege in Cin-Q being
21   revealed by Mr. Oppenheim.
22       A    Yes.  That e-mail through "sort of
23   like Sarris," first of all, it misstates our
24   settlement position; and, secondly, it gives -- it
```

15 (Pages 54 to 57)

Page 58

1    reveals work product as to the magistrate and our
2    analysis of what the defendant's position was.
3          Q    And, again, we'll come back to that
4    and discuss that in more detail, although I
5    appreciate that additional commentary.
6          Are there any other portions of
7    either Exhibit 3 or Exhibit 4 that you contend
8    contain confidential information subject to
9    privilege in Cin-Q that Mr. Oppenheim revealed in
10   either of these e-mails to Mr. Bock?
11         (Whereupon, witness perusing
12         documents.)
13   BY THE WITNESS:
14         A    Phil's e-mail of April 29th at 4:43 on
15   the bottom of Page 007, it looks like his dialogue
16   trying to cover the fact that David advised him as
17   to what the -- what the offers had been in the
18   case.
19   BY MR. COHEN:
20         Q    And that would be where Mr. Bock
21   says at the bottom of Page BLF7, "This is all
22   hypothetical of course because you never revealed
23   any nonpublic details to me," correct?
24         A    No.  It begins, ". . . I know that

Page 59

1    means you got a lot of money put on the table, and
2    he's looking at a judge who already probably thinks
3    there's plenty of money . . . available to the
4    class."
5          Q    I'm sorry.  And where is that?  I just
6    want to make sure I'm with you.
7          A    It's on 07.  It's further down, the
8    last line.
9          MR. OPPENHEIM:  We're on to Page.
10   BY MR. COHEN:
11         Q    Oh, "But I know how you negotiate and
12   I know that means you got a lot of money put on the
13   table, and he's looking at a judge who already
14   probably thinks there's plenty of money made
15   available to the class, and he's wondering how long
16   he's going to let this guy drag it out just to
17   inflate his fees."
18         Did I read that correctly?
19         A    Well, it's in the e-mail, but it's not
20   the portion that I referred to.
21         Q    I thought it was.  What --
22         A    No.  I said that begins ". . . I know
23   that means that you got a lot of money put on the
24   table . . ."

Page 60

1          Q    Okay.  So your focus is on that
2    portion that begins ". . . I know you got"
3    "that means you got a lot of money put on the
4    table . . . "  And I appreciate your setting aside
5    the preceding portion of that paragraph.
6          So to the extent I'm seeking the
7    the confidential information subject to privilege
8    that Oppenheim revealed and you've told me to start
9    with "I know that means," where does the
10   confidential information, in your estimation, end?
11         A    "I know that means you got a lot of
12   money put on the table."
13         Q    Okay.  Does that conclude your
14   identification of what you perceive to be
15   confidential information subject to privilege in
16   Cin-Q revealed by Mr. Oppenheim to Mr. Bock in
17   Exhibit 3?
18         A    That's the portion of Exhibit 3 that
19   includes information in an e-mail, and I'm sure
20   they had many, many discussions as David tried to
21   sell himself to Phil for hiring.
22         MR. COHEN:  Move to strike everything
23   about "and I'm sure they had many discussions"
24   through the end of the answer as nonresponsive.

Page 61

1    BY MR. COHEN:
2          Q    What about Exhibit 4; can you identify
3    anything in Exhibit 4 that is not contained fully
4    in Exhibit 3 that it is your position reflects
5    Mr. Oppenheim revealing to Mr. Bock confidential
6    information subject to privilege in Cin-Q?
7          A    The bottom of 17, Page 3, at least
8    numbered 3, in Exhibit 4 reveals information not
9    entirely correct about the mediation.
10         Q    And --
11         A    ". . . Brian doesn't like how the
12   Tampa Bay . . . mediation process went and resents
13   Andersen's continued efforts."
14         Q    I'm looking for that.
15         (Whereupon, counsel perusing
16         documents.)
17   BY MR. COHEN:
18         Q    Okay.  So it's at the bottom BLF17,
19   top of BLF18?
20         A    Yes.  And, also, midpart of the page,
21   "Yeah.  He wants to sets a record above the
22   Capital One $75 million settlement.  The magistrate
23   judge it's in front of is squeamish and is giving
24   the Defendants a broad shot at disproving 'on

Page 62

1  behalf of.' Sort of like Sarris."
2      Q   That's the same exact content that was
3  already identified by you from Exhibit 3, correct?
4      A   No.  Exhibit 3 just had the one line,
5  I believe.
6      Q   If you look at Exhibit 3, Bates Page
7  BLF9 --
8      A   Oh, it's in that one too.
9      Q   In fact, both of those emails are
10  fully contained on BLF Page 9, correct?
11      A   Yes.
12      Q   And so is there anything in Exhibit 4
13  that is not contained in Exhibit 3 that you contend
14  reveals confidential information subject to
15  privilege in Cin-Q being revealed by Mr. Oppenheim
16  to Mr. Bock?
17          (Whereupon, witness perusing
18          documents.)
19  BY THE WITNESS:
20      A   Well, on the top of Page 15, "Brian is
21  holding out for a record settlement in an
22  uncertified case . . ."
23          Obviously, he had to be told
24  something, and that's a mischaracterization of our

Page 63

1  settlement negotiations or position.
2  BY MR. COHEN:
3      Q   What was the largest TCPA class
4  settlement in history as of April 29, 2016, to your
5  knowledge?
6      A   Capital One.
7      Q   Did you want to set a record above the
8  Capital One $75 million settlement?
9      MR. SOBLE:  I'm going to state an
10  objection to the extent that would lead into any
11  mediation privilege that the Buccaneers have not
12  waived.
13          I think the question is vague
14  enough to be able to include that; and so he
15  shouldn't talk about actual mediation discussions,
16  but internal discussions that predated that have
17  been put at issue and are fair.
18          So I just want to be clear for
19  the record what you're asking.
20  BY MR. COHEN:
21      Q   And to be clear, I'm not at this point
22  with this question asking what you demanded, how
23  the demands changed over time.  I'm talking about
24  internal discussions at Anderson + Wanca and, in

Page 64

1  particular, your want, your desire.
2          Did you want to set a record
3  above the Capital One $75 million settlement in the
4  Cin-Q case?
5      A   I wanted to get as much money as we
6  possibly could with the -- with the great discovery
7  that we had in this case and with a defendant that
8  had a -- an ability to pay and engaged in
9  outrageous conduct by sending an incredibly large
10  number out -- of faxes out after the Cin-Q case was
11  filed and served on them in state court.
12      Q   But that wasn't my question.
13          Is it accurate, would it be
14  accurate as of April 29, 2016, to say that you
15  wanted to set a record above the Capital One
16  $75 million settlement?
17      A   No.
18      Q   And when you had first identified this
19  language which we've realized is found in both
20  Exhibits 3 and 4 about the Capital One settlement,
21  you advised me that that language about the
22  Capital One settlement, your word was "it
23  misstates"; and then just now, you've told me that
24  is not accurate, correct?

Page 65

1      A   Yes.
2      Q   Okay.  When we first talked about that
3  separate e-mail, after saying "it misstates," you
4  said it reveals work product regarding the
5  magistrate judge and our analysis of the
6  Defendant's position.
7          What work product does it reveal
8  about the magistrate judge?
9      A   What it says.
10      Q   That the Judge, which would be
11  Judge Porcelli, " . . . is squeamish and is giving
12  the Defendants a broad shot at disproving 'on
13  behalf of.'  Sort of like Sarris"?
14      A   Yes.
15      Q   Is that an accurate description of
16  your firm's work product analysis of the magistrate
17  judge?
18      A   We did not use the word "squeamish."
19  Our belief was that the magistrate was looking at
20  ruling on the issue of liability.
21      Q   I'm sorry, that the magistrate judge
22  was what?
23      A   Looking for a way not to rule on the
24  "on behalf of."

Thompson Court Reporters, Inc
thompsonreporters.com

Page 66

1    Q    And by "ruling on," you mean ruling as
2  a matter of law, a dispositive ruling one way or
3  the other?
4    A    Yes.
5    Q    That was reflected in the magistrate
6  judge's December 2014 decision denying both
7  parties' motions for summary judgment, wasn't it?
8    A    I don't know if that's the date, but
9  **the magistrate judge denied the summary judgments.**
10   Q    As to "on behalf" of liability,
11  correct?
12   A    I'd have to read exactly, but it --
13  **but it dealt with whether they were going to be**
14  **responsible for the actions of the broadcaster that**
15  **they retained.**
16   Q    I asked you if that sentence that
17  starts with "the magistrate judge" accurately
18  revealed your work product assessment relating to
19  the Judge, and you started your answer by saying,
20  "we didn't use the word 'squeamish,'" and then you
21  gave me -- you testified to what your view or
22  assessment had been.
23        But I want to be clear, as it's
24  written, understanding a word may not be the word

Page 67

1  you would have been using at the time, is
2  Mr. Oppenheim's language, "the magistrate judge
3  it's in front of is squeamish and is giving the
4  Defendants a broad shot at disproving 'on behalf
5  of.'" Sort of like Sarris" -- is that generally an
6  accurate or generally an inaccurate statement of
7  your work product assessment of the magistrate
8  judge?
9        MR. SOBLE:  Objection.  Asked and
10  answered.
11  BY THE WITNESS:
12   A    It's generally accurate.
13  BY MR. COHEN:
14   Q    And you also said "it reveals work
15  product regarding the magistrate judge and our
16  analysis of Defendant's position."
17        What language in this e-mail
18  reveals your work product analysis of the
19  defendant's position?
20   A    The language about "defendants" are
21  **given "a broad shot."**
22   Q    Okay.  Was that an accurate statement
23  of your firm's work product analysis of the
24  defendant's position?

Page 68

1    A    At a point in time.
2    Q    How about as of April 29, 2016?
3    A    I can't recall.
4    Q    You also identified Mr. Oppenheim's
5  earlier e-mail just before the one we've been
6  talking about which is also contained in both
7  Exhibits 3 and 4, the one which reads, "Could be
8  but it's more likely that Brian doesn't like how
9  the Tampa Bay Bucs mediation process went and
10  resents Andersen's continued efforts."
11        Do you see that?
12   A    Yes.
13   Q    What language in there do you contend
14  reveals confidential information subject to
15  privilege in Cin-Q?
16   A    I don't think he should be telling his
17  **new employer, who's not in the case, anything about**
18  **a mediation that has taken place.**
19   Q    Is the information contained in that
20  e-mail that I just read an accurate statement?
21   A    I was frustrated that the case didn't
22  **settle.  I wouldn't characterize as that I didn't**
23  **like how the mediation process went.  It didn't**
24  **resolve -- It didn't resolve the case, but . . .**

Page 69

1    Q    Did you resent --
2    A    And --
3    Q    -- Judge Andersen at all?
4    A    No.  I just didn't think he was very
5  **forceful with Mester.  He was Mr. Mester's sole**
6  **mediator for any case that Mester did, and he never**
7  **pushed -- pushed them to really do anything.  I**
8  **didn't think he was very effectual.  I don't resent**
9  **his continued efforts.**
10   Q    And I just want to break it down into
11  the two parts it seems to have broken into in our
12  dialogue so far.
13        There's the part, "Brian doesn't
14  like how the Tampa Bay Bucs mediation process
15  went," and you've said you were frustrated that the
16  case didn't settle.
17        So I understand you've
18  acknowledged you were frustrated that the case
19  didn't settle.
20        The portion of Mr. Oppenheim's
21  e-mail that says, "Brian doesn't like how the Tampa
22  Bay Bucs mediation process went," the words
23  Mr. Oppenheim used, is that an accurate statement?
24        MR. SOBLE:  Objection.  Asked and

Thompson Court Reporters, Inc
thompsonreporters.com

Page 70

```
 1   answered.
 2   BY THE WITNESS:
 3       A    Those are not the words that I would
 4   use, and I gave you the words that I would use.
 5   BY MR. COHEN:
 6       Q    And I appreciate that.
 7       A    And so compare my words to his words;
 8   they're different.  Okay?
 9       Q    And --
10       A    I would be -- I would be frustrated
11   with any case where promises are made on how people
12   really want to settle something, and then you go
13   and you waste two days on a -- in a mediation that
14   doesn't go anywhere close to where it needed to go.
15       Q    I understand and appreciate the way
16   you described it.  "Frustrated the case didn't
17   settle" is not the same words that Mr. Oppenheim
18   used, and two people can describe something using
19   different words but generally conveying a
20   sufficiently same thing that they're both accurate.
21           But I asked the last question
22   using the word "accurate."  I will flip it around.
23           Is it your position that that
24   language, "Brian doesn't like how the Tampa Bay
```

Page 71

```
 1   Bucs mediation process went," was inaccurate?
 2           MR. SOBLE:  Object to the form of the
 3   question and asked and answered.
 4   BY THE WITNESS:
 5       A    It's accurate that I didn't like the
 6   way the mediation process resulted, which was no
 7   settlement.
 8   BY MR. COHEN:
 9       Q    Now, you mentioned promises, and you
10   stated it in the present tense, but we were talking
11   about something that happened in the present
12   tense -- past tense.
13           So you said "promises are made."
14   I'm rewording it, just that one word, "are" to
15   "were."
16           "Promises were made that people
17   really wanted to settle, and two days were wasted,
18   and the negotiation doesn't go anywhere close to
19   where it needed to go."
20           In your analysis and internal
21   assessment of the case, where did it need to go?
22           MR. SOBLE:  Object to the form of the
23   question.
24
```

Page 72

```
 1   BY THE WITNESS:
 2       A    It needed to go to numbers that
 3   were -- and on terms that were acceptable to the
 4   plaintiffs and Mr. Addison and myself.
 5   BY MR. COHEN:
 6       Q    And in your internal assessment of
 7   numbers -- And I'm not ignoring terms; we can come
 8   back to terms.
 9           Your internal assessment of
10   numbers acceptable, and you say, to plaintiffs and
11   counsel, set aside plaintiffs for a moment,
12   counsel, meaning yourself --
13       A    Meaning Mr. Addison in the -- this was
14   his case.  Cin-Q was his plaintiff.  He brought the
15   case.  He invited me in.
16       Q    Let's segue to that.
17           What does that mean, his case?
18       A    He brought a case in Hillsborough
19   County on behalf of Craig Cin-Q or his corporation
20   against the Buccaneers quite a number of years ago.
21       Q    Your -- You've been doing TCPA class
22   action litigation for a while.  You know that
23   competing cases is not unheard of, correct?
24       A    They happen from time to time.
```

Page 73

```
 1       Q    And you're aware that sometimes the
 2   first filed case is not the case in which the class
 3   action ultimately settles, correct?
 4       A    Once in a while, some -- some other
 5   case settles that was not the first case filed,
 6   yes.
 7       Q    So going back to, "it needed to go to
 8   numbers that would be acceptable to counsel," and
 9   I'll -- I was including or focusing in on you, but
10   to the extent you said it's got to take kind of
11   Mr. Addison as well because it was his case, in
12   your internal analysis, assessment, et cetera, what
13   numbers did it need to go to to be acceptable to
14   counsel?
15           MR. SOBLE:  Objection.  Asked and
16   answered.
17   BY THE WITNESS:
18       A    I can't answer that without --
19   without compromising my position in the case that
20   we have still open.
21   BY MR. COHEN:
22       Q    Am I correct you are refusing to
23   answer?
24           MR. SOBLE:  I'm also going to object
```

19 (Pages 70 to 73)

Page 74

1    to the extent -- to the extent such information was
2    not shared with Medical & Chiropractic and was
3    strictly internal to the law firm, and that would
4    be work product privilege that Judge McCoun's order
5    did not order disclosed.
6             MR. COHEN:  So are -- I mean, he was
7    refusing, and I just wanted to be clear on the
8    record with him that he's refusing.  And now
9    you're, as counsel, stating something.
10            Are you instructing the witness
11   not to answer the question?
12            MR. SOBLE:  I'm not instructing the
13   witness not to answer the question.  I'm advising
14   the witness of the Judge's ruling on the privilege
15   issue, and it's the law firm's privilege, the
16   attorney -- the work product privilege.
17            MR. COHEN:  So --
18            MR. SOBLE:  Not to mention the various
19   jurisdictions that, even on privilege issues, find
20   it improper to instruct witnesses not to answer
21   questions at depositions, which I will readily
22   admit I do not know Middle District of Florida.
23            MR. COHEN:  Anything else?
24            MR. SOBLE:  No.

Page 75

1    BY MR. COHEN:
2        Q     Sir, your counsel has expressed a view
3    and articulated an interpretation of the Court's
4    ruling in this case but has not purported to
5    instruct you not to answer.
6             Are you refusing to answer my
7    last question?
8        A     I think my answer speaks for itself.
9    I can't and I won't provide information as to my
10   view of the case when the case is still open and
11   not been resolved.  I will not compromise my
12   plaintiffs nor -- nor the class that we have sought
13   to represent as evidenced by the only brief that's
14   on file to get as much money as we can in this
15   case.
16       Q     And, sir, I'm not trying to play games
17   with you or argue with you, and I don't intend to
18   sit and argue with you once it's clear you're
19   refusing to answer the question.
20            I just want to make certain the
21   record is clear.  I asked you a question, and
22   you're not willing to answer that question,
23   correct?
24       A     My answer -- I can't answer the

Page 76

1    question without -- without compromising our -- our
2    position in the case.
3        Q     And so you won't answer, correct?
4        A     Correct.
5             MR. BLONIEN:  If I could just seek a
6    clarification from counsel, is this attorney-client
7    privilege, is this mediation privilege?  What is
8    the basis for not answering the question?
9             MR. SOBLE:  You can check --
10            MR. BLONIEN:  -- question.
11            MR. SOBLE:  -- the record since it's
12   part of the record.
13            MR. BLONIEN:  Are you going to answer
14   my question or --
15            MR. SOBLE:  No, I'm not, because I'm
16   not --
17            MR. BLONIEN:  Okay.  Thank you,
18   Mr. Soble.
19            MR. SOBLE:  -- being deposed, Barry.
20            You're welcome, Mr. Blonien.
21   BY MR. COHEN:
22       Q     And so we don't waste time, if I asked
23   you essentially the same question regarding --
24   because you had talked about, it needed to get to

Page 77

1    numbers and terms that would be acceptable.  If --
2    And I just asked you about numbers, and you refused
3    to answer for the reasons you articulated.
4             If I had asked you the same
5    question about the terms, would you similarly
6    refuse to answer as to that for the same reason you
7    articulated?
8             MR. SOBLE:  And we would have the same
9    objection.
10   BY THE WITNESS:
11       A     Yes.
12            THE VIDEOGRAPHER:  There's about five
13   minutes left on the disc.
14            MR. COHEN:  Let's use maybe two or
15   three of it.
16   BY MR. COHEN:
17       Q     You also in Exhibit 3 on the first
18   page, Bates Page 7, directed my attention to the
19   bottom, the last paragraph, and even though this
20   was not what you identified as being confidential
21   information privileged in the Cin-Q case being
22   revealed, this is an e-mail by Mr. Bock, and you
23   did read from and then comment upon this language
24   where Mr. Bock says, "This is all hypothetical of

Thompson Court Reporters, Inc
thompsonreporters.com

Page 78

1   course because you never revealed any non-public
2   details to me," and you said something about
3   Mr. Bock trying to cover something.
4           Do you have any evidence that
5   Mr. Oppenheim had, in fact, revealed any
6   confidential, privileged Cin-Q information to
7   Mr. Bock other than the earlier portions of this
8   e-mail that you've said constitute such?
9           MR. SOBLE:  Object to the form of the
10  question.  Objection.  Misstates his testimony.
11  And objection.  Asked and answered.
12          THE WITNESS:  Can you read the
13  question back again?
14          (Whereupon, the record was
15          read as requested.)
16  BY THE WITNESS:
17      A    I believe that this is all
18  hypothetical.  It's Phil's fiction to cover up what
19  David had told him about the Buccaneers case and
20  that the Buccaneers case and the opportunity to
21  steal it was the motivation that Phil had to hire
22  David and to pay him what he paid him.
23  BY MR. COHEN:
24      Q    Have you seen the e-mails and the text

Page 79

1   messages pertaining to the decision-making process
2   that went into hiring David Oppenheim?
3       A    No.
4       Q    So going back to your answer which
5   started with "I believe" -- and I apologize if my
6   question wasn't clear -- I was not seeking your
7   inference or your opinion or belief.
8           I'm asking if you can identify
9   any facts which show or prove that David Oppenheim
10  had previously shared with Phil Bock any
11  confidential or privileged Cin-Q information other
12  than the content of e-mails in this exhibit that
13  you've already identified as such?
14          MR. SOBLE:  Same objection --
15  objections.
16  BY THE WITNESS:
17      A    "I know that you" -- that "I know that
18  means you got a lot of money put on the table."
19  BY MR. COHEN:
20      Q    Right.  So you're inferring from that,
21  that in order to know that, Mr. Oppenheim must
22  have, at some point previous to that, shared some
23  other information not otherwise contained in this
24  e-mail chain, correct?

Page 80

1       A    What we have are -- What we have are
2   e-mails here.  Obviously, there were discussions
3   going on between them about these cases and
4   anything else they could steal.
5       Q    You say "obviously."  You don't know
6   any of that, do you?
7       A    Well, look at the e-mails.  There's no
8   restrictions on that.  There's no Chinese wall
9   about that.  He's engaging in conversations and
10  trying to bait Phil into -- into doing what he
11  ultimately did.
12      Q    Sir, I don't even need to argue if
13  whether your opinion or belief is reasonable,
14  possible, probable, and I'm not arguing.
15          I'm just saying, you don't know
16  that there were other conversations or divulgences.
17  You may think there were.  You may or may not have
18  good reason to believe so, but you don't have
19  personal knowledge of it, correct?
20      A    I wasn't standing there, correct.
21          MR. COHEN:  I think this is a good
22  time.
23          THE VIDEOGRAPHER:  Going off the
24  record at 12:24 p.m.

Page 81

1           (Whereupon, a lunch recess
2           was had.)
3           THE VIDEOGRAPHER:  Going back on the
4   record.  This marks the beginning of Disc No. 2.
5   The time is now 1:24 p.m.
6           Please proceed.
7   BY MR. COHEN:
8       Q    Sir, we took a break for lunch, and
9   we're back on the record.  You're still under oath.
10          I had asked you earlier why you
11  had agreed to pay all of the Foley attorneys' fees
12  and litigation expenses associated with the
13  prosecution of M&C's case and claims against
14  Oppenheim and Bock Law Firm, claims in which you
15  had acknowledged you had no interest, and my notes
16  say you said it was the right thing to do based on
17  the conduct that took place in this case, and we've
18  covered what "this case" means when you said that.
19  We've covered the conduct or at least we've started
20  to cover the conduct you're referring to.
21          What do you mean it was the right
22  thing to do?  The right thing to do for whom?
23          MR. SOBLE:  Object to the form of the
24  question.

21 (Pages 78 to 81)

Page 82

1 BY THE WITNESS:
2    **A**   **It was the right thing to do for**
3 **Medical & Chiro.**
4 BY MR. COHEN:
5    Q   And "Medical & Chiro" could
6 sometimes -- or "M&C" could sometimes refer to a
7 cause of action as opposed to an entity. You're
8 referring to the entity.
9       For the entity Medical &
10 Chiropractic Clinic, Inc., it was the right thing
11 to do, correct?
12    **A**   Yes.
13    Q   Why?
14    **A**   **Because the actions were wrong and**
15 **egregious.**
16    Q   How did it harm M&C?
17    **A**   **They were no longer the class**
18 **representative in the case, not involved with it.**
19 **They put a substantial amount of time and effort**
20 **into -- into the case answering discovery, sitting**
21 **for dep, attending mediations.**
22    Q   You say they were no longer the class
23 rep.
24       They were never the class rep.

Page 83

1 They were at most ever a putative class rep,
2 correct?
3    **A**   **Correct.**
4    Q   And the substantial time and effort
5 that you say M&C had put into the case, the
6 compensation or remuneration available to a
7 putative class rep seeking to get a class certified
8 and either get a settlement or a successful
9 judgment on the merits, No. 1, they can get the
10 same compensation or benefit that is brought for
11 the whole class, correct?
12    **A**   **They can get what each class member is**
13 **to receive, yes.**
14    Q   And, No. 2, they can petition the
15 Court -- in the event of a settlement for the class
16 or a judgment in favor of the class, they can
17 petition the Court for an incentive award?
18    **A**   Yes.
19    Q   And an incentive award is not
20 guaranteed or assured, correct?
21    **A**   **Correct.**
22    Q   And are you aware that M&C -- in the
23 event the Technology Training settlement were to
24 proceed to final approval, are you aware that they

Page 84

1 have -- M&C has every right and will have every
2 opportunity to petition the Court for an incentive
3 award for all of their substantial time and effort
4 they invested if it benefited the class through the
5 Cin-Q case?
6    **A**   Yes.
7    Q   So why would you spend well in excess
8 of a half-million dollars to date to benefit M&C in
9 a situation where they can still get whatever
10 compensation the rest of the class gets if a
11 settlement is approved and they can still get their
12 incentive award if the Court finds they're entitled
13 to one?
14       MR. SOBLE: Objection. Asked and
15 answered.
16 BY THE WITNESS:
17    **A**   **For the reasons I set out.**
18 BY MR. COHEN:
19    Q   Right thing to do?
20    **A**   **Right thing to do.**
21    Q   Have you reviewed the pleadings that
22 have been filed back and forth, including the
23 original complaint and request for a temporary
24 restraining order and preliminary injunction in the

Page 85

1 M&C case?
2    **A**   Yes.
3    Q   Is it your understanding that M&C is
4 seeking attorneys' fees and litigation costs
5 incurred in the prosecution of this litigation?
6    **A**   **I'd have to look at the pleadings. I**
7 **don't have the recollection.**
8    Q   If M&C were awarded its attorneys'
9 fees and litigation expenses, which presupposes
10 that it prevails in any respect on its claim, but
11 assuming M&C were to prevail in any respect on its
12 claim and assuming M&C were awarded its attorneys'
13 fees and expenses, and assuming that award were
14 calculated as a function of all of Foley's invoiced
15 fees and litigation costs that you've already paid
16 or will pay, are you anticipating that you'll get
17 that back?
18    **A**   **I haven't had those discussions.**
19    Q   So there's no understanding or
20 agreement in that regard at the present time?
21    **A**   **Correct.**
22    Q   What information do you think
23 Bock Law Firm needed in order to decide to pursue a
24 competing Buccaneers class action, file it, and

Page 86

1 proceed to reach a settlement? What information do
2 you think Bock Law Firm needed to do those things
3 that was not publicly available to them?
4     A    Information that David Oppenheim had
5 about -- about the mediations and the settlement
6 posturing that had taken place up through that
7 point in --
8         THE REPORTER: I'm sorry. Could you
9 repeat that?
10        THE WITNESS: What --
11        (Whereupon, the following was
12        read from the record as
13        requested: "Information that
14        David Oppenheim had about --
15        about the mediations and the
16        settlement . . .")
17 BY THE WITNESS:
18     A    Posturing and negotiations that had
19 taken place up through that date.
20        MR. SOBLE: Keep your voice up for the
21 court reporter.
22        THE WITNESS: Okay.
23        MR. SOBLE: For them, don't worry
24 about. The court reporter, keep it up for.

Page 87

1         MR. COHEN: We'll just benefit
2 derivatively.
3 BY MR. COHEN:
4     Q    So the information that you've
5 identified in Exhibits 3 and 4, the two, April 29th
6 e-mail chains where we walked through them at
7 length before the lunch break and you identified
8 the specific things that you contend constitute the
9 confidential and privileged Cin-Q information that
10 Oppenheim was revealing to Bock, focusing only on
11 those aspects and contents of Exhibit 3 and 4, the
12 two e-mail chains, was that information in and of
13 itself, standing alone, sufficient to fill in the
14 gap of information that you think Bock Law Firm
15 needed in order to go forward with the competing
16 case without -- beyond publicly available
17 information?
18        MR. SOBLE: Object to the form.
19 BY MR. COHEN:
20     Q    Do you want me to repeat it?
21     A    Yes.
22     Q    My prior question said -- asked you
23 what you think, what information you think
24 Bock Law Firm needed in order to go forward with

Page 88

1 and conclude a competing class action again the
2 Bucs and reach a settlement, everything that
3 happened, what information you thought they needed
4 to do that that wasn't publicly available, and you
5 said the confidential information that David
6 Oppenheim shared, correct?
7     A    Yes.
8     Q    Okay. And what I want to know is, you
9 told us in Exhibits 3 and 4 what you considered to
10 be confidential information that David Oppenheim
11 was sharing.
12        Was that information that you've
13 identified from Exhibits 3 and 4, standing alone,
14 sufficient to fill in the gap of the information
15 Bock Law Firm needed to do that beyond what was
16 otherwise available in the public sector?
17     A    I'm not sure I have an opinion on that
18 at this point.
19     Q    You and the Bock -- You and the
20 Bock Law Firm have been involved in numerous TCPA
21 class actions involving fax broadcasting by a
22 company known as Business to Business Solutions or
23 B2B, correct?
24     A    Yes.

Page 89

1     Q    And in regard to Business to Business
2 Solutions or B2B, your firm came into possession of
3 a hard drive that contained, if not all, a lot of
4 B2B's fax broadcasting activities on behalf of a
5 number of its customers, correct?
6     A    Correct.
7     Q    And there were numerous B2B cases that
8 you and Bock Law Firm filed based upon the
9 transmission logs and other documentation and
10 information contained on the B2B hard drive,
11 correct?
12     A    We filed a lot of cases where that
13 information was used.
14     Q    And you filed cases where that
15 information at the time you filed the case was all
16 the information you had, correct?
17     A    I don't understand what you mean by
18 "all the information" I had.
19     Q    Well, you hadn't taken any depositions
20 yet. I mean, if you haven't filed the case yet,
21 you hadn't taken depositions of the defendant or
22 anything like that yet, correct?
23     A    Of course, right.
24     Q    So you found, in coordination with the

23 (Pages 86 to 89)

Page 90

1  Bock Law Firm, that having the kind of information
2  that was available on the B2B hard drive as to a
3  particular fax broadcasting campaign by B2B on
4  behalf of one of its customers, that was a
5  sufficient amount of information to proceed with
6  the filing of a class action lawsuit, correct?
7      A    More information would be needed than
8  that.
9      Q    Like what?
10     A    The advertisement, a willing client, a
11 client who would be willing to litigate the case,
12 as well as a determination as to where the case can
13 be filed, who -- who can bring the case, what
14 venues, and getting appropriate people to work
15 with.
16     Q    The fax advertisement itself was
17 usually found on the B2B hard drive, correct?
18     A    Sometimes, it was.
19     Q    And finding a willing client, in years
20 past, you have used mass mail marketing letters as
21 solicitations for clients to -- for people to
22 express their willingness or interest in being
23 potential named plaintiffs and class
24 representatives, correct?

Page 91

1      A    During a period of time, yes.
2      Q    And you found that sometimes people
3  who responded to those solicitation letters
4  indicating they were interested and willing to be
5  potential class representatives in TCPA litigation
6  corresponded to specific, successfully sent fax
7  transmissions found on the B2B hard drive, correct?
8          THE WITNESS:  Can you read the
9  question back for me, please?
10         (Whereupon, the record was
11         read as requested.)
12 BY THE WITNESS:
13     A    Yes.
14 BY MR. COHEN:
15     Q    Are you aware that Bock Law Firm
16 communicated with Technology Training Associates in
17 the course of a nonspecific solicitation letter
18 just as you've -- we've talked about you doing, a
19 general letter to a mass group, mass target
20 population, and the Technology Training Associates
21 had responded saying they were interested and
22 willing to participate as a class representative in
23 potential TCPA class litigation?  Are you aware of
24 that?

Page 92

1      A    No.
2      Q    You are aware that putative class
3  counsel in the Cin-Q case filed with the court, not
4  under seal, all of the relevant fax broadcast
5  transmission data identifying all the class members
6  by fax number, correct?
7      A    Yes.
8      Q    So if Bock Law Firm had a person who
9  had expressed a willingness to be a class
10 representative in TCPA class litigation, in this
11 particular instance, Technology Training, and they
12 had access to the transmission log data that you
13 filed in court, what else did they need in order to
14 have enough information and evidence to go forward
15 and file a competing Bucs class action?
16     A    I answered that about five minutes
17 ago, the information that David Oppenheim had
18 concerning the negotiations that had taken place,
19 the offers and the counteroffers in that case.
20     Q    You declared an impasse or insisted
21 that the mediator, Wayne Andersen, formally declare
22 an impasse on May 2nd, 2016, correct?
23     A    I don't remember what date.
24     Q    Whatever date it was, you did insist

Page 93

1  that Wayne Andersen do that, and he did it,
2  correct?
3      A    I'd have to check the file.
4      Q    And I just -- because my question
5  arguably was compound -- although Mr. Soble was
6  kind enough not to lodge that objection -- I want
7  to make certain that I understand what part of that
8  you'd have to check the file.
9          You do understand that
10 Wayne Andersen at some point declared an impasse?
11     A    That's my recollection.
12     Q    Don't you think that was sufficient
13 information, that a Buccaneers class action that
14 had been on file in various forms and iterations
15 for seven years that hadn't led to a successful
16 summary judgment for the plaintiffs on any issue,
17 that hadn't been certified yet, and where whatever
18 settlement negotiations had gone on over seven
19 years, now the mediator is declaring an impasse --
20 don't you think that's enough information for
21 Bock Law Firm, equipped with the transmission log
22 data and a willing class representative, to go
23 forward and file?
24     A    No, because it was time-barred.

24 (Pages 90 to 93)

Page 94

1    Q    And what effect does the fact that you
2  perceive the statute of limitations as having
3  expired have on the reasonableness of proceeding
4  with the claim anyway?
5    A    **Because the claimant whose claim is**
6  **time-barred doesn't -- doesn't have the same**
7  **standing as the people who've been litigating this**
8  **case and who can assert liability on behalf of the**
9  **class.  The interests of counsel who represents**
10  **someone like that is aligned with the Buccaneers as**
11  **the Eleventh Circuit has so indicated.**
12    Q    You used a phrase I'm not familiar
13  with.  You said in that situation -- in other
14  words, where you perceive that the statute of
15  limitations has expired on that absent class
16  member's claim -- you said that class member
17  doesn't have the same standing.
18    A    **Right.**
19    Q    And I'm -- I'm not aware of different
20  levels of standing.  I'm aware of, you have
21  standing or you don't have standing, and I don't
22  know what you meant when you said "don't have the
23  same standing."
24       Did Technology Training have

Page 95

1  standing?
2    A    **For an individual claim.**
3    Q    Did they have standing to bring a
4  putative class claim?
5    A    **No.**
6    Q    Why not?
7    A    **The statute of limitations had passed.**
8  **The Eleventh Circuit had previously ruled.**
9    Q    In what case?
10    A    **Bob Wines.**
11    Q    What happened in Bob Wines?  I mean,
12  I'm not kidding.  You're familiar with the case.
13       What relevant thing did Bob Wines
14  involve and hold?
15    A    **It held that a putative class member**
16  **can bring an action in the Eleventh Circuit for**
17  **their own individual claim only after the statute**
18  **of limitations has passed notwithstanding American**
19  **Pipe's tolling.**
20    Q    In Bob Wines, how did the case get to
21  the Court of Appeals?  Who appealed?
22    A    **I don't remember.**
23    Q    What position had the defendant taken
24  on the tolling or on the statute of limitations?

Page 96

1    A    **I'd have to look at the briefs.**
2    Q    The defendant had asserted an
3  affirmative defense of statute of limitations as to
4  a putative class case, correct?
5    A    **I'd have to go back and look at it,**
6  **and I don't recall.**
7    Q    And because the defendant asserted a
8  statute of limitations defense, that's why it was
9  an issue, correct?
10    A    **I'd have to go back and look at it.**
11    Q    You do understand that the statute of
12  limitations is an affirmative defense in the TCPA
13  case, correct?
14    A    **Yes.**
15    Q    And it's an affirmative defense
16  whether the case is brought individually or on
17  behalf of a class, correct?
18    A    **Yes.**
19    Q    And if the defendant doesn't raise
20  statute of limitations, then the putative -- the
21  plaintiff and the putative class have standing,
22  correct?
23    A    **Yes.**
24    Q    What would have been an alternative to

Page 97

1  the Buccaneers waiving statute of limitations?
2  Could the Technology Training plaintiffs and
3  counsel have reached the same settlement agreement
4  they did and then filed a motion to intervene in
5  the Cin-Q case?
6    A    **I'm not sure.**
7    Q    Is there -- Is it just a general lack
8  of knowledge of the law of intervention in putative
9  class actions, or is it a specific feature or
10  characteristic of the Technology Training situation
11  that makes you unsure?
12       MR. SOBLE:  Object to the form.
13       Can you read the question back,
14  please?
15       (Whereupon, the record was
16       read as requested.)
17  BY THE WITNESS:
18    A    **I am aware of the law relating to**
19  **intervention.  I'd have to research the issue for**
20  **the hypothetical that you posed.**
21       THE REPORTER:  Could you speak up a
22  little?  I'm sorry.
23  BY THE WITNESS:
24    A    **I would have to research the**

25 (Pages 94 to 97)

Page 98

1    hypothetical that you posed.
2    BY MR. COHEN:
3        Q    If Bock Law Firm had filed the
4    Technology Training action just as it did,
5    dismissed it just as it did, negotiated with the
6    Buccaneers just as it did, reached the settlement
7    agreement just as it did, and had filed a motion to
8    intervene in the Cin-Q case for the purpose of
9    presenting that settlement for preliminary approval
10   and, hopefully, later final approval, as putative
11   class counsel for the plaintiffs in the Cin-Q
12   action, would you have consented to such
13   intervention?
14       A    I don't have an opinion as I sit here
15   today.
16       Q    You are aware that the Buccaneers
17   specifically and expressly waived the statute of
18   limitations defense as part of the Technology
19   Training settlement?
20       A    I believe they did so.
21       Q    Do you have any personal knowledge as
22   to exactly how and why that came about?
23       A    I don't have any personal knowledge of
24   the discussions between the Bock Law Firm and the

Page 99

1    Buccaneers.
2        Q    You are familiar with and aware of the
3    fact that your practice of law and representation
4    of clients in the practice of law is subject to the
5    respective Rules of Professional Conduct
6    promulgated by whichever state bars have
7    jurisdiction over a particular representation?
8            MR. SOBLE:  Object to the form of the
9    question.
10   BY THE WITNESS:
11       A    In general, yes.
12   BY MR. COHEN:
13       Q    And as an attorney, you have been
14   trained on those rules?
15           MR. SOBLE:  Object to the form of the
16   question.
17   BY THE WITNESS:
18       A    I'm familiar with those rules, yes.
19   BY MR. COHEN:
20       Q    And where they apply to the type of
21   practice of law you have, you follow those rules?
22       A    I do my best, yes.
23       Q    As we sit here today, are you aware
24   of any act or omission in regard to your

Page 100

1    representation of Medical & Chiropractic in any
2    Buccaneers TCPA litigation where you did not comply
3    with or violated those rules?
4        A    Am I aware of any?  No, I'm not.
5            (Whereupon, Exhibit No. 5 was
6            marked for identification.)
7            (Whereupon, document tendered.)
8    BY MR. COHEN:
9        Q    Sir, I'm handing you what we've marked
10   as Exhibit 5.
11           Can you identify this as a
12   retainer agreement between yourself and
13   Medical & Chiropractic Clinic, Inc., in regards to
14   a Buccaneers class action?
15           MR. SOBLE:  And for the record, this
16   was marked confidential subject to protective
17   order, so this -- certainly this portion of the
18   deposition will also be marked as such.
19           (Whereupon, witness perusing
20           document.)
21   BY THE WITNESS:
22       A    Yes.  It's a retainer between my law
23   firm and M&C.
24

Page 101

1    BY MR. COHEN:
2        Q    For prosecution of a Buccaneers class
3    action, correct?
4        A    Correct.
5        Q    Do you see on Page 1 of this
6    agreement, which is Bates Page MC 188, the last
7    paragraph is talking about, if the case is
8    certified as a class action, how attorneys' fees
9    may be determined, what factors are relevant,
10   things of that nature?
11       A    Yes.
12       Q    And do you see, I guess that's six
13   lines down in that paragraph, there's a sentence
14   that starts a little more halfway over to the
15   right.  It says, "If permitted by the forum in
16   which the lawsuit is pending, Plaintiff's Counsel
17   may seek up to 1/3 of the total recovery . . ."
18           Did I read that correctly?
19       A    Yes.
20       Q    You are familiar with the concept of a
21   contingent fee arrangement between an attorney and
22   a client?
23       A    Yes.
24       Q    You would agree that a fee that is

Thompson Court Reporters, Inc
thompsonreporters.com

Page 102

1   going to be calculated as a percentage of the
2   recovery is a contingent fee?
3       A   I would call it that.
4       Q   And then on Page 2 of the agreement,
5   which is MC 189, the first full paragraph, which is
6   just one sentence long, reads, "In the event that
7   the class is not certified, Client agrees to pay
8   attorneys' fees equal to one-third of the total
9   amount recovered by Client on an individual basis."
10      Did I read that correctly?
11      A   Yes.
12      Q   You would agree that, to the extent
13  this contract contemplates the possibility of an
14  individual settlement or resolution as opposed to a
15  class settlement, it is also what would properly be
16  described as a contingent fee agreement?
17      A   Yes.  That's what I would call it.
18      Q   And drawing your attention to
19  Rule 1.5(c) of the Illinois Rules of Professional
20  Conduct, I'll ask you to assume the Rule reads, "A
21  fee may be contingent on the outcome of the matter
22  for which the service is rendered except in a
23  matter in which a contingent fee is prohibited by
24  Paragraph (d) or other law.  A contingent fee

Page 103

1   agreement shall be in writing signed by the client
2   and shall state the method by which the fee is to
3   be determined, including the percentage or
4   percentages that shall accrue to the lawyer in the
5   event of settlement, trial, or appeal."
6       Would you agree that Exhibit 5,
7   your contingent fee agreement with Medical &
8   Chiropractic dated October 9, 2013, is a contingent
9   fee agreement in writing signed by the client
10  stating the method by which the fee is to be
11  determined within the meaning of Rule 1.5 of the
12  Illinois Rules of Professional Conduct?
13      MR. SOBLE:  Objection to relevance to
14  this -- the M&C action against Bock Law Firm and
15  Oppenheim.
16  BY THE WITNESS:
17      A   I believe that Exhibit 5 is a
18  contingency fee agreement for representation of M&C
19  individually and on behalf of the class.
20  BY MR. COHEN:
21      Q   And based on what I read to you and
22  asked you to assume the language is from Rule 1.5
23  of the Illinois Rules of Professional Conduct, you
24  would agree that because it's in writing, it sets

Page 104

1   forth the method by which a contingent fee would be
2   calculated and it's signed by the client, that that
3   is an agreement in compliance with Rule 1.5?
4       A   And I'd need to see the language in
5   that -- in that rule to compare to this, but it
6   sounds about right.
7       Q   2013 was the year in which you filed a
8   motion for M&C to join in the Cin-Q action that was
9   already pending, correct?
10      A   I'd have to check.
11      Q   Well, the contract is dated October 9,
12  2013, correct?
13      A   Yes.
14      Q   But you had previously filed at least
15  one action on behalf of M&C relating to a
16  Buccaneers fax advertising, correct?
17      A   I'm sorry.
18      Q   Prior to October of 2013, prior to
19  having successfully gotten M&C joined into the
20  Cin-Q action, before all that, you had represented
21  M&C and filed at least one action on behalf of M&C
22  as a putative class action relating to fax
23  advertising the Buccaneers, correct?
24      A   I don't know.  I'd have to check our

Page 105

1   files.
2       Q   You don't know if M&C joining the
3   Cin-Q putative class litigation was the first
4   action you brought on behalf of M&C relating to a
5   Buccaneers fax advertisement?
6       A   Against whom?
7       Q   I'm just focusing it on a subject
8   matter, being Buccaneers fax advertising.
9       A   Well, I'm asking who the defendant is.
10  That should help my -- refresh my recollection.
11      Q   Clement.
12      A   Clement, okay.
13      Q   So is that a yes, you did represent
14  M&C in an earlier-filed putative class action
15  relating to fax advertising of Buccaneers?
16      A   I recall filing an action against
17  Clement.  I don't remember if it was a putative
18  class action or an individual action.
19      Q   And approximately when did you file
20  that?
21      A   I don't recall.
22      Q   Did you have a written contingent fee
23  agreement signed by M&C at the time you were
24  prosecuting the M&C-Clement case for that action?

27 (Pages 102 to 105)

1    A   I don't recall.
2    Q   Have you looked for it in your efforts
3  to comply with the Court's discovery rulings in
4  this case?
5    A   Yes.
6    Q   And?
7    A   I've been unable to locate anything
8  other than this document (indicating), meaning --
9  "this" meaning Exhibit 5.
10   Q   So as we sit here today, you have
11 no evidence to prove that you complied with
12 Rule 1.5(c) of the Illinois Rules of Professional
13 Conduct with regard to your earlier representation
14 of M&C against Clement?
15       MR. SOBLE:  Object to the form of the
16 question.  It's misstating his testimony.
17 BY THE WITNESS:
18   A   I'm not sure that the Illinois Rules
19 apply to representation of someone in Florida.
20 BY MR. COHEN:
21   Q   Did you know the Florida rules have
22 the same requirement for contingent fee agreements,
23 have to be in writing signed by the client?
24   A   I believe Florida has one, yes.  I'm

1  not sure if it actually applies to class actions.
2    Q   You have entered into an agreement to
3  the division of any attorneys' fees that might be
4  awarded in the prosecution of the Cin-Q putative
5  class action, correct?
6    A   Correct.
7    Q   Your firm will get part of the fees,
8  Mike Addison will get part of the fees, and
9  Joseph Siprut will get part, correct?
10   A   And his counterpart in Florida who had
11 the clients that he field two cases on.
12   Q   Siprut's counterpart, right?
13   A   Correct.
14   Q   And we got an opportunity to depose
15 Mr. Addison so we were able to flesh some things
16 out.
17       Based on the way it ended up
18 shaking out, it's my understanding that Mr. Siprut
19 gets 16 percent of the fee, Mr. Addison gets
20 25 percent of the fee -- that adds to 41 -- and
21 that you get 59 percent of the fee.
22       Do you have any reason to
23 disagree with that?
24   A   I don't know the specifics, but if

1  that's what he testified to . . .
2    Q   Do you have a document signed in
3  writing, signed by M&C, agreeing to that division
4  of fees with Addison and Siprut?
5        MR. SOBLE:  Objection.  Relevancy.
6  BY THE WITNESS:
7    A   I don't know.
8  BY MR. COHEN:
9    Q   Did you look for that in the course of
10 attempting to locate documents responsive to our
11 discovery request and compliant with the Court's
12 discovery order?
13   A   Yes.
14   Q   You were not able to find one?
15   A   I found some e-mails that I believe
16 were produced.
17   Q   Those were e-mails by, between, and
18 amongst counsel, correct?
19   A   Correct.
20   Q   You did not find, or at least did not
21 produce, any e-mails in which M&C was a recipient
22 and responded approving of the fee division,
23 correct?
24   A   I mean, you're asking me to recollect

1  every e-mail that was produced.  I can't do that
2  here today.
3    Q   You have no evidence that M&C ever
4  signed or -- well, yeah, that M&C ever signed
5  anything approving of the division of attorneys'
6  fees that you reached as an agreement with Siprut
7  and Addison, correct?
8    A   I haven't seen it.
9    Q   Do you have any memory of any such
10 agreement?
11   A   I'm not the only one that communicated
12 with M&C.
13   Q   I appreciate that, but that wasn't my
14 question.
15       Do you have any memory of any
16 such agreement?
17   A   I don't have a recollection of it here
18 today.
19   Q   I've asked you -- I'm going to ask you
20 some questions.  They're just general propositions
21 of duty by attorneys in the context of class
22 actions and, generally speaking, I'm asking if you
23 agree or disagree with these things.
24       Do you agree or disagree that the

Page 110

1  duty of class counsel or potential class counsel,
2  above all, is to the class members as a whole as
3  opposed to any particular named plaintiff?
4      A    I disagree.
5      Q    Do you agree or disagree that the duty
6  owed to class clients, meaning named plaintiffs in
7  a putative class action, differs significantly from
8  the duty owed to a client in an individual
9  representation case?
10         THE WITNESS:  Can you read that back,
11  please?
12         (Whereupon, the record was
13         read as requested.)
14  BY THE WITNESS:
15      A    I don't know how to answer that.
16  BY MR. COHEN:
17      Q    Do you agree that David Oppenheim had
18  a fiduciary duty to the entire class, including
19  Medical & Chiropractic, when he worked at your
20  firm, but that his duty was not dependent upon any
21  special desire of Medical & Chiropractic?
22      A    I don't know how to answer that
23  question.
24      Q    Do you agree that the interests of

Page 111

1  Medical & Chiropractic, on the one hand, and
2  Technology Training, on the other hand, are not
3  materially adverse?
4         MR. SOBLE:  Can you read that back,
5  please?
6         (Whereupon, the record was
7         read as requested.)
8         MR. SOBLE:  Objection.  Calls for a
9  legal conclusion.
10  BY THE WITNESS:
11      A    I don't know how to answer that
12  question.
13  BY MR. COHEN:
14      Q    Do you agree that M&C's contention
15  about a reverse auction having occurred in the
16  Technology Training settlement can be remedied in
17  the ordinary course of the approval process of the
18  settlement?
19      A    No.
20      Q    Do you agree or disagree that any
21  fiduciary duty that David Oppenheim owed in the
22  Cin-Q action belonged to the putative class, not to
23  the named plaintiffs?
24         MR. SOBLE:  Object to the form and

Page 112

1  that calls for a legal conclusion.
2         THE WITNESS:  Can you read it back to
3  me again?
4         (Whereupon, the record was
5         read as requested.)
6  BY THE WITNESS:
7      A    I disagree.
8  BY MR. COHEN:
9      Q    Were you confident that you were going
10  to get class certification in the Cin-Q case?
11      A    Yes.
12      Q    Would you go so far as to say that it
13  was a certain outcome?
14         MR. SOBLE:  Object to the form of the
15  question.
16  BY THE WITNESS:
17      A    I would say that it was highly
18  probable.
19  BY MR. COHEN:
20      Q    Why?
21      A    Because we met all the elements.
22      Q    I assume you're speaking of the
23  Rule 23 prerequisites?
24      A    Yes.

Page 113

1      Q    Did BLP, Buccaneers Limited
2  Partnership -- Did BLP assert an affirmative
3  defense that plaintiff and potential class members
4  gave prior express permission to receive the
5  subject fax advertising?
6      A    I would have to review the submissions
7  in the case and the pleadings.
8         (Whereupon, Exhibit No. 6 was
9         marked for identification.)
10         (Whereupon, document tendered.)
11  BY MR. COHEN:
12      Q    I've handed you what's been marked as
13  Exhibit 6.
14         Can you identify this as the
15  Plaintiff's Motion and Supporting Memorandum For
16  Class Certification in the Cin-Q case?
17         (Whereupon, witness perusing
18         document.)
19  BY THE WITNESS:
20      A    It appears to be, yes.
21  BY MR. COHEN:
22      Q    Drawing your attention to Page 9, do
23  you see there's a new section, "Relevant Procedural
24  History," bolded and underlined?

29 (Pages 110 to 113)

Page 114

```
 1      A   Yes.
 2      Q   Do you see five lines down, there's a
 3 sentence that starts, "BLP asserted 15 affirmative
 4 defenses including . . ."?
 5      A   Okay.
 6      Q   And then three lines further down,
 7 over to the right, just after the parenthetical
 8 about eleventh affirmative defense, it says, and
 9 that, quote, "Plaintiff publicly" -- I'm sorry --
10 and that, quote, "Plaintiff and potential class
11 members invited faxes by advertising or displaying
12 their fax numbers publicly," close quotes, and it's
13 identified as BLP's Twelfth Affirmative Defense.
14           Do you see that?
15      A   Yes. I see that.
16      Q   Does that refresh your recollection
17 about whether BLP interposed an affirmative defense
18 of prior express permission or consent?
19      A   Well, I'm not sure they phrased it
20 that way. I'll rely on the pleading filed by my
21 law firm where they say they invited it by
22 displaying their fax numbers publicly. I'd have to
23 see their answer if they entitled it something
24 else.
```

Page 115

```
 1      Q   And your firm's entire position
 2 throughout your motion for class certification on
 3 the issue of whether that affirmative defense of
 4 prior consent or permission -- your firm's entire
 5 position on that in your class cert briefing was
 6 that prior permission or invitation was irrelevant
 7 because the opt-out notice was not compliant,
 8 correct?
 9           MR. SOBLE: Object to the form.
10 BY THE WITNESS:
11      A   I mean, whatever we have in the -- in
12 the brief is what we -- what we filed at that point
13 in time.
14 BY MR. COHEN:
15      Q   If you look at Page 14, the last
16 paragraph at the bottom, you write, "Defendants
17 sometimes argue a TCPA class is not ascertainable
18 because individualized inquiries are required into
19 which class members had an EBR with the defendant
20 or gave prior express invitation or permission.
21 That objection fails at the starting gate because
22 it has to do with whether common issues predominate
23 under Rule 23(b)(3), not ascertainability. More
24 important, neither EBR nor prior express permission
```

Page 116

```
 1 are available to BLP because its faxes lack
 2 compliant opt-out notice."
 3           Did I read that correctly?
 4      A   Yes.
 5      Q   Does that refresh your recollection as
 6 to whether that was the position you took in your
 7 class certification briefing in the Cin-Q case?
 8      A   Well, that's in the briefing.
 9      Q   And that argument that prior express
10 invitation or permission is not an available
11 affirmative defense in a TCPA case if the opt-out
12 notice is not compliant has been completely
13 rejected by the DC Circuit Court of Appeals, and it
14 is now the law of the land that solicited faxes are
15 not subject to the opt-out requirement, correct?
16           MR. SOBLE: Object to the form.
17 BY THE WITNESS:
18      A   I don't believe it's the law of the
19 land.
20 BY MR. COHEN:
21      Q   Have you won that argument in any
22 court yet?
23      A   I'm not here to -- get into the
24 other cases that we have and the other arguments
```

Page 117

```
 1 that we're making in other courts.
 2           MR. BLONIEN: Objection.
 3 Nonresponsive.
 4 BY MR. COHEN:
 5      Q   Is Alpha Tech versus Lagasse your
 6 case?
 7      A   Yes. That's one of the -- one of
 8 the -- We represent one of the class members in
 9 that case.
10      Q   And Judge Durkin just rejected your
11 suggestion that Bais Yaakov is not the law of the
12 land, didn't he?
13           MR. SOBLE: Objection. Relevancy.
14 BY THE WITNESS:
15      A   I don't have Judge Durkin's opinion
16 here.
17 BY MR. COHEN:
18      Q   Are you aware that Judge Durkin just
19 denied your -- denied class certification in your
20 case?
21      A   Yes. I'm aware that Judge Durkin
22 denied class cert in the case.
23      Q   Do you have an assessment as to
24 whether the Technology Training plaintiffs are
```

30 (Pages 114 to 117)

Page 118

1 adequate class representatives?
2         MR. SOBLE: Objection to the extent
3 that it calls for attorney work product-protected
4 materials and analysis that have not been put at
5 issue in this case.
6         MR. COHEN: Reverse auction puts them
7 at issue.
8 BY MR. COHEN:
9     Q    You can go ahead.
10        MR. SOBLE: No. We don't agree with
11 that, and I don't know that's consistent with
12 Judge McCoun's order, so I will advise the witness
13 not to disclose our work product privilege.
14 BY THE WITNESS:
15    **A    I can't answer your question without**
16 **disclosing work product, our work product, which is**
17 **constantly evolving as a result of information that**
18 **becomes available and the Eleventh Circuit decision**
19 **which has been rendered.**
20 BY MR. COHEN:
21    Q    You would agree that for purposes of
22 evaluating the adequacy of class representatives
23 under Rule 23, the requisite threshold of knowledge
24 is low, correct?

Page 119

1         MR. SOBLE: Object to the form of the
2 question.
3 BY THE WITNESS:
4    **A    I'm not sure I agree with your**
5 **characterization, nor am I here to give -- to give**
6 **legal opinions as to what constitutes adequacy in**
7 **general.**
8 BY MR. COHEN:
9    Q    Would you turn to Page 22 of your
10 class certification motion?
11        MR. BLONIEN: I object to that last
12 response as nonresponsive.
13 BY MR. COHEN:
14    Q    You see Section D, "Plaintiffs and
15 their counsel will adequately represent the class."
16 Subsection 1, "Plaintiffs are adequate class
17 representatives."
18        Do you see that?
19    **A    Yes. I see it.**
20    Q    Do you see the third line down, and
21 I'm quoting, "The required threshold of knowledge
22 is low."
23        Did I read that correctly?
24    **A    Yes.**

Page 120

1    Q    Is there a reason you file things in
2 court to persuade Judge Porcelli your class
3 representatives are adequate and then, under oath,
4 testify that you don't agree with your own
5 statements?
6         MR. SOBLE: Objection. Argumentative
7 and misstates what he said before.
8 BY MR. COHEN:
9    Q    You can answer.
10        THE WITNESS: Can you read the
11 question back, please?
12        (Whereupon, the record was
13        read as requested.)
14 BY THE WITNESS:
15    **A    I don't know how to answer that**
16 **question.**
17        **(Whereupon, Exhibit No. 7,**
18        **No. 8, No. 9, No. 10, No. 11,**
19        **No. 12, No. 13, No. 14, and**
20        **No. 15 were marked for**
21        **identification.)**
22        **(Whereupon, documents**
23        **tendered.)**
24

Page 121

1 BY MR. COHEN:
2    Q    Sir, I've handed you what we've marked
3 as Exhibits 7 through 15. I'll represent to you
4 this is production of documents by M&C in this
5 case, and all of the documents have M&C Bates
6 labeling at the bottom right hand indicating
7 exactly where they came from in M&C's production of
8 documents.
9         And I'll represent to you these
10 all appear to be term sheets or drafts or
11 iterations of term sheets for a potential
12 settlement of the Cin-Q/Buccaneers class action.
13        Have you seen all of these
14 documents before?
15        MR. SOBLE: I have a couple of
16 objections. First, your description is incomplete
17 since they also all have an OPP Bates label
18 indicating that they came from Mr. Oppenheim's
19 files before they were provided to M&C.
20        And, also, you want him to look
21 at Exhibits 7 through 15 before answering that
22 question, just to clarify? You want him to look at
23 all eight of them?
24        MR. COHEN: It was his production.

Thompson Court Reporters, Inc
thompsonreporters.com

Page 122

1    And if he can't recognize his own firm template,
2    then he can say he doesn't know, but, no; I'm not
3    going to sit here while he reads all of it unless
4    we go off the record and --
5           MR. SOBLE:  We're not going --
6           MR. COHEN:  -- then we can --
7           MR. SOBLE:  -- to go off the record.
8    If you show him an exhibit, he's entitled to read
9    it.
10          MR. COHEN:  Oh --
11          MR. SOBLE:  And you've shown him eight
12   exhibits --
13          MR. COHEN:  -- we will go off the
14   record because I'm not counting his review time as
15   my deposition time.
16          MR. SOBLE:  That's how depositions
17   work.  If you want him to read eight documents
18   together, he gets to read them, and --
19   BY MR. COHEN:
20       Q    Sir --
21          MR. SOBLE:  -- they're not --
22   BY MR. COHEN:
23       Q    -- is the answer no?
24          MR. SOBLE:  They're not his production

Page 123

1    because they're an Oppenheim production and then a
2    Medical & Chiropractic production.  He's neither of
3    those.
4           MR. COHEN:  That's a nonsensical
5    statement and -- make whatever record you want, and
6    then stop talking.
7           MR. SOBLE:  No.  I'm going to keep the
8    record clear of what the documents are.
9           MR. COHEN:  Make whatever record you
10   want and stop talking.  So tell me when you're done
11   talking so I can get back to the witness.
12          MR. SOBLE:  As soon as you say
13   something that's wrong and objectionable, I will
14   talk again.
15          MR. COHEN:  Are you done now?
16          MR. SOBLE:  I'm done now.
17          MR. COHEN:  Moron.
18   BY MR. COHEN:
19       Q    All right.  So you've got Exhibits 7
20   through 15 in front of you.  I'm not going to sit
21   here while you read them all.  And if you want to
22   say "Without reading them, I have no idea what they
23   are," that's fine.
24          Do you know what these are?

Page 124

1           (Whereupon, witness perusing
2           documents.)
3    BY THE WITNESS:
4       A    And is there a difference between 7
5    and 10?
6    BY MR. COHEN:
7       Q    They look the same to me.
8           (Whereupon, witness perusing
9           documents.)
10   BY THE WITNESS:
11      A    I have seen -- Yes.
12   BY MR. COHEN:
13      Q    Without disclosing which ones, as you
14   sit here today, do you know which ones of these
15   term sheets, Exhibits 7 through 15, were actually
16   transmitted either to Wayne Andersen for him to
17   forward to the Buccaneers or transmitted directly
18   to the Buccaneers?  Do you know which ones were
19   actually transmitted as settlement demands?
20      A    I know of at least one.
21      Q    And without disclosing which one it
22   was, to your knowledge, was it being transmitted as
23   an actual settlement proposal and demand on behalf
24   of the Cin-Q plaintiffs and the putative class, or

Page 125

1    was it being tendered for some other reason?
2       A    I know which one -- which one was
3    tendered, I know one that definitely was not, and I
4    know another one that was created for a different
5    purpose which was not our demand.
6       Q    Okay.
7       A    But I don't think I can say what the
8    purpose is without breaching the mediation
9    privilege.
10      Q    You've just said you know one that was
11   not tendered, one that was, and a third that was
12   not created as a true settlement demand from the
13   plaintiffs.
14          Was that one that was not created
15   as a true settlement demand from the plaintiffs --
16   was that transmitted either directly to the
17   Buccaneers or through the mediator?
18      A    I'm going to need to talk to counsel
19   to see whether I can answer that and whether my
20   answer is going to violate the privilege, so give
21   me a moment.
22          THE VIDEOGRAPHER:  Going off the
23   record at 2:44 p.m.
24          MR. COHEN:  We've been on for an hour.

Page 126

```
1              Do you want to take five minutes?
2         MR. SOBLE:  Yeah, sure.
3              (Whereupon, a brief recess
4              was had.)
5    BY MR. COHEN:
6         Q    Sir, we took a break for you to confer
7    with your counsel, and I'll represent to you
8    that --
9         THE VIDEOGRAPHER:  We've got to go
10   back on the record.
11        Going back on the record at
12   2:53 p.m.  This marks the beginning of Disc No. 3.
13        Please proceed.
14   BY MR. COHEN:
15        Q    Sir, we took a break for you to confer
16   with your counsel regarding an issue you perceived
17   a mediation privilege.
18             I'll represent to you that,
19   during the break, your counsel came in and
20   indicated an expectation that you would not be able
21   to answer the question.  In further discussion with
22   him regarding the very limited nature of what I was
23   seeking, it seemed to me he thought perhaps you
24   would, in fact, be able to ask -- answer the
```

Page 127

```
1    question.
2              To make it extremely clear, I'm
3    going to reask the question.  Okay?
4              I know there is one document out
5    of Exhibits 7 through 15 which you have told us is
6    not an actual settlement proposal or plan or demand
7    by the plaintiffs.  You've told us you do not feel
8    you can tell us why it was created if it was not
9    the plaintiffs' demand without invading privilege,
10   and so I'm not asking you that.  I'm also not
11   asking you to tell me which one it is.
12             Whichever one it is in there and
13   why ever it was created, was it, in fact,
14   transmitted to the Buccaneers or through the
15   mediator to the Buccaneers?
16        A    Yes.
17        Q    So I'm not saying all of these that
18   have the same fund or attorneys' fee are identical,
19   but what I'm seeing in here is that -- and you tell
20   me if I'm wrong -- Exhibits 7, 8, and 10 are term
21   sheets that talk about, in Paragraph 1, 343,122
22   faxes; in Paragraph 2, a settlement fund of
23   $92 million.
24        MR. SOBLE:  I don't think he can get
```

Page 128

```
1    into all of that.
2         MR. COHEN:  I'm just talking about
3    what the document says.
4         MR. SOBLE:  Okay.  I missed the
5    beginning of that question and I apologize.
6         MR. COHEN:  That's okay.  I'm just
7    categorize -- grouping the documents into --
8         MR. SOBLE:  Without getting into --
9    any way into what's given or not given or what was
10   negotiated --
11        MR. COHEN:  Right.
12        MR. SOBLE:  Okay.  I apologize.
13        MR. COHEN:  I'm just lumping them into
14   groups of similarity.
15   BY MR. COHEN:
16        Q    Is it okay with you if I just pick up
17   kind of where I was, or do you want me to start the
18   question?
19        A    I don't know.  Is there a question
20   yet?  I'm waiting for the question.
21        MR. SOBLE:  I definitely interrupted
22   him and I apologize.
23   BY MR. COHEN:
24        Q    I'm going to start again.
```

Page 129

```
1              7, 8, and 10, it appears in
2    Paragraph 1 of each is referencing 343,122 faxes.
3    In Paragraph 2, it's referencing a settlement fund
4    of $92 million.
5              And there does appear to be a
6    variability in the Paragraph 4(c), the fees to
7    class counsel.  Exhibit 7 and Exhibit 10 reference
8    a fee of 30 percent of the settlement fund or
9    $27,600,000, and Exhibit 8 references a 25 percent
10   fee on the settlement fund or $23 million, correct?
11        A    Yes.
12        Q    Okay.  And then Exhibit 9 is unique
13   among all the exhibits.  It does reference the same
14   in Paragraph 1, 343,122 faxes, but it describes a
15   fund in Paragraph 2 of $257,341,000, and it
16   references an attorneys' fee of 25 percent of the
17   settlement fund or $64,335,250, correct?
18        A    Yes.
19        Q    And then Exhibits 11, 12, 13, and 14
20   share some similarities in that Paragraph 1,
21   instead of referencing 343,000 and change faxes, it
22   references 131,011 persons.  In Paragraph 2, these
23   exhibits all reference a settlement fund of
24   $39,303,300, correct?
```

33 (Pages 126 to 129)

Page 130

1    A    Yes.
2    Q    And all three of these exhibits, 11,
3  12, and 13, reflect an attorneys' fee in
4  Paragraph 4(c) of 30 percent of the settlement fund
5  or $11,790,990, correct?
6    A    Yes.
7    Q    And then the last one is Exhibit 15,
8  and Exhibit 15 references in Paragraph 1 that the
9  parties, quote, "have reached a settlement in
10  principle, parentheses (subject to the execution
11  and approval of a formal settlement agreement),
12  close paren, of the above-captioned case on the
13  terms set forth herein."
14          Did I read that correctly?
15    A    Yes.
16    Q    And in Paragraph 2, it references the
17  approximately 131,000 persons in the class,
18  correct?
19    A    Okay.
20    Q    And in Paragraph 3, it indicates
21  defendant will make a total of $16 million
22  available as the settlement fund to pay claims,
23  incentive awards, and attorneys' fees and expenses
24  and notices and administration costs, correct?

Page 131

1    A    Yes.
2    Q    And it indicates in Paragraph 4(c),
3  without specifying numerically what the attorneys'
4  fee would be, it says it would be 25 percent of the
5  settlement fund, correct?
6    A    Yes.
7    Q    Okay.  So we can set these aside for a
8  little while.
9          Were you at any point in time
10  from the first inception of settlement talks with
11  the Buccaneers through to the settlement of the
12  Technology Training case confident that you were
13  going to be able to reach a settlement with the
14  Buccaneers on a class basis?
15    A    I was optimistic that we could reach
16  one.
17    Q    Did you have that same level of
18  optimism throughout the entire process and period?
19    MR. SOBLE:  Object to the form.
20  BY THE WITNESS:
21    A    No.
22  BY MR. COHEN:
23    Q    As of May 2nd, 2016 -- and I
24  understand you didn't have specific recollection of

Page 132

1  when an impasse was declared, but I'll ask you to
2  assume for purposes of my question that the
3  mediator, Wayne Andersen, declared an impasse on
4  May 2nd, 2016.
5          As of that date, what was your
6  level of confidence, if any, that you were going to
7  be able to reach a class settlement with the
8  Buccaneers?
9    MR. SOBLE:  I object to the form of
10  the question.
11  BY THE WITNESS:
12    A    I was optimistic that we could reach a
13  settlement with the Buccaneers based on
14  communications that I had received from the
15  mediator after David left the firm.
16  BY MR. COHEN:
17    Q    Mr. Oppenheim left the firm -- your
18  firm as of April 8th, 2016, correct?
19    A    It was a Thursday, yes.
20    Q    And you received some communication
21  from the mediator after April 8th that gave you
22  optimism that you'd be able to reach a settlement
23  with the Buccaneers?
24    A    Correct.

Page 133

1    Q    What form did that communication take?
2  By that I mean, was it a phone call, was it a
3  letter, was it an e-mail?
4    A    I believe it was an e-mail, and it may
5  have also included a phone call.
6    Q    Do you recall the specific date?
7    A    This would be the Friday over the
8  weekend and through the Monday.  So that would have
9  been, what, the 9th?
10    Q    The reason I ask -- and I would have
11  asked anyway, but I'll represent to you that
12  Ross Good was deposed and, although he did not say
13  he was certain, he seemed relatively confident that
14  a communication had been received from Wayne
15  Andersen by e-mail and he -- that gave him
16  confidence that you were going to be able to get a
17  settlement, and he said, to his best recollection,
18  it was April 18th, which would have been ten days
19  after Mr. Oppenheim left.
20    A    It could have been.
21    Q    Okay.
22    A    It could have been.
23    Q    Okay.  I just wanted to try and
24  figure --

34 (Pages 130 to 133)

Page 134

1     A    It was -- Well, it was after David
2  left, and it was before we became aware of the suit
3  filed in Florida.
4     Q    Okay.  And I -- My only goal was to
5  try and figure out, are we probably talking about
6  the same communication --
7     A    We're talking about the only
8  communication that we had --
9     Q    Okay.
10    A    -- with -- with Judge Andersen.
11    Q    Whatever increased optimism you had
12  about the ability to get a class settlement done
13  with the Buccaneers based upon Judge Andersen's --
14  we'll assume it's April 18th of 2016, did you still
15  have that level of optimism as of May 2nd, 2016,
16  when Judge Andersen filed the impasse?
17    A    I can't tell you as I sit here today.
18    Q    Would you have requested that Judge
19  Andersen file an impasse on May 2nd, 2016, if, in
20  fact, you were still carrying a significant level
21  of optimism based on an April 18th communication
22  from Judge Andersen?
23    A    As I sit here today, I don't
24  recollect.

Page 135

1     Q    As of May 2nd, 2016, the day I'll ask
2  you to assume Judge Andersen filed the Notice of
3  Impasse, did you have any additional mediation
4  sessions scheduled with the Buccaneers?
5     A    Did I?  No.
6           (Whereupon, Exhibit No. 16 was
7           marked for identification.)
8  BY MR. COHEN:
9     Q    Sir, I'm handing you what's been
10  marked as Exhibit 16.
11          (Whereupon, document tendered.)
12  BY MR. COHEN:
13    Q    Are you able to recognize this as an
14  e-mail chain from March 11th of 2015?
15          (Whereupon, witness perusing
16          document.)
17  BY THE WITNESS:
18    A    What was the question?
19  BY MR. COHEN:
20    Q    Are you able to recognize this as an
21  e-mail chain in which you were a participant on
22  March 11, 2015?
23    A    Yes.
24    Q    And so what we see in the middle is an

Page 136

1  e-mail from you on March 11, 2015, at 12:08 p.m.
2  to -- and I'm just saying last names, not to be
3  rude, but only to get through them quicker -- to
4  Oppenheim, Addison, Good and Kelly; "Subject:
5  Mediation Communication in the Cin-Q case," and
6  your statement, "There is no reason to keep running
7  the meter with Rod" -- that would be Rodney Max,
8  the mediator, correct?
9     A    Correct.
10    Q    Continuing -- "the def" -- for
11  "defendant" -- "The defendant does not want to
12  settle the case and won't until there is a
13  judgment."
14          Did I read that correctly?
15    A    Yes.
16    Q    Was that your serious, sincere, and
17  genuine assessment of the prospects of settlement
18  at that time?
19    A    This was a year before we were just
20  talking about, yes, that's correct.  I wouldn't
21  have written it unless it was.
22          (Whereupon, Exhibit No. 17 was
23          marked for identification.)
24

Page 137

1  BY MR. COHEN:
2     Q    I'm handing you what's been marked as
3  Exhibit 17.
4           (Whereupon, document tendered.)
5  BY MR. COHEN:
6     Q    Do you recognize this as an e-mail
7  chain in which you were a participant spanning
8  August 28th of 2015 through September 1st of 2015?
9           (Whereupon, witness perusing
10          document.)
11  BY THE WITNESS:
12    A    Actually, I see one on August 27th on
13  the last page.
14  BY MR. COHEN:
15    Q    Oh, and I said "28th," didn't I?  So
16  August 27th through September 1st of 2015.
17    A    Yes.
18    Q    Okay.  And, in part, this is some
19  communications between yourself and Mr. Siprut,
20  correct?
21    A    Yes.
22    Q    And on Page 2 of the document -- of
23  the exhibit, Bates page MC 337, at the bottom, you
24  say to Mr. Siprut, "You do not represent our

Page 138

1  plaintiffs. You are not class counsel. We agreed
2  to handle the case and pay you if we get paid.
3  That is it."
4          Did I read that part correctly?
5      A   Yes.
6      Q   And then there's some other stuff
7  you're talking about in there after that; but if
8  you'll turn the page to Bates Page 338, your last
9  sentence of that e-mail to Mr. Siprut is, "We made
10 it clear to you" -- I'm sorry -- "We made it clear
11 that you would not be a part of the process as you
12 wanted to be."
13         Did I read that correctly?
14     A   Yes.
15     Q   So did Mr. Siprut provide any
16 significant contribution to the attorneys' services
17 in furtherance of the Cin-Q case or benefit to the
18 class?
19     A   He refused to take a lowball
20 settlement to resolve the case.
21     Q   That was the extent of his
22 contribution, correct?
23     A   Well, whatever he did for his
24 plaintiffs up to the point in time that -- that we

Page 139

1  got involved for -- for his people.
2      Q   But as far as benefiting the class as
3  opposed to anything he may have done for his
4  specific plaintiffs, the extent of the contribution
5  of benefit he conferred upon the class, as far as
6  you know, was declining a low settlement offer?
7      MR. SOBLE: Objection. Misstates his
8  testimony.
9  BY THE WITNESS:
10     A   He declined a low -- a low settlement
11 offer.
12 BY MR. COHEN:
13     Q   Okay. So we've talked about the fact
14 that there's a fee split arrangement between your
15 firm, Mike Addison's firm, and Mr. Siprut, and
16 maybe some colleagues he's --
17     A   Whoever his person is down in Florida
18 that brought him the case.
19     Q   Sure. Is it fair to say that
20 Mr. Siprut's agreed portion of any fees that might
21 be generated was not based upon his anticipated
22 work that he would be doing on the case?
23     A   He had already done quite a bit of
24 work on two different cases he had filed. I

Page 140

1  believe there were two. He had multiple plaintiffs
2  from the referring attorney who I thought was his
3  co-counsel down in Florida whose name escapes me.
4          So he had the Stein case and he
5  had the Accounting To You case. There were two
6  separate cases. One case, his plaintiff got picked
7  off, and he appealed to the Eleventh Circuit and
8  got the Eleventh Circuit to reverse the trial
9  court.
10         I'd have to look and see what he
11 did with respect to the Stein case, but he had two
12 different cases.
13     Q   As you understand it, and I'll ask you
14 to assume -- Since I think you said you weren't
15 positive of the numbers, I'll ask you to assume
16 that Mr. Addison confirmed that Joe Siprut is to
17 get 16 percent of any attorneys' fees generated in
18 a resolution of the Cin-Q class action.
19         Was Mr. Siprut's 16 percent share
20 based on his proportion of work contributing to the
21 end result?
22     MR. SOBLE: Object to the form of the
23 question.
24

Page 141

1  BY THE WITNESS:
2      A   We were aware of and were provided
3  with his time and expense records, I believe, on
4  his two cases, which he claimed a substantial
5  amount of time and expense up through -- through
6  the date, but no written discovery had proceeded in
7  any of his cases since our case was quite -- quite
8  far along and just about completed with discovery
9  compared to where he was.
10 BY MR. COHEN:
11     Q   And I appreciate the answer. It does
12 have responsive information in it, but it sounds
13 like, given the amount of effort you had put into
14 your case, the amount of time, the more advanced
15 state you were at with discovery when he had not
16 initiated formal discovery, you would agree that,
17 to the extent Joe Siprut was promised 16 percent of
18 the fee share, that was not based upon the
19 proportion of work he invested in any way, shape,
20 or form for the benefit of the class as compared to
21 that which you and Mr. Addison invested, correct?
22     A   I don't know how to answer your
23 question because he had done work on behalf of two
24 cases that involved the same class, the same

Page 142

1    defendants, and he was contacted and offered a sum
2    of money to settle the case, I believe by
3    Mr. Postman, on a class-wide basis. So he had not
4    done any work in our case. I can say that to you.
5    I don't know how to answer the rest of your
6    question.
7         Q    But you've already said that other
8    than declining the low class settlement offer by
9    Mr. Postman, none of Mr. Siprut's work directly
10   benefited your case or an attempt to benefit the
11   class, correct?
12        A    Benefit the class because the class
13   wasn't left with a ridiculously low settlement to
14   claim into.
15        Q    But that's what I -- I acknowledge you
16   said declining that offer was a benefit to the
17   class, but that was the only class benefit that
18   Mr. Siprut and his time brought to benefit the
19   class or to facilitate or enhance your case,
20   correct?
21        A    I mean --
22             MR. SOBLE: Object to --
23   BY THE WITNESS:
24        A    -- I --

Page 143

1              MR. SOBLE: Object to the form of the
2    question. It's asked and answered.
3    BY THE WITNESS:
4         A    I haven't analyzed all the possible
5    iterations of what he brought to the table, and
6    maybe he had some things to add. But he did not
7    work on our case, and he had two cases. He
8    received offers, monetary offers, to settle the
9    case, and he refused them.
10   BY MR. COHEN:
11        Q    What about his lodestar? You
12   indicated he did submit to you his time and costs.
13   How did his lodestar compare to yours, yours and
14   Mike Addison's combined?
15        A    You know, I don't recall what the
16   specifics were of that.
17        Q    You wouldn't --
18        A    Compared to mine, I wasn't -- we
19   actually did the work in the case. We just -- We
20   had played around with the appeals just to be able
21   to bring a case.
22        Q    You would not expect that Mr. Siprut's
23   total lodestar time that he submitted to you is
24   anywhere near 16 percent of the total attorney time

Page 144

1    that you and Mr. Addison invested, would you?
2         A    I don't know.
3         Q    So Mr. Siprut then responded to your
4    April 28th e-mail on September 1st, which was the
5    day after your mediation with Judge Andersen,
6    correct?
7              MR. SOBLE: Did you say "August" or
8    "April"?
9              MR. COHEN: Let me just repeat it in
10   case I got the date wrong.
11   BY MR. COHEN:
12        Q    We're looking at a response e-mail
13   from Joe Siprut dated September 1, 2015, asking
14   "How did it go yesterday?" And the "Subject" says
15   "Re: Bucs mediation on Monday."
16             I'm assuming Mr. Siprut would be
17   referring to your mediation with Judge Andersen on
18   August 31, 2015, correct?
19        A    I'm not sure. Did we have one on that
20   date? I don't have -- I don't have these dates
21   memorized.
22        Q    Okay. I'll ask you to --
23        A    Assuming that one took place, that is
24   what I understood he was referring to. The e-mail

Page 145

1    says what it says.
2         Q    And at the top of that page,
3    Bates MC 337, which is Exhibit 17, you responded to
4    him on September 1, 2015. You said, "They finally
5    made a monetary offer, but it is well short of
6    where they need to be. Unfortunately, the person
7    who makes the decisions wasn't there, and they want
8    a couple of days to talk to him. I don't see this
9    as happening at this time, but it is a start of a
10   dialogue."
11             Did I read that right?
12        A    Yes.
13        Q    When you said that, was that an
14   expression of your serious, sincere, and genuine
15   assessment?
16        A    Of course; I wouldn't have said it
17   otherwise.
18             (Whereupon, Exhibit No. 18 was
19             marked for identification.)
20             (Whereupon, document tendered.)
21   BY MR. COHEN:
22        Q    Handing you what we've marked as
23   Exhibit 18, this is another e-mail chain that
24   overlaps in part with what we saw in Exhibit 17.

37 (Pages 142 to 145)

Page 146

1    It's got your dialogue with Mr. Siprut that we just
2    read and then -- and this is on Page 1, MC 340,
3    it's an e-mail from Mike Addison on September 1st,
4    2015, to you, David Oppenheim, and Ross Good,
5    "Could we talk today about the status and the
6    proposal that the mediator conveyed at the end.  I
7    am not sure I understand what it is that they are
8    proposing in terms of payment to an open-ended
9    number of claims submitted out of the 340,000 faxes
10   that were sent and received."
11           Did I read that correctly?
12      A    Yes.
13           (Whereupon, Exhibit No. 19 was
14           marked for identification.)
15           (Whereupon, document tendered.)
16   BY MR. COHEN:
17      Q    Handing you what we have marked as
18   Exhibit 19, once again, some of the early part of
19   this e-mail carries forward from Exhibits 17 and
20   18.
21           On Page 1 of this Exhibit 19,
22   MC 3574, there's an e-mail from Mr. Addison that
23   states -- Well, there was a question posed by
24   Ross Good:  "Is there anything we still need to

Page 147

1    discuss together?"  And Mr. Addison's answer was,
2    "Yes."  And then he asks, "Does the recent caselaw
3    indicate that a settlement of the type proposed by
4    Judge Andersen should be evaluated for attorneys'
5    fees as a lump sum of $300 per fax times 343,000
6    fax recipients or, instead, is it evaluated only
7    after claims?"
8           Did I read that correctly?
9      A    Yes.
10      Q    And I'm looking up at the -- Well, I
11   look at the page before that or the next page which
12   temporally, sequentially, came first, and I see an
13   e-mail from you.  And then on Page 1 above what I
14   just read, I see an e-mail from Ross Good to
15   Addison, Wanca, and Oppenheim.
16           Is it fair to say that the
17   portion I just read from Mike Addison on
18   September 2nd at 2:04 p.m., you would have been a
19   recipient of that?
20      A    I'm sorry.  That was so long.  What --
21   What is the question?
22      Q    You would have been a recipient of
23   this e-mail from Mike Addison on September 2nd,
24   2015, at 2:04 p.m. because you were shown on an

Page 148

1    earlier e-mail as actually participating in the
2    dialogue, and then you're shown in the last part of
3    the e-mail chain as a recipient of Ross Good.
4           So you would have seen this
5    e-mail from Mike Addison, correct?
6      A    You mean the middle one on the page?
7      Q    Yes.
8      A    I can't tell you for sure the way this
9    is produced.
10      Q    But if we look at the top, when
11   Ross Good sends this e-mail on Wednesday,
12   September 2nd, at 10:24 p.m. to Mike Addison, Brian
13   Wanca, and David Oppenheim, you would have received
14   that, and it would have carried forward Mike
15   Addison's e-mail immediately below it, correct?
16      A    I -- I can't tell you.
17      Q    Isn't that the way e-mails work?
18      A    I don't know.
19           (Whereupon, Exhibit No. 20 was
20           marked for identification.)
21           (Whereupon, document tendered.)
22   BY MR. COHEN:
23      Q    Showing you what we've marked as
24   Exhibit 20, on the first page of this exhibit,

Page 149

1    which is MC 5086, we have an e-mail from you at the
2    bottom, Monday, September 21, 2015, at 9:25 a.m.,
3    Brian Wanca wrote, quote, "What do we say the
4    number of unique fax numbers is?"  Question mark,
5    close quote.
6           Did I read that right?
7      A    Yes.
8      Q    And then Ross Good responded and
9    that's redacted, and then you replied to Mr. Good
10   and Mr. Oppenheim, quote, "We should get Andersen
11   to confirm they are putting up a fund of" --
12   redacted blank -- "confirm our number of unique fax
13   numbers and the fund amount, but that was their
14   offer when we left the mediation so this is nothing
15   new."
16           Did I read that right?
17      A    Yes.
18           (Whereupon, Exhibit No. 21 was
19           marked for identification.)
20           (Whereupon, document tendered.)
21   BY MR. COHEN:
22      Q    Exhibit 21 is an e-mail from
23   Michael Gardner on Tuesday, September 29, 2015, to
24   David Oppenheim, subject is "Cin-Q v Buccaneers."

38 (Pages 146 to 149)

Page 150

1    It references an attachment, Exhibit 7, and then
2    Mr. Gardner -- He worked for your firm, correct?
3       **A    Yes.**
4       Q    Was he an attorney or --
5       **A    He was a paralegal that did our**
6    **discovery work.**
7       Q    Mr. Gardner says, "Exhibit 7 to the
8    Biggerstaff report, 131,011 unique fax numbers,
9    343,122 total faxes," correct?
10      **A    That's what it says, yes.**
11      Q    And as we sit here today, is that your
12   understanding of the number of unique fax numbers
13   and the total number of faxes sent advertising the
14   Buccaneers stuff?
15      **A    I have no reason to believe that it**
16   **was changed after this -- maybe I'll see something,**
17   **where it was.  It comes out of the expert report,**
18   **so I don't think his report has been amended.**
19              **(Whereupon, Exhibit No. 22 was**
20              **marked for identification.)**
21              **(Whereupon, document tendered.)**
22   BY MR. COHEN:
23      Q    Handing you what we've marked as
24   Exhibit 22, this is an e-mail between you and

Page 151

1    Mr. Oppenheim dated September 29, 2015.
2    Mr. Oppenheim writes to you something that's
3    redacted, and then what's left unredacted, he says,
4    "Mine is a payout of $31.25 million."
5              Did I read that right?
6       **A    Yes.**
7       Q    And you responded on the same date,
8    quote, "I would push the fees to 30 percent," close
9    quote, right?
10      **A    Yes.**
11      Q    And when Mr. Oppenheim writes "Mine is
12   a payout of 31.25 million," in the parlance and
13   terminology used within your firm to discuss class
14   settlement proposals, am I correct that the
15   reference to a payout being a certain figure takes
16   account of the size of the fund, a percentage
17   attorneys' fee on that fund, plus litigation
18   expenses, incentive awards, and then an anticipated
19   claim rate?
20              Is that -- Am I correct that is
21   what Mr. Oppenheim's reference to a payout would
22   take into account and incorporate?
23      **A    That's what he did.**
24

Page 152

1              (Whereupon, Exhibit No. 23 was
2              marked for identification.)
3    BY MR. COHEN:
4       Q    I'm handing you what we have marked as
5    Exhibit 23.
6              (Whereupon, document tendered.)
7    BY MR. COHEN:
8       Q    This is additional e-mails between you
9    and Mr. Oppenheim on the same day, September 29,
10   2015.  We start on this e-mail with the previous
11   e-mail we saw in Exhibit 22, Mr. Oppenheim saying,
12   after a redaction, "Mine is a payout of
13   $31.25 million."  Mr. Oppenheim follows up and
14   says, "How is this, now $35.75 million," correct?
15      **A    Yes.  I see that.**
16      Q    And you responded on September 29,
17   2015, at 4:59 p.m., "I'm not going down from,
18   dollar sign, $92," correct?
19      **A    Yes.**
20      Q    Is it fair to say that when we see
21   references to $31.25 million, we see references to
22   $35.75 million, that when we read your closing
23   e-mail, "I'm not going down from, dollar sign,
24   $92," that the meaning is, "I'm not going down from

Page 153

1    $92 million"?
2              MR. SOBLE:  Do you want to have a
3    quick discussion?
4              MR. COHEN:  Okay.  We'll go off the
5    record.  I assume this is relating to an issue of
6    privilege.
7              MR. SOBLE:  We'll come right back.
8              THE VIDEOGRAPHER:  Going off the
9    record at 3:32 p.m.
10             (Whereupon, a brief recess
11             was had.)
12             THE VIDEOGRAPHER:  Going back on the
13   record at 3:34 p.m.
14             Please proceed.
15             THE WITNESS:  Can you read the
16   question back?
17             (Whereupon, the record was
18             read as requested.)
19   BY THE WITNESS:
20      **A    I don't see how the 31.25 and the**
21   **35.75 have any relationship to the $92 million fund**
22   **that I'm referring to.**
23   BY MR. COHEN:
24      Q    All right.  And I'm not even going to

Thompson Court Reporters, Inc
thompsonreporters.com



Page 154

1  argue with you because I -- for all I know, you may
2  be right. But am I correct that what you were
3  referring to when you said "I'm not going down
4  from, dollar sign, $92," is, I'm not going down
5  from a $92 million fund"?
6      A    Yes.
7      Q    And as with other things I've asked
8  you the same question, at the time you said that,
9  you were serious, sincere, and genuine?
10     A    Yes.
11          (Whereupon, Exhibit No. 24 was
12          marked for identification.)
13          (Whereupon, document tendered.)
14 BY MR. COHEN:
15     Q    Handing you what we've marked as
16 Exhibit 24, this is another e-mail, again, dated
17 September 29, 2015, I believe a little later in the
18 day because your statement on Exhibit 23, "I'm not
19 going down from $92 million," was at 4:59 p.m.
20 This is an e-mail from Mr. Oppenheim at 5:07 p.m.
21 It's Bates labeled MC 454. It's from Mr. Oppenheim
22 to you, attachments, "Bucs Settlement Term Sheet,
23 9/29/15." "Here is 92/30-payout of 36.25. Should
24 I share?"

Page 155

1          Did I read that correctly?
2      A    Yes.
3      Q    Would you agree the reasonable
4  interpretation of this is, "Here is a term sheet
5  describing a $92 million fund, a 30 percent
6  attorney fee, with an anticipated payout by the
7  defendant of everything on that fund of
8  $36.25 million?
9      A    That's what David meant, yes.
10          (Whereupon, Exhibit No. 25 was
11          marked for identification.)
12          (Whereupon, document tendered.)
13 BY MR. COHEN:
14     Q    Showing you what I've marked as
15 Exhibit 25, this is an e-mail chain on
16 September 29th and 30th, 2015, the first on the
17 29th, the same day we've been talking about earlier
18 only later in the evening, Mr. Oppenheim to
19 Mr. Addison, "This is their last offer plugged into
20 our term sheet. Our thinking is that we try to get
21 them to confirm/tell us what is different."
22          Did I read that correctly?
23     A    Yes.
24     Q    And then Mr. Addison writes back the

Page 156

1  next day, September 30, 2015, at 9:16 a.m., to both
2  Mr. Oppenheim and you, and the subject heading that
3  he inserted, which is not the same subject heading
4  that Mr. Oppenheim had had in his earlier e-mail,
5  is "Term Sheet to Submit For Bucs Review and
6  Approval or Comment."
7          Did I read that correctly?
8      A    The "Subject" line?
9      Q    Yes.
10     A    Yes.
11          (Whereupon, Exhibit No. 26 was
12          marked for identification.)
13          (Whereupon, document tendered.)
14 BY MR. COHEN:
15     Q    Handing you what we've marked as
16 Exhibit -- sorry -- 26, this is an e-mail chain of
17 November 2nd, 2015, and -- yeah; they all seem to
18 be November 2nd. I'm focused on the first page,
19 which is MC 3252. Mr. Addison writes to you,
20 copying Oppenheim, Good, and Hara; "Subject:
21 Status of Mediation-Judge Andersen?" And the first
22 question by Mr. Addison, "Brian, any news from
23 Judge Andersen on the status of continuing
24 mediation discussions with the Bucs," correct?

Page 157

1      A    Yes.
2      Q    And your response was, "I don't
3  believe David has received a response through
4  J. Andersen or directly from Mester," correct?
5      A    Correct.
6          (Whereupon, Exhibit No. 27 was
7          marked for identification.)
8          (Whereupon, document tendered.)
9  BY MR. COHEN:
10     Q    Handing you what we've marked as
11 Exhibit 27, this is a series of e-mail
12 communications that appear to start on Page 3 of
13 the e-mail, which is Bates page MC 5134, an e-mail
14 from Mark Mester to Wayne Andersen on December 2nd,
15 2015, carried forward to a final e-mail at the top
16 of Page 1 from you to Mr. Addison and Mr. Oppenheim
17 on December 8, 2015, correct?
18     A    Yes.

Thompson Court Reporters, Inc
thompsonreporters.com



Page 158

```
1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 160

```
1
2
3
4
5
6
7
8
9
10
11
12
13                                                    t
14
15
16
17
18
19
20
21
22
23
24
```

Page 159

```
1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 161

```
1
2
3
4
5
```
```
6     Q     And so on Page 1 of this e-mail,
7   December 8th of 2015, 10:34 a.m., you weigh in,
8   from Brian Wanca to Addison and Oppenheim, and you
9   say, "You are correct.  They are trying to pay" --
10  redacted blank -- "no way, Jose, to that!
11  Exclamation point."  Right?
12     A     That's what it says.
13               (Whereupon, Exhibit No. 28 was
14               marked for identification.)
15  BY MR. COHEN:
16     Q     This is Exhibit 28.
17               (Whereupon, document tendered.)
18  BY MR. COHEN:
19     Q     This is an initiating e-mail from
20  Brooke at JAMS about possibly scheduling to
21  reconvene with Judge Andersen, and there's an
22  e-mail from you, December 16, 2015, 4:26 p.m., and
23  you write, "Who said anything about Andersen?
24  Question mark -- I'm not wasting any more money
```

Thompson Court Reporters, Inc

thompsonreporters.com

Page 162

1    until they respond to a written term sheet in
2    writing."
3          Did I read that right?
4    A    Yes.
5          (Whereupon, Exhibit No. 29 was
6          marked for identification.)
7          (Whereupon, document tendered.)
8    BY MR. COHEN:
9    Q    Showing you Exhibit 29, this is an
10   e-mail from Mike Addison to Ross Good, yourself,
11   and Mr. Oppenheim dated January 14th, 2016, and
12   Mike Addison asks in the next to last sentence --
13   or he states in the next to last sentence, "I also
14   saw the e-mails between David and Brian rejecting
15   further mediation efforts proposed by Mester and
16   Judge Andersen."
17         Did I read that right?
18   A    Yes.
19   Q    Is that correct that at that time
20   there were e-mails between David Oppenheim and
21   yourself rejecting further mediation efforts
22   proposed by Mester and Judge Andersen?
23   A    I'm not aware of any other than the
24   December 16th e-mail from me to David on

Page 163

1    Exhibit 28.
2          (Whereupon, Exhibit No. 30 was
3          marked for identification.)
4          (Whereupon, document tendered.)
5    BY MR. COHEN:
6    Q    Showing you what we've marked as
7    Exhibit 30, this is an e-mail chain running a
8    period of time from August 17th of 2015 in the
9    initiating e-mail all the way to January 19th,
10   2016, on the last of them, and there's an 11/4/2015
11   e-mail on Page 2.  That's MC 31271.  It's from
12   Mike Addison to David Oppenheim.  And in the second
13   paragraph, Mr. Addison says, "There does not seem
14   to be any interest on the part of the Buccaneers in
15   the Cin-Q case to get serious."
16         Did I read that right?
17   A    Yes.
18         (Whereupon, Exhibit No. 31 was
19         marked for identification.)
20         (Whereupon, document tendered.)
21   BY MR. COHEN:
22   Q    Handing you what I've marked as
23   Exhibit 31, do you see the first page of this is an
24   e-mail from David Oppenheim to Judy" -- how do you

Page 164

1    pronounce that?
2    A    Siano.
3    Q    -- [continuing] Siano.
4          She works for you?
5    A    Yes.
6    Q    And Mr. Oppenheim says to her on
7    March 15, 2016, "Can I get expenses?  Thanks," and
8    the "Subject" was "Cin-Q v Buccaneers," correct?
9    A    Yes.
10   Q    And on Page 2 of this exhibit, there's
11   an e-mail from Ms. Siano to Mr. Oppenheim and
12   yourself, same date, March 15th, 2016, with a PDF
13   attachment, and Ms. Siano says, "Dave, total
14   expenses are $220,102.55," correct?
15   A    Yes.
16   Q    So to the extent that your costs in
17   the M&C case paid to Foley for fees and litigation
18   costs are well in excess of $500,000, you have
19   vastly exceeded in paying Foley to prosecute this
20   M&C litigation -- you have vastly exceeded your
21   total expenses in all your years of prosecuting the
22   Cin-Q and M&C action, right?
23   A    I don't know what they are today.
24   Q    Well, even if they're -- Oh, what your

Page 165

1    Cin-Q expenses are?
2    A    Yes.
3    Q    But well in excess of $500,000 is a
4    lot more than $220,000, right?
5    A    I agree with your math.
6    Q    Thank you.
7          (Whereupon, Exhibit No. 34 was
8          marked for identification.)
9          (Whereupon, document tendered.)
10   BY MR. COHEN:
11   Q    Showing you what we've marked as
12   Exhibit 34 --
13         MR. COHEN:  And, yes, I'm jumping.
14         MR. SOBLE:  So we're skipping 32 and
15   33?
16         MR. COHEN:  Yes.
17         MR. SOBLE:  Do you expect to come back
18   to them?
19         MR. COHEN:  Yeah.
20         MR. SOBLE:  Okay.
21   BY MR. COHEN:
22   Q    Showing you what's been marked as
23   Exhibit 34, can you confirm this is an e-mail chain
24   between yourself and Phil Bock on May 12th of 2016?

42 (Pages 162 to 165)

Page 166

1    A    Yes.
2    Q    You start by saying, "Why are you
3  filing over me?" Phil Bock responds, "Brian, we've
4  had this discussion before.  We've never had any
5  agreement that precludes an overlapping or related
6  case where our firms are not actively working
7  together on a case."  And you replied, "Do you
8  really want to go down this path?  Question mark?
9  I have never done this to you."
10        Did I read that right?
11    A    Yes.
12    Q    Never done what to you?
13    A    Filing over him.
14        MR. SOBLE:  How long have we been on
15  the record?
16        THE VIDEOGRAPHER:  Four hours and
17  12 minutes.
18        MR. SOBLE:  Okay.
19  BY MR. COHEN:
20    Q    You and Bock Law Firm prosecuted a
21  TCPA putative class action against BMW?
22    A    They did.
23    Q    Who is "they"?
24    A    Bock's firm.

Page 167

1    Q    Who's the plaintiff in that case?
2  City Select?
3    A    City Select.
4    Q    So City Select is Bock Law Firm's
5  client?
6    A    I thought it was a joint client at one
7  point, but I'm not sure today.
8    Q    Who originated that claim?
9    A    I think we did.
10    Q    So what's your understanding of what
11  happened in that City Select versus BMW case up to
12  the present time, just the big highlights?
13        MR. SOBLE:  Object to the form of the
14  question.
15        MR. COHEN:  It's a term of art, "big
16  highlights."
17        MR. SOBLE:  Subjective term of art.
18  BY THE WITNESS:
19    A    Bock's firm filed the case, took
20  discovery, moved for class certification, and
21  certification was denied.  They went up to the
22  Court of Appeals, and the law in that circuit on
23  ascertainability was different than the law in
24  other circuits.

Page 168

1        My understanding is that the
2  appeal was argued, a decision was rendered giving
3  them the opportunity to take another shot at it on
4  ascertainability.  And after that case was on
5  appeal, we had a client of ours that received a
6  fax.  We tried to bring a case.
7  BY MR. COHEN:
8    Q    Received a fax advertising BMW?
9    A    Advertising Credit Smart, BMW, right.
10    Q    And when you say "We tried to bring a
11  case," you mean Anderson + Wanca filed a new,
12  separate cause of action with that named plaintiff,
13  that other named plaintiff, in a different
14  jurisdiction and venue seeking to pursue a putative
15  class action?
16    A    Yes.
17    Q    And you said, if I understood you
18  correctly, that at some point after the trial
19  court had initially denied certification in the
20  City Select BMW case, you had a client who received
21  a fax advertising Credit Smart and BMW.  In fact,
22  the -- that other client had received that fax
23  before the faxes that City Select received, hadn't
24  they?

Page 169

1    A    I don't know.  I'd have to look at the
2  dates.
3    Q    Was your firm named in the pleadings
4  filed on behalf of City Select in the District
5  Court prior to the denial of certification?
6    A    I don't know.  I'd have to look at it.
7  We never had our appearance entered.  We asked for
8  discovery and information as to what was filed in a
9  case that I think at some point someone from Phil's
10  office put our name on, but we never got any of the
11  information.
12    Q    So it's your testimony -- Because I'm
13  not positive and it's been a while, so I may just
14  be getting loose, as far as you understand, was
15  your firm named in the pleadings on behalf of the
16  plaintiffs in the City Select/BMW case?
17    A    We may have been at some point.
18    Q    Do you know whether your firm is --
19  Strike that.
20        Do you know whether the retainer
21  agreement by which City Select retained counsel to
22  prosecute the BMW case named your firm?
23    A    I don't think we ever got it.
24    Q    You don't think you ever got what?

43 (Pages 166 to 169)

Page 170

1      A    The retainer agreement.
2      Q    From whom?
3      A    Whoever submitted one to City Select,
4  whether that's the Pennsylvania counsel or Phil's
5  office or who.
6      Q    So you don't know whether you even
7  have a copy in your files of the retention
8  agreement by which City Select retained counsel to
9  prosecute the BMW putative class action?
10         MR. SOBLE: Objection. Asked and
11  answered.
12  BY THE WITNESS:
13     A    That's correct.
14  BY MR. COHEN:
15     Q    I thought you said City Select
16  originated as an Anderson + Wanca client.
17     A    We had gotten faxes for them and may
18  have filed one or more lawsuits on their behalf
19  before the BMW case was filed but haven't gotten
20  anything since, didn't get a response to our
21  request for the retainer agreement or any of the
22  discovery that was taken in the case.
23     Q    So now you're telling me that you
24  requested a copy of the City Select/BMW retainer

Page 171

1  agreement, and you didn't get it?
2      A    Yes.
3      Q    Did you make those requests in
4  writing?
5      A    I may have, yes, or other people at my
6  firm did.
7      Q    So taking everything you just said at
8  face value, you don't know one way or another
9  whether you are listed as counsel in the retention
10  agreement signed by City Select for the BMW case?
11     A    Correct.
12     Q    And after that certification was
13  denied initially by the District Court in the
14  City Select/BMW case, you went to the United States
15  District Court for the Central District of Illinois
16  and filed Foley Motors, Inc., versus BMW, et al,
17  correct?
18     A    Yes.
19     Q    Did you contact City Select to let
20  them know that you were going to file a class
21  action that overlapped with the class that they
22  were seeking to certify and that they were going to
23  be appealing the denial of certification on?
24     A    I think their appeal was already

Page 172

1  pending.
2         MR. BLONIEN: I'm sorry. Mr. Wanca,
3  I'm going to ask that you speak up. I can't hear
4  what you're saying which may lead to me asking the
5  same questions over again if I can't hear your
6  responses.
7         Can you please speak up?
8  BY THE WITNESS:
9      A    I think the appeal may have already
10  been pending.
11  BY MR. COHEN:
12     Q    Okay. So knowing that City Select,
13  a client that at least originally was an
14  Anderson + Wanca client, not knowing the extent to
15  which your firm was or was not listed as counsel of
16  record on pleadings in the City Select/BMW case,
17  not knowing, according to you, whether your firm
18  was listed in the retention agreement as one of the
19  firms being retained by City Select to prosecute
20  that case, and knowing City Select was appealing
21  the denial of certification, at the time you filed
22  Foley Motors versus BMW, did you contact City
23  Select to find out any of those things, and if, in
24  fact, you were listed as counsel of record, if, in

Page 173

1  fact, you were on the retention agreement, seek
2  City Select's permission and consent to proceed
3  with the overlapping Foley Motors case? Did you do
4  that?
5         MR. SOBLE: Object to form of the
6  question and to the fact that we're very far afield
7  from the actual issues in the case.
8  BY MR. COHEN:
9      Q    Did you do that?
10     A    I contacted their attorneys for the
11  retainer agreement and asked for the discovery and
12  got no response.
13     Q    But who -- If you were on the
14  pleadings in City Select/BMW and if you were on the
15  retention agreement in City Select/BMW, your duty,
16  according to you, was to City Select?
17         MR. SOBLE: Object --
18  BY THE WITNESS:
19     A    I never had --
20         MR. SOBLE: -- to the form of the
21  question.
22  BY THE WITNESS:
23     A    I never had an appearance in the case.
24

44 (Pages 170 to 173)

Page 174

1    BY MR. COHEN:
2        Q    But if you were on the retention
3    agreement, your duty was to City Select.
4             Did you contact City Select?
5             MR. SOBLE:  Object to the form of the
6    question.
7    BY THE WITNESS:
8        A    I contacted their attorneys.
9    BY MR. COHEN:
10       Q    I understand, sir.  Let's -- Let's --
11       A    That's all I can do is communicate
12   with counsel.  I can't go directly to people.
13            (Whereupon, witness and counsel
14            viewing computer screen.)
15   BY MR. COHEN:
16       Q    Sir, can you see, that's a retainer
17   agreement?
18       A    Yes, I see.
19       Q    City Select hiring counsel in regard
20   to a BMW Bank class action.
21       A    Right.
22       Q    It's the standard form contract that
23   yourself and the Bock Law Firm used many, many
24   times.  It's signed by City Select, Louis

Page 175

1    Pellegrini.  It's dated 7/26/2013.  It's signed by
2    Phil Bock, by yourself, and by Mr. Milstein,
3    correct?
4        A    Yes.
5        Q    Why didn't you call City Select and
6    get their permission for you to file this
7    overlapping BMW case on behalf of Foley Motors if
8    every argument you make in the M&C case about
9    duties running to individual plaintiffs is true?
10            MR. SOBLE:  Objection.  Asked and
11   answered.
12   BY THE WITNESS:
13       A    I didn't recall having that document.
14   I don't think we had the document in our custody
15   and control.  I asked for discovery and pleadings
16   in the case, and I did not get any.
17            (Whereupon, Exhibit No. 35,
18            No. 36, and No. 37 were
19            marked for identification.)
20   BY MR. COHEN:
21       Q    Sir, I'm handing you what we've marked
22   as Exhibits 35, 36, and 37.
23            (Whereupon, documents
24            tendered.)

Page 176

1    BY MR. COHEN:
2        Q    35 is M&C's Bates Page production
3    4520.  The bottom e-mail from David Oppenheim,
4    September 29, 2015, he says, "Here is their $300
5    per person offer superimposed on our term sheet and
6    my proposed counter.  Theirs is a payout at
7    5 percent of approximately $12 million.  Mine is a
8    payout of $31.25 million."
9             Did I read that correctly?
10       A    Yes.
11       Q    And then Mr. Oppenheim follows up.  He
12   says, "How is this?  Now $35.75 million."  You
13   respond, and this is an e-mail from you we've seen
14   before, "I'm not going down from, dollar sign, $92,
15   which you've confirmed is, "I'm not going down from
16   a $92 million fund," correct?
17       A    Yes.  Asked and answered before.
18       Q    And then Mr. Oppenheim follows up or
19   replies.  He says, "Weren't we at 94/25 percent at
20   the end of the mediation?"
21            Did I read that correctly?
22       A    That's what it says.
23       Q    Exhibit 36 is, in part, the same
24   e-mail except that it diverges or segues after you

Page 177

1    say -- and I'm paraphrasing -- that "I'm not going
2    down from a $92 million fund."  Mr. Oppenheim
3    responds, "Then what is the point of this
4    exercise?"  Correct?
5        A    I'm not sure that that's a response to
6    me or to what's underneath it.
7        Q    As we sit here today, are you prepared
8    to testify that it is, in fact, something other
9    than a response to what you said?
10       A    I can't tell.  You're asking me to say
11   that.  I -- I said I can't tell that.
12       Q    And Exhibit 37 is another e-mail that
13   starts with the initial Oppenheim 2:44 p.m. e-mail
14   on September 29, 2015, and it's a version that
15   we've also seen, this response from you in a
16   previous exhibit, "I would push the fees to
17   30 percent," and Mr. Oppenheim replies at the top,
18   "That's going up from last proposal."
19            Did I read that correctly?
20       A    That's what it says.
21       Q    In your experience, is that what
22   reasonable negotiation is --
23            MR. SOBLE:  Object to the form of the
24   question.

45 (Pages 174 to 177)

Page 178

1    MR. COHEN:  I wasn't done.
2    MR. SOBLE:  Sorry.
3  BY MR. COHEN:
4    Q    You make a demand, the defendant
5  rejects it or proposes something lower, and your
6  counterdemand after that goes up.
7         Is that -- Is that reasonable,
8  promising negotiating style?
9    MR. SOBLE:  Object to the form of the
10  question.
11  BY THE WITNESS:
12    A    **Mr. Oppenheim took it upon himself,**
13  **without discussing what his -- his belief is that**
14  **we should be requesting on fees from either**
15  **Mr. Addison or myself to respond in the fashion**
16  **that he did in the e-mail where he said 25 percent.**
17         **(Whereupon, Exhibit No. 38 was**
18         **marked for identification.)**
19         **(Whereupon, document tendered.)**
20  BY MR. COHEN:
21    Q    Handing you what we've marked as
22  Exhibit 38, do you recognize this as an e-mail
23  chain between Mr. Addison, yourself, and
24  Mr. Oppenheim, August 13, 2015, "Subject:

Page 179

1  Mediation in Chicago," and it starts with an e-mail
2  from Mike Addison to you and David Oppenheim,
3  correct?
4    A    **Yes.**
5    Q    And you had talked about the fact you
6  don't have the dates memorized, which is
7  understandable, but it says, "In advance of our
8  gathering in Chicago on August 31 to conduct the
9  second mediation with the Buccaneers, do you feel
10  it's advisable to ask for any advanced disclosure
11  of what it is that the Buccaneers are proposing
12  beyond what happened in Miami that resulted in the
13  waste of a day plus attendant travel expenses,
14  et cetera."
15         Did I read that right?
16    A    **Yes.**
17    Q    Does that refresh your recollection
18  that the second mediation this time with
19  Judge Andersen was scheduled for August 31, 2015?
20    A    **Okay. I'll accept that.**
21    Q    And in the second paragraph of
22  Mr. Addison's e-mail, in the fourth line, there's a
23  sentence that starts, "However," and it says, "At
24  the last mediation through David we indicated that

Page 180

1  our demand would be lowered from 90-plus million
2  dollars to $50 million if the Buccaneers would
3  increase their offer to $10 million.  It was hoped
4  that such a bracket might accelerate the
5  discussions, but it was rejected, and we walked
6  away with no meaningful offer other than ███
7  ███ ██████████████████████████████████████
8  ████████████████████████████████████████████
9  ███
10         You responded, same day, about
11  30 minutes later, 2:04 p.m., on August 13, 2015, an
12  you said, "I am NOT" -- all caps -- "NOT going down
13  to 50 million on this case."
14         Did I read that right?
15    A    **Yes.**
16    Q    Were you just talking about, given the
17  particular settlement positions of the respective
18  parties at that moment, that it would be an -- a
19  bad move at that time, or were you meaning you're
20  not going down to 50 million on this case?
21    A    **I can't answer that without waiving**
22  **the mediation privilege.**
23    Q    Whatever you meant, whatever it was,
24  were you serious, sincere, and genuine when you

Page 181

1  said it?
2    A    **That was my best belief at that time.**
3         **(Whereupon, Exhibit No. 39 was**
4         **marked for identification.)**
5         **(Whereupon, document tendered.)**
6  BY MR. COHEN:
7    Q    Handing you what I've marked as
8  Exhibit 39, these are e-mails dated August 21,
9  2015.  It's got Ross Good sending an e-mail to
10  Oppenheim, you, Kelly, Addison --
11    MR. SOBLE:  Before --
12  BY MR. COHEN:
13    Q    -- and Good --
14    MR. SOBLE:  I'm sorry to interrupt;
15  but before you get into detail, that e-mail on the
16  bottom is not properly redacted, and it's got a
17  reference to exchange numbers in the mediation
18  which are privileged, and it should be redacted.
19  We'll replace the document in production.
20    MR. COHEN:  And I'm not here to argue
21  with you.  I understand you're articulating a
22  position.  I view it as a clawback.  We don't agree
23  with it, and we'll oppose it, but I appreciate you
24  indicating your intentions.

Thompson Court Reporters, Inc
thompsonreporters.com

Page 182

1    I'm going to ask my questions the
2  way I ask them, and I guess the chips will fall how
3  the clawback goes.
4        MR. SOBLE:  I don't think there's any
5  need for you to ask the questions referencing the
6  actual exchange of numbers in the mediation.
7        MR. BLONIEN:  If I could state for the
8  record some additional context, which is that in a
9  letter dated August 23rd, 2017, I sent a list of
10  discovery concerns over to Foley & Lardner,
11  including this particular document as one that we
12  had concerns with, and the response that we
13  received from Foley & Lardner on August 30th, 2017,
14  was that they believed that all the documents were
15  correctly produced.  This is also a document that
16  was shown and discussed in the previous deposition.
17        MR. COHEN:  I'm going to ask my
18  questions, and you'll take --
19        MR. SOBLE:  Go ahead.
20        MR. COHEN:  -- appropriate . . .
21  BY MR. COHEN:
22     Q    So it's an e-mail that starts out from
23  Oppenheim to people, and we don't see on this who
24  it is, and then we see a response from Ross Good to

Page 183

1  Oppenheim, Wanca, Kelly, Addison, and Good, and
2  then an e-mail from you, Brian Wanca, to Ross Good,
3  and then Ross Good replies, and it shows the people
4  on that reply are Oppenheim, Wanca, Kelly, and
5  Addison, correct?  That's the sequence of who's
6  talking, right?
7     A    I mean, the document says who the
8  e-mails are from and to.
9     Q    Sure.  I just want to make sure we all
10  were in agreement about that.
11    A    What the document says is what it is.
12    Q    And so in this e-mail on August 21,
13  2015, which we know is ten days before the next
14  mediation session scheduled for August 31, 2015,
15  Mr. Oppenheim mentions, "Last mediation, we
16  demanded a $99 million fund with a 25 percent fee
17  and a 20 percent cy-pres" --
18        MR. COHEN:  That's two words, c-y,
19  p-r-e-s.
20  BY MR. COHEN:
21    Q    -- [continuing] "floor.  Do we start
22  there again or a higher number due to the fact that
23  we now have the Slingshot information?"  Your
24  response was, "I say we go higher," correct?

Page 184

1     A    That was my response, but I was
2  communicating -- I misunderstood David's e-mail.
3  That's what it says.  That's not what -- what I was
4  responding to at the time.
5     Q    Are you able to disclose what it was
6  you were responding to or thought you were
7  responding to or thinking you were saying?  Because
8  to be fair to everybody, I left something out
9  unintentionally.  I just didn't see it the way
10  things are compressed.
11        It has this part from
12  Mr. Oppenheim about what was demanded at the last
13  mediation, what the fee was, what the cy-pres floor
14  was, and he says, "Do we start there again or a
15  higher number due to the fact that we now have the
16  Slingshot information?"
17        And what I left out was Mr. Good
18  responding first saying, "I think we leave
19  everything the same.  Anything else shows our
20  possible weakness on the early 2009 records," and
21  that's when we get to your contribution, and you
22  say, "I say we go higher."
23    A    My response was in error.  I
24  misunderstood what was coming before.  I was not

Page 185

1  asking to up a demand from 99 million.
2     Q    Okay.
3        MR. COHEN:  Good time for a break?
4        MR. SOBLE:  Sure.
5        MR. COHEN:  We've been going for --
6        How long have we been going?
7        THE VIDEOGRAPHER:  Four hours and 44
8  minutes.
9        MR. COHEN:  I didn't mean the total.
10  I meant how long on this set.
11        THE VIDEOGRAPHER:  One hour and
12  20 minutes.
13        MR. COHEN:  Okay.  It seems
14  reasonable.
15        THE VIDEOGRAPHER:  Going off the
16  record at 4:26 p.m.
17            (Whereupon, a brief recess
18            was had.)
19        THE VIDEOGRAPHER:  Going back on the
20  record.  This marks the beginning of Disc No. 4.
21  The time is now 4:39 p.m.
22        Please proceed.
23  BY MR. COHEN:
24     Q    Mr. Wanca, we took a short break.

47 (Pages 182 to 185)

Page 186

1    When we stopped, we had been talking about
2    Exhibit 39.  That's the exhibit where Mr. Oppenheim
3    talks about a prior position, wants to know should
4    we start there or go to a higher number.  Mr. Good
5    says, "I think we leave everything the same."  And
6    your response was, "I say we go higher," and you
7    have said that, in some fashion, you misunderstood
8    or whatever.
9            What did you think you were
10   talking about when you said, "I say we go higher"?
11           THE VIDEOGRAPHER:  If I could
12   interrupt, one of the mics is making a lot of
13   noise.  I'm not sure --
14           (Whereupon, there was a brief
15           interruption.)
16           THE VIDEOGRAPHER:  Thanks.
17   BY THE WITNESS:
18       A    I don't know what I was thinking at
19   the time, but I did not want to go over the
20   $99 million number that was identified there.
21   BY MR. COHEN:
22       Q    And I'm not trying to put words in
23   your mouth.  I am suggesting something only because
24   we saw it in some other documents, and so it

Page 187

1    provides a possible explanation.  It may jog your
2    recollection or it may not.
3            We saw some other e-mails that
4    had been marked as exhibits where Mr. Oppenheim had
5    a proposal at a 25 percent attorneys' fee, and you
6    had responded something to the effect, "I say we
7    push it up to 30 percent."
8            Could that have been what you
9    were referring to, not changing the fund, but going
10   higher on the fee; because Mr. Oppenheim here shows
11   25 percent fee, could you have been talking about
12   increasing the fee to 30 percent?
13       A    I -- I don't know.
14       Q    Okay.  What claims administrators have
15   you used in TCPA class action settlements?
16           MR. SOBLE:  Objection.  Relevance.
17   BY THE WITNESS:
18       A    KCC, class-settlement.com, there's two
19   or three others I just -- off the top of my head, I
20   can't recall.
21   BY MR. COHEN:
22       Q    What kinds of claim rates have you had
23   on average in TCPA class settlements where you've
24   been settling class counsel and you proceeded with

Page 188

1    class notice under an approved notice plan?  What
2    has been the average prevailing range of claim
3    rates?
4        A    You're asking me average.  I don't
5    know.  I didn't sit down and compute -- compute
6    them.
7        Q    We talked earlier about the fact that
8    there's at least one exhibit we marked and
9    discussed in which David Oppenheim talks about a
10   fund amount, and then he talks about an actual
11   payout amount, the payout amount being on that fund
12   what the attorneys' fee would be plus the projected
13   claim rate the defendant would have to pay out of
14   the fund to the claiming class members, plus
15   litigation expenses and incentive awards.
16           What is the purpose of
17   calculating the actual payout with regard to a
18   proposed settlement?
19           MR. SOBLE:  Object to the form.
20   BY THE WITNESS:
21       A    Trying to understand in a litigation
22   what someone is willing to pay based on the form of
23   the settlement being proposed, what are they really
24   offering.

Page 189

1    BY MR. COHEN:
2        Q    Would you agree that it also serves
3    the reverse purpose, that the plaintiff's counsel
4    on behalf of the either class or putative class is
5    attempting to show a defendant or defense counsel
6    that even though the fund may be a significant
7    number up here, that the actual, anticipated claim
8    rate is likely to fall in this range, meaning the
9    defendant is not going to have to likely pay out
10   the whole fund.  They'll pay the agreed attorneys'
11   fees at a certain percentage and amount, these
12   anticipated litigation expenses and incentive
13   award, and then at that predicted or projected
14   claim rate, this amount to the class.  So you're
15   trying to let the defendant know what they will
16   actually have to pay?
17           MR. SOBLE:  Object to the form.
18   BY THE WITNESS:
19       A    That's not something that I do or
20   share with them.  That's something that David did
21   and I disagreed with, and I told him not to do
22   that.
23   BY MR. COHEN:
24       Q    So -- And I want to make certain I

48 (Pages 186 to 189)

Page 190

1   understand what you just said and what you meant.
2       You're aware that Mr. Oppenheim
3   did that in this case, in the Cin-Q case; he shared
4   that information with the Buccaneers --
5       MR. SOBLE:  If it's within the
6   mediation, that's plainly mediation privilege.
7       MR. COHEN:  And to be clear, I'm not
8   at this moment talking about any specifics.  I'm
9   talking about a concept that he -- because I think
10  he just said it.
11  BY MR. COHEN:
12      Q    Without getting into the specifics of
13  something that David -- the numericals of a
14  settlement proposal that David made to the
15  Buccaneers, if I understand what you just said, he
16  shared with them a projected total payout based
17  upon a projected claim rate.
18      Is that what you were indicating;
19  in this case, he did that and you didn't approve?
20      **A    I -- I had an ongoing debate with him**
21  **for quite some time over that.  I was not in favor**
22  **of doing that.  Everyone can compute their own**
23  **claim rates, whatever they are.  I don't predict**
24  **claim rates.  I don't try to get claim rates to a**

Page 191

1   **certain number.  I try to get as many people as**
2   **possible to claim in.**
3       Q    And so I understand, at least the way
4   we got to the question you just were answering, was
5   about sharing with a defendant, or this defendant,
6   a projected claim rate as part of the
7   back-and-forth settlement discussions, but your
8   answer may have gone beyond that.
9       Are you suggesting that
10  internally you don't engage in anticipations or
11  projections of likely claim rates when you're
12  analyzing settlement demands?
13      **A    I'm not sure I understand the**
14  **question.  We will look at the numbers internally**
15  **to figure out what someone's likely payout is to**
16  **be.  It is not something that we project or that I**
17  **want projected or shared with the -- with the other**
18  **side.**
19      Q    And I understand you said you don't
20  want it shared with the other side, but internally
21  you take it into account when you're trying to
22  figure out what they'll pay out?
23      **A    When we try to understand what the**
24  **nature of their offer is under the circumstances,**

Page 192

1   **because sometimes these things are kind of**
2   **convoluted, so what exactly are they -- are they**
3   **paying out and, within ranges, what -- what are the**
4   **numbers looking at in a particular case.**
5       (Whereupon, Exhibit No. 32 was
6       marked for identification.)
7   BY MR. COHEN:
8       Q    Sir, I'm handing you what we've marked
9   as Exhibit 32.
10      (Whereupon, document tendered.)
11  BY MR. COHEN:
12      Q    This is an e-mail from David Oppenheim
13  to you and Michael Addison dated March 15th of
14  2016.  The "Subject" is "Bucs Settlement Term
15  Sheet 031516."
16      And although we have not, as far
17  as we know, received the draft term sheet
18  referenced in the first sentence, Mr. Oppenheim was
19  proposing internally, amongst your team, a
20  communication of a cover e-mail which would read,
21  "Attached is a response to your latest settlement
22  proposal which involved your client paying
23  approximately $6,315,000 at a 5 percent claim rate
24  ($4 million fees, 310,000 expenses, $40,000

Page 193

1   incentive, $1,965,000 in claims) and $8,280,000 at
2   a 10 percent claim rate.  Under this proposal,
3   which I assume is the internal discussion of a
4   counter, your client would pay $31,930,000 at
5   5 percent claims and $40,510,000 at 10 percent.  We
6   note that the Capital One TCPA case settled for
7   $75,455,099 with no reversion.  While we are
8   willing to agree to a settlement with a
9   reversionary fund prior to class certification
10  here, there is no reason why the fund should be
11  less than in Capital One, which involved robocalls
12  and, thus, far more proof issues than does this
13  case."
14      Did I read it correctly?
15      **A    Yes.**
16      Q    Setting aside your feelings and views
17  that you've already expressed about sharing claim
18  rate predictions with opposing counsel, do you see
19  anything unreasonable in analyzing a potential fund
20  settlement with the Buccaneers internally amongst
21  your team through the lens of a range of a 5 to
22  10 percent claim rate?
23      MR. SOBLE:  Object to the form.
24      THE WITNESS:  Can you read it back to

Page 194

1   me, please?
2       (Whereupon, the record was
3       read as requested.)
4   BY THE WITNESS:
5     **A**   **No, not internally.**
6   BY MR. COHEN:
7     Q   And in an internal discussion among
8   your team in this case, do you recall taking any
9   exception to this proposal?
10     **A**   **I don't know -- I don't know what the**
11   **attached or draft term sheet was. I take issue**
12   **with the -- I took issue with him quoting claims**
13   **rates in communications with the other side.**
14     Q   I'll represent to you that with the
15   benefit of the information contained in the first
16   sentence of Mr. Oppenheim's draft e-mail in
17   Exhibit 32 about the litigation expenses, the
18   incentive award, that it's possible to reverse the
19   math on the internal discussion Mr. Oppenheim was
20   having with you and Mr. Addison in this e-mail, and
21   I'll represent to you that it reflects or
22   calculates out to be a discussion of a $92 million
23   fund with a 25 percent attorney fee, meaning
24   $23 million, the same $310,000 litigation expenses,

Page 195

1   the same $40,000 incentive fee and that, when you
2   look at the two figures of payout being
3   $31,930,0000 at a 5 percent claims rate and
4   $40,510,000 at a 10 percent claims rate, that
5   translates to a payout of $500 per fax, do you have
6   any reason to disagree that that would be the
7   reverse math?
8       MR. SOBLE: Object to the form.
9   BY THE WITNESS:
10     **A**   **I'm not in a position here today to do**
11   **those calculations.**
12   BY MR. COHEN:
13     Q   If, in fact, that's what those
14   calculations come out to be so that on a 5 percent
15   claims rate, we're talking about $23 million in
16   attorneys' fees and only approximately $8.5 million
17   in actual class payout or, at a 10 percent claim
18   rate, $23 million in attorneys' fees and just over
19   $17 million in class payout, does that cause you
20   any concern that the attorneys, in setting a
21   $92 million fund, are focusing more on generating
22   and increasing their attorney fee than in actually
23   making sure there's enough money to benefit the
24   class?

Page 196

1       MR. SOBLE: Object to the form of the
2   question.
3   BY THE WITNESS:
4     **A**   **I don't understand your question.**
5   BY MR. COHEN:
6     Q   It's kind of simple: If the analysis
7   internally about a settlement demand creates a big
8   fund so that 25 percent is a ton of money,
9   $23 million, but you're anticipating the likely
10   claim rate is only going to get the class 8.5 to
11   $17 million in actual class benefit, doesn't it
12   cause you some concern that the fund is being
13   increased unnecessarily just to generate more
14   attorneys' fees?
15       MR. SOBLE: Object to the form of the
16   question.
17   BY THE WITNESS:
18     **A**   **The belief within our group was that**
19   **the claim rate on this case was going to be very**
20   **high.**
21   BY MR. COHEN:
22     Q   How high?
23       MR. SOBLE: I object that that calls
24   for internal work product privilege that was not

Page 197

1   shared with M&C.
2       MR. BLONIEN: I object to the
3   objection. I don't think that that is how the
4   Court's interpreting the order.
5       I'm not meaning to argue, but
6   just reserving my position.
7       MR. SOBLE: Okay. I'm going to double
8   secret object to your objection and just stick with
9   my original objection.
10       MR. COHEN: Nicely done.
11       MR. SOBLE: I'm pretty sure that's not
12   how objections work.
13       MR. COHEN: And are you going to
14   advise him not to answer?
15   BY THE WITNESS:
16     **A**   **I don't think I can answer the**
17   **question without giving up work product --**
18       MR. SOBLE: Particularly --
19   Particularly, the whole thing is still pending.
20   BY MR. COHEN:
21     Q   With the -- Strike that.
22       Without seeking the numerical,
23   which was my last question, how high, what was the
24   basis for the belief that it would be an

Page 198

1 exceptionally high claim rate or an unusually high
2 claim rate?
3          MR. SOBLE:  Object to the form of the
4 question.
5 BY THE WITNESS:
6     A     Because of the publicity concerning
7 the case, because of the notoriety of the
8 defendant, and because of the fact that most of
9 Western Florida, every fax machine received at
10 least one.
11 BY MR. COHEN:
12     Q     Were you aware -- As we sit here
13 today, are you aware of any anecdotal TCPA
14 settlement that has any of those factors you've
15 identified as being somewhat unique or unusual to
16 this case that support your belief that those
17 factors in this case would yield or generate an
18 unusually high claim rate?  And by "anecdotal," I
19 mean, can you point to any other case where those
20 factors were in play and, in fact, generated an
21 unusually high claim rate?
22          MR. SOBLE:  Object to the form.
23 BY THE WITNESS:
24     A     There were high claims rates in at

Page 199

1 least two cases that come to mind quickly.
2 BY MR. COHEN:
3     Q     Which are those?
4     A     One is a case involving LexisNexis,
5 which the class was attorneys.  It was a high claim
6 rate in that case in excess of 20 percent.  It may
7 be even higher.
8              There's another case involving
9 architects where the claim rate was over
10 40 percent.
11     Q     In the LexisNexis -- Were you involved
12 in either of those?
13     A     Both of them.
14     Q     What's the name of the case involving
15 architects?
16     A     I don't remember the defendant.  The
17 plaintiff was CE Design.
18     Q     The architects case?
19     A     Yes.
20     Q     And do you recall the name of the
21 plaintiff in the LexisNexis case?
22     A     I'm not sure.
23     Q     What court was the CE Design
24 Architects case in?

Page 200

1     A     State court in Illinois.
2     Q     Do you remember what county?
3     A     No.
4     Q     And what court was the LexisNexis case
5 in?
6     A     I'd like to say St. Louis area.
7     Q     Federal or State, as you recall?
8     A     Likely State.
9     Q     Are you aware of caselaw generally
10 holding that it is inappropriate to negotiate
11 attorneys' fees in a class settlement negotiation
12 until the parties have reached agreement on the
13 provisions or terms of the settlement as they
14 relate to benefit to the class, including fund
15 size, if it's going to be a fund settlement?
16          MR. SOBLE:  Object to the form of the
17 question.
18          THE WITNESS:  Can you read it back,
19 please?
20              (Whereupon, the record was
21               read as requested.)
22 BY THE WITNESS:
23     A     Yes.
24

Page 201

1 BY MR. COHEN:
2     Q     Did you at any time reach agreement
3 with the Buccaneers on the terms of a class
4 settlement as it would relate solely to the fund
5 and class benefit, but not the attorneys' fees?
6     A     No.
7     Q     You mentioned that CE Design
8 Architects case.
9              Was Bock Law Firm co-counsel on
10 behalf of the plaintiffs in that?
11     A     I believe so.
12     Q     You recall -- And we can dig through
13 the exhibits and find it, if we need to.
14              Do you recall there was an
15 exhibit that was an e-mail chain.  It started with



24     A     Oh, yes.  I remember that very well.

Thompson Court Reporters, Inc
thompsonreporters.com

Page 202

1    Q    That was not true?
2    A    **Absolutely never true.**
3    Q    You are aware of the terms of the
4  settlement reached in the Technology Training case
5  with the Buccaneers?
6    A    **I haven't looked at it in a while.**
7    Q    I'll represent to you and ask you to
8  assume it's a $19.5 million fund, claims
9  administration paid outside of the fund, 25 percent
10  attorneys' fees, it's a per fax as opposed to per
11  claimant claim-in settlement with the first fax
12  that a claiming class member received entitling
13  compensation at $350 and, for subsequent faxes,
14  that each class member might have received as
15  reflected in data records and transmissions,
16  et cetera, being numericals less than $350 per fax,
17  I take it you think that's an unreasonably low
18  settlement in many respects?
19        MR. SOBLE:  Object to the form.
20  BY THE WITNESS:
21    A    **For all the reasons set forth in our**
22  **briefs, correct.**
23  BY MR. COHEN:
24    Q    If the Buccaneers had made that

Page 203

1  settlement offer to your firm while David Oppenheim
2  was at your firm, was it within David Oppenheim's
3  scope of authority to accept that offer?
4    A    **No.  He had check to with**
5  **Mike Addison, myself, as well as the plaintiffs.**
6    Q    And I assume, given your opinion of
7  the settlement, you would not have given him
8  permission to accept that settlement?
9    A    **It would have been a collective**
10  **decision by everyone.  This was Mike's case.  Mike**
11  **invited me in.**
12    Q    Your collective -- Your contribution
13  to the collective would have been no, correct?
14    A    **That's correct.**
15    Q    And you were and are the owner of the
16  firm, and at the time David Oppenheim was an
17  employee of the firm employed by you, correct?
18    A    **Yes.**
19    Q    Do you have criticisms of the notice
20  plan that is a part of the TTA or Technology
21  Training plaintiffs' settlement with the
22  Buccaneers?
23    A    **For all the reasons set forth in our**
24  **briefs.**

Page 204

1    Q    I was -- I took Ross Good's
2  deposition.
3        Have you received any information
4  about questions, topics, answers that came up and
5  were given in his deposition?
6        MR. SOBLE:  Outside of anything that
7  may have been discussed with his counsel, I presume
8  you're asking?  Because that would be privileged.
9        MR. BLONIEN:  I wholly disagree with
10  that --
11        MR. COHEN:  Facts are not privileged.
12        MR. SOBLE:  "Facts are not
13  privileged."
14        I understand the position.  If
15  you're asking what we discussed with respect to
16  Ross Good's deposition --
17        MR. COHEN:  I'm not asking --
18        MR. SOBLE:  -- that's attorney-client
19  privilege.
20        MR. COHEN:  -- what you discussed.
21  That's like having a photograph of a tractor and I
22  say, "Have you ever seen the tractor?"  And you
23  say, "You mean outside of if I showed him the
24  photo"?

Page 205

1        MR. SOBLE:  No.  I mean, you like to
2  say if it's facts, which means if I were a criminal
3  who came to a criminal defense attorney and said,
4  "I just killed my wife," that fact would not be
5  privileged because it's a fact as opposed to
6  something related to legal advice.
7        MR. COHEN:  Well --
8        MR. SOBLE:  To the extent he knows
9  anything about Ross's deposition that doesn't have
10  to do with his discussions with counsel, absolutely
11  go ahead and ask questions.
12        MR. COHEN:  All right.  Instruct him
13  not to answer, just so I can make sure it's
14  preserved because we're going to need to get
15  rulings on this just so it doesn't happen anymore.
16        MR. SOBLE:  Okay.
17  BY MR. COHEN:
18    Q    Are you going to follow your
19  attorneys' advice and refuse to answer a question
20  about whether you know what happened in Ross Good's
21  deposition?
22    A    **I know he had a deposition, and I know**
23  **he finished it late at night.**
24    Q    Do you know anything else?

52 (Pages 202 to 205)

Page 206

1      A    That's it.
2           MR. COHEN:  So either you made an
3  unnecessary objection, or he's not telling the
4  truth.  That's a conundrum.
5  BY MR. COHEN:
6      Q    So you have settled TCPA class actions
7  in the past with provisions for initially fax
8  notice to the class followed up by hard mail notice
9  to the fax failures, correct?
10     A    Yes.
11     Q    What steps have you ever taken or had
12 your vendor who does the reverse lookup take to
13 take account of the fact that a significant amount
14 of time has passed since the fax transmissions went
15 out to make sure that the hard-mail addresses are
16 going to be corresponding to the owner or operator
17 of the fax line in question at the time of the fax
18 broadcast?
19     A    Done reverse lookups, also got -- got
20 back and -- and got historical information about
21 the fax numbers.
22     Q    You've done that one time, correct?
23     A    I've done it a few times.
24     Q    The subpoenas to telephone carriers?

Page 207

1      A    I did that on at least one case.
2      Q    Stryker?
3      A    Yes.
4      Q    Because the Judge wanted it, correct?
5      A    I think that was our proposal to him,
6  and he accepted it.
7      Q    How sure are you of that?
8      A    You know what?  I'd have to read
9  the -- read the briefs and go back and look at the
10 files.  You're talking about something that
11 happened several years ago.
12     Q    So we know one time you subpoenaed
13 telephone carrier records in Stryker.
14          What have you done with your
15 vendors who do the reverse lookups for the
16 fallback, hard-mail notice that is not being done
17 by the vendors consulted by the parties in the
18 Technology Training case for purposes of finding
19 hard-mailing addresses?
20     A    I'm sorry.  I don't understand your
21 question.
22     Q    Well, I'll represent to you, Ross Good
23 had a criticism of our vendors and the way they
24 were attempting to do the reverse lookups for

Page 208

1  hard-mail addresses because, according to
2  Ross Good, there's insufficient evidence to show
3  that they are actually identifying the owners or
4  operators of those fax lines for 2009 and 2010
5  and, instead, were just finding out when these
6  people were correlated with that fax number for the
7  first time being entered into a database and that
8  that's insufficient methodology to get true
9  historical reverse lookup for the time period in
10 question, 2009 and 2010, and I'm wanting to know,
11 when you've had fallback, hard-mail reverse lookups
12 in your class settlements, what have you done
13 beyond what we have our vendors doing?
14          MR. SOBLE:  Object to the form of the
15 question.
16 BY THE WITNESS:
17     A    I don't think I can answer that
18 question without revealing our work product.
19 BY MR. COHEN:
20     Q    You mean your work product in other
21 cases?
22     A    Our work product in other cases, yes.
23     Q    You think what you contract with
24 reverse lookup vendors in publicly approved class

Page 209

1  settlements -- what you contract with them to do to
2  accurately get addresses for class members to make
3  the notice plan robust and comport with
4  constitutional due process is your work product?
5          MR. SOBLE:  Objection.  Argumentative.
6  BY THE WITNESS:
7      A    I believe that our strategies and our
8  mental processes in determining how to best
9  identify class members is our work product, yes, I
10 do.
11 BY MR. COHEN:
12     Q    And just to be clear, on that basis,
13 you are refusing to answer the question that I
14 asked, correct?  I just want the record to be
15 clear.
16     A    I'm not -- I'm not sure I can answer
17 without divulging our strategies and our
18 methodology.
19     Q    Which you are unwilling to do?
20     A    Correct.
21          (Whereupon, Exhibit No. 40 was
22          marked for identification.)
23 BY MR. COHEN:
24     Q    Sir, I'm handing you what's been

53 (Pages 206 to 209)

1    marked as Exhibit 40.
2         (Whereupon, document tendered.)
3         THE VIDEOGRAPHER: Don't forget your
4    mic.
5         MR. COHEN: Thank you. Should I say
6    it again? Somebody is looking out for me.
7    BY MR. COHEN:
8         Q    Sir, this appears to be at least a
9    cover page and e-mail from David Oppenheim dated
10   March 15, 2016, to Ross Good saying, "Can you
11   forward me the Barnett quotes?" And attached to
12   this document, at least as I've constituted this
13   exhibit, is four pages of what appear to be
14   separate letters dated December 12, 2014, from
15   Dorothy Sue Merryman, M-e-r-r-y-m-a-n, with
16   class-settlement.com, and then the last page is an
17   e-mail from Ms. Merryman to Ross Good,
18   David Oppenheim, and Andrew Barnett dated March 15,
19   2016, re-sending the quotes originally prepared
20   back in December of 2014.
21        Would you agree that's what
22   Exhibit 40 is?
23        A    That's what it appears to be. I'm not
24   on this e-mail.

1         Q    You have no reason to doubt these
2    are, in fact, communications between people
3    in your office and Ms. Merryman and at
4    class-settlement.com, do you?
5         A    Correct.
6         Q    And so it appears that Ms. Merryman
7    did these four December 12, 2014 class
8    administration proposals that included class notice
9    components, and she summarizes them in her e-mail
10   dated March 15th, 2016, and Option 1 is mail -- and
11   I assume that's mail notice -- mail notice to all
12   records with addresses, fax notice to remaining
13   records, no claims process, and then mail checks to
14   all members who do not opt out."
15        Do you see that?
16        A    Yes.
17        Q    Her second option is essentially the
18   same as the first option, but it flips the sequence
19   of faxing versus mailing. It says, "fax to all
20   records, mail to failed records with addresses or
21   records with no fax numbers, no claims process,
22   mail checks to all members who do not opt out."
23        Do you see that?
24        A    Yes.

1         Q    So, generally speaking, Options 1 and
2    2 envision a situation where class members won't be
3    claiming in; they'll receive whatever notice
4    they're going to receive in whatever manner they're
5    going to receive it; and if they don't opt out,
6    they will simply be sent a check for whatever class
7    compensation they're entitled to, correct?
8         A    That's how I understand it.
9         Q    Did you ever have any reasonable basis
10   to believe that the Buccaneers were ever going to
11   agree to a class settlement in the Buccaneers case
12   under which it would be an opt-out notice scenario,
13   and then checks would just issue to everybody who
14   didn't opt out?
15        A    I can't answer that without waiving
16   the mediation privilege.
17        Q    And I do want to make sure I
18   understand something about that.
19        That's your position irrespective
20   of the answer. I mean, if your answer is "Yes; I
21   have a basis to believe they would," you're saying
22   that would be mediation privilege. And if your
23   answer is, "No. I had absolutely no good-faith
24   basis to ever believe the Bucs would do that," you

1    believe that's mediation privilege too.
2         So irrespective of what your
3    answer is to my question, you think the answer is
4    mediation-privileged?
5         MR. SOBLE: Object to the form of the
6    question.
7    BY THE WITNESS:
8         A    I'm not sure I can tell you what the
9    Buccaneers wanted to do because we had no direct
10   communications with Mr. Mester, and everything went
11   through the mediator. And all I can deal with or
12   attempt to -- to answer your question with is what
13   was exchanged as part of the mediation process
14   between them, Andersen, and us or them, Rodney Max,
15   and us, so . . .
16   BY MR. COHEN:
17        Q    The third and fourth options offered
18   by class-settlement.com, these are -- these are
19   describing claim-in scenarios, right? Option 3,
20   mail to all records with fax -- with addresses, fax
21   to remaining records, members submit claims via
22   fax, mail, and web, and mail checks to all
23   claimants, correct?
24        A    Yes.

Page 214

1    Q    And Option 4 is the same except
2  instead of mailing first and faxing to remaining,
3  it's fax first and mail to failures or class
4  members for whom a fax number couldn't be obtained?
5    **A    That's what it says, yes.**
6    Q    Why did Anderson + Wanca include in
7  the four scenarios that it asked
8  class-settlement.com to come with options for --
9  why did it include an option and, in particular,
10  Option 3, first mail to all hard addresses that can
11  be found, and then fax to the remaining?
12    **A    I don't think I can answer that**
13  **without waiving the mediation privilege.**
14    Q    And so you are refusing to answer that
15  question on that ground, on that basis?
16    **A    I think that's my answer.**
17    Q    Without divulging specific details,
18  did Anderson + Wanca's negotiations with the
19  Buccaneers, direct or through a mediator, ever
20  reach the point of negotiating the details of a
21  notice plan on a settlement?
22    **A    I don't think I can answer that**
23  **question based on the -- on the mediation privilege**
24  **which hasn't been waived.**

Page 215

1    Q    And on that ground, you're refusing
2  to answer that question, correct?
3    **A    I'm saying I can't.**
4    Q    Well, you could, but you're unwilling
5  to do so because of your view of the mediation
6  privilege, correct?
7    **A    That's correct.**
8    MR. COHEN:  I may be done.  I may have
9  five, ten minutes more.  So if we can take a
10  break --
11    MR. SOBLE:  So you can look over your
12  notes and stuff?
13    MR. COHEN:  Yeah.
14    MR. SOBLE:  Okay.
15    THE VIDEOGRAPHER:  Going off the
16  record at 5:27 p.m.
17    (Whereupon, a brief recess
18    was had.)
19    THE VIDEOGRAPHER:  Going back on the
20  record.  This is the beginning of Disc No. 5.  The
21  time is now 5:40 p.m.
22    Please proceed.
23  BY MR. COHEN:
24    Q    Sir, I just have a few other things I

Page 216

1  want to circle back and cover with you.
2    Sometimes the TCPA putative class
3  actions or certified class actions that you've been
4  involved with have proceeded to appeals in the
5  appellate court system, correct?
6    **A    Yes.**
7    Q    Have you ever appeared at oral
8  argument and argued on behalf of the plaintiffs or
9  the class in any of those TCPA class action
10  appeals?
11    MR. SOBLE:  Objection to relevance.
12  BY THE WITNESS:
13    **A    Me personally, no; I've appeared, but**
14  **not argued.**
15  BY MR. COHEN:
16    Q    Your firm has filed numerous cases,
17  TCPA putative class action cases, in the state of
18  Florida?
19    **A    Yes.**
20    Q    Does your firm have an office located
21  within the state of Florida?
22    **A    No.**
23    Q    Have you filed TCPA cases in the state
24  of Florida without associating with local -- a

Page 217

1  local Florida firm or a local Florida attorney as
2  co-counsel on the pleadings?
3    **A    Yes.**
4    Q    And I'm circling back to this only
5  because the answer, while fine, is just an unusual
6  answer you don't hear very often in lawsuits in
7  deposition, so I want to make certain I understand
8  it.
9    I asked you why you were paying
10  Foley's fees and litigation expenses in this case,
11  and you said "to do the right thing."  And I
12  circled back.  I followed up with you about that.
13  If I understand, it was to do the right thing for
14  M&C?
15    MR. SOBLE:  Objection.  Asked and
16  answered.
17  BY THE WITNESS:
18    **A    Yes.  My earlier answer says that.**
19  BY MR. COHEN:
20    Q    Are you -- For accounting purposes,
21  are you reflecting that expenditure for Foley's
22  fees and expenses as a business expense of
23  Anderson + Wanca?
24    **A    I don't know.  My accountant handles**

Page 218

1 **the accounting.**
2  Q  So you don't know?
3  **A  I don't know.**
4  Q  Does your firm stand to benefit from a
5 successful outcome on behalf of the plaintiff M&C
6 in this litigation?
7  **A  I'm not sure.**
8  Q  Why not?
9  **A  I'm not sure what a successful outcome**
10 **would be.**
11  Q  Well, do you understand that one of
12 the things M&C wants is an injunction to prohibit
13 and preclude Bock Law Firm from going forward with
14 the Technology Training class action settlement?
15  **A  I believe that was in the pleadings.**
16  Q  Does your firm stand to benefit if
17 Bock Law Firm is enjoined from proceeding on the
18 Technology Training class action settlement?
19  **A  If we can prevail on our case.**
20  Q  And in order to prevail in your case,
21 the Technology Training class action settlement,
22 whether in front of Judge Honeywell or in front of
23 Judge Porcelli, has got to fail or be enjoined,
24 correct?

Page 219

1       MR. SOBLE:  Object to the form.
2 BY THE WITNESS:
3  **A  I guess there's some other iterations**
4 **that could take place.**
5 BY MR. COHEN:
6  Q  Such as?
7  **A  Stay, dismissal.**
8  Q  Of Technology Training?
9  **A  Yes.**
10  Q  Okay.  Just to try and simplify it
11 then:  In one way or another, in order for you to
12 benefit and have the opportunity to succeed on the
13 Cin-Q case, the Technology Training settlement has
14 to be denied, enjoined, stayed, dismissed, or
15 delayed, correct?
16  **A  Yes.**
17  Q  And is that part of the reason you are
18 financing the M&C litigation?
19  **A  Yes.**
20  Q  And I don't want to, with this
21 question, get from you any communications, any
22 specific communications you or your firm have had
23 with Foley about the M&C litigation, but just
24 broadly, have you and/or your firm had a role in

Page 220

1 decision-making about the M&C litigation?
2  **A  I haven't.**
3  Q  Has anyone in your firm been assigned
4 to have that role on behalf of the firm?
5       MR. SOBLE:  Object to the form of the
6 question.
7 BY THE WITNESS:
8  **A  I'm not aware.**
9 BY MR. COHEN:
10  Q  You're not aware one way or another
11 whether someone in your firm is participating in
12 that kind of decision-making?
13  **A  I'm not sure what decision-making**
14 **you're talking about.  Obviously, we had to be**
15 **involved to respond to subpoenas and document**
16 **requests and -- and to that extent, we are involved**
17 **in the decisions as to what we could produce in**
18 **discovery and what had to be redacted or where**
19 **privilege had to be asserted.**
20  Q  What about decision-making as to the
21 actual filing and prosecution of the case in the
22 first instance; did your firm have a role in that
23 decision-making process?
24       MR. SOBLE:  Object to the form.

Page 221

1 BY THE WITNESS:
2  **A  We paid for it.**
3 BY MR. COHEN:
4  Q  I understand, but -- So let me say,
5 other than just the fact that you're paying for it,
6 has your firm had any role in the decision-making
7 process to actually file and prosecute the M&C
8 case?
9  **A  Well, that would be a communication**
10 **between us and our clients, so I'm not sure I**
11 **can -- I can discuss that.**
12  Q  Has your firm had a role in reviewing
13 proposed, outgoing pleadings and discovery
14 documents and incoming pleadings and discovery
15 documents from Bock Law Firm and had input to
16 counsel of record, Foley, about those matters?
17       MR. SOBLE:  Objection based on the
18 attorney-client privilege and advise the witness
19 not to answer.
20 BY MR. COHEN:
21  Q  Do you intend to follow your
22 attorneys' advice?
23  **A  Yes.**
24       MR. COHEN:  That's all I have at this

Thompson Court Reporters, Inc
thompsonreporters.com

Page 222

```
 1   time.
 2           Let's trade.
 3           MR. BLONIEN:  Yeah.
 4              EXAMINATION
 5           By Mr. Blonien:
 6
 7   Q     I want to pick up right where
 8   Mr. Cohen left off.
 9           Have you received all of the
10   pleadings in this case?
11   A     No.
12   Q     Have you received any pleadings in
13   this case?
14   A     The complaint and the discovery.
15   Q     When did you receive the discovery?
16   A     Shortly after that was propounded.
17   Q     So you're talking about the Bock Law
18   Firm's interrogatories and document requests?
19   A     Oh, subpoenas.
20   Q     Okay.
21   A     My subpoenas to my firm or -- for
22   documents.
23   Q     Have you received any of the document
24   requests propounded in this case?
```

Page 223

```
 1   A     I haven't personally, no.
 2   Q     Has anyone from your law firm?
 3   A     I don't know.
 4   Q     Have you asked anyone at your law firm
 5   to review the document requests in this case?
 6   A     Have I asked them?  No.
 7   Q     Have you asked anyone in your law firm
 8   to perform any work in connection with the -- this
 9   particular litigation?
10   A     Ross Good.
11   Q     What did you ask Ross Good to do?
12           MR. SOBLE:  Go ahead -- That's getting
13   into both work product and attorney-client
14   privilege, so we'll object on those bases.
15   BY MR. BLONIEN:
16   Q     Are you refusing to answer the
17   question?
18   A     Yes.
19   Q     Have you instructed Ross Good to
20   perform work in connection with this litigation?
21           MR. SOBLE:  Same objection to the same
22   questioning.
23   BY THE WITNESS:
24   A     Same answer.
```

Page 224

```
 1   BY MR. BLONIEN:
 2   Q     You're not answering that question?
 3   A     No, sir.
 4   Q     On privilege grounds?
 5   A     Right.
 6   Q     You don't represent Medical &
 7   Chiropractic in this case, correct?
 8   A     I'm not counsel of record in this
 9   case, correct.
10   Q     Okay.  So the answer is "yes"?
11           MR. SOBLE:  Actually, I think the way
12   you asked it, I think it was no.
13   BY MR. BLONIEN:
14   Q     Do you represent anyone in this
15   litigation?
16   A     Yes.
17   Q     Who do you represent in this
18   litigation?
19   A     Medical & Chiro.
20   Q     And by "this litigation," I mean
21   Medical & Chiropractic's lawsuit against
22   Mr. Oppenheim and Bock Law Firm.
23           Do you understand that?
24   A     No.  I was referring to the Medical &
```

Page 225

```
 1   Chiro/Buccaneers case.
 2   Q     Okay.  Well, then I'm relieved that we
 3   solved that confusion.
 4           With respect to the
 5   Medical & Chiropractic case against Mr. Oppenheim
 6   and Bock Law Firm, you don't represent anybody,
 7   correct?
 8   A     I personally don't, no.
 9   Q     No one in your law firm represents
10   anybody in this litigation, correct?
11   A     We're not of record in the case,
12   correct.
13   Q     Okay.  My question wasn't whether you
14   were of record but whether or not you or anyone in
15   your law firm represent anybody in this case.
16           Can you answer my question?
17   A     Yes.  We represent Medical & Chiro.
18   Q     In this case, in Medical &
19   Chiropractic's lawsuit against Mr. Oppenheim and
20   Bock Law Firm?
21   A     No.  They're represented by Foley.
22   Q     Okay.  In this case -- And just so the
23   record is clear, when I say, "in this case," I mean
24   Medical & Chiropractic's lawsuit against
```

57 (Pages 222 to 225)

Page 226

1    Mr. Oppenheim and the Bock Law Firm, do you or your
2    law firm represent anybody?
3       A    We represent Medical & Chiro --
4       Q    Okay.
5       A    -- generally.
6       Q    When did that representation with
7    respect to this case begin?
8       A    I've represented Medical & Chiro for a
9    number of years.
10      Q    Okay.  My question is limited to this
11   litigation.
12           Do you understand that?
13      A    Okay.
14      Q    With respect to this litigation,
15   when did your attorney-client relationship with
16   Medical & Chiropractic begin?
17           MR. SOBLE:  Object to the form.
18   BY THE WITNESS:
19      A    We don't represent them in this case.
20   Foley does.
21   BY MR. BLONIEN:
22      Q    No one at your law firm represents
23   Medical & Chiropractic in connection with this
24   litigation?

Page 227

1       A    We represent Medical & Chiro to the
2    extent that this litigation affects other cases
3    that we have for them.
4       Q    Okay.  Anything else that you can
5    answer in response to my question?
6       A    No.
7       Q    Okay.  You do recall seeing a retainer
8    agreement that was shown to you earlier today,
9    Exhibit No. 5, with Medical & Chiropractic.
10           Can you pull that one out for me,
11   Mr. Wanca?
12      A    Yes.
13      Q    This agreement governs the scope of
14   your relationship with respect to Medical &
15   Chiropractic and its claims against the Buccaneers
16   and any related entities, correct?
17      A    Correct.
18      Q    Are there any other terms of your
19   relationship with Medical & Chiropractic as it
20   relates to its claims against the Buccaneers and
21   related entities that are not reflected in this
22   agreement?
23      A    I don't believe so.
24      Q    Did you have any sort of oral

Page 228

1    agreement with Medical & Chiropractic regarding its
2    representation in this case that are different than
3    the terms reflected here?
4       A    I'm not aware of any.
5       Q    Were you aware of any amendments that
6    were made to this agreement after it was signed?
7       A    No.
8       Q    Were you aware of any other agreements
9    that existed regarding Medical & Chiropractic's
10   claims against the Buccaneers before you signed
11   this agreement?
12      A    I don't recall.
13      Q    So to the best of your recollection,
14   the answer is no?
15      A    I said I don't --
16           MR. SOBLE:  Objection.
17   BY THE WITNESS:
18      A    -- recall.
19           MR. SOBLE:  Misstates his testimony.
20   BY MR. BLONIEN:
21      Q    Okay.  Then what do you recall as to
22   any other agreements with Medical & Chiropractic
23   regarding the Buccaneers litigation apart from the
24   agreement that's sitting before you today,

Page 229

1    Mr. Wanca?
2           MR. SOBLE:  Objection.  Asked and
3    answered.
4    BY THE WITNESS:
5       A    I don't have any other recollection.
6    BY MR. BLONIEN:
7       Q    This is the only agreement that you
8    recall?
9           MR. SOBLE:  Objection.  Asked and
10   answered.
11   BY THE WITNESS:
12      A    That's correct.
13   BY MR. BLONIEN:
14      Q    And this agreement requires that you
15   list out any division of fees, right?
16           MR. SOBLE:  Objection.  Asked and
17   answered.
18           MR. BLONIEN:  Well, then it should be
19   easy.
20   BY THE WITNESS:
21      A    I think it addresses retention.
22   BY MR. BLONIEN:
23      Q    If you look at Page 189, which should
24   be the second page in the exhibit that is before

Page 230

1  you, Mr. Wanca, about a middle of the page, there's
2  a sentence that starts "Plaintiff's counsel."
3         Let me know when you see
4  "Plaintiff's counsel."
5         (Whereupon, witness perusing
6         document.)
7  BY THE WITNESS:
8     A    Oh, there it is.
9  BY MR. BLONIEN:
10    Q    Okay.  The document reads,
11 "Plaintiff's counsel agree that any agreement among
12 counsel as to the division of fees and costs among
13 them shall be in writing and that be subject to
14 client's written consent."
15        That was your agreement with
16 Ms. Zakrzewski and M&C, correct?
17    A    Yes.
18    Q    When did you inform Medical &
19 Chiropractic of your division-of-fees arrangement
20 with Mr. Addison?
21    A    Mr. -- Mr. Good had primary client
22 contact on this case.
23    Q    Okay.
24    A    I don't know the dates.

Page 231

1     Q    Do you know whether Medical &
2  Chiropractic was informed of the division-of-fees
3  agreement?
4     A    Yes.
5     Q    When was Medical & Chiropractic
6  informed of the division-of-fees agreement with
7  Michael Addison?
8     A    I told you I don't remember the dates.
9     Q    No, but you remember when -- or you
10 remember that it happened?
11    A    Yes.
12    Q    Okay.  Can you give me an
13 approximation?
14        MR. SOBLE:  Objection.  Asked and
15 answered.
16 BY MR. BLONIEN:
17    Q    Was it in 2013?
18        MR. SOBLE:  Same objection.
19 BY THE WITNESS:
20    A    I'd have to go back and -- and look.
21 BY MR. BLONIEN:
22    Q    Do you know whether it was before this
23 agreement was signed?
24    A    I don't recall.  I didn't have primary

Page 232

1  contact with this client.
2     Q    Did you instruct anyone to contact
3  Ms. Zakrzewski and find out whether Medical &
4  Chiropractic consented to the division of fees as
5  you and Mr. Addison agreed to?
6     A    That would be communication with the
7  law firm again.
8        MR. SOBLE:  Then don't answer on the
9  basis of privilege.
10 BY THE WITNESS:
11    A    I can't answer that question.
12 BY MR. BLONIEN:
13    Q    You're not answering that question?
14    A    I said I can't answer it, so I'm
15 not --
16    Q    Right.
17    A    -- that's correct.
18    Q    So you do have an answer that you're
19 not willing to share because you're refusing to on
20 privilege grounds?  Just so I make sure I
21 understand and I'm not missing anything, there's
22 nothing that impairs your ability to answer,
23 correct?
24    A    The impairment is a disclosure of

Page 233

1  privileged communications.
2     Q    So you are asserting and relying on a
3  privilege and refusing to answer?
4     A    Yes.
5     Q    Okay.  Do you have any other
6  impairments that prohibit you from answering fully
7  and truthfully today?
8     A    No.
9     Q    Are you on any drugs or other
10 medication that would impair your ability to answer
11 truthfully today?
12    A    No.
13    Q    Mr. Addison is not a party to this
14 agreement, correct?
15    A    Correct.
16    Q    And this agreement requires that if
17 there's any affiliation with other law firms in
18 connection with this representation that the client
19 be notified and agree in writing, correct?
20    A    That's what it says.
21    Q    Okay.  And that didn't happen here,
22 right?
23    A    Any relationship between us and our
24 client is not of issue in this case, and we've

Page 234

1 complied with the terms of this agreement.
2 Q Do you remember my question?
3 A I could have it read back to me.
4 MR. BLONIEN: Why don't you repeat it?
5 BY MR. BLONIEN:
6 Q I'm happy to do that, if you like.
7 A Well, I've been getting a lot of the
8 same questions, so maybe you want to give it to me
9 again.
10 Q That didn't happen here, right?
11 A What didn't happen here?
12 A Mr. Addison's agreement to the terms
13 listed here.
14 MR. SOBLE: Object to the form.
15 BY THE WITNESS:
16 A I believe Mr. Addison had -- has
17 agreed to the terms of the representation of not
18 only his client, but also our plaintiff.
19 BY MR. BLONIEN:
20 Q Okay. And where in the production
21 that you provided us in response to the subpoena
22 can I find that document?
23 A I don't know.
24 Q Did you produce it?

Page 235

1 A We've produced what we have.
2 Q Okay. Did you produce Mr. Addison's
3 agreement?
4 A I don't know the sum total of the
5 production.
6 Q Are you -- Do you recall seeing
7 Mr. Addison's signature on a retention agreement
8 with Medical & Chiropractic?
9 A No, I haven't.
10 Q Do you recall seeing M&C's agreement
11 in writing to Mr. Addison's retention in connection
12 with the Tampa Bay Buccaneers litigation?
13 A I would have to check the file.
14 Q Did you check the file?
15 A The files were checked in response to
16 the subpoenas that were directed to my firm.
17 Q Okay. So you checked and you found
18 what? What did you find?
19 A I didn't handle that.
20 Q You found nothing?
21 A I said I didn't handle that.
22 Q Right. So I'm asking you based on
23 your personal knowledge what you found when you
24 checked your records.

Page 236

1 A I just said I didn't --
2 Q Okay.
3 A I didn't check it.
4 Q Do you instruct someone to check your
5 records?
6 A Yes, I did.
7 Q And what did they report back after
8 they checked the records?
9 MR. SOBLE: Object to the form.
10 BY THE WITNESS:
11 A You're asking for communications
12 between myself and other lawyers in my firm?
13 BY MR. BLONIEN:
14 Q Do you understand my question?
15 A Is your question that you're asking me
16 for communications between me and another attorney
17 in my firm --
18 Q What I asked you -- Sir, what I asked
19 you was whether or not you instructed anyone to
20 look through your records, and your answer was yes.
21 A Yes.
22 Q And I asked you, what did they report
23 back?
24 A That would be an attorney -- attorney

Page 237

1 communication, correct? I don't think I can answer
2 that.
3 Q Are you not answering that question?
4 A That would be an attorney -- a work
5 product and attorney-client communication.
6 Q Okay. Are you refusing to answer that
7 question?
8 A Yes.
9 Q When was that agreement signed?
10 MR. SOBLE: Object to the form.
11 BY THE WITNESS:
12 A What agreement are you talking about?
13 BY MR. BLONIEN:
14 Q The agreement that Mr. Addison made
15 agreeing to the terms of the retention agreement
16 that's before you today, Mr. Wanca.
17 A I don't know.
18 Q Can you provide the Court with any
19 information about this supposed agreement that
20 Mr. Addison made as to the terms of the retention
21 agreement?
22 MR. SOBLE: Object to --
23 BY MR. BLONIEN:
24 Q Are there any details that you can

60 (Pages 234 to 237)

Page 238

1    provide?
2         MR. SOBLE:  Object to the form.
3    BY THE WITNESS:
4         A    The relationship between myself, my
5    law firm, and Medical & Chiropractic is not at
6    issue in this case and has been handled
7    appropriately.
8    BY MR. BLONIEN:
9         Q    Anything else that you can state under
10   oath in response to my question, Mr. Wanca?
11        A    I think I've given you my answer.
12        Q    How did M&C select you as counsel?
13        A    They were recommended by other medical
14   professionals at a seminar that they attended, I
15   believe.
16        Q    And where did you learn that
17   information?
18        A    When they communicated with -- with
19   our firm a number of years ago.
20        Q    When was that?
21        A    I can't give you the exact date.  I
22   don't know.
23        Q    Okay.  I don't want the exact date,
24   the best you can do.

Page 239

1         A    Prior to 2013.
2         Q    Was it before 2012?
3         A    I don't know exactly.
4         Q    Was it perhaps 2010?
5         A    I can't tell you.  I don't know.
6         Q    Could it have been 2010?
7              MR. SOBLE:  Objection.  Asked and
8    answered.
9    BY THE WITNESS:
10        A    I can't give you an exact date.
11   BY MR. BLONIEN:
12        Q    I didn't ask for an exact date.  I
13   asked you whether or not it's possible that it
14   could be 2010.
15        A    It's possible --
16             MR. SOBLE:  Objection.  Asked and
17   answered.
18   BY THE WITNESS:
19        A    It's possible that Elvis is alive too
20   so, you know, anything is possible.
21   BY MR. BLONIEN:
22        Q    Okay.  Is that the sum and substance
23   of your response to that question, Mr. Wanca?
24             MR. SOBLE:  Objection.  Asked and

Page 240

1    answered four times.
2              MR. COHEN:  But we got the Elvis
3    stuff --
4              MR. BLONIEN:  Right.
5              MR. COHEN:  -- so he's got to follow
6    up.
7    BY MR. BLONIEN:
8         Q    Is that the sum and substance of your
9    answer?  I'm making sure that you have adequate
10   opportunity to provide what you think is a true and
11   accurate answer to my questions.  That's your
12   requirement under oath.
13        A    I already have.
14             MR. SOBLE:  Same objection.
15   BY MR. BLONIEN:
16        Q    You understand you're still under
17   oath, right?
18        A    Yes.
19        Q    Okay.  Have you ever asked Mr. Bock to
20   participate in a class action involving the
21   Tampa Bay Buccaneers?
22        A    No.
23        Q    You don't recall ever communicating
24   with Phil and asking him to join a lawsuit

Page 241

1    involving the Tampa Bay Buccaneers?
2              MR. SOBLE:  Objection.  Asked and
3    answered.
4    BY THE WITNESS:
5         A    There may have been some e-mails that
6    have gone out that he was included in a chain that
7    he shouldn't have gotten.  I don't recall.
8    BY MR. BLONIEN:
9         Q    Okay.  You don't recall, but there may
10   have been?  Is there anything else that you recall
11   about the document that may have been in existence,
12   those e-mails?  Do you recall reading them?
13             MR. SOBLE:  Object to the form.
14   BY THE WITNESS:
15        A    I don't recall.
16   BY MR. BLONIEN:
17        Q    Is there anything else that you
18   recall?
19        A    No.
20        Q    Did you tell M&C about your experience
21   or credentials when they called you?
22        A    I don't recall the conversation with
23   them.  It's been a number of years.
24        Q    Do you recall whether or not you told

61 (Pages 238 to 241)

Thompson Court Reporters, Inc
thompsonreporters.com

Page 242

1    them about your licensure in Florida?
2        A    That they have two attorneys that have been
3    generally admitted in Florida.
4        Q    Are you licensed in Florida?
5        A    No, I'm not.
6        Q    Did you tell M&C that you were
7    licensed in Florida?
8        A    I don't believe so.
9        Q    Are you a member of the trial bar in
10   the Northern District of Illinois?
11       A    Yes.
12       Q    When did you become a member of the
13   trial bar?
14       A    A long time ago.
15       Q    Can you give me an approximate date?
16       A    Prior to '81.
17       Q    Thank you.
18            Do you hold yourself out as an
19   expert in the Telephone Consumer Protection Act?
20       A    I would say I've litigated a large
21   number of those cases.
22       Q    Okay.  My question is, do you hold
23   yourself out as an expert in TCPA litigation?
24       A    Yes.

Page 243

1        Q    Have you told any prospective clients
2    that you're an expert in TCPA litigation?
3        A    Well, I've told them something close
4    to that, either experienced or -- or something
5    close to those words.  I can't recall every word
6    that I've ever used in describing our experience in
7    that area.
8        Q    Did you say anything along those lines
9    to M&C when they first spoke with you?
10       A    I don't recall the conversations with
11   them.
12       Q    Do you know whether M&C considered any
13   other attorneys before selecting you as class
14   counsel on their behalf?
15       A    I don't.
16       Q    I'm sorry.  I missed your response.
17       A    I don't.
18       Q    You don't.  Thank you.
19            You said at one point, Mr. Wanca,
20   that there were promises made in the Buccaneers
21   mediation that they really wanted to settle, and
22   then it went nowhere and you were frustrated by
23   that.
24            What promises did -- were made?

Page 244

1        A    That they really wanted to settle the
2    case.
3        Q    Who told you that?
4        A    Barry Postman.
5        Q    And Barry Postman was the attorney for
6    the Tampa Bay Buccaneers?
7        A    Yes.
8        Q    And at some point, Mr. Postman was
9    replaced with Mr. Mester, correct?
10       A    Is Postman still in the case?  Mester
11   said the same thing to Mike Addison.
12       Q    When did Mr. Mester say that to
13   Mr. Addison?
14       A    When he was retained and came into the
15   case, he says, "I'm here to settle the case.  I'm
16   not a litigator."
17       Q    And you and your colleagues were
18   excited and optimistic about Mester's involvement
19   in the case, right?
20       A    I wouldn't say excited and optimistic.
21   I was hopeful.
22       Q    And Mr. Mester wanted to use
23   Wayne Andersen as a mediator, right?
24       A    Yes.

Page 245

1        Q    And you did not?
2        A    Correct.
3        Q    But Mr. Siprut did?
4        A    Yes.
5        Q    And Mr. Siprut had conversations with
6    Mr. Mester about the potential mediation, right?
7        A    You'd have to talk to Mr. Siprut about
8    it.  I understood he did, but I wasn't a party to
9    those conversations.
10       Q    I appreciate that.
11            But he told you he did, right?
12       A    He told me he did, yes.
13       Q    And he said that he thought that
14   Andersen was a good idea, right?
15       A    I believe he was in favor of Andersen,
16   yes.
17       Q    Because he's settled a case with
18   Andersen before, right?
19       A    Yes.
20       Q    Do you remember what case that was
21   that he settled with Andersen and Mester?
22       A    I believe he mediated a text message
23   case with -- with the two of them, and there may
24   have been more cases.

62 (Pages 242 to 245)

Page 246

1    Q    After you told Mr. Siprut that he
2  wasn't allowed to attend the mediation, he
3  responded by e-mail in a rather forceful manner,
4  right?
5        MR. SOBLE:  Object to the form.
6  BY THE WITNESS:
7    A    Yes.  He wasn't too happy.
8  BY MR. BLONIEN:
9    Q    And he threatened to show up and
10 physically insert himself or something along those
11 lines?
12   A    Something along those lines, yes.
13   Q    And then after that discussion, you
14 had a phone call with him and settled him down?
15       MR. SOBLE:  Object to the form.
16 BY THE WITNESS:
17   A    I guess you can call it that.
18 BY MR. BLONIEN:
19   Q    Okay.  Tell me about that
20 conversation.
21       MR. SOBLE:  If it's not about the
22 mediation, you can tell him about it.
23       THE WITNESS:  Well, it is about the
24 mediation.

Page 247

1        MR. SOBLE:  As long as it's not about
2  exchanges that would be mediation-privileged, you
3  can tell him about it.  The internal discussions --
4  BY THE WITNESS:
5    A    Well, the internal -- the discussions
6  I had between myself and Joe Siprut are reflected
7  in the e-mail exchange that was produced.
8  BY MR. BLONIEN:
9    Q    Okay.  I don't want to know what the
10 e-mails say.  I want to know what your best
11 recollection is under oath as to what you said to
12 Mr. Siprut and what he said to you in that
13 conversation you just referred to, settling him
14 down after he made a threat about physically
15 intruding himself into the mediation.
16       What was discussed in that call?
17   A    What's contained in the e-mails that
18 were produced.
19   Q    Okay.  I'm not asking you to tell me
20 what was produced.  I'm asking you to tell me
21 what's up in your head right now that you can
22 recall, to the best of your recollection under
23 oath, as to what was said in that conversation.
24   A    That he was not to -- he was not

Page 248

1  representing either of the plaintiffs in our case;
2  that we were handling the case; that we were
3  negotiating the case; and that we were working the
4  case, which is reflected in the e-mails.
5    Q    Did you make a promise to him about
6  sharing in the fees to the extent that the case
7  resolved?
8    A    There was an agreement for sharing of
9  fees if the case ever resolved.
10   Q    And Mr. Siprut and his firm would get
11 26 percent of the proceeds of attorneys' fees?
12   A    I thought Mr. Cohen said it was 16.
13   Q    Oh, 16 percent.
14       Is it your understanding that
15 Mr. Siprut did 16 percent of the work in the class
16 action litigation?
17       MR. SOBLE:  Objection.  Asked and
18 answered, following the same line of questioning
19 from Mr. Cohen.
20 BY THE WITNESS:
21   A    Mr. Siprut had a very large lodestar
22 that he shared with us at that point in time.
23 BY MR. BLONIEN:
24   Q    What was his lodestar?

Page 249

1        MR. SOBLE:  Objection.  Asked and
2  answered.
3  BY THE WITNESS:
4    A    Somewhere between four hundred and
5  $900,000.
6  BY MR. BLONIEN:
7    Q    Is it your understanding that
8  Mr. Siprut did 16 percent of the work in the class
9  action litigation?
10       MR. SOBLE:  Objection.  Asked and
11 answered.
12       MR. BLONIEN:  Not answered.
13 BY MR. BLONIEN:
14   Q    Please answer.
15       MR. SOBLE:  Objection.  Asked and
16 answered.
17 BY THE WITNESS:
18   A    I don't know what -- what his lodestar
19 at that time compared to ours and Mike's.
20 BY MR. BLONIEN:
21   Q    Would you say, between you and
22 Mr. Addison, who did the larger share of the work?
23       MR. SOBLE:  Object to the form.
24

63 (Pages 246 to 249)

Thompson Court Reporters, Inc
thompsonreporters.com

Page 250

1    BY MR. BLONIEN:
2        Q    Do you understand the question?
3        **A    Yes, I do.**
4            MR. SOBLE:  Do you understand whether
5    "you" means you personally or the law firm of
6    Anderson + Wanca?
7            MR. BLONIEN:  I vociferously object to
8    coaching the witness on that answer.
9    *1*        And please mark the deposition
10   transcript at this location.
11   BY MR. BLONIEN:
12       Q    And go ahead and answer, please.
13       **A    I don't know the respective lodestars**
14   **of the -- of all the attorneys at that time.**
15       Q    Based on your best estimation under
16   oath sitting here today, Mr. Wanca, who did more of
17   the work, Mr. Addison or you or your firm?
18       **A    Through what date?**
19       Q    The totality.
20       **A    My firm.**
21       Q    What percentage would you say that
22   your firm has spent of the overall attorneys' fees
23   invested in the Tampa Bay Buccaneers class action
24   litigation, your best estimate?

Page 251

1        **A    I don't know.**
2        Q    Would it be about 50 percent of the
3    work?
4        **A    Yes.  It would be more than 50 percent**
5    **of the work.**
6        Q    You said that Mike Addison invited you
7    into the case; is that right?
8        **A    Yes.**
9        Q    Did he also invite Medical &
10   Chiropractic?
11       **A    Yes.**
12       Q    Why was Medical & Chiropractic added
13   as a plaintiff?
14       **A    That's work product and attorney --**
15   **attorney communications between Mike and myself.  I**
16   **don't think I can answer that question.**
17       Q    Attorney -- Okay.  Who's the client in
18   that scenario?
19       **A    Which scenario?**
20       Q    In the scenario where you're refusing
21   to answer a question that I asked you under oath.
22       **A    Mike represented Cin-Q.  We**
23   **represented Medical & Chiro.**
24       Q    Okay.

Page 252

1        **A    So those were the clients.**
2        Q    Mike did not represent Medical &
3    Chiropractic, correct?
4        **A    Mike became involved in the suit when**
5    **we -- or on their behalf when the -- when we**
6    **intervened them in.**
7        Q    Do you recall when the intervention
8    was?
9        **A    No, I don't.**
10       Q    Would it refresh your recollection if
11   I told you that it was October 11th, 2013?
12       **A    No.**
13       Q    Okay.  Assume for me that the motion
14   to intervene was filed on October 11th, 2013.
15           Is it your understanding that
16   Mr. Addison at that time represented
17   Medical & Chiropractic?
18       **A    Well, after the intervention was --**
19           THE REPORTER:  I'm sorry.  Could you
20   start over?
21   BY THE WITNESS:
22       **A    He represented them as well as -- when**
23   **they were intervened into the case.**
24

Page 253

1    BY MR. BLONIEN:
2        Q    Okay.  And what is the basis for you
3    saying that he represented them?  Is there a
4    written agreement somewhere?
5        **A    I'd have to look.**
6        Q    Are you aware of any written
7    agreement?
8        **A    I'd have to go check the appearances**
9    **in the case.**
10       Q    Are you aware of a written agreement?
11       **A    I'm aware of a number of agreements.**
12       Q    Okay.  Are you aware of a written
13   agreement that Mr. Addison has reflecting his terms
14   of representation for Medical & Chiropractic in
15   connection with the Tampa Bay Buccaneers
16   litigation?
17       **A    As I sit here today, no.**
18       Q    Okay.  Were you aware at any time?
19       **A    I'm not sure.**
20       Q    Do you know of any unwritten agreement
21   specifying terms of Mr. Addison's representation of
22   M&C?
23       **A    No.**
24       Q    When did Mr. Addison start

Page 254

```
 1   representing Medical & Chiropractic based on your
 2   understanding, Mr. Wanca?
 3           MR. SOBLE:  Objection.  Asked and
 4   answered.
 5   BY THE WITNESS:
 6       A    When Medical & Chiro intervened in.
 7   BY MR. BLONIEN:
 8       Q    By permission of the Court?
 9       A    I don't remember the form of the
10   order.
11       Q    Okay.  Mainly, I'm just trying to
12   understand if it was the time of filing the motion
13   to intervene, in your view, or if it was after the
14   Court had accepted that motion to intervene and
15   allowed for them to enter.
16           Which is it?
17       A    I don't know.
18       Q    You don't know?
19       A    I don't know.
20       Q    You don't know when Mr. Addison
21   started to represent Medical & Chiropractic in
22   connection with the Tampa Bay Buccaneers
23   litigation?
24           MR. SOBLE:  Objection.  Asked and
```

Page 255

```
 1   answered.
 2   BY MR. BLONIEN:
 3       Q    But you're certain that it happened?
 4       A    I'd have to check the file.
 5       Q    What would you check in the file?
 6       A    I told you, the appearances.
 7       Q    Do you think that an appearance form
 8   controls whether or not someone has a legal
 9   relationship with a client?
10           MR. SOBLE:  Object to the form.
11   BY THE WITNESS:
12       A    Yes.
13   BY MR. BLONIEN:
14       Q    When Mike invited you into the case,
15   did he tell you what he expected the case value to
16   be at that time?
17       A    That would be attorney -- attorney
18   communications.  I'm not sure I can answer that.
19           MR. SOBLE:  Okay.
20   BY MR. BLONIEN:
21       Q    Are you refusing to answer the
22   question?
23       A    No.  I'm saying I don't believe I can
24   answer it.
```

Page 256

```
 1       Q    Do you know the answer to that
 2   question?
 3       A    Yes.
 4       Q    Okay.  And can you answer that
 5   question without invading any attorney privilege or
 6   whatever privilege you're asserting here today,
 7   Mr. Wanca?
 8       A    I don't believe I can.
 9       Q    Okay.  So are you asserting a
10   privilege as a basis to refuse to answer that
11   question?
12       A    Work product and attorney --
13   attorney-client privilege.
14       Q    Work product and attorney-client?
15       A    Yeah.
16       Q    And who's the client?
17       A    Cin-Q and Medical & Chiro.
18       Q    Do you represent Cin-Q?
19       A    Yes, we do.
20       Q    And that would be Anderson & Wanca
21   represents Cin-Q?
22       A    Yes, we do.
23       Q    And who else does Anderson + Wanca
24   represent in the Tampa Bay Buccaneers litigation,
```

Page 257

```
 1   Mr. Wanca?
 2       A    Medical & Chiro.
 3       Q    Is there anyone else?
 4       A    Those are the only parties that I
 5   believe are in that case.  We also represent the
 6   Stein plaintiffs in the -- in the Siprut case, and
 7   we had, I believe, been involved for Accounting For
 8   You, which is also a Siprut case that was filed.
 9   He had two of them.
10       Q    Anyone else?
11       A    That's all I recall.
12       Q    Who all represented Medical &
13   Chiropractic in the Tampa Bay Buccaneers
14   litigation?
15       A    Myself, my firm, and Mike.
16       Q    Anyone else?
17       A    No.
18       Q    Mr. Siprut did not represent M&C,
19   correct?
20       A    Correct.
21       Q    Mr. Siprut did not sign any sort of a
22   retention agreement with M&C, correct?
23       A    Correct.
24       Q    Mr. Siprut did not agree to the terms
```

65 (Pages 254 to 257)

Page 258

1  of the retention agreement, correct?
2       MR. SOBLE: Object to the form.
3  BY THE WITNESS:
4       A   He wouldn't have agreed to them
5  because he wouldn't have -- he wouldn't have seen
6  them.
7  BY MR. BLONIEN:
8       Q   He never saw the terms of the
9  retention agreement?
10      MR. SOBLE: Object to the form.
11 BY THE WITNESS:
12      A   No.
13 BY MR. BLONIEN:
14      Q   And M&C didn't give written consent to
15 the division of fees for Mr. Siprut, correct?
16      A   I'm not sure.
17      Q   You don't know, sitting here today, of
18 any agreement?
19      A   There's been no fees divided, so
20 there's nothing to talk about.
21      Q   But there's been a -- an agreement as
22 to the division of fees is your testimony, right?
23      A   There's been an agreement.
24      Q   So there's been an agreement on behalf

Page 259

1  of your client, Medical & Chiropractic, right?
2       A   There's been an agreement among
3  attorneys.
4       Q   Right. The attorneys representing
5  Medical & Chiropractic?
6       A   Yes.
7       Q   As to how the division of fees would
8  work in the event of an eventual settlement, right?
9       A   Yes.
10      Q   So you and Mr. Siprut and Mr. Addison
11 had already divvied up the pie of attorneys' fees,
12 assuming that there was a settlement; that part had
13 been agreed to?
14      A   We had agreed -- agreed between
15 ourselves as to how to handle our respective cases.
16      Q   And did you consider that agreement
17 binding?
18      A   I considered it an agreement that --
19 that was binding that -- Yes.
20      Q   And you didn't tell M&C about the
21 agreement?
22      A   I don't recall that I had discussions
23 with them. Ross may have.
24      Q   Okay. But you don't recall ever

Page 260

1  having any discussions with M&C about that topic?
2       MR. SOBLE: Objection. Asked and
3  answered.
4  BY THE WITNESS:
5       A   I don't recall.
6  BY MR. BLONIEN:
7       Q   And you don't recall seeing a written
8  agreement where M&C agreed to the division of fees
9  as you and Mr. Siprut and Mr. Addison all agreed
10 to, correct?
11      A   I don't recall seeing an agreement,
12 that's correct.
13      Q   You understand in light of the
14 Eleventh Circuit's ruling that your motion to
15 intervene will likely be granted in the TTA case?
16      MR. SOBLE: Object to the form.
17 BY THE WITNESS:
18      A   I would hope it would.
19 BY MR. BLONIEN:
20      Q   Okay. And assume with me that the
21 Court grants that intervention.
22      Is it your understanding that at
23 that moment of you entering in the case as an
24 intervenor, that you would also represent TTA as

Page 261

1  class plaintiffs?
2       A   I don't think I want to represent TTA.
3       Q   That wasn't my question.
4       A   I'm sorry?
5       Q   My question was whether you would,
6  assuming the Court allows your intervention, as it
7  appears you would agree with me that they're likely
8  to do so, would you represent TTA upon your
9  intervention in the case?
10      A   I'd be representing my clients.
11      Q   Would you be representing TTA?
12      A   I'd have to look and see what the
13 effect of the -- the intervention is with respect
14 to a settlement such as what we're dealing with in
15 this case.
16      Q   So sitting here today, you can't
17 answer my question?
18      A   You're asking me for the legal effect
19 of something. I would need to research it.
20      Q   Right. So you can't answer the
21 question sitting here today?
22      A   Correct.
23      Q   Thank you.
24      What facts are necessary --

66 (Pages 258 to 261)

Page 262

1  f-a-c-t-s -- in order to file a TCPA claim?
2          MR. SOBLE: Objection. Asked and
3  answered.
4  BY THE WITNESS:
5      **A      A willing plaintiff, a determination**
6  **of who the defendant is, a determination that --**
7  **that the plaintiff received an ad, perhaps some**
8  **other things that I -- that don't occur to me right**
9  **now.**
10  BY MR. BLONIEN:
11      Q      Okay. But that's all that occurs to
12  you right now?
13      **A      Yes, at 6:30 on Friday.**
14      Q      That's all you can remember right now
15  as to what would be necessary to file a TCPA case?
16      **A      Yes.**
17          MR. SOBLE: Objection. Asked and
18  answered.
19  BY MR. BLONIEN:
20      Q      You wouldn't need to know mediation
21  history in order to file a TCPA case, wouldn't you
22  agree with that, Mr. Wanca?
23          MR. SOBLE: Objection. Asked and
24  answered and to the form.

Page 263

1  BY THE WITNESS:
2      **A      In the abstract, correct.**
3  BY MR. BLONIEN:
4      Q      Do you know when the faxes were sent
5  in the Tampa Bay Buccaneers litigation? The faxes
6  at issue there, do you know when they were sent?
7      **A      2009 and 2010.**
8      Q      Do you know when M&C filed its motion
9  to intervene?
10          MR. SOBLE: Objection. Asked and
11  answered.
12  BY THE WITNESS:
13      **A      I think you've asked me that before.**
14  **You gave me a date, and I said it doesn't refresh**
15  **my recollection.**
16  BY MR. BLONIEN:
17      Q      Do you know when in 2009 the faxes
18  were sent?
19      **A      June or July; I don't recall the exact**
20  **time.**
21      Q      Do you have an understanding as to
22  whether, if Medical & Chiropractic decided to file
23  its own class action complaint in -- on
24  October 11th of 2013, whether their claim would

Page 264

1  have been time-barred?
2      **A      I don't. I'd have to look at it.**
3      Q      Did you attempt to negotiate a
4  different settlement for the claimants whose faxes
5  were in 2009?
6      **A      That would be a mediation privilege.**
7  **I can't answer that.**
8      Q      Are you refusing to answer the
9  question I asked?
10      **A      No. I'm saying I can't answer that.**
11      Q      Do you not know the answer to that
12  question?
13      **A      I know the answer to that.**
14      Q      Okay. Then you can answer, but you're
15  choosing not to on the grounds of privilege.
16          Am I understanding you correctly?
17      **A      A mediation privilege, which the**
18  **Buccaneers has refused to waive.**
19      Q      Okay. But you understand that
20  Medical & Chiropractic waived it in this case,
21  right?
22      **A      Yes. We waived the mediation**
23  **privilege, but the Buccaneers would not.**
24      Q      Okay. So, internally, did you discuss

Page 265

1  with your team whether or not to negotiate a
2  different settlement for people whose faxes were
3  sent before October 2009?
4      **A      I'm not sure.**
5      Q      You knew when Dave left your firm that
6  he would be continuing to work on joint cases,
7  right?
8      **A      He was supposed to, yes.**
9      Q      Okay. And what do you mean by "he was
10  supposed to"?
11      **A      He hasn't.**
12      Q      What do you -- He was authorized to do
13  so at the time?
14          Let me try it differently. I
15  understand from your expression that I'm not
16  getting through on my question, so let me try it in
17  a little different way.
18          At the time that Mr. Oppenheim
19  left your employment, there were a number of active
20  cases ongoing at that particular time between your
21  firm and Bock Law Firm, correct?
22      **A      Where we were both co-counsel on the**
23  **cases; is that what you mean?**
24      Q      That is what I mean.

67 (Pages 262 to 265)

1   **A   Yes.**
2   Q   Okay.  Do you have an estimation of
3   how many cases at the time that Mr. Oppenheim left
4   your firm?
5   **A   Less than 30.**
6   Q   Less than 30 cases.
7       More than 20?
8   **I can't tell you.**
9   Q   Just less than 30 is all you got?
10  **A   Yes.**
11  Q   Okay.  So there were some amount of
12  cases less than 30 that you had a co-counsel
13  relationship with the Bock Law Firm at the time
14  that Mr. Oppenheim departed your firm, correct?
15  **A   Correct.**
16  Q   And it was your understanding that
17  Mr. Oppenheim would continue to work on those
18  cases?
19  **A   Yes.**
20  Q   And you didn't raise any objection at
21  the time of his departure for his continued
22  involvement in those cases, right?
23  **A   No, I did not.**
24  Q   When Mr. Oppenheim left your firm, did

1   you tell M&C?
2   **A   At some point in time.**
3   Q   When?
4   **A   I can't recall.**
5   Q   When did you learn that
6   Mr. Oppenheim's laptop had been stolen?
7   **A   When a police report was provided.**
8   Q   Who gave you the police report?
9   **A   I don't recall how -- how it got to**
10  **me.**
11  Q   Did Foley & Lardner provide it to you?
12  **A   I don't recall.**
13  Q   Did you have any conversations with
14  Foley & Lardner about Mr. Oppenheim's report of a
15  theft?
16      MR. SOBLE:  Objection.  Calls for
17  attorney-client privilege.  I'm advising --
18  BY MR. BLONIEN:
19  **A   Are you refusing to answer the**
20  **question?**
21      MR. SOBLE:  -- him not to answer.
22  BY THE WITNESS:
23  **A   Yes.**
24

1   BY MR. BLONIEN:
2   Q   When did you decide to pay all of the
3   costs and fees associated with this litigation,
4   Mr. Wanca?
5   **A   The date that's on the engagement**
6   **letter.**
7   Q   Okay.  When did you decide to engage
8   Foley & Lardner?
9   **A   Sometime in advance of the May 26,**
10  **2015 engagement letter.**
11  Q   When was the first time you contacted
12  Foley & Lardner about this representation?
13  **A   Sometime after we became aware of the**
14  **litigation that was -- that was filed down in**
15  **Florida by the Bock firm.**
16  Q   Do you recall whether it was after the
17  discussion that you had by e-mail with Phil Bock
18  about filing on top of you?
19  **A   I don't recall.**
20  Q   When did you make -- When did you
21  inform Medical & Chiropractic that you promised to
22  pay all of their litigation fees and expenses?
23  **A   It was somewhere around the time of**
24  **the engagement letter, which is May 26th, 2015.**

1   Q   Did you introduce M&C to Foley &
2   Lardner?
3   **A   You mean my firm?**
4   Q   Either your firm or you.
5   **A   Yes; I believe so.**
6   Q   Do you know when that happened?
7   **A   No.**
8   Q   At the time that M&C was introduced to
9   Foley & Lardner, do you know whether M&C had an
10  understanding as to whether you and your firm were
11  going to pay all the fees and expenses?
12  **A   I don't recall all the discussions at**
13  **that point in time.**
14  Q   Do you recall the discussions that you
15  had with M&C after Mr. Oppenheim's departure, but
16  before you retained Foley & Lardner as counsel in
17  this case?
18  **A   That's attorney-client.**
19      THE WITNESS:  Isn't it?
20      MR. SOBLE:  Right now, he's just
21  asking if you recall such a discussion.
22  BY THE WITNESS:
23  **A   I don't recall the discussions.**
24

Page 270

```
 1    BY MR. BLONIEN:
 2        Q    Do you recall having any such
 3    discussions?
 4        A    What does "such discussions" refer to
 5    again?
 6        Q    With M&C regarding the potential
 7    claims at issues in this case.
 8        A    Yes.  I recall that there were some.
 9        Q    How many conversations?
10        A    I couldn't tell you.
11        Q    Can you give me an approximation?
12        A    More than one, less than ten.
13        Q    Do you recall when they happened?
14        A    Sometime prior to, in close
15    relationship to the May 26, 2015 date.
16        Q    When you say "close relationship," are
17    you talking a matters of weeks?
18        A    Yes.
19        Q    Months?
20        A    No, during May of 2015.
21        Q    Under the agreement with Foley &
22    Lardner, under no circumstances is Medical &
23    Chiropractic responsible for fees and costs,
24    correct?
```

Page 271

```
 1            MR. SOBLE:  Objection.  Asked and
 2    answered.
 3    BY THE WITNESS:
 4        A    We covered -- Mr. Cohen covered that.
 5    He read it into the record.
 6    BY MR. BLONIEN:
 7        Q    Okay.  There are a lot of questions
 8    that might duplicate.  I'm doing my best to move it
 9    along.  We can spend some time and go back to the
10    record, or you can just answer the question.
11        A    I did --
12            MR. SOBLE:  Or you can just answer
13    another question.  He just did.
14    BY THE WITNESS:
15        A    I did.  I said he read it into the
16    record.
17    BY MR. BLONIEN:
18        Q    Okay.  So is it your understanding
19    that in no circumstances whatsoever is
20    Medical & Chiropractic responsible for their fees
21    and expenses associated with this litigation,
22    Mr. Wanca?
23            MR. SOBLE:  Objection.  Asked and
24    answered.
```

Page 272

```
 1    BY THE WITNESS:
 2        A    Yes, only the law firm is responsible
 3    for the payment of the firm's invoices and expenses
 4    incurred.
 5    BY MR. BLONIEN:
 6        Q    So when did M&C first become aware of
 7    your commitment to pay all of the costs and fees
 8    unconditionally?
 9            MR. SOBLE:  Objection.  Asked and
10    answered.
11    BY THE WITNESS:
12        A    Somewhere around the time, in May
13    of 2016 -- 2015.
14    BY MR. BLONIEN:
15        Q    Did you have any conversations with
16    Mike Addison about this case?
17        A    About?
18        Q    About the Medical & Chiropractic's
19    claims against Mr. Oppenheim and Bock Law Firm.
20        A    Yes.
21        Q    When did you have conversations with
22    Mr. Addison about that topic, Mr. Wanca?
23        A    I can't give you a timeline on that.
24    I don't know.
```

Page 273

```
 1        Q    How many conversations?
 2        A    Through the period of time from May of
 3    2015 to the present.
 4        Q    2016.  I think that's misdated.  If
 5    you look at the signature page, perhaps that would
 6    help refresh your recollection about when that
 7    agreement was signed.
 8            MR. SOBLE:  I didn't think it was two
 9    years ago.
10            MR. BLONIEN:  It feels like it.
11    BY THE WITNESS:
12        A    2016, okay, 2016.
13            MR. SOBLE:  So just for the record,
14    the last couple answers he gave the "2015" when he
15    was reading the letter should be "2016," I think.
16    He was just reading the date on the letter.
17    BY MR. BLONIEN:
18        Q    So in previous responses, you may have
19    said "2015."  Now that you've refreshed your
20    recollection about when -- the date it was signed,
21    was it 2016?
22        A    It looks like 2016.
23        Q    Okay.
24        A    That's dated that, although the letter
```

**69 (Pages 270 to 273)**

Page 274

1    itself has a -- has a typo as to the year.
2        Q    Okay. So my question is, recall for
3    me, as best as you can, the conversations that you
4    had with Mr. Addison about this litigation. And
5    you understand what I mean by that phrase?
6        MR. SOBLE: Well, first answer whether
7    you understand what he means about that phrase.
8    BY THE WITNESS:
9        A    I believe I understand what you mean.
10   BY MR. BLONIEN:
11       Q    Okay.
12       A    That would be attorney-to-attorney
13   communication.
14       MR. SOBLE: It's work product --
15   BY THE WITNESS:
16       A    Yes.
17       MR. SOBLE: It's work product
18   privilege.
19   BY THE WITNESS:
20       A    It's work product and attorney-client.
21       MR. SOBLE: It has not been waived in
22   this case.
23   BY MR. BLONIEN:
24       Q    Who's the client?

Page 275

1        MR. SOBLE: My objection is work
2    product privilege.
3        But go ahead. I didn't hear that
4    at first.
5    BY THE WITNESS:
6        A    Medical & Chiro.
7    BY MR. BLONIEN:
8        Q    Medical & Chiropractic? And who's the
9    attorney?
10       A    And Anderson + Wanca is the -- is the
11   client also.
12       Q    Anderson + Wanca is the client also.
13   I'm not sure I understand what you mean by that.
14       Can you please --
15       A    We were party to the rep agreement.
16       Q    Okay. But you're not a party to this
17   litigation, right?
18       A    I'm not a named party to the
19   litigation, that's correct.
20       MR. SOBLE: What's our time total?
21       THE VIDEOGRAPHER: Six hours and
22   34 minutes.
23   BY MR. BLONIEN:
24       Q    When was the last invoice you received

Page 276

1    for this case?
2        A    I don't remember.
3        Q    When was the last invoice you
4    remember?
5        A    I get invoices fairly regularly. I
6    believe they bill on a monthly basis.
7        Q    Has anyone requested those invoices
8    from you or your firm?
9        A    Request them from me, no.
10       Q    What's your best understanding as to
11   the total amount that has been invoiced to date?
12       MR. SOBLE: Objection. Asked and
13   answered.
14   BY THE WITNESS:
15       A    More than 500,000, less than a
16   million.
17   BY MR. BLONIEN:
18       Q    If your firm was successful in the
19   class action litigation with the Tampa Bay
20   Buccaneers, do you have an estimate of what your
21   firm would likely make in attorneys' fees?
22       A    My firm would make from what, in
23   the -- in our case against the Buccaneers?
24       Q    In the --

Page 277

1        A    Is that your question?
2        Q    In the event that your firm is
3    successful in the Tampa Bay Buccaneers litigation,
4    do you have an estimate of what your firm's likely
5    recovery for fees would be?
6        MR. SOBLE: Objection. Calls for
7    speculation.
8    BY THE WITNESS:
9        A    Yeah; I don't know what -- what the
10   fund amount is going to be, what the terms are
11   going to be, or what the Court's going to award.
12   BY MR. BLONIEN:
13       Q    Did you ever have any understanding as
14   to what the expected amount of attorneys' fees in
15   this case would be?
16       MR. SOBLE: Same objection, and to the
17   form.
18       THE WITNESS: Can you read the
19   question back for me?
20       (Whereupon, the record was
21       read as requested.)
22   BY THE WITNESS:
23       A    As to -- As to that question as to
24   amount, I can't answer that because of the

70 (Pages 274 to 277)

Page 278

1    mediation privilege.  As to a range, I can give you
2    a range.
3    BY MR. BLONIEN:
4        Q    All right.  You can't answer because
5    you don't know the answer; or you do know the
6    answer, but you're refusing to answer on the
7    grounds of privilege?
8        A    No.  My answer would reveal what the
9    Buccaneers were offering, so that's privileged
10   because they won't waive it.
11       Q    If the total fund was $99 million, do
12   you have an understanding as to how much the
13   attorneys' fees would be in such a fund?
14       A    As much as the Court would approve.
15       Q    Is that it?  You have nothing else?
16       A    That's correct.
17       Q    You're a contingency fee lawyer,
18   right?
19       A    Correct.
20       Q    Are all of the cases that you work on
21   contingency fee?
22       A    Yes.
23       Q    Do you have a range of what the
24   contingency fee arrangement is for the work that

Page 279

1    you do?
2        A    The range varies sometimes from --
3    from circuit to circuit.
4        Q    Okay.
5        A    25 percent to -- to a third has
6    been the range that we've received in the
7    Eleventh Circuit.
8        Q    Have you ever received anything
9    greater than 33 percent in the Eleventh Circuit?
10       A    I never asked for any more.
11       Q    Or in any other case, have you asked
12   for more?
13       A    I don't recall asking for more.
14       Q    The retention agreement in the
15   Buccaneers litigation limited the amount that you
16   could request of 33 percent, right?
17       A    I believe so, yes.
18       Q    Do you know what 33 percent of 92 is?
19       A    You can do the arithmetic.
20       Q    Do you know what 33 percent of 92 is?
21   Do you know what 33 percent of 99 is?
22       A    33.
23       Q    So if the ultimate settlement was a
24   $99 million fund, a third would be $33 million; is

Page 280

1    that right?
2        A    That's how the arithmetic works,
3    right.
4        Q    So if you were to manage to settle the
5    case for a $99 million fund, you would get more
6    than half of $33 million, your firm?
7            MR. SOBLE:  Objection.  Calls for
8    speculation.
9    BY THE WITNESS:
10       A    If the Court approves it.
11   BY MR. BLONIEN:
12       Q    Do you know what the low end of the
13   expected value of settlement was in this case,
14   Mr. Wanca?
15           MR. SOBLE:  Object to the form.
16   BY THE WITNESS:
17       A    I wouldn't say that there was an
18   expected value on this case.
19   BY MR. BLONIEN:
20       Q    Okay.  But you refused to settle for
21   less than 50 million, according to the
22   correspondence we saw, right?
23       A    At that time.
24       Q    Okay.  So if we take $50 million, can

Page 281

1    you tell me what a third of that would be?
2        A    Well, whatever the arithmetic works
3    to.
4        Q    What does the arithmetic work to,
5    Mr. Wanca?
6        A    Do you want me to take out a
7    calculator and do it?
8        Q    Sure.  You should have one, I think,
9    on your phone.  You can do it pretty quick, I hope.
10           THE VIDEOGRAPHER:  Except your phone
11   is starting to interfere with the mic for some
12   reason, so I don't know if it was because it was
13   turned off . . .
14           THE WITNESS:  It's not vibrating or
15   anything else like that, so --
16           MR. SOBLE:  Don't worry about it.
17   Just do the arithmetic.
18           (Brief pause.)
19   BY THE WITNESS:
20       A    16 million, six hundred, and some odd
21   thousand.
22   BY MR. BLONIEN:
23       Q    Did you expect to receive between
24   fifteen and $33,000,000 in attorneys' fees in this

Thompson Court Reporters, Inc
thompsonreporters.com

Page 282

1 case?
2    **A   I had no expectancy in this case. I**
3 **was trying to get the best deal I could for the**
4 **class.**
5    Q   Okay. But you do work for money,
6 right?
7    **A   I have to or else I'm out of business.**
8    Q   Right. So your business is a
9 contingency-fee attorney where you win, and then
10 you get paid a percentage of the fee?
11    **A   Correct.**
12    Q   And when Bock Law Firm filed a
13 competing lawsuit, that threatened your ability to
14 make money in the competing case, right?
15    **A   Yes.**
16    Q   To the tune of many millions of
17 dollars, potentially, right?
18    **A   However much it would settle for.**
19    Q   Right. So there was a lot at stake
20 for you?
21    **A   Yes.**
22    Q   And there is a lot at stake for you?
23    **A   Yes.**
24    Q   And that is why that you've chosen to

Page 283

1 spend less -- at least a half a million, less than
2 a million dollars in attorneys' fees for
3 Medical & Chiropractic in this litigation, right?
4    THE VIDEOGRAPHER: Could we move your
5 phone? It's really buzzing loudly.
6    THE WITNESS: (Indicating).
7    Read the question. I'm sorry.
8 We had an interruption here.
9    (Whereupon, the record was
10    read as requested.)
11 BY THE WITNESS:
12    **A   In part.**
13 BY MR. BLONIEN:
14    Q   Okay. What other part?
15    **A   Because it was the right thing to do**
16 **because of how this came down and how David stole**
17 **from us.**
18    Q   Okay. So it was the right thing to
19 do, and your firm stood to make many millions of
20 dollars in the event that you were successful in
21 financing this litigation, right?
22    MR. SOBLE: Objection. Asked and
23 answered.
24

Page 284

1 BY THE WITNESS:
2    **A   I'm not -- I wouldn't characterize it**
3 **that I was financing the litigation. I was**
4 **handling a piece of litigation that I was heavily**
5 **invested into.**
6 BY MR. BLONIEN:
7    Q   Okay. You're heavily invested in this
8 case?
9    **A   Yes.**
10    Q   And M&C's damages in this case are
11 fairly small compared to what you stand to lose,
12 right?
13    **A   I don't know what M&C's damages are.**
14 **I'm not handling the case, and I haven't analyzed**
15 **their -- their damages in this case.**
16    Q   You've had no discussions with anyone
17 about the damages in this case?
18    **A   No.**
19    Q   Have you discussed that issue with
20 Foley & Lardner?
21    **A   No.**
22    Q   Have you discussed that issue with
23 Medical & Chiropractic?
24    **A   No.**

Page 285

1    Q   Have you discussed that issue with
2 Michael Addison?
3    **A   I guess that would, once again, get**
4 **into attorney-attorney communication.**
5    Q   Okay. So are you refusing to answer
6 the question?
7    **A   Work product and attorney-client, my**
8 **conversations with Mike Addison --**
9    MR. SOBLE: If it's something you
10 discussed with Mike and you have a privilege to
11 assert, then assert it. If you never discussed it
12 with him, then . . .
13 BY THE WITNESS:
14    **A   I don't recall if I discussed it with**
15 **Mike. Let's just leave it that way. I had a**
16 **number of conversations with Mike about this case.**
17 BY MR. BLONIEN:
18    Q   Do you have an understanding whether
19 M&C would have brought the case on its own had you
20 not promised to pay for the litigation expenses and
21 fees?
22    MR. SOBLE: Object to the form.
23 BY THE WITNESS:
24    **A   I don't believe they had the financial**

72 (Pages 282 to 285)

Page 286

1 resources to do that.
2 BY MR. BLONIEN:
3 Q Why do you believe that? What's your
4 basis for that, Mr. Wanca?
5 A Well, that would be my communications
6 with the clients.
7 Q Do you believe that M&C is indigent?
8 MR. SOBLE: Object to the form and
9 asked and answered.
10 BY THE WITNESS:
11 A M&C runs an ongoing -- a medical
12 business, and they support themselves through that
13 business.
14 BY MR. BLONIEN:
15 Q Okay. Do you remember my question?
16 A Yes.
17 Q Can you answer mine?
18 A Are they indigent?
19 Q Yes, sir.
20 A I don't believe that would be a proper
21 characterization of -- of their business.
22 Q You would not characterize them that
23 way?
24 A I would not.

Page 287

1 Q Is it your understanding based on
2 their inability to pay that they would not have
3 brought this lawsuit had you not promised to
4 unconditionally pay the fees and expenses?
5 A I'm not sure that they had an ability
6 to fund this litigation.
7 Q Let me ask it differently because that
8 sounds unsure.
9 Do you know whether they had the
10 ability to fund this litigation on their own?
11 A I don't believe they did.
12 Q Okay. So is that you believe that
13 they didn't have the ability to fund the litigation
14 on their own?
15 A Correct.
16 MR. SOBLE: Objection. Asked and
17 answered.
18 BY MR. BLONIEN:
19 Q Did M&C ever tell you, "We can't
20 afford this litigation"?
21 MR. SOBLE: Objection to the extent it
22 calls for the attorney-client privilege, advise the
23 witness not to answer.
24

Page 288

1 BY MR. BLONIEN:
2 Q Are you following the instructions of
3 your client?
4 A Absolutely.
5 Q The advisement of your counsel.
6 I appreciate that distinction.
7 MR. SOBLE: I figured you would.
8 BY MR. BLONIEN:
9 Q You were shown a bunch of e-mails
10 today.
11 What is your e-mail address, sir?
12 A Bwanca@andersonwanca.com.
13 Q And do you use e-mails in the ordinary
14 course of your business?
15 A Yes.
16 Q And to the extent that e-mails were
17 shown to you today, do you have any reason to
18 dispute that you actually received them or sent
19 them to the extent the document reflected it?
20 A No.
21 Q Mr. Oppenheim was an employee of
22 yours, correct?
23 A Correct.
24 Q And he negotiated settlements and

Page 289

1 mediation for a number of the cases that he worked
2 on in your firm, right?
3 A Including cases he didn't work on,
4 yes.
5 Q What do you mean by that?
6 A Cases that the firm had and other
7 members of the firm worked on the case and he
8 attended a mediation.
9 Q And when he attended the mediation, he
10 was acting within the scope of his employment,
11 right?
12 A Yes.
13 Q And he was acting as an agent of your
14 firm?
15 A Yes.
16 Q With full authority and authorization
17 for his participation in those mediations?
18 A To participate, yes.
19 Q Is there any manner in which
20 Mr. Oppenheim was acting at these mediations where
21 he was outside the scope of his agency or
22 employment in your view, Mr. Wanca?
23 A As I sit here today, I can't think of
24 any.

73 (Pages 286 to 289)

Page 290

1   Q   You were his boss, right?
2   **A   Yes.**
3   Q   So you directed as to how the
4  mediation strategy should go, right?
5   **A   We discussed it.  I wouldn't -- I**
6  **wouldn't call it a autocratic.**
7   Q   Okay.  To the extent that there was
8  disagreement within the firm, you had the final
9  say, right?
10   **A   Yes.**
11   Q   And that's true with respect to the
12  M&C litigation as well, right, the Tampa Bay
13  Buccaneers case?
14   **A   No.**
15   Q   That's not true with respect to the
16  Tampa Bay Buccaneers case?
17   **A   Oh, the Buccaneers case.  I'm sorry.**
18  **You said "M&C case."**
19   Q   I did and I'm sorry for misleading
20  you.
21      With respect to the mediations,
22  discussions, and Mr. Oppenheim's involvement, the
23  same is true, correct, that you were the ultimate
24  decider within the firm?

Page 291

1      MR. SOBLE:  Object to the form.
2  BY THE WITNESS:
3   **A   I think we went down this with**
4  **Mr. Cohen.  Mike Addison -- This was Mike's case.**
5  **Mike invited me in.  Mike was involved with and,**
6  **ultimately, Mike's views on settlement would --**
7  **were -- would be listened to, and it would be a**
8  **collective decision.**
9  BY MR. BLONIEN:
10   Q   Do you remember my question?  You were
11  the ultimate decider within the firm, correct?
12   **A   Within the firm, within my firm, yes.**
13   Q   Okay.  And in any way that you can
14  recall sitting here today, did Mr. Oppenheim act in
15  a way that was inconsistent with your instructions
16  or authority granted to him in the scope of the
17  mediation?
18   **A   Yes.  He suggested claims rates to --**
19  **and payouts to the other side, and he also put**
20  **something out there on attorneys' fees before we**
21  **had -- we had all internally discussed it with**
22  **Mike.**
23   Q   Okay.  And you claim that this is
24  without authority?

Page 292

1      MR. SOBLE:  Objection.  Asked and
2  answered.
3  BY THE WITNESS:
4   **A   Yes.**
5  BY MR. BLONIEN:
6   Q   Did you talk with Mr. Oppenheim about
7  that?
8   **A   Yes, many times.**
9   Q   Okay.  When did you talk with
10  Mr. Oppenheim about that?
11   **A   After I -- After I saw the e-mails**
12  **or -- and a number of other settlements where he**
13  **communicated payout rates.**
14   Q   Did you do anything in writing to that
15  effect?
16   **A   He's just down the hall from me,**
17  **so . . . I believe I've sent him some e-mails**
18  **through the years about not predicting claims rates**
19  **and putting out predictions on payouts to people.**
20   Q   Do you assert that Mr. Oppenheim's
21  activities constitutes a breach of fiduciary duty
22  in that respect?  I can be more specific, if you
23  want.
24      MR. SOBLE:  Object to the form.

Page 293

1  BY THE WITNESS:
2   **A   I'm not -- I do not have an opinion as**
3  **we sit here today as to how I would characterize**
4  **his actions.**
5  BY MR. BLONIEN:
6   Q   Did you inform the mediator that
7  Mr. Oppenheim was acting beyond the scope of his
8  apparent authority in that mediation?
9   **A   That would be a mediation privilege**
10  **issue again.**
11   Q   Are you refusing to answer the
12  question?
13   **A   I don't believe I can because the**
14  **Buccaneers haven't waived the mediation privilege.**
15   Q   Okay.  So when you say "can," you mean
16  you know the answer to that question, and you're
17  refusing to answer on the grounds of a privilege;
18  is that correct?
19   **A   Yes.**
20   Q   Did you make any other promises to M&C
21  apart from unconditional payment of all fees and
22  expenses?
23      MR. SOBLE:  Object to the form.
24      THE WITNESS:  That's attorney-client

74 (Pages 290 to 293)

Page 294

1 communication.
2        MR. SOBLE:  And attorney-client
3 communication.
4 BY THE WITNESS:
5     A     Yeah.
6 BY MR. BLONIEN:
7     Q     Are you refusing to answer that
8 question?
9     A     Yes.
10    Q     Did you promise to M&C to pay all
11 expenses and fees in this litigation?
12       MR. SOBLE:  Same objection and asked
13 and answered and it's in the engagement letter.  So
14 it's been asked and answered by both Mr. Cohen and
15 Mr. --
16 BY MR. BLONIEN:
17    Q     Okay.  So tell me any other terms that
18 you made with M&C and promises that you made in
19 connection with that same agreement -- that's what
20 I'm asking you -- or you can refuse to answer on
21 the grounds of privilege.
22    A     There's a number of paragraphs here
23 that are redacted.
24    Q     Do they contain promises that you made

Page 295

1 to M&C?
2     A     I don't know.
3     Q     You don't know?
4     A     I'd have to see them all.
5     Q     Can you recall, sitting here today,
6 any other promise that you made to M&C regarding
7 this litigation apart from paying all of the fees
8 and expenses unconditionally?
9     A     I don't recall of any.
10    Q     Did you promise any other clients that
11 you would pay their fees and expenses?
12       MR. SOBLE:  Object to the form of the
13 question.
14 BY THE WITNESS:
15    A     I believe we've had to engage counsel
16 on behalf of some of the clients through the years
17 in litigation.
18 BY MR. BLONIEN:
19    Q     Did you pay for all the litigation
20 fees and expenses?
21    A     For other clients?
22    Q     For other clients.
23       THE WITNESS:  Can I get into that?
24       MR. SOBLE:  Well, if it's privileged

Page 296

1 communications with other clients, then assert the
2 privilege.
3 BY THE WITNESS:
4     A     Yeah; and I guess it would be.
5 BY MR. BLONIEN:
6     Q     Okay.  So you're refusing to answer
7 whether you have ever agreed to pay expenses and
8 fees for other clients?
9     A     I don't believe I can answer the
10 question without getting into work product and
11 attorney-client communications with other clients
12 in other cases that have nothing to do with this
13 case.
14       MR. SOBLE:  And I would add to that
15 last objection, it has nothing to do with this.
16 BY MR. BLONIEN:
17    Q     Do you understand that unconditionally
18 paying the expenses and fees for a client in an
19 ongoing case violates 1.8(e) of the Rules of
20 Professional Ethics, Mr. Wanca?
21       MR. SOBLE:  Object to the form of the
22 question.
23 BY THE WITNESS:
24    A     I have no opinion on that.

Page 297

1 BY MR. BLONIEN:
2     Q     Okay.  Given that it is a violation of
3 ethical rules, my question is whether or not you've
4 done this in any other instance; that is, agreed to
5 pay expenses and fees for an ongoing client.
6        I'm not asking you right now in
7 this question to identify which client or
8 discussions of communications, but whether there
9 have been any other instances where you have
10 unconditionally agreed to pay litigation expenses
11 and fees on behalf of an ongoing client in
12 violation of Rule 1.8(e)?
13       MR. SOBLE:  And I will object that
14 it's -- First of all, the question is
15 argumentative, and it still has absolutely nothing
16 to do with M&C's claims against your client and the
17 Bock Law Firm.
18       MR. BLONIEN:  It sure sounds like that
19 objection is argumentative.  I'm just looking for
20 an answer.
21       MR. SOBLE:  The objections can be.
22 The questions, they can't be.
23       MR. COHEN:  Guys, you're getting me
24 all frazzled.  I just knocked over my soda.

Page 298

1    MR. SOBLE: Better that than your dip.
2    MR. COHEN: What's that?
3    MR. SOBLE: Better that than your dip.
4    MR. COHEN: No doubt.
5    BY THE WITNESS:
6    **A    I don't believe that anything we have**
7    **done in any case violates the Code of Professional**
8    **Responsibility.**
9    BY MR. BLONIEN:
10    Q    Okay.  Who is "Anderson" of
11    Anderson + Wanca?
12    **A    John Anderson.**
13    Q    And did John Anderson ever work with
14    your firm?
15    **A    Yes, he did.**
16    Q    When did he work with your firm?
17    **A    He worked with me from the time we**
18    **both left Wilson & McIlvaine through 2001, 2003**
19    **timeframe.**
20    Q    During that time, did you agree to pay
21    the expenses and fees for any of your clients?
22    MR. SOBLE: Same objection.
23    BY THE WITNESS:
24    **A    I don't recall that far --**

Page 299

1    BY MR. BLONIEN:
2    Q    Okay.
3    **A    -- back.**
4    Q    After that point in your law firm's
5    existence, have there been other instances where
6    you have unconditionally agreed to pay the expenses
7    and fees on behalf of ongoing clients?
8    MR. SOBLE: Same objection.
9    BY THE WITNESS:
10    **A    I can't answer that question without**
11    **getting into representations with other clients.**
12    BY MR. BLONIEN:
13    Q    You're choosing not to answer that
14    question on the grounds of privilege, sir?
15    **A    Yes, sir.**
16    Q    Do you know whether Mr. Addison has
17    assumed the financial responsibility for the
18    Tampa Bay Buccaneers litigation?
19    MR. SOBLE: Object to the form of the
20    question.
21    BY THE WITNESS:
22    **A    I don't know what you mean by that.**
23    BY MR. BLONIEN:
24    Q    Can you answer that question in any

Page 300

1    way?
2    **A    I don't know what you mean by that.**
3    Q    Well, it's pretty straightforward.
4    My question is, do you know
5    whether Mr. Addison has assumed any financial
6    responsibility for the Tampa Bay Buccaneers
7    litigation?
8    MR. SOBLE: Object to the form of the
9    question and asked and answered.
10    BY THE WITNESS:
11    **A    I believe Mike Addison has assumed --**
12    **Before I answer the question, I'd like to confer**
13    **with counsel because I don't want to say something**
14    **that's going to waive the privilege.**
15    MR. BLONIEN: Okay.  Let's go off the
16    record.
17    THE VIDEOGRAPHER: Going off the
18    record at 7:05 p.m.
19    (Whereupon, a brief recess
20    was had.)
21    THE VIDEOGRAPHER: Going back on the
22    record at 7:07 p.m.
23    Please proceed.
24

Page 301

1    BY THE WITNESS:
2    **A    It's my understanding that Mr. Addison**
3    **is responsible for the expenses for his client in**
4    **the litigation.  So just as we're responsible for**
5    **the expenses for our client in the litigation, and**
6    **when we win or in the cases that we lose, a bill of**
7    **costs sometimes gets filed by the defendants, and**
8    **the attorneys in the case pay the defendant's**
9    **expenses or try to resolve the bill of costs.**
10    BY MR. BLONIEN:
11    Q    Has Mr. Siprut agreed to accept first
12    financial responsibility for this case, Mr. Wanca?
13    MR. SOBLE: Object to the form.
14    BY THE WITNESS:
15    **A    Discussions between counsel --**
16    BY MR. BLONIEN:
17    Q    Are you refusing to answer the
18    question on the grounds of privilege?
19    **A    I'm trying to figure out the privilege**
20    **here.**
21    MR. SOBLE: If you understand the
22    question -- I understood the question to be the
23    same question as related to Mr. Anderson -- excuse
24    me -- Addison, but I don't know if Mr. Blonien has

Page 302

1   done it as a different question.
2   BY THE WITNESS:
3       A   I believe, yes.
4   BY MR. BLONIEN:
5       Q   Identify everything that you know of
6   within your personal knowledge that supports the
7   assertion that Mr. Oppenheim shared
8   mediation-privileged information with the Bock Law
9   Firm?
10          MR. SOBLE:  Objection.  Asked and
11  answered multiple times through Mr. Cohen.
12  BY MR. BLONIEN:
13      Q   Have you answered the question fully
14  based on your knowledge?  Is there any other
15  knowledge that you have that would support the
16  claim?
17          MR. SOBLE:  Same objection.
18  BY THE WITNESS:
19      A   The documents that you produced in
20  discovery, many of which you had had his Bates
21  labeling on them.
22  BY MR. BLONIEN:
23      Q   Anything else?
24      A   I may --

Page 303

1           MR. SOBLE:  Same objection.
2   BY THE WITNESS:
3       A   I may see more documents and be able
4   to identify more; but of what you've shown me
5   today, there's quite a number of them, yes.
6   BY MR. BLONIEN:
7       Q   All right.  Well, I'm asking you for
8   information --
9           MR. SOBLE:  It's been seven hours.
10  BY MR. BLONIEN:
11      Q   -- within your personal knowledge.
12          MR. SOBLE:  And we're -- we're --
13          THE REPORTER:  I didn't hear that
14  last . . .
15  BY MR. BLONIEN:
16      Q   Have you described all of that today,
17  anything that you have personal knowledge about?
18          MR. SOBLE:  It's the same objection,
19  and you're over seven hours.  The deposition is
20  over.
21          MR. BLONIEN:  I object.  I'd like to
22  have an answer to that question, and -- it's one
23  question.  Your witness has taken all the time in
24  the world to answer.  I'm just asking for an answer

Page 304

1   to that question.
2           MR. SOBLE:  You've gotten an answer to
3   that question multiple times in the last seven
4   hours.
5           MR. BLONIEN:  Okay.  Let's go off the
6   record.
7           THE VIDEOGRAPHER:  Going off the
8   record at 7:10 p.m.
9           THE REPORTER:  Signature?
10          MR. SOBLE:  I'm sorry?
11          THE REPORTER:  Signature?
12          MR. SOBLE:  We'll sign it and waive.
13          MR. COHEN:  You'll sign and waive?
14          MR. SOBLE:  I mean, we'll review and
15  sign.
16          I'll take an E-tran PDF.
17          THE REPORTER:  What about you,
18  Mr. Cohen?
19          MR. COHEN:  We will take E-tran, full
20  size and condensed.
21
22          (FURTHER DEPONENT SAITH NOT.)
23
24          (Deposition concluded at 7:10 p.m.)

Page 305

1       IN THE UNITED STATES DISTRICT COURT
        FOR THE NORTHERN DISTRICT OF ILLINOIS
2               EASTERN DIVISION
3
    MEDICAL & CHIROPRACTIC CLINIC,)
4   INC.,                        )
                                 )
5       Plaintiff,               )
                                 )
6       -vs-                     )No. 8:16-CV-01477-CEH-TBM
                                 )
7   DAVID M. OPPENHEIM, et al,   )
                                 )
8       Defendants.              )
                                 )
9
10      I, BRIAN WANCA, being first duly sworn,
11  on oath, say that I am the deponent in the
12  aforesaid videotaped deposition, that I have read
13  the foregoing transcript of my videotaped
14  deposition, consisting of Pages 1 through 307,
15  taken on November 17, 2017, at the aforesaid place
16  and that the foregoing is a true and correct
17  transcript of my testimony so given.
18
19
20          BRIAN WANCA
21  SUBSCRIBED AND SWORN TO
    before me this    day
22  of        , A.D., 2017.
23
24      Notary Public

77 (Pages 302 to 305)

Page  306

1    STATE OF ILLINOIS )
                  ) SS:
2    COUNTY OF C O O K )

3

4        I, KELLY ANN POTTS, Certified Shorthand
5    Reporter in and for the County of Cook, State of
6    Illinois, do hereby certify that on
7    November 17, 2017, the videotaped deposition of the
8    witness, BRIAN WANCA, was taken before me, reported
9    stenographically and was thereafter reduced to
10   typewriting under my direction.
11       The said videotaped deposition was taken
12   at 321 North Clark Street, Chicago, Illinois, and
13   there were present counsel as previously set forth.
14       The said witness, BRIAN WANCA, was first
15   duly sworn to tell the truth, the whole truth, and
16   nothing but the truth, and was then examined upon
17   oral interrogatories.
18       I further certify that the foregoing is
19   a true, accurate, and complete record of the
20   questions asked of and answers made by said
21   witness, BRIAN WANCA, at the time and place
22   hereinabove referred to.
23       The signature of the witness, BRIAN
24   WANCA, was reserved by agreement of the parties.

Page  307

1       The undersigned is not interested in the
2   within case, nor of kin or counsel to any of the
3   parties.
4       WHEREUPON, I set my hand pursuant to the
5   Illinois Shorthand Reporters Act of 1984 on this
6   1st day of December, A.D., 2017.
7
8
9
10   KELLY ANN POTTS, CSR
11   CSR No. 084-003558
12
13
14
15
16
17
18
19
20
21
22
23
24

78 (Pages 306 to 307)

Thompson Court Reporters, Inc
thompsonreporters.com

## A

**A.D** 1:21 305:22 307:6
**a.m** 1:21 7:9 40:18 40:22 149:2 156:1 161:7
**ability** 12:16 64:8 134:12 232:22 233:10 282:13 287:5,10,13
**able** 63:14 107:15 108:14 126:20,24 131:13 132:7,22 133:16 135:13,20 143:20 184:5 303:3
**above** 57:7 61:21 63:7 64:3,15 110:2 147:13
**above-captioned** 130:12
**absent** 94:15
**absolutely** 202:2 205:10 212:23 288:4 297:15
**abstract** 263:2
**accelerate** 180:4
**accept** 179:20 203:3 203:8 301:11
**acceptable** 72:3,10 73:8,13 77:1
**accepted** 207:6 254:14
**access** 92:12
**according** 172:17 173:16 208:1 280:21
**account** 151:16,22 191:21 206:13
**accountant** 217:24
**accounting** 140:5 217:20 218:1 257:7
**accrue** 103:4
**accurate** 64:13,14 64:24 65:15 67:6 67:12,22 68:20 69:23 70:20,22 71:5 240:11 306:19
**accurately** 66:17 209:2
**accusing** 53:10
**acknowledge** 142:15
**acknowledged**

69:18 81:15
**act** 99:24 242:19 291:14 307:5
**acting** 289:10,13,20 293:7
**actions** 30:3 32:11 32:15 38:4 66:14 82:14 88:21 97:9 107:1 109:22 206:6 216:3,3 293:4
**active** 265:19
**actively** 166:6
**activities** 89:4 292:21
**actual** 63:15 124:23 127:6 173:7 182:6 188:10,17 189:7 195:17 196:11 220:21
**actually** 14:1,9,13 27:19 107:1 124:15,19 137:12 143:19 148:1 189:16 195:22 208:3 221:7 224:11 288:18
**ad** 262:7
**Adams** 2:9
**add** 143:6 296:14
**added** 251:12
**Addison's** 11:2 139:15 143:14 147:1 148:15 179:22 234:12 235:2,7,11 253:21
**additional** 10:12 44:22 49:5 58:5 135:3 152:8 182:8
**address** 23:7,11,14 288:11
**addresses** 206:15 207:19 208:1 209:2 211:12,20 213:20 214:10 229:21
**adds** 107:20
**adequacy** 118:22 119:6
**adequate** 118:1 119:16 120:3 240:9
**adequately** 119:15
**administration** 130:24 202:9 211:8

**administrators** 187:14
**admit** 74:22
**admitted** 242:3
**advance** 179:7 268:9
**advanced** 141:14 179:10
**adverse** 111:3
**advertisement** 90:10,16 105:5
**advertising** 104:16 104:23 105:8,15 113:5 114:11 150:13 168:8,9,21
**advice** 205:6,19 221:22
**advisable** 179:10
**advise** 18:23 118:12 197:14 221:18 287:22
**advised** 58:16 64:21
**advisement** 288:5
**advising** 74:13 267:17
**affects** 227:2
**affiliation** 233:17
**affirmative** 96:3,12 96:15 113:2 114:3 114:8,13,17 115:3 116:11
**afford** 287:20
**afield** 173:6
**aforesaid** 305:12,15
**again** 12:1 15:18 18:14 57:6 58:3 78:13 88:1 112:3 123:14 128:24 146:18 154:16 172:5 183:22 184:14 210:6 232:7 234:9 270:5 285:3 293:10
**against** 43:20,22 44:13 45:10 46:18 72:20 81:13 103:14 105:6,16 106:14 166:21 224:21 225:5,19 225:24 227:15,20 228:10 272:19 276:23 297:16
**agency** 289:21
**agent** 289:13
**ago** 9:19 72:20 92:17 207:11

238:19 242:14 273:9
**agreed** 47:9,18 48:1 81:11 138:1 139:20 159:15 189:10 232:5 234:17 258:4 259:13,14,14 260:8,9 296:7 297:4,10 299:6 301:11
**agreeing** 50:20 108:3 237:15
**agreements** 37:1,19 37:22 38:3 43:3 106:22 228:8,22 253:11
**agrees** 102:7
**ahead** 118:9 182:19 205:11 223:12 250:12 275:3
**al** 1:7 7:4 171:16 305:7
**aligned** 94:10
**alive** 25:23 239:19
**allegation** 31:10
**allowed** 159:18 246:2 254:15
**allows** 261:6
**alone** 87:13 88:13
**along** 141:8 159:14 243:8 246:10,12 271:9
**Alpha** 117:5
**already** 19:6,11 48:18 49:2 59:2 59:13 62:3 79:13 85:15 104:9 139:23 142:7 171:24 172:9 193:17 240:13 259:11
**alternative** 96:24
**although** 58:4 93:5 133:12 192:16 273:24
**always** 44:20
**am** 17:5 44:10 45:15 73:22 97:18 100:4 119:5 146:7 151:14,20 154:2 180:12 186:23 264:16 305:11
**amended** 150:18
**amendments** 228:5
**American** 95:18

**among** 129:13 194:7 230:11,12 259:2
**amongst** 108:18 192:19 193:20
**amount** 48:21 82:19 90:5 102:9 141:5 141:13,14 149:13 180:7 188:10,11 188:11 189:11,14 206:13 266:11 276:11 277:10,14 277:24 279:15
**analysis** 58:2 65:5 65:16 67:16,18,23 71:20 73:12 118:4 196:6
**analyzed** 143:4 284:14
**analyzing** 191:12 193:19
**and/or** 43:19 44:12 219:24
**Andersen's** 61:13 68:10 134:13
**Andrew** 210:18
**anecdotal** 198:13,18
**Ang** 3:2 7:19
**Ann** 1:17 306:4 307:10
**another** 18:4 21:11 125:4 145:23 154:16 168:3 171:8 177:12 199:8 219:11 220:10 236:16 271:13
**answering** 76:8 82:20 121:21 191:4 224:2 232:13 233:6 237:3
**answers** 204:4 273:14 306:20
**anticipated** 139:21 151:18 155:6 189:7,12
**anticipating** 85:16 196:9
**anticipation** 10:7
**anticipations** 191:10
**anybody** 225:6,10 225:15 226:2
**anymore** 205:15
**anyone** 14:17 15:24

16:3 220:3 223:2
223:4,7 224:14
225:14 232:2
236:19 257:3,10
257:16 276:7
284:16
**anyway** 94:4 133:11
**anywhere** 70:14
71:18 143:24
**apart** 25:18 228:23
293:21 295:7
**apologize** 79:5
128:5,12,22
**apparent** 293:8
**apparently** 158:4
159:24
**appeal** 103:5 168:2
168:5 171:24
172:9
**appealed** 95:21
140:7
**appealing** 171:23
172:20
**appeals** 95:21
116:13 143:20
167:22 216:4,10
**appear** 9:14 121:10
129:5 157:12
210:13
**appearance** 169:7
173:23 255:7
**appearances** 253:8
255:6
**appeared** 2:6,12,18
201:18 216:7,13
**appears** 113:20
129:1 159:13
201:21 210:8,23
211:6 261:7
**appellate** 216:5
**applied** 34:7 35:15
**applies** 107:1
**apply** 33:24 99:20
106:19
**appreciate** 36:15
58:5 60:4 70:6,15
109:13 141:11
181:23 245:10
288:6
**appropriate** 90:14
158:9 182:20
**appropriately** 238:7
**approval** 83:24 98:9
98:10 111:17
130:11 156:6
**approve** 42:15

190:19 278:14
**approved** 42:14
84:11 188:1
208:24
**approves** 280:10
**approving** 108:22
109:5
**approximate** 13:3
24:17 242:15
**approximately** 11:8
12:2 15:16 17:4,6
22:14 23:4 24:2,6
24:7 38:15 48:22
105:19 130:17
159:11 176:7
192:23 195:16
**approximation**
29:21 231:13
270:11
**April** 55:1 57:2
58:14 63:4 64:14
68:2 87:5 132:18
132:21 133:18
134:14,21 144:4,8
**architects** 199:9,15
199:18,24 201:8
**area** 29:6 200:6
243:7
**arguably** 93:5
**argue** 31:15 75:17
75:18 80:12
115:17 154:1
181:20 197:5
**argued** 168:2 216:8
216:14
**arguing** 80:14
**argument** 116:9,21
175:8 216:8
**argumentative** 12:6
12:10,20 18:21
25:10,15 27:7
29:10 52:13 120:6
209:5 297:15,19
**arguments** 116:24
**arithmetic** 279:19
280:2 281:2,4,17
**around** 16:9 24:10
70:22 143:20
268:23 272:12
**arrangement** 32:23
33:12,20,24 35:13
35:14 101:21
139:14 230:19
278:24
**art** 167:15,17
**articulated** 75:3

77:3,7
**articulating** 181:21
**ascertainability**
115:23 167:23
168:4
**ascertainable**
115:17
**aside** 60:4 72:11
131:7 193:16
**asks** 147:2 162:12
**aspects** 87:11
**assert** 94:8 113:2
285:11,11 292:20
296:1
**asserted** 96:2,7
114:3 220:19
**asserting** 46:18
233:2 256:6,9
**assertion** 302:7
**assessment** 66:18
66:22 67:7 71:21
72:6,9 73:12
117:23 136:17
145:15
**assigned** 220:3
**associated** 81:12
268:3 271:21
**Associates** 91:16,20
**associating** 216:24
**assume** 51:17
102:20 103:22
112:22 132:2
134:14 135:2
140:14,15 153:5
193:3 202:8 203:6
211:11 252:13
260:20
**assumed** 16:24
17:12,16 299:17
300:5,11
**assumed-name** 18:1
**assuming** 85:11,12
85:13 144:16,23
259:12 261:6
**assured** 83:20
**attached** 192:21
194:11 210:11
**attachment** 150:1
164:13
**attachments** 154:22
**attempt** 142:10
213:12 264:3
**attempted** 159:19
**attempting** 108:10
189:5 207:24
**attend** 246:2

**attendant** 179:13
**attended** 238:14
289:8,9
**attending** 82:21
**attention** 77:18
102:18 113:22
**attorney-attorney**
285:4
**attorney-client** 76:6
204:18 221:18
223:13 226:15
237:5 256:13,14
267:17 269:18
274:20 285:7
287:22 293:24
294:2 296:11
**attorney-to-attor...**
274:12
**attorneys** 39:20
109:21 173:10
174:8 195:20
199:5 242:2
243:13 250:14
259:3,4 301:8
**auction** 31:10,11
51:11 111:15
118:6
**August** 137:8,12,16
144:7,18 163:8
178:24 179:8,19
180:11 181:8
182:9,13 183:12
183:14
**authority** 203:3
289:16 291:16,24
293:8
**authorization**
289:16
**authorized** 265:12
**autocratic** 290:6
**available** 59:3,15
83:6 86:3 87:16
88:4,16 90:2
116:1,10 118:18
130:22
**average** 187:23
188:2,4
**award** 83:17,19
84:3,12 85:13
189:13 194:18
277:11
**awarded** 85:8,12
107:4
**awards** 130:23
151:18 188:15
**away** 180:6

**B**
**b** 47:21
**B2B** 88:23 89:2,7
89:10 90:2,3,17
91:7
**B2B's** 89:4
**back-and-forth**
191:7
**background** 158:15
**bad** 180:19
**Bais** 117:11
**bait** 80:10
**Bank** 174:20
**banks** 26:18
**bar** 242:9,13
**Barnett** 210:11,18
**Barry** 2:9 7:20
76:19 244:4,5
**barry@blonienle...**
2:11
**bars** 99:6
**based** 50:3,9 81:16
89:8 103:21
107:17 132:13
134:13,21 139:21
140:20 141:18
188:22 190:16
214:23 221:17
235:22 250:15
254:1 287:1
302:14
**bases** 223:14
**basis** 76:8 102:9
131:14 142:3
197:24 209:12
212:9,21,24
214:15 232:9
253:2 256:10
276:6 286:4
**Bates** 62:6 77:18
101:6 121:5,17
137:23 138:8
145:3 154:21
157:13,21 159:5
176:2 302:20
**Bates-labeled** 13:19
**Bay** 61:12 68:9
69:14,22 70:24
235:12 240:21
241:1 244:6
250:23 253:15
254:22 256:24
257:13 263:5
276:19 277:3
290:12,16 299:18
300:6

**became** 15:16 18:1
22:13 37:17 134:2
252:4 268:13
**become** 242:12
272:6
**becomes** 118:18
**begin** 226:7,16
**beginning** 7:14 81:4
126:12 128:5
185:20 215:20
**begins** 7:1 58:24
59:22 60:2
**behind** 42:17 53:8
**being** 7:11 42:24,24
43:16 57:20 62:15
76:19 77:20,21
90:22 105:8
124:22 125:1
151:15 172:19
188:11,23 195:2
196:12 198:15
202:16 207:16
208:7 305:10
**belief** 27:4 65:19
79:7 80:13 178:13
181:2 196:18
197:24 198:16
**believed** 182:14
**Bell** 15:15 22:13,15
22:17,19,24 24:5
**belonged** 111:22
**below** 148:15
159:23 160:23
**benchmark** 160:14
**benefit** 83:10 84:8
87:1 138:17 139:5
141:20 142:10,12
142:16,17,18
194:15 195:23
196:11 200:14
201:5 218:4,16
219:12
**benefited** 84:4
142:10
**benefiting** 139:2
**Berman** 39:11,19
**best** 24:21 99:22
133:17 181:2
209:8 228:13
238:24 247:10,22
250:15,24 271:8
274:3 276:10
282:3
**Better** 298:1,3
**beyond** 87:16 88:15
161:1 179:12

191:8 208:13
293:7
**big** 167:12,15 196:7
**Biggerstaff** 150:8
**bill** 276:6 301:6,9
**billed** 48:8
**Billing** 46:22
**binding** 259:17,19
**bit** 139:23
**Blackmun** 15:13
19:24
**blank** 149:12
161:10
**BLF** 62:10
**BLF17** 61:18
**BLF18** 61:19
**BLF7** 58:21
**BLF9** 57:2,6 62:7
**BLP** 113:1,2 114:3
114:17 116:1
**BLP's** 114:13
**BMW** 166:21
167:11 168:8,9,20
168:21 169:22
170:9,19 171:10
171:16 172:22
174:20 175:7
**Bob** 95:10,11,13,20
**Bock's** 166:24
167:19
**bolded** 113:24
**Bomberger** 15:13
19:23
**boss** 290:1
**both** 34:11 35:18
36:23 50:15 53:12
54:17 55:7,13,24
62:9 64:19 66:6
68:6 70:20 156:1
199:13 223:13
265:22 294:14
298:18
**bottom** 31:1 35:3
53:9 54:15 58:15
58:21 61:7,18
77:19 115:16
121:6 137:23
149:2 176:3
181:16 201:19
**Boulevard** 3:6
**bracket** 180:4
**Brady** 26:1
**breach** 292:21
**breaching** 125:8
**break** 40:14 51:2
69:10 81:8 87:7

126:6,15,19 185:3
185:24 215:10
**Bridgeview** 30:16
30:22
**brief** 40:19 75:13
115:12 126:3
153:10 185:17
186:14 215:17
281:18 300:19
**briefed** 57:13
**briefing** 49:6 115:5
116:7,8
**briefs** 33:15 50:11
50:14,16,22 96:1
202:22 203:24
207:9
**bring** 51:10 90:13
95:3,16 143:21
168:6,10
**broad** 57:9 61:24
65:12 67:4,21
**broadcast** 92:4
206:18
**broadcaster** 66:14
**broadcasting** 88:21
89:4 90:3
**broadly** 219:24
**broken** 69:11
**Brooke** 161:20
**brought** 50:7,14,16
51:8,14,16,18
52:21 53:1 72:14
72:18 83:10 96:16
105:4 139:18
142:18 143:5
285:19 287:3
**Bruce** 3:5 7:9
**bruce@thompson...**
3:8
**Bucs** 68:9 69:14,22
71:1 88:2 92:15
144:15 154:22
156:5,24 192:14
212:24
**building** 12:13
82:13 213:22
**bunch** 288:9
**business** 16:12,22
32:2 88:22,22
89:1,1 217:22
282:7,8 286:12,13
286:21 288:14
**businesses** 26:12
**buzzing** 283:5
**Bwanca@anderso...**
288:12

C

**C** 2:1 306:2
**c-y** 183:18
**calculated** 47:12
85:14 102:1 104:2
**calculates** 194:22
**calculating** 188:17
**calculations** 195:11
195:14
**calculator** 281:7
**call** 102:3,17 133:2
133:5 175:5
246:14,17 247:16
290:6
**called** 1:13 8:13
21:15,16 241:21
**calls** 111:8 112:1
118:3 196:23
267:16 277:6
280:7 287:22
**came** 15:14 37:6,10
89:2 98:22 121:7
121:18 126:19
147:12 204:4
205:3 244:14
283:16
**campaign** 90:3
**cannot** 13:2
**capacity** 18:4,5
**Capital** 57:7 61:22
63:6,8 64:3,15,20
64:22 193:6,11
**caps** 180:12
**career** 15:10
**carried** 148:14
157:15
**carrier** 207:13
**carriers** 206:24
**carries** 146:19
**carrying** 52:10,17
134:20
**caselaw** 147:2 160:6
200:9
**categorize** 128:7
**cause** 82:7 168:12
195:19 196:12
**CE** 199:17,23 201:7
**Central** 22:7 171:15
**cert** 4:19 57:13
115:5 117:22
**certain** 10:13 75:20
93:7 112:13
133:13 151:15
189:11,24 191:1
217:7 255:3
**certainly** 100:17

**certification** 112:10
113:16 115:2
116:7 117:19
119:10 167:20,21
168:19 169:5
171:12,23 172:21
193:9
**certified** 1:18 83:7
93:17 101:8 102:7
216:3 306:4
**certify** 171:22 306:6
306:18
**cetera** 73:12 179:14
202:16
**chain** 79:24 135:14
135:21 137:7
145:23 148:3
155:15 156:16
163:7 165:23
178:23 201:15
241:6
**chains** 55:1,3,7 56:6
87:6,12
**chair** 28:3
**chance** 157:23
**change** 34:20
129:21
**changed** 16:10
63:23 150:16
**changing** 187:9
**characteristic** 97:10
**characterization**
119:5 286:21
**characterize** 68:22
284:2 286:22
293:3
**check** 76:9 93:3,8
104:10,24 203:4
212:6 235:13,14
236:3,4 253:8
255:4,5
**checked** 235:15,17
235:24 236:8
**checks** 211:13,22
212:13 213:22
**Chicago** 1:20 2:4,16
3:7 7:12 15:15
23:6 179:1,8
306:12
**Chinese** 80:8
**chips** 182:2
**Chiro** 82:3,5 224:19
225:17 226:3,8
227:1 251:23
254:6 256:17
257:2 275:6

**Chiro/Buccaneers** 225:1
**Chiropractic's** 224:21 225:19,24 228:9 272:18
**choosing** 264:15 299:13
**chosen** 282:24
**Cin-Q/Buccaneers** 121:12
**circle** 216:1
**circled** 217:12
**circling** 217:4
**circuit** 31:14 94:11 95:8,16 116:13 118:18 140:7,8 167:22 279:3,3,7 279:9
**Circuit's** 260:14
**circuits** 167:24
**circumstance** 160:7
**circumstances** 191:24 270:22 271:19
**civil** 1:15 20:6,10,11 22:20 27:20 28:3 30:11
**claim-in** 158:22 202:11 213:19
**claimant** 94:5 202:11
**claimants** 213:23 264:4
**claimed** 141:4
**claiming** 188:14 202:12 212:3
**claims-made** 159:15
**clarification** 76:6
**clarify** 121:22
**Clark** 1:20 2:4 7:12 30:16,22 306:12
**class-settlement.c...** 187:18 210:16 211:4 213:18 214:8
**class-wide** 142:3
**clawback** 181:22 182:3
**clear** 45:3 56:14 63:18,21 66:23 74:7 75:18,21 79:6 123:8 127:2 138:10,10 158:18 160:4 190:7 209:12,15 225:23
**Clement** 105:11,12

105:17 106:14
**client's** 230:14
**Clinic** 1:4 8:8 41:20 48:7 82:10 100:13 305:3
**close** 25:19,21 47:13 70:14 71:18 114:12 130:12 149:5 151:8 243:3 243:5 270:14,16
**closing** 152:22
**co-class** 30:11
**co-counsel** 30:3 32:17,23 140:3 201:9 217:2 265:22 266:12
**coaching** 250:8
**Code** 298:7
**colleagues** 139:16 244:17
**collective** 203:9,12 203:13 291:8
**college** 15:7
**combined** 143:14
**come** 56:5 57:16 58:3 72:7 153:7 165:17 195:14 199:1 214:8
**comes** 150:17
**coming** 184:24
**commanding** 9:14
**comment** 77:23 156:6
**commentary** 58:5
**commercial** 20:22 22:20 24:1 26:18
**commitment** 272:7
**common** 115:22 159:17 160:4 161:3
**communicate** 174:11
**communicated** 91:16 109:11 238:18 292:13
**communicating** 184:2 240:23
**communication** 132:20 133:1,14 134:6,8,21 136:5 192:20 221:9 232:6 237:1,5 274:13 285:4 294:1,3
**communications** 38:16 55:5 132:14

137:19 157:12 194:13 211:2 213:10 219:21,22 233:1 236:11,16 251:15 255:18 286:5 296:1,11 297:8
**company** 88:22
**compare** 70:7 104:5 143:13
**compared** 141:9,20 143:18 249:19 284:11
**compel** 43:8
**compelled** 42:18
**compensate** 47:10 47:18
**compensation** 47:12 83:6,10 84:10 202:13 212:7
**competing** 72:23 85:24 87:15 88:1 92:15 282:13,14
**complaint** 84:23 222:14 263:23
**complete** 161:2 306:19
**completed** 141:8
**completely** 116:12
**complexity** 35:2
**compliance** 10:11 104:3
**compliant** 108:11 115:7 116:2,12
**complied** 106:11 234:1
**comply** 100:2 106:3
**components** 211:9
**comport** 209:3
**compound** 20:4 35:24 93:5
**compressed** 184:10
**comprised** 11:10
**compromise** 75:11
**compromising** 73:19 76:1
**compute** 188:5,5 190:22
**computer** 43:23 51:20 53:5,6,12 174:14
**concept** 101:20 190:9
**concern** 12:4 195:20 196:12
**concerning** 92:18

198:6
**concerns** 182:10,12
**conclude** 60:13 88:1
**concluded** 55:22 304:24
**conclusion** 111:9 112:1
**condensed** 304:20
**condition** 12:8
**conduct** 50:3,4,8,9 50:10,17,19 51:2 51:3,13 64:9 81:17,19,20 99:5 102:20 103:12,23 106:13 179:8
**confer** 126:6,15 300:12
**conferred** 139:5
**confidence** 132:6 133:16
**confident** 112:9 131:12 133:13
**confirm** 149:11,12 165:23
**confirm/tell** 155:21
**confirmation** 159:21
**confirmed** 140:16 176:15
**confirms** 159:23
**confusing** 44:16 45:3
**confusion** 225:3
**connection** 8:7 223:8,20 226:23 233:18 235:11 253:15 254:22 294:19
**Conrail** 21:10
**consent** 53:6 114:18 115:4 173:2 230:14 258:14
**consented** 98:12 232:4
**consider** 28:8,15,24 29:5 160:8 259:16
**considered** 88:9 243:12 259:18
**consistent** 118:11 158:23
**consisting** 305:14
**constantly** 118:17
**constitute** 78:8 87:8
**constituted** 210:12
**constitutes** 119:6 292:21

**constitutional** 209:4
**consulted** 207:17
**Consumer** 242:19
**contact** 171:19 172:22 174:4 230:22 232:1,2
**contacted** 34:22 142:1 173:10 174:8 268:11
**contain** 58:8 294:24
**contained** 61:3 62:10,13 68:6,19 79:23 89:3,10 194:15 247:17
**contemplates** 102:13 159:23
**contemplating** 159:23
**contend** 56:18 57:19 58:7 62:13 68:13 87:8
**content** 57:18 62:2 79:12
**contention** 111:14
**contents** 56:7 87:11
**context** 109:21 182:8
**contingency** 103:18 278:17,21,24
**contingency-fee** 282:9
**contingent** 101:21 102:2,16,21,23,24 103:7,8 104:1 105:22 106:22
**continue** 43:12 266:17
**continued** 61:13 68:10 69:9 266:21
**continuing** 47:1 136:10 156:23 164:3 183:21 265:6
**contract** 14:16,24 25:6 102:13 104:11 174:22 208:23 209:1
**contributing** 140:20
**contribution** 138:16 138:22 139:4 184:21 203:12
**control** 25:20 175:15
**controls** 255:8
**conundrum** 206:4
**conversation**

241:22 246:20
247:13,23
conversations 80:9
80:16 243:10
245:5,9 267:13
270:9 272:15,21
273:1 274:3 285:8
285:16
conveyed 146:6
158:24
conveying 70:19
convoluted 192:2
Cook 1:19 306:5
coordination 89:24
copied 53:5
copies 11:19,20,21
copy 170:7,24
copying 156:20
159:13
corp 16:14
corporation 16:16
16:21 17:11,18
72:19
correctly 48:9 55:20
57:14 59:18
101:18 102:10
116:3 119:23
130:14 136:14
138:4,13 146:11
147:8 155:1,22
156:7 168:18
176:9,21 177:19
182:15 193:14
264:16
correlated 208:6
correspond 160:20
corresponded 91:6
correspondence
280:22
corresponding
206:16
costs 85:4,15 130:24
143:12 164:16,18
230:12 268:3
270:23 272:7
301:7,9
couldn't 11:15
36:13 214:4
270:10
counsels 7:13
count 11:12
counter 176:6 193:4
counterdemand
178:6
countered 43:9
counteroffers 92:19

counterpart 107:10
107:12
counting 122:14
county 1:19 72:19
200:2 306:2,5
couple 26:18 121:15
145:8 273:14
course 44:23 58:22
78:1 89:23 91:17
108:9 111:17
145:16 288:14
Court's 75:3 106:3
108:11 197:4
277:11
courtroom 27:19
courts 117:1
cover 58:16 78:3,18
81:20 192:20
210:9 216:1
coverage 20:16,18
22:21
covered 81:18,19
271:4,4
Craig 72:19
created 125:4,12,14
127:8,13
creates 196:7
credentials 241:21
credibility 12:5
credit 168:9,21
180:7
criminal 205:2,3
criticism 207:23
criticisms 203:19
CSR 307:10,11
CSX 21:23
Cusack 22:15,19
custody 175:14
customers 89:5 90:4
cy-pres 183:17
184:13

            D
d 102:24 119:14
d/b/a 16:15
damages 284:10,13
284:15,17
Dan 7:16 19:2 31:6
DANIEL 2:15
danieljaycohen20...
2:17
data 92:5,12 93:22
202:15
database 208:7
dated 103:8 104:11
144:13 151:1

154:16 162:11
175:1 181:8 182:9
192:13 210:9,14
210:18 211:10
273:24
dates 25:6 40:13
144:20 169:2
179:6 230:24
231:8
Dave 164:13 265:5
David's 184:2
day 1:21 12:11
31:18 135:1 144:5
152:9 154:18
155:17 156:1
179:13 180:10
305:21 307:6
days 70:13 71:17
133:18 145:8
183:13
DC 116:13
deal 213:11 282:3
dealing 261:14
dealt 66:13
debate 190:20
December 26:6 66:6
157:14,17 159:12
161:7,22 162:24
210:14,20 211:7
307:6
decide 28:20 33:9
85:23 268:2,7
decided 43:1 51:9
263:22
decider 290:24
291:11
decision 66:6
118:18 168:2
203:10 291:8
decision-making
79:1 220:1,12,13
220:20,23 221:6
decisions 145:7
220:17
declare 92:21
declared 92:20
93:10 132:1,3
declaring 93:19
declined 139:10
declining 139:6
142:8,16
def 136:10
defendant's 58:2
65:6 67:16,19,24
301:8
defendants 1:8

37:15 57:9 61:24
65:12 67:4,20
115:16 142:1
301:7 305:8
defense 20:21,22,23
21:7 30:13,20
31:22 96:3,8,12
96:15 98:18 113:3
114:8,13,17 115:3
116:11 189:5
205:3
defenses 114:4
define 44:16
definitely 125:3
128:21
degree 15:7
degrees 15:8
delayed 219:15
demand 124:23
125:5,12,15 127:6
127:9 178:4 180:1
185:1 196:7
demanded 63:22
183:16 184:12
demands 63:23
124:19 191:12
denial 169:5 171:23
172:21
denied 43:10 66:9
117:19,19,22
167:21 168:19
171:13 219:14
denying 66:6
dep 82:21
departed 266:14
departure 266:21
269:15
dependent 110:20
depends 28:17
deponent 304:22
305:11
depose 107:14
deposed 76:19
133:12
depositions 1:17
33:14 49:6 74:21
89:19,21 122:16
derivatively 87:2
describe 29:8 70:18
described 33:21
44:11 70:16
102:16 303:16
describes 129:14
describing 155:5
213:19 243:6
description 65:15

121:16
Design 199:17,23
201:7
desire 64:1 110:21
destiny 25:20
detail 58:4 181:15
details 58:23 78:2
214:17,20 237:24
determination
42:23 43:2 90:12
262:5,6
determined 101:9
103:3,11
determining 209:8
deviate 160:13
dialogue 56:7 58:15
69:12 145:10
146:1 148:2
difference 124:4
different 70:8,19
94:19 125:4
139:24 140:12
155:21 167:23
168:13 228:2
264:4 265:2,17
302:1
differently 265:14
287:7
differs 110:7
difficult 12:9
dig 201:12
dip 298:1,3
direct 53:16 213:9
214:19
directed 9:13 77:18
235:16 290:3
direction 306:10
directly 124:17
125:16 142:9
157:4 174:12
disagree 107:23
109:23,24 110:4,5
111:20 112:7
195:6 204:9
disagreed 189:21
disagreement 290:8
disc 77:13 81:4
126:12 185:20
215:20
disclose 118:13
184:5
disclosed 53:2 74:5
disclosing 118:16
124:13,21
disclosure 179:10
232:24

33:13 64:6 82:20
106:3 108:11,12
141:6,8,15,16
150:6 167:20
169:8 170:22
173:11 175:15
182:10 220:18
221:13,14 222:14
222:15 302:20
**discuss** 58:4 147:1
151:13 157:23
158:9 159:7
221:11 264:24
**discussed** 182:16
188:9 204:7,15,20
247:16 284:19,22
285:1,10,11,14
290:5 291:21
**discussing** 178:13
**discussion** 126:21
153:3 166:4 193:3
194:7,19,22
246:13 268:17
269:21
**dismissal** 219:7
**dismissed** 98:5
219:14
**displaying** 114:11
114:22
**dispositive** 66:2
**disproving** 57:9
61:24 65:12 67:4
**dispute** 288:18
**distinction** 288:6
**distinguish** 10:17
**distribution** 33:1
**District** 1:1,1,16 7:5
7:5 74:22 169:4
171:13,15,15
242:10 305:1,1
**diverge** 55:12
**divergence** 55:8
**diverges** 176:24
**divided** 258:19
**division** 1:2 33:2
107:3 108:3,22
109:5 229:15
230:12 232:4
258:15,22 259:7
260:8 305:2
**division-of-fees**
230:19 231:2,6
**divulgences** 80:16
**divulging** 209:17
214:17
**divvied** 259:11

**Doctorate** 15:8
**documentation** 89:9
**doesn't** 31:10 61:11
68:8 69:13,21
70:14,24 71:18
94:6,6,17 96:19
122:2 196:11
205:9,15 263:14
**doing** 52:3,3 72:21
80:10 91:18
139:22 190:22
208:13 271:8
**dollar** 152:18,23
154:4 176:14
**dollars** 49:9,16 84:8
180:2 282:17
283:2,20
**done** 8:19 123:10,15
123:16 134:12
139:3,23 141:23
142:4 166:9,12
178:1 197:10
206:19,22,23
207:14,16 208:12
215:8 297:4 298:7
302:1
**Dorothy** 210:15
**double** 197:7
**doubt** 14:11,14
211:1 298:4
**drabs** 159:20
**draft** 192:17 194:11
194:16
**drafts** 121:10
**drag** 59:16
**drawing** 53:20
102:18 113:22
**dribs** 159:19
**drive** 89:3,10 90:2
90:17 91:7
**drugs** 233:9
**due** 183:22 184:15
209:4
**duly** 8:13 305:10
306:15
**duplicate** 271:8
**during** 91:1 126:19
270:20 298:20
**Durkin** 117:10,18
117:21
**Durkin's** 117:15
**duties** 175:9
**duty** 109:21 110:1,5
110:8,18,20
111:21 173:15
174:3 292:21

**E**

**E** 2:1,1
**E-tran** 304:16,19
**each** 83:12 129:2
202:14
**earlier** 39:3 41:2,7
68:5 78:7 81:10
106:13 148:1
155:17 156:4
188:7 217:18
227:8
**earlier-filed** 105:14
**early** 12:13 34:18
34:19 49:1,7
146:18 184:20
**EASTERN** 1:2
305:2
**easy** 229:19
**EBR** 115:19,24
**education** 15:2
**effect** 94:1 187:6
261:13,18 292:15
**effectual** 69:8
**effort** 82:19 83:4
84:3 141:13
**efforts** 61:13 68:10
69:9 106:2 162:15
162:21
**egregious** 82:15
**eight** 121:23 122:11
122:17
**eight-year** 24:23
**either** 24:18 56:13
56:20 57:18 58:7
58:10 83:8 124:16
125:16 178:14
189:4 199:12
206:2 243:4 248:1
269:4
**electronic** 11:20
**elements** 112:21
**eleventh** 31:14
94:11 95:8,16
114:8 118:18
140:7,8 260:14
279:7,9
**Elvis** 239:19 240:2
**emails** 62:9
**employed** 15:12,15
15:21 203:17
**employee** 203:17
288:21
**employees** 21:3 39:6
**employer** 68:17
**employment** 265:19
289:10,22

**encouraged** 158:4
**end** 26:6 60:10,24
140:21 146:6
176:20 280:12
**ended** 107:17
**engage** 191:10
268:7 295:15
**engaged** 64:8
**engagement** 4:15
41:17 42:6 43:3,5
46:22 268:5,10,24
294:13
**engaging** 80:9
**enhance** 142:19
**enjoined** 218:17,23
219:14
**enough** 45:5,7
63:14 92:14 93:6
93:20 195:23
**enrich** 51:12
**enter** 254:15
**entered** 41:18 107:2
169:7 208:7
**entering** 260:23
**entire** 43:9 110:18
115:1,4 131:18
**entirely** 61:9 160:19
**entities** 227:16,21
**entitled** 84:12
114:23 122:8
212:7
**entitling** 202:12
**entity** 18:4 82:7,8,9
**envision** 212:2
**equal** 102:8
**equipped** 93:21
**error** 184:23
**escapes** 140:3
**essentially** 76:23
211:17
**estimate** 13:3
250:24 276:20
277:4
**estimation** 60:10
250:15 266:2
**et** 1:7 7:4 73:12
171:16 179:14
202:16 305:7
**ethical** 297:3
**Ethics** 296:20
**evaluated** 147:4,6
**evaluating** 118:22
**even** 33:18 56:9
74:19 77:19 80:12
153:24 160:21
164:24 170:6

189:6 199:7
**evening** 155:18
**evenly** 33:16
**event** 48:6 83:15,23
102:6 103:5 259:8
277:2 283:20
**eventual** 259:8
**every** 31:4,22 84:1,1
109:1 175:8 198:9
243:5
**everybody** 184:8
212:13
**everybody's** 40:12
**everyone** 190:22
203:10
**everything** 60:22
88:2 155:7 171:7
184:19 186:5
213:10 302:5
**evidence** 53:16 54:5
78:4 92:14 106:11
109:3 208:2
**evidenced** 75:13
**evolving** 118:17
**exact** 17:3 23:14
24:16 40:13 48:21
62:2 238:21,23
239:10,12 263:19
**exactly** 24:15 25:1
37:12,23 56:18
66:12 98:22 121:7
192:2 239:3
**examination** 1:13
4:1,6,7 8:16 222:4
**examined** 8:14
306:16
**exceeded** 164:19,20
**except** 43:11 102:22
176:24 214:1
281:10
**exception** 21:10
194:9
**exceptionally** 198:1
**exceptions** 35:4
**excess** 49:8,12 84:7
164:18 165:3
199:6
**exchange** 181:17
182:6 247:7
**exchanged** 213:13
**exchanges** 247:2
**excited** 244:18,20
**Exclamation** 161:11
**excuse** 301:23
**execution** 130:10
**exercise** 177:4

**exhibits** 4:10 54:18
56:2,13 64:20
68:7 87:5 88:9,13
121:3,21 122:12
123:19 124:15
127:5,20 129:13
129:19,23 130:2
146:19 175:22
187:4 201:13
**existed** 228:9
**existence** 56:6
241:11 299:5
**expect** 143:22
160:13,24 165:17
281:23
**expectancy** 282:2
**expectation** 126:20
**expected** 255:15
277:14 280:13,18
**expenditure** 217:21
**expense** 141:3,5
217:22
**experience** 31:2,4
177:21 241:20
243:6
**experienced** 29:5
243:4
**expert** 28:9,16,20
28:23,23 29:1,9
29:12 150:17
242:19,23 243:2
**expired** 94:3,15
**explanation** 187:1
**express** 90:22 113:4
114:18 115:20,24
116:9
**expressed** 75:2 92:9
193:17
**expression** 145:14
265:15
**expressly** 98:17
**extent** 60:6 63:10
73:10 74:1,1
102:12 118:2
138:21 139:4
141:17 164:16
172:14 205:8
220:16 227:2
248:6 287:21
288:16,19 290:7
**extremely** 127:2

**F**

**f** 48:6
**f-a-c-t-s** 262:1
**face** 171:8

**facilitate** 142:19
**factors** 101:9
198:14,17,20
**facts** 8:22 79:9
204:11,12 205:2
261:24
**factual** 53:16
**fail** 218:23
**failed** 211:20
**fails** 115:21
**failures** 206:9 214:3
**fair** 45:5,7 63:17
139:19 147:16
152:20 184:8
**fairly** 276:5 284:11
**fall** 182:2 189:8
**fallback** 207:16
208:11
**falling** 25:18
**familiar** 94:12
95:12 99:2,18
101:20
**far** 31:1 69:12
112:12 139:2,5
141:8 160:1,23
169:14 173:6
192:16 193:12
298:24
**fashion** 178:15
186:7
**favor** 83:16 190:21
245:15
**favorable** 29:16
**faxes** 32:3 34:22
64:10 114:11
116:1,14 127:22
129:2,14,21 146:9
150:9,13 168:23
170:17 202:13
263:4,5,17 264:4
265:2
**faxing** 211:19 214:2
**feature** 97:9
**February** 49:1
**Federal** 1:14 200:7
**feel** 127:7 179:9
**feelings** 193:16
**feels** 273:10
**few** 15:17 35:3
206:23 215:24
**fiction** 78:18
**fiduciary** 110:18
111:21 292:21
**field** 28:9,16 29:1
107:11
**fifteen** 281:24

**figure** 50:24 52:24
133:24 134:5
151:15 191:15,22
301:19
**figured** 288:7
**figures** 195:2
**file** 32:15 37:3 75:14
85:24 92:15 93:3
93:8,14,23 105:19
120:1 134:19
171:20 175:6
221:7 235:13,14
255:4,5 262:1,15
262:21 263:22
**files** 105:1 121:19
170:7 207:10
235:15
**filing** 32:7,16,21
34:4,7 35:16 38:7
38:7 90:6 105:16
166:3,13 220:21
254:12 268:18
**fill** 87:13 88:14
**final** 83:24 98:10
157:15 290:8
**finally** 145:4
**financial** 285:24
299:17 300:5
301:12
**financing** 219:18
283:21 284:3
**find** 55:6,11 56:15
74:19 108:14,20
172:23 201:13
232:3 234:22
235:18
**finding** 90:19
207:18 208:5
**finds** 84:12
**fine** 123:23 217:5
**finished** 205:23
**fired** 22:10 23:1
**firm's** 31:2 47:23
65:16 67:23 74:15
115:1,4 167:4
222:18 272:3
277:4 299:4
**firms** 34:11 35:18
36:23 166:6
172:19 233:17
**first-chair** 26:20
27:5,18
**five** 11:14 77:12
92:16 114:2 126:1
215:9
**flesh** 107:15

**flip** 48:5 70:22
**flips** 211:18
**floor** 183:21 184:13
**Florida** 43:3 74:22
106:19,21,24
107:10 134:3
139:17 140:3
198:9 216:18,21
216:24 217:1,1
242:1,3,4,7
268:15
**focus** 60:1
**focused** 156:18
**focusing** 73:9 87:10
105:7 195:21
**Foley's** 48:2 49:7
85:14 217:10,21
**follow** 55:4 99:21
205:18 221:21
240:5
**followed** 206:8
217:12
**following** 10:20
18:17 19:14 86:11
248:18 288:2
**follows** 8:15 152:13
176:11,18
**forceful** 69:5 246:3
**foregoing** 305:13,16
306:18
**forever** 37:16
**forget** 210:3
**formal** 130:11
141:16
**formally** 92:21
**formed** 17:2
**forms** 93:14
**forth** 84:22 104:1
130:13 202:21
203:23 306:13
**forum** 101:15
**forward** 87:15,24
92:14 93:23
124:17 146:19
148:14 157:15
210:11 218:13
**forwarded** 159:5
201:17
**found** 64:19 89:24
90:17 91:2,7
108:15 214:11
235:17,20,23
**foundation** 14:3
25:4
**four** 166:16 185:7
210:13 211:7

214:7 240:1 249:4
**fourth** 179:22
213:17
**framework** 24:20
**franchise** 26:12,17
**frazzled** 297:24
**Friday** 133:7
262:13
**Friedrich** 15:13
19:23
**front** 11:22 55:4,8,9
57:8 61:23 67:3
123:20 161:1
218:22,22
**frustrated** 68:21
69:15,18 70:10,16
243:22
**full** 102:5 289:16
304:19
**fully** 57:13 61:3
62:10 233:6
302:13
**function** 85:14
**funds** 159:18
**further** 9:24 59:7
114:6 126:21
160:24 162:15,21
304:22 306:18
**furtherance** 138:17

**G**

**galaxy** 160:22
**game** 44:4,23
**games** 75:16 161:2
**Gantman** 3:2 7:19
**gap** 87:14 88:14
**Gardner** 149:23
150:2,7
**gate** 115:21
**gathering** 179:8
**gave** 18:12 54:6
66:21 70:4 113:4
115:20 132:21
133:15 263:14
267:8 273:14
**general** 20:22 26:17
91:19 97:7 99:11
109:20 119:7
**generally** 55:3 67:5
67:6,12 70:19
109:22 200:9
212:1 226:5 242:3
**generate** 196:13
198:17
**generated** 139:21
140:17 198:20

generating 195:21
gentleman 12:15
genuine 136:17
  145:14 154:9
  180:24
gets 84:10 107:19
  107:19 122:18
  301:7
getting 31:20 37:13
  90:14 128:8
  169:14 190:12
  223:12 234:7
  265:16 296:10
  297:23 299:11
give 11:13 18:14
  24:8 29:21 40:13
  119:5,5 125:20
  231:12 234:8
  238:21 239:10
  242:15 258:14
  270:11 272:23
  278:1
given 10:21 13:10
  44:20 67:21 128:9
  128:9 141:13
  158:6 160:14
  180:16 203:6,7
  204:5 238:11
  297:2 305:17
gives 57:24
giving 57:9 61:23
  65:11 67:3 168:2
  197:17
Glenn 39:9,14,16,17
goal 134:4
goes 47:11 158:3
  160:3,5 178:6
  182:3
gone 93:18 191:8
  241:6
Good's 14:12 204:1
  204:16 205:20
good-faith 212:23
gotten 10:14 104:19
  159:20 170:17,19
  241:7 304:2
governs 227:13
graduate 15:5
graduated 41:3
granted 260:15
  291:16
grants 260:21
great 64:6
greater 279:9
ground 214:15
  215:1

grounds 224:4
  232:20 264:15
  278:7 293:17
  294:21 299:14
  301:18
group 91:19 196:18
grouping 128:7
groups 128:14
guaranteed 83:20
guess 47:21 101:12
  182:2 219:3
  246:17 285:3
  296:4
guy 59:16
Guys 297:23

_____
H
hadn't 37:14 89:19
  89:21 93:15,17
  168:23
half 280:6 283:1
half-inch 11:13
half-million 48:23
  49:8,21 84:8
halfway 101:14
hall 292:16
hand 111:1,2 121:6
  307:4
handed 113:12
  121:2
handful 34:23
handing 9:7 41:13
  100:9 135:9 137:2
  145:22 146:17
  150:23 152:4
  154:15 156:15
  157:10 163:22
  175:21 178:21
  181:7 192:8
  209:24
handle 138:2
  235:19,21 259:15
handled 28:13
  33:13,13 34:14
  35:4 238:6
handles 217:24
handling 248:2
  284:4,14
happen 72:24
  205:15 233:21
  234:10,11
happened 71:11
  88:3 95:11 167:11
  179:12 205:20
  207:11 231:10
  255:3 269:6

270:13
happening 145:9
happens 19:13
happy 234:6 246:7
Hara 39:16,17
  156:20
hard 11:19 89:3,10
  90:2,17 91:7
  206:8 214:10
hard-mail 206:15
  207:16 208:1,11
hard-mailing
  207:19
harm 82:16
hasn't 31:5,23
  214:24 265:11
Hatch 2:18 31:8
haven't 10:14 85:18
  89:20 109:8 143:4
  170:19 202:6
  220:2 223:1 235:9
  284:14 293:14
having 8:13 38:16
  41:7 90:1 94:2
  104:19 111:15
  175:13 194:20
  204:21 260:1
  270:2
he's 43:1 44:16
  52:23 59:2,13,15
  59:16 74:8 80:9
  122:8 123:2
  139:16 206:3
  240:5 245:17
  269:20 292:16
head 51:23 52:5,10
  52:17,23 53:12
  187:19 247:21
heading 156:2,3
hear 36:5,13,15
  172:3,5 217:6
  275:3 303:13
hearings 49:6
heavily 284:4,7
held 95:15
help 105:10 273:6
her 164:6 211:9,17
hereby 306:6
herein 8:13 130:13
hereinabove 306:22
high 196:20,22
  197:23 198:1,1,18
  198:21,24 199:5
higher 183:22,24
  184:15,22 186:4,6
  186:10 187:10

199:7
Highland 15:12
  18:7
highlights 167:12
  167:16
highly 112:17
Hillsborough 72:18
himself 51:12 60:21
  178:12 246:10
  247:15
hire 78:21
hiring 60:21 79:2
  174:19
historical 206:20
  208:9
history 63:4 113:24
  262:21
hold 95:14 242:18
  242:22
holding 37:9 62:21
  200:10
Honeywell 218:22
hope 260:18 281:9
hoped 180:3
hopeful 244:21
hopefully 98:10
hour 125:24 185:11
  275:21 303:9,19
  304:4
However 179:23
  282:18
hundred 249:4
  281:20
hypothetical 58:22
  77:24 78:18 97:20
  98:1

_____
I
I'll 19:2 25:12 48:24
  54:22 73:9 102:20
  114:20 121:3,9
  126:7,18 132:1
  133:11 135:1
  140:13,15 144:22
  150:16 179:20
  194:14,21 202:7
  207:22 304:16
I've 13:10 15:21
  19:11 28:13 54:14
  106:7 109:19
  113:12 121:2
  154:7 155:14
  163:22 181:7
  206:23 210:12
  216:13 226:8

234:7 238:11
  242:20 243:3,6
  292:17
idea 42:16 123:22
  245:14
identical 127:18
identified 62:3
  64:18 68:4 77:20
  79:13 87:5,7
  88:13 114:13
  186:20 198:15
identify 41:17 51:2
  53:17 57:18 61:2
  79:8 100:11
  113:14 209:9
  297:7 302:5 303:4
identifying 92:5
  208:3
ignoring 72:7
Ilinois 2:16
Illinois 1:1,19,20
  2:4 3:7 7:6,12
  22:7 102:19
  103:12,23 106:12
  106:18 171:15
  200:1 242:10
  305:1 306:1,6,12
  307:5
imaged 51:21
immediately 148:15
impair 233:10
impairment 232:24
impairments 233:6
impairs 232:22
impasse 92:20,22
  93:10,19 132:1,3
  134:16,19 135:3
implying 53:2,10
important 115:24
improper 74:20
inability 287:2
inaccurate 67:6
  71:1
inappropriate
  200:10
Inc 1:4 8:9 41:20
  82:10 100:13
  171:16 305:4
incentive 83:17,19
  84:2,12 130:23
  151:18 188:15
  189:12 193:1
  194:18 195:1
inception 131:10
inch 11:14
inches 11:14

include 63:14 214:6 214:9
included 11:4 133:5 211:8 241:6
includes 60:19
including 8:20 39:7 73:9 84:22 103:3 110:18 114:4 182:11 200:14 289:3
incoming 221:14
incomplete 121:16
inconsistent 291:15
incorporate 151:22
Incorporated 7:3
increase 180:3
increased 134:11 196:13
increasing 187:12 195:22
incredibly 64:9
incurred 47:24 85:5 272:4
INDEX 4:1,10
Indiana 15:4,13 18:7 21:10 41:4,6
Indianapolis 41:6
indicate 147:3
indicated 9:19,24 45:9 51:13 94:11 126:20 143:12 159:16 179:24
indicates 130:20 131:2
indicating 91:4 106:8 121:6,18 181:24 190:18 283:6
indigent 286:7,18
individual 18:3 32:8 95:2,17 102:9,14 105:18 110:8 175:9
individualized 115:18
individually 96:16 103:19
inference 53:20 79:7
inferences 53:21
inferring 79:20
inflate 59:17
inform 230:18 268:21 293:6
informed 231:2,6
initial 177:13

initially 32:6 168:19 171:13 206:7
initiated 141:16
initiating 157:19 161:19 163:9 201:20
injunction 84:24 218:12
Injuries 21:1
Injury 20:24
input 221:15
inquiries 115:18
insert 246:10
inserted 156:3
insist 92:24
insisted 92:20
instance 92:11 220:22 297:4
instances 297:9 299:5
instead 129:21 147:6 208:5 214:2
instruct 18:24 19:19 74:20 75:5 205:12 232:2 236:4
instructed 223:19 236:19
instructing 18:22 74:10,12
instructions 288:2 291:15
insufficient 208:2,8
Insurance 20:18,21
intend 35:2 75:17 221:21
intentions 181:24
interacted 35:19
interacting 34:16 35:7
interest 46:17 50:1 81:15 90:22 160:24 163:14
interested 91:4,21 307:1
interests 94:9 110:24
interfere 281:11
internal 63:16,24 71:20 72:6,9 73:12 74:3 193:3 194:7,19 196:24 247:3,5
internally 191:10 191:14,20 192:19 193:20 194:5 196:7 264:24

291:21
interposed 114:17
interpretation 75:3 155:4
interpreting 197:4
interrelated 54:23
interrogatories 8:14 222:18 306:17
interrupt 181:14 186:12
interrupted 128:21
interruption 186:15 283:8
intervene 50:15 97:4 98:8 252:14 254:13,14 260:15 263:9
intervened 252:6,23 254:6
intervenor 260:24
intervention 97:8 97:19 98:13 252:7 252:18 260:21 261:6,9,13
introduce 7:13 269:1
introduced 269:8
intruding 247:15
invading 127:9 256:5
invested 84:4 141:19,21 144:1 250:23 284:5,7
investigate 30:21
investment 32:24
invitation 115:6,20 116:10
invite 251:9
invited 72:15 114:11,21 203:11 251:6 255:14 291:5
invoice 275:24 276:3
invoiced 49:2 85:14 276:11
invoices 47:23 48:3 49:1,7 272:3 276:5,7
involve 95:14
involved 27:4 32:1 82:18 88:20 139:1 141:24 192:22 193:11 199:11 216:4 220:15,16 252:4 257:7 291:5

involvement 244:18 266:22 290:22
involving 88:21 199:4,8,14 240:20 241:1
irrelevant 36:1 115:6 160:19
irrespective 212:19 213:2
Isn't 148:17 269:19
issue 63:17 65:20 74:15 93:16 96:9 97:19 115:3 118:5 118:7 126:16 153:5 194:11,12 212:13 233:24 238:6 263:6 284:19,22 285:1 293:10
issues 74:19 115:22 173:7 193:12 270:7
iterations 93:14 121:11 143:5 219:3
its 85:8,10,11,12 89:5 90:4 116:1 227:15,20 228:1 263:8,23 285:19
itself 75:8 87:13 90:16 274:1

_____ J _____
J 2:9,15 17:1,2,7,11 17:13,15,21 157:4
JAMS 161:20
January 15:19 16:9 162:11 163:9
JDPC 17:1,2,7,11 17:13,15,21
Jeff 7:23 39:11,19
JEFFREY 2:3
job 19:3,4,7
Joe 140:16 141:17 144:13 247:6
jog 187:1
John 298:12,13
Johnson 15:15 22:13,15,16,19,24 24:5
join 104:8 240:24
joined 7:18 43:21 104:19
joining 105:2
joint 167:6 265:6
jointly 34:3,6 35:15

35:22 38:3
Jose 161:10
Joseph 107:9
jsoble@foley.com 2:5
judge's 66:6 74:14
judgment 66:7 83:9 83:16 93:16 136:13
judgments 66:9
Judy 163:24
July 263:19
jumping 165:13
June 263:19
juries 31:3
Juris 15:8
jurisdiction 99:7 160:15 168:14
jurisdictions 74:19
jury 28:3 29:15 30:4,11,23

_____ K _____
K 306:2
Kansas 22:5
KCC 187:18
keep 19:5 86:20,24 123:7 136:6
Kelly 1:17 7:10 39:8 39:14 136:4 181:10 183:1,4 306:4 307:10
kept 44:21
kidding 95:12
killed 205:4
kin 307:2
kind 16:12 20:1,2 20:11,23 22:18 23:22,23 26:14 73:10 90:1 93:6 128:17 192:1 196:6 220:12
kinds 187:22
knew 34:22,24 52:4 52:10,15,19,22 265:5
knocked 297:24
knowing 172:12,14 172:17,20
knowledge 10:14 53:6 63:5 80:19 97:8 98:21,23 118:23 119:21 124:22 235:23 302:6,14,15 303:11,17

**known** 22:16 88:22
**knows** 205:8

**L**

**label** 121:17
**labeled** 154:21
**labeling** 121:6
302:21
**lack** 97:7 116:1
**Lagasse** 117:5
**land** 116:14,19
117:12
**language** 64:19,21
67:2,17,20 68:13
70:24 77:23
103:22 104:4
**laptop** 267:6
**Lardner** 2:3 7:24
9:15 41:20 42:4
42:10 43:7,18
182:10,13 267:11
267:14 268:8,12
269:2,9,16 270:22
284:20
**large** 28:13 64:9
242:20 248:21
**larger** 249:22
**largest** 63:3
**LaSalle** 2:15
**late** 205:23
**later** 34:20 45:4
98:10 154:17
155:18 159:11
180:11 201:18
**latest** 192:21
**lawsuit** 90:6 101:16
224:21 225:19,24
240:24 282:13
287:3
**lawsuits** 170:18
217:6
**lawyer** 43:16 103:4
278:17
**lawyers** 15:21 39:5
236:12
**lay** 50:17
**lead** 27:12 28:2
63:10 172:4
**learn** 238:16 267:5
**least** 61:7 81:19
104:14,21 108:20
124:20 172:13
188:8 191:3
198:10 199:1
207:1 210:8,12
283:1

**leave** 22:9,24 25:17
26:2,5 184:18
186:5 285:15
**led** 37:18,21 93:15
**legal** 2:8 7:21 15:1
111:9 112:1 119:6
205:6 255:8
261:18
**length** 87:7
**lens** 193:21
**less** 39:23 193:11
202:16 266:5,6,9
266:12 270:12
276:15 280:21
283:1,1
**lesser** 31:11
**let** 26:3 59:16 144:9
160:3 171:19
189:15 221:4
230:3 265:14,16
287:7
**let's** 12:1 15:1 51:2
72:16 77:14 159:7
174:10,10 222:2
285:15 300:15
304:5
**letter** 4:15 41:18
42:6,19,21 43:5,9
46:22 91:17,19
133:3 182:9 268:6
268:10,24 273:15
273:16,24 294:13
**letters** 90:20 91:3
210:14
**level** 131:17 132:6
134:15,20
**levels** 94:20
**Lewis** 2:18
**LexisNexis** 199:4,11
199:21 200:4
**liability** 65:20 66:10
94:8
**licensed** 242:4,7
**licensure** 242:1
**light** 260:13
**likely** 25:19 68:8
189:8,9 191:11,15
196:9 200:8
260:15 261:7
276:21 277:4
**limitations** 94:2,15
95:7,18,24 96:3,8
96:12,20 97:1
98:18
**limited** 13:13 113:1
126:22 226:10

279:15
**line** 31:1 35:3 53:9
59:8 62:4 119:20
156:8 159:15
179:22 201:19
206:17 248:18
**lines** 101:13 114:2,6
208:4 243:8
246:11,12
**list** 51:13 182:9
229:15
**listed** 35:18 36:22
171:9 172:15,18
172:24 234:13
**listened** 291:7
**lists** 34:11
**litigate** 90:11
**litigated** 242:20
**litigating** 94:7
**litigator** 244:16
**little** 97:22 101:14
131:8 154:17
265:17
**LLC** 7:17,18 16:13
**LLP** 41:21
**loaded** 52:11
**local** 216:24 217:1,1
**locate** 106:7 108:10
**located** 23:5,6
216:20
**location** 9:15 41:5
250:10
**lodestar** 143:11,13
143:23 160:19
248:21,24 249:18
**lodestars** 250:13
**lodge** 93:6
**log** 92:12 93:21
**logs** 89:9
**long** 59:15 102:6
147:20 166:14
185:6,10 242:14
247:1
**longer** 38:2,3 82:17
82:22
**looked** 11:17,21
13:4,11 106:2
202:6
**looking** 56:15 59:2
59:13 61:14 65:19
65:23 144:12
147:10 192:4
210:6 297:19
**looks** 58:15 273:22
**lookup** 206:12
208:9,24

**lookups** 206:19
207:15,24 208:11
**loose** 169:14
**lose** 284:11 301:6
**losing** 31:4
**lot** 59:1,12,23 60:3
60:11 79:18 89:3
89:12 165:4
186:12 234:7
271:7 282:19,22
**loudly** 283:5
**Louis** 174:24 200:6
**low** 118:24 119:22
139:6,10,10 142:8
142:13 202:17
280:12
**lowball** 138:19
**lower** 178:5
**lowered** 180:1
**LP** 16:13
**lump** 147:5
**lumping** 128:13
**lunch** 81:1,8 87:7

**M**

**M** 1:7 2:12 3:1 7:4
7:22 8:9 44:6
305:7
**M-e-r-r-y-m-a-n**
210:15
**M&C's** 81:13
111:14 121:7
176:2 235:10
284:10,13 297:16
**M&C-Clement**
105:24
**machine** 198:9
**made** 10:18 42:22
43:1 46:8 59:14
70:11 71:13,16
138:9,10 145:5
190:14 202:24
206:2 228:6
237:14,20 243:20
243:24 247:14
294:18,18,24
295:6 306:20
**Madison** 2:10
**magistrate** 57:8
58:1 61:22 65:5,8
65:16,19,21 66:5
66:9,17 67:2,7,15
**mail** 90:20 206:8
211:10,11,11,13
211:20,22 213:20
213:22,22 214:3

214:10
**mailing** 211:19
214:2
**Mainly** 254:11
**makes** 12:8 97:11
145:7
**making** 117:1
186:12 195:23
240:9
**man-hours** 32:24
**manage** 280:4
**manner** 212:4 246:3
289:19
**many** 11:8 14:1,12
29:14 37:8 39:5
39:20 60:20,20,23
174:23,23 191:1
202:18 266:3
270:9 273:1
282:16 283:19
292:8 302:20
**March** 49:1 135:14
135:22 136:1
164:7,12 192:13
210:10,18 211:10
**Marie** 3:2 7:19
**mark** 149:4 157:14
161:24 166:8
201:16 250:9
**marketing** 90:20
**marks** 81:4 126:12
185:20
**mass** 90:20 91:19
91:19
**materially** 111:3
**materials** 118:4
**math** 24:12 165:5
194:19 195:7
**matter** 7:2 42:9,10
43:6,6,15,18
44:12 45:17 48:8
48:11,20 66:2
102:21,23 105:8
157:23
**matters** 26:16 46:6
221:16 270:17
**Max** 136:7 213:14
**maybe** 77:14
139:16 143:6
150:16 234:8
**MC** 101:6 102:5
137:23 145:3
146:2,22 149:1
154:21 156:19
157:13 163:11
**McCoun's** 74:4

118:12
**McIlvaine** 15:18
24:3,8,10,22
25:17,21 26:8,11
298:18
**meaning** 44:22
72:12,13 103:11
106:8,9 110:6
152:24 180:19
189:8 194:23
197:5
**meaningful** 161:2
180:6
**means** 10:13 13:22
59:1,12,23 60:3,9
60:11 79:18 81:18
205:2 250:5 274:7
**meant** 94:22 155:9
180:23 185:10
190:1
**measure** 11:17
12:16 25:5
**mediated** 245:22
**Mediation-Judge**
156:21
**mediation-privile...**
213:4 247:2 302:8
**mediations** 51:24
82:21 86:5,15
289:17,20 290:21
**mediator** 69:6
92:21 93:19
125:17 127:15
132:3,15,21 136:8
146:6 213:11
214:19 244:23
293:6
**medication** 233:10
**meeting** 41:8
**member** 83:12
94:16 95:15
202:12,14 242:9
242:12
**member's** 94:16
**members** 92:5
110:2 113:3
114:11 115:19
117:8 158:6 180:8
188:14 209:2,9
211:14,22 212:2
213:21 214:4
289:7
**Memorandum**
113:15
**memorized** 144:21
179:6

**memory** 109:9,15
**mental** 209:8
**mention** 74:18
**mentioned** 41:2
53:7 71:9 201:7
**mentions** 183:15
**merchandise/food...**
180:8
**merged** 25:22
**merits** 83:9
**Merryman** 210:15
210:17 211:3,6
**message** 245:22
**messages** 79:1
**Mester** 69:5,6 157:4
157:14,19 162:15
162:22 201:16
213:10 244:9,10
244:12,22 245:6
245:21
**Mester's** 69:5 159:6
201:19 244:18
**met** 9:2 10:4 32:12
112:21
**meter** 136:7
**method** 103:2,10
104:1
**methodology** 208:8
209:18
**Miami** 179:12
**mic** 210:4 281:11
**Michael** 149:23
192:13 231:7
285:2
**mics** 186:12
**middle** 74:22
135:24 148:6
230:1
**midpart** 61:20
**might** 107:3 139:20
180:4 202:14
271:8
**Mike's** 203:10
249:19 291:4,6
**millions** 282:16
283:19
**Milstein** 175:2
**mind** 158:16 199:1
**mine** 32:3 143:18
151:4,11 152:12
176:7 286:17
**minutes** 77:13
92:16 126:1
159:11 166:17
180:11 185:8,12
215:9 275:22

**mischaracterizati...**
62:24
**miscommunication**
159:14
**misdated** 273:4
**misleading** 290:19
**missed** 128:4
243:16
**missing** 232:21
**Missouri** 22:1
**misstates** 25:15
57:23 64:23 65:3
78:10 120:7 139:7
228:19
**misstating** 106:16
**misunderstood**
184:2,24 186:7
**Molly** 3:2 7:19
**moment** 9:19 57:17
72:11 125:21
158:14 180:18
190:8 260:23
**Monday** 133:8
144:15 149:2
**monetary** 143:8
145:5
**money** 59:1,3,12,14
59:23 60:3,12
64:5 75:14 79:18
142:2 161:24
195:23 196:8
282:5,14
**monitor** 7:8
**monthly** 276:6
**Months** 270:19
**Moron** 123:17
**most** 35:11 83:1
159:19 198:8
**motion** 4:19 43:10
97:4 98:7 104:8
113:15 115:2
119:10 252:13
254:12,14 260:14
263:8
**motions** 66:7
**motivation** 78:21
**Motors** 171:16
172:22 173:3
175:7
**mouth** 186:23
**move** 60:22 180:19
271:8 283:4
**moved** 43:8 167:20
**Ms** 3:2,2 41:19
164:11,13 210:17
211:3,6 230:16

232:3
**much** 48:18 49:15
64:5 75:14 278:12
278:14 282:18
**multiple** 140:1
302:11 304:3
**must** 79:21
**myself** 29:5 39:7
72:4 178:15 203:5
236:12 238:4
247:6 251:15
257:15

**N**

**N** 2:1
**name** 7:9 8:4 16:6,7
16:10,24 17:12,16
17:19 23:15,18
140:3 169:10
199:14,20
**named** 90:23 110:3
110:6 111:23
168:12,13 169:3
169:15,22 275:18
**names** 39:13 136:2
**narrowed** 13:13
**natural** 18:3
**nature** 101:10
126:22 191:24
**near** 143:24
**necessary** 261:24
262:15
**need** 12:12 71:21
73:13 80:12 92:13
104:4 125:18
145:6 146:24
161:1 182:5
201:13 205:14
261:19 262:20
**needed** 70:14 71:19
72:2 73:7 76:24
85:23 86:2 87:15
87:24 88:3,15
90:7
**negotiate** 59:11
200:10 264:3
265:1
**negotiated** 98:5
128:10 288:24
**negotiating** 178:8
214:20 248:3
**negotiation** 71:18
177:22 200:11
**negotiations** 63:1
86:18 92:18 93:18
214:18

**neither** 115:24
123:2
**never** 58:22 69:6
78:1 82:24 166:4
166:9,12 169:7,10
173:19,23 202:2
258:8 279:10
285:11
**new** 38:4 44:6 45:11
51:9,16 52:22,24
53:1 68:17 113:23
149:15 168:11
**news** 156:22
**next** 23:13 55:10
147:11 156:1
158:13,14 160:10
160:18 162:12,13
183:13
**Nicely** 197:10
**night** 205:23
**noise** 186:13
**non-employees** 21:4
21:5
**non-inferential** 54:4
**non-public** 78:1
**non-testimony**
25:15
**none** 142:9
**nonpublic** 58:23
**nonresponsive**
60:24 117:3
119:12
**nonsensical** 123:4
**nonspecific** 91:17
**nor** 75:12,12 115:24
119:5 307:2
**Norfolk** 21:19,21
**North** 1:20 2:4,15
7:12 306:12
**Northern** 1:1 7:5
242:10 305:1
**Northwest** 21:9
**Notary** 305:24
**note** 56:16 193:6
**notes** 81:15 215:12
**nothing** 10:12 42:20
42:21 51:11
149:14 232:22
235:20 258:20
278:15 296:12,15
297:15 306:16
**notice** 1:14 115:7
116:2,12 135:2
188:1,1 203:19
206:8,8 207:16
209:3 211:8,11,11

notices 130:24
noticing 7:15
notified 233:19
notify 38:1
notoriety 198:7
notwithstanding
  95:18
November 1:21 7:7
  156:17,18 157:22
  305:15 306:7
nowhere 243:22
numbered 61:8
numbers 72:2,7,10
  73:8,13 77:1,2
  114:12,22 140:15
  149:4,13 150:8,12
  181:17 182:6
  191:14 192:4
  206:21 211:21
numerical 197:22
numerically 131:3
numericals 14:12
  190:13 202:16
numerous 88:20
  89:7 216:16

_____

O

O 306:2,2
O'Hara 39:9,14,16
oath 50:18 81:9
  120:3 238:10
  240:12,17 247:11
  247:23 250:16
  251:21 305:11
objectionable
  123:13
objections 79:15
  121:16 197:12
  297:21
obtained 214:4
obvious 53:4
obviously 62:23
  80:2,5 220:14
occur 262:8
occurred 111:15
occurs 262:11
October 103:8
  104:11,18 252:11
  252:14 263:24
  265:3
odd 281:20
of.' 57:10 62:1
off 40:17 80:23
  122:4,7,13 125:22

140:7 153:4,8
185:15 187:19
215:15 222:8
281:13 300:15,17
304:5,7
offer 139:6,11 142:8
  142:16 145:5
  149:14 155:19
  157:24 158:16,22
  158:24 160:20,24
  161:3 176:5 180:3
  180:6 191:24
  203:1,3
offered 142:1
  213:17
offering 188:24
  278:9
offers 58:17 92:19
  143:8,8 159:20
office 9:15 23:7
  169:10 170:5
  211:3 216:20
often 217:6
Oh 31:9,15 54:16
  59:11 62:8 122:10
  137:15 164:24
  201:24 222:19
  230:8 248:13
  290:17
omission 99:24
once 54:18 73:4
  75:18 146:18
  285:3
one-third 102:8
ones 35:17 124:13
  124:14,18
ongoing 37:13
  190:20 265:20
  286:11 296:19
  297:5,11 299:7
only 11:20 53:11
  75:13 87:10 95:17
  109:11 134:4,7
  136:3 142:17
  147:6 155:18
  160:7 186:23
  195:16 196:10
  217:4 229:7
  234:18 257:4
  272:2
open 73:20 75:10
open-ended 146:8
opened 23:3,16
operates 17:16,19
operator 206:16
operators 208:4

opinion 27:4 79:7
  80:13 88:17 98:14
  117:15 203:6
  293:2 296:24
opinions 119:6
OPP 121:17
Oppenheim's 67:2
  68:4 69:20 121:18
  151:21 194:16
  203:2 267:6,14
  269:15 290:22
  292:20
opportunity 78:20
  84:2 107:14 168:3
  219:12 240:10
oppose 181:23
opposed 82:7
  102:14 110:3
  139:3 202:10
  205:5
opposing 193:18
opt 211:14,22 212:5
  212:14
opt-out 115:7 116:2
  116:11,15 212:12
optimism 131:18
  132:22 134:11,15
  134:21
optimistic 131:15
  132:12 244:18,20
option 211:10,17,18
  213:19 214:1,9,10
options 212:1
  213:17 214:8
oral 8:14 216:7
  227:24 306:17
order 25:22 47:7
  55:4 74:4,5 79:21
  84:24 85:23 87:15
  87:24 92:13
  100:17 108:12
  118:12 197:4
  218:20 219:11
  254:10 262:1,21
ordinary 111:17
  288:13
organization 16:12
  16:22
organizations 26:13
original 84:23 197:9
originally 172:13
  210:19
originated 167:8
  170:16
others 187:19
otherwise 79:23

88:16 145:17
  158:23
ours 168:5 249:19
ourselves 259:15
outcome 102:21
  112:13 218:5,9
outgoing 221:13
outlined 50:11,22
outrageous 64:9
outright 53:10
outside 33:4 202:9
  204:6,23 289:21
over 63:23 93:18
  99:7 101:14 114:7
  133:7 166:3,13
  172:5 182:10
  186:19 190:21
  195:18 199:9
  215:11 252:20
  297:24 303:19,20
overall 250:22
overlap 19:14
overlapped 171:21
overlapping 54:24
  166:5 173:3 175:7
overlaps 145:24
owed 110:6,8
  111:21
own 12:4 15:17,19
  15:20,22 16:20
  17:13 23:3,24
  24:6 25:20,20
  26:9,10 31:2
  95:17 120:4 122:1
  190:22 263:23
  285:19 287:10,14
owned 17:23
owner 17:7,21
  203:15 206:16
owners 208:3
ownership 15:24
  16:3
owns 16:22

_____

P

P 2:1,1
p-r-e-s 183:19
Pacific 21:12,17
  22:1,3
pages 210:13
  305:14
paid 37:14 48:18
  78:22 85:15 138:2
  164:17 202:9
  221:2 282:10
paper 11:21

paragraphs 294:22
paralegal 150:5
paraphrasing 177:1
paren 130:12
parentheses 130:10
parenthetical 114:7
parlance 151:12
partial 159:20
partially 54:24
participant 135:21
  137:7
participate 91:22
  240:20 289:18
participated 30:10
participating 31:2
  148:1 220:11
participation
  289:17
particular 20:8 51:3
  51:7 64:1 90:3
  92:11 99:7 110:3
  180:17 182:11
  192:4 214:9 223:9
  265:20
Particularly 197:18
  197:19
parties 130:9
  180:18 200:12
  201:21 207:17
  257:4 306:24
  307:3
parties' 66:7
partner 15:16 22:13
Partnership 113:2
parts 69:11
party 7:15 43:24
  233:13 245:8
  275:15,16,18
passed 21:9 95:7,18
  206:14
past 71:12 90:20
  206:7
path 166:8
Patrick 39:18
pause 281:18
paying 37:15 49:23
  164:19 192:3,22
  217:9 221:5 295:7
  296:18
payment 47:23 48:2
  146:8 272:3
  293:21
payout 151:4,12,15
  151:21 152:12
  155:6 176:6,8
  188:11,11,17

190:16 191:15
195:2,5,17,19
292:13
**payouts** 291:19
292:19
**PC** 16:17 18:1
**PDF** 164:12 304:16
**Pellegrini** 175:1
**pending** 101:16
104:9 172:1,10
197:19
**Pennsylvania** 170:4
**people** 34:21 70:11
70:18 71:16 90:14
90:21 91:2 94:7
139:1 171:5
174:12 182:23
183:3 191:1 208:6
211:2 265:2
292:19
**per** 147:5 176:5
195:5 202:10,10
202:16
**perceive** 60:14 94:2
94:14
**perceived** 126:16
**percentage** 102:1
103:3 151:16
160:11 189:11
250:21 282:10
**percentages** 103:4
**perform** 223:8,20
**perhaps** 126:23
239:4 262:7 273:5
**period** 91:1 131:18
163:8 208:9 273:2
**permission** 113:4
114:18 115:4,6,20
115:24 116:10
173:2 175:6 203:8
254:8
**permitted** 101:15
**person** 18:3 51:23
92:8 139:17 145:6
176:5
**personal** 18:5 80:19
98:21,23 235:23
302:6 303:11,17
**personally** 16:20
216:13 223:1
225:8 250:5
**persons** 21:2 129:22
130:17
**persuade** 120:2
**pertaining** 1:16
79:1

**perusing** 41:22
55:15 56:23 58:11
61:15 62:17
100:19 113:17
124:1,8 135:15
137:9 230:5
**petition** 83:14,17
84:2
**Phil** 32:12,16,22,22
35:14,22 37:7,18
38:1,16 56:7
60:21 78:21 79:10
80:10 165:24
166:3 175:2
240:24 268:17
**Phil's** 34:24 58:14
78:18 169:9 170:4
**Phillip** 3:1 7:18
**phone** 12:12 133:2
133:5 246:14
281:9,10 283:5
**photo** 204:24
**photograph** 204:21
**phrase** 94:12 274:5
274:7
**phrased** 114:19
**physically** 246:10
247:14
**pick** 128:16 222:7
**picked** 140:6
**pie** 259:11
**piece** 284:4
**Pipe's** 95:19
**place** 50:3,5,10,19
68:18 81:17 86:6
86:19 92:18
144:23 219:4
305:15 306:21
**plainly** 190:6
**plaintiff** 1:5 2:7
7:24 29:16 72:14
96:21 110:3 113:3
114:9,10 140:6
167:1 168:12,13
199:17,21 218:5
234:18 251:13
262:5,7 305:5
**plaintiff's** 101:16
113:15 189:3
230:2,4,11
**plaintiffs'** 127:9
203:21
**plan** 127:6 188:1
203:20 209:3
214:21
**play** 44:4,22 75:16

198:20
**played** 143:20
**pleading** 114:20
**pleadings** 32:17
36:24 84:21 85:6
113:7 169:3,15
172:16 173:14
175:15 217:2
218:15 221:13,14
222:10,12
**plenty** 59:3,14
**plug** 159:19
**plugged** 155:19
**plus** 151:17 179:13
188:12,14
**police** 267:7,8
**population** 91:20
**Porcelli** 65:11 120:2
218:23
**portion** 6:7 42:19
42:21 43:10,11
59:20 60:2,5,18
69:20 100:17
139:20 147:17
**portions** 58:6 78:7
**posed** 97:20 98:1
146:23
**position** 57:24 58:2
61:4 63:1 65:6
67:16,19,24 70:23
73:19 76:2 95:23
115:1,5 116:6
181:22 186:3
195:10 197:6
204:14 212:19
**positions** 180:17
**positive** 140:15
169:13
**possession** 89:2
**possibility** 102:13
**possible** 80:14
143:4 184:20
187:1 191:2
194:18 239:13,15
239:19,20
**possibly** 64:6
161:20
**Postman** 142:3,9
244:4,5,8,10
**posturing** 86:6,18
**potential** 90:23 91:5
91:23 110:1 113:3
114:10 121:11
193:19 245:6
270:6
**potentially** 8:21

282:17
**Potts** 1:17 7:10
306:4 307:10
**practice** 15:17 20:3
22:18 23:4,16,23
23:24 24:6 99:3,4
99:21
**preceding** 60:5
**preclude** 218:13
**precludes** 166:5
**predated** 63:16
**predicate** 25:8
**predict** 190:23
**predicted** 189:13
**predicting** 292:18
**predictions** 193:18
292:19
**predominate**
115:22
**preliminary** 84:24
98:9
**prepare** 8:20
**prepared** 157:24
158:16 177:7
210:19
**preparing** 10:8
**prerequisites**
112:23
**present** 3:1 7:22
17:6 71:10,11
85:20 167:12
273:3 306:13
**presenting** 98:9
**preserved** 205:14
**presume** 204:7
**presupposes** 85:9
**pretty** 53:4 197:11
281:9 300:3
**prevail** 85:11
218:19,20
**prevailing** 188:2
**prevails** 85:10
**previous** 79:22
152:10 177:16
182:16 273:18
**previously** 56:3
79:10 95:8 104:14
306:13
**primary** 51:23
230:21 231:24
**principle** 130:10
158:5 201:22
**prior** 14:17 87:22
104:18,18 113:4
114:18 115:4,6,20
115:24 116:9

169:5 186:3 193:9
239:1 242:16
270:14
**privileged** 42:13,24
42:24 43:4 77:21
78:6 79:11 87:9
181:18 204:8,11
204:13 205:5
233:1 278:9
295:24
**privy** 44:9 45:13
**probable** 80:14
112:18
**probably** 38:11
59:2,14 134:5
**problem** 37:13
**Procedural** 113:23
**Procedure** 1:15
**proceed** 40:23 81:6
83:24 86:1 90:5
126:13 153:14
173:2 185:22
215:22 300:23
**proceeded** 29:15
30:4,11 141:6
187:24 216:4
**proceeding** 38:7
94:3 218:17
**proceeds** 248:11
**process** 61:12 68:9
68:23 69:14,21
71:1,6 79:1
111:17 131:18
138:11 160:9
209:4 211:13,21
213:13 220:23
221:7
**processes** 209:8
**produce** 10:10 14:7
42:19 43:9 108:21
220:17 234:24
235:2
**produced** 8:24 9:6
9:20 10:1 11:10
13:12,14,22 14:2
14:13 42:20
108:16 109:1
148:9 182:15
235:1 247:7,18,20
302:19
**product-protected**
118:3
**production** 9:16
10:17,18,21,24
121:4,7,24 122:24
123:1,2 176:2

181:19 234:20
235:5
**professional** 16:14
16:16 17:18 99:5
102:19 103:12,23
106:12 296:20
298:7
**professionals**
238:14
**prohibit** 218:12
233:6
**prohibited** 102:23
**project** 191:16
**projected** 188:12
189:13 190:16,17
191:6,17
**projections** 191:11
**promise** 248:5
294:10 295:6,10
**promised** 141:17
268:21 285:20
287:3
**promises** 70:11 71:9
71:13,16 243:20
243:24 293:20
294:18,24
**promising** 178:8
**prompt** 56:16
**promulgated** 99:6
**pronounce** 164:1
**proof** 193:12
**proper** 286:20
**properly** 102:15
181:16
**proportion** 140:20
141:19
**proposal** 124:23
127:6 146:6
160:13 177:18
187:5 190:14
192:22 193:2
194:9 207:5
**proposals** 151:14
211:8
**proposed** 24:12
147:3 158:6
162:15,22 176:6
188:18,23 221:13
**proposes** 178:5
**proposing** 146:8
160:4 179:11
192:19
**propositions** 109:20
**propounded** 222:16
222:24
**proprietorship**

16:13 23:20
**prosecute** 164:19
169:22 170:9
172:19 221:7
**prosecuted** 166:20
**prosecuting** 38:4
105:24 164:21
**prosecution** 48:20
49:23 50:20 81:13
85:5 101:2 107:4
220:21
**prospective** 243:1
**prospects** 136:17
**Protection** 242:19
**protective** 47:7
100:16
**prove** 79:9 106:11
**proves** 53:17
**provide** 21:6 75:9
138:15 237:18
238:1 240:10
267:11
**provided** 121:19
141:2 234:21
267:7
**provides** 187:1
**providing** 26:15
43:7,23 44:8
45:12
**provision** 158:18
**provisions** 200:13
206:7
**public** 88:16 305:24
**publicity** 198:6
**publicly** 86:3 87:16
88:4 114:9,12,22
208:24
**pull** 227:10
**purported** 75:4
**purpose** 98:8 125:5
125:8 188:16
189:3
**purposes** 10:8 47:4
118:21 132:2
207:18 217:20
**pursuant** 1:14,14
8:24 9:6,20 10:1
11:10 41:8 44:17
307:4
**pursue** 85:23
168:14
**push** 151:8 177:16
187:7
**pushed** 69:7,7
**put** 35:22 59:1,12
59:23 60:3,12

63:17 79:18 82:19
83:5 118:4 141:13
169:10 186:22
291:19
**putative** 83:1,7 92:2
95:4,15 96:4,20
96:21 97:8 98:10
104:22 105:3,14
105:17 107:4
110:7 111:22
124:24 166:21
168:14 170:9
189:4 216:2,17
**puts** 118:6
**putting** 37:18,21
38:2 149:11
292:19

---

**Q**

**Quarles** 26:1
**questioning** 223:22
248:18
**questions** 18:17
19:5,13 55:14,19
74:21 109:20
172:5 182:1,5,18
204:4 205:11
234:8 240:11
271:7 297:22
306:20
**quick** 153:3 281:9
**quicker** 136:3
**quickly** 199:1
**quite** 72:20 139:23
141:7,7 190:21
303:5
**quote** 47:13,13 48:6
114:9,10 130:9
149:3,5,10 151:8
151:9
**quote/quote** 26:10
**quotes** 114:12
210:11,19
**quoting** 119:21
194:12

---

**R**

**R** 2:1
**railroad** 20:21,23
21:7,13,17
**railroads** 21:3,4,6,9
22:22
**raise** 96:19 266:20
**range** 188:2 189:8
193:21 278:1,2,23
279:2,6

**ranges** 192:3
**rate** 151:19 188:13
189:8,14 190:17
191:6 192:23
193:2,18,22 195:3
195:4,15,18
196:10,19 198:1,2
198:18,21 199:6,9
**rates** 187:22 188:3
190:23,24,24
191:11 194:13
198:24 291:18
292:13,18
**rather** 246:3
**Re** 144:15
**re-sending** 210:19
**reach** 37:20 86:1
88:2 131:13,15
132:7,12,22 201:2
214:20
**reached** 97:3 98:6
109:6 130:9
200:12 201:21
202:4
**readily** 74:21
**reading** 123:22
241:12 273:15,16
**reads** 57:5 68:7
102:6,20 122:3
230:10
**ready** 55:19
**realize** 27:3
**realized** 64:19
**really** 69:7 70:12
71:17 166:8
188:23 243:21
244:1 283:5
**reask** 127:3
**reason** 14:11,14
50:20 55:5 77:6
80:18 107:22
120:1 125:1
133:10 136:6
150:15 193:10
195:6 211:1
219:17 281:12
288:17
**reasonable** 24:13
80:13 155:3
160:22 177:22
178:7 185:14
212:9
**reasonableness** 94:3
**reasons** 26:7 77:3
84:17 202:21
203:23

**receive** 83:13 113:4
212:3,4,5 222:15
281:23
**recent** 147:2
**recently** 159:19
**recess** 40:19 81:1
126:3 153:10
185:17 215:17
300:19
**recipient** 108:21
147:19,22 148:3
**recipients** 147:6
**recognize** 122:1
135:13,20 137:6
178:22
**recollect** 108:24
134:24
**recollection** 8:21
85:7 93:11 105:10
109:17 114:16
116:5 131:24
133:17 179:17
187:2 228:13
229:5 247:11,22
252:10 263:15
273:6,20
**recommended**
238:13
**reconvene** 161:21
**records** 141:3
184:20 202:15
207:13 211:12,13
211:20,20,21
213:20,21 235:24
236:5,8,20
**recovered** 102:9
**recovery** 101:17
102:2 277:5
**redacted** 13:14
42:13 43:10,11
149:9,12 151:3
161:10 181:16,18
220:18 294:23
**redaction** 152:12
**redactions** 42:14,16
42:17
**reduced** 33:21
306:9
**refer** 45:22 50:23
82:6 270:4
**reference** 129:7,13
129:23 151:15,21
181:17
**referenced** 192:18
**references** 129:9,16
129:22 130:8,16

150:1 152:21,21
**referencing** 129:2,3
129:21 182:5
**referred** 59:20
247:13 306:22
**referring** 9:21 51:1
81:20 82:8 140:2
144:17,24 153:22
154:3 187:9
224:24
**reflect** 130:3
**reflected** 66:5
202:15 227:21
228:3 247:6 248:4
288:19
**reflecting** 217:21
253:13
**reflects** 61:4 194:21
**refresh** 8:21 105:10
114:16 116:5
179:17 252:10
263:14 273:6
**refreshed** 273:19
**refuse** 77:6 205:19
256:10 294:20
**refused** 37:7 77:2
138:19 143:9
264:18 280:20
**refusing** 19:9,21
73:22 74:7,8 75:6
75:19 209:13
214:14 215:1
223:16 232:19
233:3 237:6
251:20 255:21
264:8 267:19
278:6 285:5
293:11,17 294:7
296:6 301:17
**regard** 26:15 42:9
43:6,15,17 44:5
44:11 85:20 89:1
99:24 106:13
174:19 188:17
**regarding** 44:6
45:10 56:8 65:4
67:15 76:23
126:16,22 228:1,9
228:23 270:6
295:6
**regards** 100:13
**regularly** 276:5
**rejected** 116:13
117:10 180:5
**rejecting** 162:14,21
**rejects** 178:5

**relate** 200:14 201:4
**related** 47:22 166:5
205:6 227:16,21
301:23
**relates** 227:20
**relating** 66:18 97:18
104:15,22 105:4
105:15 153:5
**relationship** 37:7
153:21 226:15
227:14,19 233:23
238:4 255:9
266:13 270:15,16
**relatively** 133:13
**relevance** 26:22
27:13,21 29:17
33:3 34:1 103:13
187:16 216:11
**Relevancy** 108:5
117:13
**relevant** 82:2 92:4
95:13 101:9
113:23
**relief** 158:5
**relieved** 225:2
**rely** 114:20
**relying** 233:2
**remaining** 211:12
213:21 214:2,11
**remedied** 111:16
**remember** 21:11,18
21:20,22 23:14
25:2 56:4 92:23
95:22 105:17
199:16 200:2
201:24 231:8,9,10
234:2 245:20
254:9 262:14
276:2,4 286:15
291:10
**remuneration** 83:6
**rendered** 102:22
118:19 168:2
**rep** 82:23,24 83:1,7
275:15
**repeat** 45:6 86:9
87:20 144:9 234:4
**replace** 181:19
**replaced** 244:9
**replied** 149:9 166:7
**replies** 176:19
177:17 183:3
**reply** 183:4
**report** 150:8,17,18
236:7,22 267:7,8
267:14

**reported** 306:8
**reporter** 1:18 7:10
8:2 19:19 36:11
86:8,21,24 97:21
252:19 303:13
304:9,11,17 306:5
**Reporters** 3:6 7:11
307:5
**representation**
22:22 26:14 43:7
99:3,7 100:1
103:18 106:13,19
110:9 226:6 228:2
233:18 234:17
253:14,21 268:12
**representations**
299:11
**representative**
82:18 91:22 92:10
93:22
**representatives**
90:24 91:5 118:1
118:22 119:17
120:3
**represented** 21:8
104:20 225:21
226:8 251:22,23
252:16,22 253:3
257:12
**representing** 42:5
42:10 43:17 44:17
44:23 248:1 254:1
259:4 261:10,11
**represents** 44:3,5
44:11 45:9,14,17
46:7 94:9 225:9
226:22 256:21
**request** 51:21 84:23
108:11 170:21
276:9 279:16
**requested** 6:8 36:20
78:15 86:13 91:11
97:16 110:13
111:7 112:5
120:13 134:18
153:18 170:24
194:3 200:21
276:7 277:21
283:10
**requesting** 178:14
**requests** 171:3
220:16 222:18,24
223:5
**required** 115:18
119:21
**requirement** 9:16

106:22 116:15
240:12
**requires** 229:14
233:16
**requisite** 118:23
**research** 97:19,24
261:19
**resent** 69:1,8
**resents** 61:12 68:10
**reserved** 306:24
**reserving** 197:6
**resolution** 102:14
140:18
**resolve** 68:24,24
138:20 301:9
**resolved** 37:15
75:11 248:7,9
**resources** 286:1
**respect** 43:21 44:7
45:11 85:10,11
140:11 204:15
225:4 226:7,14
227:14 261:13
290:11,15,21
292:22
**respective** 99:5
180:17 250:13
259:15
**respects** 202:18
**respond** 161:3
162:1 176:13
178:15 220:15
**responded** 38:8
91:3,21 108:22
144:3 145:3 149:8
151:7 152:16
180:10 187:6
246:3
**responding** 184:4,6
184:7,18
**responds** 166:3
177:3
**response** 38:9 44:18
119:12 144:12
157:2,3 170:20
173:12 177:5,9,15
182:12,24 183:24
184:1,23 186:6
192:21 227:5
234:21 235:15
238:10 239:23
243:16
**responses** 172:6
273:18
**responsibility** 33:1
298:8 299:17

300:6 301:12
**responsible** 47:22
48:2,7 66:14
270:23 271:20
272:2 301:3,4
**responsive** 108:10
141:12
**rest** 84:10 142:5
**restraining** 84:24
**restrictions** 80:8
**result** 118:17
140:21
**resulted** 71:6
179:12
**resulting** 33:2
**retained** 66:15
169:21 170:8
172:19 244:14
269:16
**retainer** 4:18 34:10
34:17 35:8,17,20
35:23 36:24 37:19
37:21 38:3 42:19
42:21,23 43:3,9
100:12,22 169:20
170:1,21,24
173:11 174:16
227:7
**retention** 45:20
170:7 171:9
172:18 173:1,15
174:2 229:21
235:7,11 237:15
237:20 257:22
258:1,9 279:14
**reveal** 65:7 278:8
**revealed** 56:12,20
57:21 58:9,22
60:8,16 62:15
66:18 77:22 78:1
78:5
**revealing** 61:5
87:10 208:18
**reveals** 58:1 61:8
62:14 65:4 67:14
67:18 68:14
**reverse** 31:10,11
51:11 111:15
118:6 140:8 189:3
194:18 195:7
206:12,19 207:15
207:24 208:9,11
208:24
**reversion** 159:18
193:7
**reversionary** 193:9

**review** 10:7 11:9
55:22 113:6
122:14 156:5
223:5 304:14
**reviewed** 8:23 9:5
9:20,24 12:17
13:18 41:8 84:21
**reviewing** 221:12
**rewording** 71:14
**ridiculously** 142:13
**robocalls** 193:11
**robust** 209:3
**Rod** 136:7
**Rodney** 136:7
213:14
**role** 219:24 220:4
220:22 221:6,12
**Ross's** 10:24 205:9
**rude** 136:3
**rule** 65:23 102:19
102:20 103:11,22
104:3,5 106:12
112:23 115:23
118:23 297:12
**ruled** 95:8
**rules** 1:15 99:5,14
99:18,21 100:3
102:19 103:12,23
106:12,18,21
296:19 297:3
**ruling** 65:20 66:1,1
66:2 74:14 75:4
260:14
**rulings** 106:3
205:15
**running** 136:6
163:7 175:9
**runs** 286:11
**Ryan** 39:8,14

———————
S
**S** 2:1 3:2
**S-a-r-r-i-s** 57:11
**S&Ls** 26:19
**sailing** 158:18
**SAITH** 304:22
**Sarris** 57:10,23
62:1 65:13 67:5
**saw** 145:24 152:11
162:14 186:24
187:3 258:8
280:22 292:11
**saying** 44:2 65:3
66:19 80:15 91:21
127:17 136:2
152:11 166:2

172:4 184:7,18
210:10 212:21
215:3 253:3
255:23 264:10
**scenario** 212:12
251:18,19,20
**scenarios** 213:19
214:7
**scheduled** 135:4
179:19 183:14
**scheduling** 161:20
**school** 15:3 41:3,4
**scope** 33:4,9 203:3
227:13 289:10,21
291:16 293:7
**screen** 174:14
**seal** 92:4
**second** 163:12
179:9,18,21
211:17 229:24
**second-chair** 27:18
**secondly** 57:24
**secret** 197:8
**section** 46:22
113:23 119:14
**sector** 88:16
**seeing** 127:19 227:7
235:6,10 260:7,11
**seek** 76:5 101:17
173:1
**seeking** 27:4 60:6
79:6 83:7 85:4
126:23 159:21
168:14 171:22
197:22
**seem** 24:13 156:17
163:13
**seemed** 126:23
133:13
**seems** 69:11 185:13
**seen** 56:2,9 78:24
109:8 121:13
124:11 148:4
176:13 177:15
204:22 258:5
**segue** 72:16
**segues** 176:24
**select** 167:2,3,4,11
168:20,23 169:4
169:21 170:3,8,15
171:10,19 172:12
172:19,20,23
173:16 174:3,4,19
174:24 175:5
238:12
**Select's** 173:2

**Select/BMW**
169:16 170:24
171:14 172:16
173:14,15
**selecting** 243:13
**sell** 60:21
**seminar** 238:14
**sending** 64:9 181:9
**sends** 148:11
**sent** 34:22 91:6
146:10 150:13
159:10 182:9
212:6 263:4,6,18
265:3 288:18
292:17
**sentence** 47:2,14
66:16 101:13
102:6 114:3 138:9
158:21 160:6
162:12,13 179:23
192:18 194:16
230:2
**separate** 65:3 140:6
168:12 210:14
**September** 137:8,16
144:4,13 145:4
146:3 147:18,23
148:12 149:2,23
151:1 152:9,16
154:17 155:16
156:1 158:24
176:4 177:14
**sequence** 55:4 183:5
211:18
**sequentially** 147:12
**series** 157:11
**serious** 136:16
145:14 154:9
163:15 180:24
**served** 64:11
**serves** 189:2
**service** 102:22
**services** 21:7 47:10
47:19 138:16
**session** 183:14
**sessions** 135:4
**set** 11:5 57:6 63:7
64:2,15 72:11
84:17 130:13
131:7 185:10
202:21 203:23
306:13 307:4
**sets** 61:21 103:24
**setting** 60:4 193:16
195:20
**settle** 68:22 69:16

69:19 70:12,17
71:17 136:12
142:2 143:8
243:21 244:1,15
280:4,20 282:18
**settled** 37:14 193:6
206:6 245:17,21
246:14
**settlements** 187:15
187:23 208:12
209:1 288:24
292:12
**settles** 73:3,5
**settling** 187:24
247:13
**seven** 39:7 93:15,18
303:9,19 304:3
**several** 38:6 207:11
**shaking** 107:18
**shall** 48:6 103:1,2,4
230:13
**shape** 141:19
**share** 129:20
140:19 141:18
154:24 158:8
189:20 232:19
249:22
**shared** 53:3,13 74:2
79:10,22 88:6
190:3,16 191:17
191:20 197:1
248:22 302:7
**sharing** 88:11 191:5
193:17 248:6,8
**she** 18:15 19:11
164:4 211:9
**sheet** 4:20,21,22,23
4:24 5:1,2,3,4
154:22 155:4,20
156:5 162:1 176:5
192:15,17 194:11
**sheets** 121:10,11
124:15 127:21
**shell** 161:2
**short** 145:5 185:24
**Shorthand** 1:18
306:4 307:5
**Shortly** 222:16
**shot** 57:9 61:24
65:12 67:4,21
168:3
**should** 19:1 68:16
105:10 147:4
149:10 154:23
158:5 178:14
181:18 186:3

193:10 210:5
229:18,23 273:15
281:8 290:4
**shouldn't** 63:15
241:7
**show** 79:9 122:8
189:5 208:2 246:9
**showed** 49:2 204:23
**Showing** 148:23
155:14 162:9
163:6 165:11,22
**shown** 122:11
147:24 148:2
182:16 227:8
288:9,17 303:4
**shows** 183:3 184:19
187:10
**Siano** 164:2,3,11,13
**sic** 39:9
**side** 52:2 191:18,20
194:13 291:19
**sign** 34:16 35:7,19
152:18,23 154:4
176:14 257:21
304:12,13,15
**signature** 42:2
235:7 273:5 304:9
304:11 306:23
**signed** 103:1,9
104:2 105:23
106:23 108:2,3
109:4,4 171:10
174:24 175:1
228:6,10 231:23
237:9 273:7,20
**significant** 134:20
138:16 189:6
206:13
**significantly** 54:24
110:7
**silence** 25:12
**similarities** 129:20
**similarity** 128:14
**similarly** 77:5
**simple** 196:6
**simplify** 219:10
**simply** 212:6
**since** 15:20 49:7
51:23 76:11
121:17 140:14
141:7 157:22
170:20 206:14
**sincere** 136:16
145:14 154:9
180:24
**Siprut's** 107:12

139:20 140:19
142:9 143:22
sit 75:18 98:14
99:23 106:10
122:3 123:20
124:14 134:17,23
150:11 177:7
188:5 198:12
253:17 289:23
293:3
sitting 82:20 228:24
250:16 258:17
261:16,21 291:14
295:5
situation 84:9 94:13
97:10 212:2
six 101:12 275:21
281:20
size 151:16 200:15
304:20
skip 158:14
skipping 165:14
Slingshot 183:23
184:16
small 26:12 284:11
Smart 168:9,21
soda 297:24
Solberg 39:11,15,18
39:18
sole 16:13 17:20
23:20 69:5
solely 201:4
solicit 51:9
solicitation 91:3,17
solicitations 90:21
solicited 53:19
116:14
Solutions 88:22
89:2
solved 225:3
Somebody 210:6
someone 94:10
106:19 169:9
188:22 220:11
236:4 255:8
someone's 191:15
someplace 50:24
sometime 24:19
268:9,13 270:14
sometimes 19:13
73:1 82:6,6 90:18
91:2 115:17 192:1
216:2 279:2 301:7
somewhat 198:15
somewhere 39:2
159:14 249:4

253:4 268:23
272:12
soon 33:7 123:12
sorry 16:18 36:4
39:13 59:5 65:21
86:8 97:22 104:17
114:9 138:10
147:20 156:16
172:2 178:2
181:14 207:20
243:16 252:19
261:4 283:7
290:17,19 304:10
sort 57:10,22 62:1
65:13 67:5 227:24
257:21
sought 75:12
sounded 35:1
sounds 104:6
141:12 287:8
297:18
Southern 21:19
22:3,5
spanning 137:7
speak 31:11 36:14
97:21 172:3,7
speaking 109:22
112:22 212:1
speaks 31:13 75:8
special 110:21
specialize 20:2
specific 42:19,20
50:13 87:8 91:6
97:9 131:24 133:6
139:4 214:17
219:22 292:22
specifically 20:11
98:17
specifics 47:6
107:24 143:16
190:8,12
specifying 131:3
253:21
speculate 49:19,20
speculation 277:7
280:8
spend 84:7 271:9
283:1
spent 250:22
split 33:16,17,18
139:14
spoke 243:9
squeamish 57:8
61:23 65:11,18
67:3
squeamish,' 66:20

SS 306:1
St 200:6
stack 12:2,16 13:3
stake 16:1,4 282:19
282:22
stand 218:4,16
284:11
standard 174:22
standing 80:20
87:13 88:13 94:7
94:17,20,21,21,23
95:1,3 96:21
start 12:14 15:1
40:12 54:22 55:6
55:7 60:8 128:17
128:24 145:9
152:10 157:12
166:2 183:21
184:14 186:4
252:20 253:24
started 24:3,9,22
25:1 32:16,21
44:2 66:19 79:5
81:19 201:15
254:21
starting 25:9
115:21 281:11
starts 47:9 66:17
101:14 114:3
158:15 177:13
179:1,23 182:22
230:2
state 1:19 7:14 8:4
46:13 63:9 64:11
99:6 103:2 141:15
182:7 200:1,7,8
216:17,21,23
238:9 306:1,5
stated 71:10
statement 67:6,22
68:20 69:23 123:5
136:6 154:18
statements 120:5
states 1:1,15 7:4
29:15 146:23
162:13 171:14
305:1
stating 74:9 103:10
status 146:5 156:21
156:23
statute 94:2,14 95:7
95:17,24 96:3,8
96:11,20 97:1
98:17
stay 25:23 219:7
stayed 219:14

steal 78:21 80:4
stealing 43:22 44:7
45:12
Stein 140:4,11
257:6
stenographically
306:9
steps 206:11
stick 197:8
still 73:20 75:10
81:9 84:9,11
134:14,20 146:24
197:19 240:16
244:10 297:15
stole 283:16
stolen 267:6
stood 283:19
stooges 31:11
stop 33:7 37:18,21
123:6,10
stopped 186:1
straightforward
300:3
strategies 209:7,17
strategy 290:4
Street 1:20 2:4,9,15
7:12 306:12
strictly 74:3
strike 16:6 60:22
169:19 197:21
structure 158:23
159:21 160:8
Stryker 207:2,13
stuff 138:6 150:14
215:12 240:3
style 178:8
styled 8:8
Subjective 167:17
submissions 113:6
submit 143:12
156:5 213:21
submitted 143:23
146:9 170:3
Subparagraph 47:1
47:21
subpoena 4:14 8:24
9:6,13,20,21,24
10:1,2,11 11:11
41:8 44:17,18
234:21
subpoenaed 207:12
subpoenas 206:24
220:15 222:19,21
235:16
SUBSCRIBED
305:21

Subsection 47:9
48:6 119:16
subsequent 202:13
substance 239:22
240:8
substantial 82:19
83:4 84:3 141:4
succeed 219:12
successful 83:8
93:15 218:5,9
276:18 277:3
283:20
successfully 91:6
104:19
such 74:1 78:8
79:13 98:12
100:18 109:9,16
160:10,19 180:4
219:6 261:14
269:21 270:2,4
278:13
Sue 210:15
suffer 12:8
sufficient 87:13
88:14 90:5 93:12
sufficiently 70:20
suggested 291:18
suggesting 53:10
186:23 191:9
suggestion 117:11
suit 134:2 252:4
Suite 2:4,15 3:6
sum 142:1 147:5
235:4 239:22
240:8
summarizes 211:9
summary 66:7,9
93:16
superimposed
176:5
support 198:16
286:12 302:15
Supporting 113:15
supports 302:6
supposed 33:17
36:18 237:19
265:8,10
swear 8:2
sworn 8:3,14 305:10
305:21 306:15
system 216:5

T
table 59:1,13,24
60:4,12 79:18
143:5

**take** 8:7 24:9 25:12
40:14 55:12 73:10
126:1 133:1
138:19 151:22
168:3 182:18
191:21 194:11
202:17 206:12,13
215:9 219:4
280:24 281:6
304:16,19
**taken** 1:17 7:11
68:18 86:6,19
89:19,21 92:18
95:23 170:22
206:11 303:23
305:15 306:8,11
**takes** 151:15
**taking** 1:16 31:3
171:7 194:8
**talk** 47:11 63:15
123:14 125:18
127:21 145:8
146:5 160:5 245:7
258:20 292:6,9
**talked** 31:14 41:7
65:2 76:24 91:18
139:13 179:5
188:7
**talks** 131:10 186:3
188:9,10
**Tampa** 61:12 68:9
69:14,21 70:24
235:12 240:21
241:1 244:6
250:23 253:15
254:22 256:24
257:13 263:5
276:19 277:3
290:12,16 299:18
300:6
**target** 91:19
**team** 192:19 193:21
194:8 265:1
**Tech** 117:5
**Technology** 50:7,15
53:18 83:23 91:16
91:20 92:11 94:24
97:2,10 98:4,18
111:2,16 117:24
131:12 202:4
203:20 207:18
218:14,18,21
219:8,13
**telephone** 206:24
207:13 242:19
**telling** 51:21 68:16

170:23 206:3
**template** 122:1
**temporally** 147:12
**temporary** 84:23
**ten** 133:18 183:13
215:9 270:12
**tense** 71:10,12,12
**term** 4:20,21,22,23
4:24 5:1,2,3,4
121:10,11 124:15
127:20 154:22
155:4,20 156:5
162:1 167:15,17
176:5 192:14,17
194:11
**terminology** 151:13
**testified** 8:15 14:15
17:13 66:21 108:1
**testify** 51:1 120:4
177:8
**testifying** 50:19
**testimony** 8:20 47:5
78:10 106:16
139:8 169:12
228:19 258:22
305:17
**text** 78:24 245:22
**thank** 36:12 38:24
54:16 76:17 165:6
210:5 242:17
243:18 261:23
**Thanks** 31:16 164:7
186:16
**theft** 267:15
**Theirs** 176:6
**themselves** 7:14
286:12
**thereafter** 306:9
**they'll** 189:10
191:22 212:3
**they're** 70:8,20
84:12 109:20
122:21,24 123:1
164:24 212:4,4,7
225:21 261:7
**thick** 12:2
**thickness** 11:13
12:16 13:3
**thing** 50:2 55:11
70:20 81:16,22,22
82:2,10 84:19,20
95:13 197:19
217:11,13 244:11
283:15,18
**things** 86:2 87:8
101:10 107:15

109:23 120:1
143:6 154:7
172:23 184:10
192:1 215:24
218:12 262:8
**thinking** 155:20
184:7 186:18
**thinks** 59:2,14
**third** 119:20 125:11
213:17 279:5,24
281:1
**third-chair** 27:18
**Thompson** 3:6 7:10
**though** 77:19 189:6
**thought** 10:23
59:21 88:3 126:23
140:2 167:6
170:15 184:6
245:13 248:12
**thoughts** 52:2
**thousand** 281:21
**threat** 247:14
**threatened** 246:9
282:13
**three** 23:4,17,23
24:7 39:10 77:15
114:6 130:2
187:19
**threshold** 118:23
119:21
**throughout** 115:2
131:18
**throwing** 44:21
**Thursday** 132:19
**thus** 193:12
**till** 17:24
**time-barred** 51:10
93:24 94:6 264:1
**timeframe** 37:12
38:15 298:19
**timeline** 24:15,16
24:17 272:23
**times** 17:20 38:6
147:5 174:24
206:23 240:1
292:8 302:11
304:3
**Timing** 53:20
**today's** 7:7,11 8:20
**together** 34:4,7
35:16 36:23 38:8
122:18 147:1
166:7
**told** 60:8 62:23
64:23 78:19 88:9
127:5,7 189:21

231:8 241:24
243:1,3 244:3
245:11,12 246:1
252:11 255:6
**tolling** 95:19,24
**ton** 196:8
**too** 46:4 62:8 213:1
239:19 246:7
**took** 50:3,4,9,19
51:5,6,20,22
53:11 81:8,17
116:6 126:6,15
144:23 167:19
178:12 185:24
194:12 204:1
**top** 61:19 62:20
145:2 148:10
157:15,21 177:17
187:19 268:18
**topic** 260:1 272:22
**topics** 204:4
**total** 49:7 101:17
102:8 130:21
143:23,24 150:9
150:13 164:13,21
185:9 190:16
235:4 275:20
276:11 278:11
**totality** 250:19
**towards** 55:8
**tractor** 204:21,22
**trade** 222:2
**trained** 99:14
**Training** 53:18
83:23 91:16,20
92:11 94:24 97:2
97:10 98:4,19
111:2,16 117:24
131:12 202:4
203:21 207:18
218:14,18,21
219:8,13
**transcript** 6:7
250:10 305:13,17
**translates** 195:5
**transmission** 89:9
92:5,12 93:21
**transmissions** 91:7
202:15 206:14
**transmitted** 124:16
124:17,19,22
125:16 127:14
**transpired** 49:7
**travel** 49:5 179:13
**trial** 26:20 27:20
28:3 29:15 30:4

30:23 103:5 140:8
168:18 242:9,13
**trials** 27:18 31:3
**tried** 26:21 27:5,11
60:20 168:6,10
**true** 125:12,15
175:9 202:1,2
208:8 240:10
290:11,15,23
305:16 306:19
**truth** 12:9 206:4
306:15,15,16
**truthfully** 233:7,11
**try** 12:1 50:24 51:11
133:23 134:5
155:20 190:24
191:1,23 219:10
265:14,16 301:9
**trying** 12:15 19:7
25:3 44:4 52:24
58:16 75:16 78:3
80:10 161:9
186:22 188:21
189:15 191:21
254:11 282:3
301:19
**TTA** 203:20 260:15
260:24 261:2,8,11
**Tuesday** 149:23
**tune** 282:16
**turn** 119:9 138:8
**turned** 281:13
**Tweedle** 15:13
19:23
**Twelfth** 114:13
**type** 26:15 27:11
99:20 147:3
**typewriting** 306:10
**typically** 160:12
**typo** 274:1

---
U
---

**ultimate** 279:23
290:23 291:11
**ultimately** 15:15
25:22 73:3 80:11
291:6
**unable** 106:7
**uncertified** 62:22
**unclaimed** 159:18
**unconditional**
293:21
**unconditionally**
272:8 287:4 295:8
296:17 297:10
299:6

**underlined** 113:24
**underneath** 177:6
**undersigned** 307:1
**understandable** 179:7
**understood** 33:23 144:24 168:17 245:8 301:22
**undisclosed** 180:7
**unfortunate** 45:6
**Unfortunately** 145:6
**unheard** 72:23
**unintentionally** 184:9
**Union** 21:12,17
**unique** 129:12 149:4,12 150:8,12 198:15
**United** 1:1,15 7:4 29:15 171:14 305:1
**University** 15:4 41:4,6
**unless** 18:24 122:3 136:21
**unnecessarily** 196:13
**unnecessary** 206:3
**unreasonable** 193:19
**unreasonably** 202:17
**unredacted** 151:3
**unsure** 97:11 287:8
**until** 136:12 162:1 200:12
**unusual** 198:15 217:5
**unusually** 198:1,18 198:21
**unwilling** 209:19 215:4
**unwritten** 253:20
**upon** 8:14 77:23 89:8 110:20 134:13 139:5,21 141:18 178:12 190:17 261:8 306:16
**us** 10:21 13:14,23 42:18 47:10,16 51:22 88:9 127:5 127:7,8 155:21 160:24 213:14,15 221:10 233:23

234:21 248:22 283:17
**used** 69:23 70:18 89:13 90:20 94:12 151:13 174:23 180:7 187:15 243:6
**using** 67:1 70:18,22
**usually** 90:17

---

**V**

**v** 149:24 164:8
**vague** 52:6 56:22 63:13
**value** 171:8 255:15 280:13,18
**variability** 129:6
**varies** 279:2
**various** 74:18 93:14
**vastly** 164:19,20
**vendor** 206:12
**vendors** 207:15,17 207:23 208:13,24
**venue** 168:14
**venues** 90:14
**verdict** 26:21 27:6 27:12 28:3 29:16 30:4,12,13,17,19 30:20 31:4,23
**version** 177:14
**versus** 7:3 8:9 30:16 30:22 31:7 44:5 46:3 48:16 117:5 167:11 171:16 172:22 211:19
**very** 12:12 29:5 35:3 69:4,8 126:22 173:6 196:19 201:24 217:6 248:21
**via** 213:21
**vibrating** 281:14
**video** 7:8
**videotaped** 1:12 7:2 305:12,13 306:7 306:11
**view** 66:21 75:2,10 158:7,8 181:22 215:5 254:13 289:22
**viewing** 174:14
**views** 193:16 291:6

**violate** 125:20
**violated** 100:3
**violates** 296:19 298:7
**violation** 297:2,12
**vociferously** 250:7
**voice** 86:20
**volume** 11:9
**voluntarily** 22:9,11 23:1,2 26:2,4
**vs-** 1:6 305:6

---

**W**

**Wacker** 23:10,13
**waiting** 55:18 128:20
**waive** 264:18 278:10 300:14 304:12,13
**waived** 63:12 98:17 214:24 264:20,22 274:21 293:14
**waiving** 97:1 180:21 212:15 214:13
**walk** 15:10
**walked** 87:6 180:5
**wall** 80:8
**Wally** 39:11,15,18
**Wanca's** 214:4
**wanted** 25:19 26:8 64:5,15 71:17 74:7 133:23 138:12 207:4 213:9 243:21 244:1,22
**wanting** 208:10
**wants** 57:6 61:21 186:3 218:12
**Washington** 3:6
**wasn't** 30:20,23 64:12 66:7 79:6 80:20 88:4 109:13 142:13 143:18 145:7 178:1 225:13 245:8 246:2,7 261:3
**waste** 70:13 76:22 179:13
**wasted** 71:17
**wasting** 161:24
**Wayne** 92:21 93:1 93:10 124:16 132:3 133:14 157:14 201:16,20 244:23
**we'll** 7:19 57:16

58:3 87:1 134:14 153:4,7 181:19,23 223:14 304:12,14
**we're** 8:6 12:12 18:16,17 25:8 31:17,19 33:6 45:2 48:14 59:9 81:9 117:1 122:5 134:7 144:12 165:14 173:6 195:15 205:14 225:11 261:14 301:4 303:12,13
**weakness** 184:20
**web** 213:22
**Wednesday** 148:11
**weekend** 133:8
**weeks** 270:17
**weigh** 161:7
**welcome** 76:20
**went** 15:18 22:12 28:3 30:17 41:3 52:11,15,20 61:12 68:9,23 69:15,22 71:1 79:2 167:21 171:14 206:14 213:10 243:22 291:3
**weren't** 140:14 176:19
**West** 3:6 23:13
**Western** 21:21 198:9
**what's** 9:7 16:6 36:9 41:13 42:16 113:12 128:9 135:9 137:2 151:3 165:22 167:10 177:6 199:14 209:24 247:17,21 275:20 276:10 286:3 298:2
**whatever** 14:15 84:9 92:24 93:17 115:11 123:5,9 134:11 138:23 180:23,23 186:8 190:23 212:3,4,6 256:6 281:2
**whatsoever** 43:2 271:19
**whichever** 99:6 127:12
**while** 72:22 73:4 122:3 123:21 131:8 169:13

193:7 202:6 203:1 217:5
**who's** 9:3 68:17 167:1 183:5 251:17 256:16 274:24 275:8
**who've** 94:7
**Whoever** 139:17 170:3
**whole** 55:10 83:11 110:2 189:10 197:19 306:15
**wholly** 204:9
**whom** 7:14 21:1 81:22 105:6 170:2 214:4
**whose** 94:5 140:3 264:4 265:2
**why** 25:17 35:23 37:5 49:23 81:10 82:13 84:7 95:6 96:8 98:22 112:20 127:8,13 166:2 175:5 193:10 214:6,9 217:9 218:8 234:4 251:12 282:24 286:3
**wife** 205:4
**will** 47:6,10,12,22 70:22 74:21 75:11 84:1 85:16 100:18 107:7,8,9 118:12 119:15 122:13 123:13 130:21 182:2 189:15 191:14 212:6 260:15 297:13 304:19
**willing** 29:8 75:22 90:10,11,19 91:4 91:22 93:22 188:22 193:8 232:19 262:5
**willingness** 90:22 92:9
**Wilson** 15:18 24:3,8 24:10,22 25:17,21 26:8,11 298:18
**win** 282:9 301:6
**window** 24:23
**Wines** 95:10,11,13 95:20
**Wisconsin** 2:10 25:23
**within** 1:18 24:20

103:11 151:13
190:5 192:3
196:18 203:2
216:21 289:10
290:8,24 291:11
291:12,12 302:6
303:11 307:2
**witnesses** 74:20
**Witty** 3:5 7:9
**won** 116:21
**won't** 19:3 55:10
75:9 76:3 136:12
212:2 278:10
**wondering** 59:15
**word** 44:4 64:22
65:18 66:20,24,24
70:22 71:14 243:5
**words** 53:1 69:22
70:3,4,7,7,17,19
94:14 183:18
186:22 243:5
**worked** 15:14 18:19
110:19 150:2
289:1,7 298:17
**working** 24:22
166:6 248:3
**works** 164:4 280:2
281:2
**world** 303:24
**worry** 86:23 281:16
**wouldn't** 68:22
136:20 143:17
145:16 244:20
258:4,5,5 262:20
262:21 280:17
284:2 290:5,6
**write** 115:16 161:23
**writes** 151:2,11
155:24 156:19
159:12
**writing** 33:21 38:12
103:1,9,24 106:23
108:3 162:2 171:4
230:13 233:19
235:11 292:14
**written** 66:24
105:22 136:21
141:6 162:1
230:14 253:4,6,10
253:12 258:14
260:7
**wrong** 82:14 123:13
127:20 144:10
**wrote** 33:15 149:3

___ **X** ___

___ **Y** ___

**Yaakov** 117:11
**yeah** 33:9 38:6 50:9
54:19 57:6 61:21
109:4 126:2
156:17 165:19
215:13 222:3
256:15 277:9
294:5 296:4
**year** 24:9 104:7
136:19 274:1
**years** 15:14,17 18:7
23:4,17,23 24:7
34:24 37:8 72:20
90:19 93:15,19
164:21 207:11
226:9 238:19
241:23 273:9
292:18 295:16
**yesterday** 144:14
**yet** 89:20,20,22
93:17 116:22
128:20
**yield** 198:17
**you'd** 12:19 54:14
93:8 132:22 245:7
**you'll** 54:22 55:6,11
85:16 138:8
182:18 304:13
**yours** 35:5 143:13
143:13 288:22
**yourself** 8:20 16:4
28:8,15,24 29:9
39:9 41:18 72:12
100:12 137:19
162:10,21 164:12
165:24 174:23
175:2 178:23
242:18,23

___ **Z** ___

**Zakrzewski** 41:19
230:16 232:3

___ **0** ___

**007** 58:15
**031516** 192:15
**07** 59:7
**084-003558** 307:11

___ **1** ___

**1** 4:14 6:10 9:8,9,16
83:9 101:5 119:16
127:21 129:2,14
129:20 130:8
144:13 145:4

146:2,21 147:13
157:16 161:6
211:10 212:1
250:9 305:14
**1,965,000** 193:1
**1.5** 103:11,22 104:3
**1.5(c)** 102:19
106:12
**1.8(e)** 296:19
297:12
**1/3** 101:17
**1:24** 81:5
**10** 4:23 120:18
124:5 127:20
129:1,7 180:3
193:2,5,22 195:4
195:17
**10:16** 1:21 7:9
**10:24** 148:12
**10:34** 161:7
**100** 4:18
**1000** 2:15
**1017** 3:6
**11** 4:24 40:3 120:18
129:19 130:2
135:22 136:1
**11,790,990** 130:5
**11/4/2015** 163:10
**11:01** 40:18
**11:16** 40:22
**113** 4:19
**11th** 135:14 252:11
252:14 263:24
**12** 5:1 40:5 120:19
129:19 130:3
166:17 176:7
210:14 211:7
**12:08** 136:1
**12:24** 80:24
**120** 4:20,21,22,23
4:24 5:1,2,3,4
**12th** 165:24
**13** 5:2 40:7 120:19
129:19 130:3
178:24 180:11
**131,000** 130:17
**131,011** 129:22
150:8
**134** 2:15
**135** 5:5
**136** 5:6
**14** 5:3 40:9 115:15
120:19 129:19
**145** 5:7
**146** 5:8
**148** 5:9

**149** 5:10
**14th** 162:11
**15** 5:4 40:11 62:20
114:3 120:20
121:3,21 123:20
124:15 127:5
130:7,8 164:7
210:10,18
**150** 5:11
**152** 5:12
**154** 5:13
**155** 5:14
**156** 5:15
**157** 5:16
**15th** 164:12 192:13
211:10
**16** 5:5 107:19
130:21 135:6,10
140:17,19 141:17
143:24 161:22
248:12,13,15
249:8 281:20
**161** 5:17
**162** 5:18
**163** 5:19,20
**165** 5:22
**16th** 162:24
**17** 5:6 61:7 136:22
137:3 145:3,24
146:19 158:24
195:19 196:11
305:15 306:7
**1718** 2:9
**175** 5:23,24 6:1
**178** 6:2
**17th** 1:21 7:7 163:8
**18** 5:7 145:18,23
146:20
**181** 6:3
**188** 101:6
**189** 102:5 229:23
**18th** 133:18 134:14
134:21 157:22
**19** 5:8 146:13,18,21
**19.5** 202:8
**192** 5:21
**1979** 15:6,11 21:15
**1981** 21:15
**1984** 307:5
**1989** 15:17 22:14
24:6
**1992** 24:10
**1996** 26:6
**1998** 15:19 16:9
17:24
**19th** 163:9

**1st** 137:8,16 144:4
146:3 307:6

___ **2** ___

**2** 4:15 41:10,14 42:7
46:21 81:4 83:14
102:4 127:22
129:3,15,22
130:16 137:22
163:11 164:10
212:2
**2.1** 158:17 160:20
**2:04** 147:18,24
180:11
**2:44** 125:23 177:13
**2:53** 126:12
**20** 5:9 148:19,24
183:17 185:12
199:6 266:7
**2001** 298:18
**2003** 298:18
**2009** 39:2,21 184:20
208:4,10 263:7,17
264:5 265:3
**2010** 17:4,6 40:1
208:4,10 239:4,6
239:14 263:7
**2012** 239:2
**2013** 14:17 39:2
103:8 104:7,12,18
231:17 239:1
252:11,14 263:24
**2014** 66:6 210:14,20
211:7
**2017** 1:21 7:8 49:1,7
182:9,13 305:15
305:22 306:7
307:6
**205** 23:13
**209** 6:4
**21** 5:10 149:2,18,22
181:8 183:12
**22** 5:11 119:9
150:19,24 152:11
**220,000** 165:4
**220,102.55** 164:14
**222** 4:7 23:13
**23** 5:12 112:23
118:23 129:12
152:1,5 154:18
194:24 195:15,18
196:9
**23(b)(3)** 115:23
**23rd** 182:9
**24** 5:13 154:11,16
**25** 5:14 107:20

129:9,16 131:4
155:10,15 160:12
178:16 183:16
187:5,11 194:23
196:8 202:9 279:5
**250** 6:10
**257,341,000** 129:15
**26** 5:15 156:11,16
248:11 268:9
270:15
**26th** 268:24
**27** 5:16 157:6,11
**27,600,000** 129:9
**27th** 137:12,16
**28** 5:17 161:13,16
163:1
**2800** 2:4
**28th** 137:8,15 144:4
**29** 5:18 57:2 63:4
64:14 68:2 149:23
151:1 152:9,16
154:17 162:5,9
176:4 177:14
**29th** 55:1 58:14
87:5 155:16,17
**2F** 3:6
**2nd** 92:22 131:23
132:4 134:15,19
135:1 147:18,23
148:12 156:17,18
157:14

_____ **3** _____
**3:32** 153:9
**3:34** 153:13
**3:50** 159:9
**30** 5:19 129:8 130:4
151:8 155:5 156:1
163:2,7 177:17
180:11 187:7,12
266:5,6,9,12
**300** 147:5 176:4
**307** 305:14
**30th** 155:16 182:13
**31** 5:20 144:18
159:11 163:18,23
179:8,19 183:14
**31,930,000** 193:4
**31,930,0000** 195:3
**31.25** 151:4,12
152:13,21 153:20
176:8
**310,000** 192:24
194:24
**312** 2:5 3:7
**31271** 163:11

**32** 5:21 165:14
192:5,9 194:17
**321** 1:20 2:4 7:12
306:12
**3252** 156:19
**33** 165:15 279:9,16
279:18,20,21,22
279:24 280:6
**33,000,000** 281:24
**337** 137:23 145:3
**338** 138:8
**34** 5:22 165:7,12,23
275:22
**340** 146:2
**340,000** 146:9
**343,000** 129:21
147:5
**343,122** 127:21
129:2,14 150:9
**35** 5:23 175:17,22
176:2
**35.75** 152:14,22
153:21 176:12
**350** 202:13,16
**3574** 146:22
**36** 5:24 175:18,22
176:23
**36.25** 154:23 155:8
**37** 6:1 175:18,22
177:12
**38** 6:2 178:17,22
**39** 6:3 181:3,8 186:2
**39,303,300** 129:24

_____ **4** _____
**4** 4:17 46:21,22
54:10,15 56:2,13
58:7 61:2,3,8
62:12 64:20 68:7
87:5,11 88:9,13
157:20 185:20
192:24 214:1
**4(c)** 129:6 130:4
131:2
**4:21** 159:10
**4:26** 161:22 185:16
**4:39** 185:21
**4:43** 58:14
**4:59** 152:17 154:19
**40** 6:4 199:10
209:21 210:1,22
**40,000** 192:24 195:1
**40,510,000** 193:5
195:4
**400,000** 49:3
**41** 4:15 107:20

**421-3377** 3:7
**44** 185:7
**4520** 176:3
**454** 154:21

_____ **5** _____
**5** 4:18 48:5 100:5,10
103:6,17 106:9
176:7 192:23
193:5,21 195:3,14
215:20 227:9
**5:07** 154:20
**5:21** 57:2
**5:27** 215:16
**5:40** 215:21
**50** 180:2,13,20
251:2,4 280:21,24
**500** 195:5
**500,000** 164:18
165:3 276:15
**5086** 149:1
**5134** 157:13 159:5
**5135** 157:21
**53711** 2:10
**54** 4:16,17
**59** 107:21

_____ **6** _____
**6** 4:19 113:8,13
**6,315,000** 192:23
**6:30** 262:13
**60602** 2:16
**60607** 3:7
**60654** 2:4
**608** 2:10
**620-5357** 2:10
**64,335,250** 129:17

_____ **7** _____
**7** 4:20 26:6 77:18
120:17 121:3,21
123:19 124:4,15
127:5,20 129:1,7
150:1,7 159:12
**7/26/2013** 175:1
**7:05** 300:18
**7:07** 300:22
**7:10** 304:8,24
**75** 57:7 61:22 63:8
64:3,16
**75,455,099** 193:7
**786-7772** 2:16

_____ **8** _____
**8** 4:6,21 120:18
127:20 129:1,9

157:17
**8,280,000** 193:1
**8.4** 160:21
**8.5** 195:16 196:10
**8:16-cv-01477** 7:6
**8:16-CV-01477-C...**
1:6 305:6
**81** 242:16
**832-4500** 2:5
**844** 2:16
**89** 24:19
**8th** 132:18,21 161:7

_____ **9** _____
**9** 4:14,22 62:10
103:8 104:11
113:22 120:18
129:12
**9/29/15** 154:23
**9:16** 156:1
**9:25** 149:2
**90-plus** 180:1
**900,000** 249:5
**92** 127:23 129:4
152:18,24 153:1
153:21 154:4,5,19
155:5 176:14,16
177:2 194:22
195:21 279:18,20
**92/30-payout**
154:23
**94/25** 176:19
**95** 24:24
**96** 24:24
**97** 24:20
**99** 183:16 185:1
186:20 278:11
279:21,24 280:5
**9th** 133:9