UNITED STATES DISTRICT COURT
FOR THE
MIDDLE DISTRICT OF FLORIDA

| | |
|---|---|
| MEDICAL & CHIROPRACTIC CLINIC, INC., | ) ) ) |
| Plaintiff, | ) ) No. |
| -vs- | ) 8:16-CV-01477-CEH-TBM ) |
| DAVID M. OPPENHEIM, et al., | ) ) ) |
| Defendants. | ) |

The videotaped 30(b)(6) deposition of MEDICAL & CHIROPRACTIC CLINIC, INC., (MICHELLE ZAKRZEWSKI), called by the Defendants for examination, taken pursuant to the Federal Rules of Civil Procedure of the United States District Courts pertaining to the taking of depositions before MAUREEN A. WOODMAN, a notary public within and for the County of Cook and State of Illinois, at Suite 2800, 321 North Clark Street, Chicago, Illinois, on the 8th day of November 2017, at the hour of 10:18 o'clock a.m.

APPEARANCES:
FOLEY & LARDNER, LLP.
  BY: MR. JEFFREY SOBLE
    321 North Clark Street
    Suite 2800
    Chicago, Illinois 60654
    312.832.5393
    Jsoble@foley.com,
    On behalf of the Plaintiff;
BLONIEN LEGAL COUNSEL
  BY: MR. BARRY J. BLONIEN
    1718 Adams Street
    Madison, Wisconsin 53711
    608.620.5357
    Barry@blonienlegal.com,

    On behalf of the Defendant, David
    Oppenheim;
BOCK & HATCH, LLC.
  BY: MR. DANIEL J. COHEN
    134 North LaSalle Street
    Suite 1000
    Chicago, Illinois 60602
    312.658.5500
    Danieljaycohen209@gmail.com,
    On behalf of Defendant, Bock Law
    Firm.

ALSO PRESENT:
    Mr. Phillip Bock;
    Mr. David Oppenheim;
    Mr. Bruce Witty, Videographer,
    Thompson Court Reporters, Inc.

INDEX
WITNESS                              PAGE
MICHELLE ZAKRZEWSKI
    Examination by Mr. Cohen ...........5-170
    Examination by Mr. Blonien.........170-224

------------------

EXHIBITS
DEPOSITION EXHIBIT                   PAGE

    Exhibit 1 ............................ 53
    Exhibit 2 ........................... 112
    Exhibit 3 ........................... 117
    Exhibit 4 ........................... 117
    Exhibit 5 ........................... 127
    Exhibit 6 ........................... 155
    Exhibit 7 ........................... 178
    Exhibit 8 ........................... 179

            (ATTACHED)

1    THE VIDEOGRAPHER: Here begins the
2   videotaped deposition of Michelle Zakrzewski,
3   30(b)(6) witness in the matter of Medical &
4   Chiropractic Clinic, Incorporated, versus David
5   M. Oppenheim, et al., in the United States
6   District Court for the Middle District of
7   Florida, Tampa Division, case number
8   8:16-CV-01477. Today's date is November 8th,
9   2017, and the time object video monitor is
10  10:18 a.m. My name is Bruce Witty, and the
11  court reporter is Maureen Woodman, representing
12  Thompson Court Reporters.
13          Today's deposition is being taken
14  at 321 North Clark Street, Chicago, Illinois.
15          Will counsel please introduce
16  themselves and state whom they represent
17  beginning with the noticing party.
18      MR. COHEN: Dan Cohen, Bock Law Firm, LLC,
19  representing defendant Bock Hatch or Bock Law
20  Firm, LLC, and Phillip Bock is here as the
21  representative of Bock Law Firm.
22      MR. BLONIEN: Barry Blonien with Blonien
23  Legal Counsel on behalf of David M. Oppenheim,
24  who appears in person, as well.

1    MR. SOBLE: Jeff Soble on behalf of
2   plaintiff, Medical & Chiropractic Clinic, Inc.
3       THE VIDEOGRAPHER: Will the court reporter
4   please swear in the witness.
5           (Witness was duly
6           sworn.)
7           MICHELLE ZAKRZEWSKI,
8   called as a witness herein, after having been
9   first duly sworn, was examined and testified as
10  follows:
11      THE WITNESS: Yes.
12      THE VIDEOGRAPHER: Please proceed.
13          EXAMINATION
14  BY MR. COHEN:
15      Q. Good morning, ma'am. State your full
16  name.
17      A. Michelle Zakrzewski.
18      Q. And, ma'am, we had an opportunity to
19  meet once before during the preliminary
20  injunction hearing in this case. Do you recall
21  that?
22      A. Yes, sir.
23      Q. And I was mispronouncing your name at
24  the time, because there's a Z in the middle of

2 (Pages 2 to 5)

1  your name that's silent, correct?
2  **A.  Correct.**
3  Q.  It's Zakrzewski?
4  **A.  Correct.**
5  Q.  We were advised by your counsel before
6  we started the deposition that you have a
7  medical illness that you're receiving treatment
8  for, and I want you to know I'm going to ask
9  you a small number of questions just to cover a
10 couple of very basic things.  My goal is not to
11 invade your privacy or embarrass you in any
12 way.  Okay?
13 **A.  Yes, sir.**
14 Q.  We're told that you have cancer, and
15 you are undergoing treatment for that.
16 **A.  Yes, I have metastatic stage IV breast**
17 **cancer.**
18 Q.  I'm very sorry.  I'm led to understand
19 by your counsel that we may be taking more
20 frequent breaks than usual.  Usually somebody
21 in the room wants to take a break every hour or
22 hour and 15.  I was led to understand that just
23 because of the situation, you may throughout
24 the deposition want to take some more frequent

1  breaks.
2  **A.  Yes, sir.**
3  Q.  I want you to know that except when a
4  question is pending, like I've asked it, we're
5  waiting for the answer, except then, we can
6  stop any time you want, as many times as you
7  want, as often as you want, and I don't want
8  that to be an issue of concern for you at all.
9  Okay?
10 **A.  Yes, sir.**
11 Q.  The only -- the converse of that is if
12 I have asked a question, I will ask you to give
13 me an answer to the question before we take the
14 break.  As soon as you answer the question, we
15 can take that break.  Okay?
16 **A.  Yes, sir.**
17 Q.  The plaintiff in this case is Medical
18 & Chiropractic Clinic, Inc., correct?
19 **A.  Yes, sir.**
20 Q.  And you understand that you're here
21 today as the corporate representative, the
22 designee of that plaintiff entity to testify on
23 its behalf, because the corporation can't
24 actually appear, it's not a natural person, so

1  it designates somebody, and you're the person
2  Medical & Chiropractic has designated to speak
3  for it on its behalf in this deposition.  Do
4  you understand that?
5  **A.  Yes, sir.**
6  Q.  It's my understanding you're also an
7  owner of M & C?
8  **A.  Correct.**
9  Q.  And last we inquired, you were a
10 50-percent owner?
11 **A.  Correct.**
12 Q.  And your husband, Gregory Williams,
13 Dr. Gregory Williams, is the other 50 percent
14 owner?
15 **A.  Yes, sir.**
16 Q.  What, if anything, have you reviewed,
17 looked at in any way, shape or form to refresh
18 your recollection about things, to prepare for
19 the deposition topics we're going to ask you
20 about in today's deposition, what have you
21 looked at?
22 MR. SOBLE:  Object to the form.  You can
23 answer.
24 THE WITNESS:  The eight-hour deposition

1  that I took with Mr. Postman, court documents,
2  my court testimony, any other questions,
3  production of documents, things of that nature.
4  BY MR. COHEN:
5  Q.  The deposition by Mr. Postman, that's
6  the deposition that you gave in the Cin-Q
7  automobiles class action against the
8  Buccaneers, correct?
9  **A.  Yes, sir.**
10 Q.  And you said -- I'm skipping the court
11 documents, that was the second thing you
12 mentioned.  I'm going to come back to that in a
13 minute and ask you some details, but the third
14 thing you said was court testimony.
15 Did you review your July 18th,
16 2016, testimony from the preliminary injunction
17 hearing?
18 **A.  Yes, sir.**
19 Q.  When you use the term court testimony,
20 was there any other court testimony you
21 reviewed other than your testimony at that
22 hearing?
23 **A.  No, sir.**
24 Q.  And other witnesses testified at that

3 (Pages 6 to 9)

1  hearing. Did you review any of the testimony
2  of any of the other witnesses?
3      **A. No, sir.**
4      Q. Just yours?
5      **A. Yes, sir.**
6      Q. And the fourth thing you mentioned was
7  production of documents. What documents do you
8  recall reviewing?
9      **A. I believe it's the pleadings that have**
10  **been filed in this case requesting either**
11  **depositions or production of papers, things of**
12  **that nature.**
13      Q. I'm going to go through those three
14  categories. I'm not saying you list them as
15  categories, I can list what you say and
16  come back and ask for details.
17      You mentioned the pleadings in
18  this case. You talked about the things for the
19  depositions which lawyers call deposition
20  notices, and you mentioned things that the
21  lawyer would call discovery requests,
22  interrogatories, requests for production of
23  documents, things like that.
24      **A. Yes, sir.**

1      Q. We'll start with that first one.
2  Pleadings in this case. Do you recall what
3  court filings by the parties in this case that
4  you may have reviewed?
5      **A. Not all of them, but I've looked at**
6  **the sequential filings of them. I mean I don't**
7  **know them verbatim, but I have looked at them.**
8      Q. And am I correct, because there's two
9  things you could mean, you could mean as things
10  were filed by one side or the other, they were
11  sent to you, a copy for your file, and you
12  would have reviewed them at that time, and you
13  remember what you remember, or you could mean
14  that getting ready for today's deposition you
15  actually spent some time reviewing them to
16  refresh your recollection. When did you
17  actually do this review?
18      **A. Yesterday, and if something had been**
19  **e-mailed me to look at.**
20      Q. Okay. So you -- when I say you,
21  unless I specify that I mean Michelle
22  Zakrzewski, in that first person, I'm talking
23  about you as the designee for M & C today.
24  Okay?

1      **A. Okay.**
2      Q. You filed a verified complaint that is
3  the lawsuit we call M & C versus Oppenheim and
4  Bock Law Firm, correct?
5      **A. Yes, sir.**
6      Q. Was one of the pleadings that you
7  reviewed in preparation for today's deposition
8  that verified complaint?
9      **A. Yes, sir.**
10      Q. Your attorneys filed a motion for
11  preliminary injunction, either at or shortly
12  after the time the verified complaint was
13  filed. Did you review the motion for
14  preliminary injunction in preparing for today's
15  deposition?
16      **A. Yes, sir.**
17      Q. Did you review things like the
18  Defendant's Motions to Dismiss and the
19  Memorandum in Support and, perhaps, your
20  attorney's response to that, did you also
21  review those things?
22      **A. I believe so.**
23      Q. Any other pleadings that were actually
24  filed with the court in this case that you can

1  recall reviewing to prepare for your
2  deposition?
3      **A. Just the answers to the**
4  **interrogatories.**
5      Q. Did you review M & C's answers to Bock
6  Law Firm's interrogatories?
7      **A. Yes, sir.**
8      Q. Did you review M & C's answers
9  to -- I'm not sure how I started the first one.
10      Did you review both sides'
11  answers to the other side's interrogatories
12      **A. I believe I only reviewed our answers.**
13      Q. Did you review what we call the
14  30(b)(6) notice to take the deposition of M & C
15  through a corporate designee that listed
16  specific topics we intended to ask questions
17  about?
18      **A. Yes, sir.**
19      Q. Do you believe that you are prepared
20  and capable of testifying for and answering on
21  behalf of M & C regarding those topics?
22      **A. Yes, sir.**
23      Q. Other than M & C's attorneys in this
24  case, the Foley Law Firm, did you communicate

Thompson Court Reporters, Inc
thompsonreporters.com

1   with anyone else in any way about this
2   deposition, the topics, your possible answers?
3       **A.  No, sir.**
4       Q.   You did not communicate with your
5   husband about this?
6       MR. SOBLE:  Objection.  Asked and
7   answered.
8       THE WITNESS:  Just that I had to be here
9   for the deposition.
10   BY MR. COHEN:
11       Q.   No details about topics, issues,
12   information that might be relevant?
13       MR. SOBLE:  Objection.  Asked and
14   answered.
15       THE WITNESS:  No, sir.
16   BY MR. COHEN:
17       Q.   And your attorney may or may not have
18   discussed this with you.  We make objections on
19   the record.  Most of the time it's so that we
20   preserve that objection, we can present it to
21   the court later if we think it's important
22   enough.  And 98 percent of the time usually
23   those are just for the record, so the witness
24   goes ahead and answers the questions.

1           There will be times -- there may
2   be times when your attorney not only objects
3   and states his reason, but for some reason
4   instructs you not to answer.  Of course if your
5   attorney instructs you not to answer, don't
6   answer.  Okay?
7       **A.  Yes, sir.**
8       Q.   In reviewing your verified complaint
9   against David Oppenheim and Bock Law Firm for
10   purposes of this deposition, did you see
11   anything in there that you no longer believe is
12   true or no longer believe is fully accurate?
13       MR. SOBLE:  Object to the form.
14       THE WITNESS:  No, sir.
15   BY MR. COHEN:
16       Q.   In reviewing M & C's answers to Bock
17   Law Firm's interrogatories, including, I
18   believe, the first supplemental answers and the
19   second supplemental answers, did you see any
20   answer that you thought was not completely
21   correct or not complete?
22       **A.  No, sir.**
23       MR. SOBLE:  Object to the form.
24       THE WITNESS:  No, sir.

1   BY MR. COHEN:
2       Q.   Why did you decide to file this
3   lawsuit?
4       **A.  Because I felt that we were wronged in**
5   **the actions by Mr. Oppenheim, and it was a very**
6   **upsetting situation to me.**
7       Q.   In what way did you feel -- in what
8   way did you feel that you were wronged in
9   actions by Mr. Oppenheim?
10       **A.   There was a lot of work involved in**
11   **this case, and the things that I had done for**
12   **the case, and I felt that we were being taken**
13   **advantage of.**
14       Q.   And I'm going to ask you some
15   questions about the details of what you just
16   said, but that is, I think, the second time at
17   least that in answering about this topic you
18   used the term we.  Who's we?
19       **A.   My company and the people that I've**
20   **been working for in the particular case in the**
21   **class.**
22       Q.   Can you clarify who the people you've
23   been working for are?
24       **A.  All of the people that would be**

1   considered in the class of the Buccaneers case.
2       Q.   And not to put words in your mouth,
3   are you talking about the absent class members,
4   the class at large?
5       **A.  Class at large, yes.**
6       Q.   And your answer was very responsive.
7   My question, kind of starting with your
8   original answer, your original answer was we
9   felt wronged in the actions of Mr. Oppenheim,
10   and I asked you why you felt wronged in the
11   actions of Mr. Oppenheim, and you just gave me
12   four things I'm going to want to ask you about,
13   and they seemed to focus on why you felt
14   wronged.  Which actions by Mr. Oppenheim are
15   you referring to that wronged you?
16       **A.   Taking our information from the**
17   **company he was working for to another company**
18   **and competing against all the work I was doing**
19   **for the attorneys that I hired, Anderson +**
20   **Wanca.**
21       Q.   Is it your understanding or belief
22   that Mr. Oppenheim took information from
23   Anderson + Wanca about the Cin-Q class action
24   and shared it with Bock Law Firm in order to

Thompson Court Reporters, Inc
thompsonreporters.com

1   enable or facilitate Bock Law Firm to compete
2   against the Cin-Q case?
3     **A. Yes, sir.**
4     Q. Can you tell me what the factual basis
5   is for your understanding or belief in that
6   regard?
7     **A. I think there's a lot of things I**
8   **can't say because it's privileged, but I**
9   **believe he took pertinent information to enable**
10  **the opposing firm of Bock Hatch to start an**
11  **exact same case.**
12     Q. Without conceding this, let's start
13  with an assumption that working at Anderson +
14  Wanca, David Oppenheim came into possession of
15  some information about the Cin-Q class action,
16  that seems to at least in part be a premise of
17  what you're saying, correct?
18     **A. Yes, sir.**
19     Q. And then we all know David Oppenheim
20  came over to Bock Law Firm and started working
21  for Bock Law Firm. Obviously whatever
22  information he's got in his head is still in
23  his head when he is working for Bock Law Firm,
24  correct?

1     **A. I would assume so.**
2     Q. So what I'm focusing on is what is the
3  factual basis for your understanding or belief
4  that Mr. Oppenheim shared any of that
5  information with Bock Law Firm that in any way
6  enabled or facilitated Bock Law Firm to
7  prosecute the competing Technology Training
8  case?
9     **A. Can you repeat that again?**
10     Q. Sure. And when I try to clarify a
11  question, if I say something that seems like
12  I'm putting words in your mouth, and you're
13  like I didn't say that and I didn't mean that,
14  then you need to stop me and say, I didn't say
15  that and I didn't mean that. I'm always just
16  trying to facilitate the back and forth and get
17  information, but I don't want to be saying
18  something that you disagree with, and you need
19  to tell me if I ever do. Okay?
20     **A. Yes, sir.**
21     Q. It seems like a fundamental part of
22  why you feel wronged is not just that David
23  Oppenheim had been working on Cin-Q at Anderson
24  + Wanca so that he had some knowledge and that

1   he came to work at Bock Law Firm and, of
2   course, carried that knowledge with him, and
3   that Bock Law Firm just so happened to then
4   file a competing case, it seems that either the
5   reason or significant part of the reason you
6   feel wronged is because it's your understanding
7   or belief that Mr. Oppenheim when he came to
8   Bock Law Firm shared with Bock Law Firm some of
9   what he knew about the Cin-Q case that either
10  enabled or facilitated Bock Law Firm then
11  pursuing the competing case; is that accurate?
12  You think that David Oppenheim shared
13  information?
14     MR. SOBLE: Object to the form of the
15  question.
16     THE WITNESS: Yes, I believe he shared a
17  lot of information.
18  BY MR. COHEN:
19     Q. I appreciate that answer, because
20  that's actually what I'm trying to focus on
21  right now.
22     What is the factual basis for
23  your belief that Mr. Oppenheim, quote unquote,
24  "shared a lot of information" with Bock Law

1   Firm about the Cin-Q case that enabled or
2   facilitated Bock Law Firm to pursue the
3   competing case?
4     **A. My understanding of his role in our**
5   **case when he was working for Anderson + Wanca,**
6   **he prepared all of the documents for all of the**
7   **mediations. I believe he was well aware of**
8   **everything going on in the case, and he could**
9   **have shared that information with his new**
10  **employer.**
11     Q. Is the fact that you believe
12  Mr. Oppenheim did, in fact, share that
13  information with his new employer a fundamental
14  part of why you feel wronged in this case?
15     **A. Yes, sir.**
16     Q. And I am -- I don't play games. I
17  don't trick, but I do dig, and so usually I'll
18  give you an advance warning if I'm going up to
19  something that seems inconsistent with me
20  because I'm not playing games.
21     MR. SOBLE: Object to the form of the
22  non-question.
23  BY MR. COHEN:
24     Q. You just said a fundamental part of

6 (Pages 18 to 21)

1 the reason you feel wronged and pursuing this
2 is because you do believe that David Oppenheim
3 shared a lot of information about the Cin-Q
4 case with Bock Law Firm, but when I asked you
5 the basis, you said your understanding is that
6 he was central to the Cin-Q case, he prepared
7 all the settlement stuff, he participated, he
8 knew everything, and you finished that answer
9 by saying, So he could have shared that
10 information with his new employer.
11         Could have shared and did share
12 are two different things. What is your basis
13 to believe not that he could have, which means
14 it's possible, but that he, in fact, did?
15     **A. I believe some of the statements in**
16 **the testimonies when I was in court with -- in**
17 **front of Judge Honeywell, some of the things**
18 **said were -- would have only been known by**
19 **being at a mediation, and I was at those**
20 **mediations, and I would have heard those**
21 **comments or statements. And I don't believe I**
22 **can go any further than that, because those are**
23 **privileged meetings between attorneys and the**
24 **people at those mediations.**

1     MR. SOBLE: Excuse me. That's awfully
2 distracting. Can you please -- we can hear it
3 all down here. If you need to talk, I can get
4 you a conference room.
5     MR. OPPENHEIM: I think we have a breakout
6 room.
7     MR. SOBLE: But I can get you a conference
8 room if you need one, but the whispering is not
9 helping the deposition.
10     MR. COHEN: I didn't hear it.
11 BY MR. COHEN:
12     Q. I want to be clear. I asked you the
13 basis for your belief which was fundamental to
14 your feeling of being wronged and your decision
15 to pursue this case.
16         The basis for your belief not
17 only that Mr. Oppenheim could have shared
18 Cin-Q-related information with Bock Law Firm,
19 but that he, in fact, did, and you told me some
20 of the statements in the testimony in front of
21 Judge Honeywell could only be known by having
22 been at the mediations, and you were there, so
23 that's why and how you know that, correct?
24     **A. Yes, sir.**

1     Q. I'm going to ask you about that, but
2 before I do, is there any other basis for your
3 belief that Mr. Oppenheim did, in fact, share
4 Cin-Q-related information with Bock Law Firm
5 other than some of the testimony in front of
6 Judge Honeywell?
7     **A. My belief?**
8     Q. But facts, evidence upon which your
9 belief is based.
10     **A. I don't think a competing case would**
11 **have been started if he didn't know pertinent**
12 **facts about the already existing case, so I**
13 **believe that's where the second case came from.**
14     Q. And is -- I am wanting to know -- I'm
15 not ignoring about what you said about some
16 testimony in front of Judge Honeywell. I'm
17 going to ask you about that. I'm setting aside
18 the hearing in front of Judge Honeywell where
19 there was testimony. We're going to come back
20 to that.
21     **A. Okay.**
22     Q. But I'm looking for specific facts you
23 know, specific evidence you're aware of that
24 supports facts, other than testimony in front

1 of Judge Honeywell that indicates David
2 Oppenheim shared Cin-Q-related information with
3 Bock Law Firm?
4     **A. Facts, I believe the solicitation**
5 **letter I received from the Bock Law Firm was**
6 **the first indication that there was something**
7 **going on, and then a phone call from Ross Good**
8 **the day after I called him about the**
9 **solicitation letter led me and told me that**
10 **there was new information and a new case, and**
11 **things were going on behind closed doors.**
12     Q. Am I correct that by the time you
13 received the, quote unquote, "solicitation
14 letter" that you're referencing from Bock Law
15 Firm, the Technology Training case had already
16 been filed?
17     **A. I believe so.**
18     Q. Do you have any knowledge or
19 information whether that solicitation letter,
20 and I'm using your term when I refer to it that
21 way, whether that letter was unique and
22 uniquely sent to you, or whether it was a part
23 of a mass marketing mailing?
24     **A. The only information that I believe**

1  led me to believe that it was sent to me was
2  the name on there was my married name and not
3  my maiden name, and most people don't know that
4  I can use the way -- the name Williams unless
5  they know me.
6      Q.  Am I correct in understanding that
7  what you're saying is from the fact the Bock
8  Law Firm letter was sent to you using your
9  married name, you're drawing the inference
10 because that's a piece of information many
11 people wouldn't know if they didn't have unique
12 access to you?
13     A.  Yes, sir.
14     Q.  That you believe there's a reasonable
15 inference to be drawn that Bock Law Firm must
16 have gotten that information, your married
17 name, and to send it to you in your married
18 name from Mr. Oppenheim?
19     A.  Yes, sir.
20     Q.  Now, the telephone call from Ross Good
21 about a new case having been filed, the
22 Technology Training case, am I correct that
23 call came --
24     A.  Saturday morning.

1      Q.  -- within a day or so of you receiving
2  the letter from Bock Law Firm?
3      A.  Yes, sir.
4      Q.  You mentioned that -- again, the whole
5  subject that I'm asking you about is your
6  basis, your evidentiary factual basis for
7  believing that Mr. Oppenheim not only could
8  have shared information with the Bock Law Firm
9  about the Cin-Q case, but that he actually did,
10 you started by talking about testimony in front
11 of Judge Honeywell.  We still haven't come back
12 to it, and we will.  I asked you anything else,
13 and you mentioned the solicitation letter from
14 Bock Law Firm, and we talked about that, and
15 now we're talking about the telephone call from
16 Ross Good about the new case filed, that call
17 coming like the very next day after you
18 received the letter.
19         I'm getting the impression, but
20 if I'm misunderstanding or if there is more to
21 it, please correct me, I'm getting the
22 impression that just the kind of domino-like
23 effect, you get this solicitation letter from
24 Bock Law Firm one day, it's unusual to you in

1  that it uses your married name, which could
2  allow the inference you draw that Mr. Oppenheim
3  provided that information to Bock Law Firm, and
4  then the very next day you received a call from
5  Ross Good about the new case, I'm getting the
6  impression what you're seeing is like dominos
7  falling that seems to all point to something?
8      A.  Yes, sir.
9      Q.  Is there anything else about those two
10 things that leads you to understand or believe
11 that David Oppenheim had shared information
12 with Bock Law Firm about the Cin-Q case that we
13 haven't covered about you receiving the
14 solicitation letter and the call from Mr. Good?
15     A.  Not that I can recall as of now.
16     Q.  And I'm about to come back to the
17 testimony in front of Judge Honeywell, but
18 before I do, is there any other basis, facts,
19 evidence that supports your understanding or
20 belief that David Oppenheim shared information
21 about the Cin-Q case with Bock Law Firm that
22 enabled or facilitated its bringing of the
23 Technology Training case?
24     A.  Not that I can recall as of now.

1      Q.  And I didn't say this at the beginning
2  of the deposition.  We talked about taking
3  breaks and everything.  A deposition of this
4  type will go a long time.
5      A.  Yes, sir.
6      Q.  It is not supposed to be an endurance
7  contest.  You already know you can take a break
8  any time you want, but I want to be clear, you
9  don't have to reserve breaks just for medical,
10 you can take a break just because you are a
11 little fatigued, you are tired, you just need
12 to clear your head, go downstairs and get some
13 air.
14     A.  Okay.
15     Q.  I want you fresh to the best of your
16 ability answering questions so we can rely on
17 them.  Okay?
18     A.  Okay.
19     MR. SOBLE:  Do you need a break or are you
20 doing okay?
21     THE WITNESS:  I'm doing okay.  Thank you.
22 BY MR. COHEN:
23     Q.  And if at any time you don't
24 understand one of my questions -- and it's not

8 (Pages 26 to 29)

1  like I'm going to speak Latin, it's that you've
2  already seen my questions are long.
3      A.  Yes, sir.
4      Q.  I've been doing this 25 years.  It
5  wouldn't be the first time somebody said, What?
6  And wants me to repeat it.  Sometimes they make
7  me repeat it three times.  Do that.  Don't kind
8  of guess at what you think I probably mean,
9  because then we're just not communicating.  And
10  it's my fault because I'm asking a question
11  that's too unwieldy, but the only person who
12  can protect us from that is you by saying, I
13  need you to repeat that, and I will be happy
14  to.  Okay?
15      A.  Yes, sir.
16      Q.  So where we left off a second ago was
17  me asking if there was any other basis that we
18  haven't mentioned for your belief about
19  Mr. Oppenheim sharing information about Cin-Q
20  with Bock Law Firm, and you answered not that
21  you can recall as we're sitting here, right?
22      A.  No, sir.
23      Q.  So what I wanted to ask you -- we're
24  going to be here for a while.  We will take

1  lots of breaks.  And this applies to all of my
2  questions throughout the deposition.  If
3  there's something where I ask you to list off
4  all the things that answer this, that or the
5  other, and you go one, two and three, and an
6  hour and a half later during the break, you
7  remember and there was four, come on here and
8  say, Can we go back, I remembered in addition
9  to the one, two three reasons I gave you,
10  there's also four.
11      A.  Okay.
12      Q.  So let's go back to the first part of
13  your answer to why you believe Mr. Oppenheim
14  not only could have shared but, in fact, did
15  share Cin-Q-related information with Bock Law
16  Firm that enabled or facilitated the pursuit of
17  the Technology Training case.  You said some of
18  the statements in testimony in front of Judge
19  Honeywell could only be known by having been at
20  the Cin-Q mediations, correct?
21      A.  Yes, sir.
22      Q.  There were multiple witnesses who
23  testified at the hearing in front of Judge
24  Honeywell.  I assume when you say some of the

1  statements, you're talking about witnesses
2  testifying on the stand?
3      A.  Yes, sir.
4      Q.  I could assume you're just talking
5  about testimony by Mr. Oppenheim, but I don't
6  want to assume that.  Was it just
7  Mr. Oppenheim's testimony that, quote unquote,
8  could only have been known by being at the
9  mediation, or was it things that anyone else
10  may have said?
11      A.  Mr. Oppenheim.
12      Q.  Okay.  You understand that when you
13  were testifying at the preliminary injunction
14  hearing in front of Judge Honeywell, you were
15  just answering questions, whether it was
16  Mr. Soble asking the questions or me or
17  Mr. Blonien, we decided the question, the
18  subject and you gave us whatever your answer
19  was?
20      A.  Yes, sir.
21      Q.  You understand when Mr. Oppenheim got
22  up there, it was the same scenario, people
23  asked questions, the attorneys, and whatever
24  his answer was he answered?

1      A.  Yes, sir.
2      Q.  So what I'm not quite sure I'm
3  understanding, whatever it is that
4  Mr. Oppenheim testified to on the stand in
5  front of Judge Honeywell, whether it was
6  something that he could have only known by
7  having been at the mediations, why does that
8  support your understanding or belief that he
9  had shared any of that information with Bock
10  Law Firm before that hearing?
11      A.  Okay.  Can you simplify it a little
12  bit more?
13      Q.  Sure.  Absolutely.  I'll even give you
14  an example.  A simple one kind of sometimes
15  clarifies.
16          Suppose there was something, a
17  particular fact, about the Cin-Q case that
18  Mr. Oppenheim could only know if -- and because
19  he was at one of the mediations, and suppose
20  Mr. Blonien at the hearing in front of Judge
21  Honeywell asked Mr. Oppenheim a question, and
22  he gave that answer that he could only know
23  because he was at the mediation.  And we can
24  look at that, we can say, Well, okay, he only

1 knows that answer because he was at the
2 mediation, and he just testified to it in front
3 of Judge Honeywell.  But that doesn't
4 necessarily mean that Mr. Oppenheim had shared
5 that same information he testified about in
6 front of Judge Honeywell with Bock Law Firm at
7 any time before the hearing.
8         So my question is, I understand
9 you're saying Mr. Oppenheim testified about
10 stuff in front of Judge Honeywell he only could
11 have known from being at the mediations in
12 Cin-Q, but why does that in your mind mean he
13 had previously shared that same information
14 with anyone at Bock Law Firm?
15      **A.  I believe the information that he knew**
16 **helped to facilitate starting of the second**
17 **case, and I believe there were certain**
18 **situations of the first case that he allowed**
19 **information to pass that would have**
20 **specifically started the competing case, and he**
21 **would have only been the one knowing that**
22 **information.**
23      Q.  And I'm not arguing with you.  I'm
24 trying to find out what the factual or

1 explains Bock Law Firm filing that case?
2      **A.  Yes, sir.**
3      Q.  But you've shared with us the specific
4 facts from which you're drawing that inference?
5      **A.  Yes, sir.**
6      Q.  What testimony by Mr. Oppenheim at the
7 preliminary injunction hearing was the
8 testimony that you're saying could only have
9 been known by being at the mediations?
10      **A.  I can't remember specifically what he**
11 **said.  I just know when I was in court, there**
12 **were things that he said that I knew were**
13 **incorrect, because I had been at the mediation,**
14 **and I didn't think he was saying them correctly**
15 **as to the situation that occurred in the**
16 **mediation.**
17      Q.  I appreciate that, because I may have
18 been misunderstanding what we were both talking
19 about before.
20         If I heard you right just now, a
21 concern and a problem you had and have with
22 Mr. Oppenheim's testimony at the preliminary
23 injunction hearing is that he said things about
24 the mediations in the Cin-Q case during the

1 evidentiary basis is that there was actually a
2 transmission of information from Mr. Oppenheim
3 to Bock Law Firm of Cin-Q-related information
4 before Bock Law Firm filed the Technology
5 Training case.
6      **A.  I believe the facts would have been**
7 **his knowledge of the case, and knowing the**
8 **situations that were going on in the case.**
9      Q.  And I think we started with the
10 premise, of course by working on the case at
11 Wanca Law Firm he would have some knowledge,
12 some information, and you seem to just kind of
13 restated that probably even better than I have.
14         My question is, what evidence or
15 proof do you have that Mr. Oppenheim shared any
16 of that information with Bock Law Firm before
17 Bock Law Firm filed the Technology Training
18 case?
19      **A.  I don't have any paper.  It is an**
20 **opinion that I have in my head.**
21      Q.  I'm not calling your opinion wrong.
22 I'm just trying to get the basis.
23         Am I correct it's inferences
24 you're drawing about what you think likely

1 preliminary injunction hearing that because you
2 were at one or more of those mediations, you
3 believed what Mr. Oppenheim testified to was
4 factually incorrect?
5      **A.  Yes, sir.**
6      Q.  Because what I had thought you meant
7 before, and for all I know you did mean that,
8 too, but what I thought you had meant before
9 was that during the preliminary injunction
10 hearing, Mr. Oppenheim said things that were
11 true, but he could only have known those truths
12 by having been at the mediations, but now it
13 sounds like you're saying, no, he said things
14 about the mediations that weren't true.
15      **A.  Yes, sir.**
16      Q.  Okay.  And I've looked at some of the
17 preliminary injunction hearing testimony, too,
18 and I know that some of the questions of you,
19 of Mr. Oppenheim, when they were about the
20 mediations in the Cin-Q case, sometimes they
21 were specific to the actual mediation session,
22 and sometimes they were about a dinner the
23 night before the mediation.
24         Are you wrapping those all up

1   together as the mediation, or when you talk
2   about Mr. Oppenheim saying things about what
3   happened at the mediations that wasn't correct,
4   are you limiting it specifically to the
5   mediation sessions themselves?
6       **A. To the mediation.**
7       Q. Have you seen a series of emails dated
8   April 29th of 2016, and Mr. Bock and
9   Mr. Oppenheim were not the only ones
10  participating in that email chain, but at some
11  point they had a discussion in their email of
12  that date, April 29th, 2016, where the Cin-Q
13  case came up? Have you seen those emails?
14      **A. I have not seen the emails, no. I was**
15  **aware of them in a deposition that I was a --**
16  **at, present.**
17      Q. That's a very good point. You sat in
18  on the depositions of David Oppenheim and Phil
19  Bock in this case, correct?
20      **A. Yes, sir.**
21      Q. So you heard, even if you weren't
22  looking at the emails yourself and haven't seen
23  them, you heard some of the contents of those
24  emails between Mr. Bock and Mr. Oppenheim of

1   April 29th read into the record as part of
2   questions and answers?
3       **A. Yes, sir.**
4       Q. And the reason I brought it up is
5   because when I asked you what the factual basis
6   was for your understanding or belief that David
7   Oppenheim not only could have shared but, in
8   fact, did share Cin-Q-related information with
9   Bock Law Firm that enabled or facilitated the
10  pursuit of the Technology Training case, and
11  you mentioned certain things, testimony in the
12  Judge Honeywell preliminary injunction hearing,
13  the Bock Law Firm solicitation letter, the
14  telephone call from Ross Good the next day, you
15  didn't mention anything about the April 29th,
16  2016, emails between Mr. Bock and
17  Mr. Oppenheim.
18      So I'm kind of bringing it up
19  myself. Does that form any part of the basis
20  for your understanding or belief that David
21  Oppenheim shared Cin-Q-related information with
22  Bock Law Firm that facilitated or enabled the
23  pursuit of the Technology Training case?
24      **A. I don't want to say yes or no, because**

1   **I haven't actually read the emails.**
2       Q. The way we got started on this long
3   venture was my question about why you filed
4   this action, and you had said because you felt
5   wronged in the actions by Mr. Oppenheim. And
6   when I first asked why, you told me about why
7   you felt wronged, and we haven't come back to
8   those and discussed those. I'm going to go
9   that now. Then what we've been off on the side
10  doing is discussing the actions of
11  Mr. Oppenheim.
12      Am I correct you've shared with
13  me all of the actions by Mr. Oppenheim that you
14  are aware of or have factual basis for, you've
15  told us about all those actions by
16  Mr. Oppenheim that constituted the wrong?
17      **A. Yes, sir.**
18      Q. The way you said you felt wronged --
19  and I'm mentioning these only kind of to bring
20  us back to where we were 25, 30 minutes ago. I
21  said why did you feel wronged, you said there
22  was a lot of work involved and things that you
23  had done for the case, and you felt like we
24  were being taken advantage of. And when I

1   asked you who's we, you said myself and the
2   class at large.
3       **A. Yes, sir.**
4       Q. Okay. When you talk about the lot of
5   work involved, in particular whose work, what
6   work?
7       **A. All the work that the attorney firm of**
8   **Anderson + Wanca has put into the case. I**
9   **understand it's thousands of hours. There's**
10  **been numerous discoveries, depositions. I've**
11  **attended depositions. I've attended anything**
12  **that was required to do the work under the law**
13  **for the class. I just feel that they -- the**
14  **whole amount of work that went into this**
15  **particular case, that Anderson + Wanca is also**
16  **being wronged, because they put out a lot of**
17  **money under the production of this case.**
18      Q. Of the four things, a lot of work
19  involved and things I had done for the case,
20  meaning you?
21      **A. Yes, sir.**
22      Q. Am I correct what you just shared with
23  me kind of captures both of those things, the
24  first and second thing?

1    **A. Yes, sir.**

2    Q. And you said you felt, quote unquote,

3  "We were being taken advantage of," and I asked

4  you who we was and you answered that. But

5  taken advantage of how?

6    **A. All of our work to make this case**

7  **happen was used to facilitate a second class**

8  **for someone to slide in and make the money off**

9  **of it.**

10    MR. SOBLE: How long have we been on the

11  record?

12    THE VIDEOGRAPHER: 55 minutes.

13    MR. SOBLE: Whenever is a good break for

14  you.

15    MR. COHEN: Now is fine.

16    THE VIDEOGRAPHER: Going off the record at

17  11:13 a.m.

18    (Recess.)

19    THE VIDEOGRAPHER: Going back on the record

20  at 11:23 a.m. Please proceed.

21  BY MR. COHEN:

22    Q. Ma'am, we're back on the record. And

23  I didn't ask this before about your medical

24  condition. Is any of the condition, the

1  treatment, any medications you may be on, do

2  any of them interfere in any way with your

3  memory, your mental processing that you think

4  could interfere with your ability to give

5  accurate and complete information here today?

