UNITED STATES DISTRICT COURT
FOR THE
MIDDLE DISTRICT OF FLORIDA

MEDICAL & CHIROPRACTIC          )
CLINIC, INC.,                   )
                                )
              Plaintiff,        )
                                )  No.
              -vs-              )  8:16-CV-01477-CEH-TBM
                                )
DAVID M. OPPENHEIM, et          )
al.,                            )
                                )
              Defendants.       )


        The videotaped deposition of MICHAEL

ADDISON, called by the Defendants for

examination, taken pursuant to the Federal

Rules of Civil Procedure of the United States

District Courts pertaining to the taking of

depositions before MAUREEN A. WOODMAN, a notary

public within and for the County of Cook and

State of Illinois, at Suite 2800, 321 North

Clark Street, Chicago, Illinois, on the 10th

day of November 2017, at the hour of 9:00

o'clock a.m.

1  APPEARANCES:
2  FOLEY & LARDNER, LLP,
    BY: MS. LAUREN LOEW
3       321 North Clark Street
        Suite 2800
4       Chicago, Illinois 60654
        312.832.5393
5       Lloew@foley.com,
            On behalf of the Plaintiff;
6  BLONIEN LEGAL COUNSEL
7  BY: MR. BARRY J. BLONIEN
8       1718 Adams Street
        Madison, Wisconsin 53711
9       608.620.5357
        Barry@blonienlegal.com,
10          On behalf of the Defendant, David
11          Oppenheim;
12  BOCK & HATCH, LLC,
    BY: MR. DANIEL J. COHEN
13      134 North LaSalle Street
        Suite 1000
14      Chicago, Illinois 60602
        312.658.5500
15      Danieljaycohen209@gmail.com,
16          On behalf of Defendant, Bock Law
            Firm, LLC.
17
18  ALSO PRESENT:
    Mr. Phillip Bock;
19  Mr. David Oppenheim;
    Mr. Stephen Goethals, Videographer,
20      Thompson Court Reporters, Inc.
21
22
23
24

1           I N D E X
2  WITNESS                         PAGE
3  MICHAEL ADDISON
4   Examination by Mr. Blonien .......... 4-139
    Examination by Mr. Cohen........... 139-295
5
6
7          -----------------
8
9
           E X H I B I T S
10
   DEPOSITION EXHIBIT              PAGE
11
   Exhibit 1 ........................... 7
12  Exhibit 2 ........................... 20
    Exhibit 3 ........................... 85
13  Exhibit 4 ........................... 88
    Exhibit 5 ........................... 90
14  Exhibit 6 ........................... 124
    Exhibit 7 ........................... 126
15  Exhibit 8 ........................... 131
    Exhibit 9 ........................... 268
16  Exhibit 10 ......................... 288
           (ATTACHED)
17
18
19
20
21
22
23
24

1       THE VIDEOGRAPHER: Here begins the
2  videotaped deposition of Michael Addison. Tape
3  one, volume one, in the matter of Medical &
4  Chiropractic Clinic versus Oppenheim, case
5  number 8:16-CV-01477-CEH-TBM. Today's date is
6  November 10th, 2017, and the time on the video
7  monitor is 9:09 a.m.
8       My name is Stephen Goethals and
9  the court reporter is Maureen Woodman of
10  Thompson Court Reporters. Today's deposition
11  is taking place at Foley & Lardner, LLP, in
12  Chicago, Illinois. Would counsel please
13  introduce themselves and state whom they
14  represent.
15      MR. BLONIEN: This is Barry Blonien on
16  behalf of David Oppenheim.
17      MR. COHEN: Dan Cohen joined by Phillip
18  Bock for Bock Law Firm, LLC.
19      MS. LOEW: Lauren Loew on behalf of
20  Medical & Chiropractic Clinic, Inc., and
21  Mr. Addison.
22      THE VIDEOGRAPHER: Will the court reporter
23  please swear in the witness.
24          (Witness was duly

1  sworn.)
2       MICHAEL ADDISON,
3  called as a witness herein, after having been
4  first duly sworn, was examined and testified as
5  follows:
6       THE WITNESS: I do.
7           EXAMINATION
8  BY MR. BLONIEN:
9    Q.  Good morning, Mr. Addison.
10   A.  Good morning.
11   Q.  Could you state your full name.
12   A.  Michael Casey Addison. C-A-S-E-Y.
13  Addison, as all Chicago people should know,
14  A-D-D-I-S-O-N.
15   Q.  Lucky you to have a street named after
16  you.
17   A.  That's right.
18   Q.  Have you been deposed before,
19  Mr. Addison?
20   A.  Yes.
21   Q.  Are you familiar with the basics of
22  deposition practice?
23   A.  Yes.
24   Q.  Let me go over a few simple points to

1  make sure we're on the same page.  Please avoid
2  interrupting.  I will do the same.  It is hard
3  talking over each other for Maureen to get
4  everything we're saying.
5      You are under oath.  If you don't
6  understand my question, then please ask;
7  otherwise, I will assume you understood my
8  question and answered it truthfully and fully;
9  is that fair?
10     A.  That's fair.
11     Q.  Your law firm is Addison Law Office,
12  PA; is that correct?
13     A.  Yes, sir.
14     Q.  How long have you been there?
15     A.  I have been operating as Addison Law
16  Office, PA, or some name changes prior to that
17  since 1972, but more recently since 1992.
18     Q.  Have you worked at any other law firm
19  apart from your own?
20     A.  Yes.
21     Q.  And when was that?
22     A.  1974 to 1980 I was at the law firm of
23  Trenam, Kemker, Scharf, Barkin, Frye & O'Neill,
24  PA.  1980 I went out on my own.  1983 I joined

1  with Charlie Ketchie and Mike Horan to form a
2  firm.  Stayed with that firm from '83 to 1990.
3  1990 I joined the Tampa office of Dykema
4  Gossett, a Detroit, Michigan, law firm.  Stayed
5  with Dykema Gossett until 1992, at which time I
6  went back out on my own.  And since then have
7  been in the same firm with different names,
8  Addison & Paria, PA, Addison & Howard, PA,
9  Addison & Associates, PA, and most recently
10  Addison Law Office, PA.
11     Q.  Do you currently have any other
12  attorneys that you work with at Addison Law
13  Office, PA?
14     A.  No.
15     Q.  And are you currently affiliated with
16  any other law firm?
17     A.  No.
18     Q.  Is your email address M@mcalaw.net?
19     A.  Yes, sir.
20     MR. BLONIEN:  Give me a moment to mark this
21  exhibit here.
22         (WHEREUPON, said
23          document was marked as
24          Addison Deposition

1         Exhibit No. 1 for
2         Identification.)
3  BY MR. BLONIEN:
4     Q.  Mr. Addison, have you seen this
5  document before?
6     A.  Yes, I've seen a copy of it.
7     Q.  Is this the subpoena that requires
8  your attendance at today's deposition?
9     A.  Yes.
10     Q.  And do you also see on the subpoena
11  the request for documents?
12     A.  I see it, paragraph that's been
13  inserted into the subpoena form that starts
14  out, "All documents" and ends with "plaintiff."
15     Q.  And have you reviewed your materials
16  to determine whether or not you have any
17  responsive documents?
18     A.  Yes.
19     Q.  And have you brought those documents
20  today?
21     A.  Not with me, no, sir.
22     Q.  I understand that I received a disk
23  this morning from Foley & Lardner.  Are all of
24  the documents that you are producing in

1  response to the subpoena on that disk?
2     A.  Yes.
3     Q.  Okay.  How are the documents
4  organized?
5     A.  Well, since I'm not the one that
6  prepared the disk, I'm not sure how they're
7  organized.
8      I supplied some materials that I
9  believe are responsive to the requests that are
10  not otherwise shielded from production by
11  either attorney-client privilege, work-client
12  privilege or mediation privilege, but I'm not
13  sure how they were assembled to be replicated
14  on the CD.
15     Q.  Okay.  And what documents did you
16  produce to Foley & Lardner?
17     A.  I think -- I'm not sure I had much of
18  anything that you didn't already have either
19  from Medical & Chiro or from Anderson + Wanca.
20  Maybe we should go through the categories and
21  that would refresh my recollection.
22     Q.  Sure.  The first on the production
23  request is all documents reflecting agreements
24  among or between counsel relating to the

3  (Pages 6 to 9)

1  putative class action against the Tampa Bay
2  Buccaneers?
3      A.  I believe that's been produced to the
4  extent something exists. You're talking about
5  the agreements between myself and Anderson +
6  Wanca firm and our respective clients.
7      Q.  Can you tell me what you did to
8  identify and produce responsive documents to
9  that portion of the request?
10     A.  Well, I only have -- talking about
11 agreements with the clients; is that right?
12     Q.  Agreements among or between counsel.
13     A.  I don't know that I even have an
14 agreement with the Anderson + Wanca firm that's
15 not an agreement that's part of the client's
16 representation agreement.
17     Q.  Okay. Can you tell me what you did to
18 review and identify responsive documents?
19     A.  I went through my -- I have a case
20 management software called Time Matters, and in
21 to Time Matters I'm able to identify a
22 particular client matter set -- set up a client
23 matter. And in that client matter, I then have
24 the ability to take documents that either came

1  in as PDFs or that I generated as a Word
2  document and saved them to that client matter.
3  And I save them under various headings,
4  pleadings, research, correspondence, billing
5  and the like. And if I have a fee agreement
6  with a client, I would save it under either
7  letter if it was a retainer letter or billing
8  if it was a contingency fee agreement. And if
9  I have one of those, it would have been
10 identified and produced. So I didn't really
11 pay much attention to whether I got it as a --
12 whatever arrangement I have. I know Cin-Q and
13 I have a retainer agreement that originated in
14 2009. We redid that retainer agreement in
15 2013. Mr. Wanca's firm came on as co-counsel.
16 I just don't recall whether or not we did a
17 separate retainer agreement at that point or
18 contingency fee agreement at that point. But
19 if we did, I produced it, so...
20     Q.  Have you produced the retainer
21 agreement that you signed in connection with
22 Cin-Q?
23     A.  I believe so. It's not a secret, so I
24 think it's been produced.

1      Q.  So you are not asserting any privilege
2  over that agreement?
3      A.  No, I don't think that's an
4  appropriate objection to make in a fee
5  arrangement -- fee agreement.
6      Q.  The next portion of the request is,
7  "All documents reflecting communications with
8  other recipients of faxes from the Tampa Bay
9  Buccaneers"; do you see that?
10     A.  Yes. And I only have some documents
11 that I kept that were -- or that I generated
12 that were communications with other recipients
13 of Buccaneers fax in 2009, and those have not
14 been produced because there was an objection
15 made to that.
16            I think it's on the basis of
17 relevancy, but I'm not sure.
18     Q.  So you've refused to produce documents
19 reflecting communications with other recipients
20 of faxes from the Tampa Bay Buccaneers on the
21 grounds of relevance?
22     A.  Yes, I think that's the -- I think
23 that was the objection that was interposed.
24 Just to make it very succinct, I only had one

1  person that I spoke with and interacted with by
2  email that was also a recipient of faxes from
3  the Buccaneers during 2009, and the
4  communications that I had with her are spread
5  on the record in the Cin-Q versus Buccaneers
6  case, so that information is really not
7  privileged. She did an affidavit and e-mails
8  and correspondence with the Buccaneers were
9  attached. So the one person is attorney
10 Phyllis Towsey. T-O-W-S-E-Y.
11     Q.  Okay. That's the only other person
12 who -- that you're aware of that received a fax
13 from the Tampa Bay Buccaneers that you had
14 communications with?
15     A.  That's correct.
16     Q.  The next portion is, "All documents
17 reflecting communications with Plaintiff about
18 this litigation." You understand the plaintiff
19 in this litigation is Medical & Chiropractic?
20     A.  Right. I don't think I have any
21 communications with her, but I'm sure they
22 would be potentially privileged in the sense
23 that she was my client in the context of the
24 Buccaneers litigation. But my search of the

Thompson Court Reporters, Inc
thompsonreporters.com

1  records indicated that I didn't have any
2  communications in writing with her, her being
3  Medical & Chiro.
4      Q.  Ms. Zakzrewski is the president?
5      A.  Yes.
6      Q.  The next portion is, "All documents
7  reflecting internal discussions of settlement,
8  mediation, settlement offers and M & C's
9  position on settlement at mediation by and
10  among Plaintiff's counsel in the putative class
11  action against the Tampa Bay Buccaneers."
12      A.  I understand that those documents have
13  been produced, an objection was made and was
14  overruled in part, and my communications that
15  were the -- my part of that were also on the
16  other side, on the Anderson + Wanca side of the
17  case, and I think all of those documents have
18  now been produced.
19      Q.  And I believe the last segment here
20  is, "All retention agreements with the
21  Plaintiff."
22      A.  I don't believe I have a retention
23  agreement with M & C, Medical & Chiro.
24      Q.  In any matter?

1      A.  Again, I'm not sure whether -- there
2  may be a retention agreement that we entered
3  into in 2014 when we did the second amended
4  complaint in the Cin-Q versus Buccaneers case.
5  If there is one, it was produced.  If there
6  isn't one, it wasn't produced.
7      Q.  So you wouldn't be asserting a
8  privilege over that?
9      A.  Again, if there was a retention
10  agreement, no.
11      Q.  Let's talk about your preparations for
12  today's deposition.  Did you meet with anyone
13  to prepare?
14      A.  Met with attorney Loew yesterday.
15      Q.  How long did you meet with attorney
16  Loew?
17      A.  With her, face-to-face, probably an
18  hour.
19      Q.  What about not with her face-to-face?
20      A.  I came in yesterday morning, and she
21  gave me a three-ring binder to look at that was
22  the evidentiary hearing before Judge Honeywell
23  in Tampa, and then copies of the discovery
24  requests, responses to the discovery requests,

1  the ruling from Judge McCoun, copy of the
2  subpoena that you've just handed me as Exhibit
3  1, and something else that I don't recall.
4      Q.  Okay.  You anticipated my next
5  question, but I want to just clarify one thing.
6  You said the evidentiary hearing in front of
7  Judge Honeywell.  Are you referring to the
8  preliminary injunction hearing?
9      A.  Yes.
10      Q.  Thank you.
11          And you identified several
12  documents that were presented to you by counsel
13  to review in preparation for today's
14  deposition.
15          Is there anything else aside from
16  what you listed that you recall reviewing in
17  preparation for today's deposition?
18      A.  I just don't remember what the last
19  tab in the book was.  It was something -- it
20  might have been Judge McCoun's ruling.  I
21  wasn't aware that he had actually ruled on
22  various objections and rendered his decisions
23  concerning the privilege.  That might have been
24  the last document in the three-ring binder.

1      Q.  Did you review any documents on your
2  own apart from the materials that Ms. Loew
3  provided?
4      A.  Yes.  I was asked on more than one
5  occasion to try to retrieve from my files
6  e-mail correspondence that I engaged in in
7  connection with the underlying case, and I went
8  to my Time Matters case management software and
9  identified the e-mail correspondence that was
10  saved in connection with that representation
11  since 2013 and had to work with a technical
12  representative from the Time Matters division
13  of LexisNexis to figure out how to export those
14  e-mails into something that was usable without
15  having that software package yourself.  We
16  eventually figured out how to do that by
17  exporting the e-mails to Excel spreadsheet.
18          So I did that, and then I
19  furnished the e-mails to Ms. Loew through an
20  electronic -- I don't remember how it was.
21  Somehow I got the electronic data to Foley &
22  Lardner that was the Excel spreadsheet contents
23  of what had been the Time Matters e-mails, and
24  I think, as I understand, she's used that to

Thompson Court Reporters, Inc
thompsonreporters.com

1   compare with the Anderson + Wanca production
2   and realized they're the same e-mails.
3      Q. Okay.
4      A. Which only makes sense, because that's
5   who I was corresponding with.
6      Q. Did you review any of those documents
7   in preparing for your testimony today?
8      A. Not other than identified that they
9   were the e-mails that had gone on during that
10   time period.
11      Q. Okay. Are there any other documents
12   you remember reviewing for today's deposition?
13      If you could distinguish what you
14   did to review and produce and what you did to
15   review in preparing yourself for today's
16   deposition, is there anything else you've not
17   already listed?
18      A. No, I didn't review anything to
19   prepare for the deposition, per se, except when
20   I looked at Foley & Lardner yesterday morning.
21      Q. Do you have a sense of -- I understand
22   there are electronic documents, of the volume
23   of materials that you provided to your attorney
24   in response to these questions?

1      A. 755 e-mails, approximately.
2      Q. Okay. Anything else apart from
3   e-mails, or were they all e-mails to your
4   recollection?
5      A. The interesting thing about e-mails is
6   that you can attach documents to them. And
7   when I generated this Excel spreadsheet, I did
8   it such that it attached the document. It had
9   the information as the date, name of sender,
10   name of recipient, subject matter line, but
11   then it actually included the language of the
12   e-mail, as well, which made it quite voluminous
13   in the Excel spreadsheet printout. So
14   voluminous that I didn't take the time to try
15   to read it all and make sure they were all
16   there. But it looked like they were, so...
17      MR. BLONIEN: Okay. To note for the
18   record, Mr. Oppenheim has also joined us today
19   for the deposition.
20      THE WITNESS: Yes, he has.
21   BY MR. BLONIEN:
22      Q. Mr. Addison. I marked Exhibit No. 2,
23   which is your testimony from the preliminary
24   injunction hearing. Do you see that?

1      (WHEREUPON, said
2      document was marked as
3      Addison Deposition
4      Exhibit No. 2 for
5      Identification.)
6      A. Yes, sir.
7      Q. And you indicated that you reviewed
8   this testimony before your deposition today?
9      A. Yes.
10      Q. Have you reviewed it at any other time
11   apart from preparing for the deposition today?
12      A. No.
13      Q. Do you have any revisions or
14   alterations to the testimony that you provided?
15      A. I wasn't reading it to see if I would
16   revise an answer or say more or less in
17   response to the questions, so I haven't
18   highlighted it or anything like that, if that's
19   what you mean.
20      Q. No, I don't. I just want to provide
21   you an opportunity to correct anything that you
22   stated there upon review you determined that it
23   might not be totally accurate?
24      MS. LOEW: Do you want him to read the

1   entire document now and do that?
2      MR. BLONIEN: No, I do not want him to read
3   the entire document now.
4   BY MR. BLONIEN:
5      Q. I'm providing an opportunity to
6   correct the record if you see it necessary.
7      A. I didn't see anything in there that
8   jumped out on me as being incorrect. But we're
9   talking about things that happened on Monday
10   morning, June 20th or Wednesday afternoon, June
11   22nd. And I don't remember here as I sit here
12   today a year and a half later whether that was
13   accurate at the time.
14      Q. To the best of your recollection, all
15   the testimony you provided at the preliminary
16   injunction was true and accurate to the best of
17   your understanding?
18      A. Yes, sir.
19      Q. Okay. When you met with Ms. Loew
20   yesterday, did she provide you any information
21   that you previously were not aware of?
22      MS. LOEW: Objection. I would advise the
23   witness not to answer on the basis of
24   attorney-client privilege.

Thompson Court Reporters, Inc
thompsonreporters.com

1    THE WITNESS: I'll follow the instruction
2  of Ms. Loew.
3  BY MR. BLONIEN:
4    Q. Did Ms. Loew convey to you any facts
5  from Ms. Zakzrewski's deposition on Wednesday?
6    **A. No.**
7    MS. LOEW:  Same objection.
8  BY MR. BLONIEN:
9    Q. Are you following the advice of your
10  counsel?
11    **A. She didn't, other than Ms. Zakzrewski**
12  **was apparently ill.**
13    MR. COHEN:  What is the basis for your
14  standing to instruct this witness not to answer
15  the question?
16    MS. LOEW:  I am representing this witness
17  in this deposition.
18    MR. BLONIEN:  I'm going to get into that
19  question specifically.
20         Thank you for that, Dan.
21  BY MR. BLONIEN:
22    Q. Is Ms. Loew representing you today?
23    **A. Yes.**
24    Q. And when did your attorney-client

1  relationship with Ms. Loew begin?
2    **A. When I was first subpoenaed, I think.**
3    Q. When you were subpoenaed with Exhibit
4  No. 1, is that what you're referring to?
5    **A. If this is the first subpoena that you**
6  **issued, yes.**
7    Q. Have you received any other subpoenas
8  in this case?
9    **A. Not that I'm aware of.**
10    Q. Did Ms. Loew represent you in
11  connection with the preliminary injunction
12  proceeding?
13    **A. I'm not sure about that.**
14    Q. What are you not sure of?
15    **A. Whether she represented me at that.**
16    Q. You don't know whether she represented
17  you?
18    **A. That's correct.**
19    Q. Okay. Did anyone else represent you
20  in connection with the preliminary injunction
21  proceeding?
22    **A. Not that I'm aware of.**
23    Q. Have you signed an agreement with Ms.
24  Loew?

1    **A. No.**
2    Q. Are you paying Ms. Loew's attorney's
3  fees?
4    **A. No.**
5    Q. Who is paying Ms. Loew's attorney's
6  fees?
7    **A. I don't know.**
8    Q. You don't know who is paying her
9  attorney's fees?
10    **A. No, sir.**
11    Q. Okay. But you've accepted her
12  representation today?
13    **A. Yes.**
14    Q. Did Ms. Loew offer her representation?
15    MS. LOEW:  Objection. These are getting
16  into attorney-client privileged discussions
17  about representation.
18         Is there a question as to whether
19  I actually represent this witness? Because
20  we've already established that.
21    MR. BLONIEN:  We've established that you
22  and the witness have asserted that there's an
23  attorney-client relationship.
24         My understanding of the law with

1  respect to attorney-client privilege and the
2  assertion of that privilege and testimony is
3  that it relates to communications pertaining to
4  advice provided by attorneys, not to the
5  formation of the relationship itself. I'm
6  trying to establish the predicate facts to
7  better understand how this relationship began,
8  when it started, and what the basis for
9  asserting that the relationship exists.
10  BY MR. BLONIEN:
11    Q. When was the first time you talked
12  with Ms. Loew about her representing you in
13  this matter?
14    **A. I don't recall, because my**
15  **conversations were with a gentleman named**
16  **Patrick McMahon, who is an associate attorney**
17  **with Ms. Loew in the Foley & Lardner firm. So**
18  **my first conversation with Attorney Loew**
19  **regarding this was probably yesterday.**
20    Q. And when was your conversation with
21  Mr. McMahon?
22    **A. Over the period of time I'm gathering**
23  **the documents and having them exported to Excel**
24  **and trying to figure out how to do that.**

1    Q. All after receiving the subpoena?
2    A. Some of it might have been before the
3  subpoena in anticipation of a deposition. I
4  think we agreed on a date months ago, but the
5  subpoena was only issued October 19th, so I'm
6  sure I've been working towards preparing for
7  this for much longer than that.
8    Q. Okay. And so what date would the
9  attorney-client relationship have begun?
10   A. I don't know. Several months ago.
11   Q. What is the scope of the
12 attorney-client relationship?
13   A. I'm working with them to provide the
14 information in response to the -- what we
15 anticipated would be discovery requests in
16 connection with my deposition and appearance at
17 the deposition.
18   Q. Anything else, to your knowledge?
19   A. No, I don't think so.
20   Q. Do you know how much Ms. Loew and
21 Foley & Lardner are charging for their services
22 today?
23   A. I do not.
24   Q. You live in Florida, correct?

1    A. That is correct.
2    Q. Tampa, Florida?
3    A. Yes.
4    Q. Did you fly in for today's deposition?
5    A. Yes, sir.
6    Q. Did you fly in yesterday?
7    A. Flew in yesterday morning. Flight
8  left at 6:05 a.m.
9    Q. Did you pay for your own flight?
10   A. Yes.
11   Q. Do you anticipate being reimbursed for
12 the cost of the flight?
13   A. I do not anticipate being reimbursed.
14   Q. Are you staying in a hotel?
15   A. I stayed in an Airbnb.
16   Q. Do you anticipate being reimbursed for
17 your lodging?
18   A. No.
19   Q. Have you submitted any reimbursement
20 in connection with this case to either Foley &
21 Lardner or anyone else?
22   A. No.
23   Q. Have you signed any agreement with
24 Foley & Lardner?

1    A. Nothing in writing.
2    Q. Anything that's not in writing?
3    A. Well, other than they've agreed to
4  represent me in gathering the discovery
5  documents and organizing the response and
6  appearing at the deposition.
7    Q. What are the basis for Medical &
8  Chiropractic's claims in this case as you
9  understand it?
10   MS. LOEW: Objection. Foundation.
11   THE WITNESS: I'm not really familiar with
12 the litigation. I haven't read the complaint,
13 so I don't know what the basis would be. As
14 asserted in whatever documents are filed in
15 connection with this case.
16 BY MR. BLONIEN:
17   Q. Do you know what claims Medical &
18 Chiropractic is asserting against
19 Mr. Oppenheim?
20   A. As I said, I haven't read the
21 complaint, so I'm not sure.
22   Q. Has anyone told you what claims
23 Medical & Chiropractic is asserting in this
24 case?

1    A. I think I have a general understanding
2  that medical Cairo is upset with attorney
3  Oppenheim and his apparent conflict of interest
4  in getting involved in the Technology Training
5  versus Buccaneers case. That probably is the
6  basis for the claim. But, again, I haven't
7  read the complaint.
8    Q. Are you also upset with Mr. Oppenheim?
9    A. Yes.
10   Q. Why?
11   A. Because I believe that he took
12 advantage of a situation that was created by
13 his disagreement with the Anderson + Wanca firm
14 and brought information to Mr. Bock, and
15 together they filed a lawsuit that has
16 interfered with the claim that I was presenting
17 with the Anderson + Wanca firm against the
18 Tampa Bay Buccaneers for a series of broadcast
19 fax advertisements sent in violation of the
20 Telephone and Consumer Protection Act.
21   Q. You said he brought information. Do
22 you have any facts that demonstrate that he
23 brought information over to Bock Law Firm?
24   A. Do I have any facts? Other than the

1   fact that a complaint was filed in state court
2   by Technology Training and Bock Law Firm and
3   Mr. Cohen using information that Mr. Oppenheim
4   was privy to.
5           Obviously I wasn't in the room
6   when they were discussing whatever they
7   discussed, so...
8       Q.  You said that the complaint used
9   information that Mr. Oppenheim was privy to.
10  What information did Mr. Oppenheim have that he
11  was privy to that was contained in the
12  complaint?
13      MS. LOEW:  Objection to foundation.
14      THE WITNESS:  I don't know what was in the
15  complaint.
16  BY MR. BLONIEN:
17      Q.  Maybe I misunderstood you.  I want to
18  get this correct here.
19          You said -- when I asked you if
20  you have any facts to suggest that
21  Mr. Oppenheim brought information over to Bock
22  Law Firm, you said other than the fact a
23  complaint was filed using information that
24  Mr. Oppenheim was privy to.

1       A.  Okay.  Now I know which complaint
2   you're talking about.  The Technology Training
3   case was basically a copycat lawsuit filed in
4   state court by the Bock Law Firm, and in order
5   to do that, they were able to use information
6   that Mr. Oppenheim had acquired while he was
7   with the Anderson + Wanca Law Firm.
8       Q.  What information that's contained in
9   the complaint reflects information
10  Mr. Oppenheim was privy to?
11      A.  Well, I'm not sure that it is in the
12  complaint, itself.  They filed the complaint,
13  but the information that Mr. Oppenheim was
14  privy to was the entire history of the case
15  from the time it was filed in 2013 through the
16  spring of 2016 when this Technology Training
17  case was filed.
18      Q.  Okay.  What information do you believe
19  that Mr. Oppenheim brought with him to Bock Law
20  Firm?
21      A.  All of the history of the case from
22  the time it was filed in 2013 through the June
23  of 2016 time frame.
24      Q.  And what information in that set was

1   reflected in the complaint that gives you
2   reason to believe that Mr. Oppenheim used that
3   information or shared that information with
4   Bock Law Firm?
5       A.  Again, I think the information was
6   what was accomplished during the efforts to
7   mediate the Cin-Q case with the Buccaneers over
8   the time period from February of 2017 -- 2015
9   through the end of March 2016 through two
10  mediation sessions with the Buccaneers and
11  various communications that happened after that
12  through the mediator, and that information
13  wasn't necessarily put in the complaint, but it
14  was the reason that information existed that
15  caused them, I think, to file the complaint.
16      Q.  And what's your factual basis for
17  making that assertion, Mr. Addison?
18      A.  My factual basis that they filed the
19  complaint and had access to the information
20  from Mr. Oppenheim from his involvement in the
21  case from 2013 through the end of March 2016.
22      Q.  You filed a complaint on behalf of
23  Cin-Q in 2013 in federal court; is that
24  correct?

1       A.  That's when I filed in federal court.
2   I filed first in state court in 2009.
3       Q.  And the complaint that you filed in
4   2013, it's your contention today that the
5   complaint that Technology Training filed in
6   2016 is identical in substance; is that
7   correct?
8       A.  Basically a copycat complaint, yes,
9   sir.
10      Q.  Are there any other complaints that
11  have been consolidated with the Cin-Q federal
12  action?
13      A.  Yes.
14      Q.  And what would those be?
15      A.  There's a lawsuit that was filed by an
16  attorney named Siprut from Chicago with local
17  counsel, last name Thomas from Clearwater,
18  Florida.  And I think the name of the plaintiff
19  in that case is Accounting To You,
20  Incorporated.  That case was filed in the fall
21  of 2013, and ultimately consolidated with the
22  Cin-Q lawsuit.
23      Q.  And is that case also a copycat?
24      A.  Basically, yes, sir.

Thompson Court Reporters, Inc
thompsonreporters.com

1    Q.  So the complaint filed by Mr. Siprut

2  and Thomas is identical in substance, at least

3  in large part?

4    A.  Yes, sir.

5    Q.  And I don't want to paraphrase your

6  testimony.  If I do it inaccurately, please

7  correct me.  I think you stated you believe

8  when Mr. Oppenheim brought information over to

9  Bock Law Firm and together with Bock Law Firm

10  brought this copycat lawsuit, to use your term,

11  that interfered with the claims you brought on

12  behalf of the Cin-Q plaintiff?

13    A.  Yes.

14    Q.  And how did it interfere with those

15  claims?

16    A.  Well, just as a matter of history, as

17  I mentioned, I filed the case in 2013, in June,

18  after having the case pending in state court in

19  August of 2009.

20        After working on the case and

21  pleading activities with the Buccaneers as the

22  opposing party, eventually a decision was made

23  to mediate the case to attempt a settlement.

24        I frankly don't recall if the

1  judge ordered that mediation independently or

2  if we really recognized it would happen sooner

3  or later and agreed to proceed with a

4  mediation.  But we did a one-day mediation in

5  Miami with a mediator by the last name of Max.

6  M-A-X.  We did not achieve a settlement at that

7  point.  And thereafter, the Buccaneers

8  apparently decided to change counsel, and

9  brought in the Latham & Watkins law firm, the

10  Chicago office, and I believe it was in July of

11  2015 that we were approached by the new

12  attorney, Mr. Mester, M-E-S-T-E-R, who

13  requested the opportunity to mediate the case

14  again, because he was the new attorney on the

15  scene for the Buccaneers, and that was -- that

16  request was made in a conference telephone call

17  with myself and Mr. Wanca and I believe

18  Mr. Oppenheim.

19        Naturally, we agreed to

20  participate in a mediation again, and that was

21  scheduled in Chicago, and I think it was August

22  31st, 2015.  Mediator was a retired Judge

23  Anderson.  That mediation was conducted for

24  another full day and did not yield a settlement

1  at that point either.  But thereafter rather

2  than declaring an impasse, which would have

3  terminated the participation of Judge Anderson

4  as a mediator, the decision was made to allow

5  him back-channel communications between the

6  parties to see if he could somehow bridge the

7  gap that existed between the parties, and he

8  endeavored to do that over the next six months,

9  seven months, September through March of 2016.

10  And although we got a -- finally did get a

11  settlement offer in the format that

12  Mr. Oppenheim insisted on, and by that I mean a

13  term sheet laying out not only the amount of

14  money theoretically being paid in gross, but

15  also some specifics with respect to how

16  notification would occur to the absent class

17  members, how the claims would be administered

18  and by whom, what the time period would be for

19  getting the settlement agreement as a proposed

20  document in front of the court and the

21  procedure to be followed for compensation of

22  the attorneys and the representative class

23  members, so on.

24        It's a format that Mr. Oppenheim

1  had used in the past in other cases, and that's

2  what was insisted on in order to have

3  meaningful discussions with the Buccaneers.  So

4  we got eventually a term sheet and -- trying to

5  remember the question now.  Then --

6    Q.  If I can interrupt, with apologies.

7  The question that I asked was, in what manner

8  do you believe Mr. Oppenheim bringing

9  information and together bringing the lawsuit

10  interfered with your claims -- with Cin-Q's

11  claims against Tampa Bay?

12    A.  You helped me focus.

13        We did not get a meaningful follow-on

14  settlement dialogue with the Buccaneers

15  following the offer of the term sheet by the

16  Buccaneers and the response to that, and things

17  kind of went silent.  So it was my suggestion

18  that the discussions and the efforts by Judge

19  Anderson were not being productive.  And I

20  thought we ought to just say we've declared an

21  impasse, because otherwise we were just

22  drifting.  And so I believe that application

23  was made to the mediator, that he recognized he

24  wasn't making any progress, and I think he

Thompson Court Reporters, Inc

thompsonreporters.com

1  eventually did file a report that an impasse
2  had been declared. And we had gone ahead and
3  filed our motion for class certification, which
4  Judge Porcelli had required be done by a
5  certain date, and that was while Judge Anderson
6  was still making his efforts to see if the
7  settlement could be achieved.
8  And so, if I recall correctly,
9  the order required the Buccaneers to respond to
10  the motion for certification by a set date, I
11  don't remember whether it was 30 days after the
12  filing or 40 days or whatever it was, but they
13  asked for an extension of time to prepare their
14  response to the motion for certification, which
15  was granted, and so they used up that time.
16  Then they came and asked for another extension
17  of time to respond, so it would have been a
18  second request for more weeks before they had
19  to go on record to respond, and that was
20  frustrating, because, you know, they'd been
21  aware of the case since 2009, and if there was
22  a response to make, they should have had the
23  idea what it was at some point along that way.
24  In any event, the judge gave them

1  an additional extension of time. I think it
2  was till June 20 or June 30, something like
3  that. And I knew that if they responded to the
4  motion for certification, that it was every
5  likelihood that the class would be certified,
6  and that their best hope of settling the case
7  favorably from the Buccaneers' point of view
8  was to settle it before class certification was
9  ruled on. They knew that, I knew that, Brian
10  Wanca knew that. So they were running out of
11  rope, because they were going to have to
12  respond to the motion for certification, and if
13  there's ever a class action where certification
14  would be appropriate, it would be this case.
15  And unbeknownst to me, that was
16  when Mr. Oppenheim and Mr. Bock set about their
17  plan to find the plaintiff, file a case and try
18  to settle the case that was exactly the same
19  case that we had brought and been working on.
20  MR. COHEN: Can you read back the
21  beginning of his answer.
22  (Said answer was read
23  back.)
24  MR. COHEN: Thank you very much.

1  BY MR. BLONIEN:
2  Q. So it's your opinion that
3  certification was certain?
4  A. Not certain, but every likelihood.
5  Q. And given that there was every
6  likelihood that certification would be granted,
7  you believed that it was advantageous to go
8  forward with settlement discussions at that
9  time?
10  A. Well, you always entertain settlement
11  discussions if they're offered to you when
12  you're a plaintiff or a defendant, in my
13  opinion.
14  Q. Did you see any potential risks that
15  certification would not be granted?
16  A. There's always a risk that -- you
17  can't predict what a judge will do, so...
18  You can't guarantee an outcome.
19  Q. I understand that. You said there was
20  every likelihood that class certification would
21  be granted in your opinion.
22  I'm trying to identify whether or
23  not there were any risks in particular to the
24  Cin-Q litigation, the class action against the

1  Tampa Bay Buccaneers, that you believed posed a
2  risk to not get certification in this case?
3  A. No.
4  Q. I want to make sure, I know you had a
5  long answer on that. Did you have the
6  opportunity to answer fully in your opinion as
7  to how Mr. -- go ahead, please.
8  A. By the Bock Law Firm filing the
9  Technology Training case, they gave the
10  Buccaneers an escape valve to negotiate a
11  settlement, and what they understood was the
12  exact same case, but this time with a very
13  favorable plaintiff that was handicapped
14  because whatever claim it had independently
15  already barred by the statute of limitations,
16  and couldn't be brought meaningfully without
17  the consent of the Buccaneers, and they had a
18  law firm that was willing to step in and
19  negotiate a settlement without having done any
20  work whatsoever on the case, other than taking
21  advantage of what Mr. Oppenheim knew about the
22  case from his history of three years of working
23  on it.
24  Q. Anything else?

Thompson Court Reporters, Inc
thompsonreporters.com

1    A.   And obviously that eliminated the
2  imperative that the Buccaneers otherwise had to
3  negotiate with and settle the case brought by
4  my clients, Cin-Q and Medical & Chiro.  So
5  that's how they caused the problem and caused
6  the damage.
7    Q.   When you say they, whom are you
8  referring to?
9    A.   Bock Hatch Law Firm and Mr. Oppenheim.
10   Q.   What facts do you have that
11 Mr. Oppenheim was involved in any way in the
12 identification of a plaintiff in bringing the
13 lawsuit?
14   A.   I think Mr. Bock testified in the
15 evidentiary hearing how they selected their
16 plaintiff.  I don't know that Mr. Oppenheim is
17 the one that actually picked up the phone and
18 called, but certainly the technique that they
19 used to hire the plaintiff to bring the case
20 was described and is well-known from the way
21 their law firm practices.
22   Q.   What technique did they use?
23   A.   They have a practice of telephoning
24 Consumer Protection Acts cases, class action

1  cases, that they worked on for years with
2  Anderson + Wanca law firm, as I understand it.
3  And over a period of time, they collect names
4  of people and their fax numbers, and then if
5  they ever find out about a broadcast fax that's
6  sent out, they contact their client and say,
7  Did you get this fax, or at least the name that
8  might be a client.  If they say yes, Well,
9  would you like to be a plaintiff in a case
10 brought by the send -- brought against the
11 sender?  If they say yes, they file a class
12 action complaint.  They hire the plaintiff to
13 be the class representative and then bring the
14 case and then attempt to get it resolved.
15   Q.   Is that technique any different than
16 the technique that you used?
17   A.   Absolutely.  I was approached by
18 Mr. Cin-Q to bring the action.  I didn't know
19 him until he contacted me.  I never had any
20 dealings with him before, and he selected me as
21 his attorney.  I didn't select him as my
22 plaintiff.
23   Q.   Do you send out solicitation letters?
24   A.   No.

1    Q.   Do you have a TCPA practice?
2    A.   I do.
3    Q.   How many cases have you been involved
4  with that involved the TCPA?
5    A.   I would guess about 20 to 25.
6    Q.   Over the course of your career or
7  active?
8    A.   Oh, no, over the course of my career.
9    Q.   How many active cases do you have
10 involving the TCPA?
11   A.   Well, there are various active
12 statuses.  I've gotten judgments and now we're
13 seeking to obtain payment from insurance
14 companies in declaratory judgment actions.  So
15 that's a follow-on case from the original TCPA
16 class action case.
17       So I probably got five or six
18 that are active in one sense or another.
19   Q.   Of the 20 or so TCPA cases that you
20 have been involved with in your legal career,
21 how many of those cases were with Anderson +
22 Wanca?
23   A.   Most of them.  I'm not sure I can give
24 you a discrete number.  But I started working

1  as local counsel for Anderson + Wanca in cases
2  they were interested in pursuing in Florida, or
3  at least West Central Florida.  And so my TCPA
4  practice prior to that I might have had four or
5  five cases I filed on my own, then I started
6  working as local counsel for Brian Wanca in
7  cases that his law firm wanted to bring and
8  they needed a Florida lawyer to bring them, so
9  in West Central Florida I was the lawyer they
10 agreed to work with.
11   Q.   Do you know whether Anderson + Wanca
12 uses solicitation letters to identify potential
13 clients?
14   A.   I understand that -- I'm not sure if
15 solicitation is the right term, but I
16 understand they do correspond with people who
17 have -- they have sued on behalf of a class
18 action plaintiff and sometimes they interact
19 with the defendant that was sued, and if they
20 settle the case they say to the defendant, In
21 ease we ever have another broadcast fax that
22 comes to our attention, would you be interested
23 in being a plaintiff with our law firm
24 representing you?  And then as they get that

Thompson Court Reporters, Inc
thompsonreporters.com

1  feedback, they add them to the database of
2  potential fax recipients that might be
3  interested in being a class representative in
4  the next broadcast fax case to come along.
5      Q.  Of the cases that you've been involved
6  with involving TCPA litigation, have any of
7  those cases also involved the Bock Law Firm?
8      A.  Yes, as I said, Brian Wanca asked me
9  to be local counsel as cases were filed.  I
10  think for the most part the ones where I was
11  local counsel, it indicated that it was
12  Anderson + Wanca and Bock Hatch as the
13  plaintiffs' attorneys.
14      Q.  Do you understand Bock Hatch to also
15  be referred to as Bock Law Firm?
16      A.  I guess they've done a name change, as
17  I did.
18      Q.  Do you believe that the technique that
19  Bock Law Firm used in this case is in any way
20  illegal or improper?
21      A.  The technique in identifying
22  Technology Training as the plaintiff they
23  wanted to hire?
24      Q.  Yes, sir.

1      A.  I don't think it's illegal.  Not sure
2  in terms of the ethics of it.  Not sure.
3      Q.  You're not sure?
4      A.  No.  Just separate and apart of how it
5  was used in this case, in terms of the damage
6  that was done to Oppenheim's existing client, I
7  think that's unethical.  Just broadcast they
8  went out and found Technology Training was a
9  recipient of a fax that was sent out by some
10  drug company, and they approached him and said
11  do you want to be a plaintiff in this next case
12  we're going to file, and he said yes, I don't
13  know whether that's unethical or not.
14      Q.  Okay.  So I gather from what you've
15  said today that your basis for believing that
16  Mr. Oppenheim took information and shared it
17  with the Bock Law Firm, is that the timing of
18  the filing of the lawsuit and the nature of the
19  lawsuit give you that -- you reached that
20  conclusion from those bases; is that correct?
21      A.  I think there's also some e-mail
22  communications that confirm that.  Generally
23  speaking, it's the timing and the maneuvering,
24  the secrecy that they employed to try to, you

1  know, do a, quote, "mediation" secretly.
2      When I discovered what they were
3  up to, tried to disguise it further, and
4  various steps they went to.
5      So, yeah, I think it's not just
6  that they filed, and it's not just that they
7  reached a settlement, it is the whole mechanism
8  that they employed.
9      Q.  You mentioned e-mail communications
10  that confirm that.  Can you please describe
11  what you're referring to, Mr. Addison?
12      A.  I think there's some e-mail
13  communications that were referenced in the
14  Eleventh Circuit decision that just came out
15  two weeks ago that was kind of the first -- I
16  guess there's -- there was some discussion of
17  those e-mails, I think, in one of the filings
18  in an attempt to enjoin them from pursuing the
19  Technology Training case in the proceedings
20  before Judge Porcelli.  But the significance of
21  those e-mail exchanges were highlighted in the
22  Eleventh Circuit opinion.
23      Q.  For purposes of my question here, I'm
24  not interested in what the Eleventh Circuit

1  believes or information you don't have personal
2  knowledge about.
3      And I take it the that e-mail
4  communications that you were just referring to,
5  you weren't copied on those e-mails, correct?
6      A.  I was not.
7      Q.  You don't have them in your personal
8  possession?
9      A.  That's correct.
10      Q.  I want to focus on what you know and
11  the personal knowledge that you have as forming
12  a basis for your conclusion that Mr. Bock and
13  Mr. Oppenheim worked together for purposes of
14  filing the Technology Training case.
15      A.  Well, what I know about is that I got
16  an e-mail from Judge Anderson's office
17  confirming a mediation that was going to occur
18  in the Buccaneers TCPA case at some point in
19  time, I think it was in May, and this was after
20  Judge Anderson had confirmed the impasse in our
21  case, so when I see an e-mail from his
22  assistant confirming a mediation in a case that
23  he shouldn't be involved in anymore, I didn't
24  recognize the names as the other addressees, I

## Page 50

1 inquired as to what was going on, and through a
2 couple communications with Judge Anderson's
3 office, plus my own investigation, I discovered
4 the pendency of a case that was filed in state
5 court by Technology Training against the
6 Buccaneers on the online docket of the court.
7 And I noted it was described in the filing as
8 presenting a constitutional question, as
9 opposed to proper nomenclature it should have
10 used as to what the subject matter of the
11 lawsuit was.
12    When I investigated further, I
13 found that it was a copycat lawsuit, except
14 this time filed in state court.
15    So I undertook efforts to stop
16 that from going forward and including filing an
17 application with the state court to intervene
18 in the case and bring to the judge's attention
19 what was going on, and I arranged to get a
20 hearing in front of the assigned judge, I think
21 it was going to be the day before the mediation
22 that they were going to conduct, and Judge
23 Anderson in the meantime backed off and said
24 that he wasn't going to be involved in a

## Page 51

1 mediation, and the attorney for the Buccaneers
2 contacted me and said Judge Anderson's not
3 going to mediate any dispute between the
4 Buccaneers and Mr. Bock's client. I said, When
5 I hear that from the judge, I'll cancel my
6 motion to intervene -- or motion for the
7 injunction. And I did subsequently hear from
8 Judge Anderson's office that he was not going
9 to mediate a dispute between the Bock client
10 and the Buccaneers. So I notified the Court
11 that -- I think I notified Judge Porcelli that
12 I was no longer seeking an emergency
13 injunction, because I accepted what the
14 Buccaneers' counsel and the judge told me.
15    Thinking that that problem was
16 taken care of for the immediate date that we
17 were talking about, I showed up at the office
18 of Peter Grilli on Wednesday in another case
19 that I have where he was the mediator, and when
20 I walked into his office, he greeted me, told
21 me my clients were in one of the conference
22 rooms to the side, and asked me, Are you going
23 to be here tomorrow for the mediation in the
24 Buccaneers case? And I said, What mediation in

## Page 52

1 the Buccaneers case? And thinking that I was
2 involved, he showed me the paperwork indicating
3 that he was -- had been hired to take over and
4 do the mediation in lieu of Judge Anderson.
5    So while it was technically
6 correct that Judge Anderson wasn't going to be
7 doing the mediation, they just found an
8 alternative mediator. And that Wednesday
9 afternoon when I put Mr. Grilli on notice that
10 I had actually filed a pending federal action
11 to enjoin the mediation from going forward, he
12 decided that he needed to ethically let the
13 parties know that he had let the cat out of the
14 bag by talking to the one lawyer in Tampa that
15 it was meaningful to about the mediation he was
16 going to do the next day. And when they
17 learned that, they dismissed the case in state
18 court, thereby denying the judge in state court
19 the opportunity to rule on my request to
20 intervene.
21    Thinking that took care of the
22 problem, we proceeded with the anticipated
23 briefing by the Buccaneers in response to the
24 motion for class certification.

## Page 53

1    We had a hearing in front of
2 Judge Porcelli. He scheduled another mediation
3 and required the parties to go to a further
4 mediation in Chicago between the Cin-Q
5 plaintiffs and the Buccaneers. So arrangements
6 were made for that to occur. And I traveled to
7 Chicago, as did Michelle Zakzrewski on behalf
8 of Medical & Chiro, and we met with Anderson +
9 Wanca lawyers, and we participated in a
10 mediation the following day, but found out late
11 afternoon the day before the mediation that the
12 Buccaneers claimed to have settled the case
13 with the Bock Hatch law firm, although they
14 didn't have a case pending, there was no
15 existing lawsuit on behalf of Technology
16 Training on the day they announced a
17 settlement, but they filed a case the following
18 Monday, and then I think Wednesday filed a
19 motion for approval of a settlement and
20 certification of the class.
21  Q.  One point I want to clarify, just to
22 make sure I understand. This mediation -- the
23 last mediation you were referring to, before
24 you, Anderson + Wanca and Michelle Zakzrewski

Thompson Court Reporters, Inc
thompsonreporters.com

1  attended that mediation session, you were
2  informed that a settlement had already been
3  reached, correct?
4  **A. I think it was like 5:40 in the**
5  **afternoon we got an e-mail or a text message**
6  **from Mark Mester saying the Buccaneers had**
7  **reached a settlement, and they weren't going to**
8  **attend the mediation the next day. And the**
9  **judge that was assigned for the mediation said,**
10 **Oh, yes, they will attend, and sure enough they**
11 **did attend the next day, but they didn't**
12 **participate. They just said we got a**
13 **settlement, we're done, we're leaving. So...**
14 MS. LOEW: If you can let us know when
15 it's time for a break.
16 MR. BLONIEN: Now is fine.
17 THE VIDEOGRAPHER: Off the record. The
18 time is 10:15.
19       (Recess.)
20 THE VIDEOGRAPHER: We are back on the
21 record. The time is 10:22.
22 BY MR. BLONIEN:
23   Q. Mr. Addison, I want to make sure you
24 had an opportunity to answer fully and

1  truthfully the question I had previously asked.
2  Did you complete the answer?
3    A. I don't recall.
4    Q. Okay. Did you talk with your counsel
5  during the break about the testimony that you
6  provided?
7    **A. Only that she said I talk to much.**
8    Q. Are there any other facts that you
9  believe that you have knowledge of that
10 demonstrate that Mr. Oppenheim was involved in
11 the preparation of and filing of the Technology
12 Training case?
13   **A. I think that's basically it.**
14   Q. Okay. You mentioned that there was a
15 statute of limitations issue. When did the
16 statute of limitations run for the faxes that
17 were sent?
18   **A. The last fax that was sent in the**
19 **second series was in early June of 2010, so the**
20 **statute of limitations would have run out in**
21 **early June 2014.**
22   Q. And when was the first series of
23 faxes, to your knowledge?
24   **A. July and August of 2009.**

1    Q. And when would the statute of
2  limitations have run then?
3    **A. Well, mid August 2013.**
4    Q. Do you know when M & C had sought to
5  intervene in the Buccaneers litigation?
6    **A. I think they filed their motion in the**
7  **fall of 2013, and it was granted in January of**
8  **2014.**
9    Q. Do you know when the case that was
10 brought by Joe Siprut and Mr. Thomas was filed?
11   **A. No. It was fall -- fall is a relative**
12 **term in Florida. It was several months after I**
13 **filed the case that -- in federal court.**
14 **Whether it was August, September, October, I**
15 **don't remember exactly.**
16   Q. You had mentioned that you believe
17 Mr. Oppenheim took advantage of a situation
18 that had developed between him and Mr. Wanca.
19 Can you describe what situation you were
20 referring to?
21   **A. It's hearsay from my point of view,**
22 **but I know lawyers, I've been around lawyers my**
23 **whole adult life, and it's always about money.**
24   Q. You said it's hearsay. What is

1  hearsay?
2    **A. That he was unhappy with the**
3  **compensation he was earning at Anderson + Wanca**
4  **and felt that he was more valuable to the firm**
5  **than what his compensation reflected.**
6    Q. Who told you that?
7    **A. Multiple people.**
8    Q. Can you list them, please?
9    **A. Ross Good, Ryan Kelly, Glenn Harra,**
10 **Wally Solberg, Brian Wanca. I'm not sure how**
11 **many other lawyers there are, but --**
12   Q. Quite a few, I think. I appreciate
13 that.
14       Aside from money, did they tell
15 you that there was anything else involved in
16 the situation that you had referred to?
17   **A. I don't think so. From my point of**
18 **view, I don't know what else he would have been**
19 **unhappy about.**
20       **From what I can tell, David was**
21 **given a lot of authority and a lot of**
22 **discretion and a lot of responsibility insofar**
23 **as the mediation process of these various cases**
24 **were concerned. And lawyers always want to**

15  (Pages 54 to 57)

1  have an opportunity to, you know, run the show,
2  so to speak, so that feeds your ego to some
3  extent, but money is also very important. I
4  think it was the money that was missing.
5     Q.  So it's your understanding that
6  Mr. Oppenheim left Anderson + Wanca because of
7  the money and went to Bock Law Firm and engaged
8  in illegal conduct with Bock Law Firm?
9     A.  Well, I'm not saying illegal. I think
10  he engaged in unethical conduct. That's
11  different than being illegal.
12     Q.  Apart from the description that you
13  provided earlier, is there anything else that
14  you believe to be unethical?
15     A.  Again, I believe things, and I know
16  things, but I believe some things that I don't
17  know based on personal knowledge.
18     Q.  What are those?
19     A.  Well, I understand that Mr. Oppenheim
20  copied his electronic records from the Anderson
21  + Wanca firm and took them with him to the Bock
22  Hatch law firm. That might be illegal, might
23  not. Do I have personal knowledge that he did
24  it? No. I heard that he did it.

1     Q.  Who told you that?
2     A.  Ross Good and Brian Wanca.
3     Q.  When did they tell you that?
4     A.  Whenever they discovered it. I don't
5  remember when that was. Months and months ago.
6     Q.  Was it after the filing of the
7  lawsuit?
8     A.  I don't know when the lawsuit was
9  filed.
10     Q.  Was it after the preliminary
11  injunction testimony you provided?
12     A.  Yeah, I believe so, yes.
13     Q.  How did M & C become involved in the
14  Cin-Q litigation, Mr. Addison?
15     A.  Are you ready for another long answer?
16     Q.  Well, I'd like as much information as
17  you believe necessary to fully and truthfully
18  answer the question.
19     A.  Okay. Going to be a lot of
20  background, so just -- as I mentioned to you, I
21  was approached by Greg Cin-Q about the fact
22  that he received a facsimile ad offering the
23  opportunity to buy Buccaneers tickets.
24     Q.  If I could just quickly interrupt so

1  we don't have to circle back. That was before
2  2009. How much before 2009 did Cin-Q contact
3  you?
4     A.  It wasn't before 2009, it was in 2009,
5  and he contacted me in August, and I filed the
6  suit in August, so it was less than two weeks.
7     Q.  Thank you. I apologize for
8  interrupting.
9     A.  Okay. I filed the lawsuit in state
10  court and sought class certification on behalf
11  of the class. I didn't know how many people
12  had been -- received the fax, but I knew it was
13  more than one. So I filed the suit. The
14  Buccaneers hired local counsel in Tampa to
15  defend the case. We engaged in some document
16  discovery as is available in state court. They
17  produced their -- what they said were all of
18  their records regarding this fax advertising
19  campaign that they engaged in. In those
20  records, I learned that hundreds of thousands
21  of faxes had been sent. So I realized that it
22  was a potentially good class action. It wasn't
23  more than just a couple dozen, it was many fax
24  ads that had gone out.

1     When I attempted to learn to whom
2  the faxes had been sent, the Buccaneers claimed
3  ignorance, because they had not actually sent
4  them; they hired somebody else to send them on
5  their behalf. So they were unable to respond
6  to identify the recipients.
7     I felt that presented a problem,
8  because I could get a class certified of
9  everybody who received that fax ad on that day
10  in question, but I couldn't tell who they were,
11  and I wouldn't necessarily know how to feasibly
12  suggest to the court that we could represent a
13  class when we couldn't tell who was in the
14  class.
15     So for a period of time I
16  addressed that conundrum, and I spoke with
17  Brian Wanca on occasion, because at that point
18  I was working with him as local counsel in a
19  couple of cases that were already pending, and
20  I invited him to join with me and collaborate
21  on the case.
22     He initially said that he was not
23  interested in doing that, because I couldn't
24  tell who had gotten the faxes and the Bucs

Thompson Court Reporters, Inc
thompsonreporters.com

1  didn't know. So the case drifted for a while.
2      I got a copy of the check that
3  the Bucs had sent to the man who did the
4  broadcast or who originated the contacts with
5  the fax broadcaster, and I got the back copy of
6  that check, and I saw a bank account number on
7  it that was stamped from the Republic Bank of
8  Texas. So I eventually subpoenaed that bank to
9  produce the records of who owned that account,
10  and I found out somebody by the name of Michael
11  Clement, and that, of course, was the name of
12  the individual, the payee of the check.
13      So I again approached Mr. Wanca,
14  and I think it was about that time that he
15  agreed to work with me on the case, and he
16  filed an action on behalf of Medical & Chiro
17  against Mr. Clement in federal court, and
18  through that -- we did some discovery. We,
19  Mr. Wanca's office, took the deposition of
20  Mr. Clement. Found out who he hired to do the
21  fax broadcast. And because Mr. Wanca was very
22  experienced in the fax broadcast business and
23  who the players were, he was able to identify
24  the likely source of the underlying information

1  about who was actually a recipient of the fax.
2  And we issued subpoenas to those parties. And
3  as a result of a lot of legal wrangling and
4  discovery disputes and efforts, finally got a
5  hold of the actual hard disk that contained not
6  only the image of the ad that was sent but then
7  a listing of every number that was dialed and
8  every fax that was received, as well as every
9  fax that didn't go through.
10      And when we got that database, we
11  realized that we did have the ability to
12  represent to the court that if the class was
13  certified, we could present the claim and
14  identify who the people were that were entitled
15  to compensation. And that's when we filed in
16  federal court. I dismissed the state court
17  action without prejudice, filed in federal
18  court.
19      In the meantime, the U.S. Supreme
20  Court had ruled in the Mims case, M-I-M-S, that
21  the TCPA was, in fact, a federal cause of
22  action that could be brought in federal court,
23  not just in state court. And so coupled with
24  that, we filed in federal court. And then

1  ultimately took the deposition of Mr. Clement,
2  as well as the other folks involved in the fax
3  broadcast.
4      And so that's how I got involved
5  with Medical & Chiro, because once I filed the
6  case in June of 2013, Mr. Wanca indicated that
7  Medical & Chiro wished to be a coplaintiff in
8  the case, and they filed a motion to intervene
9  in the fall of 2013, and that motion was
10  granted in January or February of 2014.
11      Q.  So before M & C got involved in the
12  Cin-Q litigation, you had done some discovery
13  in that case; is that right?
14      A.  Yes. Not just in -- I had done some
15  discovery in the original Cin-Q case. I don't
16  know that I had -- I did a request for
17  admissions in the federal case to basically
18  take all the documents that they produced in
19  state court and get them to have to admit that
20  they were true and accurate, et cetera, in the
21  federal court case. Just import them into that
22  case as legitimate discovery responses.
23      Q.  And before M & C was involved in the
24  Tampa Bay Buccaneers class action, you had

1  obtained the list of faxes from the
2  broadcaster; is that right?
3      A.  Run that by my again.
4      Q.  Before M & C got involved in the Tampa
5  Bay Buccaneers class action litigation, you had
6  obtained the list of fax recipients from the
7  broadcaster?
8      A.  Before they got involved in the Cin-Q
9  case, yes.
10      Q.  Okay. And you mentioned that
11  separately Mr. Wanca had filed an action, a
12  case called Clement?
13      A.  Yeah, I think Medical & Chiro versus
14  Clement.
15      Q.  Were you affiliated with that case?
16      A.  I'm trying to remember now. I might
17  have been. My recollection is he might have
18  filed that in Texas. I think he filed it in
19  Texas. And I would not have been involved. I
20  don't recall exactly.
21      Q.  But you didn't have a relationship
22  with M & C at that time, right?
23      A.  Well, other than that Mr. Wanca and I
24  were cooperating to try to identify where the

Thompson Court Reporters, Inc
thompsonreporters.com

1     faxes went, that would have been my
2     relationship.
3       Q. Did you have any written agreement
4     with Mr. Wanca at that time?
5       A. I don't believe so.
6       Q. Did you have any understanding or
7     agreement orally as to what the division of
8     fees would be?
9       A. At that point in time, no, I don't
10    think so.
11      Q. Did you have any other agreement about
12    the terms of your affiliation with Mr. Wanca,
13    and when I say at that time, before M & C
14    became involved in the Cin-Q litigation?
15      A. Just in the matters where I was acting
16    as local counsel in the other cases, is that
17    what you're asking about? Or is that with
18    respect to the Cin-Q matters?
19      Q. I'm focused on M & C in particular.
20    And you mentioned M & C had been involved in
21    this Clement case.
22      A. Yeah, I don't -- I don't think I had
23    any understanding with Mr. Wanca one way or the
24    other.

1       Q. The list of faxes that were sent, was
2     that ever made public?
3       A. Unfortunately.
4       Q. Why do you say unfortunately,
5     Mr. Addison?
6       A. It was filed with the expert report.
7     We had an expert report in connection with our
8     motion for certification, and the expert did
9     his report, and I believe we -- I think we
10    attached the printout of the fax logs, and it
11    was attached as an exhibit to the expert
12    report.
13      Q. And that was filed in federal court?
14      A. Yes, sir.
15      Q. And so it would have been available
16    for anyone who accessed the docket to obtain
17    that information?
18      A. Anybody who went there.
19      Q. You said unfortunately. I guess I'm
20    confused about why you think that's unfortunate
21    that that information was publicly available.
22      A. We should have filed it under seal.
23      Q. And why?
24      A. Because Mr. Oppenheim and Mr. Bock

1     took that list and checked their list of Bock's
2     prospective plaintiffs and found one that they
3     matched the fax number up to, and I believe
4     approached that person and said, Do you want to
5     be a plaintiff in a case that we can settle in
6     a week.
7       Q. If someone who had not been
8     affiliated, let's just take Mr. Oppenheim and
9     Bock Law Firm out of this for a second, let's
10    say some other attorney had obtained that list
11    of faxes and sent a solicitation letter or
12    otherwise had found a client, do you think
13    there's anything wrong or illegal about filing
14    another class action complaint?
15      A. Nothing wrong about it, other than the
16    claim would have been barred by the statute of
17    limitations. Nothing illegal about it. But
18    what happened was that the people that looked
19    that number up and found that plaintiff already
20    knew what was going on in the case in terms of
21    the prior mediations, and the case was ready to
22    settle.
23      Q. And what facts do you have that
24    information was made available to anyone?

1       A. Well, certainly available to
2     Mr. Oppenheim because he'd been there.
3       Q. Okay.
4       A. Do I know what he told Phil Bock? I
5     wasn't in the room. I saw the e-mails that
6     they exchanged and the maneuvering started,
7     so...
8       Q. You saw the e-mails they exchanged,
9     you're referring again to the Eleventh Circuit
10    e-mails?
11      A. The ones that were quoted in the
12    opinion, yeah.
13      Q. Was that the first time that you saw
14    those e-mails?
15      A. I don't think so. I think I mentioned
16    earlier that they were -- I think they were
17    included in the -- some of the briefing in
18    front of Judge Porcelli.
19      Q. Is it your understanding that
20    Mr. Oppenheim had a fiduciary relationship with
21    M & C?
22      A. Absolutely.
23      Q. And what's your basis for asserting
24    that?

Thompson Court Reporters, Inc
thompsonreporters.com

1    A.  He represented Medical & Chiropractic
2  Clinic, Incorporated, in a lawsuit.
3    Q.  Did he represent anyone else in that
4  lawsuit?
5    A.  He was co-counsel with me on behalf of
6  Cin-Q, as well, his law firm was, and he was.
7    Q.  And this was a class action, right?
8    A.  That's the whole point, yes, sir.
9    Q.  So there weren't any individual claims
10  that at that time were being pursued; isn't
11  that fair?
12    A.  Well, I'm sure you understand how
13  class actions work. There's an individual
14  claim brought on behalf of each named plaintiff
15  and on behalf of the class they seek to
16  represent, if certified by the Court.
17    Q.  How is Mr. Oppenheim's relationship
18  with M & C different than anyone else in the
19  class?
20    A.  He was their lawyer.
21    Q.  He was the lawyer for the class as
22  well, right?
23    A.  There is no class yet.
24    Q.  Even before a class is certified, you

1  understand that an attorney has duties to the
2  class, not the named plaintiff, right?
3    A.  No, that's not correct. He has duties
4  to the named plaintiff, and he can't sell out
5  the class. But there isn't a class as such.
6  He just can't settle for the named plaintiff
7  and take a premium and disband or dismiss the
8  case, because that would prejudice the absent
9  class members yet to be identified as a class.
10    Q.  So it's your view that Mr. Oppenheim
11  had a unique and special relationship with M &
12  C?
13    A.  Absolutely.
14    Q.  Who else did Mr. Oppenheim have a
15  unique and special relationship with within
16  your view, Mr. Addison?
17    A.  Well, insofar as he was co-counsel
18  with me on behalf of Cin-Q and Anderson + Wanca
19  firm, he had the same duties to Cin-Q.
20    Q.  Has Cin-Q sued Mr. Oppenheim or Bock
21  Law Firm?
22    A.  No.
23    Q.  Why not?
24    A.  I don't know.

1    Q.  Have you consulted with Cin-Q on that
2  issue?
3    A.  I'm not going to talk about
4  communications with my client.
5    MS. LOEW:  Objection.
6  BY MR. BLONIEN:
7    Q.  At all?
8    A.  At all.
9    Q.  Even if they don't convey any sort of
10  advice or --
11    A.  That was a precisely the question you
12  asked, was did I convey any advice or did he
13  convey any response.
14    Q.  I asked you whether you conferred with
15  your client about whether or not to bring the
16  case.
17    A.  That's the subject matter, and I'm not
18  going to discuss that.
19    Q.  You are not going to discuss whether
20  or not you had such conversation with your
21  client? I'm just trying to understand the
22  scope, not to be arguing with you here.
23    A.  You're asking me about different
24  conversations with my client about something

1  specific, and if I were to answer yes or no,
2  I'm answering the question about that something
3  specific.
4    Q.  What special duties did Mr. Oppenheim
5  owe to M & C in your view that he did not owe
6  to other members of the class?
7    A.  He owed all of the duties to his
8  client that any lawyer owes to his or her
9  client in the context of handling litigation.
10    He didn't know who was a member
11  of the class yet, because there wasn't a class
12  certified yet.
13    So he had a client, he brought a
14  lawsuit on behalf of a client.
15    Q.  Identify for me, please, everyone that
16  you believe had a fiduciary relationship with M
17  & C, apart from Mr. Oppenheim.
18    A.  Mr. Wanca, Ryan Kelly, I mean all of
19  the attorneys at Anderson + Wanca. And, again,
20  I'm not sure how many there are or were, as
21  well as myself, and at the time my partner,
22  Laura Howard. I can't think of anybody else.
23    Q.  And did Mr. Oppenheim owe a fiduciary
24  duty to anyone else apart from M & C and Cin-Q,

1 in your view?
2    A. Well, in other cases.
3    Q. In the Tampa Bay litigation. Thanks
4 for clarifying.
5    A. No, I don't think so. I mean
6 somebody -- whatever duty he owes to his law
7 firm is separate and apart from the duty he
8 owes to his client. Just in the context of
9 that lawsuit, those are the two parties.
10    Q. And you owe M & C a fiduciary duty in
11 your view, correct?
12    A. I do.
13    Q. And Cin-Q?
14    A. Yes.
15    Q. Do you owe other class members a
16 fiduciary duty, in your view?
17    A. I can't sell them out by settling the
18 case, but in that sense -- under the class
19 action rules, as you know, you are precluded,
20 at least in federal court, from settling a case
21 and demanding a premium on behalf of your named
22 plaintiff with the understanding that upon
23 payment of that premium, you'll dismiss and
24 abandon the class that you otherwise were

1 seeking to represent. So you have kind of a
2 hybrid fiduciary duty at that point.
3      Those absent class members don't
4 know who you are, and they don't know what
5 you're doing for them; but nevertheless, you
6 owe them a duty to not sabotage their case.
7    Q. What about the Stein plaintiffs, do
8 you owe a fiduciary duty to them?
9    A. Yes.
10    Q. What about the Accounting to You
11 plaintiff?
12    A. Yes.
13    Q. When did your fiduciary relationship
14 with M & C begin?
15    A. I think I went through that long
16 chronology without necessarily specifying all
17 the dates, but it began whenever Medical &
18 Chiro brought the action against Mr. Clement.
19    Q. In Texas?
20    A. I'm trying to remember whether that
21 was filed in Texas or Florida, but I don't
22 recall.
23    Q. When did you first meet M & C?
24    A. I met Michelle and her husband in

1 advance of the mediation that took place in
2 Miami. Maybe even before that. I don't
3 remember when they took her -- I met her and
4 her husband at their depositions, but also had
5 dinner with them in advance of the mediation in
6 Miami, and whatever the sequence was, whichever
7 one of those happened first would have been the
8 first time.
9    Q. Okay. I want to back up just one
10 clarifying question.
11      When you had said that you owe a
12 fiduciary duty to the Stein plaintiffs and the
13 Accounting to You, do you also believe that you
14 owe a fiduciary duty to the Technology Training
15 plaintiffs?
16    A. To the extent they're an absent class
17 member, whatever quasi hybrid duty I owe, I
18 look to them as absent class members as well.
19    Q. I appreciate that clarification.
20      It seems like, if I'm
21 understanding your testimony, you are drawing a
22 distinction between duties owed to named
23 plaintiffs and absent class members; is that
24 right?

1    A. Yes.
2    Q. Do you owe that special duty owed to
3 other named plaintiffs to TTA, as well?
4    A. No.
5    Q. Why not?
6    A. Because they didn't hire me.
7    Q. Did the Stein plaintiffs hire you?
8    A. Yes.
9    Q. And Accounting to You?
10    A. Yes.
11    Q. Did you sign an agreement with them?
12    A. Yes.
13    Q. Did you produce a copy of that
14 agreement?
15    A. I don't remember.
16    Q. In reviewing the documents, do you
17 recall coming across that?
18    A. Yeah, absolutely.
19    Q. Did you produce it to your attorneys?
20    A. I don't remember.
21    Q. Do you assert any privilege over that
22 document?
23    A. No.
24    Q. But you do recall seeing it when you

Thompson Court Reporters, Inc
thompsonreporters.com

1 were reviewing the documents?
2    A. Yes.
3    Q. Do you believe that that's responsive
4 to the requests that we asked?
5    A. I don't know whether an objection was
6 interposed to that or not, but I don't
7 have -- there is no secret, so...
8    Q. I'm a little bit handicapped, because
9 all we have today is a disk, so I can't look at
10 those documents to determine whether they're
11 there.
12    A. It's a standard retainer agreement,
13 each of the doctors signed.
14    Q. And did it contain any sort of terms
15 about the division of fees?
16    A. No.
17    Q. It didn't list anything about fees?
18    A. No.
19    Q. Is there an agreement on the division
20 of fees?
21    A. With the Stein plaintiffs?
22    Q. Yes.
23    A. No.
24    Q. You don't have an agreement with the

1 Stein plaintiffs or their attorneys as to how
2 the fees would be divvied up?
3    A. Now, you're confusing -- so you
4 understand, the way I look at it, in a class
5 action, the plaintiffs don't agree to how much
6 of a fee they might incur, in a
7 common fund, and the fee is determined by the
8 court. So I never ask my clients to stipulate
9 that they will pay X dollars or Y percentage in
10 the event of a successful recovery. That's all
11 done by the court.
12      There is an agreement with
13 Anderson + Wanca firm in the event a gross
14 recovery is awarded by the court in fees as to
15 how that's to be allocated between my law firm
16 and the Anderson + Wanca law firm.
17    Q. And what is that agreement?
18    A. Agreement was 30 percent of the
19 recovery would go to the Addison law firm.
20    Q. And how much to Anderson + Wanca?
21    A. The balance.
22    Q. 70 percent?
23    A. Yes.
24    Q. Was there any agreement as to the

1 division of fees in a gross award by the court
2 to the Stein plaintiffs?
3    A. Now you got me. That's the Siprut
4 clients, correct?
5    Q. Yes, as you've testified.
6    A. I do -- now that you mention it, I do
7 believe we started out with a gross 70/30, and
8 I think when the Stein plaintiffs signed on,
9 Mr. Siprut was accorded 16 percent that was
10 allocated pro rata between myself and
11 Mr. Wanca's relative percentages.
12    Q. I think I understand that, but I want
13 to make sure.
14    A. I think if we recover an award of
15 attorneys' fees in this case, I think the
16 numbers shake out that I would receive 25
17 percent, Mr. Siprut would receive 16 percent,
18 and Mr. Wanca's firm would receive the balance.
19    Q. Is that reflected in a written
20 agreement?
21    A. I believe so.
22    Q. Do you know when that written
23 agreement was entered?
24    A. You know now that you mention it, I

1 don't think so. I don't think it's in a
2 written agreement.
3    Q. An oral agreement among counsel?
4    A. Yeah, yeah.
5    Q. Do you know when that oral agreement
6 was entered?
7    A. When the Stein plaintiffs asked our
8 law firms to represent them.
9    Q. Do you know whether that was ever
10 incorporated in the retention agreement with
11 the Stein plaintiffs?
12    A. In terms of the allocation, no, I
13 don't think so.
14      Again, they don't care. They're
15 not paying the fee. They're not being asked to
16 compensate the attorneys, other than the court
17 would make whatever allocation appropriate
18 under the circumstances.
19    Q. Do you know whether the decision to
20 affiliate with the attorneys for the Stein
21 plaintiffs was ever reflected in a written
22 agreement?
23    A. Yes, I said I filed -- we had an
24 engagement agreement, each of the Stein

Thompson Court Reporters, Inc
thompsonreporters.com

1     is -- I may be mistaken about this, but if I
2     am, it's because there's something new, but I
3     don't believe that there's any standard listing
4     of responsibilities of class representative in
5     federal court or in state court, but case law
6     has indicated that class representatives have
7     typically certain obligations that they have to
8     adhere to in order to be effective class
9     representatives, and it includes, among other
10    things, being familiar with litigation,
11    prosecuting the case effectively and hiring
12    lawyers that are experienced in class action
13    litigation, because those are Rule 23-B
14    requirements to get a class certified.
15      Q. Is it your understanding that
16    contingency-fee agreements in Florida have to
17    be reduced to writing?
18      A. Yes.
19      Q. Is it your understanding that
20    contingency fee agreements have to list what
21    the breakdown of distribution of fees would be?
22      A. No.
23      Q. Is it your understanding that every
24    attorney who's representing a client would have

1     to sign the written agreement?
2      A. I don't believe so, but certainly on
3    behalf of a firm.
4      Q. I'm sorry. Could you explain what you
5    mean by that?
6      A. Well, for example, Anderson + Wanca
7    had a law firm of lawyers that were all
8    representing Medical & Chiropractic clinic in
9    the context of this case.
10      Brian Wanca signed on behalf of
11    the firm, but not all of the individual lawyers
12    were required to sign.
13      Q. But each participating law firm would
14    be required to sign, correct?
15      A. Right, I think so, yeah.
16      Q. If you look at Addendum A on page 192,
17    if you look at Addendum A, number four, that
18    provision states, "Before signing a
19    contingent-fee contract with you, a lawyer must
20    advise you whether the lawyer intends to handle
21    your case alone or whether other lawyers will
22    be helping with the case. If your lawyer
23    intends to refer the case to others, the lawyer
24    should tell you what kind of fee-sharing

1     arrangement will be made with the other
2    lawyers. If lawyers from different law firms
3    will represent you, at least one lawyer from
4    each law firm must sign a contingent-fee
5    contract." Did I read that correctly?
6      A. You did.
7      Q. Is that your understanding of the law?
8      A. That's correct. And this form is
9    required by the Florida rules dealing with
10    rules regulating the Florida bar. This form
11    Addendum A is required with a contingent-fee
12    agreement. I don't think Addendum B is
13    required.
14      Q. So the addendum is required and number
15    four accurately states the law, in your view?
16      A. Well, I'm not sure it's the law. It's
17    the rules regulating the Florida bar.
18      Q. And this agreement that we're looking
19    at here as Exhibit No. 3 states that, "M & C
20    agrees that it is not now and has never been
21    represented by any other attorney with regard
22    to the claims against defendants," correct?
23      A. That's what it says on page three of
24    the retainer agreement.

1      Q. And nowhere in this retainer agreement
2    does it contain any sort of allocation of what
3    the fees would be between you and Mr. Wanca's
4    firm, correct?
5      A. It does not.
6      Q. Was your understanding as to the 30/70
7    split decided before October 9th of 2013?
8      A. No.
9      Q. Was it decided after October 9th,
10    2013?
11      A. Obviously.
12      Q. When was it decided?
13      A. I don't know. Several months later.
14    After the motion was granted.
15      Q. So there wasn't an understanding as to
16    the breakdown of fees when you filed the motion
17    to intervene and file a second amended
18    complaint on behalf of Medical & Chiropractic?
19      A. I filed a motion for leave to file the
20    second amended complaint, and I don't think
21    there was an agreement at that point.
22      The judge ultimately granted that
23    motion and the second amended complaint was
24    thereafter filed, and I think after that

Thompson Court Reporters, Inc
thompsonreporters.com

1     Mr. Wanca and I had the discussion.
2     Q. But you never had that discussion with
3 M & C directly, correct?
4     A. I don't believe so.
5     Q. And that would be in-person or in
6 writing?
7     A. I don't know what M & C was -- what
8 information was given to them by Mr. Wanca's
9 firm once he and I had that discussion.
10     Q. But you didn't send any written
11 notification to M & C, correct?
12     A. I didn't, that's correct.
13     Q. Nor did you obtain written consent
14 from Medical & Chiropractic?
15     A. I did not directly, no.
16     Q. Or indirectly? Did you instruct
17 anyone to do so?
18     A. I don't recall that, no.
19     Q. So we've seen the motion for leave to
20 intervene and file the second amended
21 complaint, and you filed that on behalf of M &
22 C and Cin-Q.
23     What other activities have you
24 performed for M & C as its attorney in the

1 Tampa Bay Buccaneers litigation?
2     A. What does the docket sheet show?
3 Basically whatever was done in this case after
4 February of -- I guess January 3rd of 2014, I
5 did it on behalf of Medical & Chiropractic.
6     Q. Did you participate in the mediation
7 sessions on behalf of Medical & Chiropractic?
8     A. Yes.
9     Q. Do you know what the settlement terms
10 were that were proposed at that mediation?
11     A. Generally.
12     Q. Did you provide any advice to Medical
13 & Chiropractic about whether or not to accept
14 or to counter as to any offers that were made
15 in the Bucs litigation?
16     A. Which mediation?
17     Q. All of them.
18     A. There were no offers made in the first
19 one, so the answer to that is no.
20     And there really wasn't an offer
21 made in the second one, so the answer to that
22 is no.
23     Q. Are you aware of any offers that were
24 made after the mediation sessions?

1     A. Yes.
2     Q. Did you provide any advice to Medical
3 & Chiropractic about whether to accept or
4 reject that offer?
5     A. I didn't individually.
6     Q. Did you agree with Mr. Wanca as to the
7 approach on settlement and mediation in the
8 Tampa Bay Buccaneers litigation?
9     A. Yes.
10     Q. What would have happened if you
11 disagreed with Mr. Wanca?
12     A. We would have had a more heated
13 discussion.
14     Q. And assume for me after the more
15 heated discussion that you still disagreed,
16 what would have happened at that point?
17     MS. LOEW: Objection. Form, speculation.
18     THE WITNESS: Yeah, I don't know.
19 BY MR. BLONIEN:
20     Q. Generally speaking, do you have an
21 understanding based on your experience in the
22 law as to what happens when two attorneys
23 representing plaintiffs in class action
24 litigation disagree as to whether or not a

1 settlement is appropriate?
2     A. I think what you do is you talk to
3 your client, and the client makes the decision
4 as to whether settlement should be accepted or
5 not.
6     Q. Did you have any conversations with
7 your client, Cin-Q, about the settlement
8 proposals made by the Tampa Bay Buccaneers?
9     A. Yes.
10     Q. Were those -- was the advice that you
11 provided in any way different than the
12 consultations that you had with Mr. Wanca?
13     MS. LOEW: Objection. To the extent that
14 he's asking for attorney-client privilege, I'll
15 advise you not to answer.
16 BY MR. BLONIEN:
17     Q. Are you following your attorney's
18 advice?
19     A. Yes.
20     Q. Have you had attorney-client
21 communications with Cin-Q?
22     A. Absolutely.
23     Q. Have you had attorney-client
24 communications with M & C?

28 (Pages 106 to 109)

1    A.  Yes.
2    Q.  Have you had attorney-client
3  communications with Cin-Q that you cannot share
4  with M & C?
5    A.  No.
6    Q.  Have you had attorney-client
7  communications with M & C that you cannot share
8  with Cin-Q?
9    A.  No.
10   Q.  Can you share those communications
11  with other prospective class members?
12   A.  No.
13   Q.  You can't?
14   A.  No.
15   Q.  Not even if they're named plaintiffs
16  in the litigation?
17   A.  Oh, if they're named plaintiffs, and
18  I'm representing them, then, yes.
19       If they are named plaintiffs,
20  then they would be my clients at that point if
21  I was representing them.
22   Q.  And if you didn't represent them,
23  would it be inappropriate to share information?
24   A.  I don't know.  That's speculative.

1    Q.  Did you share any information about
2  the litigation or mediation with class members
3  that you did not represent?
4    A.  No.
5    Q.  Have you represented M & C in any
6  capacity outside of the Tampa Bay Buccaneers
7  litigation?
8    A.  Again, I don't know whether I was
9  representing them in connection with the matter
10  against Mr. Clement, depends on where that was
11  filed.  I think it was in Texas, and I wasn't,
12  but I don't believe so.
13   Q.  I understand the uncertainty on that
14  case.  Is there any other case you can think
15  of?
16   A.  No.
17   Q.  Were there any other class actions you
18  were involved with where M & C was a putative
19  class representative?
20   A.  No.
21   Q.  Have you ever represented M & C as an
22  individual entity?
23   A.  No.
24   Q.  Have you ever represented Cin-Q as an

1  individual entity?
2    A.  Only in this case.  Well, I think
3  Cin-Q also filed against Mr. Clement in Tampa
4  federal court, so in connection with the
5  Buccaneers fax broadcast.
6    Q.  What role have you had in this matter,
7  by this matter I mean the breach of fiduciary
8  duty case that M & C has brought against
9  Mr. Oppenheim and Bock Law Firm?
10   A.  What role?
11   Q.  Yes, sir.
12   A.  None, other than as a witness here
13  today.
14   Q.  You don't represent M & C in any
15  capacity in connection with this litigation,
16  correct?
17   A.  That's correct.
18   Q.  Have you performed any activities as
19  an attorney in this litigation?
20   A.  No.
21   Q.  Have you been present with M & C for
22  any discussions about this case?
23   A.  No.
24   Q.  Were you involved in drafting the

1  complaint?
2    A.  No.
3    Q.  Were you involved in formulating any
4  of the legal theories underlying the complaint?
5    A.  No.
6    Q.  Have you talked with anyone about this
7  litigation?
8    A.  Other than Attorney Loew yesterday,
9  no.
10   Q.  Have you talked with Brian Wanca about
11  this litigation?
12   A.  I just knew that it existed, because I
13  got a request to produce documents and
14  subpoena, but I haven't discussed it with him.
15   Q.  Did Mr. Wanca inform you at any point
16  that he was intending to file this action on
17  behalf of M & C?
18   A.  I think I heard about it after it was
19  filed, but I don't think he filed it.  I think
20  this is filed by Foley & Lardner, as I
21  understand it.
22   Q.  What did you hear about it after it
23  was filed?
24   A.  I think other than I was going to

Thompson Court Reporters, Inc
thompsonreporters.com

1 probably have to be a witness and produce
2 documents, that's about it.
3     Q. Did you discuss the allegations with
4 anyone else at Anderson + Wanca apart from
5 Brian Wanca?
6     A. I don't know. I've discussed
7 with -- I mean my intermediary contact with
8 Anderson + Wanca was Ross Good. It was in
9 connection with telling me that there's
10 discovery that's outstanding. They needed my
11 participation to locate e-mails and
12 communications that related to the mediation
13 process. I guess I knew there was a lawsuit
14 pending, and that was the vehicle that was
15 going to be used to get me involved as a
16 witness. But other than that, I didn't really
17 care to know.
18     Q. How did you know that the lawsuit was
19 pending?
20     A. I think, as I said, Mr. Good would
21 have contacted me and said, There's a lawsuit
22 pending, and we've gotten a request for
23 discovery. Check your files and be ready to
24 respond, words to that effect.

1     Q. Before the lawsuit was filed, did
2 anyone at Anderson + Wanca ask you for facts
3 that relate to the allegations in this case?
4     A. I don't think so. They would have
5 known all the facts that I knew.
6     Q. What actions of Mr. Oppenheim do you
7 believe constitute a breach of fiduciary duty
8 in this case?
9     A. Well, what he's done is he's taken
10 information that he obtained during a time he
11 was an attorney for Cin-Q and Medical & Chiro
12 in this case against the Buccaneers that was
13 filed in 2013 and exported that information to
14 the Bock Hatch law firm, and they used that
15 information and the background of the process
16 of the case to insert themselves into the
17 discussions with the Buccaneers and seek to
18 achieve a settlement on behalf of the same
19 class of persons that were sought to be
20 represented in the case filed by Cin-Q.
21     Q. Do you have any personal knowledge
22 that David Oppenheim exported information to
23 Bock Law Firm?
24     A. I have no personal knowledge, just so

1 you know. I wasn't there whenever he did what
2 he did, so my understanding is that would be my
3 source for having personal knowledge.
4     Q. Did anyone talk to you about the
5 underlying facts that give rise to a breach of
6 fiduciary duty action in this case?
7     A. Well, I know about underlying facts
8 leading up to the purported settlement that was
9 announced on June 19th or June 20th or whatever
10 it is, because I was the one who discovered
11 those facts.
12         What David Oppenheim talked to
13 Mr. Bock about and what Mr. Bock talked to
14 Mr. Oppenheim about and what information was
15 exchanged, I don't know that.
16     Q. Or to whom Mr. Oppenheim shared any
17 information, you don't know that either?
18     A. Right.
19     Q. How did the sharing or misuse of
20 information as alleged in this complaint harm
21 Medical & Chiropractic?
22     MS. LOEW: Objection. Foundation.
23     THE WITNESS: It basically interfered with
24 the resolution of this case in a manner

1 favorable to the class and gave the Buccaneers
2 a -- the Buccaneers an opportunity to try to
3 dispose of this case for an insufficient amount
4 of money, and in a context of a claim form that
5 is inadequate and will -- was set up and
6 designed to make sure claims would be very
7 difficult to make, and ultimately any payout
8 pursuant to a claims process will be
9 ineffective to get people compensation. No
10 matter what happens, following the Eleventh
11 Circuit ruling and the ultimate decision by
12 Judge Porcelli, this ultimate resolution in
13 this case will be delayed further by more
14 appeals. And so a case that was been
15 resolved by June of 2015 will probably not be
16 ultimately concluded until June of 2020.
17 BY MR. BLONIEN:
18     Q. At the time that Mr. Oppenheim
19 allegedly shared information with Bock Law
20 Firm, there was an impasse declared in the Bucs
21 litigation?
22     A. That's correct.
23     Q. In fact, you advocated for that
24 impasse?

1    A.  I did.
2    Q.  Who was entitled to learn information
3  about this mediation, the mediations generally
4  speaking, so I'm talking about the whole set of
5  mediations occurring in the Buccaneers
6  litigation?
7    A.  Who was entitled to learn about them,
8  that they were happening?
9    Q.  And the information that was shared in
10  those mediations.
11    A.  Only the participants.
12    Q.  What about others affiliated with
13  them?
14    A.  Affiliated in what respect?
15    Q.  Is anyone affiliated with the law firm
16  entitled to information from a mediation in
17  your view?
18    A.  What do you mean affiliated?  You mean
19  an employed?
20    Q.  Do you understand the word affiliated?
21    A.  No, not in the context you are using
22  it.
23    Q.  Who would be entitled, besides from
24  the actual participants in a mediation, to

1  learn about what happened at the mediation?
2    A.  The attorneys at the law firm that are
3  employees or partners.
4    Q.  Anyone else?
5    A.  Well, the mediator, the clients.
6    Q.  Anyone else?
7    A.  I suppose if you had an expert witness
8  that was involved in some context in mediation,
9  they might be allowed to know what's being
10  discussed.
11    Q.  What about other attorneys involved in
12  the class action?
13    A.  If they're representing parties in the
14  case, is that what you're saying?
15    Q.  Yes, sir.
16    A.  I would guess they would be entitled
17  to know what's going on, yes.
18    Q.  Such as Mr. Siprut?
19    A.  Sure.
20    Q.  And Mr. Thomas?
21    A.  Yes.
22    Q.  And Ishmael Salam?
23    A.  Yes.
24    Q.  What about the attorneys for

1  Technology Training?
2    A.  No.
3    Q.  Why not?
4    A.  Because they weren't -- there was no
5  case pending, and they weren't clients.
6    Q.  When the case was pending, were they
7  entitled to information as to what happened at
8  the mediations in your view, Mr. Addison?
9    A.  No.
10    Q.  Why not?
11    A.  Because they weren't clients at the
12  time, and they weren't participants in the
13  mediation.
14    Q.  Are you asserting on M & C's behalf
15  there is a reverse auction in this case?
16    A.  Yes.
17    Q.  What's the basis for that assertion?
18    A.  That Mr. Bock's law firm took
19  information that he got from Mr. Oppenheim's
20  representation of Cin-Q plaintiffs in this case
21  and filed a competing lawsuit on behalf of a
22  party whose claim was time barred and then used
23  that initial complaint in state court and later
24  the promise of filing an action in federal

1  court to negotiate with the Buccaneers and seek
2  to get a settlement that was more advantageous
3  for the Buccaneers than would otherwise have
4  been allowed to be agreed upon in the context
5  of the Cin-Q case.
6    Q.  Do you know whether the attorneys,
7  Mr. Siprut and Mr. Thomas, represented Medical
8  & Chiropractic -- Medical & Chiropractic in
9  this litigation?
10    A.  I don't think so.
11    Q.  Do you know whether medical and --
12    MS. LOEW:  This litigation.  Objection.
13  Form.  Not sure which litigation you are
14  referring to.
15  BY MR. BLONIEN:
16    Q.  Do you know whether Siprut and Thomas
17  represented M & C in connection with the
18  Buccaneers litigation?
19    A.  They did not.
20    Q.  They did not.  Do you know whether M &
21  C was ever informed of their involvement in the
22  class action litigation?
23    A.  Just so you -- I don't know.
24    Q.  You didn't tell them?

Thompson Court Reporters, Inc
thompsonreporters.com

1    A. I didn't tell them. I'm not sure they
2  are involved.
3    Q. Is there an assignment of case
4  responsibilities in the Tampa Bay Buccaneers
5  litigation?
6    A. Assignment from who?
7    Q. Within the attorneys, is there a
8  general agreement about who does what?
9    A. No. Other than Mr. Oppenheim was in
10 charge of the mediations.
11   Q. So you had mentioned that there was an
12 agreement among counsel as to the division of
13 fees and any gross payout, right?
14   A. Right.
15   Q. Are there any other terms that were
16 agreed to by or among counsel?
17   A. Basically that Mr. Wanca's firm was
18 absorbing the out-of-pocket expenses for the
19 discovery that was necessary to learn the
20 identity of the sender of the facsimile ads and
21 retrieve the data to establish who the faxes
22 were sent to and when they were sent and how
23 many pages, et cetera.
24   Q. Anything else?

1    A. I mean basically he was responsible
2  for the out-of-pocket expenses, the discovery
3  was required to accomplish.
4    Q. Do you know if that agreement was
5  reduced to writing?
6    A. The agreement between him and me?
7    Q. The agreement between counsel as to
8  the division of fees.
9    A. No.
10   Q. Or the agreement that Wanca would be
11 absorbing the out-of-pocket expenses?
12   A. No, it was not.
13   Q. Or any agreement as to who had what
14 responsibility in the litigation?
15   A. No.
16   Q. Was information restricted from the
17 Siprut firm?
18   A. I am -- I don't understand the
19 question.
20   Q. Was any information that you or
21 Mr. Wanca learned not shared with the Siprut
22 firm?
23   A. I'm sure there was plenty of
24 information that was not shared with the Siprut

1  firm.
2    Q. Was there information that was
3  withheld because it couldn't be shared with the
4  firm of Siprut and Thomas, the attorneys?
5    A. I don't recall having much interaction
6  with the Siprut firm at all. So from my
7  personal observation, I didn't share
8  information with them one way or the other. So
9  if there was other information shared with
10 them, it would have been from the Anderson +
11 Wanca firm.
12   Q. Do you know whether the Siprut firm
13 agreed to step back and let you and Mr. Wanca
14 handle the case and all settlements?
15   A. I believe that's the case, yes.
16   Q. And was that written in an agreement?
17   A. I think there was an e-mail trail at
18 least with respect to that.
19   Q. Do you know what that agreement said?
20   A. I don't recall specifically, no.
21   Q. Do you recall Ms. Lally from Latham &
22 Watkins asking whether or not the Siprut firm
23 represented M & C in the litigation?
24   A. Did she ask that? I don't know. I

1  don't recall her asking that.
2    Q. I'm handing you what's been marked as
3  Exhibit No. 6, Mr. Addison, which is marked
4  MC5109 and 5110. If you can take a moment to
5  read this and let me know when you're ready for
6  a question.
7         (WHEREUPON, said
8          document was marked as
9          Addison Deposition
10         Exhibit No. 6 for
11         Identification.)
12   A. Okay.
13   Q. Does that refresh your recollection
14 that Ms. Lally from Latham & Watkins is
15 concerned whether Siprut represented Cin-Q or
16 Medical & Chiropractic?
17   A. Apparently, I'm writing this e-mail at
18 the top of the first page of Exhibit 6.
19 Apparently, she made an inquiry of somebody
20 about whether or not the Siprut firm was on the
21 engagement agreement, and I answered that it
22 was not on the engagement agreement. So I
23 don't see her inquiry in the e-mails below, but
24 apparently somehow she made that known that she

Thompson Court Reporters, Inc
thompsonreporters.com

1  wished that information.
2     Q.  And your response was that you
3  reviewed the existing engagement agreement,
4  correct?
5     A.  Right.
6     Q.  You responded and advised that the
7  Siprut firm is not a party to either agreement?
8     A.  Right.
9     Q.  The two firms listed are the only
10  attorneys representing the class plaintiffs
11  against the Buccaneers brought by Cin-Q Medical
12  & Chiropractic, right?
13     A.  That's correct.
14     Q.  Were you one of the two firms listed?
15     A.  Yes.
16     Q.  And what document are you referring to
17  where you were listed as an attorney
18  representing Medical & Chiropractic?
19     A.  Apparently on the engagement
20  agreement.
21     Q.  And the engagement agreement we've
22  looked at, Exhibit No. 3, doesn't list you as
23  an attorney for Medical & Chiropractic,
24  correct?

1     A.  Not as of October 9th, 2013.
2     Q.  Do you recall whether Mr. Siprut ever
3  sought information about the mediations and
4  what happened in them?
5     A.  I don't know whether he sought it or
6  not. It might have been provided voluntarily
7  that a mediation was going to take place, and a
8  mediation had taken place and no settlement was
9  reached.
10     Q.  Do you know whether any additional
11  information was shared with Mr. Siprut?
12     A.  I didn't. I've never spoken to the
13  gentleman.
14     Q.  Did you advise that information be
15  shared with Mr. Siprut?
16     A.  No.
17     Q.  I'm going to hand you what's been
18  marked as Exhibit No. 7, which is MC-420 to
19  422.
20          If you recall, when you print out
21  e-mails, they're sort of back to front in terms
22  of chronological order.
23          (WHEREUPON, said
24              document was marked as

1          Addison Deposition
2          Exhibit No. 7 for
3          Identification.)
4     A.  Yeah. The oldest ones are first.
5  More recent ones end up -- the oldest ones
6  appear on the back and more recent ones appear
7  on the top.
8     Q.  Right. On August 27th, 2015, Joseph
9  Siprut wrote to Ross Good, Brian Wanca, Ismael
10  Salam stating, "It is amazing to me that my
11  co-counsel in this case has not only failed to
12  keep us in the mediation loop as I requested
13  despite the processing initiated by me, but has
14  actively concealed this fact from me, never
15  seen anything like it before and unlikely to
16  see it" -- "to ever see it again. This is not
17  only unprofessional and disrespectful, which
18  goes without saying, it is a breach of our
19  JPA." Do you see where I'm reading from?
20     A.  Yes.
21     Q.  Are you familiar with the JPA that
22  Joseph Siprut is referring to here?
23     A.  No.
24     Q.  Were you a party to the JPA?

1     A.  I don't know what it is, so not sure.
2     Q.  Were you a party to any agreement with
3  Mr. Siprut?
4     A.  I know that I signed on to represent
5  his Stein, et al, clients.
6     Q.  On August 28th at 10:43 a.m. Brian
7  Wanca responded, "You do not represent our
8  plaintiffs. You are not class counsel. We
9  agreed to handle the case and pay you if we get
10  paid. That is it. Your Accounting To You
11  plaintiff has been dismissed out because they
12  are unwilling to participate. Mediations are
13  confidential. And if the case resolves, we
14  will let you know when we can. We made it
15  clear to you that you would not be a part of
16  the process as you wanted to be." Did I read
17  that correctly?
18     A.  Yes.
19     Q.  Have you seen that e-mail before?
20     A.  I think so, yes. I think my e-mail is
21  at the top, the first page.
22     Q.  And then on Tuesday, September 1st,
23  2015, Joseph Siprut asked, "How did it go
24  yesterday?" Do you see that?

1    A.  Yes.
2    Q.  And Mr. Wanca responded, "They finally
3  made a monetary offer, but it is well short of
4  where they needed to be.  Unfortunately, the
5  person who makes the decisions wasn't there,
6  and they want a couple of days to talk to him.
7  I don't see this as happening at this time, but
8  it is the start of a dialogue."  Do you see
9  that?
10    A.  I see that.
11    Q.  Do you recall that message being sent
12  to Mr. Siprut?
13    A.  I recall this whole e-mail.  So you
14  don't have to ask me about each part of it.
15    Q.  And Joseph Siprut then asked what the
16  amount of money was that was put on the table.
17  Mr. Wanca said I don't think we can say because
18  you didn't participate.  Mr. Oppenheim said if
19  you don't tell him, he'll probably call Mester,
20  and you said you agreed; is that correct?
21    A.  Yes, that's what I said.
22    Q.  So you believed it was okay to share
23  that information with Mr. Siprut as to the
24  conduct of the mediations and the amount?

1    A.  No, no.  I agreed with Mr. Oppenheim's
2  assessment of the situation that he would
3  probably call Mester, and if he did, Mester
4  wouldn't be able to tell him.
5    Q.  So you think it would be inappropriate
6  to share information what happened at the
7  mediation with Mr. Siprut?
8    A.  Yes.
9    Q.  What about Mr. Thomas?
10    A.  Same reason.
11    Q.  And Mr. Salam, same reason?
12    A.  Same reason.
13    Q.  Do you remember ever receiving any
14  signed retainer agreements from Mr. Thomas for
15  the Stein plaintiffs?
16    A.  Yes.
17    Q.  And would that have been stored in
18  your Time Matters software, as well?
19    A.  Yes.
20    Q.  So is it your contention that it would
21  be inappropriate to share information with
22  people who did not directly participate in the
23  mediation as to what was happening there?
24    A.  Yes.

1    Q.  You think it would be inappropriate to
2  tell someone who was not directly involved that
3  there wasn't any serious negotiations going on
4  in the mediation?
5    A.  No, no, that's -- that's a general
6  statement.  That's why you left the mediation
7  without a settlement.  Nothing serious was
8  happening.
9    Q.  I'm handing you, Mr. Addison, what's
10  been marked as Exhibit No. 8, which includes a
11  final judgment against defendant.  That's not
12  the part I'm really interested in.
13    I'd like for you to look at the
14  e-mails that start on 3270 and go through 3272.
15    (WHEREUPON, said
16    document was marked as
17    Addison Deposition
18    Exhibit No. 8 for
19    Identification.)
20    A.  Okay.
21    Q.  Do you see an e-mail that you had sent
22  to David Oppenheim on November 4th, 2015?
23    A.  Yes.
24    Q.  And in that e-mail to David, you

1  state, "Given that there does not seem to be
2  any interest on the part of the Buccaneers in
3  the Cin-Q case to get serious, and we're
4  waiting for their expert report before
5  scheduling any further discovery of experts.  I
6  was hoping that there might be a chance to take
7  a gook look at the Reed final judgment."  Did I
8  read that correctly?
9    A.  Yes, you did.
10    Q.  And you forwarded that e-mail to Phil
11  Bock at Bock Law Firm, correct?
12    A.  Right.
13    Q.  Were you working with Phil Bock on the
14  final judgment in the Lee Alan Reed case?
15    A.  Yes.
16    Q.  And in the course of your
17  correspondence with respect to the Lee Alan
18  Reed case, you shared information with Phil
19  Bock as to what was happening in the mediation,
20  right?
21    A.  No, just the fact that there's nothing
22  serious happening in the Cin-Q case, and that
23  was obvious from the docket sheet, that we had
24  a mediation and there was no settlement.

Thompson Court Reporters, Inc
thompsonreporters.com

1    Actually, we had two mediations, and there was
2  no settlement.
3    Q.  Do you claim that you've been damaged
4  by Mr. Oppenheim's conduct?
5    A.  I haven't sued him.
6    Q.  That wasn't my question.
7    A.  Yes, I think I've been damaged.
8    Q.  How have you been damaged?
9    A.  The Buccaneers case was a case I
10  started on behalf of Cin-Q in August of 2009.
11  It was at the time my thought that the
12  Buccaneers had sent a mass fax advertisement
13  out. I wasn't sure to how many, but if my
14  guess was correct, it was to a lot of people;
15  that they did it in violation of the Telephone
16  Consumer Protection Act in at least two
17  respects and subjected themselves to a
18  potential penalty or potential sanction of $500
19  per fax. And based on that premise, that I
20  filed the case as a class action on behalf of a
21  named plaintiff to represent the class.
22    When I got the discovery
23  responses from the Buccaneers to my document
24  request in 2011, and I reviewed it, I realized

1  that not only had they sent out faxes in 2009
2  in July and August, but after being sued by me,
3  they sent the same type of ads out again in
4  2010. And I realized that those faxes that
5  were sent in 2010 had every likelihood of being
6  identified as intentionally sent with knowledge
7  of the law exposing them to $1500 per fax for
8  those faxes.
9    So we had had an argument by the
10  Buccaneers previous to that document production
11  that somehow they got scammed by Steve Sims,
12  and that they were trying to do everything
13  legally and everything by best practices, et
14  cetera, and that they were the innocent victim
15  of this fax broadcast, when, in fact, their
16  subsequent conduct in 2010 showed that they
17  went ahead and did it again with full knowledge
18  that they'd been sued for violating the
19  Telephone Consumer Protection Act.
20    And I realized at that point that
21  this was a very important fact in this case,
22  and that it was a case against a solvent
23  defendant, albeit uninsured, but a defendant
24  worth more than a billion dollars, and they had

1  no defense whatsoever, at least to the faxes
2  that they sent in 2010, because they'd already
3  been sued and put on full notice.
4    So it was a case that I realized
5  had an exceptional settlement value. And every
6  maneuver that the Buccaneers tried to pull in
7  this case told me they realized the same thing.
8  So by David Oppenheim and Phil Bock interfering
9  at the last stage in the settlement process and
10  usurping the claim the way they did, they've
11  destroyed the chance for the moment of settling
12  the case for a fair value and putting the
13  Buccaneers in a position where they have to pay
14  the absent class members a realistic amount of
15  money using a realistic claim form and a
16  realistic settlement claims management process.
17    Now I expect to have that undone,
18  and if and when that happens, then the damages
19  to me will be ameliorated. But if it doesn't
20  happen, I've been significantly damaged,
21  because I've invested eight years in this case,
22  and they invested two weeks.
23    Q.  What is the fair value of the case in
24  your mind?

1    A.  Well over a hundred million dollars in
2  settlement.
3    Q.  You think that a fair and appropriate
4  settlement is over a hundred million dollars?
5    A.  Yes, sir.
6    Q.  What would be an inappropriate amount,
7  anything under a hundred million dollars?
8    A.  Anything under 20.
9    Q.  Anything under $20 million is
10  inappropriate in your view?
11    A.  Yes, sir.
12    Q.  When there is a payday, do you expect
13  to be paid in this case?
14    A.  I hope so.
15    Q.  Do you believe Mr. Oppenheim stabbed
16  you in the back?
17    A.  Yes.
18    Q.  Do you intend to seek fees in the
19  Technology Training case to the extent that the
20  judge approves the settlement?
21    A.  If he proceeds and approves the
22  settlement, absolutely.
23    Q.  Okay. How much are you going to
24  receive?

1   A. All of it.
2   Q. Hundred percent of the fees?
3   A. Yeah.
4   Q. Do you believe you are entitled a
5   hundred percent of the fees?
6   A. Yes.
7   Q. Do you believe that Medical &
8   Chiropractic was injured?
9   A. Yes.
10  Q. How?
11  A. They have the same investment in time
12  and energy in the case, and they had the
13  opportunity to see the case through after
14  investing days of deposition and days of
15  mediation and many hours of collaboration with
16  their counsel only to have the case pulled out
17  from under them.
18  Q. How much damage do you understand M &
19  C suffered?
20  A. I'm not in a position to quantify how
21  much their time and effort was worth, but the
22  problem is a class representative is one who
23  has to invest the time and the energy and
24  sacrifice their schedule to accommodate the

1   wishes of opposing parties, and it can be
2   mentally draining and mentally challenging to
3   do that, especially when the attorney on the
4   other side is using discovery and depositions
5   to harass and annoy you. So there's some value
6   for that, as well.
7   Q. Do you intend to seek any recovery in
8   this litigation?
9   A. No.
10  Q. Do you have a contract with M & C in
11  connection with recovery in this case?
12  A. No.
13  Q. Or any contract with M & C in this
14  case?
15  A. In this case, the one that I'm here
16  deposing?
17  Q. Right, M & C case against
18  Mr. Oppenheim.
19  A. No.
20  Q. Have you promised to pay any costs and
21  expenses associated with this litigation?
22  A. No.
23  Q. Aside from your own?
24  A. I paid my own, yes.

1   MR. BLONIEN: If we could go off the
2   record.
3   THE VIDEOGRAPHER: Off the record. The
4   time is 11:56.
5   (WHEREUPON, a luncheon
6   break was had.)
7   THE VIDEOGRAPHER: We are back on the
8   record. The time is 12:53.
9   EXAMINATION
10  BY MR. COHEN:
11  Q. Mr. Addison, my name is Dan Cohen.
12  We've met before. We're back on the record
13  after a short lunch break and prepared to
14  continue.
15  A. Yes.
16  Q. You produced documents to the Foley &
17  Lardner law firm for purposes of compliance
18  with the subpoena duces tecum served upon you,
19  correct?
20  A. That's right.
21  Q. Have you reviewed the CD that has been
22  provided to us by the Foley & Lardner law firm
23  today purportedly containing the documents that
24  you were producing in response to the subpoena

1   to confirm whether the documents you gave to
2   her have all been produced to us?
3   A. Have not.
4   Q. Have you reviewed the privilege log
5   she has created of the documents that you gave
6   to her that she's not providing to us under
7   some claim of privilege and cross-checked them
8   against the CD that has been provided to us to
9   see if that constitutes the entire universe of
10  everything you came up with in attempted
11  compliance with the subpoena?
12  A. I reviewed a privilege log yesterday.
13  It was not my understanding that was a
14  privilege log just from the documents I
15  produced, but I thought it was a privilege log
16  for the entire universe of materials being
17  provided by Medical & Chiro and its various
18  agents.
19  So if that was a privilege log
20  just for my materials, I reviewed it. I guess
21  I thought there was more to it than that.
22  Q. As we sit here today, you understand
23  at least some of the documents that you
24  gathered to produce in compliance with the

Thompson Court Reporters, Inc
thompsonreporters.com

1  subpoena duces tecum were withheld by Ms. Loew
2  and identified on that privilege log?
3      A.  That's right.
4      Q.  But, again, you can't, and you haven't
5  taken that privilege log, compared it to the CD
6  of documents that are being produced to us to
7  see if, in fact, between the privilege log
8  documents that were your production and the CD
9  production whether, in fact, that comprises the
10 total universe of documents you put together
11 and produced, correct?
12     A.  That's correct.
13     Q.  There was a question whether there
14 were any communications between yourself and
15 Medical & Chiropractic about this litigation,
16 and you said I don't think I have anything, at
17 least in writing.
18         Have you had any oral
19 communications with M & C in any way related to
20 this litigation?
21     A.  To this lawsuit?
22     Q.  Yes.
23     A.  No.
24     Q.  There were some questions about

1  agreements between your firm and Medical &
2  Chiropractic and in answering several of
3  Mr. Blonien's questions you were careful to
4  always clarify that you were referring to
5  retention agreements.
6          Will you please clarify for me
7  what you mean when you describe an agreement as
8  a retention agreement?
9      A.  It's a written agreement whereby I as
10 a lawyer agree to represent a company or an
11 individual as a client in providing legal
12 advice or legal assistance, more particularly
13 in my situation in connection with a lawsuit as
14 opposed to a transaction.
15     Q.  I'll represent to you that you were
16 listed as counsel of record on the original
17 Medical & Chiropractic versus Clement lawsuit,
18 and you were listed among others as counsel of
19 record on behalf of Medical & Chiropractic.
20 Assuming that's true, would you agree you had
21 an attorney-client relationship with Medical &
22 Chiropractic with regard to that case?
23     A.  Yes.
24     Q.  Do you have a contract reflecting your

1  attorney-client relationship with Medical &
2  Chiropractic at that time?
3      A.  I don't recall.
4      Q.  If there was any such contract, would
5  it be in the production that you have delivered
6  to Ms. Loew and has been produced to us?
7      A.  I would hope so.
8      Q.  If it is not, do you have any
9  explanation for its omission or absence?
10     A.  My inadvertence.
11     Q.  So is it fair to say if we go through
12 these documents that have been produced to us
13 today, about 1500 pages' worth, and we can't
14 find an agreement between Medical &
15 Chiropractic and at least among others, your
16 firm, that are consistent with and related to
17 the M & C versus Clement litigation, then we
18 can notify Ms. Loew, she can notify you, you
19 will find that and supplement that?
20     A.  Yes, sir.
21     Q.  So setting aside any retention
22 agreements, per se, as you defined, as I asked
23 to you, and I appreciate that, what other
24 written agreements of any kind have you had at

1  any time with or related to Medical &
2  Chiropractic?
3      A.  None that I can think of.
4      Q.  Some of the documents that have been
5  produced by Ms. Loew on your behalf in
6  compliance with the subpoena duces tecum served
7  on you contain redactions.  Did you make those
8  redactions?
9      A.  No.
10     Q.  Do you know who made those redactions?
11     A.  I'm assuming Ms. Loew or somebody
12 working with her.
13     Q.  Were you notified of the particular
14 redactions that were being made?
15     A.  Well, I saw the -- a number of the
16 documents that were produced yesterday in
17 the -- I think in the binder, and I did see
18 some indications of redactions.  I'm not sure
19 if those were documents that I had produced or
20 just generally documents to illustrate to me
21 that redactions had been made.
22     Q.  Why is the Foley & Lardner firm
23 representing you in this case for purposes of
24 your compliance with the subpoena and testimony

Thompson Court Reporters, Inc
thompsonreporters.com

1    here today?

2    **A. Because they were the only ones that**

3    **agreed to do it.**

4    Q. Who else did you ask to do it?

5    **A. Well, I asked about who else should be**

6    **consulted regarding this, and there was an**

7    **attorney from Ohio that was recommended to me,**

8    **but decided that it would be difficult for him**

9    **to be representing me given the fact that he is**

10   **in Ohio and I'm in Florida and the deposition's**

11   **in Illinois, so I opted to go with Foley &**

12   **Lardner.**

13   Q. You say opted to go with, how did that

14   come about? Did you contact them and ask them,

15   or did they contact you and offer?

16   **A. Trying to recall. I think my request**

17   **for their assistance was relayed through Ross**

18   **Good at the Anderson + Wanca firm.**

19   Q. When was that?

20   **A. Months ago. I don't remember when.**

21   Q. You've indicated before that you view

22   yourself as having an attorney-client

23   relationship with M & C, correct?

24   **A. Yes.**

1    Q. You understand M & C is a party in

2    this litigation against Bock Law Firm and

3    Mr. Oppenheim?

4    **A. That's what I understand.**

5    Q. Did you consult with and receive the

6    approval and authorization of your client, M &

7    C, to be represented by M & C's attorneys in

8    this litigation, to have M & C's attorneys in

9    this litigation represent you in this

10   litigation?

11   MS. LOEW: Objection. I advise you not to

12   answer to the extent this is implicating

13   attorney-client privileged discussions with his

14   client.

15   BY MR. COHEN:

16   Q. Are you going to follow Ms. Loew's

17   advice?

18   **A. Yes.**

19   Q. Earlier in Mr. Blonien's questioning

20   of you, he asked if you, yourself, were upset

21   with Mr. Oppenheim, you said yes. He asked

22   why, and you said Mr. Oppenheim took advantage

23   of a situation created by a disagreement he had

24   with Anderson + Wanca and brought information

1    to Bock Law Firm, and then together they filed

2    suit interfering with the Cin-Q lawsuit. Do

3    you recall that?

4    **A. Yes.**

5    Q. I want to break that down.

6    I understand Mr. Blonien asked

7    you, and he didn't use the exact words, but he

8    asked you what kind of disagreement or whatnot

9    that you were referring to that Mr. Oppenheim

10   had with the Anderson + Wanca law firm, and do

11   you recall you talked about money?

12   **A. That was my understanding, right.**

13   Q. You got that understanding from the

14   sources that you shared with Mr. Blonien when

15   he asked for your sources, correct?

16   **A. That's correct.**

17   Q. I just want to be clear. When you

18   testified before he probed for the details,

19   when you testified that, quote unquote,

20   "Mr. Oppenheim took advantage of a situation

21   created by a disagreement that he had with

22   Anderson + Wanca," is the disagreement that he

23   had with Anderson + Wanca to which you were

24   referring specifically the issue of monetary

1    remuneration for his services while he was at

2    Anderson + Wanca?

3    **A. That's what I believe the source of**

4    **the disagreement was. There may have been**

5    **other issues, too, but David Oppenheim never**

6    **came to me and said, I'm leaving Anderson +**

7    **Wanca because they are not paying me enough**

8    **money. So I could not have learned it from the**

9    **source. But what I'm saying is I heard about**

10   **it after the fact from several sources, and I**

11   **don't know whether it's true or not. That's**

12   **what I was told.**

13   Q. You already shared the details about

14   what you heard and from whom with Mr. Blonien?

15   **A. Right.**

16   Q. I just want to make certain. There's

17   no other disagreements that Mr. Oppenheim had

18   with Anderson + Wanca that you are aware of

19   that you were referring to when you talked

20   about disagreement?

21   **A. No. As I said, I don't know the**

22   **specifics. That was one plausible explanation**

23   **that I was told. I mean he might not have**

24   **liked the size of the office he had. He might**

Thompson Court Reporters, Inc

thompsonreporters.com

1  not have liked the laptop he was given. There
2  could be anything. But I only heard it had to
3  do with dollars and cents.
4      Q.  Now, I'm going to start talking to you
5  about some other stuff that you said in that
6  particular part of your testimony and in
7  others, but I want to draw a distinction first.
8      You understand the difference
9  between direct evidence of a fact and
10  inferential evidence of a fact?
11      A.  That's correct.
12      Q.  And if it comes up as a gray area at
13  any point, I'll, perhaps, probe when we're
14  talking about.
15      I just want you to understand,
16  unless I say otherwise, when I ask about
17  evidence or a fact, I'm speaking your testimony
18  regarding direct evidence of a fact, not your
19  inferential conclusion from existing direct
20  evidence. Okay?
21      A.  Okay. I'll try to make that
22  distinction, too.
23      Q.  I appreciate that.
24      So you indicated that you were

1  upset because Mr. Oppenheim took advantage of a
2  situation created by his disagreement with
3  Anderson + Wanca, and we've already covered
4  your understanding of the nature of that
5  disagreement. You said and brought information
6  to Bock Law Firm. What information did David
7  Oppenheim bring to Bock Law Firm that has
8  relation to why you're upset with David
9  Oppenheim, why think he behaved improperly and
10  unethically, and I'm speaking of facts you know
11  regarding information that David Oppenheim
12  brought to Bock Law Firm?
13      A.  Well, what David Oppenheim had is
14  personal knowledge of the Cin-Q versus
15  Buccaneers case from his involvement in the
16  case from and after June of 2013. He had that
17  information. He possessed that knowledge. He
18  had access to the documents. He had access to
19  the research. He had access to the deposition
20  testimony. He had access to the briefing. He
21  had access to all the e-mails that went back
22  and forth over that time period. He had all of
23  that knowledge and background, and he took it
24  with him.

1      Q.  Was there any way he could purge the
2  knowledge he had in his brain? Do we have that
3  ability when we move from one law firm to
4  another?
5      MS. LOEW:  Objection.
6      THE WITNESS:  No.
7  BY MR. COHEN:
8      Q.  So it was a guarantee that he was
9  taking that knowledge with him wherever he
10  went, whether he went to Bock Law Firm, to
11  another law firm or opened his own firm,
12  correct?
13      A.  That's correct.
14      Q.  So generally speaking, when you say he
15  brought the information to Bock Law Firm, I
16  assume you are speaking of more than the mere
17  fact he can't purge knowledge from his brain,
18  you were implying that he shared the
19  information with Bock Law Firm?
20      A.  Yes.
21      Q.  What facts do you know that prove or
22  tend to prove that David Oppenheim, in fact,
23  shared that information with Bock Law Firm?
24      A.  The facts that -- do I have personal

1  knowledge? As I said, I've seen some e-mail
2  communications between Mr. Oppenheim and Mr.
3  Bock relating to the Buccaneers case and the
4  status of that case at a point in time in
5  March, April of 2015.
6      Q.  '16.
7      A.  '16.
8      Q.  And if I represent to you that that
9  would be e-mails from April 29th of 2016 where
10  they start discussing why Brian Wanca doesn't
11  want to use Wayne Anderson in another case, the
12  Rogan Shoes case, Phil Bock wants to know why,
13  it goes on into a discussion of Mr. Wanca's
14  dissatisfaction with Wayne Anderson's
15  performance or results in the Cin-Q case, and
16  then goes further, are those the e-mails you're
17  talking about?
18      A.  I think so.
19      Q.  And I don't think that's nonresponsive
20  at all. I think those two e-mails are direct
21  evidence of whatever they're evidence of, and I
22  appreciate your identifying them.
23      Setting aside those two e-mails,
24  what direct factual evidence can you identify

Thompson Court Reporters, Inc
thompsonreporters.com

1 or do you have personal knowledge of that David
2 Oppenheim at any time other than whatever you
3 think is revealed in those two e-mail chains
4 that he shared information that he gained about
5 the Cin-Q case with Bock Law Firm?
6     A. I have no direct knowledge because I
7 wasn't with them.
8     Q. And when you say I have no direct
9 knowledge, that's a completely fair answer. It
10 could mean you have the ability to draw
11 inferences which we talked about before which
12 I'm not seeking at this time. It could also
13 mean that you have learned from other people,
14 other people have shared with you that which
15 might or might not be described as hearsay, and
16 you don't know if what they've told you is
17 true, but if it is true, you would describe
18 that as a direct fact of Mr. Oppenheim sharing
19 Cin-Q information with Bock Law Firm outside of
20 your own personal knowledge what information
21 has been shared with you by anyone else to
22 support the proposition directly that David
23 Oppenheim shared Cin-Q information with Bock
24 Law Firm?

1     A. Wow. That was kind of convoluted, but
2 I have been told by attorney Ross Good that
3 Mr. Oppenheim copied his computer files from
4 the Anderson + Wanca firm and took them with
5 him to Bock Hatch. I don't know that. I've
6 been told that.
7     I can infer from that that that
8 would make it possible for Mr. Oppenheim to
9 share information and data much more easily
10 than trying to remember every fax number that
11 was sent by the Buccaneers' agent during these
12 two fax blast episodes in 2009 and 2010.
13     I don't see how anybody could
14 remember that, but that data was available
15 easily.
16     Also, the information about the
17 various mediation discussions and positions and
18 responses to positions and so on would have
19 been in there as well. So, again, I was told
20 that. It's hearsay to me.
21     Q. Understand. Fair enough.
22     I'm going to ask you a couple of
23 questions about that in a moment.
24     Have you had any other

1 information about hearsay, direct facts showing
2 David Oppenheim shared Cin-Q information with
3 the Bock Law Firm other than what you just
4 disclosed to me?
5     A. I don't believe so. I think that
6 pretty much -- I mean he had access to all of
7 the information, so what part of it was shared
8 and what part was kept secret, if any, I don't
9 know.
10     Q. And that actually was right back where
11 I was going. With regard to the fact you've
12 been told by Ross Good that Mr. Oppenheim
13 copied computer files that contained
14 Cin-Q-related documents and information, took
15 that with him when he joined Bock Hatch and
16 what you've acknowledged that would contain
17 information about mediation, positions,
18 responses to positions, and it would make it
19 easier if you were going to share information
20 with Bock Law Firm to have that information and
21 documentation recorded in the files he had
22 downloaded and copied, rather than relying upon
23 his own recollection, is it fair to say you
24 still have no personal knowledge that he

1 actually shared any of that information and no
2 facts that you can point to that show he shared
3 that information with Bock Law Firm, other than
4 those two April 29, 2016, e-mails we've
5 referenced, whatever they do or don't show?
6     A. Whatever -- I don't have direct
7 knowledge. There's just the inference, as I
8 said, that draw from the timing and the
9 sequence of events and the secrecy of the
10 attempt to maneuver into the Buccaneers' ambit.
11     Q. Let me ask you something. If Phil
12 Bock had contacted you and told you he was
13 going to file the Technology Training class
14 action, a competing case with the Cin-Q action,
15 would you have responded or reacted any
16 differently than you did when you found out
17 after the fact that he had filed it?
18     A. Yeah, I think I would have.
19     Q. How so?
20     A. I would have attempted to talk him out
21 of it.
22     Q. And let's assume you would have been
23 unsuccessful, and he said, hey, I'm filing it
24 anyway. Wouldn't you have taken all the same

Thompson Court Reporters, Inc

thompsonreporters.com

1 steps to try to stop him and interfere with the
2 successful mediation and resolution of the
3 Technology Training case for all the reasons
4 that you ended up doing?
5 A. Well, I don't think that mediation was
6 successful. But taking that adjective out of
7 the equation, no, I would have tried to explain
8 to him how that was going to be
9 counterproductive. It was not going to work.
10 It was -- he was being manipulated by the
11 Buccaneers and was falling into their trap, and
12 then I wouldn't have been running around trying
13 to figure out who Daniel Cohen is on a
14 mysterious e-mail shows up on my inbox and
15 referring to some mediation that was supposed
16 to occur and wasted all that time, I would have
17 been filing papers sooner.
18 Q. It would have led to the same general
19 outcome, correct, in terms of the actions you
20 ended up taking?
21 A. The only things we can do were what we
22 did. So maybe we didn't do them as soon as we
23 would have otherwise, but, yeah.
24 You can only move to intervene in

1 the case you filed, and you can only move to
2 enjoin it in the other case.
3 Q. All I'm getting at, I think we're
4 saying the same thing, if Phil Bock had told
5 you beforehand he was going to do this with the
6 Technology Training case, and if you had been
7 unable to and he had let you know that you had
8 been unable to talk him out of it, you would
9 have taken the same kinds of steps and
10 procedural moves to try to stop that from
11 happening that you ended up taking, correct?
12 MS. LOEW: Objection to form.
13 THE WITNESS: I would also have asked him
14 why he was doing it, but you didn't ask about
15 that, so...
16 BY MR. COHEN:
17 Q. That's fair.
18 Just as far as the procedural
19 moves you took in state court and federal court
20 to stop the TTA case from going forward, from
21 reaching a settlement, whether you think it's
22 good or bad, you would have taken those same
23 steps, correct?
24 A. Probably, yeah.

1 Q. Going back to your statement that
2 Mr. Oppenheim took advantage of the situation
3 created by a disagreement with Anderson +
4 Wanca, brought information to Bock Law Firm,
5 and together they filed suit interfering with
6 the Cin-Q lawsuit, what direct facts or
7 evidence can you point to that Bock Law Firm's
8 filing of the Technology Training lawsuit was
9 done, quote unquote, "together with
10 Mr. Oppenheim"?
11 A. I don't have direct knowledge based on
12 your definition of direct knowledge.
13 Q. If I reference the Yaakov Bais case in
14 the DC Circuit Court of Appeals and the
15 decision issued by the DC Circuit Court of
16 Appeals, are you familiar with what I'm talking
17 about?
18 A. No.
19 Q. If I reference Bais Yaakov?
20 A. Not that one either.
21 Q. Thank you.
22 A. I know about Yakov Sprinoff
23 (phonetic), but that dates me.
24 Q. Got a note here from when you were

1 talking with Mr. Blonien, and these are
2 not -- a lot of these are your exact words, but
3 I don't mean to suggest it is verbatim because
4 I was trying to catch the words that mattered.
5 Generally speaking, I've got that
6 -- and this is leading up to the impasse being
7 declared, that there had been no meaningful
8 follow-up from the Buccaneers, and that you
9 believed Wayne Anderson was not moving the
10 mediation and settlement efforts toward
11 anything productive, and you thought an impasse
12 should be declared, and you communicated that
13 or it was communicated to Judge Anderson who
14 later filed the impasse, correct?
15 A. Yeah. I think I communicated to
16 Mr. Wanca who communicated to Judge Anderson.
17 I don't believe I was communicating necessarily
18 directly to Judge Anderson.
19 Q. Fair enough.
20 But the idea that the Buccaneers
21 were not following up in settlement or
22 mediation negotiations in what you perceived to
23 be any meaningful way, and that you thought an
24 impasse should be declared and the ultimate

41 (Pages 158 to 161)

1  declaration of an impasse by Judge Anderson was
2  all consistent with your views and what you
3  thought should be done?
4      A.  Yes.
5      Q.  And at the time an impasse was
6  declared, there were no continuing mediation
7  plans or settlement negotiation plans with the
8  Buccaneers at that time, correct?
9      A.  At the instant that he filed the
10  notice of impasse, that's correct.
11      Q.  And from the time he filed -- and from
12  the time Judge Anderson filed the notice of
13  impasse through to the time that the Technology
14  Training case was filed, there was no change in
15  that status quo relative to any settlement
16  negotiations, any planned settlement
17  negotiations or mediations in the Cin-Q case,
18  correct?
19      A.  Which technology case are you talking
20  about, the state court case?
21      Q.  Yes.
22      A.  When was that filed?
23      Q.  Do we have a date?  Date the state
24  court TTA case was filed?

1      A.  Was that in April?
2      Q.  No, it was May.
3      A.  The settlement was -- the mediation
4  that I got alerted to by Judge Anderson's
5  office, I think, was supposedly scheduled for
6  May 20th, so I think the filing date of the
7  lawsuit was like May 13th or 12th or something
8  like that, in that time frame.
9      No, the impasse had been notified
10  to the court.  The motion to certify the class
11  had been filed, the Buccaneers had been due to
12  file their response.  They got it extended.
13  Then they got it extended again.  So just
14  because a mediation impasse was declared didn't
15  mean that either party couldn't continue to
16  pursue settlement discussions.
17      In fact, sometimes that's when it
18  actually starts happening.
19      But I had no communication from
20  Mr. Mester indicating that, notwithstanding the
21  impasse by Judge Anderson, that he was still
22  interested in pursuing settlement, so there was
23  no specific plan to engage further in those
24  discussions, but I preface that by saying when

1  I had the telephone conversation in July of
2  2015, when Mr. Mester initiated the telephone
3  conference with myself and Mr. Wanca and
4  Mr. Oppenheim, he started out the conversation
5  by saying, We're going to get this case
6  settled.  That was the opening statement.  And
7  that he had been hired to get it settled.  And
8  that that was what he did, is he settled class
9  action cases, which was music to my ears, as
10  you can imagine, having just fought with
11  Mr. Postman for two years over every little
12  nitpicky thing you could think of, including
13  hiring an expert to prove a fax was actually
14  sent.
15      But I always knew that we were
16  going to settle the case, it was just a
17  question of how much money they were prepared
18  to put into the settlement.
19      Q.  Can you point to any evidence of the
20  Buccaneers expressing interest in reconvening
21  settlement negotiations or restarting mediation
22  with the Cin-Q plaintiffs or their counsel
23  after the impasse was declared and before the
24  Technology Training settlement was reached?

1      A.  I think I already answered that, but
2  no.
3      Q.  And there was some discussion about
4  your efforts to procedurally intercede or
5  intervene to stop the Technology Training case
6  from moving forward in any settlement
7  direction, and I don't think -- I may have just
8  been hearing wrong or writing down wrong, but I
9  wanted to make certain the delineation or
10  distinction is made between your efforts in the
11  state court action and then your efforts in the
12  Cin-Q action in front of Judge Porcelli.
13      A.  Right.
14      Q.  When you learned about the state court
15  Technology Training action being filed, you
16  ultimately filed a motion to intervene and for
17  either a restraining order or injunction to
18  stop that action from going forward and to stop
19  any settlement negotiations in that action,
20  correct?
21      A.  Yeah.  I'm not sure exactly how that
22  was bundled, but, yeah, to intervene and to get
23  them declared to be inappropriate class
24  representatives or inappropriate counsel for

1    class representatives.  The pleading will say
2    what it says.  It was put together on very
3    short notice.
4        Q.  It wasn't a criticism of the pleading,
5    it was just...
6            And then when the state court
7    Technology Training action was dismissed, prior
8    to the first mediation session in the
9    Technology Training case, the Cin-Q plaintiff's
10   counsel filed something in the Cin-Q case with
11   Judge Porcelli seeking to enjoin the Buccaneers
12   and the Technology Training plaintiffs from
13   engaging in any settlement negotiations?
14       A.  Right.
15       Q.  There was a hearing held in the Cin-Q
16   case before Judge Porcelli on that request for
17   an injunction, correct?
18       A.  There was a hearing -- trying to put
19   this in sequence, because we had two hearings
20   in front of Judge Porcelli.
21           I believe when we had the
22   hearing, the state court case had already been
23   dismissed, and so he deemed it a moot request
24   that -- when the request had been made to

1    enjoin the parties in a state court proceeding
2    that no longer existed, he ruled that that was
3    no longer relief that he could or should give.
4    And I think he extracted from the Buccaneers an
5    agreement that if they tried to do any kind of
6    negotiation, that they would alert me and
7    Mr. Wanca, Cin-Q plaintiffs' counsel, that that
8    effort was being pursued by the Buccaneers, so
9    that we wouldn't get blind-sided again.
10       Q.  Sir, it's been awhile.  I don't mean
11   to suggest you are -- to the extent what you
12   just said might not be completely consistent
13   with the sequence of events and the orders of
14   Judge Porcelli, I don't mean to suggest you are
15   intentionally misrepresenting anything, and see
16   if this refreshes your recollection.  All that
17   Judge Porcelli ended up ordering on a request
18   to enjoin the Buccaneers and Technology
19   Training counsel from going forward, was that,
20   number one, he would not enjoin the Buccaneers
21   from negotiating with Technology Training
22   counsel, but that if the Buccaneers and
23   Technology Training counsel reached a
24   settlement, notice of that would be provided to

1    Cin-Q plaintiffs' counsel a certain amount of
2    time in advance of filing any motion for
3    preliminary approval on that reached
4    settlement; do you recall that?
5        A.  I think that's generally correct.
6        Q.  And setting aside anything the
7    Buccaneers might want to do moving forward with
8    possible settlement negotiations with
9    Technology Training, Judge Porcelli ordered
10   that there would be another mediation in the
11   Cin-Q case?
12       A.  Right.
13       Q.  And that further mediation with the
14   Buccaneers in the Cin-Q case was something that
15   the Cin-Q plaintiffs wanted, correct?
16       A.  Oh, sure.  I mean, to be fair, both
17   sides were hoping the case could be resolved,
18   so, yes.  Did I think it was going to work?
19   Probably.
20       Q.  Did you think what was going to work?
21       A.  A third mediation was going to somehow
22   solve the problem?  I wasn't very optimistic
23   that that was the case.
24           But, you know, you don't ever

1    throw the baby out with the bath water.
2        Q.  There's been this word thrown around
3    in pleadings, in testimony, reverse auction.
4        A.  Right.
5        Q.  Laypeople, maybe they get it, maybe
6    they don't.  Maybe they get part of it, but
7    there are nuances they don't.
8            You are an experienced attorney,
9    and you have class action experience, correct?
10       A.  Right.
11       Q.  You are familiar with the concept of a
12   reverse auction?
13       A.  Well, I had never seen it before, but
14   I think I'm familiar with it now.
15       Q.  Setting aside the implication of that,
16   do your best to tell me -- so that we're
17   talking to one another we're speaking the same
18   language, when you refer to a reverse auction,
19   not specific to the TTA and Cin-Q situation,
20   but in general, what is a reverse auction when
21   you use the term?
22       A.  Well, in the context of a class action
23   where a defendant wishes to get a settlement,
24   they -- in many instances, there are multiple

Thompson Court Reporters, Inc
thompsonreporters.com

1   actions filed within the statute of limitations
2   that would otherwise govern a claim of the type
3   that's involved in a given case, and those
4   various lawsuits have different lawyers that
5   represent different potential class
6   representatives.
7        So a defendant might seek to
8   settle the case with the least-competent group
9   of attorneys or with the least-effective class
10  representative or a combination of both in the
11  hope that a settlement can be achieved that
12  would result in a class-wide settlement with
13  res judicata effect so that they settle the
14  case for the least amount of money.
15       Defendant always wants to settle
16  for the least amount of money.  And when you
17  give the defendant the ability to negotiate in
18  that way, one can't really blame them for
19  trying to do that.
20       Kind of like President Trump said
21  the other day that he doesn't blame the Chinese
22  for taking advantage of us, we're just stupid,
23  and they get to take advantage of us.
24       I thought it was kind of ironic,

1   given his campaign promises.
2       But what I think a reverse
3   auction contemplates is there is a settlement
4   number that would be available with one group
5   of plaintiffs, and the defendant seeks to go
6   find somebody to offer a better deal and
7   thereby bind everybody in the class.
8   Q.  Appreciate that.
9       At a simpler level, a more
10  mundane description, and I'm not saying this
11  captures every scenario that may be subject to
12  the accusation of reverse auction, but would
13  you agree the concept of an auction involves
14  increasing bids, do I hear $5?  I hear 5.  Do I
15  hear 10?  I hear 10.  Do I hear 20?  And the
16  bidding goes up.  A reverse auction is the
17  defendant -- or can be the defendant says, Will
18  you pay 20 million?  They'll take 20 million.
19  Will you take 19?  They'll take 19,000 now.
20  Will you take 18?  So the point is, the bidding
21  goes down?
22  A.  Right.  Right.  Just like selling a
23  tax certificate.  Which got Mr. Oppenheim
24  questioning what the hell is that.

1   Q.  Would you agree that one of the
2   features of the sequence of events, vis-a-vis
3   the Cin-Q case, the Technology Training case,
4   is that when the Technology Training case went
5   to mediation, there was no existing mediation
6   session in the Cin-Q case, there was no pending
7   demand, there was no outstanding offer from the
8   Buccaneers in the Cin-Q case, correct?
9   A.  There was a pending demand.
10  Q.  Explain that to me.
11  A.  There was a pending demand.
12  Q.  I need to understand what you're
13  referring to.
14  A.  I can't talk about it.
15  Q.  Well, you can tell me when it was
16  conveyed so I can understand how it was or
17  wasn't pending.
18  A.  It was conveyed in the sessions after
19  the fact when Judge Anderson was spending those
20  months going back and forth with the Buccaneers
21  on one side and the Cin-Q plaintiffs on the
22  other.
23  Q.  So we have received quite a bit of
24  production, and we know that there was

1   transmission of a demand in late March of 2016.
2   We don't necessarily know exactly what it was,
3   but all the e-mails seem to suggest that would
4   have been.  Does that sound about right, a
5   demand conveyed late March of 2016?
6   A.  Right.
7   Q.  Had the Buccaneers provided no
8   response whatsoever between the end of March
9   2016 when that was -- that demand, whatever it
10  was, was made by Cin-Q counsel and mid to late
11  May and early June when the Technology Training
12  negotiations went on, had the Buccaneers not
13  responded at all?
14  A.  Well, you have to remember, we weren't
15  having communications directly with the
16  Buccaneers, so...
17  Q.  Had any communication been brought to
18  Cin-Q counsel, if not directly by the
19  Buccaneers, from the Buccaneers through the
20  conduit, perhaps, of Judge Anderson?  And I'm
21  not asking for the content of it.  But had a
22  responsive communication been conveyed to Cin-Q
23  counsel regarding whether the Buccaneers were
24  going to accept and pay that demand, whatever

1  it may have been?

2    A.  No. But, again, you had to remember

3  you're dealing with the Buccaneers, and they

4  don't decide anything quickly.

5    Q.  So you felt that whatever the late

6  March 2016 demand Cin-Q counsel had tendered

7  was, that it remained open and pending and

8  unresponded to in April, May and June of 2016?

9    A.  Yes, sir.

10    Q.  Do you have any --

11    A.  All we were doing with the impasse is

12  trying to stop Judge Anderson from charging for

13  the time that he was spending.

14        If you understand, that was a

15  significant hourly rate, number of hours, over

16  which we had no control, had no idea what he

17  was doing, and it seemed to go on for nine

18  months without anything happening, and there's

19  no need for a mediator after a mediation

20  session in his office to continue for months

21  and months and months being played by the

22  defendant and charging for that exercise.

23    Q.  From the time Cin-Q plaintiffs'

24  counsel tendered whatever their demand was in

1  late March of 2016 to the Bucs or to the Bucs

2  through Judge Anderson, is it fair to say the

3  Buccaneers had not responded directly or

4  through Judge Anderson in any way, shape or

5  form, suggesting or implying, a willingness or

6  an intention to accept that demand and pay that

7  demand?

8    A.  No, they went ahead and negotiated

9  with the Bock firm and settled it for the

10  number they -- they liked that number a lot

11  better than the number that was -- the demand

12  from the Cin-Q plaintiffs.

13    Q.  I appreciate that.

14        I will move to strike as

15  nonresponsive.

16        And I think the no is, but I

17  don't want to assume something that's not fair

18  to you.

19        Would you agree that at no point

20  after the Cin-Q plaintiffs' March 2016 demand,

21  whatever the details were, at no point after

22  that Cin-Q demand was made, through to the time

23  the Buccaneers reached a settlement with the

24  Technology Training plaintiffs, at no point did

1  Buccaneers directly or through a mediator

2  convey any interest or willingness to pay the

3  Cin-Q plaintiffs' demand?

4    A.  No, but they also did not communicate

5  through the mediator or to us directly that

6  they rejected it.

7    Q.  Do you have any knowledge of direct

8  facts that suggest Bock Law Firm knew what the

9  March 2016 Cin-Q plaintiffs' settlement demand

10  was at any time before or during their

11  settlement negotiations with Buccaneer's

12  counsel?

13    A.  I don't have any direct evidence.

14    Q.  And just to make certain we're not

15  missing anything, I'm still not asking for

16  inferences, and I'm not saying inferences

17  aren't -- they can be reasonable, they can be

18  unreasonable, I'm just not wanting any

19  inferences, reasonable or unreasonable.  Have

20  you received information from any other source,

21  has anyone shared direct fact information with

22  you that Bock Law Firm knew what the March 2016

23  Cin-Q plaintiffs' demand had been?

24    A.  I don't have any direct knowledge.

1  Nobody from the Bock Law Firm nor from the

2  Buccaneers nor from Mr. Grilli told me anything

3  about what happened in their mediation. But

4  all of my inferences are reasonable.

5    MR. COHEN:  I'll move to strike the

6  reference to all the inferences being

7  reasonable as nonresponsive.

8  BY MR. COHEN:

9    Q.  And in identifying the various

10  potential sources that were, in fact, not

11  sources, for example Bock Law Firm, Buccaneers,

12  Mediator Grilli, you didn't mention Anderson +

13  Wanca.

14        At any time has Anderson + Wanca

15  shared with you any direct fact evidence

16  indicating that Bock Law Firm had any knowledge

17  of the details of the March 2016 Cin-Q

18  plaintiffs' settlement demand up through the

19  conclusion of the Technology Training

20  settlement?

21    A.  The only thing they shared -- the

22  Anderson + Wanca firm let me know about was

23  that Mr. Oppenheim had taken copies of all of

24  his files. So I knew he knew it independent of

1 his files, but the files also shared that
2 information to anybody that wanted to read it.
3     Q. Anybody that Mr. Oppenheim provided it
4 to?
5     A. Well, he wouldn't have to provide it.
6 He could simply -- it could be available, and
7 somebody could go look at it.
8     Q. Do you have any fact information or
9 knowledge that it was, in fact. so available?
10     A. I have no idea.
11     Q. Just to be clear about my original
12 question, at no time has Anderson + Wanca or
13 anyone affiliated with Anderson + Wanca
14 communicated to you direct factual information
15 or evidence showing that Bock Law Firm knew
16 anything about the details of the March 2016
17 Cin-Q settlement demand, correct?
18     A. Can you run that by me again? I think
19 that was one I already answered. Could you
20 repeat that, please.
21     (Said question was read
22 back.)
23     THE WITNESS: Again, other than the fact
24 that they told me about the files being

1 exported, other than that, no.
2 BY MR. COHEN:
3     Q. And the files being exported would
4 allow an inference reasonable or unreasonable
5 about whether Bock Law Firm had access to and
6 learned the content, but as far as the direct
7 factual premise that Bock Law Firm knew the
8 last Cin-Q plaintiffs' demand, no one from
9 Anderson + Wanca has shared with you direct
10 proof of that, correct?
11     A. That's correct.
12     Q. You are aware that in the Technology
13 Training settlement, the Buccaneers waived
14 their statute of limitations defense?
15     A. Yes, I am.
16     Q. Had the parties reached a settlement
17 on a class basis without waiver by the
18 Buccaneers of the statute of limitations, how
19 would that have affected -- as an expert class
20 action TCPA attorney, how would that have
21 affected the status of the settlement, the
22 enforceability of the settlement?
23     A. I'm not really testifying as an
24 expert, I don't think.

1     Q. Judge Honeywell recognized you as
2 such.
3     A. Well, that's very nice of her, but I
4 don't get compensated, if -- I'm not an expert.
5 I don't provide opinion testimony without
6 having --
7     Q. You seem to have some opinions in this
8 case.
9     A. I do. But I think that was a -- that
10 was the ploy, because clearly the statute of
11 limitations had been exceeded by the time
12 Technology Training filed their action, and
13 everybody knew it. To get the defendant to
14 say, well, you know what? I'll waive the
15 statute of limitations so we can settle this
16 case, that's a convenient way to make the
17 reverse auction happen. I don't think they
18 have to waive it to settle. I guess they could
19 just try to settle with anybody -- the
20 Buccaneers weren't interested in settling with
21 anybody when I came along and sued them. And
22 it wasn't until we spend a hell of a lot of
23 time, energy and money to get them to the point
24 where they realized that we had them, and then

1 they wanted to settle.
2     Q. With all due respect, sir, because my
3 question actually was fairly narrow, I'll move
4 to strike as nonresponsive.
5     As a class action experienced
6 TCPA attorney, if the Buccaneers had not waived
7 statute of limitations as part of the
8 settlement of the Technology Training case, but
9 had nevertheless entered into the terms, the
10 rest of the terms of the Technology Training
11 settlement, what would have been the path to
12 get that settlement presented to a court?
13     MS. LOEW: Objection. Speculation.
14     THE WITNESS: I think it would be the same.
15 BY MR. COHEN:
16     Q. Okay.
17     A. See, if they didn't -- if they wanted
18 to, they could move to dismiss it immediately,
19 because it's barred by the statute of
20 limitations. But they didn't want to dismiss
21 it, they wanted to settle it.
22     Q. What was the status of the M & C
23 statute of limitations at the time M & C
24 intervened in the Cin-Q pending action from

1   Judge Porcelli?
2       A.  When the motion to intervene was made
3   was --
4       Q.  September --
5       A.  September of 2013.
6       Q.  September or October of 2013.  Okay.
7       A.  So the 2010 faxes were within the
8   statute of limitations.  The July, August 2009
9   faxes were outside.
10      Q.  And which ones did M & C receive?
11      A.  I think they received both of them,
12  but I'm not sure.
13      Q.  But by intervening in the Cin-Q case,
14  it related back?
15      A.  Right.
16      Q.  And M & C's intervention in the Cin-Q
17  case was with Cin-Q's consent, correct?
18      A.  Sure, yes.
19      Q.  You are aware that intervention can
20  occur without the consent of the existing
21  original parties?
22      A.  Yes.
23      Q.  What would have prevented the
24  Buccaneers and Technology Training -- let me

1   rephrase it.
2           What would have prevented
3   Technology Training from having reached a
4   settlement with the Buccaneers without a
5   statute of limitations waiver, and then
6   Technology Training seeking to intervene in the
7   Cin-Q case as an intervention plaintiff and
8   then to present their settlement for
9   preliminary approval?  What would have
10  prevented them from attempting that?
11      MS. LOEW:  Objection.  Form.
12      THE WITNESS:  Nothing would have prevented
13  them from attempting, except we would have
14  resisted it.
15  BY MR. COHEN:
16      Q.  And if Technology Training without a
17  statute of limitations waiver in the settlement
18  agreement with the Buccaneers had sought
19  intervention over the objection of the Cin-Q
20  plaintiffs in the Cin-Q action and
21  notwithstanding the Cin-Q plaintiffs'
22  opposition, Judge Porcelli had allowed the
23  intervention, it would have related back,
24  correct, for purposes of the statute of

1   limitations?
2       MS. LOEW:  Objection.  Form.
3       THE WITNESS:  I don't know that, but it
4   would probably be, you know, kind of backwards
5   of where we were trying to get to intervene
6   into it to stop the settlement.  So the reverse
7   side of the same coin, I guess.
8   BY MR. COHEN:
9       Q.  You don't know whether the Technology
10  Training plaintiffs intervening in the Cin-Q
11  action and then presenting a settlement that
12  they reached with the Buccaneers on a class
13  basis, you don't know whether for statute of
14  limitations purposes the Technology Training
15  intervention would relate back?
16      A.  Over our client's objection, I don't
17  think it would have related back, because it
18  was 2016, whereas the M & C intervention was in
19  2013, and their statute hadn't run on the
20  second tranche of advertisements.
21      Q.  But you said a moment ago that even
22  though the statute of limitations otherwise
23  would have expired on any faxes from 2009 that
24  M & C had received, by intervening in late

1   2013, early 2014 with the consent of Cin-Q,
2   that it related back for both statute of
3   limitations periods, correct?
4       A.  Well, I may have misspoken.  I don't
5   know that we ever got to that point, because
6   Buccaneers didn't challenge it based on statute
7   of limitations, so it got waived if it was an
8   issue.
9       Q.  Are you suggesting, though, in what
10  you said about Cin-Q's opposition, that Cin-Q
11  would have opposed intervention by the
12  Technology Training plaintiffs in the Cin-Q
13  action, are you suggesting that somehow the
14  consent versus opposition of the original class
15  action named plaintiff has an effect on whether
16  the intervening plaintiffs' claims relate back
17  for statute of limitations purposes?
18      A.  I'm not sure.  I haven't researched
19  that.  If you want to pay me to research it, I
20  will be glad to do it.
21      Q.  Stick around.
22          You said at some point that the
23  Technology Training claim was handicapped, and
24  one of the things you added was Bock Law Firm

1  lacked any information but what David Oppenheim
2  brought. Do you recall saying that?
3     A. **Words to that effect.**
4     Q. Okay. Wasn't the technology -- wasn't
5  the Cin-Q second amended complaint on file a
6  matter of public record?
7     A. **Oh, yeah. What I meant was, in**
8  **effect, the mediation history of the case.**
9  **Yeah, the case was filed, you could go online,**
10 **you could read the pleadings, you could follow**
11 **the docket sheet, you could see the various**
12 **stages the case was in.**
13    Q. You could pull Mr. Biggerstaff's
14 report, you could pull the entire list of all
15 of the identified class members, right?
16    A. **Right, bad on us.**
17    Q. You had some testimony about Bock Law
18 Firm's methods for marketing its class action
19 services in the TCPA arena.
20     Are you aware that Anderson +
21 Wanca has a long history of sending out large
22 marketing mailings nationwide seeking people
23 who would be interested in being TCPA
24 plaintiffs in class action litigation?

1     A. **I'm not aware if it's nationwide. I'm**
2  **aware that they've historically had a**
3  **bar-approved solicitation that's gone out.**
4     Q. And as long as it complies with the
5  bar requirements in any given jurisdiction, you
6  are not criticizing that, correct?
7     A. **Well, not saying I'm not criticizing**
8  **it. It's not my place to say whether something**
9  **should be pursued or not, but they do it.**
10    Q. You are not suggesting in your
11 comments about any marketing methodology that
12 Bock Law Firm used, that its marketing
13 methodology was not compliant with any
14 governing rules, correct?
15    A. **No.**
16    Q. What I said was correct?
17    A. **Yes. Just wanted to see if I could**
18 **trick you.**
19    Q. It's much easier than you think.
20     You were talking about, this was
21 with Mr. Blonien, a sequence of events from
22 when you got the JAMS e-mail about the May 16th
23 schedule Technology Training mediation by
24 mistake.

1     A. **Was that May 16 or May 20? I don't**
2  **remember.**
3     Q. I think -- I think it may have been
4  scheduled for then, and the actual mediation
5  that took place, I believe, was more consistent
6  with your recollection, although I think it may
7  have been May 19th.
8      But the sequences, as I was
9  writing it down, was you got that e-mail by
10 mistake. You found the state court Technology
11 Training action. You sought to intervene to
12 get an injunction. You heard that Wayne
13 Anderson was not going to do it. He was not
14 going to do the Technology Training mediation.
15 You said you had to hear that for yourself and
16 you heard it.
17    A. **Right.**
18    Q. The idea that Wayne Anderson
19 ultimately decided he was not going to do it,
20 from the time that you found out that the
21 mediation was scheduled with Wayne Anderson at
22 JAMS, through to the time you heard that Wayne
23 Anderson was not going to do it, what
24 communications did you make or were you aware

1  of anyone else making to anyone at JAMS or
2  representing or on behalf of JAMS expressing
3  the Cin-Q plaintiffs' position that JAMS and/or
4  Wayne Anderson could not and should not do
5  that?
6     A. **I don't believe I had any**
7  **communications except through his assistant, I**
8  **think her name was Brooke. I did not**
9  **communicate with the judge directly.**
10     **I think I heard that Mr. Wanca**
11 **passed on his opinion.**
12    Q. Was that as you heard it, and I
13 appreciate we're talking about hearsay, as you
14 heard it, was that communication made to Judge
15 Anderson directly, or was that to someone else
16 on behalf of JAMS, such as general counsel?
17    A. **I don't know.**
18    Q. What's your understanding of what was
19 communicated to JAMS?
20    A. **I remember hearing something about**
21 **efforts were made to complain that Judge**
22 **Anderson shouldn't be putting himself in that**
23 **position, and then eventually he backed off and**
24 **said wasn't going to do it.**

1    Q. Based strictly on what you heard,
2 since they were not your communications, and
3 you were not privy to the actual
4 communications, however they were transmitted
5 at the time, were any threats of legal action
6 made towards JAMS or Judge Anderson?
7    A. I have no idea.
8    Q. So you said you would have to hear it
9 for yourself and you heard it. How did you
10 hear it?
11    A. Well, I certainly wasn't going to
12 accept Mr. Mester's promise that they weren't
13 going to be doing a mediation.
14    As it turns out, I shouldn't have
15 trusted him as far as I did.
16    But I heard from Brooke that
17 Judge Anderson was not going to be conducting a
18 mediation in the Buccaneers/Technology Training
19 case, and unfortunately I accepted that as the
20 end of that process.
21    Q. What she communicated to you ended up
22 being true, correct?
23    A. Yeah, absolutely.
24    Q. You were mentioning how it was the

1 next day you were at Mr. Grilli's office, and
2 he mentioned the Technology Training or the
3 Buccaneers mediation that was scheduled and
4 asked if you were going to be attending?
5    A. Right.
6    Q. And I assume you notified him in one
7 way or another you didn't know what he was
8 talking about, or you said, What are you
9 talking about?
10    A. Yeah, I said -- he showed me the
11 mediation statement.
12    Q. Mr. Grilli showed you the Technology
13 Training plaintiffs' confidential mediation
14 statement that had been provided to him?
15    A. I believe so. I mean he wouldn't have
16 been showing me the Buccaneers mediation
17 statement. Now, did I sit down and study it?
18 No. Just saw the style of the case.
19    Q. At the time he showed you the
20 Technology Training plaintiffs' confidential
21 mediation statement that had been given to him,
22 had you already notified him that was not your
23 case?
24    A. I think he said, Are you going to be

1 here tomorrow for the Buccaneers mediation, and
2 I said the mediation's been called off, or
3 words to that effect. And he had a package of
4 papers in his hand and displayed them to me. I
5 didn't read them. I read the style of the
6 case, and I realized that was the case that was
7 pending in state court, and now I realized
8 Judge Anderson had backed out, but Mr. Grilli
9 had been brought in. So I said, not only am I
10 not going to be here, this is a case I tried to
11 file papers -- papers pending in front of Judge
12 Huey trying to stop this mediation. And then
13 he went like, Oh, that's a problem.
14    Q. I understand you testified a little
15 while ago, I didn't sit down and study the
16 mediation statement in the Technology Training
17 mediation with Mr. Grilli. Studying would be
18 not only reading it page by page, cover to
19 cover, but digesting carefully for future
20 thoughtful purposes the content.
21    You also mentioned at some point
22 just a moment ago how you looked at the
23 letterhead, the case caption. There's a wide
24 area between careful studying and just reading

1 the case caption.
2    Please tell me what you recall
3 reviewing and reading in that?
4    A. Very little, other than seeing the
5 style of the case and flipping to the back to
6 see who signed it and realize that Mr. Grilli
7 had apparently been retained.
8    So, no, it was not a study. It
9 was not even a perusal, it was an
10 acknowledgement that this document existed, and
11 this scheduled mediation was going to take
12 place -- I guess -- trying to think. It was
13 the next day, the 19th. I put it in an
14 affidavit anyway. It's out there in the record
15 somewhere.
16    Q. I want to switch to this discussion of
17 Mr. Oppenheim's role and authority on behalf of
18 the Cin-Q plaintiffs, including M & C, during
19 any settlement negotiations or mediation. And
20 this came up in your testimony with
21 Mr. Blonien. It kind of was an offshoot of the
22 discussion of what you meant by Mr. Oppenheim
23 having had some disagreement with Mr. Wanca,
24 and it came after you talked about with

1   attorneys it's all about money. Apparently
2   Mr. Oppenheim was dissatisfied with his
3   compensation. You heard that from Mr. Wanca,
4   Mr. Good, Mr. Kelly and Mr. Solberg, and you
5   said other than money, what could it be, and
6   that's when you said, "I mean Mr. Oppenheim had
7   lots of authority." Do you recall all that?
8       A.  Yes, I just -- yeah.
9       Q.  Mr. Oppenheim had a role to play as
10  the point person in settlement negotiations and
11  at the formal mediation sessions in the Cin-Q
12  case, correct?
13      A.  Yes.
14      Q.  He was the person who would actually
15  speak so that all the plaintiffs and all the
16  counsel would speak with one voice, correct?
17      A.  Right.
18      Q.  You would agree, Mr. Oppenheim did not
19  have full authority to settle the case for
20  whatever he thought was appropriate?
21      A.  No, you'd always have to have your
22  client's consent to that.
23      Q.  And if Mr. Oppenheim had expressed the
24  view that the settlement that the Technology

1   Training plaintiffs ended up entering into with
2   the Buccaneers was the right place to settle
3   the Cin-Q case, he would not have had
4   authority, nor would he have been allowed to
5   settle on those terms, correct?
6       MS. LOEW:  Objection. Form.
7       THE WITNESS:  I don't know. That's kind of
8   speculative, because they never made that
9   offer.
10      BY MR. COHEN:
11      Q.  Isn't it fair to say that he would
12  have to get -- he'd have to confer with and get
13  the joint approval of yourself and Mr. Wanca.
14      A.  And the client's.
15      Q.  Are you aware that the retention
16  agreement signed in 2013 between M & C and the
17  Anderson + Wanca law firm had a specific
18  provision that if class counsel thought that M
19  & C was no longer an adequate representative,
20  that class counsel could seek to have the class
21  representative replaced with alternative class
22  representatives?
23      A.  Not aware of that, unless it's in this
24  exhibit, and I just haven't read it.

1       Q.  We'll go back and take a look at that.
2   But do you have kind of a provision in your
3   agreements with class representatives?
4       A.  No. It wouldn't have been the case
5   with Cin-Q.
6       Q.  Your original Cin-Q case was filed in
7   September of 2009?
8       A.  August.
9       Q.  And I only asked it that way, I
10  thought you said Greg Cin-Q contacted you in
11  August of 2009, and it was filed in state court
12  in September of 2009.
13      A.  I think it was filed in August, but
14  it's within a day or two either way.
15      Q.  Now, when your investigation revealed
16  Michael Clement, and you shared with Mr. Wanca
17  about that, and then you and Mr. Wanca went and
18  filed the M & C versus Clement case, why did
19  you do that?
20          Why didn't you join the Clement
21  defendants in your pending state court action
22  for Cin-Q and go after the same discovery that
23  way?
24      MS. LOEW:  Objection. To the extent this

1   is seeking work product or attorney-client
2   communications, I advise you not to answer.
3   BY MR. COHEN:
4       Q.  Are you going to follow your
5   attorney's instructions?
6       A.  I think I will.
7       Q.  You indicated at some point you got a
8   hold of the hard drive for the faxes, and you
9   refiled in federal court, and Brian Wanca said
10  that M & C must join.
11          Why did Brian Wanca think it was
12  important or necessary that M & C join in the
13  refiled federal action?
14      MS. LOEW:  Same objection. On the basis of
15  work product and attorney-client privilege, I
16  advise you not to answer.
17      THE WITNESS:  Just so we're clear, I don't
18  think I said Brian Wanca said that Medical &
19  Chiropractic must join.
20          I think if you go back and look
21  at it, I think it said that entity wanted to
22  join.
23  BY MR. COHEN:
24      Q.  Circling back on a few things.

Thompson Court Reporters, Inc
thompsonreporters.com

1           Number one, if I ask you to
2  assume that M & C only received one of the 2009
3  Buccaneers faxes and none of the 2010 faxes,
4  would you agree that at the time the motion was
5  filed seeking to join M & C in the federal
6  Cin-Q action, but for being allowed to
7  intervene, M & C statute of limitations would
8  have been expired?
9      MS. LOEW:  Objection to form.
10     THE WITNESS: I guess.  I mean other than
11  there was a continuing process of sending a fax
12  and ads, and I guess you could argue that until
13  the last fax was sent in June of, 2010 that it
14  was an ongoing conspiracy.
15  BY MR. COHEN:
16     Q.  You think a continuing tort theory
17  applies to statute of limitations for the
18  earlier received faxes?
19     A.  Possibly.
20     Q.  Have you ever seen a case hold that?
21     A.  Just because I haven't seen a case
22  doesn't mean it's not possible.
23     Q.  Have you seen a case?
24     A.  I haven't looked.

1     Q.  So you and Mr. Wanca filed the M & C
2  versus Clement case, meaning you had an
3  attorney-client relationship with M & C in
4  2012.  You got the hard drive, and that case
5  was terminated in 2012, correct?
6     A.  Or 2013.  I don't remember which.
7     Q.  And it was after that that the federal
8  case with Judge Porcelli was filed in 2013,
9  correct?
10     A.  Yes.
11     Q.  And when it was originally filed in
12  2013, M & C wasn't included as a plaintiff?
13     A.  That's correct.
14     Q.  Why not?
15     MS. LOEW:  Objection.  To the extent this
16  is calling for attorney-client communications
17  or work product, I advise you not to answer.
18  BY MR. COHEN:
19     Q.  Are you going to follow your
20  attorney's advice?
21     A.  Yes.
22     Q.  If you had refiled your client M & C's
23  TCPA claims for the one 2009 fax that it
24  received from the Buccaneers at the time that

1  you initiated the first Cin-Q federal action in
2  2013, M & C's statute of limitations would have
3  been timely, correct?
4     A.  Yes.
5     Q.  At some point in your testimony
6  responding to Mr. Blonien's questions, you said
7  Bock Law Firm approached Technology Training
8  and said, Do you want to be a plaintiff in a
9  class action that we can settle in a week?"
10  Do you recall saying that?
11     A.  Generally, yeah.
12     Q.  Do you have any evidence at all that
13  Bock Law Firm said that to Technology Training?
14     A.  No, I don't have any direct knowledge.
15     Q.  You talked about the original
16  agreement to the division of fees on the
17  settlement of the Cin-Q action being 30 percent
18  to yourself and 70 percent to Anderson + Wanca,
19  correct?
20     A.  Yes.
21     Q.  And you said that an agreement was
22  then reached that Mr. Siprut would get a 16
23  percent pro rata cut from each of yours and
24  Mr. Wanca's previously agreed cuts, correct?

1     A.  Yes.
2     Q.  You testified in the preliminary
3  injunction hearing, and I mean it was a long
4  question and a long answer, but generally
5  speaking it had to do with materially adverse
6  interests, the concept of a class
7  representative having or not having materially
8  adverse interests to other class members, and
9  at page 108, lines three and four, and you were
10  referring to Ms. Zakzrewski on behalf of M & C,
11  you said, "I don't think she," meaning Ms.
12  Zakzrewski, "and M & C would ever be adverse to
13  the other class members."  Do you see that?
14     A.  Uh-huh.  Yeah.
15     Q.  And do you still agree with that?
16     A.  Well, I suppose other than the
17  Technology Training and the other entity that
18  was added to the case when it was filed, I
19  don't remember the name.  I suppose she'd be
20  adverse to them now because they are trying to
21  do a settlement that she doesn't want.
22     Q.  And I present that answer.  Because
23  that's what I was getting at.
24     Is it your position any time a

1 putative class rep in an existing case who in
2 your opinion is not adverse to any other class
3 members has the situation arise where some
4 other absent class member filed a competing
5 case and tries to settle on terms that the
6 first filed putative class rep doesn't like,
7 now they have materially adverse interests?
8     MS. LOEW: Objection. Form.
9     THE WITNESS: No, no. I think what I'm
10 saying is, because the Technology Training case
11 was presented the way it was, filed the way it
12 was, filed late and manipulated to get the
13 settlement, that makes her situation as a class
14 representative on behalf of her class feel that
15 Technology Training's not doing what they
16 should be doing for the class. So that makes
17 them adverse.
18     Certainly M & C has objected to
19 the settlement that is being proffered by
20 Technology Training and the other plaintiff.
21 BY MR. COHEN:
22     Q. And that's actually what I was going
23 to ask you.
24     Doesn't that just make M & C an

1 objector to the Technology Training settlement?
2     A. No.
3     Q. Doesn't M & C have the ability to go
4 in as an objector in the Technology Training
5 court and case and present all of these same
6 issues and reasons, whether it be the
7 accusation of shared information, the
8 accusation and allegation of a reverse auction
9 or collusion, and most importantly, to
10 challenge the fairness and reasonableness of
11 the settlement, and if there's evidence to base
12 any of those accusations on, then Judge
13 Porcelli can reject the settlement?
14     A. That's one avenue.
15     Q. What's wrong with that avenue?
16     MS. LOEW: Objection to Form.
17     THE WITNESS: It's not the best avenue.
18 BY MR. COHEN:
19     Q. The best avenue is to have another
20 court and another judge that has nothing
21 otherwise to do with an action that's been
22 pending in front of Judge Porcelli for four
23 years decide whether Judge Porcelli gets to
24 rule on the reasonableness of the Technology

1 Training settlement?
2     MS. LOEW: Objection. Form.
3     THE WITNESS: I don't know what other case
4 you're talking about.
5 BY MR. COHEN:
6     Q. This case.
7     A. No, that's not what this case is all
8 about, as I understand it.
9     Q. Aren't you aware this case primarily
10 seeks injunctive relief to prevent Technology
11 Training from going forward with the settlement
12 in front of Judge Porcelli?
13     MS. LOEW: Objection. Mischaracterizes.
14     THE WITNESS: I'm not sure what's going on
15 in this case. But we made a motion to
16 intervene in this Technology Training case once
17 it was finally filed after the settlement was
18 announced, and that's where we intend to bring
19 forward the objection to this maneuver.
20     But we could make the same
21 objection, I suppose, at a fairness hearing,
22 but why go to that trouble and that expense and
23 that time when we can make the same and better
24 objections earlier once we're allowed to

1 intervene.
2 BY MR. COHEN:
3     Q. I'm not sure I understand.
4     Now I do understand what you're
5 saying.
6     So you could have made the same
7 points as an objector, but wouldn't it be
8 better to make them as an intervenor and now
9 you've been granted intervention?
10     A. I believe so.
11     Q. Okay. And I wasn't drawing a
12 distinction between intervenor status in the
13 Technology Training case versus just objector
14 status, I was drawing the distinction between
15 isn't the more appropriate venue and forum and
16 court and judge to evaluate these issues the
17 one that has had jurisdiction of the class
18 action and will or won't approve any settlement
19 in the class action than in a different case in
20 a different court before a different judge
21 asking that court and judge to prevent Judge
22 Porcelli from ever deciding?
23     MS. LOEW: Objection. Form.
24     THE WITNESS: I'm not going to weigh in on

1  that. I don't know what's going on in this
2  case exactly, so I'm not sure whether or
3  not -- which case is better for what.
4       The case I'm involved in is the
5  Cin-Q case, and we're trying to now intervene,
6  and I think we've been granted intervention in
7  the Technology Training case. That's the case
8  I'm concerned about.
9  BY MR. COHEN:
10    Q. And you do plan in the Technology
11  Training case where intervention is now, if not
12  granted, forthcoming, you do intend to make all
13  of these same arguments and raise all of these
14  same issues, present the same evidence and seek
15  the right to discovery evidence and seek to
16  have Judge Porcelli rule on all of these
17  issues?
18    MS. LOEW: Objection. To the extent
19  that's seeking work product, I advise you not
20  to answer.
21    THE WITNESS: Okay. I won't answer.
22    MR. COHEN: I object to that. You don't
23  represent him with regard to what he may or may
24  not do in the case where he's lead counsel. I

1  mean you can --
2    MS. LOEW: I'm his attorney in this
3  deposition. If you are asking him about his
4  work product, I can make that advice, and he
5  also can assert himself work product
6  protection.
7    MR. COHEN: But he wasn't going to, and he
8  is the only proper person to do so on that
9  issue.
10    MS. LOEW: Why don't you ask him if he's
11  going to follow his attorney's advice in this
12  litigation?
13    MR. COHEN: No, I'm not going to ask him
14  that.
15  BY MR. COHEN:
16    Q. Sir, as an attorney and one of the
17  lead counsel for the Cin-Q plaintiffs who have
18  forthcoming intervention in the Technology
19  Training case, do you intend to make all the
20  same issues, arguments, evidence and seek the
21  same relief in the Technology Training case
22  before Judge Porcelli that, as you understand
23  it, M & C is seeking in front of Judge
24  Honeywell?

1    MS. LOEW: I will provide the same
2  objection and advice.
3    THE WITNESS: I don't want to quibble, but
4  I don't -- I haven't decided what I'm going to
5  do yet, frankly. And so to some extent, that's
6  speculative.
7       In the context of the case we're
8  intervening in, I don't expect we will be
9  asking for an injunction against anybody.
10  Okay?
11  BY MR. COHEN:
12    Q. Because that's not the way a class
13  action goes?
14    **A. Well, Judge Porcelli doesn't need to**
15  **grant an injunction against himself.**
16    Q. That's right. He can just sustain or
17  overrule your positions?
18    **A. Right.**
19    Q. And is it fair to say you have
20  articulated many of your positions and your
21  intended goals in the Technology Training case,
22  whether it was as an objector or now as a
23  forthcoming intervenor in the pleadings you
24  already filed in the Technology Training case

1  seeking to intervene and strike class
2  allegations and alleging a reverse auction, et
3  cetera?
4    **A. Yes.**
5    Q. So this 30 percent to you, 70 percent
6  to Anderson + Wanca and then modified to the 16
7  percent pro rata from each of your shares going
8  to Mr. Siprut, how did that come about?
9    **A. Because Mr. Siprut filed the Stein**
10  **cases in the summer of 2013, and the Buccaneers**
11  **immediately approached them and made a**
12  **settlement offer to pick them off, and Judge**
13  **Merryday agreed that there -- they were not**
14  **adequate class representatives, I guess,**
15  **because they'd gotten the full relief they**
16  **would be entitled to. Thereafter, he filed**
17  **another case on behalf of another plaintiff,**
18  **Accounting To You, and sought to have that**
19  **consolidated with our case, the Cin-Q case, and**
20  **that eventually was done, and in effect he**
21  **turned over responsibility for the consolidated**
22  **cases to Mr. Wanca's firm and myself, and his**
23  **participation was recognized based on that fee**
24  **agreement.**

Thompson Court Reporters, Inc
thompsonreporters.com

1    Q.  And I appreciate that.  That was
2  useful detail.
3        I was focusing not on the
4  predicate facts you just shared about why would
5  Mr. Siprut and how did it ever come to be that
6  Mr. Siprut might be entitled to or offered or
7  there would be a discussion.  I meant the
8  actual hammering out of him getting some, and
9  it being 16 percent pro rata.
10    **A.  I think that was negotiated between**
11  **him and Mr. Wanca with me being consulted, you**
12  **know, was I okay with it.  I didn't like it,**
13  **but...**
14    Q.  When would you have known those terms,
15  that your 30 percent and Mr. Wanca's were each
16  subject to a 16 percent share pro rata going to
17  Mr. Siprut?
18    **A.  Whenever it was agreed to.**
19    Q.  And the reason I'm asking you is
20  because in your preliminary injunction
21  testimony, at page 95, and this was -- my
22  questions tend to be extremely long, so I am
23  never criticizing when I talk about a long
24  answer, but this comes at the end of a long

1  answer, and really everything in your answer
2  before what I'm going to draw your attention to
3  was you telling us in the preliminary
4  injunction hearing these predicate facts about
5  Mr. Siprut's original plaintiffs and then his
6  new plaintiff and then the agreement that you
7  guys would handle the case, and so we're on
8  page 95, line 13, and the sentence begins, "The
9  case was consolidated and in that fashion,
10  Mr. Siprut, if the matter is successfully," and
11  it says included, I think it --
12    **A.  Concluded.**
13    Q.  "By trial or settlement, will have an
14  interest in an attorney fee claim in some
15  amount," and you say at line 18, "I didn't
16  negotiate it, so I'm not specifically sure what
17  the arrangement is."
18        I'm not suggesting you
19  intentionally said something incorrect.  Is it
20  fair to say that the arrangement would have
21  been reached before your preliminary injunction
22  testimony, and you would have been aware of it?
23    **A.  Absolutely.  I just didn't want to be**
24  **testifying under oath at that point, because I**

1  **didn't -- I didn't recall.**
2    MR. COHEN:  Seem like a good time for a
3  break?
4    THE VIDEOGRAPHER:  Off the record.  The
5  time is 2:25.
6        (Recess.)
7    THE VIDEOGRAPHER:  We are back on the
8  record.  The time is 2:37.
9  BY MR. COHEN:
10    Q.  Sir, we're back on the record.
11        Were there any other divisions or
12  splits of the potential attorneys' fees that
13  could be generated in a settlement of the Cin-Q
14  class action if it persisted and reached a
15  class action settlement other than the 25
16  percent to you, 16 percent to Mr. Siprut, and
17  59 percent to Mr. Wanca?
18    **A.  I don't think so.  I believe**
19  **Mr. Siprut and his local counsel probably have**
20  **their own arrangement, but that was included in**
21  **gross in the Siprut calculation.**
22    Q.  Do you recall your testimony and
23  dialogue with Mr. Blonien where you described
24  the Cin-Q plaintiffs' duty and the Cin-Q

1  plaintiffs' counsel's duty to absent class
2  members such as Technology Training as being a,
3  quote unquote, "quasi hybrid duty"?
4    **A.  That was my terminology.  I'm not sure**
5  **that's a recognized term of art.**
6    Q.  Neither am I, but I liked it, too.
7  Without agreeing to it, I just like the
8  sequence of words.
9        But then you said Mr. Blonien
10  asked you is that duty, whatever you want to
11  call it, that the Cin-Q plaintiffs and Cin-Q
12  plaintiffs' counsel had to absent class members
13  such as Technology Training the same as the
14  Cin-Q counsel's duty to the named plaintiffs,
15  and you said no.
16    **A.  No, that's right.**
17    Q.  You no doubt have read Judge
18  Porcelli's order of March 31, 2017, denying
19  intervention and preliminarily granting
20  approval to the Technology Training settlement?
21    **A.  Is that March of '17 or March of '16?**
22    Q.  I'm pretty sure it was March 17th of
23  2017.
24    **A.  I read it.  The number of years that**

Thompson Court Reporters, Inc
thompsonreporters.com

1  have gone on is staggering, but, okay, March
2  2017. Whatever his decision was, yes, I read
3  it.
4      Q.  Did you also have an opportunity at
5  some point to read Judge Honeywell's order in
6  the M & C versus Bock Law Firm and Oppenheim
7  case, I believe it was dated October 19th of
8  2016, where she denied M & C's motion for
9  preliminary injunction, have you had an
10  opportunity to review that at some point?
11     A.  I suppose I had an opportunity. I
12  don't recall reviewing it.
13     Q.  To the extent that either or both of
14  those orders held that putative class counsel
15  or certified appointed class counsel have an
16  overriding duty to the class as a whole and no
17  unique duty to a named plaintiff, you just
18  disagree with that?
19     A.  Yeah, I disagree with it in the sense
20  that when Cin-Q hired me to represent it, I had
21  a direct attorney-client relationship with
22  Cin-Q, and I owed a fiduciary duty to Cin-Q to
23  pursue the matter on their behalf and on behalf
24  of the class. The class may never have been

1  certified. So in that sense, I have a
2  different duty to it than I would to somebody
3  who might be considered an absent class member
4  of a class that never got certified.
5      Once a class is certified, then I
6  think it takes on a different mantle of
7  responsibility on behalf of counsel
8  representing both the named plaintiff in his
9  cause of action and the absent class members in
10  theirs.
11     Q.  You are familiar with the term
12  fiduciary duty?
13     A.  Yes.
14     Q.  And I guess it varies by context or
15  application. In general, are you familiar with
16  the consent that a fiduciary duty is a duty of
17  highest and utmost loyalty?
18     A.  Yes.
19     Q.  Are you familiar with prevailing case
20  law, state and federal, that says in a class
21  action, even before certification, putative
22  class counsel owes a fiduciary duty to the
23  uncertified absent class?
24     A.  Right, I think that's what I said.

1  They can't sell out the class in exchange for
2  the payment to the named plaintiffs.
3      Q.  So what greater or different
4  duty -- of fiduciary duty is the highest and
5  utmost loyalty, and if putative class counsel
6  has a fiduciary duty of highest and utmost
7  loyalty to the absent uncertified class, what
8  different greater duty could putative class
9  counsel have to the named putative class
10  representatives that goes beyond the fiduciary
11  duty of highest and utmost loyalty to the
12  absent class?
13     MS. LOEW:  Objection to form.
14     THE WITNESS:  Well, I just think when
15  you're dealing directly with your client, you
16  have a direct relationship, and to me that is
17  more palpable, more present, more real, more
18  non-speculative. And then once the class is
19  certified, then it firms it up insofar as the
20  absent class members are concerned.
21     BY MR. COHEN:
22     Q.  Even if a case like this one where you
23  were so sure of the future certifiability, that
24  you knew the class would be certified?

1      A.  Still hadn't been.
2      Q.  Sir, I know you've seen this before.
3  I don't think I have it here in paper form, but
4  it's that -- those April 29th, 2016, e-mails
5  we've referenced earlier between Mr. Bock and
6  Mr. Oppenheim.
7      A.  Okay.
8      Q.  That I told you started out talking
9  about a different case and a mediator selection
10  and Mr. Wanca not being agreeable to using
11  Judge Anderson and Mr. Bock asking why, which
12  led Mr. Oppenheim to respond, it's more
13  likely -- I'm sorry. "It's more likely that
14  Brian," meaning Mr. Wanca, "doesn't like how
15  the Tampa Bay Bucs mediation process went and
16  resents Anderson's continued efforts." And
17  Phil Bock responded, "Good. I hope he takes
18  that case to trial because I'm sure you and
19  Judge Anderson already offered him more than he
20  could ever get. Laugh out loud." And
21  Mr. Oppenheim responded, "Yeah, he," meaning
22  Mr. Wanca, "wants to set a record above the
23  Capital One $75 million settlement. The
24  magistrate judge it's in front of is squeamish

Thompson Court Reporters, Inc
thompsonreporters.com

1 and is giving the defendants a broad shot at
2 disproving "on behalf of." Sort of like
3 Farris, F-A-R-R-I-S, class cert is fully
4 briefed."
5      Now, I want to stop at that
6 communication. By Mr. Oppenheim, "Yeah. He,"
7 Mr. Wanca, "wants to set a record above the
8 Capital One $75 million settlement." Is that
9 confidential Cin-Q information?
10    A. Yeah, I think so.
11    Q. Is it confidential Cin-Q information
12 even if it's not true?
13    MS. LOEW: Objection to form.
14    THE WITNESS: Well, I think you're talking
15 about mental -- I don't know how you can say it
16 was true or not true, per se. It's a
17 discussion by Mr. Oppenheim of mediation
18 strategy in the context of a mediation he was
19 participating in.
20 BY MR. COHEN:
21    Q. Sure. But let's assume, just by way
22 of example, you said something about -- I think
23 Mr. Blonien asked you what would a reasonable
24 settlement here be, and you said something

1 along the lines -- we'll come to it in a little
2 while, so I don't mean to get you to commit,
3 yeah, that's what I said. You said something
4 about a hundred million dollars.
5    A. Right.
6    Q. Assuming just for sake of this
7 question that you and Mr. Wanca were thinking
8 the case was worth around a hundred million,
9 should settle around a hundred million, and
10 Mr. Oppenheim in an e-mail with Mr. Bock on
11 April 29th said, "Wanca wants more than a
12 billion dollars." it's clearly not correct,
13 it's not an accurate statement of anything
14 going on in the Cin-Q case. It's not revealing
15 anything accurate. Is that still Mr. Oppenheim
16 disclosing confidential Cin-Q mediation-related
17 stuff?
18    MS. LOEW: Objection to form.
19    THE WITNESS: I think discussion about
20 anything that happened in the mediation and any
21 of the negotiations should not be disclosed,
22 and the example you've given me is not
23 realistic, because you've taken it to an absurd
24 hypothesis that somebody wants a billion

1 dollars and the case couldn't possibly be worth
2 that much because it's only worth 267 million.
3    So I think the problem is that the
4 disclosure is occurring in a context where
5 Mr. Oppenheim knew something that nobody else
6 outside the mediation group knew about.
7 BY MR. COHEN:
8    Q. I guess what I'm trying to get at is,
9 if Mr. Oppenheim said something to Mr. Bock
10 that is simply factually not true about
11 Mr. Wanca's position relative to the Cin-Q
12 settlement, is he disclosing confidential stuff
13 if it's simply not true?
14    A. Is that another way of getting me to
15 tell you what is true?
16    Q. No. I'm not going to ask you that.
17    A. I know if he were to have said that
18 about a billion dollars, that would not be
19 true.
20    I'm not going to get into what
21 really was true and what really did happen in
22 the mediation and what discussions were going
23 on between counsel.
24    Q. And I haven't asked you that.

1    A. I know. You asked me the other way
2 around, so...
3    Q. It's just this is what Mr. Oppenheim
4 said.
5    A. Right.
6    Q. And an accusation has been made that
7 Mr. Oppenheim shared confidential mediation
8 information.
9    A. Right.
10    Q. All I'm saying is, if this is what he
11 said, if this isn't true, as M & C's counsel of
12 record in the M & C -- in the Cin-Q case, if
13 this isn't true, is this still the sharing or
14 divulging of confidential mediation
15 information?
16    MS. LOEW: Objection to form.
17    THE WITNESS: I think so, because
18 it's -- the minute you start talking about what
19 was said and theoretically what responses might
20 have been forthcoming, you're talking about the
21 mediation process that you are not supposed to
22 be disclosing to third parties.
23 BY MR. COHEN:
24    Q. Okay. So then Mr. Bock says, "He

Thompson Court Reporters, Inc
thompsonreporters.com

1  loves it. Now he is a Tampa Bay Buccaneers
2  fan." And Mr. Oppenheim responds, "Something
3  about pigs and hogs comes to mind."
4       Is that the disclosure of
5  confidential mediation privileged information?
6       A.  Coupled with what was said before,
7  it's all in context, yeah, I think so.
8       Q.  What about just taken alone?  What if
9  Mr. Oppenheim had never said anything about he
10  wants to set a record, he'd just said something
11  about pigs and hogs comes to mind?
12       A.  That's speculative, because that's not
13  what happened.
14       Q.  But I'm looking at each part of what
15  he did say.
16       A.  I know you are, and you're trying to
17  dissect it, but yet it was all in one exchange.
18       We can take it word by word, but
19  without the context, it doesn't mean anything.
20       Q.  Mr. Oppenheim then said, "They," being
21  the Buccaneers, "actually brought in Mark
22  Mester with Latham & Watkins after having
23  Mr. Postman for most of the case."
24       A.  That's not exactly what he said, but

1  that's correct.
2       Q.  Is the disclosure of the fact that the
3  Buccaneers have brought in Mr. Mester and after
4  having Mr. Postman on the case a fact that can
5  be ascertained by going to the public docket in
6  the Buccaneers/Cin-Q case?
7       A.  Yes.
8       Q.  Is that confidential mediation
9  information?
10       A.  No.
11       Q.  You were notified -- or it was your
12  interpretation when Mr. Mester got involved
13  that he brought to the table the possible
14  opportunity at settlement that had not been
15  available with Mr. Postman, correct?
16       A.  There was always an opportunity to
17  settle.  He brought to the table the
18  representation that he was going to get the
19  case settled.
20       Q.  And that representation preceded any
21  mediation attempts with the Buccaneers with
22  Mr. Mester involved, correct?
23       A.  Oh, yeah.  Until he was involved, any
24  mediation would have been without him being

1  involved.
2       Q.  I know this came out in your
3  discussions with Mr. Blonien.  The Buccaneers
4  made no offer at all in the first mediation
5  session with Mediator Max, correct?
6       A.  Well, not an offer in the sense you
7  could say I accept that.  There was a concept.
8       Q.  Was the Buccaneers' concept one that
9  was fundamentally and substantively acceptable
10  to Cin-Q plaintiffs' counsel?
11       A.  No.
12       Q.  You indicated the Buccaneers made no
13  offer in the second mediation, correct?
14       A.  That's correct.  They held out the
15  opportunity for an offer in the relatively near
16  future.
17       Q.  Did they then make an offer after the
18  second mediation?
19       A.  Eventually.
20       Q.  How many different separate settlement
21  proposals did the Buccaneers make after the
22  second mediation before you were notified of
23  the Technology Training settlement?
24       A.  You have to understand, we were

1  dealing only with the mediator.
2       Q.  And I just -- for clarification, I'm
3  treating the mediator -- and after there is a
4  reason I shouldn't, you can let me know, but
5  I'm treating the mediator as a conduit.  If he
6  brings you a settlement proposal or offer from
7  the Buccaneers, I'm meaning to include that in
8  an offer from the Buccaneers.
9       A.  I understand.  But the way in which
10  Judge Anderson communicated, it was fairly
11  non-specific and, I guess, also vague, so that
12  you couldn't get a sense of was it his idea, or
13  was it the Bucs' idea, or was it a trial
14  balloon, or was it a shot in the dark.  You
15  didn't know what authority he had, if any, to
16  say anything, and so made it very difficult to
17  joust with that.
18       Q.  And --
19       A.  So there were a number of hypotheses
20  that seemed to have been floated to see, you
21  know, would there be a receptive response from
22  the plaintiffs in the case, but there was only
23  one offer.
24       Q.  By the Bucs?

Thompson Court Reporters, Inc
thompsonreporters.com

1    **A.  By the Bucs.**
2    Q.  Was that the offer in and around March
3    of 2016?
4    **A.  I don't remember.  It came with a term**
5    **sheet.**
6    Q.  So earlier talking to Mr. Blonien, you
7    had said offers, in the plural, were made after
8    the second mediation.  I'm not criticizing
9    verbiage.  I want to harmonize it with what you
10   just told me.
11          There were hypotheticals, gray
12   stuff, uncertainty about whether Judge Anderson
13   was authorized, but there was only one
14   definitive firm offer that came with the term
15   sheet?
16   **A.  And even that was potentially**
17   **susceptible to being disallowed, because it**
18   **came through the mediator, not from the**
19   **Buccaneers' authored document, as I recall.**
20   Q.  But you still -- recognizing your
21   caveat, you still perceived that to be an
22   offer, and as far as you recall, it was the one
23   and only real offer?
24   **A.  Tangible, right.**

1    Q.  And segueing for a second, but it's
2    the same segue that happened during
3    Mr. Blonien's questioning.
4          He had this series of questions
5    about whether you agreed with Mr. Wanca, but
6    what if you hadn't, what would have happened,
7    and you said there would have been more heated
8    discussion, and it came down to the point where
9    you said, "And if we can't agree, I would
10   discuss it with the client and let the client
11   decide."  Do you recall that?
12   **A.  Yes.**
13   Q.  And I want to make sure I
14   understand -- and I understand we're talking
15   about within a hypothetical scenario, but we're
16   talking about how it's supposed to work between
17   class counsel and the named plaintiff and if
18   there's multiple class counsel and multiple
19   named plaintiffs.
20          If the Buccaneers made a
21   settlement proposal, you thought it should be
22   accepted, Mr. Wanca did not, you had your
23   heated discussion, you can't resolve it.
24   According to what you told Mr. Blonien, you

1    would discuss it with the client, let the
2    client decide.
3          So in that scenario, applied like
4    a construct over the Cin-Q context, you would
5    go to Cin-Q, you would tell them, you'd say, I
6    think we should take it, Mr. Wanca doesn't, and
7    he and I can't agree.  Mr. Wanca would go to M
8    & C and say, There's is an offer, I don't think
9    we should take it, Mr. Addison does.  What do
10   you think?
11   **A.  Again, if you are talking --**
12   MS. LOEW:  Objection.  Form.
13   THE WITNESS:  You are talking about
14   something hypothetical that didn't happen, but
15   I don't -- I don't agree I would have gone and
16   talked to Cin-Q separately and he would have
17   talked to M & C separately.
18          I would envision the two of us
19   would sit down with both of our clients and
20   we'd lay out our respective positions and a
21   consensus would be reached.
22   BY MR. COHEN:
23   Q.  Okay.  Well, I appreciate the dynamic,
24   but a consensus would be reached is only one

1    possible outcome.
2          You could have a situation where
3    Mr. Wanca's client, M & C, says, I stand with
4    Mr. Wanca, and Cin-Q says, I stand with
5    Mr. Addison, no.  If I'm understanding the
6    situation at that point, based on the position
7    M & C has about Mr. Oppenheim, at that point
8    you can't proceed to advocate for the
9    settlement because your client, M & C, doesn't
10   agree, Mr. Wanca can't advocate against the
11   settlement, because his client, Cin-Q, doesn't
12   agree, now all four of you, two plaintiffs
13   counsel and two clients are all internally
14   conflicted, and you just have to drop the case
15   and go home?
16   MS. LOEW:  Objection to form.
17   THE WITNESS:  No.
18   BY MR. COHEN:
19   Q.  Why not?
20   **A.  Never would have happened.**
21   Q.  Why not?
22   **A.  Because it wouldn't have happened.**
23   Q.  What part of it wouldn't have
24   happened?

1    A. We would not have abandoned the case
2  and gone home. We would have reached an
3  agreement as to where we were in the case and
4  either proceeded or settled.
5    Q. Mr. Blonien asked you what harm was
6  suffered by Mr. Oppenheim's alleged breach of
7  fiduciary duty. And if my notes are right, you
8  said that it interfered with the resolution of
9  the Cin-Q class action in a manner favorable to
10 the class, and it gave the Buccaneers a chance
11 to settle for an inadequate amount of money.
12   A. Right.
13   Q. Isn't that exactly the two issues that
14 Judge Porcelli, it's his role to consider and
15 decide?
16   A. He is not the only one, but he is one
17 of the ones.
18   Q. Who else should be deciding that?
19   A. I'm assuming that the case that you
20 are litigating in front of Judge Honeywell,
21 that she has the opportunity to weigh in on
22 that as well.
23   Q. Do you have any reason to believe,
24 especially now -- and I mean, you know, it's

1  been our position all along that M & C is going
2  to have a full and fair opportunity to litigate
3  all of that as just an objector in the
4  Technology Training case, but now that the
5  forthcoming intervention of the Cin-Q
6  plaintiffs in the Technology Training case is
7  on its way, wouldn't you agree that the Cin-Q
8  plaintiffs are going to have a full-and-fair
9  opportunity to litigate and seek resolution in
10 their favor on those issues in front of Judge
11 Porcelli?
12   MS. LOEW: Objection to form.
13   THE WITNESS: I'm not going to say they
14 won't have the opportunity to present those
15 arguments, but in the context of the case
16 that's presently in front of Judge Honeywell, I
17 think there's additional remedy that's being
18 requested against Mr. Oppenheim and his law
19 firm that is not going to be part of whatever
20 is going to be argued as an intervenor in the
21 Cin-Q litigation.
22 BY MR. COHEN:
23   Q. What additional remedy?
24   A. An injunction against their unethical

1  behavior.
2    Q. But an injunction would just serve the
3  same effect as Judge Porcelli rejecting the
4  settlement?
5    A. Not the same, no. It would be -- it
6  would be a more serious ramification for
7  Mr. Oppenheim and Bock going forward in the
8  future versus just somebody saying, you know,
9  they're being disqualified, and they
10 can't -- there's -- their preliminary
11 settlements now and the withdrawal of that
12 approval is forthcoming, and we're back to
13 dealing with our case against the Buccaneers
14 versus him being enjoined.
15   Q. What you seem to be saying is an
16 injunction in the Honeywell action, this
17 action, would have potentially broader
18 consequences for Mr. Oppenheim and/or Bock Law
19 Firm, but as far as the benefit to M & C, it's
20 the same benefit in each situation, correct?
21   MS. LOEW: Objection. Form.
22   THE WITNESS: Vindicate their rights of the
23 client that's been abused.
24 BY MR. COHEN:

1    Q. To the same beneficial --
2    A. Potentially monetarily, but there's
3  more to it than that.
4    Q. What more?
5    A. When you have a breach of fiduciary
6  duty and a betrayal by your attorney, the
7  damages aren't necessarily calculable, that's
8  why injunctive relief might be the appropriate
9  remedy.
10   Q. And I understand you're not M & C's
11 counsel in the litigation in front of Judge
12 Honeywell.
13   A. That's correct.
14   Q. But based on your understanding of
15 what's at issue, the remedy sought and the
16 issues necessarily incidental or subordinate to
17 the remedy sought, isn't M & C asking Judge
18 Honeywell to evaluate the reasonableness and
19 fairness of this settlement through the lens of
20 an alleged reverse auction?
21   A. I don't think so.
22   Q. Are you aware that the verified
23 complaint specifically alleges this was a
24 reverse auction?

Thompson Court Reporters, Inc
thompsonreporters.com

1    A. Well, it may do it, because that's the
2 basis on which the breach of fiduciary duty was
3 predicated, I suppose. But she is not being
4 asked to approve the settlement or disapprove
5 it.
6    Q. But if she determines it is a reverse
7 auction, isn't she making a determination that
8 otherwise would be made by Judge Porcelli?
9    A. I don't know that she needs to make
10 that determination to make whatever ruling she
11 is going to make.
12    Q. I thought you just said, reverse
13 auction is the basis upon which the breach of
14 fiduciary is --
15    A. It is part of what the breach resulted
16 in, but she wouldn't have to say it's a reverse
17 auction to say that what was done was a breach
18 of fiduciary duty.
19    Q. One of the things you said focused on
20 delay and more delay. Do you recall that?
21    A. Yes.
22    Q. You haven't been particularly prompt
23 and swift getting a resolution of the Cin-Q
24 class action, have you?

1    A. Not for want of trying.
2    Q. But David Oppenheim and Bock Law Firm
3 up through May of 2016, no responsibility for
4 that can be laid at their feet under any
5 circumstance, can it?
6    MS. LOEW: Objection to form.
7    THE WITNESS: Oppenheim, I guess, in the
8 sense that he was with the Anderson + Wanca law
9 firm and handled the mediations.
10    But I mean beyond that, no. I
11 mean the Buccaneers made it very difficult and
12 raised issues and defenses and strategy to try
13 to delay and postpone, primarily because they
14 knew the class should be certified, and if it
15 was, they had a huge problem on their hands.
16    So, unfortunately, they made
17 arguments that Judge Porcelli maybe thought
18 were reasonable, perhaps because of his
19 inexperience in class action litigation. It
20 turned out not to be reasonable and caused
21 problems down the road that contributed to the
22 delay.
23    But even those delays, my point
24 is, we were on the verge of getting a

1 settlement or a class certification when the
2 Bucs filed their response to the motion for
3 class certification that they delayed two times
4 past the 30 days they were given initially, and
5 this case came in and threw that off track.
6 And no matter what happens, there's going to be
7 additional delay now.
8 BY MR. COHEN:
9    Q. Let's start with they knew, being the
10 Bucs, they knew the case would be certified.
11    At any time has anyone from the
12 Buccaneers or on behalf of the Buccaneers ever
13 conveyed a communication to you or that's been
14 shared with you by your co-counsel that the
15 Bucs communicated it to them that they knew the
16 case would be certified?
17    A. They never said that. They didn't
18 have to.
19    MR. COHEN: Move to strike they didn't
20 to.
21 BY MR. COHEN:
22    Q. Have you ever tried a TCPA class
23 action to a verdict?
24    A. No, I've always won them on summary

1 judgment.
2    Q. You've won every single TCPA class
3 action you've ever had on summary judgment?
4    A. No, I've settled some, but...
5    Q. How many TCPA class action trials are
6 you aware of going to verdict nationwide, state
7 and federal?
8    A. Very few.
9    Q. What's your understanding of the
10 breakdown between defense verdicts versus
11 plaintiff verdicts?
12    A. I haven't studied it.
13    Q. You just said we were on the verge of
14 getting a settlement with the Buccaneers or
15 getting certification.
16    What fact, evidence, direct
17 evidence can you identify that you were on the
18 verge of getting a settlement with the
19 Buccaneers?
20    A. I said or.
21    Q. I know. I'm going do the or in a
22 moment.
23    What fact evidence do you have
24 that you were on the verge of getting the

Thompson Court Reporters, Inc
thompsonreporters.com

1  Buccaneers settled?

2      A.  We were going to get one or the other.

3  I didn't know whether we were going to get a

4  settlement. Their smartest move would be

5  settle before it's certified. And they are not

6  stupid.

7      Q.  Why was certification such a certainty

8  in your mind in this case?

9      A.  Because if you can't certify this

10  case, there's no such thing as a class action.

11     Q.  I appreciate that, but that takes all

12  the actual reasons and buries them in the

13  conclusion, and then you gave me another way of

14  saying the conclusion.

15         What are the actual factors about

16  the Cin-Q motion for class certification in the

17  context of the facts of the case that make

18  certification such a certainty?

19     A.  The same impact on every class member.

20  There's no distinguishing characteristic

21  between the representative class plaintiff and

22  anybody else. There's no established business

23  relationship that the Buccaneers can point to,

24  because they didn't even know who they were

1  sent to.

2         The fax advertisement didn't

3  comply with the opt-out requirements in the

4  statute and in the regulations.

5         There's no offset for damages.

6  It's a statutory amount for unintentional faxes

7  and the statutory amount for intentional faxes

8  that violate the law.

9         They're numerous. Counsel was

10  experienced. There were no conflicts between

11  the representative class and other class

12  members.

13         It was the most sufficient way to

14  handle the litigation versus 360,000 separate

15  cases or maybe 330,000. I'm sorry.

16     Q.  Or 343,000?

17     A.  Yeah, whatever, in that number. It's

18  precisely the thing that class actions were

19  designed to deal with, so it should have been

20  certified.

21         And if a defendant feels like

22  there's no liability, that somehow we got it

23  wrong, they should want it certified, because

24  then when they get a res judicata ruling

1  winning the case, they're done.

2      Q.  If the four-year statute has run, that

3  doesn't matter?

4      A.  Doesn't matter as to somebody who's

5  had the four-year statute run, but Cin-Q

6  hadn't.

7      Q.  But everybody but Cin-Q had, and so

8  they didn't need to get it certified and then

9  get the win, everybody else was going to die on

10  the vine if they beat just Cin-Q, correct?

11     A.  In they prevented the class from being

12  certified, you are absolutely correct.

13         And that's why they should have

14  been trying to either get it certified or get

15  it over with.

16     Q.  You mention something about the

17  opt-out. Explain the opt-out to me again.

18     A.  There was a provision in terms of how

19  to get off a fax list. There's language you're

20  supposed to use to indicate to the recipient of

21  the fax what procedure they have to follow to

22  have their name removed, and if you don't do

23  that, that's a violation of the statute.

24     Q.  When does the -- as you understand it,

1  when does the opt-out notice requirement apply?

2      A.  When you send a fax advertisement.

3      Q.  Okay. I mean the TCPA prohibits

4  sending unsolicited fax advertisements, right?

5      A.  Right.

6      Q.  Unsolicited means I never gave prior

7  expressed invitation or permission?

8      A.  Right.

9      Q.  If I'm going to send a fax

10  advertisement to somebody from whom I do have

11  prior expressed invitation or permission, under

12  whatever you're referring to, does it still

13  have to have the opt-out?

14     A.  Yes. So they can unpermit.

15     Q.  Did any of the campaigns, the

16  Buccaneers fax broadcast campaigns -- by that I

17  mean however many there were in '09 and how

18  many there were in 2010, in your development of

19  the case, did any of them have a compliant

20  opt-out notice?

21     A.  No.

22     Q.  And was that fact standing all by

23  itself significant to the merits of the case

24  and the certifiability of the case?

Thompson Court Reporters, Inc
thompsonreporters.com

1    A.  Went hand in glove with the fact it
2  was an advertisement, and it was sent by fax,
3  et cetera, but it's just a dual prong.
4    Q.  And I guess what I meant is, to the
5  extent the Buccaneers had a defense that they
6  had prior expressed permission or consent from
7  one or more or lots of the potential class, and
8  that that created individualized issues as to
9  consent from this one versus that one, I'm
10  understanding you're saying the opt-out
11  requirement and the failure to meet it mooted
12  that defense?
13    A.  Right.  Plus they couldn't
14  establish -- they couldn't demonstrate an
15  established business relationship because they
16  didn't know where the faxes went.
17    Q.  But they did when you got the logs?
18    A.  Well, I don't think they ever bothered
19  to check to see where they went.
20    Q.  May be a reasonable inference, may
21  not.  Do you have any direct evidence about
22  whether they did or not?
23    A.  No, no.
24    Q.  You said something about the

1  Technology Training settlement, you mentioned
2  it a couple of times, that the claim form is
3  inadequate.
4    A.  Right.
5    Q.  Can you explain what you're referring
6  to and how and why whatever you're referring to
7  is inadequate?
8    A.  Well, I don't have it in front of me,
9  so I don't recall it specifically.
10    My recollection is that generally
11  a claimant, if he receives a letter that is
12  going to be sent out in the mail to the
13  claimant, can state under oath on a certain day
14  he got a fax from the Buccaneers without
15  necessarily having his recollection refreshed
16  as to what day he actually received it, and he
17  files that claim form, and the Buccaneers then
18  have the opportunity to take that database and
19  verify whether they received that fax on that
20  date, then they might be approved as a
21  qualified claimant to be paid out of the
22  settlement fund.
23    But the idea that you would be
24  asking people to state under oath that they

1  received a one-page fax or two-page fax eight
2  years ago on a certain date is totally
3  unrealistic, when we know when they got it, we
4  know the date and the time, we know how many
5  pages, and so that's just an
6  unworkable -- basically a settlement that's
7  designed to pay attorneys' fees and not have
8  much other exposure.
9    Q.  Isn't a proper issue whether -- a
10  person receiving a notice of a settlement,
11  isn't a proper issue whether they, in fact,
12  owned that fax number during the relevant time?
13    A.  Yes.
14    Q.  Is it unreasonable to ask somebody to
15  swear under oath that in 2009 or 2010 this was
16  their fax number, or to ask them to state under
17  oath in 2009 or 2010 what was their fax number?
18    A.  I don't think you need to do it under
19  oath.
20    Q.  And --
21    A.  That's designed to make sure people
22  don't fill it out and file it.
23    Q.  Let's set aside the under oath part
24  for a moment.

1    Is it unreasonable to request or
2  require as part of making a claim that the
3  person who receives the notice of settlement,
4  if they want to make a claim, they have to
5  represent that in the particular relevant time
6  period, either they owned such and such fax
7  number or such and such was their fax number at
8  that time?
9    A.  Right.  I think that's okay.
10    Q.  And I understand your view that
11  creating the under oath, which necessarily
12  creates the penalty of perjury, you view that
13  as having a dissuading effect or a potential
14  for a dissuading effect?
15    A.  Right.
16    Q.  Do you believe that that potential
17  dissuading effect, as you view it, is so
18  improperly dissuading as to it be unreasonable
19  in and of itself?
20    A.  Yes.
21    Q.  Do you know whether Anderson + Wanca
22  has ever negotiated an approved TCPA class
23  action settlement in which the claim form
24  required an under-oath or

1  under-penalty-of-perjury claim form?
2  MS. LOEW: Objection. Form.
3  THE WITNESS: I don't know.
4  BY MR. COHEN:
5  Q. And I asked you what about the claim
6  form was inadequate, and you started -- and I'm
7  not criticizing at all, but you said you get a
8  letter in the mail, and they got an under oath
9  and this and that. Have we covered --
10  **A. No, I think the note should go out by**
11  **fax, ironically enough.**
12  Q. So that is a second inadequacy in the
13  notice?
14  **A. Right, right.**
15  Q. Just by fax?
16  **A. No, you should send it out by fax. If**
17  **you get it back, that it didn't go through,**
18  **then you spend the next level of effort to**
19  **identify the owner of that fax number at the**
20  **time, and you send a letter. Then you do a**
21  **publication.**
22  Q. So -- and I'm not arguing or making an
23  issue out of if you send by fax, and you get a
24  failure, you do a reverse lookup, you get a

1  hard address, and you send it by mail, that's
2  what you said, right?
3  **A. Right.**
4  Q. Take just one class member -- and I
5  understand you don't do it differently. These
6  guys get this, these guys get that. I'm just
7  saying for purposes of what's at the heart of
8  what you're saying. Take one class member,
9  John Doe, and you have the fax number that was
10  his, or at least you think that was his, back
11  in 2009 or 2010, and you could send him notice
12  by fax, or you could do a reverse lookup, and
13  you can get a hard mail address and send notice
14  by hard mail. Are you taking a position as to
15  that one class member as to whether the fax
16  notice is better than the reverse lookup and
17  the hard mail address?
18  MS. LOEW: Objection to form.
19  THE WITNESS: I think the fax notice in
20  this context is probably better, because you
21  have to remember the database that these
22  numbers were drawn from were business fax
23  numbers.
24  Most John Does don't have a fax

1  number.
2  So, although, businesses move
3  from location to location, they typically keep
4  their same fax number.
5  So you can send out a letter to
6  what you believed was ABC Corporation's address
7  on a certain date in July of 2009, and they're
8  not going to be at that physical address
9  anymore, and the forwarding of their mail would
10  have expired after six months from the time
11  they left, but the fax number is still their
12  fax number.
13  BY MR. COHEN:
14  Q. What are you able to share with us
15  based upon your knowledge and experience in
16  TCPA class action settlement notice by fax
17  about the reliability of business fax numbers
18  seven or eight years after the fact?
19  **A. Well, the difference is that now**
20  **everybody does things by e-mail, and the faxes**
21  **are not utilized with the frequency that they**
22  **used to be utilized, except in doctors and**
23  **pharmacies and hospitals.**
24  **But from my experience, and**

1  **that's just anecdotal, people keep their same**
2  **fax number and their same fax machine, and it**
3  **sits in the corner and every once in a while it**
4  **spits out a fax.**
5  Q. To the extent research exists -- and
6  I'm not an expert in it, but to the extent
7  research exists as to the reliability on a
8  statistical basis of fax number correlation to
9  owner over time, I understand your anecdotal
10  experience, I have mine, too, but I wouldn't
11  hold my anecdotal experience up against
12  carefully done research by professionals in the
13  field; would you?
14  **A. No. And I'm not aware of any**
15  **carefully done research regarding that subject**
16  **matter. So would kind of be surprised that it**
17  **even exists.**
18  Q. You might be surprised.
19  So it's your position that in a
20  situation of a case of this type, a notice plan
21  that instead of using fax notice to the numbers
22  from 2009 and 2010 that does reverse lookups to
23  find hard mailing addresses and sends hard mail
24  to everybody who can be located, that in and of

Thompson Court Reporters, Inc
thompsonreporters.com

1     itself is unreasonable?

2     **A. I can't say just in and of itself.**

3     **I'm saying it's -- the whole way it was**

4     **structured, I think, is designed to make sure**

5     **claims don't come forward.**

6     Q. And I am not ignoring, dismissing or

7     pretending we didn't discuss your views on the

8     under-oath penalty of perjury part.

9     But the under-oath penalty of

10     perjury part only comes in if a class member

11     actually receives the claim form?

12     **A. Right.**

13     Q. So we're focusing on the

14     reasonableness of the method of getting the

15     claim form, whatever it requires or doesn't

16     require, to the class member, focusing only on

17     getting it to the class member.

18     Is it your position on behalf of

19     M & C in the TTA case that instead of doing fax

20     notice, doing reverse lookups for hard mailing

21     addresses and sending to all the hard mail

22     addresses that can be located is, itself,

23     unreasonable?

24     **A. I think it's not the best way, not**

1     **the -- it is a way. I just don't think it's**

2     **the best way to get the claim form into the**

3     **hand of the person that is in a position to act**

4     **on behalf of the business that received it in**

5     **the first place.**

6     Q. And when you say the best way, it

7     could mean a couple of things, so I want to be

8     real careful and clear with you.

9     You're familiar with the fact

10     that class action notice plans are required to

11     meet certain constitutional due process

12     thresholds.

13     Is it your position that hard

14     mail notice based on reverse lookup in this

15     case would not meet constitutional due process?

16     **A. No.**

17     Q. No, it wouldn't, or, no, you are not

18     saying that?

19     **A. No, I am not saying that.**

20     Q. Okay. That was one where I really had

21     to ask. I wasn't just making the record clear.

22     Have you looked at the

23     publication component of the proposed notice

24     plan in the Technology Training settlement for

1     purposes of assessing whether it is a

2     sufficiently robust publication plan to

3     adequately provide notice to those for whom

4     hard mail notice fail?

5     **A. I'm not really that familiar, other**

6     **than I've sat in on conference calls with Judge**

7     **Porcelli discussing where they are with the**

8     **mail notice, and the last I heard is they**

9     **haven't even agreed among -- between the**

10     **Buccaneers and Mr. Bock, they haven't agreed on**

11     **the method they are going to use, so I'm not**

12     **sure what -- if there is a plan yet.**

13     Q. To whatever extent there is in the

14     publication component and to whatever extent

15     the parties have or have not reached an

16     agreement, you don't have personal knowledge

17     one way or another?

18     **A. I don't.**

19     Q. Mr. Blonien was asking you about a

20     JPA, and you said, I don't know what a JPA is.

21     But you said, We did sign that we would

22     represent Mr. Siprut's clients. Do you recall

23     that?

24     **A. Yes, I remember signing the engagement**

1     **agreement to represent the Stein group of**

2     **doctors, and I believe also the Accounting to**

3     **You at a subsequent point. Or maybe prior and**

4     **then the doctors when they got their case**

5     **reversed, the dismissal reversed in the**

6     **Eleventh Circuit and they came back, I think**

7     **that's when I signed on.**

8     Q. And I'll just represent to you, JPA is

9     a joint prosecution agreement. It's the

10     notion, we all have our clients and we're all

11     working together. And there is a reference

12     I'll tell you in some e-mails about the fact we

13     have a JPA. And a JPA doesn't have to be in

14     writing to exist and be valid.

15     What I'm wondering is, to your

16     knowledge, was there a written joint

17     prosecution agreement between all the different

18     law firms saying these are all our prospective

19     clients, and we're all working together in

20     furtherance of this common interest?

21     **A. I don't believe so.**

22     Q. Mr. Blonien asked you if it would be

23     an improper disclosure or divulgence of

24     confidential mediation privileged mediation to

1  say that nothing serious was going on at the
2  mediations, or that the Buccaneers weren't
3  serious, or they weren't coming forward with
4  any meaningful settlement offers, and if I
5  understood, you said those kinds of general
6  statements would not be wrong to share with
7  outsiders?
8      A.  I don't really think so, that it would
9  be wrong, because of the obvious -- if you had
10  a mediation, and a month later, two months
11  later, three months later there wasn't anything
12  that came to a record settlement offer being
13  put before the court, anybody that looked at it
14  would say, Well, there must not be much going
15  on.
16          It's too general and too vague to
17  be of any use to anybody.
18      Q.  I don't think I'm asking you to agree
19  to anything you didn't agree in your
20  preliminary injunction hearing testimony.
21          You deny telling Mr. Oppenheim on
22  April 18th of 2016 after he had left the
23  employment of Anderson + Wanca that you were
24  concerned about the fact that Mr. Wanca was

1  holding up settlement in the Buccaneers case to
2  increase the fund to get more attorneys' fees,
3  you deny that, correct?
4      A.  Yes.
5      Q.  Actually, I apologize.  That was
6  something I asked you if you agreed you told
7  Mr. Bock on April 18th, 2016, and you denied
8  telling Mr. Bock that, correct?
9      A.  That's correct.
10      Q.  And then on May 2nd of 2016, I asked
11  you whether you had told Mr. Oppenheim at a
12  scheduling conference in Tampa federal court in
13  the case called Zurich, Z-U-R-I-C-H, versus
14  Dalzell, D-A-L-Z-E-L, two Ls at the end,
15  whether you had told Mr. Oppenheim at that time
16  with regard to the Buccaneers case that
17  Mr. Wanca was holding the class hostage to his
18  ego, and you denied having made that statement,
19  correct?
20      A.  Yes.
21      MS. LOEW:  Where are you in the
22  transcript?
23      MR. COHEN:  I apologize.  Because I
24  thought I was being faithful to the transcript,

1  not that that forgives what I just did.  I was
2  at page 115.
3      THE WITNESS:  115?
4  BY MR. COHEN:
5      Q.  Yes.  It's -- at line eight is my
6  question.
7      A.  Right, right.
8      Q.  And your answer was very long, and
9  what you kind of focused on was what you
10  thought you had said, but kind of by exclusion
11  you deny that you said that to Mr. Oppenheim on
12  May 2nd, 2016?
13      A.  Yeah.  I think he is conflating.
14      Q.  Conflating is usually when you take
15  one thing and another thing, and you overlap
16  them in a way that they confuse one another?
17      A.  Yes.
18      Q.  Okay.  So -- and I'm not trying to
19  play games, I'm actually trying to take your
20  use of the term conflating.  Was there some
21  other conversation you had with Mr. Oppenheim
22  about something being held hostage to
23  Mr. Wanca's ego, but it wasn't the Buccaneers
24  settlement?

1      A.  Not exactly.
2      Q.  And I don't want to find out later
3  what it was exactly.  What do you recall in any
4  way relates to Mr. Wanca's ego and hostages?
5      A.  Okay.  Since I was having the
6  conversation with him, he could testify about
7  it, if he got it right.  But in the time period
8  from early September through March -- early
9  September of 2015 through March of 2016,
10  Mr. Oppenheim and I had multiple conversations
11  about the status of the case, settlement
12  discussions, potential offers to make, reasons
13  why offers might be made, all of the things
14  that you discuss with your co-counsel in the
15  context of a class action where settlement is,
16  you know, theoretically being actively pursued.
17  And what I said to him -- and, again, this
18  isn't talking about the specifics of the
19  settlement, it's just -- I knew that
20  Mr. Oppenheim was a Harvard law graduate.  You
21  didn't have to know him very long before you
22  found that out.  And it seemed to me in my
23  dealings with him that he was very full of
24  himself in the context of these cases.

1    Relatively younger lawyer going into these
2    multi million dollar class action mediations
3    and handling the negotiations. And so what I
4    tried to convey to him indirectly in a tactful,
5    subtle way was to say, do not let hubris
6    overtake your judgment, or in this case I used
7    Mr. Wanca so that it wasn't so direct to
8    Mr. Oppenheim. I would say, be sure and talk
9    with Mr. Wanca and make sure he understands not
10   to let hubris get in the way of dealing with
11   the case in a reasonable, objective and
12   effective manner.
13          So I was able to send that
14   message to Mr. Oppenheim through Mr. Oppenheim
15   but use Mr. Wanca as the apparent target of the
16   criticism.
17      Q.  Except this is May 2nd after
18   Mr. Oppenheim no longer works --
19      A.  Never happened on May 2nd. That's the
20   conflating.
21      Q.  When did it happen?
22      A.  Over a period of months, as I just
23   testified.
24      Q.  Here's the problem. You are at the

1    mediations. Wanca's at the mediations. You're
2    copied on all these e-mails that we've been
3    produced in 2015, up through March of 2016,
4    putting together term sheets, everybody
5    agreeing to term sheets that we're going to
6    send over to the Bucs. You're in charge.
7    Wanca's in charge. If you guys didn't like the
8    positions that Mr. Oppenheim was sending forth,
9    Mr. Oppenheim could easily have been ordered to
10   send different demands?
11      A.  He wasn't sending things. We were
12   talking about how you present the opportunity
13   to make an offer when it's present.
14          We didn't have an offer from the
15   Buccaneers until March.
16      Q.  Point to a specific moment of
17   Mr. Oppenheim, quote unquote, "hubris" that you
18   were actually only in a veiled way referencing
19   by making him think you were actually directing
20   it to Wanca when you were hoping he would
21   realize it and was beneficial for him to take
22   the same advice, point to a specific moment
23   when you felt that was necessary, vis-a-vis a
24   context in the case, that it was becoming

1    problematic and he was the holdup.
2      MS. LOEW: I'll say just to the extent that
3    you answer, be careful not to answer
4    mediation-privileged information.
5      THE WITNESS: I'm not saying that he was
6    the holdup. What I was saying is we all need
7    to keep in mind not to be guilty of hubris, so
8    more of a grandfather advice to keep things in
9    perspective.
10   BY MR. COHEN:
11      Q.  You'd agree that -- I'm not ignoring
12   what you said. I'm just saying I'm sitting
13   here with sworn testimony from Mr. Bock about
14   what you told him on April 18th and sworn
15   testimony from Mr. Oppenheim about what you
16   told him on May 2nd of 2016.
17          You'd agree if you made those
18   communications, as they've testified and as
19   I've described to you, that Wanca was holding
20   the class hostage, that he's attempting to
21   inflate the fund to increase the attorneys'
22   fees, that would have been confidential
23   information covered by the mediation privilege
24   that you shouldn't have been sharing?

1      A.  If that were true, yeah.
2      Q.  And, sir, I never ever want somebody
3    to think I'm trying to create the impression
4    you agree with something. I acknowledge. You
5    say that didn't happen, so that's clear.
6          But you're familiar with the
7    concept of waiver by an attorney knowingly and
8    voluntarily disclosing that which would
9    otherwise be confidential out into the public
10   sector to persons who otherwise did not have an
11   entitlement to receive it?
12      A.  Yes.
13      Q.  If you had revealed those kinds of
14   comments to Mr. Bock on April 18th, 2016, and
15   Mr. Wanca on May 2nd, 2016, that could
16   accomplish a waiver of your otherwise existing
17   mental impressions and attorney strategies
18   regarding the case?
19      MS. LOEW: Objection to form.
20      THE WITNESS: I don't think so.
21   BY MR. COHEN:
22      Q.  Why not?
23      A.  Because you used Mr. Wanca in the
24   question.

66 (Pages 258 to 261)

1    Q. Did I?

2    **A. Yes.**

3    Q. What I meant to say is, if I -- did I

4  say it wrong? Let's get on with it.

5    If you said the things to

6  Mr. Bock on April 18th, Mr. Oppenheim on May

7  2nd about Mr. Wanca as they've testified and as

8  I've described to you, acknowledging you deny

9  having said that, that could accomplish a

10  waiver with regard to that aspect of your

11  confidential attorney impressions and

12  settlement strategies in the case?

13    MS. LOEW: Objection. Form.

14    THE WITNESS: As to that aspect -- as to

15  the fact that theoretically Brian Wanca was

16  holding up a settlement to get a higher fee.

17  BY MR. COHEN:

18    Q. And holding the class hostage to his

19  ego?

20    **A. I don't know what that tells you about**

21  **what's going on in mediation, except,**

22  **theoretically, he as class counsel is not**

23  **judging the case in an appropriate manner to**

24  **evaluate a settlement.**

1    MS. LOEW: We've been going about an hour

2  and 15.

3    MR. COHEN: Let's take a break.

4    THE VIDEOGRAPHER: Off the record the time

5  is 3:46.

6    (Recess.)

7    THE VIDEOGRAPHER: We are back on the

8  record. The time is 3:55.

9  BY MR. COHEN:

10    Q. We took a short break. We're back on

11  the record, sir. Are you ready to proceed?

12    **A. Yes.**

13    Q. You had said something in talking

14  about why this was such a lock of a case for

15  class certification purposes, and you went

16  through a lot of factors specific to your

17  assessment or analysis and evaluation of

18  these -- proposed class in Cin-Q, and you said

19  it's the same impact on every class member, no

20  distinguishing characteristics between the

21  class members of any significance, correct?

22    **A. Right.**

23    Q. But you had also talked earlier in the

24  deposition with Mr. Blonien about the fact that

1  there was actually, in your assessment, a

2  growing momentum of evidence over time from the

3  inception of the 2009 fax campaigns through to

4  the conclusion of the 2010 fax campaigns of

5  notification to the Buccaneers, I didn't

6  consent, you can't send unsolicited faxes like

7  this to me, this is illegal, you can be held

8  liable for damages, even a let of a suit,

9  correct?

10    **A. Right. And actually got sued. Better**

11  **than a threat.**

12    Q. And I'll ask you to assume that there

13  are actually e-mails between yourself or among

14  yourself and some of the attorneys at the Wanca

15  law firm over time discussing that momentum

16  feature, and when I use that word, I'm only

17  talking about all the things we just discussed,

18  creating what you perceived to be stronger

19  cases and potentially more valuable claims for

20  class members who receive later faxes than

21  earlier faxes, correct?

22    **A. Yes.**

23    Q. Did you perceive that in any way to be

24  an obstacle to an homogeneous single class?

1    **A. Not at that point.**

2    Q. Do you now?

3    **A. No.**

4    Q. Why not?

5    **A. As I said, we hadn't really gotten**

6  **very far down the road in negotiating a**

7  **specific settlement. It might have been at**

8  **some point that a subclass would be appropriate**

9  **for people that got faxes in 2009 versus 2010,**

10  **but the argument had to be that 2010 was an**

11  **intentional fax versus 2009 being an accidental**

12  **fax, and we weren't prepared to make that**

13  **distinction in terms of trying to quantify the**

14  **value of the case.**

15    Q. For settlement purposes?

16    **A. Right.**

17    Q. Now, and this is a change of topic.

18  At some point, Mr. Blonien asked you, Beyond M

19  & C allegedly being harmed by the action, the

20  alleged actions of Mr. Bock and Mr. Oppenheim,

21  he asked you if you, yourself, felt you had

22  been harmed or damaged by Mr. Oppenheim's

23  conduct, and I believe you said you felt you

24  had, and he asked you why, and the first point

Thompson Court Reporters, Inc
thompsonreporters.com

1  you made is that the Buccaneers case, the TCPA
2  class action against the Buccaneers, is one
3  that you started, correct?
4  **A.  Yes.**
5  Q.  Do you have some perception or
6  underlying notion that because one attorney or
7  one law firm is the first in the country to
8  initiate or commence a particular putative
9  class action referencing a particular putative
10  class, that there's some ownership or
11  entitlement or first rite of passage to that
12  lawyer or firm, such that it's somehow
13  inappropriate if another firm later comes in
14  and actually is the one that accomplishes the
15  settlement?
16  **A.  No, as long as it's not a reverse**
17  **auction.**
18  Q.  So -- and I'm actually going to go
19  through my notes real quick, only to as much as
20  possible refresh your recollection of what I
21  think you were talking to Mr. Blonien about so
22  I can ask you questions about it.
23  By your silence or your uh-huh,
24  okay, I am not suggesting I am verbatim getting

1  it right or that you are agreeing with my
2  representation of exactly what you said.
3  In describing how you feel you've
4  been harmed after saying the Buccaneers case is
5  one that you started, you said we had a solvent
6  defendant, no defenses at all, at least as to
7  the 2010 faxes. You said you recognized the
8  case had exceptional value. You said the
9  Buccaneers' actions tell the same story. Then
10  you referenced the Bock Law Firm and
11  Mr. Oppenheim's, quote unquote, "maneuvering."
12  And you said you expect to have that undone,
13  the Technology Training effect, and you said if
14  that happens, the damages will be ameliorated.
15  But if it's not undone, you will be
16  significantly harmed.
17  Without conceding that I'm
18  verbatim at all, do you recall the line of
19  questioning and answer to which I'm referring?
20  **A.  I do.**
21  Q.  And you said in response to a question
22  by Mr. Blonien around that point in time, he
23  asked you what is the case worth for settlement
24  purposes, and you said it's worth over a

1  hundred million.
2  **A.  Yes.**
3  Q.  And he asked you at what point would a
4  settlement of this case on a class basis be
5  unreasonable, and you said anything under $20
6  million is unreasonable.
7  **A.  Right.**
8  Q.  Now, we're at one of those things
9  where we got bookends, but a vast expanse in
10  between. We got you saying the case is worth
11  over a hundred million, but that doesn't
12  necessarily mean something less than a hundred
13  million would be unreasonable. And then we
14  have you drawing a line below which you're
15  definitely saying it is unreasonable at $20
16  million, correct?
17  **A.  Right.**
18  Q.  So help me fill in the gap between the
19  $20 million and the hundred million dollars,
20  because I don't know if you meant to say
21  anything down to 20 million but still at 20 or
22  above could be reasonable, but anything below
23  $20 million is just flat unreasonable, or
24  whether pulling 20 million was totally

1  arbitrary, and there are a lot of figures
2  growing above 20 million you would still say is
3  flat unreasonable.
4  **A.  I can't answer that. Dynamic process.**
5  Q.  If Judge Porcelli rejected the
6  proposed Technology Training settlement on its
7  merits, would Medical & Chiropractic still be
8  harmed?
9  MS. LOEW: Objection to form. Foundation.
10  THE WITNESS: Other than the fact that
11  we've had this delay, I don't know.
12  BY MR. COHEN:
13  Q.  I believe I have two copies. I'll
14  pass it to you first. It's from the production
15  today.
16  After you take a look, if you can
17  pass it to him, because I only have one other
18  to look at.
19  (WHEREUPON, said
20  document was marked as
21  Addison Deposition
22  Exhibit No. 9 for
23  Identification.)
24  MS. LOEW: So this -- I mean,

Thompson Court Reporters, Inc
thompsonreporters.com

1  unfortunately, it looks like this e-mail has
2  specific mediation privileged information in it
3  that is pertaining to offers and demands in the
4  mediation. So that portion of the e-mail will
5  need to be reproduced redacted.
6      MR. COHEN: We are not going to consent or
7  concede that point.
8      I acknowledge you produced it as
9  is. I acknowledge you're claiming an
10 inadvertent production, and that you're seeking
11 to retract, and we don't concede that. And to
12 the extent procedurally that tees you up to
13 your next procedural move, ball's in your
14 court.
15     You can instruct him not to
16 answer as you see fit, otherwise we'll see what
17 we can get from the witness.
18     MS. LOEW: That's fine, you can ask him
19 questions, but I put this on the record and
20 we'll continue to raise the objection. We will
21 reproduce the document.
22 BY MR. COHEN:
23     Q. Mr. Addison, we've handed you what's
24 been marked as Exhibit No. 9. It's Bates page

1  AWMA 0001148. Do you see that at the bottom
2  right?
3      A. Yes.
4      Q. And this is a document, among many,
5  that were produced by the Foley & Lardner law
6  firm in furtherance of your compliance with the
7  subpoena duces tecum served upon you, correct?
8      A. Yes.
9      Q. And it's two e-mails in a chain. The
10 first e-mail is from you to Mr. Wanca and
11 Mr. Oppenheim, the subject is mediation in
12 Chicago, it's dated August 13th of 2015 at 1:35
13 p.m., correct?
14     A. Yes.
15     Q. And then the response is
16 from Mr. Wanca to you, same day, at 2:04 p.m.,
17 so just under a half hour later, correct?
18     A. Yes.
19     Q. And it appears your e-mail subject
20 Mediation in Chicago starts, "Brian and David:
21 In advance of our gathering in Chicago on
22 August 31 to conduct the second mediation with
23 the Buccaneers." That's the intro, correct?
24     A. That's correct.

1      Q. In the second paragraph of your
2  e-mail, it starts, "Is it unproductive to ask
3  for some preview from attorney Mester as to
4  where he thinks this session might be heading,
5  or should we simply attend, keep open minds and
6  see where the process takes us?"
7      Did I read that correctly?
8      A. You did. In other words, you can
9  read.
10     Q. Don't bet on it. I'm getting lucky.
11     And it goes on. You say, "I know
12 no one defendant wants to make an offer outside
13 of the mediation setting, itself, for fear that
14 whatever is offered becomes the floor." And
15 you indicate, "However, at the last mediation
16 through David, we indicated that our" --
17     MS. LOEW: Objection to the extent that
18 you're going to put this on the record. We've
19 already asserted a mediation privilege. The
20 Buccaneers have not waived the privilege, so
21 this is breaching the mediation privilege.
22     MR. BLONIEN: This is a document that you
23 produced today.
24     MS. LOEW: Which needs to be reproduced

1  with a redacted -- in a redacted form.
2      MR. COHEN: The deposition testimony can
3  be designated, -- which includes the question,
4  can be designated as confidential under the
5  protective order.
6      And if you believe that allowing
7  the witness to answer would somehow further
8  some improper thing, then you can instruct him
9  not to answer, and we can all take it up in
10 coordination with your attempt to claw back
11 this document.
12     But I can't be precluded from
13 asking the question that you are not going to
14 allow him to answer.
15     MS. LOEW: And I want to put on the record
16 before you ask the question, because you're
17 going to read something into the record that we
18 have -- we, the Buccaneers, have asserted a
19 mediation privilege over. And I object to you
20 reading it into the record.
21     MR. COHEN: I appreciate your objection.
22 Procedurally, I believe it's appropriate to do
23 it. The judge can order if he agrees with your
24 ultimate position on the clawback. He can

Thompson Court Reporters, Inc
thompsonreporters.com

1  order that it be stricken, that no party refer
2  to it, and it not be disseminated or disclosed
3  for any purpose.
4        But I think for preserving my
5  record, I have to ask the question and have you
6  instruct him not to answer.
7     MS. LOEW:  Understood.
8  BY MR. COHEN:
9     Q.  It states, "However, at the last
10  mediation through David, we indicated that our
11  demand would be lowered from 90 plus million to
12  50 million if the Buccaneers would increase
13  their offer to 10 million.  It was hoped that
14  such a bracket might accelerate the
15  discussions, but it was rejected, and we walked
16  away with no meaningful offer, other than some
17  undisclosed amount of credit to be used by
18  class members for merchandise/food/drink from
19  the Buccaneers."
20        Don't say anything, because I
21  don't know exactly what my question is going to
22  be, and there is no question pending until I
23  do.
24        Sir, was this e-mail -- strike

1  that.
2        And I'm only striking the
3  beginning of the question, not going all the
4  way back.  I'm striking the last part of what I
5  started to ask, not everything going back to
6  reading the e-mail.
7        And then, sir, Mr. Wanca's only
8  response was, "I am NOT going down to 50
9  million on this case," and he did all caps on
10  the not, correct?
11    **A.  Yes.**
12     MR. COHEN:  You haven't waived anything.
13  Make any position you want.
14     MS. LOEW:  And I will advise you not to
15  answer on the basis of mediation privilege.
16  Please pause before answering this line of
17  questioning.
18     THE WITNESS:  I just thought he asked if
19  they capitalized not.
20  BY MR. COHEN:
21     Q.  And, actually, that was what I asked.
22        I understand there's a
23  predicate -- there's some predicate information
24  in your e-mail, the second paragraph that I

1  read, but am I correct in understanding that,
2  generally speaking, you were having a
3  communication with Mr. Oppenheim and Mr. Wanca
4  about how to approach the next mediation
5  session?
6     MS. LOEW:  You can answer that question.
7     THE WITNESS:  I hope so.
8  BY MR. COHEN:
9     Q.  And Mr. Wanca is saying I'm not going
10  down to 50 million on this case was an internal
11  discussion of what you guys may or might or
12  might not do in the upcoming mediation session?
13     MS. LOEW:  You can answer that question.
14  As long as it's not indicating an actual offer
15  or demand within the mediation or an actual
16  communication within the mediation, you can
17  answer the question.
18     THE WITNESS:  No.
19  BY MR. COHEN:
20     Q.  Why do you say that?
21    **A.  I didn't take it seriously.**
22     Q.  You didn't take Mr. Wanca seriously?
23    **A.  No.**
24     MR. BLONIEN:  Ms. Loew, can I just ask a

1  point of clarification on your assertion of
2  mediation privilege?
3        I believe that it is the case
4  that you're asserting it as to any
5  communications or offers, even if they were
6  made by M & C or M & C's counsel?
7     MS. LOEW:  In the mediation, yes.
8     MR. BLONIEN:  So if an offer was made in
9  the mediation, even if it was made from M & C
10  to the Buccaneers through the mediator, you're
11  claiming that's outside production in this
12  case?
13     MS. LOEW:  I believe so.  I will have to
14  look back at the exact language of the order,
15  but my recollection is that the -- that Judge
16  McCoun said that the mediation privilege was
17  not waived.  Internal discussions, to the
18  extent they didn't breach the mediation
19  privilege, were not.
20     MR. BLONIEN:  I'm only looking right now to
21  understand the scope of the mediation privilege
22  you are asserting in this deposition and want
23  to make sure that you're asserting that it
24  applies to any offers that M & C made in the

1   context of the mediations themselves.

2   MS. LOEW: I believe that is correct.

3   MR. BLONIEN: Thank you.

4   MS. LOEW: And same with the demands. The

5   discussions of what happened in the mediation.

6   MR. COHEN: I don't want to interrupt this

7   creative dialogue. Let me know when you're

8   done.

9   MR. BLONIEN: I'm done. Sorry for

10  interrupting.

11  BY MR. COHEN:

12  Q. I know that we may have to have her

13  read back my last question, your last answer,

14  because my follow-up is why not.

15  **A. Because there wasn't an offer pending,**

16  **and it's all hypothetical, all speculative.**

17  **It's not the real world.**

18  Q. And I appreciate that, and that could

19  mean at least one of two things. So I just

20  want to explore that. It could mean that when

21  we read Mr. Wanca saying, "I am not going down

22  to 50 million on this case," and you say

23  because I didn't take it seriously, then you

24  give me the explanation you just did, you could

1   mean I didn't take him seriously that he

2   wouldn't go down to 50 million at some point if

3   it was viable and reasonable, or it could just

4   mean more broadly I didn't take it seriously

5   because there was nothing on the table, it was

6   all speculation and hypothetical anyway, so it

7   was a meaningless blurt out.

8   I mean one of them is, I didn't

9   believe Brian Wanca wouldn't settle this case

10  for 50 million if we could, the other is it

11  just was meaningless because there was nothing

12  on the table, so it was a comment about

13  nothing.

14  **A. I think both.**

15  Q. Okay. Sir, there are some e-mails

16  that have been generated, produced in this case

17  in discovery from the 2009/2010 time period

18  when the first, as far as we know,

19  communications between yourself and Brian Wanca

20  and Phil Bock occurred, e-mails about the

21  prospect of working together on the Buccaneers

22  TCPA case.

23  Do you recall that you

24  corresponded in e-mails that had both Mr. Wanca

1  and Mr. Bock on them about a Bucs case?

2  **A. I don't recall Mr. Bock being on the**

3  **e-mails, but I certainly did reach out to -- at**

4  **least to Brian. He is the only one that I ever**

5  **talked to in that time period.**

6  **And I remember when I got the**

7  **call from Mr. Cin-Q, and I did me preliminary**

8  **investigation, I reach out to Brian to see if**

9  **he wanted to work on the case with me, because**

10  **I realized that was more his area of specialty**

11  **than mine, and I may -- because I was local**

12  **counsel apparently with both of these in these**

13  **earlier-filed cases, I might have just sent it**

14  **to both of them. I don't know.**

15  Q. I'll represent to you that as of the

16  2009/2010 time period, as far as we know, both

17  firms, Bock Law Firm and the Wanca law firm,

18  whenever one of them filed a TCPA case, the

19  other one was on the pleadings as co-counsel.

20  Do you have any knowledge, including knowledge

21  you may have gained at any time from anyone at

22  Anderson + Wanca as to why Bock Law Firm was

23  not included as co-counsel on the M & C or M &

24  C and Cin-Q case?

1  **A. No, I don't. I know that Brian**

2  **declined to participate in 2009, and I never**

3  **did hear anything from Mr. Bock. So I gathered**

4  **that he declined to participate as well. Later**

5  **when I came back and told Brian I needed help**

6  **in terms of trying to identify -- figure out**

7  **who got the faxes, we both knew it was going to**

8  **be extensive, and he is the one that offered to**

9  **participate.**

10  **I don't believe that I**

11  **specifically directed a request at that point**

12  **to Mr. Bock. But whatever the e-mails say,**

13  **they would say.**

14  Q. But as we sit here today, you don't

15  recall ever having received any information,

16  explanation or communication from anyone with

17  Anderson + Wanca, including Brian Wanca

18  himself, as to why he did not include Bock Law

19  Firm as co-counsel in these cases?

20  **A. No.**

21  Q. I understand you've drawn what you

22  perceive to be distinctions between what's at

23  issue or what the available remedies would be

24  or what the bigger outcome, effect would be of

1 having all of these issues about Mr. Oppenheim
2 and Bock Law Firm and whether they breached
3 something, some duty to M & C. You've
4 explained your view about why -- what's teed up
5 before Judge Porcelli in the Technology
6 Training class action could be in some ways
7 different than what's teed up before Judge
8 Honeywell in the M & C action, correct?
9    A. Okay. Now I -- I think I understand
10 where you're going.
11    Q. Okay. And my question is, even if
12 you're correct in your perception that there
13 are some differences either in the issues or in
14 the effect of --
15    A. Or the outcome.
16    Q. Or the outcome of the rulings in the
17 two different cases, wouldn't it be reasonable
18 to have Judge Porcelli, one judge, consider and
19 resolve all of these interrelated factual
20 disputes and issues?
21    MS. LOEW: Objection. Form.
22    THE WITNESS: No.
23 BY MR. COHEN:
24    Q. Why not?

1    A. I just don't think so.
2    Q. I appreciate that. And I'd like to
3 know why.
4    A. That's my opinion. I don't think so.
5    Q. But an opinion has a basis.
6    A. This case is a separate case. Got
7 different issues. And I don't know whether
8 there's been a motion to consolidate it with
9 the existing case of Technology Training or the
10 Cin-Q case.
11    But if it was so appropriate that
12 they be together, then somebody should have
13 moved to consolidate them. And if they did,
14 and it was denied, then that's my answer.
15    Q. I think you testified at the beginning
16 of this deposition that -- toward the
17 beginning, that you have not at any time
18 advised M & C in any way, shape or form
19 relative to its prosecution of this litigation,
20 correct?
21    A. That's correct.
22    Q. Were you aware that Bock Law Firm and
23 Mr. Oppenheim consented to Magistrate
24 Porcelli -- having this case transferred to

1 Magistrate Porcelli for determination on the
2 merits?
3    A. This case?
4    Q. Yes.
5    A. Not the Technology Training case?
6    Q. Correct.
7    A. No, I'm not, but I don't think it
8 could have been done, so...
9    Q. Were you aware that M & C refused to
10 consent to transfer to the magistrate?
11    A. No.
12    Q. And it's fair to say that given that
13 you provided M & C no advice or legal guidance
14 in regard to this litigation, you would --
15 obviously you didn't give them input one way or
16 another as to whether to agree to consent to
17 transfer to the magistrate?
18    A. Right, that's correct, I didn't. I
19 don't think you could, though, because it was
20 McCoun's case.
21    Q. You've mediated cases with Mr. Grilli?
22    A. Lots of them.
23    Q. Have you mediated cases with
24 Mr. Grilli after the events in May of 2016

1 where you were visiting his office, and you
2 learned that he was going to be mediating the
3 Technology Training case?
4    A. Yeah, I've already testified about
5 that.
6    Q. No, no. Have you mediated with him
7 after that?
8    A. Oh.
9    Q. In other words, in the last almost
10 year and a half.
11    A. Yeah, I think so, sure.
12    Q. You still consider him a good
13 mediator? You're looking in the camera when
14 you say that. Be careful.
15    A. I'm under oath.
16    MS. LOEW: Objection to form.
17    THE WITNESS: He's a good mediator.
18 BY MR. COHEN:
19    Q. Have you ever known Mr. Grilli to
20 knowingly participate in a reverse auction?
21    A. Apparently.
22    Q. You're suggesting by reference to the
23 Technology Training case?
24    A. Yes.

1    Q. Do you have some reason to believe
2 that Mr. Grilli had knowledge of the respective
3 positions of the Buccaneers and the Cin-Q
4 plaintiffs in their mediation and settlement
5 negotiations as he served as mediator in the
6 Technology Training case?
7    **A. No.**
8    Q. In order to knowingly participate in a
9 reverse auction, wouldn't that be something
10 that he would need to have some advance notice
11 of?
12    **A. I don't think he would need to know**
13 **the specifics of the negotiating posture. He**
14 **was told by me that we were trying to stop this**
15 **because it was reverse auction effort on the**
16 **part of the Buccaneers, and that's all he**
17 **needed to know.**
18    Q. So not taking Mike Addison's
19 proclamation as the word of God and heeding it
20 and refusing to participate because Mike
21 Addison said so, makes him knowingly
22 participate in the reverse auction?
23    MS. LOEW: Object to form.
24    THE WITNESS: Yes. Not as God, but yes.

1 BY MR. COHEN:
2    Q. And I think this was covered with
3 Mr. Blonien, but I want to make sure.
4    Are you aware of any agreement
5 whatsoever -- and I mean the word agreement as
6 broadly as it stretches to reach the subject
7 matter of what I'm about to ask. Any
8 agreement, whatsoever, under which Anderson +
9 Wanca or Brian Wanca would be allowed to recoup
10 its expenditure of money to pay for M & C's
11 fees and costs in this litigation from any
12 settlement, if there ever is one, in the Cin-Q
13 class action?
14    MS. LOEW: Sorry. Can you read that
15 question back?
16    (Said question was read
17    back.)
18    MS. LOEW: Objection. Foundation.
19    THE WITNESS: Any agreement with anybody?
20 BY MR. COHEN:
21    Q. Any agreement, whatsoever, that would
22 enable or allow him to recoup the money he
23 spent to help M & C prosecute this case from
24 any settlement, if any, reached in the Cin-Q

1 class action?
2    **A. I'm aware of no agreement of any type**
3 **that fits within that parameter.**
4    Q. And am I correct you are not financing
5 and have not agreed to be responsible for any
6 of M & C's legal fees or costs incurred or for
7 any reimbursement or indemnification of any of
8 those fees or costs to be incurred in this
9 litigation?
10    **A. That's correct.**
11    MR. COHEN: Can we take a break? And I
12 think I'm winding down.
13    THE VIDEOGRAPHER: Off the record. The
14 time is 4:28.
15    (Recess.)
16    THE VIDEOGRAPHER: We are back on the
17 record. The time is 4:34.
18 BY MR. COHEN:
19    Q. Sir, we took a short break. We're
20 back on the record, and we are going to be able
21 to finish this up very quickly here.
22    MR. COHEN: For the record, during the
23 previous break, Ms. Loew and I had reached a
24 stipulation. I just want to make sure the

1 record reflects it accurately. Both in M & C's
2 previous production of documents that included
3 e-mails between Cin-Q, M & C counsel that seem
4 to identify Mr. Addison either as a recipient
5 in an e-mail chain or an actual sender of
6 particular e-mail communications, as well as in
7 some of Mr. Addison's subpoena production
8 compliance today that has e-mails similar
9 showing him as a recipient, participant or
10 actual sender of an e-mail, where the e-mails
11 so identify him, there's no dispute as to the
12 authenticity of the e-mails or of the
13 communications attributable to him, or that by
14 virtue of him being listed as a recipient he
15 would have been a recipient, correct?
16    MS. LOEW: Correct. In those productions,
17 that's correct.
18    MR. COHEN: Thank you.
19 BY MR. COHEN:
20    Q. Once again, I'm just stuck with two of
21 these. If you can let her take a look at this.
22 This is Exhibit 10.
23    (WHEREUPON, said
24    document was marked as

Thompson Court Reporters, Inc
thompsonreporters.com

1              Addison Deposition
2              Exhibit No. 10 for
3              Identification.)
4       **A.** Okay.
5       **Q.** Sir, what we've marked as Exhibit 10,
6 and I just handed to you and gave you a little
7 time to review, is an e-mail chain amongst
8 yourself, Mr. Wanca, Mr. Kelly and Mr. Harra,
9 and then at the -- toward the top,
10 Mr. Oppenheim is joined in, connect?
11      **A.** Right.
12      **Q.** And these are dated January 27 and 28
13 of 2015 and are addressing an upcoming
14 mediation session with the Buccaneers and,
15 among other things, the preparation of the
16 mediation summary, correct?
17      **A.** Right.
18      **Q.** And the subject heading says,
19 Mediation Summary and Court Order for Mediation
20 Proceeding?
21      **A.** Right.
22      **Q.** And the initiating e-mail is from you
23 on January 27th, 2015, correct?
24      **A.** That's right.

1      **Q.** What I wanted to focus your attention
2 on was the second sentence of your initiating
3 e-mail where you state, "Also, do you think
4 that we should jointly ask the court to enter
5 an order requiring/approving of the scheduling
6 of the mediation that we have arranged so that
7 it is the imprimatur of a court-ordered
8 proceeding. Under our state mediation
9 provisions, a court-ordered mediation (as
10 opposed to one privately arranged but not
11 sanctioned) has certain protections for the
12 participating in same." Did I read that
13 correctly?
14      **A.** You did.
15      **Q.** Am I correct that at no time
16 throughout the entirety of the mediation
17 sessions that actually occurred where the
18 Buccaneers came and participated was there a
19 court order for the mediation within the
20 meaning of your e-mail?
21      **A.** I don't recall, but I don't think so.
22      **I think the court did order the**
23 **mediation, and in the mediations everybody was**
24 **instructed at the outset of the -- terms of the**

1 **confidentiality, is that what you're saying?**
2      **Q.** I appreciate what you're saying.
3      My understanding is the
4 anticipated third mediation that was scheduled
5 to take place with -- Judge Anderson?
6      **A.** Well, no.
7      **Q.** I'm focusing on the one in June of
8 2016 where you all showed up and Mr. Mester
9 called in and notified -- confirmed what he had
10 previously notified you of, that he had a
11 settlement, that may arguably be pursuant to a
12 court order because Judge Porcelli said, I'm
13 sending in one -- another mediation session,
14 correct?
15      **A.** I think he expected us to be going to
16 **the second one, too.**
17      **Q.** Are you aware of any order by Judge
18 Porcelli at any time ordering the parties to
19 mediation?
20      **A.** I haven't gone back and looked. I'm
21 **not sure.**
22      **If there what was an order, it**
23 **would be in the court docket.**
24      **Q.** And to the extent you talked about

1 proclamations or acknowledgement of mediation
2 confidentiality at the start of each session,
3 those were private contractual agreements? For
4 example, the second mediation session, which
5 was August 31st of 2016, those would have been
6 the JAMS confidentiality agreement, correct?
7      **A.** It would be 2015, but, yes.
8      **Q.** Okay. Just may as well clear it up.
9 The first mediator was Mr. Max in 2015. The
10 second mediation was with Wayne Anderson August
11 31 of 2016, correct?
12      **A.** No, 2015.
13      **Q.** You're absolutely right.
14      **A.** I know I'm right.
15      **Q.** You're crushing my sense of myself. I
16 told you before, I hate being proven wrong.
17      The first mediation session was
18 in February of 2015 with Mr. Max.
19      **A.** Yeah, must have been, because I'm
20 **writing this on January 27, and it hasn't**
21 **happened yet, so...**
22      **Q.** So this was in anticipation of the
23 first mediation session with Mr. Max?
24      **A.** In Miami with Mr. Max.

1    Q.  And then the second mediation would
2   have been August 31, 2015, with Mr. -- with
3   Judge Anderson, correct?
4       A.  That's correct.
5       Q.  Just by way of example, at the August
6   31, 2015, mediation, what you were referencing
7   earlier about the acknowledgements of
8   confidentiality would have been something
9   embodied within the private contractual forms
10  of JAMS?
11      A.  Right, but it doesn't mean it's not
12  binding on the parties, and mediation priv
13  -- the point I was making here is that under
14  the state system in Florida, in Florida state
15  court, sometimes if you don't have a
16  court-ordered mediation, you don't have any
17  confidentiality, unless you agree to it as a
18  part of your contract with the mediator, and
19  that would be, you know, a few days in advance
20  of the session where everybody's committing to
21  it or at the start of the session, whereas I
22  think in federal court they deem it a little
23  bit more rigorously, if it's a mediation it's
24  confidential.

1       Q.  As you sit here today, are you able to
2   cite us any particular federal rule, whether
3   statutory or otherwise, that recites what you
4   described?
5       A.  No, no, I'm just saying, I just know
6   it's a little bit loser in the state system.
7       MR. COHEN:  Sir, I appreciate your time.  I
8   have nothing further.
9       MS. LOEW:  I have no questions.
10      THE VIDEOGRAPHER:  This concludes today's
11  deposition.  The time is 4:43.
12
13          (WHEREUPON, the deposition
14          was adjourned at 4:43 p.m.)
15
16
17
18
19
20
21
22
23
24

1        UNITED STATES DISTRICT COURT
            FOR THE
2        MIDDLE DISTRICT OF FLORIDA
3   MEDICAL & CHIROPRACTIC  )
    CLINIC, INC.,           )
4                           )
         Plaintiff,  )
5                    ) No.
     -vs-            ) 8:16-CV-01477-CEH-TBM
6                    )
    DAVID M. OPPENHEIM, et  )
7   al.,                    )
                            )
8        Defendants.  )
9       I hereby certify that I have read the
    foregoing transcript of my deposition given at
10  the time and place aforesaid, and I do again
    subscribe and make oath that the same is a
11  true, correct and complete transcript of my
    deposition given as aforesaid, with
12  corrections, if any, appearing on the attached
    correction sheet(s).
13
        Please check one:
14  _____ I made no corrections
             Number of Correction
15           sheets attached
16
        MICHAEL ADDISON
17
18  SUBSCRIBED AND SWORN TO
    before me this   day
19  of           A.D., 2017
20
21  Notary Public
22
23
24

1   STATE OF ILLINOIS  )
                       ) SS:
2   COUNTY OF C O O K  )
3       I, MAUREEN A. WOODMAN, Certified Shorthand
4   Reporter and Notary Public in and for the
5   County of Cook and State of Illinois, do hereby
6   certify that MICHAEL ADDISON was first duly
7   sworn to testify the whole truth and that the
8   above deposition was recorded stenographically
9   by me, and was reduced to typewriting under my
10  personal direction.
11      I further certify that the said deposition
12  was taken at the time and place specified.
13      I further certify that I am not a relative
14  nor employee or attorney nor counsel of any of
15  the parties, nor a relative or employee of such
16  attorney nor counsel nor financially interested
17  directly nor indirectly in this action.
18      In witness whereof, I have hereunto set my
19  hand and affixed my seal of office at Chicago,
20  Illinois, this 16th day of November
21  A.D., 2017.
22
23          MAUREEN A. WOODMAN, C.S.R.
24          License No. 084-002740

Thompson Court Reporters, Inc
thompsonreporters.com

**A**

**A-D-D-I-S-O-N**
5:14
**A.D** 296:19 297:21
**a.m** 1:20 4:7 27:8
129:6
**abandon** 74:24
**abandoned** 230:1
**ABC** 248:6
**ability** 10:24 63:11
152:3 154:10
170:17 203:3
**able** 10:21 31:5
62:23 83:15 88:24
131:4 248:14
258:13 288:20
295:1
**above** 217:22 218:7
268:22 269:2
297:8
**absence** 144:9
**absent** 36:16 71:8
75:3 76:16,18,23
90:20 95:4 136:14
202:4 213:1,12
215:3,9,23 216:7
216:12,20
**absolutely** 43:17
69:22 71:13 77:18
109:22 137:22
190:23 211:23
240:12 293:13
**absorbing** 122:18
123:11
**absurd** 219:23
**abused** 232:23
**accelerate** 274:14
**accept** 107:13 108:3
173:24 175:6
190:12 224:7
**acceptable** 224:9
**accepted** 24:11
51:13 109:4
190:19 227:22
**access** 32:19 151:18
151:18,19,20,21
156:6 179:5
**accessed** 67:16
**accidental** 265:11
**accidentally** 98:4
**accommodate**
138:24
**accomplish** 123:3
261:16 262:9
**accomplished** 32:6
96:18

**accomplishes**
266:14
**accorded** 80:9
**According** 227:24
**account** 62:6,9
**Accounting** 33:19
75:10 76:13 77:9
129:10 209:18
253:2
**accurate** 20:23
21:13,16 64:20
219:13,15
**accurately** 104:15
289:1
**accusation** 171:12
203:7,8 221:6
**accusations** 203:12
**achieve** 35:6 115:18
**achieved** 38:7
170:11
**acknowledge** 261:4
270:8,9
**acknowledged**
156:16
**acknowledgement**
193:10 293:1
**acknowledgements**
294:7
**acknowledging**
262:8
**acquired** 31:6
**across** 77:17
**act** 29:20 134:16
135:19 251:3
**acting** 66:15 92:12
**actions** 44:14 70:13
111:17 115:6
158:19 170:1
239:18 265:20
267:9
**active** 44:7,9,11,18
**actively** 128:14
257:16
**activities** 34:21
106:23 112:18
**Acts** 42:24
**actual** 63:5 118:24
188:4 190:3 210:8
238:12,15 276:14
276:15 289:5,10
**ad** 59:22 61:9 63:6
**Adams** 2:8
**add** 46:1 88:3 90:13
91:6
**added** 90:15 91:3
185:24 201:18

**addenda** 101:11
**addendum** 101:4,9
103:16,17 104:11
104:12,14
**Addison's** 286:18
289:7
**additional** 39:1
90:14,16 127:10
231:17,23 236:7
**address** 7:18 101:11
247:1,13,17 248:6
248:8
**addressed** 61:16
**addressees** 49:24
**addresses** 249:23
250:21,22
**addressing** 290:13
**adequate** 195:19
209:14
**adequately** 252:3
**adhere** 102:8
**adjective** 158:6
**adjourned** 295:14
**administered** 36:17
**admissions** 64:17
**admit** 64:19
**ads** 60:24 122:20
135:3 198:12
**adult** 56:23
**advance** 76:1,5
168:2 271:21
286:10 294:19
**advantage** 29:12
41:21 56:17
147:22 148:20
151:1 160:2
170:22,23
**advantageous** 40:7
121:2
**adverse** 201:5,8,12
201:20 202:2,7,17
**advertisement**
134:12 239:2
241:2,10 242:2
**advertisements**
29:19 184:20
241:4
**advertising** 60:18
**advice** 22:9 25:4
72:10,12 107:12
108:2 109:10,18
143:12 147:17
199:20 207:4,11
208:2 259:22
260:8 284:13
**advise** 21:22 103:20

109:15 127:14
147:11 197:2,16
199:17 206:19
275:14
**advised** 126:6
283:18
**advocate** 229:8,10
**advocated** 117:23
**affected** 179:19,21
**affidavit** 13:7
193:14
**affiliate** 81:20 93:1
**affiliated** 7:15 65:15
68:8 118:12,14,15
118:18,20 178:13
**affiliating** 82:24
**affiliation** 66:12
93:3,11
**affixed** 297:19
**afforded** 87:11
**aforesaid** 296:10,11
**afternoon** 21:10
52:9 53:11 54:5
**agent** 155:11
**agents** 141:18
**ago** 26:4,10 48:15
59:5 96:7 146:20
184:21 192:15,22
244:2
**agree** 79:5 96:15
108:6 143:10,20
171:13 172:1
175:19 194:18
198:4 201:15
227:9 228:7,15
229:10,12 231:7
254:18,19 260:11
260:17 261:4
284:16 294:17
**agreeable** 217:10
**agreed** 26:4 28:3
35:3,19 45:10
62:15 96:17 121:4
122:16 124:13
129:9 130:20
131:1 146:3
200:24 209:13
210:18 227:5
252:9,10 255:6
288:5
**agreeing** 213:7
259:5 267:1
**agreements** 9:23
10:5,11,12 14:20
82:3 84:15 87:4
99:11 100:20,21

102:16,20 131:14
143:1,5 144:22,24
196:3 293:3
**agrees** 92:24 93:20
104:20 273:23
**ahead** 38:2 41:7
135:17 175:8
**Airbnb** 27:15
**al** 1:7 129:5 296:7
**Alan** 133:14,17
**albeit** 135:23
**alert** 167:6
**alerted** 163:4
**allegation** 203:8
**allegations** 114:3
115:3 209:2
**alleged** 116:20
230:6 233:20
265:20
**allegedly** 117:19
265:19
**alleges** 233:23
**alleging** 209:2
**allocated** 79:15
80:10
**allocation** 81:12,17
105:2
**allow** 36:4 96:15
179:4 273:14
287:22
**allowed** 94:21 119:9
121:4 183:22
195:4 198:6
204:24 287:9
**allowing** 273:6
**almost** 285:9
**alone** 103:21 222:8
**along** 38:23 46:4
91:4 180:21 219:1
231:1
**already** 9:18 18:17
24:20 41:15 54:2
61:19 68:19 82:4
136:2 149:13
151:3 165:1
166:22 178:19
191:22 208:24
217:19 272:19
285:4
**alterations** 20:14
**alternative** 52:8
195:21
**although** 36:10
53:13 188:6 248:2
**always** 40:10,16
56:23 57:24 143:4

164:15 170:15
194:21 223:16
236:24
am 22:16 83:16
102:2 123:18
179:15 192:9
210:22 213:6
250:6 251:19
266:24,24 275:8
276:1 278:21
288:4 291:15
297:13
amazing 128:10
ambit 157:10
ameliorated 136:19
267:14
amend 88:3 96:20
amended 15:3 90:1
90:13 91:16
105:17,20,23
106:20 186:5
among 9:24 10:12
14:10 81:3 102:9
122:12,16 143:18
144:15 252:9
264:13 271:4
290:15
amongst 290:7
amount 36:13 117:3
130:16,24 136:14
137:6 168:1
170:14,16 211:15
230:11 239:6,7
274:17
analysis 263:17
and/or 189:3 232:18
Anderson's 49:16
50:2 51:2,8
153:14 163:4
217:16
anecdotal 249:1,9
249:11
announced 53:16
116:9 204:18
annoy 139:5
answered 6:8
125:21 165:1
178:19
answering 73:2
143:2 275:16
anticipate 27:11,13
27:16
anticipated 16:4
26:15 52:22 292:4
anticipation 26:3
293:22

anybody 67:18
73:22 155:13
178:2,3 180:19,21
208:9 238:22
254:13,17 287:19
anymore 49:23
248:9
anyone 15:12 23:19
27:21 28:22 67:16
68:24 70:3,18
73:24 106:17
113:6 114:4 115:2
116:4 118:15
119:4,6 154:21
176:21 178:13
189:1,1 236:11
280:21 281:16
anyway 91:5 157:24
193:14 279:6
apart 6:19 17:2
19:2 20:11 47:4
58:12 73:17,24
74:7 88:17 114:4
apologies 37:6
apologize 60:7
255:5,23
apparent 29:3
258:15
apparently 22:12
35:8 125:17,19,24
126:19 193:7
194:1 280:12
285:21
appeals 117:14
160:14,16
appear 128:6,6
appearance 26:16
APPEARANCES
2:1
appearing 28:6
296:12
appears 271:19
application 37:22
50:17 90:12 92:16
215:15
applied 228:3
applies 198:17
277:24
apply 241:1
appointed 214:15
appreciate 57:12
76:19 144:23
150:23 153:22
171:8 175:13
189:13 210:1
228:23 238:11

273:21 278:18
283:2 292:2 295:7
approach 108:7
276:4
approached 35:11
43:17 47:10 59:21
62:13 68:4 200:7
209:11
appropriate 12:4
39:14 81:17 109:1
137:3 194:20
205:15 233:8
262:23 265:8
273:22 283:11
approval 53:19
147:6 168:3 183:9
195:13 213:20
232:12
approve 205:18
234:4
approved 243:20
245:22
approves 137:20,21
approximately 19:1
April 153:5,9 157:4
163:1 174:8 217:4
219:11 254:22
255:7 260:14
261:14 262:6
arbitrary 269:1
area 150:12 192:24
280:10
aren't 101:3 176:17
204:9 233:7
arena 186:19
arguably 292:11
argue 198:12
argued 231:20
arguing 72:22
246:22
argument 135:9
265:10
arguments 206:13
207:20 231:15
235:17
arise 202:3
around 56:22 96:4
158:12 169:2
185:21 219:8,9
221:2 226:2
267:22
arranged 50:19
291:6,10
arrangement 11:12
12:5 104:1 211:17
211:20 212:20

arrangements 53:5
art 213:5
articulated 208:20
ascertained 223:5
aside 16:15 57:14
139:23 144:21
153:23 168:6
169:15 244:23
asking 66:17 72:23
94:21 109:14
124:22 125:1
173:21 176:15
205:21 207:3
208:9 210:19
217:11 233:17
243:24 252:19
254:18 273:13
aspect 262:10,14
assembled 9:13
assert 77:21 207:5
asserted 24:22
28:14 272:19
273:18
asserting 12:1 15:7
25:9 28:18,23
69:23 97:6 120:14
277:4,22,23
assertion 25:2 32:17
120:17 277:1
assessing 252:1
assessment 131:2
263:17 264:1
assigned 50:20 54:9
assignment 122:3,6
assist 93:2
assistance 143:12
146:17
assistant 49:22
189:7
associate 25:16
associated 139:21
Associates 7:9
assume 6:7 97:13
108:14 152:16
157:22 175:17
191:6 198:2
218:21 264:12
assuming 143:20
145:11 219:6
230:19
attach 19:6
attached 3:16 13:9
19:8 67:10,11
296:12,15
attempt 34:23
43:14 48:18

157:10 273:10
attempted 61:1
141:10 157:20
attempting 183:10
183:13 260:20
attempts 223:21
attend 54:8,10,11
272:5
attendance 8:8
attended 54:1
attending 191:4
attention 11:11
45:22 50:18 211:2
291:1
attorney's 24:2,5,9
93:4 109:17 197:5
199:20 207:11
attorney-client 9:11
21:24 22:24 24:16
24:23 25:1 26:9
26:12 83:6 100:10
109:14,20,23
110:2,6 143:21
144:1 146:22
147:13 197:1,15
199:3,16 214:21
attorneys' 80:15
212:4 244:7
255:2 260:21
attributable 289:13
auction 120:15
169:3,12,18,20
171:3,12,13,16
180:17 203:8
209:2 233:20,24
234:7,13,17
266:17 285:20
286:9,15,22
August 34:19 35:21
55:24 56:3,14
60:5,6 128:8
129:6 134:10
135:2 182:8 196:8
196:11,13 271:12
271:22 293:5,10
294:2,5
authenticity 289:12
authored 226:19
authority 57:21
193:17 194:7,19
195:4 225:15
authorization 147:6
authorized 226:13
automobiles 89:17
92:8
available 60:16

67:15,21 68:24
69:1 155:14 171:4
178:6,9 223:15
281:23
avenue 203:14,15
203:17,19
avoid 6:1
award 80:1,14
awarded 79:14
away 274:16
awhile 167:10
AWMA 271:1

**B**

B 3:9 101:4 104:12
baby 169:1
back-channel 36:5
backed 50:23
189:23 192:8
background 59:20
115:15 151:23
backwards 184:4
bad 159:22 186:16
bag 52:14
Bais 160:13,19
balance 79:21 80:18
ball's 270:13
balloon 225:14
bank 62:6,7,8
bar 104:10,17 187:5
bar-approved
187:3
Barkin 6:23
barred 41:15 68:16
120:22 181:19
Barry 2:7 4:15
Barry@blonienle...
2:9
base 203:11
based 58:17 108:21
134:19 160:11
185:6 190:1
209:23 229:6
233:14 248:15
251:14
bases 47:20
basically 31:3 33:8
33:24 55:13 64:17
107:3 116:23
122:17 123:1
244:6
basics 5:21
basis 12:16 21:23
22:13 25:8 28:7
28:13 29:6 32:16
32:18 47:15 49:12

69:23 94:12
120:17 179:17
184:13 197:14
234:2,13 249:8
268:4 275:15
283:5
Bates 270:24
bath 169:1
Bay 10:1 12:8,20
13:13 14:11 29:18
37:11 41:1 64:24
65:5 74:3 95:16
107:1 108:8 109:8
111:6 122:4
217:15 222:1
beat 240:10
became 66:14
become 59:13 96:24
becomes 272:14
becoming 259:24
beforehand 159:5
began 25:7 75:17
begin 23:1 75:14
95:20
beginning 39:21
275:3 283:15,17
begins 4:1 211:8
begun 26:9
behaved 151:9
behavior 232:1
believed 40:7 41:1
130:22 161:9
248:6
believes 49:1
believing 47:15
below 125:23
268:14,22
beneficial 233:1
259:21
benefit 232:19,20
besides 118:23
best 21:14,16 39:6
135:13 169:16
203:17,19 250:24
251:2,6
bet 272:10
betrayal 233:6
better 25:7 83:15
84:6 171:6 175:11
204:23 205:8
206:3 247:16,20
264:10
beyond 216:10
235:10 265:18
bidding 171:16,20
bids 171:14

bigger 281:24
Biggerstaff's 186:13
billing 11:4,7
billion 135:24
219:12,24 220:18
bind 171:7
binder 15:21 16:24
145:17
binding 294:12
bit 78:8 101:2
172:23 294:23
295:6
blame 170:18,21
blast 155:12
blind-sided 167:9
Blonien's 143:3
147:19 200:6
227:3
blurt 279:7
board 93:16
Bock's 51:4 68:1
120:18
book 16:19
bookends 268:9
both 87:23 92:7
168:16 170:10
182:11 185:2
214:13 215:8
228:19 279:14,24
280:12,14,16
281:7 289:1
bothered 242:18
bottom 92:20 271:1
bracket 274:14
brain 152:2,17
breach 112:7 115:7
116:5 128:18
230:6 233:5 234:2
234:13,15,17
277:18
breached 282:2
breaching 272:21
break 54:15 55:5
140:6,13 148:5
212:3 263:3,10
288:11,19,23
breakdown 102:21
105:16 237:10
bridge 36:6
briefed 218:4
briefing 52:23
69:17 151:20
briefly 85:10
bring 42:19 43:13
43:18 45:7,8
50:18 72:15 151:7

204:18
bringing 37:8,9
42:12
brings 225:6
broad 218:1
broadcast 29:18
43:5 45:21 46:4
47:7 62:4,21,22
64:3 112:5 135:15
241:16
broadcaster 62:5
65:2,7
broader 232:17
broadly 279:4 287:6
Brooke 189:8
190:16
Buccaneer's 176:11
Buccaneers' 39:7
51:14 155:11
157:10 224:8
226:19 267:9
Buccaneers/Cin-Q
223:6
Buccaneers/Tech...
190:18
Bucs 61:24 62:3
107:15 117:20
175:1,1 217:15
225:24 226:1
236:2,10,15 259:6
280:1
Bucs' 225:13
bundled 165:22
buries 238:12
business 62:22
98:19 238:22
242:15 247:22
248:17 251:4
businesses 248:2
buy 59:23

**C**

C's 14:8 95:7
120:14 147:7,8
182:16 199:22
200:2 214:8
221:11 233:10
277:6 287:10
288:6 289:1
C-A-S-E-Y 5:12
C.S.R 297:23
Cairo 29:2
calculable 233:7
calculation 212:21
call 35:16 130:19
131:3 213:11

280:7
called 1:11 5:3
10:20 42:18 65:12
192:2 255:13
292:9
calling 199:16
calls 252:6
came 10:24 11:15
15:20 38:16 48:14
91:4,8 141:10
149:6 180:21
193:20,24 224:2
226:4,14,18 227:8
236:5 253:6
254:12 281:5
291:18
camera 285:13
campaign 60:19
171:1
campaigns 241:15
241:16 264:3,4
can't 40:17,18 71:4
71:6 73:22 74:17
78:9 110:13 142:4
144:13 152:17
170:18 172:14
216:1 227:9,23
228:7 229:8,10
232:10 238:9
250:2 264:6 269:4
273:12
cancel 51:5
cannot 110:3,7
capacity 111:6
112:15
Capital 217:23
218:8
capitalized 275:19
caps 275:9
caption 192:23
193:1
captures 171:11
care 51:16 52:21
81:14 114:17
career 44:6,8,20
careful 143:3
192:24 251:8
260:3 285:14
carefully 192:19
249:12,15
Casey 5:12
cat 52:13
catch 161:4
categories 9:20
cause 63:21 215:9
caused 32:15 42:5,5

235:20
caveat 226:21
CD 9:14 140:21
141:8 142:5,8
Central 45:3,9
cents 150:3
cert 218:3
certain 38:5 40:3,4
102:7 149:16
165:9 168:1
176:14 243:13
244:2 248:7
251:11 291:11
certainly 42:18 69:1
103:2 190:11
202:18 280:3
certainty 238:7,18
certifiability 216:23
241:24
certificate 171:23
certification 38:3,10
38:14 39:4,8,12
39:13 40:3,6,15
40:20 41:2 52:24
53:20 60:10 67:8
215:21 236:1,3
237:15 238:7,16
238:18 263:15
certified 39:5 61:8
63:13 70:16,24
73:12 102:14
214:15 215:1,4,5
216:19,24 235:14
236:10,16 238:5
239:20,23 240:8
240:12,14 297:3
certify 163:10 238:9
296:9 297:6,11,13
cetera 64:20 122:23
135:14 209:3
242:3
chain 271:9 289:5
290:7
chains 154:3
challenge 185:6
203:10
challenging 139:2
chance 85:10 133:6
136:11 230:10
change 35:8 46:16
162:14 265:17
changes 6:16
characteristic
238:20
characteristics
263:20

charge 122:10
259:6,7
charging 26:21
174:12,22
Charlie 7:1
check 62:2,6,12
114:23 242:19
296:13
checked 68:1
Chicago 1:18 2:4,14
4:12 5:13 33:16
35:10,21 53:4,7
271:12,20,21
297:19
Chinese 170:21
Chiro 9:19 14:3,23
42:4 53:8 62:16
64:5,7 65:13
75:18 82:16 85:5
90:24 91:4 115:11
141:17
Chiropractic's 28:8
94:5
chronological 89:20
127:22
chronology 75:16
Cin-Q's 37:10
182:17 185:10
Cin-Q-related
156:14
circle 60:1
Circling 197:24
Circuit 48:14,22,24
69:9 117:11
160:14,15 253:6
circumstance 235:5
circumstances
81:18
cite 295:2
Civil 1:13
claimant 243:11,13
243:21
claimed 53:12 61:2
claiming 270:9
277:11
claims 28:8,17,22
34:11,15 36:17
37:10,11 70:9
93:22 95:7,10,15
100:17 104:22
117:6,8 136:16
185:16 199:23
250:5 264:19
clarification 76:19
225:2 277:1
clarify 16:5 53:21

143:4,6
clarifying 74:4
76:10
Clark 1:18 2:3
class-wide 170:12
claw 273:10
clawback 273:24
clear 129:15 148:17
178:11 197:17
251:8,21 261:5
293:8
clearly 180:10
219:12
Clearwater 33:17
Clement 62:11,17
62:20 64:1 65:12
65:14 66:21 75:18
111:10 112:3
143:17 144:17
196:16,18,20
199:2
client's 10:15 93:6
184:16 194:22
195:14
clients 10:6,11 42:4
45:13 51:21 79:8
80:4 96:2 110:20
119:5 120:5,11
129:5 228:19
229:13 252:22
253:10,19
clinic 1:3 4:4,20
70:2 103:8 296:3
co-counsel 11:15
70:5 71:17 91:8
128:11 236:14
257:14 280:19,23
281:19
coin 184:7
collaborate 61:20
collaboration
138:15
collect 43:3
collusion 203:9
combination 170:10
come 46:4 146:14
209:8 210:5 219:1
250:5
comes 45:22 150:12
210:24 222:3,11
250:10 266:13
coming 77:17 254:3
commence 266:8
comment 279:12
comments 187:11
261:14

commit 219:2
committing 294:20
common 79:7
253:20
communicate 176:4
189:9
communicated
161:12,13,15,16
178:14 189:19
190:21 225:10
236:15
communicating
161:17
communication
163:19 173:17,22
189:14 218:6
236:13 276:3,16
281:16
companies 44:14
company 47:10
143:10
compare 18:1
compared 101:2
142:5
compelled 101:14
compensate 81:16
compensated 180:4
compensation 36:21
57:3,5 63:15
117:9 194:3
competing 120:21
157:14 202:4
complain 189:21
complaints 33:10
complete 55:2
296:11
completely 154:9
167:12
compliance 140:17
141:11,24 145:6
145:24 271:6
289:8
compliant 187:13
241:19
complies 187:4
comply 239:3
component 251:23
252:14
comprises 142:9
computer 155:3
156:13
concealed 128:14
concede 270:7,11
conceding 267:17
concept 169:11
171:13 201:6

224:7,8 261:7
concerned 57:24
125:15 206:8
216:20 254:24
concerning 16:23
concluded 117:16
211:12
concludes 295:10
conclusion 47:20
49:12 150:19
177:19 238:13,14
264:4
conduct 50:22 58:8
58:10 130:24
134:4 135:16
265:23 271:22
conducted 35:23
conducting 190:17
conduit 173:20
225:5
confer 195:12
conference 35:16
51:21 164:3 252:6
255:12
conferred 72:14
confidential 85:22
85:24 86:3 129:13
191:13,20 218:9
218:11 219:16
220:12 221:7,14
222:5 223:8
253:24 260:22
261:9 262:11
273:4 294:24
confidentiality 87:5
292:1 293:2,6
294:8,17
confirm 47:22 48:10
141:1
confirmed 49:20
292:9
confirming 49:17
49:22
conflating 256:13
256:14,20 258:20
conflict 29:3
conflicted 229:14
conflicts 239:10
confuse 256:16
confused 67:20
confusing 79:3
connect 290:10
connection 11:21
17:7,10 23:11,20
26:16 27:20 28:15
67:7 111:9 112:4

112:15 114:9
121:17 139:11
143:13
consensus 228:21
228:24
consent 41:17 90:24
93:7 106:13
182:17,20 185:1
185:14 194:22
215:16 242:6,9
264:6 270:6
284:10,16
consented 283:23
consequences
232:18
consider 230:14
282:18 285:12
considered 215:3
consistent 101:22
144:16 162:2
167:12 188:5
consolidate 283:8
283:13
consolidated 33:11
33:21 209:19,21
211:9
conspiracy 198:14
constitute 115:7
constitutes 141:9
constitutional 50:8
251:11,15
construct 228:4
consult 147:5
consultations
109:12
consulted 72:1
146:6 210:11
Consumer 29:20
42:24 134:16
135:19
contact 43:6 60:2
114:7 146:14,15
contacted 43:19
51:2 60:5 114:21
157:12 196:10
contacts 62:4
contain 78:14 105:2
145:7 156:16
contained 30:11
31:8 63:5 156:13
containing 140:23
contemplates 171:3
contend 95:5,9,14
content 173:21
179:6 192:20
contention 33:4

94:8 131:20
contents 17:22
context 13:23 73:9
74:8 103:9 117:4
118:21 119:8
121:4 169:22
208:7 215:14
218:18 220:4
222:7,19 228:4
231:15 238:17
247:20 257:15,24
259:24 278:1
contingency 11:8,18
84:20 102:20
contingency-fee
102:16
contingent-fee
103:19 104:4,11
continue 140:14
163:15 174:20
270:20
continued 217:16
continuing 162:6
198:11,16
contract 103:19
104:5 139:10,13
143:24 144:4
294:18
contractual 293:3
294:9
contributed 235:21
control 174:16
conundrum 61:16
convenient 180:16
conversation 25:18
25:20 72:20 96:10
164:1,4 256:21
257:6
conversations 25:15
72:24 109:6
257:10
convey 22:4 72:9,12
72:13 176:2 258:4
conveyed 172:16,18
173:5,22 236:13
convoluted 155:1
Cook 1:16 297:5
cooperating 65:24
coordination
273:10
copied 49:5 58:20
155:3 156:13,22
259:2
copies 15:23 82:2
177:23 269:13
coplaintiff 64:7

coplaintiffs 82:18
copy 8:6 16:1 62:2,5
77:13 97:2,12
copycat 31:3 33:8
33:23 34:10 50:13
corner 249:3
Corporation's
248:6
correction 296:12
296:14
corrections 296:12
296:14
correctly 38:8 91:17
93:8 104:5 129:17
133:8 272:7
291:13
correlation 249:8
correspond 45:16
corresponded
279:24
correspondence
11:4 13:8 17:6,9
133:17
corresponding 18:5
cost 27:12
costs 139:20 287:11
288:6,8
couldn't 41:16
61:10,13,23 124:3
163:15 220:1
225:12 242:13,14
counsel's 213:1,14
counter 107:14
counterproductive
158:9
countersign 88:19
countersigned 85:2
country 266:7
County 1:16 297:2
297:5
couple 50:2 60:23
61:19 130:6
155:22 243:2
251:7
coupled 63:23 222:6
course 44:6,8 62:11
97:20,23 133:16
court-ordered
291:7,9 294:16
Courts 1:14
cover 192:18,19
covered 101:3 151:3
246:9 260:23
287:2
create 261:3
created 29:12 141:5

147:23 148:21
151:2 160:3 242:8
creates 245:12
creating 245:11
264:18
creative 278:7
credit 274:17
criticism 166:4
258:16
criticizing 187:6,7
210:23 226:8
246:7
cross-checked
141:7
crushing 293:15
currently 7:11,15
cut 200:23
cuts 200:24

D
D 3:1 87:1
D-A-L-Z-E-L
255:14
Dalzell 255:14
damage 42:6 47:5
138:18
damaged 134:3,7,8
136:20 265:22
damages 136:18
233:7 239:5 264:8
267:14
Dan 4:17 22:20
140:11
Daniel 2:12 158:13
Danieljaycohen20-
2:15
dark 225:14
data 17:21 122:21
155:9,14
database 46:1 63:10
243:18 247:21
date 4:5 19:9 26:4,8
38:5,10 51:16
90:3 162:23,23
163:6 243:20
244:2,4 248:7
dated 87:23 214:7
271:12 290:12
dates 75:17 160:23
David 1:6 2:10,19
4:16 57:20 115:22
116:12 132:22,24
136:8 149:5 151:6
151:8,11,13
152:22 154:1,22
156:2 186:1 235:2

271:20 272:16
274:10 296:6
day 1:19 35:24
50:21 52:16 53:10
53:11,16 54:8,11
61:9 170:21 191:1
193:13 196:14
243:13,16 271:16
296:18 297:20
days 38:11,12 95:23
95:24 96:2 130:6
138:14,14 236:4
294:19
DC 160:14,15
deal 90:18 171:6
239:19
dealing 104:9 174:3
216:15 225:1
232:13 258:10
dealings 43:20
257:23
decide 174:4 203:23
227:11 228:2
230:15
decided 35:8 52:12
105:7,9,12 146:8
188:19 208:4
deciding 205:22
230:18
decision 34:22 36:4
48:14 81:19 109:3
117:11 160:15
214:2
decisions 16:22
130:5
declaration 162:1
declaratory 44:14
declared 37:20 38:2
117:20 161:7,12
161:24 162:6
163:14 164:23
165:23
declaring 36:2
declined 281:2,4
deem 294:22
deemed 86:3 166:23
defend 60:15
defendant 2:10,16
40:12 45:19,20
94:17 132:11
135:23,23 169:23
170:7,15,17 171:5
171:17,17 174:22
180:13 239:21
267:6 272:12
defendants 1:8,11

93:23 104:22
196:21 218:1
296:8
defense 136:1
179:14 237:10
242:5,12
defenses 235:12
267:6
defined 144:22
definitely 268:15
definition 160:12
definitive 226:14
delay 234:20,20
235:13,22 236:7
269:11
delayed 117:13
236:3
delays 235:23
delete 98:1
deleted 98:4
delineation 165:9
delivered 144:5
demand 172:7,9,11
173:1,5,9,24
174:6,24 175:6,7
175:11,20,22
176:3,9,23 177:18
178:17 179:8
274:11 276:15
demanding 74:21
demands 259:10
270:3 278:4
demonstrate 29:22
55:10 242:14
denied 214:8 255:7
255:18 283:14
deny 254:21 255:3
256:11 262:8
denying 52:18
213:18
depends 111:10
deposed 5:18
deposing 139:16
deposition's 146:10
depositions 1:15
76:4 139:4
describe 48:10
56:19 143:7
154:17
described 42:20
50:7 154:15
212:23 260:19
262:8 295:4
describing 267:3
description 58:12
171:10

designated 273:3,4
designed 117:6
239:19 244:7,21
250:4
despite 128:13
destroyed 136:11
detail 210:2
details 148:18
149:13 175:21
177:17 178:16
determination
234:7,10 284:1
determine 8:16
78:10
determined 20:22
79:7
determines 234:6
Detroit 7:4
developed 56:18
development
241:18
dialed 63:7
dialogue 37:14
130:8 212:23
278:7
die 240:9
difference 150:8
248:19
differences 282:13
different 7:7 43:15
58:11 70:18 72:23
100:22 104:2
109:11 170:4,5
205:19,20,20
215:2,6 216:3,8
217:9 224:20
253:17 259:10
282:7,17 283:7
differently 157:16
247:5
difficult 117:7 146:8
225:16 235:11
digesting 192:19
dinner 76:5
directed 281:11
directing 259:19
direction 98:14
165:7 297:10
directly 100:1 106:3
106:15 131:22
132:2 154:22
161:18 173:15,18
175:3 176:1,5
189:9,15 216:15
297:17
disagree 108:24

214:18,19
disagreed 108:11,15
disagreement 29:13
147:23 148:8,21
148:22 149:4,20
151:2,5 160:3
193:23
disagreements
149:17
disallowed 226:17
disapprove 234:4
disband 71:7
disclosed 156:4
219:21 274:2
disclosing 219:16
220:12 221:22
261:8
disclosure 97:10
220:4 222:4 223:2
253:23
discovered 48:2
50:3 59:4 116:10
discovery 15:23,24
26:15 28:4 60:16
62:18 63:4 64:12
64:15,22 114:10
114:23 122:19
123:2 133:5
134:22 139:4
196:22 206:15
279:17
discrete 44:24
discretion 57:22
discuss 72:18,19
114:3 227:10
228:1 250:7
257:14
discussed 30:7
113:14 114:6
119:10 264:17
discussing 30:6
100:1 153:10
252:7 264:15
discussion 48:16
106:1,2,9 108:13
108:15 153:13
165:3 193:16,22
210:7 218:17
219:19 227:8,23
276:11
discussions 14:7
24:16 37:3,18
40:8,11 112:22
115:17 147:13
155:17 163:16,24
220:22 224:3

257:12 274:15
277:17 278:5
disguise 48:3
disk 8:22 9:1,6 63:5
78:9 84:16
dismiss 71:7 74:23
181:18,20
dismissal 253:5
dismissed 52:17
63:16 129:11
166:7,23
dismissing 250:6
displayed 192:4
dispose 117:3
disproving 218:2
dispute 51:3,9
289:11
disputes 63:4
282:20
disqualified 232:9
disrespectful
128:17
dissatisfaction
153:14
dissatisfied 194:2
dissect 222:17
disseminated 274:2
dissuading 245:13
245:14,17,18
distinction 76:22
150:7,22 165:10
205:12,14 265:13
distinctions 281:22
distinguish 18:13
distinguishing
238:20 263:20
distribution 102:21
89:18 296:1,2
division 17:12 66:7
78:15,19 80:1
83:2 99:22 122:12
123:8 200:16
divisions 212:11
divulgence 253:23
divulging 221:14
divvied 79:2
docket 50:6 67:16
89:16 91:7 107:2
133:23 186:11
223:5 292:23
doctors 78:13 82:8
82:9 248:22 253:2
253:4
document's 97:9
documentation

156:21
Doe 247:9
does 89:23 92:11
100:8 105:2,5
107:2 122:8
125:13 133:1
173:4 228:9
240:24 241:1,12
247:24 248:20
249:22
doesn't 97:12,14
126:22 136:19
153:10 170:21
198:22 201:21
202:6,24 203:3
208:14 217:14
222:19 228:6
229:9,11 240:3,4
250:15 253:13
268:11 294:11
doing 52:7 61:23
75:5 96:5 158:4
159:14 174:11,17
190:13 202:15,16
250:19,20
dollar 258:2
dollars 79:9 135:24
137:1,4,7 150:3
219:4,12 220:1,18
268:19
done 38:4 41:19
46:16 47:6 54:13
64:12,14 79:11
107:3 115:9 160:9
162:3 209:20
234:17 240:1
249:12,15 278:8,9
284:8
doubt 213:17
down 148:5 165:8
171:21 188:9
191:17 192:15
227:8 228:19
235:21 265:6
268:21 275:8
276:10 278:21
279:2 288:12
downloaded 156:22
dozen 60:23
drafting 112:24
draining 139:2
draw 150:7 154:10
157:8 211:2
drawing 76:21
205:11,14 268:14
drawn 247:22

281:21
drifted 62:1
drifting 37:22
drive 197:8 199:4
drop 229:14
drug 47:10
dual 242:3
duces 140:18 142:1
145:6 271:7
due 163:11 181:2
251:11,15
duly 4:24 5:4 297:6
during 13:3 18:9
32:6 55:5 115:10
155:11 176:10
193:18 227:2
244:12 288:22
duties 71:1,3,19
73:4,7 76:22
101:17,23
Dykema 7:3,5
dynamic 228:23
269:4

**E**

E 3:1,9 87:1
each 6:3 70:14
78:13 81:24 82:8
82:8 103:13 104:4
130:14 200:23
209:7 210:15
222:14 232:20
293:2
earlier 58:13 69:16
90:18 147:19
198:18 204:24
217:5 226:6
263:23 264:21
294:7
earlier-filed 280:13
early 55:19,21
173:11 185:1
257:8,8
earning 57:3
ears 164:9
easier 156:19
187:19
easily 155:9,15
259:9
effect 114:24 170:13
185:15 186:3,8
192:3 209:20
232:3 245:13,14
245:17 267:13
281:24 282:14
effective 102:8

258:12
effectively 102:11
effort 90:18 138:21
167:8 246:18
286:15
efforts 32:6 37:18
38:6 50:15 63:4
161:10 165:4,10
165:11 189:21
217:16
ego 58:2 255:18
256:23 257:4
262:19
eight 136:21 244:1
248:18 256:5
either 9:11,18 10:24
11:6 27:20 36:1
116:17 126:7
160:20 163:15
165:17 196:14
214:13 230:4
240:14 245:6
282:13 289:4
electronic 17:20,21
18:22 58:20
electronically 92:2
Eleventh 48:14,22
48:24 69:9 117:10
253:6
eliminated 42:1
email 7:18 13:2
embodied 294:9
emergency 51:12
employed 47:24
48:8 118:19
employee 297:14,15
employees 119:3
employment 254:23
enable 287:22
end 32:9,21 128:5
173:8 190:20
210:24 255:14
endeavored 36:8
ended 158:4,20
159:11 167:17
190:21 195:1
ends 8:14
energy 138:12,23
180:23
enforceability
179:22
engage 163:23
engaged 17:6 58:7
58:10 60:15,19
engagement 81:24
82:23 125:21,22

126:3,19,21
252:24
engaging 166:13
enjoin 48:18 52:11
159:2 166:11
167:1,18,20
enjoined 232:14
enough 54:10 149:7
155:21 161:19
246:11
enter 291:4
entered 15:2 80:23
81:6 82:14 181:9
entering 195:1
entertain 40:10
entire 21:1,3 31:14
141:9,16 186:14
entirety 291:16
entities 100:18
entitled 63:14 87:4
118:2,7,16,23
119:16 120:7
138:4 209:16
210:6
entitlement 261:11
266:11
entity 111:22 112:1
197:21 201:17
envision 228:18
episodes 155:12
equation 158:7
escape 41:10
especially 139:3
230:24
establish 25:6
122:21 242:14
established 24:20
24:21 238:22
242:15
et 1:6 64:20 122:23
129:5 135:13
209:2 242:3 296:6
ethically 52:12
ethics 47:2
evaluate 205:16
233:18 262:24
evaluation 263:17
even 10:13 70:24
72:9 76:2 110:15
184:21 193:9
215:21 216:22
218:12 226:16
235:23 238:24
249:17 252:9
264:8 277:5,9
282:11

event 38:24 79:10
79:13
events 157:9 167:13
172:2 187:21
284:24
eventually 17:16
34:22 37:4 38:1
62:8 189:23
209:20 224:19
every 39:4 40:4,5,20
63:7,8,8 102:23
135:5 136:5
155:10 164:11
171:11 237:2
238:19 249:3
263:19
everybody 61:9
171:7 180:13
240:7,9 248:20
249:24 259:4
291:23
everybody's 294:20
everyone 73:15
everything 6:4
135:12,13 141:10
211:1 275:5
evidence 150:9,10
150:17,18,20
153:21,21,24
160:7 164:19
176:13 177:15
178:15 200:12
203:11 206:14,15
207:20 237:16,17
237:23 242:21
264:2
evidentiary 15:22
16:6 42:15
exact 41:12 148:7
161:2 277:14
exactly 39:18 56:15
65:20 165:21
173:2 206:2
222:24 230:13
257:1,3 267:2
274:21
examination 1:12
3:4,4 5:7 140:9
examined 5:4
example 103:6
177:11 218:22
219:22 293:4
294:5
exceeded 180:11
Excel 17:17,22 19:7
19:13 25:23

except 18:19 50:13
87:13 183:13
189:7 248:22
258:17 262:21
exceptional 136:5
267:8
exchange 216:1
222:17
exchanged 69:6,8
116:15
exchanges 48:21
exclusion 256:10
executed 82:1 96:19
exercise 174:22
exist 97:14 253:14
existed 32:14 36:7
113:12 167:2
193:10
existing 47:6 53:15
126:3 150:19
172:5 182:20
202:1 261:16
283:9
exists 10:4 25:9
88:17 249:5,7,17
expanse 268:9
expect 136:17
137:12 208:8
267:12
expected 292:15
expended 90:18
expenditure 287:10
expense 204:22
expenses 122:18
123:2,11 139:21
experience 108:21
169:9 248:15,24
249:10,11
experienced 62:22
101:20 102:12
169:8 181:5
239:10
expert 67:6,7,8,11
119:7 133:4
164:13 179:19,24
180:4 249:6
experts 133:5
expired 184:23
198:8 248:10
explain 94:12 103:4
158:7 172:10
240:17 243:5
explained 282:4
explanation 144:9
149:22 278:24
281:16

explore 278:20
export 17:13
exported 25:23
  115:13,22 179:1,3
exporting 17:17
exposing 135:7
exposure 244:8
expressed 194:23
  241:7,11 242:6
expressing 164:20
  189:2
extended 163:12,13
extension 38:13,16
  39:1
extensive 281:8
extent 10:4 58:3
  76:16 109:13
  137:19 147:12
  167:11 196:24
  199:15 206:18
  208:5 214:13
  242:5 249:5,6
  252:13,14 260:2
  270:12 272:17
  277:18 292:24
extracted 167:4
extremely 210:22

**F**

F 87:1
F-A-R-R-I-S 218:3
face-to-face 15:17
  15:19
facsimile 59:22
  122:20
factors 238:15
  263:16
facts 22:4 25:6
  29:22,24 30:20
  42:10 55:8 68:23
  115:2,5 116:5,7
  116:11 151:10
  152:21,24 156:1
  157:2 160:6 176:8
  210:4 211:4
  238:17
factual 32:16,18
  153:24 178:14
  179:7 282:19
factually 220:10
fail 252:4
failed 128:11
failure 242:11
  246:24
fair 6:9,10 70:11
  97:13 136:12,23

137:3 144:11
154:9 155:21
156:23 159:17
161:19 168:16
175:2,17 195:11
208:19 211:20
231:2 284:12
fairly 181:3 225:10
fairness 203:10
  204:21 233:19
faithful 255:24
fall 33:20 56:7,11
  56:11 64:9
falling 158:11
familiar 5:21 28:11
  101:18 102:10
  128:21 160:16
  169:11,14 215:11
  215:15,19 251:9
  252:5 261:6
fan 222:2
far 159:18 179:6
  190:15 226:22
  232:19 265:6
  279:18 280:16
Farris 218:3
fashion 211:9
favor 231:10
favorable 41:13
  117:1 230:9
favorably 39:7
fear 272:13
feasibly 61:11
feature 264:16
features 172:2
February 32:8
  64:10 107:4
  293:18
fee 11:5,8,18 12:4,5
  79:6,7 81:15
  84:21 88:20
  102:20 209:23
  211:14 262:16
fee-sharing 103:24
feedback 46:1
feeds 58:2
feel 202:14 267:3
feels 239:21
feet 235:4
felt 57:4 61:7 174:5
  259:23 265:21,23
few 5:24 57:12
  197:24 237:8
  294:19
fiduciary 69:20
  73:16,23 74:10,16

75:2,8,13 76:12
76:14 112:7 115:7
116:6 214:22
215:12,16,22
216:4,6,10 230:7
233:5 234:2,14,18
field 249:13
figure 17:13 25:24
  158:13 281:6
figured 17:16
figures 269:1
file 32:15 38:1 39:17
  43:11 47:12 89:24
  90:10,12 96:16
  105:17,19 106:20
  113:16 157:13
  163:12 186:5
  192:11 244:22
files 17:5 114:23
  155:3 156:13,21
  177:24 178:1,1,24
  179:3 243:17
filing 38:12 41:8
  47:18 49:14 50:7
  50:16 55:11 59:6
  68:13 92:13
  120:24 157:23
  158:17 160:8
  163:6 168:2
filings 48:17
fill 244:22 268:18
final 132:11 133:7
  133:14
finally 36:10 63:4
  130:2 204:17
financially 297:16
financing 288:4
find 39:17 43:5
  144:14,19 171:6
  249:23 257:2
fine 54:16 270:18
finish 288:21
Firm's 160:7 186:18
firms 81:8 93:2
  104:2 126:9,14
  216:19 253:18
  280:17
fit 270:16
fits 288:3
five 44:17 45:5
flat 268:23 269:3
Flew 27:7
flight 27:7,9,12
flipping 193:5
floated 225:20
floor 272:14

Florida 1:2 26:24
  27:2 33:18 45:2,3
  45:8,9 56:12
  75:21 87:6,13,14
  89:18 101:14
  102:16 104:9,10
  104:17 146:10
  294:14,14 296:2
fly 27:4,6
focus 37:12 49:10
  291:1
focused 66:19
  234:19 256:9
focusing 210:3
  250:13,16 292:7
Foley 2:2 4:11 8:23
  9:16 17:21 18:20
  25:17 26:21 27:20
  27:24 113:20
  140:16,22 145:22
  146:11 271:5
folks 64:2
follow 22:1 147:16
  186:10 197:4
  199:19 207:11
  240:21
follow-on 37:13
  44:15
follow-up 161:8
  278:14
followed 36:21
following 22:9 37:15
  53:10,17 86:2
  109:17 117:10
  161:21
follows 5:5
foregoing 296:9
forgives 256:1
formal 194:11
format 36:11,24
formation 25:5
forming 49:11
forms 294:9
formulating 113:3
forth 151:22 172:20
  259:8
forthcoming 206:12
  207:18 208:23
  221:20 231:5
  232:12
forum 205:15
forward 40:8 50:16
  52:11 159:20
  165:6,18 167:19
  168:7 204:11,19
  232:7 250:5 254:3

forwarded 133:10
forwarding 248:9
fought 164:10
found 47:8 50:13
  52:7 53:10 62:10
  62:20 68:2,12,19
  157:16 188:10,20
  257:22
foundation 28:10
  30:13 94:14
  100:15 116:22
  269:9 287:18
four 45:4 103:17
  104:15 201:9
  203:22 229:12
four-year 240:2,5
frame 31:23 163:8
frankly 34:24 208:5
frequency 248:21
front 16:6 36:20
  50:20 53:1 69:18
  88:22 127:21
  165:12 166:20
  192:11 203:22
  204:12 207:23
  217:24 230:20
  231:10,16 233:11
  243:8
frustrating 38:20
Frye 6:23
full 5:11 35:24
  135:17 136:3
  194:19 209:15
  231:2 257:23
full-and-fair 231:8
fully 6:8 41:6 54:24
  59:17 218:3
fund 79:7 243:22
  255:2 260:21
fundamentally
  224:9
furnished 17:19
further 48:3 50:12
  53:3 82:19 117:13
  133:5 153:16
  163:23 168:13
  273:7 295:8
  297:11,13
furtherance 253:20
  271:6
future 192:19
  216:23 224:16
  232:8

**G**

gained 154:4

280:21
games 256:19
gap 36:7 268:18
gather 47:14
gathered 141:24
281:3
gathering 25:22
28:4 271:21
gave 15:21 38:24
41:9 117:1 141:1
141:5 230:10
238:13 241:6
290:6
general 29:1 84:20
122:8 132:5
158:18 169:20
189:16 215:15
254:5,16
generally 47:22
96:9 100:16 101:9
101:13,18 107:11
108:20 118:3
145:20 152:14
161:5 168:5
200:11 201:4
243:10 276:2
generated 11:1
12:11 19:7 212:13
279:16
gentleman 25:15
127:13
gets 203:23
getting 24:15 29:4
36:19 159:3
201:23 210:8
220:14 234:23
235:24 237:14,15
237:18,24 250:14
250:17 266:24
272:10
give 7:20 44:23
47:19 116:5 167:3
170:17 278:24
284:15
given 40:5 57:21
83:19 106:8 133:1
146:9 150:1 170:3
171:1 187:5
191:21 219:22
236:4 284:12
296:9,11
gives 32:1
giving 218:1
glad 185:20
Glenn 57:9
glove 242:1

goals 208:21
God 286:19,24
goes 128:18 153:13
153:16 171:16,21
208:13 216:10
272:11
Goethals 2:19 4:8
gone 18:9 38:2
60:24 187:3 214:1
228:15 230:2
292:20
good 5:9,10 57:9
59:2 60:22 114:8
114:20 128:9
146:18 155:2
156:12 159:22
194:4 212:2
217:17 285:12,17
gook 133:7
Gossett 7:4,5
gotten 44:12 61:24
90:24 114:22
209:15 265:5
govern 100:9 170:2
governing 187:14
graduate 257:20
grandfather 260:8
grant 208:15
granted 38:15 40:6
40:15,21 56:7
64:10 105:14,22
205:9 206:6,12
granting 213:19
gray 150:12 226:11
great 90:18
greater 216:3,8
greeted 51:20
Greg 59:21 196:10
Grilli 51:18 52:9
177:2,12 191:12
192:8,17 193:6
284:21,24 285:19
286:2
Grilli's 191:1
gross 36:14 79:13
80:1,7 122:13
212:21
grounds 12:21
group 170:8 171:4
220:6 253:1
growing 264:2
269:2
guarantee 40:18
152:8
guess 44:5 46:16
48:16 67:19 92:14

95:21 100:12
107:4 114:13
119:16 134:14
141:20 180:18
184:7 193:12
198:10,12 209:14
215:14 220:8
225:11 235:7
242:4
guidance 284:13
guilty 260:7
guys 211:7 247:6,6
259:7 276:11

_____
**H**
H 3:9
hadn't 91:11 184:19
217:1 227:6 240:6
265:5
half 21:12 271:17
285:10
hammering 210:8
hand 89:8 127:17
192:4 242:1 251:3
297:19
handed 16:2 270:23
290:6
handicapped 41:13
78:8 185:23
handing 125:2
132:9
handle 98:11
103:20 124:14
129:9 211:7
239:14
handled 235:9
handling 73:9 258:3
hands 235:15
happen 35:2 96:16
99:1 136:20
180:17 220:21
228:14 258:21
261:5
happened 21:9
32:11 68:18 76:7
96:24 108:10,16
119:1 120:7 127:4
131:6 177:3
219:20 222:13
227:2,6 229:20,22
229:24 258:19
278:5 293:21
happening 118:8
130:7 131:23
132:8 133:19,22
159:11 163:18

174:18
happens 108:22
117:10 136:18
236:6 267:14
harass 139:5
hard 6:2 63:5 197:8
199:4 247:1,13,14
247:17 249:23,23
250:20,21 251:13
252:4
harm 116:20 230:5
harmed 265:19,22
267:4,16 269:8
harmonize 226:9
Harra 57:9 290:8
Harvard 257:20
hasn't 293:20
Hatch 2:12 42:9
46:12,14 53:13
58:22 115:14
155:5 156:15
hate 293:16
haven't 20:17 28:12
28:20 29:6 88:24
101:2 113:14
134:5 142:4
185:18 195:24
198:21,24 208:4
220:24 234:22
237:12 252:9,10
275:12 292:20
he'd 69:2 195:12
222:10
he'll 130:19
he's 109:14 115:9,9
206:24 207:10
260:20 285:17
heading 272:4
290:18
headings 11:3
hear 51:5,7 113:22
171:14,14,15,15
171:15 188:15
190:8,10 281:3
heard 58:24 113:18
149:9,14 150:2
188:12,16,22
189:10,12,14
190:1,9,16 194:3
252:8
hearing 15:22 16:6
16:8 19:24 42:15
50:20 53:1 165:8
166:15,18,22
189:20 201:3
204:21 211:4

254:20
hearings 166:19
hearsay 56:21,24
57:1 154:15
155:20 156:1
189:13
heart 247:7
heated 108:12,15
227:7,23
heeding 286:19
held 166:15 214:14
224:14 256:22
264:7
hell 171:24 180:22
help 268:18 281:5
287:23
helped 37:12
helping 103:22
Here's 258:24
hereby 296:9 297:5
herein 5:3
hereunto 297:18
hey 157:23
higher 262:16
highest 215:17
216:4,6,11
highlighted 20:18
48:21
himself 189:22
207:5 208:15
257:24 281:18
hire 42:19 43:12
46:23 77:6,7
101:20
hired 52:3 60:14
61:4 62:20 164:7
214:20
hiring 102:11
164:13
historically 187:2
history 31:14,21
34:16 41:22 186:8
186:21
hogs 222:3,11
hold 63:5 197:8
198:20 249:11
holding 255:1,17
260:19 262:16,18
holdup 260:1,6
home 229:15 230:2
homogeneous
264:24
Honeywell 15:22
16:7 180:1 207:24
230:20 231:16
232:16 233:12,18

282:8
Honeywell's 214:5
hope 39:6 97:18
137:14 144:7
170:11 217:17
276:7
hoped 274:13
hoping 133:6
168:17 259:20
Horan 7:1
hospitals 248:23
hostage 255:17
256:22 260:20
262:18
hostages 257:4
hotel 27:14
hour 1:19 15:18
263:1 271:17
hourly 174:15
hours 138:15
174:15
Howard 7:8 73:22
however 190:4
241:17 272:15
274:9
hubris 258:5,10
259:17 260:7
Huey 192:12
huge 235:15
hundred 137:1,4,7
138:2,5 219:4,8,9
268:1,11,12,19
hundreds 60:20
husband 75:24 76:4
100:2
hybrid 75:2 76:17
213:3
hypotheses 225:19
hypothesis 219:24
hypothetical 227:15
228:14 278:16
279:6
hypotheticals
226:11

_____ I _____

I'd 59:16 132:13
283:2
I'll 22:1 51:5 109:14
143:15 150:13,21
177:5 180:14
181:3 253:8,12
260:2 264:12
269:13 280:15
I've 8:6 26:6 44:12
56:22 82:4 101:11

114:6 127:12
134:7 136:20,21
153:1 155:5 161:5
236:24 237:4
252:6 260:19
262:8 285:4
idea 38:23 88:6
161:20 174:16
178:10 188:18
190:7 225:12,13
243:23
identical 33:6 34:2
identification 8:2
20:5 42:12 85:15
89:14 91:23
125:11 128:3
132:19 269:23
290:3
identified 11:10
16:11 17:9 18:8
71:9 135:6 142:2
186:15
identify 10:8,18,21
40:22 45:12 61:6
62:23 63:14 65:24
73:15 90:19
153:24 237:17
246:19 281:6
289:4,11
identifying 46:21
153:22 177:9
identity 122:20
ignorance 61:3
ignoring 250:6
260:11
ill 22:12
illegal 46:20 47:1
58:8,9,11,22
68:13,17 264:7
Illinois 1:17,18 2:4
2:14 4:12 87:8,9
146:11 297:1,5,20
illustrate 145:20
image 63:6
imagine 164:10
immediate 51:16
immediately 181:18
209:11
impact 238:19
263:19
impasse 36:2 37:21
38:1 49:20 117:20
117:24 161:6,11
161:14,24 162:1,5
162:10,13 163:9
163:14,21 164:23

174:11
imperative 42:2
implicating 147:12
implication 169:15
implying 152:18
175:5
import 64:21
important 58:3
135:21 197:12
importantly 203:9
impression 261:3
impressions 261:17
262:11
imprimatur 291:7
improper 46:20
253:23 273:8
improperly 151:9
245:18
in-person 106:5
inaccurately 34:6
inadequacy 246:12
inadequate 117:5
230:11 243:3,7
246:6
inadvertence
144:10
inadvertent 270:10
inappropriate
110:23 131:5,21
132:1 137:6,10
165:23,24 266:13
inbox 158:14
Inc 1:3 2:20 4:20
92:8,9 296:3
inception 264:3
incidental 233:16
include 99:10 225:7
281:18
included 19:11
69:17 199:12
211:11 212:20
280:23 289:2
includes 102:9
132:10 273:3
including 50:16
92:16 164:12
193:18 280:20
281:17
incorporated 33:20
70:2 81:10
incorrect 21:8 94:10
211:19
incorrectly 98:3
increase 255:2
260:21 274:12
increasing 171:14

incur 79:6
incurred 288:6,8
indemnification
288:7
independent 177:24
independently 35:1
41:14
indicate 240:20
272:15
indicated 14:1 20:7
46:11 64:6 96:13
102:6 146:21
150:24 197:7
224:12 272:16
274:10
indicating 52:2
163:20 177:16
276:14
indications 145:18
indirectly 106:16
258:4 297:17
individual 62:12
70:9,13 103:11
111:22 112:1
143:11
individualized
242:8
individually 108:5
ineffective 117:9
inexperience 235:19
infer 155:7
inference 157:7
179:4 242:20
inferences 154:11
176:16,16,19
177:4,6
inferential 150:10
150:19
inflate 260:21
inform 113:15
informed 54:2
99:22 121:21
initial 120:23
initially 61:22 236:4
initiate 266:8
initiated 128:13
164:2 200:1
initiating 290:22
291:2
injunction 16:8
19:24 21:16 23:11
23:20 51:7,13
59:11 83:13
165:17 166:17
188:12 201:3
208:9,15 210:20

211:4,21 214:9
231:24 232:2,16
254:20
injunctive 204:10
233:8
injured 138:8
innocent 135:14
input 284:15
inquired 50:1 96:14
inquiry 125:19,23
insert 115:16
inserted 8:13
insisted 36:12 37:2
insofar 57:22 71:17
216:19
instance 97:22
98:24
instances 169:24
instant 162:9
instead 249:21
250:19
instruct 22:14
106:16 270:15
273:8 274:6
instructed 291:24
instruction 22:1
instructions 197:5
insufficient 117:3
insurance 44:13
intend 137:18 139:7
204:18 206:12
207:19
intended 208:21
intending 113:16
intends 103:20,23
intention 175:6
intentional 239:7
265:11
intentionally 135:6
167:15 211:19
interact 45:18
interacted 13:1
interaction 124:5
intercede 165:4
interest 29:3 133:2
164:20 176:2
211:14 253:20
interested 45:2,22
46:3 48:24 61:23
132:12 163:22
180:20 186:23
297:16
interesting 19:5
interests 201:6,8
202:7
interfere 34:14

158:1
interfered 29:16
  34:11 37:10
  116:23 230:8
interfering 136:8
  148:2 160:5
intermediary 114:7
internal 14:7
  276:10 277:17
internally 229:13
interposed 12:23
  78:6
interpretation
  223:12
interrelated 282:19
interrupt 37:6
  59:24 278:6
interrupting 6:2
  60:8 278:10
intervene 50:17
  51:6 52:20 56:5
  64:8 82:17 91:17
  105:17 106:20
  158:24 165:5,16
  165:22 182:2
  183:6 184:5
  188:11 198:7
  204:16 205:1
  206:5 209:1
intervened 181:24
intervening 182:13
  184:10,24 185:16
  208:8
intervenor 92:15,17
  94:21 205:8,12
  208:23 231:20
Intervenor's 91:15
intervention 182:16
  182:19 183:7,19
  183:23 184:15,18
  185:11 205:9
  206:6,11 207:18
  213:19 231:5
into 8:13 15:3 17:14
  22:18 24:16 51:20
  64:21 98:21
  115:16 153:13
  157:10 158:11
  164:18 181:9
  184:6 195:1
  220:20 251:2
  258:1 261:9
  273:17,20
intro 271:23
introduce 4:13
invest 138:23

invested 136:21,22
investigated 50:12
investigation 50:3
  196:15 280:8
investing 138:14
investment 138:11
invitation 241:7,11
invited 61:20
involvement 32:20
  121:21 151:15
involves 171:13
involving 44:10
  46:6
ironic 170:24
ironically 246:11
Ishmael 119:22
Ismael 128:9
isn't 15:6 70:10
  71:5 195:11
  205:15 221:11,13
  230:13 233:17
  234:7 244:9,11
  257:18
issue 55:15 72:2
  148:24 185:8
  207:9 233:15
  244:9,11 246:23
  281:23
issued 23:6 26:5
  63:2 99:4 160:15
issues 149:5 203:6
  205:16 206:14,17
  207:20 230:13
  231:10 233:16
  235:12 242:8
  282:1,13,20 283:7
  its 95:10,15 106:24
  141:17 144:9
  186:18 187:12
  231:7 269:6
  283:19 287:10
itself 25:5 31:12
  241:23 245:19
  250:1,2,22 272:13

J

J 2:7,12
JAMS 187:22
  188:22 189:1,2,3
  189:16,19 190:6
  293:6 294:10
January 56:7 64:10
  107:4 290:12,23
  293:20
Joe 56:10
John 247:9,24

join 61:20 82:17
  91:1 96:14 196:20
  197:10,12,19,22
  198:5
joined 4:17 6:24 7:3
  19:18 82:16,20
  156:15 290:10
joint 195:13 253:9
  253:16
jointly 91:2 291:4
Joseph 128:8,22
  129:23 130:15
joust 225:17
JPA 128:19,21,24
  252:20,20 253:8
  253:13,13
judge's 50:18
judging 262:23
judgment 44:14
  132:11 133:7,14
  237:1,3 258:6
judgments 44:12
judicata 170:13
  239:24
July 35:10 55:24
  135:2 164:1 182:8
  248:7
jumped 21:8
June 21:10,10 31:22
  34:17 39:2,2
  55:19,21 64:6
  90:22 116:9,9
  117:15,16 151:16
  173:11 174:8
  198:13 292:7
jurisdiction 187:5
  205:17

K

K 297:2
keep 97:23 128:12
  248:3 249:1 260:7
  260:8 272:5
Kelly 57:9 73:18
  194:4 290:8
Kemker 6:23
kept 12:11 97:16
  98:16,17 156:8
Ketchie 7:1
kind 37:17 48:15
  75:1 103:24
  144:24 148:8
  155:1 167:5
  170:20,24 184:4
  193:21 195:7
  196:2 249:16

256:9,10
kinds 159:9 254:5
  261:13
knowing 93:15
knowingly 261:7
  285:20 286:8,21
known 115:5
  125:24 210:14
  285:19
knows 94:15

L

L 87:1
lacked 186:1
laid 235:4
Lally 124:21 125:14
language 19:11
  169:18 240:19
  277:14
laptop 150:1
Lardner 2:2 4:11
  8:23 9:16 17:22
  18:20 25:17 26:21
  27:21,24 113:20
  140:17,22 145:22
  146:12 271:5
large 34:3 186:21
LaSalle 2:13
last 14:19 16:18,24
  33:17 35:5 53:23
  55:18 136:9 179:8
  198:13 252:8
  272:15 274:9
  275:4 278:13,13
  285:9
late 53:10 173:1,5
  173:10 174:5
  175:1 184:24
  202:12
later 21:12 35:3
  95:23,24 105:13
  120:23 161:14
  254:10,11,11
  257:2 264:20
  266:13 271:17
  281:4
Latham 35:9
  124:21 125:14
  222:22
Laugh 217:20
Laura 73:22
Lauren 2:2 4:19
lawsuits 170:4
lawyer 45:8,9 52:14
  70:20,21 73:8
  103:19,20,22,23

104:3 143:10
  258:1 266:12
lawyers 53:9 56:22
  56:22 57:11,24
  101:20 102:12
  103:7,11,21 104:2
  104:2 170:4
lay 228:20
laying 36:13
Laypeople 169:5
lead 206:24 207:17
leading 116:8 161:6
learn 61:1 118:2,7
  119:1 122:19
learned 52:17 60:20
  123:21 149:8
  154:13 165:14
  179:6 285:2
least 34:2 43:7 45:3
  74:20 90:20 104:3
  124:18 134:16
  136:1 141:23
  142:17 144:15
  170:14,16 247:10
  267:6 278:19
  280:4
least-competent
  170:8
least-effective 170:9
leave 88:2 89:24
  91:6,15 96:20
  105:19 106:19
leaving 54:13 149:6
led 158:18 217:12
Lee 133:14,17
left 27:8 58:6 132:6
  248:11 254:22
legal 2:7 44:20 63:3
  98:19 113:4
  143:11,12 190:5
  284:13 288:6
legally 135:13
legitimate 64:22
lens 233:19
less 20:16 60:6
  268:12
let 5:24 52:12,13
  54:14 85:9 95:7
  124:13 125:5
  129:14 157:11
  159:7 177:22
  182:24 225:4
  227:10 228:1
  258:5,10 264:8
  278:7 289:21
let's 15:11 68:8,9

157:22 218:21
236:9 244:23
262:4 263:3
**letter** 11:7,7 68:11
243:11 246:8,20
248:5
**letterhead** 192:23
**letters** 43:23 45:12
**level** 171:9 246:18
LexisNexis 17:13
**liability** 239:22
**liable** 264:8
License 297:24
**lieu** 52:4
**life** 56:23
**liked** 149:24 150:1
175:10 213:6
**likelihood** 39:5 40:4
40:6,20 135:5
**likely** 62:24 217:13
217:13
Limited 94:18,20
100:17
**line** 19:10 83:22
211:8,15 256:5
267:18 268:14
275:16
**lines** 201:9 219:1
**list** 57:8 65:1,6 67:1
68:1,1,10 78:17
102:20 126:22
186:14 240:19
**listed** 16:16 18:17
82:23 101:17
126:9,14,17
143:16,18 289:14
**listing** 63:7 102:3
**litigate** 231:2,9
**litigating** 230:20
**little** 78:8 101:1
164:11 192:14
193:4 219:1 290:6
294:22 295:6
**live** 26:24
LLC 2:12 4:18
Lloew@foley.com
2:5
LLP 2:2 4:11
**local** 33:16 45:1,6
46:9,11 60:14
61:18 66:16
212:19 280:11
**locate** 88:24 114:11
**located** 249:24
250:22
**location** 248:3,3

**lock** 263:14
**lodging** 27:17
Loew's 24:2,5
147:16
**log** 141:4,12,14,15
141:19 142:2,5,7
**logs** 67:10 242:17
**long** 6:14 15:15
41:5 59:15 75:15
186:21 187:4
201:3,4 210:22,23
210:24 256:8
257:21 266:16
276:14
**longer** 26:7 51:12
101:2 167:2,3
195:19 258:18
**look** 15:21 76:18
78:9 79:4 83:18
83:22 85:20 92:20
103:16,17 132:13
133:7 178:7 196:1
197:20 269:16,18
277:14 289:21
**looked** 18:20 19:16
68:18 126:22
192:22 198:24
251:22 254:13
292:20
**looking** 100:23
104:18 222:14
277:20 285:13
**looks** 270:1
**lookup** 246:24
247:12,16 251:14
**lookups** 249:22
250:20
**loop** 128:12
**loser** 295:6
**lot** 57:21,21,22
59:19 63:3 134:14
161:2 175:10
180:22 263:16
269:1
**lots** 194:7 242:7
284:22
**loud** 217:20
**loves** 222:1
**lowered** 274:11
**loyalty** 215:17
216:5,7,11
Ls 255:14
**lucky** 5:15 272:10
**lunch** 140:13
**luncheon** 140:5

**M**
M-A-X 35:6
M-E-S-T-E-R
35:12
M-I-M-S 63:20
M@mcalaw.net
7:18
**machine** 249:2
Madison 2:8
**magistrate** 217:24
283:23 284:1,10
284:17
**mail** 243:12 246:8
247:1,13,14,17
248:9 249:23
250:21 251:14
252:4,8
**mailing** 249:23
250:20
**mailings** 186:22
**makes** 18:4 109:3
130:5 202:13,16
286:21
**making** 32:17 37:24
38:6 89:6 92:16
189:1 234:7 245:2
246:22 251:21
259:19 294:13
**man** 62:3
**management** 10:20
17:8 136:16
**maneuver** 136:6
157:10 204:19
**maneuvering** 47:23
69:6 267:11
**manipulated**
158:10 202:12
**manner** 37:7 116:24
230:9 258:12
262:23
**mantle** 215:6
**many** 44:3,9,21
57:11 60:11,23
73:20 96:7 122:23
134:13 138:15
169:24 208:20
224:20 237:5
241:17,18 244:4
271:4
**March** 32:9,21 36:9
153:5 173:1,5,8
174:6 175:1,20
176:9,22 177:17
178:16 213:18,21
213:21,22 214:1
226:2 257:8,9

259:3,15
**mark** 7:20 54:6
222:21
**marked** 7:23 19:22
20:2 83:19 85:9
85:12,22 89:9,11
91:14,20 100:9
125:2,3,8 127:18
127:24 132:10,16
269:20 270:24
289:24 290:5
**marketing** 186:18
186:22 187:11,12
**mass** 134:12
**matched** 68:3
**materially** 201:5,7
202:7
**materials** 8:15 9:8
17:2 18:23 141:16
141:20
**matter** 4:3 10:22,23
10:23 11:2 14:24
19:10 25:13 34:16
50:10 72:17 111:9
112:6,7 117:10
186:6 211:10
214:23 236:6
240:3,4 249:16
287:7
**mattered** 161:4
**matters** 10:20,21
17:8,12,23 66:15
66:18 97:17 98:3
98:9,22 99:4
131:18
Maureen 1:15 4:9
6:3 297:3,23
Max 35:5 224:5
293:9,18,23,24
**maybe** 9:20 30:17
76:2 91:3,3
158:22 169:5,5,6
235:17 239:15
253:3
MC-190 87:17
93:19
MC-420 127:18
MC5109 125:4
McCoun 16:1
277:16
McCoun's 16:20
284:20
McMahon 25:16,21
**meaning** 199:2
201:11 217:14,21
225:7 291:20

**meaningful** 37:3,13
52:15 161:7,23
254:4 274:16
**meaningfully** 41:16
**meaningless** 279:7
279:11
**means** 241:6
**meant** 186:7 193:22
210:7 242:4 262:3
268:20
**meantime** 50:23
63:19
**mechanism** 48:7
**mediate** 32:7 34:23
35:13 51:3,9
**mediated** 284:21,23
285:6
**mediating** 285:2
**mediation's** 192:2
mediation-privile...
260:4
mediation-related
219:16
**mediations** 68:21
118:3,5,10 120:8
122:10 127:3
129:12 130:24
134:1 162:17
235:9 254:2 258:2
259:1,1 278:1
291:23
**mediator** 32:12
35:5,22 36:4
37:23 51:19 52:8
119:5 174:19
176:1,5 177:12
217:9 224:5 225:1
225:3,5 226:18
277:10 285:13,17
286:5 293:9
294:18
**meet** 15:12,15 75:23
242:11 251:11,15
**member** 73:10
76:17 95:3,4
202:4 215:3
238:19 247:4,8,15
250:10,16,17
263:19
**members** 36:17,23
71:9 73:6 74:15
75:3 76:18,23
90:20 110:11
111:2 136:14
186:15 201:8,13
202:3 213:2,12

215:9 216:20 239:12 263:21 264:20 274:18
**mental** 218:15 261:17
**mentally** 139:2,2
**mention** 80:6,24 177:12 240:16
**mentioned** 34:17 48:9 55:14 56:16 59:20 65:10 66:20 69:15 90:17 100:20 122:11 191:2 192:21 243:1
**mentioning** 190:24
**merchandise/food...** 274:18
**mere** 152:16
**merits** 241:23 269:7 284:2
**Merryday** 209:13
**message** 54:5 130:11 258:14
**Mester** 35:12 54:6 130:19 131:3,3 163:20 164:2 222:22 223:3,12 223:22 272:3 292:8
**Mester's** 190:12
**met** 15:14 21:19 53:8 75:24 76:3 140:12
**method** 250:14 252:11
**methodology** 187:11,13
**methods** 186:18
**Miami** 35:5 76:2,6 293:24
**Michael** 1:10 3:3 4:2 5:2,12 62:10 196:16 296:16 297:6
**Michelle** 53:7,24 75:24 87:18 94:9 95:6,7 100:1
**Michigan** 7:4
**mid** 56:3 173:10
**Middle** 1:2 89:17 296:2
**Mike** 7:1 286:18,20
**Mims** 63:20
**mind** 136:24 222:3 222:11 238:8

260:7
**minds** 272:5
**mine** 101:3 249:10 280:11
**minute** 221:18
**Mischaracterizes** 204:13
**misrepresenting** 167:15
**missed** 99:18
**missing** 58:4 176:15
**misspoken** 185:4
**mistake** 187:24 188:10
**mistaken** 102:1
**misunderstood** 30:17
**misuse** 116:19
**modified** 85:4 209:6
**moment** 7:20 84:6 125:4 136:11 155:23 184:21 192:22 237:22 244:24 259:16,22
**momentum** 264:2 264:15
**Monday** 21:9 53:18
**monetarily** 233:2
**monetary** 130:3 148:24
**money** 36:14 56:23 57:14 58:3,4,7 90:19 117:4 130:16 136:15 148:11 149:8 164:17 170:14,16 180:23 194:1,5 230:11 287:10,22
**monitor** 4:7
**month** 254:10
**months** 26:4,10 36:8,9 56:12 59:5 59:5 105:13 146:20 172:20 174:18,20,21,21 248:10 254:10,11 258:22
**moot** 166:23
**mooted** 242:11
**morning** 5:9,10 8:23 15:20 18:20 21:10 27:7
**most** 7:9 44:23 46:10 203:9 222:23 239:13 247:24

**move** 152:3 158:24 159:1 175:14 177:5 181:3,18 236:19 238:4 248:2 270:13
**moved** 283:13
**moves** 159:10,19
**moving** 161:9 165:6 168:7
**much** 9:17 11:11 26:7,20 39:24 55:7 59:16 60:2 79:5,20 124:5 137:23 138:18,21 155:9 156:6 164:17 187:19 220:2 244:8 254:14 266:19
**multi** 258:2
**multiple** 57:7 169:24 227:18,18 257:10
**mundane** 171:10
**music** 164:9
**must** 101:18,19,20 103:19 104:4 197:10,19 254:14 293:19
**myself** 10:5 35:17 73:21 80:10 98:12 101:13 164:3 209:22 293:15
**mysterious** 158:14

_____
**N**
_____

**N** 3:1 87:1,1
**name** 4:8 5:11 6:16 19:9,10 33:17,18 35:5 43:7 46:16 62:10,11 140:11 189:8 201:19 240:22
**named** 5:15 25:15 33:16 70:14 71:2 71:4,6 74:21 76:22 77:3 90:14 91:12 110:15,17 110:19 134:21 185:15 213:14 214:17 215:8 216:2,9 227:17,19
**names** 7:7 43:3 49:24
**narrow** 181:3
**nationwide** 186:22 187:1 237:6

**Naturally** 35:19
**nature** 47:18 151:4
**near** 224:15
**necessarily** 32:13 61:11 75:16 97:15 161:17 173:2 233:7,16 243:15 245:11 268:12
**necessary** 21:6 59:17 96:18,22 98:17 122:19 197:12 259:23
**need** 172:12 174:19 208:14 240:8 244:18 260:6 270:5 286:10,12
**needed** 45:8 52:12 114:10 130:4 281:5 286:17
**needs** 234:9 272:24
**negotiate** 41:10,19 42:3 121:1 170:17 211:16
**negotiated** 175:8 210:10 245:22
**negotiating** 167:21 265:6 286:13
**negotiation** 162:7 167:6
**negotiations** 132:3 161:22 162:16,17 164:21 165:19 166:13 168:8 173:12 176:11 193:19 194:10 219:21 258:3 286:5
**Neither** 213:6
**never** 43:19 79:8 93:21 104:20 106:2 127:12 128:14 149:5 169:13 195:8 210:23 214:24 215:4 222:9 229:20 236:17 241:6 258:19 261:2 281:2
**nevertheless** 75:5 181:9
**new** 35:11,14 102:2 211:6
**next** 12:6 13:16 14:6 16:4 36:8 46:4 47:11 52:16 54:8,11 93:20

191:1 193:13 246:18 270:13 276:4
**nice** 180:3
**nine** 174:17
**nitpicky** 164:12
**nobody** 177:1 220:5
**nomenclature** 50:9
**non-specific** 225:11
**non-speculative** 216:18
**none** 112:12 145:3 198:3
**nonresponsive** 153:19 175:15 177:7 181:4
**nor** 106:13 177:1,2 195:4 297:14,14 297:15,16,16,17
**North** 1:17 2:3,13
**notary** 1:15 296:21 297:4
**note** 19:17 85:21 160:24 246:10
**noted** 50:7
**notes** 230:7 266:19
**nothing** 28:1 68:15 68:17 132:7 133:21 183:12 203:20 254:1 279:5,11,13 295:8
**notification** 36:16 106:11 264:5
**notified** 51:10,11 93:10 145:13 163:9 191:6,22 223:11 224:22 292:9,10
**notify** 93:3 144:18 144:18
**notion** 253:10 266:6
**notwithstanding** 163:20 183:21
**November** 1:19 4:6 132:22
**nowhere** 105:1
**nuances** 169:7
**numbers** 43:4 80:16 247:22,23 248:17 249:21
**numerous** 239:9

_____
**O**
_____

**O** 87:1 297:2,2
**o'clock** 1:20
**O'Neill** 6:23

oath 6:5 211:24
  243:13,24 244:15
  244:17,19,23
  245:11 246:8
  285:15 296:10
object 206:22
  273:19 286:23
objected 202:18
objections 16:22
  97:6 204:24
objective 258:11
objector 203:1,4
  205:7,13 208:22
  231:3
obligations 102:7
observation 124:7
obstacle 264:24
obtain 44:13 67:16
  93:6 106:13
obtained 65:1,6
  68:10 115:10
obvious 133:23
  254:9
obviously 30:5 42:1
  84:13 105:11
  284:15
occasion 17:5 61:17
occur 36:16 49:17
  53:6 158:16
  182:20
occurred 279:20
  291:17
occurring 118:5
  220:4
October 26:5 56:14
  87:23 88:7 90:5
  91:7,11 94:1,4,10
  95:11,16 105:7,9
  127:1 182:6 214:7
off 50:23 54:17
  140:1,3 189:23
  192:2 209:12
  212:4 236:5
  240:19 263:4
  288:13
offered 40:11 87:14
  210:6 217:19
  272:14 281:8
offering 59:22
offers 14:8 107:14
  107:18,23 226:7
  254:4 257:12,13
  270:3 277:5,24
office 6:11,16 7:3,10
  7:13 35:10 49:16
  50:3 51:8,17,20

62:19 98:21
  149:24 163:5
  174:20 191:1
  285:1 297:19
offset 239:5
offshoot 193:21
Oh 44:8 54:10
  110:17 168:16
  186:7 192:13
  223:23 285:8
Ohio 146:7,10
oldest 128:4,5
omission 144:9
once 64:5 106:9
  204:16,24 215:5
  216:18 249:3
  289:20
one-day 35:4
one-page 82:7 244:1
ones 46:10 69:11
  98:17 128:4,5,5,6
  146:2 182:10
  230:17
ongoing 83:7
  198:14
online 50:6 186:9
open 174:7 272:5
opened 152:11
opening 164:6
operating 6:15
opinion 40:2,13,21
  41:6 48:22 69:12
  180:5 189:11
  202:2 283:4,5
opinions 180:7
Oppenheim's 47:6
  70:17 120:19
  131:1 134:4
  193:17 230:6
  265:22 267:11
opportunity 20:21
  21:5 35:13 41:6
  52:19 54:24 58:1
  59:23 117:2
  138:13 214:4,10
  214:11 223:14,16
  224:15 230:21
  231:2,9,14 243:18
  259:12
opposed 50:9
  143:14 185:11
  291:10
opposing 34:22
  139:1
opposition 183:22
  185:10,14

opt-out 239:3
  240:17,17 241:1
  241:13,20 242:10
opted 146:11,13
optimistic 168:22
oral 81:3,5 142:18
orally 66:7
order 31:4 37:2
  38:9 85:23 89:21
  96:23 102:8
  127:22 165:17
  213:18 214:5
  273:5,23 274:1
  277:14 286:8
  290:19 291:5,19
  291:22 292:12,17
  292:22
ordered 35:1 168:9
  259:9
ordering 167:17
  292:18
orders 167:13
  214:14
ordinary 97:19,23
  98:8,10,18,20
organized 9:4,7
organizing 28:5
original 44:15 64:15
  143:16 178:11
  182:21 185:14
  196:6 200:15
  211:5
originally 199:11
originated 11:13
  62:4
others 103:23
  118:12 143:18
  144:15 150:7
otherwise 6:7 9:10
  37:21 42:2 68:12
  74:24 121:3
  150:16 158:23
  170:2 184:22
  203:21 234:8
  261:9,10,16
  270:16 295:3
ought 37:20
our 10:6 38:3 45:22
  45:23 49:20 67:7
  81:7 128:18 129:7
  184:16 209:19
  228:19,20 231:1
  232:13 253:10,18
  271:21 272:16
  274:10 291:8
out-of-pocket

122:18 123:2,11
outcome 40:18
  158:19 229:1
  281:24 282:15,16
outset 291:24
outside 111:6
  154:19 182:9
  220:6 272:12
  277:11
outsiders 254:7
outstanding 114:10
  172:7
overlap 256:15
overlooked 99:16
overriding 214:16
overrule 208:17
overruled 14:14
overtake 258:6
owe 73:5,5,23 74:10
  74:15 75:6,8
  76:11,14,17 77:2
owed 73:7 76:22
  77:2 214:22
owes 73:8 74:6,8
  215:22
own 6:19,24 7:6
  17:2 27:9 45:5
  50:3 96:16 139:23
  139:24 152:11
  154:20 156:23
  212:20
owned 62:9 244:12
  245:6
owner 246:19 249:9
ownership 266:10

P

p.m 271:13,16
  295:14
PA 6:12,16,24 7:8,8
  7:9,10,13
package 17:15
  192:3
page 3:2,10 6:1
  83:20,23 85:20
  87:17 89:22 92:1
  92:20 93:19 101:4
  103:16 104:23
  125:18 129:21
  192:18,18 201:9
  210:21 211:8
  256:2 270:24
pages 122:23 244:5
pages' 144:13
paid 36:14 98:15
  129:10 137:13

139:24 243:21
palpable 216:17
paper 217:3
papers 158:17
  192:4,11,11
paperwork 52:2
  96:17,23
paragraph 8:12
  272:1 275:24
paralegal 98:11,13
parameter 288:3
paraphrase 34:5
Paria 7:8
participant 289:9
participants 118:11
  118:24 120:12
participate 35:20
  54:12 107:6
  129:12 130:18
  131:22 281:2,4,9
  285:20 286:8,20
  286:22
participated 53:9
  291:18
participating
  103:13 218:19
  291:12
participation 36:3
  96:11 114:11
  209:23
particular 10:22
  40:23 66:19 83:20
  145:13 150:6
  245:5 266:8,9
  289:6 295:2
particularly 143:12
  234:22
parties 36:6,7 52:13
  53:3 63:2 74:9
  119:13 139:1
  167:1 179:16
  182:21 221:22
  252:15 292:18
  294:12 297:15
partner 73:21
partners 119:3
Partnership 94:18
  94:20 100:18
party 34:22 120:22
  126:7 128:24
  129:2 147:1
  163:15 274:11
pass 269:14,17
passage 266:11
passed 189:11
past 37:1 236:4

path 181:11
Patrick 25:16
pause 275:16
pay 11:11 27:9 79:9
  129:9 136:13
  139:20 171:18
  173:24 175:6
  176:2 185:19
  244:7 287:10
payday 137:12
payee 62:12
paying 24:2,5,8
  81:15 149:7
payment 44:13
  74:23 216:2
payout 117:7
  122:13
PDFs 11:1
penalty 134:18
  245:12 250:8,9
pendency 50:4
pending 34:18
  52:10 53:14 61:19
  94:22 114:14,19
  114:22 120:5,6
  172:6,9,11,17
  174:7 181:24
  192:7,11 196:21
  203:22 274:22
  278:15
people 5:13 43:4
  45:16 57:7 60:11
  63:14 68:18 117:9
  131:22 134:14
  154:13,14 186:22
  243:24 244:21
  249:1 265:9
per 18:19 134:19
  135:7 144:22
  218:16
perceive 264:23
  281:22
perceived 161:22
  226:21 264:18
percent 79:18,22
  80:9,17,17 138:2
  138:5 200:17,18
  200:23 209:5,5,7
  210:9,15,16
  212:16,16,17
percentage 79:9
percentages 80:11
perception 266:5
  282:12
performance
  153:15

performed 106:24
  112:18
perhaps 150:13
  173:20 235:18
period 18:10 25:22
  32:8 36:18 43:3
  61:15 151:22
  245:6 257:7
  258:22 279:17
  280:5,16
periods 185:3
perjury 245:12
  250:8,10
permission 241:7,11
  242:6
persisted 212:14
person 13:1,9,11
  68:4 130:5 194:10
  194:14 207:8
  244:10 245:3
  251:3
personal 49:1,7,11
  58:17,23 96:22
  115:21,24 116:3
  124:7 151:14
  152:24 154:1,20
  156:24 252:16
  297:10
personally 93:17
persons 115:19
  261:10
perspective 260:9
pertaining 1:14
  25:3 270:3
perusal 193:9
Peter 51:18
pharmacies 248:23
Phil 69:4 133:10,13
  133:18 136:8
  153:12 157:11
  159:4 217:17
  279:20
Phillip 2:18 4:17
phone 42:17
phonetic 160:23
Phyllis 13:10
physical 248:8
pick 209:12
picked 42:17
pigs 222:3,11
place 4:11 76:1
  127:7,8 187:8
  188:5 193:12
  195:2 251:5 292:5
  296:10 297:12
plaintiff's 14:10

93:1 166:9 174:23
  176:3
plaintiffs' 46:13
  167:7 168:1
  175:20 176:9,23
  177:18 179:8
  183:21 185:16
  189:3 191:13,20
  212:24 213:1,12
  224:10
plan 39:17 163:23
  206:10 249:20
  251:24 252:2,12
planned 162:16
plans 162:7,7
  251:10
plausible 149:22
play 194:9 256:19
played 174:21
players 62:23
pleading 34:21
  93:15 95:21 166:1
  166:4
pleadings 11:4
  169:3 186:10
  208:23 280:19
please 4:12,23 6:1,6
  34:6 41:7 48:10
  57:8 73:15 92:19
  143:6 178:20
  193:2 275:16
  296:13
plenty 123:23
ploy 180:10
plural 226:7
plus 50:3 242:13
  274:11
points 5:24 205:7
Porcelli's 213:18
portion 10:9 12:6
  13:16 14:6 85:23
  270:4
posed 41:1
position 14:9
  136:13 138:20
  189:3,23 201:24
  220:11 229:6
  231:1 247:14
  249:19 250:18
  251:3,13 273:24
  275:13
positions 155:17,18
  156:17,18 208:17
  208:20 228:20
  259:8 286:3
possessed 151:17

possession 49:8
possible 98:2 155:8
  168:8 198:22
  223:13 229:1
  266:20
possibly 198:19
  220:1
Postman 164:11
  222:23 223:4,15
postpone 235:13
posture 286:13
potential 40:14
  45:12 46:2 134:18
  134:18 170:5
  177:10 212:12
  242:7 245:13,16
  257:12
potentially 13:22
  60:22 226:16
  232:17 233:2
  264:19
practice 5:22 42:23
  44:1 45:4 98:8,10
  98:18,21
practices 42:21
  135:13
preceded 223:20
precisely 72:11
  239:18
precluded 74:19
  273:12
predicate 25:6
  210:4 211:4
  275:23,23
predicated 234:3
predict 40:17
preface 163:24
prejudice 63:17
  71:8
preliminarily
  213:19
preliminary 16:8
  19:23 21:15 23:11
  23:20 59:10 83:13
  168:3 183:9 201:2
  210:20 211:3,21
  214:9 232:10
  254:20 280:7
premise 134:19
  179:7
premium 71:7
  74:21,23
preparation 16:13
  16:17 55:11
  290:15
preparations 15:11

prepare 15:13
  18:19 38:13
prepared 9:6
  140:13 164:17
  265:12
preparing 18:7,15
  20:11 26:6
present 2:18 63:13
  112:21 183:8
  201:22 203:5
  206:14 216:17
  231:14 259:12,13
presented 16:12
  61:7 94:19 181:12
  202:11
presenting 29:16
  50:8 100:16
  184:11
presently 231:16
preserving 274:4
president 14:4
  170:20
pretending 250:7
pretty 156:6 213:22
prevailing 215:19
prevent 204:10
  205:21
prevented 182:23
  183:2,10,12
  240:11
preview 272:3
previous 135:10
  288:23 289:2
previously 21:21
  55:1 200:24
  292:10
primarily 204:9
  235:13
print 127:20
printing 89:16
printout 19:13
  67:10
prior 6:16 45:4
  68:21 94:21 166:7
  241:6,11 242:6
  253:3
priv 294:12
private 293:3 294:9
privately 291:10
privileged 13:7,22
  24:16 97:10
  147:13 222:5
  253:24 270:2
privy 30:4,9,11,24
  31:10,14 190:3
pro 80:10 200:23

209:7 210:9,16
**probably** 15:17
  25:19 29:5 44:17
  83:15 88:7 93:18
  114:1 117:15
  130:19 131:3
  159:24 168:19
  184:4 212:19
  247:20
**probe** 150:13
**probed** 148:18
**problem** 42:5 51:15
  52:22 61:7 138:22
  168:22 192:13
  220:3 235:15
  258:24
**problematic** 260:1
**problems** 235:21
**procedural** 159:10
  159:18 270:13
**procedurally** 165:4
  270:12 273:22
**procedure** 1:13
  36:21 240:21
**proceed** 35:3 229:8
  263:11
**proceeded** 52:22
  230:4
**proceeding** 23:12
  23:21 167:1
  290:20 291:8
**proceedings** 48:19
**proceeds** 137:21
**process** 57:23
  114:13 115:15
  117:8 129:16
  136:9,16 190:20
  198:11 217:15
  221:21 251:11,15
  269:4 272:6
**processing** 128:13
**proclamation**
  286:19
**proclamations**
  293:1
**produce** 9:16 10:8
  12:18 18:14 62:9
  77:13,19 84:14
  113:13 114:1
  141:24
**producing** 8:24
  140:24
**product** 197:1,15
  199:17 206:19
  207:4,5
**production** 9:10,22

18:1 99:19 135:10
  142:8,9 144:5
  172:24 269:14
  270:10 277:11
  289:2,7
**productions** 289:16
**productive** 37:19
  161:11
**professionals**
  249:12
**proffered** 202:19
**progress** 37:24
**prohibits** 241:3
**promise** 120:24
  190:12
**promised** 139:20
**promises** 171:1
**prompt** 234:22
**prong** 242:3
**proof** 179:10
**proper** 50:9 207:8
  244:9,11
**properly** 83:17
**proposal** 225:6
  227:21
**proposals** 109:8
  224:21
**proposed** 36:19
  91:15 92:17
  107:10 251:23
  263:18 269:6
**proposition** 154:22
**prosecute** 101:19
  287:23
**prosecuting** 102:11
**prosecution** 253:9
  253:17 283:19
**prospect** 279:21
**prospective** 68:2
  110:11 253:18
**protection** 29:20
  42:24 87:15
  134:16 135:19
  207:6
**protections** 87:11
  291:11
**protective** 85:23
  273:5
**prove** 152:21,22
  164:13
**proven** 293:16
**provide** 20:20 21:20
  26:13 93:4 107:12
  108:2 178:5 180:5
  208:1 252:3
**provided** 17:3 18:23

20:14 21:15 25:4
  55:6 58:13 59:11
  89:3 96:19 97:3
  109:11 127:6
  140:22 141:8,17
  167:24 173:7
  178:3 191:14
  284:13
**providing** 21:5
  141:6 143:11
**provision** 92:23
  103:18 195:18
  196:2 240:18
**provisions** 291:9
**public** 11:6 67:2
  186:6 223:5 261:9
  296:21 297:4
**publication** 246:21
  251:23 252:2,14
**publicly** 67:21
**pull** 136:6 186:13
  186:14
**pulled** 138:16
**pulling** 268:24
**purge** 152:1,17
**purported** 116:8
**purportedly** 92:12
  140:23
**purpose** 274:3
**purposes** 48:23
  49:13 140:17
  145:23 183:24
  184:14 185:17
  192:20 247:7
  252:1 263:15
  265:15 267:24
**pursuant** 1:12
  85:22 117:8
  292:11
**pursue** 163:16
  214:23
**pursued** 70:10
  167:8 187:9
  257:16
**pursuing** 45:2 48:18
  163:22
**put** 32:13 52:9
  98:21 130:16
  136:3 142:10
  164:18 166:2,18
  193:13 254:13
  270:19 272:18
  273:15
**putative** 10:1 14:10
  111:18 202:1,6
  214:14 215:21

216:5,8,9 266:8,9
**putting** 136:12
  189:22 259:4

---
**Q**
---

**qualified** 243:21
**quantify** 138:20
  265:13
**quasi** 76:17 213:3
**questioning** 147:19
  171:24 227:3
  267:19 275:17
**questions** 18:24
  20:17 142:24
  143:3 155:23
  200:6 210:22
  227:4 266:22
  270:19 295:9
**quibble** 208:3
**quick** 266:19
**quickly** 59:24 174:4
  288:21
**quite** 19:12 57:12
  172:23
**quo** 162:15
**quote** 48:1 148:19
  160:9 213:3
  259:17 267:11
**quoted** 69:11

---
**R**
---

**raise** 206:13 270:20
**raised** 235:12
**ramification** 232:6
**rata** 80:10 200:23
  209:7 210:9,16
**rate** 174:15
**rather** 36:1 156:22
**reach** 280:3,8 287:6
**reached** 47:19 48:7
  54:3,7 127:9
  164:24 167:23
  168:3 175:23
  179:16 183:3
  184:12 200:22
  211:21 212:14
  228:21,24 230:2
  252:15 287:24
  288:23
**reaching** 159:21
**reacted** 157:15
**reading** 20:15
  128:19 192:18,24
  193:3 273:20
  275:6
**reads** 93:20

**ready** 59:15 68:21
  114:23 125:5
  263:11
**real** 216:17 226:23
  251:8 266:19
  278:17
**realistic** 136:14,15
  136:16 219:23
**realize** 193:6 259:21
**realized** 18:2 60:21
  63:11 134:24
  135:4,20 136:4,7
  180:24 192:6,7
  280:10
**really** 1:11 10:13 13:6
  28:11 35:2 107:20
  114:16 132:12
  170:18 179:23
  211:1 220:21,21
  251:20 252:5
  254:8 265:5
**reason** 32:2,14
  99:14 131:10,11
  131:12 210:19
  225:4 230:23
  286:1
**reasonable** 176:17
  176:19 177:4,7
  179:4 218:23
  235:18,20 242:20
  258:11 268:22
  279:3 282:17
**reasonableness**
  203:10,24 233:18
  250:14
**reasons** 158:3 203:6
  238:12 257:12
**recalled** 84:5
**receive** 80:16,17,18
  98:15 137:24
  147:5 182:10
  261:11 264:20
**received** 8:22 13:12
  23:7 59:22 60:12
  61:9 63:8 172:23
  176:20 182:11
  184:24 198:2,18
  199:24 243:16,19
  244:1 251:4
  281:15
**receives** 243:11
  245:3 250:11
**receiving** 26:1
  131:13 244:10
**recent** 128:5,6
**recently** 6:17 7:9

receptive 225:21
**Recess** 54:19 212:6
  263:6 288:15
**recipient** 13:2 19:10
  47:9 63:1 240:20
  289:4,9,14,15
**recipients** 12:8,12
  12:19 46:2 61:6
  65:6
**recites** 295:3
**recognize** 49:24
**recognized** 35:2
  37:23 180:1
  209:23 213:5
  267:7
**recognizing** 226:20
**recollection** 9:21
  19:4 21:14 65:17
  89:23 92:11 99:24
  100:6 125:13
  156:23 167:16
  188:6 243:10,15
  266:20 277:15
**recommended**
  146:7
**reconvening** 164:20
**recorded** 156:21
  297:8
**records** 14:1 58:20
  60:18,20 62:9
  84:10
**recoup** 287:9,22
**recover** 80:14
**recovery** 79:10,14
  79:19 139:7,11
**redacted** 270:5
  273:1,1
**redactions** 145:7,8
  145:10,14,18,21
**redid** 11:14
**reduced** 102:17
  123:5 297:9
**Reed** 133:7,14,18
**refer** 103:23 169:18
  274:1
**reference** 160:13,19
  177:6 253:11
  285:22
**referenced** 48:13
  157:5 217:5
  267:10
**referencing** 259:18
  266:9 294:6
**referred** 46:15
  57:16
**referring** 16:7 23:4

42:8 48:11 49:4
  53:23 56:20 69:9
  121:14 126:16
  128:22 143:4
  148:9,24 149:19
  158:15 172:13
  201:10 241:12
  243:5,6 267:19
**refiled** 197:9,13
  199:22
**reflect** 82:11
**reflected** 32:1 57:5
  80:19 81:21 83:3
  100:14,23
**reflecting** 9:23 12:7
  12:19 13:17 14:7
  143:24
**reflects** 31:9 91:7
  289:1
**refresh** 9:21 89:23
  92:11 125:13
  266:20
**refreshed** 243:15
**refreshes** 167:16
**refused** 12:18 284:9
**refusing** 286:20
**regard** 93:22 95:6
  95:10,15 96:10
  104:21 143:22
  156:11 206:23
  255:16 262:10
  284:14
**regarding** 25:19
  60:18 146:6
  150:18 151:11
  173:23 249:15
  261:18
**regulating** 104:10
  104:17
**regulations** 239:4
**reimbursed** 27:11
  27:13,16
**reimbursement**
  27:19 288:7
**reject** 108:4 203:13
**rejected** 176:6
  269:5 274:15
**rejecting** 232:3
**relate** 115:3 184:15
  185:16
**related** 100:18
  114:12 142:19
  144:16 145:1
  182:14 183:23
  184:17 185:2
**relates** 25:3 257:4

**relating** 9:24 153:3
**relation** 151:8
**relative** 56:11 80:11
  162:15 220:11
  283:19 297:13,15
**relatively** 224:15
  258:1
**relayed** 146:17
**relevance** 12:1
**relevancy** 12:17
**relevant** 244:12
  245:5
**reliability** 248:17
  249:7
**relief** 167:3 204:10
  207:21 209:15
  233:8
**relying** 156:22
**remained** 174:7
**remedies** 281:23
**remedy** 231:17,23
  233:9,15,17
**removed** 240:22
**remuneration** 149:1
**rendered** 16:22
**rep** 202:1,6
**repeat** 178:20
**rephrase** 183:1
**replaced** 195:21
**replicated** 9:13
**report** 38:1 67:6,7,9
  67:12 133:4
  186:14
**reporter** 4:9,22
  297:4
**Reporters** 2:20 4:10
**representation**
  10:16 17:10 24:12
  24:14,17 88:21
  93:2 100:13
  120:20 223:18,20
  267:2
**representative**
  17:12 36:22 43:13
  46:3 101:8,12
  102:4 111:19
  138:22 170:10
  195:19,21 201:7
  202:14 238:21
  239:11
**representatives**
  101:23 102:6,9
  165:24 166:1
  170:6 195:22
  196:3 209:14
  216:10

**represented** 23:15
  23:16 70:1 84:1
  93:21 94:15 95:5
  95:10 104:21
  111:5,21,24
  115:20 121:7,17
  124:23 125:15
  147:7
**representing** 22:16
  22:22 25:12 45:24
  91:9 102:24 103:8
  108:23 110:18,21
  111:9 119:13
  126:10,18 145:23
  146:9 189:2 215:8
**reproduce** 270:21
**reproduced** 270:5
  272:24
**Republic** 62:7
**request** 8:11 9:23
  10:9 12:6 35:16
  38:18 52:19 64:16
  113:13 114:22
  134:24 146:16
  166:16,23,24
  167:17 245:1
  281:11
**requested** 35:13
  128:12 231:18
**requests** 9:9 15:24
  15:24 26:15 78:4
**require** 245:2
  250:16
**required** 38:4,9
  53:3 103:12,14
  104:9,11,13,14
  123:3 245:24
  251:10
**requirement** 241:1
  242:11
**requirements**
  102:14 187:5
  239:3
**requires** 8:7 250:15
**requiring/approvi...**
  291:5
**res** 170:13 239:24
**research** 11:4
  151:19 185:19
  249:5,7,12,15
**researched** 185:18
**resents** 217:16
**resisted** 183:14
**resolution** 116:24
  117:12 158:2
  230:8 231:9

234:23
**resolve** 227:23
  282:19
**resolved** 43:14
  117:15 168:17
**resolves** 129:13
**respect** 25:1 36:15
  66:18 96:8 98:5
  118:14 124:18
  133:17 181:2
**respective** 10:6
  228:20 286:2
**respects** 134:17
**respond** 38:9,17,19
  39:12 61:5 114:24
  217:12
**responded** 39:3
  126:6 129:7 130:2
  157:15 173:13
  175:3 217:17,21
**responding** 99:3
  200:6
**responds** 222:2
**response** 9:1 18:24
  20:17 26:14 28:5
  37:16 38:14,22
  52:23 72:13 126:2
  140:24 163:12
  173:8 225:21
  236:2 267:21
  271:15 275:8
**responses** 15:24
  64:22 134:23
  155:18 156:18
  221:19
**responsibilities**
  101:8,12 102:4
  122:4
**responsibility** 57:22
  123:14 209:21
  215:7 235:3
**responsible** 123:1
  288:5
**responsive** 8:17 9:9
  10:8,18 78:3 99:7
  173:22
**rest** 181:10
**restarting** 164:21
**restraining** 165:17
**restricted** 123:16
**result** 63:3 170:12
**resulted** 234:15
**results** 153:15
**retained** 193:7
**retainer** 11:7,13,14
  11:17,20 78:12

84:21 87:4 93:5
97:23 100:8
104:24 105:1
131:14
**retention** 14:20,22
15:2,9 81:10
92:19,23 93:7
98:13,20 99:10
100:21 143:5,8
144:21 195:15
**retired** 35:22
**retract** 270:11
**retrieve** 17:5 122:21
**revealed** 154:3
196:15 261:13
**revealing** 219:14
**reversed** 253:5,5
**review** 10:18 16:13
17:1 18:6,14,15
18:18 20:22 85:10
99:19 214:10
290:7
**reviewed** 8:15 20:7
20:10 99:4 126:3
134:24 140:21
141:4,12,20
**reviewing** 16:16
18:12 77:16 78:1
193:3 214:12
**revise** 20:16
**revised** 82:19 85:4
**revisions** 20:13
**rights** 101:7 232:22
**rigorously** 294:23
**rise** 116:5
**risk** 40:16 41:2
**risks** 40:14,23
**rite** 266:11
**road** 235:21 265:6
**robust** 252:2
**Rogan** 153:12
**role** 112:6,10
193:17 194:9
230:14
**room** 30:5 69:5
**rooms** 51:22
**rope** 39:11
**Ross** 57:9 59:2
114:8 128:9
146:17 155:2
156:12
**rough** 88:6
**rule** 52:19 102:13
203:24 206:16
295:2
**ruled** 16:21 39:9

63:20 167:2
**rules** 1:13 74:19
104:9,10,17
187:14
**ruling** 16:1,20
117:11 234:10
239:24
**rulings** 282:16
**run** 55:16,20 56:2
58:1 65:3 178:18
184:19 240:2,5
**running** 39:10
158:12
**Ryan** 57:9 73:18

_____

**S**

**S** 3:9
**sabotage** 75:6
**sacrifice** 138:24
**sake** 219:6
**Salam** 119:22
128:10 131:11
**sanction** 134:18
**sanctioned** 291:11
**sat** 252:6
**save** 11:3,6 98:9
**saved** 11:2 17:10
98:7
**saw** 62:6 69:5,8,13
145:15 191:18
**says** 104:23 166:2
171:17 211:11
215:20 221:24
229:3,4 290:18
**scammed** 135:11
**scan** 98:9
**scanned** 98:6
**scenario** 171:11
227:15 228:3
**scene** 35:15
**Scharf** 6:23
**schedule** 138:24
187:23
**scheduled** 35:21
53:2 163:5 188:4
188:21 191:3
193:11 292:4
**scheduling** 133:5
255:12 291:5
**scope** 26:11 72:22
100:13 277:21
**se** 18:19 144:22
218:16
**seal** 67:22 297:19
**search** 13:24 89:1
**searched** 84:10

**secrecy** 47:24 157:9
**secret** 11:23 78:7
156:8
**secretly** 48:1
**sector** 261:10
**seeing** 77:24 193:4
**seek** 70:15 115:17
121:1 137:18
139:7 170:7
195:20 206:14,15
207:20 231:9
**seeking** 44:13 51:12
75:1 154:12
166:11 183:6
186:22 197:1
198:5 206:19
207:23 209:1
270:10
**seeks** 171:5 204:10
**seem** 133:1 173:3
180:7 212:2
232:15 289:3
**seemed** 174:17
225:20 257:22
**seems** 76:20
**seen** 8:4,6 82:4
85:17 89:4 101:9
101:11 106:19
128:15 129:19
153:1 169:13
198:20,21,23
217:2
**segment** 14:19
**segue** 227:2
**segueing** 227:1
**select** 43:21
**selected** 42:15 43:20
**selection** 217:9
**sell** 71:4 74:17
216:1
**selling** 171:22
**send** 43:10,23 61:4
106:10 241:2,9
246:16,20,23
247:1,11,13 248:5
258:13 259:6,10
264:6
**sender** 19:9 43:11
122:20 289:5,10
**sending** 186:21
198:11 241:4
250:21 259:8,11
292:13
**sends** 249:23
**sense** 13:22 18:4,21
44:18 74:18

214:19 215:1
224:6 225:12
235:8 293:15
**sentence** 93:20
211:8 291:2
**separate** 11:17 47:4
74:7 84:23 224:20
239:14 283:6
**separately** 65:11
228:16,17
**September** 36:9
56:14 129:22
182:4,5,6 196:7
196:12 257:8,9
**sequence** 76:6 157:9
166:19 167:13
172:2 187:21
213:8
**sequences** 188:8
**series** 29:18 55:19
55:22 227:4
**serious** 132:3,7
133:3,22 232:6
254:1,3
**seriously** 276:21,22
278:23 279:1,4
**serve** 232:2
**served** 140:18 145:6
271:7 286:5
**services** 26:21 149:1
186:19
**session** 54:1 166:8
172:6 174:20
224:5 272:4 276:5
276:12 290:14
292:13 293:2,4,17
293:23 294:20,21
**sessions** 32:10 107:7
107:24 172:18
194:11 291:17
**set** 10:22,22 31:24
38:10 39:16 117:5
118:4 217:22
218:7 222:10
244:23 297:18
**setting** 144:21
153:23 168:6
169:15 272:13
**settled** 53:12 164:6
164:7,8 175:9
223:19 230:4
237:4 238:1
**settlements** 124:14
232:11
**settling** 39:6 74:17
74:20 136:11

180:20
**seven** 36:9 248:18
**several** 16:11 26:10
56:12 105:13
143:2 149:10
**shake** 80:16
**shall** 93:3,4,6
**shape** 175:4 283:19
**share** 110:3,7,10,23
111:1 124:7
130:22 131:6,21
155:9 156:19
210:16 248:14
254:6
**shares** 209:7
**sharing** 116:19
154:18 221:13
260:24
**she'd** 201:19
**she's** 17:24 97:5
141:6
**sheet** 36:13 37:4,15
89:16 107:2
133:23 186:11
226:5,15
**sheet(s)** 296:12
**sheets** 259:4,5
296:15
**shielded** 9:10
**Shoes** 153:12
**short** 130:3 140:13
166:3 263:10
288:19
**Shorthand** 297:3
**shot** 218:1 225:14
**shouldn't** 49:23
189:22 190:14
225:4 260:24
**show** 58:1 91:13
107:2 157:2,5
**showed** 51:17 52:2
135:16 191:10,12
191:19 292:8
**showing** 85:8 88:17
156:1 178:15
191:16 289:9
**shows** 158:14
**side** 14:16,16 51:22
139:4 172:21
184:7
**sides** 168:17
**sign** 77:11 83:9
103:1,12,14 104:4
252:21
**signature** 87:17,20
88:9

signatures 87:23
signed 11:21 23:23
    27:23 78:13 80:8
    82:8,9 84:8,24
    85:1 92:2 94:1,9
    103:10 129:4
    131:14 193:6
    195:16 253:7
significance 48:20
    263:21
significant 174:15
    241:23
significantly 136:20
    267:16
signing 103:18
    252:24
silence 266:23
silent 37:17
similar 289:8
simple 5:24
simpler 171:9
simply 178:6 220:10
    220:13 272:5
Sims 135:11
since 6:17,17 7:6
    9:5 17:11 38:21
    190:2 257:5
single 237:2 264:24
Siprut's 211:5
    252:22
sit 21:11 141:22
    191:17 192:15
    228:19 281:14
    295:1
sits 249:3
sitting 260:12
situation 29:12
    56:17,19 57:16
    131:2 143:13
    147:23 148:20
    151:2 160:2
    169:19 202:3,13
    229:2,6 232:20
    249:20
six 36:8 44:17 82:9
    248:10
size 149:24
smartest 238:4
software 10:20 17:8
    17:15 97:17,24
    98:9,22 99:5
    131:18
Solberg 57:10 194:4
solicitation 43:23
    45:12,15 68:11
    187:3

solve 168:22
solvent 135:22
    267:5
somebody 61:4
    62:10 74:6 125:19
    145:11 171:6
    178:7 215:2
    219:24 232:8
    240:4 241:10
    244:14 261:2
    283:12
somehow 17:21
    36:6 125:24
    135:11 168:21
    185:13 239:22
    266:12 273:7
someone 68:7 132:2
    189:15
sometimes 45:18
    163:17 294:15
somewhere 96:3
    193:15
soon 158:22
sooner 35:2 158:17
sorry 103:4 217:13
    239:15 278:9
    287:14
sort 72:9 78:14 87:5
    96:1 105:2 127:21
    218:2
sought 56:4 60:10
    115:19 127:3,5
    183:18 188:11
    209:18 233:15,17
sound 173:4
source 62:24 116:3
    149:3,9 176:20
sources 148:14,15
    149:10 177:10,11
speak 58:2 194:15
    194:16
speaking 47:23
    101:10 108:20
    118:4 150:17
    151:10 152:14,16
    161:5 169:17
    201:5 276:2
special 71:11,15
    73:4 77:2 87:5,11
specialty 280:10
specific 73:1,3
    99:24 100:6
    163:23 169:19
    195:17 259:16,22
    263:16 265:7
    270:2

specifically 22:19
    96:8 124:20
    148:24 211:16
    233:23 243:9
    281:11
specifics 36:15
    149:22 257:18
    286:13
specified 297:12
specifying 75:16
speculation 108:17
    181:13 279:6
speculative 110:24
    195:8 208:6
    222:12 278:16
spend 180:22
    246:18
spending 172:19
    174:13
spent 287:23
spits 249:4
split 105:7
splits 212:12
spoke 13:1 61:16
spoken 127:12
spread 13:4
spreadsheet 17:17
    17:22 19:7,13
spring 31:16
Sprinoff 160:22
squeamish 217:24
SS 297:1
stabbed 137:15
stage 136:9
stages 186:12
staggering 214:1
stamped 62:7
stand 229:3,4
standard 78:12
    84:20 100:21
    102:3
standing 22:14
    241:22
start 95:7 130:8
    132:14 150:4
    153:10 221:18
    236:9 293:2
    294:21
started 25:8 44:24
    45:5 69:6 80:7
    134:10 164:4
    217:8 246:6 266:3
    267:5 275:5
starting 83:22
starts 8:13 163:18
    271:20 272:2

stated 20:22 34:7
    83:24
statement 94:9
    132:6 160:1 164:6
    191:11,14,17,21
    192:16 219:13
    255:18
statements 254:6
states 1:1,13 87:13
    92:24 103:18
    104:15,19 274:9
    296:1
stating 128:10
statistical 249:8
status 87:5 153:4
    162:15 179:21
    181:22 205:12,14
    257:11
statuses 44:12
statutory 239:6,7
    295:3
stayed 7:2,4 27:15
staying 27:14
Stein 75:7 76:12
    77:7 78:21 79:1
    80:2,8 81:7,11,20
    81:24 82:20,22
    129:5 131:15
    209:9 253:1
stenographically
    297:8
step 41:18 124:13
Stephen 2:19 4:8
steps 48:4 158:1
    159:9,23
Steve 135:11
Stick 185:21
still 38:6 108:15
    156:24 163:21
    176:15 201:15
    217:1 219:15
    221:13 226:20,21
    241:12 248:11
    268:21 269:2,7
    285:12
stipulate 79:8
stipulation 288:24
stop 50:15 158:1
    159:10,20 165:5
    165:18,18 174:12
    184:6 192:12
    218:5 286:14
stored 131:17
story 267:9
strategies 261:17
    262:12

strategy 218:18
    235:12
street 1:18 2:3,8,13
    5:15
stretches 287:6
stricken 274:1
strictly 190:1
strike 175:14 177:5
    181:4 209:1
    236:19 274:24
striking 275:2,4
stronger 264:18
structured 250:4
stuck 289:20
studied 237:12
study 191:17
    192:15 193:8
studying 192:17,24
stuff 150:5 219:17
    220:12 226:12
stupid 170:22 238:6
style 191:18 192:5
    193:5
subclass 265:8
subject 19:10 50:10
    72:17 171:11
    210:16 249:15
    271:11,19 287:6
    290:18
subjected 134:17
submit 96:1
submitted 27:19
    92:7
subordinate 233:16
subpoena 8:7,10,13
    9:1 16:2 23:5 26:1
    26:3,5 99:3
    113:14 140:18,24
    141:11 142:1
    145:6,24 271:7
    289:7
subpoenaed 23:2,3
    62:8
subpoenas 23:7
    63:2
subscribe 296:10
SUBSCRIBED
    296:18
subsequent 135:16
    253:3
subsequently 51:7
substance 33:6 34:2
substantively 224:9
subtle 258:5
successful 79:10
    158:2,6

successfully 211:10
succinct 12:24
such 19:8 71:5
  72:20 87:15 93:3
  93:4,7 97:13
  119:18 144:4
  180:2 189:16
  213:2,13 238:7,10
  238:18 245:6,6,7
  245:7 263:14
  266:12 274:14
  297:15
sued 45:17,19 71:20
  134:5 135:2,18
  136:3 180:21
  264:10
suffered 138:19
  230:6
sufficient 239:13
sufficiently 252:2
suggest 30:20 61:12
  161:3 167:11,14
  173:3 176:8
suggesting 175:5
  185:9,13 187:10
  211:18 266:24
  285:22
suggestion 37:17
suit 60:6,13 148:2
  160:5 264:8
Suite 1:17 2:3,13
summary 236:24
  237:3 290:16,19
summer 209:10
supplement 144:19
supplied 9:8
support 154:22
suppose 119:7
  201:16,19 204:21
  214:11 234:3
supposed 158:15
  221:21 227:16
  240:20
supposedly 163:5
Supreme 63:19
surprised 249:16,18
susceptible 226:17
sustain 208:16
swear 4:23 244:15
swift 234:23
switch 193:16
sworn 5:1,4 260:13
  260:14 296:18
  297:7
system 294:14
  295:6

**T**

T 3:9 87:1
T-O-W-S-E-Y
  13:10
tab 16:19
table 130:16 223:13
  223:17 279:5,12
tactful 258:4
taken 1:12 51:16
  115:9 127:8 142:5
  157:24 159:9,22
  177:23 219:23
  222:8 297:12
takes 215:6 217:17
  238:11 272:6
taking 1:14 4:11
  41:20 152:9 158:6
  158:20 159:11
  170:22 247:14
  286:18
talk 15:11 55:4,7
  72:3 93:17 109:2
  116:4 130:6
  157:20 159:8
  172:14 210:23
  258:8
talked 25:11 113:6
  113:10 116:12,13
  148:11 149:19
  154:11 193:24
  200:15 228:16,17
  263:23 280:5
  292:24
Tangible 226:24
Tape 4:2
target 258:15
tax 171:23
TCPA 44:1,4,10,15
  44:19 45:3 46:6
  49:18 63:21
  179:20 181:6
  186:19,23 199:23
  236:22 237:2,5
  241:3 245:22
  248:16 266:1
  279:22 280:18
technical 17:11
technically 52:5
  92:14
technique 42:18,22
  43:15,16 46:18,21
tecum 140:18 142:1
  145:6 271:7
teed 282:4,7
tees 270:12
telephone 29:20

35:16 134:15
  135:19 164:1,2
telephoning 42:23
tell 10:7,17 57:14,20
  59:3 61:10,13,24
  100:4 103:24
  121:24 122:1
  130:19 131:4
  132:2 169:16
  172:15 193:2
  220:15 228:5
  253:12 267:9
telling 114:9 211:3
  254:21 255:8
tells 262:20
tend 152:22 210:22
tendered 174:6,24
term 34:10 36:13
  37:4,15 45:15
  56:12 169:21
  213:5 215:11
  226:4,14 256:20
  259:4,5
terminated 36:3
  199:5
terminology 213:4
terms 47:2,5 66:12
  68:20 78:14 81:12
  84:18 93:5 100:23
  107:9 122:15
  127:21 158:19
  181:9,10 195:5
  202:5 210:14
  240:18 265:13
  281:6 291:24
testified 5:4 42:14
  80:5 148:18,19
  192:14 201:2
  258:23 260:18
  262:7 283:15
  285:4
testify 257:6 297:7
testifying 83:12
  179:23 211:24
Texas 62:8 65:18,19
  75:19,21 111:11
text 54:5
Thank 16:10 22:20
  39:24 60:7 160:21
  278:3 289:18
Thanks 74:3
theirs 215:10
themselves 4:13
  115:16 134:17
  278:1
theoretically 36:14

221:19 257:16
  262:15,22
theories 113:4
theory 198:16
thereafter 35:7 36:1
  105:24 209:16
thereby 52:18 171:7
they'd 38:20 135:18
  136:2 209:15
They'll 171:18,19
they're 9:6 18:2
  40:11 76:16 78:10
  81:14,15 84:16
  101:14 110:15,17
  119:13 127:21
  153:21 232:9
  239:9 240:1 248:7
they've 28:3 46:16
  136:10 154:16
  187:2 260:18
  262:7
thing 16:5 19:5
  136:7 159:4
  164:12 177:21
  238:10 239:18
  256:15,15 273:8
things 21:9 37:16
  58:15,16,16 98:2
  98:3 101:3 102:10
  158:21 185:24
  197:24 234:19
  248:20 251:7
  257:13 259:11
  260:8 262:5
  264:17 268:8
  278:19 290:15
thinking 51:15 52:1
  52:21 219:7
thinks 272:4
third 168:21 221:22
  292:4
Thomas 33:17 34:2
  56:10 119:20
  121:7,16 124:4
  131:9,14
Thompson 2:20
  4:10
though 184:22
  185:9 284:19
thought 37:20
  134:11 141:15,21
  161:11,23 162:3
  170:24 194:20
  195:18 196:10
  227:21 234:12
  235:17 255:24

256:10 275:18
thoughtful 192:20
thousands 60:20
threat 264:11
threats 190:5
three 41:22 104:23
  201:9 254:11
three-ring 15:21
  16:24
thresholds 251:12
threw 236:5
throughout 291:16
throw 169:1
thrown 169:2
tickets 59:23
till 39:2
timely 200:3
times 236:3 243:2
timing 47:17,23
  157:8
title 91:17
today 8:20 18:7
  19:18 20:8,11
  21:12 22:22 24:12
  26:22 33:4 47:15
  78:9 83:16 112:13
  140:23 141:22
  144:13 146:1
  269:15 272:23
  281:14 289:8
  295:1
today's 4:5,10 8:8
  15:12 16:13,17
  18:12,15 27:4
  295:10
together 29:15 34:9
  37:9 49:13 142:10
  148:1 160:5,9
  166:2 253:11,19
  259:4 279:21
  283:12
tomorrow 51:23
too 149:5 150:22
  213:6 249:10
  254:16,16 292:16
took 29:11 47:16
  52:21 56:17 58:21
  62:19 64:1 68:1
  76:1,3 120:18
  147:22 148:20
  151:1,23 155:4
  156:14 159:19
  160:2 188:5
  263:10 288:19
top 125:18 128:7

129:21 290:9
topic 265:17
tort 198:16
total 142:10
totally 20:23 244:2
  268:24
toward 161:10
  283:16 290:9
towards 26:6 190:6
Towsey 13:10
track 236:5
trail 124:17
Training's 202:15
tranche 184:20
transaction 143:14
transcript 83:19
  255:22,24 296:9
  296:11
transfer 284:10,17
transferred 283:24
transmission 173:1
transmitted 190:4
trap 158:11
traveled 53:6
treating 225:3,5
Trenam 6:23
trial 211:13 217:18
  225:13
trials 237:5
trick 187:18
tried 48:3 136:6
  158:7 167:5
  192:10 236:22
  258:4
tries 202:5
trouble 204:22
true 21:16 64:20
  143:20 149:11
  154:17,17 190:22
  218:12,16,16
  220:10,13,15,19
  220:21 221:11,13
  261:1 296:11
Trump 170:20
trusted 190:15
truth 297:7
truthfully 6:8 55:1
  59:17
try 17:5 19:14 39:17
  47:24 65:24 98:1
  98:1 117:2 150:21
  158:1 159:10
  180:19 235:12
TTA 77:3 159:20
  162:24 169:19
  250:19

**U**

Tuesday 129:22
turn 89:20 92:18
  101:4
turned 209:21
  235:20
turns 190:14
two-page 244:1
type 135:3 170:2
  249:20 288:2
typewriting 297:9
typically 98:13
  100:24 102:7
  248:3

**U**

U.S 63:19
uh-huh 201:14
  266:23
ultimate 117:11,12
  161:24 273:24
ultimately 33:21
  64:1 105:22 117:7
  117:16 165:16
  188:19
unable 61:5 159:7,8
unbeknownst 39:15
uncertainty 111:13
  226:12
uncertified 215:23
  216:7
under-oath 245:24
  250:8,9
under-penalty-of-...
  246:1
underlying 17:7
  62:24 113:4 116:5
  116:7 266:6
understands 258:9
understood 6:7
  41:11 254:5 274:7
undertook 50:15
undisclosed 274:17
undone 136:17
  267:12,15
unethical 47:7,13
  58:10,14 231:24
unethically 151:10
unfortunate 67:20
unfortunately 67:3
  67:4,19 130:4
  190:19 235:16
  270:1
unhappy 57:2,19
uninsured 135:23
unintentional 239:6
unique 71:11,15

214:17
United 1:1,13 296:1
universe 141:9,16
  142:10
unless 150:16
  195:23 294:17
unlikely 128:15
unnamed 95:2
unpermit 241:14
unproductive 272:2
unprofessional
  128:17
unquote 148:19
  160:9 213:3
  259:17 267:11
unrealistic 244:3
unreasonable
  176:18,19 179:4
  244:14 245:1,18
  250:1,23 268:5,6
  268:13,15,23
  269:3
unresponded 174:8
unsolicited 241:4,6
  264:6
unsuccessful 157:23
until 7:5 43:19
  117:16 180:22
  198:12 223:23
  259:15 274:22
unwilling 129:12
unworkable 244:6
upcoming 276:12
  290:13
upon 20:22 74:22
  121:4 140:18
  156:22 234:13
  248:15 271:7
upset 29:2,8 147:20
  151:1,8
us 19:18 54:14
  128:12 140:22
  141:2,6,8 142:6
  144:6,12 170:22
  170:23 176:5
  186:16 211:3
  228:18 248:14
  272:6 292:15
  295:2
usable 17:14
use 31:5 34:10
  42:22 101:13
  148:7 153:11
  169:21 240:20
  252:11 254:17
  256:20 258:15

264:16
used 17:24 30:8
  32:2 37:1 38:15
  42:19 43:16 46:19
  47:5 50:10 114:15
  115:14 120:22
  187:12 248:22
  258:6 261:23
  274:17
useful 210:2
uses 45:12
using 30:3,23
  118:21 136:15
  139:4 217:10
  249:21
usually 256:14
usurping 136:10
utilized 248:21,22
utmost 215:17
  216:5,6,11

**V**

vague 225:11
  254:16
valid 253:14
valuable 57:4
  264:19
value 136:5,12,23
  139:5 265:14
  267:8
valve 41:10
varies 215:14
various 11:3 16:22
  32:11 44:11 48:4
  57:23 141:17
  155:17 170:4
  177:9 186:11
vast 268:9
vehicle 114:14
veiled 259:18
venue 205:15
verbatim 161:3
  266:24 267:18
verbiage 226:9
verdict 236:23
  237:6
verdicts 237:10,11
verge 235:24
  237:13,18,24
verified 233:22
verify 243:19
versus 4:4 13:5 15:4
  29:5 65:13 96:16
  143:17 144:17
  151:14 185:14
  196:18 199:2

205:13 214:6
  232:8,14 237:10
  239:14 242:9
  255:13 265:9,11
very 12:24 39:24
  41:12 58:3 62:21
  117:6 135:21
  166:2 168:22
  180:3 193:4
  225:16 235:11
  237:8 256:8
  257:21,23 265:6
  288:21
viable 279:3
victim 135:14
video 4:6
Videographer 2:19
  4:1,22 54:17,20
  140:3,7 212:4,7
  263:4,7 288:13,16
  295:10
videotaped 1:10 4:2
view 39:7 56:21
  57:18 71:10,16
  73:5 74:1,11,16
  83:7 99:15 100:9
  104:15 118:17
  120:8 137:10
  146:21 194:24
  245:10,12,17
  282:4
views 162:2 250:7
vigorously 101:19
Vindicate 232:22
vine 240:10
violate 239:8
violating 135:18
violation 29:19
  134:15 240:23
virtue 289:14
vis-a-vis 172:2
  259:23
visiting 285:1
voice 194:16
volume 4:3 18:22
voluminous 19:12
  19:14
voluntarily 127:6
  261:8
vs- 1:5 296:5

**W**

waiting 133:4
waive 180:14,18
waived 179:13
  181:6 185:7

272:20 275:12
277:17
**waiver** 179:17
183:5,17 261:7,16
262:10
**walked** 51:20
274:15
**Wally** 57:10
**Wanca's** 11:15
62:19 80:11,18
82:16 84:23 90:19
99:23 105:3 106:8
122:17 153:13
200:24 209:22
210:15 220:11
229:3 256:23
257:4 259:1,7
275:7
**wanted** 45:7 46:23
91:5 92:15 129:16
165:9 168:15
178:2 181:1,17,21
187:17 197:21
280:9 291:1
**wanting** 176:18
**wants** 153:12
170:15 217:22
218:7 219:11,24
222:10 272:12
**wasted** 158:16
**water** 169:1
**Watkins** 35:9
124:22 125:14
222:22
**Wayne** 153:11,14
161:9 188:12,18
188:21,22 189:4
293:10
**ways** 282:6
**we'd** 228:20
**we'll** 196:1 219:1
270:16,20
**we've** 24:20,21
37:20 106:19
114:22 126:21
140:12 151:3
157:4 206:6 217:5
259:2 263:1
269:11 270:23
272:18 290:5
**Wednesday** 21:10
22:5 51:18 52:8
53:18
**week** 68:6 200:9
**weeks** 38:18 48:15
60:6 136:22

**weigh** 205:24
230:21
**well-known** 42:20
**weren't** 49:5 54:7
70:9 92:14 98:17
120:4,5,11,12
173:14 180:20
190:12 254:2,3
265:12
**West** 45:3,9
**what's** 32:16 69:23
85:8 89:8 91:13
100:23 119:9,17
120:17 125:2
127:17 132:9
189:18 203:15
204:14 206:1
233:15 237:9
247:7 262:21
270:23 281:22
282:4,7
**whatnot** 148:8
**whatsoever** 41:20
136:1 173:8 287:5
287:8,21
**whenever** 59:4
75:17 116:1
210:18 280:18
**whereas** 184:18
294:21
**whereby** 143:9
**whereof** 297:18
**WHEREUPON**
7:22 20:1 85:11
86:1 89:10 91:19
125:7 127:23
132:15 140:5
269:19 289:23
295:13
**wherever** 152:9
**whichever** 76:6
**while** 31:6 38:5 52:5
62:1 149:1 192:15
219:2 249:3
**who's** 102:24 240:4
**whole** 48:7 56:23
70:8 118:4 130:13
214:16 250:3
297:7
**whom** 4:13 36:18
42:7 61:1 116:16
149:14 241:10
252:3
**whose** 120:22
**wide** 192:23
**willing** 41:18

**willingness** 175:5
176:2
**win** 240:9
**winding** 288:12
**winning** 240:1
**Wisconsin** 2:8
**wished** 64:7 96:13
126:1
**wishes** 139:1 169:23
**withdrawal** 232:11
**withheld** 124:3
142:1
**within** 1:16 71:15
98:21 122:7 170:1
182:7 196:14
227:15 276:15,16
288:3 291:19
294:9
**without** 17:14 41:16
41:19 63:17 75:16
93:15 128:18
132:7 174:18
179:17 180:5
182:20 183:4,16
213:7 222:19
223:24 243:14
267:17
**won** 236:24 237:2
**won't** 205:18
206:21 231:14
**wondering** 253:15
**Woodman** 1:15 4:9
297:3,23
**word** 11:1 118:20
169:2 222:18,18
264:16 286:19
287:5
**words** 114:24 148:7
161:2,4 186:3
192:3 213:8 272:8
285:9
**work** 7:12 17:11
41:20 45:10 62:15
70:13 96:15 158:9
168:18,20 197:1
197:15 199:17
206:19 207:4,5
227:16 280:9
**work-client** 9:11
**worked** 6:18 43:1
49:13
**working** 26:6,13
34:20 39:19 41:22
44:24 45:6 61:18
82:12 133:13
145:12 253:11,19

279:21
**works** 258:18
**world** 278:17
**worth** 135:24
138:21 144:13
219:8 220:1,2
267:23,24 268:10
**wouldn't** 15:7 61:11
87:14 99:14 131:4
157:24 158:12
167:9 178:5
191:15 196:4
205:7 229:22,23
231:7 234:16
249:10 251:17
279:2,9 282:17
286:9
**Wow** 155:1
**wrangling** 63:3
**writing** 14:2 28:1,2
96:1 102:17 106:6
123:5 125:17
142:17 165:8
188:9 253:14
293:20
**written** 66:3 80:19
80:22 81:2,21
83:9,13 84:14,15
93:6 96:23 103:1
106:10,13 124:16
143:9 144:24
253:16
**wrong** 68:13,15
165:8,8 203:15
239:23 254:6,9
262:4 293:16
**wrote** 128:9

**X**
X 3:1,9 79:9

**Y**
Y 79:9
**Yaakov** 160:13,19
**Yakov** 160:22
**year** 21:12 285:10
**years** 41:22 43:1
96:7 136:21
164:11 203:23
213:24 244:2
248:18
**yesterday** 15:14,20
18:20 21:20 25:19
27:6,7 113:8
129:24 141:12
145:16

**yet** 70:23 71:9 73:11
73:12 91:12 92:15
208:5 222:17
252:12 293:21
**yield** 35:24
**you'd** 194:21 228:5
260:11,17
**you'll** 74:23
**you've** 12:18 16:2
18:16 24:11 46:5
47:14 80:5 85:10
92:1 134:3 146:21
156:11,16 205:9
217:2 219:22,23
237:2,3 267:3
281:21 282:3
284:21
**younger** 258:1
**yours** 200:23
**yourself** 17:15
18:15 142:14
146:22 147:20
188:15 190:9
195:13 200:18
264:13,14 265:21
279:19 290:8

**Z**
Z-U-R-I-C-H
255:13
**Zakzrewski** 14:4
22:11 53:7,24
87:18 94:9 95:6
201:10,12
**Zakzrewski's** 22:5
**Zurich** 255:13

**0**
**0001148** 271:1
**084-002740** 297:24
**09** 241:17

**1**
1 3:11 8:1 16:3 23:4
1:35 271:12
10 3:16 171:15,15
274:13 289:22
290:2,5
10:15 54:18
10:22 54:21
10:43 129:6
1000 2:13
108 201:9
10th 1:18 4:6
11 83:22
11:56 140:4

**115** 256:2,3
**119** 83:20,23
**11th** 90:5 94:4
**12:53** 140:8
**124** 3:14
**126** 3:14
**12th** 163:7
**13** 211:8
**131** 3:15
**134** 2:13
**139-295** 3:4
**13th** 163:7 271:12
**15** 263:2
**1500** 135:7 144:13
**16** 80:9,17 153:6,7
  188:1 200:22
  209:6 210:9,16
  212:16 213:21
**16th** 187:22
**17** 213:21
**1718** 2:8
**17th** 213:22
**18** 171:20 211:15
**189** 92:20
**18th** 254:22 255:7
  260:14 261:14
  262:6
**19** 171:19
**19,000** 171:19
**190** 93:19
**192** 103:16
**194** 101:5
**1972** 6:17
**1974** 6:22
**1980** 6:22,24
**1983** 6:24
**1990** 7:2,3
**1992** 6:17 7:5
**19th** 26:5 116:9
  188:7 193:13
  214:7
**1st** 129:22

_____ **2** _____

**2** 3:12 19:22 20:4
  83:20
**2:04** 271:16
**2:25** 212:5
**2:37** 212:8
**20** 3:12 39:2 44:5,19
  137:8,9 171:15,18
  171:18 188:1
  268:5,15,19,21,21
  268:23,24 269:2
**2009/2010** 279:17
  280:16

**2010** 55:19 135:4,5
  135:16 136:2
  155:12 182:7
  198:3,13 241:18
  244:15,17 247:11
  249:22 264:4
  265:9,10 267:7
**2011** 134:24
**2012** 199:4,5
**2014** 15:3 55:21
  56:8 64:10 107:4
  185:1
**2015** 32:8 35:11,22
  117:15 128:8
  129:23 132:22
  153:5 164:2 257:9
  259:3 271:12
  290:13,23 293:7,9
  293:12,18 294:2,6
**2017** 1:19 4:6 32:8
  213:18,23 214:2
  296:19 297:21
**2020** 117:16
**20th** 21:10 116:9
  163:6
**22nd** 21:11
**23-B** 102:13
**25** 44:5 80:16
  212:15
**26** 89:22
**267** 220:2
**268** 3:15
**27** 290:12 293:20
**27th** 128:8 290:23
**28** 290:12
**2800** 1:17 2:3
**288** 3:16
**28th** 129:6
**29** 157:4
**29th** 153:9 217:4
  219:11
**2nd** 255:10 256:12
  258:17,19 260:16
  261:15 262:7

_____ **3** _____

**3** 3:12 85:9,14 92:19
  100:9 104:19
  126:22
**3:46** 263:5
**3:55** 263:8
**30** 38:11 39:2 79:18
  200:17 209:5
  210:15 236:4
**30/70** 105:6
**31** 213:18 271:22

**293:11** 294:2,6
**312.658.5500** 2:14
**312.832.5393** 2:4
**31st** 35:22 293:5
**321** 1:17 2:3
**3270** 132:14
**3272** 132:14
**330,000** 239:15
**343,000** 239:16
**360,000** 239:14
**3rd** 107:4

_____ **4** _____

**4** 3:13 89:9,13
**4-139** 3:4
**4:28** 288:14
**4:34** 288:17
**4:43** 295:11,14
**40** 38:12
**422** 127:19
**4th** 132:22

_____ **5** _____

**5** 3:13 91:14,22
  171:14,14
**5:40** 54:4
**50** 274:12 275:8
  276:10 278:22
  279:2,10
**500** 134:18
**5110** 125:4
**53711** 2:8
**59** 212:17

_____ **6** _____

**6** 3:14 125:3,10,18
**6:05** 27:8
**60602** 2:14
**60654** 2:4
**608.620.5357** 2:9

_____ **7** _____

**7** 3:11,14 127:18
  128:2
**70** 79:22 200:18
  209:5
**70/30** 80:7
**75** 217:23 218:8
**755** 19:1

_____ **8** _____

**8** 3:15 89:22 132:10
  132:18
**8:16-CV-01477-C...**
  1:5 4:5 296:5
**83** 7:2

**85** 3:12
**88** 3:13

_____ **9** _____

**9** 3:15 269:22
  270:24
**9:00** 1:19
**9:09** 4:7
**90** 3:13 274:11
**95** 210:21 211:8
**9th** 87:24 88:7 94:2
  94:10 95:11,17
  105:7,9 127:1