1

UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF FLORIDA

TAMPA DIVISION

| | | |
|---|---|---|
| MEDICAL & | ) | |
| CHIROPRACTIC CLINIC, | ) | |
| INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. |
| vs. | ) | 16-cv-1477 |
| | ) | |
| DAVID M. OPPENHEIM, | ) | |
| an individual and | ) | |
| BOCK LAW FIRM, LLC | ) | |
| d/b/a BOCK, HATCH, | ) | |
| LEWIS & OPPENHEIM, | ) | |
| LLC, | ) | |
| | ) | |
| Defendants. | ) | |

        The videotaped deposition of
DAVID M. OPPENHEIM, called by the
Plaintiff for examination, pursuant to
Notice, and pursuant to the Rules of
Civil Procedure for the United States
District Courts, taken before Renee E.
Brass, CSR and Notary Public in and for
the County of Cook and State of
Illinois, at 321 North Clark Street,
28th Floor, Chicago, Illinois, on
August 15, 2017, at the hour of
9:44 a.m.

Reported By:
Renee E. Brass
Job No: 51441

**2**

```
 1
 2   PRESENT:
 3   on behalf of the
     Plaintiff;
 4   FOLEY & LARDNER, LLP
     321 North Clark Street
 5   28th Floor
     Chicago, Illinois 60654
 6   BY: LAUREN M. LOEW, ESQ.
         lloew@foley.com
 7
 8   on behalf of Defendant
     Oppenheim;
 9
     BLONIEN LEGAL COUNSEL
10   1718 Adams Street
     Madison, Wisconsin 53711-2142
11   BY: BARRY J. BLONIEN, ESQ.
         barry@blonienlegal.com
12
13   on behalf of Defendant Bock
     Law Firm.
14
     BOCK & HATCH, LLC
15   132 North LaSalle Street
     Suite 1000
16   Chicago, Illinois 60602
     BY: DANIEL J. COHEN, ESQ.
17       danieljaycohen209@gmail.com
18
19   ALSO PRESENT:
20
     Phillip A. Bock
21   Michele Zakrzewski
     Gregory Williams
22
23
24
25
```

**4**

```
 1
 2               E X H I B I T S
     No.     Description        Page
 3
     Exhibit 1  Notice of           6
 4              Deposition
     Exhibit 2  Retainer Agreement   33
 5   Exhibit 3  Mediation Agreement  52
     Exhibit 4  Email               69
 6   Exhibit 5  Text Messages       74
     Exhibit 6  Answers             78
 7   Exhibit 7  Letter              88
     Exhibit 8  Email Chain         92
 8   Exhibit 9  Text Messages       93
     Exhibit 10 Police Report       114
 9   Exhibit 11 Email Chain         137
     Exhibit 12 Email Chain         147
10   Exhibit 13 Email Chain         150
     Exhibit 14 Text Messages       152
11   Exhibit 15 Email Chain         158
     Exhibit 16 Privilege Log       167
12   Exhibit 17 Objections and      170
                Responses
13   Exhibit 18 Text Messages       175
     Exhibit 19 Text Messages       179
14   Exhibit 20 Answers to          182
                Complaint
15
16   NOTE: Exhibit 3 not
     tendered for inclusion with transcript
17
18
19
20
21
22
23
24
25
```

**3**

```
 1
 2          I N D E X
 3   EXAMINATIONS          PAGE
 4   MS. LOEW              6
     MR. COHEN             186
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**5**

```
 1              OPPENHEIM
 2      THE VIDEOGRAPHER:  We are now
 3   on the record.  This marks the
 4   beginning of media No. 1 in the
 5   deposition of David Oppenheim in
 6   the matter of Medical and
 7   Chiropractic Clinic, Inc. versus
 8   Oppenheim, et al, in the U.S.
 9   District Court for the Middle
10   District of Florida, Tampa
11   Division.
12      This deposition is being held
13   at 321 North Clark Street, Chicago,
14   Illinois, on August 15, 2017, and
15   the time is now 9:44 a.m.
16      Will the attorneys please
17   identify themselves.
18      MS. LOEW:  Lauren Loew on
19   behalf of Medical and Chiropractic
20   Clinic, Inc.
21      MR. BLONIEN:  Barry Blonien of
22   Blonien Legal Counsel representing
23   David Oppenheim.
24      MR. COHEN:  Dan Cohen on
25   behalf of defendant, Bock Law Firm.
```

2 (Pages 2 to 5)

6

OPPENHEIM

1
2      THE VIDEOGRAPHER:  Will the
3  court reporter please swear in the
4  witness.
5      DAVID M. OPPENHEIM,
6  having been first duly sworn, was
7  examined and testified as follows:
8      EXAMINATION
9  BY MS. LOEW:
10      Q.   Good morning, Mr. Oppenheim.
11  Is it Oppenheim?
12      A.   Oppenheim.
13      Q.   Could you please state your
14  full name for the record.
15      A.   David Max Oppenheim.
16      Q.   And Mr. Oppenheim, are you an
17  attorney?
18      A.   Yes.
19          (Oppenheim Exhibit
20          No. 1 marked for
21          identification.)
22  BY MS. LOEW:
23      Q.   Okay.  We have noticed your
24  deposition today.  Just going to -- we've
25  marked this as Exhibit 1.  This is --

7

OPPENHEIM

1
2  yeah.  Here we go -- which is just the
3  deposition notice for today's deposition.
4      So how long have you been
5  practicing law?
6      A.   Since 2002, so nearly 15
7  years.
8      Q.   Where did you go to law
9  school?
10      A.   Harvard.
11      Q.   And what -- what was your
12  undergraduate degree?
13      A.   I have a bachelor's degree
14  from Yale University.
15      Q.   And what did you study there?
16      A.   I double majored in political
17  science and economics.
18      Q.   Did you go straight from
19  undergraduate to law school?
20      A.   Yes, I did.
21      Q.   Do you have any other degrees
22  other than your bachelor's degree and
23  your degree from Harvard?
24      A.   No.
25      Q.   So what was your first

8

OPPENHEIM

1
2  position out of law school?
3      A.   I worked for Wildman, Harold,
4  Allen & Dixon, which isn't around
5  anymore, as an associate.
6      Q.   Did you have a particular area
7  of specialty there?
8      A.   It was sort of general
9  litigation, but based on who I worked
10  with and what experience I gained, I sort
11  of ended up with a concentration in
12  insurance defense and class action
13  defense.
14      Q.   How long were you at -- what
15  was the name at the time?
16      A.   Wildman, Harold, Allen &
17  Dixon.
18      Q.   Wildman --
19      A.   They went by WHAD.
20      Q.   How long were you at Wildman?
21      A.   Seven years.  Well, nearly
22  seven years.
23      Q.   So you -- does that mean you
24  left there in around 2009?
25      A.   Exactly, April -- well, June

9

OPPENHEIM

1
2  of 2009.
3      Q.   And what did you do next?
4      A.   I went to work for Anderson &
5  Wanca.
6      Q.   What did you -- what was your
7  position at Anderson & Wanca?
8      A.   Never really gave us titles.
9  I was one of the attorneys.
10      Q.   Were you an employee?
11      A.   Yes.
12      Q.   When you were at Wildman, were
13  you an associate the whole time that you
14  were there?
15      A.   I was.
16      Q.   How did you learn about
17  Anderson & Wanca?
18      A.   A friend of mine at Wildman
19  had a case opposite Brian Wanca.  I was
20  looking to get out of Wildman.  I was
21  entertaining the possibility of jumping
22  the fence, so -- so to speak, between the
23  defense side and plaintiff's side, and my
24  friend was in court with Brian, and Brian
25  was talking about how much work he's got



10

OPPENHEIM

1
2  and how busy he is.
3         And so my friend is like, hey,
4  maybe -- there's a guy at my office maybe
5  you should talk to, and then he went back
6  and talked to me about it.
7      Q.   Did you know Brian Wanca
8  before that?
9      A.   No.
10     Q.   Had you ever litigated against
11 him?
12     A.   No.
13     Q.   Before you joined Anderson &
14 Wanca, did you do any plaintiff's side
15 class action work?
16     A.   No.
17     Q.   While you were at Anderson &
18 Wanca, what type of work did you do?
19     A.   It was almost entirely
20 Telephone Consumer Protection Act class
21 actions, and most of what I did, other
22 than working on settling those cases, was
23 I litigated insurance coverage cases that
24 stemmed out of the TCPA class actions.
25         A lot of the cases, the only

11

OPPENHEIM

1
2  chance of recovery was against the
3  defendant's insurance company, usually a
4  general liability insurer, sometimes a
5  professional liability or director and
6  officer type policy, and oftentimes the
7  insurers contested coverage, and then we
8  would have to litigate that case
9  separately.
10     Q.   Did you do any nonclass action
11 work at Anderson & Wanca?
12     A.   Well, the coverage cases, I
13 guess, technically are -- were on behalf
14 of the underlying classes, but were not
15 class actions themselves.  They were
16 typically declaratory judgment actions.
17         But with that caveat aside,
18 the only one that I can remember is that
19 we took on a pro bono defense for one of
20 the firms regular class plaintiffs.  Guy
21 named Bob Hinman and I took that case
22 over to handle an appeal in the Illinois
23 Appellate Court.
24     Q.   So other than the TCPA and the
25 insurance coverage cases or covered

12

OPPENHEIM

1
2  cases, did you work on any other types of
3  class actions?
4      A.   There were a handful of FACTA
5  class actions, Fair and Accurate Credit
6  Transaction Acts, which I touched at
7  certain times.
8         Near the end of my stay there,
9  I know that there was an effort to try
10 and broaden the focus of the firm into
11 some other areas, so I looked into
12 certain other things, but never --
13 they -- at least while I was there, they
14 didn't get off the ground.
15     Q.   Did you know any attorneys --
16 I asked you if you know Anderson -- Brian
17 Wanca.  Did you know any other attorneys
18 at Anderson & Wanca before you joined the
19 firm?
20     A.   No.
21     Q.   At that -- at Anderson &
22 Wanca, were there partners in the firm?
23     A.   As far as I know, it was only
24 ever Brian Wanca.  I don't even know who
25 Anderson is.

13

OPPENHEIM

1
2      Q.   You never -- you never worked
3  with anyone named Anderson --
4      A.   No.
5      Q.   -- there?
6         MR. BLONIEN:  Just to clarify,
7  was your question did he ever work
8  with an Anderson there?
9         MS. LOEW:  Yes.
10        MR. BLONIEN:  Okay.  Thank
11 you.
12        MS. LOEW:  Yes.
13        THE WITNESS:  Yeah.  There was
14 a partner named Anderson at
15 Wildman, just for what it's worth.
16 BY MS. LOEW:
17     Q.   Okay.  But not -- I was asking
18 about Anderson & Wanca.
19     A.   Okay.
20     Q.   And so when did you leave
21 Anderson & Wanca?
22     A.   April of 2016, last year.
23     Q.   So you were there for
24 approximately seven years?
25     A.   Right.

4  (Pages 10 to 13)

14

OPPENHEIM

Q. When you were at Anderson & Wanca, did your responsibilities change over time?

A. I think so, yes. When I first got there, I was mostly writing briefs for appeals and for coverage cases, which I continued to do, but a year or two in, maybe three, I started picking up the niche of doing negotiations and settlements.

Q. Did you have any role in bringing in business at Anderson & Wanca?

A. No.

Q. How did the cases come in?

A. People would send in piles of faxes that they had received and then a group of interns would sift through them, and somebody would figure out which ones they thought would make for good cases, and then the cases would be filed.

Q. When you were leaving Wildman, did you look at any other opportunities other than Anderson & Wanca?

A. I did.

15

OPPENHEIM

Q. Where else were you looking?

A. Primarily the runner-up in my little personal search was a place called KamberEdelson, working for a class action attorney in the city named Jay Edelson who has since gone through, I think, two or three other partners since Kamber.

Q. So were you only exploring really the -- the plaintiff's side class action at that time?

A. It's what I wanted to do.

Q. Why did you want to make that switch?

A. I got a little bit tired of being sort of boxed in in a defense side firm where everything was all about the billable hour and everything was all about the sort of clickish office politics relationships.

I -- it appealed to me to go to a practice where you got paid if you won.

Q. At Anderson Wanca, so when you started, you said you were primarily

16

OPPENHEIM

writing briefs, those types of things?

A. I think so.

Q. Where are you admitted to practice law?

A. Just in Illinois if we're taking states, several federal district and circuit courts as well.

Q. So where -- I guess the early stages of your practice at Anderson & Wanca, where were your cases?

A. All over the country.

Q. So you have had kind of a national practice since you went into plaintiff's side class action work?

A. Yes.

Q. Did you interact with clients at all at Anderson & Wanca?

A. Very, very rarely.

Q. On what types of occasions would you interact with clients?

A. Occasionally our client -- our class representative would be deposed in one of the coverage cases I would -- I was handling and I would have to defend

17

OPPENHEIM

that deposition.

Occasionally the class representative was obligated to or wanted to attend a mediation, so they would be in the room with me for that.

Q. Did you take depositions at all at Anderson Wanca?

A. Yes.

Q. And although I didn't go over the typical deposition rules with you at the beginning, as you being an attorney, I will touch on those again right now.

So obviously I'm here asking questions. If you don't understand any of my questions, please let me know.

If you need a break at any time, please let me know. As long as there's not a question pending, we'll take a break, be flexible today.

I'll hand you some exhibits. I have copies for other counsel. I know there is a protective active order in the case, so to the extent any of your testimony is getting into areas that you

18

OPPENHEIM

1  have designated as attorney's eyes only,
2  please gives us a heads up so we can make
3  sure that the client -- or my clients,
4  you know, leave the room.
5       Same with any documents that
6  are designated attorney's eyes only, just
7  let us know.  I'll make sure to give you
8  documents before I ask questions about
9  them.
10      MR. COHEN:  Okay.  For the
11  record, not to be obstructive or a
12  problem, attorney's eyes only
13  creates the burden on you to not
14  use attorney's eyes only documents
15  in the presence of people who
16  aren't allowed to see them, so
17  start with the notion the burden is
18  on you and I'll try to back you up.
19      MS. LOEW:  And the -- the
20  burden would be on the attorney
21  designating a document as
22  attorney's eyes only.
23      We don't know exactly which
24  documents are attorney's eyes only

Note: lines 1-24 above correspond to page 18; the following continues.

19

OPPENHEIM

1  at this point because they say
2  confidential and, where
3  appropriate, attorney's eyes only,
4  so I'll hand you the documents and
5  you can tell me if it is attorney's
6  eyes only and, if so, why and then
7  we can -- we can go from there.
8       MR. COHEN:  I stand on what I
9  said before.  Be careful.
10      MS. LOEW:  Understood.
11 BY MS. LOEW:
12      Q.   So the -- have you ever given
13 a deposition before?
14      A.   Yes.
15      Q.   And what was the context of
16 that deposition?
17      A.   This will be my fourth time.
18      Q.   So the other three
19 depositions, what types of cases were
20 those for?
21      A.   Working chronologically, the
22 first one was a case in which one of the
23 insurers for one of our TCPA class
24 defendants sued another insurer for that

20

OPPENHEIM

1  defendant for contribution, and there was
2  a big issue about whether or not the
3  second insurer received notice of the
4  lawsuit in a timely manner and in a
5  non-prejudicial manner.
6       And so they subpoenaed me to
7  talk about what happened in the
8  underlying case at various times and
9  various stages, I guess, to get at that
10 question.
11      Q.   Okay.
12      A.   The second deposition I gave
13 was in another one of our cases against
14 an insurance company, and when I say our,
15 in this case, as well as the first case,
16 this would be a joint case between
17 Anderson & Wanca and the Bock Law Firm.
18      In this second instance there
19 was a settlement with the underlying
20 defendant, a portion of which was to be
21 satisfied by future efforts to collect
22 from the defendant's insurance company.
23      In that context one of the
24 issues is whether the underlying

21

OPPENHEIM

1  settlement was reasonable and was reached
2  in a nonconclusive manner, and so the
3  attorney for the insurance company
4  noticed up the deposition of the lawyers
5  who had been active in the settlement,
6  including myself.
7       The third one was a deposition
8  taken by the Illinois Attorney
9  Registration Disciplinary Commission
10 based on the complaint Brian Wanca made
11 against me stemming out of the matters at
12 issue in this case.
13      Q.   When was that deposition?
14      A.   That was last year.  I want to
15 say it was last September.  It may have
16 been October.
17      Q.   And who took that deposition?
18      A.   I believe her name was Gina
19 Abbatemarco.  I'm sure I butchered it,
20 but she is with the ARDC.
21      Q.   Other than the complaint by --
22 did you say by Brian Wanca?
23      A.   (Witness nods head.)
24      Q.   Have you had any other

6 (Pages 18 to 21)

22

OPPENHEIM

1  disciplinary complaints?
2      A.   No.
3      Q.   Have you ever been convicted
4  of a crime?
5      A.   Are we talking traffic
6  offenses or --
7      Q.   I guess whatever.  I don't
8  know what the -- what -- what your
9  background is so --
10     A.   I have --
11     MR. BLONIEN:  Objection,
12     vague, confusing.
13 BY MS. LOEW:
14     Q.   Have you ever been convicted
15 of a crime?
16     A.   I have had various convictions
17 for traffic offenses over the years.
18     Q.   Okay.  Were any of them -- did
19 any of them constitute, I guess, a
20 criminal conviction?
21     A.   As far as I know, no.
22     Q.   Were you -- were they related
23 to speeding infractions?
24     A.   Mostly.

23

OPPENHEIM

1      Q.   Did you ever have any, I
2  guess, DUI or DWI types of convictions?
3      A.   No.
4      Q.   Have you ever plead guilty to
5  a criminal complaint?
6      A.   Again, in the traffic context,
7  yes.
8      Q.   So in the -- can you please
9  explain to me what -- what is the traffic
10 context?  What does that mean?
11     A.   Speeding, I think I had one
12 for an illegal right turn on red, and I
13 did have an instance in which I was
14 pulled over and charged with a DUI, but
15 ultimately it would -- the result of that
16 was reckless driving citation.
17     Q.   Were -- and were all of those
18 in Illinois?
19     A.   No.
20     Q.   Where were they?
21     A.   Well, the -- the last one was
22 Miami, Florida, but in terms of speeding,
23 I think at one point I had a ticket in
24 Pennsylvania.  I know I have had one in

24

OPPENHEIM

1  Wisconsin, Ohio, Illinois, Minnesota.  I
2  don't recall any others.
3      Q.   Where do you live?
4      A.   Chicago.
5      Q.   How long have you lived in
6  Chicago?
7      A.   Since 2005.
8      Q.   Where did you live before
9  that?
10     A.   Evanston, Illinois.
11     (Mr. Bock
12     entered the deposition
13     proceedings.)
14 BY MS. LOEW:
15     Q.   And so before 2005 you lived
16 in Evanston?
17     A.   Right, from 2002 to 2005.
18     Q.   Where did you live before
19 Evanston?
20     A.   Out in Somerville,
21 Massachusetts, just over the line from
22 Cambridge.
23     Q.   How long were you there?
24     A.   The three years that I was at

25

OPPENHEIM

1  law school.
2      Q.   And where did you live before
3  that?
4      A.   In campus housing at Yale
5  University in New Haven, Connecticut.
6      Q.   And where were you before you
7  were at Yale?
8      A.   I lived with my parents in
9  Deerfield, Illinois.
10     Q.   How long were you in
11 Deerfield?
12     A.   I think they moved there when
13 I was 3 in 1980.  May have been '79.
14     Q.   So you have been in the -- the
15 City of Chicago since 2005?
16     A.   Yes, Rogers Park.
17     Q.   Have you lived in -- at the
18 same location since 2005?
19     A.   Yes.
20     Q.   Okay.  How many class action
21 matters did you work on at Anderson &
22 Wanca?
23     A.   I think I touched a lot of
24 them, over 100 for sure.

7 (Pages 22 to 25)

26

OPPENHEIM

Q. How many times did you actually appear in a case?

A. Well, in state court the firm makes the appearance, so are we talking federal?

Q. Yes.

A. I don't know.

Q. Would there be certain situations in which you would not file an appearance in a case?

MR. BLONIEN: Objection, confusing.

THE WITNESS: I'm sure there are cases in which, for example, I negotiated a settlement or unsuccessfully tried to and did not formally appear.

BY MS. LOEW:

Q. Why -- why would you appear in some cases, but not others?

A. If I needed to cover a hearing in court, I would need to, of course, have an appearance on file, same with deposition.

27

OPPENHEIM

Any case that I was primarily handling, I would put in an appearance at the beginning of the case.

Q. Did you file an appearance in I'll call it the -- the Medical and Chiropractic action, the M&C action, which is the case where Medical and Chiropractic was a punitive class representative against the Buccaneers?

A. I don't believe I did.

Q. And why not?

A. Again, the only involvement I had was trying to negotiate a settlement.

Q. So in cases where you were focused on negotiating a settlement, you typically would not file an appearance?

A. I think that's fair.

Q. The -- did you work with the Bock Law Firm when you were at Anderson & Wanca?

A. Yes, extensively.

Q. How many matters did you work with the Bock Law Firm?

MR. BLONIEN: Objection, vague

28

OPPENHEIM

as to time frame.

BY MS. LOEW:

Q. When you were at Anderson & Wanca.

A. Easily hundreds. Every case that Anderson & Wanca had when I got there in 2009 up until about 2012, 2013, thereabouts, was a case that was joint between Anderson & Wanca and the Bock Law Firm.

Q. When did you first meet Phil Bock?

A. I went in my first week at Anderson & Wanca to watch a class certification argument that he was arguing in a case called CE Design versus Cy's Crab House.

It was a argument ultimately that he won, and I met him afterwards.

Q. Was that a case in which the Bock Law Firm and Anderson & Wanca were co-counsel?

A. Yes.

Q. Did you understand whether

29

OPPENHEIM

there was any sort of formal relationship between Anderson & Wanca and the Bock Law Firm?

MR. BLONIEN: Objection, vague.

THE WITNESS: As far as I know, it was an implied partnership. I have never seen anything in writing.

BY MS. LOEW:

Q. Were there other firms that Anderson & Wanca worked with as extensively as the Bock Law Firm?

A. No.

Q. Were there other firms that Anderson & Wanca worked with generally --

A. Yes.

Q. -- on more than one occasion?

A. Yes.

Q. And what were those firms?

A. Well, the Margolis Law Group I think is what it's called in St. Louis has a number of cases both with Wanca and with the Bock Law Firm and with both.

8 (Pages 26 to 29)

30

OPPENHEIM

There was later on a gentleman
named John Lawry and his firm in
Cleveland, Ohio that was an extensive --
had an extensive relationship with Wanca.

Beyond that there were people
that were used as local counsel, some on
multiple occasions.

Q.   Did you work with Mike Addison
on more than one matter?

A.   I did.  Still do.

Q.   And how many matters did you
work with Mike Addison on while you were
at Anderson & Wanca?

A.   I want to say -- well, and I
guess it depends on if you define a case
like the Superior Pharmacy case where
there was the underlying class action and
then there were two separate insurance
companies with coverage actions, does
that count as one or does that count as
three?

Each -- if you count it as
three, each individual matter as a
separate matter, probably 10.

31

OPPENHEIM

Q.   How did Mike Addison and
Anderson & Wanca come to work together?

MR. BLONIEN:  Objection, calls
for speculation.

THE WITNESS:  I don't know.

BY MS. LOEW:

Q.   The Medical and Chiropractic
action, how did that matter come to
Anderson & Wanca?

MR. BLONIEN:  Objection, calls
for speculation.

THE WITNESS:  I don't know.

BY MS. LOEW:

Q.   When did you first start
working on it?

A.   I think shortly before the
February 2015 scheduled mediation with
Rodney Max in Miami.

Q.   Were you aware of the matter
before that?

A.   I think so.

Q.   Who was working on the matter?

MR. BLONIEN:  Objection, calls
for speculation.

32

OPPENHEIM

THE WITNESS:  Well, the office
generally had kind of an assembly
line approach, so Brian Wanca
oversaw getting complaints put
together and filed, so I imagine he
did that in that case, although I
don't know for sure.

Ryan Kelly primarily took
depositions and did discovery along
with Ross Good, and I think both of
them did that -- fulfilled that
function in the Medical case.

I'm not sure if anyone else
would have been involved, but,
again, I wasn't until shortly
before the mediation.

BY MS. LOEW:

Q.   How long has Ross Good been an
attorney?

MR. BLONIEN:  Objection, calls
for speculation.

THE WITNESS:  It's a good
question.

He was there as an intern or,

33

OPPENHEIM

I guess, the head of the clerks
before that, and then he passed the
bar and became an attorney, I want
to say a couple of years ago.

BY MS. LOEW:

Q.   So he -- he was at the firm as
a non-attorney for a period of time?

A.   Right.

Q.   So what -- when you became
involved, what was your role with the M&C
action?

A.   Well, I had to put together a
mediation statement and then go down and
work the mediation, see if I could get a
class deal done.

Q.   And when you got involved in
the case, who did you understand was your
client?

A.   The class, and that's true of
pretty much every case.

MS. LOEW:  This is Exhibit 2.
(Oppenheim Exhibit
No. 2 marked for
identification.)

9 (Pages 30 to 33)

34

OPPENHEIM

1  BY MS. LOEW:
2      Q.   The court reporter has handed
3  you what we've marked as Exhibit 2, which
4  is entitled retainer agreement at the top
5  and is M&C 0000188 through 195, and I'll
6  note that this is confidential pursuant
7  to the protective order.
8          Have you seen this document
9  before?
10     A.   No, with the caveat that I was
11 aware that it was part of the document
12 production in this case.
13     Q.   When you were at Anderson &
14 Wanca, did you review retainer
15 agreements?
16     A.   I may have seen one or two
17 once or twice, but as a general practice,
18 no.
19     Q.   The -- if you look at this
20 retainer agreement, do you see Medical
21 and Chiropractic Clinic, Inc. listed as
22 the client at the top?
23     A.   In the capital letters?
24     Q.   Yes.

35

OPPENHEIM

1      A.   I see that.
2      Q.   Okay.  And that it says M&C,
3  Medical and Chiropractic Clinic, Inc.,
4  hereby retains Anderson & Wanca to
5  represent the client regarding any and
6  all claims that the client may have or
7  similarly situated individuals, the
8  class, in quotes.
9          Do you see that?
10     A.   I see that.
11     Q.   Okay.  May have against
12 Buccaneers Limited Partnership and any
13 related entities.
14         Did I read that correctly?
15     A.   I think so.
16     Q.   Okay.  And under the action,
17 it says, client understands and agrees
18 that this action will be brought on
19 behalf of the client, individually, and
20 also as a representative of a proposed
21 class of similarly-situated claimants
22 against the above defendants.
23         Did I read that correctly?
24     A.   I think so.

36

OPPENHEIM

1      Q.   Were you familiar with the
2  terms of the representation of Medical
3  and Chiropractic Clinic, Inc. between
4  Anderson & Wanca and M&C?
5      A.   No.
6      Q.   How did you go about
7  determining who was your client that you
8  were representing at the mediation?
9      A.   I was sent to negotiate a
10 class settlement and, therefore, I was
11 negotiating on behalf of the class.
12     Q.   How did you learn that you had
13 that authority?
14     A.   Brian Wanca told me.  Of
15 course, he would need to approve
16 anything.  That was always our
17 relationship.
18     Q.   If you turn to the second page
19 of this, the first -- the first paragraph
20 starts a new paragraph.  It says, in the
21 event that the class is not certified,
22 client agrees to pay attorney fees equal
23 to one-third of the total amount
24 recovered by clients on an individual

37

OPPENHEIM

1  basis.
2          Do you see that?
3      A.   I do.
4      Q.   Do you know if that -- if that
5  has ever come to pass with Medical and
6  Chiropractic Clinic, Inc.?
7      A.   I don't.
8      Q.   Have you had any clients in
9  class actions you worked on at Anderson &
10 Wanca that recovered on an individual
11 basis?
12     A.   Yes.
13     Q.   And --
14     A.   Well, I mean, the firm had
15 cases that settled that way.
16     Q.   And do you know if the firm
17 received fees from those cases where the
18 individual client settled?
19     A.   I believe so.
20     Q.   Have you had that circumstance
21 arise since you have been at the Bock Law
22 Firm?
23         MR. BLONIEN:  Objection,
24 vague.

10  (Pages 34 to 37)

38

OPPENHEIM
1
2  THE WITNESS:  What
3  circumstance?
4  BY MS. LOEW:
5  Q.   Where a punitive class
6  representative settles on an individual
7  basis.
8  A.   Yes.
9  Q.   And do you know if the
10 arrangement between the Bock Law Firm and
11 the punitive class representative
12 included an individual representation?
13 MR. BLONIEN:  I object on the
14 ground that this gets into
15 attorney-client privilege outside
16 the scope of this particular
17 litigation, to the extent that the
18 question calls for Mr. Oppenheim to
19 testify about the terms of
20 retention agreements with respect
21 to other clients.
22 MR. COHEN:  I join the
23 objection, and on behalf of Bock
24 Law Firm, speaking to an employee
25 of Bock Law Firm based on privilege

39

OPPENHEIM
1
2  in the case, I instruct him not to
3  answer.
4  BY MS. LOEW:
5  Q.   Okay.  Have you ever
6  negotiated a settlement on behalf of an
7  individual through a class action?
8  MR. COHEN:  Objection, vague
9  and ambiguous.
10 THE WITNESS:  They never start
11 out that way.
12 The only time that comes up is
13 if class certification has already
14 been litigated and lost or if the
15 defendant doesn't have enough money
16 to pay a class settlement.
17 BY MS. LOEW:
18 Q.   But have you actually
19 negotiated an individual settlement on
20 behalf of a client?
21 A.   I have negotiated individual
22 settlement, yes.
23 Q.   Did you engage in any
24 negotiations on behalf of Medical and
25 Chiropractic Clinic as an individual

40

OPPENHEIM
1
2  client?
3  A.   No.
4  Q.   Do you have an understanding
5  of whether Medical and Chiropractic
6  Clinic could have personal liability for
7  fees or costs in the class action against
8  the Buccaneers?
9  A.   I don't.  Yeah.  No, I don't.
10 Q.   Did you meet with
11 representatives from Medical and
12 Chiropractic Clinic?
13 A.   I had dinner with
14 Ms. Zakrzewski before the February
15 mediation, and she was present at that
16 mediation.  I think that's the sum total
17 of my face-to-faces with anybody at
18 Medical prior to today and other court
19 appearances in this case.
20 Q.   So you said you had dinner
21 with Ms. Zakrzewski?
22 A.   Right, me, her, Ryan Kelly and
23 Ross Good.
24 Q.   And then you attended the
25 mediation with Ms. Zakrzewski?

41

OPPENHEIM
1
2  A.   Right, the four of us, plus
3  Michael Addison and Craig Cinque, who was
4  the other potential named plaintiff in
5  that action.
6  Q.   So you actually attended the
7  mediation?
8  A.   Yes.
9  Q.   Other than those two
10 instances, did you have any
11 communications with Medical and
12 Chiropractic Clinic representatives?
13 A.   Not to my knowledge.  I may
14 have been on an email back and forth
15 between them and somebody else, but, no.
16 Q.   What was your understanding of
17 Medical and Chiropractic's role in the
18 M&C action?
19 A.   They were a class
20 representative.
21 Q.   What -- what obligations come
22 with being a class representative?
23 MR. BLONIEN:  Objection, calls
24 for a legal conclusion.
25 THE WITNESS:  Right.  I mean,

11 (Pages 38 to 41)

42

OPPENHEIM

1
2  there's lots and lots of case law
3  on that.
4       Essentially it's to stand in,
5  allow their individual claim to be
6  tested as a proxy for everybody's
7  claim in the class and at the same
8  time act as a fiduciary on behalf
9  of the class to make sure that they
10  and the attorneys don't do things
11  that benefit either the
12  representative or the attorneys at
13  the expense of the class.
14  BY MS. LOEW:
15       Q.   Did you have any duties to
16  Medical and Chiropractic Clinic?
17       MR. BLONIEN:  Objection, calls
18  for a legal conclusion.
19       MR. COHEN:  Join.
20       THE WITNESS:  As the -- a
21  member of a class that I was trying
22  to represent, certainly.  I had a
23  fiduciary duty as class counsel to
24  them as to any other class member.
25

43

OPPENHEIM

1
2  BY MS. LOEW:
3       Q.   So the -- the relationship
4  that you had with Medical and
5  Chiropractic was not distinct from any
6  other member of the class?
7       A.   I think that's fair.
8       Q.   That was your understanding of
9  the relationship?
10       A.   Yes.
11       Q.   Have you ever taken any ethics
12  courses specific to class litigation,
13  class action litigation?
14       A.   I don't think so.
15       Q.   Have you ever testified as an
16  expert on ethics?
17       A.   No.
18       Q.   Do you consider yourself to be
19  an expert in ethics?
20       A.   No.
21       Q.   How did you -- I guess on what
22  basis did you understand what your duties
23  were to Medical and Chiropractic?
24       MR. BLONIEN:  Objection, calls
25  for a legal conclusion and also

44

OPPENHEIM

1
2  potentially mediation privilege to
3  the extent that the answer would
4  divulge communications directly
5  related to the mediation.
6       THE WITNESS:  I understood
7  that we were trying to get a class
8  settlement or a class judgment in
9  the -- in the case and that if that
10  were to happen, that they would
11  stand to benefit.
12  BY MS. LOEW:
13       Q.   Did they -- did Medical and
14  Chiropractic as an -- as a punitive class
15  representative have anything to lose as
16  being a punitive class representative?