6    **A. No, sir. I'm tolerating the treatment**

7  **very well. So I'm doing very well.**

8    Q. Thank you.

9    Where we left off, we were

10  talking about why you, quote unquote, "felt

11  wronged" by the actions of Mr. Oppenheim. And

12  we had gotten to the third thing you said,

13  which was you felt we were being taken

14  advantage of, and I asked you either why or in

15  what way, and you said all of our work was

16  being used to facilitate a second class action

17  for someone to slide in and make money off of

18  all of it. What is the factual basis for your

19  statement that all of your work, your efforts,

20  Anderson + Wanca's efforts were used to

21  facilitate the filing, prosecution or the

22  settlement of the Technology Training case? I

23  want to be real clear, because it could sound

24  like I'm talking about the same thing we

1  covered at length before. I previously asked

2  you what was the factual basis for your belief

3  that Mr. Oppenheim, himself, shared

4  Cin-Q-related information with Bock Law Firm

5  that enabled or facilitated the pursuit of the

6  Technology Training case. This current

7  question, though, isn't specific to information

8  Mr. Oppenheim may have shared with Bock Law

9  Firm, it's broader to the meaning of your

10  answer where you said all of our work was being

11  used to facilitate the second class action and

12  the settlement in the Technology Training case.

13  What's the factual basis for your testimony

14  that all of your work was being used to

15  facilitate that second class action and the

16  settlement of it?

17    **A. The amount of work done to build the**

18  **case by the Anderson + Wanca firm made the**

19  **case. I don't think there would have been the**

20  **existence of the case if it hadn't been for all**

21  **of the discovery and all of the work that Ryan**

22  **Kelly did or Ross Good did to prove that there**

23  **was a case worth creating. And I believe their**

24  **work was used to facilitate the competing case.**

1    Q. And I appreciate that. What's the

2  basis for your belief that their work was used

3  to facilitate the competing case and the

4  settlement of the competing case? I'm not

5  saying you're wrong, I'm just asking what your

6  factual basis is for believing.

7    **A. I don't believe there would have been**

8  **a case to steal if the original case hadn't**

9  **been made. And if this case hadn't existed**

10  **from Anderson + Wanca, why didn't some other**

11  **firm find out about the fax and start it before**

12  **Anderson + Wanca? I believe Anderson + Wanca**

13  **built the whole case.**

14    Q. Were you ever familiar with Bock Law

15  Firm or its d/b/a, Bock and Hatch, Bock, Hatch,

16  Lewis & Oppenheim, were you ever familiar with

17  any of those firm names before the -- you

18  received the solicitation letter and learned

19  that Bock Law Firm had filed the Technology

20  Training case?

21    **A. No, sir, I had not heard of them.**

22    Q. Do you recall submitting a claim as an

23  absent class member in a class action

24  settlement called Florida First versus Spivey?

Thompson Court Reporters, Inc
thompsonreporters.com

1     A. I could have, sir. I get cards in the
2 mail about class actions frequently. It could
3 have been something that I could have responded
4 to.
5     Q. And if I were to represent to you that
6 you did respond to a notification of a class
7 action TCPA settlement in that case of Florida
8 First versus Spivey, and that the firms that
9 were identified as class counsel in that case
10 were the Bock Law Firm or Bock and Hatch,
11 Anderson + Wanca and Michael Addison, would you
12 have any reason to doubt that or disagree with
13 that?
14     A. No.
15     Q. Have you become aware in general
16 through -- from the time you found out about
17 the filing of the Technology Training case up
18 until now, have you become aware that Bock Law
19 Firm and Anderson + Wanca co-counseled or
20 partnered together on lots of TCPA cases for
21 years in the past?
22     A. Yes, I have been made aware of that.
23     Q. Do you have any understanding as to
24 why Bock Law Firm was not included as class

1 counsel or potential class counsel in the
2 prosecution of the Cin-Q case?
3     A. I believe this was because Mike
4 Addison brought Anderson + Wanca in on the
5 case.
6     Q. Have you seen emails from 2009 and
7 2010 between Brian Wanca, Phil Bock and Mike
8 Addison about pursuing a Buccaneers TCPA class
9 action?
10     A. No, sir.
11     Q. How was it that you first ever knew
12 about and had contact with Brian Wanca or
13 anyone from his firm?
14     A. I stated this previously. My husband
15 was at a local society meeting, an attorney
16 friend of ours there commented about junk fax
17 cases. He said if you receive any of these,
18 save them, I know a firm that handles these
19 kinds of cases, and we became in contact with
20 Brian Wanca through that meeting with our
21 friend in Tampa and since then we have sent
22 faxes to that law firm.
23     Q. Who was this attorney friend?
24     A. I believe it was Scott Jeeves.

1     Q. How do you spell Jeeves?
2     A. J-E-E-V-E-S
3     Q. And after Mr. Jeeves said I know of a
4 firm that handles those kinds of cases, how did
5 you translate from receiving that information
6 from Mr. Jeeves to actually coming in contact
7 with Mr. Wanca?
8     A. I believe we also got a letter from
9 Mr. Wanca following up, and if we had those
10 kinds of faxes, that he would look at them and
11 pursue them.
12     Q. I'm not certain if there's more, so
13 I'm just going to make sure I understand. I
14 understand Mr. Jeeves mentions to your husband
15 during a local society meeting that he knows of
16 a firm that handles junk-fax-related cases and
17 class action, something like that?
18     A. Yes, sir.
19     Q. And your husband passed that along to
20 you?
21     A. Yes, sir.
22     Q. And you said through that contact, I
23 came into contact with Mr. Wanca?
24     A. Yes, sir.

1     Q. And so I asked what's the next step
2 after your husband receives this information
3 from Mr. Jeeves and he shares it with you that
4 actually leads to you coming in contact with
5 Mr. Wanca, and you said I believe there was a
6 letter from Anderson + Wanca or Mr. Wanca
7 following up, and it's the following up that
8 I'm not quite sure I'm following.
9     A. There was a letter -- a solicitation
10 letter, I believe, also, saying that they
11 handled those kinds of cases.
12     Q. Am I correct in understanding that as
13 far as you recall, between the time that
14 Mr. Jeeves told your husband and your husband
15 told you about Mr. Wanca and the time you
16 received this solicitation letter from Anderson
17 + Wanca, there had been no previous
18 communication between you and Anderson + Wanca,
19 and there had been no previous effort by to you
20 make contact with Anderson + Wanca?
21     A. No, sir.
22     Q. I am correct?
23     A. Correct. Yeah.
24     Q. Do you know how Mr. Wanca got your

13 (Pages 46 to 49)

1  information to include you in his solicitation
2  letter?
3  **A. No, sir.**
4  Q. Do you know how Mr. Wanca identified
5  you in his solicitation letter as -- in other
6  words, Michelle Zakrzewski versus Michelle
7  Williams?
8  **A. No, I don't, sir. It was over ten**
9  **years ago.**
10  Q. When do you think this initial contact
11  and solicitation letter was, approximately?
12  **A. Sometime in 2005 or 2006. It was**
13  **before I had breast cancer the first time, and**
14  **I was diagnosed in 2007.**
15  Q. Did you hire or retain Mr. Wanca or
16  his firm in regard to any TCPA claims, cases or
17  possible class actions other than the
18  Buccaneers case before the Buccaneers case?
19  **A. Yes, sir.**
20  Q. Which ones can you recall?
21  **A. The most prominent one was a Well Care**
22  **solicitation case.**
23  Q. What do you mean by solicitation case?
24  **A. They sent us faxes trying to get us to**

1  **refer our patients to them, to switch over for**
2  **their Medicare Advantage plans.**
3  Q. So Well Care was soliciting?
4  **A. Correct.**
5  Q. Any other cases you retained Anderson
6  + Wanca to pursue before you retained them to
7  pursue a Buccaneers case?
8  **A. I don't think so.**
9  Q. Approximately when do you recall
10  retaining Anderson + Wanca in regard to any
11  kind of TCPA case based upon a Buccaneers
12  advertising fax?
13  **A. They needed to add me to the case,**
14  **sometime in 2009, I believe ,as I had a fax**
15  **from a stack of faxes I had sent to them. And**
16  **then I believe I've been added to other**
17  **pleadings, either in 2011 and then once again**
18  **in 2013.**
19  Q. And jumping to the last of the things
20  you mentioned where you said and again in 2013,
21  is it your understanding that the Cin-Q
22  Automobiles versus Buccaneers case was already
23  pending, and that you were added to that case
24  in 2013?

1  **A. I believe I understand there were**
2  **issues in the state court, and it had to be**
3  **turned over into a federal case, and I was**
4  **added on when it turned into a federal case,**
5  **and I believe that was sometime in 2011 and**
6  **2013.**
7  Q. And if I represent to you that you
8  were joined into the pending federal Cin-Q
9  versus Buccaneers case in 2013, would you have
10  any reason to doubt that?
11  **A. No, sir.**
12  Q. But as you recall, Anderson + Wanca
13  initially either added you to a case or filed a
14  case with you as a plaintiff involving
15  Buccaneers fax advertisement around 2009, and
16  as you recall may have done so again in another
17  case in 2011?
18  **A. I believe something to that effect,**
19  **yes, sir.**
20  Q. And I'm not ignoring the later cases,
21  I'm just trying to figure out the beginning.
22  Your initial retaining of Anderson + Wanca,
23  signing a contract with them to pursue a case
24  against somebody arising out of a Buccaneers

1  fax advertisement would have been around 2009?
2  **A. I don't think I actually signed a**
3  **retainer until time between 2011 or 2013. I**
4  **think they needed some documents from me**
5  **somewhere around 2009. Or it could have been I**
6  **sent them the faxes in 2009. But I don't think**
7  **I signed a retainer regarding the case until a**
8  **later date.**
9  Q. Just going to step over and see if I
10  can find something real quick.
11  **A. Okay.**
12  **(Brief pause.)**
13  BY MR. COHEN:
14  Q. Ms. Zakrzewski, I've handed you what
15  we've marked as Exhibit 1, and I'll represent
16  to you this is your testimony from the
17  preliminary injunction hearing in this case
18  held on July 18th of 2016. And take as long as
19  you'd like. It's many pages. And I'm going to
20  direct your attention to something specific in
21  a moment, but can you through whatever time you
22  need to do so confirm this appears to be your
23  testimony?
24  **(WHEREUPON, said**

1        document was marked as
2        Deposition Exhibit No. 1
3        for Identification.)
4    **A. Yes, sir.**
5    Q. I would draw your attention to page
6  51, the page numbers are at the bottom right.
7  Do you see there's a question toward the bottom
8  at line 22, and it reads, "Does the contract
9  that you signed when you hired on as a desiring
10  class representative with the Wanca law firm.
11  And when was that? Back in 2000 what? And
12  your answer at page 52, line one, was,
13  "Somewhere around 2009, I believe," correct?
14    **A. Yes. I most likely did. I don't have**
15  **the document in front of me.**
16    Q. And I understand. When you would have
17  hired Anderson + Wanca and signed a contract
18  around 2009 in relation to a fax advertising
19  Buccaneers, as you recall, what firms were
20  listed on that retainer contract that you would
21  have been hiring?
22    **A. To my knowledge, Anderson + Wanca.**
23    Q. And no other firms?
24    **A. I do not believe so.**

1    Q. As you recall, did you sign new or
2  superseding retainer agreements with Anderson +
3  Wanca either in 2011 or 2013, or did the
4  original 2009 retainer agreement simply carry
5  through?
6    **A. I'm not certain. It's possible. I've**
7  **had to sign for other cases, so it's possible.**
8  **I do not know.**
9    Q. As you recall, as we sit here today,
10  and I understand this is kind of a what if,
11  because you've said you don't recall, do you
12  have any recollection of any retainer agreement
13  you've signed with Anderson + Wanca for a
14  Buccaneers-related fax advertisement, do you
15  have any recollection of any of those retainer
16  agreements identifying any law firm that's
17  being hired other than Anderson + Wanca?
18    **A. No, sir.**
19    Q. As far as you can recall, have you
20  ever signed an agreement or entered into a
21  retainer agreement with Mike Addison or his law
22  firm?
23    **A. No, sir, I have not.**
24    Q. To your knowledge and recollection,

1  have you ever signed anything specifically
2  consenting to the fact that Mike Addison or any
3  other attorney not working at Anderson + Wanca
4  would be representing your interests in the
5  Cin-Q case?
6    **A. Not to my knowledge.**
7    Q. Do you know whether any other
8  attorneys other than the Wanca Law Firm and
9  Michael Addison have had any role or
10  responsibility in the prosecution of the Cin-Q
11  case?
12    **A. No, sir.**
13    Q. Do you -- strike that.
14    Do you have any knowledge or
15  information or understanding as to whether any
16  lawyers or law firms other than Anderson +
17  Wanca and Mr. Addison and his firm stand to
18  receive any portion of any attorneys' fee
19  awarded in the Cin-Q case?
20    **A. Can you repeat it again?**
21    Q. If I wasn't the one asking it, I
22  couldn't follow that question.
23    Other than Anderson + Wanca and
24  Mike Addison, do you have any knowledge,

1  information or understanding as to whether any
2  other lawyers or law firms stand to receive or
3  are entitled to receive any portion of any
4  attorneys' fees that might be awarded in the
5  Cin-Q action?
6    **A. Through my knowledge of the case, I**
7  **understand that Mike Addison is part of this,**
8  **and he will be paid. That is my only knowledge**
9  **of any other attorney.**
10    Q. And that's fair enough.
11    So if we set aside Anderson +
12  Wanca and set aside Mike Addison, you are not
13  aware of any other attorney having any other
14  entitlement or stake in any of the attorneys'
15  fees that might be generated in the Cin-Q case,
16  correct?
17    **A. Correct.**
18    Q. What is your understanding, if any, as
19  to what attorneys' fees Mr. Addison would be
20  entitled to from any attorneys' fees generated
21  or awarded in the Cin-Q case?
22    **A. I'm not aware of any of that**
23  **information.**
24    Q. As we sit here today, are you aware

1   that before Anderson + Wanca had you added to
2   the Cin-Q case pending in federal court, that
3   you were named as the plaintiff in the case
4   against four or five defendants based upon the
5   same Buccaneers advertising fax where, I
6   believe, two of the defendants their last names
7   were Clement?
8       **A.   I believe so.  There was something to**
9   **that effect around 2009.**
10      Q.   If you'll take a look at page 22 of
11  your preliminary injunction testimony, at line
12  three, the question is asked, "Can you tell me
13  just generally speaking what sort of things
14  were done related to the case between 2009 and
15  2013 that you recall?"  And your answer was, "I
16  believe there was a lot of discovery as to a
17  client list of all the people that received the
18  faxes, and I believe there was an issue in the
19  State of Florida, that was the first part of
20  the class action."  Did I read that correctly?
21      **A.   Yes, sir.**
22      Q.   What is your understanding of how
23  Anderson + Wanca obtained the list of all the
24  people that received the faxes between 2009 and

1   2013?
2       **A.   My understanding was Ross figured**
3   **out -- Ross Good, the attorney on the case,**
4   **figured out that Mr. Clement was another person**
5   **using a fictitious name, and he somehow tracked**
6   **down the client list through a fax broadcaster**
7   **in Canada, and they have since then retained**
8   **the actual hard drive that contained the whole**
9   **list of every fax that was sent.**
10      Q.   And I don't want to oversimplify what
11  you said and to the extent you said more than
12  I'm going to summarize, I don't mean to ignore
13  what else you said, but am I correct in
14  understanding that your understanding as you
15  just described it is that the Clement case
16  ultimately was a vehicle, as you understand it,
17  that allowed Anderson + Wanca to obtain the
18  hard drive of the fax broadcaster that did the
19  Buccaneers fax broadcasts, and it's from that
20  hard drive that Anderson + Wanca was able to
21  identify all of the recipients?
22      **A.   That is my understanding, yes.**
23      Q.   What I'm going to ask you is a very
24  broad question, and you can break it down into

1   parts or time periods as you want to.  It's
2   just if I don't ask it broadly, I won't know
3   where to draw lines to create categories or
4   subparts.
5           Can you explain to me your
6   involvement, investment of time, your
7   activities in furtherance of a
8   Buccaneers-related TCPA case, whether it's the
9   Clement case or any later case you joined from
10  the first time when you got involved up through
11  May of 2016?
12          I'm trying to understand what
13  your role was, what your responsibility was,
14  what you actually did.
15          And, again, that's a long window
16  of time, but you are the only one who knows
17  where distinguishing periods might -- you might
18  say I want to talk first about 2009 through
19  2012, because that's different from 2012
20  through 2014.  So you're the one who knows.
21  I'm just the one trying to figure it out.  Can
22  you help me understand your role,
23  responsibilities, activities and efforts from
24  the start of your involvement in a Buccaneers

1   TCPA-related case up until May of 2016?
2       **A.   There wasn't a lot of duties in the**
3   **beginning.  It's gotten more requirements.  In**
4   **the beginning, I just had to either review**
5   **documents or sign pleadings, but as the case**
6   **was developed and built, my time was required**
7   **for more review of documents.  I've been out of**
8   **the office for depositions, I've attended**
9   **whatever mediations, which has taken me out of**
10  **the office.  Whatever forms that need to be**
11  **reviewed, I've done.  I know there was one**
12  **particular time that I had to sign very**
13  **specific documents for courts in Canada, I had**
14  **to review all of those documents.  It**
15  **was -- the last -- I would say the beginning**
16  **was not a lot, but as the case has been built,**
17  **I've had more time into it.**
18      Q.   When do you think -- and I understand
19  this as an approximation, and even whatever
20  approximation you give, I'm not going to hold
21  you tightly to that, because that's the nature
22  of an approximation, but approximately when
23  would you see the calendar line drawn between
24  it having been not a lot and becoming more?

1    **A. May I ask my attorney a question?**

2    MR. COHEN: Sure.

3    THE WITNESS: What was the date of my

4    deposition with Mr. Postman? Which year was

5    that?

6    MR. SOBLE: Why don't you just answer for

7    him that it was about the time of the

8    deposition.

9    THE WITNESS: It was about the time of the

10    deposition with Mr. Postman.

11    BY MR. COHEN:

12    Q. Fair enough. I should have said that.

13    If you don't know the date, but there is an

14    event that we can all go back to. So if we

15    look at the date when Mr. Postman took your

16    deposition, that would be an indication of when

17    your investment went from not a lot to becoming

18    more?

19    **A. Correct. I apologize.**

20    Q. That's fine.

21    I understand everything you

22    believe -- that you told me so far, everything

23    you believe Mr. Oppenheim did that you think

24    was, as you described it, a wrong, and that you

1    believe that it enabled and facilitated the

2    Technology Training case filed by Bock Law

3    Firm.

4    What I want to make sure I

5    understand, if we took Mr. Oppenheim completely

6    out of the picture, if Mr. Oppenheim never left

7    Anderson + Wanca, but still in May of 2016 Bock

8    Law Firm filed a Technology Training case

9    through its own sources, its own means,

10    negotiated a settlement and sought court

11    approval of that settlement of the Buccaneers

12    TCPA liability, would you still believe that

13    that was wrong and unfair and taking advantage

14    of all of your work and essentially stealing

15    the case?

16    MR. SOBLE: Object to the form. Go ahead.

17    THE WITNESS: Yes.

18    BY MR. COHEN:

19    Q. For all the same reasons?

20    MR. SOBLE: Object to the form.

21    THE WITNESS: Yes.

22    BY MR. COHEN:

23    Q. You understand that a mediation at

24    heart is an attempt by the parties to sit down

1    and with the assistance of a mediator to see if

2    they can't work out a settlement of the case?

3    **A. Yes.**

4    Q. But mediation isn't the only way a

5    case can get settled; the parties to a lawsuit

6    can just talk together without a mediator,

7    without formal mediation, and try to see if

8    they can't reach an agreement to settle a case.

9    You understand it can be done that way, too?

10    **A. I guess so.**

11    Q. The reason I brought that up is

12    because when I asked you this question about

13    your role or responsibility, your involvement,

14    your participation in any settlement-related

15    activities in the Buccaneers case, the Cin-Q

16    case, I'm not limiting it to formal mediation

17    sessions, I'm talking about any aspect of any

18    efforts or activities where Anderson + Wanca or

19    Michael Addison were endeavoring to explore

20    settlement of the Buccaneers TCPA case. And

21    for now I'm not asking you for any specifics.

22    For example, I'm not asking you to say, I told

23    them this was my thought, or I told them I

24    thought it should be this or that. I'm looking

1    for more generic stuff like whether you talked

2    about strengths and weaknesses with them,

3    whether you gave them your assessment of

4    strengths and weaknesses, whether you discussed

5    your views on what would or wouldn't be fair

6    compensation for the class, without telling me

7    what your specific communication was. So those

8    were all just examples.

9    What in general has been your

10    role, responsibility or contribution to any of

11    the settlement activities, efforts, et cetera

12    in the Buccaneers TCPA case?

13    **A. Presence as the class representative**

14    **was a main role. And mostly it was the**

15    **presence of the class rep being there. Most of**

16    **the documents and the settlement things were**

17    **already pre done before I was ever involved in**

18    **any mediation function. I believe that's a**

19    **requirement, also, that those kinds of forms**

20    **have to be done and presented to a mediator**

21    **before you show up for the session.**

22    Q. You were asked -- and I can find the

23    page, I've got some notes that help us go

24    through your deposition with Mr. Postman, but

1  it's a long deposition.
2  **A.  Oh, it was.**
3  Q.  Brutal?
4  **A.  Yes, sir.**
5  Q.  Hard to read it.  I can't imagine what
6  it was like to sit through it.
7          There were questions asked in
8  your deposition by Mr. Postman as to whether
9  you had a position or view on what would be
10 reasonable compensation for you as a person who
11 had a TCPA violation, what would be reasonable
12 compensation for the class, and my general
13 recollection it was asked several times,
14 several ways, that you said at that time, at
15 the time of the deposition by Mr. Postman, you
16 did not have a position to express on that.  Do
17 you seem to generally recall that?
18 **A.  Yes, sir.**
19 Q.  Okay.  Did you at any time after that,
20 including leading up to, during, after any of
21 the mediation sessions in the Buccaneers TCPA
22 class action, the Cin-Q case, did you form an
23 assessment of your own as to what the
24 reasonable compensation that the claiming class

1  members should get in a reasonable settlement?
2  **A.  In my own mind, what I think would be**
3  **reasonable?**
4  Q.  Yes.
5  **A.  Based on my knowledge of other**
6  **settlements or other cases, yes, sir.**
7  Q.  Before I pursue the specifics of that,
8  when you say based on my knowledge of other
9  cases and other settlements, what other cases
10 or other settlements are you referring to?
11 **A.  Other class actions I've been included**
12 **in.  Sometimes you get $100, sometimes you get**
13 **$500.  I believe that it shouldn't -- I**
14 **wouldn't want to put someone out of business in**
15 **my forming of an opinion for a settlement, but**
16 **I believe that it should be a reasonable**
17 **settlement.**
18 Q.  When you talk about your knowledge of
19 other cases and other settlements, and you
20 mention sometimes you get $100, sometimes you
21 get $500, are we talking about your experience
22 with being a claiming class member in a TCPA
23 class settlement?
24 **A.  Yes, sir.**

1  Q.  So your own experience and knowledge
2  of other TCPA class cases and class settlements
3  has run the spectrum of anywhere from $100 per
4  claim all the way up to $500 per claim?
5  **A.  Yes, sir.**
6  Q.  Do you have any understanding of what
7  factors or issues in one case versus another
8  justified or led to a settlement being agreed
9  to and approved by a court in the amount of
10 $100 claiming class member in one case, but
11 $500 claiming class member in another?
12 **A.  No, I'm not privy to it, but sometimes**
13 **you get a little card in the mail and it says**
14 **they've come to this agreement, and you're**
15 **entitled, and if you file a claim form, you can**
16 **receive a payment.**
17 Q.  And you have filed a claim form, some
18 were a hundred and some were $500?
19 **A.  Yes, sir.**
20 Q.  Have you ever -- outside of the Cin-Q
21 Technology Training situation, have you ever
22 received notice of a TCPA class settlement
23 where you could be a claiming class member and
24 instead of making a claim, you filed an

1  objection and said you didn't feel that the
2  $100 per class member or whatever was
3  sufficient, and you thought the settlement was
4  inadequate because of that and you were
5  objecting?
6  **A.  No, sir.**
7  MR. SOBLE:  How long have we been on the
8  record?
9  THE VIDEOGRAPHER:  One hour and 45 minutes.
10 MR. COHEN:  That's total, right?
11 THE VIDEOGRAPHER:  Yes.
12 MR. SOBLE:  You doing okay?
13 THE WITNESS:  Yes, sir.  Thank you.
14 THE VIDEOGRAPHER:  There's about fifteen
15 minutes left on the disk.
16 BY MR. COHEN:
17 Q.  Earlier when I asked you what your
18 role and responsibility and contribution was to
19 any settlement-related activities in the Cin-Q
20 case, you said your main role was your presence
21 as the class representative, correct?
22 **A.  Yes, sir.**
23 Q.  And you went on to mention that the
24 documents had been pre done before you got

1    involved?
2    **A.  For mediation, yes, sir.**
3        Q.   And am I correct that by the
4    documents, you'd be referring to the Anderson +
5    Wanca and Michael Addison attorneys having
6    already put together an analysis of the case
7    for settlement purposes and having submitted
8    those documents to the mediator?
9        **A.  Yes, sir.**
10       Q.   Were you made -- whenever you did get
11   involved for your main role of being present as
12   the class representative, were you made privy
13   to those documents that had been pre done and
14   already submitted to the mediator?
15       **A.  No, sir.**
16       Q.   In your communications with Anderson
17   + Wanca attorneys about mediation, about
18   settlement even more broadly than just
19   mediation, whether it was before mediation,
20   during mediation or after a mediation session,
21   were you made aware of particular settlement
22   positions or demands that Anderson + Wanca was
23   making through the mediator or directly to the
24   Buccaneers for a settlement proposal?

1        **A.  Yes, sir.  Was that loud enough?  Did**
2    **you hear that one?  Okay.**
3        Q.   To the best of your knowledge and
4    awareness, were you always aware of the
5    settlement positions and the settlement
6    positions communicated by Anderson + Wanca to
7    the Buccaneers either through a mediator or
8    directly to the Buccaneers?  Were you aware of
9    the positions and settlement positions
10   communicated one way or another by Anderson +
11   Wanca to the Buccaneers?
12       **A.  Yes, sir.**
13       Q.   Did you ever express a position of
14   your own as to what would or should be
15   reasonable in terms of the terms of the
16   settlement as it relates to the compensation
17   for claiming class members to attorneys at
18   Anderson + Wanca?
19       **A.  I believe so, yes, sir.**
20       Q.   When in the scheme of things would
21   that have happened?  And it may have happened
22   more than once, so I don't mean to lock you in
23   to as if it only happened once.  When and under
24   what circumstances do you recall that

1    happening?
2        **A.  The first mediation I attended in**
3    **Miami.**
4        Q.   How many mediation sessions total
5    occurred?
6        **A.  Three that I had knowledge of.  One I**
7    **was not able to attend.**
8        Q.   But even though you were not able to
9    attend it, that is one of the three you're
10   aware of?
11       **A.  Correct.**
12       Q.   And it's my understanding there were
13   two different mediators used over time?
14       **A.  Yes, sir.**
15       Q.   Judge Wayne Anderson was one of them?
16       **A.  Yes, sir.**
17       Q.   And the other guy?
18       **A.  Was --**
19       Q.   Bax?
20       **A.  The gentleman in Miami.  I don't**
21   **remember his name.**
22       Q.   He was the first one though, correct?
23       **A.  Correct.**
24       Q.   And as you recall, was there one with

1    the first gentleman in Miami and then two with
2    Wayne Anderson?
3        **A.  Correct.**
4        Q.   And the one that you're aware of but
5    didn't attend, that was one of the Wayne
6    Anderson mediations?
7        **A.  I believe so.  There was one that I**
8    **did attend that the Buccaneers did not show up**
9    **for, and that was November of -- because they**
10   **claim that the case was already settled.**
11       Q.   Was that November of 2014 and then
12   August of 2015?
13       **A.  Yes, August of 2015, yes, sir.**
14       Q.   Was that the one -- the first one with
15   Wayne Anderson?
16       **A.  Let me get the timeline.  I had**
17   **surgery in 2016.  So that was the one I could**
18   **not attend.  No, it was -- 2015 was the**
19   **mediation I could not attend, because I had**
20   **surgery, and I believe there was one more after**
21   **that that I was in Chicago for, and the**
22   **Buccaneers did not attend that one, because**
23   **they stated that they had already settled the**
24   **case.**

**19 (Pages 70 to 73)**

1     But I was there with Mr. Addison
2  and Mr. Good, and Mr. Mester, I believe,
3  was -- attended by phone and said there would
4  not be a mediation that day as they had already
5  settled the case.
6     Q.  Okay.  So I started by asking you if
7  you ever communicated your position of what
8  would be a reasonable settlement to Anderson +
9  Wanca, and you said the first mediation in
10  Miami.
11     A.  Yes, sir.
12     Q.  And that would have been with the
13  first mediator, not Wayne Anderson?
14     A.  I think I only spoke my opinions to
15  Ross Good.
16     Q.  But that would have been for that
17  mediation in Miami with the first mediator?
18     A.  Yes, sir.
19     Q.  And just to close the loop, am I
20  correct in understanding, to the best of your
21  recollection, other than that one time for the
22  first mediation with the first mediator in
23  Miami, when you communicated your view on
24  what's reasonable or what would be reasonable

1  settlement for the class to Ross Good, you did
2  not, to your recollection, communicate your
3  view on what would or wouldn't be reasonable as
4  a class settlement again?
5     A.  No, sir.
6     Q.  I'm correct?
7     A.  Yes, sir, you are.
8     MR. COHEN:  I'm going to take 30 seconds to
9  confer, and we'll finish out the disk, and
10  maybe you want to take your break at that
11  point.
12     THE VIDEOGRAPHER:  Going off the record at
13  12:22 p.m.
14          (Brief pause.)
15     THE VIDEOGRAPHER:  Going back on the record
16  at 12:23 p.m.  Please proceed.
17  BY MR. COHEN:
18     Q.  And I'm advised the first mediator --
19  his name may have been Rodney Max.  Does that
20  ring a bell?
21     A.  Yes, sir.
22     Q.  That's the one you recall attending?
23     A.  Yes, sir.
24     Q.  That would have been the one you

1  shared your views on reasonable settlement with
2  the class with Ross Good?
3     A.  I believe so, on one of the breakout
4  sessions.
5     Q.  Do you know or have an understanding
6  of what it means in litigation, class action or
7  otherwise, where you're engaged in an ongoing
8  mediation process, perhaps multiple sessions,
9  and one side or the other declares or asks the
10  mediator to declare an impasse, do you know
11  what that means?
12     A.  My understanding is neither side can
13  agree to any terms, and that leads it to go to
14  the next avenue, which would be in front of a
15  judge.
16     Q.  Are you aware that in 2016 after the
17  mediation with Rodney Max, after the mediation
18  effort with Wayne Anderson, that at Anderson +
19  Wanca's request, Wayne Anderson declared an
20  impasse in the mediation and settlement
21  negotiation?
22     A.  I believe Ross Good transferred that
23  information to me.
24     Q.  So you -- and you understood what that

1  meant based on what you just told me about your
2  understanding what an impasse in that situation
3  would be?
4     A.  Yes, sir.
5     Q.  So as of the time that Anderson +
6  Wanca requested and in compliance with that
7  request Wayne Anderson declared an impasse in
8  the Cin-Q litigation as it related to
9  settlement, you understood the parties could
10  not agree on terms, and that the case was going
11  to continue forward in front of the court?
12     A.  That was my understanding, yes, sir.
13     Q.  Did that concern you at all in terms
14  of ultimately gaining some relief, some remedy,
15  some compensation for the class?
16     A.  Did it concern me?
17     Q.  Yes.
18     MR. SOBLE:  Object to the form.
19     THE WITNESS:  My thought was it could be a
20  bad situation for the Buccaneers.
21  BY MR. COHEN:
22     Q.  Did it ever -- did you ever entertain
23  the possibility that it could end up being a
24  bad thing for the class, that if a settlement

1 weren't reached, the case could proceed in
2 front of the court, and the court could either
3 not certify a class at all, in which case the
4 class doesn't get anything, or the court could
5 certify a class, and it could go to trial and
6 maybe the class would lose at trial?
7    **A.  No, I never entertained that the class**
8 **would lose.**
9    Q.  Why not?
10    **A.  There was too many things I believe**
11 **done by the Buccaneers that were not correct,**
12 **and I thought that would have come out in the**
13 **trial, and I don't think it would have been**
14 **favorable for them.**
15    Q.  Not asking you at this point for
16 specifics about communications by Anderson +
17 Wanca attorneys to you, but to the extent it
18 never occurred to you that it could turn out
19 bad for the class proceeding without a
20 settlement, because as I'm hearing what you're
21 saying, the case was so strong against the
22 Buccaneers, is it fair to say your feeling
23 about that would have been based significantly
24 upon what your attorneys were communicating to

1 you about the merits of the case?
2    **A.  Yes.**
3    MR. COHEN:  Probably a good time to stop.
4    THE VIDEOGRAPHER:  This marks the
5 conclusion of disk number one.  Going off the
6 record at 12:28 p.m.
7          (Recess.)
8    THE VIDEOGRAPHER:  Going back on the
9 record.  This is disk number two.  The time is
10 now 1:22 p.m.  Please proceed.
11 BY MR. COHEN:
12    Q.  Good afternoon, ma'am.  We're back on
13 the record after taking a short lunch break.
14    **A.  Yes, sir.**
15    Q.  You talked earlier -- we talked
16 earlier about the concept of risks associated
17 with not reaching a settlement in this
18 Buccaneers TCPA Cin-Q case.  Do you recall
19 that?
20    **A.  Yes, sir.**
21    Q.  And if I understood you correctly, you
22 said it never crossed your mind, it never
23 occurred to you, it was never a concern for you
24 the idea that without a settlement proceeding

1 forward to a judgment one way or another on the
2 merits in court, that that could turn out bad
3 for the class, correct?
4    **A.  Yes, sir.**
5    Q.  And if I'm correct, you also indicated
6 your view in that regard was based upon
7 communications from your attorneys about their
8 views and what the risks or concerns were or
9 were not, correct?
10    **A.  Yes, sir.**
11    Q.  Do you have any knowledge one way or
12 another about whether the Anderson + Wanca Law
13 Firm or anyone in that law firm has ever tried
14 a TCPA class action to a verdict?
15    **A.  Not to my knowledge, sir.**
16    Q.  And not to your knowledge you don't
17 know one way or another or not to your
18 knowledge --
19    **A.  I don't know one way or another**
20 **whether they've actually gone to court or not.**
21    Q.  Do you have any knowledge or
22 information about any TCPA class actions
23 prosecuted by any law firms on behalf of any
24 plaintiff classes anywhere in the country that

1 have gone to verdict and how they've turned
2 out?
3    **A.  No, sir.**
4    Q.  Are you aware of what the Buccaneers'
5 affirmative defenses are in the Cin-Q case?  In
6 other words, their defenses that say this is
7 why we can't be held liable?
8    **A.  I'm not sure if this is correct or**
9 **not.  I was under the impression that they're**
10 **claiming non-liability because they didn't**
11 **actually send the fax, that Mr. Clement sent**
12 **the fax.  That's my opinion and from what I've**
13 **learned through being involved in the case.**
14    Q.  Sitting through that eight-hour
15 deposition with Mr. Postman would certainly
16 lead you to believe that that was their
17 defense, wouldn't it?
18    **A.  Yes, sir.**
19    Q.  Beyond that potential defense
20 repeatedly suggested by Mr. Postman, are you
21 aware of any other defensive basis that the
22 Buccaneers have raised in the Cin-Q case?
23    **A.  No, sir.**
24    Q.  Were you aware before the Technology

21 (Pages 78 to 81)

1  Training case was filed and reached a
2  settlement -- and by aware, I mean aware on
3  your own or more likely aware because through
4  your relationship with the lawyers representing
5  the plaintiffs in Cin-Q, they might have made
6  you aware, were you aware of any important
7  legal issues that were pending in any appellate
8  courts around the country involving TCPA class
9  issues where the decision of that Appellate
10  Court on that issue could potentially impact
11  the chances of succeeding in the Cin-Q class
12  action?
13      MR. SOBLE: Object to the form of the
14  question as outside the scope of topics
15  noticed.
16      THE WITNESS: Not to my knowledge, sir, no.
17  BY MR. COHEN:
18    Q.  At any time after the filing and
19  settlement of the Technology Training case,
20  have you become aware of any decisions that
21  have been issued out of any appellate courts or
22  federal courts of appeals involving TCPA class
23  action litigation that could impact on the
24  merits of the Cin-Q class action and its

1    A.  I don't think so.  I would have filed
2  it in a box of bills, and I've cleaned the
3  attic out because there's only so much room up
4  there.  So that would have been more than ten
5  years ago.  I don't think I would have saved
6  it.
7    Q.  What about this -- and I know we don't
8  know if there's more than one, but at least it
9  would have been the first one, this 2009
10  retainer agreement when you first would have
11  hired Anderson + Wanca, and they would have
12  initiated that first Buccaneers fax advertising
13  case, the Clement case, have you looked for, do
14  you know if you have that contract?
15    A.  I can't be certain.  I would probably
16  have to dig through boxes in the attic to look
17  for it.
18    Q.  We have been provided with a retainer
19  agreement that you entered into with Anderson +
20  Wanca, but it's dated later for the Cin-Q case
21  in 2013.
22    A.  Okay.
23    Q.  Did you obtain and provide that or did
24  that come to us through Anderson + Wanca

1  chances of succeeding or failing either at the
2  certification point or at a trial on the
3  merits?
4      MR. SOBLE:  Same objection.
5      THE WITNESS: No, sir.
6  BY MR. COHEN:
7    Q.  I know I'm jumping around a little bit
8  here.
9      Going back to attorney Jeeves who
10  had mentioned, I think you said to your
11  husband, at that chiropractors' society meeting
12  about Mr. Wanca.  Did Mr. Jeeves enter into, as
13  far as you're aware, any kind of referral
14  arrangement where he stands to receive any --
15    A.  No, sir.
16    Q.  Okay.
17    A.  No.
18    Q.  You mentioned earlier a solicitation
19  letter you received from Mr. Wanca after
20  Mr. Jeeves provided your husband his name and
21  your husband provided you with Mr. Wanca's name
22  but before you had otherwise taken any
23  independent effort to make contact.  Do you
24  have possession of that letter?