17       A.   I don't think so.  Obviously
18  you have to do some work, appear for a
19  deposition and which I believe happened,
20  participate in discovery and do so
21  honestly, which is something that
22  occasionally will trip up class
23  representatives, but apart from time and
24  effort, no.
25       Q.   Have you been involved in any

45

OPPENHEIM

1
2  cases where a punitive class
3  representative had a judgment or was
4  required to pay fees to the other side?
5       MR. BLONIEN:  Objection.
6  BY MS. LOEW:
7       Q.   As an individual client?
8       MR. BLONIEN:  Objection,
9  compound question.
10       THE WITNESS:  I don't think
11  so, no.
12  BY MS. LOEW:
13       Q.   Are you aware whether there's
14  any authority in law of TCPA law or case
15  law to assess fees or expenses against a
16  punitive class representative?
17       MR. BLONIEN:  Objection, calls
18  for a legal conclusion.
19       THE WITNESS:  Beyond the
20  general discovery sanction power of
21  any Court in any action, I don't
22  think that there is that
23  possibility.
24  BY MS. LOEW:
25       Q.   In preparing for the mediation

12  (Pages 42 to 45)



46

OPPENHEIM

1
2     in the Cin-Q action, did you review any
3     of the discovery in that case?  I'm
4     sorry, the M&C action.
5          MR. COHEN:  Can you repeat the
6     question?
7     BY MS. LOEW:
8          Q.    Did -- in preparing for the
9     mediation in the M&C action, did you
10    review any of the discovery in that case?
11         MR. COHEN:  I apologize.  I
12    don't know what the M&C action is
13    as opposed to this action.
14         MS. LOEW:  Certainly.
15    BY MS. LOEW:
16         Q.    So the M&C action is the
17    punitive class action against the
18    Buccaneers.
19         A.    I don't recall.  I might have.
20         Q.    Okay.  Do you know if Medical
21    and Chiropractic gave any depositions in
22    that case?
23         A.    I believe they did.
24         Q.    How did you go about preparing
25    for the mediation --

47

OPPENHEIM

1
2          A.    I --
3          Q.    -- the first mediation?
4          A.    -- looked at the numbers, I --
5     which I guess is discovery, so absolutely
6     I would have looked at that.
7          The numbers I'm referring
8     to would be the number of fax
9     transmissions, the number of fax
10    transmissions that were successful, the
11    dates of those transmissions.
12         I looked at -- well, to
13    confirm that they would be within the
14    statute of limitations and then, yeah,
15    actually now that -- that I am recalling,
16    I reviewed some of the discovery
17    responses provided by the Buccaneers in
18    terms of nailing down the main legal
19    question in the case, which was whether
20    the faxes that were sent were sent on
21    behalf of the Buccaneers.  That I knew
22    was going to be the major sticking point,
23    and so looked at that stuff and then put
24    together a mediation statement, which is
25    largely from a template.

48

OPPENHEIM

1
2          Q.    Who was representing the
3     Buccaneers at that point?
4          A.    Barry Postman was the lead
5     counsel.  I can't recall if he had
6     somebody else there with him.
7          Q.    At that point in time had the
8     class been certified?
9          A.    No.
10         Q.    Had there been a motion for
11    class certification?
12         A.    I don't believe so.  No, there
13    hadn't because Judge Porcelli wanted to
14    handle summary judgment before class
15    certification.
16         Q.    What was the outcome on
17    summary judgment?
18         A.    The motions were denied.  In
19    fact, I don't even recall -- I think it
20    was probably just the Buccaneers motion
21    that was in play, but it was denied, and
22    there's a fairly highly cited written
23    opinion talking about the standards for
24    when a fax is sent on behalf of a
25    particular defendant.

49

OPPENHEIM

1
2          Q.    Was the mediation, the first
3     mediation in you said February 2015, was
4     that mediation successful?
5          A.    No.
6          Q.    Was it adjourned?  Was it
7     terminated, I should say?
8          MR. COHEN:  I just object.  I
9     can't tell whether adjourned should
10    be part of terminated, in which
11    case it's vague and ambiguous.
12    BY MS. LOEW:
13         Q.    Do you understand my question?
14         MR. BLONIEN:  I'd also like to
15    interpose an objection on the
16    ground that this appears to call
17    for mediation-privileged
18    information.
19         To the extent that the
20    question is not withdrawn, you may
21    answer.
22    BY MS. LOEW:
23         Q.    The -- I'm asking about
24    whether the mediator, I guess, told the
25    Court that the mediation was at an

13  (Pages 46 to 49)

50

OPPENHEIM

1  impasse?
2      A.   I don't recall.
3      Q.   After the day of mediation,
4  the February 2015 mediation, when was
5  your next involvement in the Cin-Q case?
6      A.   There was talk about a second
7  attempt at mediation once the defendants
8  switched counsel.  The view was that
9  Mr. Postman wasn't interested in
10  settlement and that their new counsel
11  might well be, at which point I was
12  brought in the loop.
13      Q.   And when was that?
14      A.   It would have been in the
15  summer of 2016, probably July.  2015,
16  excuse me.
17      Q.   So without getting into what
18  actually was said at the mediation, what
19  was your role at the mediation, the first
20  mediation?
21      A.   To try and negotiate a class
22  settlement.
23      Q.   Did you communicate directly
24  with the Buccaneers counsel?

51

OPPENHEIM

1      A.   At one point during the
2  session and I -- I mean, how much do you
3  want me to get into what happened?
4      Q.   I'm just asking if you
5  communicated directly with the Buccaneers
6  counsel.
7      A.   At one point the mediator did
8  have a joint session.
9      Q.   Did you communicate directly
10  with the mediator?
11      A.   Yes.
12      Q.   Were there any further
13  negotiations after the day of the
14  mediation?
15      MR. BLONIEN:  Objection, calls
16  for mediation-privileged
17  information.
18      To the extent the question is
19  not withdrawn, you may answer.
20  BY MS. LOEW:
21      Q.   The -- I'm not asking about
22  the substance of the communication.  I'm
23  only asking if there were communications.
24      A.   I don't think so.  We're

52

OPPENHEIM

1  talking about February, right?
2      Q.   Yes.
3      A.   Yeah.  No, I don't think so.
4      Q.   So your -- when did you first
5  learn there was going to be a second
6  mediation?
7      A.   It would be in the emails in
8  the case, but some time during that
9  summer.
10      MS. LOEW:  We'll mark this as
11  the next exhibit.
12      (Oppenheim Exhibit
13      No. 3 marked for
14      identification.)
15      MR. BLONIEN:  I do have an
16  objection I want to interpose after
17  you describe the exhibit, please.
18  BY MS. LOEW:
19      Q.   So this is what we've marked
20  as Exhibit 3, Oppenheim 005968 to 005969,
21  entitled JAMS mediation agreement at the
22  top.
23      MR. BLONIEN:  The objection I
24  would like to interpose is that it

53

OPPENHEIM

1  appears this document is Bates
2  numbered with OPP 005968 and 5969,
3  although there are no other
4  designations of Bates numbers
5  listed on this document.
6      The production that
7  Mr. Oppenheim made was specifically
8  to M&C only as per the Court's
9  order, and then M&C determined
10  which of those materials would be
11  produced in this case by producing
12  it themselves with an M&C Bates
13  number.  I don't see an M&C Bates
14  number on this.
15      Therefore, I don't think it's
16  been properly produced in this
17  case.
18      MS. LOEW:  Okay.
19      MR. COHEN:  And for the
20  record, on behalf of Bock Law Firm,
21  who has no way of knowing what has
22  and hasn't been produced because
23  we're in the blind as to all of it,
24  we are not going to sit here and

54

OPPENHEIM

1
2  have questioning of a witness with
3  a document that wasn't produced to
4  us, so if you can tell me where it
5  has been produced, fine.
6       If you can't or won't, because
7  it's not a privilege issue, I can't
8  instruct the witness not to answer.
9       I can adjourn the deposition
10  and seek a protective order, so
11  I'll leave you with that decision.
12       MS. LOEW:  I will see which
13  production it was in and if one of
14  these numbers is an M&C Bates
15  number.
16       MR. COHEN:  Thank you.
17       MS. LOEW:  Let's take a break
18  at this point.
19       THE VIDEOGRAPHER:  Going off
20  the record.  The time is
21  10:3:7 a.m.
22       (A recess was had.)
23       THE VIDEOGRAPHER:  Going on
24  the record.  This marks the
25  beginning of media No. 2.  The time

55

OPPENHEIM

1
2  is now 11:05 a.m.
3       MS. LOEW:  Okay.  So there was
4  a question about a document marked
5  Exhibit 3 to the deposition, so
6  that document was a document that
7  M&C did not assert a privilege over
8  in its original evaluation of the
9  Oppenheim production to M&C.
10       Did Oppenheim produce that
11  document thereafter to the Bock Law
12  Firm?
13       MR. BLONIEN:  None of the
14  production of Mr. Oppenheim was
15  shared with Bock Law Firm per the
16  Court's order and the position that
17  M&C took in the course of this
18  litigation, the correspondence from
19  M&C after the Court had originally
20  been presented with this issue took
21  the position that every single one
22  of the documents that Mr. Oppenheim
23  had were privileged and should not
24  be disclosed to Mr. Bock.
25       Subsequently to that, M&C

56

OPPENHEIM

1
2  submitted a privilege log, actually
3  several, listing documents that
4  were on the privilege log and
5  withheld.
6       Nothing from Mr. Oppenheim's
7  production per the Court's order
8  has been shared with Bock Law Firm.
9       To the extent that M&C has
10  determined that documents are
11  responsive and non-privilege, they
12  should have been produced, although
13  I would note and, in the nature of
14  an objection, state that on
15  August 2, Foley & Lardner wrote a
16  letter describing their position on
17  mediation privilege and stated
18  specifically on page 3,
19  subsection B, consistent with the
20  Florida's mediation-privileged
21  statute, communications with
22  opposing counsel arranging the
23  mediations may be privileged.  The
24  statute makes no difference between
25  coordination communications and

57

OPPENHEIM

1
2  communications revealing the
3  substance of the mediation.  The
4  mediation privilege attaches even
5  in advance of the mediation date as
6  the statute defines mediation
7  communications to include
8  communications prior to mediation
9  if made in furtherance of the
10  mediation, therefore we withheld
11  these documents.
12       It's my understanding based on
13  that description of an assertion of
14  privilege that documents involving
15  the arrangement of mediation would
16  be withheld as privileged per M&C's
17  position on mediation, and it sure
18  as heck seems to me this document
19  fits that bill, so we object on the
20  ground that M&C has asserted
21  mediation privilege over documents
22  such as these and now appears to be
23  making an attempt to produce this
24  document.
25       MS. LOEW:  So the -- the

15  (Pages 54 to 57)

58

OPPENHEIM

1 documents that you provided to us,
2 you have produced none of those
3 documents even if we did not assert
4 privilege over them to Bock Law
5 Firm?
6 MR. BLONIEN:  I would like to
7 move forward with the deposition
8 questioning of the witness who is
9 here today.
10 I have made the record as
11 plain as I can.
12 If you want further
13 clarification, perhaps we could do
14 this off the record at a break
15 because I would like to move this
16 deposition along.
17 MS. LOEW:  There will be a
18 couple other documents I have
19 questions about.  They're
20 compensation related.
21 I don't know if you also
22 withheld those, so for the time
23 being, we will not ask questions of
24 this witness about this document

59

OPPENHEIM

1 and --
2 MR. BLONIEN:  Just to be
3 clear -- and I'm sorry to
4 interrupt.
5 We didn't withhold anything.
6 Per the Court's order we provided
7 only M&C with the copy of the
8 documents that were relevant and
9 responsive, and then it was the
10 burden of M&C to identify which
11 documents would be then produced in
12 the litigation, that's certainly my
13 understanding so far at least.
14 MR. COHEN:  For the record,
15 that's what happened, and I also
16 have been candid with the Court and
17 with M&C's counsel about the snafu
18 with all of the Oppenheim documents
19 actually being facilitated through
20 Bock Hatch staff.
21 And as soon as we realized
22 that was not something we could
23 look at, which was on the first
24 page of the first document, that

60

OPPENHEIM

1 nobody has looked at any of those,
2 and we have not received any of it
3 from Mr. Oppenheim or from his
4 counsel.
5 MS. LOEW:  Okay.  I don't know
6 if we -- I'm looking to see if that
7 actually was produced by us in a
8 different format, but I don't know
9 that we have the same
10 interpretation of the Court's order
11 as to whether that such types of
12 documents were supposed to come
13 from us or from Mr. Oppenheim.
14 Nonetheless, we will withhold
15 or we will not ask questions about
16 that particular document.
17 If you can give it back to me
18 please.  All right.
19 BY MS. LOEW:
20 Q.   So are you -- Mr. Oppenheim,
21 are you familiar with the mediation
22 privilege in Florida?
23 A.   I think so, yes.
24 Q.   Okay.  And did you have any

61

OPPENHEIM

1 obligations to withhold or to -- to keep
2 mediation communications confidential
3 beyond just the mediation privilege in
4 Florida?
5 For example, were there any
6 other agreements that you had with
7 opposing counsel to keep communications
8 confidential?
9 MR. BLONIEN:  Objection, calls
10 for a legal conclusion, vague,
11 compound.
12 THE WITNESS:  I don't believe
13 in this case there was anything
14 additional with opposing counsel.
15 BY MS. LOEW:
16 Q.   Okay.  Were there any
17 protective orders in the Medical and
18 Chiropractic case?
19 A.   There may have been.
20 Q.   And what is your understanding
21 of your obligation to keep mediation
22 information confidential?
23 MR. BLONIEN:  Objection, calls
24 for a legal conclusion.

16  (Pages 58 to 61)

62

OPPENHEIM

1
2     THE WITNESS:  That information
3  about what goes on at a mediation
4  can't be introduced into evidence,
5  can't be shared with the Court and
6  shouldn't be shared with third
7  parties who could be adverse to
8  your side.
9  BY MS. LOEW:
10     Q.   And what -- okay.
11        MS. LOEW:  Can you read that
12  answer back, please.
13        (Record read as
14        requested.)
15     THE WITNESS:  I said third
16  parties.
17  BY MS. LOEW:
18     Q.   What do you mean by third
19  parties who could be adverse?
20     A.   Well, I guess if the defendant
21  in a lawsuit, had a bunch of employees
22  and one of them was a golfing buddy, I
23  really shouldn't be talking about the
24  mediation with him.
25     Q.   Can you share what happens at

63

OPPENHEIM

1
2  a mediation with other members of the
3  class?
4     A.   I think so.
5        MR. BLONIEN:  Objection, calls
6  for speculation.
7        THE WITNESS:  Sorry.
8        MR. BLONIEN:  Go ahead.
9        THE WITNESS:  I think so.
10  They're not -- they're part of who
11  is being represented.
12  BY MS. LOEW:
13     Q.   So the -- you attended a
14  second mediation in the M&C action?
15     A.   Yes.
16     Q.   And when was that mediation?
17     A.   I believe September 1 of 2015.
18     Q.   Who attended that mediation?
19     A.   For our side it was myself,
20  Brian Wanca and Mike Addison.  For the
21  Buccaneers there was definitely Mark
22  Mester, who was their new lead counsel.
23        I frankly am not sure who else
24  they had in the room because there was no
25  joint session.

64

OPPENHEIM

1
2     Q.   Did any representative of
3  Medical and Chiropractic Clinic
4  participate in that mediation?
5     A.   No.
6     Q.   Did you correspond with anyone
7  from Medical and Chiropractic Clinic
8  before the mediation about the mediation?
9     A.   I didn't personally.
10     Q.   Did other members of the firm?
11        MR. BLONIEN:  Objection, calls
12  for speculation.
13        THE WITNESS:  I don't know.
14  BY MS. LOEW:
15     Q.   And what was your role at
16  that -- at the second mediation?
17     A.   Well, because Mr. Wanca was
18  there, I was sort of junior to him, and
19  it just so happened at that mediation I
20  had a really bad -- I guess it was a cold
21  or something, but my throat was all
22  closed up, and I could barely speak, so
23  largely it was observing and sharing as
24  best I could my insights.
25     Q.   After the day of the

65

OPPENHEIM

1
2  mediation, did you have any further
3  involvement in the M&C action?
4     A.   I was on emails and involved
5  in putting together settlement proposals,
6  communicating, I think --
7        MR. BLONIEN:  I'm going to
8  interrupt on that score and as to
9  substantive communications with
10  respect to the mediation, I
11  instruct you not to answer about
12  specific substance.
13        Pardon my interruption.
14        MR. COHEN:  Based on?
15        MR. BLONIEN:  Based on the
16  mediation privilege as the Court
17  has ordered being placed in this
18  case.
19        THE WITNESS:  Okay.  And so
20  communicating with other members of
21  the firm, the Wanca firm and the
22  mediator.  I won't get into the
23  content.
24  BY MS. LOEW:
25     Q.   But about the mediation?

17 (Pages 62 to 65)

66

OPPENHEIM

1
2   A.   About settlement.
3        MS. LOEW:  Okay.  And so are
4   you asserting mediation privilege
5   over internal discussions about
6   settlement at Anderson & Wanca?
7        MR. BLONIEN:  No.
8        But my understanding, just to
9   be clear, so the record is clear,
10  M&C is asserting a mediation
11  privilege with respect to internal
12  discussions of settlement,
13  settlement offers and mediation
14  according to the August 2 letter
15  that we received from Foley &
16  Lardner, and to the extent that
17  these questions would ostensibly
18  invade that privilege, it's
19  certainly an issue that we will
20  bring up to the Court if necessary.
21       Our position in interpreting
22  the Court's order is that any
23  direct communications that involve
24  the substance of the mediation are
25  off limits for purposes of this

67

OPPENHEIM

1
2   case.
3        Is that consistent with
4   your -- at least as a minimum
5   threshold, would you agree that
6   communications to the mediator and
7   to opposing counsel are privilege?
8        MS. LOEW:  Yes.
9        MR. BLONIEN:  Okay.  Thank
10  you.
11       MS. LOEW:  We agree.
12  BY MS. LOEW:
13  Q.   Were you still engaging in
14  discussions about the mediation at the --
15  at the time that you left Anderson &
16  Wanca?
17  A.   It was still ongoing,
18  certainly.
19  Q.   When did you first meet Phil
20  Bock?
21  A.   I think as I testified
22  earlier, we met after I watched him argue
23  class certification in a case called CE
24  Design versus Cy's Crab house the week I
25  started with Anderson & Wanca in 2009.

68

OPPENHEIM

1
2   Q.   And do you consider Mr. Bock a
3   friend?
4   A.   Yes.
5   Q.   And when did that friendship
6   develop?
7   A.   As we worked together closely
8   over the years.
9   Q.   How frequently would you
10  communicate with Mr. Bock?
11       MR. BLONIEN:  Objection.
12  BY MS. LOEW:
13  Q.   At Anderson & Wanca?
14       MR. BLONIEN:  Vague as to time
15  frame.
16       THE WITNESS:  Fairly
17  frequently.  He was obviously
18  co-counsel on anything that I was
19  working on, at least in the early
20  range of time that I was at
21  Anderson & Wanca, and even on most
22  things even after Brian Wanca
23  decided to start filing cases on
24  his own, so, yeah, we talked
25  frequently.

69

OPPENHEIM

1
2        (Oppenheim Exhibit
3        No. 4 marked
4        for identification.)
5   BY MS. LOEW:
6   Q.   I have handed you what we've
7   marked Exhibit 4, which is BLF 00076
8   through 77.  And the top of this document
9   it says, forward Siding v. Alco.
10       Do you see that?
11  A.   Uh-huh.
12  Q.   Are you familiar with this
13  document?
14  A.   Yes, yes, I am familiar with
15  it.
16       MR. BLONIEN:  I'm sorry.  For
17  clarification, was your question
18  that was he familiar with Siding
19  versus Alco or familiar with this
20  document?
21  BY MS. LOEW:
22  Q.   This document.
23  A.   The answer is yes either way.
24  Q.   Okay.  And what is Siding
25  versus Alco?

18  (Pages 66 to 69)

70

OPPENHEIM

1     A.   It is a case that is being
2     litigated jointly by Anderson & Wanca and
3     the Bock Law Firm.  It is currently
4     pending in the Northern District of Ohio.
5           It was up to the 6th Circuit
6     after it -- there was a summary judgment
7     entered for -- in favor of the defendant.
8     The 6th Circuit reversed, and that's the
9     subject of this email.
10    Q.   Did you work on this case when
11    you were at Anderson & Wanca?
12    A.   I may have reviewed the
13    appellate brief.  Beyond that I don't
14    recall.
15    Q.   Okay.  Do you know why Mike
16    Anderson sent the email to you and
17    Mr. Bock?
18         MR. BLONIEN:  Objection, calls
19    for speculation.
20         MR. COHEN:  Join.
21         THE WITNESS:  No.
22    BY MS. LOEW:
23    Q.   So this Siding versus Alco
24    case, it's not a case in which you had a
25

71

OPPENHEIM

1     significant involvement at Anderson &
2     Wanca?
3     A.   I don't believe so, no.
4     Q.   Did you socialize with
5     Mr. Bock while you were at Anderson &
6     Wanca?
7     A.   Certainly we talked.  We often
8     traveled together.
9     Q.   And was that for -- for
10    business reasons?
11    A.   Yes.
12    Q.   Was there a, I guess, division
13    of responsibility on cases in which
14    Anderson & Wanca and the Bock Law Firm
15    were co-counsel between the two firms?
16    A.   Right, yeah.  Typically
17    Anderson & Wanca handled the discovery,
18    pretrial, pre-heavy lifting stuff and
19    then the Bock Firm did the briefing for
20    class certification and summary judgment
21    and the arguments.
22         That certainly was the
23    division before I got there.  As I
24    started doing some substantive stuff, it

72

OPPENHEIM

1     got blurred a little bit more.
2     Q.   And when you say there, are
3     you talking about at Anderson & Wanca?
4     A.   Yes.
5     Q.   Is there still a, I guess,
6     division of responsibilities between the
7     firms?
8         MR. BLONIEN:  Objection,
9     vague.
10         THE WITNESS:  It's an --
11    obviously the relationships have
12    been strained a bit mainly by this
13    lawsuit, but, yes, and now it's
14    more each firm takes the lead on
15    different matters.
16    BY MS. LOEW:
17    Q.   Are Bock Law Firm and Anderson
18    & Wanca still co-counsel on cases?
19    A.   Yes.
20    Q.   How many cases?
21    A.   I counted them up last night.
22    I believe the number is 57.
23    Q.   And were any of those cases
24    that you worked on before you left

73

OPPENHEIM

1     Anderson & Wanca?
2     A.   Yes.
3     Q.   When did you first consider
4     leaving Anderson & Wanca?
5     A.   I got a call from Phil Bock on
6     March 31 of last year asking if I would
7     consider making the jump and offering
8     significant -- significantly better
9     compensation.
10    Q.   March 31, is that what you
11    said?
12    A.   I believe so, yes.
13    Q.   So before March 31, were you
14    considering leaving Anderson & Wanca?
15    A.   Not seriously.  I think any
16    time you are working somewhere for a
17    number of years, there are days that you
18    feel like this isn't worth it.  Maybe I
19    should just go get a shack on the beach,
20    but no serious consideration.
21    Q.   So you weren't applying for
22    jobs?
23    A.   No.
24    Q.   Okay.  And so after the

19  (Pages 70 to 73)

74

OPPENHEIM

1  **original communication on March 31, what**
2  **happened?**
3       MR. BLONIEN:  Objection,
4  vague.
5       THE WITNESS:  We arranged to
6  meet over dinner.  I think we had
7  some back and forth about
8  scheduling and ultimately met that
9  following Sunday, which would have
10 been, I want to say, the 3rd.
11 BY MS. LOEW:
12      **Q.   So April 3rd you met?**
13      A.   Yes, assuming that's the date
14 of Sunday.  If my math is correct, it is.
15          (Oppenheim Exhibit
16          No. 5 marked
17          for identification.)
18 BY MS. LOEW:
19      **Q.   So this is a document that's**
20 **been marked Exhibit 5, which is --**
21      MR. COHEN:  You don't have to
22 read all the zeros.
23      MS. LOEW:  Okay.
24
25

75

OPPENHEIM

1
2  BY MS. LOEW:
3       **Q.   BLF -- I will anyway --**
4  **0000091 through 94.  Have you seen this**
5  **document before?**
6       A.   Yes.
7       **Q.   What is this?**
8       A.   This is a screen shot of a
9  text exchange between Phil Bock and
10 myself, I guess a series of exchanges
11 between Sunday, April 3 and Monday,
12 April 4.
13      **Q.   And Sunday, April 3 is the day**
14 **that you actually met Mr. Bock in person?**
15      A.   Yes.
16      **Q.   Okay.  And what did you**
17 **discuss in that meeting?**
18      A.   Terms of employment.
19      **Q.   Did Mr. Bock give you an**
20 **offer?**
21      A.   Yes.
22      MS. LOEW:  So are your
23 discovery responses attorney's eyes
24 only about compensation, your
25 written discovery responses?

76

OPPENHEIM

1
2  They are not marked, but --
3       MR. COHEN:  Anything that
4  speaks to his specific compensation
5  package.
6       MS. LOEW:  Have -- have your
7  written discovery responses been
8  shared with Mr. Blonien?
9       MR. COHEN:  I'm sure he's seen
10 them.
11      MS. LOEW:  Okay.  So I'm going
12 to give you the actual document.
13 Give it to the two of you for the
14 moment.
15      If you turn to page 5, I have
16 handed you Defendant Bock Law Firm,
17 LLC's first supplemental answers
18 and objections to plaintiff's first
19 set of interrogatories.
20      THE WITNESS:  I don't have
21 one.  Is that by design?
22 BY MS. LOEW:
23      **Q.   Not yet.  Yes, by design.**
24      A.   Okay.
25      **Q.   Yes.**

77

OPPENHEIM

1
2       MS. LOEW:  The information
3  that is listed on page 5, is this
4  information that is intended to be
5  shielded from Mr. Oppenheim?
6       MR. COHEN:  No.
7       MS. LOEW:  Okay.
8       MR. COHEN:  It is otherwise
9  attorney's eyes only.
10      MS. LOEW:  We will exclude you
11 guys at this point.
12      Just note for the record we
13 are excluding Ms. Zakrzewski and
14 Dr. Williams.
15          (Ms. Zakrzewski and
16          Dr. Williams exited
17          the deposition
18          proceedings.)
19      MS. LOEW:  Can you mark this
20 as the next exhibit.
21      THE WITNESS:  Should I put 5
22 away or are you coming back to it?
23 BY MS. LOEW:
24      **Q.   You can hold on to it for now.**
25      A.   Yes.

20  (Pages 74 to 77)

78

OPPENHEIM

1
2    MR. COHEN:  It would be
3  interesting if he didn't know what
4  his own compensation package was.
5    THE WITNESS:  I wouldn't be a
6  very good negotiator.
7    MS. LOEW:  So we do request
8  that Bock Law Firm provide us a
9  copy that's stamped with anything
10 that you want to make attorney's
11 eyes only or confidential, so we
12 know which particular portions you
13 want to retain.
14   MR. COHEN:  We will do that.
15   (Oppenheim Exhibit
16   No. 6 marked for
17   identification.)
18 BY MS. LOEW:
19   **Q.  So this document is defendant**
20 **Bock Law Firm, LLC's first supplemental**
21 **answers, objections to plaintiff's first**
22 **set of interrogatories.**
23   **Will you turn to page 5.  This**
24 **interrogatory answer, have you read this**
25 **before?**

79

OPPENHEIM

1
2    A.  I think so.
3    **Q.  Okay.**
4    A.  Yeah.
5    **Q.  So prior to this, I mean it**
6  **says, Mr. Bock expressed his interest in**
7  **hiring Mr. Oppenheim, and Mr. Oppenheim**
8  **expressed his interest in coming to work**
9  **for the Bock Law Firm.**
10   **Before this, had you expressed**
11 **an interest to Mr. Bock to come to work**
12 **for the Bock Law Firm?**
13   MR. BLONIEN:  Objection, vague
14   as to before this.
15 BY MS. LOEW:
16   **Q.  Before this is -- is referring**
17 **to April 3, 2016.**
18   A.  Well, in the phone call on
19 March 31 for sure.
20   **Q.  What did you tell him at that**
21 **time?**
22   A.  That I would certainly be open
23 to it and that obviously we had been --
24 we had a good relationship for years,
25 that it wouldn't be a learning curve for

80

OPPENHEIM

1
2  me because obviously the caseload is
3  hugely overlapping, as well as almost
4  completely overlapping in terms of
5  subject matter, and, as I recall, there
6  was kind of a preview of what numbers we
7  might be talking about, and I shared with
8  him what I was making at Anderson &
9  Wanca.
10   **Q.  And what did you tell him you**
11 **were making at Anderson & Wanca?**
12   A.  That --
13   MR. BLONIEN:  For the purpose
14   of attorney's eyes only
15   designation, I would like the
16   record to reflect that this answer
17   is attorney's eyes only.
18   THE WITNESS:  That I had
19   $145,000 base salary with a
20   completely discretionary bonus up
21   to Mr. Wanca and that the previous
22   two years my total was 390,000.
23 BY MS. LOEW:
24   **Q.  And so you told him that in**
25 **the March 31 conversation?**

81

OPPENHEIM

1
2    A.  To the best of my
3  recollection.
4    **Q.  And what was his response?**
5    A.  Wow, that's low.  I could do
6  so much better for you.
7    **Q.  At that point in time did he**
8  **give you any offer?**
9    A.  He was -- he, I think, said
10 something about getting close to seven
11 figures, that -- that he would also --
12 and this was actually a lot of the call,
13 talking about how it would be sort of
14 more of a guaranteed profit share
15 situation or it wouldn't be
16 discretionary.
17   **Q.  So the -- the bonus that you**
18 **received at Anderson & Wanca was not tied**
19 **to a specific percentage, for example?**
20   A.  No.
21   **Q.  Of attorney's fees?**
22   A.  No, it was tied to whatever
23 Mr. Wanca felt like.
24   **Q.  Do you know how your**
25 **compensation compared to other people at**

21 (Pages 78 to 81)

82

**OPPENHEIM**

1    Anderson & Wanca?
2        A.   That was kept pretty close to
3    the vest, so I don't.  I would have to
4    speculate.
5        Q.   Before that conversation with
6    Mr. Bock, did you know -- did you know
7    what the compensation structure was at
8    the Bock Law Firm?
9        A.   No.
10       Q.   So the offer that -- the
11   initial proposal from Mr. Bock is listed
12   here as, at will W2 employee, $50,000
13   starting bonus, plus $200,000 annualized
14   salary, plus 50 percent of the first
15   $300,000 in excess of 2 million and 10
16   percent above 2.3 million of the fees the
17   firm collects and keeps for itself during
18   his employment in 2016, excepting any new
19   work originated by Oppenheim for which he
20   would be paid 50 percent of the first 1
21   million, 25 percent of the next 2 million
22   and 15 percent in excess of 3 million in
23   fees the firm collects and keeps for
24   itself during his employment in 2016.

83

**OPPENHEIM**

1        Is that consistent with your
2    recollection of the first offer from
3    Mr. Bock?
4        A.   Right, yes.  That was, I
5    think, all brought up at the April 4 or
6    April 3, excuse me, meeting.
7        Q.   Okay.  And did he present it
8    to you in that type of a detailed
9    structure with percentages?
10       A.   Yes.
11       Q.   Did he provide you a written
12   offer at that time?
13       A.   He had it printed out, but it
14   was not something he gave to me.
15       Q.   So he was referring to a
16   printed document --
17       A.   Right.
18       Q.   -- at the time?  Did he -- did
19   you review that document that he had
20   printed out?
21       A.   I saw it across the table.
22       Q.   Do you know what it said?
23       A.   I just remember these numbers
24   on it, and it was the same things that

84

OPPENHEIM

1    were communicated.  It was in the vein of
2    notes.
3        Q.   Based on this structure that
4    he was proposing, did you believe that
5    you would be then making more at the Bock
6    Law Firm than you were making at Anderson
7    & Wanca?
8        A.   I think with that -- with
9    that, yes, ultimately.
10           Obviously as the rest of the
11   interrogatory makes clear, we negotiated
12   something slightly different.
13       Q.   It says then that you
14   responded and you proposed increases to
15   the following terms, $100,000 starting
16   bonus, plus $400,000 annualized salary,
17   plus 10 percent in excess of 2.5 to 6
18   million, and 20 percent in excess of
19   6 million of the fees the firm collects
20   and keeps for itself during his at will
21   W2 employment in 2016.
22           Is that accurate?
23       A.   Yes.
24       Q.   Okay.  And then plus including

85

**OPPENHEIM**

1    his surname on an amended company name;
2    is that accurate?
3        A.   Yes.
4        Q.   And deleting the separate
5    bonus schedule for work he might
6    originate; is that correct?
7        A.   Yes.
8        Q.   Why did you want to delete the
9    separate bonus schedule for the work that
10   you originate?
11       A.   I don't really originate work,
12   so I figured it was for my advantage to
13   just get a higher base and not -- better
14   percentages of total revenue.
15       Q.   Why did you want your surname
16   in an amended company name?
17       A.   The flip answer would be
18   vanity, but I think it conveys a certain
19   level of recognition of my
20   accomplishments and what I bring to the
21   firm.
22       Q.   Did you want to be a partner
23   in the firm?
24       A.   In what sense?

22  (Pages 82 to 85)

86

OPPENHEIM

Q. An actual partner as in a partnership structure.

A. I never asked for that.

Q. Did you ask to be a member of the LLC?

A. No.

Q. Why not?

A. I was fine with the setup as detailed in -- on page 5.

Q. And is the structure that you proposed as we sit here the actual compensation structure that you had when you joined the Bock Law Firm?

A. Yes.

Q. It says that on February 26, 2017, Mr. Bock reduced Mr. Oppenheim's compensation package.

Is that the current compensation package that you have, what's listed here?