1  through the Foley Law Firm?  Do you know one
2  way or another where that came from that we
3  got?
4    A.  I believe it would have been provided
5  to our -- to the Foley firm and then given to
6  you.  I didn't produce it.
7    Q.  Okay.  So -- and that doesn't
8  necessarily mean it came from Anderson + Wanca,
9  as between Anderson + Wanca and you, it wasn't
10  you?
11    A.  Correct.
12    Q.  Have you ever believed that you had a
13  potential claim against Anderson + Wanca, Brian
14  Wanca, or any of the attorneys at Anderson +
15  Wanca, other than David Oppenheim?
16    A.  No, sir.
17    Q.  Have you ever placed Anderson + Wanca
18  or anyone there on notice of a potential claim
19  you might have against them?
20    A.  No, sir.
21    Q.  Have you ever settled, resolved,
22  released or waived any potential claims or
23  rights against Anderson + Wanca or any of the
24  attorneys at Anderson + Wanca?

1     **A. Not to my knowledge, no, sir.**
2     Q. We have been provided in discovery in
3   this case a redacted copy of a retainer
4   agreement with the Foley Law Firm signed by
5   Mr. Wanca on behalf of Anderson + Wanca and you
6   on behalf of Medical & Chiropractic, and I
7   think it's countersigned by the Foley Law Firm,
8   and we'll look at it a little bit later. Do
9   you understand what I'm referring to?
10    **A. Yes, sir.**
11    Q. Have you signed or entered into any
12   other agreements of any kind in any way, shape
13   or form related to the M & C action against
14   Mr. Oppenheim and Bock Law Firm?
15    **A. No, sir.**
16    Q. I understand. I don't necessarily
17   agree, but I certainly understand that you have
18   a view of the way events unfolded where David
19   Oppenheim came over to the Bock Law Firm, Bock
20   Law Firm ended up filing a Technology Training
21   class action against the bucks that competed
22   with the Cin-Q action, Bock Law Firm ended up
23   reaching a settlement of that action, and you
24   think that's wrong. And I understand you've

1   also said even if we take David Oppenheim
2   completely out of the equation, Bock Law Firm
3   without David Oppenheim even having moved over
4   and joined the firm, Bock Law Firm had done
5   that independently on its own, you would still
6   think it was wrong, but have you looked at the
7   specific terms of the settlement that Bock Law
8   Firm reached with the Buccaneers on behalf of
9   the class, looked at the terms and evaluated
10   their reasonableness?
11    MR. SOBLE: Object to form as vague and
12   confusing and factually inaccurate.
13    THE WITNESS: Have I looked at the -- their
14   proposed settlement?
15   BY MR. COHEN:
16    Q. Have you looked at the Technology
17   Training proposed settlement, the one that was
18   entered into and is pending before Judge
19   Porcelli for approval or not, have you looked
20   at it to evaluate the terms in terms of whether
21   they're reasonable for the class?
22    **A. Yes.**
23    Q. And I had asked you about what you
24   knew about the terms of the settlement back at

1   the preliminary injunction hearing July 18th of
2   2016, and I think you indicated you had perused
3   it, and so I just want to make certain I
4   understand. Have you given it more
5   consideration and review since then in terms of
6   whether the terms are reasonable?
7    **A. I believe they're unreasonable. And**
8   **so, yes, I've thought about it.**
9    Q. Okay. What is it about the terms of
10   the Technology Training settlement that M & C
11   views as unreasonable?
12    **A. The part where you would have to sign**
13   **the perjury thing where you -- person would**
14   **have to agree to the terms of the settlement**
15   **beyond any reasonable doubt, and you would be**
16   **under perjury if you didn't really get the**
17   **facts, I think that's a little bit unreasonable**
18   **to ask someone considering that it's 2017, who**
19   **is going to remember whether they got that fax**
20   **almost 12 or 13 years ago. That's my thought**
21   **to that.**
22    Q. And I appreciate that. I'm going to
23   have some more questions about that. But as
24   you've seen, when I asked a question that could

1   have more than one part to the answer, I like
2   to get them all out, and then we can revisit
3   them. Not ignoring that at all. Just set that
4   aside to come back to.
5     What else, if anything, about the
6   settlement agreement in the Technology Training
7   case is M & C's position it's unreasonable?
8    **A. I don't think the fee is enough for**
9   **the amount of people that can be considered in**
10   **this class. They're going to get very little.**
11    Q. Okay. So what you said fee, I thought
12   you meant the attorney's fee. You mean the
13   compensation --
14    **A. I mean the compensation to the class.**
15   **When you factor in the total amount and divide**
16   **it by what would be given to the class, it's**
17   **very little.**
18    Q. I'm going to have some follow-ups with
19   you on that.
20     Anything else that it's M & C's
21   position is not reasonable for the class and as
22   a settlement in general about the Technology
23   Training settlement that's pending before Judge
24   Porcelli?

1    A.  I think the settlement as a whole is
2  too low.  I don't think it's enough to cover
3  sufficiently for the class.  I don't believe
4  that it's a correct amount of money, based on
5  my knowledge of how cases can settle and the
6  law based on the fees associated with
7  the -- federal fees associated with a fax case.
8    Q.  And I can't wait till we start going
9  through them, and we get to talk about them,
10  but I just want to make certain before we
11  circle back and start taking them one by one
12  that I haven't cut you off, and that we know if
13  there's anything else at all about the
14  settlement that you think is unreasonable is
15  not appropriate benefit for the class, does not
16  properly benefit the class in any way.
17    A.  Nothing else that I can think of.
18    Q.  You indicated that the first thing you
19  mentioned was signing under penalty of perjury,
20  and I'm not using your exact words, and if you
21  think I summarize it or describe it in a way
22  that's not fair to what you were trying to
23  convey, you just tell me.  It sounded like for
24  a single fax that somebody might have received

1  eight years ago or more to require them to put
2  themselves at the risk of perjury by requiring
3  them to swear under penalty of perjury that
4  they received that fax is harsh and unfair?
5    A.  Yes.
6    Q.  What if they were required to swear
7  under penalty of perjury that as of 2009 or
8  2010, that was their fax number?
9    A.  That's not unreasonable.
10    Q.  Your second and your third, I
11  understand and appreciate they are not
12  identical, but they seem to kind of
13  interrelate, so I'm a going to see how I can
14  keep them separate and also not ignore one
15  while I'm talking about the other.
16        The second thing you said was
17  that the compensation to the class is not
18  enough.  These are not your exact words, but if
19  I understand you, because if you divide the
20  settlement fund across the entire class, it's
21  going to end up being a very low
22  per-class-member compensation?
23    A.  Yes, sir.
24    Q.  First of all, and this isn't a test,

1  it's really just to make sure I understand what
2  your understanding is before we move on, what's
3  your understanding in the settlement in the
4  Technology Training case about whether the
5  compensation is per class member versus per
6  fax?
7    A.  I'm understanding it's per class
8  member.  Some people could have more than one
9  fax number, so it would -- I believe it's per
10  class member.
11    Q.  And what I'll represent to you -- and
12  just for purposes of my questions, if I ever
13  ask you to assume something that turns out to
14  not be true, you're not held responsible for
15  assuming it to be true; I'm going to be held
16  responsible for asking you to assume something
17  that was false.
18        I'll represent to you, and I'll
19  ask you to assume, that under the Technology
20  Training settlement, it's kind of a combination
21  of both, it's per class member, but the amount
22  of compensation can vary depending on how many
23  of the Bucc faxes that class member received,
24  so that for the first fax it's a certain amount

1  of money, and then for each additional fax to
2  that same claiming class member, he or she
3  could receive additional money on top of the
4  money for the first fax.  Do you understand
5  that?
6    A.  Yes, I do.
7    Q.  Okay.  Just as an initial analysis,
8  would you agree that's a reasonable factor to
9  take into account in class compensation, how
10  many faxes each class member received?
11    MR. SOBLE:  Object to the form of the
12  question.
13    THE WITNESS:  I would say yes.
14  BY MR. COHEN:
15    Q.  Have you -- and I'm not suggesting
16  it's like simple math or anything, but you're a
17  smart person, so I'm asking anyway.
18        Have you done any analysis or
19  calculation of the settlement fund that would
20  be created under the Technology Training
21  settlement?  In other words, the amount of fund
22  that the Buccaneers are putting up and assuming
23  the attorney fees were awarded as proposed and
24  litigation expenses, and so there's the

Thompson Court Reporters, Inc
thompsonreporters.com

1 remaining amount to actually pay claims, have
2 you done any analysis or calculation or do you
3 otherwise have any understanding of what
4 percentage of the total class would have to
5 make claims against the fund before it would be
6 exhausted?
7 **A. No, sir.**
8 Q. Do you have any knowledge, experience
9 or through your involvement in this kind of
10 litigation over time being a class rep,
11 interacting with your lawyers at Anderson +
12 Wanca, do you have any knowledge, information
13 or understanding about what the range has been
14 in TCPA class action litigation over the years
15 for the class claim rate? In other words, what
16 percentage of the class in general as a range
17 actually claims against the fund?
18 **A. I've heard comments in other**
19 **situations. It could vary. It could be as low**
20 **as 5 percent, it could be as high 20 percent.**
21 **It can vary.**
22 Q. Are you aware of your attorneys at
23 Anderson + Wanca in their settlement analysis
24 trying to come up with proposals or

1 counterproposals to the Buccaneers analyzing
2 settlement proposals through the lens of a
3 low-claim rate of 5 percent and the high-end
4 claim rate of 10 percent, are you aware of
5 that?
6 MR. SOBLE: Object to the form.
7 THE WITNESS: No, sir.
8 BY MR. COHEN:
9 Q. If, in fact, attorneys at Anderson +
10 Wanca in evaluating the settlement, what fund
11 would be adequate, what the anticipated payout
12 to the claiming class members would be based
13 upon a predicted or projected claim rate, if
14 the Anderson + Wanca attorneys were always
15 analyzing that through the lens of the low end
16 of a 5 percent claim rate and a high end of a
17 10 percent claim rate, are you able to say one
18 way or another whether that's a reasonable
19 range to use versus unreasonable?
20 MR. SOBLE: Object to the form and
21 foundation.
22 THE WITNESS: No, sir.
23 BY MR. COHEN:
24 Q. Do you know whether the settlement

1 fund described in the proposed settlement in
2 the Technology Training case, after deduction
3 for attorneys' fees and litigation expenses,
4 would leave a sufficient remaining fund to
5 cover a claims rate in excess of 10 percent?
6 MR. SOBLE: Same objection.
7 THE WITNESS: No, sir.
8 BY MR. COHEN:
9 Q. If I were to ask you to assume that
10 the fund described in the Technology Training
11 settlement after deduction for the proposed
12 attorneys' fees and litigation expenses would
13 leave a sufficient fund for class member claim
14 payouts to cover almost a 20 percent claim rate
15 before any claiming class member would actually
16 start to suffer a reduction in their
17 compensation because so many people claimed in,
18 it can go almost up to 20 percent claim rate,
19 and all the claiming class members would get
20 their full compensation, would that in any way
21 affect your assessment of whether that fund is,
22 in fact, a reasonably sufficient amount?
23 MR. SOBLE: Same objection.
24 THE WITNESS: I would have to ask based on

1 how many faxes, because I was told a huge
2 number. I don't know what number you have. So
3 I'm basing it on the large number I was told
4 was faxed. To me sitting down on my phone and
5 doing simple math, it was a large amount of
6 money that would have been needed to cover the
7 large amount of faxes I was told that was
8 faxed. I don't think there would be enough
9 money in that fund left.
10 BY MR. COHEN:
11 Q. And I said it once before in this
12 deposition, and I meant it, I am not here to
13 argue with you at all. So what just happened
14 was I said if I ask you to assume and what I
15 heard back was you saying but you're wrong, I'm
16 not going to assume that, and that's not unfair
17 of you to do.
18 But I'll still ask it anyway.
19 I'll ask you to suspend your disbelief, and
20 only for purposes of this question, and if the
21 premise of my question, what I'm asking you to
22 assume isn't true, it's not like you're locked
23 into anything because my premise was wrong.
24 If, in fact, the fund is sufficient so that

1    after deduction of attorneys' fees and
2    litigation expenses it should be sufficient to
3    cover full compensation as provided under the
4    terms of the settlement agreement up to almost
5    a 20-percent claim rate, if that's true, would
6    that affect your assessment of whether the fund
7    is sufficiently large to be reasonable?
8    MR. SOBLE: Same objection.
9    THE WITNESS: Based on the federal law
10   allowed for the amount of a fax or based on the
11   number you -- this lawsuit settled for their
12   amount per fax? Because the law says one
13   thing, but attorneys can negotiate another
14   thing.
15   BY MR. COHEN:
16   Q. I appreciate what you just said. I'm
17   going to try to address that first.
18       I think it's a fair comment you
19   just made.
20   **A. Okay.**
21   Q. First of all, what's your
22   understanding of a claiming class member under
23   the Technology Training settlement for a first
24   fax?

1       So maybe they only received one,
2    so they're only claiming for a first. Maybe
3    they received three. But for the first of the
4    three that they're getting compensated for,
5    under the Technology Training settlement, the
6    first fax claim compensation, what's your
7    understanding of what the compensation is for
8    that?
9    **A. I have been educated to the number of**
10  **$500 per fax, first. If you're not doing**
11  **something wrong, and you continually do**
12  **something wrong, you can be subjected to a**
13  **higher level of monetary damage per fax.**
14   Q. And what you just said is absolutely
15   accurate about what the TCPA, itself, statute
16   provides, that one fax, statutory damages $500.
17   If it's willful and knowing, it can be trebled
18   up to 1500.
19       But I'll represent to you in the
20   settlement, as you've experienced in some of
21   your own TCPA class actions where you weren't a
22   representative, you were just a claiming class
23   member, sometimes you receive notice it was
24   $500, sometimes you receive notice it was $100.

1    So in a settlement, the actual terms of
2    settlement can be different than exactly what
3    the statute says. And so I just want to
4    know -- I'll tell you, I want to know before I
5    share information what you do or don't know, do
6    you have an understanding under the terms of
7    the Technology Training settlement what a
8    claiming class member is entitled to as
9    compensation for the first fax?
10   **A. No, sir, I don't.**
11   Q. Okay. If I represent to you that it's
12   $350 for the first fax for a claiming class
13   member, does that seem within the range of
14   reasonable, setting aside whether the fund is
15   large number, just that part of it?
16   **A. Just that part --**
17   MR. SOBLE: Object to the form.
18   THE WITNESS: -- that would seem
19   reasonable.
20   BY MR. COHEN:
21   Q. And then I'll represent to you that
22   for a claiming class member who received more
23   than one fax, they're entitled to additional
24   compensation for the additional faxes, but it's

1    at a reduced rate, it's at a reduced amount per
2    fax, and it continues to diminish, but what we
3    know is that the class is made up of about
4    131,000 persons, and that all told those
5    131,000 persons received a total of
6    approximately 343,000 faxes.
7    **A. Okay.**
8    Q. So any of the 131,000 persons making a
9    claim, for their first fax they get $350. If
10   they happen to be class members who received
11   more than one, they get additional compensation
12   but at a reduced and continuing reducing
13   amount. I'm just asking, do you understand
14   what I'm describing?
15   **A. Yes, sir.**
16   Q. Assuming that, and assuming that the
17   settlement fund provided in the Technology
18   Training settlement after deduction for
19   attorneys' fees and litigation expenses would
20   be sufficient to cover around a 20-percent
21   claim rate with full payment to the claiming
22   class members under the terms, like I said 350
23   for first fax, diminishing for subsequent
24   faxes, so the fund is sufficient to cover

1  approaching a 20-percent claim rate. If that
2  were all true --
3      MR. SOBLE:  Object to the form and
4  foundation.
5  BY MR. COHEN:
6      Q.  -- would that affect your assessment
7  of whether the fund, itself, may be reasonable
8  under the circumstances?
9      MR. SOBLE:  Same objection.
10     THE WITNESS:  It sounds reasonable.
11 BY MR. COHEN:
12     Q.  Are you aware that the Technology
13 Training settlement provides that the Bock Law
14 Firm will request of the court that it be
15 awarded a certain attorney fee based upon a
16 certain percentage, I think it's 25 percent of
17 the fund, and that the Buccaneers won't oppose
18 that, so that if the court awarded fees -- if
19 the court approved the settlement and awarded
20 fees, it might award attorneys' fees up to 25
21 percent of the fund or in the range of $4.75
22 million. Now, I'm not focusing on who gets
23 that, whether it's Bock Law Firm or Anderson +
24 Wanca or anyone else. Just the idea that a

1  fund for a settlement where the per-claimant
2  compensation is reasonable, and if we assume
3  the fund, itself, is sufficient to cover around
4  a 20 percent claim rate, do you have any
5  position as to whether a 25-percent attorney
6  fee on the fund, whichever attorneys get it
7  isn't the issue, but a 25-percent attorney fee
8  for having gotten the case settled and brought
9  the benefit to the class, whether that's a
10 reasonable percentage?
11     MR. SOBLE:  Objection to form and
12 foundation.
13     THE WITNESS:  I guess it's reasonable. I
14 don't know if it's customary, but it could be
15 reasonable. From things that I've understood,
16 usually it's a third. Sometimes it could be
17 lower. Sometimes it could be higher. It could
18 be reasonable.
19 BY MR. COHEN:
20     Q.  And I understand the things you
21 testified to and the way you feel about your
22 sense of fairness, right and wrong. You're
23 upset with what you think happened. I think
24 you're also -- I think you've also agreed,

1  number one, you were never promised an
2  incentive award as the class rep if the Cin-Q
3  case ever paid out, and you were never told any
4  specific number that you might get, correct?
5      A.  Correct.
6      Q.  But have you been made aware that in
7  the Technology Training case, Bock Law Firm and
8  the Technology Training plaintiffs have
9  expressly told Judge Porcelli that we have no
10 objection if he approves our settlement to you
11 receiving whatever incentive award the court
12 thinks you're entitled to for your service in
13 the Cin-Q case, to the extent the court thinks
14 it helped the class and got the class a good
15 settlement? Are you aware that Bock Law Firm
16 and the Technology Training plaintiffs have
17 taken that position and conveyed that to the
18 judge?
19     A.  I heard that in court, yes.
20     Q.  Setting aside all the other stuff,
21 just focusing on that, in terms of -- and I'm
22 focusing on where you talked about what you had
23 done, the effort you had invested, the time you
24 had invested, does it seem reasonable to you

1  that if Judge Porcelli, for whatever reasons,
2  found that the Technology Training settlement
3  terms were reasonable and fair for the class,
4  and on top of that without any objection from
5  Bock Law Firm or the Technology Training
6  plaintiffs, he could award you an incentive
7  award for all your effort in the Cin-Q case;
8  does that seem reasonable?
9      MR. SOBLE:  Object to the form.
10     THE WITNESS:  It could be considered
11 reasonable, yes.
12 BY MR. COHEN:
13     Q.  Are you aware of the size of the
14 settlement fund that Anderson + Wanca viewed as
15 the appropriate gross fund for the Buccaneers
16 to create as a settlement in the Cin-Q case?
17     MR. SOBLE:  I'm going to object that it's
18 privileged. It's fair game for the deposition
19 in the case, but for the record it's
20 privileged. It's been put at issue. I'm fine
21 with it. I don't want there to be any
22 misunderstanding there is a blanket waiver by
23 going forward.
24     MR. COHEN:  I'm not going out and

1    screaming it on street.
2    MR. SOBLE: I don't want there to be any
3    presumption or -- or a blank waiver going
4    forward. She can go ahead and answer.
5    MR. COHEN: Just so you know, I won't take
6    that position on anything.
7    MR. BLONIEN: I might, but I hear your
8    objection.
9    MR. COHEN: Do what you got to do.
10    THE WITNESS: I've heard numbers. I don't
11    know what part of those numbers would be
12    considered in the fund, I don't know what part
13    of those numbers would be considered for
14    attorneys' fees, but I've heard numbers.
15    BY MR. COHEN:
16    Q. Remember a little while ago you -- I
17    mentioned the 25-percent attorney fee proposed
18    in the Technology Training case. I asked you
19    what you thought of that in terms of
20    reasonable, and summarizing, not using your
21    exact words, you said it could be reasonable,
22    and you mentioned you heard a third, it could
23    be less. Do you recall that?
24    **A. Yes, sir.**

1    Q. I'll represent to you in many
2    jurisdictions, including in federal courts in
3    the 11th Circuit, which includes Florida, it is
4    common and customary for attorneys who
5    successfully settle a TCPA class action on
6    behalf of a class and the court approves it
7    that the court awards attorney fees based on a
8    percentage of the fund.
9    And I mention that because when I
10    asked you if you knew what the Anderson + Wanca
11    firm was viewing as appropriate for a gross
12    fund, your answer kind of said you recall or
13    you heard numbers, but you don't know whether
14    that included attorneys' fees or -- and I'll
15    represent to you that as a general rule,
16    whatever the fund is we're talking about, you
17    would then calculate the attorneys' fees on
18    that as a percentage, at least in the 11th
19    Circuit. Okay? Will you accept that for
20    purposes of my questions?
21    **A. Yes.**
22    Q. Would it seem right to you -- I
23    apologize. I should figure this out before I
24    start my question.

1    Would it seem right to you to
2    settle the Buccaneers TCPA class action, the
3    one you are a potential class rep in in the
4    Cin-Q case, on terms that if you assume on the
5    low end a five-percent claim rate, on the high
6    end a ten-percent claim rate, that the actual
7    payout to claiming class members will range
8    between approximately 2 million on the low end,
9    4 million on the high end, that's the total,
10    all the claiming class members, they claimed
11    in, and they're paid out according to whatever
12    the settlement provides, that the class,
13    claiming class members, end up getting 2 to 4
14    million total, and the attorneys end up getting
15    27 to $28 million in attorneys' fees; would
16    that seem reasonable to you?
17    MR. SOBLE: Object to form and foundation.
18    You're also getting well outside the scope of
19    the topics in the notice of deposition for a
20    corporate rep.
21    She plainly has no expertise to
22    talk about what are reasonable attorney fees in
23    TCPA cases around the entire country.
24    But if you want to spend your

1    time continuing to get that, knock yourself
2    out.
3    BY MR. COHEN:
4    Q. He's got a flare with that, doesn't
5    he?
6    MR. SOBLE: I learned from you.
7    MR. COHEN: Thank you. Because I liked
8    it. So that was a compliment.
9    BY MR. COHEN:
10    Q. I'm not going repeat the whole
11    question.
12    MR. SOBLE: You can have it read back if
13    you want.
14    MR. COHEN: That would be very long,
15    because it was a long question.
16    BY MR. COHEN:
17    Q. Generally speaking, a settlement of
18    the Buccaneers TCPA class action litigation
19    where the class is expected to claim in on a
20    low end is only going to get 2 million, on a
21    higher projection of a claim rate they're going
22    to get about 4 million, and the attorneys are
23    going to end up with 27 or more million
24    dollars, does that seem reasonable to you?

1    MR. SOBLE:  Same objection.
2    THE WITNESS:  I don't -- I can't comment on
3  that.  I just don't know enough on how much
4  attorneys get paid for that kind of situation.
5  BY MR. COHEN:
6    Q.  Would you agree that you would not
7  want your attorneys in a case where you're the
8  potential class rep to be pushing for an
9  unnecessarily large settlement fund well beyond
10  what's necessary to cover any reasonably
11  anticipated claim rate from the class just to
12  increase their resulting attorneys' fees,
13  because the larger the fund, and they're taking
14  a percentage of the fund, the larger their
15  fees?
16    You wouldn't want the attorneys
17  pushing for an unnecessarily large fund just to
18  generate more attorneys' fees; can you agree
19  with that?
20    MR. SOBLE:  Object to form and foundation.
21    THE WITNESS:  I don't have a comment,
22  because there's always so many circumstances to
23  different cases, and it could depend on how
24  much work was involved, and how many years of

1  work, or how many hours.  Every case is
2  different.
3    I need to take a break.
4    MR. COHEN:  Absolutely.
5    THE VIDEOGRAPHER:  Going off the record at
6  2:09 p.m.
7    (Recess.)
8    THE VIDEOGRAPHER:  Back on the record at
9  2:23 p.m.  Please proceed.
10  BY MR. COHEN:
11    Q.  Ma'am, we took another break.  We're
12  back on the record.
13    I know this kind of comes out of
14  left field probably, but do you know who an
15  attorney named Joe Siprut is?
16    A.  No, sir.
17    Q.  Fair to say then you're not aware of
18  any arrangement or agreement entered in by
19  Anderson + Wanca whereby Mr. Siprut would
20  receive a portion of any attorneys' fee that
21  might be awarded in a successful result in the
22  Cin-Q case?
23    A.  No, sir.
24    Q.  I'm handing you what's been marked as

1  No. 2, and this was production that your
2  attorneys made on your behalf in response to
3  some discovery request we served.  You'll see
4  at the bottom right there's Bates labeling, and
5  there's two different sets of Bates labeling,
6  one that says OPP 001363 and the other one is
7  MC 0000336, do you see that?
8    (WHEREUPON, said
9    document was marked as
10    Deposition Exhibit No. 2
11    for Identification.)
12    A.  Yes, sir.
13    Q.  I'll represent to you that the MC one
14  is your attorney's Bates labeling of this
15  production.  Okay?
16    A.  Okay.
17    Q.  And I'll represent to you this is an
18  e-mail chain between, and among other people,
19  Mr. Wanca of Anderson + Wanca and attorney
20  Joseph Siprut where they're talking about
21  settlement issues related to the Cin-Q case.
22  And if you look at the third page, which is
23  Bates label 338.
24    A.  Yes, sir.

1    Q.  Middle of the page, it's an e-mail
2  from Mr. Siprut dated August 27th, 2015, and
3  the subject is the Buccs mediation on Monday,
4  and Mr. Siprut starts, "It is amazing to me
5  that my co-counsel in this case has not only
6  failed to keep us in the mediation loop, as I
7  requested, despite the process, itself, being
8  initiated by me, but has actively concealed
9  this fact from me.  Never seen anything like it
10  before and unlikely to ever see it again.  This
11  is not only unprofessional and disrespectful,
12  which goes without saying, it is a breach of
13  our JPA," which I'll ask you to assume means
14  joint prosecution agreement.
15    To the extent Mr. Siprut in this
16  email is describing himself as co-counsel in
17  the Buccaneers TCPA litigation, am I correct
18  that up to this moment you've never known who
19  he is or that he had any co-counsel
20  arrangement?
21    MR. SOBLE:  And you have the right and
22  should read the entire email string before you
23  answer his question, as with any document.
24  BY MR. COHEN:

1    Q.  Absolutely.  Just because it is an
2  e-mail, you probably start at the very back,
3  the last page, and you read them forward in the
4  order that they were sent.  And you let me know
5  when you're done.
6          (Brief pause.)
7    **A.  Okay, I've read the --**
8    Q.  My question was:  Am I correct that
9  before today and before me bringing up
10  Mr. Siprut's name and showing you this email,
11  you had no understanding about who Mr. Siprut
12  was, whether he might be co-counsel in this
13  case or be entitled to any share of any
14  attorneys' fees that might be generated in the
15  case, correct?
16    MR. SOBLE:  Objection.  Asked and
17  answered.
18    THE WITNESS:  I have no knowledge of this.
19  BY MR. COHEN:
20    Q.  And, in particular, focusing on the
21  second page of the email, toward the bottom,
22  this is Bates page 337 where Mr. Wanca
23  responded to the email from Mr. Siprut that I
24  had read into the record earlier, and he says,

1  "You," being Mr. Siprut, "do not represent our
2  plaintiffs.  You are not class counsel.  We
3  agreed to handle the case and pay you if we get
4  paid."  You were never aware of any such
5  agreement, correct?
6    MR. SOBLE:  Objection.  Asked and
7  answered.
8    THE WITNESS:  I have no knowledge of this.
9  BY MR. COHEN:
10    Q.  Setting aside the attorneys, whether
11  Anderson + Wanca, Bock Law Firm, Mr. Oppenheim,
12  do you perceive that you have any interests as
13  a potential member of a class that received
14  this Buccaneers fax advertising in 2009/2010,
15  do you perceive that you have any interests as
16  a class member that are materially adverse to
17  any other class member?
18    MR. SOBLE:  Object to the form as vague.
19    THE WITNESS:  Just putting me inside the
20  total class?
21  BY MR. COHEN:
22    Q.  Correct.
23    **A.  Outside the whole other big picture?**
24    Q.  The big picture being the attorneys.

1    **A.  And me, I'd be part of the class as**
2  **receiving a fax, I see that.**
3    Q.  Okay.  And the idea in the class
4  action is to get compensation to benefit the
5  class, correct?
6    **A.  That is my understanding, yes.**
7    Q.  And everybody in the class is supposed
8  to receive fairly and equitably from whatever
9  funds may be generated for the class, whether
10  by settlement or judgment, right?
11    MR. SOBLE:  Objection.  Lack of
12  foundation.
13    THE WITNESS:  I'm not an attorney, so I'm
14  assuming that you have to work to the best of
15  what the law says and for the class.
16  BY MR. COHEN:
17    Q.  And I appreciate you are not an
18  attorney.  And to the extent I say things like
19  an attorney, I've been doing since I was two
20  years old, so it's a dysfunction I have.
21    MR. SOBLE:  You were quite advanced to get
22  your law degree at that age.
23  BY MR. COHEN:
24    Q.  Generally speaking, would you agree it

1  kind of seems fair that everybody in a class is
2  going to kind of get treated the same way in
3  the outcome of a class action?
4    MR. SOBLE:  Objection.  Asked and
5  answered.  Lack of foundation.
6    THE WITNESS:  I would say I would hope so.
7  BY MR. COHEN:
8    Q.  I'm not going to mark this --
9    MR. SOBLE:  If you are going to show it to
10  her, we're going to mark it.
11    MR. COHEN:  Okay.
12          (WHEREUPON, said
13          documents were marked as
14          Deposition Exhibit Nos.
15          3 and 4 for
16          Identification.)
17    MR. SOBLE:  By the way, I also noticed the
18  last item marked Confidential Subject to
19  Protective Order.  So we will designate now all
20  the questions about that in the deposition as
21  confidential.  And any questions regarding any
22  document that's been marked confidential
23  subject to protective order will be
24  confidential.

1 MR. COHEN: Okay.
2 MR. SOBLE: Just put it on the record.
3 BY MR. COHEN:
4 Q. Ma'am, we're passing you what's been
5 marked as Exhibits 3 and 4. And just in full
6 disclosure, 3 is a notice of class action
7 settlement with an attached claim form in the
8 Florida First Financial versus Spivey Mowers
9 case that we discussed earlier in the
10 deposition.
11 And 4 is a claim form that
12 appears to have been sent in by you with your
13 signature making a claim as a class member in
14 that Florida First versus Spivey Mowers case.
15 What I'll ask you first is, do
16 you remember or recall receiving Exhibit 3 and
17 filling out and sending in Exhibit 4 as your
18 claim?
19 **A. Yes, I did this in the Zephyrhills**
20 **office. Like I said, because we bought the**
21 **office, we might not have owned that particular**
22 **fax number at the time, but it -- we assumed**
23 **the office, so this possibly should have been**
24 **under Dr. Arnott and not actually under us,**

1 **even though I filled out the claim form, and I**
2 **think I mentioned it down there.**
3 **So I just want to make clear that**
4 **I might not have been on the fax list, Dr.**
5 **Arnott might have been on the fax list.**
6 Q. And what you just mentioned was one of
7 the things I wanted to ask you about, not
8 exactly the way you brought it up, but still
9 wanted to ask you a question about it.
10 **A. Okay.**
11 Q. First of all, it appears this claim
12 form would have been sent in based on the
13 postage shown at the top right of the second
14 page of Exhibit 4 February 14th of 2012?
15 **A. Yes, sir.**
16 Q. And --
17 MR. SOBLE: No Bates numbers?
18 MR. COHEN: No.
19 MR. SOBLE: Never produced pursuant to any
20 discovery.
21 MR. COHEN: Didn't even know, but no.
22 BY MR. COHEN:
23 Q. I just wanted to ask you about your
24 name Michelle Williams being shown on there.

1 **A. Yes.**
2 Q. I know you had some concern about how
3 would Bock Law Firm have any reason to mail to
4 you as Michelle Williams, but for Mr. Oppenheim
5 having shared something after he came to the
6 firm. I'm not asking you to toss out a belief
7 you have.
8 Would you agree that based on
9 this claim form, Bock Law Firm completely
10 independent of Mr. Oppenheim coming over to the
11 firm in May of -- April of 2016, they did have
12 some documentation providing your name as
13 Michelle Williams?
14 **A. Yes, sir.**
15 MR. SOBLE: Do you have other documents
16 you haven't produced you intend to use in the
17 deposition?
18 MR. COHEN: No.
19 MR. SOBLE: Other documents that aren't on
20 your automatic disclosure you intend to use in
21 the deposition?
22 MR. COHEN: No.
23 MR. SOBLE: Okay.
24 MR. COHEN: Unless I had to produce your

1 verified complaint back to you.
2 MR. SOBLE: You do not.
3 BY MR. COHEN:
4 Q. And the other thing, and it gets kind
5 of at the explanation you volunteered before,
6 on Exhibit 4, it says, "We obtained the number
7 and fax number when we bought the clinic from
8 Dr. Arnott's estate in 2007, he passed away."
9 But in your deposition that you gave in the
10 Cin-Q case, at page 122 -- well, at the bottom
11 of 121, you gave the fax number 813-237-3792.
12 That's the correct fax number?
13 **A. That's to our main office in Tampa.**
14 Q. Which is where you received the
15 Buccaneers fax, correct?
16 **A. Correct, sir.**
17 Q. Then on page 122, the question was
18 asked, "How long has that been your fax
19 number?" You said, "It's been our fax number
20 since -- I believe it has been our fax number
21 since 1994 when we purchased the practice from
22 Dr. Richard Renfro, it was also his fax number.
23 When we bought the practice, everything came
24 with the practice." And the question was,

Thompson Court Reporters, Inc
thompsonreporters.com

1     "Okay. And when was that you purchased the
2     practice? Answer: September, October, October
3     of 1994."
4     **A. Yes, sir.**
5     Q. So I'm just trying to -- if there's an
6     inconsistency, I'm just trying to figure out
7     what it is.
8     It sounds like from your
9     deposition testimony in the Cin-Q case you were
10    saying you would have bought the practice and
11    the fax number that went with it from Dr.
12    Renfro as early as 1994. In the Spivey claim
13    form, it seems like you were saying you bought
14    it from -- when you bought the practice from
15    Dr. Arnott in 2007. And I'm just wondering
16    what I'm missing.
17    MR. SOBLE: Objection. Outside the scope
18    of the notice of topics in the notification for
19    the deposition.
20    THE WITNESS: It's two separate offices.
21    BY MR. COHEN:
22    Q. Two different fax numbers?
23    **A. Correct.**
24    Q. There you go. I wanted you to clarify

1     it. Thank you.
2     **A. Okay.**
3     Q. I'm going to go through some of the
4     paragraphs of your verified complaint with you
5     in a second, and I'll show it to you. I'm not
6     going to hold it away from you or anything.
7     **A. Okay.**
8     Q. One of the things that you allege in
9     there is something called a reverse auction.
10    That Bock Law Firm in negotiating and reaching
11    a settlement with the Buccaneers in the
12    Technology Training case engaged in a reverse
13    auction. And I'm wondering what you think that
14    term means and what your basis is for alleging
15    in a verified complaint that Bock Law Firm did
16    that.
17    MR. SOBLE: Objection. Foundation. And
18    to the extent it calls for a legal conclusion.
19    You can answer.
20    THE WITNESS: Okay. Do you want me to
21    answer it now?
22    BY MR. COHEN:
23    Q. Yes.
24    **A. To my understanding, what a reverse**

1     **auction is, an attorney can go in to another**
2     **attorney's case and undercut the original**
3     **attorney and try to settle the case for a**
4     **lesser amount of work and maybe a lesser amount**
5     **of money and settle the case.**
6     Q. I'll ask you to assume that the
7     concept of a reverse auction presupposes that
8     the firm that comes later and gets the
9     settlement underbid the first firm that was
10    separately negotiating, and the first firm's
11    settlement position was reasonable, and the
12    underbidding second firm reached a settlement
13    that was unreasonable, they essentially sold
14    out the class for too little in order to get
15    attorneys' fees. Will you, for purposes of my
16    question, accept that concept?
17    MR. SOBLE: Object to the form and same
18    other objections.
19    THE WITNESS: I understand that, yes, sir.
20    BY MR. COHEN:
21    Q. And so a lot of what you said when you
22    told me what you understand reverse auction
23    means is kind of a part of what I described,
24    too. I just added a couple of features to it,

1     which is what supposedly makes a reverse
2     auction a bad thing, because it ends up not
3     being enough money for the class, and yet it
4     was done to get attorneys' fees.
5     What is your basis to believe or
6     allege in a verified complaint that the
7     settlement that Bock Law Firm reached with the
8     Buccaneers was a reverse auction in that it was
9     too low, unreasonable, and that your attorneys
10    were negotiating reasonably and could have
11    gotten better?
12    MR. SOBLE: I'll object that I think
13    that's double compound instead of just
14    compound.
15    If you want her to try to answer
16    all four of those things in one, that's fine.
17    And also asked and answered, I
18    think the first and the third.
19    BY MR. COHEN:
20    Q. I will let the question stand and
21    whatever you answer we can explore that, too.
22    **A. Okay. Can we repeat some of that,**
23    **because I think I lost it along the way?**
24    Q. Sure. Do you have any reason or basis

1  to believe the Buccaneers were ever going to
2  settle with your attorneys in the Cin-Q case
3  for more than they settled in the Technology
4  Training case?
5      MR. SOBLE:  Object to form and foundation.
6      THE WITNESS:  I can't say yes or no to
7  that.
8  BY MR. COHEN:
9      Q.  And the only reason I asked it that
10  way, and I appreciate the candor of your
11  answer, is because I think you acknowledged
12  earlier that at the time an impasse was
13  declared, your understanding, based on your
14  communications with counsel and your
15  understanding of what an impasse was, was that
16  settlement was not the focus or the prospect
17  anymore, it was going back to court, and unless
18  the Buccaneers significantly altered their
19  settlement position, the case was going to move
20  forward in court towards a judgment, correct?
21      A.  Correct.
22      Q.  Ma'am, we passed you what we marked as
23  Exhibit 5, and I'll represent to you that this
24  is the engagement letter agreement entered into

1  in May of 2016, even though it says 2015 at the
2  top of page one.
3      If you look at the last page,
4  you'll see all the signatures are May of 2016.
5  That this is the engagement letter agreement
6  between Anderson + Wanca and Mr. Wanca and you
7  and M & C, and the Foley Larder, LLP, law firm
8  where based on the unredacted portions, it
9  appears that Anderson + Wanca and M & C, both
10  as clients, are hiring Foley Lardner to pursue
11  a lawsuit on behalf of M & C relating to the
12  Technology Training litigation.  Would you
13  agree that's what this is?
14          (WHEREUPON, said
15          document was marked as
16          Deposition Exhibit No. 5
17          for Identification.)
18      A.  Yes, sir.
19      Q.  How and why did you decide to pursue
20  this case?
21      MR. SOBLE:  Object to the form.  And
22  object to the extent it calls for any
23  privileged discussions between her and counsel
24  that have not been put at issue.