A. Yes.

Q. So remaining an at will W2 employee, $300,000 annualized salary on a going forward basis, plus 7.5 percent in

87

OPPENHEIM

excess of 3 million to 6 million and 10 percent in excess of 6 million of the fees the firm collects and keeps for itself.

Is that correct?

A. Yes.

Q. Okay. And why was your compensation reduced?

A. Frankly the -- the firm couldn't afford what originally was negotiated.

Q. Did you, in fact, make more at the Bock Law Firm than you made at Anderson & Wanca?

MR. BLONIEN: Objection, vague as to time frame.

THE WITNESS: Yes. There was no single year at Anderson & Wanca that came close to what I made at the Bock firm in 2016.

I guess if you add up all seven years, that's probably still a higher number, but I don't think that's what you're asking.

88

OPPENHEIM

BY MS. LOEW:

Q. Right. I was asking on a yearly basis.

(Oppenheim Exhibit No. 7 marked for identification.)

BY MS. LOEW:

Q. This is marked as Exhibit 7.

MR. BLONIEN: For the record, this is attorney's eyes only as well.

BY MS. LOEW:

Q. This is Oppenheim 005 -- 9551 through 9555.

MS. LOEW: And I'll ask counsel, has this document been provided to the Bock Law Firm?

MR. BLONIEN: I believe that it has. It was produced to the M&C in response to its request for compensation information, as Mr. Cohen indicated, under an attorney's eyes only agreement.

MR. COHEN: For the record --

89

OPPENHEIM

and I may be incorrect, I don't believe it was produced to us by Mr. Blonien.

My recollection is that Mr. Blonien brought a package, an envelope of documents to the hearing and which Mr. Soble attended or which Mr. Soble attended and he told me what was in the envelope, and he indicated it contained this letter which because it's in the Bock Law Firm letter, I was familiar with it and I knew he gave it to Mr. Soble.

I don't believe it was ever given to me. I don't believe the contents of that envelope were ever produced to us, but generally speaking, I think that's because we had the contents of the envelope otherwise.

MS. LOEW: Okay. Do you object to me asking questions about this document?

23 (Pages 86 to 89)

90

OPPENHEIM

1
2      MR. COHEN:  No.  But just so
3   the record is clear, the reason is
4   because this is a document, at
5   least the letter and the W2s are
6   Bock Law Firm documents, so it
7   would be hard to contend there's a
8   surprise associated with using it
9   here today?
10  BY MS. LOEW:
11      Q.   So this letter, Mr. Oppenheim,
12  is dated January 12 of 2017, and it has
13  also an attachment with a W2 for 2016.
14      Do you see that?
15      A.   Yes.
16      Q.   Are you familiar with this
17  document?
18      A.   Yeah.
19      Q.   This indicates that you were
20  paid $940,093.19 in 2016; is that
21  correct?
22      A.   From the Bock firm, yes.
23      Q.   And the bonus component of
24  this was $563,170.03; is that correct?
25      A.   Yes.

91

OPPENHEIM

1
2      Q.   Did that include a starting
3   bonus of $100,000?
4      A.   Certainly the 940 does.  I'm
5   not sure whether the 563 includes the
6   100,000 or the 376 includes the 100,000.
7      Q.   When was the starting bonus of
8   $100,000 provided to you?
9      A.   The dinner meeting on April 3,
10  2016.
11      Q.   And how was it provided to
12  you?
13      A.   Checks.
14      Q.   Was it a written check?
15      A.   Yes or two of them.
16      Q.   Two written checks.  And what
17  were the amounts of the checks?
18      A.   50,000 each.
19      Q.   Were they paid by Bock Law
20  Firm?
21      A.   I believe so.
22      Q.   And did Mr. Bock give you
23  those checks?
24      A.   Yes.
25      Q.   Did you accept an employment

92

OPPENHEIM

1
2   offer with the Bock Law Firm on April 3
3   of 2016?
4      A.   Yes.
5      Q.   Did you cash the two $50,000
6   checks from Mr. Bock?
7      A.   I deposited them.
8      Q.   Deposited them.  And when did
9   you deposit those funds?
10      A.   I believe the next day, which
11  would have been the Monday the 5th, 4th,
12  Monday the 4th.
13         (Oppenheim Exhibit
14          No. 8 marked
15          for identification.)
16  BY MS. LOEW:
17      Q.   I have handed you what I have
18  marked as Exhibit 8, which is MC 0000143
19  to 144.  Have you seen this email before?
20      A.   Yes.
21      Q.   And this is dated April 6 of
22  2016?
23      A.   Yes.  It's a set of emails,
24  but it appears they're all on that date.
25      Q.   And who is Nicole Oppenheim?

93

OPPENHEIM

1
2      A.   My wife.
3      Q.   The bottom portion of this
4   email references a hold on a recent
5   deposit of $50,000.  Do you see that?
6      A.   Yes.
7      Q.   Was that one of the deposit
8   checks from Mr. Bock?
9      A.   Right, one of the checks.
10      Q.   Were both checks put on hold?
11      A.   I believe so.
12      Q.   So was this -- these
13  payments -- these checks from Mr. Bock,
14  were they intended to be a loan or a
15  bonus?
16      A.   My understanding was a signing
17  bonus.
18         (Oppenheim Exhibit
19          No. 9 marked for
20          identification.)
21  BY MS. LOEW:
22      Q.   I have handed you what we've
23  marked as Exhibit 9, BLF 000098 through
24  102, and this is a series of text
25  messages.  Are you -- have you seen these

24  (Pages 90 to 93)

94

OPPENHEIM

1  text messages before?
2      A.   Yes.
3      Q.   And who are these text
4  messages between?
5      A.   Myself and Phil Bock.
6      Q.   It -- it says banking saga
7  continues.  Money is gone from my account
8  April 4.
9          Is that Mr. Bock texting you?
10     A.   Yes.
11     Q.   And -- and further down in
12 this email it says, can you send me the
13 model number of your new laptop?
14         Do you see that?
15     A.   Yes.
16     Q.   And is that Mr. Bock asking
17 you?
18     A.   Yes.
19     Q.   What new laptop is he
20 referring to?
21     A.   I bought a new laptop, I
22 think, I guess the day before this day --
23 the day or the two days before these
24 texts were sent.

95

OPPENHEIM

1      Q.   The exhibit that is BLF 91,
2  starts BLF 91, if you can grab that,
3  other text messages.
4          MR. BLONIEN:  Are you
5  referring to Exhibit No. 5?
6  BY MS. LOEW:
7      Q.   Exhibit 5, yes?
8      A.   I got it.
9      Q.   So this -- these text messages
10 on April 3, it continues into April 4,
11 who are these test messages between?
12     A.   Phillip Bock and myself.
13     Q.   And there's on BLF 93 at the
14 bottom, it says, did I give you a few
15 hundred bucks or did I give it to the
16 Uber driver?
17         Is that from Phil Bock?
18     A.   Yes.
19     Q.   And then the response, you
20 gave it to me to buy a computer.
21         Is that what you said in the
22 response?
23     A.   Yes.
24     Q.   And why were you -- why did

96

OPPENHEIM

1  Mr. Bock give you the money to buy a
2  computer?
3      A.   Because I was going to use it
4  in my new employment with him.
5      Q.   And it says, also I assumed
6  taxes will have to be taken out for the
7  blank to be added in on first payroll.
8          Do you know what the -- the
9  basis of this redaction is?
10     A.   That's probably an attorney
11 question.  I don't.
12     Q.   Is -- did you at that point in
13 time, did you ultimately pay taxes on the
14 $100,000 in checks that Mr. Bock wrote to
15 you --
16     A.   Yes.
17     Q.   -- on April 3?
18         If you turn back to Exhibit 9,
19 what day did you actually buy the
20 computer?
21     A.   It would have been either the
22 4th or the 5th.
23     Q.   How much money did Mr. Bock
24 give you?

97

OPPENHEIM

1      A.   I don't recall exactly.  I
2  think it was $1,200.  No.  Maybe -- yeah.
3  That I don't recall.
4      Q.   And did you use all of it to
5  buy the laptop?
6      A.   Yes.
7      Q.   What -- what type of laptop
8  was it, what brand?
9      A.   It was a Lenovo.
10     Q.   And is this the model number
11 listed here, the 15-53 00U?
12     A.   Well, I think that's I5,
13 but --
14     Q.   Oh, I5.
15     A.   But, yes.
16     Q.   So at what -- on what day did
17 you tell Anderson & Wanca that you were
18 leaving?
19     A.   I believe it was the 7th when
20 I told Brian Wanca.  Again, I don't know
21 who Anderson is.
22     Q.   The emails about the 14-day
23 hold on checks, why were you concerned
24 about there being a 14-day hold on the

25 (Pages 94 to 97)

98

OPPENHEIM

1  checks?
2
3      A.   I imagine I wanted the funds.
4      Q.   Was there a particular reason
5  that you needed funds before the 14 days?
6      A.   Not that I recall.
7          MR. BLONIEN:  When you are
8  done with the exhibit, I could use
9  a short break when it is convenient
10  for you.
11         MS. LOEW:  We can take a break
12  now.
13         MR. O'CONNOR:  Okay.  Thank
14  you.
15         THE VIDEOGRAPHER:  Going off
16  the record.  The time is 11:55 a.m.
17             (Whereupon, the
18             deposition in
19             the above-entitled
20             cause was recessed
21             to 1:08 p.m. this
22             date.)
23
24
25

99

OPPENHEIM

1
2      A F T E R N O O N   S E S S I O N
3      EXAMINATION(Resumed)
4          THE VIDEOGRAPHER:  Going on
5  the record.  This marks the
6  beginning of media No. 3.  The time
7  is now 1:08 p.m.
8          MS. LOEW:  Mr. Oppenheim, we're
9  back from lunch now.
10         And Ms. Zakrzewski and
11  Dr. Williams are back in the room
12  as well, just for the record.
13  BY MS. LOEW:
14     Q.   So we talked about before we
15  broke that you accepted an offer on
16  April 3, correct?
17     A.   Yes.
18     Q.   And then what day was it that
19  you gave notice to Anderson & Wanca?
20     A.   I told Brian Wanca on the 7th.
21     Q.   Why did you wait until the 7th
22  to tell him?
23     A.   I think he was out of town.
24     Q.   Did you tell anybody at the
25  firm before you told Brian Wanca that you

100

OPPENHEIM

1
2  were leaving?
3      A.   No.
4      Q.   Before you left Anderson &
5  Wanca, did you consult with anybody about
6  how you should go about leaving the firm?
7      A.   No.
8      Q.   Did you take any steps to
9  prepare to leave Anderson & Wanca?
10         MR. BLONIEN:  Objection,
11  vague.
12  BY MS. LOEW:
13     Q.   Do you understand my question?
14     A.   Not really.  I'm sorry.
15     Q.   Okay.  So in -- in getting
16  ready to leave Anderson & Wanca, did you
17  do anything to get your files in order
18  before you left, for example?
19     A.   Yes.  I packed up my office.
20  I had a number of things in there over
21  the course of seven years, and I copied
22  my hard drive from my old computer to my
23  new one.
24     Q.   And what day did you do that?
25     A.   It would have been the day

101

OPPENHEIM

1
2  that I bought the new computer.
3      Q.   So either the 4th or the 5th?
4      A.   Yeah.
5      Q.   And why did you do that?
6      A.   Well, I mean, I knew where I
7  was going, that I would be substantially
8  working on the same matters, so I think I
9  wanted to have all of my personal stuff.
10         In addition, there were things
11  that were just personal related to my
12  own -- just to me.  Like I had a game,
13  Diamond Mind Baseball, with a whole bunch
14  of data that I didn't want to lose and,
15  yeah.  That's basically it.
16     Q.   How did you actually copy the
17  materials?
18     A.   I handed both laptops to a
19  tech professional at Abt Computing and
20  said, I want the contents of the hard
21  drive on the new one.
22     Q.   Why -- why was it at Abt?
23     A.   That's where I bought the
24  computer.
25     Q.   So was it at the same time you

26  (Pages 98 to 101)

102

OPPENHEIM

1 bought the computer?
2    A.  Yes.
3    Q.  **Did you specify particular**
4 **folders to copy?**
5    A.  No.
6    Q.  **It was just the entire hard**
7 **drive?**
8    A.  Yes.
9    Q.  **And what kind of materials**
10 **were on your hard drive?**
11    A.  I mean, I gave a detailed
12 accounting to your client, Mr. Wanca, but
13 strictly speaking or generally speaking,
14 I should say, there were, again, personal
15 things.
16    There were briefs and other
17 documents that I personally worked on.
18 There were pleading documents from
19 various cases, and then I copied a year's
20 worth of my emails so I would have those.
21    Q.  **Did you -- did you copy all**
22 **emails that were on your hard drive?**
23    A.  No.  I mean, well, no -- no
24 emails were ever on my hard drive till I
25

103

OPPENHEIM

1 did an Outlook backup.
2    What I did was I did an
3 Outlook backup creating a PST file of one
4 year's worth of inbox and sent items.
5    Q.  **And was the PST backup also**
6 **copied to the new laptop?**
7    A.  Yes.
8    Q.  **And when did you copy that to**
9 **the new laptop?**
10    A.  It was in the same process as
11 everything else.
12    Q.  **When you -- you said that you**
13 **copied a year's worth of emails, was --**
14 **was it more than just that PST copy of**
15 **the copy of one year worth of emails?**
16    A.  No, one year's worth.
17    Q.  **So did you tell Anderson &**
18 **Wanca that you were copying those**
19 **materials?**
20    A.  No.
21    Q.  **Why not?**
22    A.  I didn't think it was an
23 issue.  Again, where -- where -- when I
24 left and where I was going, it was
25

104

OPPENHEIM

1 largely a continuation of the same joint
2 practice.
3    In fact, that's what Mr. Wanca
4 told me on my way out the door, gave me a
5 hug and said, don't worry, we'll still be
6 working together.
7    Q.  **But did you tell Bock --**
8 **anyone from Bock Law Firm that you were**
9 **copying the materials on to a laptop?**
10    A.  No.
11    Q.  **Before you copied the**
12 **materials, did you determine whether you**
13 **had any confidentiality obligations to**
14 **those materials?**
15    MR. BLONIEN:  Before you
16 answer, I would like to interpose
17 an objection that Brian Wanca and,
18 in particular, Anderson & Wanca has
19 filed a complaint, as you're fully
20 aware, in the state court in Cook
21 County of Illinois allegedly to
22 pursue the interests of Mr. Wanca.
23    We do not think that it's
24 appropriate to use the discovery
25

105

OPPENHEIM

1 mechanisms in this case to order
2 advance interests in that case.
3    I have allowed for the leeway
4 that I believe is appropriate here
5 given the nature of this case, but
6 I caution that you move to
7 something else and not use this
8 discovery mechanism to advance your
9 own case.
10    MS. LOEW:  I can assure you
11 that's not what we are doing, but
12 we do have the right to explore
13 what materials he took from the
14 firm considering they included our
15 client's materials.
16    MR. BLONIEN:  So I suggest
17 that you limit your questions to
18 the client's materials and the
19 materials that are produced in the
20 litigation that are responsive and
21 relevant.
22    Mr. Soble made a statement on
23 the record to the Court that other
24 materials on Mr. Oppenheim's laptop
25

27 (Pages 102 to 105)

106

OPPENHEIM

1
2 that don't pertain to M&C are not
3 relevant to this case.
4        MS. LOEW:  Understood.  And we
5 are exploring the context of him
6 taking the materials from the
7 laptop and what he was doing with
8 them.
9 BY MS. LOEW:
10    Q.   So the -- did you ask M&C's
11 permission before you copied the files?
12    A.   No.
13    Q.   Did you ask any client's
14 permission?
15    A.   No.
16    Q.   Were you familiar with the
17 ethical rules about leaving a firm at
18 that point and what you needed to tell
19 clients?
20    A.   I think so.
21    Q.   Were there any -- any rules
22 that applied to retaining materials
23 pertaining to client representation?
24        MR. BLONIEN:  Objection, calls
25 for a legal conclusion, vague.

107

OPPENHEIM

1
2        THE WITNESS:  I think so, yes.
3 BY MS. LOEW:
4    Q.   And did you take any steps to
5 determine whether what you were doing
6 complied with those rules?
7    A.   I believe the only rule at
8 issue is one that governs physical
9 possessions of which there aren't
10 additional copies, in other words, worked
11 on a client's will and the original will
12 is the important thing.  You can't take
13 the original will.  That was essentially
14 my analysis.
15    Q.   So your interpretation was
16 that it didn't apply to the other
17 electronic materials that you were
18 taking?
19        MR. BLONIEN:  Objection,
20 mischaracterizes previous
21 testimony.
22        THE WITNESS:  My determination
23 was that anything I had was my own
24 intellectual property, non-client
25 materials, client materials from

108

OPPENHEIM

1
2 joint cases in which the client
3 remained -- relationship remained
4 the same and publically available
5 documents.
6 BY MS. LOEW:
7    Q.   Other than the copy that you
8 made on to your -- your new laptop, did
9 you make any other copies of materials
10 from your time at A&W, at Anderson &
11 Wanca?
12        MR. BLONIEN:  Objection, vague
13 and confusing as to other materials
14 related to your employment with
15 Anderson & Wanca.
16        As stated previously, any
17 materials that haven't been
18 produced in this litigation aren't
19 relevant, are outside the scope and
20 are an inappropriate use of this
21 discovery mechanism to advance the
22 interests in another case.
23        THE WITNESS:  Yeah, I just
24 took my laptop to Abt and had a
25 copy of what was on it.

109

OPPENHEIM

1
2
3 BY MS. LOEW:
4    Q.   Did you -- did you retain any
5 hard copy materials of your working on
6 the M&C case?
7    A.   No.
8    Q.   Did you take materials home
9 with you when you were working on cases
10 at Anderson & Wanca?
11    A.   Yes.
12    Q.   Did you retain any --
13 copies of those materials after you left
14 Anderson & Wanca?
15    A.   No.
16    Q.   Before you left, so in the --
17 in the period of time between April 3 and
18 April 7, did you perform any work on the
19 Medical and Chiropractic matter?
20    A.   I don't believe so.
21    Q.   Did you have any further
22 discussions with Mr. Bock about leaving
23 and joining his firm between April 3 and
24 April 7?
25    A.   I'm sure I must have.

28 (Pages 106 to 109)

110

OPPENHEIM

1    Logistics, setting up my office, that
2    sort of thing.
3        Q.   Did you guys discuss -- did
4    you and Mr. Bock discuss whether you
5    would work on matters that you had worked
6    at Anderson & Wanca when you joined Bock
7    Law Firm?
8        A.   I don't recall a specific
9    discussion of that nature.
10       Q.   Did you discuss the Medical
11   and Chiropractic action?
12       A.   No.
13       Q.   Did you discuss any actions
14   against the Buccaneers?
15           MR. BLONIEN:  Objection, vague
16   as to time frame.
17           THE WITNESS:  Yeah.  That's a
18   good point.
19           Obviously after this
20   litigation commenced, we had to
21   defend the case and certainly that
22   was part of it.
23   BY MS. LOEW:
24       Q.   Prior to April 3, did you

111

OPPENHEIM

1    discuss any litigation against the
2    Buccaneers with Mr. Bock?
3        A.   I don't believe so.  However,
4    I do recall sitting in a room at a
5    mediation in a case called Florida First
6    versus Superior Pharmacy, attended by
7    myself, Mr. Bock and Mike Addison where
8    Mike Addison started talking in detail
9    about the Buc's litigation in front of
10   Mr. Bock, and I imagine I answered his
11   questions.
12       Q.   When was that?
13       A.   I want to say end of 2014,
14   late 2014.
15       Q.   Other than that interchange,
16   did you discuss the Buccaneers'
17   litigation in front of Mr. Bock at any
18   point?
19           MR. BLONIEN:  Objection, vague
20   as to time frame.
21   BY MS. LOEW:
22       Q.   Before April 7.
23       A.   Of 2016?
24       Q.   Of 2016.

112

OPPENHEIM

1        A.   Yeah.  I don't recall any
2    specific instances, no.
3        Q.   Did you discuss the
4    Buccaneers -- litigation against the
5    Buccaneers with anyone else related to
6    the Bock Law Firm other than Mr. Bock?
7            MR. BLONIEN:  Objection.
8            MR. COHEN:  Same time frame?
9    BY MS. LOEW:
10       Q.   Before April 2016.
11       A.   I don't believe so, no.
12   Although I will clarify that answer just
13   because the litigation, as I mentioned
14   earlier, generated a summary judgment
15   ruling that became precedent in other
16   cases, so it may have -- the decision as
17   precedent may have come up in other work
18   on other cases.
19       Q.   The laptop that -- that you
20   purchased with Mr. -- the money that
21   Mr. Bock gave you, was it -- was that
22   laptop owned by Bock Law Firm?
23       A.   We never really discussed it.
24   I considered it to be mine, and I --

113

OPPENHEIM

1    to qualify it, over lunch, my
2    recollection was refreshed somewhat that
3    he gave me less money than I had thought
4    and, in fact, a significant portion
5    were -- was my own funds.
6        Q.   So how -- the laptop you --
7    you purchased, how much did the laptop
8    cost when you purchased it?
9        A.   I believe the -- it itself
10   before tax or warranty or anything was
11   about $1,100, and then I also got an
12   anti-virus program and Microsoft Office
13   to go with it, so I think the total price
14   tag was close to 2,000.
15       Q.   And what portion of that was
16   paid for by Mr. Bock?
17       A.   And again, I don't recall
18   specifically, but he thinks it was on the
19   order of $300.
20       Q.   Did you discuss any of your
21   other answers with Mr. Bock over lunch?
22       A.   No.  Just that one.
23       Q.   Have you discussed any of your
24   other answers during the course of this

29 (Pages 110 to 113)

114

OPPENHEIM

1  deposition with Mr. Bock over the lunch?
2
3      A.   Yeah.  I'm trying to figure
4  out the difference.  Oh, no, I guess
5  you're expanding it to be during breaks,
6  no.
7          We are not sending each other
8      telepathic signals across the table
9      either.
10     Q.   The -- the laptop that you
11  purchased, I understand that you had a
12  laptop stolen recently?
13     A.   Yes.
14     Q.   Is it the same laptop that you
15  purchased with that money?
16     A.   Yes.
17          (Oppenheim Exhibit
18          No. 10 marked
19          for identification.)
20  BY MS. LOEW:
21     Q.   Mr. Oppenheim, have you seen
22  this document before that's marked as
23  Exhibit 10?
24     A.   I noted it was an exhibit to
25  your amended Illinois complaint.

115

OPPENHEIM

1
2      Q.   The -- this is titled Chicago
3  Police Department original case incident
4  report; is that correct?
5      A.   It's what it looks like.
6      Q.   Okay.  Did you see it before
7  the complaint in state court?
8      A.   No.
9      Q.   The -- the Lenovo -- if you
10  turn to the second page of this.  It
11  describes Lenovo ThinkPad T450 laptop.
12  Do you see that?
13     A.   Yes.
14     Q.   Is that the laptop that was
15  purchased with the -- on April -- on or
16  about April 4 of 2016?
17     A.   Yes.
18     Q.   At the time that it was
19  stolen, did it have M&C materials on it,
20  materials relating to the M&C action?
21     A.   Yes.
22     Q.   The -- if you can, the
23  narrative that's at the bottom there.
24     A.   Uh-huh.
25     Q.   How did you report this to the

116

OPPENHEIM

1  police?
2
3      A.   I went to the substation
4  that's closest to my residence.  I did it
5  in person.
6      Q.   And what day did you report
7  it?
8      A.   June 14 of this year.
9      Q.   What day was the laptop
10  stolen?
11     A.   The previous day, the 13th.
12     Q.   When did you determine that it
13  was stolen?
14     A.   That night, the 13th.
15     Q.   Why did you wait until the
16  next day to report it?
17     A.   It was late.  It was about
18  11 p.m.  I was about to go to bed and
19  realized that my glasses were in my
20  laptop case, which I then realized was in
21  my car.  I went out to the car and it
22  wasn't there.
23     Q.   Was there any damage to your
24  car?
25     A.   No.

117

OPPENHEIM

1
2      Q.   Was the vehicle left unlocked?
3      A.   It might have been.  My
4  practice is to lock the car.
5          I have a key fob that has an
6  astounding range.  Sometimes just sitting
7  down, I'll set off the alarm.
8          I assume what happened was it
9  unlocked by having the button pressed in
10  my pocket.
11          MR. COHEN:  For what it's
12      worth, move to strike his
13      assumption as lacking foundation
14      based on speculation.
15  BY MS. LOEW:
16     Q.   The -- so what -- do you
17  typically park your car in your driveway?
18     A.   Yes.
19     Q.   Do you have a garage?
20     A.   No.
21     Q.   And is it your normal practice
22  to leave your car unlocked?
23     A.   No.
24     Q.   Do you usually leave your
25  laptop bag in your car?

30  (Pages 114 to 117)

118

OPPENHEIM

1    A.   No.

2    **Q.   The files, the M&C files that**

3  **were on the laptop, are those saved**

4  **anywhere else?**

5    A.   Yes.

6    **Q.   Where are they saved?**

7    A.   Well, my counsel has a set.

8  You have got a set.  And we -- I believe

9  they are on a thumb drive that was put

10  together in order to facilitate the

11  document production in this case.

12    **Q.   Where is that thumb drive?**

13    A.   In the -- in my desk in my

14  office.

15    **Q.   At Bock Law Firm?**

16    A.   Yeah.

17    **Q.   Did you receive a document**

18  **preservation letter pertaining to the M&C**

19  **action?**

20    A.   Yes.

21    **Q.   And what steps did you do to**

22  **comply with that preservation letter?**

23    A.   Didn't throw anything out or

24  delete anything after I received it.

---

119

OPPENHEIM

1    **Q.   The -- the copy of the M&C**

2  **documents that you have on the thumb**

3  **drive, what types of files -- what type**

4  **of file is it?**

5    MR. BLONIEN:  I'm going to

6  object and seek a standing

7  objection that this is outside the

8  scope of permissible discovery as

9  ruled on by this Court that print

10  and paper copies were sufficient

11  for purposes of discovery.

12    I'll also note that Foley &

13  Lardner on behalf of its other

14  client, Brian J. Wanca, has sued

15  Mr. Oppenheim asserting, most

16  recently, negligence and spoliation

17  of evidence related to the theft of

18  the laptop.

19    This to me seems to be an

20  entirely inappropriate use of the

21  Middle District of Florida's

22  discovery process and I vigorously

23  object.

24    MS. LOEW:  Your objection is

---

120

OPPENHEIM

1  noted.  We are exploring the

2  preservation of evidence in this

3  case which is an appropriate

4  subject matter for this deposition.

5    The Court ruled that you did

6  not have to provide metadata at

7  that time, but we were permitted to

8  renew our objection at a later date

9  or our request at a later date if

10  circumstances are appropriate.

11  BY MS. LOEW:

12    **Q.   The thumb drive, does that**

13  **have original electronic files on it?**

14    A.   Yes.

15    **Q.   Are they in the native format?**

16    A.   I'm no computer scientist, but

17  I think so.

18    **Q.   And when did -- when was that**

19  **thumb drive created, the documents on the**

20  **thumb drive?**

21    A.   Whenever we responded to the

22  discovery request.

23    **Q.   Was there a backup of -- other**

24  **than that thumb drive that you have**

---

121

OPPENHEIM

1  **identified, was there a backup of the**

2  **materials on the laptop?**

3    MR. BLONIEN:  Objection, vague

4  as to materials on the laptop and,

5  again, renew my objection that this

6  line of inquiry to the extent it

7  extends beyond the M&C materials

8  produced in this litigation is

9  inappropriate and harassing my

10  witness, and I urge opposing

11  counsel to move on to another

12  topic.

13    MS. LOEW:  I am, as I said, I

14  am asking questions that pertain to

15  the M&C materials which were stolen

16  and are, as far as I know, still

17  missing, so this is an appropriate

18  line of questioning.

19    MR. BLONIEN:  I may have

20  misunderstood, Ms. Loew, that the

21  question didn't seem to be limited

22  in any way to the M&C documents.

23  BY MS. LOEW:

24    **Q.   The -- is there a backup of --**

---

31 (Pages 118 to 121)

122

OPPENHEIM

1  other than the thumb drive, is there a
2  backup of the M&C files that were on the
3  laptop?
4      A.   None that I am aware of,
5  although I would surmise that my counsel
6  has a set because I gave them to him to
7  produce to you.
8      Q.   Okay.  Did you access the
9  Medical and Chiropractic documents at any
10  time after you left Anderson & Wanca?
11      MR. BLONIEN:  Objection, vague
12      as to time frame.
13      THE WITNESS:  Are we talking
14      before this litigation commenced?
15  BY MS. LOEW:
16      Q.   At any time after you left
17  Anderson & Wanca, did you access the M&C
18  files?
19      A.   Yes, in order to collect them
20  to produce to you.
21      Q.   Other than when you were
22  collecting them -- was it in response to
23  a discovery request?
24      A.   Yes.

123

OPPENHEIM

1      Q.   Other than in collecting them
2  in response to a discovery request, did
3  you access any of the files pertaining to
4  Medical and Chiropractic?
5      A.   Not that I can recall.
6      Q.   Was the Medical and
7  Chiropractic, the Medical and
8  Chiropractic materials, how were they
9  stored on your laptop?
10      MR. BLONIEN:  Objection,
11      confusing.
12      THE WITNESS:  Yeah.  Keep
13      going.
14      MR. BLONIEN:  Both with
15      respect to M&C materials and the
16      general nature of the question.
17      THE WITNESS:  Yeah.  I'm not
18      sure what you mean by how were they
19      stored.
20  BY MS. LOEW:
21      Q.   Where were they saved?
22      A.   Within my documents folder, as
23  well as part of the Outlook PST file,
24  which I think was -- no.  That was also

124

OPPENHEIM

1  in the documents folder.
2      Q.   Were they segregated in any
3  way from other files that you were
4  working on?
5      A.   I believe some were.  Some
6  weren't.  I think I had a folder called
7  Buc's or something of that nature where a
8  lot of them were.
9          However, not the most
10  organized guy in the world, so I had some
11  just saved in the general documents
12  folder, not inside any subfolder.
13      Q.   Did you access the PST file in
14  which the M&C related emails existed
15  after you left Anderson & Wanca?
16      MR. BLONIEN:  Objection, vague
17      as to time frame.
18      THE WITNESS:  Yes.
19  BY MS. LOEW:
20      Q.   Other than in gathering
21  documents for responses to discovery
22  requests in this case, did you access the
23  PST file which contained the M&C files
24  after you left Anderson & Wanca?

125

OPPENHEIM

1      A.   The PST file itself contained
2  every single email I sent or received
3  from April of 2015 to April of 2016, so
4  yes.
5      Q.   Were the M&C emails within the
6  PST file identifiable?
7      A.   Yes.  I mean, I was able to
8  find them in order to produce them.
9      Q.   Did you store them in any
10  particular way, in a folder structure,
11  something like that, in your emails?
12      A.   No.
13      Q.   Are they more --
14      A.   Just did keyword searches.
15      Q.   So they were mixed in with
16  other emails?
17      A.   Yes.
18      Q.   Before you left Anderson &
19  Wanca, were you familiar with the
20  relationship between Mr. Bock and
21  Mr. Wanca?
22      MR. BLONIEN:  Objection,
23      vague.
24      MR. COHEN:  Join.

32 (Pages 122 to 125)

126

OPPENHEIM

1
2   THE WITNESS:  I'm not sure
3   what you're asking.  I certainly
4   know that they jointly prosecuted a
5   lot of cases.
6 BY MS. LOEW:
7   Q.  Were you aware of any
8 conflicts between them?
9   A.  Yes.
10   Q.  What type of conflicts?
11   A.  Brian Wanca thought that he
12 was paying too much in terms of initial
13 outlays, out of pocket expenses and
14 determined that he was owed some amount
15 of money to make things even, and I think
16 that all got resolved in 2015.  That was
17 certainly one of them.
18   Q.  Do you know what the nature
19 was of that resolution?  Were you
20 involved in discussing it?
21   A.  Only to the extent that
22 Mr. Wanca vented to me about it a few
23 times.
24   I do know just based on
25 knowledge I have since acquired that

127

OPPENHEIM

1
2 Mr. Bock paid some money to make sure
3 that everybody was out of pocket 50
4 percent of expenses on all the
5 outstanding cases, and that happened in
6 late 2015.
7   Q.  Since late 2015, has Bock Law
8 Firm and Anderson & Wanca filed new cases
9 as co-counsel?
10   A.  I don't believe so.
11   Q.  So you -- earlier you
12 mentioned that there were 57 cases on
13 which Bock Law Firm and Anderson & Wanca
14 are co-counsel; is that correct?
15   A.  Yes.
16   Q.  Were all of those cases filed
17 before the end of 2015?
18   MR. BLONIEN:  Objection, calls
19   for speculation.
20 BY MS. LOEW:
21   Q.  Do you know the answer?
22   A.  I think I do, and I think the
23 answer is yes.
24   Q.  And when I -- when I say on
25 which they are co-counsel, does that mean

128

OPPENHEIM

1
2 that there are attorneys from Bock Law
3 Firm who have appeared and attorneys from
4 Anderson & Wanca who have appeared?
5   A.  I'm not sure if both firms
6 have appearances in every single case.
7   Q.  How would you -- when you say
8 57 cases on which they are co-counsel,
9 what -- what do you consider to be
10 co-counsel?
11   A.  Cases in which each firm has a
12 stake or essentially joint ownership
13 over -- that's a clumsy term, but --
14   Q.  Are you working on all of
15 those cases?
16   A.  Yeah, I oversee all of them in
17 our office.