1      MR. COHEN:  Well, I'll clarify.
2  BY MR. COHEN:
3      Q.  For the moment, I'm not seeking
4  communications that you had with anyone from
5  the Foley firm.  And I'm not seeking for the
6  moment communications that you may have had
7  with anyone from Anderson + Wanca in the
8  presence of attorneys with the Foley firm.  But
9  let me ask a predicate question before I go
10  forward.
11      You understand Foley & Lardner is
12  representing -- they are counsel of record,
13  they are the attorneys representing M & C in
14  this litigation, correct?
15      A.  Yes, sir.
16      Q.  Anderson + Wanca is your counsel of
17  record representing M & C in the Cin-Q action,
18  correct?
19      A.  Yes, sir.
20      Q.  Anderson + Wanca is not your counsel
21  of record and is not representing you in this
22  lawsuit, correct?
23      A.  Correct.
24      Q.  So setting aside any communications

1  you had with Foley attorneys or any
2  communications you had with Anderson + Wanca
3  attorneys in the presence of Foley attorneys,
4  how and why did you decide to pursue this
5  litigation?
6      MR. SOBLE:  So I'll still object.  I think
7  you're trying to carve out conversations she
8  had with Anderson + Wanca about this
9  litigation, but those are also privileged.  M &
10  C is privileged.
11      MR. COHEN:  I don't agree with that.
12      MR. SOBLE:  Understand.  And we can
13  discuss it further, but I don't want to waste
14  your time on the record discussing it further.
15  I'm happy to discuss it at a break.  But I
16  think they are privileged, and I'm going to
17  advise the witness not to answer questions that
18  invade that privilege.
19  BY MR. COHEN:
20      Q.  Ma'am, would you be able to answer my
21  question fully without divulging communications
22  that you had with the Anderson + Wanca Law Firm
23  outside the presence of Foley attorneys?
24      A.  No.

1  Q. If it were not for Mr. Soble
2  instructing you not to answer, would you be
3  able to answer my question?
4  **A. Not all of it.**
5  MR. SOBLE: I'm sorry, did she say not all
6  of it?
7  THE WITNESS: Not all of it.
8  MR. COHEN: And so, for the record, without
9  waiving our position that the instruction --
10 the privilege doesn't apply to the carve-out
11 and the instruction not to answer is improper,
12 depending on what time it is, we may see if the
13 court is available to address this while we're
14 all here, especially given the witness
15 traveling.
16 BY MR. COHEN:
17 Q. Without divulging any communications
18 you had with Foley or Anderson + Wanca -- my
19 last question was, if you weren't limited and
20 you could tell me about communications you had
21 with Anderson + Wanca outside Foley attorneys,
22 would you be able to fully answer my question,
23 and my question had been how and why did M & C
24 decide to pursue this litigation; your answer

1  was, Not all of it.
2  What part of how and why you
3  decided to pursue this litigation would you
4  still not be able to answer even if you were
5  able to tell me about communications you had
6  with Anderson + Wanca outside the presence of
7  Foley attorneys?
8  What part of it -- what about the
9  how and why would you still not be able to
10 explain?
11 MR. SOBLE: Are you asking him what she
12 can explain or can't explain?
13 MR. COHEN: Can't. When she says not all
14 of it.
15 MR. SOBLE: Discussions between her and
16 people at Anderson + Wanca?
17 MR. COHEN: No, no. I said but if you
18 could tell me about discussions with people at
19 Anderson + Wanca outside the presence of Foley
20 attorneys, would you then be able to answer my
21 question fully and completely, and she still
22 said not all of it. So which I take that to
23 mean, even if she was going to tell me about
24 communications with Anderson + Wanca outside

1  the presence of Foley attorneys, she still
2  wouldn't be able to fully explain how and why
3  she decided to pursue this litigation. And I'm
4  just wondering what part of the how and why
5  wouldn't she be able to explain with that
6  universe of information available to her.
7  It doesn't call for her to reveal
8  the privileged communication.
9  MR. SOBLE: Agreed. But I understood it
10 differently. We should do this and let her
11 answer. I understood that she can't disclose
12 all of it, because some of it would be
13 privileged and some of it would not be. So you
14 can ask about the not privileged part, and she
15 can disclose that.
16 The way you asked the question I
17 think ended up misleading you in her answer,
18 and now you're going down the road that doesn't
19 make any sense.
20 BY MR. COHEN:
21 Q. Let me try and say it again.
22 Just so you know, the reason we
23 do this is because one of the things when an
24 attorney says that's privileged, don't answer,

1  we look at the person and say -- we look at the
2  witness and say, if you weren't instructed not
3  to answer, could you fully answer my question,
4  they usually say yes.
5  That's what I meant to be asking
6  you. I may not have done it well. And you
7  said not all of it, as if I still might not be
8  able to fully answer your question. So I want
9  to be real clear.
10 I'm not asking you for
11 communications you had with Foley attorneys.
12 I'm not asking you for communications you had
13 with Anderson + Wanca attorneys in the presence
14 of Foley attorneys. But if Mr. Soble were
15 willing to let you answer my question about how
16 and why you decided to pursue this litigation,
17 and he was willing to let you disclose
18 communications you had with Anderson + Wanca
19 outside the presence of Foley attorneys, would
20 you be able to fully answer my question as to
21 how and why you decided to pursue this
22 litigation?
23 **A. Yes.**
24 Q. Okay. You under the terms of the

1 Foley engagement agreement are not responsible
2 for any of the attorney fees or costs incurred
3 in prosecuting the M & C litigation against
4 Mr. Oppenheim and Bock Law Firm, correct?
5 **A. Yes, sir.**
6 Q. Why is that?
7 MR. SOBLE: Objection to the extent that
8 also invades the attorney-client privilege, and
9 I will advise the client not to answer.
10 MR. COHEN: Mr. Soble, when you say
11 advise, are you instructing the witness not to
12 answer?
13 MR. SOBLE: Technically the privilege
14 belongs to the client. I don't believe that
15 instructing is actually my role in that case.
16 If the witness decides not to take my advice,
17 then the witness cannot take my advice. She
18 would be the first.
19 MR. COHEN: You shouldn't take his advice.
20 I'm kidding.
21 MR. SOBLE: She would be the first. But
22 instructing a witness not to answer a question
23 I don't believe is proper. No, I think mostly
24 just a semantics discussion.

1 BY MR. COHEN:
2 Q. Mr. Wanca has agreed to fund all of
3 the legal fees and expenses in this case,
4 correct?
5 MR. SOBLE: You can answer.
6 THE WITNESS: Yes, sir.
7 BY MR. COHEN:
8 Q. Is this a no-strings-attached
9 agreement? In other words, there's no quid pro
10 quo? There's no this for that? You're not
11 obligated to do anything, give anything, secure
12 or promise anything in return for his agreement
13 to cover all of these fees and costs?
14 **A. Correct.**
15 Q. Are you aware of how much Foley
16 has invoiced for their services and expenses to
17 date and how much Mr. Wanca has paid Foley for
18 their services and expenses to date?
19 **A. No, sir.**
20 Q. Did you declare the payment of Foley's
21 attorneys' fees and expenses by Mr. Wanca or
22 his firm in 2016 to the IRS as income?
23 MR. SOBLE: Object to the form of the
24 question.

1 THE WITNESS: No, it's not considered
2 income.
3 BY MR. COHEN:
4 Q. Says who?
5 **A. I'm an accountant.**
6 MR. SOBLE: Same objection.
7 THE WITNESS: I don't believe it's
8 considered as income.
9 BY MR. COHEN:
10 Q. Why?
11 **A. I wasn't 1099'd either, so...**
12 Q. Is that the only reason you don't
13 think it's income because you weren't 1099?
14 **A. And I've never seen this ever be**
15 **considered as income.**
16 Q. Have you ever seen a situation before
17 this case in which a third-party agreed to
18 finance litigation on behalf of a plaintiff
19 without any obligation of repayment of the fees
20 and expenses?
21 MR. SOBLE: Same objection. Also outside
22 the scope of the topics noticed.
23 THE WITNESS: I have no knowledge of that,
24 so I don't know.

1 BY MR. COHEN:
2 Q. Do you have a tax professional with
3 whom you consult on your business tax matters?
4 MR. SOBLE: Objection. We're not going to
5 go too much further down this line. It's got
6 nothing to do with the any of the noticed
7 topics or the case for that matter.
8 MR. COHEN: We can reserve it for the
9 individual deposition. I don't see quite the
10 purpose of that, but...
11 MR. SOBLE: It wouldn't be germane to
12 anything in the case there either.
13 MR. COHEN: Oh, we have a champerty
14 affirmative defense, and I think it is.
15 THE WITNESS: No, I haven't discussed
16 anything with anyone, no.
17 BY MR. COHEN:
18 Q. But do you have a tax professional
19 with whom you consult regarding your
20 business-related matters?
21 **A. Not -- no, I don't.**
22 Q. I'll ask you to assume that Foley has
23 invoiced hundreds and hundreds and hundreds of
24 thousands of dollars in legal fees, and Brian

35 (Pages 134 to 137)

1　Wanca has paid those legal fees in the
2　prosecution of this case on your behalf.
3　　　　Why are you -- I mean you've got
4　a fax you received that under federal law could
5　be worth $500 maximum statutory damages, unless
6　trebled to $1500, and you got the potential, if
7　it's a successful class action result, to get
8　an incentive award if the judge decided to give
9　it in the amount of, who knows, 10,000, 15,000,
10　$25,000. Why would you allow Brian Wanca and
11　his firm to advance hundreds of thousands of
12　dollars of attorneys' fees and expenses for
13　your benefit to prevail on a claim that might
14　inure to your benefit if it was successful of
15　helping you get your statutory damages under
16　the TCPA and maybe a 15 to $25,000 incentive
17　award?
18　　　　Why would you allow a
19　third-party, in this instance Mr. Wanca, to
20　advance hundreds of thousands of dollars in
21　order to possibly secure tens of thousands of
22　dollars of benefit to M & C?
23　　　　MR. SOBLE: Objection. Asked and
24　answered. Object to the form of the question.

1　　　　THE WITNESS: What?
2　　　　MR. SOBLE: I said objection, asked and
3　answered, and object to the form of the
4　question, but you can answer it, presuming you
5　followed all of it.
6　　　　THE WITNESS: Okay. Why am I allowing
7　Mr. Wanca to pay the bills for this litigation?
8　BY MR. COHEN:
9　　　Q. Bills that exponentially exceed any
10　possible financial benefit that might redound
11　to you if you are successful in this case?
12　　　　MR. SOBLE: The question was not why are
13　you allowing Mr. Wanca to pay. The question is
14　why are you pursuing it. That's how I
15　understood the question.
16　　　　Maybe I misunderstood it in all
17　of it. She answered your question with
18　something different.
19　　　　MR. COHEN: Okay. I'm not sure how I
20　phrased it the first time, but I'm going to ask
21　you a predicate question that will get us
22　around Mr. Soble's distinction.
23　BY MR. COHEN:
24　　　Q. Would you be willing to spend hundreds

1　and hundreds of thousands of dollars of your
2　own money to pursue this case against Bock Law
3　Firm and David Oppenheim to secure the benefit
4　of controlling the destiny of your own
5　individual claim for 500 to $1500 for a fax you
6　received, plus the possibility of incentive
7　award of who knows, 15 to $25,000?
8　　　　Would you, yourself, with your
9　own money be willing to spend your own hundreds
10　of thousands of dollars in furtherance of that
11　claim?
12　　　MR. SOBLE: Object to the form.
13　　　THE WITNESS: If I felt I had been wronged,
14　and there were issues that were extenuating
15　that I felt were wrong, possibly, yes.
16　BY MR. COHEN:
17　　　Q. But we're not talking about a
18　hypothetical, we're talking about this case and
19　the facts.
20　　　　Would you be willing to spend
21　your own hundreds of thousands of dollars on
22　this case to obtain statutory damages of 500 to
23　$1500 for an illegal fax and maybe 15 to
24　$25,000 as an incentive award?

1　　　MR. SOBLE: Same objection. She just
2　answered that same question.
3　　　THE WITNESS: I would have to say in the
4　ethical realm of everything, yes.
5　BY MR. COHEN:
6　　　Q. Then why aren't you paying your own
7　fees and expenses?
8　　　A. There's --
9　　　MR. SOBLE: Object to the form. Object to
10　the extent it invades the attorney-client
11　privilege.
12　BY MR. COHEN:
13　　　Q. Well, I'll rephrase it.
14　　　　Obviously, Mr. Wanca in some way,
15　shape or form offered and agreed to pay them
16　for you, but if you feel in a, quote unquote,
17　"ethical realm" that you'd be willing, and it
18　would be reasonable for you to spend your own
19　hundreds of thousands of dollars to get 25 to
20　30,000 maximum back for the investment of
21　hundreds of thousands, why don't you spend your
22　own money instead of having somebody else
23　finance the case?
24　　　MR. SOBLE: Same objections.

1    THE WITNESS:  There's a lot of extenuating
2  circumstances in this case, and I believe
3  Mr. Wanca's been wronged more than anybody.
4  And there's other things I just can't answer to
5  that question.  I believe it's between me and
6  Anderson + Wanca.  Or Medical & Chiropractic
7  Clinic and Anderson + Wanca.
8  BY MR. COHEN:
9    Q.  Do you believe that M & C's pursuit of
10  this case is serving a benefit to Anderson +
11  Wanca of increasing the viability of the Cin-Q
12  case by possibly stopping or terminating the
13  Technology Training case?
14    MR. SOBLE:  Objection.  Foundation.
15    THE WITNESS:  I believe the Buccs case is
16  Mr. Wanca's case to begin with.
17    I don't think Cin -- your
18  Technology Training case has any merit at all,
19  that's my opinion.
20    And I believe Mr. Wanca has done
21  the work, his firm has done the work.  I
22  believe the case should belong to him.
23  BY MR. COHEN:
24    Q.  And is that a significant part of

1  reason you're pursuing this case?
2    **A.  Yes, sir.**
3    Q.  And I asked you in the preliminary
4  injunction hearing, I think it was like very
5  much toward the end of my questioning, even if
6  it wasn't -- even if David Oppenheim had no
7  involvement here, and by no involvement, he
8  never came over to the Bock Law Firm, so there
9  couldn't even be a suggestion that he
10  facilitated or enabled the Technology Training
11  case, it was just Bock Law Firm individually
12  bringing this Technology Training action,
13  reaching a settlement, and even if you thought
14  the terms of the settlement were reasonable
15  compensation and benefit for the class, if you
16  would still be opposing that settlement under
17  the circumstances -- the extenuating
18  circumstances of it being Mr. Wanca's case, my
19  recollection is you said yes?
20    **A.  Yes.  My thought is, why did Mr. Bock**
21  **do it now?  Why didn't he do it nine years ago?**
22  **So, therefore, I have a problem with the way**
23  **things transpired.  And for -- sorry, but for**
24  **any other -- why didn't some other attorney**

1  **firm do what Mr. Bock did seven years ago?**
2  **That's my problem.**
3    Q.  My question is this -- and it's a
4  follow-up to the question I just asked you
5  about your previous testimony in the
6  preliminary injunction hearing, and whether you
7  still stand by that and you said yes.  If as a
8  class representative your overarching and
9  primary duty is to the class, not to the class
10  attorneys but to the class, why would you still
11  say that even if this settlement in the
12  Technology Training case was reasonable and
13  beneficial to the class, that you would oppose
14  it and seek to stop it to protect Mr. Wanca?
15    How is that -- who you is putting
16  Mr. Wanca's interests ahead of the class'
17  interest on a settlement, even if it was
18  reasonable for the class, how is that
19  fulfilling your primary duty to the class?
20    MR. SOBLE:  Objection.  Asked and
21  answered.  Misstates her testimony.
22    THE WITNESS:  There's a lot of -- Mr. Wanca
23  built the case.  He financed the case, let's
24  say.  He has hundreds of thousands of dollars

1  invested in this case.  I understand being a
2  business owner that you have to put money out,
3  you're always paying the bills.  He deserves to
4  be at least paid for what he's got invested in
5  this case, just like me sending out our
6  insurance claims and making sure we get paid so
7  I can pay the bills and keep the office
8  running.  I believe that he should be at least
9  taken care of in that situation.
10  BY MR. COHEN:
11    Q.  Are you aware that Bock Law Firm and
12  the Technology Training plaintiffs have
13  expressly stated on the record to the court in
14  the Technology Training case, not only that
15  there's no objection to you seeking and being
16  awarded an incentive award if the Technology
17  Training settlement is approved, but also we've
18  acknowledged that Mr. Wanca has the right to
19  seek attorneys' fees for what he believes he
20  did to benefit the class leading to the
21  Technology Training settlement, whether that's
22  him seeking reimbursement of expenses or
23  seeking some portion of the attorney fees?
24    Are you aware that Bock Law Firm

1   and Technology Training plaintiffs have
2   expressly made that representation to the court
3   in the Technology Training case?
4      MR. SOBLE:  Object to the form of the
5   question.
6      THE WITNESS: I heard that in court, yes.
7   BY MR. COHEN:
8      Q.  So if Mr. Wanca is not precluded from
9   fighting for a right if he believes he has one
10  to fees and reimbursement of expenses out of a
11  settlement in the Technology Training case,
12  why, even if the settlement is reasonable for
13  the class, would you put the class at risk and
14  oppose the settlement?
15     MR. SOBLE:  Objection. Misstates her
16  testimony and asked and answered.
17     THE WITNESS: I don't think that the
18  settlement that's been proposed is fair enough
19  for the class.  I just don't think it is.
20  That's my opinion.
21  BY MR. COHEN:
22     Q.  Just to make sure I'm correct, I did
23  ask you sometime ago --
24     **A.  Yes, you asked me if it's reasonable,**

1   **but I don't think it's fair.**
2      Q.  Is there a reason it's not fair in
3   your estimation beyond the things we talked
4   about before?
5      **A.  Based on my opinions and what I've**
6   **been told on the behavior of the Buccaneers,**
7   **they did a lot of incorrect things, and I**
8   **believe that the class should be compensated**
9   **for better based on the misbehavings of the**
10  **Buccaneers.**
11     Q.  Is it fair to say, though, that your
12  assessment in that regard, both about the idea
13  the Buccaneers should pay more and that the
14  class is entitled to more than the Technology
15  Training settlement would get them, is based in
16  significant part on your understanding based on
17  interaction with Mr. Wanca's people that the
18  class has a great case if they go to trial and
19  judgment, and there's really very little or no
20  risk of them losing?
21     MR. SOBLE:  Objection. Asked and
22  answered.
23     THE WITNESS: Yes.
24  BY MR. COHEN:

1      Q.  Do you know what a statute of
2   limitations is?
3      **A.  Yes, sir.**
4      Q.  Are you aware that under federal law,
5   the statute of limitations for a TCPA claim is
6   four years?
7      **A.  Yes, sir.**
8      Q.  Are you aware that at the time
9   Mr. Wanca added you to the pending -- already
10  pending Cin-Q case against the Buccaneers, the
11  four-year statute of limitation on your claim
12  had expired?
13     **A.  No, I was not aware of any of that,**
14  **because I believe I was added on by Mike**
15  **Addison's already existing case, which I**
16  **believe I was in part of that already.**
17     Q.  And I'll represent to you, and I'll
18  ask you to assume that under the law in the
19  11th Circuit, which is where the Cin-Q case is
20  pending, if someone like Cin-Q files a what we
21  call a putative class action, meaning a
22  potential class action, against the Buccaneers,
23  and they file within the four years, they've
24  preserved the timeliness for statute of

1   limitations purposes of all of the class
2   members, and if any of those class members are
3   allowed to join in the Cin-Q case, even after
4   the four years has run on their case, their
5   claim is still okay, but they can't go file
6   their own separate action.  So, in other words,
7   you were added to the Cin-Q case after the four
8   years would have otherwise run on your statute
9   of limitations, and the only reason your claim
10  was timely was because you were joined in the
11  Cin-Q case.  You couldn't have filed your own
12  separate case, because the four years had run.
13  Were you aware of that?
14     MR. SOBLE:  Object to the form and
15  foundation.
16     THE WITNESS: I was aware that I was added
17  to the case, but I was not made aware it had to
18  do with statute of limitations.  I was made
19  aware of the fact it had to do with a change in
20  the law between -- in the state court, and
21  that's what I was made aware of.
22     MR. COHEN:  Why don't we go ahead and
23  change tape.
24     THE VIDEOGRAPHER: This marks the

**38 (Pages 146 to 149)**

1 conclusion of disk number two. Going off the
2 record at 3:21 p.m.
3        (Recess.)
4    THE VIDEOGRAPHER: Going back on the
5 record. This marks the beginning of disk
6 number three. The time is now 3:34 p.m.
7 Please proceed.
8 BY MR. COHEN:
9    Q. Ma'am, I previously asked you -- but I
10 want to make sure I ask you at this time and
11 then some follow-up questions as well. How and
12 why did you decide to pursue this litigation?
13 And I'm not asking for any communications you
14 may have had with or in the presence of Foley
15 attorneys, but if you had communications with
16 or in the presence of Anderson + Wanca
17 attorneys outside the presence of Foley
18 attorneys, I am asking you to reveal that.
19    MR. SOBLE: We object on the basis that
20 her discussions with Anderson + Wanca about
21 what to do in light of the TTA class action
22 being filed are attorney-client privileged and
23 advise the witness not to answer the questions.
24 BY MR. COHEN:

1    Q. Ma'am, following up, what
2 communications, if any, did you have with
3 Anderson + Wanca that in any way, shape or
4 form, contributed to or prompted your decision
5 to pursue this litigation?
6    MR. SOBLE: Same objection.
7 BY MR. COHEN:
8    Q. Did Anderson + Wanca ever
9 communication to you why they were willing to
10 accept complete non-reimbursable responsibility
11 to pay all fees and expenses associated with
12 the prosecution of this litigation?
13    MR. SOBLE: Same objection.
14    MR. BLONIEN: I assume, but I think it
15 would be helpful for the record to state that
16 the witness has chosen to follow the advice of
17 counsel and is refusing to answer these
18 questions.
19    MR. SOBLE: I'm fine doing that for all of
20 them at the end.
21    MR. BLONIEN: Thank you.
22 BY MR. COHEN:
23    Q. I understand that the contract with
24 Foley provides that Anderson + Wanca and only

1 Anderson + Wanca will be responsible for the
2 payment of the firm's invoices and expenses
3 incurred.
4        Have you received any agreement,
5 promise, assurance or other communication or
6 representation in any way, shape or form from
7 Anderson + Wanca that if there is any adverse
8 fall-out, adverse consequences to M & C from
9 having brought this case, such as a malicious
10 prosecution claim by the defendants in this
11 case against M & C, or an abuse of process
12 claim by the defendants in this case against M
13 & C for having brought this claim, have you
14 received any assurance, representation or
15 agreement that Anderson + Wanca or any attorney
16 in Anderson + Wanca will indemnify or protect
17 you from any such costs?
18    MR. SOBLE: You mean beyond what's in the
19 retainer?
20    MR. COHEN: Does the retainer agreement
21 say --
22    MR. SOBLE: It says in no event shall the
23 claimant be responsible for any fees or
24 expenses billed on the matter. I think you are

1 saying beyond what's in the retainer agreement,
2 but I want the record to be clear.
3 BY MR. COHEN:
4    Q. Sure. Billed in the matter would be
5 billed in the M & C prosecution of a claim
6 against Bock Law Firm and Oppenheim. I'm
7 suggesting if the case against Bock Law Firm
8 and Oppenheim fails, and Bock Law Firm and
9 Oppenheim turn around and sue Medical &
10 Chiropractic for malicious prosecution and
11 abuse of process, and M & C has attorneys' fees
12 and expenses defending those subsequent claims
13 or is held liable on those subsequent claims
14 and is expected or obligated to pay damages to
15 Bock Law Firm or Mr. Oppenheim, have you
16 received any communication, promise,
17 representation, agreement or anything similar
18 thereto from Anderson + Wanca or anyone in
19 Anderson + Wanca that they will protect you,
20 hold you harmless and indemnify you for any
21 such out-of-pocket obligations?
22    MR. SOBLE: Same objection.
23    MR. BLONIEN: And you are advising the
24 witness not to answer on privilege?

39 (Pages 150 to 153)

1  MR. SOBLE: That's been the same objection
2  each time.
3  BY MR. COHEN:
4  Q.  Ma'am, you're going to follow your
5  counsel's instruction not to answer those
6  questions?
7  **A.  Yes, sir.**
8  Q.  Or advice?
9  **A.  Yes, sir.**
10  MR. SOBLE: Can I ask something if we're
11  done with this?
12  MR. COHEN: We are done. I will let you
13  know I shot a single-sentence email to Ms.
14  Butler, Judge McCoun's clerk. I said the
15  parties may be calling in to ask for a ruling
16  on a narrow privilege issue. If we called in
17  the next five minutes, would he be available,
18  she said yes.
19  MR. SOBLE: You contacted but didn't copy
20  me?
21  MR. COHEN: I don't believe contacting the
22  judge's clerk is an ex-parte communication, but
23  I will still send you that email.
24  MR. BLONIEN: Go off the record.

1  MR. SOBLE: Yes.
2  THE VIDEOGRAPHER: Off the record at 3:39
3  p.m.
4  (Recess.)
5  THE VIDEOGRAPHER: Going back on the record
6  at 4:00 p.m. Please proceed.
7  BY MR. COHEN:
8  Q.  Ms. Zakrzewski, we took a short break.
9  I'm going to pass you what's been marked as
10  Exhibit 6, and I'll represent to you this is a
11  copy of your verified complaint. We may end up
12  deciding we don't need to include all these
13  exhibits at the back and make this not so much
14  paper. Am I correct that Exhibit 6 is a
15  complaint that was filed on your behalf in this
16  action and verified by you before a notary as
17  being true?
18  (WHEREUPON, said
19  document was marked as
20  Deposition Exhibit No. 6
21  for Identification.)
22  **A.  Yes.**
23  Q.  On page three of the verified
24  complaint, you indicate at paragraph 19 that

1  Mr. Oppenheim represented Medical &
2  Chiropractic as its attorney in the federal
3  action, and I'll tell you that earlier it's
4  clarified the federal action is the Cin-Q
5  action. Is that what it says there?
6  **A.  Yes.**
7  Q.  Did Mr. Oppenheim ever enter an
8  appearance as counsel of record on behalf of
9  Medical & Chiropractic in the Cin-Q action?
10  MR. SOBLE: Object to the form as vague.
11  THE WITNESS: Can you repeat the question,
12  please?
13  BY MR. COHEN:
14  Q.  Did Mr. Oppenheim ever formally file
15  an entry of appearance as counsel of record on
16  behalf of Medical & Chiropractic in the Cin-Q
17  action?
18  MR. SOBLE: Same objection.
19  THE WITNESS: I have no knowledge. I don't
20  know. I believe he's an attorney of Anderson +
21  Wanca at the time period. Wouldn't he be
22  considered one of my attorneys?
23  MR. SOBLE: Just answer his questions.
24  THE WITNESS: Okay.

1  BY MR. COHEN:
2  Q.  Am I correct you don't know one way or
3  another whether he filed a formal entry of
4  appearance or obtained what we call admission
5  pro hac vice as out-of-state attorney who's not
6  licensed by the Florida bar, you don't know one
7  way or another, correct?
8  **A.  No, sir.**
9  Q.  At paragraphs 29 -- I'm sorry. At
10  paragraphs 27 and 30 of your verified
11  complaint, you indicate or you reference
12  communicating to Mr. Oppenheim what's described
13  as Medical & Chiropractic's legal position. Do
14  you see that?
15  **A.  27.**
16  Q.  And 30.
17  MR. SOBLE: Take your time to read it.
18  THE WITNESS: And what was the question
19  again now that I read it?
20  BY MR. COHEN:
21  Q.  In both of those paragraphs, you
22  reference what you describe as Medical &
23  Chiropractic's legal position, correct?
24  **A.  Yes.**

1    Q.  And that same term or phrase is
2  referenced or used in paragraph 35, correct,
3  Medical & Chiropractic's legal position?
4    A.  Yes.
5    Q.  What was Medical & Chiropractic's,
6  quote unquote, "legal position" that you're
7  referencing in those paragraphs?
8    A.  **We were -- Medical & Chiropractic**
9  **Clinic as part of a class action was trying to**
10 **settle a class action situation with the**
11 **Buccaneers.  And whatever was laid out in the**
12 **mediation documents we were trying to settle.**
13   Q.  I want to make sure I understand what
14 that means.  You've told us earlier that before
15 the mediations, Anderson + Wanca and
16 Mr. Oppenheim had prepared pre-mediation
17 documents that set forth Anderson + Wanca's
18 settlement position and their goals and their
19 assessment of the case, and they already
20 submitted that to the mediator, correct?
21   A.  I believe so, yes.
22   Q.  And that was done without your
23 contribution, it was something you were made
24 aware of when the mediations came around,

1  correct?
2    A.  Yes.
3    Q.  Did -- when these paragraphs reference
4  medical and legal -- Medical & Chiropractic's
5  legal position, are you just suggesting that
6  what Anderson + Wanca had previously put in
7  documents and submitted was fine with Medical &
8  Chiropractic, or are you suggesting that
9  Medical & Chiropractic had its own separate and
10 independent legal position that you
11 communicated to Mr. Oppenheim?
12   A.  **No, what was put in the documents by**
13 **Anderson + Wanca.**
14   Q.  Paragraph number 81 at page 12.  This
15 paragraph reads, "Bock, Hatch's and the
16 Buccaneers' actions are consistent with
17 pursuing a reverse auction of the federal
18 action.  In a reverse auction or class action
19 defendant attempts to negotiate a weak
20 settlement with one of the class lawyers in an
21 attempt to get the settlement approved, and
22 thereby preclude other class claims against the
23 defendant."  Did I read that correctly?
24   A.  Yes, sir.

1    Q.  Do you recall earlier in the
2  deposition you and I had a series of questions
3  and answers about what you understand a reverse
4  auction to be and why you believe or alleged
5  that a reverse auction either had taken place
6  here or may have taken place here, do you
7  recall we had that dialogue?
8    A.  Yes, sir.
9    Q.  Do you have anything else to add as a
10 factual basis for the allegation in paragraph
11 81 about a reverse auction that you didn't
12 previously share with me?
13   MR. SOBLE:  Asked and answered as stated
14 in the question itself.
15   THE WITNESS:  No.
16 BY MR. COHEN:
17   Q.  You've read this complaint, I assume,
18 on multiple occasions, correct?
19   A.  Yes.
20   Q.  It's got a lot of pages to it.  It's
21 got a lot of paragraphs.  That's the way legal
22 documents end up having to be sometimes.
23   A.  Yes.
24   Q.  Do you understand that generally

1  speaking what is alleged as a legal proposition
2  here is that Mr. Oppenheim while at Anderson +
3  Wanca participating in whatever his role was in
4  the Cin-Q case had some duty of loyalty to
5  Medical & Chiropractic separate and apart from
6  a general duty to the class that Medical &
7  Chiropractic was seeking to represent, such
8  that it would create a conflict of interest and
9  be a breach of fiduciary duty for Mr. Oppenheim
10 to go to another law firm where that law firm
11 would then pursue a competing class action
12 using a different named plaintiff as to the
13 same class and the same claim, and the claim
14 was Mr. Oppenheim thereby engaged in a breach
15 of fiduciary duty, and Bock Law Firm aided and
16 abetted a breach of fiduciary duty?  Do you
17 understand, generally speaking, cutting through
18 the many paragraphs, that's what you were
19 claiming?
20   MR. SOBLE:  Object to the form of the
21 question.
22   THE WITNESS:  Yes, sir.
23 BY MR. COHEN:
24   Q.  Are you aware of and have you reviewed

1 Judge Honeywell's order denying your request
2 for a preliminary injunction against
3 Mr. Oppenheim and Bock Law Firm?
4 **A. Yes, sir.**
5 Q. Do you understand that the court held
6 that an attorney who is involved in a class
7 action on behalf of plaintiffs or plaintiff
8 class, the duty is to the class as a whole, not
9 to any individual class member, including the
10 named plaintiff? Do you understand that's what
11 she held?
12 MR. SOBLE: Object to the form of the
13 question. Also outside the scope of the
14 corporate rep notice.
15 THE WITNESS: I have a different
16 understanding.
17 BY MR. COHEN:
18 Q. What's your understanding?
19 **A. I -- to my understanding, that that**
20 **wasn't the right avenue; that it should have**
21 **been done in the Appellate Court; that she -- I**
22 **don't think it was -- this is my opinion. I'm**
23 **not an attorney. I don't think it was the**
24 **right court to do that -- to do that in. I**

1 **could be wrong.**
2 Q. I guess what I would ask you, assuming
3 that an attorney involved on behalf of a
4 putative plaintiff class has a duty owed to the
5 class as a whole and not to any one class
6 member over another and not to the named
7 plaintiffs over any other class members or any
8 other named plaintiffs in another case, and
9 that there's not a conflict of interest when an
10 attorney such as Mr. Oppenheim switches to
11 another law firm and that law firm pursues the
12 competing case. Assuming that was the legal
13 conclusion, and understand you don't
14 necessarily agree with that, just assuming
15 that, what I'm really wanting to know, is there
16 anything else that you're alleging that
17 Mr. Oppenheim did wrong or that Bock Law Firm
18 did wrong other than Bock Law Firm after
19 Mr. Oppenheim came over pursuing a competing
20 case?
21 MR. SOBLE: Object to the form of the
22 question as vague and confusing.
23 THE WITNESS: I believe I stated I don't
24 think he did the correct things. I don't

1 believe -- I believe we were wrong -- I was
2 wronged as a class representative in the
3 actions that happened. It was very upsetting
4 to me. I don't know that any of this was done
5 correctly.
6 BY MR. COHEN:
7 Q. I appreciate that. We're all entitled
8 to have our assessment of what's fair or right
9 or should or shouldn't be permissible.
10 What I am -- and I'm not trying
11 to get you to admit that your position is
12 wrong. What I'm trying to make sure I
13 understand is, aside from a certain set of
14 allegations, are you claiming there was
15 anything else? So we know, David Oppenheim
16 worked on the Cin-Q case while at Anderson +
17 Wanca where you were one of the named
18 plaintiffs; he then moved over to the Bock Law
19 Firm, and the Bock Law Firm then obtained a
20 different named plaintiff, initiated a
21 competing Buccaneers TCPA class action,
22 ultimately reached a settlement agreement, and
23 I understand those facts in and of themselves,
24 just those facts, you think is unfair, it's not

1 right, it's unjust, it's upsetting, I
2 understand that's a lot of why you filed this
3 suit. What I want to understand is, whether
4 you are right or wrong about that. Is there
5 anything else that you're claiming or alleging
6 that David Oppenheim or Bock Law Firm did
7 wrong?
8 MR. SOBLE: Object to the form of the
9 question and asked and answered.
10 THE WITNESS: No, not at this time. Can we
11 take a break?
12 MR. COHEN: Yes.
13 THE VIDEOGRAPHER: Going off the record at
14 4:19 p.m.
15 (Recess.)
16 THE VIDEOGRAPHER: Going back on the record
17 at 4:32 p.m. Please proceed.
18 BY MR. COHEN:
19 Q. We are back from another short break.
20 We were looking at your verified complaint, and
21 I wanted to ask you some questions about your
22 claimed damages or potential damages from the
23 conduct that you challenge. One of the things
24 you raise is the potential costs or exposure in

42 (Pages 162 to 165)

1    the Cin-Q case, correct?
2    **A.   I didn't raise it, Mr. Postman raised**
3    **it.**
4       Q.   You have since then had an opportunity
5    to review your retainer agreement with Anderson
6    + Wanca in which they clearly represent that
7    they are going to hold you harmless and cover
8    any and all costs, expenses, litigation fees in
9    any way arising out of the prosecution of the
10   Cin-Q case, correct?
11      **A.   Yes, sir.**
12      Q.   So I'm not -- we talked about it.   We
13   laughed about this earlier.   Mr. Postman
14   clearly tried to give you that impression.   But
15   having the benefit of the reflection of seeing
16   your retainer agreement with Mr. Wanca, you
17   understand that's not actually an exposure or
18   damage you would face if in the event the
19   Technology Training settlement went forward and
20   the Cin-Q case were ended, correct?
21      MR. SOBLE:   Object to the form.   Lack of
22   foundation.
23      THE WITNESS:  Yes, I understand that.
24   BY MR. COHEN:

1       Q.   And at paragraph 95, which is on page
2    14 of your verified complaint, talking about
3    other harm that Medical & Chiropractic might
4    suffer, in the second sentence in the third
5    line, it says, "If the Technology Training
6    action proceeds, Medical & Chiropractic could
7    lose the ability to act as class representative
8    and could lose the financial and other
9    incentives in acting as the lead class
10   representative."   Do you see where I read that
11   from?
12      **A.   Yes, sir.**
13      Q.   Am I correct, and you would have seen
14   this in reviewing your testimony at the
15   preliminary injunction hearing, you understand
16   that you haven't lost the right or the ability
17   to petition Judge Porcelli even if in the
18   Technology Training case for a full incentive
19   award for whatever the court may think you are
20   entitled to for the benefit you've conferred
21   upon the class through your efforts in the
22   Cin-Q case even if the Technology Training case
23   proceeds to settlement, correct?
24      **A.   Yes.**

1       Q.   Then we've added to that the fact that
2    you are aware that Bock Law Firm and the
3    Technology Training plaintiffs have expressly
4    advised the court that you are fully entitled
5    to and that we would not oppose any requests
6    for an incentive award you might make out of
7    the settlement proceeds if the Technology
8    Training settlement proceeds, you've indicated
9    you're aware of that, too, correct?
10      **A.   Yes.**
11      Q.   Would you agree that under all those
12   circumstances, loss of the opportunity to
13   obtain an incentive award is not a damage that
14   you -- that's reasonably going to be caused by
15   the Technology Training case proceeding one way
16   or the other?
17      MR. SOBLE:   Object to the form of the
18   question.   Calls for speculation and a legal
19   conclusion.
20      THE WITNESS:  In my thought, anything could
21   happen, and the judge can decide whatever they
22   want, so there's no yes-or-no answer to that,
23   it's all going to depend on the court and the
24   judge.