18   Q.  So other than kind of this
19 issue that was resolved at the end of
20 2015, were you aware of any other, I
21 guess, conflict between Mr. Bock and
22 Mr. Wanca?
23   A.  Well, I'm -- again, this is
24 sort of just my understanding, but I do
25 know that Mr. Wanca unilaterally decided

129

OPPENHEIM

1
2 to start filing cases without Mr. Bock
3 sometime in, I think, 2013, and I believe
4 there was some tension between the two
5 once Mr. Bock found out about it.  I'm
6 sure you are going to ask him all about
7 it, but that was sort of my
8 understanding.
9   I do know that it was all a
10 big secret that we had these kind of side
11 cases that we were cutting the Bock Firm
12 out at in the beginning and then it
13 became less of a secret.
14   Q.  When you say it was a secret,
15 what do you mean?
16   A.  I mean, just for example,
17 things that are pending in Chicago,
18 typically we would use the Bock firm as
19 somebody to file stuff.
20   For these new cases that they
21 weren't a part of, there would be
22 elaborate steps taken, like, you know, go
23 and copy things at Kinko's instead of
24 asking your co-counsel or someone with
25 whom you have a professional relationship

33 (Pages 126 to 129)

130

OPPENHEIM

1    to just do the courtesy of making copies,
2    stuff like that.
3         Q.   And were you ever told to keep
4    that secret from Bock Law Firm?
5         A.   Yes.
6         Q.   By whom?
7         A.   Brian Wanca.
8         Q.   And when did he tell you that?
9         A.   This would have been right
10   around the time that -- that the Wanca
11   firm started filing its own cases.
12        Q.   And did you -- I thought you
13   said earlier that was around 2013?
14        A.   I think so.
15        Q.   Was the -- the Medical and
16   Chiropractic action against the
17   Buccaneers one of those cases that was
18   filed without the Bock Law Firm?
19        A.   Yes.
20        Q.   Was it -- was it supposed to
21   be kept a secret from the Bock Law Firm?
22        A.   It -- I think, as I testified
23   earlier, possibly at the beginning, but
24   it became pretty well common knowledge as

131

OPPENHEIM

1    time went on.
2         Q.   The case -- so I guess how
3    were you supposed to keep it secret if
4    it's a publically filed case?
5         MR. BLONIEN:   Objection,
6    argumentative.
7         THE WITNESS:   It's an
8    incredibly good question.
9    BY MS. LOEW:
10        Q.   So Anderson & Wanca was filing
11   these cases under its own firm name?
12        A.   Yes.
13        Q.   Or its own attorney's names?
14        A.   Yes.
15        Q.   Were you ever told to keep the
16   Buccaneers case secret from Bock Law
17   Firm?
18        A.   I don't recall a specific
19   conversation about this particular case.
20   Again, I didn't have much, if anything,
21   to do with it until much later.
22        Q.   Do you know why some cases
23   were being filed without Bock Law Firm?
24        MR. BLONIEN:   Objection, calls

132

OPPENHEIM

1    for speculation.
2         THE WITNESS:   Yeah.  I mean, I
3    can only relate what Brian Wanca
4    told me, which was, number one, he
5    was angry about the expense fight
6    and, number two, he felt that he
7    had enough talent in his own firm
8    that he didn't need Mr. Bock
9    anymore.
10   BY MS. LOEW:
11        Q.   And when he said that to you,
12   did you interpret that to mean you were
13   part of that talent?
14        A.   Yes.
15        Q.   When you were, I guess,
16   contemplating leaving Anderson & Wanca to
17   join Bock Law Firm, did you have any
18   concern about the, you know, any conflict
19   between Mr. Wanca and Mr. Bock and how
20   this departure would impact that?
21        A.   I really didn't.  Again, at
22   the time it was -- it was just moving
23   from one half of the team to the other
24   half of the team, and, yeah, there were

133

OPPENHEIM

1    new cases that each of the -- each firm
2    had that were separate, but there was
3    never any instance that I was aware of of
4    direct conflict.
5         Q.   Did you think that Bock Law
6    Firm was, I guess, a similar type of firm
7    to Anderson & Wanca as far as type of
8    cases?
9         A.   Yes.
10        Q.   And what did you think of the
11   attorneys at Bock Law Firm, their --
12        MR. BLONIEN:   Objection.
13   BY MS. LOEW:
14        Q.   -- their competence in
15   handling those types of cases?
16        A.   They were very good, very
17   smart, especially Phil Bock.
18        I mean, that was -- he was
19   much more of a hands-on intellectual
20   person in terms of coming up with the way
21   to handle the cases.
22        Q.   And when you say much more
23   intellectual, what -- what are you
24   comparing that to?

34 (Pages 130 to 133)

134

OPPENHEIM

1
2    A.   Well, to Mr. Wanca.  He was
3  less of -- less of, I guess, a detailed
4  person.
5         He had his ideas of how things
6  were supposed to be and wasn't really
7  open to, you know, thinking about
8  differences, and largely his people
9  pulled the train, whereas I think
10  Mr. Bock really is the intellectual heft,
11  you know, of his firm, just my
12  observation.
13    Q.   So other than Mr. Wanca, did
14  you think the other attorneys at Anderson
15  & Wanca were good at handling class
16  actions?
17    A.   Well, I mean, you never want
18  to have to evaluate your coworkers.
19         In some senses, for example,
20  Ross Good was incredibly good at managing
21  data and figuring out what records were
22  needed and how to get them, but, again,
23  it was more of an assembly line
24  compartmentalized approach, so I didn't
25  really get to see that closely what

135

OPPENHEIM

1
2  others were doing in their stage of the
3  case, cases.
4    Q.   Did you have any concerns
5  about the way that Anderson & Wanca was
6  handling the Medical and Chiropractic
7  action against the Buccaneers?
8         MR. BLONIEN:  I'm going to
9     object and interpose an instruction
10     that Mr. Oppenheim not reveal any
11     direct communications related to
12     the mediation to the extent that
13     that -- that would be invoked by
14     the question.
15         MR. COHEN:  Could you read --
16     read the question back too.
17         (Record read as
18         requested.)
19         MR. COHEN:  Thank you.
20         THE WITNESS:  And I don't know
21     that I can answer that question
22     without getting into settlement
23     posture and strategy.
24  BY MS. LOEW:
25    Q.   So you are not answering on

136

OPPENHEIM

1
2  the basis of mediation privilege, is that
3  what I understand?
4    A.   Yes, as having been instructed
5  by counsel.
6         MR. COHEN:  And I just ask, is
7     it also opinion work product or
8     not?  Because I don't know the
9     responsive information, so I can't
10     make the objection.
11         THE WITNESS:  It would be my
12     opinion, but I think that's what
13     the question called for, so sure.
14         MR. COHEN:  Okay.
15  BY MS. LOEW:
16    Q.   The -- did you express any
17  concerns with the way the M&C action was
18  being handled by Anderson & Wanca to
19  anyone at Bock Law Firm?
20         MR. BLONIEN:  Objection, vague
21     as to time frame.
22  BY MS. LOEW:
23    Q.   At any point in time.
24    A.   There -- obviously there's an
25  email string from April 29 that was

137

OPPENHEIM

1
2  produced.  That would be the only
3  communication that might fall within the
4  ambit of the question.
5         MS. LOEW:  Can you mark this
6     as Exhibit 11.
7         (Oppenheim Exhibit
8         No. 11 marked
9         for identification.)
10  BY MS. LOEW:
11    Q.   So this is a document that's
12  Bates labelled BLF 00007 through 14.  Is
13  this the email string that you were just
14  referring to?
15    A.   Yes.
16    Q.   So at the time that -- on
17  April 29, 2016, you had already -- you
18  were at Bock Law Firm --
19    A.   Yes.
20    Q.   -- at this point in time?  You
21  are -- the original, the bottom portion
22  of this email string that reference
23  Rogan, what is that case?
24    A.   It's a case that both the
25  Anderson & Wanca and the Bock firm were

35 (Pages 134 to 137)

138

OPPENHEIM

1  co-counsel in.  It was a case in which --
2  it was a FACTA case in which settlement
3  with the defendant was reached many years
4  ago, I want to say in 2009, and then ever
5  since, the fight was against the
6  insurance company to try and collect the
7  judgment that was entered.
8      And we ended up getting to a
9  point where we were talking settlement
10  with the insurance company, which was
11  Travelers, and trying to set up
12  mediation.  Ultimately the case did
13  settle.
14      Q.   The -- so if you look at the
15  page that's Bates labeled 8, the email at
16  the very bottom.
17      A.   8, I see it.
18      Q.   So this is an email from
19  Mr. Bock to you and he says, I love it.
20  All of a sudden I'm a Tampa Bay
21  Buccaneers fan.  Another case based on
22  hard drive and work leading up to it that
23  I paid 50 percent on involving clients
24  that were solicited through marketing
25

139

OPPENHEIM

1  efforts I paid 50 percent on.
2      Do you see that?
3      A.   I do.
4      Q.   Do you know what he's
5  referring to there?
6      A.   I do only because of dealing
7  with this litigation.  I can't say that I
8  knew what he was talking about at the
9  time the email was sent.
10      Q.   What -- what is he talking
11  about?
12      MR. BLONIEN:  Objection, calls
13  for speculation.
14      THE WITNESS:  As I understand
15  it, the records leading to the
16  Tampa Bay Buccaneers case came from
17  a fax broadcaster that was pursued
18  in another case, and this is,
19  again, information I learned from
20  Mr. Bock since this case was filed,
21  and that the subpoena process and
22  the pursuit of this evidentiary
23  material was in a joint case paid
24  half by Mr. Bock.  Likewise that
25

140

OPPENHEIM

1  the -- his understanding is that
2  the -- either the M&C
3  representation or the Cin-Q
4  representation or both came out of
5  a marketing -- a letter marketing
6  campaign that was supposed to be on
7  behalf of the joint enterprise.
8      But, again, I don't have
9  personal knowledge of any of that.
10 BY MS. LOEW:
11      Q.   Okay.  So do you know if, in
12  fact, this M&C action against the
13  Buccaneers was based on this hard drive
14  that's referred to here?
15      A.   I don't know.
16      Q.   His email is in response to an
17  email from you at the top of page 9.  It
18  says, yeah, he wants to set a record
19  above the Capital One $75 million
20  settlement.  The magistrate judge it's in
21  front of is squeamish and is giving the
22  defendants a broad shot at disproving on
23  behalf of, sort of like the Sarris class.
24  Cert is fully briefed.
25

141

OPPENHEIM

1      Do you see that?
2      A.   I do.
3      Q.   And what are you referring to
4  here?
5      A.   Well, a number of things.  I
6  guess going from back to front, it's --
7      MR COHEN:  You mean bottom to
8  top?
9      THE WITNESS:  Yeah, bottom to
10  top, sorry.
11      Class cert is fully briefed, I
12  mean, that's self explanatory.
13  It's the stage that the litigation
14  is in.
15      Sort of like Sarris means,
16  again, that's this on behalf of
17  liability question.
18      Sarris was our joint case, I
19  think argued by Phil Bock in the
20  11th Circuit in which the 11th
21  Circuit set down a standard for
22  establishing liability under the
23  TCPA.
24      And then the Buc's summary
25

36 (Pages 138 to 141)

142

OPPENHEIM

1
2  judgment ruling applied the Sarris
3  standards and sort of fashioned
4  their own little twist on it,
5  and -- okay.
6       Magistrate judge is squeamish
7  and giving defendants a broad shot
8  was my interpretation of the
9  summary judgment ruling itself, as
10 well as the acknowledgement that a
11 lot of times when these things go
12 to -- these cases go to juries,
13 they don't end up too well.
14      And finally, the he wants to
15 set a record is just Brian's
16 personal goals for amassing large
17 amounts of money.
18 BY MS. LOEW:
19      Q.   So the magistrate judge you
20 are referring to here is Porcelli?
21      A.   It is.
22      Q.   And he wants to set a record,
23 is that referring to Brian Wanca?
24      A.   Yes.
25      Q.   Were you referring to the M&C

143

OPPENHEIM

1
2  action in that statement?
3      A.   Yeah.
4      Q.   And where did you get that
5  information?
6      A.   Well, again, the Brian wants
7  to set a record is something that is his
8  general professional goal, which I think
9  was well-known by both Mr. Bock and
10 myself at this point.  That's -- yeah.
11      Q.   In giving this information to
12 Mr. Bock, did you think that you were
13 violating any of the mediation privilege
14 requirements?
15      A.   No.
16      Q.   Why not?
17      MR. BLONIEN:  Calls for a
18 legal conclusion, I object.
19      THE WITNESS:  I also think it
20 involves for getting into what was
21 actually going on in the mediation,
22 and I'm not sure I'm supposed to do
23 that.
24      MR. BLONIEN:  On the grounds
25 of the client indicating that the

144

OPPENHEIM

1
2  answer may well involve direct
3  communications relating to
4  mediation privilege, I instruct the
5  witness not to answer to the extent
6  that the Court has ordered us not
7  to get into mediation-privileged
8  communications.
9  BY MS. LOEW:
10      Q.   The -- and you are referring
11 specifically to communications with the
12 Buccaneers and the mediator?
13      A.   Right.
14      Q.   The April 29 of 2016 at
15 5:25 p.m., your response to Mr. Bock, it
16 says something about pigs and hogs comes
17 to mind?
18      A.   Oh, I see it, right.
19      Q.   What does that mean?
20      A.   It's a famous saying, pigs get
21 fat, hogs get slaughtered.
22      Q.   And who is the pig in this
23 situation?
24      A.   Not Mr. Wanca.
25      Q.   And who is the hog?

145

OPPENHEIM

1
2      A.   Mr. Wanca.
3      Q.   So then you -- this email
4  chain continues on with Mr. Bock
5  responding to you and a couple of more
6  emails.
7       Did you discuss this with
8  Mr. Bock outside of these emails?
9      A.   No.
10      Q.   In your top email here on the
11 very first page, you said that was
12 Anderson's read.
13      Do you see that?
14      A.   Yes.
15      Q.   What are you referring to
16 there?
17      A.   Judge Anderson, who is a
18 mediator that we've all used
19 frequently -- when I say all, is the
20 Wanca firm, myself, Mr. Bock -- had just
21 a personal sense that he works with
22 Mr. Mester a lot, and Mark Mester is
23 somebody who comes into cases to get them
24 settled.
25      Q.   And where did you learn that

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123 1.800.642.1099

146

OPPENHEIM

1    information about Judge Anderson?
2    A.   About Judge Anderson?
3    Q.   That he -- that that was his
4    read of Mark Mester.
5    A.   In conversations with Judge
6    Anderson.
7    Q.   And were those conversations
8    part of the mediation in the Buccaneers'
9    case?
10   A.   I think so, yeah.
11   Q.   The -- if you go down further
12   on this page, the email from Phil Bock to
13   you of 4:43 p.m., it's -- there's a lot
14   of stuff going on in this email, but if
15   you look at the last couple sentences of
16   the first paragraph, it says, to make it
17   even more Machiavellian, perhaps it would
18   be easy to get other people on the side
19   of the class, such as local attorney
20   Michael Addison.  It would be funny to
21   put a bug in his ear that somebody else
22   is secretly negotiating with the
23   Buccaneers in an uncertified class
24   action.

147

OPPENHEIM

1    Do you see that?
2    A.   Uh-huh.
3    Q.   Did you have any concern when
4    you read that?
5    A.   No.
6    Q.   Did you think that Bock Law
7    Firm was going to then file a class
8    action against the Buccaneers?
9    A.   No.
10       (Oppenheim Exhibit
11       No. 12 marked
12       for identification.)
13   BY MS. LOEW:
14   Q.   I have handed you a document
15   that we've marked as Exhibit 12, which is
16   BLF 15 through 26.
17       If you look at the top email
18   here, this is an email from Phil Bock to
19   Todd Lewis, Jim Smith and Dan Cohen on
20   Friday, April 29, 2016 at 5:31 p.m.
21       Do you see that?
22   A.   Yes.
23   Q.   Have you seen this email
24   before?

148

OPPENHEIM

1
2    A.   Only in the context of the
3    document production in this case.
4    Q.   And this email is sent shortly
5    after the email exchange between you and
6    Mr. Bock about the Buccaneers' case;
7    isn't that right?
8       MR. BLONIEN:  Objection, calls
9    for speculation.
10      THE WITNESS:  Based on the
11   timestamps on the printout, it
12   looks like 48 minutes, but I'm
13   trusting the accuracy of the
14   timestamps.
15   BY MS. LOEW:
16   Q.   So he says here, Brian is
17   holding out for a record settlement in an
18   uncertified case, not that the latter
19   part is so relevant.  We could find the
20   plaintiff and approach the defendant
21   about settling, question mark.  LOL.
22   Do you see that?
23   A.   Uh-huh yes.
24   Q.   And is that what, in fact,
25   happened?

149

OPPENHEIM

1
2    A.   I don't know.  You would have
3    to ask Mr. Bock.
4    Q.   The -- did anyone at Bock Law
5    Firm discuss with you that they were
6    looking for a plaintiff for the
7    Buccaneers' litigation?
8    A.   No.
9       MR. BLONIEN:  Ms. Loew, would
10      it be acceptable to take a truly
11      short break?
12      MS. LOEW:  Yes.
13      THE VIDEOGRAPHER:  Going off
14      the record.  The time is 2:04 p.m.
15       (A recess was had.)
16      THE VIDEOGRAPHER:  Going on
17      the record.  This marks the
18      beginning of media 4.
19      The time is now 2:14 p.m.
20      MS. LOEW:  Can you read the
21      last question and answer, please.
22       (Record read as
23       requested.)
24   BY MS. LOEW:
25   Q.   When was the first time you

38 (Pages 146 to 149)

150

OPPENHEIM

1    learned that Bock Law Firm had filed
2    against the Buccaneers?
3        A.   I got a notification, like an
4    e-filing notice, through the firm's
5    distribution list from the, I think, it
6    was Hillsborough County State Court
7    saying complaint filed.
8            (Off therecord.)
9            (Oppenheim Exhibit
10           No. 13 marked
11           for identification.)
12   BY MS. LOEW:
13       Q.   I'm handing you what was
14   marked as Exhibit 13, which is BLF 000028
15   through 29, and there's an email within
16   this chain at the bottom that is May 6,
17   2016 at 4:40 p.m.
18           Do you see that?
19       A.   I see it.
20       Q.   Are you -- have you seen this
21   document before?
22       A.   Yes.
23       Q.   And what is this document?
24       A.   That's what I referred to a

151

OPPENHEIM

1    moment ago, the e-filing receipt.
2        Q.   So on May 6, when you received
3    this e-filing receipt, this is the first
4    time that you discovered that Bock Law
5    Firm was filing an action against the
6    Buccaneers?
7        A.   I think I forwarded it right
8    away, so I think I must have left early
9    that day, and I didn't actually see it
10   until the following morning.
11       Q.   And who did you forward it to?
12       A.   Phil Bock.
13       Q.   Is that the email that's on
14   May 7, 2015, at 9:40 a.m.?
15       A.   Yes.
16       Q.   Did you -- I mean, when you
17   saw it, what was your reaction?
18       A.   That, wow, they must have
19   filed their own case against the
20   Buccaneers after that email conversation
21   a week before.
22       Q.   And did you discuss that with
23   anybody?
24       A.   No.  Ultimately, I got the

152

OPPENHEIM

1    response that you see three minutes
2    later, and I believe right around the
3    same time, Phil sent me a text saying we
4    filed a case against the Buccaneers.
5    You're screened off.
6            (Oppenheim Exhibit
7            No. 14 marked for
8            identification.)
9    BY MS. LOEW:
10       Q.   So I have handed you
11   Exhibit 14, which is BLF 000127 through
12   130.  Is this the text message that you
13   are talking about?
14       A.   Yes.
15       Q.   What day did you exchange
16   these text messages?
17       A.   I don't recall.  I would
18   imagine it was right around -- let's see.
19   That Saturday makes -- so I think it
20   would have been that Saturday, May 7.
21           I don't see a date on the
22   printout or else I could have told you
23   for sure.
24       Q.   The -- so the top text message

153

OPPENHEIM

1    in which it says, filed a case against
2    Buccaneers, is this from Phil to you?
3        A.   Yes.
4        Q.   And then there's a response
5    here that is redacted out?
6        A.   Yes.
7        Q.   Do you know the basis for that
8    redaction?
9        A.   It was responding to a
10   different issue.  There's an unrelated
11   text from Phil to me that's right above
12   the one that you see on the first page.
13   I responded to the first one first and
14   then I responded to the one about this
15   litigation.
16       Q.   The I saw the e-filing receipt
17   on the Bucs.  I can pretend I didn't.
18   The -- so that's your response to Phil?
19       A.   Yes.
20       Q.   And then it says on the last
21   page, BLF 130, it says, I will forward.
22           Did you -- is that the text
23   from you to Phil?
24       A.   Yes.

39 (Pages 150 to 153)



154

OPPENHEIM

1
2      Q.   And that May 7, 2016, at
3   9:48 a.m., is that the first time that
4   you had forwarded that to him?
5      A.   Yes.  So I guess looking at
6   this then the sequence was I got the
7   e-filing receipt, then I got the text,
8   and after we were in the text
9   conversation, I said I would forward it.
10     Q.   Then it says at the very top
11   message here on 127, it says, please keep
12   confidential.
13        Do you see that?
14     A.   Oh, yes, yes.
15     Q.   Do you know why you were
16   supposed to keep this confidential?
17        MR. BLONIEN:  Objection, calls
18     for speculation.
19        THE WITNESS:  No.
20   BY MS. LOEW:
21     Q.   Did you tell anyone about this
22   filing after it happened?
23     A.   No.
24     Q.   Did you -- did you have
25   concerns about the fact that this was

155

OPPENHEIM

1
2   filing an action against the Buccaneers?
3        MR. BLONIEN:  Objection, vague
4     as to concerns.
5        THE WITNESS:  I knew that it
6     was going to provoke an incredibly
7     vindictive out of proportion
8     response from Brian Wanca and in
9     that I think I was dead on the
10     money.
11   BY MS. LOEW:
12     Q.   Did you express those concerns
13   to anyone?
14     A.   No, because the only person I
15   might have expressed that to was Phil
16   Bock, and I'm sure he knew exactly what
17   he was getting himself into.
18     Q.   Was there an ethical screen or
19   wall set up at Bock Law Firm pertaining
20   to this Buccaneers' action?
21     A.   Yes.
22     Q.   And this action that was filed
23   by Technology Training Associates, I'm
24   going to refer to it as the Technology
25   Training action, when were you informed

156

OPPENHEIM

1
2   about the ethical wall that was set up?
3      A.   In that email exchange.
4      Q.   And what -- what actually
5   was -- I mean, what was the ethical wall?
6      A.   That no one was to discuss the
7   case with me, that no one was to share
8   documents from the Technology case with
9   me.  I wasn't to go looking for them, of
10   course.
11        I think -- although I'm not
12   certain because I didn't go looking for
13   them -- that there are controls on the
14   electronic system to prevent me from
15   accessing it, but, again, I don't know
16   for sure.
17     Q.   And how -- how did you learn
18   what constituted an ethical wall?
19     A.   I talked to Phil Bock.
20     Q.   And so he explained to you
21   what the ethical wall was going to
22   entail?
23     A.   Yes.
24     Q.   Did you speak with any counsel
25   about the fact that there was going to be

157

OPPENHEIM

1
2   an ethical wall?
3      A.   Other than Mr. Bock?
4      Q.   Yes.
5      A.   I may have talked about it
6   with Jim Smith, who is another attorney
7   at our firm, who at that time was the
8   managing attorney and so was in charge of
9   the office procedures.
10     Q.   Did you consult any outside
11   attorneys about what procedures needed to
12   be in place to screen you off from that
13   case?
14        MR. COHEN:  Before you answer,
15     I assume you are talking about
16     within some period of time --
17        MS. LOEW:  Right.
18        MR. COHEN:  -- proximate to
19     the institution of it as opposed to
20     conversations with counsel?
21        MS. LOEW:  During the course
22     of litigation.
23        MR. COHEN:  Or in anticipation
24     of litigation?
25        MS. LOEW:  Right.

40  (Pages 154 to 157)

158

OPPENHEIM

BY MS. LOEW:

Q.   So at the time that the screen
was set up, did you speak with any
outside counsel about what the screening
had to entail?

A.   No.

(Oppenheim Exhibit
No. 15 marked
for identification.)

BY MS. LOEW:

Q.   I have handed you what we have
marked as Exhibit 14, which is BLF 30 to
32, and this is an email chain between
you and Phil Bock on May 12, 2016 at the
top.

Do you see that?

A.   Yes.

Q.   And below that is an email
from Mike Addison to you and Mr. Bock and
Mr. Wanca.

Do you see that?

A.   Yes.

Q.   Are you familiar with this

159

OPPENHEIM

document?

A.   Yes.

Q.   The -- when was the first time
that Mike Addison reached out to you
about the filing of the Technology
Training action?

A.   Would be this email.

Q.   You didn't have any other
communications with him before that?

A.   I don't think so.

Q.   What about anyone from
Anderson & Wanca, when was the first time
you communicated with them about the
Technology Training action?

A.   I think it would be -- I mean,
if you count this email, since Mr. Wanca
is cc'd on it, then it would be this
email.

I believe there was one
shortly after this sent to me in a
accusatory tone, but it would have been
this day, Thursday, May 12.

Q.   So this -- did you respond to
Mr. Addison?

160

OPPENHEIM

A.   No.

Q.   Why not?

A.   Because, as you will see, the
response above was that I am Chinese
walled off of the case and that I was not
to review or respond to emails anyone
sends me or calls they make.

Q.   In the top email you say I
will -- okay.  I will delete all emails.

Do you see that?

A.   Yes.

Q.   Did you delete any emails at
that time?

A.   I think so.  It would have
only been the e-file receipts for the
complaint and I think there were a couple
others, maybe appearances.

Q.   So other than appearances and
e-file receipts, did you delete any other
materials relating to the Technology
Training action?

A.   I don't think so.

Q.   Other than this email from
Mike Addison, did you have any other

161

OPPENHEIM

communications with him after this email
about the Technology Training action?

A.   I don't think so.  I spent
some time with him in Tampa on another
case a few months ago.  I don't think
that the Buccaneers or this case came up.

MR. COHEN:  And I want to be
clear, I got the -- because I don't
remember your exact wording.  I
understood your question to be
talking about after that email.

MS. LOEW:  Right.

MR. COHEN:  Not whether he
talked to Addison before any --

MS. LOEW:  During the course
of the previous litigation, you
mean?

MR. COHEN:  Right.

MS. LOEW:  Yes.  My question
was after this email.

MR. COHEN:  Thank you.

BY MS. LOEW:

Q.   Does that change your answer
at all?

41 (Pages 158 to 161)

162

OPPENHEIM

1        A.   No, no.  I mean, I -- he had a
2    conversation with me venting some
3    frustrations with how things were going
4    with the settlement in the mediation that
5    happened prior to May 12.  That would
6    have been around May 1, but nothing after
7    May 12.
8        Q.   So the conversation that you
9    just referred to that was May 1, where
10    were you?
11        A.   In court, in Federal Court in
12    the Middle District.  We had a case --
13    still have a case called Zurich American
14    Insurance Company versus Robert Dalzell
15    and European Tiles.  It's another
16    insurance coverage stemming out of one of
17    the TCPA cases.
18             That's a joint case among the
19    Bock firm, Anderson & Wanca and
20    Mr. Addison, and we had the initial
21    scheduling conference on May 1 of 2016.
22        Q.   And who was part of that
23    conversation that you are referring to?
24        A.   Just me and Mike Addison.

163

OPPENHEIM

1        Q.   What did he say?
2        A.   He said that Brian was being
3    greedy, that he was worried that we
4    were -- that he still -- he said "we" at
5    that point were going to get nothing.
6        Q.   Did he know at that point in
7    time that you had left Anderson & Wanca?
8        A.   Yes.
9        Q.   Did he --
10        A.   He did.
11        Q.   Sorry.  Did he know that you
12    were at Bock Law Firm?
13        A.   Yes.
14        Q.   And how do you know that he
15    knew that?
16        A.   Because during the course of
17    that conversation, he also asked me for
18    details about how that came about and why
19    I switched from one to the other.
20        Q.   And did you -- when you spoke
21    with Mr. Addison on May 1, did you share
22    that conversation with anybody else
23    afterwards?
24        A.   In preparation for the

164

OPPENHEIM

1    preliminary injunction hearing in this
2    case, I shared it with the defense team.
3        Q.   Okay.  So other than during
4    the course of this litigation, did you
5    share it with anybody else?
6        A.   I don't think so, no.
7        Q.   The -- was -- was Phil Bock
8    part of that discussion with Mike
9    Addison?
10        A.   No.  He wasn't there.  It was
11    just Mike and me at the counsel table.
12        Q.   Between when you left
13    Anderson & Wanca and when the Technology
14    Training action was filed, other than the
15    emails with Mr. Bock that we've already
16    looked at today and that discussion with
17    Mike Addison, did you discuss the Medical
18    and Chiropractic action against the
19    Buccaneers with anybody else?
20        A.   I had a conversation with
21    Judge Anderson when I was talking to him
22    about another mediation in another matter
23    in which he brought the case up, the
24    status of the settlement.

165

OPPENHEIM

1        Q.   And when was that discussion?
2        A.   Right around that same time at
3    the end of April, possibly even early
4    May.
5        Q.   And what -- what did you guys
6    discuss?
7        A.   He just brought up, look, I
8    think -- I mean, again trying to dance
9    around the -- the restrictions on the
10    privilege here.
11             He brought up what he thought
12    that he could get the Buccaneers to do
13    and wondered if I still had influence
14    with Mr. Wanca to get him to take it, and
15    I said I'm not handling that anymore.
16        Q.   Who was part of that
17    discussion?
18        A.   It's a phone call between me
19    and Judge Anderson.
20        Q.   And did you share what
21    happened during that discussion with
22    anybody else?
23        A.   Not until preparation for the
24    preliminary injunction hearing in this

42 (Pages 162 to 165)

166

OPPENHEIM

1  litigation.
2      Q.   So you mentioned an email from
3  Mr. Wanca to you after this email from
4  Mike Addison regarding the new Technology
5  Training action?
6      A.   Yes.
7      Q.   Did -- have you -- other than
8  that email exchange, have you discussed
9  the Technology Training action with
10 Mr. Wanca since you left the firm?
11     A.   I don't think so.  Discussions
12 really aren't his way.
13     Q.   Have you talked with anybody
14 else in Anderson & Wanca about the case,
15 about the Technology Training action or
16 Medical and Chiropractic action?
17     A.   I know that in the early days
18 Ross Good called me up a few times in
19 ostensibly an effort to try and work
20 things out among everybody.
21     Q.   Do you still communicate with
22 attorneys at Anderson & Wanca?
23     A.   Yeah.  I mean, we still have
24 57 cases together.

168

OPPENHEIM

1  oral communication by Mr. Oppenheim to
2  Mr. Bock on or about May 18 of 2016,
3  seemingly pertaining to settlement
4  negotiations in Cin-Q action referenced
5  in the Bock Law Firm, LLC's supplemental
6  answer to M&C Interrogatory No. 4.
7      Do you see that?
8      A.   Uh-huh.
9      Q.   Do you know what communication
10 that's referring to?
11     A.   I don't.
12     Q.   The answers to
13 interrogatory --
14     MR. BLONIEN:  6.
15     THE WITNESS:  BLF answers?
16 BY MS. LOEW:
17     Q.   Yes.  So on page 9, in the
18 first full paragraph, there's a
19 description here regarding a discussion
20 between you and Mr. Bock.  Do you see
21 that?
22     A.   Uh-huh.  I should say yes for
23 the court reporter.
24     Q.   Thank you.

167

OPPENHEIM

1      Q.   When was the last time you
2  spoke with Ross Good?
3      A.   That's a good question.  Not
4  even trying to make a pun.  Maybe a month
5  ago.
6      Q.   Are you guys friendly?
7      A.   At one time we were.
8      Q.   Are you currently?
9      A.   No.
10     Q.   Defendant Bock Law Firm in its
11 privilege log identified a communication
12 between you and Mr. Bock on May 18 of
13 2016.  I will give you the privilege log.
14     (Oppenheim Exhibit
15     No. 16 marked
16     for identification.)
17 BY MS. LOEW:
18     Q.   The description -- I
19 apologize.  We marked this as Exhibit 15.
20     MR. BLONIEN:  Exhibit 16.
21 BY MS. LOEW:
22     Q.   Exhibit 16, this is the
23 defendant Bock Law Firm, LLC's privilege
24 log.  The description is unsolicited or

169

OPPENHEIM

1      Does this refresh your
2  recollection about what this
3  communication was?
4      A.   It doesn't, although it
5  refreshes my recollection that Phil Bock
6  sort of remembered something, but it
7  wasn't something that I remembered.
8      Q.   Okay.  And it says, the
9  communication occurred in the context of
10 anticipated litigation.
11     Do you see that?
12     A.   Yes, I do.
13     Q.   Why were you anticipating
14 litigation at that time?
15     MR. BLONIEN:  Objection, calls
16 for speculation as to another.
17     These are not Mr. Oppenheim's
18 responses.
19 BY MS. LOEW:
20     Q.   Were you anticipating
21 litigation at that time, Mr. Oppenheim?
22     A.   On May 18?
23     Q.   Yes.
24     A.   Well, this would have been

43 (Pages 166 to 169)

170

OPPENHEIM

1  after the emails of May 12, and it would
2  have been after Ross Good basically told
3  me that unless things got worked out,
4  that they were coming after me, so, yeah,
5  I think there was a fair anticipation of
6  something.
7     Q.   So Mr. -- so Ross Good told
8  you that basically they were going to sue
9  you?