1    BY MR. COHEN:
2       Q.   I don't think anybody would disagree
3    with that, but we also confirmed in the
4    preliminary injunction hearing, and I think
5    even earlier in the deposition here today,
6    nobody ever promised you that you would receive
7    an incentive award, it was always going to be
8    in the discretion of the trial judge anyway,
9    correct?
10      **A.   Yes, sir.**
11      Q.   You also have a claim for attorneys'
12   fees and litigation expenses incurred in
13   prosecuting the Medical & Chiropractic case,
14   correct?
15      **A.   Can you state that again?**
16      Q.   Sure.   Are you seeking as part of your
17   damages in this case against Bock Law Firm and
18   Mr. Oppenheim, are you seeking as damages
19   attorneys' fees incurred in prosecuting this
20   case and costs of litigation?
21      **A.   I don't have an answer to that one.   I**
22   **don't know.**
23      Q.   Okay.   If the court in your case
24   against Mr. Oppenheim and Bock Law Firm were to

1  find in your favor, and if your ultimate
2  decision were that you are seeking attorneys'
3  fees and litigation costs, would you be
4  submitting the fees and litigation expenses
5  incurred by Foley Law Firm?
6      **A.  I don't have an answer to that one.**
7      Q.  Do you have any agreement or
8  understanding of any kind with Anderson + Wanca
9  to seek recoupment of the Foley attorneys' fees
10  and expenses that they are paying on your
11  behalf in the prosecution of this case?
12      **A.  No.**
13      MR. COHEN:  Ma'am, I appreciate your time.
14  I'm going to pass the witness at this time.
15  Mr. Blonien will probably have some questions
16  for you.
17      THE VIDEOGRAPHER:  Going off the record at
18  4:40 p.m.
19          (Brief pause.)
20      THE VIDEOGRAPHER:  Going back on the record
21  at 4:41 p.m.  Please proceed.
22              EXAMINATION
23  BY MR. BLONIEN:
24      Q.  Good afternoon, Ms. Zakrzewski.  My

1  name is attorney Barry Blonien.  I am an
2  attorney for David Oppenheim.
3          Do you recall meeting at the
4  preliminary injunction hearing for questions
5  and answers?
6      **A.  Yes, sir.**
7      Q.  I think Dan asked this question, but I
8  just want to be sure.
9          Have you had an opportunity to
10  review the preliminary injunction testimony
11  that you provided?
12      MR. SOBLE:  Objection.  Asked and
13  answered.
14      THE WITNESS:  Yes.
15  BY MR. BLONIEN:
16      Q.  After the discussions today, after
17  preparing with your counsel, is there anything
18  you want to change or revise in that
19  preliminary injunction testimony?
20      **A.  That's Judge Honeywell?**
21      Q.  Correct.
22      **A.  I don't know, sir, because there were**
23  **a lot of things I did answer to.**
24          **Is there a specific question you**

1  want to ask me?
2      Q.  To the best of your knowledge, the
3  testimony you provided at that hearing, is that
4  true and correct?
5      **A.  Yes, sir.**
6      Q.  Okay.  Who represents you for the
7  purpose of this litigation?
8      MR. SOBLE:  Object to the form of the
9  question.
10  BY MR. BLONIEN:
11      Q.  Do you understand what I mean by this
12  litigation?
13      MR. SOBLE:  Same objection.
14      THE WITNESS:  Foley & Lardner.
15  BY MR. BLONIEN:
16      Q.  Do you understand what I mean by this
17  litigation?
18      **A.  My case against Mr. Oppenheim.**
19      Q.  That is what I mean.
20      **A.  Yes, sir.**
21      Q.  And who represents you in this
22  litigation?
23      MR. SOBLE:  Object to the form and asked
24  and answered.

1      THE WITNESS:  Foley & Lardner.
2  BY MR. BLONIEN:
3      Q.  What attorneys at Foley & Lardner
4  represent you?
5      **A.  Jeff Soble and Lauren Loew.**
6      Q.  Anyone else?
7      **A.  It could be anyone in the firm, I**
8  **assume.**
9      Q.  Have you talked with anyone else in
10  the firm?
11      **A.  Yes.**
12      Q.  Who else have you talked to?
13      **A.  There was a gentleman yesterday.**
14  **Patrick?**
15      MR. SOBLE:  Yes.  Don't mention anything
16  we talked about.
17      THE WITNESS:  And there was another
18  gentleman in the room, and I forget his name.
19  BY MR. BLONIEN:
20      Q.  Do you know if he was an attorney with
21  Foley & Lardner?
22      **A.  Yes, sir.**
23      Q.  But you don't know his name?
24      **A.  I do not remember his name.**

1 Q. Does anyone who's not an attorney at
2 Foley & Lardner represent you for purposes of
3 this litigation?
4 **A. Say that again, sir.**
5 Q. Does anyone who's not an attorney at
6 Foley & Lardner represent you for purposes of
7 this litigation?
8 **A. I don't believe so. I believe anyone**
9 **in this firm could be my attorney for any**
10 **situation that is needed for this litigation.**
11 Q. For purposes of this litigation?
12 **A. Yes, sir.**
13 Q. Do they represent you outside the
14 scope of this litigation in any capacity?
15 **A. No, sir.**
16 Q. One of the exhibits that was shown
17 earlier was the litigation -- or the engagement
18 agreement with Foley. Do you remember seeing
19 that document?
20 **A. Yes, sir.**
21 Q. I forget what exhibit number it was.
22 MR. COHEN: I believe that's 6.
23 MR. SOBLE: 5.
24 BY MR. BLONIEN:

1 Q. Also called the Cin-Q case, right?
2 **A. Yes.**
3 Q. You said Anderson + Wanca. What
4 attorney at Anderson + Wanca represented you
5 for the purpose of the Buccaneers litigation?
6 MR. SOBLE: Objection. Vague as to time.
7 THE WITNESS: Do you want the ones that
8 I've dealt with mostly or the names of the
9 attorneys that I know there?
10 BY MR. BLONIEN:
11 Q. Who has represented you for the
12 purpose of the Tampa Bay Buccaneers litigation?
13 I'd like any names that you can remember today.
14 MR. SOBLE: Objection. Vague.
15 THE WITNESS: Ross Good. Ryan Kelly. Dave
16 Oppenheim. There's Wally, I don't know his
17 last name. And Glen, and I don't know his last
18 name. And Brian Wanca.
19 BY MR. BLONIEN:
20 Q. Anyone else you can think of?
21 **A. Those are the names I know of.**
22 Q. Anyone else at Anderson + Wanca that
23 you've worked with in connection with the Tampa
24 Bay Buccaneers litigation?

1 Q. Does that represent all of the terms
2 of your engagement with Foley & Lardner for
3 purposes of this litigation?
4 MR. SOBLE: You mean the redacted version?
5 BY MR. BLONIEN:
6 Q. Of the document itself. Obviously as
7 Mr. Soble pointed out, there are redactions on
8 this document.
9 Does the document in full
10 represent the terms of your representation with
11 Foley and -- sorry, your engagement with Foley
12 & Lardner?
13 **A. Yes.**
14 Q. Are there any other terms that aren't
15 reflected in that written agreement that are
16 part of your representation, your engagement of
17 Foley & Lardner for purposes of this case?
18 **A. No.**
19 Q. Okay. Who represents you for purposes
20 of the Buccaneers litigation?
21 **A. Anderson + Wanca.**
22 Q. Do you know what I mean by the
23 Buccaneers litigation?
24 **A. Yes, sir.**

1 **A. I've just talked to the secretaries on**
2 **the phone.**
3 Q. No other attorneys?
4 **A. No, sir.**
5 Q. Anyone else that is not with Anderson
6 + Wanca that represents you for purposes of the
7 Tampa Bay Buccaneers litigation?
8 **A. I would believe Mike Addison would be**
9 **considered one of my attorneys.**
10 Q. And what is the basis for you saying
11 that?
12 **A. He has attended every mediation, court**
13 **appearance or depositions that I've been**
14 **involved with.**
15 Q. Just to be clear, when we say we or
16 you, we are talking about M & C for purposes of
17 this deposition?
18 **A. Correct. I apologize.**
19 Q. That's fine. No reason to apologize.
20 Do you have any terms of the
21 relationship that you have with Anderson +
22 Wanca for purposes of the Tampa Bay Buccaneers
23 litigation?
24 **A. Say that again.**

1  Q. Do you understand what the terms of
2  the representation are between you and Anderson
3  + Wanca?
4  **A. I believe I understand it.**
5  Q. Is there a written agreement that
6  reflects those terms?
7  **A. I believe I signed the retainer.**
8  Q. Is there more than one retainer or is
9  there one retainer that reflects your
10 engagement with Anderson + Wanca for the Tampa
11 Bay Buccaneers litigation?
12 **A. I believe there's only one with the**
13 **Buccaneers case. There could be addendums or**
14 **supplementals, but I believe there's a main**
15 **one.**
16 Q. All right. I'm going to show you very
17 quickly what's marked as Exhibit No. 7.
18       (WHEREUPON, said
19       document was marked as
20       Deposition Exhibit No. 7
21       for Identification.)
22       Which is a notice of deposition
23 for Medical & Chiropractic Clinic, Inc. Do you
24 see the document?

1  **A. Yes, sir.**
2  Q. And, again, No. 7, have you seen this
3  document before right now?
4  **A. Have I seen this particular document?**
5  Q. Yes.
6  **A. Yes, sir.**
7  Q. Did you review it in preparation for
8  the deposition today?
9  **A. Yes, sir.**
10 Q. I'm also going to hand you what's
11 marked as Exhibit 8.
12       (WHEREUPON, said
13       document was marked as
14       Deposition Exhibit No. 8
15       for Identification.)
16 MR. SOBLE: Did you want to set 7 aside?
17 MR. BLONIEN: Yes, I labeled them before I
18 started the questions, so I wanted to keep them
19 in order for our sanity.
20 BY MR. BLONIEN:
21 Q. I want to focus right now on Exhibit 8
22 first, and then we'll come back to 7 in a
23 minute.
24 MR. SOBLE: We'll mark this portion of the

1  deposition confidential, subject to protective
2  order.
3       C O N F I D E N T I A L
4  BY MR. BLONIEN:
5  Q. Have you seen this agreement before
6  today? What is this I should start by asking?
7  **A. This is a retainer that I signed with**
8  **Anderson + Wanca for the Cin-Q Buccaneers case.**
9  Q. Okay. Is that your signature on page
10 MC-190?
11 **A. Yes, sir.**
12 Q. And do you recall signing this on
13 October 9th, 2013?
14 **A. Yes, sir.**
15 Q. Do you recall signing any other
16 addendums or revisions to terms or any other
17 document that reflects your terms of engagement
18 for purposes of the Tampa Bay Buccaneers
19 litigation?
20 **A. No, sir.**
21 Q. So to the best of your knowledge
22 today, the terms of the representation that M &
23 C has for purposes of class action against the
24 Tampa Bay Buccaneers is all reflected in

1  Exhibit 8?
2  **A. Yes, sir.**
3  Q. Did you read this document before
4  signing it on October 9th, 2013?
5  **A. Yes, sir.**
6  Q. Have you reviewed it since then?
7  **A. Not for this case but for other cases.**
8  Q. For what other case?
9  **A. Other fax litigation cases.**
10 Q. You've reviewed this retainer
11 agreement for other fax litigation cases?
12 **A. Separate cases. Same retainer.**
13 Q. Okay. Do you have other retainer
14 agreements with Anderson + Wanca?
15 **A. Yes, sir.**
16 Q. And what cases do you have retainer
17 agreements with Anderson + Wanca?
18 **A. There's one for KMH. I believe**
19 **there's one for Well Care. Ancient Nutrition.**
20 **There might be one other one on -- I can't**
21 **remember. It was a software company, a medical**
22 **software company. I can't remember the name.**
23 Q. Anything else that you can remember?
24 **A. No, sir.**

46 (Pages 178 to 181)

1    Q.  Do you recall any differences in the
2 terms of those engagement letters as compared
3 to the one that's before you, Exhibit No. 8?
4    **A.  No, sir.**
5    Q.  To the best of your recollection,
6 they're all the same?
7    **A.  Yes, sir.**
8    Q.  Did anyone explain these terms to you
9 at any point?
10    **A.  Ryan Kelly did.**
11    Q.  Ryan Kelly did.
12        Do you recall what Ryan Kelly say
13 said about these terms?
14    MR. SOBLE:  Objection.  Attorney-client
15 privilege and advise the witness not to answer.
16 BY MR. BLONIEN:
17    Q.  Are you accepting your attorney's
18 advice?
19    **A.  Yes, sir.**
20    Q.  Do you have any understanding about
21 the terms of this agreement that are not
22 reflected on the face of the agreement itself?
23    MR. SOBLE:  Or that do not come from
24 talking with one of your lawyers.

1    MR. BLONIEN:  I'm not going to argue with
2 you.  I'm talking to the witness.  I'd ask that
3 you not interrupt me.  Let's start there,
4 please.
5    MR. SOBLE:  Whatever you say, Barry.
6 BY MR. BLONIEN:
7    Q.  Do you have any other understanding of
8 the terms of the agreement apart from what's
9 written here?
10    MR. SOBLE:  And apart what's from your
11 lawyers, because the question implies the
12 attorney-client privilege, so we're going to
13 keep doing this as much as you want.
14    MR. BLONIEN:  I'm going to ask you one more
15 time not to interrupt and limit your objections
16 to the ones that are permitted under the rules.
17    MR. SOBLE:  You can ask anything you want,
18 but when you purposely ask a question that
19 implies the attorney-client privilege, I am
20 going to object based on the same
21 attorney-client privilege.
22 BY MR. BLONIEN:
23    Q.  Do you understand my question?
24    **A.  No.**

1    Q.  Do you have an understanding of the
2 terms of your engagement for --
3    **A.  I understand what's here.**
4    Q.  Is there anything else that you
5 understand that's not here in Exhibit No. 8?
6    MR. SOBLE:  Object to the extent the
7 question invokes the attorney-client privilege,
8 if her understanding comes from talking with
9 her lawyer.
10    MR. COHEN:  But it doesn't call for her to
11 disclose what her lawyer said or in what way
12 her understanding is different, it just asks
13 her if she has a different understanding.
14    MR. SOBLE:  Go ahead.
15 BY MR. BLONIEN:
16    Q.  Are you going answer the question I've
17 asked?
18    **A.  State it again, please.**
19    Q.  Do you have any understanding of the
20 terms of your engagement that are not reflected
21 in Exhibit No. 8?
22    **A.  I don't believe there's anything else**
23 **except for what's stated here.**
24    Q.  Okay.  With respect to what's stated

1 here, did you have a relationship with Anderson
2 + Wanca before signing this agreement?
3    MR. SOBLE:  Objection.  Asked and
4 answered.
5    THE WITNESS:  Working relationship?
6 BY MR. BLONIEN:
7    Q.  Attorney-client relationship?
8    MR. SOBLE:  Objection.  Asked and
9 answered.
10    THE WITNESS:  Yes.
11 BY MR. BLONIEN:
12    Q.  Did you have an attorney-client
13 relationship in connection with the Tampa Bay
14 Buccaneers litigation before you signed this
15 agreement?
16    **A.  I don't have an answer to that**
17 **question.**
18    Q.  When did your attorney-client
19 relationship begin with Anderson + Wanca with
20 respect to the Tampa Bay Buccaneers case?
21    **A.  I'm not certain of the date.  It could**
22 **have been 2009, it could have been 2011.  I**
23 **didn't sign anything until this document.**
24    Q.  With respect to the Tampa Bay

**47 (Pages 182 to 185)**

1    Buccaneers litigation, this is the only
2    document that you recall signing?
3         MR. SOBLE:  Objection.  Asked and
4    answered.
5         THE WITNESS:  I don't know.
6    BY MR. BLONIEN:
7         Q.   What do you understand your
8    responsibilities to be under this agreement?
9         **A.   It's stated here on Addendum B, if I'm**
10   **a class representative, I'm supposed to do the**
11   **best to my ability to follow these rules under**
12   **the federal laws.**
13        Q.   And do you believe that you fulfilled
14   your responsibility as class representative
15   listed here?
16        **A.   Yes.**
17        Q.   You pointed to Addendum B which is
18   MC-194.  Do you see number one on Addendum B?
19        **A.   Yes.**
20        Q.   Do you agree that you're suing as a
21   class representative for purposes of the Tampa
22   Bay Buccaneers case?
23        **A.   Yes.**
24        Q.   And do you agree that as such, you

1    represent the interest of all class members who
2    have been affected by the challenged conduct?
3         **A.   Yes.**
4         Q.   Do you believe you have any special
5    role in the Tampa Bay Buccaneers litigation
6    that sets you apart from the other class
7    members?
8         **A.   I think I've done more work than most**
9    **cases, considering court appearances,**
10   **depositions.  I think, yes, I've done more much**
11   **work than other cases.**
12        Q.   Does that then in your mind entitle
13   you to special treatment in the Tampa Bay
14   Buccaneers litigation?
15        **A.   I can't answer that question.  I don't**
16   **know what you would consider special treatment.**
17        Q.   Was there anything that you would
18   consider as a right or privilege that you have
19   that no one else in the class action has?
20        **A.   I've worked very hard for the class,**
21   **so I would say yes.**
22        Q.   And what is the special treatment that
23   you think you are entitled to?
24        MR. SOBLE:  Object to the form of the

1    question.
2         THE WITNESS:  I don't know.
3    BY MR. BLONIEN:
4         Q.   Do you believe that you are entitled
5    to payment?
6         **A.   Now, yes, I've done a lot of work,**
7    **yes.**
8         Q.   And how much are you entitled to?
9         MR. SOBLE:  Object to the form of the
10   question and asked and answered.
11        THE WITNESS:  I can't answer that.  I don't
12   know.
13   BY MR. BLONIEN:
14        Q.   But you believe you are entitled to
15   payment?
16        MR. SOBLE:  Object.  Asked and answered.
17        THE WITNESS:  Yes, sir.
18   BY MR. BLONIEN:
19        Q.   But you can't identify how much?
20        **A.   Correct.**
21        MR. SOBLE:  Objection.  Asked and
22   answered.
23   BY MR. BLONIEN:
24        Q.   Okay.  Is there any other special

1    treatment that you believe that you are
2    entitled to other than you are entitled to
3    payment in your view?
4         MR. SOBLE:  Object to the form of the
5    question.
6         THE WITNESS:  I don't know.  I can't answer
7    that.
8    BY MR. BLONIEN:
9         Q.   Can you turn to the next page, MC-195,
10   please.  Do you see number five?
11        **A.   Yeah.**
12        Q.   Can you read number five into the
13   record, please?
14        **A.   "You have not been promised any**
15   **special treatment other than the treatment that**
16   **may be awarded to other class members.  If**
17   **successful, we may ask the judge to award you**
18   **additional compensation for the extra time and**
19   **effort you expend as class representative.  We**
20   **cannot guarantee that the judge will award any**
21   **such amounts.  In our experiences judges often**
22   **will do."**
23        **I believe I answered that**
24   **question.  I can't answer that because it's up**

**48 (Pages 186 to 189)**

1  to the judge.
2    Q.  But you believe that you are entitled
3  to payment?
4    A.  It would -- you would assume so with
5  all the work I've put into this case.
6    Q.  Anything other than the amount of time
7  that you've put into this case that establishes
8  your entitlement to payment in this case?
9    A.  Other than the work, no.
10   Q.  Okay.  Do you believe that you are
11 entitled to a different award than other class
12 members are entitled to?
13   MR. SOBLE:  Objection.  Asked and answered
14 twice.
15   THE WITNESS:  I've already answered that
16 question.
17 BY MR. BLONIEN:
18   Q.  And what's the answer?
19   MR. SOBLE:  Same objection.
20   THE WITNESS:  I do not have knowledge of
21 what would be a figure.  I don't do cases like
22 this all the time, so I would leave it to my
23 attorneys and their expertise in this
24 department.

1  BY MR. BLONIEN:
2    Q.  Are you seeking damages in this case?
3    A.  Which case?
4    Q.  This litigation, the M & C case that
5  it brought against David Oppenheim and Bock Law
6  Firm for breach of fiduciary duty and aiding
7  and abetting.
8    MR. SOBLE:  Objection.  Asked and
9  answered.
10   THE WITNESS:  I believe there's a base
11 figure for a breach of fiduciary and a basic
12 figure.  I don't --
13 BY MR. BLONIEN:
14   Q.  What's --
15   A.  I think it was $15,000 that I read.
16   Q.  That's the amount of damages that
17 you're seeking in this case?
18   MR. SOBLE:  Objection.  Misstates her
19 testimony.
20   THE WITNESS:  I don't know, sir.
21 BY MR. BLONIEN:
22   Q.  You did sue Mr. Oppenheim and Bock Law
23 Firm, right?
24   A.  Yes, sir.

1    Q.  And are you -- do you have a specific
2  amount of damages that you're seeking in
3  connection with that case?
4    A.  Not at the moment, sir.
5    Q.  Do you anticipate a moment when you
6  will have a figure?
7    A.  I don't know.  I can possibly get back
8  to you on that at a later date.
9    Q.  At a later date?
10   A.  Yes, sir.
11   Q.  Okay.  What damages can you set forth
12 here today that you've incurred as a result of
13 the actions of either Mr. Oppenheim or Bock Law
14 Firm?
15   MR. SOBLE:  Objection.  Asked and
16 answered.
17   THE WITNESS:  Damages?  I lost time from
18 work.  My husband's lost time from work.
19 Without me being there, we lose money because
20 I'm my husband's assistant.  The possibility of
21 an incentive award.  There's no guarantee, of
22 course, but that's always up to a judge.  I
23 would say mostly my time away from the office.
24 BY MR. BLONIEN:

1    Q.  Are you seeking compensation in this
2  lawsuit for the time away from the office?
3    A.  I would say yes.
4    Q.  How much time away from the office
5  have you spent as a result of your
6  participation in the Tampa Bay Buccaneers
7  litigation?
8    A.  Probably three or four full days.
9    Q.  And how much money are you seeking for
10 those three or four full days of time?
11   A.  I don't know.  I haven't been asked to
12 calculate anything.
13   Q.  Did you volunteer for the role of
14 class action representative?
15   A.  I was asked, yes.
16   Q.  Did you agree voluntarily?
17   A.  Yes, sir.
18   Q.  Were you coerced in any way?
19   A.  No.
20   Q.  Okay.  Did you understand what the
21 obligations of a class representative were when
22 you undertook that responsibility?
23   A.  Yes, sir.
24   Q.  Did you understand it would take time

49 (Pages 190 to 193)

1  away from work?
2  **A.  Yes.  But I think I've done more than**
3  **I was told.**
4  Q.  In what way?
5  **A.  I was told I might have to have a**
6  **deposition.  I was told it might be just an**
7  **hour or two, and it went way above that.  I was**
8  **told my husband probably wouldn't have to be**
9  **deposed, and he was.  Things of that nature.**
10  Q.  You're seeking compensation for the
11  time you were deposed?
12  **A.  I don't know.**
13  Q.  You don't know whether you're seeking
14  compensation for the time that you were
15  deposed?
16  **A.  No, not yet, sir.  I don't know.**
17  Q.  When were you deposed?  You can give
18  me a year.
19  **A.  The event with Mr. Postman.**
20  Q.  Was that before or after Mr. Oppenheim
21  left Anderson + Wanca?
22  **A.  It was before.**
23  Q.  Is it your contention today that
24  you've suffered time away from the office after

1  Mr. Oppenheim left the firm?
2  **A.  Yes, sir.**
3  Q.  And can you identify for me what time
4  away from the office you've experienced?
5  **A.  I've prepared for trial.  I was at**
6  **trial.  I've been to the deposition in August.**
7  **I've been here preparing for that.  I would say**
8  **that's four days out of the office.**
9  Q.  Okay.  And apart from days out of the
10  office, are there any other damages that you're
11  arguing -- and for the possibility of an
12  incentive award, those are the two you
13  mentioned, are there any other damages you're
14  seeking in this case?
15  MR. SOBLE:  Objection.  Asked and
16  answered.
17  THE WITNESS:  I don't know at this time.
18  BY MR. BLONIEN:
19  Q.  So those are the only two that you
20  know of at this time?
21  **A.  Correct, sir.**
22  Q.  You can't put a dollar amount to
23  either; is that fair?
24  **A.  Not yet, no, sir.**

1  Q.  Have you been responsible for any
2  expenses in this litigation?
3  **A.  No, sir.**
4  Q.  Did you fly here today?
5  **A.  Yes, sir.**
6  Q.  Are you staying at a hotel?
7  **A.  Yes, sir.**
8  Q.  Who is paying for that?
9  **A.  Mr. Wanca paid for it.**
10  Q.  Have you ever received a bill or an
11  invoice in this case?
12  **A.  No, sir.**
13  Q.  Have you ever seen a bill or an
14  invoice in this case?
15  **A.  No.**
16  Q.  That includes any of the expenses that
17  you've incurred in connection with this case;
18  is that right?
19  **A.  Correct.**
20  Q.  Do you know what the expenses are that
21  you've incurred so far?
22  MR. SOBLE:  Objection.  Foundation.
23  THE WITNESS:  No, sir.
24  BY MR. BLONIEN:

1  Q.  You don't know what expenses you've
2  incurred so far?
3  MR. SOBLE:  Objection.  Asked and
4  answered.
5  THE WITNESS:  No, sir.
6  BY MR. BLONIEN:
7  Q.  Let's go back to the retention
8  agreement, please, Ms. Zakrzewski.  This
9  agreement that you signed on behalf of M & C is
10  between M & C and Anderson + Wanca, correct?
11  **A.  Yes, sir.**
12  Q.  This agreement doesn't pertain to any
13  other lawyers involved in the Tampa Bay
14  Buccaneers litigation, correct, just between
15  you and Anderson + Wanca?
16  **A.  Yes, sir.**
17  Q.  No other attorneys signed an agreement
18  with you to perform work on your behalf,
19  correct?
20  **A.  Correct.**
21  Q.  And to the best of your recollection,
22  you haven't authorized any other attorneys to
23  do work on your behalf; is that fair?
24  **A.  Can you state that again, please?**

**50 (Pages 194 to 197)**

1    Q.  To the best of your knowledge, have
2  you authorized any other attorneys to work on
3  your behalf in the Tampa Bay Buccaneers
4  litigation?
5      MR. SOBLE:  Objection.  Asked and
6  answered.
7      THE WITNESS:  Not to my knowledge.
8  BY MR. BLONIEN:
9    Q.  If you can look at MC-189, the second
10  page.  The very bottom there is a section that
11  says "other attorneys."  Do you see that
12  section?
13    A.  Yes, sir.
14    Q.  And it states, "Client agrees that
15  plaintiff's counsel may affiliate with other
16  law firms to assist with this representation.
17  Shall notify client of such affiliation, and
18  shall provide client with such other attorneys'
19  agreement to the terms of this retainer
20  agreement, and shall obtain client's written
21  consent to such retention."  Did I read that
22  correctly?
23    A.  Yes.
24    Q.  Is that what you agreed to?

1    A.  Yes, sir.
2    Q.  At any time did you or were you
3  notified of an affiliation between Anderson +
4  Wanca and other law firms?
5    A.  No, sir.
6    Q.  At any time did you provide written
7  consent for Anderson + Wanca to affiliate with
8  other law firms for purposes of the Tampa Bay
9  Buccaneers litigation?
10    A.  I believe they were brought in to the
11  case through Mike Addison, so I don't think
12  that would apply in this situation.
13    Q.  Where did you learn that information?
14    A.  From Ryan Kelly.
15    Q.  What did Ryan Kelly tell you?
16      MR. SOBLE:  Objection.  Calls for
17  attorney-client privilege.
18      MR. BLONIEN:  It calls for simply facts
19  that were told to the witness.  Attorney-client
20  privilege does not protect the sharing of
21  facts.
22  BY MR. BLONIEN:
23    Q.  Let me ask again, what did Ryan Kelly
24  tell you about facts related to this case?

1      MR. SOBLE:  Same objection.  Advise you
2  not to answer.
3  BY MR. BLONIEN:
4    Q.  Are you following your attorney's
5  advice?
6    A.  Yes, I am.
7    Q.  Okay.  Do you see MC-190, right above
8  the section entitled Cancellation, it states
9  that, "Client agrees that he is not now and has
10  never been represented by any other attorney
11  with regard to the claims against defendants"?
12    A.  Yes.
13    Q.  Was that true when you signed this
14  agreement?
15    A.  Yes.
16    Q.  Did you ever talk with Michael Addison
17  about him representing you in connection with
18  this case?
19    A.  No, sir.
20    Q.  Are you familiar Joseph Siprut?
21      MR. SOBLE:  Objection.  Asked and
22  answered.
23      THE WITNESS:  Not until today.
24  BY MR. BLONIEN:

1    Q.  Did you authorize him to affiliate
2  with Anderson + Wanca?
3      MR. SOBLE:  Objection.  Asked and
4  answered.
5      THE WITNESS:  I know nothing of the
6  situation.
7  BY MR. BLONIEN:
8    Q.  Are you familiar with the name Jim or
9  James Thomas?
10    A.  No, sir.
11    Q.  Did you authorize Jim or James Thomas
12  to be affiliated with Anderson + Wanca in
13  connection with the Buccs litigation?
14    A.  I have -- I don't know any of that,
15  sir.
16    Q.  What about Ismael Salam?  I-S-M-A-E-L.
17  Salam, S-A-L-A-M.
18      MR. SOBLE:  Objection.  Outside the scope
19  of the corporate rep notice.
20      THE WITNESS:  I don't know that name, sir.
21  BY MR. BLONIEN:
22    Q.  Does he represent you in connection
23  with the Tampa Bay Buccaneers litigation?
24    A.  I don't know that.

51 (Pages 198 to 201)

1    Q.  Have you authorized him to affiliate
2  with Anderson + Wanca?
3    MR. SOBLE:  Same objection.
4    THE WITNESS:  I don't have an answer to
5  that.
6  BY MR. BLONIEN:
7    Q.  To the best of your knowledge, you
8  haven't authorized anything that would allow
9  for an attorney apart from Anderson + Wanca
10  attorneys to work on your behalf in the class
11  action, right?
12    MR. SOBLE:  Same objection.
13    THE WITNESS:  No.  If that's the answer to
14  the question, no.  I don't know the name.  I've
15  never heard the name before, I don't know who
16  he is.
17  BY MR. BLONIEN:
18    Q.  Why did you choose Anderson + Wanca to
19  represent you in connection with the Tampa Bay
20  Buccaneers litigation?
21    **A.  I didn't chose them, they called me.**
22    Q.  They called you?
23    **A.  Yes.**
24    Q.  When did they call you?

1    **A.  Sometime in 2009 after I sent them a**
2  **package of faxes.**
3    Q.  When you signed -- before you signed
4  the retainer agreement that's been marked as
5  Exhibit 8, did you consider any other attorneys
6  to represent you in connection with the Tampa
7  Bay Buccaneers litigation?
8    **A.  No, sir.**
9    Q.  Did you evaluate the experience of
10  Mr. Wanca and his firm before choosing him?
11    **A.  No, sir.**
12    Q.  Did ask you him any questions about
13  his experience in some of their litigation
14  before choosing him?
15    **A.  No.**
16    Q.  Do you consider it part of your
17  responsibility as a class representative to
18  ensure you select good counsel?
19    **A.  I don't think he's bad counsel, so I**
20  **would not have had a reason to search or do**
21  **anything to that fact.**
22    Q.  My question is, do you consider it
23  part of your responsibility, speaking on behalf
24  of M & C, to ensure that the attorneys working

1  on behalf of the class are good at what they
2  do?
3    **A.  I would say yes.**
4    Q.  And what steps did you take to make
5  sure that that was the case here?
6    **A.  I did not take any steps.**
7    Q.  If you could turn to Addendum A,
8  please, which is MC-192.  I'd like for you to
9  look specifically at paragraph number five,
10  which states, "If your lawyer intends to refer
11  your case to another lawyer or counsel with
12  other lawyers, your lawyer should tell you
13  about that at the beginning."
14    I'm going to pause there and ask
15  you, did Anderson + Wanca tell you at the
16  beginning that they intended to affiliate with
17  any other law firms?
18    **A.  No.**
19    Q.  The paragraph five continues, "If your
20  lawyer takes the case and later decides to
21  refer to another lawyer or associate with other
22  lawyers, you should sign a new contract that
23  includes the new lawyers."  Do you see where
24  I'm reading from?

1    **A.  Yes, sir.**
2    Q.  Did you sign a new contract at any
3  point in the Tampa Bay Buccaneers litigation
4  that changed the terms?
5    **A.  No, sir.**
6    Q.  Or that allowed the affiliation of
7  other attorneys in the case?
8    **A.  No, sir.**
9    Q.  The paragraph five continues, "You,
10  the client, also have the right to consult with
11  each lawyer working on your case, and each
12  lawyer is legally responsible to represent your
13  interests and is legally responsible for the
14  acts of the other lawyers involved in the
15  case."  Do you see that?
16    **A.  Yes, sir.**
17    Q.  Did you consult with any other
18  attorneys apart from the Anderson + Wanca
19  attorneys that you've already talked with?
20    **A.  No, sir.**
21    Q.  The lawsuit that we're here for today,
22  this litigation, is it on your own behalf or on
23  behalf of M & C as a class representative?
24    MR. SOBLE:  Object to form of the

1   question.
2      THE WITNESS: I'm one and the same, so it
3   would be regarding the business.
4   BY MR. BLONIEN:
5      Q. Regarding the business?
6      **A. So it would be under Medical &**
7   **Chiropractic Clinic.**
8      Q. Are you suing on behalf of the class?
9      MR. SOBLE: Same objection.
10     THE WITNESS: I can't answer that question.
11   I don't know.
12   BY MR. BLONIEN:
13     Q. Did you share any individual or
14   personal information with Mr. Oppenheim when
15   you interacted with him?
16     **A. I can't recall.**
17     Q. Is there any proprietary information,
18   proprietary to Medical & Chiropractic, that you
19   shared with Mr. Oppenheim in your interactions
20   with him?
21     **A. Not that I can recall.**
22     Q. Is there anything that you shared that
23   sets Medical & Chiropractic apart from the rest
24   of the class that you shared with

1   Mr. Oppenheim?
2      MR. SOBLE: Object to the form of the
3   question as vague.
4      THE WITNESS: Not that I can recall.
5   BY MR. BLONIEN:
6     Q. When did your relationship with
7   Mr. Oppenheim start?
8     **A. When I signed the retainer for the**
9   **Well Care case.**
10     Q. And when was that?
11     **A. I think it was 2011.**
12     Q. Did you sign an agreement in 2011?
13     **A. In that particular case, yes, sir.**
14     Q. Did you produce it in this litigation?
15     **A. I don't think it involves this**
16   **litigation.**
17     Q. So you didn't produce it in this
18   litigation?
19     **A. Not that I'm aware of.**
20     Q. Did you search for any retainer
21   agreements with Anderson + Wanca in order to
22   fulfill your responsibilities in this case?
23      MR. SOBLE: Object to the form of the
24   question.

1      THE WITNESS: I did not.
2   BY MR. BLONIEN:
3     Q. Did you look for any sort of
4   engagement agreements with other law firms in
5   answering the discovery in this case?
6      MR. SOBLE: Object to the form of the
7   question.
8      THE WITNESS: Other law firms regarding --
9   BY MR. BLONIEN:
10     Q. How many attorneys have you had in
11   your life, Ms. Zakrzewski, many or a few?
12     **A. Two.**
13     Q. Two?
14     **A. Yes, sir.**
15     Q. And that would be Anderson + Wanca is
16   one?
17     **A. Yes.**
18     Q. Who's the other?
19     **A. My husband's family law attorney.**
20     Q. As for Anderson + Wanca, I believe you
21   mentioned there were several agreements that
22   you believed you signed over the years, and you
23   listed to the best of your recollection which
24   cases those were?

1     **A. Yes, sir.**
2     Q. Have you produced any of those
3   agreements in the discovery in this case?
4      MR. SOBLE: Object to the form of the
5   question.
6      THE WITNESS: Whatever documents needed to
7   be produced I believe were provided.
8   BY MR. BLONIEN:
9     Q. Did you provide any retention
10   agreements apart from -- let me ask a different
11   question.
12      This retainer agreement didn't
13   come from you, correct?
14     **A. No, sir.**
15     Q. Did you look for a copy of this
16   particular agreement in your files?
17     **A. No, sir.**
18     Q. Did you look for any documents
19   responsive to the questions that the defendants
20   had asked in your files?
21     **A. No, sir.**
22     Q. What did you do to respond to the
23   discovery requests, you I mean -- on behalf of
24   M & C, what did M & C do to answer the

1  questions the defendants had in this case?
2  **A.  I just reviewed the documents that**
3  **were provided to me for this deposition.**
4  Q.  Okay.  In responding to the discovery,
5  did M & C look through its files at all?
6  **A.  No.**
7  Q.  In responding to the discovery, did M
8  & C reach out to attorneys at Anderson + Wanca?
9  **A.  I might have talked to Ross Good on**
10  **the phone, but, no, I did not.**
11  Q.  Did you look anywhere else for
12  responsive documents?
13  **A.  No, sir.**
14  Q.  Did you talk with anyone in
15  anticipation of your testimony here today to
16  help prepare, apart from the attorneys at Foley
17  & Lardner?
18  **A.  No, sir.**
19  Q.  What did you do to prepare yourself
20  for the seven topics that are listed in the
21  deposition?
22  MR. SOBLE:  Objection.  Asked and
23  answered.
24  THE WITNESS:  I reviewed all of the

1  deposition I gave the court, my testimony in
2  court, the requests for documentation, answers
3  to interrogatories, I reviewed the exhibits,
4  retainer agreements.
5  BY MR. BLONIEN:
6  Q.  Did you talk with attorneys at
7  Anderson + Wanca to prepare for
8  today's deposition?
9  **A.  No, sir.**
10  Q.  With respect to the topic number
11  one -- and then I'm back on Exhibit No. 7 now,
12  please.  Topic number one, "The existence of
13  any attorney-client relationship M & C alleges
14  it had or has with Mr. Oppenheim or his former
15  firm Anderson + Wanca, including the formation
16  and scope of any such relationship."
17  I believe that you've testified
18  that the retainer agreement marked as Exhibit
19  No. 8 is the sum and total of the terms of your
20  engagement with Anderson + Wanca for purposes
21  of this case, right?
22  MR. SOBLE:  Objection.  Asked and
23  answered.
24  THE WITNESS:  Yes.