10    A.   Yeah, in so many words, that
11 his -- I think the quote was this just
12 looks bad and the focus is going to be on
13 you, and I told him what I have said
14 today and what I have said before, which
15 is I don't have or didn't have anything
16 to do with the filing of the Technology
17 case and if -- whatever they're going to
18 do, they're going to do.
19           (Oppenheim Exhibit
20            No. 17 marked
21            for identification.)
22 BY MS. LOEW:
23    Q.   Handing you what we've marked
24 as Exhibit 17, which is David M.

171

OPPENHEIM

1  Oppenheim's objections and responses to
2  plaintiff's first set of interrogatories.
3           If you turn to page 3 of 13,
4  question, identify all cases on which you
5  performed work where Medical and
6  Chiropractic was the client, and there's
7  an objection interspersed.
8           You said, Mr. Oppenheim worked
9  on the following cases in which Medical
10 and Chiropractic was involved in some
11 capacity.  The first one is the Cin-Q
12 Automobile, Inc. versus Buccaneers
13 Limited Partnership case and the second
14 is Medical and Chiropractic Clinic, Inc.
15 versus eclinicalworks, LLC.
16          Do you see that?
17    A.   Yes.
18    Q.   What is that case?
19    A.   It was another class action
20 against a defendant named eclinicalworks,
21 another TCPA case.
22    Q.   Is that case still pending?
23    A.   I believe it settled.
24    Q.   Were you involved in the

172

OPPENHEIM

1  settlement of that case?
2     A.   Yes.
3     Q.   And did you -- did you speak
4  with Medical and Chiropractic Clinic
5  representatives during the course of that
6  case?
7     A.   I don't think so.  Don't
8  recall.
9     Q.   Do you remember if you
10 prepared mediation statements or anything
11 like that in that case?
12    A.   I would have.  I'm pretty sure
13 I did.
14    Q.   If you turn to page 11, the
15 response that's listed above No. 15, it
16 says, over the course of several years
17 working with Bock Hatch and co-counsel,
18 Mr. Oppenheim had discussed with Mr. Bock
19 the prospect of working at Bock Hatch,
20 but nothing specific was discussed before
21 late March 2016.
22          Do you see that?
23    A.   I do.
24    Q.   What were the discussions

173

OPPENHEIM

1  before late March of 2016?
2     A.   I think they were in the
3  nature of times when there were
4  disagreements between myself and
5  Mr. Wanca or when was feeling underpaid
6  or underappreciated, the -- I would raise
7  the issue of, hey, wouldn't it be great
8  for me to come over and work for you
9  instead, but it would never be -- got
10 beyond that level.
11    Q.   Did he express an interest in
12 hiring you before that?
13    A.   I think that it was, whether
14 said in all seriousness or not, that that
15 would be great, but I can't afford you,
16 and since everything is a joint case
17 anyway, I'll take the benefit of your
18 services with Brian paying you.
19          MS. LOEW:  I'm going to get
20       into compensation information, so
21       for that reason, I'll ask -- you
22       guys can step out.  We'll let you
23       know when you can come back in.

44 (Pages 170 to 173)

174

OPPENHEIM

        (Ms. Zakrzewski and
        Dr. Williams exited
        the deposition
        proceedings.)
        MR. COHEN:  And I -- this is
not to pressure you or anything, just
getting a read on how you think things
are going.
        MS. LOEW:  Great.  No.  Just
kidding.
        MR. COHEN:  No.  Before lunch
you indicated, you know, we take a
one-hour lunch, and the way I read
what you said was at least two more
hours, and that would mean 20
minutes from now.
        I don't think we are 20
minutes away from you being bone, I
am wondering if you have any more
likely accurate peg given that
we're an hour and 40 minutes
further in?
        MS. LOEW:  I would -- I mean,

175

OPPENHEIM

we'll definitely be done before 5.
I'm not sure how much longer it's
going to be, but we'll definitely
be before 5.  I know that was your
concern.
        MR. COHEN:  Thank you.
        THE WITNESS:  I appreciate it.
I got to get home to watch the
kids.
BY MS. LOEW:
        Q.   Okay.  I'm handing you what
we've marked as Exhibit 18.
        (Oppenheim Exhibit
        No. 18 marked
        for identification.)
        BY MS. LOEW:
        Q.   Which is a series of text
messages, BLF 82 through 86.
        A.   Yes.
        Q.   Is this a text exchange
between you and Mr. Bock?
        A.   Yes.
        Q.   The last page, on page 86, I
see a date of March 31, 8:30 p.m.

176

OPPENHEIM

        A.   Yes.
        Q.   Do you know what the date was
of the text before this?
        A.   This was all March 31.
        Q.   So this -- this is the first
day that you talked about potentially
joining Bock Law Firm?
        A.   Yes.
        Q.   And what -- what was the --
okay.
        So on the second page,
page 83, it says, throw everybody on a
plane and come to Miami for the weekend
so we can hang out for an hour and I'll
pay for it.
        At that point in time did you
know what the discussion was going to be
about between you and Mr. Bock?
        A.   I think so, yeah, I mean, not
the specific numbers, but yeah.
        Q.   So how did you know what you
guys were going to be discussing?
        A.   Because of the phone call that
preceded the text.

177

OPPENHEIM

        Q.   So the -- you guys talked
before this text chain?
        A.   Yes.
        Q.   Had Mr. Bock ever flown you
down to Florida before?
        A.   Not when -- actually, yeah.
No.  I mean, I have been down in Florida
on cases with him, but always as part of
just whatever case I was working on at
A & W.
        Q.   So after you guys had the
original discussion about the offer, then
you guys had this text exchange about
potentially going to Miami?
        MR. BLONIEN:  Objection,
mischaracterizes previous
testimony.
        MR. COHEN:  Join.
        THE WITNESS:  The text came
after the phone call, yes.
BY MS. LOEW:
        Q.   Do you know what spurred -- I
guess previously you said that
Mr. Bock -- you guys had discussions

45  (Pages 174 to 177)

178

OPPENHEIM

1  about potentially joining the Bock Law
2  Firm, but it was -- it was too expensive
3  to hire you at that time.  Do you know
4  what changed?
5          MR. BLONIEN:  Objection, calls
6      for speculation.
7          MR. COHEN:  Join.
8          THE WITNESS:  Yeah, I would be
9      speculating, but it -- yeah, I
10     would be speculating.
11 BY MS. LOEW:
12     Q.   Have you heard from anybody
13 else what inspired the offer?
14     A.   I have seen some of the
15 documents produced in this case.
16     Q.   And what did they say?
17         MR. BLONIEN:  Objection, calls
18     for speculation.
19         MR. COHEN:  And documents
20     speak for themselves, but subject
21     to that, you can.
22         THE WITNESS:  Right.  I
23     mean --

(lines 1-23 numbered; note original shows 1-25)

179

OPPENHEIM

1  BY MS. LOEW:
2      Q.   I don't know which documents
3  you are referring to.
4      A.   Sorry.  There -- there were
5  texts between Mr. Cohen and Mr. Bock, and
6  then there were some emails about, oh,
7  okay, I think I want to go hire David.
8      Q.   And what was the content of
9  the text messages that you were referring
10 to between Mr. Cohen and Mr. Bock?
11     A.   I think in part to discuss my
12 merit and whether it was -- would be a
13 good idea to hire me and whether it made
14 sense and then afterwards Mr. Cohen's
15 opinion that Mr. Bock agreed to pay me
16 too much.
17     Q.   In certain words.
18         MS. LOEW:  Can you mark this
19     as Exhibit 19.
20         (Oppenheim Exhibit
21         No. 19 marked
22         for identification.)
23 BY MS. LOEW:
24     Q.   This is -- this is an exhibit

180

OPPENHEIM

1  marked Exhibit 19.  It's BLF 162 through
2  165.  Is this the text stream you were
3  referring to?
4          MR. BLONIEN:  I object on the
5      grounds it calls for speculation
6      and lack of foundation with respect
7      to Mr. Oppenheim.
8          THE WITNESS:  Yes.
9  BY MS. LOEW:
10     Q.   Is this the text stream you
11 were referring to just now?
12     A.   Subject to my counsel's
13 objection, yes.
14     Q.   So you had reviewed this
15 before today?
16     A.   Yes, when documents were
17 produced.
18     Q.   Were you aware of Mr. Cohen's
19 views of you prior to reviewing the text
20 chain?
21     A.   That's a very wide open
22 question.  But the answer is with respect
23 to this particular issue, at the time
24 Mr. Bock had relayed that Mr. Cohen

181

OPPENHEIM

1  thought I -- he paid me too much.
2      Q.   Okay.  Have you had any
3  discussions with Mr. Cohen about your
4  compensation?
5      A.   No.
6      Q.   Is Mr. Cohen a member of the
7  firm?
8          MR. BLONIEN:  Objection,
9      vague.
10         THE WITNESS:  In terms of
11     having an ownership stake, no.  In
12     terms of being one of the member
13     attorneys, yes.
14 BY MS. LOEW:
15     Q.   All right.
16     A.   As far as I know.
17     Q.   So before you left Anderson &
18 Wanca the year prior, what was your total
19 compensation there?
20     A.   $390,000.
21     Q.   And then your total
22 compensation at Bock Law Firm this past
23 year was over 900,000; is that correct?
24     A.   Yes.

46 (Pages 178 to 181)

182

OPPENHEIM

1
2     Q.   So what's the -- why are you
3  making so much more money at Bock Law
4  Firm?
5     A.   Because I'm working for
6  someone who values my contributions.
7     Q.   Is -- do you know of the
8  compensation structure for other
9  employees of Bock Law Firm?
10    A.   No.
11    Q.   So do you know how your
12 compensation compares to others?
13    A.   No.
14    Q.   Is your compensation tied at
15 all to the Technology Training action?
16    A.   No.
17    Q.   Is Bock Law Firm paying your
18 attorney's fees in this case?
19    A.   They are reimbursing
20 Mr. Blonien's fees, yes.
21             (Oppenheim Exhibit
22             No. 20 marked
23             for identification.)
24 BY MS. LOEW:
25    Q.   We're marking as Exhibit 20,

183

OPPENHEIM

1
2  David -- Defendant David M. Oppenheim's
3  answers to plaintiff's verified
4  complaint.
5             If you turn to page 32, do you
6  see the affirmative defenses listed?
7     A.   I do.
8     Q.   Under maintenance -- and I
9  have a hard time pronouncing this one,
10 champerty.
11    A.   Champerty.
12    Q.   Champerty.  Thank you.
13    A.   Sure.
14    Q.   I always say champerty.
15             Maintenance and champerty, are
16 you -- do you have any other facts to
17 support this affirmative defense beyond
18 what is plead here?
19    A.   Well, my understanding is that
20 plaintiff has admitted during the course
21 of discovery in this case that Anderson &
22 Wanca's paying your firm's fees and I
23 think we've even gotten some invoices
24 with the descriptions blocked out.
25    Q.   Other than --

184

OPPENHEIM

1
2     A.   Oh.  And now following all
3  discovery fights, there's the redacted
4  retention agreement.
5     Q.   Okay.  Other than those items,
6  is there anything else that you -- any
7  other facts that you know to support this
8  affirmative defense?
9     A.   That's plenty.  Yeah.  I mean,
10 the fact that the retention agreement
11 contains the terms that it does, for
12 sure.
13    Q.   Anything else other than what
14 you've said so far?
15    A.   No, although I will obviously
16 put in the caveat that I'm a party here
17 and I have an attorney who is getting
18 compensated to do all the legal
19 arguments.
20             MS. LOEW:  All right.  If we
21 can just take a couple minute break
22 here.
23             MR. BLONIEN:  Sure.
24             THE VIDEOGRAPHER:  Going off
25 the record.  The time is 2:56 p.m.

185

OPPENHEIM

1
2             (A recess was had.)
3             THE VIDEOGRAPHER:  Going on
4  the record.  This marks the
5  beginning of media No. 5.  The time
6  is 3:04 p.m.
7             MS. LOEW:  For the record,
8  Dr. Williams and Ms. Zakrzewski
9  re-entered the room.
10            I don't have any further
11 questions at this time.
12            MR. COHEN:  Can you give me a
13 second?
14            MS. LOEW:  Yeah.
15            MR. BLONIEN:  This is Barry
16 Blonien.  I have no questions for
17 this witness.
18            MR. COHEN:  We're going to
19 just take a short break.
20            THE VIDEOGRAPHER:  Going off
21 the record.  The time is 3:05 p.m.
22            (A recess was had.)
23            THE VIDEOGRAPHER:  Going on
24 the record.  The time is 3:12 p.m.
25            MR. COHEN:  Thank you.

47 (Pages 182 to 185)

186

OPPENHEIM

1  EXAMINATION
2  BY MR. COHEN:
3     Q.   I just have a couple of
4  questions for you.
5          One, there were some questions
6  and answers between yourself and Ms. Loew
7  regarding communications you had with
8  Wayne Anderson after you left the Wanca
9  law firm and joined the Bock Firm.
10         Do you recall that?
11    A.   Yes.
12    Q.   And I know a lot of time has
13 passed.  At some points, I think there
14 was one moment where you -- she asked you
15 when a particular communication with
16 Wayne Anderson occurred, and you said
17 something to the effect it could have
18 been in mid to late April, it may have
19 been in early may, correct?
20    A.   That's right.
21    Q.   Fair to say that off the top
22 of your head, not having gone back and
23 reviewed anything, that's the best you
24 can do as far as pinpointing exactly when

187

OPPENHEIM

1  those communications with Wayne Anderson
2  happened?
3     A.   Yes.
4     Q.   Ms. Loew also asked you some
5  questions about your verified answer to
6  the complaint and, in particular, about
7  your affirmative defense of maintenance
8  and champerty.
9     A.   Right.
10    Q.   And it's your understanding
11 from reviewing M&C's interrogatory
12 answers and then some of their production
13 that the Wanca law firm or Brian Wanca
14 himself has agreed to pay all of M&C
15 attorney's fees and litigation costs in
16 the prosecution of this case?
17    A.   That's my understanding.
18    Q.   And have you seen invoices at
19 least as of some point in the past
20 showing that the Wanca firm has been
21 billed and has paid as much as $400,000
22 in attorneys fees and litigation costs?
23    A.   Yes.
24    Q.   And that was as of quite some

188

OPPENHEIM

1  time ago?
2     A.   Right.
3     Q.   In all of the years that you
4  worked at the Wanca firm, was that ever
5  something, to your knowledge, that the
6  Wanca firm did, pay people who had signed
7  up to be punitive class plaintiffs in a
8  class action that would be prosecuted by
9  the Wanca firm, essentially finance and
10 fund lawsuits to be brought by those
11 class plaintiffs against other people?
12    A.   No.
13    Q.   I know you are not a tax
14 expert, but have you given consideration
15 to the notion that by virtue of having
16 paid whatever it was, whether it was
17 $400,000 as of some point in the past or
18 whether it's up to 7 or $800,000 to date
19 on behalf of M&C, whether M&C needs to
20 treat that as income and report it to the
21 IRS and pay taxes on it?
22    A.   I hadn't really considered
23 that, but it makes sense.
24    Q.   Just to clean up a couple of

189

OPPENHEIM

1  things, there was a question some hours
2  ago when you indicated that M&C was,
3  quote, unquote, the class representative.
4          If we define class
5  representative as a court-appointed
6  representative on behalf of the certified
7  class, is that what M&C was?
8     A.   No.
9     Q.   You also talked about there's
10 some discussion or dialogue on an email
11 chain where -- and you broke down each
12 sentence of it essentially.  Do you
13 recall that?
14    A.   I do.
15    Q.   And one of the sentences you
16 indicated, in some aspect, that was your
17 interpretation of Judge Porcelli based
18 upon your interpretation of his summary
19 judgment order?
20    A.   Right.
21    Q.   Was that interpretation
22 something that was necessary not only to
23 a time when you were working at the Wanca
24 firm, involved in your limited way in the

48 (Pages 186 to 189)

190

1      **OPPENHEIM**
2  **Buccaneers' class action at that time,**
3  **but also an interpretation that you**
4  **formed for purposes of all the other**
5  **cases that the Wanca and Bock law firms**
6  **were working together and that you would**
7  **have and, in fact, did share for purposes**
8  **of the two firms ability to work**
9  **effectively on all those other cases?**
10     A.   Absolutely.  In fact, that
11  opinion got cited all over the place,
12  including by the 6th Circuit, the Alco
13  decision that we discussed earlier.
14         MR. COHEN:  I don't have
15  anything further.  Thank you.
16         MS. LOEW:  I have no follow-up
17  questions.
18         THE VIDEOGRAPHER:  Going off
19  the record.  The time is 3:18 p.m.
20     FURTHER DEPONENT SAITH NOT
21
22
23
24
25

191

1          OPPENHEIM
2          (Which were all the
3           proceedings had
4           or offered at said
5           hearing of the
6           above-entitled cause
7           at 3:18 p.m.)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

192

1
2  STATE OF _____ )
3                           ) :ss
4  COUNTY OF _____)
5
6
7      I, DAVID M. OPPENHEIM, the
8  witness herein, having read the foregoing
9  testimony of the pages of this deposition,
10  do hereby certify it to be a true and
11  correct transcript, subject to the
12  corrections, if any, shown on the attached
13  page.
14
15         _____
16         DAVID M. OPPENHEIM
17
18
19
20  Sworn and subscribed to before me,
21  this _____ day of _____, 2017.
22
23  _____
24     Notary Public
25

193

1
2  STATE OF ILLINOIS    )
                         )  SS:
3  COUNTY OF COOK       )
4      I, Renee E. Brass, Certified
5  Shorthand Reporter of the State of
6  Illinois, CSR No. 084-004119, do hereby
7  certify that said witness was duly
8  sworn by me to testify the truth; that
9  the said deposition was taken at the
10  time and place aforesaid; that the
11  testimony given by said witness was
12  reduced to writing by means of
13  shorthand and thereafter transcribed
14  into typewritten form; and that the
15  foregoing is a true, correct, and
16  complete transcript of my shorthand
17  notes so taken as aforesaid.
18      I further certify that there were
19  present at the taking of the said
20  deposition the persons and parties as
21  indicated on the appearance page made a
22  part of this deposition transcript.
23      I further certify the
24  signature of the witness to the
25  foregoing deposition was not waived by

49 (Pages 190 to 193)

194

1         OPPENHEIM
2 agreement of counsel; and that I am not
3 counsel for nor in any way related to
4 any of the parties to this suit, nor am
5 I in any way interested in the outcome
6 thereof.
7      IN WITNESS WHEREOF, I have
8 hereunto set my hand this 21st day of
9 August 2017.
10
11
12
13
14
15
16 Notary Public, Cook County, Illinois
17
18
19
20
21
22
23
24
25

196

        E R R A T A

1
2
3
4
5    I wish to make the following changes,
6 for the following reasons:
7
8 PAGE LINE
9 ___ ___ CHANGE:_____
10 REASON:_____
11 ___ ___ CHANGE:_____
12 REASON:_____
13 ___ ___ CHANGE:_____
14 REASON:_____
15 ___ ___ CHANGE: _____
16 REASON:_____
17 ___ ___ CHANGE: _____
18 REASON:_____
19 ___ ___ CHANGE: _____
20 REASON:_____
21
22 _____  _____
23   WITNESS' SIGNATURE     DATE
24
25

195

1      INSTRUCTIONS TO WITNESS
2
3    Please read your deposition over carefully
4 and make any necessary corrections. You should state
5 the reason in the appropriate space on the errata
6 sheet for any corrections that are made.
7    After doing so, please sign the errata sheet
8 and date it.
9    You are signing same subject to the changes
10 you have noted on the errata sheet, which will be
11 attached to your deposition.
12    It is imperative that you return the original
13 errata sheet to the deposing attorney within thirty
14 (30) days of receipt of the deposition transcript by
15 you. If you fail to do so, the deposition transcript
16 may be deemed to be accurate and may be used in court.
17
18
19
20
21
22
23
24
25

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123 1.800.642.1099

**A**

**Abbatemar...** 21:20
**ability** 190:8
**able** 125:8
**above-entit...** 98:19 191:6
**absolutely** 47:5 190:10
**Abt** 101:19 101:22 108:24
**accept** 91:25
**acceptable** 149:10
**accepted** 99:15
**access** 122:9 122:18 123:4 124:14,23
**accessing** 156:15
**accomplish...** 85:21
**account** 94:8
**accounting** 102:13
**accuracy** 148:13
**accurate** 12:5 84:23 85:3 174:22 195:16
**accusatory** 159:22
**acknowled...** 142:10
**acquired** 126:25
**act** 10:20 42:8
**action** 8:12 10:15 11:10 15:5,11 16:15 25:21 27:7,7 30:18 31:9

33:12 35:17 35:19 39:7 40:7 41:5 41:18 43:13 45:21 46:2 46:4,9,12 46:13,16,17 63:14 65:3 110:12 115:20 118:20 130:17 135:7 136:17 140:13 143:2 146:25 147:9 151:6 155:2,20,22 155:25 159:7,15 160:22 161:3 164:15,19 166:6,10,16 166:17 168:5 171:20 182:15 188:9 190:2
**actions** 10:21 10:24 11:15 11:16 12:3 12:5 30:20 37:10 110:14 134:16
**active** 17:23 21:6
**Acts** 12:6
**actual** 76:12 86:2,12
**Adams** 2:10
**add** 87:22
**added** 96:8
**Addison** 30:9 30:13 31:2 41:3 63:20

111:8,9 146:21 158:21 159:5,25 160:25 161:15 162:21,25 163:22 164:10,18 166:5
**addition** 101:10
**additional** 61:15 107:10
**adjourn** 54:9
**adjourned** 49:6,9
**admitted** 16:4 183:20
**advance** 57:5 105:3,9 108:21
**advantage** 85:13
**adverse** 62:7 62:19
**affirmative** 183:6,17 184:8 187:8
**afford** 87:11 173:16
**aforesaid** 193:10,17
**ago** 33:5 138:5 151:2 161:6 167:6 188:2 189:3
**agree** 67:5,11
**agreed** 179:16 187:15
**agreement** 4:4,5 34:5 34:21 52:22 88:24 184:4 184:10 194:2

**agreements** 34:16 38:20 61:7
**agrees** 35:18 36:23
**ahead** 63:8
**al** 5:8
**alarm** 117:7
**Alco** 69:9,19 69:25 70:24 190:12
**allegedly** 104:22
**Allen** 8:4,16
**allow** 42:5
**allowed** 18:17 105:4
**amassing** 142:16
**ambiguous** 39:9 49:11
**ambit** 137:4
**amended** 85:2,17 114:25
**American** 162:14
**amount** 36:24 126:14
**amounts** 91:17 142:17
**analysis** 107:14
**Anderson** 9:4 9:7,17 10:13,17 11:11 12:16 12:18,21,25 13:3,8,14 13:18,21 14:2,13,24 15:24 16:10 16:18 17:8 20:18 25:22 27:20 28:4 28:7,10,15

28:22 29:3 29:13,17 30:14 31:3 31:10 34:14 35:5 36:5 37:10 66:6 67:15,25 68:13,21 70:3,12,17 71:2,6,15 71:18 72:4 72:18 73:2 73:5,15 80:8,11 81:18 82:2 84:7 87:15 87:19 97:18 97:22 99:19 100:4,9,16 103:18 104:19 108:10,15 109:10,14 110:7 122:11,18 124:16,25 125:19 127:8,13 128:4 131:11 132:17 133:8 134:14 135:5 136:18 137:25 145:17 146:2,3,7 159:13 162:20 163:8 164:14,22 165:20 166:15,23 181:18 183:21 186:9,17 187:2

**Anderson's** 145:12
**angry** 132:6
**annualized** 82:14 84:17 86:24
**answer** 39:3 44:3 49:21 51:20 54:8 62:12 65:11 69:23 78:24 80:16 85:18 104:17 112:13 127:21,23 135:21 144:2,5 149:21 157:14 161:24 168:7 180:23 187:6
**answered** 111:11
**answering** 135:25
**answers** 4:6 4:14 76:17 78:21 113:22,25 168:13,16 183:3 186:7 187:13
**anticipated** 169:11
**anticipating** 169:14,21
**anticipation** 157:23 170:6
**anti-virus** 113:13
**anybody** 40:17 99:24 100:5 151:24 163:23

164:6,20
165:23
166:14
178:13
**anymore** 8:5
132:10
165:16
**anyway** 75:3
173:18
**apart** 44:23
**apologize**
46:11
167:20
**appeal** 11:22
**appealed**
15:21
**appeals** 14:7
**appear** 26:3
26:18,20
44:18
**appearance**
26:5,11,24
27:3,5,17
193:21
**appearances**
40:19 128:6
160:18,19
**appeared**
128:3,4
**appears**
49:16 53:2
57:22 92:24
**appellate**
11:23 70:14
**applied**
106:22
142:2
**apply** 107:16
**applying**
73:22
**appreciate**
175:8
**approach**
32:4 134:24
148:20
**appropriate**
19:4 104:25
105:5 120:4

120:11
121:18
195:5
**approve**
36:16
**approxima...**
13:24
**April** 8:25
13:22 74:13
75:11,12,13
79:17 83:6
83:7 91:9
92:2,21
94:9 95:11
95:11 96:18
99:16
109:17,18
109:23,24
110:25
111:23
112:11
115:15,16
125:4,4
136:25
137:17
144:14
147:21
165:4
186:19
**ARDC** 21:21
**area** 8:6
**areas** 12:11
17:25
**argue** 67:22
**argued**
141:20
**arguing**
28:17
**argument**
28:16,19
**argumenta...**
131:7
**arguments**
71:22
184:19
**arranged**
74:6
**arrangement**

38:10 57:15
**arranging**
56:22
**aside** 11:17
**asked** 12:16
86:4 163:18
186:15
187:5
**asking** 13:17
17:14 49:23
51:5,22,24
73:7 87:25
88:3 89:24
94:17
121:15
126:3
129:24
**aspect** 189:17
**assembly**
32:3 134:23
**assert** 55:7
58:4
**asserted**
57:20
**asserting**
66:4,10
119:16
**assertion**
57:13
**assess** 45:15
**associate** 8:5
9:13
**associated**
90:8
**Associates**
155:23
**assume** 117:8
157:15
**assumed** 96:6
**assuming**
74:14
**assumption**
117:13
**assure** 105:11
**astounding**
117:6
**attached**
192:12

195:11
**attaches** 57:4
**attachment**
90:13
**attempt** 50:8
57:23
**attend** 17:5
**attended**
40:24 41:6
63:13,18
89:9,10
111:7
**attorney** 6:17
15:6 17:12
18:21 21:4
21:9 32:20
33:4 36:23
96:11
146:20
157:6,8
184:17
195:13
**attorneys**
5:16 9:9
12:15,17
42:10,12
128:2,3
133:12
134:14
157:11
166:23
181:14
187:23
**attorney's**
18:2,7,13
18:15,23,25
19:4,6
75:23 77:9
78:10 80:14
80:17 81:21
88:11,24
131:14
182:18
187:16
**attorney-cl...**
38:15
**August** 1:18
5:14 56:15

66:14 194:9
**authority**
36:14 45:14
**Automobile**
171:13
**available**
108:4
**aware** 31:20
34:12 45:13
104:21
122:5 126:7
128:20
133:4
180:19
**A&W** 108:10
**a.m** 1:18 5:15
54:21 55:2
98:16
151:15
154:3

———————

**B**

**B** 4:2 56:19
**bachelor's**
7:13,22
**back** 10:5
18:19 41:14
60:18 62:12
74:8 77:22
96:19 99:9
99:11
135:16
141:7
173:24
186:23
**background**
22:10
**backup** 103:2
103:4,6
120:24
121:2,25
122:3
**bad** 64:20
170:13
**bag** 117:25
**banking** 94:7
**bar** 33:4
**barely** 64:22

**Barry** 2:11
5:21 48:4
185:15
**barry@blo...**
2:11
**base** 80:19
85:14
**Baseball**
101:13
**based** 8:9
21:11 38:25
57:12 65:14
65:15 84:4
117:14
126:24
138:22
140:14
148:10
189:18
**basically**
101:15
170:3,9
**basis** 37:2,12
38:7 43:22
86:25 88:4
96:10 136:2
153:8
**Bates** 53:2,5
53:13,14
54:14
137:12
138:16
**Bay** 138:21
139:17
**beach** 73:20
**bed** 116:18
**beginning** 5:4
17:12 27:4
54:25 99:6
129:12
130:24
149:18
185:5
**behalf** 2:3,8
2:13 5:19
5:25 11:13
35:20 36:12
38:23 39:6

39:20,24
42:8 47:21
48:24 53:21
119:14
140:8,24
141:17
188:20
189:7
**believe** 21:19
27:11 37:20
44:19 46:23
48:12 61:13
63:17 71:4
72:23 73:13
84:5 88:19
89:3,16,17
91:21 92:10
93:11 97:20
105:5 107:7
109:20
111:4
112:12
113:10
118:9 124:6
127:10
129:3 152:3
159:20
171:24
**benefit** 42:11
44:11
173:18
**best** 64:24
81:2 186:24
**better** 73:9
81:6 85:14
**beyond** 30:6
45:19 61:4
70:14 121:8
173:11
183:17
**big** 20:3
129:10
**bill** 57:19
**billable** 15:18
**billed** 187:22
**bit** 15:15 72:2
72:13
**blank** 96:8

**BLF** 69:7
75:3 93:23
95:2,3,14
137:12
147:17
150:15
152:12
153:22
158:14
168:16
175:19
180:2
**blind** 53:24
**blocked**
183:24
**Blonien** 2:9
2:11 5:21
5:21,22
13:6,10
22:12 26:12
27:25 29:5
31:4,11,24
32:21 37:24
38:13 41:23
42:17 43:24