1  BY MR. BLONIEN:
2  Q.  Did you do anything else to prepare
3  yourself for number one?
4  MR. SOBLE:  Objection.  Vague, asked and
5  answered.
6  THE WITNESS:  No.
7  BY MR. BLONIEN:
8  Q.  Number two, "M & C's involvement in
9  the Cin-Q litigation, including all
10  interactions with defendant David M. Oppenheim
11  and other attorneys in the case."
12  Have you testified to all of the
13  involvement that M & C had in the Cin-Q
14  litigation, including interactions with
15  Mr. Oppenheim?
16  MR. SOBLE:  Objection.  Vague.
17  THE WITNESS:  Yes.
18  BY MR. BLONIEN:
19  Q.  Is there anything else that you know
20  that you haven't testified to about M & C's
21  involvement in the Cin-Q litigation including
22  with Mr. Oppenheim?
23  **A.  I'm sorry.  State the question again,**
24  **please.**

1  Q.  Are there any other activities
2  involving Mr. Oppenheim that you haven't
3  already testified to here today?
4  **A.  Not to my knowledge.**
5  Q.  Number three states, "All activities
6  that M & C alleges were a conflict of interest
7  materially adverse to its interest or in breach
8  of fiduciary duty owed to M & C, including what
9  M & C knew about those activities and how M & C
10  learned such information."
11  What activities do you allege
12  constitute a conflict of interest in this case?
13  MR. SOBLE:  Objection.  Asked and answered.
14  THE WITNESS:  I thought I answered all of
15  that already.  I thought I answered all of that
16  already.
17  BY MR. BLONIEN:
18  Q.  What activities do you allege were a
19  conflict of interest?
20  MR. SOBLE:  Objection.  Asked and
21  answered.
22  THE WITNESS:  The activities that I believe
23  were a conflict of interest was I think that
24  all of our files were taken from Anderson +

1  Wanca and brought other to Bock Hatch and used
2  for litigation against us in a competing case.
3  BY MR. BLONIEN:
4   Q. When you say all our files, what do
5  you mean by that?
6   **A. Whatever documents could have been**
7  **under our cases.**
8   Q. And how did you learn that all those
9  documents were taken?
10   **A. I was informed that a computer was**
11  **taken from Anderson + Wanca and our files were**
12  **on that computer.**
13   Q. Who told you that?
14   **A. Ross Good.**
15   Q. When did Ross Good tell you that?
16   **A. Sometime this year. I don't know the**
17  **exact date.**
18   Q. Do you know what season it was?
19   **A. No, I can't remember.**
20   Q. Do you know whether it was before or
21  after you filed this lawsuit?
22   **A. I believe it was after the lawsuit was**
23  **filed. I can't be certain though. I'm not**
24  **certain.**

1   Q. But to the best of your recollection,
2  you remember a conversation with Ross Good
3  where he told you after the litigation was
4  filed that David Oppenheim took all the files?
5   MR. SOBLE: Object to the question.
6  Misstated her testimony and vague.
7   THE WITNESS: I don't know that the word
8  all was used.
9  BY MR. BLONIEN:
10   Q. What word did Ross Good use?
11   **A. I was told that files were taken.**
12   Q. Okay. Do you know which files?
13   **A. No, sir.**
14   Q. Do you know how many?
15   **A. No, sir.**
16   Q. Do you know any details about the
17  files that were purportedly taken?
18   **A. No, because the computer was**
19  **supposedly stolen.**
20   Q. Do you have any other basis apart from
21  the conversation with Ross Good after the
22  litigation was filed that Mr. Oppenheim took
23  files?
24   **A. Just that what was told to me by**

1   **Mr. Good.**
2   Q. Anything else?
3   **A. No, sir.**
4   Q. Do you have any basis to state that
5  those documents were used?
6   **A. I can't -- no, I can't be certain. I**
7  **don't know.**
8   Q. Did anyone tell you those documents
9  were used?
10   **A. No, no.**
11   Q. Did anyone tell you that Dave was
12  sharing information with Bock Law Firm?
13   **A. I can't answer that question.**
14   Q. Why not?
15   **A. I don't think it would have come from**
16  **a conversation. I think it would have come**
17  **from knowing that the case was filed that**
18  **things had to have been told from our files,**
19  **that information was used to do a separate**
20  **case.**
21   Q. But no one told you that information
22  was used to do a separate case?
23   **A. No.**
24   Q. Did anyone tell you that Dave stole

1  the computer?
2   MR. SOBLE: Objection. Asked and answered.
3   THE WITNESS: No, I'm putting -- I'm
4  putting that together myself.
5  BY MR. BLONIEN:
6   Q. Did anyone else tell you any facts
7  about what Dave did transitioning from Anderson
8  + Wanca to Bock Law Firm?
9   **A. No.**
10   Q. When did you learn Mr. Oppenheim left
11  Anderson + Wanca?
12   **A. The day I called Ross Good when I got**
13  **the solicitation letter.**
14   Q. And what did Ross Good tell you at
15  that time?
16   **A. He told me.**
17   MR. SOBLE: Objection. Attorney-client
18  privilege.
19   THE WITNESS: And I believe I've answered
20  that question already.
21  BY MR. BLONIEN:
22   Q. Are you not answering it now?
23   MR. SOBLE: I don't believe it's been asked
24  and answered. If it has been answered, then

1    it's asked and answered.  But certainly asking
2    her what she talked about with her lawyer is
3    privileged.
4         THE WITNESS:  Yeah, I've answered that
5    question.
6    BY MR. BLONIEN:
7         Q.   What did Ross Good tell you when you
8    called him to tell him about the solicitation
9    letter that you received?
10        **A.   My specific question was, did Dave**
11   **leave the firm?  And he said by -- however he**
12   **phrased it, yes, he did.  He did leave the**
13   **firm.**
14        Q.   How did he phrase it?
15        **A.   I said, By chance, did Dave leave the**
16   **firm?  And he said, Yes, he did.**
17        Q.   And did Ross Good tell you any other
18   facts at that call?
19        **A.   Other facts, no.**
20        Q.   Any other circumstances surrounding
21   Mr. Oppenheim's departure?
22        **A.   No, sir.**
23        Q.   At any other time did Anderson + Wanca
24   attorneys communicate to you facts about

1    Mr. Oppenheim's departure?
2         **A.   Not specifics, they just told me he**
3    **had left the firm.**
4         Q.   You mentioned before that you believe
5    Mr. Wanca was hurt most of all by the competing
6    case; is that fair?
7         **A.   Yes.**
8         Q.   And how was Mr. Wanca hurt?
9         **A.   He's -- his firm put a lot of time and**
10   **effort into that case.**
11        Q.   Do you know how much time?
12        **A.   It's -- it was years, so I would say**
13   **at least seven years into the case.**
14        Q.   Did you talk with Mr. Wanca about how
15   much time he devoted to the case?
16        **A.   No, not Mr. Wanca.**
17        Q.   Anyone else at Anderson + Wanca?
18        **A.   Ryan and -- Ryan Kelly and Ross Good.**
19        Q.   What did they tell you?
20        **A.   All the time that they had spent on**
21   **the case.**
22        Q.   And what did they tell you about the
23   time that they spent?
24        **A.   Depositions, they've flown to Texas,**

1    **they had flown to Switzerland, they had to go**
2    **to Canada.  It was extensive discovery.  And I**
3    **think I've answered that question already.**
4         Q.   Are you trying to recover those fees
5    in this case?
6         **A.   Me recover it?**
7         Q.   M & C.
8         MR. SOBLE:  Object to the form.
9         THE WITNESS:  I don't have an answer to
10   that question.
11   BY MR. BLONIEN:
12        Q.   If you prevail, if the judge decides
13   for you and for M & C in this case, is Anderson
14   + Wanca going to be recovering any money?
15        **A.   I don't have an answer.**
16        Q.   Are you asserting any claims on their
17   behalf?
18        **A.   No, sir, I'm not going to speak for**
19   **them.**
20        Q.   You are not trying to recover for
21   them?
22        **A.   I'm not going to speak for them.**
23        Q.   I'm asking you, are you trying to
24   recover for them?

1         **A.   I'm not going to answer that question,**
2    **because I haven't talked to anyone about that.**
3         Q.   Well, you are here today as the
4    representative for M & C, you understand that,
5    right?
6         **A.   Yes.**
7         Q.   My question to you is, are you seeking
8    to recover any fees from Anderson + Wanca in
9    this case, as M & C?
10        **A.   Recover from Anderson + Wanca?**
11        Q.   Are you seeking to recover from
12   Mr. Oppenheim and Bock Law Firm in this case
13   fees that were incurred by Anderson and Wanca?
14        **A.   I don't have an answer to that.**
15        Q.   When the judge issues a decision,
16   assuming it's in your favor, is it your
17   understanding that the judge would award fees
18   to Anderson + Wanca?
19        **A.   I don't know.**
20        Q.   Have you asked for that?
21        MR. SOBLE:  Objection.  Asked and answered
22   a few times now.
23        THE WITNESS:  I don't have an answer to
24   that.

**Thompson Court Reporters, Inc**
thompsonreporters.com

BY MR. BLONIEN:

1 Q. What activities do you believe were
2 materially adverse to M & C's interest that
3 Mr. Oppenheim and Bock Law Firm engaged?
4 MR. SOBLE: Objection. Asked and answered
5 both during Mr. Cohen's questions and yours.
6 THE WITNESS: I believe I've answered that
7 already.
8 BY MR. BLONIEN:
9 Q. And what's your answer?
10 MR. SOBLE: Same objection.
11 THE WITNESS: Rephrase the question again,
12 please.
13 BY MR. BLONIEN:
14 Q. What activities do you contend
15 constitute a materially adverse interest to M &
16 C in this litigation that Mr. Oppenheim and
17 Bock Law Firm engaged?
18 MR. SOBLE: Same objection.
19 THE WITNESS: I'm sorry. I'm not focusing.
20 Say that again.
21 MR. SOBLE: Are you able to continue?
22 THE WITNESS: Can we take a short break?
23 MR. SOBLE: There is a question pending,

1 so I'm not trying to stop that.
2 Do you want her to try to answer
3 the question before we take a short break?
4 BY MR. BLONIEN:
5 Q. If you don't know, that's okay, too.
6 But it would be helpful to have an answer.
7 **A. Okay. Say it again.**
8 Q. What activities do you contend
9 constitute the material -- what do you contend
10 are materially adverse to M & C's interests
11 that Mr. Oppenheim or Bock Law Firm engaged?
12 MR. SOBLE: Same objection.
13 THE WITNESS: That they're settling a case,
14 very little time spent on their part on the
15 work of Anderson + Wanca, and they don't have
16 any of the time invested, they don't have the
17 money invested, they didn't do the work.
18 That's my answer.
19 MR. BLONIEN: Thank you. We can take a
20 break.
21 THE VIDEOGRAPHER: Going off the record at
22 5:36 p.m.
23 (Recess.)
24 THE VIDEOGRAPHER: Going back on the record

1 at 5:44 p.m. Please proceed.
2 MR. SOBLE: As we talked about off the
3 record, the witness does not feel as if she can
4 continue today given her illness, so we've
5 agreed that we will end for the day and leave
6 this open.
7 The only thing else we need to do
8 is what our time on the record is.
9 THE VIDEOGRAPHER: Five hours and 13
10 minutes.
11 MR. BLONIEN: Thank you.
12 MR. SOBLE: We can go off the record.
13 THE VIDEOGRAPHER: This marks the
14 conclusion of the deposition. Going off the
15 record at 5:44 p.m.
16 THE COURT REPORTER: Do you want this
17 ordered into a transcript?
18 MR. COHEN: Yes.
19 THE COURT REPORTER: Do you know what
20 format you want?
21 MR. COHEN: Full size and condensed.
22 (WHEREUPON, the deposition
23 was adjourned at 5:44 p.m.)
24

UNITED STATES DISTRICT COURT
FOR THE
MIDDLE DISTRICT OF FLORIDA

MEDICAL & CHIROPRACTIC    )
CLINIC, INC.,             )
                          )
        Plaintiff,        )
                          ) No.
    -vs-                  ) 8:16-CV-01477-CEH-TBM
                          )
DAVID M. OPPENHEIM, et    )
al.,                      )
                          )
        Defendants.       )

I hereby certify that I have read
the foregoing transcript of my deposition given
at the time and place aforesaid, and I do again
subscribe and make oath that the same is a
true, correct and complete transcript of my
deposition given as aforesaid, with
corrections, if any, appearing on the attached
correction sheet(s).

Please check one:
_____ I made no corrections
_____ Number of Correction
sheets attached

                    _____
                    MICHELLE ZAKRZEWSKI

SUBSCRIBED AND SWORN TO
before me this      day
of           A.D., 2017

_____
Notary Public

Thompson Court Reporters, Inc
thompsonreporters.com

1    STATE OF ILLINOIS )

         ) SS:

2    COUNTY OF C O O K )

3        I, MAUREEN A. WOODMAN, Certified Shorthand

4    Reporter and Notary Public in and for the

5    County of Cook and State of Illinois, do hereby

6    certify that MICHELLE ZAKRZEWSKI was first duly

7    sworn to testify the whole truth and that the

8    above deposition was recorded stenographically

9    by me, and was reduced to typewriting under my

10   personal direction.

11       I further certify that the said deposition

12   was taken at the time and place specified.

13       I further certify that I am not a relative

14   nor employee or attorney nor counsel of any of

15   the parties, nor a relative or employee of such

16   attorney nor counsel nor financially interested

17   directly nor indirectly in this action.

18       In witness whereof, I have hereunto set my

19   hand and affixed my seal of office at Chicago,

20   Illinois, this 28th day of November

21   A.D., 2017.

22

23            MAUREEN A. WOODMAN, C.S.R.

24            License No.  084-002740

Thompson Court Reporters, Inc
thompsonreporters.com

**A**

**A.D** 225:20 226:21
**a.m** 1:21 4:10 42:17 42:20
**abetted** 161:16
**abetting** 191:7
**ability** 29:16 43:4 167:7,16 186:11
**able** 59:20 72:7,8 95:17 129:20 130:3,22 131:4,5 131:9,20 132:2,5 133:8,20 222:22
**above** 194:7 200:7 226:8
**absent** 17:3 45:23
**absolutely** 33:13 99:14 111:4 114:1
**abuse** 152:11 153:11
**accept** 107:19 124:16 151:10
**accepting** 182:17
**access** 26:12
**according** 108:11
**account** 93:9
**accountant** 136:5
**accurate** 15:12 20:11 43:5 99:15
**acknowledged** 126:11 145:18
**across** 91:20
**act** 167:7
**acting** 167:9
**actions** 16:5,9 17:9 17:11,14 40:5,10 40:13,15 43:11 46:2 50:17 67:11 80:22 99:21 159:16 164:3 192:13
**actively** 113:8
**activities** 60:7,23 64:15,18 65:11 69:19 213:1,5,9 213:11,18,22 222:2,15 223:8
**acts** 205:14
**actual** 37:21 59:8 100:1 108:6
**actually** 7:24 11:15 11:17 12:23 20:20 27:9 35:1 40:1 48:6 49:4 53:2 60:14 80:20 81:11 94:1,17 96:15

118:24 134:15 166:17
**Adams** 2:8
**add** 51:13 160:9
**added** 51:16,23 52:4,13 58:1 124:24 148:9,14 149:7,16 168:1
**Addendum** 186:9 186:17,18 204:7
**addendums** 178:13 180:16
**Addison** 46:11 47:4 47:8 55:21 56:2,9 56:17,24 57:7,12 57:19 64:19 70:5 74:1 177:8 199:11 200:16
**Addison's** 148:15
**addition** 31:8
**additional** 93:1,3 100:23,24 101:11 189:18
**address** 98:17 130:13
**adequate** 95:11
**adjourned** 224:23
**admission** 157:4
**admit** 164:11
**advance** 21:18 138:11,20
**advanced** 116:21
**advantage** 16:13 40:24 42:3,5 43:14 51:2 63:13
**adverse** 115:16 152:7,8 213:7 222:3,16 223:10
**advertisement** 52:15 53:1 55:14
**advertising** 51:12 54:18 58:5 84:12 115:14
**advice** 134:16,17,19 151:16 154:8 182:18 200:5
**advise** 129:17 134:9 134:11 150:23 182:15 200:1
**advised** 6:5 75:18 168:4
**advising** 153:23
**affect** 96:21 98:6 102:6
**affected** 187:2
**affiliate** 198:15

199:7 201:1 202:1 204:16
**affiliated** 201:12
**affiliation** 198:17 199:3 205:6
**affirmative** 81:5 137:14
**affixed** 226:19
**aforesaid** 225:11,12
**afternoon** 79:12 170:24
**again** 19:9 27:4 51:17,20 52:16 56:20 60:15 75:4 113:10 132:21 157:19 169:15 174:4 177:24 179:2 184:18 197:24 199:23 212:23 222:12,21 223:7 225:11
**age** 116:22
**ago** 30:16 40:20 50:9 84:5 88:20 91:1 106:16 143:21 144:1 146:23
**agree** 76:13 77:10 86:17 88:14 93:8 110:6,18 116:24 120:8 127:13 129:11 163:14 168:11 186:20,24 193:16
**agreed** 68:8 103:24 115:3 132:9 135:2 136:17 141:15 198:24 224:5
**agreements** 55:2,16 86:12 181:14,17 207:21 208:4,21 209:3,10 211:4
**agrees** 198:14 200:9
**ahead** 14:24 63:16 106:4 144:16 149:22 184:14
**aided** 161:15
**aiding** 191:6
**air** 29:13
**al** 1:7 4:5 225:7
**allegation** 160:10
**allegations** 164:14
**allege** 123:8 125:6 213:11,18
**alleged** 160:4 161:1
**alleges** 211:13 213:6

**alleging** 123:14 163:16 165:5
**allow** 28:2 138:10 138:18 202:8
**allowed** 34:18 59:17 98:10 149:3 205:6
**allowing** 139:6,13
**almost** 88:20 96:14 96:18 98:4
**along** 48:19 125:23
**already** 24:12 25:15 29:7 30:2 51:22 65:17 70:6,14 73:10,23 74:4 148:9,15,16 158:19 190:15 205:19 213:3,15 213:16 217:20 220:3 222:8
**altered** 126:18
**always** 19:15 71:4 95:14 110:22 145:3 169:7 192:22
**amazing** 113:4
**among** 112:18
**amount** 41:14 44:17 68:9 89:9,15 90:4 92:21,24 93:21 94:1 96:22 97:5,7 98:10,12 101:1,13 124:4,4 138:9 190:6 191:16 192:2 195:22
**amounts** 189:21
**analysis** 70:6 93:7 93:18 94:2,23
**analyzing** 95:1,15
**Ancient** 181:19
**another** 17:17 52:16 59:4 68:7,11 71:10 80:1,12,17 80:19 85:2 95:18 98:13 111:11 124:1 157:3,7 161:10 163:6,8,11 165:19 173:17 204:11,21
**answering** 13:20 16:17 29:16 32:15 208:5 217:22
**answers** 13:3,5,8,11 13:12 14:2,24 15:16,18,19 39:2 160:3 171:5 211:2
**anticipate** 192:5

**anticipated** 95:11 110:11
**anticipation** 210:15
**anybody** 142:3 169:2
**anymore** 126:17
**anyway** 93:17 97:18 169:8
**anywhere** 68:3 80:24 210:11
**apart** 161:5 183:8 183:10 187:6 195:9 202:9 205:18 206:23 209:10 210:16 215:20
**apologize** 62:19 107:23 177:18,19
**appeals** 82:22
**appear** 7:24
**appearance** 156:8 156:15 157:4 177:13
**appearances** 2:1 187:9
**appearing** 225:13
**appears** 4:24 53:22 118:12 119:11 127:9
**appellate** 82:7,9,21 162:21
**applies** 31:1
**apply** 130:10 199:12
**appreciate** 20:19 36:17 45:1 88:22 91:11 98:16 116:17 126:10 164:7 170:13
**approaching** 102:1
**appropriate** 90:15 105:15 107:11
**approval** 63:11 87:19
**approved** 68:9 102:19 145:17 159:21
**approves** 104:10 107:6
**approximately** 50:11 51:9 61:22 101:6 108:8
**approximation** 61:19,20,22
**April** 38:8,12 39:1 39:15 120:11

**aren't** 120:19 141:6
175:14
**argue** 97:13 183:1
**arguing** 34:23
195:11
**arising** 52:24 166:9
**Arnott** 118:24
119:5 122:15
**Arnott's** 121:8
**around** 52:15 53:1
53:5 54:13,18
58:9 82:8 83:7
101:20 103:3
108:23 139:22
153:9 158:24
**arrangement** 83:14
111:18 113:20
**aside** 24:17 57:11
57:12 89:4 100:14
104:20 115:10
128:24 164:13
179:16
**asking** 27:5 30:10
30:17 32:16 45:5
56:21 64:21,22
74:6 78:15 92:16
93:17 97:21
101:13 120:6
131:11 133:5,10
133:12 150:13,18
180:6 218:1
220:23
**asks** 76:9 184:12
**aspect** 64:17
**asserting** 220:16
**assessment** 65:3
66:23 96:21 98:6
102:6 147:12
158:19 164:8
**assist** 198:16
**assistance** 64:1
**assistant** 192:20
**associate** 204:21
**associated** 79:16
90:6,7 151:11
**assume** 19:1 31:24
32:4,6 92:13,16
92:19 96:9 97:14
97:16,22 103:2
108:4 113:13
124:6 137:22
148:18 151:14
160:17 173:8
190:4
**assumed** 118:22
**assuming** 92:15

93:22 101:16,16
116:14 163:2,12
163:14 221:16
**assumption** 18:13
**assurance** 152:5,14
**attached** 3:14 118:7
225:13,16
**attempt** 63:24
159:21
**attempts** 159:19
**attend** 72:7,9 73:5,8
73:18,19,22
**attended** 41:11,11
61:8 72:2 74:3
177:12
**attending** 75:22
**attention** 53:20 54:5
**attic** 84:3,16
**attorney's** 12:20
89:12 112:14
124:2 182:17
200:4
**attorney-client**
134:8 141:10
150:22 182:14
183:12,19,21
184:7 185:7,12,18
199:17,19 211:13
217:17
**auction** 123:9,13
124:1,7,22 125:2
125:8 159:17,18
160:4,5,11
**August** 73:12,13
113:2 195:6
**authorize** 201:1,11
**authorized** 197:22
198:2 202:1,8
**automatic** 120:20
**automobiles** 9:7
51:22
**available** 130:13
132:6 154:17
**avenue** 76:14
162:20
**award** 102:20 104:2
104:11 105:6,7
138:8,17 140:7,24
145:16 167:19
168:6,13 169:7
189:17,20 190:11
192:21 195:12
221:17
**awarded** 56:19 57:4
57:21 93:23
102:15,18,19

111:21 145:16
189:16
**awards** 107:7
**awareness** 71:4
**away** 121:8 123:6
192:23 193:2,4
194:1,24 195:4
**awfully** 23:1

_____

**B**

**B** 3:8 186:9,17,18
**bad** 77:20,24 78:19
80:2 125:2 203:19
**bar** 157:6
**Barry** 2:7 4:22
171:1 183:5
**Barry@blonienle...**
2:9
**base** 191:10
**based** 24:9 51:11
58:4 67:5,8 77:1
78:23 80:6 90:4,6
95:12 96:24 98:9
98:10 102:15
107:7 119:12
120:8 126:13
127:8 147:5,9,15
147:16 183:20
**basic** 6:10 191:11
**basing** 97:3
**Bates** 112:4,5,14,23
114:22 119:17
**Bax** 72:19
**Bay** 176:12,24
177:7,22 178:11
180:18,24 185:13
185:20,24 186:22
187:5,13 193:6
197:13 198:3
199:8 201:23
202:19 203:7
205:3
**became** 47:19
**become** 46:15,18
82:20
**becoming** 61:24
62:17
**begin** 142:16
185:19
**beginning** 4:17 29:1
52:21 61:3,4,15
150:5 204:13,16
**begins** 4:1
**behavior** 147:6
**behind** 25:11
**belief** 17:21 18:5

19:3 20:7,23
23:13,16 24:3,7,9
28:20 30:18 33:8
39:6,20 44:2 45:2
120:6
**believed** 37:3 85:12
208:22
**believes** 145:19
146:9
**believing** 27:7 45:6
**bell** 75:20
**belong** 142:22
**belongs** 134:14
**beneficial** 144:13
**benefit** 90:15,16
103:9 116:4
138:13,14,22
139:10 140:3
142:10 143:15
145:20 166:15
167:20
**best** 29:15 71:3
74:20 116:14
172:2 180:21
182:5 186:11
197:21 198:1
202:7 208:23
215:1
**better** 35:13 125:11
147:9
**between** 22:23
38:24 39:16 47:7
49:13,18 53:3
58:14,24 61:23
85:9 108:8 112:18
127:6,23 131:15
142:5 149:20
178:2 197:10,14
199:3
**beyond** 81:19 88:15
110:9 147:3
152:18 153:1
**big** 115:23,24
**bill** 196:10,13
**billed** 152:24 153:4
153:5
**bills** 84:2 139:7,9
145:3,7
**bit** 33:12 83:7 86:8
88:17
**blank** 106:3
**blanket** 105:22
**both** 13:10 36:18
41:23 92:21 127:9
147:12 157:21
222:6

**bottom** 54:6,7 112:4
114:21 121:10
198:10
**bought** 118:20
121:7,23 122:10
122:13,14
**box** 84:2
**boxes** 84:16
**breach** 113:12
161:9,14,16 191:6
191:11 213:7
**break** 6:21 7:14,15
29:7,10,19 31:6
42:13 59:24 75:10
79:13 111:3,11
129:15 155:8
165:11,19 222:23
223:3,20
**breakout** 23:5 76:3
**breaks** 6:20 7:1
29:3,9 31:1
**breast** 6:16 50:13
**Brian** 47:7,12,20
85:13 137:24
138:10 176:18
**Brief** 53:12 75:14
114:6 170:19
**bring** 40:19
**bringing** 28:22
39:18 114:9
143:12
**broad** 59:24
**broadcaster** 59:6,18
**broadcasts** 59:19
**broader** 44:9
**broadly** 60:2 70:18
**brought** 39:4 47:4
64:11 103:8 119:8
152:9,13 191:5
199:10 214:1
**Bruce** 2:19 4:10
**Brutal** 66:3
**Bucc** 92:23
**Buccaneers'** 81:4
159:16
**Buccaneers-related**
55:14 60:8
**Buccs** 113:3 142:15
201:13
**bucks** 86:21
**build** 44:17
**built** 45:13 61:6,16
144:23
**business** 67:14
137:3 145:2 206:3
206:5

business-related 137:20
Butler 154:14

**C**

C's 13:5,8,23 15:16
89:7,20 142:9
212:8,20 222:3
223:10
C.S.R 226:23
calculate 107:17
193:12
calculation 93:19
94:2
calendar 61:23
call 10:19,21 12:3
13:13 25:7 26:20
26:23 27:15,16
28:4,14 39:14
132:7 148:21
157:4 184:10
202:24 218:18
called 1:12 5:8 25:8
45:24 123:9
154:16 176:1
202:21,22 217:12
218:8
calling 35:21 154:15
calls 123:18 127:22
168:18 199:16,18
came 18:14,20 20:1
20:7 24:13 26:23
38:13 48:23 85:2
85:8 86:19 120:5
121:23 143:8
158:24 163:19
Canada 59:7 61:13
220:2
Cancellation 200:8
cancer 6:14,17
50:13
candor 126:10
cannot 134:17
189:20
capable 13:20
capacity 174:14
captures 41:23
card 68:13
cards 46:1
care 50:21 51:3
145:9 181:19
207:9
carried 20:2
carry 55:4
carve 129:7
carve-out 130:10

categories 10:14,15
60:3
caused 168:14
central 22:6
certain 34:17 39:11
48:12 55:6 84:15
88:3 90:10 92:24
102:15,16 164:13
185:21 214:23,24
216:6
certainly 81:15
86:17 218:1
certification 83:2
Certified 226:3
certify 78:3,5
225:10 226:6,11
226:13
cetera 65:11
chain 38:10 112:18
challenge 165:23
challenged 187:2
champerty 137:13
chance 218:15
chances 82:11 83:1
change 149:19,23
171:18
changed 205:4
check 225:14
Chicago 1:19 2:4,14
4:14 73:21 226:19
Chiropractic 1:3,11
4:4 5:2 7:18 8:2
86:6 142:6 153:10
156:2,9,16 158:8
159:8,9 161:5,7
167:3,6 169:13
178:23 206:7,18
206:23 225:3
Chiropractic's
157:13,23 158:3,5
159:4
chiropractors'
83:11
choose 202:18
choosing 203:10,14
chose 202:21
chosen 151:16
Cin 142:17
Cin-Q-related
23:18 24:4 25:2
31:15 35:3 39:8
39:21 44:4
circle 90:11
Circuit 107:3,19
148:19
circumstances

71:24 102:8
110:22 142:2
143:17,18 168:12
218:20
Civil 1:14
claimant 152:23
claimed 96:17
108:10 165:22
claiming 66:24
67:22 68:10,11,23
71:17 81:10 93:2
95:12 96:15,19
98:22 99:2,22
100:8,12,22
101:21 108:7,10
108:13 161:19
164:14 165:5
claims 50:16 85:22
94:1,5,17 96:5
145:6 153:12,13
159:22 200:11
220:16
clarified 156:4
clarifies 33:15
clarify 16:22 19:10
122:24 128:1
Clark 1:19 2:3 4:14
class' 144:16
classes 80:24
cleaned 84:2
clear 23:12 29:8,12
43:23 119:3 133:9
153:2 177:15
clearly 166:6,14
Clement 58:7 59:4
59:15 60:9 81:11
84:13
clerk 154:14,22
client 58:17 59:6
134:9,14 198:14
198:17,18 200:9
205:10
client's 198:20
clients 127:10
clinic 1:4,11 4:4 5:2
7:18 121:7 142:7
158:9 178:23
206:7 225:4
close 74:19
closed 25:11
co-counsel 113:5,16
113:19 114:12
co-counseled 46:19
coerced 193:18
Cohen's 222:6
combination 92:20

come 9:12 10:16
24:19 27:11 28:16
31:7 40:7 68:14
78:12 84:24 89:4
94:24 179:22
182:23 209:13
216:15,16
comes 111:13 124:8
184:8
coming 27:17 48:6
49:4 120:10
comment 98:18
110:2,21
commented 47:16
comments 22:21
94:18
common 107:4
communicate 13:24
14:4 75:2 218:24
communicated 71:6
71:10 74:7,23
159:11
communicating
30:9 78:24 157:12
communication
49:18 65:7 132:8
151:9 152:5
153:16 154:22
communications
70:16 78:16 80:7
126:14 128:4,6,24
129:2,21 130:17
130:20 131:5,24
133:11,12,18
150:13,15 151:2
company 16:19
17:17,17 181:21
181:22
compared 182:2
compensated 99:4
147:8
compete 18:1
competed 86:21
competing 17:18
19:7 20:4,11 21:3
24:10 34:20 44:24
45:3,4 161:11
163:12,19 164:21
214:2 219:5
complaint 12:2,8,12
15:8 121:1 123:4
123:15 125:6
155:11,15,24
157:11 160:17
165:20 167:2
complete 15:21 43:5

151:10 225:12
completely 15:20
63:5 87:2 120:9
131:21
compliance 77:6
compliment 109:8
compound 125:13
125:14
computer 214:10,12
215:18 217:1
concealed 113:8
conceding 18:12
concept 79:16 124:7
124:16
concern 7:8 36:21
77:13,16 79:23
120:2
concerns 80:8
conclusion 79:5
123:18 150:1
163:13 168:19
224:14
condensed 224:21
condition 24,24
conduct 165:23
187:2
confer 75:9
conference 23:4,7
conferred 167:20
confidentential
117:22
confidential 117:18
117:21,24 180:1
confirm 53:22
confirmed 169:3
conflict 161:8 163:9
213:6,12,19 163:2
confusing 87:12
163:22
connection 176:23
185:13 192:3
196:17 200:17
201:13,22 202:19
203:6
consent 198:21
199:7
consenting 56:2
consequences 152:8
consider 187:16,18
203:5,16,22
consideration 88:5
considered 17:1
89:9 105:10
106:12,13 136:1,8
136:15 156:22
177:9

considering 88:18
187:9
consistent 159:16
constitute 213:12
222:16 223:9
constituted 40:16
consult 137:3,19
205:10,17
contact 47:12,19
48:6,22,23 49:4
49:20 50:10 83:23
contacted 154:19
contacting 154:21
contained 59:8
contend 222:15
223:8,9
contention 194:23
contents 38:23
contest 29:7
continually 99:11
continue 77:11
222:22 224:4
continues 101:2
204:19 205:9
continuing 101:12
109:1
contract 52:23 54:8
54:17,20 84:14
151:23 204:22
205:2
contributed 151:4
contribution 65:10
69:18 158:23
controlling 140:4
conversation 215:2
215:21 216:16
conversations 129:7
converse 7:11
convey 90:23
conveyed 104:17
Cook 1:17 226:5
copy 11:11 86:3
154:19 155:11
209:15
corporate 7:21
13:15 108:20
162:14 201:15
corporation 7:23
correction 225:13
225:15
corrections 225:13
225:15
correctly 36:14
58:20 79:21
159:23 164:5
198:22

costs 134:2 135:13
152:17 165:24
166:8 169:20
170:3
couldn't 56:22
143:9 149:11
counsel 2:7 4:15,23
6:5,19 46:9 47:1,1
115:2 126:14
127:23 128:12,16
128:20 151:17
156:8,15 171:17
198:15 203:18,19
204:11 226:14,16
counsel's 154:5
counterproposals
95:1
countersigned 86:7
country 80:24 82:8
108:23
County 1:17 226:2
226:5
couple 6:10 124:24
course 15:4 20:2
35:10 192:22
courts 1:15 61:13
82:8,21,22 107:2
cover 6:9 90:2 96:5
96:14 97:6 98:3
101:20,24 103:3
110:10 135:13
166:7
covered 28:13 44:1
create 60:3 105:16
161:8
created 93:20
creating 44:23
crossed 79:22
current 44:6
customary 103:14
107:4
cut 90:12
cutting 161:17

**D**

D 3:1 180:3
d/b/a 45:15
damage 99:13
166:18 168:13
damages 99:16
138:5,15 140:22
153:14 165:22,22
169:17,18 191:2
191:16 192:2,11
192:17 195:10,13
Dan 4:18 171:7

DANIEL 2:12
Danieljaycohen20...
2:15
date 4:8 38:12 53:8
62:3,13,15 135:17
135:18 185:21
192:8,9 214:17
dated 38:7 84:20
113:2
Dave 176:15 216:11
216:24 217:7
218:10,15
day 1:19 25:8 27:1
27:17,24 28:4
39:14 74:4 217:12
224:5 225:19
226:20
days 193:8,10 195:8
195:9
dealt 176:8
decide 16:2 127:19
129:4 130:24
150:12 168:21
decided 32:17 131:3
132:3 133:16,21
138:8
decides 134:16
204:20 220:12
deciding 155:12
decision 23:14 82:9
151:4 170:2
221:15
decisions 82:20
declare 76:10
135:20
declared 76:19 77:7
126:13
declares 76:9
deduction 96:2,11
98:1 101:18
defendant 2:10,16
4:19 159:19,23
212:10
Defendant's 12:18
defendants 1:8,12
58:4,6 152:10,12
200:11 209:19
210:1 225:8
defending 153:12
defense 81:17,19
137:14
defenses 81:5,6
defensive 81:21
degree 116:22
demands 70:22
denying 162:1

department 190:24
departure 218:21
219:1
depend 110:23
168:23
depending 92:22
130:12
deposed 194:9,11
194:15,17
depositions 1:16
10:11,19 38:18
41:10,11 61:8
177:13 187:10
219:24
describe 90:21
157:22
described 59:15
62:24 96:1,10
124:23 157:12
describing 101:14
113:16
deserves 145:3
designate 117:19
designated 8:2
designates 8:1
designee 7:22 11:23
13:15
desiring 54:9
despite 113:7
destiny 140:4
details 9:13 10:16
14:11 16:15
215:16
developed 61:6
devoted 219:15
diagnosed 50:14
dialogue 160:7
differences 182:1
different 22:12
60:19 72:13 100:2
110:23 111:2
112:5 122:22
139:18 161:12
162:15 164:20
184:12,13 190:11
209:10
differently 132:10
dig 21:17 84:16
diminish 101:2
diminishing 101:23
dinner 37:22
direct 53:20
direction 226:10
directly 70:23 71:8
226:17
disagree 19:18

department 190:24
46:12 169:2
disbelief 97:19
disclose 132:11,15
133:17 184:11
disclosure 118:6
120:20
discoveries 41:10
discovery 10:21
44:21 58:16 86:2
112:3 119:20
208:5 209:3,23
210:4,7 220:2
discretion 169:8
discuss 129:13,15
discussed 14:18
40:8 65:4 118:9
137:15
discussing 40:10
129:14
discussion 38:11
134:24
discussions 127:23
131:15,18 150:20
171:16
disk 69:15 75:9 79:5
79:9 150:1,5
Dismiss 12:18
disrespectful
113:11
distinction 139:22
distinguishing
60:17
distracting 23:2
District 1:1,2,15 4:6
4:6 225:1,2
divide 89:15 91:19
Division 4:7
divulging 129:21
130:17
document 54:1,15
112:9 113:23
117:22 127:15
155:19 174:19
175:6,8,9 178:19
178:24 179:3,4,13
180:17 181:3
185:23 186:2
documentation
120:12 211:2
does 33:7 34:12
39:19 54:8 75:19
90:15 100:13
104:24 105:8
109:24 152:20
174:1,5 175:1,9
187:12 199:20

201:22 224:3
**doesn't** 34:3 78:4
85:7 109:4 130:10
132:7,18 184:10
197:12
**doing** 17:18 29:20
29:21 30:4 40:10
43:7 69:12 97:5
99:10 116:19
151:19 183:13
**dollar** 195:22
**dollars** 109:24
137:24 138:12,20
138:22 140:1,10
140:21 141:19
144:24
**domino-like** 27:22
**dominos** 28:6
**doors** 25:11
**double** 125:13
**doubt** 46:12 52:10
88:15
**down** 23:3 59:6,24
63:24 97:4 119:2
132:18 137:5
**downstairs** 29:12
**Dr** 8:13 118:24
119:4 121:8,22
122:11,15
**draw** 28:2 54:5 60:3
**drawing** 26:9 35:24
36:4
**drawn** 26:15 61:23
**drive** 59:8,18,20
**duly** 5:5,9 226:6
**during** 5:19 31:6
36:24 37:9 48:15
66:20 70:20 222:6
**duties** 61:2
**duty** 144:9,19 161:4
161:6,9,15,16
162:8 163:4 191:6
213:8
**dysfunction** 116:20

**E**

**E** 3:1,8 180:3
**e-mail** 112:18 113:1
114:2
**e-mailed** 11:19
**each** 93:1,10 154:2
205:11,11
**earlier** 69:17 79:15
79:16 83:18
114:24 118:9
126:12 156:3