45:5,8,17
49:14 51:16
52:16,24
55:13 58:7
59:3 61:10
61:24 63:5
63:8 64:11
65:7,15
66:7 67:9
68:11,14
69:16 70:19
72:9 74:4
76:8 79:13
80:13 87:16
88:10,19
89:4,6 95:5
98:7 100:10
104:16
105:17
106:24
107:19
108:12
110:16

111:20
112:8 119:6
121:4,20
122:12
123:11,15
124:17
125:23
127:18
131:6,25
133:13
135:8
136:20
139:13
143:17,24
148:8 149:9
154:17
155:3
167:21
168:15
169:16
177:16
178:6,18
180:5 181:9
184:23
185:15,16
**Blonien's**
182:20
**blurred** 72:2
**Bob** 11:21
**Bock** 1:9,9
2:13,14,20
5:25 20:18
24:12 27:20
27:24 28:10
28:13,22
29:3,14,25
37:22 38:10
38:23,25
53:21 55:11
55:15,24
56:8 58:5
59:21 67:20
68:2,10
70:4,18
71:6,15,20
72:18 73:6
75:9,14,19
76:16 78:8

78:20 79:6
79:9,11,12
82:7,9,12
83:4 84:6
86:14,17
87:14,21
88:18 89:13
90:6,22
91:19,22
92:2,6 93:8
93:13 94:6
94:10,17
95:13,18
96:2,15,24
104:8,9
109:22
110:5,7
111:3,8,11
111:18
112:7,7,22
112:23
113:17,22
114:2
118:16
125:21
127:2,7,13
128:2,21
129:2,5,11
129:18
130:5,19,22
131:17,24
132:9,18,20
133:6,12,18
134:10
136:19
137:18,25
138:20
139:21,25
141:20
143:9,12
144:15
145:4,8,20
146:13
147:7,19
148:6 149:3
149:4 150:2
151:5,13
155:16,19

156:19
157:3
158:16,21
162:20
163:13
164:8,16
167:11,13
167:24
168:3,6,21
169:6
172:18,19
172:20
175:22
176:8,19
177:5,25
178:2 179:6
179:11,16
180:25
181:23
182:3,9,17
186:10
190:5
**bone** 174:20
**bono** 11:19
**bonus** 80:20
81:17 82:14
84:17 85:6
85:10 90:23
91:3,7
93:15,17
**bottom** 93:3
95:15
115:23
137:21
138:17
141:8,10
150:17
**bought** 94:22
101:2,23
102:2
**boxed** 15:16
**brand** 97:9
**Brass** 1:16,21
193:4
**break** 17:17
17:20 54:17
58:15 98:9
98:11

149:11
184:21
185:19
**breaks** 114:5
**Brian** 9:19,24
9:24 10:7
12:16,24
21:11,23
32:4 36:15
63:20 68:22
97:21 99:20
99:25
104:18
119:15
126:11
130:8 132:4
142:23
143:6
148:16
155:8 163:3
173:19
187:14
**Brian's**
142:15
**brief** 70:14
**briefed**
140:25
141:12
**briefing**
71:20
**briefs** 14:6
16:2 102:17
**bring** 66:20
85:21
**bringing**
14:13
**broad** 140:23
142:7
**broadcaster**
139:18
**broaden**
12:10
**broke** 99:15
189:12
**brought**
35:19 50:13
83:6 89:6
164:24

165:8,12
188:11
**Buccaneers**
27:10 35:13
40:8 46:18
47:17,21
48:3,20
50:25 51:6
63:21
110:15
111:3,17
112:5,6
130:18
131:17
135:7
138:22
139:17
140:14
144:12
146:9,24
147:9 148:6
149:7 150:3
151:7,21
152:5 153:3
155:2,20
161:7
164:20
165:13
171:13
190:2
**bucks** 95:16
**Bucs** 153:18
**Buc's** 111:10
124:8
141:25
**buddy** 62:22
**bug** 146:22
**bunch** 62:21
101:13
**burden** 18:14
18:18,21
59:11
**business**
14:13 71:11
**busy** 10:2
**butchered**
21:20
**button** 117:9

**buy** 95:21
96:2,20
97:6

**C**
**call** 27:6
49:16 73:6
79:18 81:12
165:19
176:24
177:21
**called** 1:13
15:4 28:17
29:23 67:23
111:6 124:7
136:13
162:14
166:19
**calls** 31:4,11
31:24 32:21
38:18 41:23
42:17 43:24
45:17 51:16
61:10,24
63:5 64:11
70:19
106:24
127:18
131:25
139:13
143:17
148:8
154:17
160:8
169:16
178:6,18
180:6
**Cambridge**
24:23
**campaign**
140:7
**campus** 25:5
**candid** 59:17
**capacity**
171:12
**capital** 34:24
140:20
**car** 116:21,21

116:24
117:4,17,22
117:25
**careful** 19:10
**carefully**
195:3
**case** 1:6 9:19
11:8,21
17:24 19:23
20:9,16,16
20:17 21:13
26:3,11
27:2,4,8
28:6,9,17
28:21 30:16
30:17 32:7
32:13 33:18
33:21 34:13
39:2 40:19
42:2 44:9
45:14 46:3
46:10,22
47:19 49:11
50:6 52:9
53:12,18
61:14,19
65:18 67:2
67:23 70:2
70:11,25,25
105:2,3,6
105:10
106:3
108:22
109:6
110:22
111:6 115:3
116:20
118:12
120:4
124:23
128:6 131:3
131:5,17,20
135:3
137:23,24
138:2,3,13
138:22
139:17,19
139:21,24

141:19
146:10
148:3,6,18
151:20
152:5 153:2
156:7,8
157:13
160:6 161:6
161:7
162:13,14
162:19
164:3,24
166:15
170:18
171:14,19
171:22,23
172:2,7,12
173:17
177:10
178:16
182:18
183:21
187:17
**caseload** 80:2
**cases** 10:22
10:23,25
11:12,25
12:2 14:7
14:15,20,21
16:11,24
19:20 20:14
26:15,21
27:15 29:24
37:16,18
45:2 68:23
71:14 72:19
72:21,24
102:20
108:2 109:9
112:17,19
126:5 127:5
127:8,12,16
128:8,11,15
129:2,11,20
130:12,18
131:12,23
133:2,9,16
133:22

135:3
142:12
145:23
162:18
166:25
171:5,10
177:9 190:5
190:9
**cash** 92:5
**cause** 98:20
191:6
**caution** 105:7
**caveat** 11:17
34:11
184:16
**cc'd** 159:18
**CE** 28:17
67:23
**cert** 140:25
141:12
**certain** 12:7
12:12 26:9
85:19
156:12
179:18
**certainly**
42:22 46:14
59:13 66:19
67:18 71:8
71:23 79:22
91:4 110:22
126:3,17
**certification**
28:16 39:13
48:11,15
67:23 71:21
**certified**
36:22 48:8
189:7 193:4
**certify**
192:10
193:7,18,23
**chain** 4:7,9,9
4:10,11
145:4
150:17
158:15
177:3

180:21
189:12
**champerty**
183:10,11
183:12,14
183:15
187:9
**chance** 11:2
**change** 14:3
161:24
196:9,11,13
196:15,17
196:19
**changed**
178:5
**changes**
195:9 196:5
**charge** 157:8
**charged**
23:15
**check** 91:14
**checks** 91:13
91:16,17,23
92:6 93:8,9
93:10,13
96:15 97:24
98:2
**Chicago** 1:17
2:5,16 5:13
24:5,7
25:16 115:2
129:17
**Chinese**
160:5
**Chiropractic**
1:4 5:7,19
27:7,9 31:8
34:22 35:4
36:4 37:7
39:25 40:5
40:12 41:12
42:16 43:5
43:23 44:14
46:21 61:19
64:3,7
109:19
110:12
122:10

123:5,8,9
130:17
135:6
164:19
166:17
171:7,11,15
172:5
**Chiropract...**
41:17
**chronologi...**
19:22
**Cinque** 41:3
**Cin-Q** 46:2
50:6 140:4
168:5
171:12
**circuit** 16:8
70:6,9
141:21,22
190:12
**circumstance**
37:21 38:3
**circumstan...**
120:11
**citation** 23:17
**cited** 48:22
190:11
**city** 15:6
25:16
**Civil** 1:15
**claim** 42:5,7
**claimants**
35:22
**claims** 35:7
**clarification**
58:14 69:17
**clarify** 13:6
112:13
**Clark** 1:17
2:4 5:13
**class** 8:12
10:15,20,24
11:15,20
12:3,5 15:5
15:10 16:15
16:23 17:3
19:24 25:21
27:9 28:15

30:18 33:16
33:20 35:9
35:22 36:11
36:12,22
37:10 38:5
38:11 39:7
39:13,16
40:7 41:19
41:22 42:7
42:9,13,21
42:23,24
43:6,12,13
44:7,8,14
44:16,22
45:2,16
46:17 48:8
48:11,14
50:22 63:3
67:23 71:21
134:15
140:24
141:12
146:20,24
147:8
171:20
188:8,9,12
189:4,5,8
190:2
**classes** 11:14
**clean** 188:25
**clear** 59:4
66:9,9
84:12 90:3
161:9
**clerks** 33:2
**Cleveland**
30:4
**clickish** 15:19
**client** 16:22
18:4 33:19
34:23 35:6
35:7,18,20
36:8,23
37:19 39:20
40:2 45:7
102:13
106:23
107:25

108:2
119:15
143:25
171:7
**clients** 16:17
16:21 18:4
36:25 37:9
38:21
106:19
138:24
**client's**
105:16,19
106:13
107:11
**Clinic** 1:4 5:7
5:20 34:22
35:4 36:4
37:7 39:25
40:6,12
41:12 42:16
64:3,7
171:15
172:5
**close** 81:10
82:3 87:20
113:15
**closed** 64:22
**closely** 68:7
134:25
**closest** 116:4
**clumsy**
128:13
**Cohen** 2:16
3:4 5:24,24
18:11 19:9
38:22 39:8
42:19 46:5
46:11 49:8
53:20 54:16
59:15 65:14
70:21 74:22
76:3,9 77:6
77:8 78:2
78:14 88:23
88:25 90:2
112:9
117:11
125:25

135:15,19
136:6,14
141:8
147:20
157:14,18
157:23
161:8,14,19
161:22
174:7,13
175:7
177:19
178:8,20
179:6,11
180:25
181:4,7
185:12,18
185:25
186:3
190:14
**Cohen's**
179:15
180:19
**cold** 64:20
**collect** 20:22
122:20
138:7
**collecting**
122:23
123:2
**collects** 82:18
82:24 84:20
87:4
**come** 14:15
31:3,9 37:6
41:21 60:13
79:11
112:18
173:9,24
176:14
**comes** 39:12
144:16
145:23
**coming** 77:22
79:8 133:21
170:5
**commenced**
110:21
122:15

**Commission**
21:10
**common**
130:25
**communica...**
50:24 51:10
68:10
166:22
**communica...**
51:6 84:2
159:14
**communica...**
65:6,20
**communica...**
51:23 74:2
137:3
167:12
168:2,10
169:4,10
186:16
**communica...**
41:11 44:4
51:24 56:21
56:25 57:2
57:7,8 61:3
61:8 65:9
66:23 67:6
135:11
144:3,8,11
159:10
161:2 186:8
187:2
**companies**
30:20
**company**
11:3 20:15
20:23 21:4
85:2,17
96:21
100:22
101:2,24
102:2
120:17
**Computing**
101:19
**concentrati...**
8:11
**concern**

**compensated**
184:18
**compensati...**
58:21 73:10
75:24 76:4
78:4 81:25
82:8 86:13
86:18,20
87:9 88:22
173:21
181:5,20,23
182:8,12,14
**competence**
133:15
**complaint**
4:14 21:11
21:22 23:6
104:20
114:25
115:7 150:8
160:17
183:4 187:7
**complaints**
22:2 32:5
**complete**
193:16
**completely**
80:4,20
**complied**
107:6
**comply**
118:23
**component**
90:23
**compound**
45:9 61:12
**computer**
95:21 96:3
96:21
100:22
101:2,24
102:2
120:17
**Computing**
101:19
**concentrati...**
8:11
**concern**

132:19
147:4 175:6
**concerned**
97:24
**concerns**
135:4
136:17
154:25
155:4,12
**conclusion**
41:24 42:18
43:25 45:18
61:11,25
106:25
143:18
**conference**
162:22
**confidential**
19:3 34:7
61:3,9,23
78:11
154:12,16
**confidentia...**
104:14
**confirm**
47:13
**conflict**
128:21
132:19
133:5
**conflicts**
126:8,10
**confusing**
22:13 26:13
108:13
123:12
**Connecticut**
25:6
**consider**
43:18 68:2
73:4,8
128:9
**considerati...**
73:21
188:15
**considered**
112:25
188:23

**considering**
73:15
105:15
**consistent**
56:19 67:3
83:2
**constitute**
22:20
**constituted**
156:18
**consult** 100:5
157:10
**Consumer**
10:20
**contained**
89:12
124:24
125:2
**contains**
184:11
**contemplat...**
132:17
**contend** 90:7
**content** 65:23
179:9
**contents**
89:18,21
101:20
**contested**
11:7
**context** 19:16
20:24 23:7
23:11 106:5
148:2
169:10
**continuation**
104:2
**continued**
14:8
**continues**
94:8 95:11
145:4
**contribution**
20:2
**contributio...**
182:6
**controls**
156:13

**convenient**
98:9
**conversation**
80:25 82:6
131:20
151:21
154:9 162:3
162:9,24
163:18,23
164:21
**conversatio...**
146:6,8
157:20
**conveys**
85:19
**convicted**
22:4,15
**conviction**
22:21
**convictions**
22:17 23:3
**Cook** 1:16
104:21
193:3
194:16
**coordination**
56:25
**copied**
100:21
102:20
103:7,14
104:12
106:11
**copies** 17:22
107:10
108:9
109:13
119:11
130:2
**copy** 59:8
78:9 101:16
102:5,22
103:9,15,16
108:7,25
109:5 119:2
129:23
**copying**
103:19

104:10
**correct** 74:15
85:7 87:6
90:21,24
99:16 115:4
127:14
181:24
186:20
192:11
193:15
**corrections**
192:12
195:4,6
**correctly**
35:15,24
**correspond**
64:6
**correspond...**
55:18
**cost** 113:9
**costs** 40:7
187:16,23
**counsel** 2:9
5:22 17:22
30:7 42:23
48:5 50:9
50:11,25
51:7 56:22
59:18 60:5
61:8,15
63:22 67:7
88:17 118:8
121:12
122:6 136:5
156:24
157:20
158:6
164:12
194:2,3
**counsel's**
180:13
**count** 30:21
30:21,23
159:17
**counted**
72:22
**country**
16:12

**County** 1:16
104:22
150:7 192:4
193:3
194:16
**couple** 33:5
58:19 145:5
146:16
160:17
184:21
186:4
188:25
**course** 26:23
36:16 55:17
100:21
113:25
156:10
157:21
161:16
163:17
164:5 172:6
172:17
183:20
**courses** 43:12
**court** 1:1 5:9
6:3 9:24
11:23 26:4
26:23 34:3
40:18 45:21
49:25 55:19
59:17 62:5
65:16 66:20
104:21
105:24
115:7
119:10
120:6 144:6
150:7
162:12,12
168:24
195:16
**courtesy**
130:2
**courts** 1:15
16:8
**Court's** 53:9
55:16 56:7
59:7 60:11

66:22
**court-appo...**
189:6
**cover** 26:22
**coverage**
10:23 11:7
11:12,25
14:7 16:24
30:20
162:17
**covered**
11:25
**coworkers**
134:18
**co-counsel**
28:23 68:18
71:16 72:19
127:9,14,25
128:8,10
129:24
138:2
172:18
**Crab** 28:18
67:24
**Craig** 41:3
**created**
120:20
**creates** 18:14
**creating**
103:4
**Credit** 12:5
**crime** 22:5,16
**criminal**
22:21 23:6
**CSR** 1:16
193:6
**current** 86:19
**currently**
70:4 167:9
**curve** 79:25
**cutting**
129:11
**Cy's** 28:18
67:24

**D**

**D** 3:2
**Dalzell**

damage
116:23
Dan 5:24
147:20
dance 165:9
DANIEL
2:16
danieljayco...
2:17
data 101:14
134:21
date 57:5
74:14 92:24
98:22 120:9
120:10
152:22
175:25
176:3
188:19
195:8
196:23
dated 90:12
92:21
dates 47:11
David 1:8,13
5:5,23 6:5
6:15 170:25
179:8 183:2
183:2 192:7
192:16
day 50:4
51:14 64:25
75:13 92:10
94:23,23,24
96:20 97:17
99:18
100:24,25
116:6,9,11
116:16
151:10
152:16
159:23
176:7
192:21
194:8
days 73:18
94:24 98:5
166:18

195:14
dead 155:9
deal 33:16
dealing 139:7
decided
68:23
128:25
decision
54:11
112:17
190:13
declaratory
11:16
deemed
195:16
Deerfield
25:10,12
defend 16:25
110:22
defendant
2:8,13 5:25
20:2,21
39:15 48:25
62:20 70:8
76:16 78:19
138:4
148:20
167:11,24
171:21
183:2
defendants
1:11 19:25
35:23 50:8
140:23
142:7
defendant's
11:3 20:23
defense 8:12
8:13 9:23
11:19 15:16
164:3
183:17
184:8 187:8
defenses
183:6
define 30:16
189:5
defines 57:6

definitely
63:21 175:2
175:4
degree 7:12
7:13,22,23
degrees 7:21
delete 85:9
118:25
160:10,13
160:20
deleting 85:5
denied 48:18
48:21
Department
115:3
departure
132:21
depends
30:16
DEPONENT
190:20
deposed
16:23
deposing
195:13
deposit 92:9
93:5,7
deposited
92:7,8
deposition
1:13 4:4 5:5
5:12 6:24
7:3,3 17:2
17:11 19:14
19:17 20:13
21:5,8,14
21:18 24:13
26:25 44:19
54:9 55:5
58:8,17
77:17 98:18
114:2 120:5
174:5 192:9
193:9,20,22
193:25
195:3,11,14
195:15
depositions

17:7 19:20
32:10 46:21
describe
52:18
describes
115:11
describing
56:16
description
4:2 57:13
167:19,25
168:20
descriptions
183:24
design 28:17
67:24 76:21
76:23
designated
18:2,7
designating
18:22
designation
80:15
designations
53:5
desk 118:14
detail 111:9
detailed 83:9
86:10
102:12
134:3
details
163:19
determinat...
107:22
determine
104:13
107:5
116:12
determined
53:10 56:10
126:14
determining
36:8
develop 68:6
dialogue
189:11
Diamond

101:13
difference
56:24 114:4
differences
134:8
different 60:9
72:16 84:13
153:11
dinner 40:13
40:20 74:7
91:9
direct 66:23
133:5
135:11
144:2
directly 44:4
50:24 51:6
51:10
director 11:5
disagreeme...
173:5
disciplinary
21:10 22:2
disclosed
55:24
discovered
151:5
discovery
32:10 44:20
45:20 46:3
46:10 47:5
47:16 71:18
75:23,25
76:7 104:25
105:9
108:21
119:9,12,23
120:23
122:24
123:3
124:22
183:21
184:3
discretionary
80:20 81:16
discuss 75:17
110:4,5,11
110:14

111:2,17
112:4
113:21
145:7 149:5
151:23
156:6
164:18
165:7
179:12
discussed
112:24
113:24
166:9
172:19,21
190:13
discussing
126:20
176:23
discussion
110:10
164:9,17
165:2,18,22
168:20
176:18
177:13
189:11
discussions
66:5,12
67:14
109:22
166:12
172:25
177:25
181:4
disproving
140:23
distinct 43:5
distribution
150:6
district 1:1,2
1:15 5:9,10
16:7 70:5
119:22
162:13
division 1:3
5:11 71:13
71:24 72:7
divulge 44:4

**Dixon** 8:4,17
**document**
  18:22 34:9
  34:12 53:2
  53:6 54:3
  55:4,6,6,11
  57:18,24
  58:25 59:25
  60:17 69:8
  69:13,20,22
  74:20 75:5
  76:12 78:19
  83:17,20
  88:17 89:25
  90:4,17
  114:22
  118:12,18
  137:11
  147:15
  148:3
  150:22,24
  159:2
**documents**
  18:6,9,15
  18:25 19:5
  55:22 56:3
  56:10 57:11
  57:14,21
  58:2,4,19
  59:9,12,19
  60:13 89:7
  90:6 102:18
  102:19
  108:5 119:3
  120:20
  121:23
  122:10
  123:23
  124:2,12,22
  156:8
  178:16,20
  179:3
  180:17
**doing** 14:10
  71:25
  105:12
  106:7 107:5
  135:2 195:7

**door** 104:5
**double** 7:16
**Dr** 77:14,16
  99:11 174:4
  185:8
**drive** 100:22
  101:21
  102:8,11,23
  102:25
  118:10,13
  119:4
  120:13,20
  120:21,25
  122:2
  138:23
  140:14
**driver** 95:17
**driveway**
  117:17
**driving** 23:17
**DUI** 23:3,15
**duly** 6:6
  193:7
**duties** 42:15
  43:22
**duty** 42:23
**DWI** 23:3
**d/b/a** 1:9

————————
**E**
**E** 1:15,21 3:2
  4:2 99:2,2
  193:4 196:1
**ear** 146:22
**earlier** 67:22
  112:15
  127:11
  130:14,24
  190:13
**early** 16:9
  68:19 151:9
  165:4
  166:18
  186:20
**Easily** 28:6
**easy** 146:19
**eclinicalwo...**
  171:16,21

**economics**
  7:17
**Edelson** 15:6
**effect** 186:18
**effectively**
  190:9
**effort** 12:9
  44:24
  166:20
**efforts** 20:22
  139:2
**either** 42:11
  69:23 96:22
  101:3 114:9
  140:3
**elaborate**
  129:22
**electronic**
  107:17
  120:14
  156:14
**email** 4:5,7,9
  4:9,10,11
  41:14 70:10
  70:17 92:19
  93:4 94:13
  125:3
  136:25
  137:13,22
  138:16,19
  139:10
  140:17,18
  145:3,10
  146:13,15
  147:18,19
  147:24
  148:4,5
  150:16
  151:14,21
  156:3
  158:15,20
  159:8,17,19
  160:9,24
  161:2,12,21
  166:3,4,9
  189:11
**emails** 52:8
  65:4 92:23

97:23
  102:21,23
  102:25
  103:14,16
  124:15
  125:6,12,17
  145:6,8
  160:7,10,13
  164:16
  170:2 179:7
**employee**
  9:10 38:24
  82:13 86:24
**employees**
  62:21 182:9
**employment**
  75:18 82:19
  82:25 84:22
  91:25 96:5
  108:14
**ended** 8:11
  138:9
**engage** 39:23
**engaging**
  67:13
**entail** 156:22
  158:7
**entered** 24:13
  70:8 138:8
**enterprise**
  140:8
**entertaining**
  9:21
**entire** 102:7
**entirely**
  10:19
  119:21
**entities** 35:14
**entitled** 34:5
  52:22
**envelope** 89:7
  89:11,18,21
**equal** 36:23
**errata** 195:5
  195:7,10,13
**especially**
  133:18
**ESQ** 2:6,11

2:16
**essentially**
  42:4 107:13
  128:12
  188:10
  189:13
**establishing**
  141:23
**et** 5:8
**ethical**
  106:17
  155:18
  156:2,5,18
  156:21
  157:2
**ethics** 43:11
  43:16,19
**European**
  162:16
**evaluate**
  134:18
**evaluation**
  55:8
**Evanston**
  24:11,17,20
**event** 36:22
**everybody**
  127:3
  166:21
  176:13
**everybody's**
  42:6
**evidence** 62:4
  119:18
  120:3
**evidentiary**
  139:23
**exact** 161:10
**exactly** 8:25
  18:24 97:2
  155:16
  186:25
**examination**
  1:14 6:8
  186:2
**EXAMINA...**
  3:3
**EXAMINA...**

99:3
**examined** 6:7
**example**
  26:15 61:6
  81:19
  100:18
  129:16
  134:19
**excepting**
  82:19
**excess** 82:16
  82:23 84:18
  84:19 87:2
  87:3
**exchange**
  75:9 148:5
  152:16
  156:3 166:9
  175:21
  177:14
**exchanges**
  75:10
**exclude** 77:10
**excluding**
  77:13
**excuse** 50:17
  83:7
**exhibit** 4:3,4
  4:5,5,6,6,7
  4:7,8,8,9,9
  4:10,10,11
  4:11,12,13
  4:13,14,15
  6:19,25
  33:22,23
  34:4 52:12
  52:13,18,21
  55:5 69:2,7
  74:16,21
  77:20 78:15
  88:5,9
  92:13,18
  93:18,23
  95:2,6,8
  96:19 98:8
  114:17,23
  114:24
  137:6,7

147:11,16
150:10,15
152:7,12
158:9,14
167:15,20
167:21,23
170:20,25
175:13,14
179:20,21
179:25
180:2
182:21,25
**exhibits**
17:21
**existed**
124:15
**exited** 77:16
174:4
**expanding**
114:5
**expense**
42:13 132:6
**expenses**
45:15
126:13
127:4
**expensive**
178:3
**experience**
8:10
**expert** 43:16
43:19
188:15
**explain** 23:10
**explained**
156:20
**explanatory**
141:13
**explore**
105:13
**exploring**
15:9 106:5
120:2
**express**
136:16
155:12
173:12
**expressed**

79:6,8,10
155:15
**extends** 121:8
**extensive**
30:4,5
**extensively**
27:22 29:14
**extent** 17:24
38:17 44:3
49:19 51:19
56:9 66:16
121:7
126:21
135:12
144:5
**eyes** 18:2,7
18:13,15,23
18:25 19:4
19:7 75:23
77:9 78:11
80:14,17
88:11,24
**e-file** 160:16
160:20
**e-filing** 150:5
151:2,4
153:17
154:7

_____
**F**
**F** 99:2
**face-to-faces**
40:17
**facilitate**
118:11
**facilitated**
59:20
**fact** 48:19
87:13 104:4
113:5
140:13
148:24
154:25
156:25
184:10
190:7,10
**FACTA** 12:4
138:3

**facts** 183:16
184:7
**fail** 195:15
**fair** 12:5
27:18 43:7
170:6
186:22
**fairly** 48:22
68:16
**fall** 137:3
**familiar** 36:2
60:22 69:12
69:14,18,19
89:14 90:16
106:16
125:20
158:25
**famous**
144:20
**fan** 138:22
**far** 12:23
22:22 29:7
59:14
121:17
133:8
181:17
184:14
186:25
**fashioned**
142:3
**fat** 144:21
**favor** 70:8
**fax** 47:8,9
48:24
**faxes** 14:17
47:20
**February**
31:18 40:14
49:3 50:5
52:2 86:16
**federal** 16:7
26:6 162:12
**feel** 73:19
**feeling** 173:6
**fees** 36:23
37:18 40:7
45:4,15

81:21 82:17
82:24 84:20
87:4 182:18
182:20
183:22
187:16,23
**felt** 81:23
132:7
**fence** 9:22
**fiduciary**
42:8,23
**fight** 132:6
138:6
**fights** 184:3
**figure** 14:19
114:3
**figured** 85:13
**figures** 81:11
**figuring**
134:21
**file** 26:10,24
27:5,17
103:4 119:5
123:24
124:14,24
125:2,7
129:19
147:8
**filed** 14:21
32:6 104:20
127:8,16
130:19
131:5,24
139:21
150:2,8
151:20
152:5 153:2
155:22
164:15
**files** 100:17
106:11
118:3,3
119:4
120:14
122:3,19
123:4 124:4
124:24
**filing** 68:23

129:2
130:12
131:11
151:6
154:22
155:2 159:6
170:17
**finally** 142:14
**finance**
188:10
**find** 125:9
148:19
**fine** 54:5 86:9
**firm** 1:9 2:13
5:25 12:10
12:19,22
15:17 20:18
26:4 27:20
27:24 28:11
28:22 29:4
29:14,25
30:3 33:7
37:15,17,23
38:10,24,25
53:21 55:12
55:15 56:8
58:6 64:10
65:21,21
70:4 71:15
71:20 72:15
72:18 76:16
78:8,20
79:9,12
82:9,18,24
84:7,20
85:22,24
86:14 87:4
87:10,14,21
88:18 89:13
90:6,22
91:20 92:2
99:25 100:6
104:9
105:15
106:17
109:23
110:8 112:7
112:23

118:16
127:8,13
128:3,11
129:11,18
130:5,12,19
130:22
131:12,18
131:24
132:8,18
133:2,7,7
133:12
134:11
136:19
137:18,25
145:20
147:8 149:5
150:2 151:6
155:19
157:7
162:20
163:13
166:11
167:11,24
168:6 176:8
178:3 181:8
181:23
182:4,9,17
186:10,10
187:14,21
188:5,7,10
189:25
**firms** 11:20
29:12,16,21
71:16 72:8
128:5 190:5
190:8
**firm's** 150:5
183:22
**first** 6:6 7:25
14:5 19:23
20:16 28:12
28:14 31:15
36:20,20
47:3 49:2
50:20 52:5
59:24,25
67:19 73:4
76:17,18

| | | | | | |
|---|---|---|---|---|---|
| 78:20,21 | 190:16 | **front** 111:10 | 89:19 | 179:8 | **179:14** |
| 82:15,21 | **foregoing** | 111:18 | 102:14 | **goal** 143:8 | **gotten** 183:23 |
| 83:3 96:8 | 192:8 | 140:22 | **generated** | **goals** 142:16 | **governs** |
| 111:6 | 193:15,25 | 141:7 | 112:15 | **goes** 62:3 | 107:8 |
| 145:11 | **form** 193:14 | **frustrations** | **gentleman** | **going** 6:24 | **grab** 95:3 |
| 146:17 | **formal** 29:2 | 162:4 | 30:2 | 47:22 52:6 | **great** 173:8 |
| 149:25 | **formally** | **fulfilled** | **getting** 17:25 | 53:25 54:19 | 173:16 |
| 151:4 | 26:18 | 32:12 | 32:5 50:18 | 54:23 65:7 | 174:11 |
| 153:13,14 | **format** 60:9 | **full** 6:14 | 81:10 | 76:11 86:25 | **greedy** 163:4 |
| 153:14 | 120:16 | 168:19 | 100:15 | 96:4 98:15 | **Gregory** 2:21 |
| 154:3 159:4 | **formed** 190:4 | **fully** 104:20 | 135:22 | 99:4 101:7 | **ground** 12:14 |
| 159:13 | **forth** 41:14 | 140:25 | 138:9 | 103:25 | 38:14 49:16 |
| 168:19 | 74:8 | 141:12 | 143:20 | 119:6 | 57:20 |
| 171:3,12 | **forward** 58:8 | **function** | 155:17 | 123:14 | **grounds** |
| 176:6 | 69:9 86:25 | 32:13 | 174:9 | 129:6 135:8 | 143:24 |
| **fits** 57:19 | 151:12 | **fund** 188:11 | 184:17 | 141:7 | 180:6 |
| **flexible** 17:20 | 153:22 | **funds** 92:9 | **Gina** 21:19 | 143:21 | **group** 14:18 |
| **flip** 85:18 | 154:9 | 98:3,5 | **give** 18:8 | 146:15 | 29:22 |
| **Floor** 1:17 | **forwarded** | 113:6 | 60:18 75:19 | 147:8 | **guaranteed** |
| 2:5 | 151:8 154:4 | **funny** 146:21 | 76:12,13 | 149:13,16 | 81:14 |
| **Florida** 1:2 | **found** 129:5 | **further** 51:13 | 81:8 91:22 | 155:6,24 | **guess** 11:13 |
| 5:10 23:23 | **foundation** | 58:13 65:2 | 95:15,16 | 156:21,25 | 16:9 20:10 |
| 60:23 61:5 | 117:13 | 94:12 | 96:2,25 | 162:4 163:6 | 22:8,20 |
| 111:6 177:6 | 180:7 | 109:21 | 167:14 | 170:9,13,18 | 23:3 30:16 |
| 177:8 | **four** 41:2 | 146:12 | 185:12 | 170:19 | 33:2 43:21 |
| **Florida's** | **fourth** 19:18 | 174:24 | **given** 19:13 | 173:20 | 47:5 49:24 |
| 56:20 | **frame** 28:2 | 185:10 | 89:17 105:6 | 174:10 | 62:20 64:20 |
| 119:22 | 68:15 87:17 | 190:15,20 | 174:22 | 175:4 | 71:13 72:6 |
| **flown** 177:5 | 110:17 | 193:18,23 | 188:15 | 176:18,23 | 75:10 87:22 |
| **fob** 117:5 | 111:21 | **furtherance** | 193:11 | 177:15 | 94:23 114:4 |
| **focus** 12:10 | 112:9 | 57:9 | **gives** 18:3 | 184:24 | 128:21 |
| 170:13 | 122:13 | **future** 20:22 | **giving** 140:22 | 185:3,18,20 | 131:3 |
| **focused** 27:16 | 124:18 | ——————— | 142:7 | 185:23 | 132:16 |
| **folder** 123:23 | 136:21 | **G** | 143:11 | 190:18 | 133:7 134:3 |
| 124:2,7,13 | **frankly** 63:23 | **gained** 8:10 | **glasses** | **golfing** 62:22 | 141:7 154:5 |
| 125:11 | 87:10 | **game** 101:12 | 116:19 | **good** 6:10 | 177:24 |
| **folders** 102:5 | **frequently** | **garage** | **go** 7:2,8,18 | 14:20 32:11 | **guilty** 23:5 |
| **Foley** 2:4 | 68:9,17,25 | 117:19 | 15:21 17:10 | 32:19,23 | **guy** 10:4 |
| 56:15 66:15 | 145:19 | **gathering** | 19:8 33:14 | 40:23 78:6 | 11:20 |
| 119:13 | **Friday** | 124:21 | 36:7 46:24 | 79:24 | 124:11 |
| **following** | 147:21 | **general** 8:8 | 63:8 73:20 | 110:19 | **guys** 77:11 |
| 74:10 84:16 | **friend** 9:18 | 11:4 34:18 | 100:6 | 131:9 | 110:4 165:6 |
| 151:11 | 9:24 10:3 | 45:20 | 113:14 | 133:17 | 167:7 |
| 171:10 | 68:3 | 123:17 | 116:18 | 134:15,20 | 173:23 |
| 184:2 196:5 | **friendly** | 124:12 | 129:22 | 134:20 | 176:23 |
| 196:6 | 167:7 | 143:8 | 142:11,12 | 166:19 | 177:2,12,14 |
| **follows** 6:7 | **friendship** | **generally** | 146:12 | 167:3,4 | 177:25 |
| **follow-up** | 68:5 | 29:17 32:3 | 156:9,12 | 170:3,8 | |

**H**

**H** 4:2
**half** 132:24
  132:25
  139:25
**hand** 17:21
  19:5 194:8
**handed** 34:3
  69:6 76:16
  92:17 93:22
  101:18
  147:15
  152:11
  158:13
**handful** 12:4
**handing**
  150:14
  170:24
  175:12
**handle** 11:22
  48:14
  133:22
**handled**
  71:18
  136:18
**handling**
  16:25 27:3
  133:16
  134:15
  135:6
  165:16
**hands-on**
  133:20
**hang** 176:15
**happen** 44:10
**happened**
  20:8 44:19
  51:4 59:16
  64:19 74:3
  117:5 127:5
  148:25
  154:22
  162:6
  165:22
  187:3
**happens**
  62:25
**harassing**

121:10
**hard** 90:7
  100:22
  101:20
  102:7,11,23
  102:25
  109:5
  138:23
  140:14
  183:9
**Harold** 8:3
  8:16
**Harvard** 7:10
  7:23
**Hatch** 1:9
  2:14 59:21
  172:18,20
**Haven** 25:6
**head** 21:24
  33:2 186:23
**heads** 18:3
**heard** 178:13
**hearing**
  26:22 89:8
  164:2
  165:25
  191:5
**heck** 57:18
**heft** 134:10
**held** 5:12
**hereunto**
  194:8
**hey** 10:3
  173:8
**higher** 85:14
  87:24
**highly** 48:22
**Hillsborough**
  150:7
**Hinman**
  11:21
**hire** 178:4
  179:8,14
**hiring** 79:7
  173:13
**hog** 144:25
**hogs** 144:16
  144:21

**hold** 77:24
  93:4,10
  97:24,25
**holding**
  148:17
**home** 109:8
  175:9
**honestly**
  44:21
**hour** 1:18
  15:18
  174:23
  176:15
**hours** 174:17
  189:2
**house** 28:18
  67:24
**housing** 25:5
**hug** 104:6
**hugely** 80:3
**hundred**
  95:16
**hundreds**
  28:6

**I**

**idea** 179:14
**ideas** 134:5
**identifiable**
  125:7
**identification**
  6:21 33:25
  52:15 69:4
  74:18 78:17
  88:7 92:15
  93:20
  114:19
  137:9
  147:13
  150:12
  152:9
  158:11
  167:17
  170:22
  175:16
  179:23
  182:23
**identified**

121:2
  167:12
**identify** 5:17
  59:11 171:5
**illegal** 23:13
**Illinois** 1:17
  1:17 2:5,16
  5:14 11:22
  16:6 21:9
  23:19 24:2
  24:11 25:10
  104:22
  114:25
  193:2,6
  194:16
**imagine** 32:6
  98:3 111:11
  152:19
**impact**
  132:21
**impasse** 50:2
**imperative**
  195:12
**implied** 29:8
**important**
  107:12
**inappropri...**
  108:20
  119:21
  121:10
**inbox** 103:5
**incident**
  115:3
**include** 57:7
  91:2
**included**
  38:12
  105:15
**includes** 91:5
  91:6
**including**
  21:7 84:25
  190:12
**inclusion**
  4:16
**income**
  188:21
**incorrect**

89:2
**increases**
  84:15
**incredibly**
  131:9
  134:20
  155:6
**indicated**
  88:23 89:11
  174:14
  189:3,17
  193:21
**indicates**
  90:19
**indicating**
  143:25
**individual**
  1:8 30:24
  36:25 37:11
  37:19 38:6
  38:12 39:7
  39:19,21,25
  42:5 45:7
**individually**
  35:20
**individuals**
  35:8
**influence**
  165:14
**information**
  49:18 51:18
  61:23 62:2
  77:2,4
  88:22 136:9
  139:20
  143:5,11
  146:2
  173:21
**informed**
  155:25
**infractions**
  22:24
**initial** 82:12
  126:12
  162:21
**injunction**
  164:2
  165:25

**inquiry** 121:7
**inside** 124:13
**insights**
  64:24
**inspired**
  178:14
**instance**
  20:19 23:14
  133:4
**instances**
  41:10 112:3
**institution**
  157:19
**instruct** 39:2
  54:8 65:11
  144:4
**instructed**
  136:4
**instruction**
  135:9
**INSTRUC...**
  195:1
**insurance**
  8:12 10:23
  11:3,25
  20:15,23
  21:4 30:19
  138:7,11
  162:15,17
**insurer** 11:4
  19:25 20:4
**insurers** 11:7
  19:24
**intellectual**
  107:24
  133:20,24
  134:10
**intended** 77:4
  93:14
**interact**
  16:17,21
**interchange**
  111:16
**interest** 79:6
  79:8,11
  173:12
**interested**
  50:10 194:5

interesting 78:3
interests
104:23
105:3
108:22
intern 32:25
internal 66:5
66:11
interns 14:18
interpose
49:15 52:17
52:25
104:17
135:9
interpret
132:13
interpretat...