158:14 160:1
166:13 169:5
174:17
**early** 122:12
**educated** 99:9
**effect** 27:23 52:18
58:9
**effort** 49:19 76:18
83:23 104:23
105:7 189:19
219:10
**efforts** 43:19,20
60:23 64:18 65:11
167:21
**eight** 91:1
**eight-hour** 8:24
81:14
**either** 10:10 12:11
20:4,9 43:14
51:17 52:13 55:3
61:4 71:7 78:2
83:1 136:11
137:12 160:5
192:13 195:23
**email** 38:10,11
113:16,22 114:10
114:21,23 154:13
154:23
**emails** 38:7,13,14
38:22,24 39:16
40:1 47:6
**embarrass** 6:11
**employee** 226:14,15
**employer** 21:10,13
22:10
**enable** 18:1,9
**enabled** 19:6 20:10
21:1 28:22 31:16
39:9,22 44:5 63:1
143:10
**end** 77:23 91:21
95:15,16 108:5,6
108:8,9,13,14
109:20,23 143:5
151:20 155:11
160:22 224:5
**endeavoring** 64:19
**ended** 86:20,22
132:17 166:20
**ends** 125:2
**endurance** 29:6
**engaged** 76:7
123:12 161:14
222:4,18 223:11
**engagement** 126:24
127:5 134:1

174:17 175:2,11
175:16 178:10
180:17 182:2
184:2,20 208:4
211:20
**enough** 14:22 57:10
62:12 71:1 89:8
90:2 91:18 97:8
110:3 125:3
146:18
**ensure** 203:18,24
**enter** 83:12 156:7
**entered** 55:20 84:19
86:11 87:18
111:18 126:24
**entertain** 77:22
**entertained** 78:7
**entire** 91:20 108:23
113:22
**entitle** 187:12
**entitled** 57:3,20
68:15 100:8,23
104:12 114:13
147:14 164:7
167:20 168:4
187:23 188:4,8,14
189:2,2 190:2,11
190:12 200:8
**entitlement** 57:14
190:8
**entity** 7:22
**entry** 156:15 157:3
**equation** 87:2
**equitably** 116:8
**especially** 130:14
**essentially** 63:14
124:13
**establishes** 190:7
**estate** 121:8
**estimation** 147:3
**et** 1:7 4:5 65:11
225:7
**ethical** 141:4,17
**evaluate** 87:20
203:9
**evaluated** 87:9
**evaluating** 95:10
**even** 33:13 35:13
38:21 61:19 70:18
72:8 87:1,3 119:1
119:21 127:1
131:4,23 143:5,6
143:9,13 144:11
144:17 146:12
149:3 167:17,22
169:5

**event** 62:14 152:22
166:18 194:19
**events** 86:18
**every** 6:21 59:9
111:1 177:12
**everybody** 116:7
117:1
**everything** 21:8
22:8 29:3 62:21
62:22 121:23
141:4
**evidence** 24:8,23
28:19 35:14
**evidentiary** 27:6
35:1
**ex-parte** 154:22
**exact** 18:11 90:20
91:18 106:21
214:17
**exactly** 100:2 119:8
**examination** 1:13
3:4,4 5:13 170:22
**examined** 5:9
**example** 33:14
64:22
**examples** 65:8
**exceed** 139:9
**except** 7:3,5 184:23
**excess** 96:5
**Excuse** 23:1
**exhausted** 94:6
**exhibits** 118:5
155:13 174:16
211:3
**existed** 45:9
**existence** 44:20
211:12
**existing** 24:12
148:15
**expected** 109:19
153:14
**expend** 189:19
**experience** 67:21
68:1 94:8 203:9
203:13
**experienced** 99:20
195:4
**experiences** 189:21
**expertise** 108:21
190:23
**expired** 148:12
**explain** 60:5 131:10
131:12,12 132:2,5
182:8
**explains** 36:1
**explanation** 121:5

**explore** 64:19
125:21
**exponentially** 139:9
**exposure** 165:24
166:17
**express** 66:16 71:13
**expressly** 104:9
145:13 146:2
168:3
**extensive** 220:2
**extent** 59:11 78:17
104:13 113:15
116:18 123:18
127:22 134:7
141:10 184:6
**extenuating** 140:14
142:1 143:17
**extra** 189:18

**F**

**F** 180:3
**face** 166:18 182:22
**facilitate** 18:1 19:16
34:16 42:7 43:16
43:21 44:11,15,24
45:3
**facilitated** 19:6
20:10 21:2 28:22
31:16 39:9,22
44:5 63:1 143:10
**fact** 21:11,12 22:14
23:19 24:3 26:7
31:14 33:17 39:8
56:2 95:9 96:22
97:24 113:9
149:19 168:1
203:21
**factor** 89:15 93:8
**factors** 68:7
**facts** 24:8,12,22,24
25:4 28:18 35:6
36:4 88:17 140:19
164:23,24 199:18
199:21,24 217:6
218:18,19,24
**factual** 18:4 19:3
20:22 27:6 34:24
39:5 40:14 43:18
44:2,13 45:6
160:10
**factually** 37:4 87:12
**failed** 113:6
**failing** 83:1
**fails** 153:8
**fair** 57:10 62:12
65:5 78:22 90:22

98:18 105:3,18
111:17 117:1
146:18 147:1,2,11
164:8 195:23
197:23 219:6
**fairly** 116:8
**fairness** 103:22
**fall-out** 152:8
**falling** 28:7
**false** 92:17
**familiar** 45:14,16
200:20 201:8
**family** 208:19
**far** 49:13 55:19
62:22 83:13
196:21 197:2
**fatigued** 29:11
**fault** 30:10
**favor** 170:1 221:16
**favorable** 78:14
**faxed** 97:4,8
**faxes** 47:22 48:10
50:24 51:15 53:6
58:18,24 92:23
93:10 97:1,7
100:24 101:6,24
203:2
**features** 124:24
**February** 119:14
**federal** 1:13 52:3,4
52:8 58:2 82:22
90:7 98:9 107:2
138:4 148:4 156:2
156:4 159:17
186:12
**fee** 56:18 89:8,11,12
102:15 103:6,7
106:17 111:20
**feel** 16:7,8 19:22
20:6 21:14 22:1
40:21 41:13 69:1
103:21 141:16
224:3
**feeling** 23:14 78:22
**felt** 16:4,12 17:9,10
17:13 40:4,7,18
40:23 42:2 43:10
43:13 140:13,15
**few** 208:11 221:22
**fictitious** 59:5
**fiduciary** 161:9,15
161:16 191:6,11
213:8
**field** 111:14
**fifteen** 69:14
**fighting** 146:9

**figure** 52:21 60:21
107:23 122:6
190:21 191:11,12
192:6
**figured** 59:2,4
**file** 11:11 16:2 20:4
68:15 148:23
149:5 156:14
**files** 148:20 209:16
209:20 210:5
213:24 214:4,11
215:4,11,12,17,23
216:18
**filing** 36:1 43:21
46:17 82:18 86:20
**filings** 11:3,6
**filled** 119:1
**filling** 118:17
**finance** 136:18
141:23
**financed** 144:23
**financial** 118:8
139:10 167:8
**financially** 226:16
**find** 34:24 45:11
53:10 65:22 170:1
**fine** 42:15 62:20
105:20 125:16
151:19 159:7
177:19
**finish** 75:9
**finished** 22:8
**firm's** 13:6 15:17
124:10 152:2
**firms** 46:8 54:19,23
56:16 57:2 80:23
198:16 199:4,8
204:17 208:4,8
**five** 58:4 154:17
189:10,12 204:9
204:19 205:9
224:9
**five-percent** 108:5
**flare** 109:4
**Florida** 1:2 4:7
45:24 46:7 58:19
107:3 118:8,14
157:6 225:2
**flown** 219:24 220:1
**fly** 196:4
**focus** 17:13 20:20
126:16 179:21
**focusing** 19:2
102:22 104:21,22
114:20 222:20
**Foley's** 135:20

**follow** 56:22 151:16
154:4 186:11
**follow-up** 144:4
150:11
**follow-ups** 89:18
**followed** 139:5
**following** 48:9 49:7
49:7,8 151:1
200:4
**follows** 5:10
**foregoing** 225:10
**forget** 173:18
174:21
**formal** 64:7,16
157:3
**formally** 156:14
**format** 224:20
**formation** 211:15
**former** 211:14
**forming** 67:15
**forms** 61:10 65:19
**forth** 19:16 158:17
192:11
**forward** 77:11 80:1
105:23 106:4
114:3 126:20
128:10 166:19
**found** 46:16 105:2
**foundation** 95:21
102:4 103:12
108:17 110:20
116:12 117:5
123:17 126:5
142:14 149:15
166:22 196:22
**four** 17:12 31:7,10
41:18 58:4 125:16
148:6,23 149:4,7
149:12 193:8,10
195:8
**four-year** 148:11
**fourth** 10:6
**frequent** 6:20,24
**frequently** 46:2
**fresh** 29:15
**friend** 47:16,21,23
**front** 22:17 23:20
24:5,16,18,24
27:10 28:17 31:18
31:23 32:14 33:5
33:20 34:2,6,10
54:15 76:14 77:11
78:2
**fulfill** 207:22
**fulfilled** 186:13
**fulfilling** 144:19

**full** 5:15 96:20 98:3
101:21 118:5
167:18 175:9
193:8,10 224:21
**fully** 15:12 129:21
130:22 131:21
132:2 133:3,8,20
168:4
**function** 65:18
**fundamental** 19:21
21:13,24 23:13
**funds** 116:9
**further** 22:22
129:13,14 137:5
226:11,13
**furtherance** 60:7
140:10

---

**G**

**gaining** 77:14
**game** 105:18
**games** 21:16,20
**gave** 9:6 17:11 31:9
32:18 33:22 65:3
121:9,11 211:1
**general** 46:15 65:9
66:12 89:22 94:16
107:15 161:6
**generally** 58:13
66:17 109:17
116:24 160:24
161:17
**generate** 110:18
**generated** 57:15,20
114:14 116:9
**generic** 65:1
**gentleman** 72:20
73:1 173:13,18
**germane** 137:11
**gets** 102:22 121:4
124:8
**getting** 11:14 27:19
27:21 28:5 99:4
108:13,14,18
**give** 7:12 21:18
33:13 43:4 61:20
135:11 138:8
166:14 194:17
**given** 85:5 88:4
89:16 130:14
224:4 225:10,12
**Glen** 176:17
**goal** 6:10
**goals** 158:18
**goes** 14:24 113:12
**gone** 80:20 81:1

**got** 18:22 32:21
40:2 48:8 49:24
60:10 65:23 69:24
85:3 88:19 104:14
106:9 109:4 137:5
138:3,6 145:4
160:20,21 217:12
**gotten** 26:16 43:12
61:3 103:8 125:11
**great** 147:18
**Gregory** 8:12,13
**gross** 105:15 107:11
**guarantee** 189:20
192:21
**guess** 30:8 64:10
103:13 163:2
**guy** 72:17

---

**H**

**H** 3:8
**hac** 157:5
**hadn't** 44:20 45:8,9
**half** 31:6
**hand** 179:10 226:19
**handed** 53:14
**handing** 111:24
**handle** 115:3
**handled** 49:11
**handles** 47:18 48:4
48:16
**happen** 42:7 101:10
168:21
**happened** 20:3 38:3
71:21,21,23 97:13
103:23 164:3
**happening** 72:1
**happy** 30:13 129:15
**hard** 59:8,18,20
66:5 187:20
**harm** 167:3
**harmless** 153:20
166:7
**harsh** 91:4
**Hatch** 2:12 4:19
18:10 45:15,15
46:10 214:1
**Hatch's** 159:15
**haven't** 27:11 28:13
30:18 38:22 40:1
40:7 90:12 120:16
137:15 167:16
193:11 197:22
202:8 212:20
213:2 221:2
**having** 5:8 23:21
26:21 31:19 33:7

37:12 57:13 61:24
70:5,7 87:3 103:8
120:5 141:22
152:9,13 160:22
166:15
**he's** 18:22 109:4
145:4 156:20
203:19 219:9
**head** 18:22,23 29:12
35:20
**hear** 23:2,10 71:2
106:7
**heard** 22:20 36:20
38:21,23 45:21
94:18 97:15
104:19 106:10,14
106:22 107:13
146:6 202:15
**hearing** 5:20 9:17
9:22 10:1 24:18
31:23 32:14 33:10
33:20 34:7 36:7
36:23 37:1,10,17
39:12 53:17 78:20
88:1 143:4 144:6
167:15 169:4
171:4 172:3
**heart** 63:24
**held** 53:18 81:7
92:14,15 153:13
162:5,11
**help** 60:22 65:23
210:16
**helped** 34:16 104:14
**helpful** 151:15
223:6
**helping** 23:9 138:15
**her** 117:10 125:15
127:23 131:15
132:6,7,10,17
144:21 146:15
150:20 184:8,9,10
184:11,12,13
191:18 215:6
218:2,2 223:2
224:4
**hereby** 225:10
226:5
**herein** 5:8
**hereunto** 226:18
**high** 94:20 95:16
108:5,9
**high-end** 95:3
**higher** 99:13 103:17
109:21
**him** 20:2 25:8 62:7

131:11 142:22
145:22 200:17
201:1 202:1
203:10,12,14
206:15,20 218:8,8
**himself** 44:3 113:16
**hire** 50:15
**hired** 17:19 54:9,17
55:17 84:11
**hiring** 54:21 127:10
**hold** 61:20 123:6
153:20 166:7
**Honeywell** 22:17
23:21 24:6,16,18
25:1 27:11 28:17
31:19,24 32:14
33:5,21 34:3,6,10
39:12 171:20
**Honeywell's** 162:1
**hope** 117:6
**hotel** 196:6
**hour** 1:20 6:21,22
31:6 69:9 194:7
**hours** 41:9 111:1
224:9
**however** 218:11
**huge** 97:1
**hundred** 68:18
**hundreds** 137:23,23
137:23 138:11,20
139:24 140:1,9,21
141:19,21 144:24
**hurt** 219:5,8
**husband** 8:12 14:5
47:14 48:14,19
49:2,14,14 83:11
83:20,21 194:8
**husband's** 192:18
192:20 208:19
**hypothetical** 140:18

**I**

**I'd** 116:1 176:13
183:2 204:8
**I-S-M-A-E-L**
201:16
**idea** 79:24 102:24
116:3 147:12
**identical** 91:12
**Identification** 54:3
112:11 117:16
127:17 155:21
178:21 179:15
**identified** 46:9 50:4
**identify** 59:21
188:19 195:3

**identifying** 55:16
**ignore** 59:12 91:14
**ignoring** 24:15
52:20 89:3
**illegal** 140:23
**Illinois** 1:18,19 2:4
2:14 4:14 226:1,5
226:20
**illness** 6:7 224:4
**imagine** 66:5
**impact** 82:10,23
**impasse** 76:10,20
77:2,7 126:12,15
**implies** 183:11,19
**important** 14:21
82:6
**impression** 27:19,22
28:6 81:9 166:14
**improper** 130:11
**inaccurate** 87:12
**inadequate** 69:4
**Inc** 1:4,11 2:20 5:2
7:18 178:23 225:4
**incentive** 104:2,11
105:6 138:8,16
140:6,24 145:16
167:18 168:6,13
169:7 192:21
195:12
**incentives** 167:9
**include** 50:1 155:12
**included** 46:24
67:11 107:14
**includes** 107:3
196:16 204:23
**including** 15:17
66:20 107:2 162:9
211:15 212:9,14
212:21 213:8
**income** 135:22
136:2,8,13,15
**inconsistency** 122:6
**inconsistent** 21:19
**Incorporated** 4:4
**incorrect** 36:13 37:4
147:7
**increase** 110:12
**increasing** 142:11
**incurred** 134:2
152:3 169:12,19
170:5 192:12
196:17,21 197:2
221:13
**indemnify** 152:16
153:20
**independent** 83:23

120:10 159:10
**independently** 87:5
**indicate** 155:24
157:11
**indicated** 80:5 88:2
90:18 168:8
**indicates** 25:1
**indication** 25:6
62:16
**indirectly** 226:17
**individual** 137:9
140:5 162:9
206:13
**individually** 143:11
**inference** 26:9,15
28:2 36:4
**inferences** 35:23
**informed** 214:10
**initial** 50:10 52:22
93:7
**initially** 52:13
**initiated** 84:12
113:8 164:20
**injunction** 5:20
9:16 12:11,14
32:13 36:7,23
37:1,9,17 39:12
53:17 58:11 88:1
143:4 144:6 162:2
167:15 169:4
171:4,10,19
**inquired** 8:9
**inside** 115:19
**instance** 138:19
**instead** 68:24
125:13 141:22
**instructed** 133:2
**instructing** 130:2
134:11,15,22
**instruction** 130:9
130:11 154:5
**instructs** 15:4,5
**insurance** 145:6
**intend** 120:16,20
**intended** 13:16
204:16
**intends** 204:10
**interacted** 206:15
**interacting** 94:11
**interaction** 147:17
**interactions** 206:19
212:10,14
**interest** 144:17
161:8 163:9 187:1
213:6,7,12,19,23
222:3,16

**interested** 226:16
**interests** 56:4
115:12,15 144:16
205:13 223:10
**interfere** 43:2,4
**interrelate** 91:13
**interrogatories**
10:22 13:4,6,11
15:17 211:3
**interrupt** 183:3,15
**into** 18:14 39:1 41:8
41:14 48:23 52:3
52:4,8 55:20
59:24 61:17 83:12
84:19 86:11 87:18
93:9 97:23 114:24
126:24 189:12
190:5,7 219:10,13
224:17
**introduce** 4:15
**inure** 138:14
**invade** 6:11 129:18
**invades** 134:8
141:10
**invested** 104:23,24
145:1,4 223:16,17
**investment** 60:6
62:17 141:20
**invoice** 196:11,14
**invoiced** 135:16
137:23
**invoices** 152:2
**invokes** 184:7
**involved** 16:10
40:22 41:5,19
60:10 65:17 70:1
70:11 81:13
110:24 162:6
163:3 177:14
197:13 205:14
**involvement** 60:6
60:24 64:13 94:9
143:7,7 212:8,13
212:21
**involves** 207:15
**involving** 52:14
82:8,22 213:2
**IRS** 135:22
**Ismael** 201:16
**isn't** 44:7 64:4
91:24 97:22 103:7
**issue** 7:8 58:18
82:10 103:7
105:20 127:24
154:16
**issued** 82:21

**issues** 14:11 52:2
68:7 82:7,9
112:21 140:14
221:15
**item** 117:18
**its** 7:23 8:3 28:22
45:15 63:9,9
82:24 87:5 156:2
159:9 210:5 213:7
**itself** 99:15 102:7
103:3 113:7
160:14 175:6
182:22
**IV** 6:16

**J**

**J** 2:7,12
**J-E-E-V-E-S** 48:2
**James** 201:9,11
**Jeeves** 47:24 48:1,3
48:6,14 49:3,14
83:9,12,20
**Jeff** 5:1 173:5
**JEFFREY** 2:2
**Jim** 201:8,11
**Joe** 111:15
**join** 149:3
**joined** 52:8 60:9
87:4 149:10
**joint** 113:14
**Joseph** 112:20
200:20
**JPA** 113:13
**Jsoble@foley.com**
2:5
**judge's** 154:22
**judges** 189:21
**judgment** 80:1
116:10 126:20
147:19
**July** 9:15 53:18
88:1
**jumping** 51:19 83:7
**junk** 47:16
**junk-fax-related**
48:16
**jurisdictions** 107:2
**justified** 68:8

**K**

**K** 226:2
**keep** 91:14 113:6
145:7 179:18
183:13
**Kelly** 44:22 176:15
182:10,11,12

**199**:14,15,23
219:18
**kidding** 134:20
**kind** 17:7 27:22
30:7 33:14 35:12
39:18 40:19 41:23
51:11 55:10 83:13
86:12 91:12 92:20
94:9 107:12 110:4
111:13 117:1,2
121:4 124:23
170:8
**kinds** 47:19 48:4,10
49:11 65:19
**KMH** 181:18
**knew** 20:9 22:8
34:15 36:12 47:11
87:24 107:10
213:9
**knock** 109:1
**knowing** 34:21 35:7
99:17 216:17
**known** 22:18 23:21
31:19 32:8 33:6
34:11 36:9 37:11
113:18
**knows** 34:1 48:15
60:16,20 138:9
140:7

**L**

**L** 180:3
**label** 112:23
**labeled** 179:17
**labeling** 112:4,5,14
166:21
**Lack** 116:11 117:5
166:21
**laid** 158:11
**Larder** 127:7
**Lardner** 2:2 127:10
128:11 172:14
173:1,3,21 174:2
174:6 175:2,12,17
210:17
**large** 17:4,5 41:2
97:3,5,7 98:7
100:15 110:9,17
**larger** 110:13,14
**LaSalle** 2:13
**last** 8:9 51:19 58:6
61:15 114:3
117:18 127:3
130:19 176:17,17
**later** 14:21 31:6
52:20 53:8 60:9
84:20 86:8 124:8

**192**:8,9 204:20
**Latin** 30:1
**laughed** 166:13
**Lauren** 173:5
**laws** 186:12
**lawsuit** 12:3 16:3
64:5 98:11 127:11
128:22 193:2
205:21 214:21,22
**lawyer** 10:21 184:9
184:11 204:10,11
204:12,20,21
205:11,12 218:2
**lawyers** 10:19 56:16
57:2 82:4 94:11
159:20 182:24
183:11 197:13
204:12,22,23
205:14
**lead** 81:16 167:9
**leading** 66:20
145:20
**leads** 28:10 49:4
76:13
**learn** 199:13 214:8
217:10
**learned** 45:18 81:13
109:6 213:10
**least** 16:17 18:16
84:8 107:18 145:4
145:8 219:13
**leave** 96:4,13
190:22 218:11,12
218:15 224:5
**led** 6:18,22 25:9
26:1 68:8
**left** 30:16 43:9 63:6
69:15 97:9 111:14
194:21 195:1
217:10 219:3
**legal** 2:7 4:23 82:7
123:18 135:3
137:24 138:1
157:13,23 158:3,6
159:4,5,10 160:21
161:1 163:12
168:18
**legally** 205:12,13
**length** 44:1
**lens** 95:2,15
**less** 106:23
**lesser** 124:4,4
**let** 73:16 114:4
125:20 128:9
132:10,21 133:15
133:17 154:12

**199**:23 209:10
**let's** 18:12 31:12
144:23 183:3
197:7
**letters** 182:2
**level** 99:13
**Lewis** 45:16
**liability** 63:12
**liable** 81:7 153:13
**License** 226:24
**licensed** 157:6
**life** 208:11
**light** 150:21
**liked** 109:7
**likely** 35:24 54:14
82:3
**limit** 183:15
**limitation** 148:11
**limitations** 148:2,5
149:1,9,18
**limited** 130:19
**limiting** 38:4 64:16
**line** 54:8,12 58:11
61:23 137:5 167:5
**lines** 60:3
**list** 10:14,15 31:3
58:17,23 59:6,9
119:4,5
**listed** 13:15 54:20
186:15 208:23
210:20
**little** 29:11 33:11
68:13 83:7 86:8
88:17 89:10,17
106:16 124:14
147:19 223:14
**LLC** 2:12 4:18,20
**LLP** 2:2 127:7
**local** 47:15 48:15
**lock** 71:22
**locked** 97:22
**Loew** 173:5
**long** 29:4 30:2 40:2
42:10 53:18 60:15
66:1 69:7 109:14
109:15 121:18
**longer** 15:11,12
**look** 11:19 33:24
48:10 58:10 62:15
84:16 86:8 112:22
127:3 133:1,1
198:9 204:9 208:3
209:15,18 210:5
210:11
**looked** 8:17,21 11:5
11:7 37:16 84:13

**87**:6,9,13,16,19
**looking** 24:22 38:22
64:24 165:20
**loop** 74:19 113:6
**lose** 78:6,8 167:7,8
192:19
**losing** 147:20
**loss** 168:12
**lost** 125:23 167:16
192:17,18
**lot** 16:10 18:7 20:17
20:24 22:3 40:22
41:4,16,18 58:16
61:2,16,24 62:17
124:21 142:1
144:22 147:7
160:20,21 165:2
171:23 188:6
219:9
**lots** 31:1 46:20
**loud** 71:1
**low** 90:2 91:21
94:19 95:15 108:5
108:8 109:20
125:9
**low-claim** 95:3
**lower** 103:17
**loyalty** 161:4
**lunch** 79:13

**M**

**ma'am** 5:15,18
42:22 79:12
111:11 118:4
126:22 129:20
150:9 151:1 154:4
170:13
**made** 44:18 45:9
46:22 70:10,12,21
82:5 98:19 101:3
104:6 112:2 146:2
149:17,18,21
158:23 225:15
**Madison** 2:8
**maiden** 26:3
**mail** 46:2 68:13
120:3
**mailing** 25:23
**main** 65:14 69:20
70:11 121:13
178:14
**make** 14:18 30:6
42:6,8 43:17
48:13 49:20 63:4
83:23 88:3 90:10
92:1 94:5 119:3

132:19 146:22
150:10 155:13
158:13 164:12
168:6 204:4
225:11
**makes** 125:1
**making** 68:24 70:23
101:8 118:13
145:6
**malicious** 152:9
153:10
**many** 7:6 26:10
53:19 72:4 78:10
92:22 93:10 96:17
97:1 107:1 110:22
110:24 111:1
161:18 208:10,11
215:14
**mark** 117:8,10
179:24
**marked** 53:15 54:1
111:24 112:9
117:13,18,22
118:5 126:22
127:15 155:9,19
178:17,19 179:11
179:13 203:4
211:18
**marketing** 25:23
**marks** 79:4 149:24
150:5 224:13
**married** 26:2,9,16
26:17 28:1
**mass** 25:23
**material** 223:9
**materially** 115:16
213:7 222:3,16
223:10
**math** 93:16 97:5
**matter** 4:3 137:7
152:24 153:4
**matters** 137:3,20
**Maureen** 1:16 4:11
226:3,23
**Max** 75:19 76:17
**maximum** 138:5
141:20
**maybe** 75:10 78:6
99:1,2 124:4
138:16 139:16
140:23
**MC** 112:7,13
**MC-189** 198:9
**MC-190** 180:10
200:7
**MC-192** 204:8

**MC-194** 186:18
**MC-195** 189:9
**McCoun's** 154:14
**meaning** 41:20 44:9
148:21
**means** 22:13 63:9
76:6,11 113:13
123:14 124:23
158:14
**meant** 37:6,8 77:1
89:12 97:12 133:5
**mediations** 21:7
22:20,24 23:22
31:20 33:7,19
34:11 36:9,24
37:2,12,14,20
38:3 61:9 73:6
158:15,24
**mediator** 64:1,6
65:20 70:8,14,23
71:7 74:13,17,22
75:18 76:10
158:20
**mediators** 72:13
**Medicare** 51:2
**medications** 43:1
**meet** 5:19
**meeting** 47:15,20
48:15 83:11 171:3
**meetings** 22:23
**members** 17:3 67:1
71:17 95:12 96:19
101:10,22 108:7
108:10,13 149:2,2
163:7 187:1,7
189:16 190:12
**Memorandum**
12:19
**memory** 43:3
**mental** 43:3
**mention** 39:15
67:20 69:23 107:9
173:15
**mentioned** 9:12
10:6,17,20 27:4
27:13 30:18 39:11
51:20 83:10,18
90:19 106:17,22
119:2,6 195:13
208:21 219:4
**mentioning** 40:19
**mentions** 48:14
**merit** 142:18
**merits** 79:1 80:2
82:24 83:3
**Mester** 74:2

**metastatic** 6:16
**Miami** 72:3,20 73:1
74:10,17,23
**Michael** 46:11 56:9
64:19 70:5 200:16
**Michelle** 1:11 3:3
4:2 5:7,17 11:21
50:6,6 119:24
120:4,13 225:17
226:6
**middle** 1:2 4:6 5:24
113:1 225:2
**Mike** 47:3,7 55:21
56:2,24 57:7,12
148:14 177:8
199:11
**million** 102:22
108:8,9,14,15
109:20,22,23
**mind** 34:12 67:2
79:22 187:12
**minute** 9:13 179:23
**minutes** 40:20
42:12 69:9,15
154:17 224:10
**misbehavings** 147:9
**misleading** 132:17
**mispronouncing**
5:23
**missing** 122:16
**Misstated** 215:6
**Misstates** 144:21
146:15 191:18
**misunderstanding**
27:20 36:18
105:22
**misunderstood**
139:16
**moment** 53:21
113:18 128:3,6
192:4,5
**Monday** 113:3
**monetary** 99:13
**money** 41:17 42:8
43:17 90:4 93:1,3
93:4 97:6,9 124:5
125:3 140:2,9
141:22 145:2
192:19 193:9
220:14 223:17
**monitor** 4:9
**morning** 5:15 26:24
**most** 14:19 26:3
50:21 54:14 65:15
187:8 219:5
**mostly** 65:14 134:23

176:8 192:23
**motion** 12:10,13
**Motions** 12:18
**mouth** 17:2 19:12
**move** 92:2 126:19
**moved** 87:3 164:18
**Mowers** 118:8,14
**Ms** 53:14 154:13
155:8 170:24
197:8 208:11
**much** 84:3 110:3,24
135:15,17 137:5
143:5 155:13
183:13 187:10
188:8,19 193:4,9
219:11,15
**multiple** 31:22 76:8
160:18
**must** 26:15
**myself** 39:19 41:1
217:4

**N**

**N** 3:1 180:3,3
**named** 58:3 111:15
161:12 162:10
163:6,8 164:17,20
**names** 45:17 58:6
176:8,13,21
**narrow** 154:16
**natural** 7:24
**nature** 9:3 10:12
61:21 194:9
**necessarily** 34:4
85:8 86:16 163:14
**necessary** 110:10
**need** 19:14,18 23:3
23:8 29:11,19
30:13 53:22 61:10
111:3 155:12
224:7
**needed** 51:13 53:4
97:6 174:10 209:6
**negotiate** 98:13
159:19
**negotiated** 63:10
**negotiating** 123:10
124:10 125:10
**negotiation** 76:21
**neither** 76:12
**never** 63:6 78:7,18
79:22,22,23 104:1
104:3 113:9,18
115:4 119:19
136:14 143:8
200:10 202:15

**new** 21:9,13 22:10
25:10,10 26:21
27:16 28:5 55:1
204:22,23 205:2
**next** 27:17 28:4
39:14 49:1 76:14
154:17 189:9
**night** 37:23
**nine** 143:21
**no-strings-attached**
135:8
**nobody** 169:6
**non-liability** 81:10
**non-question** 21:22
**non-reimbursable**
151:10
**nor** 226:14,14,15,16
226:16,17
**North** 1:18 2:3,13
4:14
**Nos** 117:14
**notary** 1:16 155:16
225:22 226:4
**notes** 65:23
**nothing** 90:17 137:6
201:5
**notice** 13:14 68:22
85:18 99:23,24
108:19 118:6
122:18 162:14
178:22 201:19
**noticed** 62:15
117:17 136:22
137:6
**notices** 10:20
**noticing** 4:17
**notification** 46:6
122:18
**notified** 199:3
**notify** 198:17
**November** 1:20 4:8
73:9,11
**numbers** 54:6
106:10,11,13,14
107:13 119:17
122:22
**numerous** 41:10
**Nutrition** 181:19

**O**

**O** 180:3 226:2,2
**o'clock** 1:20
**oath** 225:11
**objecting** 69:5
**objections** 14:18
124:18 141:24

183:15
**objects** 15:2
**obligated** 135:11
153:14
**obligation** 136:19
**obligations** 153:21
193:21
**obtain** 59:17 84:23
140:22 168:13
198:20
**obtained** 58:23
121:6 157:4
164:19
**Obviously** 18:21
141:14 175:6
**occasions** 160:18
**occurred** 36:15 72:5
78:18 79:23
**October** 122:2,2
180:13 181:4
**off** 30:16 31:3 40:9
42:8,16 43:9,17
75:12 79:5 90:12
111:5 150:1
154:24 155:2
165:13 170:17
223:21 224:2,12
224:14
**offered** 141:15
**office** 61:8,10
118:20,21,23
121:13 145:7
192:23 193:2,4
194:24 195:4,8,10
226:19
**offices** 122:20
**often** 7:7 189:21
**Oh** 66:2 137:13
**old** 116:20
**once** 5:19 51:17
71:22,23 97:11
**ones** 38:9 50:20
176:7 183:16
**ongoing** 76:7
**open** 224:6
**opinion** 35:20,21
67:15 81:12
142:19 146:20
162:22
**opinions** 74:14
147:5
**OPP** 112:6
**Oppenheim's** 32:7
36:22 218:21
219:1
**opportunity** 5:18

166:4 168:12
171:9
**oppose** 102:17
144:13 146:14
168:5
**opposing** 18:10
143:16
**order** 17:24 114:4
117:19,23 124:14
138:21 162:1
179:19 180:2
207:21
**ordered** 224:17
**original** 17:8,8 45:8
55:4 124:2
**otherwise** 76:7
83:22 94:3 149:8
**ours** 47:16
**out-of-pocket**
153:21
**out-of-state** 157:5
**outcome** 117:3
**outside** 68:20 82:14
108:18 115:23
122:17 129:23
130:21 131:6,19
131:24 133:19
136:21 150:17
162:13 174:13
201:18
**over** 18:20 50:8
51:1 52:3 53:9
72:13 86:19 87:3
94:10,14 120:10
143:8 163:6,7,19
164:18 208:22
**overarching** 144:8
**oversimplify** 59:10
**owed** 163:4 213:8
**own** 63:9,9 66:23
67:2 68:1 71:14
82:3 87:5 99:21
140:2,4,9,9,21
141:6,18,22 149:6
149:11 159:9
205:22
**owned** 118:21
**owner** 8:7,10,14
145:2

―――――――――
**P**
**p.m** 75:13,16 79:6
79:10 111:6,9
150:2,6 155:3,6
165:14,17 170:18
170:21 223:22

224:1,15,23
**package** 203:2
**page** 3:2,9 54:5,6,12
58:10 65:23
112:22 113:1
114:3,21,22
119:14 121:10,17
127:2,3 155:23
159:14 167:1
180:9 189:9
198:10
**pages** 53:19 160:20
**paid** 57:8 104:3
108:11 110:4
115:4 135:17
138:1 145:4,6
196:9
**paper** 35:19 155:14
**papers** 10:11
**paragraph** 155:24
158:2 159:14,15
160:10 167:1
204:9,19 205:9
**paragraphs** 123:4
157:9,10,21 158:7
159:3 160:21
161:18
**participated** 22:7
**participating** 38:10
161:3
**participation** 64:14
193:6
**particular** 16:20
33:17 41:5,15
61:12 70:21
114:20 118:21
179:4 207:13
209:16
**parties** 11:3 63:24
64:5 77:9 154:15
226:15
**partnered** 46:20
**parts** 60:1
**party** 4:17
**pass** 34:19 155:9
170:14
**passed** 48:19 121:8
126:22
**passing** 118:4
**past** 46:21
**patients** 51:1
**Patrick** 173:14
**pause** 53:12 75:14
114:6 170:19
204:14
**pay** 94:1 115:3

139:7,13 141:15
145:7 147:13
151:11 153:14
**paying** 141:6 145:3
170:10 196:8
**payment** 68:16
101:21 135:20
152:2 188:5,15
189:3 190:3,8
**payout** 95:11 108:7
**payouts** 96:14
**penalty** 90:19 91:3
91:7
**pending** 7:4 51:23
52:8 58:2 82:7
87:18 89:23 148:9
148:10,20 222:24
**people** 16:19,22,24
22:24 26:3,11
32:22 58:17,24
89:9 92:8 96:17
112:18 131:16,18
147:17
**per** 68:3,4 69:2 92:5
92:5,7,9,21 98:12
99:10,13 101:1
**per-claimant** 103:1
**per-class-member**
91:22
**perceive** 115:12,15
**percent** 8:13 14:22
94:20,20 95:3,4
95:16,17 96:5,14
96:18 102:16,21
103:4
**percentage** 94:4,16
102:16 103:10
107:8,18 110:14
**perform** 197:18
**perhaps** 12:19 76:8
**period** 156:21
**periods** 60:1,17
**perjury** 88:13,16
90:19 91:2,3,7
**permissible** 164:9
**permitted** 183:16
**person** 4:24 7:24
8:1 11:22 30:11
59:4 66:10 88:13
93:17 133:1
**personal** 206:14
226:10
**persons** 101:4,5,8
**pertain** 197:12
**pertaining** 1:15
**pertinent** 18:9

24:11
**perused** 88:2
**petition** 167:17
**Phil** 38:18 47:7
**Phillip** 2:18 4:20
**phone** 25:7 74:3
97:4 177:2 210:10
**phrase** 158:1
218:14
**phrased** 139:20
218:12
**picture** 63:6 115:23
115:24
**piece** 26:10
**place** 160:5,6
225:11 226:12
**placed** 85:17
**plainly** 108:21
**plaintiff** 1:5 2:6 5:2
7:17,22 52:14
58:3 80:24 136:18
161:12 162:7,10
163:4 164:20
225:5
**plaintiff's** 198:15
**plaintiffs** 82:5 104:8
104:16 105:6
115:2 145:12
146:1 162:7 163:7
163:8 164:18
168:3
**plans** 51:2
**play** 21:16
**playing** 21:20
**pleadings** 10:9,17
11:2 12:6,23
51:17 61:5
**plus** 140:6
**point** 28:7 38:11,17
75:11 78:15 83:2
182:9 205:3
**pointed** 175:7
186:17
**Porcelli** 87:19 89:24
104:9 105:1
167:17
**portion** 56:18 57:3
111:20 145:23
179:24
**portions** 127:8
**position** 66:9,16
71:13 74:7 89:7
89:21 103:5
104:17 106:6
124:11 126:19
130:9 157:13,23

158:3,6,18 159:5
159:10 164:11
**positions** 70:22 71:5
71:6,9,9
**possession** 18:14
83:24
**possibility** 77:23
140:6 192:20
195:11
**possible** 14:2 22:14
50:17 55:6,7
139:10
**possibly** 118:23
138:21 140:15
142:12 192:7
**postage** 119:13
**Postman** 9:1,5 62:4
62:10,15 65:24
66:8,15 81:15,20
166:2,13 194:19
**potential** 47:1 81:19
85:13,18,22 108:3
110:8 115:13
138:6 148:22
165:22,24
**potentially** 82:10
**practice** 121:21,23
121:24 122:2,10
122:14
**pre** 65:17 69:24
70:13
**pre-mediation**
158:16
**preclude** 159:22
**precluded** 146:8
**predicate** 128:9
139:21
**predicted** 95:13
**preliminary** 5:19
9:16 12:11,14
32:13 36:7,22
37:1,9,17 39:12
53:17 58:11 88:1
143:3 144:6 162:2
167:15 169:4
171:4,10,19
**premise** 18:16
35:10 97:21,23
**preparation** 12:7
179:7
**prepare** 8:18 13:1
210:16,19 211:7
212:2
**prepared** 13:19
21:6 22:6 158:16
195:5