60:11
107:15
142:8
189:18,19
189:22
190:3
interpreting
66:21
interrogato...
76:19 78:22
171:3
interrogato...
78:24 84:12
168:7,14
187:12
interrupt
59:5 65:8
interruption
65:13
interspersed
171:8
introduced
62:4
invade 66:18
invoices
183:23
187:19
invoked
135:13
involve 66:23

144:2
involved
32:15 33:11
33:17 44:25
65:4 126:20
171:11,25
189:25
involvement
27:13 50:6
65:3 71:2
involves
143:20
involving
57:14
138:24
IRS 188:22
issue 20:3
21:13 54:7
55:20 66:19
103:24
107:8
128:19
153:11
173:8
180:24
issues 20:25
items 103:5
184:5
I5 97:13,15

_____ J _____

J 2:11,16
119:15
JAMS 52:22
January
90:12
Jay 15:6
Jim 147:20
157:6
Job 1:22
jobs 73:23
John 30:3
join 38:22
42:19 70:21
125:25
132:18
177:19
178:8

joined 10:13
12:18 86:14
110:7
186:10
joining
109:23
176:8 178:2
joint 20:17
28:9 51:9
63:25 104:2
108:2
128:12
139:24
140:8
141:19
162:19
173:17
jointly 70:3
126:4
judge 48:13
140:21
142:6,19
145:17
146:2,3,6
164:22
165:20
189:18
judgment
11:16 44:8
45:3 48:14
48:17 70:7
71:21
112:15
138:8 142:2
142:9
189:20
July 50:16
jump 73:8
jumping 9:21
June 8:25
116:8
junior 64:18
juries 142:12

_____ K _____

Kamber 15:8
KamberEd...
15:5

keep 61:2,8
61:22
123:13
130:4 131:4
131:16
154:11,16
keeps 82:18
82:24 84:21
87:4
Kelly 32:9
40:22
kept 82:3
130:22
key 117:5
keyword
125:15
kidding
174:12
kids 175:10
kind 16:13
32:3 45:14
80:6 102:10
128:18
129:10
Kinko's
129:23
knew 47:21
89:14 101:6
139:9 155:5
155:16
163:16
know 10:7
12:9,15,16
12:17,23,24
17:16,18,22
18:5,8,24
22:9,22
23:25 26:8
29:8 31:6
31:13 32:8
37:5,17
38:9 46:12
46:20 58:22
60:6,9
64:13 70:16
78:3,12
81:24 82:7
82:7 83:23

96:9 97:21
121:17
126:4,18,24
127:21
128:25
129:9,22
131:23
132:19
134:7,11
135:20
136:8 139:5
140:12,16
149:2 153:8
154:15
156:15
163:7,12,15
166:18
168:10
173:24
174:14
175:5 176:3
176:18,22
177:23
178:4 179:3
181:17
182:7,11
184:7
186:13
188:14
knowing
53:22
knowledge
41:13
126:25
130:25
140:10
188:6

_____ L _____

labeled
138:16
labelled
137:12
lack 180:7
lacking
117:13
laptop 94:14
94:20,22

97:6,8
103:7,10
104:10
105:25
106:7 108:8
108:24
112:20,23
113:7,8
114:10,12
114:14
115:11,14
116:9,20
117:25
118:4
119:19
121:3,5
122:4
123:10
laptops
101:18
Lardner 2:4
56:15 66:16
119:14
large 142:16
largely 47:25
64:23 104:2
134:8
LaSalle 2:15
late 111:15
116:17
127:6,7
172:22
173:2
186:19
Lauren 2:6
5:18
law 1:9 2:13
5:25 7:5,8
7:19 8:2
16:5 20:18
25:2 27:20
27:24 28:10
28:22 29:3
29:14,22,25
37:22 38:10
38:24,25
42:2 45:14
45:15 53:21

55:11,15
56:8 58:5
70:4 71:15
72:18 76:16
78:8,20
79:9,12
82:9 84:7
86:14 87:14
88:18 89:13
90:6 91:19
92:2 104:9
110:8 112:7
112:23
118:16
127:7,13
128:2 130:5
130:19,22
131:17,24
132:18
133:6,12
136:19
137:18
147:7 149:4
150:2 151:5
155:19
163:13
167:11,24
168:6 176:8
178:2
181:23
182:3,9,17
186:10
187:14
190:5
**Lawry** 30:3
**lawsuit** 20:5
  62:21 72:14
**lawsuits**
  188:11
**lawyers** 21:5
**lead** 48:4
  63:22 72:15
**leading**
  138:23
  139:16
**learn** 9:16
  36:13 52:6
  145:25

156:17
**learned**
  139:20
  150:2
**learning**
  79:25
**leave** 13:20
  18:5 54:11
  100:9,16
  117:22,24
**leaving** 14:22
  73:5,15
  97:19 100:2
  100:6
  106:17
  109:22
  132:17
**leeway** 105:4
**left** 8:24
  67:15 72:25
  100:4,18
  103:25
  109:13,16
  117:2
  122:11,17
  124:16,25
  125:19
  151:9 163:8
  164:13
  166:11
  181:18
  186:9
**legal** 2:9 5:22
  41:24 42:18
  43:25 45:18
  47:18 61:11
  61:25
  106:25
  143:18
  184:18
**Lenovo** 97:10
  115:9,11
**letter** 4:7
  56:16 66:14
  89:12,13
  90:5,11
  118:19,23
  140:6

**letters** 34:24
**let's** 54:17
  152:19
**level** 85:20
  173:11
**Lewis** 1:10
  147:20
**liability** 11:4
  11:5 40:6
  141:18,23
**lifting** 71:19
**Likewise**
  139:25
**limit** 105:18
**limitations**
  47:14
**limited** 35:13
  121:22
  171:14
  189:25
**limits** 66:25
**line** 24:22
  32:4 121:7
  121:19
  134:23
  196:8
**list** 150:6
**listed** 34:22
  53:6 77:3
  82:12 86:21
  97:12
  172:16
  183:6
**listing** 56:3
**litigate** 11:8
**litigated**
  10:10,23
  39:14 70:3
**litigation** 8:9
  38:17 43:12
  43:13 55:18
  59:13
  105:21
  108:18
  110:21
  111:2,10,18
  112:5,14
  121:9

122:15
139:8
141:14
149:7
153:16
157:22,24
161:17
164:5 166:2
169:11,15
169:22
187:16,23
**little** 15:4,15
  72:2 142:4
**live** 24:4,9,19
  25:3
**lived** 24:6,16
  25:9,18
**LLC** 1:9,10
  2:14 86:6
  171:16
**LLC's** 76:17
  78:20
  167:24
  168:6
**lloew@fole...**
  2:6
**LLP** 2:4
**loan** 93:14
**local** 30:7
  146:20
**location**
  25:19
**lock** 117:4
**Loew** 2:6 3:4
  5:18,18 6:9
  6:22 13:9
  13:12,16
  18:20 19:11
  19:12 22:14
  24:15 26:19
  28:3 29:11
  31:7,14
  32:18 33:6
  33:22 34:2
  38:4 39:4
  39:17 42:14
  43:2 44:12
  45:6,12,24

46:7,14,15
49:12,22
51:21 52:11
52:19 53:19
54:12,17
55:3 57:25
58:18 60:6
60:20 61:16
62:9,11,17
63:12 64:14
65:24 66:3
67:8,11,12
68:12 69:5
69:21 70:23
72:17 74:12
74:19,24
75:2,22
76:6,11,22
77:2,7,10
77:19,23
78:7,18
79:15 80:23
88:2,8,13
88:16 89:23
90:10 92:16
93:21 95:7
98:11 99:8
99:13
100:12
105:11
106:4,9
107:3 108:6
109:3
110:24
111:22
112:10
114:20
117:15
119:25
120:12
121:14,21
121:24
122:16
123:21
124:20
126:6
127:20
131:10

132:11
133:14
135:24
136:15,22
137:5,10
140:11
142:18
144:9
147:14
148:15
149:9,12,20
149:24
150:13
152:10
154:20
155:11
157:17,21
157:25
158:3,12
161:13,16
161:20,23
167:18,22
168:17
169:20
170:23
173:20
174:11,25
175:11,17
177:22
178:12
179:2,19,24
180:10
181:15
182:24
184:20
185:7,14
186:7 187:5
190:16
**log** 4:11 56:2
  56:4 167:12
  167:14,25
**Logistics**
  110:2
**LOL** 148:21
**long** 7:4 8:14
  8:20 17:18
  24:6,24
  25:11 32:19

**longer** 175:3
**look** 14:23
  34:20 59:24
  138:15
  146:16
  147:18
  165:8
**looked** 12:11
  47:4,6,12
  47:23 60:2
  164:17
**looking** 9:20
  15:2 60:7
  149:6 154:5
  156:9,12
**looks** 115:5
  148:12
  170:13
**loop** 50:13
**lose** 44:15
  101:14
**lost** 39:14
**lot** 10:25
  25:24 81:12
  124:9 126:5
  142:11
  145:22
  146:14
  186:13
**lots** 42:2,2
**Louis** 29:23
**love** 138:20
**low** 81:5
**lunch** 99:9
  113:2,22
  114:2
  174:13,15

**M**
**M** 1:8,13 2:6
  6:5 170:25
  183:2 192:7
  192:16
**Machiavell...**
  146:18
**Madison** 2:10
**magistrate**
  140:21

**main** 47:18
**maintenance**
  183:8,15
  187:8
**major** 47:22
**majored** 7:16
**making** 57:23
  73:8 80:8
  80:11 84:6
  84:7 130:2
  182:3
**managing**
  134:20
  157:8
**manner** 20:5
  20:6 21:3
**March** 73:7
  73:11,14
  74:2 79:19
  80:25
  172:22
  173:2
  175:25
  176:5
**Margolis**
  29:22
**mark** 52:11
  63:21 77:19
  137:5
  145:22
  146:5
  148:21
  179:19
**marked** 6:20
  6:25 33:24
  34:4 52:14
  52:20 55:4
  69:3,7
  74:17,21
  76:2 78:16
  88:6,9
  92:14,18
  93:19,23
  114:18,22
  137:8
  147:12,16
  150:11,15

**152:8**
  158:10,14
  167:16,20
  170:21,24
  175:13,15
  179:22
  180:2
  182:22
**marketing**
  138:25
  140:6,6
**marking**
  182:25
**marks** 5:3
  54:24 99:5
  149:17
  185:4
**Massachus...**
  24:22
**material**
  139:24
**materials**
  53:11
  101:17
  102:10
  103:20
  104:10,13
  104:15
  105:14,16
  105:19,20
  105:25
  106:6,22
  107:17,25
  107:25
  108:9,13,17
  109:5,8,13
  115:19,20
  121:3,5,8
  121:16
  123:9,16
  160:21
**math** 74:15
**matter** 5:6
  30:10,24,25
  31:9,20,23
  80:5 109:19
  120:5
  164:23

**matters** 5:6
  21:12 25:22
  27:23 30:12
  72:16 101:8
  110:6
**Max** 6:15
  31:19
**MC** 92:18
**mean** 8:23
  23:11 37:15
  41:25 51:3
  62:18 79:5
  101:6
  102:12,24
  123:19
  125:8
  127:25
  129:15,16
  132:3,13
  133:19
  134:17
  141:8,13
  144:19
  151:17
  156:5
  159:16
  161:18
  162:2 165:9
  166:24
  174:17,25
  176:20
  177:8
  178:24
  184:9
**means** 141:16
  193:12
**mechanism**
  105:9
  108:21
**mechanisms**
  105:2
**media** 5:4
  54:25 99:6
  149:18
  185:5
**mediation**
  4:5 17:5
  31:18 32:17

**33:14,15**
  36:9 40:15
  40:16,25
  41:7 44:2,5
  45:25 46:9
  46:25 47:3
  47:24 49:2
  49:3,4,25
  50:4,5,8,19
  50:20,21
  51:15 52:7
  52:22 56:17
  57:3,4,5,6,8
  57:10,15,17
  57:21 60:22
  61:3,4,22
  62:3,24
  63:2,14,16
  63:18 64:4
  64:8,8,16
  64:19 65:2
  65:10,16,25
  66:4,10,13
  66:24 67:14
  111:6
  135:12
  136:2
  138:13
  143:13,21
  144:4 146:9
  162:5
  164:23
  172:11
**mediations**
  56:23
**mediation-...**
  49:17 51:17
  56:20 144:7
**mediator**
  49:24 51:8
  51:11 65:22
  67:6 144:12
  145:18
**Medical** 1:4
  5:6,19 27:6
  27:8 31:8
  32:13 34:21
  35:4 36:3

**37:6 39:24**
  40:5,11,18
  41:11,17
  42:16 43:4
  43:23 44:13
  46:20 61:18
  64:3,7
  109:19
  110:11
  122:10
  123:5,7,8
  130:16
  135:6
  164:18
  166:17
  171:6,10,15
  172:5
**meet** 28:12
  40:10 67:19
  74:7
**meeting**
  75:17 83:7
  91:9
**member**
  42:21,24
  43:6 86:5
  181:7,13
**members**
  63:2 64:10
  65:20
**mentioned**
  112:14
  127:12
  166:3
**merit** 179:13
**message**
  152:13,25
  154:11
**messages** 4:6
  4:8,10,13
  4:13 93:25
  94:2,5 95:4
  95:10,12
  152:17
  175:19
  179:10
**Mester** 63:22
  145:22,22

146:5
met 28:20
67:22 74:9
74:13 75:14
metadata
120:7
Miami 23:23
31:19
176:14
177:15
Michael 41:3
146:21
Michele 2:21
Microsoft
113:13
mid 186:19
Middle 1:2
5:9 119:22
162:13
Mike 30:9,13
31:2 63:20
70:16 111:8
111:9
158:21
159:5
160:25
162:25
164:9,12,18
166:5
million 82:16
82:17,22,22
82:23 84:19
84:20 87:2
87:2,3
140:20
mind 101:13
144:17
mine 9:18
112:25
minimum
67:4
Minnesota
24:2
minute
184:21
minutes
148:12
152:2

174:18,20
174:23
mischaract...
107:20
177:17
missing
121:18
misunderst...
121:21
mixed 125:16
model 94:14
97:11
moment
76:14 151:2
186:15
Monday
75:11 92:11
92:12
money 39:15
94:8 96:2
96:24
112:21
113:4
114:15
126:15
127:2
142:17
155:10
182:3
month 167:5
months 161:6
morning 6:10
151:11
motion 48:10
48:20
motions
48:18
move 58:8,16
105:7
117:12
121:12
moved 25:13
moving
132:23
multiple 30:8
M&C 27:7
33:11 34:6
35:3 36:5

41:18 46:4
46:9,12,16
53:9,10,13
53:14 54:14
55:7,9,11
55:19,25
56:9 57:20
59:8,11
63:14 65:3
66:10 88:20
106:2 109:6
115:19,20
118:3,19
119:2 121:8
121:16,23
122:3,18
123:16
124:15,24
125:6
136:17
140:3,13
142:25
168:7
187:15
188:20,20
189:3,8
M&C's 57:16
59:18
106:10
187:12

___

**N**

N 3:2 99:2,2
99:2
nailing 47:18
name 6:14
8:15 21:19
85:2,17
131:12
named 11:21
13:3,14
15:6 30:3
41:4 171:21
names 131:14
narrative
115:23
national
16:14

native 120:16
nature 56:13
105:6
110:10
123:17
124:8
126:18
173:4
Near 12:8
nearly 7:6
8:21
necessary
66:20
189:23
195:4
need 17:17
26:23 36:16
132:9
needed 26:22
98:5 106:18
134:22
157:11
needs 188:20
negligence
119:17
negotiate
27:14 36:10
50:22
negotiated
26:16 39:6
39:19,21
84:12 87:12
negotiating
27:16 36:12
146:23
negotiations
14:10 39:24
51:14 168:5
negotiator
78:6
never 9:8
12:12 13:2
13:2 29:9
39:10 86:4
112:24
133:4
134:17
173:10

new 25:6
36:21 50:11
63:22 82:19
94:14,20,22
96:5 100:23
101:2,21
103:7,10
108:8 127:8
129:20
133:2 166:5
niche 14:10
Nicole 92:25
night 72:22
116:14
nods 21:24
nonclass
11:10
nonconclus...
21:3
non-attorney
33:8
non-client
107:24
non-prejud...
20:6
non-privilege
56:11
normal
117:21
North 1:17
2:4,15 5:13
Northern
70:5
Notary 1:16
192:24
194:16
note 4:15
34:7 56:13
77:12
119:13
noted 114:24
120:2
195:10
notes 84:3
193:17
notice 1:14
4:3 7:3 20:4
99:19 150:5

noticed 6:23
21:5
notification
150:4
notion 18:18
188:16
number
29:24 47:8
47:9 53:14
53:15 54:15
72:23 73:18
87:24 94:14
97:11
100:20
132:5,7
141:6
numbered
53:3
numbers
47:4,7 53:5
54:14 80:6
83:24
176:21

___

**O**

O 99:2,2,2
object 38:13
49:8 57:19
89:24 119:7
119:24
135:9
143:18
180:5
objection
22:12 26:12
27:25 29:5
31:4,11,24
32:21 37:24
38:23 39:8
41:23 42:17
43:24 45:5
45:8,17
49:15 51:16
52:17,24
56:14 61:10
61:24 63:5
64:11 68:11
70:19 72:9

74:4 79:13
87:16
100:10
104:18
106:24
107:19
108:12
110:16
111:20
112:8 119:8
119:25
120:9 121:4
121:6
122:12
123:11
124:17
125:23
127:18
131:6,25
133:13
136:10,20
139:13
148:8
154:17
155:3
169:16
171:8
177:16
178:6,18
180:14
181:9
**objections**
4:12 76:18
78:21 171:2
**obligated**
17:4
**obligation**
61:22
**obligations**
41:21 61:2
104:14
**observation**
134:12
**observing**
64:23
**obstructive**
18:12
**obviously**

17:14 44:17
68:17 72:12
79:23 80:2
84:11
110:20
136:24
184:15
**occasion**
29:19
**occasionally**
16:22 17:3
44:22
**occasions**
16:20 30:8
**occurred**
169:10
186:17
**October**
21:17
**offenses** 22:7
22:18
**offer** 75:20
81:8 82:11
83:3,13
92:2 99:15
177:13
178:14
**offered** 191:4
**offering** 73:8
**offers** 66:13
**office** 10:4
15:19 32:2
100:19
110:2
113:13
118:15
128:17
157:9
**officer** 11:6
**oftentimes**
11:6
**oh** 97:15
114:4
144:18
154:14
179:7 184:2
**Ohio** 24:2
30:4 70:5

**okay** 6:23
13:10,17,19
18:11 20:12
22:19 25:21
35:3,12,17
39:5 46:20
53:19 55:3
60:6,25
61:17 62:10
65:19 66:3
67:9 69:24
70:16 73:25
74:24 75:16
76:11,24
77:7 79:3
83:8 84:25
87:8 89:23
98:13
100:15
115:6 122:9
136:14
140:12
142:5
160:10
164:4 169:9
175:12
176:11
179:8 181:3
184:5
**old** 100:22
**once** 34:18
50:8 129:5
**ones** 14:19
**one-hour**
174:15
**one-third**
36:24
**ongoing**
67:17
**open** 79:22
134:7
180:22
**opinion** 48:23
136:7,12
179:16
190:11
**OPP** 53:3
**Oppenheim**

1:8,10,13
2:8 5:1,5,8
5:23 6:1,5
6:10,11,12
6:15,16,19
7:1 8:1 9:1
10:1 11:1
12:1 13:1
14:1 15:1
16:1 17:1
18:1 19:1
20:1 21:1
22:1 23:1
24:1 25:1
26:1 27:1
28:1 29:1
30:1 31:1
32:1 33:1
33:23 34:1
35:1 36:1
37:1 38:1
38:18 39:1
40:1 41:1
42:1 43:1
44:1 45:1
46:1 47:1
48:1 49:1
50:1 51:1
52:1,13,21
53:1,8 54:1
55:1,9,10
55:14,22
56:1 57:1
58:1 59:1
59:19 60:1
60:4,14,21
61:1 62:1
63:1 64:1
65:1 66:1
67:1 68:1
69:1,2 70:1
71:1 72:1
73:1 74:1
74:16 75:1
76:1 77:1,5
78:1,15
79:1,7,7
80:1 81:1

82:1,20
83:1 84:1
85:1 86:1
87:1 88:1,5
88:14 89:1
90:1,11
91:1 92:1
92:13,25
93:1,18
94:1 95:1
96:1 97:1
98:1 99:1,8
100:1 101:1
102:1 103:1
104:1 105:1
106:1 107:1
108:1 109:1
110:1 111:1
112:1 113:1
114:1,17,21
115:1 116:1
117:1 118:1
119:1,16
120:1 121:1
122:1 123:1
124:1 125:1
126:1 127:1
128:1 129:1
130:1 131:1
132:1 133:1
134:1 135:1
135:10
136:1 137:1
137:7 138:1
139:1 140:1
141:1 142:1
143:1 144:1
145:1 146:1
147:1,11
148:1 149:1
150:1,10
151:1 152:1
152:7 153:1
154:1 155:1
156:1 157:1
158:1,9
159:1 160:1
161:1 162:1

163:1 164:1
165:1 166:1
167:1,15
168:1,2
169:1,22
170:1,20
171:1,9
172:1,19
173:1 174:1
175:1,14
176:1 177:1
178:1 179:1
179:21
180:1,8
181:1 182:1
182:21
183:1 184:1
185:1 186:1
187:1 188:1
189:1 190:1
191:1 192:7
192:16
194:1
**Oppenheim's**
56:6 86:17
105:25
169:18
171:2 183:2
**opportuniti...**
14:23
**opposed**
46:13
157:19
**opposing**
56:22 61:8
61:15 67:7
121:11
**opposite** 9:19
**oral** 168:2
**order** 17:23
34:8 53:10
54:10 55:16
56:7 59:7
60:11 66:22
100:17
105:2
113:20
118:11

122:20
125:9
189:20
**ordered**
65:17 144:6
**orders** 61:18
**organized**
124:11
**original** 55:8
74:2 107:11
107:13
115:3
120:14
137:21
177:13
195:12
**originally**
55:19 87:11
**originate**
85:7,11,12
**originated**
82:20
**ostensibly**
66:17
166:20
**outcome**
48:16 194:5
**outlays**
126:13
**Outlook**
103:2,4
123:24
**outside** 38:15
108:19
119:8 145:8
157:10
158:6
**outstanding**
127:5
**overlapping**
80:3,4
**oversaw** 32:5
**oversee**
128:16
**owed** 126:14
**owned**
112:23
**ownership**

128:12
181:12
**O'CONNOR**
98:13

_____
**P**
**package** 76:5
78:4 86:18
86:20 89:6
**packed**
100:19
**page** 3:3 4:2
36:19 56:18
59:25 76:15
77:3 78:23
86:10
115:10
138:16
140:18
145:11
146:13
153:13,22
168:18
171:4
172:15
175:24,24
176:12,13
183:5
192:13
193:21
196:8
**pages** 192:9
**paid** 15:22
82:21 90:20
91:19
113:17
127:2
138:24
139:2,24
181:2
187:22
188:17
**paper** 119:11
**paragraph**
36:20,21
146:17
168:19
**Pardon** 65:13

**parents** 25:9
**park** 25:17
117:17
**part** 34:12
49:10 63:10
110:23
123:24
129:21
132:14
146:9
148:19
162:23
164:9
165:17
177:9
179:12
193:22
**participate**
44:20 64:4
**particular**
8:6 38:15
48:25 60:17
78:12 98:4
102:4
104:19
125:11
131:20
180:24
186:16
187:7
**parties** 62:7
62:16,19
193:20
194:4
**partner**
13:14 85:23
86:2
**partners**
12:22 15:8
**partnership**
29:9 35:13
86:3 171:14
**party** 184:16
**pass** 37:6
**passed** 33:3
186:14
**pay** 36:23
39:16 45:4

96:14
176:16
179:16
187:15
188:7,22
**paying**
126:12
173:19
182:17
183:22
**payments**
93:13
**payroll** 96:8
**peg** 174:22
**pending**
17:19 70:5
129:17
171:23
**Pennsylvania**
23:25
**people** 14:16
18:16 30:6
81:25 134:8
146:19
188:7,12
**percent** 82:15
82:17,21,22
82:23 84:18
84:19 86:25
87:3 127:4
138:24
139:2
**percentage**
81:19
**percentages**
83:10 85:15
**perform**
109:18
**performed**
171:6
**period** 33:8
109:17
157:16
**permissible**
119:9
**permission**
106:11,14
**permitted**

120:8
**person** 75:14
116:5
133:21
134:4
155:14
**personal** 15:4
40:6 101:9
101:11
102:15
140:10
142:16
145:21
**personally**
64:9 102:18
**persons**
193:20
**pertain** 106:2
121:15
**pertaining**
106:23
118:19
123:4
155:19
168:4
**Pharmacy**
30:17 111:7
**Phil** 28:12
67:19 73:6
75:9 94:6
95:18
133:18
141:20
146:13
147:19
151:13
152:4 153:3
153:12,19
153:24
155:15
156:19
158:16
164:8 169:6
**Phillip** 2:20
95:13
**phone** 79:18
165:19
176:24

177:21
**physical**
107:8
**picking** 14:9
**pig** 144:22
**pigs** 144:16
144:20
**piles** 14:16
**pinpointing**
186:25
**place** 15:4
157:12
190:11
193:10
**placed** 65:17
**plain** 58:12
**plaintiff** 1:6
1:14 2:3
41:4 148:20
149:6
183:20
**plaintiffs**
11:20 188:8
188:12
**plaintiff's**
9:23 10:14
15:10 16:15
76:18 78:21
171:3 183:3
**plane** 176:14
**play** 48:21
**plead** 23:5
183:18
**pleading**
102:19
**please** 5:16
6:3,13
17:16,18
18:3 23:9
52:18 60:19
62:12
149:21
154:11
195:3,7
**plenty** 184:9
**plus** 41:2
82:14,15
84:17,18,25

86:25
pocket
  117:10
  126:13
  127:3
point 19:2
  23:24 47:22
  48:3,7
  50:12 51:2
  51:8 54:18
  77:11 81:7
  96:13
  106:18
  110:19
  111:19
  136:23
  137:20
  138:10
  143:10
  163:6,7
  176:17
  187:20
  188:18
points 186:14
police 4:8
  115:3 116:2
policy 11:6
political 7:16
politics 15:20
Porcelli
  48:13
  142:20
  189:18
portion 20:21
  93:3 113:5
  113:16
  137:21
portions
  78:12
position 8:2
  9:7 55:16
  55:21 56:16
  57:17 66:21
possessions
  107:9
possibility
  9:21 45:23
possibly

130:24
165:4
Postman 48:4
  50:10
posture
  135:23
potential
  41:4
potentially
  44:2 176:7
  177:15
  178:2
power 45:20
practice
  15:22 16:5
  16:10,14
  34:18 104:3
  117:4,21
practicing
  7:5
preceded
  176:25
precedent
  112:16,18
preliminary
  164:2
  165:25
preparation
  163:25
  165:24
prepare
  100:9
prepared
  172:11
preparing
  45:25 46:8
  46:24
presence
  18:16
present 2:2
  2:19 40:15
  83:8 193:19
presented
  55:20
preservation
  118:19,23
  120:3
pressed 117:9

pressure
  174:8
pretend
  153:18
pretrial
  71:19
pretty 33:21
  82:3 130:25
  172:13
prevent
  156:14
preview 80:6
previous
  80:21
  107:20
  116:11
  161:17
  177:17
previously
  108:16
  177:24
pre-heavy
  71:19
price 113:14
primarily
  15:3,25
  27:2 32:9
print 119:10
printed 83:14
  83:17,21
printout
  148:11
  152:23
prior 40:18
  57:8 79:5
  110:25
  162:6
  180:20
  181:19
privilege 4:11
  38:15,25
  44:2 54:7
  55:7 56:2,4
  56:17 57:4
  57:14,21
  58:5 60:23
  61:4 65:16
  66:4,11,18

67:7 136:2
143:13
144:4
165:11
167:12,14
167:24
privileged
  55:23 56:23
  57:16
pro 11:19
probably
  30:25 48:20
  50:16 87:23
  96:11
problem
  18:13
Procedure
  1:15
procedures
  157:9,11
proceedings
  24:14 77:18
  174:6 191:3
process
  103:11
  119:23
  139:22
produce
  55:10 57:23
  122:8,21
  125:9
produced
  53:12,17,23
  54:3,5
  56:12 58:3
  59:12 60:8
  88:20 89:3
  89:19
  105:20
  108:18
  121:9 137:2
  178:16
  180:18
producing
  53:12
product
  136:7
production

34:13 53:7
54:13 55:9
55:14 56:7
118:12
148:3
187:13
professional
  11:5 101:19
  129:25
  143:8
profit 81:14
program
  113:13
pronouncing
  183:9
properly
  53:17
property
  107:24
proportion
  155:7
proposal
  82:12
proposals
  65:5
proposed
  35:21 84:15
  86:12
proposing
  84:5
prosecuted
  126:4 188:9
prosecution
  187:17
prospect
  172:20
Protection
  10:20
protective
  17:23 34:8
  54:10 61:18
provide 78:8
  83:12 120:7
provided
  47:17 58:2
  59:7 88:18
  91:8,11
provoke

155:6
proximate
  157:18
proxy 42:6
PST 103:4,6
  103:15
  123:24
  124:14,24
  125:2,7
Public 1:16
  192:24
  194:16
publically
  108:4 131:5
pulled 23:15
  134:9
pun 167:5
punitive 27:9
  38:5,11
  44:14,16
  45:2,16
  46:17 188:8
purchased
  112:21
  113:8,9
  114:11,15
  115:15
purpose
  80:13
purposes
  66:25
  119:12
  190:4,7
pursuant
  1:14,14
  34:7
pursue
  104:23
pursued
  139:18
pursuit
  139:23
put 27:3 32:5
  33:13 47:23
  77:21 93:10
  118:10
  146:22
  184:16

**putting** 65:5
**p.m** 98:21
   99:7 116:18
   144:15
   146:14
   147:21
   149:14,19
   150:18
   175:25
   184:25
   185:6,21,24
   190:19
   191:7

**Q**
**qualify** 113:2
**question** 13:7
   17:19 20:11
   32:24 38:18
   45:9 46:6
   47:19 49:13
   49:20 51:19
   55:4 69:17
   96:12
   100:13
   121:22
   123:17
   131:9
   135:14,16
   135:21
   136:13
   137:4
   141:18
   148:21
   149:21
   161:11,20
   167:4 171:5
   180:23
   189:2
**questioning**
   54:2 58:9
   121:19
**questions**
   17:15,16
   18:9 58:20
   58:24 60:16
   66:17 89:24
   105:18

111:12
121:15
185:11,16
186:5,6
187:6
190:17
**quite** 187:25
**quote** 170:12
   189:4
**quotes** 35:9

**R**
**R** 99:2 196:1
   196:1
**raise** 173:7
**range** 68:20
   117:6
**rarely** 16:19
**reached** 21:2
   138:4 159:5
**reaction**
   151:18
**read** 35:15,24
   62:11,13
   74:23 78:24
   135:15,16
   135:17
   145:12
   146:5 147:5
   149:20,22
   174:9,15
   192:8 195:3
**ready** 100:16
**realized**
   59:22
   116:19,20
**really** 9:8
   15:10 62:23
   64:20 85:12
   100:14
   112:24
   132:22
   134:6,10,25
   166:13
   188:23
**reason** 90:3
   98:4 173:22
   195:5

196:10,12
196:14,16
196:18,20
**reasonable**
   21:2
**reasons** 71:11
   196:6
**recall** 24:3
   46:19 48:5
   48:19 50:3
   70:15 80:5
   97:2,4 98:6
   110:9 111:5
   112:2
   113:18
   123:6
   131:19
   152:18
   172:9
   186:11
   189:14
**recalling**
   47:15
**receipt** 151:2
   151:4
   153:17
   154:7
   195:14
**receipts**
   160:16,20
**receive**
   118:18
**received**
   14:17 20:4
   37:18 60:3
   66:15 81:18
   118:25
   125:3 151:3
**recess** 54:22
   149:15
   185:2,22
**recessed**
   98:20
**reckless**
   23:17
**recognition**
   85:20
**recollection**

81:3 83:3
89:5 113:3
169:3,6
**record** 5:3
   6:14 18:12
   53:21 54:20
   54:24 58:11
   58:15 59:15
   62:13 66:9
   77:12 80:16
   88:10,25
   90:3 98:16
   99:5,12
   105:24
   135:17
   140:19
   142:15,22
   143:7
   148:17
   149:14,17
   149:22
   184:25
   185:4,7,21
   185:24
   190:19
**records**
   134:21
   139:16
**recovered**
   36:25 37:11
**recovery** 11:2
**red** 23:13
**redacted**
   153:6 184:3
**redaction**
   96:10 153:9
**reduced**
   86:17 87:9
   193:12
**refer** 155:24
**reference**
   137:22
**referenced**
   168:5
**references**
   93:4
**referred**
   140:15

150:25
162:10
**referring**
   47:7 79:16
   83:16 94:21
   95:6 137:14
   139:6 141:4
   142:20,23
   142:25
   144:10
   145:15
   162:24
   168:11
   179:4,10
   180:4,12
**reflect** 80:16
**refresh** 169:2
**refreshed**
   113:3
**refreshes**
   169:6
**regarding**
   35:6 166:5
   168:20
   186:8
**Registration**
   21:10
**regular** 11:20
**reimbursing**
   182:19
**relate** 132:4
**related** 22:23
   35:14 44:5
   58:21
   101:11
   108:14