**preparing** 12:14
171:17 195:7
**presence** 65:13,15
69:20 128:8 129:3
129:23 131:6,19
132:1 133:13,19
150:14,16,17
**present** 2:18 14:20
38:16 70:11
**presented** 65:20
**preserve** 14:20
**preserved** 148:24
**presuming** 139:4
**presumption** 106:3
**presupposes** 124:7
**prevail** 138:13
220:12
**previous** 49:17,19
144:5
**previously** 34:13
44:1 47:14 150:9
159:6 160:12
**primary** 144:9,19
**privacy** 6:11
**privilege** 129:18
130:10 134:8,13
141:11 153:24
154:16 182:15
183:12,19,21
184:7 187:18
199:17,20 217:18
**privileged** 18:8
22:23 105:18,20
127:23 129:9,10
129:16 132:8,13
132:14,24 150:22
218:3
**privy** 68:12 70:12
**pro** 135:9 157:5
**probably** 30:8
35:13 79:3 84:15
111:14 114:2
170:15 193:8
194:8
**problem** 36:21
143:22 144:2
**Procedure** 1:14
**proceed** 5:12 42:20
75:16 78:1 79:10
111:9 150:7 155:6
165:17 170:21
224:1
**proceeding** 78:19
79:24 168:15
**proceeds** 167:6,23
168:7,8

**process** 76:8 113:7
152:11 153:11
**processing** 43:3
**produce** 85:6
120:24 207:14,17
**produced** 119:19
120:16 209:2,7
**production** 9:3 10:7
10:11,22 41:17
112:1,15
**professional** 137:2
137:18
**projected** 95:13
**projection** 109:21
**prominent** 50:21
**promise** 135:12
152:5 153:16
**promised** 104:1
169:6 189:14
**prompted** 151:4
**proof** 35:15
**proper** 134:23
**properly** 90:16
**proposal** 70:24
**proposals** 94:24
95:2
**proposed** 87:14,17
93:23 96:1,11
106:17 146:18
**proposition** 161:1
**proprietary** 206:17
206:18
**prosecute** 19:7
**prosecuted** 80:23
**prosecuting** 134:3
169:13,19
**prosecution** 43:21
47:2 56:10 113:14
138:2 151:12
152:10 153:5,10
166:9 170:11
**prospect** 126:16
**protect** 30:12
144:14 152:16
153:19 199:20
**protective** 117:19
117:23 180:1
**prove** 44:22
**provide** 84:23
198:18 199:6
209:9
**provided** 28:3 83:20
83:21 84:18 85:4
86:2 98:3 101:17
171:11 172:3
209:7 210:3

**provides** 99:16
102:13 108:12
151:24
**providing** 120:12
**public** 1:17 225:22
226:4
**purchased** 121:21
122:1
**purportedly** 215:17
**purpose** 137:10
172:7 176:5,12
**purposely** 183:18
**purposes** 15:10 70:7
92:12 97:20
107:20 124:15
149:1 174:2,6,11
175:3,17,19 177:6
177:16,22 180:18
180:23 186:21
199:8 211:20
**pursuant** 1:13
119:19
**pursue** 21:2 23:15
48:11 51:6,7
52:23 67:7 127:10
127:19 129:4
130:24 131:3
132:3 133:16,21
140:2 150:12
151:5 161:11
**pursues** 163:11
**pursuing** 20:11 22:1
47:8 139:14 143:1
159:17 163:19
**pursuit** 31:16 39:10
39:23 44:5 142:9
**pushing** 110:8,17
**put** 17:2 41:8,16
67:14 70:6 91:1
105:20 118:2
127:24 145:2
146:13 159:6,12
190:5,7 195:22
219:9
**putative** 148:21
163:4
**putting** 19:12 93:22
115:19 144:15
217:3,4

**Q**

**questioning** 143:5
**quick** 53:10
**quickly** 178:17
**quid** 135:9
**quite** 33:2 49:8

116:21 137:9
**quo** 135:10
**quote** 20:23 25:13
32:7 42:2 43:10
141:16 158:6

**R**

**raise** 165:24 166:2
**raised** 81:22 166:2
**range** 94:13,16
95:19 100:13
102:21 108:7
**rate** 94:15 95:3,4,13
95:16,17 96:5,14
96:18 98:5 101:1
101:21 102:1
103:4 108:5,6
109:21 110:11
**reach** 64:8 210:8
**reached** 78:1 82:1
87:8 124:12 125:7
164:22
**reaching** 79:17
86:23 123:10
143:13
**read** 39:1 40:1
58:20 66:5 109:12
113:22 114:3,7,24
157:17,19 159:23
160:17 167:10
181:3 189:12
191:15 198:21
225:10
**reading** 204:24
**reads** 54:8 159:15
**ready** 11:14
**real** 43:23 53:10
133:9
**really** 88:16 92:1
147:19 163:15
**realm** 141:4,17
**reason** 15:3,3 20:5,5
22:1 39:4 46:12
52:10 64:11 120:3
125:24 126:9
132:22 136:12
143:1 147:2 149:9
177:19 203:20
**reasonableness**
87:10
**reasonably** 96:22
110:10 125:10
168:14
**reasons** 31:9 63:19
105:1
**receive** 47:17 56:18

57:2,3 68:16
83:14 93:3 99:23
99:24 111:20
116:8 169:6
**receives** 49:2
**receiving** 6:7 27:1
28:13 48:5 104:11
116:2 118:16
**Recess** 42:18 79:7
111:7 150:3 155:4
165:15 223:23
**recipients** 59:21
**recollection** 8:18
11:16 55:12,15,24
66:13 74:21 75:2
143:19 182:5
197:21 208:23
215:1
**recorded** 226:8
**recoupment** 170:9
**recover** 220:4,6,20
220:24 221:8,10
221:11
**recovering** 220:14
**redacted** 86:3 175:4
**redactions** 175:7
**redound** 139:10
**reduced** 101:1,1,12
226:9
**reducing** 101:12
**reduction** 96:16
**refer** 25:20 51:1
204:10,21
**reference** 157:11,22
159:3
**referenced** 158:2
**referencing** 25:14
158:7
**referral** 83:13
**referring** 17:15
67:10 70:4 86:9
**reflected** 175:15
180:24 182:22
184:20
**reflection** 166:15
**reflects** 178:6,9
180:17
**refresh** 8:17 11:16
**refusing** 151:17
**regard** 18:6 50:16
51:10 80:6 147:12
200:11
**regarding** 13:21
53:7 117:21
137:19 206:3,5
208:8

**reimbursement**
145:22 146:10
**related** 58:14 77:8
86:13 112:21
199:24
**relates** 71:16
**relating** 127:11
**relation** 54:18
**relationship** 82:4
177:21 185:1,5,7
185:13,19 207:6
211:13,16
**relative** 226:13,15
**released** 85:22
**relevant** 14:12
**relief** 77:14
**rely** 29:16
**remaining** 94:1
96:4
**remedy** 77:14
**remember** 11:13,13
31:7 36:10 72:21
88:19 106:16
118:16 173:24
174:18 176:13
181:21,22,23
214:19 215:2
**remembered** 31:8
**Renfro** 121:22
122:12
**rep** 65:15 94:10
104:2 108:3,20
110:8 162:14
201:19
**repayment** 136:19
**repeat** 19:9 30:6,7
30:13 56:20
109:10 125:22
156:11
**repeatedly** 81:20
**rephrase** 141:13
222:12
**reporter** 4:11 5:3
224:16,19 226:4
**Reporters** 2:20 4:12
**representation**
146:2 152:6,14
153:17 175:10,16
178:2 180:22
198:16
**representative** 4:21
7:21 54:10 65:13
69:21 70:12 99:22
144:8 164:2 167:7
167:10 186:10,14
186:21 189:19

193:14,21 203:17
205:23 221:4
**represented** 156:1
176:4,11 200:10
**representing** 4:11
4:19 56:4 82:4
128:12,13,17,21
200:17
**represents** 172:6,21
175:19 177:6
**request** 76:19 77:7
102:14 112:3
162:1
**requested** 77:6
113:7
**requesting** 10:10
**requests** 10:21,22
168:5 209:23
211:2
**require** 91:1
**required** 41:12 61:6
91:6
**requirement** 65:19
**requirements** 61:3
**requiring** 91:2
**reserve** 29:9 137:8
**resolved** 85:21
**respect** 184:24
185:20,24 211:10
**respond** 46:6
209:22
**responded** 46:3
114:23
**responding** 210:4,7
**response** 12:20
112:2
**responsibilities**
60:23 186:8
207:22
**responsibility** 56:10
60:13 64:13 65:10
69:18 151:10
186:14 193:22
203:17,23
**responsible** 92:14
92:16 134:1 152:1
152:23 196:1
205:12,13
**responsive** 17:6
209:19 210:12
**rest** 206:23
**restated** 35:13
**result** 111:21 138:7
192:12 193:5
**resulting** 110:12
**retain** 50:15

**retained** 51:5,6 59:7
**retaining** 51:10
52:22
**retention** 197:7
198:21 209:9
**return** 135:12
**reveal** 132:7 150:18
**reverse** 123:9,12,24
124:7,22 125:1,8
159:17,18 160:3,5
160:11
**review** 9:15 10:1
11:17 12:13,17,21
13:5,8,10,13 61:4
61:7,14 88:5
166:5 171:10
179:7
**reviewed** 8:16 9:21
11:4,12 12:7
13:12 61:11
161:24 181:6,10
210:2,24 211:3
**reviewing** 10:8
11:15 13:1 15:8
15:16 167:14
**revise** 171:18
**revisions** 180:16
**revisit** 89:2
**Richard** 121:22
**rights** 85:23
**ring** 75:20
**risk** 91:2 146:13
147:20
**risks** 79:16 80:8
**road** 132:18
**Rodney** 75:19 76:17
**role** 21:4 56:9 60:13
60:22 64:13 65:10
65:14 69:18,20
70:11 134:15
161:3 187:5
193:13
**room** 6:21 23:4,6,8
84:3 173:18
**Ross** 25:7 26:20
27:16 28:5 39:14
44:22 59:2,3
74:15 75:1 76:2
76:22 176:15
210:9 214:14,15
215:2,10,21
217:12,14 218:7
218:17 219:18
**rule** 107:15
**rules** 1:14 183:16
186:11

**ruling** 154:15
**run** 68:3 149:4,8,12
**running** 145:8
**Ryan** 44:21 176:15
182:10,11,12
199:14,15,23
219:18,18

_____
**S**
_____

**S** 3:8
**S-A-L-A-M** 201:17
**Salam** 201:16,17
**sanity** 179:19
**sat** 38:17
**Saturday** 26:24
**save** 47:18
**saved** 84:5
**saying** 10:14 18:17
19:17 22:9 26:7
30:12 34:9 36:8
36:14 37:13 38:2
45:5 49:10 78:21
97:15 113:12
122:10,13 153:1
177:10
**says** 68:13 98:12
100:3 112:6
114:24 116:15
121:6 127:1
131:13 132:24
136:4 152:22
156:5 167:5
198:11
**scenario** 32:22
**scheme** 71:20
**scope** 82:14 108:18
122:17 136:22
162:13 174:14
201:18 211:16
**Scott** 47:24
**screaming** 106:1
**seal** 226:19
**search** 203:20
207:20
**season** 214:18
**second** 9:11 15:19
16:16 24:13 30:16
34:16 41:24 42:7
43:16 44:11,15
91:10,16 114:21
119:13 123:5
124:12 167:4
198:9
**seconds** 75:8
**secretaries** 177:1
**section** 198:10,12

200:8
**secure** 135:11
  138:21 140:3
**see** 15:10,19 53:9
  54:7 61:23 64:1,7
  91:13 112:3,7
  113:10 116:2
  127:4 130:12
  137:9 157:14
  167:10 178:24
  186:18 189:10
  198:11 200:7
  204:23 205:15
**seeing** 28:6 166:15
  174:18
**seek** 144:14 145:19
  170:9
**seeking** 128:3,5
  145:15,22,23
  161:7 169:16,18
  170:2 191:2,17
  192:2 193:1,9
  194:10,13 195:14
  221:7,11
**seem** 35:12 66:17
  91:12 100:13,18
  104:24 105:8
  107:22 108:1,16
  109:24
**seemed** 17:13
**seems** 18:16 19:11
  19:21 20:4 21:19
  28:7 117:1 122:13
**seen** 30:2 38:7,13,14
  38:22 47:6 88:24
  113:9 136:14,16
  167:13 179:2,4
  180:5 196:13
**select** 203:18
**semantics** 134:24
**send** 26:17 81:11
  154:23
**sending** 118:17
  145:5
**sense** 103:22 132:19
**sent** 11:11 25:22
  26:1,8 47:21
  50:24 51:15 53:6
  59:9 81:11 114:4
  118:12 119:12
  203:1
**sentence** 167:4
**separate** 91:14
  122:20 149:6,12
  159:9 161:5
  181:12 216:19,22

**separately** 124:10
**September** 122:2
**sequential** 11:6
**series** 38:7 160:2
**served** 112:3
**service** 104:12
**services** 135:16,18
**serving** 142:10
**session** 37:21 65:21
  70:20
**sessions** 38:5 64:17
  66:21 72:4 76:4,8
**set** 57:11,12 89:3
  158:17 164:13
  179:16 192:11
  226:18
**sets** 112:5 187:6
  206:23
**setting** 24:17
  100:14 104:20
  115:10 128:24
**settle** 64:8 90:5
  107:5 108:2 124:3
  124:5 126:2
  158:10,12
**settled** 64:5 73:10
  73:23 74:5 85:21
  98:11 103:8 126:3
**settlement-related**
  64:14 69:19
**settlements** 67:6,9
  67:10,19 68:2
**settling** 223:13
**seven** 144:1 210:20
  219:13
**several** 66:13,14
  208:21
**shall** 152:22 198:17
  198:18,20
**shape** 8:17 86:12
  141:15 151:3
  152:6
**share** 21:12 22:11
  24:3 31:15 39:8
  100:5 114:13
  160:12 206:13
**shares** 49:3
**sharing** 30:19
  199:20 216:12
**she** 93:2 106:4
  108:21 129:7
  130:5 131:11,13
  131:21,23 132:1,3
  132:5,11,14
  134:17,21 139:17
  141:1 154:18

162:11,21 184:13
  218:2 224:3
**sheet(s)** 225:13
**sheets** 225:16
**short** 79:13 155:8
  165:19 222:23
  223:3
**Shorthand** 226:3
**shortly** 12:11
**shot** 154:13
**should** 62:12 64:24
  67:1,16 71:14
  98:2 107:23
  113:22 118:23
  132:10 142:22
  145:8 147:8,13
  162:20 164:9
  180:6 204:12,22
**shouldn't** 67:13
  134:19 164:9
**show** 65:21 73:8
  117:9 123:5
  178:16
**showing** 114:10
**shown** 119:13,24
  174:16
**side** 11:10 40:9 76:9
  76:12
**side's** 13:11
**sides'** 13:10
**sign** 55:1,7 61:5,12
  88:12 185:23
  204:22 205:2
  207:12
**signature** 118:13
  180:9
**signatures** 127:4
**signed** 53:2,7 54:9
  54:17 55:13,20
  56:1 86:4,11
  178:7 180:7
  185:14 197:9,17
  200:13 203:3,3
  207:8 208:22
**significant** 20:5
  142:24 147:16
**significantly** 78:23
  126:18
**signing** 52:23 90:19
  180:12,15 181:4
  185:2 186:2
**silent** 6:1
**similar** 153:17
**simple** 33:14 93:16
  97:5
**simplify** 33:11

**simply** 55:4 199:18
**since** 47:21 59:7
  88:5 116:19
  121:20,21 166:4
  181:6
**single** 90:24
**single-sentence**
  154:13
**Siprut** 111:15,19
  112:20 113:2,4,15
  114:11,23 115:1
  200:20
**Siprut's** 114:10
**sit** 55:9 57:24 63:24
  66:6
**sitting** 30:21 81:14
  97:4
**situation** 6:23 16:6
  36:15 68:21 77:2
  77:20 110:4
  136:16 145:9
  158:10 174:10
  199:12 201:6
**situations** 34:18
  35:8 94:19
**size** 105:13 224:21
**skipping** 9:10
**slide** 42:8 43:17
**small** 6:9
**smart** 93:17
**Soble's** 139:22
**society** 47:15 48:15
  83:11
**software** 181:21,22
**sold** 124:13
**solicitation** 25:4,9
  25:13,19 27:13,23
  28:14 39:13 45:18
  49:9,16 50:1,5,11
  50:22,23 83:18
  217:13 218:8
**soliciting** 51:3
**somebody** 6:20 8:1
  30:5 52:24 90:24
  141:22
**somehow** 59:5
**someone** 42:8 43:17
  67:14 88:18
  148:20
**something** 11:18
  19:11,18 21:19
  25:6 28:7 31:3
  33:6,16 46:3
  48:17 52:18 53:10
  53:20 58:8 92:13
  92:16 99:11,12

120:5 123:9
  139:18 154:10
  158:23
**sometime** 50:12
  51:14 52:5 146:23
  203:1 214:16
**sometimes** 30:6
  33:14 37:20,22
  67:12,12,20,20
  68:12 99:23,24
  103:16,17 160:22
**somewhere** 53:5
  54:13
**soon** 7:14
**sorry** 6:18 130:5
  143:23 157:9
  175:11 212:23
  222:20
**sort** 58:13 208:3
**sought** 63:10
**sound** 43:23
**sounded** 90:23
**sounds** 37:13
  102:10 122:8
**sources** 63:9
**speak** 8:2 30:1
  220:18,22
**speaking** 58:13
  109:17 116:24
  161:1,17 203:23
**special** 187:4,13,16
  187:22 188:24
  189:15
**specific** 13:16 24:22
  24:23 36:3 37:21
  44:7 53:20 61:13
  65:7 87:7 104:4
  171:24 192:1
  218:10
**specifically** 34:20
  36:10 38:4 56:1
  204:9
**specifics** 64:21 67:7
  78:16 219:2
**specified** 226:12
**specify** 11:21
**spectrum** 68:3
**speculation** 168:18
**spell** 48:1
**spend** 108:24
  139:24 140:9,20
  141:18,21
**spent** 11:15 193:5
  219:20,23 223:14
**Spivey** 45:24 46:8
  118:8,14 122:12

spoke 74:14
SS 226:1
stack 51:15
stage 6:16
stake 57:14
stand 32:2 33:4
   56:17 57:2 125:20
   144:7
stands 83:14
start 11:1 18:10,12
   45:11 60:24 90:8
   90:11 96:16
   107:24 114:2
   180:6 183:3 207:7
started 6:6 13:9
   18:20 24:11 27:10
   34:20 35:9 40:2
   74:6 179:18
starting 17:7 34:16
starts 113:4
state 1:18 4:16 5:15
   52:2 58:19 149:20
   151:15 169:15
   184:18 197:24
   212:23 216:4
   226:1,5
stated 47:14 73:23
   145:13 160:13
   163:23 184:23,24
   186:9
statement 43:19
statements 22:15,21
   23:20 31:18 32:1
states 1:1,14 4:5
   15:3 198:14 200:8
   204:10 213:5
   225:1
statute 99:15 100:3
   148:1,5,11,24
   149:8,18
statutory 99:16
   138:5,15 140:22
staying 196:6
steal 45:8
stealing 63:14
stenographically
   226:8
step 49:1 53:9
steps 204:4,6
still 18:22 27:11
   63:7,12 87:5
   97:18 119:8 129:6
   131:4,9,21 132:1
   133:7 143:16
   144:7,10 149:5
   154:23

stole 216:24
stolen 215:19
stop 7:6 19:14 79:3
   144:14 223:1
stopping 142:12
street 1:19 2:3,8,13
   4:14 106:1
strengths 65:2,4
strike 56:13
string 113:22
strong 78:21
stuff 22:7 34:10
subject 27:5 32:18
   113:3 117:18,23
   180:1
subjected 99:12
submitted 70:7,14
   158:20 159:7
submitting 45:22
   170:4
subparts 60:4
subscribe 225:11
SUBSCRIBED
   225:19
subsequent 101:23
   153:12,13
succeeding 82:11
   83:1
successful 111:21
   138:7,14 139:11
   189:17
successfully 107:5
such 115:4 152:9,17
   153:21 161:7
   163:10 186:24
   189:21 198:17,18
   198:21 211:16
   213:10 226:15
sue 153:9 191:22
suffer 96:16 167:4
suffered 194:24
sufficient 69:3 96:4
   96:13,22 97:24
   98:2 101:20,24
   103:3
sufficiently 90:3
   98:7
suggested 81:20
suggesting 93:15
   153:7 159:5,8
suggestion 143:9
suing 186:20 206:8
suit 165:3
Suite 1:18 2:3,13
sum 211:19

summarize 59:12
   90:21
summarizing
   106:20
superseding 55:2
supplemental 15:18
   15:19
supplementals
   178:14
support 12:19 33:8
supports 24:24
   28:19
suppose 33:16,19
supposed 29:6
   116:7 186:10
supposedly 125:1
   215:19
sure 13:9 19:10
   33:2,13 48:13
   49:8 62:2 63:4
   81:8 92:1 125:24
   139:19 145:6
   146:22 150:10
   153:4 158:13
   164:12 169:16
   171:8 204:5
surgery 73:17,20
surrounding 218:20
suspend 97:19
swear 5:4 91:3,6
switch 51:1
switches 163:10
Switzerland 220:1
sworn 5:6,9 225:19
   226:7

_____

T
T 3:8 180:3
taken 1:13 4:13
   16:12 40:24 42:3
   42:5 43:13 61:9
   83:22 104:17
   145:9 160:5,6
   213:24 214:9,11
   215:11,17 226:12
takes 204:20
taking 1:15 6:19
   17:16 29:2 63:13
   79:13 90:11
   110:13
talk 23:3 38:1 41:4
   60:18 64:6 67:18
   90:9 108:22
   200:16 210:14
   211:6 219:14
talked 10:18 27:14

29:2 65:1 79:15
   79:15 104:22
   147:3 166:12
   173:9,12,16 177:1
   205:19 210:9
   218:2 221:2 224:2
talking 11:22 17:3
   27:10,15 32:1,4
   36:18 43:10,24
   64:17 67:21 91:15
   107:16 112:20
   140:17,18 167:2
   177:16 182:24
   183:2 184:8
Tampa 4:7 47:21
   121:13 176:12,23
   177:7,22 178:10
   180:18,24 185:13
   185:20,24 186:21
   187:5,13 193:6
   197:13 198:3
   199:8 201:23
   202:19 203:6
   205:3
tape 149:23
tax 137:2,3,18
TCPA-related 61:1
Technically 134:13
telephone 26:20
   27:15 39:14
tell 18:4 19:19
   58:12 90:23 100:4
   130:20 131:5,18
   131:23 156:3
   199:15,24 204:12
   204:15 214:15
   216:8,11,24 217:6
   217:14 218:7,8,17
   219:19,22
telling 65:6
ten 50:8 84:4
ten-percent 108:6
tens 138:21
term 9:19 16:18
   25:20 123:14
   158:1
terminating 142:12
test 91:24
testified 5:9 9:24
   31:23 33:4 34:2,5
   34:9 37:3 103:21
   211:17 212:12,20
   213:3
testify 7:22 226:7
testifying 13:20
   32:2,13

testimonies 22:16
Texas 219:24
Thank 29:21 43:8
   69:13 109:7 123:1
   151:21 223:19
   224:11
themselves 4:16
   38:5 91:2 164:23
thereby 159:22
   161:14
therefore 143:22
thereto 153:18
these 40:19 47:17
   47:18 91:18
   135:13 151:17
   155:12 159:3
   182:8,13 186:11
they're 81:9 87:21
   88:7 89:10 99:2,4
   100:23 108:11
   109:21 110:13
   112:20 182:6
   223:13
they've 68:14 80:20
   81:1 148:23
   219:24
thing 9:11,14 10:6
   41:24 43:12,24
   77:24 88:13 90:18
   91:16 98:13,14
   121:4 125:2 224:7
thinks 104:12,13
third 9:13 43:12
   91:10 103:16
   106:22 112:22
   125:18 167:4
third-party 136:17
   138:19
Thomas 201:9,11
Thompson 2:20
   4:12
though 44:7 72:8,22
   119:1 127:1
   147:11 214:23
thought 15:20 37:6
   37:8 64:23,24
   69:3 77:19 78:12
   88:8,20 89:11
   106:19 143:13,20
   168:20 213:14,15
thousands 41:9
   137:24 138:11,20
   138:21 140:1,10
   140:21 141:19,21
   144:24
three 10:13 30:7

31:5,9 58:12 72:6
72:9 99:3,4 150:6
155:23 193:8,10
213:5
**throughout** 6:23
31:2
**tightly** 61:21
**till** 90:8
**timeline** 73:16
**timeliness** 148:24
**timely** 149:10
**times** 7:6 15:1,2
30:7 66:13 221:22
**tired** 29:11
**today** 7:21 11:23
43:5 55:9 57:24
114:9 169:5
171:16 176:13
179:8 180:6,22
192:12 194:23
196:4 200:23
205:21 210:15
213:3 221:3 224:4
**today's** 4:8,13 8:20
11:14 12:7,14
211:8
**together** 38:1 46:20
64:6 70:6 217:4
**tolerating** 43:6
**too** 30:11 37:8,17
64:9 78:10 90:2
124:14,24 125:9
125:21 137:5
168:9 223:5
**took** 9:1 17:22 18:9
62:15 63:5 111:11
155:8 215:4,22
**top** 93:3 105:4
119:13 127:2
**topic** 16:17 211:10
211:12
**topics** 8:19 13:16,21
14:2,11 82:14
108:19 122:18
136:22 137:7
210:20
**toss** 120:6
**total** 69:10 72:4
89:15 94:4 101:5
108:9,14 115:20
211:19
**toward** 54:7 114:21
143:5
**towards** 126:20
**tracked** 59:5
**transcript** 224:17

225:10,12
**transferred** 76:22
**transitioning** 217:7
**translate** 48:5
**transmission** 35:2
**transpired** 143:23
**traveling** 130:15
**treated** 117:2
**treatment** 6:7,15
43:1,6 187:13,16
187:22 189:1,15
189:15
**trebled** 99:17 138:6
**trial** 78:5,6,13 83:2
147:18 169:8
195:5,6
**trick** 21:17
**tried** 80:13 166:14
**true** 15:12 37:11,14
92:14,15 97:22
98:5 102:2 155:17
172:4 200:13
225:12
**truth** 226:7
**truths** 37:11
**try** 19:10 64:7 98:17
124:3 125:15
132:21 223:2
**trying** 19:16 20:20
34:24 35:22 50:24
52:21 60:12,21
90:22 94:24 122:5
122:6 129:7 158:9
158:12 164:10,12
220:4,20,23 223:1
**TTA** 150:21
**turn** 78:18 80:2
153:9 189:9 204:7
**turned** 52:3,4 81:1
**turns** 92:13
**twice** 190:14
**two** 11:8 22:12 28:9
31:5,9 58:6 72:13
73:1 79:9 112:5
116:19 122:20,22
150:1 194:7
195:12,19 208:12
208:13 212:8
**type** 29:4
**typewriting** 226:9

**U**

**ultimate** 170:1
**ultimately** 59:16
77:14 164:22
**underbid** 124:9

**underbidding**
124:12
**undercut** 124:2
**undergoing** 6:15
**understood** 76:24
77:9 79:21 103:15
132:9,11 139:15
**undertook** 193:22
**unfair** 63:13 91:4
97:16 164:24
**unfolded** 86:18
**unique** 25:21 26:11
**uniquely** 25:22
**United** 1:1,14 4:5
225:1
**universe** 132:6
**unjust** 165:1
**unless** 11:21 26:4
120:24 126:17
138:5
**unlikely** 113:10
**unnecessarily** 110:9
110:17
**unprofessional**
113:11
**unquote** 20:23
25:13 32:7 42:2
43:10 141:16
158:6
**unreasonable** 88:7
88:11,17 89:7
90:14 91:9 95:19
124:13 125:9
**unredacted** 127:8
**until** 46:18 53:3,7
61:1 185:23
200:23
**unusual** 27:24
**unwieldy** 30:11
**upon** 24:8 51:11
58:4 78:24 80:6
95:13 102:15
167:21
**upset** 103:23
**upsetting** 16:6
164:3 165:1
**us** 30:12 32:18 36:3
40:15,20 50:24,24
65:23 84:24 113:6
118:24 139:21
158:14 214:2
**use** 9:19 26:4 95:19
120:16,20 215:10
**used** 16:18 42:7
43:16,20 44:11,14
44:24 45:2 72:13

158:2 214:1 215:8
216:5,9,19,22
**uses** 28:1
**using** 25:20 26:8
59:5 90:20 106:20
161:12
**usual** 6:20
**usually** 6:20 14:22
21:17 103:16
133:4

**V**

**vague** 87:11 115:18
156:10 163:22
176:6,14 207:3
212:4,16 215:6
**vary** 92:22 94:19,21
**vehicle** 59:16
**venture** 40:3
**verbatim** 11:7
**verdict** 80:14 81:1
**verified** 12:2,8,12
15:8 121:1 123:4
123:15 125:6
155:11,16,23
157:10 165:20
167:2
**version** 175:4
**versus** 4:4 12:3
45:24 46:8 50:6
51:22 52:9 68:7
92:5 95:19 118:8
118:14
**very** 6:10,18 16:5
17:6 27:17 28:4
38:17 43:7,7
59:23 61:12 89:10
89:17 91:21
109:14 114:2
143:4 147:19
164:3 178:16
187:20 198:10
223:14
**viability** 142:11
**vice** 157:5
**video** 4:9
**videotaped** 1:10 4:2
**view** 66:9 74:23
75:3 80:6 86:18
189:3
**viewed** 105:14
**viewing** 107:11
**views** 65:5 76:1 80:8
88:11
**violation** 66:11
**voluntarily** 193:16

**volunteer** 193:13
**volunteered** 121:5
**vs-** 1:6 225:6

**W**

**wait** 90:8
**waiting** 7:5
**waived** 85:22
**waiver** 105:22
106:3
**waiving** 130:9
**Wally** 176:16
**Wanca's** 43:20
76:19 83:21 142:3
142:16 143:18
144:16 147:17
158:17
**wanted** 30:23 119:7
119:9,23 122:24
165:21 179:18
**wanting** 24:14
163:15
**wants** 6:21 30:6
**warning** 21:18
**wasn't** 38:3 56:21
61:2 85:9 136:11
143:6 162:20
**waste** 129:13
**Wayne** 72:15 73:2,5
73:15 74:13 76:18
76:19 77:7
**ways** 66:14
**we'll** 11:1 75:9 86:8
179:22,24
**we're** 6:14 7:4 8:19
24:19 27:15 30:9
30:21,23 42:22
79:12 107:16
111:11 117:10
118:4 130:13
137:4 140:17,18
154:10 164:7
183:12 205:21
**we've** 40:9 53:15
145:17 168:1
224:4
**weak** 159:19
**weaknesses** 65:2,4
**well** 4:24 21:7 33:24
43:7,7 50:21 51:3
108:18 110:9
121:10 128:1
133:6 141:13
150:11 181:19
207:9 221:3
**went** 41:14 62:17

69:23 122:11
166:19 194:7
**weren't** 37:14 38:21
78:1 99:21 130:19
133:2 136:13
**whatever** 18:21
32:18,23 33:3
53:21 61:9,10,19
69:2 104:11 105:1
107:16 108:11
116:8 125:21
158:11 161:3
167:19 168:21
183:5 209:6 214:6
**whenever** 42:13
70:10
**whereby** 111:19
**whereof** 226:18
**WHEREUPON**
53:24 112:8
117:12 127:14
155:18 178:18
179:12 224:22
**whichever** 103:6
**while** 30:24 91:15
106:16 130:13
161:2 164:16
**whispering** 23:8
**who's** 16:18 41:1
157:5 174:1,5
208:18
**whole** 27:4 41:14
45:13 59:8 90:1
109:10 115:23
162:8 163:5 226:7
**whom** 4:16 137:3,19
**whose** 41:5
**willful** 99:17
**Williams** 8:12,13
26:4 50:7 119:24
120:4,13
**willing** 133:15,17
139:24 140:9,20
141:17 151:9
**window** 60:15
**Wisconsin** 2:8
**within** 1:17 27:1
100:13 148:23
**without** 18:12 64:6
64:7 65:6 78:19
79:24 87:3 105:4
113:12 129:21
130:8,17 136:19
158:22 192:19
**witnesses** 9:24 10:2
31:22 32:1

**Witty** 2:19 4:10
**won't** 60:2 102:17
106:5
**wondering** 122:15
123:13 132:4
**Woodman** 1:16
4:11 226:3,23
**word** 215:7,10
**words** 17:2 19:12
50:6 81:6 90:20
91:18 93:21 94:15
106:21 135:9
149:6
**worked** 164:16
176:23 187:20
**working** 16:20,23
17:17 18:13,20,23
19:23 21:5 35:10
56:3 185:5 203:24
205:11
**worth** 44:23 138:5
**wouldn't** 26:11 30:5
65:5 67:14 75:3
81:17 110:16
132:2,5 137:11
156:21 194:8
**wrapping** 37:24
**written** 175:15
178:5 183:9
198:20 199:6
**wrong** 35:21 40:16
45:5 62:24 63:13
86:24 87:6 97:15
97:23 99:11,12
103:22 140:15
163:1,17,18 164:1
164:12 165:4,7
**wronged** 16:4,8
17:9,10,14,15
19:22 20:6 21:14
22:1 23:14 40:5,7
40:18,21 41:16
43:11 140:13
142:3 164:2

**X**

**X** 3:1,8

**Y**

**Yeah** 49:23 189:11
218:4
**year** 62:4 194:18
214:16
**years** 30:4 46:21
50:9 84:5 88:20
91:1 94:14 110:24

116:20 143:21
144:1 148:6,23
149:4,8,12 208:22
219:12,13
**yes-or-no** 168:22
**yesterday** 11:18
173:13
**yet** 125:3 194:16
195:24
**you'd** 53:19 70:4
141:17
**you'll** 58:10 112:3
127:4
**yours** 10:4 222:6
**yourself** 38:22
109:1 140:8
210:19 211:7
212:3

**Z**

**Z** 5:24
**Zakrzewski** 1:12
3:3 4:2 5:7,17 6:3
11:22 50:6 53:14
155:8 170:24
197:8 208:11
225:17 226:6
**Zephyrhills** 118:19

**0**

**0000336** 112:7
**001363** 112:6
**084-002740** 226:24

**1**

**1** 3:10 53:15 54:2
**1:22** 79:10
**10** 95:4,17 96:5
**10,000** 138:9
**10:18** 1:20 4:10
**100** 67:12,20 68:3
68:10 69:2 99:24
**1000** 2:13
**1099** 136:13
**1099'd** 136:11
**11:13** 42:17
**11:23** 42:20
**112** 3:10
**117** 3:11,11
**11th** 107:3,18
148:19
**12** 88:20 159:14
**12:22** 75:13
**12:23** 75:16
**12:28** 79:6
**121** 121:11

**122** 121:10,17
**127** 3:12
**13** 88:20 224:9
**131,000** 101:4,5,8
**134** 2:13
**14** 167:2
**14th** 119:14
**15** 6:22 138:16
140:7,23
**15,000** 138:9 191:15
**1500** 99:18 138:6
140:5,23
**155** 3:12
**170-224** 3:4
**1718** 2:8
**178** 3:13
**179** 3:13
**18th** 9:15 53:18
88:1
**19** 155:24
**1994** 121:21 122:3
122:12

**2**

**2** 3:10 108:8,13
109:20 112:1,10
**2:09** 111:6
**2:23** 111:9
**20** 94:20 96:14,18
103:4
**20-percent** 98:5
101:20 102:1
**2000** 54:11
**2005** 50:12
**2006** 50:12
**2007** 50:14 121:8
122:15
**2009** 47:6 51:14
52:15 53:1,5,6
54:13,18 55:4
58:9,14,24 60:18
84:9 91:7 185:22
203:1
**2009/2010** 115:14
**2010** 47:7 91:8
**2011** 51:17 52:5,17
53:3 55:3 185:22
207:11,12
**2012** 60:19,19
119:14
**2013** 51:18,20,24
52:6,9 53:3 55:3
58:15 59:1 84:21
180:13 181:4
**2014** 60:20 73:11
**2015** 73:12,13,18

113:2 127:1
**2016** 9:16 38:8,12
39:16 53:18 60:11
61:1 63:7 73:17
76:16 88:2 120:11
127:1,4 135:22
**2017** 1:20 4:9 88:18
225:20 226:21
**22** 54:8 58:10
**25** 30:4 40:20
102:16,20 141:19
**25-percent** 103:5,7
106:17
**25,000** 138:10,16
140:7,24
**27** 108:15 109:23
157:10,15
**27th** 113:2
**28** 108:15
**2800** 1:18 2:3
**29** 157:9
**29th** 38:8,12 39:1
39:15

**3**

**3** 3:11 117:15 118:5
118:6,16
**3:21** 150:2
**3:34** 150:6
**3:39** 155:2
**30** 40:20 75:8
157:10,16
**30(b)(6)** 1:10 4:3
13:14
**30,000** 141:20
**312.658.5500** 2:14
**312.832.5393** 2:4
**321** 1:18 2:3 4:14
**337** 114:22
**338** 112:23
**343,000** 101:6
**35** 158:2
**350** 100:12 101:9,22

**4**

**4** 3:11 108:9,13
109:22 117:15
118:5,11,17
119:14 121:6
**4.75** 102:21
**4:00** 155:6
**4:19** 165:14
**4:32** 165:17
**4:40** 170:18
**4:41** 170:21
**45** 69:9

**5**

**5** 3:12 94:20 95:3,16
126:23 127:16
174:23
**5-170** 3:4
**5:36** 223:22
**5:44** 224:1,15,23
**50** 8:13
**50-percent** 8:10
**500** 67:13,21 68:4
68:11,18 99:10,16
99:24 138:5 140:5
140:22
**51** 54:6
**52** 54:12
**53** 3:10
**53711** 2:8
**55** 42:12

**6**

**6** 3:12 155:10,14,20
174:22
**60602** 2:14
**60654** 2:4
**608.620.5357** 2:9

**7**

**7** 3:13 178:17,20
179:2,16,22
211:11

**8**

**8** 3:13 179:11,14,21
181:1 182:3 184:5
184:21 203:5
211:19
**8:16-CV-01477** 4:8
**8:16-CV-01477-C...**
1:6 225:6
**81** 159:14 160:11
**813-237-3792**
121:11
**8th** 1:19 4:8

**9**

**95** 167:1
**98** 14:22
**9th** 180:13 181:4