   112:6
   119:18
   124:15
   135:11
   194:3
**relating**
   115:20
   144:3
   160:21
**relationship**
   29:2 30:5
   36:18 43:3

43:9 79:24
108:3
125:21
129:25
**relationships**
   15:20 72:12
**relayed**
   180:25
**relevant** 59:9
   105:22
   106:3
   108:19
   148:19
**remained**
   108:3,3
**remaining**
   86:23
**remember**
   11:18 83:24
   161:10
   172:10
**remembered**
   169:7,8
**Renee** 1:15
   1:21 193:4
**renew** 120:9
   121:6
**repeat** 46:5
**report** 4:8
   115:4,25
   116:6,16
   188:21
**Reported**
   1:21
**reporter** 6:3
   34:3 168:24
   193:5
**represent**
   35:6 42:22
**representat...**
   36:3 38:12
   106:23
   140:4,5
**representat...**
   16:23 17:4
   27:10 35:21
   38:6,11
   41:20,22

42:12 44:15
44:16 45:3
45:16 64:2
189:4,6,7
**representat...**
40:11 41:12
44:23 172:6
**represented**
63:11
**representing**
5:22 36:9
48:2
**request** 78:7
88:21
120:10,23
122:24
123:3
**requested**
62:14
135:18
149:23
**requests**
124:23
**required** 45:4
**requireme...**
143:14
**residence**
116:4
**resolution**
126:19
**resolved**
126:16
128:19
**respect** 38:20
65:10 66:11
123:16
180:7,23
**respond**
159:24
160:7
**responded**
84:15
120:22
153:14,15
**responding**
145:5
153:10
**response** 81:4

88:21 95:20
95:23
122:23
123:3
140:17
144:15
152:2 153:5
153:19
155:8 160:5
172:16
**responses**
4:12 47:17
75:23,25
76:7 124:22
169:19
171:2
**responsibil...**
14:3 72:7
**responsibil...**
71:14
**responsive**
56:11 59:10
105:21
136:9
**rest** 84:11
**restrictions**
165:10
**result** 23:16
**retain** 78:13
109:4,12
**retainer** 4:4
34:5,15,21
**retaining**
106:22
**retains** 35:5
**retention**
38:20 184:4
184:10
**return**
195:12
**reveal** 135:10
**revealing**
57:2
**revenue**
85:15
**reversed** 70:9
**review** 34:15
46:2,10

83:20 160:7
**reviewed**
47:16 70:13
180:15
186:24
**reviewing**
180:20
187:12
**re-entered**
185:9
**right** 13:25
17:13 23:13
24:18 33:9
40:22 41:2
41:25 52:2
60:19 71:17
83:5,18
88:3 93:9
105:13
130:10
144:13,18
148:7 151:8
152:3,19
153:12
157:17,25
161:13,19
165:3
178:23
181:16
184:20
186:21
187:10
188:3
189:21
**Robert**
162:15
**Rodney**
31:19
**Rogan**
137:23
**Rogers** 25:17
**role** 14:12
33:11 41:17
50:20 64:15
**room** 17:6
18:5 63:24
99:11 111:5
185:9

**Ross** 32:11
32:19 40:23
134:20
166:19
167:3 170:3
170:8
**rule** 107:7
**ruled** 119:10
120:6
**rules** 1:14
17:11
106:17,21
107:6
**ruling** 112:16
142:2,9
**runner-up**
15:3
**Ryan** 32:9
40:22

**S**

**S** 4:2 99:2,2,2
**saga** 94:7
**SAITH**
190:20
**salary** 80:19
82:15 84:17
86:24
**sanction**
45:20
**Sarris** 140:24
141:16,19
142:2
**satisfied**
20:22
**Saturday**
152:20,21
**saved** 118:4,7
123:22
124:12
**saw** 83:22
151:18
153:17
**saying** 144:20
150:8 152:4
**says** 35:3,18
36:21 69:9
79:6 84:14

86:16 94:7
94:13 95:15
96:6 138:20
140:19
144:16
146:17
148:16
153:2,21,22
154:10,11
169:9
172:17
176:13
**schedule** 85:6
85:10
**scheduled**
31:18
**scheduling**
74:9 162:22
145:13
147:2,22
148:22
150:19,20
151:10
152:2,19,22
153:13
154:13
158:18,23
160:4,11
168:8,21
169:12
171:17
172:23
175:25
183:6
**seek** 54:10
119:7
**seemingly**
168:4
**seen** 29:9
34:9,17
75:4 76:9
92:19 93:25
114:21
147:24
150:21
178:15
187:19
**segregated**
124:3

129:13,14
130:5,22
131:4,17
**secretly**
146:23
**see** 18:17
33:15 34:21
35:2,10,11
37:3 53:14
54:12 60:7
69:10 90:14
93:5 94:15
115:6,12
134:25
138:18
139:3 141:2
144:18
**school** 7:9,19
8:2 25:2
**science** 7:17
**scientist**
120:17
**scope** 38:16
108:19
119:9
**score** 65:8
**screen** 75:8
155:18
157:12
158:4
**screened**
152:6
**screening**
158:6
**search** 15:4
**searches**
125:15
**second** 20:4
20:13,19
36:19 50:7
52:6 63:14
64:16
115:10
171:14
176:12
185:13
**secret** 129:10

**self** 141:13
**send** 14:16
  94:13
**sending**
  114:7
**sends** 160:8
**sense** 85:25
  145:21
  179:15
  188:24
**senses** 134:19
**sent** 36:10
  47:20,20
  48:24 70:17
  94:25 103:5
  125:3
  139:10
  148:4 152:4
  159:21
**sentence**
  189:13
**sentences**
  146:16
  189:16
**separate**
  30:19,25
  85:5,10
  133:3
**separately**
  11:9
**September**
  21:16 63:17
**sequence**
  154:6
**series** 75:10
  93:24
  175:18
**serious** 73:21
**seriously**
  73:16
**seriousness**
  173:15
**services**
  173:19
**session** 51:3,9
  63:25
**set** 76:19
  78:22 92:23

117:7 118:8
118:9 122:7
138:12
140:19
141:22
142:15,22
143:7
155:19
156:2 158:5
171:3 194:8
**setting** 110:2
**settle** 138:14
**settled** 37:16
  37:19
  145:24
  171:24
**settlement**
  20:20 21:2
  21:6 26:16
  27:14,16
  36:11 39:6
  39:16,19,22
  44:8 50:11
  50:23 65:5
  66:2,6,12
  66:13
  135:22
  138:3,10
  140:21
  148:17
  162:5
  164:25
  168:4 172:2
**settlements**
  14:11
**settles** 38:6
**settling** 10:22
  148:21
**setup** 86:9
**seven** 8:21,22
  13:24 81:10
  87:23
  100:21
**shack** 73:20
**share** 62:25
  81:14 156:7
  163:22
  164:6

165:21
190:7
**shared** 55:15
  56:8 62:5,6
  76:8 80:7
  164:3
**sharing** 64:23
**sheet** 195:6,7
  195:10,13
**shielded** 77:5
**short** 98:9
  149:11
  185:19
**shorthand**
  193:5,13,16
**shortly** 31:17
  32:16 148:4
  159:21
**shot** 75:8
  140:23
  142:7
**showing**
  187:21
**shown** 192:12
**side** 9:23,23
  10:14 15:10
  15:16 16:15
  45:4 62:8
  63:19
  129:10
  146:19
**Siding** 69:9
  69:18,24
  70:24
**sift** 14:18
**sign** 195:7
**signals** 114:8
**signature**
  193:24
  196:23
**signed** 188:7
**significant**
  71:2 73:9
  113:5
**significantly**
  73:9
**signing** 93:16
  195:9

**similar** 133:7
**similarly**
  35:8
**similarly-si...**
  35:22
**single** 55:21
  87:19 125:3
  128:6
**sit** 53:25
  86:12
**sitting** 111:5
  117:6
**situated** 35:8
**situation**
  81:15
  144:23
**situations**
  26:10
**slaughtered**
  144:21
**slightly** 84:13
**smart** 133:18
**Smith** 147:20
  157:6
**snafu** 59:18
**Soble** 89:8,9
  89:15
  105:23
**socialize** 71:5
**solicited**
  138:25
**somebody**
  14:19 41:15
  48:6 129:19
  145:23
  146:22
**Somerville**
  24:21
**somewhat**
  113:3
**soon** 59:22
**sorry** 46:4
  59:4 63:7
  69:16
  100:14
  141:11
  163:12
  179:5

**sort** 8:8,10
  15:16,19
  29:2 64:18
  81:13 110:3
  128:24
  129:7
  140:24
  141:16
  142:3 169:7
**space** 195:5
**speak** 9:22
  64:22
  156:24
  158:5 172:4
  178:21
**speaking**
  38:24 89:20
  102:14,14
**speaks** 76:4
**specialty** 8:7
**specific** 43:12
  65:12 76:4
  81:19 110:9
  112:3
  131:19
  172:21
  176:21
**specifically**
  53:8 56:18
  113:19
  144:11
**specify** 102:4
**speculate**
  82:5
**speculating**
  178:10,11
**speculation**
  31:5,12,25
  32:22 63:6
  64:12 70:20
  117:14
  127:19
  132:2
  139:14
  148:9
  154:18
  169:17
  178:7,19

180:6
**speeding**
  22:24 23:12
  23:23
**spent** 161:4
**spoke** 163:21
  167:3
**spoliation**
  119:17
**spurred**
  177:23
**squeamish**
  140:22
  142:6
**ss** 192:3
  193:2
**St** 29:23
**staff** 59:21
**stage** 135:2
  141:14
**stages** 16:10
  20:10
**stake** 128:12
  181:12
**stamped** 78:9
**stand** 19:9
  42:4 44:11
**standard**
  141:22
**standards**
  48:23 142:3
**standing**
  119:7
**start** 18:18
  31:15 39:10
  68:23 129:2
**started** 14:9
  15:25 67:25
  71:25 111:9
  130:12
**starting**
  82:14 84:16
  91:2,7
**starts** 36:21
  95:3
**state** 1:16
  6:13 26:4
  56:14

104:21
115:7 150:7
192:2 193:2
193:5 195:4
**stated** 56:17
108:16
**statement**
33:14 47:24
105:23
143:2
**statements**
172:11
**states** 1:1,15
16:7
**status** 164:25
**statute** 47:14
56:21,24
57:6
**stay** 12:8
**stemmed**
10:24
**stemming**
21:12
162:17
**step** 173:23
**steps** 100:8
107:4
118:22
129:22
**sticking**
47:22
**stolen** 114:12
115:19
116:10,13
121:16
**store** 125:10
**stored** 123:10
123:20
**straight** 7:18
**strained**
72:13
**strategy**
135:23
**stream** 180:3
180:11
**Street** 1:17
2:4,10,15
5:13

**strictly**
102:14
**strike** 117:12
**string** 136:25
137:13,22
**structure**
82:8 83:10
84:4 86:3
86:11,13
125:11
182:8
**study** 7:15
**stuff** 47:23
71:19,25
101:9
129:19
130:3
146:15
**subfolder**
124:13
**subject** 70:10
80:5 120:5
178:21
180:13
192:11
195:9
**submitted**
56:2
**subpoena**
139:22
**subpoenaed**
20:7
**subscribed**
192:20
**subsection**
56:19
**Subsequent...**
55:25
**substance**
51:23 57:3
65:12 66:24
**substantially**
101:7
**substantive**
65:9 71:25
**substation**
116:3
**successful**

47:10 49:4
**sudden**
138:21
**sue** 170:9
**sued** 19:25
119:15
**sufficient**
119:11
**suggest**
105:17
**suit** 194:4
**Suite** 2:15
**sum** 40:16
**summary**
48:14,17
70:7 71:21
112:15
141:25
142:9
189:19
**summer**
50:16 52:10
**Sunday** 74:10
74:15 75:11
75:13
**Superior**
30:17 111:7
**supplement...**
76:17 78:20
168:6
**support**
183:17
184:7
**supposed**
60:13
130:21
131:4 134:6
140:7
143:22
154:16
**sure** 18:4,8
21:20 25:25
26:14 32:8
32:14 42:9
57:17 63:23
76:9 79:19
91:5 109:25
123:19

126:2 127:2
128:5 129:6
136:13
143:22
152:24
155:16
156:16
172:13
175:3
183:13
184:12,23
**surmise**
122:6
**surname** 85:2
85:16
**surprise** 90:8
**swear** 6:3
**switch** 15:14
**switched** 50:9
163:20
**sworn** 6:6
192:20
193:8
**system**
156:14

**T**

**T** 4:2 99:2
196:1
**table** 83:22
114:8
164:12
**tag** 113:15
**take** 17:7,20
54:17 98:11
100:8 107:4
107:12
109:8
149:10
165:15
173:18
174:14
184:21
185:19
**taken** 1:15
21:9 43:11
96:7 129:22
193:9,17

**takes** 72:15
**talent** 132:8
132:14
**talk** 10:5 20:8
50:7
**talked** 10:6
68:24 71:8
99:14
156:19
157:5
161:15
166:14
176:7 177:2
189:10
**talking** 9:25
22:6 26:5
48:23 52:2
62:23 72:4
80:7 81:13
111:9
122:14
138:10
139:9,11
152:14
157:15
161:12
164:22
**Tampa** 1:3
5:10 138:21
139:17
161:5
**tax** 113:11
188:14
**taxes** 96:7,14
188:22
**TCPA** 10:24
11:24 19:24
45:14
141:24
162:18
171:22
**team** 132:24
132:25
164:3
**tech** 101:19
**technically**
11:13
**Technology**

155:23,24
156:8 159:6
159:15
160:21
161:3
164:14
166:5,10,16
170:17
182:15
**telepathic**
114:8
**Telephone**
10:20
**tell** 19:6 49:9
54:4 79:20
80:10 97:18
99:22,24
103:18
104:8
106:18
130:9
154:21
**template**
47:25
**tendered**
4:16
**tension** 129:4
**term** 128:13
**terminated**
49:7,10
**terms** 23:23
36:3 38:19
47:18 75:18
80:4 84:16
126:12
133:21
181:11,13
184:11
**test** 95:12
**tested** 42:6
**testified** 6:7
43:15 67:21
130:23
**testify** 38:19
193:8
**testimony**
17:25
107:21

177:18
192:9
193:11
**text** 4:6,8,10
4:13,13
75:9 93:24
94:2,4 95:4
95:10 152:4
152:13,17
152:25
153:12,23
154:7,8
175:18,21
176:4,25
177:3,14,20
179:10
180:3,11,20
**texting** 94:10
**texts** 94:25
179:6
**Thank** 13:10
54:16 67:9
98:13
135:19
161:22
168:25
175:7
183:12
185:25
190:15
**theft** 119:18
**thereabouts**
28:9
**therecord**
150:9
**thereof** 194:6
**thing** 107:12
110:3
**things** 12:12
16:2 42:10
68:22 83:25
100:20
101:10
102:16
126:15
129:17,23
134:5 141:6
142:11

162:4
166:21
170:4 174:9
189:2
**think** 14:5
15:7 16:3
23:12,24
25:13,24
27:18 29:23
31:17,22
32:11 35:16
35:25 40:16
43:7,14
44:17 45:10
45:22 48:19
51:25 52:4
53:16 60:24
63:4,9 65:6
67:21 73:16
74:7 79:2
81:9 83:6
84:9 85:19
87:24 89:20
94:23 97:3
97:13 99:23
101:8
103:23
104:24
106:20
107:2
113:14
120:18
123:25
124:7
126:15
127:22,22
129:3
130:15,23
133:6,11
134:9,14
136:12
141:20
143:8,12,19
146:11
147:7 150:6
151:8,9
152:20
155:9

156:11
159:11,16
160:15,17
160:23
161:4,6
164:7 165:9
166:12
170:6,12
172:8 173:3
173:14
174:9,19
176:20
179:8,12
183:23
186:14
**thinking**
134:7
**ThinkPad**
115:11
**thinks** 113:19
**third** 21:8
62:6,15,18
**thirty** 195:13
**thought**
14:20 113:4
126:11
130:13
165:12
181:2
**three** 14:9
15:8 19:19
24:25 30:22
30:24 152:2
**threshold**
67:5
**throat** 64:21
**throw** 118:24
176:13
**thumb**
118:10,13
119:3
120:13,20
120:21,25
122:2
**Thursday**
159:23
**ticket** 23:24
**tied** 81:18,22

182:14
**Tiles** 162:16
**till** 102:25
**time** 5:15
8:15 9:13
14:4 15:11
17:18 19:18
28:2 33:8
39:12 42:8
44:23 48:7
52:9 54:20
54:25 58:23
67:15 68:14
68:20 73:17
79:21 81:7
83:13,19
87:17 96:14
98:16 99:6
101:25
108:10
109:17
110:17
111:21
112:9
115:18
120:8
122:11,13
122:17
124:18
130:11
131:2
132:23
136:21,23
137:16,20
139:10
149:14,19
149:25
151:5 152:4
154:3 157:7
157:16
158:4 159:4
159:13
160:14
161:5 163:8
165:3 167:2
167:8
169:15,22
176:17

178:4
180:24
183:9
184:25
185:5,11,21
185:24
186:13
188:2
189:24
190:2,19
193:10
**timely** 20:5
**times** 12:7
20:9 26:2
126:23
142:11
166:19
173:4
**timestamps**
148:11,14
**tired** 15:15
**titled** 115:2
**titles** 9:8
**today** 6:24
17:20 40:18
58:10 90:9
164:17
170:15
180:16
**today's** 7:3
**Todd** 147:20
**told** 36:15
49:24 80:24
89:10 97:21
99:20,25
104:5 130:4
131:16
132:5
152:23
170:3,8,14
**tone** 159:22
**top** 34:5,23
52:23 69:8
140:18
141:9,11
145:10
147:18
152:25

154:10
158:17
160:9
186:22
**topic** 121:13
**total** 36:24
40:16 80:22
85:15
113:14
181:19,22
**touch** 17:13
**touched** 12:6
25:24
**town** 99:23
**traffic** 22:6
22:18 23:7
23:10
**train** 134:9
**Training**
155:23,25
159:7,15
160:22
161:3
164:15
166:6,10,16
182:15
**Transaction**
12:6
**transcribed**
193:13
**transcript**
4:16 192:11
193:16,22
195:14,15
**transmissio...**
47:9,10,11
**traveled** 71:9
**Travelers**
138:12
**treat** 188:21
**tried** 26:17
**trip** 44:22
**true** 33:20
192:10
193:15
**truly** 149:10
**trusting**
148:13

**truth** 193:8
**try** 12:9
  18:19 50:22
  138:7
  166:20
**trying** 27:14
  42:21 44:7
  114:3
  138:12
  165:9 167:5
**turn** 23:13
  36:19 76:15
  78:23 96:19
  115:10
  171:4
  172:15
  183:5
**twice** 34:18
**twist** 142:4
**two** 14:8 15:7
  30:19 34:17
  41:9 71:16
  76:13 80:22
  91:15,16
  92:5 94:24
  129:4 132:7
  174:16
  190:8
**type** 10:18
  11:6 83:9
  97:8 119:4
  126:10
  133:7,8
**types** 12:2
  16:2,20
  19:20 23:3
  60:12 119:4
  133:16
**typewritten**
  193:14
**typical** 17:11
**typically**
  11:16 27:17
  71:17
  117:17
  129:18
**T450** 115:11

**U**

**Uber** 95:17
**Uh-huh**
  69:11
  115:24
  147:3
  148:23
  168:9,23
**ultimately**
  23:16 28:19
  74:9 84:10
  96:14
  138:13
  151:25
**uncertified**
  146:24
  148:18
**underappr...**
  173:7
**undergrad...**
  7:12,19
**underlying**
  11:14 20:9
  20:20,25
  30:18
**underpaid**
  173:6
**understand**
  17:15 28:25
  33:18 43:22
  49:13
  100:13
  114:11
  136:3
  139:15
**understand...**
  40:4 41:16
  43:8 57:12
  59:14 61:21
  66:8 93:16
  128:24
  129:8 140:2
  183:19
  187:11,18
**understands**
  35:18
**understood**
  19:11 44:6

106:4
161:11
**unilaterally**
  128:25
**United** 1:1,15
**University**
  7:14 25:6
**unlocked**
  117:2,9,22
**unquote**
  189:4
**unrelated**
  153:11
**unsolicited**
  167:25
**unsuccessf...**
  26:17
**urge** 121:11
**use** 18:15
  96:4 97:5
  98:8 104:25
  105:8
  108:20
  119:21
  129:18
**usually** 11:3
  117:24
**U.S** 5:8

**V**

**v** 69:9
**vague** 22:13
  27:25 29:6
  37:25 39:8
  49:11 61:11
  68:14 72:10
  74:5 79:13
  87:16
  100:11
  106:25
  108:12
  110:16
  111:20
  121:4
  122:12
  124:17
  125:24
  136:20

155:3
181:10
**values** 182:6
**vanity** 85:19
**various** 20:9
  20:10 22:17
  102:20
**vehicle** 117:2
**vein** 84:2
**vented**
  126:22
**venting** 162:3
**verified**
  183:3 187:6
**versus** 5:7
  28:17 67:24
  69:19,25
  70:24 111:7
  162:15
  171:13,16
**vest** 82:4
**VIDEOGR...**
  5:2 6:2
  54:19,23
  98:15 99:4
  149:13,16
  184:24
  185:3,20,23
  190:18
**videotaped**
  1:13
**view** 50:9
**views** 180:20
**vigorously**
  119:23
**vindictive**
  155:7
**violating**
  143:13
**virtue** 188:16
**vs** 1:7

**W**

**W** 177:11
**wait** 99:21
  116:15
**waived**
  193:25

**wall** 155:19
  156:2,5,18
  156:21
  157:2
**walled** 160:6
**Wanca** 9:5,7
  9:17,19
  10:7,14,18
  11:11 12:17
  12:18,22,24
  13:18,21
  14:3,13,24
  15:24 16:11
  16:18 17:8
  20:18 21:11
  21:23 25:23
  27:21 28:5
  28:7,10,15
  28:22 29:3
  29:13,17,24
  30:5,14
  32:4 34:15
  35:5 36:5
  36:15 37:11
  63:20 64:17
  65:21 66:6
  67:16,25
  68:13,21,22
  70:3,12
  71:3,7,15
  71:18 72:4
  72:19 73:2
  73:5,15
  80:9,11,21
  81:18,23
  82:2 84:8
  87:15,19
  97:18,21
  99:19,20,25
  100:5,9,16
  102:13
  103:19
  104:4,18,19
  104:23
  108:11,15
  109:10,14
  110:7

119:15
122:11,18
124:16,25
125:20,22
126:11,22
127:8,13
128:4,22,25
130:8,11
131:11
132:4,17,20
133:8 134:2
134:13,15
135:5
136:18
137:25
142:23
144:24
145:2,20
155:8
158:22
159:13,17
162:20
163:8
164:14
165:15
166:4,11,15
166:23
173:6
181:19
186:9
187:14,14
187:21
188:5,7,10
189:24
190:5
**Wanca's**
  183:22
**want** 15:13
  21:15 30:15
  33:4 51:4
  52:17 58:13
  74:11 78:10
  78:13 85:9
  85:16,23
  101:14,20
  111:14
  134:17
  138:5 161:8

179:8
**wanted** 15:12
17:4 48:13
98:3 101:9
**wants** 140:19
142:14,22
143:6
**warranty**
113:11
**wasn't** 32:16
50:10 54:3
116:22
134:6 156:9
164:11
169:8
**watch** 28:15
175:9
**watched**
67:22
**way** 37:16
39:11 53:22
69:23 104:5
121:23
124:4
125:11
133:21
135:5
136:17
166:13
174:15
189:25
194:3,5
**Wayne** 186:9
186:17
187:2
**week** 28:14
67:24
151:22
**weekend**
176:14
**well-known**
143:9
**went** 8:19 9:4
10:5 16:14
28:14 116:3
116:21
131:2
**weren't** 73:22

124:7
129:21
**we'll** 17:19
52:11 104:6
173:23
175:2,4
**we're** 16:6
51:25 53:24
99:8 174:23
182:25
185:18
**we've** 6:24
34:4 52:20
69:6 93:22
145:18
147:16
164:16
170:24
175:13
183:23
**WHAD** 8:19
**WHEREOF**
194:7
**wide** 180:22
**wife** 93:2
**Wildman** 8:3
8:16,18,20
9:12,18,20
13:15 14:22
**Williams**
2:21 77:14
77:16 99:11
174:4 185:8
**Wisconsin**
2:10 24:2
**wish** 196:5
**withdrawn**
49:20 51:20
**withheld** 56:5
57:10,16
58:23
**withhold**
59:6 60:15
61:2
**witness** 6:4
13:13 21:24
26:14 29:7
31:6,13

32:2,23
38:2 39:10
41:25 42:20
44:6 45:10
45:19 54:2
54:8 58:9
58:25 61:13
79:18
62:2,15
63:7,9
64:13 65:19
68:16 70:22
72:11 74:6
76:20 77:21
78:5 80:18
87:18 107:2
107:22
108:23
110:18
121:11
122:14
123:13,18
124:19
126:2 131:8
132:3
135:20
136:11
139:15
141:10
143:19
144:5
148:10
154:19
155:5
168:16
175:8
177:20
178:9,23
180:9
181:11
185:17
192:8 193:7
193:11,24
194:7 195:1
196:23
**won** 15:23
28:20
**wondered**
165:14

**wondering**
174:21
**wording**
161:10
**words** 107:10
170:11
179:18
**work** 9:4,25
10:15,18
11:11 12:2
13:7 16:15
25:22 27:19
27:23 30:9
30:13 31:3
33:15 44:18
70:11 79:8
79:11 82:20
85:6,10,12
109:18
110:6
112:18
136:7
138:23
166:20
171:6 173:9
190:8
**worked** 8:3,9
13:2 29:13
29:17 37:10
68:7 72:25
102:18
107:10
110:6 170:4
171:9 188:5
**working**
10:22 15:5
19:22 31:16
31:23 68:19
73:17 101:8
104:7 109:5
109:9 124:5
128:14
172:18,20
177:10
182:5
189:24
190:6
**works** 145:21

**world** 124:11
**worried**
163:4
**worry** 104:6
**worth** 13:15
73:19
102:21
103:5,14,16
103:17
117:12
**wouldn't**
78:5 79:25
81:15 173:8
**wow** 81:5
151:19
**writing** 14:6
16:2 29:10
193:12
**written** 48:22
75:25 76:7
83:12 91:14
91:16
**wrote** 56:15
96:15
**W2** 82:13
84:22 86:23
90:13
**W2s** 90:5

**X**
**X** 3:2 4:2

**Y**
**Yale** 7:14
25:5,8
**yeah** 7:2
13:13 40:9
47:14 52:4
68:24 71:17
79:4 90:18
97:3 101:4
101:15
108:23
110:18
112:2 114:3
118:17
123:13,18
128:16

132:3,25
140:19
141:10
143:3,10
146:11
166:24
170:5,11
176:20,21
177:7 178:9
178:10
184:9
185:14
**year** 13:22
14:8 21:15
73:7 87:19
103:16
116:8
181:19,24
**yearly** 88:4
**years** 7:7
8:21,22
13:24 22:18
24:25 33:5
68:8 73:18
79:24 80:22
87:23
100:21
138:4
172:17
188:4
**year's** 102:20
103:5,14,17

**Z**
**Zakrzewski**
2:21 40:14
40:21,25
77:13,15
99:10 174:3
185:8
**zeros** 74:23
**Zurich**
162:14

**$**
**$1,100**
113:12
**$1,200** 97:3

**$100,000**
84:16 91:3
91:8 96:15
**$145,000**
80:19
**$200,000**
82:14
**$300** 113:20
**$300,000**
82:16 86:24
**$390,000**
181:21
**$400,000**
84:17
187:22
188:18
**$50,000**
82:13 92:5
93:5
**$563,170.03**
90:24
**$75** 140:20
**$800,000**
188:19
**$940,093.19**
90:20

**_____**
**0**
**00U** 97:12
**0000091** 75:4
**0000143**
92:18
**0000188** 34:6
**000028**
150:15
**00007** 137:12
**000098** 93:23
**000127**
152:12
**00076** 69:7
**005** 88:14
**005968** 52:21
53:3
**005969** 52:21
**084-004119**
193:6

**_____**
**1**

**1** 4:3 5:4 6:20
6:25 63:17
82:21 162:7
162:10,22
163:22
**1:08** 98:21
99:7
**10** 4:8 30:25
82:16 84:18
87:3 114:18
114:23
**10:3:7** 54:21
**100** 25:25
**100,000** 91:6
91:6
**1000** 2:15
**102** 93:24
**11** 4:9 116:18
137:6,8
172:15
**11th** 141:21
141:21
**11:05** 55:2
**11:55** 98:16
**114** 4:8
**12** 4:9 90:12
147:12,16
158:16
159:23
162:6,8
170:2
**127** 154:11
**13** 4:10
150:11,15
171:4
**13th** 116:11
116:14
**130** 152:13
153:22
**132** 2:15
**137** 4:9
**14** 4:10 98:5
116:8
137:12
152:8,12
158:14
**14-day** 97:23
97:25

**144** 92:19
**147** 4:9
**15** 1:18 4:11
5:14 7:6
82:23
147:17
158:10
167:20
172:16
**15-53** 97:12
**150** 4:10
**152** 4:10
**158** 4:11
**16** 4:11
167:16,21
167:23
**16-cv-1477**
1:7
**162** 180:2
**165** 180:3
**167** 4:11
**17** 4:12
170:21,25
**170** 4:12
**1718** 2:10
**175** 4:13
**179** 4:13
**18** 4:13
167:13
168:3
169:23
175:13,15
**182** 4:14
**186** 3:4
**19** 4:13
179:20,22
180:2
**195** 34:6
**1980** 25:14

**_____**
**2**

**2** 4:4 33:22
33:24 34:4
54:25 56:15
66:14 82:16
82:22
**2,000** 113:15
**2.3** 82:17

**2.5** 84:18
**2:04** 149:14
**2:14** 149:19
**2:56** 184:25
**20** 4:14 84:19
174:17,19
182:22,25
**2002** 7:6
24:18
**2005** 24:8,16
24:18 25:16
25:19
**2009** 8:24 9:2
28:8 67:25
138:5
**2012** 28:8
**2013** 28:8
129:3
130:14
**2014** 111:14
111:15
**2015** 31:18
49:3 50:5
50:16 63:17
125:4
126:16
127:6,7,17
128:20
151:15
**2016** 13:22
50:16 79:17
82:19,25
84:22 87:21
90:13,20
91:10 92:3
92:22
111:24,25
112:11
115:16
125:4
137:17
144:14
147:21
150:18
154:2
158:16
162:22
167:14

168:3
172:22
173:2
**2017** 1:18
5:14 86:17
90:12
192:21
194:9
**21st** 194:8
**25** 82:22
**26** 86:16
147:17
**28th** 1:17 2:5
**29** 136:25
137:17
144:14
147:21
150:16

**_____**
**3**

**3** 4:5,15
25:14 52:14
52:21 55:5
56:18 75:11
75:13 79:17
82:23 83:7
87:2 91:9
92:2 95:11
96:18 99:6
99:16
109:17,23
110:25
171:4
**3rd** 74:11,13
**3:04** 185:6
**3:05** 185:21
**3:12** 185:24
**3:18** 190:19
191:7
**30** 158:14
195:14
**31** 73:7,11,14
74:2 79:19
80:25
175:25
176:5
**32** 158:15
183:5

**321** 1:17 2:4
5:13
**33** 4:4
**376** 91:6
**390,000**
80:22

**_____**
**4**

**4** 4:5 69:3,7
75:12 83:6
94:9 95:11
115:16
149:18
168:7
**4th** 92:11,12
96:23 101:3
**4:40** 150:18
**4:43** 146:14
**40** 174:23
**48** 148:12

**_____**
**5**

**5** 4:6 74:17
74:21 76:15
77:3,21
78:23 86:10
95:6,8
175:2,5
185:5
**5th** 92:11
96:23 101:3
**5:25** 144:15
**5:31** 147:21
**50** 82:15,21
127:3
138:24
139:2
**50,000** 91:18
**51441** 1:22
**52** 4:5
**53711-2142**
2:10
**563** 91:5
**57** 72:23
127:12
128:8
166:25
**5969** 53:3

| 6 | 9:48 154:3 |
|---|---|
| **6** 3:4 4:3,6 | **900,000** |
| 78:16 84:18 | 181:24 |
| 84:20 87:2 | **91** 95:2,3 |
| 87:3 92:21 | **92** 4:7 |
| 150:17 | **93** 4:8 95:14 |
| 151:3 | **94** 75:4 |
| 168:15 | **940** 91:4 |
| **6th** 70:6,9 | **9551** 88:14 |
| 190:12 | **9555** 88:15 |
| **60602** 2:16 | |
| **60654** 2:5 | |
| **69** 4:5 | |

**7**

**7** 4:7 88:6,9
109:18,24
111:23
151:15
152:21
154:2
188:19
**7th** 97:20
99:20,21
**7.5** 86:25
**74** 4:6
**77** 69:8
**78** 4:6
**79** 25:14

**8**

**8** 4:7 92:14
92:18
138:16,18
**8:30** 175:25
**82** 175:19
**83** 176:13
**86** 175:19,24
**88** 4:7

**9**

**9** 4:8 93:19
93:23 96:19
140:18
168:18
**9:40** 151:15
**9:44** 1:18
5:15

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123 1.800.642.1099