UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

| | |
|---|---|
| MEDICAL & CHIROPRACTIC CLINIC, INC., | ) ) ) |
| Plaintiff, | ) ) |
| vs. | ) Case No. ) 8:16-cv-01477- ) CEH-TBM |
| DAVID M. OPPENHEIM, an individual, and BOCK LAW FIRM, LLC d/b/a BOCK, HATCH, LEWIS, & OPPENHEIM, LLC, | ) ) ) ) |
| Defendants. | ) ) |

The videotaped deposition of ROSS M. GOOD, called for examination pursuant to the Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, taken before Layli Phillips, Certified Shorthand Reporter of the State of Illinois, at 321 North Clark Street, Suite 2800, Chicago, Illinois, on November 13, 2017, at 9:17 a.m.

Reported by: Layli Phillips, CSR, RPR, CRR
License No.: 084.003900

```
 1   APPEARANCES:
 2   For the Plaintiff:
          FOLEY & LARDNER LLP
 3        MS. LAUREN M. LOEW
          321 North Clark Street, Suite 2800
 4        Chicago, Illinois  60654
          (312) 832-5393
 5        lloew@foley.com
 6   For the Defendant David M. Oppenheim:
          BLONIEN LEGAL COUNSEL
 7        MR. BARRY J. BLONIEN
          1718 Adams Street
 8        Madison, Wisconsin  53711
          (608) 620-5357
 9        barry@blonienlegal.com
10
     For the Defendant Bock Law Firm, LLC:
11        BOCK & HATCH, LLC
          MR. DANIEL COHEN
12        134 North LaSalle Street, Suite 1000
          10th Floor
13        Chicago, Illinois  60602
          (312) 658 5500
14        danieljaycohen209@gmail.com
15
     ALSO PRESENT:  MR. STEPHEN GOETHALS, VIDEOGRAPHER
16                  MR. DAVID M. OPPENHEIM
17
18
19
20
21
22
23
24
```

```
 1              I N D E X
 2
 3   Examinations                 Page
 4
 5   By Mr. Blonien                  5
 6   By Mr. Cohen                  204
 7
 8            E X H I B I T S
 9
10   Number      Description        Page
11
12   Exhibit 1   Retention Agreement       112
13   Exhibit 2   Term Sheet                163
14   Exhibit 3   Email Chain               169
15   Exhibit 4   MC 4784 to MC 4797        175
16   Exhibit 5   MC 3574 to MC 3579        179
17   Exhibit 6   Bates Number MC 4416 to 17  193
18   Exhibit 7   Proposed Claim Form For the  259
19               Technology Training Settlement
20
21
22
23
24
```

```
 1          THE VIDEOGRAPHER:  Here begins the
 2   videotaped deposition of Ross Good, Tape 1, Volume
 3   1, in the matter of Medical & Chiropractic Clinic
 4   versus Oppenheim, Case Number
 5   8:16-cv-01477-CEH-TBM.
 6          Today's date is November 13th, 2017, and
 7   the time on the video monitor is 9:18.
 8          My name is Stephen Goethals, and the
 9   court reporter is Layli Phillips of Thompson Court
10   Reporters.
11          Today's deposition is taking place at
12   Foley & Lardner LLP, Chicago, Illinois.
13          Would counsel please introduce
14   themselves and state whom they represent.
15          MR. BLONIEN:  This is Barry Blonien with
16   Blonien Legal Counsel on behalf of David M.
17   Oppenheim.
18          MR. COHEN:  Dan Cohen with Bock Law
19   Firm, LLC, on behalf of Bock Law Firm, LLC.
20          MS. LOEW:  Lauren Loew on behalf of
21   Medical & Chiropractic Clinic, Inc., and Ross
22   Good.
23          THE VIDEOGRAPHER:  Will the court
24   reporter please swear in the witness.
```

```
 1          ROSS M. GOOD
 2          the deponent herein, called as a
 3   witness, after having been first duly sworn, was
 4   examined and testified as follows:
 5          EXAMINATION
 6   BY MR. BLONIEN:
 7      Q.  Good morning, sir.  Could you state your
 8   name for the record, please?
 9      A.  Ross Good.
10      Q.  And is there a middle initial, Ross?
11      A.  M.
12      Q.  Have you been deposed before?
13      A.  Yes.
14      Q.  How many times?
15      A.  Approximately four.
16      Q.  Let's just go over some of the basic
17   ground rules if we can.  First, if we can avoid
18   interrupting each other and talking over each
19   other, it would help the court reporter to make
20   sure that she can get everything down that we say.
21          If you don't understand my question,
22   please ask.  Otherwise I will assume you
23   understood my question and answered it truthfully
24   and fully; is that fair?
```

1    A.   Yes.
2    Q.   And if you need a break, please ask.
3  Okay?
4    A.   Yes.
5    Q.   Mr. Good, what is your email address?
6    A.   Rgood@andersonwanca.com.
7    Q.   Mr. Good, did you receive a subpoena for
8  today's deposition?
9    A.   Yes.
10   Q.   And did that subpoena also request
11 documents?
12   A.   Yes.
13   Q.   Have you produced any documents in
14 response to that subpoena?
15   A.   I compiled documents and provided it to
16 my counsel, and I believe my counsel did produce
17 documents responsive to that subpoena.
18   Q.   Okay.  How many documents approximately
19 did you produce?
20   A.   Are you asking how many I provided to my
21 counsel or how many my counsel produced to you?
22   Q.   Whatever is in your knowledge.  I'm
23 ultimately interested in the latter, but if you
24 don't know that, then the former.

1    A.   I know how many documents I provided, or
2  I know approximately how many documents I provided
3  to my counsel.  I do not recall how many documents
4  my counsel provided to you.
5    Q.   Okay.  And how many did you provide to
6  counsel?
7    A.   Approximately 9,000 emails.
8    Q.   And when did you provide those?
9    A.   Approximately two to two and a half
10 weeks ago.
11   Q.   And do you know how the materials that
12 were produced to us were organized, that is, which
13 of those documents belonged to you?
14   A.   I know how I compiled the emails and
15 provided them to my counsel.
16   Q.   Okay.  How did you provide those emails?
17   A.   I started by looking at my own calendar
18 for the -- the time line of this matter.  And then
19 I am an administrator at -- on Anderson Wanca's
20 email server, and specifically the back end
21 support system for that server that downloads and
22 retains a backup copy of all inbound and outbound
23 email traffic for all @andersonwanca.com emails.
24      And I performed searches on those

1  emails, downloaded all of the emails that came up
2  as matches to those searches, and provided those
3  thousands and thousands of emails to my counsel.
4    Q.   Did you do any searches of those emails
5  or any other documents that you had before two and
6  a half weeks ago?
7    A.   Yes.
8    Q.   Okay.  Describe that process to me,
9  please.
10   A.   After David Oppenheim's resignation and
11 the Bock Hatch Firm filed their copycat competing
12 case, I was asked to perform email searches
13 specific to emails Oppenheim sent and received
14 related to the Buccaneers case.
15   Q.   And how many emails did you turn up in
16 that search?
17   A.   I don't remember.
18   Q.   How many emails did you produce to your
19 counsel as a result of that search?
20   A.   I know I produced all of them, but I
21 don't remember how many.
22   Q.   Do you have an approximation?
23   A.   I know I used a download link, so it was
24 more than 25 megabytes worth; but I don't know

1  beyond that.
2    Q.   Are you represented for today's
3  deposition?
4    A.   Yes.
5    Q.   By whom?
6    A.   Lauren Loew.
7    Q.   Did you meet with Ms. Loew before
8  today's deposition?
9    A.   No.
10   Q.   Did you prepare for today's deposition?
11   A.   Yes.
12   Q.   How did you prepare?
13   A.   I met with another attorney, Jeffrey
14 Soble.
15   Q.   When did you meet with Mr. Soble?
16   A.   On Friday.
17   Q.   For how long?
18   A.   Approximately 90 minutes.
19   Q.   Was anyone else in attendance?
20   A.   For part of it, another attorney named
21 Pat McMahon was for -- there.
22   Q.   Anyone else?
23   A.   No.
24   Q.   Did you do anything else to prepare for

1 this deposition, apart from the 90-minute
2 preparation session you just described?
3     **A.  Yes.**
4     Q.  What's that?
5     **A.  I reviewed the 11th Circuit Court of**
6 **Appeals decision, the false police report filed by**
7 **David Oppenheim, and written discovery responses**
8 **of Medical & Chiro, written discovery response**
9 **supplements of Medical & Chiro, and some emails**
10 **that were produced by Oppenheim; and then those**
11 **emails were produced and marked, Bates labeled by**
12 **Oppenheim and then reproduced by the Foley**
13 **attorneys and also Bates labeled, so they had two**
14 **Bates labels on them.**
15     Q.  Anything else?
16     **A.  Not that I recall.**
17     Q.  Okay.  I think I heard you say that you
18 reviewed the false police report; did I understand
19 that correctly?
20     **A.  Yes.**
21     Q.  Okay.  What gives you the indication
22 that that police report is false?
23     **A.  I do not believe that the laptop was**
24 **stolen.**

1     Q.  All right.  What do you believe,
2 Mr. Ross?
3     **A.  I believe that it was not stolen.**
4     Q.  Okay.  And what gives you that
5 impression?  What gives you that belief?
6     **A.  I was aware of the letter sent to, I**
7 **believe, you from Anderson Wanca stating that if**
8 **the laptop -- the contents, rather, were not**
9 **returned within 21 days, a lawsuit would be filed.**
10 **And I believe this happened on day 19 of 21.**
11     Q.  Okay.  And what facts do you have that
12 support your belief, Mr. Ross?
13     **A.  I just answered that.**
14     MR. COHEN:  Mr. Good.
15 BY MR. BLONIEN:
16     Q.  Or Mr. Good.  I apologize.
17     **A.  I just answered that.  It was 19 days in**
18 **the 21 days, and I don't think anybody -- well,**
19 **strike -- nobody asked me.**
20     Q.  Nobody asked you what?
21     **A.  Nobody accused me of stealing it.**
22     Q.  All right.  I'm not accusing you of
23 stealing it.  What I'm trying to understand is
24 that you stated that you reviewed a false police

1 report.  You understand that's a pretty serious
2 accusation to lie to the police, correct?
3     **A.  Yes.**
4     Q.  Okay.  Did you report to the police that
5 you believed that Mr. Oppenheim made a false
6 representation to the police?
7     **A.  I did not.**
8     Q.  Who have you informed that you believe
9 Mr. Oppenheim made a false police report?
10     **A.  My counsel.**
11     Q.  Anyone else?
12     **A.  I believe I said it to Mr. Wanca.  Just**
13 **give me a second.**
14     **I can't think of anybody else.**
15     Q.  Okay.  So that I understand you
16 correctly, the basis for you stating that
17 Mr. Oppenheim lied to the police was that he
18 reported his laptop stolen 19 days out of 21 days
19 in connection with some correspondence that you
20 referred to by Mr. Wanca; is that correct?
21     **A.  Yes.**
22     Q.  Okay.  Is there any other fact that you
23 possess that would support such a bold and
24 aggressive allegation, Mr. Good?

1     MS. LOEW:  Objection to form.
2     **A.  I believe I answered that already, but I**
3 **wasn't accused of stealing it.**
4     MR. BLONIEN:  Okay.  What's the basis
5 for the objection to form, Ms. Loew?
6     MS. LOEW:  Your characterization of bold
7 and aggressive.
8 BY MR. BLONIEN:
9     Q.  Okay.  Do you think that accusing
10 someone of lying to the police is bold, Mr. Good?
11     **A.  No.**
12     Q.  Do you think that accusing someone of
13 lying to the police is aggressive, Mr. Good?
14     **A.  No.**
15     Q.  Okay.  Do you have any other facts that
16 support Mr. Oppenheim lied to the police, apart
17 from this timing issue that you identified?
18     **A.  The fact that I wasn't accused.**
19     Q.  That you weren't accused?
20     **A.  Correct.**
21     Q.  That you weren't accused supports your
22 accusation of Mr. Oppenheim that he lied to the
23 police?
24     **A.  Correct.**

4 (Pages 10 to 13)

1      Q.   Can you explain what you mean by that?
2      **A.   I don't know anybody who would have**
3   **wanted those documents back more than me.**
4      Q.   Why would you want those documents back
5   more than anyone else?
6      **A.   Because he stole them from a system that**
7   **I set up.**
8      Q.   And how did he steal them, Mr. Good?
9      **A.   He -- he went to Abt Electronics and**
10  **instructed them to copy them off a laptop I set up**
11  **for him and is still holding them, actually still**
12  **holding a copy of them.**
13     Q.   Okay.  And were those documents, did
14  they belong to you?
15     **A.   No.**
16     Q.   Who did they belong to?
17     **A.   Anderson Wanca and clients.**
18     Q.   Okay.  In reviewing the documents that
19  you possess, did you provide any contracts that
20  Mr. Oppenheim had with Anderson & Wanca regarding
21  these documents?
22     **A.   I don't have access to any such**
23  **contracts.**
24     Q.   Okay.  So what gives you the knowledge

1   or belief that these documents belonged to
2   Anderson & Wanca and not to Mr. Oppenheim?
3      **A.   The fact that I set up his computer.**
4      Q.   The fact that you set up his computer.
5   When did you set up his computer, Mr. Good?
6      **A.   Approximately two years before he left,**
7   **so that would be the middle of 2014 approximately.**
8      Q.   All right.  So you set up his computer
9   in 2014, and that gives you reason to believe that
10  everything on his computer belonged to Anderson &
11  Wanca?
12     **A.   Correct.**
13     Q.   Okay.  Is there anything else that gives
14  you that belief, Mr. Good?
15     **A.   I also set up his email account.**
16     Q.   Okay.  Anything else?
17     **A.   Nothing that I can think of.**
18     Q.   Did you review Mr. Oppenheim's contract
19  of employment with Anderson & Wanca?
20     **A.   No.**
21     Q.   Did you review any other agreements that
22  would give you a basis to believe that these
23  documents belonged to Anderson & Wanca and not to
24  Mr. Oppenheim?

1      **A.   I did not review any agreements related**
2   **to Mr. Oppenheim.**
3      Q.   Did you review the law?
4      **A.   What law?**
5      Q.   The law that exists in books and cases.
6      **A.   I attended law school, yes.**
7      Q.   Okay.  Did you review the law with
8   respect to the possession of client materials?
9      **A.   I don't know what law you're referring**
10  **to.**
11     Q.   The law in Illinois, let's start there.
12     **A.   I have reviewed laws of the State of**
13  **Illinois, yes.**
14     Q.   Okay.  Have you reviewed the laws of the
15  State of Illinois with respect to the possession
16  of documents that belong to clients?
17     **A.   I have reviewed Illinois Rules of**
18  **Professional Conduct.  I don't believe I've**
19  **reviewed any -- I don't believe -- I'm not aware**
20  **of any Illinois laws on that subject.**
21     Q.   Okay.  Did you look for any?
22     **A.   I looked at the Illinois Rules of**
23  **Professional Conduct.**
24     Q.   Okay.  And in your view, what do those

1   rules say with respect to the possession of client
2   materials?
3      **A.   That the client has an interest in them,**
4   **and the law firm has a duty to protect those**
5   **materials.**
6      Q.   Okay.  And do you have any understanding
7   as to whether those rules also pertain to an
8   attorney, not simply the law firm?
9      **A.   Can you repeat the question?**
10     Q.   Do you have an understanding of the law
11  as to whether or not those same rules apply to an
12  attorney as compared to a law firm?
13     **A.   I do not have an understanding on that.**
14     Q.   Okay.  But you're willing to say that
15  Mr. Oppenheim stole documents from a law firm
16  without having an understanding of the law?
17        MS. LOEW:  Objection to --
18     **A.   Yes.**
19        MS. LOEW:  -- form.
20  BY MR. BLONIEN:
21     Q.   Okay.
22        THE REPORTER:  Let her finish before
23  you -- thanks.
24        THE WITNESS:  I apologize.

Thompson Court Reporters, Inc
thompsonreporters.com

1    THE REPORTER: No problem.
2  BY MR. BLONIEN:
3    Q.   And your answer was yes, correct?
4    **A.   Correct.**
5    Q.   Do you personally have a contract with
6  Ms. Loew and Foley & Lardner?
7    **A.   I do not recall ever signing a contract**
8  **with Ms. Loew or Foley & Lardner.**
9    Q.   Do you know who's paying your attorneys'
10  fees for today?
11    **A.   I believe that will be up to the court**
12  **at the end of this litigation.**
13    Q.   And why do you say that?
14    **A.   Because I think Medical & Chiro is going**
15  **to win this litigation, and I think the defendants**
16  **are going to be ordered to pay.**
17    Q.   Ordered to pay what?
18    **A.   All of the attorneys' fees.**
19    Q.   All of your attorneys' fees?
20    **A.   All of Medical & Chiro's attorneys'**
21  **fees.**
22    Q.   Okay.  And do you consider your time in
23  attendance for today's deposition a part of the
24  attorneys' fees that Medical & Chiropractic would

1  be entitled to seek in this litigation?
2    **A.   Can you repeat the question?**
3    Q.   Are you seeking your fees in connection
4  with this case?
5    **A.   I'm not seeking anything in this case.**
6    Q.   Are you seeking your time for attending
7  today's deposition in this case?
8    **A.   I'm not seeking anything in this case.**
9    Q.   Okay.  Who is paying your attorneys'
10  fees for today?
11    **A.   As I said before, I think the court will**
12  **determine that at the end of the litigation.**
13    Q.   All right.  You said that before; and I
14  don't understand what you mean by that, Mr. Good.
15  So I'm trying to understand through questions and
16  your responses what you mean by that.
17    **A.   Okay.**
18    Q.   Do you think that the court is going to
19  order Mr. Oppenheim to pay for your attorney for
20  today's deposition; is that what you're
21  contending?
22    **A.   Defendants, plural --**
23    Q.   Okay.
24    **A.   -- I believe will be ordered by the**

1  court to pay for attorneys' fees.
2    Q.   And do you think that your attorneys'
3  fees would also be part of that?
4    **A.   Yes.**
5    Q.   All right.  How much are you paying your
6  attorney for today?
7    **A.   I'm not paying anything.**
8    Q.   How much is your attorney being paid for
9  today?
10    **A.   I do not know.**
11    Q.   Who would know?
12    **A.   My attorney.**
13    Q.   Anyone else?
14    **A.   I can't speculate.  I don't know.**
15    Q.   You don't know how much your attorney is
16  being paid?
17    **A.   Correct.**
18    Q.   Do you know what the scope of your
19  representation with your attorney is?
20    **A.   I know it's in relation to today's**
21  **deposition.**
22    Q.   Is there anything else that you know?
23    **A.   I know they also represent Medical &**
24  **Chiro in this litigation, and they represent**

1  **Anderson Wanca in separate litigation pending in**
2  **Cook County.**
3    Q.   And they also represent Anderson & Wanca
4  for purposes of the depositions, like today?
5    **A.   I don't know.**
6    Q.   Is Foley & Lardner acting as your
7  attorney today?
8    **A.   Mine, yes, today.**
9    Q.   Okay.  And is Foley & Lardner acting as
10  the attorney for you law firm today?
11    **A.   In what matter?**
12    Q.   Your deposition today that your
13  appearance and the depositions that are occurring
14  in connection with this case.  And when I say this
15  case, I mean the accusations that Medical &
16  Chiropractic has made against Mr. Oppenheim and
17  Bock Law Firm; do you understand that?
18    **A.   Yes, and I understand -- yes, I do.**
19    Q.   Okay.  So in connection with this case,
20  is it your understanding that Foley & Lardner
21  represents your law firm as well?
22    **A.   I think so, but I don't know for**
23  **certain.**
24    Q.   Okay.  And what gives you the basis to

1  think so?
2  **A.  I believe that a retainer agreement**
3  **exists that is signed by Foley & Lardner, Medical**
4  **& Chiro, and Anderson Wanca.**
5  Q.   And is your representation falling under
6  that -- that retainer agreement based on your
7  understanding?
8  **A.  I have no understanding as to that.**
9  Q.   Did you speak with your attorneys about
10  any potential conflicts of interest in connection
11  with representing you and Medical & Chiropractic
12  and Mr. Addison and your law firm in connection
13  with this case?
14  **A.   I --**
15  MS. LOEW:  Objection to the extent this
16  is calling for attorney-client communications.  I
17  advise you not to answer.
18  BY MR. BLONIEN:
19  Q.   Are you going to follow that advice?
20  **A.   Yes.**
21  Q.   Do you know who is paying Foley &
22  Lardner's fees generally?
23  **A.  I believe that the court will be able to**
24  **rule on who will pay the attorneys' fees at the**

1  **end of the litigation.**
2  Q.   Have you seen the retainer agreement
3  with Foley & Lardner?
4  **A.  I think -- I think I did.**
5  Q.   Okay.  And what do you recall that
6  document saying?
7  **A.  I recall it having large redactions on**
8  **it.  I don't recall any of the language at all.**
9  Q.   Do you recall the small portion among
10  redacted text saying that Anderson & Wanca agrees
11  to pay all of the costs and expenses associated
12  with this representation?
13  **A.  I do not recall that.**
14  Q.   And do you agree the portion where -- or
15  that there is a portion that says that in no
16  circumstance will Medical & Chiropractic be
17  responsible for any fees and costs associated with
18  this litigation?
19  **A.  I don't recall the language of such an**
20  **agreement.**
21  Q.   But you didn't sign any agreement,
22  correct?
23  **A.   Correct.**
24  Q.   And that includes any representation for

1  today's deposition?
2  **A.   Correct.**
3  Q.   Did you talk with anyone else, apart
4  from your attorneys, in preparation for today's
5  deposition, Mr. Good?
6  **A.   Not to prepare for today's deposition.**
7  Q.   Did you talk with anyone about the fact
8  that you were being deposed today, apart from your
9  counsel?
10  **A.   There are other people that I told I was**
11  **being deposed today.**
12  Q.   Okay.  And who did you tell that you
13  were being deposed today?
14  **A.   Ryan Kelly; Michael Addison; Michelle**
15  **Zakzrewski; Greg Williams; I believe the**
16  **paralegal, Sue Fitzgerald, at my office; Rita**
17  **Hernandez, an assistant at my office; my wife.**
18  **I cannot think of anybody else.**
19  Q.   Okay.  When did you have a conversation
20  with Mr. Addison about today's deposition?
21  **A.   Approx -- strike that.**
22  **After I received the subpoena -- no.**
23  **Strike that.  It was before that.**
24  **When we were scheduling -- when the**

1  **Foley counsel was scheduling depositions with**
2  **yourself and Mr. Cohen, there was a discussion**
3  **about all of our availabilities for depositions.**
4  **I was sort of the point person on that, and I got**
5  **everybody's dates that they were available; and I**
6  **confirmed them with everybody and provided them to**
7  **the Foley & Lardner attorneys.**
8  Q.   Okay.  And how does the conversation
9  with Mr. Addison fit into that?
10  **A.   He was one of the people that you sought**
11  **to depose, and I was the one that contacted him to**
12  **ask him about his availability for deposition.**
13  Q.   Okay.  And did you discuss the substance
14  of any questions and answers in that conversation
15  with Mr. Addison?
16  **A.   No.**
17  Q.   And did you have any other conversations
18  with Mr. Addison about the deposition?
19  **A.  I believe I sent him the subpoena that**
20  **was signed by one of defense counsel.**
21  Q.   Okay.  Did you discuss the substance of
22  the depositions, either his deposition or yours?
23  **A.   No.**
24  Q.   At any point in time?

7 (Pages 22 to 25)

1    A.   I'm sorry for not letting you finish.
2    No.
3    Q.   And what about Ms. Zakzrewski, did you
4    talk with her about the substance of the
5    depositions?
6    A.   No.
7    Q.   Did you talk with Mr. Williams about the
8    substance of the depositions?
9    A.   No.
10   Q.   What about Mr. Kelly?
11   A.   No.
12   Q.   What about Mr. Wanca?
13   A.   No.
14   Q.   In preparing for today's deposition, you
15   did not speak with Mr. Wanca about what questions
16   or answers you were likely to be asked or the
17   answers you were likely to provide?
18   A.   That is correct.
19   Q.   And that's the same as for everyone that
20   I listed in the -- in that list?
21   A.   Correct.
22   Q.   How would you describe M & C's claims
23   against Mr. Oppenheim and Bock Law Firm --
24   A.   I'm sorry for interrupting you.

1    Incredibly strong.
2    Q.   Okay.  Apart from your characterization
3    about the likelihood of success, Mr. Good, can you
4    describe in basic terms what you believe the
5    allegations to be?
6    A.   That Mr. Oppenheim breached his
7    fiduciary duty owed to M & C and that Bock, Hatch,
8    Lewis & Oppenheim aided and abetted that breach.
9    Q.   And what specifically, what conduct do
10   you allege Mr. Oppenheim did that breached his
11   fiduciary duty?
12   A.   He stole emails related to the
13   representation of M & C, the mediation,
14   mediations, plural, and he breached the mediation
15   privilege to help Bock, Hatch, Lewis & Oppenheim
16   file and pursue a settlement with the defendant in
17   the underlying action, the Cin-Q and Medical &
18   Chiro v. Buccaneers.
19   Q.   Anything else?
20   A.   Off the top of my head, I can't think of
21   anything else.
22   Q.   Okay.  So largely as you understand it,
23   this case involves that -- the allegation that
24   Mr. Oppenheim stole emails and that he breached a

1    mediation privilege?
2    A.   I believe he admitted to all of those.
3    Q.   Okay.  Where did he admit to all of
4    those?
5    A.   Correspondence from yourself as to him
6    retaining copies of the emails he stole.  And I
7    believe somewhere in his testimony, he admitted
8    that an email to Mr. Bock was, in fact, a breach
9    of the mediation privilege.
10   Q.   Okay.  And can you be more specific
11   about what you're referring to when you say
12   somewhere in his testimony, he admitted that an
13   email to Mr. Bock, in fact, was a breach of the
14   mediation privilege?
15   A.   I don't remember which testimony it was;
16   but I recall reading in a transcript that
17   Mr. Oppenheim did, in fact, admit that he breached
18   the mediation privilege by disclosing something to
19   Mr. Bock.
20   Q.   And what was the something that he
21   disclosed?
22   A.   The impression of the mediator from the
23   mediation, and I'm specifically referring to the
24   second mediation.

1    Q.   The impression of the mediator from the
2    mediation, can you be any more specific than that?
3    A.   I know it was in an email.
4    Q.   And the mediator was Mr. Anderson,
5    correct?
6    A.   Yes, retired judge Wayne Anderson.
7    Q.   And what impression of Mr. Anderson did
8    Mr. Oppenheim share in your view?
9    A.   It's not my view.  It's -- you can read
10   the document.  And it was something about the
11   settlement position of the parties.
12   Q.   And what was the settlement position of
13   the parties that Mr. Oppenheim disclosed?
14   A.   That this case was going to have to
15   settle.
16   Q.   That this case was going to have to
17   settle?
18   A.   It was something along those lines.  I'm
19   paraphrasing.
20   Q.   Okay.  Can you be any more specific?
21   A.   Not without the document in front of me.
22   Q.   Do you remember when the document was
23   approximately?
24   A.   Approximately the end of April 2016.

1    Q.  Anything else that you recall?

2    **A.  It was approximately three weeks after**

3  **David Oppenheim resigned from Anderson Wanca and**

4  **approximately one week before Bock, Hatch, Lewis &**

5  **Oppenheim filed their first copycat class action**

6  **case against the Buccaneers in state court.**

7    Q.  Okay.  And it's your testimony that

8  Mr. Oppenheim admitted that he breached the

9  mediation agreement by this April 2016 email?

10    **A.  That's my best recollection, yes.**

11    Q.  Anything else that constitutes a breach

12  of the privilege in your view, Mr. Good, apart

13  from that email?

14    **A.  I believe his new firm's representation**

15  **of a client with an adverse interest to Medical &**

16  **Chiro also constitutes breach.**

17    Q.  All right.  Who has an adverse interest,

18  Mr. Good?

19    **A.  Technology Training.**

20    Q.  With whom?

21    **A.  Medical & Chiro.**

22    Q.  How is their interest adverse?

23    **A.  The 11th Circuit Court of Appeals**

24  **decision, I believe, answers that in some detail.**

1    Q.  Okay.  Can you be more specific?

2    **A.  It was a reverse auction, and reverse**

3  **auctions are bad.**

4    Q.  Okay.  What's your understanding of the

5  term reverse auction, Mr. Good?

6    **A.  When a party with no leverage whatsoever**

7  **is used as a stooge to pay less money than a party**

8  **that had been working on litigation for years and**

9  **has standing, you have a reverse auction.**

10    Q.  You used the word stooge.  What does

11  that word mean in your mind, Mr. Good?

12    **A.  Somebody without standing who has no**

13  **control of anything.**

14    Q.  And when you use the term standing, what

15  does that term mean to you, Mr. Good?

16    **A.  That means they have the ability to**

17  **pursue a case.**

18    Q.  Okay.  Is it your contention that

19  Technology Training has no interest in the class

20  action?

21    **A.  It is my position that Technology**

22  **Training missed the statute of limitations and,**

23  **therefore, has no standing.**

24    Q.  That's not my question.  My question was

1  whether they have any interest in the litigation.

2    **A.  I don't know.**

3    Q.  You don't know whether they have any

4  interest in the litigation?

5    **A.  Correct.**

6    Q.  Okay.  What about others who are in the

7  same position as Technology Training Associates

8  with respect to timing of their claims?

9    **A.  They can file claims -- or strike that.**

10  **I apologize.**

11    **I would like to correct my answer.  They**

12  **can file individual cases against the Buccaneers.**

13    **(Enter Mr. Oppenheim.)**

14  BY MR. BLONIEN:

15    Q.  But not a class action in your position?

16    **A.  Correct.  Ewing Industries v. Bob Wines.**

17    Q.  When did Medical & Chiropractic receive

18  its faxes?

19    **A.  In 2009 or 2010.**

20    Q.  Is there any difference in legal

21  significance between 2009 and 2010 in your view?

22    **A.  Yes.**

23    Q.  And what's that?

24    **A.  The Cin-Q action was filed in 2009; and**

1  **subsequent to the Cin-Q action being filed, the**

2  **defendants in the underlying action, that is, the**

3  **Buccaneers, sent more faxes.  And the fact that**

4  **they were in litigation at the time they continued**

5  **sending faxes is legally significant to me.**

6    Q.  Okay.  Do you know whether Medical &

7  Chiropractic received any faxes in 2009?

8    **A.  I don't remember whether it was 2009 or**

9  **2010.  You would have to see the complaint.**

10    Q.  Okay.  And is it your contention that

11  whether it was 2009 or 2010, anyone who received

12  faxes in that time frame that their claims were

13  valid from a statute of limitations perspective?

14    THE WITNESS:  I'm sorry.

15    MS. LOEW:  Objection to form.

16    THE WITNESS:  Can you repeat the

17  question back?

18    (Whereupon, record was read as

19  requested.)

20    **A.  It's my understanding that their --**

21  **they -- the statute of limitations that was**

22  **applicable was four years from the date of which**

23  **they received a fax.**

24    Q.  Okay.  So if Medical & Chiropractic

1 received its faxes in 2009, when would the statute
2 of limitations have run?
3     A.   In 2013.
4     Q.   Okay.  And when in 2009 is it alleged in
5 the Buccaneers class action litigation that faxes
6 were sent?
7     A.   To the best of my recollection, sometime
8 in the late summer of 2009 and then the early
9 summer of 2010.
10    Q.   Okay.  Late summer being July or August?
11    A.   Correct.
12    Q.   And when was it, Mr. Good, that M & C
13 sought to participate in the Buccaneers class
14 action litigation as a named class representative?
15    A.   I believe it was 2013.
16    Q.   Okay.  Would it have been October 11th,
17 2013?  Does that refresh your recollection?
18    A.   It does not.
19    Q.   Okay.  If it were October 11th, 2013,
20 you would agree with me that that is more than
21 four years after late summer 2009, right?
22    A.   Yes.
23    Q.   All right.  So that would be outside the
24 statute of limitation?

1     A.   If the only fax they received was in --
2 yes.
3     Q.   Okay.  And the class that -- the class
4 action against the Tampa Bay Buccaneers, the Cin-Q
5 litigation, does involve class members who only
6 received faxes in 2009, right?  There are members
7 of the class who only received faxes then?
8     A.   I believe that is correct.  But without
9 reviewing the records, I couldn't be sure.
10    Q.   Okay.  So is it your position that
11 anyone who received faxes in 2009 should be barred
12 from pursuing their claims against the Tampa Bay
13 Buccaneers?
14    A.   No.  I believe they should be able to
15 pursue their claims if they want to individually
16 as individual cases against the Buccaneers.
17    Q.   Okay.  But it's your contention that
18 anyone who received faxes in 2009 and only 2009
19 would not be appropriate class members?
20    A.   No, that is not correct.  They would be
21 appropriate class members.  They could not file
22 in -- they could not file separate class actions.
23    Q.   Okay.  But they could intervene to join
24 in an existing class action in your view, right?

1     A.   I'm not familiar with the law on that
2 specific subject.
3     Q.   You don't know whether or not an
4 intervention of someone -- a class member who
5 received faxes in 2009 would be appropriate?
6     A.   I don't know how the statute of
7 limitations applies to interveners.
8     Q.   Is it your position that M & C has a
9 valid non-time barred claim?
10    A.   Yes.
11    Q.   Is it your position that TTA has a
12 barred claim?
13    A.   I don't think that's precisely correct.
14 Can I explain?
15    Q.   Please do.
16    A.   I believe TTA has a valid individual
17 claim.
18    Q.   Okay.  And when you say valid individual
19 claim, what I'm trying to understand is whether
20 you believe that they have a valid class claim.
21    A.   No.
22    Q.   Do they serve as an appropriate class
23 representative?
24    A.   No.

1     Q.   Do you have any understanding as to
2 whether or not your law firm sought to represent
3 Technology Training as an absent class member?
4        THE WITNESS:  Can you repeat the
5 question?
6            (Whereupon, record was read as
7            requested.)
8     A.   My law firm sought to represent all
9 recipients of the faxes allegedly sent by the
10 Buccaneers in one class action that was Cin-Q and
11 Medical & Chiro v. Buccaneers.
12    Q.   Do you have an understanding as to
13 whether or not Technology Training was an absent
14 class member?
15    A.   I'm aware that they allege in their
16 complaint that they would be; but I have no
17 independent knowledge, nor do I recall looking
18 that up.
19    Q.   Do you have any reason to dispute that
20 to be the case?
21    A.   As I sit here today, I have no reason to
22 dispute that.
23    Q.   Okay.  Can you assume for my next
24 question that they are, in fact, an absent class

1 member?
2     **A.  I will take your hypothetical for the**
3 **next question.**
4     Q.  Okay.  Assuming that they are an absent
5 class member, would your law firm be representing
6 them in connection with the Tampa Bay Buccaneers
7 class action litigation?
8     **A.  We would seek to be certified as class**
9 **counsel, and yes.**
10     Q.  Okay.  So explain to me all of the ways
11 that you believe Technology Training is adverse to
12 M & C.
13     **A.  I believe they had no leverage in**
14 **regards to settlement with the Buccaneers and took**
15 **an offer that was forced upon them because they**
16 **had no leverage, and that was adverse to the**
17 **interests of M & C and the rest of the class.**
18     Q.  Anything else?
19     **A.  I believe that due to Mr. Oppenheim's**
20 **role as former counsel for M & C and his new role**
21 **as part of Bock Hatch, there was a conflict of**
22 **interest.**
23     Q.  Anything else?
24     **A.  Nothing else I can think of.**

1     Q.  Do you believe that in order to have a
2 reverse auction, as you used that term, that there
3 has to be a difference in the amount that's
4 settled?
5     **A.  No.**
6     Q.  Please explain.
7     **A.  You could make the claim process**
8 **unbelievably burdensome so nobody is able to claim**
9 **in where the dollar amount on the top is actually**
10 **the same.  And I believe that it would still**
11 **constitute a reverse auction.**
12     Q.  Okay.  Do you believe that you need to
13 look at the terms of the actual settlement in
14 order to evaluate whether or not a reverse auction
15 occurred?
16     **A.  I think that's a good idea; but, no, I**
17 **don't think you have to do that.**
18     Q.  You don't think it's necessary to review
19 the terms of the settlement itself in order to
20 establish a reverse auction?
21     THE WITNESS:  Can you repeat the
22 question back?
23         (Whereupon, record was read as
24         requested.)

1     A.  I think it would depend on the
2 circumstances.
3     Q.  How so?
4     **A.  Well, if the circumstances were such**
5 **that hypothetically, the class was getting**
6 **complete and total relief, there was no claim form**
7 **at all, literally everybody was getting a check**
8 **for the maximum amount, then I don't think you**
9 **could ever claim that it was a reverse auction.**
10     Q.  Okay.  But if you -- or anything short
11 of a hundred percent recovery, then you believe
12 the terms of the agreement would not be necessary
13 to establish a reverse auction?
14     **A.  I'm not sure.  It would depend on the**
15 **circumstances.  What I just gave you was one**
16 **example.**
17     Q.  I appreciate that, and I offered another
18 example.  I want to know whether that would
19 constitute a reverse auction.
20     **A.  Can you give me the example again?**
21     Q.  Sure.  Instead of a hundred percent
22 recovery, you have 99 percent recovery.  Would
23 that instance allow for a reverse auction theory
24 in your mind, Mr. Good?

1     **A.  You could allege a reverse auction, yes.**
2     Q.  Do you think you could establish a
3 reverse auction under such circumstances?
4     **A.  It would depend on the circumstances**
5 **surrounding it.  And in that case, you would --**
6 **yeah.  You would have to look at the**
7 **circumstances.**
8     Q.  Do you believe it necessary to look at
9 the terms of the underlying settlement in this
10 case in order to establish a reverse auction?
11     **A.  By this case, you mean the hypothetical?**
12     Q.  In this case, I mean the suit by your
13 client, Medical & Chiropractic, against my client,
14 Mr. Oppenheim, and against the law firm of Bock
15 Law Firm for breach of fiduciary duty and aiding
16 and abetting that breach.
17     THE WITNESS:  I'm sorry.  Can you repeat
18 the question?
19         (Whereupon, record was read as
20         requested.)
21     **A.  I'm sorry.  I don't understand your**
22 **question.  If you -- are you asking whether or not**
23 **you have to look at the terms of the settlement to**
24 **determine whether or not a breach of fiduciary**

Thompson Court Reporters, Inc
thompsonreporters.com

1    duty has taken place?
2    Q.    You have asserted that a reverse auction
3    occurred in connection with the settlement that
4    Technology Training reached with the Tampa Bay
5    Buccaneers, correct?
6        A.    Correct.
7    Q.    And I'm trying to establish what your
8    knowledge and basis is for making such an
9    accusation in this case. Do you understand?
10        A.    Yes.
11    Q.    Okay. And my question to you is whether
12    or not it's necessary to actually review the terms
13    of the settlement in order to establish a reverse
14    auction, and I believe that you said that it's not
15    necessary in a circumstance where there's a
16    hundred percent recovery.
17        A.    Correct.
18    Q.    And I'm asking in this case, is it
19    necessary to review the terms of the settlement in
20    order to establish that there was, in fact, a
21    reverse auction in connection with the TTA
22    settlement with the Buccaneers?
23        A.    I think it would be a good idea to look
24    at that. I'm not sure that it's necessary.

1    Q.    Why not?
2        A.    I would have to review all of the prongs
3    of analysis for a reverse auction. I believe
4    there is a published guide for what to look for as
5    the indicia of a reverse auction.
6    Q.    And what are those prongs that you
7    recall?
8        A.    I don't recall off the top of my head.
9    I know that they are in one of the Cin-Q and
10    Medical & Chiro briefs.
11    Q.    Do you recall any of the prongs?
12        A.    I recall one of them is whether or not
13    the parties have standing.
14    Q.    What does that term mean again,
15    standing, in your mind, Mr. Good?
16        A.    If they have the ability to pursue a
17    case on behalf of a class.
18    Q.    Can you recall any other prongs?
19        A.    The amount of time the settling
20    attorneys put into the case relative to other
21    competing cases.
22    Q.    Okay. And what legal case or standard
23    or statute establishes that as a relevant factor?
24        A.    I believe it's case law. I don't

1    recall. It's in a brief.
2    Q.    Okay. What other prongs do you recall?
3        A.    Those are the only ones I recall.
4    Q.    So is it your contention that it is not
5    necessary or that it is necessary in this case to
6    review the terms of the settlement in order to
7    establish a reverse auction?
8        A.    I believe it is not necessary.
9    Q.    And why is it not necessary in your
10    view?
11        A.    Because TTA lacks standing to pursue a
12    class claim.
13    Q.    Anything else?
14        A.    That's -- no.
15    Q.    In formulating your belief that there is
16    a reverse auction in this case, did you consider
17    the actual amount that was settled for?
18        A.    Are you asking me personally?
19    Q.    Well, do you have a belief as to whether
20    or not there was a reverse auction in this case?
21        A.    Yes, I have a belief.
22    Q.    Did you share that belief with anybody?
23        A.    Yes.
24    Q.    Who did you share that belief with?

1        A.    Attorneys at Anderson Wanca.
2    Q.    Anyone else?
3        A.    Medical & Chiro, Cin-Q, Michael Addison.
4    Q.    When did you share that belief with
5    Medical & Chiropractic?
6        A.    Within a -- I believe almost immediately
7    after the first TTA case was filed, that's the one
8    in state court, and there were subsequent
9    discussions after that.
10    Q.    When was that case filed?
11        A.    Early May 2016.
12    Q.    So immediately or almost immediately
13    after that case was filed in state court, you told
14    Medical & Chiropractic, I think this is a reverse
15    auction?
16        THE WITNESS: I -- can -- can I answer?
17        MS. LOEW: To the extent that you're
18    talking about an attorney-client -- the provision
19    of legal advice, then no. If you're talking about
20    some other context.
21        A.    It would violate attorney-client
22    privilege.
23    Q.    Okay. Do you contend that you represent
24    Medical & Chiropractic in connection with this

1 case?

2     **A.**  No.

3     Q.  You do not represent Medical &

4 Chiropractic in connection with this case?

5     **A.**  **By this case, you mean Medical & Chiro**

6 **v. Oppenheim and Bock, Hatch, Lewis & Oppenheim,**

7 **right?**

8     Q.  Correct, and --

9     **A.**  **I do not represent them in this case.**

10     Q.  Okay. And what facts did you

11 communicate in early May to Medical & Chiropractic

12 when you spoke with them almost immediately after

13 the TTA case was filed in state court?

14     MS. LOEW:  And to the extent that this

15 is requesting attorney-client privileged

16 communications, I advise you not to answer.

17     MR. BLONIEN:  I think that there's a

18 severe misunderstanding of the law as to how the

19 attorney-client privilege is being asserted in all

20 of these depositions.  We may have to present this

21 issue to the court ultimately.

22     But my question specifically and very

23 directly asked what facts, and just to be clear in

24 this case, f-a-c-t-s, Mr. Good conveyed to Medical

1 & Chiropractic in connection with the case that he

2 just said he does not represent the client in

3 connection with.

4 BY MR. BLONIEN:

5     Q.  So, again, my question is:  What facts

6 did you convey, facts, only facts, I don't want

7 advice, did you convey to Medical & Chiropractic

8 in the conversation that you testified that you

9 had almost immediately after the TTA case was

10 filed in state court?

11     MS. LOEW:  And to the extent that you

12 are talking about communications with a client

13 that involved the provision of legal advice, I am

14 advising him not to answer.

15 BY MR. BLONIEN:

16     Q.  And are you accepting that advice?

17     **A.**  **Yes.**

18     Q.  Are you willing to testify as to any

19 facts that you communicated with Medical &

20 Chiropractic, or am I going to experience the same

21 objection?

22     **A.**  **I think it depends.  For example,**

23 **scheduling and when a case was filed, I don't**

24 **believe that there's going to be any privilege**

1 issue there.

2     **But in terms of the strategy and**

3 **decisions made, I'm not answering attorney-client**

4 **privilege questions absent an order from the**

5 **court.**

6     Q.  I don't want any strategy or decisions

7 or advice, Mr. Good.  What I want to know is

8 whether or not you told Medical & Chiropractic any

9 facts, any facts, and that's it, just the facts,

10 and that's all I want.

11     MS. LOEW:  Mr. Blonien -- and

12 Mr. Blonien, I'm going to reiterate my objection

13 because you are asking -- by asking about the

14 facts that he conveyed, you are trying to invade

15 the strategy and the discussions about the

16 provision of legal advice to his client.

17     And we will reiterate our objection.

18 You're welcome to take this up with the court at a

19 later date.  But that -- that is the advice that I

20 am providing to Mr. Good.

21 BY MR. BLONIEN:

22     Q.  Are you following that advice, Mr. Good?

23     **A.**  **Yes.**

24     Q.  Okay.  I don't know that I can be any

1 clearer.  But just as an effort to do so, without

2 revealing any sort of communications that involve

3 the provision of advice that falls under the scope

4 of the attorney-client relationship that you had

5 with M & C, can you describe any facts that you

6 communicated to M & C regarding this litigation?

7     MS. LOEW:  I provide the same advice.

8 BY MR. BLONIEN:

9     Q.  Are you going to follow your

10 instruction -- the advice of your counsel?

11     **A.**  **Yes.**

12     MR. BLONIEN:  Okay.  Let's take a short

13 break, if we could, please.

14     THE WITNESS:  Great.

15     THE VIDEOGRAPHER:  Off the record.  The

16 time is 10:03.

17     (Whereupon, a short break was

18     taken.)

19     THE VIDEOGRAPHER:  We are back on the

20 record.  The time is 10:13.

21 BY MR. BLONIEN:

22     Q.  Mr. Good, I want to return to your

23 earlier testimony that Mr. Oppenheim filed a false

24 police report lying to the police in connection

Thompson Court Reporters, Inc

thompsonreporters.com

1  with the stolen laptop. Did you share that belief
2  of yours with anyone else?
3  **A. Yes.**
4  Q. With whom?
5  **A. Brian Wanca, Ryan Kelly -- actually,**
6  **strike that. I don't remember if I told Ryan**
7  **Kelly.**
8  **Definitely Brian Wanca, Michael Addison,**
9  **Sue Fitzgerald, Rita Hernandez, Mike, I said**
10  **Michael Addison.**
11  **I also -- I wanted to clarify, earlier,**
12  **I did not mention Stephanie Stewart or Scott**
13  **Tozian. I did speak to both of them as well.**
14  Q. Are all of those people Anderson & Wanca
15  attorneys?
16  **A. The last two are not.**
17  Q. Who are the last two?
18  **A. Stephanie Stewart works at a law firm.**
19  **I think it's called Meyer Lex.**
20  **And Scott Tozian, I believe his law firm**
21  **is called Smith Tozian.**
22  Q. And what relationship do they have to
23  the Buccaneers litigation?
24  **A. Ethics counsel.**

1  Q. And who retained them as ethics counsel?
2  **A. I don't recall what their retainer**
3  **agreements say, or I don't recall what -- yeah. I**
4  **don't recall what the retainer agreements say.**
5  Q. Okay. Excepting that you don't recall
6  what the retainer agreements say, do you have any
7  understanding as to who they represent?
8  **A. I believe they represent Medical &**
9  **Chiro.**
10  Q. And what gives you that belief?
11  **A. My communications with them were solely**
12  **related to the underlying Buccaneers case and**
13  **the -- this matter.**
14  Q. Okay. And did you convey your belief
15  that Mr. Oppenheim lied to the police to Medical &
16  Chiropractic?
17  MS. LOEW: Are you asking whether he
18  conveyed to Medical? What's the question?
19  MR. BLONIEN: I'm asking if he conveyed
20  to Medical & Chiropractic his belief that
21  Mr. Oppenheim lied to the police.
22  MS. LOEW: So to the extent that this is
23  in the provision of legal advice, I'll advise you
24  not to answer. To the extent it was not in the

1  provision of legal advice, you can answer.
2  **A. I recall providing to Medical & Chiro**
3  **the police report.**
4  Q. When did you do that?
5  **A. Almost immediately after receiving it.**
6  Q. Why did you do that?
7  **A. Medical & Chiro had previously been**
8  **provided one or more of the correspondences**
9  **between Anderson Wanca and yourself, and this was**
10  **subsequent to that.**
11  Q. And did you tell Medical & Chiropractic
12  that you believed Mr. Oppenheim lied to the
13  police?
14  MS. LOEW: And to the extent it was in
15  the provision of legal advice, I'll advise you not
16  to answer. To the extent it was not in the
17  provision of legal advice, you can answer.
18  **A. I think this is covered by**
19  **attorney-client privilege.**
20  Q. So you're refusing to answer the
21  question whether or not you told Medical &
22  Chiropractic that you believed Mr. Oppenheim lied
23  to the police?
24  **A. Yes.**

1  Q. After Mr. Oppenheim left Anderson &
2  Wanca, did you talk with Medical & Chiropractic
3  about his leaving?
4  **A. Can you be more specific about the time**
5  **that you're referring to?**
6  Q. When did Mr. Oppenheim leave Anderson &
7  Wanca?
8  **A. April 8th, 2016.**
9  Q. After April 8th, 2016, did you call
10  Medical & Chiropractic and inform them that
11  Mr. Oppenheim left the firm?
12  MS. LOEW: And I'll provide the same
13  advice, which is to the extent that it was
14  provided for legal advice, I'll advise you not to
15  answer. If it was provided for another purpose,
16  you can answer.
17  **A. As I've already stated, I believe they**
18  **were provided copies of correspondence between**
19  **Anderson Wanca and yourself.**
20  Q. Did you inform Medical & Chiropractic
21  that Mr. Oppenheim left the firm after April 8th?
22  **A. I believe that my last answer answered**
23  **that question.**
24  Q. I don't. I disagree.

**14 (Pages 50 to 53)**

1      My question is whether or not you told
2 Medical & Chiropractic that Mr. Oppenheim left the
3 firm after April 8th. I didn't ask you anything
4 about correspondence. I asked you whether or not
5 you used your verbal skills to tell Medical &
6 Chiropractic that Mr. Oppenheim left the firm.
7      MS. LOEW: Objection --
8 BY MR. BLONIEN:
9   Q. You can answer, or you can refuse to
10 answer on the basis of privilege for your client
11 of -- of your attorney here.
12      MS. LOEW: Objection; argumentative,
13 badgering the witness.
14      To the extent that you provided
15 information to Medical & Chiropractic in the
16 provision of legal advice, I'll advise you not to
17 answer. To the extent you provided it for another
18 purpose, you can answer the question.
19   **A. I don't recall specifically telling**
20 **Medical & Chiro that.**
21   Q. Okay. Do you recall a conversation
22 shortly after Mr. Oppenheim left his employment
23 with Anderson & Wanca?
24   **A. Can you be more specific as to**

1 **"shortly"? I'd like to get the answer to this**
2 **question correct.**
3   Q. Okay. I'm eventually going to be
4 interested in every conversation --
5   **A. Okay.**
6   Q. -- you had with Anderson & -- or Medical
7 & Chiropractic after the date Mr. Oppenheim left
8 the firm.
9      When is the first conversation that you
10 recall having after Mr. Oppenheim left the firm
11 with Medical & Chiropractic?
12   **A. Almost immediately after Technology**
13 **Training v. Buccaneers mediation email was sent to**
14 **Michael Addison.**
15   Q. How do you know that the mediation email
16 was sent to Michael Addison?
17   **A. He made me aware of it.**
18   Q. How?
19   **A. I don't recall if it was email or phone,**
20 **but it was definitely one of the two.**
21   Q. Do you recall when?
22   **A. It was definitely the day that he**
23 **received it. I don't recall specifically what**
24 **time of day.**

1   Q. And what do you recall that
2 communication saying?
3   **A. I believe he forwarded the email itself.**
4   Q. Okay. And do you recall talking with
5 Mr. Addison about that email?
6   **A. I'm sure there were discussions; but,**
7 **no, I do not recall them specifically.**
8   Q. Okay. In your search in production of
9 materials, did you include the conversation with
10 Michael Addison that you just referred to?
11   **A. I'm sure it would have been included in**
12 **the thousands and thousands of emails.**
13   Q. Are you asserting any privilege over
14 that conversation?
15   **A. I know we're not asserting privilege**
16 **over the email from the mediator's office to**
17 **Mr. Addison.**
18      **I don't recall what's in the email, so I**
19 **don't know how to answer that question. I hope**
20 **that makes sense.**
21   Q. I think so, although I -- I mean, I'm
22 sort of working in the dark to the extent that you
23 are asserting a privilege and I'm trying to
24 understand the scope of any.

1      With respect to the -- so if I
2 understand correctly, almost immediately after
3 learning of the filing of the TTA action in state
4 court, you also received some sort of
5 communication from Michael Addison.
6   **A. I actually think it's the other way**
7 **around. I don't think we knew about the state**
8 **court action until receiving that communication.**
9   Q. And that communication being that
10 communication from Michael Addison?
11   **A. No, the communication from the mediator**
12 **to Michael Addison.**
13   Q. Which you learned about through Michael
14 Addison.
15   **A. Correct.**
16   Q. In a conversation or email with Michael
17 Addison.
18   **A. Correct.**
19   Q. Okay. So the -- from -- if I understand
20 the time line from your point of view correctly,
21 Mr. Oppenheim left in early April of 2016; is that
22 right?
23   **A. April 8th, 2016.**
24   Q. Okay. And at some point after that,

Thompson Court Reporters, Inc
thompsonreporters.com

1    there was an email that you received from Michael

2    Addison indicating that there was another

3    mediation scheduled.

4    **A.   That is correct.**

5    Q.   And you spoke with Michael Addison or

6    exchanged emails with Michael Addison about that,

7    correct?

8    **A.   Correct.**

9    Q.   And you don't recall anything about what

10   those emails or conversations said?

11   **A.   I recall they were about that issue, but**

12   **I don't recall the specifics of the conversation**

13   **or email correspondence.**

14   Q.   Okay.  But you're not asserting any

15   privilege over that conversation.

16   **A.   I don't know the content of it, so I**

17   **can't answer that question without knowing it.**

18   Q.   And then after receiving the email or

19   phone call from Michael Addison, you contacted

20   Medical & Chiropractic.

21   **A.   Yes.**

22   Q.   Okay.  And what facts did you share with

23   Medical & Chiropractic in that call?

24        MS. LOEW:  And I will continue to advise

1    Mr. Good not to answer to the extent he was

2    providing a legal advice to Medical &

3    Chiropractic.

4        I'm happy to go through every

5    communication the same way.  We're going to assert

6    the same -- the same objection.  If it is in the

7    provision of legal advice, I will advise him not

8    to answer.

9        MR. BLONIEN:  I'm not asking for legal

10   advice --

11       MS. LOEW:  You can take it up with the

12   court.

13       MR. BLONIEN:  I'm asking for facts.  It

14   is lawyering 101 that facts conveyed by a lawyer

15   or to a lawyer are not covered by the privilege

16   but only the provision of legal advice.

17       I think that it's a big mistake to be

18   asserting such a broad privilege.  We will be

19   taking it up.  I'm simply preserving it for the

20   record.

21   BY MR. BLONIEN:

22   Q.   Mr. Good, are you following your

23   client -- your attorney's advice?

24       MS. LOEW:  And I want to put also on the

1    record that under your view, the fact section of

2    any legal memorandum that we do would be

3    discoverable because you would be asking all of

4    the facts that are the basis of legal advice as

5    they are communicated.

6        That is not the view that we have of

7    attorney-client privilege, and we're not going to

8    waive it without the court telling us we need to.

9    BY MR. BLONIEN:

10   Q.   Are you following your attorney's

11   advice, Mr. Good?

12   **A.   Yes.**

13   Q.   Okay.  Are you going to be sharing any

14   details about conversations that you had with

15   Medical & Chiropractic even so far as they relate

16   to facts that you told M & C that pertain to this

17   lawsuit?  Are you refusing to answer those

18   questions because I can save a whole bunch of

19   questions if that's the case.

20       MS. LOEW:  Only -- and I'll advise you,

21   you know, to the extent that my -- my advice to

22   you is to the extent a -- a fact is provided in

23   the course of legal advice and is the basis for

24   legal advice to the client that I will advise you

1    not to answer the content of those communications

2    with your client.

3        To the extent there are other purposes

4    for your communications, you can answer questions.

5    **A.   I plan on following the advice of my**

6    **counsel.**

7    Q.   How did Medical & Chiropractic learn

8    about the laptop being stolen, Mr. Good?

9    **A.   I believe Medical & Chiro reviewed**

10   **correspondence between Anderson Wanca and**

11   **yourself.**

12   Q.   And who sent those correspondences?

13   **A.   Me.**

14   Q.   And what did those correspondences say?

15   **A.   I would have to review the**

16   **correspondence.  Do you want my summary of the**

17   **correspondences?**

18   Q.   Sure.

19   **A.   Anderson Wanca became aware that David**

20   **Oppenheim stole documents, including but not**

21   **limited to those that related to his former**

22   **representation of Medical & Chiro.**

23       **Anderson Wanca demanded them back.  You**

24   **delayed for a very long time.**

1       **Our office, Anderson Wanca, said we were**

2  **going to file a lawsuit within 21 days. And**

3  **19 days later, the laptop was allegedly stolen.**

4     Q.   Okay. And did you share all of that

5  information to Medical & Chiropractic?

6     **A.   I recall sharing the correspondence with**

7  **Medical & Chiro. I would have to review the**

8  **correspondence to be able to answer your question.**

9     Q.   And did you share with Medical &

10  Chiropractic your view that Mr. Oppenheim lied to

11  the police?

12        MS. LOEW: I will continue to advise

13  Mr. Good, to the extent that it was in the

14  provision of legal advice, I will advise you not

15  to answer.

16     **A.   I'm following the advice of counsel.**

17     Q.   Did you share that view with anyone that

18  wasn't within Anderson & Wanca, apart from the

19  ethics counsel that apparently were hired for

20  Medical & Chiropractic's benefit?

21     **A.   I don't recall anybody else.**

22     Q.   And you won't answer whether or not you

23  shared that view with Medical & Chiropractic?

24     **A.   I will follow the advice of counsel.**

1     Q.   Did you share that view with

2  Mr. Addison?

3     **A.   Yes.**

4     Q.   Did Mr. Addison respond?

5     **A.   I'm sure he did.**

6     Q.   Okay. So when you told Mr. Addison, I

7  think Mr. Oppenheim lied to the police, what did

8  Mr. Addison say?

9     **A.   I don't recall. I do know that I shared**

10  **the correspondence, again, between Anderson Wanca**

11  **and yourself with Mr. Addison.**

12     Q.   Okay. That's not my question though.

13        My question is: When you told

14  Mr. Addison, I think Mr. Oppenheim lied to the

15  police, do you recall any substance of the

16  response?

17     **A.   I do not.**

18     Q.   So we talked about the bases of the

19  claims as in your view relating to the stealing of

20  information, to use your term, and the breaching

21  of the mediation privilege.

22        I'd like to review all of the facts that

23  you have personal knowledge of that support those

24  claims.

1        So with respect to stealing a laptop,

2  please identify for me every fact that you have

3  personal knowledge of that you believe supports

4  that claim.

5     **A.   I set up Mr. Oppenheim's laptop. I set**

6  **up the email account for Mr. Oppenheim. He asked**

7  **me where to go to purchase a personal laptop. I**

8  **told him to go to Abt Electronics.**

9        **It is my understanding that he**

10  **subsequently went to Abt Electronics, purchased a**

11  **laptop, and then copied Anderson Wanca information**

12  **and client materials from his Anderson Wanca**

13  **laptop to that laptop prior to his resignation on**

14  **April 8th, 2016.**

15     Q.   And what Anderson & Wanca information do

16  you believe that Mr. Oppenheim copied?

17     **A.   Emails and documents, based on**

18  **correspondence with you.**

19     Q.   Do you have any understanding as to the

20  duration of emails that Mr. Oppenheim may have had

21  in his possession?

22     **A.   I do not know.**

23     Q.   Do you have any understanding as to the

24  scope of documents that Mr. Oppenheim may have had

1  in his possession?

2     **A.   You provided a list, I believe.**

3     Q.   Did you review the list?

4     **A.   I did at the time that it was received.**

5     Q.   Did you determine anything else that

6  Mr. Oppenheim may have had in his possession that

7  wasn't reflected on the list?

8     **A.   I don't know how I could review that.**

9     Q.   Well, I believe that you testified that

10  you have administrative privileges with respect to

11  the email server for Anderson & Wanca, correct?

12     **A.   Correct.**

13     Q.   So you're sort of the techie guy at the

14  law firm, fair enough?

15     **A.   That is correct.**

16     Q.   So after Mr. Oppenheim left, you

17  searched the files with respect to what Anderson &

18  Wanca had on its server, right?

19     **A.   The email server.**

20     Q.   Right.

21     **A.   Yes, correct.**

22     Q.   And did you identify any material that

23  Mr. Oppenheim may have had in his possession that

24  he did not disclose to Anderson & Wanca?

1    A.   I recall in correspondence from you that
2  you would not disclose all of the cases that were
3  related to by all of the emails Mr. Oppenheim
4  took.
5    Q.   You recall a list of all of the matters
6  on which Mr. Oppenheim retained materials, right?
7    A.   No.  I recall a list of matters in which
8  Oppenheim had documents separate and apart from
9  the emails.
10    Q.   You have access to all of the emails
11  that were transmitted through the Anderson & Wanca
12  server, correct?
13    A.   Correct.
14    Q.   And the server maintains a backup copy?
15    A.   Correct.
16    Q.   So you would and were able to obtain all
17  of the emails that Mr. Oppenheim either sent or
18  received in the preceding year, correct?
19    A.   I would be able to do that, correct.
20    Q.   And Mr. Oppenheim surrendered his laptop
21  at the time that he retired from Anderson & Wanca
22  on April 8th, correct?
23    A.   Correct.
24    MS. LOEW:  Objection to form.

1  BY MR. BLONIEN:
2    Q.   And you reviewed that laptop for the
3  information that was contained on it, correct?
4    A.   No.
5    Q.   Why not?
6    A.   I turned the laptop -- strike that.  Let
7  me go back.
8        I was the first person that David
9  Oppenheim told that he was resigning from Anderson
10  Wanca.  He then told Brian Wanca.  Brian Wanca
11  then made the decision not to keep him on for the
12  two days that he offered to stay on.
13        And at that point, I was given the
14  laptop by Mr. Oppenheim.  I took the laptop.  I
15  turned the laptop off, and I gave it to a support
16  staff person who put it in a locked file cabinet.
17    Q.   And is that laptop still in the
18  possession of Anderson & Wanca?
19    A.   I don't believe so.
20    Q.   What happened to that laptop?
21    A.   It was provided to Foley Lardner.
22    Q.   When was that laptop provided to Foley &
23  Lardner?
24    A.   Within about a day of them requesting

1  it.
2    Q.   When did they request it?
3    A.   I believe it was around the initiation
4  of this lawsuit.
5    Q.   So at the initiation of this lawsuit,
6  you provided to Foley & Lardner the copy of the
7  laptop that Mr. Oppenheim used in his employment
8  at Anderson & Wanca.
9    A.   I provided the original.
10    Q.   Right, containing all of the information
11  that Mr. Oppenheim copied onto the second laptop.
12    A.   I do not know that to be true or false.
13    Q.   Do you have any reason to believe that
14  that's false?
15    A.   Yes.
16    Q.   Okay.  What is your basis for stating
17  that that's false?
18    A.   My understanding of the email system,
19  which, again, I'm an administrator of, was that
20  the emails would only be retained for a certain
21  amount of time.
22        So, for example, if Mr. Oppenheim were
23  to go to Abt Electronics and request that they
24  copy the emails and documents that then existed

1  on, for example, April 2nd of 2016, and then he
2  would resign again on April 8th, 2016, there would
3  be six days of email, even though I'm not sure
4  exactly when the emails were -- how long they were
5  retained, that were no longer there.
6        Did that make sense?
7    Q.   No.
8    A.   Okay.
9    Q.   Can you try again?
10    A.   Yeah.  Let me try again.
11    MS. LOEW:  What was the original
12  question?
13        (Whereupon, record was read as
14        requested.)
15    A.   Okay.  When you're ready, I'll try
16  again.
17    Q.   Please continue.
18    A.   Okay.  My understanding of the way that
19  the email server was configured was that emails
20  would be retained on the user's computer for a
21  specified period of time.
22        After that amount of time, they would
23  have to access the email server's backup component
24  to access the emails.

Thompson Court Reporters, Inc
thompsonreporters.com

1      **My understanding is that Mr. Oppenheim**
2  **copied the emails and documents prior to his**
3  **resignation from Anderson Wanca.**
4      **During the time between the copying and**
5  **the time at which he resigned, the computer was**
6  **turned off and stored in the support staff's**
7  **locked cabinet, some of the emails were no longer**
8  **retained on the laptop.**
9     Q.   But Anderson & Wanca had a backup copy
10  on its server.
11     **A.   Correct.**
12     Q.   So there's -- you're not suggesting in
13  any way that Mr. Oppenheim actually destroyed any
14  sort of material that would make it difficult for
15  Anderson & Wanca to locate, correct?
16     **A.   No, that is not correct.  I am**
17  **suggesting that specific for emails.**
18     Q.   Okay.  Is there anything else that gives
19  you the impression that Mr. Oppenheim did not act,
20  adequately disclose the material that he had in
21  his possession from his employment with Anderson &
22  Wanca?
23     **A.   Can you repeat the question?**
24

1        (Whereupon, record was read as
2        requested.)
3     **A.   It's my understanding that there is no**
4  **dispute that yourself on behalf of Mr. Oppenheim**
5  **did not identify everything Mr. Oppenheim took.**
6     Q.   Okay.  And what's the basis for making
7  that assertion here today, Mr. Good?
8     **A.   Your statements that he won't identify**
9  **all the emails.**
10     Q.   So it's with respect to emails in
11  particular?
12     **A.   Emails is one specific -- yes, emails.**
13     Q.   Is there anything else, apart from
14  emails in particular, that he --
15     **A.   He took -- I'm sorry for not letting --**
16     Q.   -- that you suggest indicate that
17  Mr. Oppenheim did not adequately disclose the
18  materials that he had in his possession?
19       You do understand Mr. Oppenheim in those
20  correspondences stated he had a year's worth of
21  emails, right?
22     **A.   Yes.**
23     Q.   And he identified the dates of that
24  particular year, right?

1     **A.   Yes.**
2     Q.   Okay.  And I'm asking you:  Do you have
3  any information to suggest that Mr. Oppenheim did
4  not adequately disclose the material that he had
5  from his time with Anderson & Wanca?
6     **A.   I do not believe he adequately disclosed**
7  **it.**
8     Q.   And what is the basis for you making
9  that assertion today?
10     **A.   He did not --**
11     MS. LOEW:  Asked and answered.
12  Objection, asked and answered.
13     **A.   He did not return everything.  He did**
14  **not disclose it at the time of his resignation.**
15     Q.   Okay.  And do you have any understanding
16  as to whether or not the law requires that he
17  disclose at the time of his resignation all of the
18  materials --
19     THE REPORTER:  Can you slow down?
20     MR. BLONIEN:  Sure.
21     THE REPORTER:  Thanks.
22  BY MR. BLONIEN:
23     Q.   Do you have any understanding as to
24  whether or not the law requires disclosure under

1  those circumstances?
2     **A.   It is my understanding that there are**
3  **many laws, Rules of Professional Conduct,**
4  **mediation agreements, et cetera, that govern what**
5  **has to be returned when an attorney leaves**
6  **representation of a client and resigns.**
7     Q.   And what is your understanding of the
8  law on that front, Mr. Good?
9     **A.   My understanding is that it's**
10  **complicated and specific to each case.**
11     Q.   Do you have any other understanding of
12  the law in that regard?
13     **A.   It is my understanding that there are**
14  **certain mediation agreements that when a lawyer**
15  **leaves representation, they have to return all of**
16  **the mediation privileged materials that they have.**
17     Q.   No matter what?
18     **A.   I don't understand what "no matter what"**
19  **means.**
20     Q.   Under every circumstance, the statement
21  that you said you believe to be true under the
22  law?
23     **A.   I can't think of any circumstance that**
24  **is an exception for that, correct.**

Thompson Court Reporters, Inc
thompsonreporters.com

1  Q. So your contention is that when a lawyer
2  leaves a firm, he's got to return all of the
3  materials that he had from his employment?
4  **A. No.**
5  Q. All right. Please clarify.
6  **A. If a lawyer has mediation privileged**
7  **materials and the lawyer leaves the representation**
8  **of a party to that mediation, if that mediation**
9  **agreement specifics the return of mediation**
10 **privileged materials, then that lawyer has to**
11 **return those materials.**
12 Q. And did you review the mediation
13 agreement in connection with the Cin-Q litigation,
14 Mr. Good?
15 **A. No.**
16 Q. Do you know whether or not the mediation
17 agreement required such return in this instance?
18 **A. In this instance, I do not.**
19 Q. Okay. Are you asserting that in this
20 instance, Mr. Oppenheim had a duty to return
21 mediation privileged information?
22 MS. LOEW: Objection to form.
23 **A. He did have a duty to return mediation**
24 **privileged materials in at least one other**

1  **instance that I'm aware of that he did not.**
2  Q. Okay. And in what instance was that?
3  **A. Wilder v. Scrip.**
4  Q. And what can you tell me about that
5  case? How do you know that case? Where did that
6  come from?
7  **A. It was a case that -- strike that.**
8  **Of the documents that you returned to my**
9  **office, a copy of which I believe you still have a**
10 **copy, one of them is a mediation privileged**
11 **document for a case that has now concluded that**
12 **Mr. Oppenheim is still holding a document from and**
13 **has not returned.**
14 Q. But that was included in the documents
15 returned.
16 **A. No. You only gave us a copy. You**
17 **didn't return it.**
18 Q. Do you know of any single document
19 whatsoever, email, memo, anything that
20 Mr. Oppenheim took the original copy of?
21 **A. I do not.**
22 Q. Do you know any document whatsoever
23 where Mr. Oppenheim took something and Anderson &
24 Wanca did not retain a copy?

1  **A. I do not.**
2  Q. Do you know of any intellectual property
3  that Mr. Oppenheim took?
4  **A. Do you mean -- yes.**
5  Q. Okay. What intellectual property did
6  Mr. Oppenheim take?
7  **A. Client lists.**
8  Q. Can you be more specific?
9  **A. Anderson & Wanca client lists.**
10 Q. Can you be more specific?
11 **A. No.**
12 Q. So just client lists generally from
13 Anderson & Wanca is all that you can say with
14 respect to the intellectual property that
15 Mr. Oppenheim took?
16 **A. I don't know how to be more specific**
17 **than that, so yes.**
18 Q. The list of all clients that Anderson &
19 Wanca had as a firm, all of them or --
20 **A. I believe they were just subsets.**
21 Q. Okay. And what subset or subsets were
22 they?
23 **A. Subsets that Mr. Oppenheim asked me to**
24 **prepare in connection with other litigation.**

1  Q. Okay. And can you describe the subsets?
2  How were they categorized?
3  **A. Potential additional class**
4  **representatives.**
5  Q. Anything else?
6  **A. Off the top of my head, nothing else I**
7  **can be certain of.**
8  Q. So when you say that Mr. Oppenheim took
9  intellectual property that was Anderson client
10 lists, you're referring to a list of -- of
11 potential additional class representatives.
12 **A. Lists, plural.**
13 Q. Okay. And were they for particular
14 cases?
15 **A. Yes.**
16 Q. What cases were they?
17 **A. Off the top of my head, I do not recall.**
18 **But I believe one of them was Fauley v. Heska.**
19 Q. Fauley?
20 **A. F-a-u-l-e-y. Heska is H-e-s-k-a.**
21 Q. And is there any other case that you can
22 recall apart from Fauley versus Heska that --
23 **A. Off the -- I'm sorry.**
24 Q. -- that Mr. Oppenheim allegedly took a

1 subset of client lists involving the potential
2 additional class representatives?
3     **A.  Off the top of my head, I cannot recall.**
4     Q.  Are there any lists, apart from
5 potential additional class representatives, that
6 you contend Mr. Oppenheim took?
7     **A.  I would have to check the records; but**
8 **off the top of my head, I'm not aware of any.**
9     Q.  Okay.  So in your -- the best of your
10 recollection sitting here today, the only
11 intellectual property that you can recall
12 Mr. Oppenheim taking is potential additional class
13 representatives related to the case Fauley versus
14 Heska?
15     **A.  I believe there were others; but I**
16 **cannot name the other cases, correct.**
17     Q.  How many others do you believe there
18 were?
19     **A.  Probably one for just about every**
20 **mediation conducted by Mr. Oppenheim.**
21     Q.  And when you say potential additional
22 class representatives and that there's a list, how
23 did this list come to be?
24     **A.  I created it.**

1     Q.  Okay.  And where did --
2     **A.  Or created them.  I'm sorry.**
3     Q.  Where did you get the information from?
4     MS. LOEW:  Objection to the extent this
5 is seeking confidential information that is not
6 the subject matter of this lawsuit.  I think this
7 is going outside the scope of admissible evidence
8 and appropriate discovery in this case.
9 BY MR. BLONIEN:
10     Q.  You can answer.
11     MS. LOEW:  How does this tie to this
12 case, Barry?
13     MR. BLONIEN:  You're not on the stand.
14 He's on the stand.  You make the objections.  He
15 responds to the questions unless you instruct him
16 not to answer.
17     Are you instructing him not to answer?
18     MS. LOEW:  I am objecting, and --
19     MR. BLONIEN:  Are you -- are you
20 instructing him not to answer?
21     MS. LOEW:  I'm not instructing him not
22 to answer, but --
23 BY MR. BLONIEN:
24     Q.  Okay.  Then Mr. Good, please go ahead

1 and answer the question.
2     MS. LOEW:  I can raise objections to
3 relevance that are not to lead to admissible
4 information in this case.
5     MR. BLONIEN:  It seems pretty clear that
6 the objections you're making at this point qualify
7 as speaking objections and providing a narrative,
8 and I ask you to stop.
9     MS. LOEW:  Barry --
10 BY MR. BLONIEN:
11     Q.  Mr. Good, can you please answer the
12 question?
13     **A.  Anderson Wanca has a client list.  I am**
14 **familiar with formulas that are used in Excel and**
15 **similar databases that allow a user to**
16 **cross-reference a potential class list against**
17 **Anderson Wanca's entire client list and export the**
18 **results that are matching.**
19     Q.  Okay.  And the class list that you refer
20 to, is that publicly available information?
21     **A.  Not frequently, but sometimes.**
22     Q.  Was it in Fauley versus Heska?
23     **A.  I do not believe so.**
24     Q.  You don't believe that the list of

1 potential class claimants was not public?
2     **A.  I believe it was confidential in that**
3 **matter.**
4     **Actually I'd like to go back.  I thought**
5 **of a second case.  I believe it's True Health v.**
6 **McKesson.**
7     Q.  And in that case, do you believe that
8 the class list was publicly available?
9     **A.  I am certain in that case, it was**
10 **confidential and not publicly available.**
11     Q.  And what do you contend that
12 Mr. Oppenheim did with this information?
13     **A.  He took it.**
14     Q.  He took it?
15     **A.  Correct.**
16     Q.  What did he do with it in your
17 contention?
18     **A.  I don't think I could speculate on that.**
19     Q.  So you don't have any knowledge
20 whatsoever as to what Mr. Oppenheim did with any
21 of the information that he received?
22     **A.  I believe he gave it to you, and I**
23 **believe there is an attorney at his -- strike**
24 **that.**

1       I believe there is -- he gave it to you;
2 and I believe at one point, at least some of what
3 he took was given to an employee of Bock Hatch by
4 the name of Jorge Labarga (phonetic).
5     Q.  Anything else?
6     A.  I couldn't speculate.
7     Q.  I don't want you to speculate. I want
8 you to testify about what your personal knowledge
9 is.
10     A.  That is my personal knowledge.
11     Q.  Okay. So that I make sure that I
12 understand, you contend that Mr. Oppenheim lied to
13 the police, right?
14     A.  Yes.
15     MS. LOEW: Objection, asked and
16 answered.
17 BY MR. BLONIEN:
18     Q.  And you contend that Mr. Oppenheim lied
19 to his former employer as to the information that
20 he retained from his former employment?
21     A.  Me.
22     Q.  He lied to you?
23     A.  Yes.
24     Q.  Okay. And how?

1     A.  Well, when he asked me about getting a
2 computer, he didn't say that he was going to copy
3 stuff from the Anderson Wanca computer.
4     And when he turned in the laptop, he
5 said he wasn't taking anything and that he would
6 ask me to take things for him and email it to him,
7 which I did.
8     Q.  What did you email to him?
9     A.  Personal materials that were left on the
10 laptop.
11     Q.  Can you be more specific?
12     A.  There was something called Diamond Mine
13 Baseball, personal emails relating to some type of
14 youth league, fantasy sports.
15     I think that's all the specifics I'm --
16 yeah. I'm not aware of any further specifics than
17 those.
18     Q.  All right. So your contention is that
19 because he asked you for these materials that he
20 lied to you when he copied the material on his
21 laptop?
22     A.  No. My -- my statement that he lied
23 reflects him saying he wasn't taking anything from
24 the laptop and him asking me if I would be able to

1 forward him personal materials on the laptop at a
2 later date, to which I said yes.
3     Q.  When did that conversation occur?
4     A.  At the time that he left on April 8th,
5 2016, prior to him telling Brian Wanca he was
6 resigning.
7     Q.  And was anyone else present for that
8 conversation?
9     A.  The paralegal, the former paralegal Tina
10 Natally (phonetic) was outside the door. I
11 don't -- she was not participating in the
12 conversation.
13     Q.  Anyone else?
14     A.  No.
15     Q.  Is there any written recordation of the
16 conversation?
17     A.  There are written records of me
18 following through and sending him Dropbox links to
19 download the Diamond Mine Baseball, the youth
20 baseball, the fantasy stuff, and forwarding the
21 emails.
22     Q.  Anything else?
23     A.  I believe there were subsequent
24 discussions about documents that Mr. Oppenheim

1 requested from the laptop that were made to me in
2 writing.
3     Q.  Apart from the Diamond Mine Baseball,
4 the personal emails, the fantasy sport?
5     A.  I think he asked for some brief for a
6 case. I don't recall the case name.
7     But I do recall there was one work
8 related thing on a joint case that he asked for as
9 well.
10     Q.  There was one joint related case that
11 Mr. Oppenheim maintained?
12     A.  No, no, no, that he asked me to get for
13 him from his laptop.
14     Q.  Okay. There was one joint related case
15 that Mr. Oppenheim maintained that he asked you to
16 get from his laptop.
17     A.  Let me clarify. I believe Mr. Oppenheim
18 in writing requested that I get something from his
19 laptop that I subsequently provided to him.
20     Q.  Do you recall what case that was?
21     A.  I do not. I recall it was a joint case.
22     Q.  Do you recall when that was?
23     A.  I believe it would have been between
24 April 8th and when the first TTA action was filed

Thompson Court Reporters, Inc

thompsonreporters.com

1  in state court or when we first became aware of
2  the TTA action filed in state court.
3      Q.  How many joint cases did Mr. Oppenheim
4  maintain after his departure from Anderson &
5  Wanca?
6      A.  He has not disclosed the contents of the
7  emails.  Therefore, I cannot answer that question.
8      Q.  I'm sorry.  I don't understand what you
9  mean by that.  Can you repeat that?
10     A.  My understanding of your question was:
11  How many files for joint cases did Mr. Oppenheim
12  retain after leaving Anderson Wanca.
13     Q.  No, it wasn't.
14     A.  Oh, I'm sorry.
15     Q.  I appreciate you clarifying.
16         How many joint cases did Mr. Oppenheim
17  participate in?  Setting aside the files for a
18  second, how many joint cases did Mr. Oppenheim
19  work on after his departure?
20     A.  I do not know.
21     Q.  Was it more than one?
22     A.  Yes.
23     Q.  Was it more than ten?
24     A.  I don't know.

1      Q.  Is it more than five?
2      A.  Yes.
3      Q.  Okay.  So what are the cases that you
4  recall off the top of your head where there
5  were -- Mr. Oppenheim continued to work on them
6  after his departure on April 8th?
7      A.  There were three in Michigan, two in
8  Florida, and at least one in Illinois.
9      Q.  All right.  What were the three in
10  Michigan?
11     A.  I think we called them the Cox cases.  I
12  don't recall their names.  C-o-x, that's the
13  judge's name for all three, I believe.
14     Q.  And that's all you recall of those three
15  cases?
16     A.  I think one of the defendants in one of
17  them was called Larbev, L-a-r-b-e-v.
18         I don't recall the other two names.
19     Q.  Of the two cases in Florida, do you
20  recall any of the case names?
21     A.  I do not.
22     Q.  Or any other identifying information?
23     A.  Actually, I take that back.  One of the
24  plaintiffs or defendants was European Tile, I want

1  to say.
2      Q.  Anything else that you recall?
3      A.  I do not.
4      Q.  The one case in Illinois, do you recall
5  that case name?
6      A.  Yes, Physicians Healthsource versus
7  Allscripts.
8      Q.  Apart from the three cases in Michigan,
9  the two cases in Florida, and the one case in
10  Illinois that you testified to already, do you
11  recall any other cases where Oppenheim continued
12  to work on them after his departure from Anderson
13  & Wanca?
14     A.  Yes.
15     Q.  Please identify them.
16     A.  In Ohio, there was a case.  One of the
17  party's name is Beachwood.
18     Q.  Anything else, Mr. Good?
19     A.  Give me a second.
20         Yes.  There's a case in Massachusetts.
21  One of the party's name is Locks & Keys, and the
22  and is an ampersand.
23         Just give me a second.  Let me --
24     Q.  Please, take your time.

1      A.  Yes.  I actually recall two others.  In
2  Florida, there's another matter which I believe
3  has since settled and has gotten final approval
4  called Daisy v. Pollo -- or no, no.  That's not
5  it.  It's Dewar v. Dough Boy, D-e-w-a-r v. Dough
6  Boy, D-o-u-g-h B-o-y.
7         And there was a case in Michigan called
8  Global Biz Dimensions, yeah, I think.
9      Q.  Anything else that you can recall
10  sitting here today?
11     A.  Yes.  There's another case in Michigan,
12  separate and apart, I believe, from the three
13  cases that I can't really identify much for, which
14  is called Bridging Communities v. Top Flite.  And
15  the Flite is F-l-i-t-e.
16     Q.  Anything else?
17     A.  Not that I recall at this time.  If you
18  told me names, I could tell you probably.
19     Q.  Do you know how many cases Anderson &
20  Wanca worked on collaboratively with Bock Law
21  Firm?
22     A.  Through what time frame?
23     Q.  Through any time frame.
24     A.  More than a hundred and 50.

1    Q.   At the time of Mr. Oppenheim's departure
2 in April of 2016, do you have an understanding of
3 how many cases were pending at that point in time
4 that -- where Anderson & Wanca and Bock Law Firm
5 were collaborating?
6    **A.   Other than the ones I just identified to**
7 **you, no.**
8    Q.   As to the more than 150 cases where
9 Anderson & Wanca and Bock Law Firm worked
10 together, do you have an understanding as to how
11 the division of labor worked?
12   **A.   I believe it was case specific.**
13   Q.   Do you have an understanding of who
14 prepared the settlement term sheets that were used
15 by both firms in collaborative cases?
16   **A.   I believe that was a collaborative**
17 **process and remains one.**
18   Q.   So when you say collaborative process,
19 you mean both Anderson & Wanca and Bock Law Firm
20 contributed to the words that were being used in
21 those settlement term sheets?
22   **A.   Correct.  My understanding is there was**
23 **a -- basically a template, and then the law firms**
24 **would collaborate to alter the template for case**

1 **specific, and that would be used.**
2    Q.   Okay.  So the TCPA claims are pretty
3 standard across cases as to their core elements,
4 right?
5    **A.   Frequently, yes.**
6    Q.   And so complaints are often used as a
7 model for the next case that the -- that is
8 brought, right?
9    **A.   Correct.**
10   Q.   And is it also true with respect to the
11 complaints that it was a collaborative process, or
12 did Anderson & Wanca generate all of the
13 complaints?
14   **A.   I -- I -- I don't know.**
15   Q.   As to the strategy and tactics used in
16 mediation, was there a general strategy and tactic
17 that was used across the TCPA cases?
18      MS. LOEW:  Objection.  To the extent
19 that's seeking, I guess, work product in cases
20 that are not this case, in mediations that are not
21 this case, I'll advise you not to answer.
22      **A.   Generally, the same materials were in**
23 **dispute in most of the joint cases.  So generally,**
24 **the same issues relative to position would be**

1 discussed.
2    Q.   Okay.  Do you have an understanding as
3 to whether or not Anderson & Wanca is asserting a
4 proprietary interest in any of the settlement term
5 sheets?
6    **A.   In the Medical & Chiro v. -- the Cin-Q**
7 **and Medical & Chiro v. Buccaneers action, is that**
8 **what you're asking?**
9    Q.   Certainly, start there, sure.
10      MS. LOEW:  Objection to foundation.
11   **A.   It's my understanding that those**
12 **documents could be covered by one or more of work**
13 **product, attorney-client privilege, or mediation**
14 **privilege.**
15   Q.   Okay.  Do you remember my question?
16   **A.   Yes.  Your question was whether or not**
17 **there was a privilege related to the actual term**
18 **sheets.**
19   Q.   I appreciate you clarifying.  The word I
20 used was proprietary interest on behalf of the law
21 firm.
22   **A.   I don't understand that question.**
23   Q.   Does Anderson & Wanca based on your
24 understanding assert a proprietary interest?  Do

1 you know what I mean by proprietary interest?
2    **A.   I mean, the word that's coming to my**
3 **mind is copyright.**
4    Q.   Okay.  That might work.
5      Do they claim that they own in any
6 meaningful sense those settlement term sheets that
7 were involved in the Medical & Chiropractic
8 litigation?
9      MS. LOEW:  Objection, foundation.
10   **A.   I don't understand the question.**
11   Q.   So you understand attorneys work for
12 clients.
13   **A.   Yes.**
14   Q.   And the clients have certain interests
15 related to the litigation.
16   **A.   Yes.**
17   Q.   And that the law firm may in some
18 instances claim their own interest.
19   **A.   In what?**
20   Q.   In the materials that were prepared for
21 a client.
22   **A.   I'm not aware.**
23   Q.   Okay.  So Anderson & Wanca is not
24 asserting any interest, apart from its clients

1  interests, over the settlement term sheets in
2  Medical & Chiropractic, fair?
3         MS. LOEW:  Objection to foundation.
4     **A.  I am not aware.**
5     Q.  All right.  So you don't know of any
6  interests that Anderson & Wanca is asserting
7  uniquely, apart from the interests of the client,
8  over the settlement term sheets involved in M & C?
9     **A.  Correct.**
10        MS. LOEW:  Objection, foundation.
11    **A.  Correct.**
12    Q.  Do you know who prepared the settlement
13  term sheets in connection with the M & C action?
14    **A.  There were a lot of them prepared.**
15    Q.  Okay.
16    **A.  Some were by myself and Mr. Oppenheim**
17  **and Mr. Addison.**
18    Q.  With respect to the settlement term
19  sheets that you prepared, did you use a standard
20  settlement term sheet that had been prepared in
21  earlier litigation?
22    **A.  Yes.**
23    Q.  Do you know who originally prepared the
24  settlement term sheet?

1     **A.  No.**
2     Q.  How much of the settlement term sheet
3  did you change for the M & C case?
4     **A.  I inserted information relative to the**
5  **discovery done to date and performed calculations.**
6     Q.  Okay.  So it's just the raw numbers was
7  pretty much all that changed?
8     **A.  And some sentences about the discovery**
9  **to date.**
10    Q.  You said that Anderson & Wanca is
11  asserting an intellectual property over the client
12  lists, the client lists being potential additional
13  class representatives that could be used in
14  several cases, two of which being the True Health
15  versus McKesson and Fauley versus Heska case.
16        Is there any other material that
17  Anderson & Wanca is asserting an intellectual
18  property over?
19    **A.  As I sit here today, I cannot think of**
20  **any others.**
21    Q.  How are those client lists proprietary
22  in your mind, Mr. Good?
23    **A.  We don't share them with anybody, and**
24  **they are ours; and we guard against people having**

1  access to them.
2         People, for example, have requested
3  access that are not part of Anderson Wanca; and we
4  have denied them access to that.
5     Q.  Who requested access?
6     **A.  Co-counsels.**
7     Q.  Which co-counsels?
8     **A.  Max Margulis has requested access in the**
9  **past.  I can't think of anybody else that's**
10 **requested access in the past.**
11    Q.  Okay.  You've identified a few instances
12  where you believe Mr. Oppenheim had lied today --
13    **A.  Yes.**
14    Q.  -- right?
15        Apart from the instances you've already
16  described, identify for me any other instance
17  where you believe that Mr. Oppenheim was lying.
18    **A.  I believe Mr. Oppenheim stated after his**
19  **resignation from Anderson Wanca that he provided**
20  **two weeks' notice.  That is not accurate.**
21    Q.  And what's the basis for you saying so?
22    **A.  His statement to me that he felt bad**
23  **only providing two days' notice and that he knew**
24  **that put me in a tough position because of an**

1  upcoming mediation in a case called Bunch v.
2  La-Z-Boy.  And that's L-a, dash, Z, dash, B-o-y.
3     Q.  Okay.  Were you present for the
4  conversation between Mr. Wanca and Mr. Oppenheim
5  as to his resignation?
6     **A.  No.  I was present before that**
7  **conversation.**
8     Q.  And your contention is that
9  Mr. Oppenheim told you before he resigned that he
10  was not providing two weeks' notice?
11    **A.  That is correct.**
12    Q.  And when did that conversation occur?
13    **A.  That occurred on April 8th immediately**
14  **after I returned from lunch before even I went to**
15  **my desk, which was really accidental as I was**
16  **intending to speak to the person in the office**
17  **next to Mr. Oppenheim.**
18    Q.  Okay.  And how long did that
19  conversation last?
20    **A.  About five minutes.**
21    Q.  Was there anyone else present?
22    **A.  As I stated before, Tina Natally was**
23  **outside the office at her desk, which is only a**
24  **few feet away from the door to where Mr. Oppenheim**

25  (Pages 94 to 97)

1　used to work; and she was there, but she was not
2　participating in the conversation.
3　　　Q.　Okay.　So as to the conversation where
4　Mr. Oppenheim spoke with the boss, which would be
5　Mr. Wanca, right?
6　　　**A.　Yes.**
7　　　Q.　You don't know what actually was said in
8　that conversation.
9　　　**A.　I spoke -- as I said, I spoke to**
10　**Mr. Oppenheim before that conversation, and I**
11　**subsequently spoke to Mr. Wanca.**
12　　　Q.　Okay.　What did Mr. Wanca say?
13　　　**A.　He said that Mr. Oppenheim had offered**
14　**two days' notice so that he could go with me to a**
15　**mediation in North Carolina for the case of Bunch**
16　**v. La-Z-Boy.**
17　　　**He said that Mr. Oppenheim had been**
18　**offered partnership, substantially more money, and**
19　**his name on the door, and that he had taken an**
20　**offer from Mr. Bock.**
21　　　**I responded that I did not believe it**
22　**was a good idea to allow Mr. Oppenheim continued**
23　**access to Anderson Wanca materials, including but**
24　**not limited to the laptop and emails, for any**

1　period of time.
2　　　**Mr. Wanca agreed with me that we should**
3　**let him go immediately, and I told Mr. Oppenheim**
4　**this.　And I called it my going-away present.**
5　　　Q.　Why did you call it that?
6　　　**A.　Because he didn't want to stay the two**
7　**days.　He told me he was doing it for me.**
8　　　Q.　And you rejected that offer?
9　　　**A.　I thought I was being nice.**
10　　　Q.　Okay.　So you contend that Mr. Oppenheim
11　lied by saying that he gave two weeks when he only
12　gave two days, but it was you that rejected the
13　two-day offer that he made.　Did I get that
14　correct?
15　　　**A.　Correct, that is correct.**
16　　　Q.　Okay.　So even if he offered two weeks,
17　you would have rejected that?
18　　　**A.　It's still a lie.**
19　　　　　MS. LOEW:　Objection --
20　BY MR. BLONIEN:
21　　　Q.　That wasn't my question.
22　　　**A.　Oh.**
23　　　　　MS. LOEW:　-- speculation.
24

1　BY MR. BLONIEN:
2　　　Q.　My question was whether you still would
3　have rejected that.
4　　　　　THE REPORTER:　One at a time.
5　　　**A.　Yes, I still would have rejected that.**
6　　　Q.　Okay.　Is there any other instance where
7　you believe Mr. Oppenheim was lying?
8　　　**A.　Just give me a second.**
9　　　**Oh, he said he was being made a partner.**
10　　　Q.　When did he say that?
11　　　**A.　To me before resigning.**
12　　　Q.　In that same conversation you just
13　referred to?
14　　　**A.　Correct.**
15　　　Q.　Anything else?
16　　　**A.　No.　That's it.**
17　　　Q.　Were you upset that Mr. Oppenheim left
18　the firm?
19　　　**A.　No.　I was the first one to congratulate**
20　**him.**
21　　　Q.　Do you have any factual basis to believe
22　that Mr. Oppenheim shared any of the information
23　that he had with Bock Law Firm?
24　　　**A.　Yes.**

1　　　Q.　And what's the basis for that?
2　　　**A.　Emails produced.**
3　　　Q.　All right.　And what in particular are
4　you referring to, Mr. Good?
5　　　**A.　Mr. Oppenheim's sharing of the**
6　**mediator's impression from the mediation with**
7　**Mr. Bock.**
8　　　Q.　In the April emails you were referring
9　to earlier?
10　　　**A.　Yes.**
11　　　Q.　Any other information that you believe
12　that you possess?
13　　　**A.　I'm sorry.　Can you repeat what the**
14　**question was before that question?**
15　　　Q.　As to -- that Mr. Oppenheim used any
16　information that he had and shared it with Bock
17　Law Firm.
18　　　And you said --
19　　　**A.　The fact --**
20　　　Q.　-- the emails produced sharing the
21　mediator information was one such instance.
22　　　And I'm asking:　What else?
23　　　**A.　Some of the emails produced by you that**
24　**were Bates labeled with the OPP give the name at**

1   the top Jorge Labarga, which indicates to me that
2   those emails were at some point provided to Bock,
3   Hatch, Lewis, Oppenheim employee Jorge Labarga.
4       I would also like to go back if that's
5   okay at some point.  There's one more lie I would
6   like to bring up.
7      Q.   Sure, go right ahead.
8      A.   Mr. Oppenheim also emailed to
9   Mr. Addison an email that was -- I was either a
10  part of or subsequently a part of in which
11  Mr. Oppenheim claimed to have never shared any
12  information about the Cin-Q and Medical & Chiro
13  action with Mr. Bock.
14     Q.   Okay.  And what's your basis for
15  asserting that that's false?
16     A.   The email I just mentioned to you where
17  Mr. Oppenheim shared the mediator's impressions
18  with Mr. Bock.
19     Q.   Okay.  Apart from those emails, do you
20  have any information to demonstrate that
21  Mr. Oppenheim shared information with Bock Law
22  Firm relating to M & C?
23     A.   Just those emails and the fact that
24  Jorge Labarga's name is on a bunch of documents.

1     Q.   Anything else?
2     A.   No.
3     Q.   Do you believe that you were harmed by
4  Mr. Oppenheim's conduct?
5     A.   Yes.
6     Q.   How?
7     A.   I'm the one that set up the security on
8  Mr. Oppenheim and everybody else's computers.  And
9  it was quite embarrassing for me for my security,
10  which Mr. Oppenheim was aware of, to be used
11  against the firm and its clients.
12     Q.   How was it used against the firm and its
13  clients?
14     A.   If I had put more security on
15  Mr. Oppenheim's laptop, I would have known when
16  the stuff was taken almost immediately.
17     Q.   So you feel embarrassed that your tech
18  savvy fell short in this instance and that you
19  weren't able to discern that Mr. Oppenheim copied
20  information from the laptop?
21     A.   No.  I feel embarrassed that I told
22  Mr. Oppenheim about the security.
23     Q.   What did you tell him about the
24  security?

1     A.   I told him what security was on the
2  laptop relative to the server and support staff
3  computers at Anderson Wanca.
4     Q.   Okay.  Were you harmed in any other way,
5  aside from your embarrassment, Mr. Good?
6     A.   I did a lot of work on the Medical &
7  Chiro and Cin-Q action which has now been delayed
8  over 17 months as a result of Mr. Oppenheim.
9     Q.   So you did a lot of work that's been
10  delayed?
11     A.   Correct.
12     Q.   Is there any other way that you believe
13  you have been injured by Mr. Oppenheim's conduct?
14     A.   Not that I can think of.
15     Q.   Do you know how much work you did on the
16  M & C case before it was delayed by Mr. Oppenheim
17  in your view?
18     A.   Hundreds and hundreds of hours.
19     Q.   Hundreds and hundreds?
20     A.   Yes.
21     Q.   Can you be any more specific?
22     A.   No.  Well, strike that.
23     I -- if I could look at my billing
24  records, I could be more specific.  But as I sit

1   here today, I cannot be more specific.
2     Q.   Are you seeking to recover in this
3  litigation, M & C's litigation, against
4  Mr. Oppenheim and Bock Law Firm any of the
5  hundreds and hundreds of hours that you spent?
6     A.   No.
7     Q.   Are you seeking to recover for the
8  embarrassment that you suffered?
9     A.   I don't believe that would be possible.
10     Q.   Are you seeking to recover anything in
11  connection with this case?
12     A.   No.  This is M & C's case.
13     Q.   Have you spoken to M & C about this
14  case?
15     A.   I discussed the scheduling of matters in
16  this case.
17     Q.   Anything else, any other conversations
18  about this case with M & C?
19     A.   The discussions only related to
20  scheduling and things that related to the Cin-Q
21  and Medical & Chiro v. Buccaneers case.
22     Q.   Did you discuss M & C's potential claims
23  with M & C?
24     A.   You mean the claims at issue in this

27 (Pages 102 to 105)

1   case or --
2     Q.  (Nodding head.)
3     **A.  You're --**
4     Q.  Yes.
5     **A.  -- nodding your head yes.**
6     Q.  I mean, the claims at issue in this
7   case.  Did you discuss the breach of fiduciary
8   duty or aiding and abetting claims with M & C at
9   any point?
10    **A.  As I was their main contact person, I --**
11  **I believe I did.  I do not have a specific**
12  **recollection.**
13    Q.  Do you recall when those conversations
14  may have occurred?
15    **A.  I believe it would have been in May or**
16  **June of 2016.**
17    Q.  And do you recall anything about the
18  substance of those discussions?
19    **A.  I do not.**
20    MS. LOEW:  To the extent -- that's fine.
21  BY MR. BLONIEN:
22    Q.  Do you have a copy of your engagement
23  agreement with M & C?
24    **A.  Do you mean Anderson Wanca's?**

1     Q.  Do you have an agreement with M & C?
2     **A.  No.**
3     Q.  Do you have -- are you aware of any
4  agreement that would likely apply to you?
5     **A.  Yes.**
6     Q.  Okay.  What agreement is that?
7     **A.  The retainer agreement that is signed by**
8  **Brian Wanca and M & C.**
9     Q.  Okay.  Have you reviewed that in
10  preparation for today's deposition?
11    **A.  Not in preparation for today's**
12  **deposition, but, yes, I have reviewed it in the**
13  **past.**
14    Q.  When did you review it?
15    **A.  I -- I specifically recall reviewing it**
16  **at the time that I pulled it for the -- per the**
17  **request of the Foley attorneys.  I don't have a**
18  **specific recollection of reviewing it, that**
19  **agreement, since then.**
20    Q.  Okay.  What about before then?
21    **A.  I believe I reviewed it and the Cin-Q**
22  **retainer before one of the depositions I handled**
23  **in the Buccaneers litigation.**
24    Q.  Do you know whether Anderson & Wanca

1   signed the Cin-Q retention agreement?
2     **A.  I assume they did.  I do not have a**
3  **specific recollection of it though.**
4     Q.  Okay.  I don't want you to assume.
5     **A.  Okay.**
6     Q.  You said that you did review the Cin-Q
7  representation agreement --
8     **A.  Yeah.**
9     Q.  -- before one of the depositions in that
10  class action, right?
11    **A.  Correct.**
12    Q.  Do you recall in your review whether or
13  not Addison, Anderson & Wanca was listed as
14  counsel for Cin-Q?
15    **A.  I do not have a specific recollection.**
16    Q.  Do you recall who was listed as counsel
17  for M & C in the retention agreement that you
18  referred to?
19    **A.  I believe it was Anderson Wanca and**
20  **Michael Addison.**
21    Q.  Okay.  And did both Mr. Addison and
22  Mr. Wanca sign the agreement?
23    **A.  I believe they both did.**
24    Q.  And did M & C sign the agreement?

1     **A.  I believe Michelle Zakzrewski on behalf**
2  **of M & C did.**
3     Q.  Okay.  And do you know when that
4  agreement was entered?
5     **A.  I think it was 2013.**
6     Q.  Do you know whether there were any other
7  representation agreements signed with M & C before
8  that point?
9     **A.  For other cases, there were.**
10    Q.  Okay.  Have you reviewed those other
11  cases' representation agreements?
12    **A.  I may have at the time they were signed.**
13  **I do not recall any review in years.**
14    Q.  Did you search for those representation
15  agreements in responding to the subpoena request
16  that you received?
17    **A.  And I just want to make sure I**
18  **understand your question.  Are you asking if I**
19  **recall review -- can you repeat the question?**
20    Q.  I -- let me do a different question --
21    **A.  Yes.**
22    Q.  -- for you.
23    M & C was represented by Anderson &
24  Wanca in other cases; is that your understanding?

1    A.  Yes.
2    Q.  And were written agreements signed as to
3  those cases?
4    A.  Yes.
5    Q.  Do you know whether they were produced
6  in this litigation?
7    A.  I do not know.
8    Q.  Did you review and produce those
9  documents?
10    A.  I definitely did not review those
11  documents.  I may have produced them to the Foley
12  attorneys.  I do not recall.
13    Q.  Do you know whether M & C made any
14  request of Anderson & Wanca to search for
15  responsive documents in this case?
16    A.  I believe they did.
17    Q.  Before receiving your subpoenas?
18    A.  Yes, I believe they did.
19    Q.  Okay.  And do you know what the scope of
20  Anderson & Wanca's search for documents was at
21  that time before the subpoenas?
22    A.  I do not recall.
23    Q.  You don't recall?
24    Do you know who performed that search?

1    A.  I did.
2    Q.  You did.
3    A.  Yes.
4    Q.  But you don't recall what you searched
5  for?
6    A.  I do not.
7    Q.  Do you recall the instructions that M &
8  C provided to you as to what to search for?
9    A.  No.
10    Q.  At what time did Foley & Lardner begin
11  to represent you?
12    A.  I believe shortly before the subpoena,
13  it was discussed; and the decision was made that
14  we agreed they would represent me.
15    (Whereupon Deposition Exhibit
16    No. 1 was marked for
17    identification by the court
18    reporter.)
19  BY MR. BLONIEN:
20    Q.  Mr. Good, I'm marking Exhibit Number 1,
21  if you could take a moment to review.
22    A.  Thank you.
23    Q.  And let me know when you're ready for
24  some questions.

1    A.  I'm ready.
2    Q.  Have you seen this document before?
3    A.  Yes.
4    Q.  Is this the retention agreement that you
5  were referring to in your testimony a minute ago?
6    A.  Yes.
7    Q.  This is the retention agreement between
8  M & C and the Anderson & Wanca, correct?
9    A.  Yes.
10    Q.  And this is the only retention agreement
11  that you're aware of that covers the M & C
12  litigation against the Tampa Bay Buccaneers.
13    A.  Yes.
14    Q.  And you're not aware of any other
15  agreements signed after October 9th that changed
16  these terms?
17    A.  Correct.
18    Q.  If you look on MC 190.
19    A.  Yes.
20    Q.  Do you see Ms. Zakzrewski's signature
21  there?
22    A.  Yes, I do.
23    Q.  And do you see Mr. Wanca's signature?
24    A.  Yes.

1    Q.  And both of those were signed on
2  October 9th, 2013, correct?
3    A.  That's what the document says.
4    Q.  Are you aware or do you have any reason
5  to believe that that's not the case --
6    A.  I --
7    Q.  -- they were signed on October 9th?
8    A.  I have no reason to believe that wasn't
9  the case.
10    Q.  So you have no reason to doubt that this
11  was signed when it purports to have been signed.
12    A.  Correct.
13    Q.  And can you identify for me what page
14  Mr. Addison's signature would be located on?
15    A.  I do not see Mr. Addison's signature.
16    Q.  If Mr. Addison signed this document, it
17  would likely be on the same page, right?
18    A.  Yes.
19    Q.  And it's nowhere else to be found in
20  this document, correct?
21    A.  That is correct.
22    Q.  This is the document that controls the
23  scope of the representation, right?
24    A.  Yes.

1     Q.  And the terms of the representation.

2     **A.  Yes.**

3     Q.  In this document, if you look at the

4 bottom of 189, please, Mr. Good, it states, "Other

5 attorneys. Client agrees that plaintiff's counsel

6 may affiliate with other law firms to assist with

7 this representation, shall notify client of such

8 affiliation, and shall provide client with such

9 other attorney's agreement to the terms of the

10 this retainer agreement" --

11     **A.  Mm-hmm.**

12     Q.  -- "and shall obtain client's written

13 consent to such retention."

14        Did I read that correctly?

15     **A.  You did.**

16     Q.  Did that happen in this instance?

17     **A.  I recall having the discussions. I do**

18 **not -- I don't know if or where the client**

19 **provided written consent to such retention.**

20     Q.  Okay. But it's certainly not in this

21 agreement, right?

22     **A.  Correct.**

23     Q.  And you're not aware of any other

24 agreement that was signed by Ms. Zakzrewski

1 covering the terms of her representation in

2 connection with the Tampa Bay Buccaneers

3 litigation, right?

4     **A.  Correct.**

5     Q.  Did Mr. Addison represent M & C under

6 your understanding?

7     **A.  Yes.**

8     Q.  In what capacity did Mr. Addison,

9 Mr. Addison, represent M & C?

10     **A.  Attorney of record in the Buccaneers**

11 **litigation.**

12     Q.  Do you know when that relationship

13 purportedly began?

14     **A.  I believe it was either 2012 or 2013.**

15     Q.  Okay. Is there a particular event that

16 you recall that started the relationship with

17 Mr. Addison and M & C?

18     **A.  I believe there was either an M & C**

19 **intervening or the case is -- they became**

20 **co-plaintiffs, M & C and Cin-Q. I believe that's**

21 **the event.**

22     Q.  Is there anyone else who also

23 represented M & C, apart from Anderson & Wanca

24 and, according to your testimony, Mr. Addison?

1     **A.  The ethics counsel.**

2     Q.  I appreciate that. The ethics counsel

3 didn't represent M & C in connection with the

4 Tampa Bay Buccaneers litigation, did they?

5     **A.  No.**

6     Q.  Okay. With respect to the Tampa Bay

7 Buccaneers litigation, are there other attorneys

8 who represented M & C apart from Anderson & Wanca

9 according to this retention agreement, and

10 Mr. Addison, according to your testimony?

11     **A.  I'm not sure.**

12     Q.  Do you know what the financial terms of

13 Mr. Addison's representation of M & C were in

14 connection with the Tampa Bay Buccaneers

15 litigation?

16        THE WITNESS: I'm sorry. Can you repeat

17 the question?

18        (Whereupon, record was read as

19        requested.)

20     **A.  I do not.**

21     Q.  Do you know whether there were any terms

22 that were agreed to?

23     **A.  I do not know.**

24     Q.  You would agree that those terms are not

1 listed in the document that I handed you, correct?

2     **A.  That is correct.**

3     Q.  If you could also look at 189 again.

4     **A.  Mm-hmm.**

5     Q.  Two paragraphs before the paragraph that

6 says class representative, about in the middle of

7 the page, there's a freestanding sentence that

8 reads, "Plaintiff's counsel agree that any

9 agreement among counsel as to the division of fees

10 and costs among them shall be in writing and that

11 be subject to client's written consent?"

12     **A.  I see that.**

13     Q.  Do you know whether that happened in

14 this instance?

15     **A.  I know that -- I know that it was**

16 **discussed. I do not know that it -- if it was**

17 **ever in writing.**

18     Q.  Who discussed it with whom?

19     **A.  I discussed it with Michelle Zakzrewski.**

20     Q.  You discussed what in particular?

21     **A.  I discussed a settlement offer that was**

22 **made in another action to another plaintiff with**

23 **Ms. Zakzrewski.**

24     Q.  Where Ms. Zakzrewski was a class

Thompson Court Reporters, Inc
thompsonreporters.com

1 representative?
2 **A. No.**
3 Q. Okay. Can you tell me more about that
4 discussion?
5 **A. There was sometime, I believe, in 2014,**
6 **although I would say give or take a year, myself,**
7 **David Oppenheim, and Brian Wanca were contacted by**
8 **another attorney whose name is Joe Siprut that**
9 **had, I believe, two cases against the Buccaneers;**
10 **and they had received a settlement offer from the**
11 **defendant that he conveyed to us and was**
12 **subsequently conveyed to Michelle Zakzrewski.**
13 Q. In connection with the Tampa Bay
14 Buccaneers litigation?
15 **A. It was a settlement offer made by the**
16 **Buccaneers to Joe Siprut's clients.**
17 Q. Just to Joe Siprut's clients?
18 **A. No. It was a class-wide offer made to**
19 **Joe Siprut.**
20 Q. What was the offer?
21 **A. The exact offer I don't remember, but it**
22 **was something like a million dollars in coupons.**
23 Q. And when did you convey to M & C the
24 offer that Mr. Siprut received from the Tampa Bay

1 Buccaneers?
2 **A. Shortly after a discussion between**
3 **myself, David Oppenheim, and Brian Wanca.**
4 Q. And when would the conversation have
5 occurred?
6 **A. Immediately after Joe Siprut called.**
7 Q. Joe Siprut did not represent M & C,
8 correct?
9 **A. Correct.**
10 Q. Joe Siprut represented other class
11 plaintiffs in the Tampa Bay Buccaneers class
12 action?
13 **A. Two of them, but correct.**
14 Q. Just two?
15 **A. There were two other class actions. One**
16 **of them, I believe, only had one plaintiff. The**
17 **other, I believe, had approximately six.**
18 Q. Okay. And Mr. Siprut represented all of
19 those class representatives?
20 **A. Correct.**
21 Q. And did -- was there an agreement among
22 counsel as to the division of fees as between
23 Anderson & Wanca and Mr. Addison?
24 THE WITNESS: I'm sorry. Can you repeat

1 the question?
2 (Whereupon, record was read as
3 requested.)
4 **A. I don't know. Can you rephrase the**
5 **question?**
6 Q. Did Anderson & Wanca and Mr. Addison
7 agree how they would split up the fees?
8 **A. Anderson Wanca, Mr. Addison, and Siprut**
9 **and whoever his local was did make an agreement.**
10 **I don't know whether there was one solely between**
11 **Mr. Wanca and Mr. Addison prior.**
12 Q. You weren't aware of any such agreement?
13 **A. Prior, I was not.**
14 Q. Prior, you mean prior as in there was an
15 agreement with essentially three parties;
16 Mr. Siprut, Mr. Addison, and Anderson & Wanca?
17 **A. I would just say four because Siprut had**
18 **a local. His name, I think, was something Thomas**
19 **or Thomas something.**
20 Q. Could it be James or Jim?
21 **A. That could be.**
22 Q. Is there also an Ismael Salam --
23 **A. Ismael was an employee of Joe Siprut's**
24 **that I had worked with, but Ismael was not a party**

1 **because he was just an associate attorney formerly**
2 **of Siprut PC.**
3 Q. Okay. And there was an agreement with
4 Mr. Siprut's firm, Mr. Thomas's firm, Mr. Addison,
5 and Anderson & Wanca as to the division of fees in
6 connection with anything recovered in the Tampa
7 Bay Buccaneers litigation?
8 **A. Yes.**
9 Q. And do you know what the terms were?
10 **A. I don't want to guess. I don't recall.**
11 **I know they were spelled out in writing. But off**
12 **the top of my head, I do not recall.**
13 Q. But you do recall seeing a writing where
14 the terms were spelled out.
15 **A. Correct.**
16 Q. Did you produce that writing in
17 connection with the subpoena?
18 **A. I recall producing to the Foley**
19 **attorneys all of the retainer agreements for those**
20 **people formally solely represented by Siprut and**
21 **Mr. Thomas; and then subsequently, I believe the**
22 **retainer agreements laid that information out.**
23 Q. Do you know when the agreements were
24 modified?

Thompson Court Reporters, Inc
thompsonreporters.com

1    A.   I don't know.  It was shortly after the
2  discussion with Siprut about the offer that he had
3  received.
4    Q.   Do you know what year that occurred?
5    A.   I believe it was either 2014 or 2015.
6  It was definitely before the second mediation in
7  the Buccaneers case, which was in August of 2015.
8  It would have had to have been summer or earlier
9  2015, but I think it was late 2014.  That's my
10  best recollection.
11    If you show me the retainer agreement,
12  that would tell us.
13    Q.   This would be the retainer agreement
14  with Joe Siprut's clients?
15    A.   Yes.
16    Q.   Was there any other agreement where the
17  terms of the division of fees among counsel were
18  set out?
19    A.   Not that I'm aware.
20    Q.   Do you know of any other terms as
21  between these counsel involved in the Tampa Bay
22  Buccaneers litigation?
23    A.   No.
24    Q.   Was there an agreement as to the

1  division of labor?
2    A.   It was my understanding that I would
3  continue leading the discovery efforts and that
4  myself, Mike Addison, Brian Wanca, David Oppenheim
5  would lead any discussions of settlement; and
6  Anderson Wanca's staff would take care of at least
7  the initial draft of any substantive pleadings.
8    Q.   Do you know whether there was any work
9  anticipated from the Siprut law firm?
10    A.   What do you mean by "work anticipated?"
11    Q.   Was it expected that the Siprut law firm
12  would perform legal services in connection with
13  the Tampa Bay Buccaneers class action litigation
14  after this co-counsel agreement was entered?
15    A.   Yes.
16    Q.   What was their expected role?
17    A.   Producing clients for deposition by the
18  Buccaneers.
19    Q.   Anything else?
20    A.   Nothing that I can think of.
21    Q.   Do you know whether the amount of fees
22  that each party was to receive had any
23  relationship to the amount of work --
24    A.   I do -- I'm sorry for interrupting.

1    Q.   -- that they had put into the case?
2    A.   I do not know.
3    Q.   Did you keep track of hours?
4    A.   Yes.
5    Q.   You wrote down all the hours that you
6  worked on this case?
7    A.   I typed them in, but yes.
8    Q.   Okay.  Do you know whether other
9  co-counsel did the same?
10    A.   I believe they did.
11    Q.   And do you know whether the terms of
12  payment in any way related to the hours that were
13  being kept?
14    A.   I do not know.
15    Q.   Did you anticipate that you would have
16  to submit your hours in order to seek compensation
17  for the time that you spent in the Tampa Bay
18  Buccaneers litigation?
19    A.   That is not why I kept my hours.
20    Q.   Why did you keep your hours?
21    A.   All Anderson Wanca attorneys were
22  instructed to keep hours for all activities,
23  whether it related for a pending action, a future
24  action, or CLEs.

1    Q.   So to the extent that we were to request
2  how many hours Anderson & Wanca has spent on the
3  Tampa Bay Buccaneers litigation, the general
4  practice and policy of the firm would allow us
5  access to that information?
6    A.   It would -- you would be able to pull
7  that from our case management system, correct.
8    Q.   Okay.  But apart from hundreds and
9  hundreds of hours, sitting here today, you don't
10  have an estimate?
11    A.   No.
12    Q.   Have you gone back to look at how much
13  time you spent?
14    A.   I have not.
15    Q.   When did the attorney-client
16  relationship begin with Anderson & Wanca and M &
17  C?
18    A.   I believe prior to their first case with
19  Anderson Wanca.
20    Q.   When did the relationship begin with
21  respect to the Tampa Bay Buccaneers litigation
22  between M & C and Anderson & Wanca?
23    A.   I don't recall.
24    Q.   Do you know if it's ongoing?

Thompson Court Reporters, Inc
thompsonreporters.com

1    **A.  Yes.**

2    Q.  What is the scope of that relationship?

3    **A.  With regards to the Buccaneers?**

4    Q.  Mm-hmm, yes.

5    **A.  To pursue claims against the Buccaneers**

6  **on behalf of M & C and the putative class.**

7    Q.  And the scope of that representation is

8  limited to the litigation involving the Tampa Bay

9  Buccaneers, correct?

10    **A.  Correct.**

11    Q.  The scope of that relationship with M &

12  C does not extend to this case, correct?

13    **A.  Anderson Wanca is not counsel of record**

14  **in this case.**

15    Q.  Okay.  Well, there's counsel of record

16  and then there's counsel.  Is Anderson & Wanca in

17  any way providing legal services in connection

18  with this case?

19    **A.  We responded to subpoenas in this case.**

20  **Is that responsive to your question?**

21    Q.  I don't think so.

22    **A.  Okay.  Can you -- can you give me an**

23  **example of what you're looking for me to provide?**

24  **I don't know how to answer your question.**

1    Q.  In connection with legal services,

2  oftentimes there's an agreement that reflects the

3  scope of the arrangement, right?

4    **A.  Yes.**

5    Q.  So oftentimes, the scope of an

6  attorney-client relationship is limited, right?

7    **A.  I believe in all times, but yes.**

8    Q.  Okay.  And the scope of Anderson &

9  Wanca's representation of M & C, recognizing there

10  are other class actions that are out there.

11    **A.  Yes.**

12    Q.  But the retention agreement says it's

13  limited to the Buccaneers litigation, correct?

14    **A.  Correct.**

15    Q.  You understand that M & C has sued my

16  client?

17    **A.  Yes.**

18    Q.  And Bock Law Firm?

19    **A.  Yes.**

20    Q.  And in connection with that lawsuit,

21  Anderson & Wanca is not not only attorney of

22  record, it is not an attorney in connection with

23  this case representing Medical & Chiropractic,

24  correct?

1    **A.  I do not know the terms of the agreement**

2  **between Foley, Anderson Wanca, and Medical &**

3  **Chiro; so I cannot answer that question.**

4    Q.  Do you have any understanding as to

5  whether or not Anderson & Wanca is providing legal

6  services in connection with this case, this case

7  being the breach of fiduciary duty action that M &

8  C has brought against Mr. Oppenheim and Bock Law

9  Firm?

10    **A.  I do not know.**

11    Q.  So you don't know of any way in which

12  Anderson & Wanca is providing legal services in

13  this case?

14    **A.  Correct.**

15    Q.  Okay.  And you're not aware of any

16  agreement that would set up such a relationship,

17  right?

18    **A.  I'm aware of an agreement between**

19  **Medical & Chiro, the Foley attorneys, and Anderson**

20  **Wanca; and I am not aware of the terms of said**

21  **agreement.**

22    Q.  So you don't know in that agreement

23  whether or not Anderson & Wanca and M & C have an

24  attorney-client relationship?

1    **A.  That is correct.**

2    MR. BLONIEN:  Is it the contention of

3  Foley & Lardner that that relationship is one of

4  attorney and client?

5    MS. LOEW:  I mean, for -- what are --

6  what are you asking me?

7    MR. BLONIEN:  I'm trying to understand

8  what role Anderson & Wanca has in this case,

9  whether they serve any role as an attorney.  The

10  witness just said that the agreement, which is

11  heavily redacted apart from the fees, may contain

12  information that suggests that Anderson & Wanca

13  represents M & C in this case, in this case.

14    MS. LOEW:  I mean, I'm not -- Ross is

15  here to testify.  To the extent you ask about

16  legal advice that they have provided to M & C,

17  then, you know, that would be covered by their

18  attorney-client relationship with M & C.

19    MR. COHEN:  Legal advice they provide in

20  this case?

21    MS. LOEW:  I don't know if they provided

22  legal advice in this case.  You'll have to ask

23  Ross.

24

BY MR. BLONIEN:

1  Q.  Have you provided any legal advice in
3  this case, Mr. Good?
4  **A.  No.**
5  Q.  Has anyone at Anderson & Wanca provided
6  legal advice to M & C in connection with this
7  case?
8  **A.  I don't believe so, no.**
9  Q.  Okay.  But you have no facts to suggest
10  that, in fact, that is the case?
11  **A.  That is correct.**
12  Q.  Okay.  What duties do you and Anderson &
13  Wanca owe to Medical & Chiropractic in connection
14  with your representation of them in the Tampa Bay
15  Buccaneers litigation?
16  **A.  I believe the same duties that any**
17  **attorney owes under the Florida Rules of**
18  **Professional Conduct and, additionally, the**
19  **Illinois Rules of Professional Conduct.**
20  Q.  Okay.  That's not an answer to my
21  question.  It's just a punt.
22  MS. LOEW:  Objection to counsel's
23  characterization of the witness's statement.

BY MR. BLONIEN:

2  Q.  What duties do you owe and your firm owe
3  to M & C in connection with the Tampa Bay
4  Buccaneers litigation?
5  **A.  We have agreed to pursue Medical &**
6  **Chiro's claim as well as the putative class**
7  **against the Buccaneers.**
8  Q.  So you've pursued a class action on
9  behalf of M & C.
10  **A.  Correct.**
11  Q.  You haven't pursued any individual
12  claims on behalf of M & C, correct?
13  **A.  Are you saying ever?**
14  Q.  In connection with the Tampa Bay
15  Buccaneers.
16  **A.  Then correct.**
17  Q.  At all times, you were representing the
18  class, right?
19  **A.  Again, relation to the Buccaneers.**
20  Q.  This line of questions is --
21  **A.  Yeah.  Okay.**
22  Q.  -- specific to the Tampa Bay Buccaneers
23  litigation, and I appreciate that clarification.
24  So in connection with the Tampa Bay

1  Buccaneers litigation --
2  **A.  Mm-hmm.**
3  Q.  -- you represented the class.
4  **A.  We -- we -- putative class, we would**
5  **like to, yes.**
6  Q.  You sought to represent the class.
7  **A.  We did.**
8  Q.  And only the class.
9  **A.  No.**
10  Q.  At no time did you advance the
11  individual claims in this case, correct?
12  **A.  That is not --**
13  MS. LOEW:  Objection, form.
14  **A.  I apologize.**
15  **That is not correct.**
16  Q.  All right.  You understand that the
17  duties in a class action are owed to the class
18  itself, correct?
19  MS. LOEW:  Objection to form.
20  **A.  Yes.**
21  Q.  And that you didn't have any sort of
22  special relationship with the class representative
23  in this case, correct?
24  **A.  We had this retainer agreement.**

1  Q.  I understand that.  But certainly you
2  didn't offer M -- M & C any promises with respect
3  to the litigation, right?
4  **A.  Correct.**
5  Q.  And you didn't offer them any special
6  treatment, right?
7  **A.  Correct.**
8  Q.  And you didn't offer them any sort of
9  award, apart from what the class members would
10  ordinarily receive, correct?
11  **A.  Correct.**
12  Q.  And understanding that in some
13  circumstances, judges award class representatives
14  an incentive award, you didn't promise M & C that
15  they would receive an incentive award, correct?
16  **A.  Correct.**
17  Q.  Is there any other way in which M & C
18  was treated special or different than any other
19  member of the class from your perspective?
20  **A.  Yes.**
21  Q.  What would that be?
22  **A.  The Buccaneers requested that a court**
23  **allow briefing on summary judgment related to the**
24  **individual claim prior to class certification.**

34 (Pages 130 to 133)

1  Plaintiff's counsel briefed summary judgment and
2  defeated defendant's motion for summary judgment
3  of M & C's individual claim.
4      Q.   What was the basis for Tampa Bay
5  Buccaneers' argument on summary judgment?
6      A.   I don't remember.  You know, give me a
7  minute.  Let me think about this one.
8      Q.   Sure.  I need to use the restroom
9  anyway.  We can make it a really short break if
10  you want to just think on it for a second.
11      A.   That would be great.  Thank you.
12      Q.   Sure.
13          THE VIDEOGRAPHER:  Off the record.  The
14  time is 11:37.
15          (Whereupon, a lunch break was
16              taken.)
17          (Whereupon, record was read as
18              requested.)
19          THE VIDEOGRAPHER:  We are back on the
20  record.  The time is 2:30.
21  BY MR. BLONIEN:
22      Q.   Mr. Good, before the break, I had asked
23  you:  What was the basis for Tampa Bay's summary
24  judgment motion against Medical & Chiropractic; do

1  you remember that?
2      A.   I remember you asking the question, yes.
3      Q.   Did you have an opportunity to consider
4  that question?
5      A.   I have thought about it, yes.
6      Q.   Okay.  Please answer.
7      A.   I don't remember the specifics, but I do
8  remember in the hearing leading up to the briefing
9  schedule being entered, the defense counsel said
10  individualized issues that would serve as a final
11  motion for summary judgment; and they repeatedly
12  made that point that it would be a final motion
13  for summary judgment.
14      Q.   And do you know whether any of the other
15  class members, apart from Medical & Chiropractic,
16  shared of -- any of the defects as from Tampa
17  Bay's perspective they raised in the summary
18  judgment motion?
19      A.   I don't recall.
20      Q.   Do you recall anything else about the
21  summary judgment motion?
22      A.   Can you be more specific?
23      Q.   With respect to the individual claims of
24  M & C, which is how the question came up --

1      A.   Mm-hmm.
2      Q.   -- do you recall anything else about the
3  nature of the summary judgment that would help us
4  understand the individualized nature of the claim
5  as compared to the class allegations that were
6  made in that case?
7      A.   No.
8      Q.   Thank you.
9          Have you ever represented M & C in any
10  capacity outside of the Tampa Bay Buccaneers
11  litigation?
12      A.   Yes.
13      Q.   In what matters?
14      A.   Medical & Chiro v. EClinicalWorks and
15  Medical & Chiro v. KMH.  There might be others,
16  but those are the two that I recall.
17      Q.   And you don't recall anything else
18  sitting here today?
19      A.   I believe there was something earlier,
20  but I don't recall what it was.
21      Q.   Do you have an estimation of when?
22      A.   No.
23      Q.   Or any other information that you can
24  share today, Mr. Good?

1      A.   I think it was against a health care
2  company, but I don't recall the name of it.
3      Q.   Do you remember the jurisdiction?
4      A.   I -- I can't guess.
5      Q.   Have you represented Medical &
6  Chiropractic in connection with this matter, the
7  breach of fiduciary action?
8      A.   I have been a part of discussions
9  related to the breach of fiduciary duty as it
10  relates to the Buccaneers case.
11      Q.   As it relates to the class action?
12      A.   The putative class action, correct.
13      Q.   Putative because the court hasn't
14  approved any certification of the class, correct?
15      A.   No.  Putative because initially, the
16  Bock Hatch preliminary approval was granted.
17      Q.   Was certification granted in the Tampa
18  Bay Buccaneers litigation that M & C pursued?
19      A.   Not yet.
20      Q.   And was Medical & Chiropractic at any
21  point designated with the imprimatur of the court
22  as the class representative?
23      A.   Not yet.
24      Q.   Okay.  So is the litigation that M & C

1 brought against Tampa Bay Buccaneers, is that
2 appropriately called a putative class action or a
3 certified class action or something else?
4 **A. It's listed as Cin-Q and Medical &**
5 **Chiro, individually and on behalf of similarly**
6 **situated people. I refer to it as a putative**
7 **class action.**
8 Q. Right. That's the same language you
9 always see in class actions, right?
10 **A. Yes.**
11 Q. How long have you been practicing,
12 Mr. Good?
13 **A. I became an attorney on October 31st,**
14 **2013.**
15 Q. Okay. And have you done exclusively
16 class actions in that time frame?
17 **A. Every case I've worked on has started**
18 **out as a class action.**
19 Q. Okay. And every case that started out
20 as a class action has the same language,
21 individually and as a representative for the
22 class, right?
23 **A. I believe so.**
24 Q. Have you talked with M & C about this

1 litigation?
2 **A. Yes.**
3 Q. And you do not represent M & C in this
4 litigation.
5 **A. I represent M & C in the Buccaneers**
6 **litigation, and there are many things that overlap**
7 **related to the two cases.**
8 Q. Okay. But you don't represent M & C in
9 this case, correct?
10 **A. As I stated before when this came up,**
11 **there are three parties to the agreement. There**
12 **is Anderson Wanca, Foley Lardner, and M & C. I**
13 **work for Anderson Wanca, which is one of the**
14 **parties to that agreement.**
15 Q. Mm-hmm. Do you have an understanding as
16 to what the nature of their relationship is in
17 that contract?
18 **A. Who is the they you are referring to?**
19 Q. Anderson & Wanca, the Foley & Lardner,
20 and M & C.
21 **A. I have some understanding, yes.**
22 Q. Okay. Is Anderson & Wanca listed in
23 that agreement in any way as an attorney?
24 **A. I don't know.**

1 Q. Is it -- do you have any understanding
2 that would suggest that Anderson & Wanca is acting
3 as an attorney in this litigation?
4 **A. I have had discussions that relate to**
5 **this litigation in as far they relate to, for**
6 **example, the conflict of interest hearing**
7 **conducted in Buccaneers litigation.**
8 Q. Right, but that's not my question.
9 My question is trying to understand what
10 the scope of M & C's relationship is with Anderson
11 & Wanca as it pertains to this case.
12 **A. I understand that. I'm trying to answer**
13 **your question, but I cannot think of any**
14 **discussions that I have had or could have had that**
15 **relate exclusively to this litigation that are not**
16 **in some way part of the Buccaneers litigation; and**
17 **that's why I don't know how to answer your**
18 **question.**
19 Q. But those aren't my questions; and you
20 understand and agree that the judge is ultimately
21 the arbiter of whether or not a privilege applies
22 in this case, right?
23 **A. I -- yes.**
24 Q. Okay. And I'm trying to understand the

1 scope of representation of Anderson & Wanca as it
2 relates to this case. And by this case, it's the
3 M & C breach of fiduciary duty action against
4 Mr. Oppenheim and aiding and abetting against the
5 Bock Law Firm. Okay?
6 **A. Okay.**
7 Q. Do you know of any agreement that
8 Anderson & Wanca has as an attorney to represent M
9 & C in this case?
10 **A. I am aware of only one agreement. I do**
11 **not know the specifics in the agreement.**
12 Q. Okay. Do you believe sitting here
13 today, Mr. Good, that you are acting as an
14 attorney for M & C in this litigation?
15 **A. I don't understand the question.**
16 Q. Really?
17 **A. Correct.**
18 Q. Okay. What additional facts can I offer
19 to you, Mr. Good, in order to help understand my
20 question?
21 **A. I suppose if you could give me an**
22 **example of anything that I could have done for M &**
23 **C that was exclusively for this litigation that**
24 **did not in any way impact Anderson Wanca's**

1  representation of M & C in the M & C v. Buccaneers
2  litigation, I could understand the distinction
3  that you are trying to make.
4      Q.  Okay.  Starting from the point that the
5  TTA action was brought in state court, can you
6  identify for me all of the conversations that you
7  had with Medical & Chiropractic after that point?
8      A.  I don't think I could -- off the top of
9  my head, I don't think I could identify all of
10  them.
11     Q.  Okay.  Approximately how many
12  conversations have you had with M & C after that
13  point?
14     A.  Would this be exclusively related to the
15  Buccaneers litigation and this instant litigation
16  or in any case whatsoever?
17     Q.  In any case whatsoever.
18     A.  I've discussed, I believe, three cases
19  with M & C since the TTA case was filed at various
20  times.
21         My first discussion after the TTA case
22  with M & C was almost immediately after being made
23  aware of Bock, Hatch, Lewis & Oppenheim's attempt
24  to mediate their first TTA case.

1          Subsequent to that, I recall discussions
2  regarding the -- the third mediation in the M & C
3  v. Buccaneers case that was to take place in
4  Chicago.  I believe the mediator's name for the
5  third one was Bobrick.
6          I recall discussions leading up to that
7  mediation.  I recall discussions specifically the
8  night before that mediation, briefly at that
9  mediation or lack thereof.
10         Subsequent to that, I recall discussions
11  before both the conflict of interest hearing and
12  the preliminary injunction hearing.
13         There were discussions immediately after
14  receiving the 11th Circuit Court of Appeals
15  decision.
16         Off the top of my head, those are the
17  only discussions that I can think of at this time.
18     Q.  Okay.  Can you tell me when the
19  discussions were that you had with M & C before
20  the preliminary injunction hearing?
21     A.  I believe it was the day of or the day
22  before.
23     Q.  And where did those conversations occur?
24     A.  At the office of Foley & Lardner.

1      Q.  In Tampa?
2      A.  Correct.
3      Q.  You're a Chicago lawyer, right?
4      A.  I'm both an Illinois and Florida
5  licensed attorney.
6      Q.  Okay.  And did you fly down to Tampa for
7  that preliminary injunction hearing?
8      A.  I believe I was already there, but I
9  stayed for the hearing and flew back after it.
10     Q.  And did you meet with the Foley &
11  Lardner attorneys along with M & C in preparation
12  for the preliminary injunction hearing?
13     A.  I don't -- to the best of my
14  recollection, I arrived at the end of their
15  preparation; and then we went to the preliminary
16  injunction hearing together.
17     Q.  How long were you there for the
18  preparation session?
19     A.  It was a very short amount of time.  I
20  don't recall exactly how long.
21     Q.  Okay.  Maybe you and I have different
22  ideas of what's short.  Can you give me an
23  approximation?
24     A.  Definitely less than an hour.

1      Q.  Less than an hour.
2      A.  Yes.
3      Q.  Who else was there with you at that
4  time?
5      A.  Lauren Loew, I believe Jeff Soble, and
6  there was another attorney that was in the Tampa
7  office.
8      Q.  Could it have been Christopher Griffin?
9      A.  That sounds correct.  I'm not a hundred
10  percent, but that sounds correct.
11     Q.  But someone from the Tampa office?
12     A.  Yes.
13     Q.  Anyone else?
14     A.  Michelle Zakzrewski.
15     Q.  Anyone else?
16     A.  At some point, we met up with Mike
17  Addison.  I do not recall at what point.
18     Q.  Anyone else?
19     A.  Not that I recall.
20     Q.  Do you know when you met up with Mike
21  Addison or where?
22     A.  I know it was before the hearing.  It
23  might have been in the hallway right in front of
24  the court.  I don't recall.

1     Q.  Were you present for any substantive
2  discussions about the case in which Mike Addison
3  was also present at the preliminary injunction
4  hearing?
5     **A.  No.**
6     Q.  How about outside the preliminary
7  injunction hearing at any point, were you present
8  with Mike Addison when discussions about this case
9  happened?
10     **A.  I believe there were discussions about**
11  **this case prior to retaining Foley & Lardner.**
12     Q.  Okay.  Were those in person or by phone?
13     **A.  By phone.**
14     Q.  And who all was attending by phone?
15     **A.  I believe it would have been myself,**
16  **Brian Wanca, and Michael Addison.**
17     Q.  Do you know how many conversations
18  occurred?
19     **A.  I know there were several, but I do not**
20  **know exactly how many.**
21     Q.  Do you know how long they lasted?
22     **A.  I don't recall.**
23     Q.  What do you recall was said at those
24  conversations?

1     MS. LOEW:  And I will object to the
2  extent that this is seeking work-product
3  information or similar mental impressions from
4  counsel.  I'll advise you not to answer.
5  BY MR. BLONIEN:
6     Q.  Are you taking your client's or -- or
7  your attorney's advice?
8     **A.  Yes.**
9     Q.  Do you have any response that you can
10  offer with respect to the question I asked you?
11     **A.  No.**
12     Q.  So you can't tell me anything about what
13  was said in conversations with yourself, with Mike
14  Addison, and with Brian Wanca regarding this case?
15     **A.  Correct.**
16     Q.  Okay.  Do you recall any facts that were
17  shared in connection with that conversation?  And
18  provide an opportunity for your attorney to object
19  and advise you not to answer, please.
20     MS. LOEW:  What was your question?
21  BY MR. BLONIEN:
22     Q.  Do you recall any facts that were shared
23  in that conversation?  And please allow your
24  attorney an opportunity to object.

1     MS. LOEW:  I will make the same
2  objection to the extent it was a work-product
3  discussion.  I'll advise you not to answer.
4  BY MR. BLONIEN:
5     Q.  Are you following your attorney's
6  advice?
7     **A.  Yes.**
8     Q.  So you will not identify for me any
9  facts that you learned in conversations with Mike
10  Addison?
11     **A.  I already told you when the conversation**
12  **started taking place.  I -- beyond that, I am**
13  **taking the advice of counsel.**
14     Q.  Okay.  So apart from when the
15  conversation occurred, you're not answering my
16  questions about those conversations.
17     **A.  Correct.**
18     Q.  Okay.  Do you personally stand to
19  benefit from a judgment for M & C in this case?
20     **A.  No.**
21     Q.  Does your law firm stand to benefit from
22  a judgment for M & C in this case?
23     **A.  I -- I don't know.**
24     Q.  Do you have any understanding as to

1  whether or not Anderson & Wanca is paying for the
2  litigation fees and expenses in this case in order
3  to receive a benefit for the law firm?
4     **A.  It is my under -- strike that.**
5     **Can you split up the question?  I'm**
6  **trying to -- can you like split it up?  Do you**
7  **understand what I mean?**
8     Q.  I don't, but feel free to split it up in
9  your answer.
10     **A.  Okay.**
11     Q.  Maybe we can do it that way.
12     MS. LOEW:  Maybe I should object to a
13  compound question.
14     **A.  It is my understanding that Anderson**
15  **Wanca is paying the fees for this litigation.  I**
16  **have no understanding that Anderson Wanca expects**
17  **to get a benefit out of the result of this**
18  **litigation.**
19     **However, it is also my understanding**
20  **that the judge can award fees at the conclusion of**
21  **this litigation; and I believe the judge is going**
22  **to award attorneys' fees.**
23     Q.  And how much?
24     **A.  All of them.**

1     Q.  And all of them, what?  I -- I'm not
2 unsure what pool you're including there.
3     **A.  All of Foley & Lardner's fees.**
4     Q.  All of Foley & Lardner's fees, including
5 the time that it spent representing you in today's
6 litigation, in today's deposition?
7     **A.  I don't know, but I hope they ask for**
8 **it.**
9     Q.  Okay.  And do you have any understanding
10 about what the basis would be to seek such fees?
11     **A.  The breach of fiduciary duty.**
12     Q.  Is there any agreement that you're aware
13 of that M & C is in any way at any time
14 responsible for those fees?
15     **A.  I do not believe M & C is responsible**
16 **for those fees.**
17     Q.  Do you know whether M & C ever received
18 an invoice for Foley & Lardner's time?
19     **A.  I do not know.**
20     Q.  Do you know whether they received an
21 invoice for any expenses?
22     **A.  I do not know.**
23     Q.  Do you know whether there's any right or
24 agreement that establishes the ability of your

1 firm, Anderson & Wanca, to recoup any costs or
2 fees in this litigation?
3     **A.  I'm not aware of any.**
4     Q.  Do you receive a salary?
5     **A.  Yes.**
6     Q.  Do you receive a bonus?
7     **A.  Sometimes.**
8     Q.  What factors go into the bonus amount
9 that you receive?
10     **A.  They are solely on the whims of Brian**
11 **Wanca.**
12     Q.  Does it relate to the performance of the
13 firm?
14     **A.  I don't know.**
15     Q.  If the firm received a judgment in the
16 Tampa Bay class action favorably and received
17 attorneys' fees, would you receive a bonus
18 including that amount?
19     **A.  Doubtful.**
20     Q.  What do you mean "doubtful?"
21     **A.  When I say the bonuses are based on**
22 **Brian Wanca's whims, I truly mean that.**
23     Q.  How are your duties to M & C different
24 than those Mr. Oppenheim may have had to M & C?

1     **A.  I don't believe there was any**
2 **difference.**
3     Q.  You think they are identical?
4     **A.  Up until his resignation, yes.**
5     Q.  Did you attend the first mediation?
6     **A.  Yes.**
7     Q.  What happened at the first mediation?
8     MS. LOEW:  And I will advise the witness
9 to the extent it's seeking specific communications
10 or offers or demands within the mediation, I'll
11 advise you not to answer.  But to the extent you
12 can provide general information that would not
13 breach the mediation privilege, you can answer.
14     **A.  The first mediation did not result in a**
15 **settlement.**
16     Q.  Did M & C make a demand?
17     **A.  Yes.**
18     Q.  What was that demand amount for?
19     MS. LOEW:  And I will advise the witness
20 not to answer on the basis of mediation privilege.
21 BY MR. BLONIEN:
22     Q.  Are you following your attorney's
23 advice?
24     **A.  Yes.**

1     Q.  Is there anything else that you can tell
2 me what happened in the first mediation, aside
3 from that there was not a deal made?
4     **A.  I think the mediation went about a half**
5 **day.**
6     Q.  Anything else?
7     **A.  It was attended by myself, David**
8 **Oppenheim, Michael Addison, Craig Cinque, and**
9 **Michelle Zakzrewski.  The mediator was Rodney Max,**
10 **and it was conducted at his office.**
11     Q.  Anything else?
12     **A.  Nothing else.**
13     Q.  Did Anderson & Wanca have an
14 understanding as to what the case was worth at
15 that point?
16     **A.  I don't recall.**
17     Q.  Did you have an understanding of what
18 the case was worth?
19     **A.  I would have to check my notes for a**
20 **couple things that came from the discovery in that**
21 **case.  I don't recall when we had completed all of**
22 **the discovery.**
23     Q.  Okay.  Do you have an understanding
24 sitting here today what the case is worth, the

1  Tampa Bay Buccaneers class action litigation?
2      **A.   I have an understanding of what a**
3  **judgment would be, yes.**
4      Q.   Okay.  And what is your understanding as
5  to what the case is worth?
6      **A.   At $500 a fax, it's worth approximately**
7  **$165 million.  If it was trebled, it would be**
8  **almost half a billion dollars.**
9      Q.   Okay.  And did you seek or demand
10 $165 million in the mediation?
11         MS. LOEW:  And I will advise the witness
12      not to answer on the basis of mediation privilege.
13 BY MR. BLONIEN:
14      Q.   And are you following your attorney's
15 advice?
16      **A.   Yes.**
17      Q.   Do you have an understanding as to what
18 happened at the second mediation?
19      **A.   Yes.**
20      Q.   Can you please describe for me what
21 happened at the second mediation?
22         MS. LOEW:  And I will interpose the same
23      advice to the deponent not to breach the mediation
24      privilege.  But to the extent you can provide

1  general information without doing so, go ahead.
2      **A.   Second mediation was attended by myself,**
3  **David Oppenheim, Michael Addison.  I don't recall**
4  **whether or not Michelle Zakzrewski was there in**
5  **person or by phone.**
6      **For the defendant, Mark Mester, Kate**
7  **Lally, and Buccaneers general counsel, David**
8  **Cohen.**
9      **It was mediated by Judge Wayne Anderson,**
10 **and it was at the end of August 2015.  I believe**
11 **it went most of the day.  That's all I have to**
12 **answer that question.**
13      **I wanted to go back and say in addition**
14 **for the first mediation, it was also attended by**
15 **defense counsel at the time Barry Postman and**
16 **general counsel for the Buccaneers, David Cohen.**
17      Q.   Was Mr. Wanca at either of the mediation
18 sessions?
19      **A.   He was definitely not at the first one.**
20 **He might have been at the second one.  I don't**
21 **recall.**
22      Q.   Okay.  Anything else that you can or
23 will share today about the mediations?
24      **A.   The second mediation did not result in a**

1  settlement.
2      Q.   Anything else?
3      **A.   Mediation discussions continued after**
4  **that mediation.**
5      Q.   Okay.  Can you tell me about those
6  mediation discussions?
7         MS. LOEW:  And I will advise the witness
8      not to answer specific information about the
9      discussions in the mediation on the basis of
10     mediation privilege.
11     **A.   It is my understanding -- it is my**
12 **understanding the mediation communications**
13 **continued until approximately the Technology**
14 **Training action was filed.**
15     Q.   Mediation discussions continued until
16 the Technology Training action was filed; did I
17 get that right?
18     **A.   Yes.**
19     Q.   All the way through?
20     **A.   I don't know the exact dates, but**
21 **approximately.**
22     Q.   And the mediation discussions did not
23 cease at any point in time before the TTA action;
24 is that your testimony?

1      **A.   They might have within a couple days of**
2  **it, but it was very close.**
3      Q.   Do you have an understanding as to
4  whether or not the mediator in the Tampa Bay
5  Buccaneers class action litigation declared an
6  impasse?
7      **A.   I believe he either -- I believe he did.**
8      Q.   When do you believe he did?
9      **A.   Either the last week of April 2016 or**
10 **the first week of May 2016.**
11     Q.   Did you have an understanding as to the
12 value of the class action at the time that the
13 second mediation was going on?
14     **A.   By that point, we had all the records;**
15 **and it was 165 million approximately if you did**
16 **$500 per, or at $1,500 per, approximately 495**
17 **million.**
18     Q.   Okay.  And when you're giving me those
19 numbers, is that a hundred percent recovery in
20 your view?
21     **A.   That would -- yes, in my view, that**
22 **would be a hundred percent.**
23     Q.   Is 165, and then 300 percent recovery is
24 the 495, right?

1    A.  No.  I think the 100 percent is the 495.
2    Q.  Okay.  And did you identify any risks
3  that the case may not, in fact, yield a judgment
4  in favor of Medical & Chiropractic in the class?
5    A.  I believe that would be covered by
6  attorney-client work-product privilege.
7    Q.  Okay.  Are you not answering the
8  question on that basis?
9    A.  Yes.
10   Q.  Did you have any internal discussions
11 about settlement?
12   A.  Yes.
13   Q.  With whom?
14   A.  David Oppenheim, Michael Addison, Brian
15 Wanca, and -- yeah, and that's it.
16   Q.  Did you have a clarification question?
17   A.  No.  I think I understood it.
18   Q.  How many times did you have internal
19 discussions about settlement?
20   A.  Before each of the two mediations and
21 subsequent discussions after the second mediation.
22   Q.  Okay.  And tell me the sum and substance
23 of those discussions, please.
24       MS. LOEW:  Which you can respond to the

1  extent it doesn't reveal an actual mediation
2  communication or -- yes, an actual mediation
3  communication.
4    A.  We discussed what we would be
5  comfortable bringing to a court for preliminary
6  and final approval in terms of the substance of
7  the relief that the putative class would receive.
8    Q.  Okay.  And what was that?
9    A.  We were not going to accept coupons.
10   Q.  And was there an amount that you were
11 looking for to present to the court?
12   A.  We didn't come up with a specific
13 amount.  The thrust of the discussions was whether
14 or not we would consider accepting coupons.
15   Q.  Any other internal discussions
16 about the settlement before or after the
17 mediations?
18   A.  There were discussions relative to the
19 dollar amount based on the records that had been
20 obtained and that we had taken the discovery in
21 order to get authenticated and explain for the
22 court, as well as the expert report of Robert
23 Biggerstaff.
24   Q.  Okay.  And in that discussion, did you

1  come up with a number that you believed would be
2  acceptable to propose to the defendants?
3    A.  I know we -- I know that we made a
4  mediation statement to the mediator for each of
5  the mediations.
6    Q.  Okay.  And did the mediation statement
7  contain a proposed amount to resolve the case?
8    A.  I believe they both did.
9    Q.  And what was that amount?
10       MS. LOEW:  I will advise you not to
11 answer on the basis of mediation privilege.
12 BY MR. BLONIEN:
13   Q.  And are you going to follow your
14 attorney's advice?
15   A.  Yes.
16   Q.  Can you tell me any of the amounts that
17 were discussed in internal discussions relating to
18 the settlement?
19   A.  Yes.
20   Q.  Please do.
21   A.  We discussed the information we received
22 from Joe Siprut about the $1 million coupon offer
23 and thought that it was a joke.
24   Q.  Anything else that you can tell me?

1    A.  No.
2    Q.  Can you tell me the range that you
3  thought was appropriate to settle this case?
4    A.  Yes.  Up to the approximately
5  $495 million, which is $1,500 times all the faxes
6  sent, approximately 330,000 faxes.
7    Q.  Anything else that you can share?
8    A.  It was going to be dollars and not
9  coupons.
10   Q.  Anything else that you can share?
11   A.  We had discussions regarding what claims
12 process we would be accepting and what notice we
13 would accept.
14   Q.  Okay.  And what claims process were you
15 willing to accept?
16   A.  We wanted -- we believed, based on the
17 records that were available, that fax and mail to
18 the failed would be the best way to notify the
19 class.  And accepting claims via fax, web, and
20 mail submission would be the best means available
21 in the situation.
22   Q.  Anything else that you can share?
23   A.  Nothing else I can share.
24   Q.  Did you in internal discussions with

1   Mr. Oppenheim discuss any numbers that could be
2   proposed at the mediation settlement?
3       **A.  I don't recall any specific discussions**
4   **with Mr. Oppenheim about that subject.**
5       Q.  Okay.  Generally speaking though, that
6   would be something that you would confer with
7   Mr. Oppenheim about, correct?
8       **A.  Correct.**
9       Q.  Okay.  And so what was the range that
10  you were willing to consider for the settlement?
11      **A.  I can't answer that question.**
12      Q.  You can't, or you choose not to because
13  of privilege?
14      **A.  I choose not to because of privilege.**
15      Q.  But you are aware of what the
16  discussions were?
17      **A.  I'm aware there were discussions.  I**
18  **truly do not know the specific amounts.**
19      **I could tell you that the best way to**
20  **determine the specific amounts would be to look at**
21  **the iterations of the proposed term sheet that**
22  **would have been included in the mediation demand.**
23
24

1           (Whereupon Deposition Exhibit
2           No. 2 was marked for
3           identification by the court
4           reporter.)
5   BY MR. BLONIEN:
6       Q.  I'm handing you what's been marked as
7   Exhibit Number 2.  Have you seen this term sheet
8   before?
9       **A.  It looks very familiar to me, as do the**
10  **terms contained.  I'm not on the email chain.**
11      Q.  Does this exhibit, Exhibit Number 2,
12  refresh your recollection as to discussions you
13  may have had with Mr. Oppenheim regarding internal
14  discussions of settlement?
15      **A.  Yes.**
16      Q.  Okay.  Can you revise your answer
17  accordingly?
18      **A.  Yes.  It was 343,122 unsolicited**
19  **facsimiles based on the records.  I had previously**
20  **said 350,000 approximately.  And the -- this**
21  **initial demand had a top line number of**
22  **$92 million.**
23      Q.  And was this demand communicated to
24  Tampa Bay Buccaneers?

1       MS. LOEW:  To the extent that it's
2   seeking an actual demand in the mediation, I'll
3   advise you not to answer on the basis of mediation
4   privilege.
5       **A.  I do not know.**
6       Q.  Do you recall discussing this figure,
7   $92 million, with Mr. Oppenheim?
8       **A.  No.**
9       Q.  Do you recall discussing with Mr. Wanca
10  what at the end of the day the amount was he would
11  be willing to settle for?
12      **A.  No.**
13      Q.  At all?
14      **A.  Correct.**
15      Q.  You don't ever remember having a
16  discussion about what the case might be settled
17  for with your boss, Mr. Wanca?
18      **A.  We had a discussion regarding whether or**
19  **not we would accept coupons.  And I can tell you**
20  **we were consistent in our opposition to accepting**
21  **coupons.**
22      Q.  And that's all you can tell me?
23      **A.  I've said other things, but that's all I**
24  **can tell you about the discussions for the dollar**

1   amount.
2       Q.  Okay.  Which isn't about the dollar
3   amount, right?
4       **A.  Actually it is.**
5       Q.  Okay.  How is it about the dollar
6   amount?
7       **A.  Because if you only gave coupons, you**
8   **would calculate the dollar amount off of coupons.**
9       Q.  Which was a million dollars of coupons
10  with what had been considered?
11      **A.  That was what was offered to Joe Siprut**
12  **which Joe Siprut conveyed to us.**
13      Q.  When did Joe Siprut convey that to you
14  all?
15      **A.  Shortly before the retainer agreements**
16  **were signed with Joe Siprut's clients.**
17      Q.  And in connection with that discussion,
18  did you discuss with Mr. Siprut what would be an
19  appropriate amount to settle this case?
20      **A.  No.**
21      Q.  And at any time, did you discuss with
22  Mr. Oppenheim what you believed to be an
23  appropriate amount to settle this case?
24      **A.  I -- I would have participated in the**

Thompson Court Reporters, Inc
thompsonreporters.com

1   creation of what's been marked as Exhibit 2, but I
2   don't have any specific recollection of that.
3      Q.  Okay.  Do you have any general
4   recollection of being involved in discussions as
5   to what Anderson & Wanca might be willing to
6   consider as a settlement offer?
7      **A.  No.**
8      Q.  Or any range that you would be willing
9   to testify to today?
10     **A.  I cannot answer that on the basis that**
11   **that would very specifically be covered by the**
12   **mediation privilege, attorney-client work product.**
13     Q.  Okay.  Apart from your statement that
14   your -- you were unwilling to consider a coupon
15   settlement and that there were specifics as to the
16   terms of class notice, is there anything else
17   about the internal discussions of the settlement
18   that you're willing to share today in light of the
19   assertion of privilege that you've made?
20     **A.  Nothing else I can think of.**
21     Q.  Did Mr. Wanca ever tell you that he was
22   looking to break the record?
23     **A.  No.**
24     Q.  Did Mr. Wanca ever tell you that he

1   wanted to beat Capital One?
2     **A.  He -- he did not say he wanted to beat**
3   **Capital One.  There was a discussion in which he**
4   **remarked after we got the complete set of**
5   **transmission logs that a complete judgment would**
6   **be significantly higher than Capital One.**
7     Q.  And was -- in that discussion, did
8   Mr. Wanca insist that he would not be willing to
9   take anything less than Capital One?
10     **A.  No.**
11     Q.  So if someone were to say, Mr. Wanca
12   refuses to settle for anything less than a
13   record-breaking settlement, that would be false in
14   your mind?
15     **A.  That is correct.**
16     Q.  Okay.  If someone said that Mr. Wanca is
17   unwilling to settle for less than $75 million,
18   would that be a true or false statement?
19     **A.  Answering that question would require me**
20   **to divulge an offer made during mediation; and,**
21   **therefore, I have to refuse to answer.**
22     Q.  So you're not going to answer that
23   question.
24     **A.  Correct.**

1     Q.  Okay.  Were you ever involved in any
2   discussions where mediation communications were
3   shared outside of the people who attended the
4   mediation?
5       THE WITNESS:  Can you repeat the
6   question?
7         (Whereupon, record was read as
8         requested.)
9     **A.  I'm not aware of any.**
10     Q.  Did you ever have any conversations with
11   Mr. Siprut about the mediation?
12     **A.  Yes.**
13     Q.  Was Mr. Siprut in attendance?
14     **A.  No.**
15     Q.  Did Mr. Siprut sign the mediation
16   agreement?
17     **A.  No.**
18       MR. BLONIEN:  Mark what's Exhibit
19   Number 3.
20         (Whereupon Deposition Exhibit
21         No. 3 was marked for
22         identification by the court
23         reporter.)
24

1   BY MR. BLONIEN:
2     Q.  When you've had a chance to look at this
3   document, please let me know so I can ask you some
4   questions.
5     **A.  Sure.**
6     **Yes, I reviewed this.**
7     Q.  Have you seen this email chain before?
8     **A.  It has my -- it was sent from me, so I**
9   **believe so; but I have no specific recollection.**
10     Q.  Did you review this in preparing for
11   today's deposition?
12     **A.  No.**
13     Q.  The document that I handed you marked as
14   Exhibit Number 7 (sic) has Bates number AW MA 335
15   to 342, right?
16     **A.  Yes.**
17     Q.  On Page 340, Mr. Siprut writes, "Gents,
18   there have been some recent developments on this
19   case that I want to give you a heads-up on.  Time
20   for a call today?  Shouldn't take more than five
21   minutes.  All of this is good news."
22     Did I read that correctly?
23     **A.  You did.**
24     Q.  Do you recall receiving that?

**43 (Pages 166 to 169)**

1    A.   Yes.

2    Q.   Do you remember what the developments

3  were that Joe wanted to share?

4    A.   Yes.

5    Q.   What were they?

6    **A.   That Mark Mester was going to be taking**

7  **over the case, and that in the past, Joe Siprut**

8  **had dealings with Mark Mester and had settled the**

9  **case, I believe, not long before this email was**

10  **sent with Mark Mester against the defendant**

11  **Western Union.**

12    Q.   Anything else?

13    **A.   He told us about that settlement.**

14    Q.   On the page marked 338, you write, "Joe,

15  I updated Brian and Dave about Postman's firing.

16  Obviously we are all more optimistic of being able

17  to reach a settlement without Postman, but Brian

18  wants to avoid using Wayne Anderson as a mediator;

19  so we can make some suggestions."

20    Did I read that correctly?

21    A.   Yes.

22    Q.   Does that accurately reflect the

23  discussion that you had with Mr. Wanca?

24    A.   Yes.

1    Q.   Why did Mr. Wanca want to avoid using

2  Wayne Anderson as a mediator?

3    **A.   He did not find him to be a particularly**

4  **effective mediator in the past.**

5    Q.   And Mr. Siprut disagreed with that,

6  correct?

7    **A.   Sort of, yes.**

8    Q.   Okay.  Can you explain your answer?

9    **A.   Yeah.  Joe Siprut basically said it**

10  **wasn't that he liked Wayne Anderson so much as he**

11  **knew how much Mark Mester liked Wayne Anderson.**

12    Q.   Okay.  But Mr. Siprut liked Mr. Anderson

13  for this case, right?

14    A.   Yes.

15    Q.   And had a good relationship with

16  Mr. Mester, right?

17    A.   Yes.

18    Q.   And was advocating that Mr. Anderson be

19  used in this case, right?

20    **A.   That is correct.**

21    Q.   And ultimately, Mr. Anderson was used in

22  this case, right?

23    **A.   That is correct.**

24    Q.   And was that the result of the

1  conference call that you scheduled?

2    **A.   Yes.**

3    Q.   And on Page 335, we have, "For today's

4  call, we're using the following," and then some

5  call-in information, right?

6    **A.   Yes.**

7    Q.   So it's your recollection that on that

8  call, which included Mr. Siprut, right?

9    **A.   Yes.**

10    Q.   And Mr. Thomas?

11    **A.   I don't think so, but it's possible he**

12  **was on the call.**

13    Q.   And it included Mr. Ismael Salam, right?

14    **A.   I don't know if he was on the call**

15  **either.**

16    Q.   Okay.  He's on this email chain, right?

17    **A.   Yes, he is.**

18    Q.   Okay.  And in that call, it was

19  determined that Mr. Anderson would be used as the

20  mediator?

21    **A.   Yes.**

22    Q.   Okay.

23    **A.   It -- strike that.**

24    **I'm sorry.  If I can further answer, it**

1  **was either decided at that call or soon -- very**

2  **soon thereafter that call.**

3    Q.   Were there any issues that arose between

4  Mr. Siprut and your firm as to the division of

5  responsibilities in this case?

6    **A.   Yes.**

7    Q.   Okay.  Tell me about those.

8    **A.   Mr. Siprut had agreed to allow us to run**

9  **the case and was upset that he was not included on**

10  **regular updates regarding the status of mediation**

11  **and other case updates that he thought he should**

12  **have been included upon immediately.  That's it.**

13    Q.   Okay.  Did Mr. Siprut ever seek

14  information about what happened at the mediation?

15    **A.   Yes.**

16    Q.   And did anyone who participated in the

17  mediation tell Mr. Siprut?

18    **A.   I did.**

19    Q.   And what did you tell Mr. Siprut

20  happened at the mediation?

21    **A.   We failed to reach a settlement.**

22    Q.   Okay.  At any point, did Mr. Siprut

23  learn what number had been proposed?

24    **A.   I don't believe so.**

1     Q.   Did you ever share that information with
2  Mr. Siprut?
3     **A.   No.**
4     Q.   Do you know whether Mr. Anderson or --
5  or, sorry, Mr. Wanca ever shared that information?
6     **A.   I do not believe Mr. Wanca spoke to Joe**
7  **Siprut after the mediation.**
8     Q.   And I mistakenly said Mr. Anderson.  Is
9  there a Mr. Anderson?
10    **A.   At Anderson Wanca?**
11    Q.   Yeah.
12    **A.   No, there is not.**
13    Q.   Where did the Anderson come from?
14    **A.   My understanding is that is a friend of**
15  **Brian Wanca's.**
16    Q.   Is the friend an attorney?
17    **A.   Yes.**
18    Q.   Has the friend ever worked at the law
19  firm?
20    **A.   I do not know.**
21    Q.   Have you ever met Mr. Anderson?
22    **A.   No.**
23
24

1     (Whereupon Deposition Exhibit
2        No. 4 was marked for
3        identification by the court
4        reporter.)
5  BY MR. BLONIEN:
6     Q.   I'm marking Exhibit Number 4, which is
7  MC 4784 to MC 4797.  Let me know when you're ready
8  for questions.
9     **Is all of this new?  Oh, no.  Never**
10  **mind.  I found it.  Thank you.  I'll let you know.**
11  **Yes.  I've reviewed this.**
12    Q.   Okay.  Do you recall this email
13  exchange?
14    **A.   I'm on it, but I don't have a specific**
15  **recollection.**
16    Q.   Okay.  But you have no reason to dispute
17  that if your name is listed on here that you
18  received these?
19    **A.   Correct.**
20    Q.   Okay.  On Page 4787, Mr. Oppenheim
21  communicates to you, Mr. Salam, and Michael
22  Addison, along with Joseph Siprut, James Thomas,
23  Ryan Kelly, and Brian Wanca a list of proposed
24  mediators, correct?

1     **A.   I see that, yes.**
2     Q.   So at this time, Anderson was still
3  being objected to, Wayne Anderson, as a potential
4  mediator?
5     **A.   Yes.**
6     Q.   So the decision to use Mr. Anderson
7  likely occurred sometime after these emails had
8  happened, right?
9     **A.   Correct.**
10    Q.   On Friday, July 10th, on Page 4785,
11  Mr. Siprut writes, "Okay.  This gives me what I
12  need to follow up with Mr. Mester.  I'll do so
13  right now and report back when I hear anything?"
14    **A.   Yes.**
15    Q.   And then on July 15th, Joseph Siprut
16  reports a conversation that he had with
17  Mr. Mester, correct?
18    **A.   Yes.**
19    Q.   In which he relayed that Mr. Mester was
20  disappointed with the rejection of Anderson as a
21  mediator?
22    **A.   Yes, I see that.**
23    Q.   And Mr. Siprut states, "Frankly, I have
24  to say I agree with Mr. Mester on all of this."

1     I'm on the bottom paragraph.
2     **A.   I see that.**
3     Q.   "We've all mediated with Anderson before
4  and everyone, except one person, as I understand
5  it, gives him nothing but high marks and an
6  endorsement for this assignment," correct?
7     **A.   Yes.**
8     Q.   That one person would be who?
9     **A.   Brian Wanca.**
10    Q.   Did you disagree with the use of
11  Anderson as a mediator in this case?
12    **A.   I had no opinion on the subject.**
13    Q.   And ultimately, Mr. Anderson was chosen,
14  right?
15    **A.   That is correct.**
16    Q.   And do you know why?
17    **A.   I convinced Brian Wanca to accept Judge**
18  **Anderson.**
19    Q.   But you have no view as to whether or
20  not he was a -- the right choice --
21    **A.   I didn't care.**
22    Q.   Then why did you convince him, Mr. Good?
23    **A.   Because I don't think the mediator makes**
24  **all that much of a difference.**

45 (Pages 174 to 177)

1    Q.   And did you ever tell Mr. Siprut that an
2  offer was made?
3    A.   Can you clarify the time frame you're
4  asking about?
5    Q.   I'm asking about the mediations with the
6  Buccaneers.
7    A.   With Mr. Anderson or with Mr. Max, both,
8  either?
9    Q.   Let's start with Mr. Max.  He was the
10  first mediator, right?
11   A.   Correct.
12   Q.   Did Mr. Siprut ever learn that an offer
13  had been made to -- to the plaintiff's counsel in
14  connection with the Tampa Bay Buccaneers mediation
15  session that happened before Mr. Max?
16       MS. LOEW:  Objection to foundation.
17   A.   I -- I know that he was made aware that
18  the mediation was attended and did not reach
19  settlement.  I don't know if he was made aware of
20  specific offers.
21   Q.   Do you know whether he was ever made
22  aware that offers were, in fact, made?
23   A.   I do not know.
24   Q.   What about the Wayne Anderson mediation?

1    A.   I do not know.
2        (Whereupon Deposition Exhibit
3         No. 5 was marked for
4         identification by the court
5         reporter.)
6  BY MR. BLONIEN:
7    Q.   I'm going to show you what's been marked
8  as Exhibit Number 5, which is MC 3574 to MC 3579.
9  Let me know when you're ready for questions.
10   A.   Okay.
11       I have reviewed the document Exhibit 5.
12   Q.   Okay.  Do you recall this email
13  exchange?
14   A.   There's a part of it that I recall.
15   Q.   What part do you recall?
16   A.   The part where Joe Siprut says, "Unless
17  Brian Wanca personally calls me with an
18  explanation and a good reason why I should not
19  show up at the mediation Monday, I have every
20  intention of crashing it and physically
21  overpowering anyone who tries to keep me out of
22  the room."
23   Q.   That's what you remember?
24   A.   It was memorable.

1    Q.   I'm sure.
2        Do you recall the preceding paragraph
3  too?
4    A.   Not specifically, but I believe it.
5    Q.   Okay.
6    A.   I -- to clarify, I believe it was part
7  of the same email.
8    Q.   And that first paragraph says, "It is
9  amazing to me that my co-counsel in this case has
10  not only failed to keep us in the mediation loop
11  as I requested, despite the process itself being
12  initiated by me, but has actively concealed this
13  fact from me.  Never seen anything like it before
14  and unlikely to ever see it again.  This is not
15  only unprofessional and disrespectful, which goes
16  without saying, it is a breach of our JPA."
17       Did I read that correctly?
18   A.   You did.
19   Q.   Do you know what the JPA is that
20  Mr. Siprut is referring to?
21   A.   I believe it's the retainer agreements
22  that the firm signed with his clients.
23   Q.   Do you know what those agreements say?
24   A.   Not specifically, no.

1    Q.   Or generally?
2    A.   Generally, I think they are similar to
3  the one Medical & Chiro signed.
4    Q.   In what way?
5    A.   They -- they relate to the case against
6  the Buccaneers and the attorneys who signed its
7  firms representing the clients that signed it.
8    Q.   Okay.  Did M & C ever sign a retainer
9  agreement that allowed for Mr. Thomas or
10  Mr. Siprut or Mr. Salam?
11   A.   Not that I'm aware of.
12   Q.   Or Mr. Addison?
13   A.   Not that I'm aware of.
14   Q.   Do you know how the issue that
15  Mr. Siprut raised in the email that you were
16  quoting from, which is on Page 3578, how that was
17  resolved?
18   A.   I recall calling Mr. Siprut and
19  discussing the matter with him personally.
20   Q.   Individually or with other people?
21   A.   Individually.
22   Q.   Okay.  The -- Mr. Wanca responded on
23  Page 3577, "You do not represent our plaintiffs,
24  you are not class counsel, we agreed to handle the

1    case and pay you if we get paid. That is it.
2    Your accounting to you plaintiff has been
3    dismissed out because they were unwilling to
4    participate. Mediations are confidential, and if
5    the case resolves, we will let you know when we
6    can. We made it clear that you would not be part
7    of the process as you wanted to be."
8        Did I read that correctly?
9    **A.  You did.**
10   Q.   Do you agree with Mr. Wanca's
11   characterization of the relationship with
12   Mr. Siprut there?
13   **A.  Yes.**
14   Q.   You see on September 1st, 2015,
15   Mr. Siprut wrote to Brian Wanca and copied you?
16   **A.  Yes.**
17   Q.   And copied Mike Addison as well, right?
18   **A.  Yes.**
19   Q.   And he asked, "How did it go yesterday?"
20   **A.  Yes.**
21   Q.   Did Mr. Wanca respond?
22   **A.  It appears that he did.**
23   Q.   You were copied on that response too,
24   right?

1    **A.  I was.**
2    Q.   And Mike Addison was copied on that
3    response?
4    **A.  Yes.**
5    Q.   And the response was, "They finally made
6    a monetary offer, but it was well short of where
7    they need to be. Unfortunately the person who
8    make the decisions wasn't there, and they want a
9    couple of days to talk to him. I don't see this
10   as happening at this time, but it is the start of
11   the dialogue."
12   **A.  I see that.**
13   Q.   Do you recall that email?
14   **A.  Yes.**
15   Q.   And Mr. Siprut then asked, "What is the
16   amount of money they put on the table," right?
17   **A.  Yeah.**
18   Q.   And then Mr. Wanca raised a concern that
19   perhaps he couldn't say because he wasn't of
20   record and didn't participate in the mediation,
21   right?
22   **A.  Yes.**
23   Q.   And Mr. Oppenheim responded," If you
24   don't tell him, he'll probably called Mester?"

1    **A.  Yes.**
2    Q.   And you responded, "I agree with Dave,"
3    right?
4    **A.  Yes.**
5    Q.   So you thought that Mr. Siprut should be
6    informed of the amount of money that was put on
7    the table?
8    **A.  Initially, yes.**
9    Q.   And then Mr. Wanca said, "Why don't we
10   ask Measer if it is okay and then we're
11   protected?"
12   **A.  Yes.**
13   Q.   Do you know who Measer is?
14   **A.  That would be Mester, defense counsel.**
15   Q.   Okay. Do you know whether Mr. Mester
16   was asked?
17   **A.  I do not know.**
18   Q.   Do you know whether Mr. Siprut was ever
19   informed of the amount of the -- that was put on
20   the table?
21   **A.  I don't believe he -- I don't know.**
22   Q.   In another discussion, email discussion,
23   you asked Dave to participate to help deal with
24   the situation with Mr. Siprut; do you remember

1    that?
2    **A.  I believe that happened on more than one**
3    **occasion. I don't know specifically what -- which**
4    **one you're referring to.**
5    Q.   I can pull up the document if you would
6    like.
7    **A.  That would --**
8    Q.   Ultimately it said "crisis averted," and
9    I want to know whether you know how the crisis was
10   averted.
11   **A.  Did it occur in between August 28th and**
12   **September 1st of 2015?**
13   Q.   Yes, sir.
14   **A.  That was me calling Joe Siprut. That**
15   **was the conversation that I identified for you a**
16   **couple minutes ago.**
17   Q.   Okay. And it was just with you; it
18   wasn't with Mr. Wanca?
19   **A.  Correct.**
20   Q.   And what did you say to Mr. Siprut to
21   avert the crisis?
22   **A.  I let him complain for a very long time,**
23   **and I calmed him down.**
24   Q.   Okay. How did you calm him down?

1     **A.   Allowing him to vent his frustration**
2  **about Brian Wanca and be heard by me, calmed him**
3  **down.**
4      **And I recall him saying he was not even**
5  **available on the date of said mediation, and he**
6  **was just angry at the way that he had been treated**
7  **thus far.**
8      **And I made assurances to him that in the**
9  **future, I would keep him in the loop on any**
10  **significant developments if the mediation did**
11  **result in a proposed settlement for the court or**
12  **if it did not, significant developments regarding**
13  **discovery, class cert briefing, et cetera.**
14    Q.  Do you know how much Mr. Siprut was
15  expecting to be paid if there was a successful
16  resolution to the case?
17     **A.  I believe there was a percentage, but I**
18  **don't know it.**
19    Q.  Could it be 16 percent?
20     **A.  That could be right.**
21    Q.  Do you know what the percent that
22  Anderson & Wanca expected to receive of the
23  overall proceeds?
24     **A.  I know it was approximately 50 percent,**

1  **but I don't recall exactly what it was.**
2    Q.  Do you know what percent of fees
3  Mr. Addison expected to receive?
4     **A.  I know if you add all three together,**
5  **you get a hundred percent; but I don't know the**
6  **exact amount.**
7    Q.  So it would be roughly 16 percent to the
8  Siprut contingent, roughly 50 percent to the
9  Anderson Wanca firm, and the remainder to
10  Mr. Addison?
11     **A.  That's correct.**
12    Q.  Do you know if Mr. Siprut was expected
13  to do any further work on the case?
14     **A.  I believe he was.**
15    Q.  What was Mr. Siprut's role?
16     **A.  Producing his clients for depositions.**
17    Q.  Do you know if the percentage of fees
18  that were provided to each of the firms in
19  distribution related in any way to the amount of
20  work that was being performed on the case?
21     **A.  I don't know.**
22    Q.  At the front of the last exhibit that I
23  gave you, Number 5, it states, "Is there anything
24  else we need to discuss together," you ask on

1  September 2nd.
2      And Mr. Addison responds, "Yes.  Does
3  the recent case law indicate that a settlement of
4  the type proposed by Judge Anderson should be
5  evaluated for attorney fees as a lump sum of $300
6  per fax times 340,000 fax recipients, or instead
7  is it evaluated only after claims?"
8      Do you see that?
9     **A.  I do see that.**
10    Q.  Do you understand what Mr. Addison is
11  asking there?
12     **A.  No.**
13    Q.  Do you recall a lump sum offer of $300
14  per fax?
15      MS. LOEW:  Objection.  To the extent
16  this is seeking mediation communications, I will
17  advise you not to answer.
18     **A.  No.**
19    Q.  Do you know what he's referring to when
20  he says of "a settlement of the type proposed by
21  Judge Anderson," do you know whether Judge
22  Anderson proposed a type of settlement?
23     **A.  I am not aware of it.**
24    Q.  You're not aware of any settlement

1  proposal that Mr. Anderson made?
2     **A.  No.  I'm not aware of any settlement**
3  **proposal of -- of this form that was made**
4  **either -- that was ever made.**
5    Q.  Okay.  There was never an offer made of
6  $300 per fax?
7     **A.  Not that I'm aware of.**
8    Q.  Was there ever an offer made of $300 per
9  anything?
10      MS. LOEW:  And I will advise you to the
11  extent this is seeking mediation-specific
12  communications, I'll advise you not to answer.
13  BY MR. BLONIEN:
14    Q.  Are you following your attorney's
15  advice, Mr. Good?
16     **A.  Yes.**
17    Q.  Do you recall having a discussion with
18  Mr. Addison about his question?
19     **A.  I don't recall the specific discussion.**
20    Q.  Okay.  But the email that we're looking
21  at certainly reflects that, right?
22     **A.  Correct.**
23    Q.  So presumably then you did have a
24  discussion with Mr. Addison regarding the question

1  that he had listed here?
2  **A.  Yes.**
3     Q.  And you don't recall anything about that
4  discussion; is that --
5  **A.  I -- I apologize.  Do you want to**
6  **finish?**
7     Q.  Is that right?
8  **A.  Correct.**
9     Q.  If I were to represent to you that the
10  "call just ended, crisis averted" email was on
11  August 28th, 2015, responding to Mr. Siprut, would
12  that refresh your recollection or change your
13  response at all?
14  **A.  No.  That would confirm my recollection.**
15     Q.  Okay.  Because I would be happy to show
16  it if it solves anything --
17  **A.  No.  It confirms my recollection.**
18     Q.  So we're on the same page there.
19  **A.  Yes.**
20     Q.  Is it your understanding that Mr. Siprut
21  and Mr. Thomas represented M & C?
22  **A.  I don't know.**
23     Q.  How would you go about finding out the
24  answer to that question?

1  **A.  I think it's a legal question, so I**
2  **guess I would have to do legal research to find**
3  **out.**
4     Q.  Would you look at the retainer
5  agreement?
6  **A.  I have looked at the retainer agreement.**
7     Q.  What else would you look at?
8  **A.  The case law on separate class actions**
9  **with overlapping counsels.**
10     Q.  Okay.  Assume for me that M & C
11  testified that they did not know of any
12  relationship with Mr. Siprut and Mr. Thomas.
13  Under that assumption, it would be inappropriate
14  to share mediate -- mediation discussions with
15  them, wouldn't it?
16  **A.  Well, it would depend on what their**
17  **knowledge was relative to the other class actions**
18  **that they were involved in.**
19     Q.  Can you explain your answer?
20  **A.  I'm trying to give a broad -- so**
21  **hypothetically, if there were multiple class**
22  **actions pending and the plaintiff in one was aware**
23  **of the other class actions but maybe couldn't name**
24  **all of the counsel on the other cases, I think it**

1  **would be reasonable to still say that you could**
2  **share information with those other counsels to the**
3  **extent you're working with them.**
4     Q.  Did you share substantive information
5  with Mr. Siprut regarding the mediations?
6  **A.  Not that I recall.**
7     Q.  Did you share substantive information
8  about the mediations with Mr. Addison?
9  **A.  Yes.**
10     Q.  Did you share substantive information
11  about the mediation with Jim Thomas?
12  **A.  Not that I recall.**
13     Q.  Did you share substantive information
14  about the mediation with Ismael Salam?
15  **A.  Not that I recall.**
16     Q.  We've been running for a while.  Maybe
17  we can take a break at this point.  Thanks.
18  **A.  Okay.**
19        THE VIDEOGRAPHER:  Off the record.  The
20  time is 3:32.
21          (Whereupon, a short break was
22          taken.)
23        THE VIDEOGRAPHER:  We are back on the
24  record.  The time is 3:40.

1  BY MR. BLONIEN:
2     Q.  Mr. Good, I have one final document to
3  show you.
4  **A.  Okay.**
5        **(Whereupon Deposition Exhibit**
6          **No. 6 was marked for**
7          **identification by the court**
8          **reporter.)**
9  BY MR. BLONIEN:
10     Q.  And it's been marked as Exhibit Number 6
11  and Bates number MC 4416 to 17.  Let me know when
12  you're ready for questions.
13        MS. LOEW:  And I'd like to take a minute
14  to talk to my client outside before he answers
15  questions on this on the basis of the privilege
16  question.
17        THE VIDEOGRAPHER:  Should we go off the
18  record or?
19        MS. LOEW:  That's fine.
20        THE VIDEOGRAPHER:  Off the record.  The
21  time is 3:40.
22          (Whereupon, a short break was
23          taken.)
24        THE VIDEOGRAPHER:  We are back on the

1   record. The time is 3:43.
2       MS. LOEW: And I'll just put on the
3   record, we -- we need to look into whether the --
4   there is mediation privileged information in this
5   email.
6       So to the extent that there are
7   questions to him about specific mediation
8   communications, I'll advise him not to answer.
9   But we will be following up if necessary to revise
10  the redaction which looks like it is just not in
11  the right place on this document, but --
12      MR. BLONIEN: I'm not sure I understand.
13  But why don't we go ahead --
14      MS. LOEW: It looks to me like this was
15  an attempted redaction, but I can't tell for sure;
16  so I will need to look back at it.
17  BY MR. BLONIEN:
18      Q.   The email that I marked as Exhibit
19  Number 6 is dated August 21st, 2015, correct?
20      **A.   Correct.**
21      Q.   It's actually an email chain, so there
22  are several emails?
23      **A.   All on August 21st, yes.**
24      Q.   On August 21st, Mr. Oppenheim wrote,

1   "There are 132,351 successful in 2010 and another
2   206,196 in 2009."
3       Do you have an understanding of what
4   Mr. Oppenheim is referring to in that email?
5       **A.   I assumed that this was the total number**
6   **that fits in with Paragraph 1 of what's been**
7   **marked as Exhibit 2, but the two numbers do not**
8   **add up to that number.**
9       Q.   Any explanation for that?
10      **A.   I do not, but I believe the 343,122 to**
11  **be accurate; and actually that number I know.**
12  **That number sticks out in my head, I should say.**
13      Q.   Okay. Mr. Oppenheim continues, "Last
14  mediation we demanded a $99 million fund with a
15  25 percent fee and a 20 percent cy pres floor."
16      Did I read that correctly?
17      MS. LOEW: And I'll note, interpose
18  again for the record that we will be analyzing to
19  determine whether this is, in fact, mediation
20  privileged intentional redaction here. And to the
21  extent that it is conveying an actual mediation
22  communication, we'll preserve that objection.
23      MR. BLONIEN: I don't -- I mean, just to
24  state for the record, I don't at all agree that

1   there's any protection that's been preserved with
2   respect to this document.
3       I will note that on August 23rd, 2017, I
4   sent a letter to you, Ms. Loew, along with other
5   counsel for M & C in this action identifying this
6   document by Bates number as one in which I
7   believed M & C to have waived its privilege.
8       And M & C responded shortly thereafter
9   indicating that they didn't have any problem with
10  the production of this document.
11      That has been many months past; and we
12  don't think any privilege has been preserved on
13  this document, particularly after we identified it
14  by Bates number to you and your co-counsel.
15      MS. LOEW: I will have to look back at
16  those communications.
17      And I want to be clear that we -- it is
18  not a question of whether we have waived the
19  privilege. It is a question of whether the
20  Buccaneers have waived the privilege. We actually
21  attempted to waive the privilege in a case, and
22  the court ordered that the Buccaneers had not.
23      So I'll look back at the communications
24  that you're referencing, but I want to interpose

1   my objection for the record and preserve it.
2   BY MR. BLONIEN:
3       Q.   Okay. My question is: Did I read that
4   statement correctly? Did I read it correctly?
5       **A.   Yes.**
6       Q.   Is that consistent with your
7   understanding of what happened at the -- at the
8   mediation session?
9       MS. LOEW: And this is where I will
10  interpose an objection on to the extent that you
11  are seeking information about what actually was
12  conveyed at the mediation, we raise a mediation
13  privilege; and I will advise the witness not to
14  answer.
15  BY MR. BLONIEN:
16      Q.   And are you taking your attorney's
17  advice?
18      **A.   I don't know. When I say that, I am**
19  **answering I don't know to your question; and so I**
20  **don't think -- I am taking my attorney's advice.**
21      Q.   Okay. Your response -- well, before
22  there, "Do we start there again or a higher number
23  due to the fact that we now have the Slingshot
24  information?" Did I read that correctly?

**50 (Pages 194 to 197)**

1    **A.  You did.**
2    Q.  Does this refresh your recollection as
3 to internal discussions with Mr. Oppenheim about
4 the settlement?
5    **A.  Yes.**
6    Q.  Okay.  So would you like to expand on
7 the answer that you provided before?
8    **A.  Yes.  The -- what I believe**
9 **Mr. Oppenheim is referring to by the Slingshot**
10 **information would be a deposition I took of**
11 **deponent Slingshot related to records that had**
12 **already been produced but had not been**
13 **authenticated yet and had since been authenticated**
14 **in between the first mediation and the second.**
15    Q.  Okay.  And so Mr. Oppenheim is asking in
16 this email whether we should stay at the demand
17 from the first mediation or go to a higher number?
18    **A.  Correct.**
19    Q.  And the amount demanded at the first
20 mediation was $99 million, according to this
21 email?
22    **A.  I don't recall.**
23    Q.  According to this email, it says
24 $99 million, right?

1    **A.  I see it says that.**
2    Q.  Do you have any reason to assume that
3 this email doesn't accurately state what happened
4 at the mediation?
5    MS. LOEW:  And, again, to the extent
6 that you are asking about specific things that
7 happened at the mediation, the Buccaneers have not
8 waived that privilege, as the judge has found; and
9 I will advise the witness not to answer.
10    **A.  Deposition Exhibit 2 points to the**
11 **correct number, I believe, of unsolicited fax**
12 **advertisements in Paragraph 1 of 343,122.**
13    **I am not sure where the discrepancy is**
14 **in Mr. Oppenheim's email, and that is my answer to**
15 **your question.**
16    Q.  Do you know what percentage of fee
17 Mr. Wanca was seeking for Anderson & Wanca?
18    **A.  I believe the common fee in that**
19 **jurisdiction is 25 percent.**
20    Q.  Do you know whether Mr. Wanca was
21 seeking 25 percent in these -- in this case?
22    **A.  I believe so.**
23    Q.  The response that you provided on
24 August 21st, 2015, is, "I think we leave

1 everything the same.  Anything else shows our
2 possible weakness on the early 2009 records."
3    Did I read that correct?
4    **A.  Yes.**
5    Q.  Does that accurately reflect your
6 assessment?
7    **A.  I'm going to refuse to answer on the**
8 **basis of work product.**
9    Q.  Is there any portion of my question that
10 you can answer?
11    **A.  The email does say what you said it**
12 **does.**
13    Q.  Anything else?
14    **A.  No.**
15    Q.  Mr. Wanca said, "I say we go higher," is
16 that right?
17    **A.  Yes.**
18    Q.  Do you remember that conversation?
19    **A.  I remember a subsequent conversation.**
20    Q.  What conversation do you remember?
21    **A.  I remember a conversation where Brian**
22 **ultimately decided not to go higher.**
23    Q.  Brian Wanca decided to stay at the offer
24 made at the first deposition -- at the first

1 mediation?
2    **A.  I don't recall what that was.  But I**
3 **recall a discussion where it was discussed whether**
4 **or not we would go into the nine figures and**
5 **decided not to.**
6    Q.  You decided to stay under nine figures?
7    **A.  Correct.**
8    Q.  How much under nine figures?
9    **A.  I don't recall.**
10    Q.  If you did, would you refuse to answer
11 on privilege grounds?
12    **A.  If it was discussed but not ultimately**
13 **part of the demand, I would answer.  And if it was**
14 **solely on the basis that I reviewed a mediation**
15 **submission, I would refuse to answer.**
16    Q.  You did understand that there were
17 certain weaknesses with respect to the Tampa Bay
18 Buccaneers class action litigation, right?
19    **A.  I under -- no.**
20    MS. LOEW:  Can you repeat the question?
21 Sorry.
22    THE WITNESS:  Can you repeat the
23 question back?
24    (Whereupon, record was read as

1    requested.)
2    MS. LOEW: To the extent this is seeking
3  work product or mental impressions, I would advise
4  you not to answer. If it's seeking something
5  else, you can answer.
6    **A. On the basis of work product and other**
7  **privilege, I will not answer.**
8    Q. Did you have an understanding as to what
9  a reasonable amount of settlement would be in this
10  litigation?
11    **A. No.**
12    Q. Did you have any discussions with
13  Mr. Wanca as to what a reasonable amount of
14  settlement would be in this litigation?
15    **A. As I stated before, there was a**
16  **discussion over whether or not we should**
17  **contemplate proposing something in nine figures;**
18  **and it was ultimately decided that we would not.**
19    Q. Do you remember having any discussions
20  with Mr. Wanca as to what the amount should be?
21    **A. Yes.**
22    Q. And how much of that -- what was that
23  amount?
24    **A. On the basis of the mediation privilege,**

1  **I cannot answer.**
2    Q. I'm not asking for you to identify for
3  me any information that was conveyed over the
4  transom to the defendant's counsel in this case
5  but rather internal discussions about the position
6  of settlement.
7    **A. Those took place in the mediation.**
8    Q. Okay. And how much was a reasonable
9  amount of settlement in your mind in those
10  discussions with Mr. Wanca?
11    **A. I cannot answer on the basis it would**
12  **violate the mediation privilege.**
13    Q. You will not answer.
14    **A. Correct.**
15    Q. Okay. Have you agreed to pay for any of
16  the costs of litigation in this case?
17    **A. No.**
18    Q. Have you agreed to pay for Foley &
19  Lardner's attorneys' fees in this case?
20    **A. No.**
21    Q. And that includes for the time that
22  Foley & Lardner spent representing you today,
23  correct?
24    **A. Correct.**

1    Q. It's your understanding that you are not
2  responsible for any of the fees and costs
3  associated with your appearance today?
4    **A. Correct.**
5    MR. BLONIEN: Those are all the
6  questions that I have. I'm going to hand the
7  witness over to Mr. Cohen. Thank you.
8        EXAMINATION
9  BY MR. COHEN:
10    Q. Given your view of the nature of the
11  relationship that exists between a class action
12  attorney who is prosecuting a putative class
13  action and the named plaintiff putative class rep
14  whose name is in the style of the case that that
15  class action attorney is prosecuting, given your
16  understanding of the nature of that relationship,
17  would it be incumbent upon such an attorney to
18  share with and explain to the client potential
19  risks, weaknesses, concerns associated with
20  prosecuting the case through to disposition on the
21  merits versus settlement?
22    **A. Can you repeat the question back.**
23    **(Whereupon, record was read as**
24    **requested.)**

1    **A. Yes.**
2    Q. You indicated earlier that you became an
3  attorney on October 31st, 2013?
4    **A. Correct.**
5    Q. So we are in mid November 2017. You've
6  been a practicing attorney for just over four
7  years?
8    **A. Correct.**
9    Q. In your just over four years as a
10  practicing attorney, how many civil trials have
11  you tried to verdict as a first-chair attorney?
12    **A. One.**
13    Q. When was that?
14    **A. I believe it was last year.**
15    Q. What case was that?
16    **A. I don't recall the case name.**
17    Q. Your very first actual trial to verdict
18  and you're telling us you can't remember the case
19  name?
20    MS. LOEW: Objection, asked and
21  answered.
22    **A. Correct.**
23    Q. What was the defendant's name?
24    **A. I don't recall.**

1    Q.    What was the plaintiff's name?
2    **A.    I don't recall.**
3    Q.    What was the nature of the case?
4    **A.    It was a TCPA action pending in McHenry**
5    **County, Illinois.**
6    Q.    To the best of your recollection, when
7    did that proceed to trial and verdict?
8    **A.    Last year.**
9    Q.    Yes, I understand, 2016.  Can you help
10   us out with a month?
11   **A.    No.**
12   Q.    Can you help us out with a winter,
13   spring, summer, or fall?
14   **A.    I don't remember.  Just say it was a**
15   **very short trial.**
16   Q.    Was that a trial on behalf of a
17   certified class, or was that an individual case?
18   **A.    Individual.**
19   Q.    Was that before a jury?
20   **A.    No.**
21   Q.    Bench trial?
22   **A.    Correct.**
23   **        And I remember the name.  I believe it**
24   **was G.M. Sign v. Swiderski.**

1    Q.    And what was the result?
2    **A.    The plaintiff prevailed.**
3    Q.    And how much was the plaintiff awarded?
4    **A.    I don't recall.**
5    Q.    Was the plaintiff seeking actual damages
6    or statutory damages?
7    **A.    Statutory damages.**
8    Q.    So it could only be, correct me if I'm
9    wrong, $500 or treble to 1,500, correct?
10   **A.    Per fax, but that is the statute.**
11   Q.    Okay.  So this plaintiff had received
12   more than one fax?
13   **A.    I don't recall.**
14   Q.    Did the trial court as to one or any of
15   the faxes the plaintiff received, if there was
16   more than one, treble damages?
17   **A.    I don't recall.**
18   Q.    Why did you try this case, this TCPA
19   case, as an individual claim?
20   **A.    The plaintiff lost the class**
21   **certification.**
22   Q.    That was your only first-chair trial to
23   verdict in your four years, correct?
24   **A.    Correct.**

1    Q.    What about any other civil trials to
2    verdict in your four years practicing law where
3    you may not have been the first-chair trial
4    lawyer, you may have been second or third chair?
5    **A.    None.**
6    Q.    You stated repeatedly in your early
7    testimony responding to Mr. Blonien's questions
8    that because in your estimation the statute of
9    limitations applicable to the Buccaneers fax that
10   Technology Training had received had expired that
11   Technology Training had, quote, no standing,
12   closed quote.
13       Do you recall that?
14   **A.    Yes.**
15   Q.    Is statute of limitations a condition
16   precedent to recovery under the TCPA, or is it an
17   affirmative defense that can be raised or waived
18   by the defendant, which?
19   **A.    I don't know.**
20   Q.    Do you know what difference that would
21   make in terms of whether the expiration of the
22   statute of limitations affects jurisdictional
23   standing?
24   **A.    I'm aware that the case on point is**

1    **Ewing Industry v. Bob Wines.  Beyond that, I do**
2    **not know.**
3    Q.    Well, did you participate -- were you
4    involved in Anderson Wanca's filings in front of
5    Judge Porcelli related to whether you would be
6    allowed to intervene, whether Anderson Wanca would
7    be allowed to intervene, for its named plaintiffs?
8    **A.    Yes.**
9    Q.    And so you would have read the briefings
10   that your firm filed, that Bock Law Firm filed?
11   **A.    Yes.**
12   Q.    And you would have read Judge Porcelli's
13   order of preliminary approval of class settlement
14   and denial of intervention.
15   **A.    Yes.**
16   Q.    So you would recall that Judge Porcelli
17   distinguished between federal statutes that
18   incorporate within themselves the statute of
19   limitations as a condition precedent to recovery
20   so that it can create a problem of standing if the
21   statute of limitations is expired versus a statute
22   of limitations borrowed from another federal
23   statute where it is an affirmative defense that
24   can be raised or waived and creates no standing

1    issue.  You would recall Judge Porcelli addressed
2    that.
3        **A.   I believe it was approximately a 50-page**
4    **opinion, and I do not recall that.**
5        Q.   Let me ask you to -- if any of this
6    rings a bell.  I'm reading from Judge Porcelli's
7    March 31st, 2017, order at Star 7.  "Cin-Q
8    plaintiffs assert that plaintiffs lack standing in
9    this instance because plaintiffs' claims were
10   filed after the statute of limitations applicable
11   to the TCPA claims had run and that equitable
12   tolling is inapplicable.  That argument is
13   misplaced, however."
14       Do you recall that?
15       A.   No.
16       Q.   "Although Cin-Q plaintiffs as nonparties
17   to this action contend that the statute of
18   limitations constitutes a jurisdictional issue,
19   not subject to waiver, such argument misses the
20   mark.  Namely, the Federal Rules of Civil
21   Procedure, as well as numerous courts, indicate
22   that the statute of limitations is an affirmative
23   defense that a party may waive."
24       Does that ring a bell?

1        A.   No.
2        Q.   "Neither the text nor the context of
3    such time prescription located in a separate
4    catch-all statute indicates that the statute of
5    limitations operates as a jurisdictional bar to
6    suit."
7        Does that ring a bell?
8        A.   No.
9        Q.   "If a right created by a statute is in
10   one act and the limitations period is in another
11   act, then the limitations period is presumed not
12   to be an integral part of the right itself.  The
13   limitations period is said to be only a procedural
14   limit on the remedy and not a substantive limit on
15   the right."
16       Does that ring a bell?
17       A.   No.
18       Q.   And Judge Porcelli was quoting there.
19       He then says, "As such, the statute of
20   limitations related to TCPA claims does not act as
21   a jurisdictional bar to suit but is rather more
22   appropriately considered only a procedural limit
23   or an affirmative defense subject to waiver."
24       And he concluded at Star 10, "In sum,

1    plaintiffs established Article 3 standing.  The
2    timeliness of plaintiffs' claims does not present
3    a jurisdictional bar to suit."
4        Do you recall that from his order?
5        A.   No.
6        Q.   As we sit here today, with your four
7    years of experience, is it your testimony that
8    everything I just read from Judge Porcelli's order
9    is legally wrong?
10       MS. LOEW:  Objection, calls for a legal
11   conclusion.
12       A.   I don't know.
13       Q.   You spent quite a bit of time in
14   answering Mr. Blonien's questions during the
15   morning session in which you gave your inferences
16   and opinions regarding conduct by Mr. Oppenheim
17   and Bock Law Firm and your assessment of the
18   strength of M & C's claims in the pending
19   litigation; do you recall that?
20       **A.   I recall part of it.  I don't recall**
21   **much discussion about M & C's strengths.  The**
22   **other part I recall.**
23       Q.   And just I -- I'm not a court reporter.
24   I can't just pull something up, and I wouldn't

1    send her on a mission to go back four hours.
2        But I've got it written down that you
3    said you believe M & C's claims in this action
4    are, quote, incredibly strong.
5        **A.   Correct.**
6        Q.   I just want to get an understanding of
7    what is at the heart of your assessment in that
8    regard.
9        Do you have a view that it is improper
10   or impermissible to file a competing class action?
11       **A.   I have a view.**
12       Q.   And what is your view?
13       **A.   That the mere filing of a competing case**
14   **is not impermissible.**
15       Q.   Do you have a view that the mere filing
16   of a competing case when the original or first
17   filed case remains pending automatically raises an
18   inference of a reverse auction?
19       **A.   Not automatically.**
20       Q.   If Bock Law Firm had never hired David
21   Oppenheim, but nevertheless, at the same time that
22   it did, it proceeded to file the Technology
23   Training class action, putative class action, and
24   then engage in the mediations and reach a

1 settlement with the Buccaneers on the exact same
2 terms that the proposed settlement contains, would
3 your view be either that that is or that that
4 creates a strong influence of a reverse auction?
5     MS. LOEW: Objection, speculation.
6     **A. My view is that it would be a reverse**
7 **auction.**
8     Q. And why is that?
9     **A. On the basis of the mediation privilege,**
10 **I cannot answer.**
11     Q. If David Oppenheim had left Anderson
12 Wanca, opened up his own firm all by himself, got
13 himself a putative class representative, filed a
14 case, and negotiated a settlement, would that
15 involve conflict of interest and breach of
16 fiduciary duty?
17     MS. LOEW: Objection to form.
18     **A. Yes.**
19     Q. And am I correct you expressed that view
20 because you perceive that having been at Anderson
21 Wanca, having had some assigned responsibility for
22 the Cin-Q case, including Medical & Chiropractic
23 as a named plaintiff, that he had extra duties
24 running to those named plaintiffs, including

1 Medical & Chiropractic, and that it would be a
2 conflict of interest and a breach of fiduciary
3 duty to those named plaintiffs to leave Anderson &
4 Wanca, leave those plaintiffs in that case behind,
5 find a different or substitute or alternative
6 named plaintiff, and pursue and obtain a
7 settlement on behalf of the class?
8     **A. Yes.**
9     **Can you let me know when we have a good**
10 **minute to take a break? I just want to run to the**
11 **bathroom.**
12     MR. COHEN: This is fine.
13     THE VIDEOGRAPHER: Off the record. The
14 time is 4:13.
15     (Whereupon, a short break was
16     taken.)
17     THE VIDEOGRAPHER: We are back on the
18 record. The time is 4:16.
19 BY MR. COHEN:
20     Q. Will you agree that the duty of class
21 counsel or potential class counsel above all is to
22 the class members as a whole as opposed to any
23 particular named plaintiff?
24     **A. No.**

1     Q. Would you agree that the duty owed to
2 class clients differs significantly from the duty
3 owed in an individual representation case?
4     THE WITNESS: Can you repeat the
5 question?
6     (Whereupon, record was read as
7     requested.)
8     **A. No.**
9     Q. Would you agree that the duty that
10 Mr. Oppenheim -- strike that.
11     Would you agree that Mr. Oppenheim had a
12 fiduciary duty to the entire putative Buccaneers
13 class including named plaintiffs when he worked
14 for Anderson Wanca, but that duty was not
15 dependent on the special desire of the named
16 plaintiff or any individual plaintiffs?
17     **A. No, I do not agree.**
18     Q. As of May 2016, taking account of the
19 fact that the Buccaneers faxed broadcasts were in
20 2009 and 2010, correct?
21     **A. Correct.**
22     Q. Except to the extent that tolling could
23 apply to a new plaintiff or new plaintiff claim by
24 virtue of intervention in an existing timely case

1 or through waiver by the Buccaneers of a statute
2 of limitations defense, the statutes of
3 limitations for plaintiffs other than absent class
4 members to bring a class action would be expired.
5     **A. Correct.**
6     Q. And just because that was a long
7 question, I don't want you to have said something
8 and look back and say that question got me
9 confused.
10     A class member who wants to be a class
11 representative in that situation could intervene
12 and might obtain the benefit of the tolling from
13 the existing action, correct?
14     **A. Correct.**
15     Q. Or as part of the settlement with the
16 Buccaneers on the class basis could obtain a
17 statute of limitations waiver.
18     **A. I don't believe so.**
19     Q. You don't believe it can happen?
20     **A. Not in the 11th Circuit.**
21     Q. So your view is outside of intervention
22 in the existing timely action, pretty much the
23 entire absent class, approximately 131,000 class
24 members, have no ability to pursue a claim for the

55 (Pages 214 to 217)

1  benefit of the class.
2  **A.  Actions, plural, but yes.**
3  Q.  Can you clarify because I don't even
4  know which time I used the word action that you're
5  making plural.
6  **A.  At the beginning, you said intervene in**
7  **this action.  But there's Siprut's two cases too**
8  **which were filed within the statute of**
9  **limitations, so there are three cases filed within**
10  **the statute of limitations.  And I believe**
11  **intervention in any of the three would allow an**
12  **intervenor to seek to represent the class.**
13  Q.  And Siprut's class -- putative class
14  actions remain pending?
15  **A.  I believe so.**
16  Q.  So you agree with what I said.  You just
17  clarified the plurality of the word actions.
18  **A.  Correct, any of those three, not just**
19  **one.**
20  Q.  Okay.  Is there any reason -- and I ask
21  you this as putative class counsel in the Cin-Q
22  case.  Is there any reason to believe that if the
23  Technology Training plaintiffs and their counsel
24  had come to your firm with the Technology Training

1  settlement signed and said, we want to now
2  intervene in the Cin-Q case and propose this
3  settlement to Judge Porcelli, that you would have
4  said, we think it's a terrible settlement and
5  we're going to oppose it, but we have no
6  opposition to your intervening.  Do you think
7  there's any chance of that?
8  MS. LOEW:  Objection to form.
9  **A.  I don't -- I think we would have opposed**
10  **the intervention.**
11  Q.  So what I'm getting at is:  In your
12  view, except for intervention in one or more
13  timely filed actions after the statute of
14  limitations has otherwise expired, it's your view
15  that any undertaking by any absent class member to
16  file a putative class action, reach a settlement
17  with the Buccaneers defendant, and then seek to
18  proceed and have that approved is, number one,
19  untimely under the statute of limitations and,
20  number two, a reverse auction because of the weak
21  position of those class members by reason of the
22  statute of limitations problem.
23  **A.  No.**
24  Q.  What did I get wrong?

1  **A.  Well, number two would be a specific**
2  **inquiry.**
3  **And as for number one, I'm referring to**
4  **my understanding of the 11th Circuit Court of**
5  **Appeals decision, which is binding in the 11th**
6  **Circuit, and Ewing Industries v. Bob Wines.**
7  Q.  And I wasn't disagreeing for purposes of
8  that question.  I was accepting your
9  interpretation of that case --
10  **A.  Okay.**
11  Q.  -- that it's your view that except by
12  way of intervention in a timely filed action, no
13  absent class member has the ability to initiate a
14  new putative class action and reach a settlement
15  and benefit the class, correct?
16  **A.  Correct.**
17  Q.  And so in that situation, the wellbeing
18  and interests of the entire class of 131,000 class
19  members are left in the sole and exclusive control
20  of existing putative class counsel in the timely
21  filed claims?
22  **A.  No.**
23  Q.  How not?
24  **A.  Intervention.**

1  Q.  Which you would oppose.
2  **A.  Correct, but we're not the judge.**
3  **Can I clarify?  When I said we would**
4  **oppose, I was specifying to your hypothetical.  I**
5  **was not saying we would oppose all attempts to**
6  **intervene.**
7  Q.  Would you agree that it would be
8  unethical, unprofessional, and a breach of
9  fiduciary duty for putative class counsel to hold
10  the class hostage by requiring an unnecessarily
11  large settlement fund that only serves to inflate
12  the attorneys' fees and is vastly more actual
13  money than necessary to pay any reasonably
14  anticipated claim rate?
15  MS. LOEW:  Objection to form.
16  **A.  Can you explain what you mean by "hold**
17  **hostage?"**
18  Q.  Kind of what we have just discussed that
19  under your view, nobody else is going to be able
20  to represent the class, so you have complete
21  control.
22  **A.  Actually, you previously asked about**
23  **duties to the class representative as plaintiff.**
24  **And I said that there is a duty owed, and one of**

Thompson Court Reporters, Inc
thompsonreporters.com

1    those duties is to relay settlement offers.
2        If the defendant makes a settlement
3    offer, it is my position, and I believe this is
4    pretty clear, that counsel has to relay that
5    settlement offer to the class representative.  And
6    should the class representative accept, I believe
7    the counsel would be duty bound to allow them to
8    accept that offer.  Whether or not that's approved
9    by a court later on, I don't know.  But that goes
10   to your question about hold hostage.
11       If you are suggesting that a plaintiff's
12   counsel could withhold a settlement offer from
13   being heard by the class representative or
14   putative class representative, I would say no, a
15   class counsel could not do that.
16       Q.    What is the retainer agreement?  What
17   exhibit number is that?
18       A.    1.
19       Q.    Just lucky.
20            Drawing your attention to Exhibit 1, the
21   Medical & Chiropractic retainer agreement with
22   Anderson Wanca Bates Pages 188 through 195; do you
23   see that?
24       A.    I do.

1        Q.    And drawing your attention to Bates
2    Page 189, and the next to last paragraph, under
3    the section bolded as Class Representative but the
4    second paragraph of that section, do you see where
5    it says, "Client also understands?"
6        A.    Yes.
7        Q.    "Client also understands the need for
8    continuity of his position as plaintiff in this
9    class action, and agrees that it will continue in
10   that capacity until such time, if any, as the
11   entire class action is resolved, subject to
12   approval of the court, or the client is deemed by
13   plaintiff's counsel or the court to be an improper
14   class representative," closed quote.
15           Did I read that correctly?
16       A.    You did.
17       Q.    So under your contract with Medical &
18   Chiropractic, they agree they have to continue
19   participating as putative class representative or
20   class representative until such time, if any, as
21   Anderson & Wanca or the court deem Medical &
22   Chiropractic to be improper as a class
23   representative, correct?
24       A.    I see what is written there.

1        Q.    And what I just said comports with
2    what's written there, correct?
3        A.    I don't know that what you said is
4    accurate, but I see what is written there.
5        Q.    Well, what does what's written there
6    mean to you --
7        A.    That --
8        Q.    -- as it focuses on "or the client is
9    deemed by plaintiff's counsel to be an improper
10   class representative?"
11       A.    That if plaintiff's counsel believes
12   that the client cannot be approved as a class
13   representative for a reason, then the plaintiff's
14   counsel may seek to find additional potential
15   class representatives and intervene them in the
16   case.
17           It's also possible, as it further
18   explains, that a court could find a plaintiff to
19   be inadequate and provide plaintiff's counsel
20   leave to identify an additional plaintiff that
21   could be a class counsel -- or class
22   representative, excuse me.
23       Q.    So let me make sure I understand how
24   this works in the real world.  Bringing it to bear

1    on your example of what you believe your duty is
2    to convey a class settlement offer to the class
3    representative and then abide by that class
4    representative's decision, if Anderson & Wanca
5    believes that the appropriate settlement value or
6    range in a particular pending putative class
7    action is up here (indicating), and for the
8    camera, I'm pointing kind of high, and an offer is
9    made to settle on a class basis by the defendant
10   way down here (indicating), a number far below
11   what putative class counsel believes the case is
12   worth, in your view, you told us you have a duty
13   to convey that settlement offer to the class --
14   the class representative anyway; and if the class
15   representative wants to accept that on behalf of
16   the class, even over your objection, you have got
17   to facilitate that.
18       A.    I don't -- to the first part of
19   conveying the offer, yes, you have to convey the
20   offer.
21           To the second part, I think it would
22   depend on the terms of the offer.  I -- I could
23   for see a possibility where the offer is very
24   harmful to a class and very beneficial to a class

1  representative in which an attorney could not
2  ethically present it at preliminary approval.
3      At that point, I assume the attorney
4  should withdraw, or I would recommend seeking
5  ethics counsel's input on what to do in that
6  situation.  I don't have knowledge of that
7  specific situation happening to me.
8      Q.    Or under your contract, you could just
9  throw the client overboard, correct?
10     MS. LOEW:  Objection to form.
11     A.    I don't know.
12     Q.    So let's take out the hyperbole that you
13  didn't like from my last question, the hostage
14  part.
15         You would agree that it would be
16  unethical and unprofessional and a breach of
17  fiduciary duty for putative class counsel in
18  negotiating with the putative class defendant to
19  insist upon an unnecessarily large settlement fund
20  far beyond that which could possibly be exhausted
21  based upon any reasonable projected claim rate
22  when that extraordinarily large fund only would
23  serve to inflate the attorneys' fees utilizing a
24  25 percent or so contingent fee model; you would

1  agree that would be unethical, unprofessional, and
2  a breach of fiduciary duty.
3      MS. LOEW:  Objection to form.
4      THE WITNESS:  Can you repeat the
5  question back?
6         (Whereupon, record was read as
7          requested.)
8      A.    I don't know what a reasonable claims
9  rate would be.  If you would add that to your
10  hypothetical, I think I might be able to answer.
11     Q.    What are the information or experience
12  sources from which an experienced TCPA class
13  action law firm such as Anderson & Wanca can
14  develop a sufficient information base or anecdotal
15  evidence in order to project likely claim rates in
16  a given settlement?
17     A.    I'm aware that a certain claims
18  administrator known as KCC, who I believe TTA has
19  contemplated using in their class action,
20  publishes such a list.
21     Q.    What kind of list?  What are you talking
22  about?
23     A.    A list of claims rates for TCPA cases.
24     Q.    And are you aware of what those claim

1  rates range between in TCPA class action
2  settlements?
3      A.    Yes, or I'm aware of what KCC's list
4  ranges between.
5      Q.    And what does it range between?
6      A.    About half a percent and around
7  35 percent.
8      Q.    So the half percent is the lowest they
9  have encountered, and 35 percent is the highest
10  they have encountered?
11     A.    That they published.
12     Q.    That they published.
13        And I always get this wrong.  I've never
14  fully understood -- and even every time I ever do
15  figure it out, it only sticks in my head for about
16  half a day -- the difference between mean and
17  median.
18        But one of them is where the actual
19  majority collects at a point the majority of
20  events that -- or information triggers that form
21  the aggregation.  What is in KCC's list the actual
22  majority range?
23     A.    Not to build the suspense, I do not
24  know.  And I can tell you having looked at the

1  list, they did not say.
2         I do know, you know, math; and you could
3  add it up and divide or however to figure out the
4  mean and median.  I did not.
5      Q.    What's the highest claim rate that
6  you've seen on any Anderson & Wanca TCPA class
7  settlement?
8      A.    30 percent.
9      Q.    Which case was that?
10     A.    I believe it was called Nack v.
11  LexisNexis.
12     Q.    Is that K-n-a-c-k?
13     A.    No.  It's N-a-c-k, I believe.
14     Q.    What is the average range or the average
15  or the average range for the claim rates on
16  Anderson & Wanca TCPA class settlements that you
17  have seen?
18     A.    It varies greatly depending on a number
19  of factors.  Sometimes we try to predict them,
20  never with a lot of success.
21     Q.    Do you view them as relevant enough to
22  the settlement negotiation with an opposing
23  defendant class counsel to incorporate projections
24  for a low and a high into your term sheets?

1    **A.  No.  However, we have in the past**
2    **circulated KCC's publication, which is how I'm**
3    **aware of it.**
4    Q.  Isn't it true that in the negotiations
5    with the Buccaneers, on your internal analysis of
6    trying to figure out what you wanted, how much,
7    and what the likely claim rate would be against a
8    given fund that you were using five percent claim
9    rate as a low and ten percent claim rate as the
10    high?
11    **A.  I don't recall.**
12    Q.  In the Buccaneers class action, with a
13    reasonably good robust notice plan on a
14    settlement, what would you anticipate to be the
15    range of likely claim rates?
16    **A.  Up to 30 percent.**
17    Q.  So the highest you've ever seen is the
18    top of the range that you would predict?
19    **A.  KCC had some that were up to 35.  But,**
20    **yes, to be safe, I would predict a range of 0 to**
21    **30.**
22    Q.  Are you aware of any internal
23    communications at Anderson & Wanca or between
24    Anderson & Wanca and its co-counsel in the Cin-Q

1    case in developing your internal position as to
2    settlement where anything over ten percent was
3    ever mentioned as the high end of a claim rate
4    range?
5    **A.  I don't recall.**
6    Q.  Little bit of a segue way, Mr. Blonien
7    had some questions for you earlier.  I -- because
8    my focus isn't going to be on exactly what he was
9    focused on, but I want to get to what you were
10    saying, and I want to explore what you meant by
11    that.
12    I think he was asking you about
13    communications you had, and you kept saying, do
14    you mean specific to this case and not overlapping
15    with the Cin-Q case; do you recall that?
16    **A.  Generally, yes.**
17    Q.  And it was because you were invoking
18    privilege in one situation, which you might not
19    invoke in the other.  And what you said, you --
20    you said something to the effect, there is an
21    interrelatedness between this action, the M & C
22    versus Oppenheim and Bock action, and the Cin-Q
23    action.
24    **A.  I believe I was referring to my role as**

1    being overlapping.
2    Q.  Fair enough.
3    And I'm not seeking communications --
4    I'm not seeking any communications, privileged or
5    not.  How do you see your role as being,
6    quote-unquote, overlapping between this M & C
7    litigation and the Cin-Q putative class action?
8    **A.  I suppose there are a number of ways.**
9    **The first one that comes to mind is testimony**
10    **provided by Mr. Bock and Mr. Oppenheim in the two**
11    **matters in front of the two judges are related.**
12    Q.  Okay.  You said in a number of ways.
13    That's number one.
14    **A.  Yeah.  In addition to that, Medical &**
15    **Chiro's appeal in the TTA action was related to**
16    **both the alleged breach of fiduciary duty, as well**
17    **as the allegations about reverse auction and**
18    **everything else that was attached to the motion to**
19    **intervene, and also relates to the breach of**
20    **fiduciary duty action.**
21    **In addition to that, I am basically the**
22    **contact person for Medical & Chiro.**
23    Q.  Even in M & C's communications to and
24    from Foley?

1    **A.  Not specifically those communications.**
2    **But in terms of gathering of documents and things**
3    **of that nature, I was the point person on that.**
4    Q.  Gathering of documents and information
5    for purposes -- for purposes of M & C's compliance
6    with discovery obligations in the M & C action?
7    **A.  Correct.**
8    Q.  Do you see any other overlapping aspect?
9    **A.  Not right this second, no.**
10    Q.  You indicated you are aware that
11    Anderson & Wanca has agreed to pay all of Foley's
12    attorneys' fees and litigation expenses incurred
13    in the prosecution of this M & C action.
14    **A.  Yes.**
15    Q.  And the question came up by Mr. Blonien,
16    who is paying your attorney representing you
17    today.
18    And I think two or three times, you said
19    something about the judge will decide that.
20    You're not under the impression that
21    Foley is working on a contingent basis.
22    **A.  That is correct.**
23    Q.  Okay.  And you are not under the
24    impression that Foley is waiting to be paid until

Thompson Court Reporters, Inc
thompsonreporters.com

1 a judge decides whether M & C wins and, if so,
2 whether M & C gets attorneys' fees.
3     **A.  That is correct.**
4     Q.  So I don't know what Mr. Blonien meant
5 by his question. I'll be more clear.
6     I'm not asking who you think will
7 ultimately in the end be out of pocket to the tune
8 of Foley's attorneys' fees. As you understand it,
9 who is paying Foley now to be sitting in here as
10 your attorney for this deposition?
11     **A.  Anderson Wanca.**
12     Q.  We have had a copy of the contract, the
13 Foley, Anderson Wanca, M & C retention or
14 engagement letter produced to us heavily redacted.
15 Have you seen the heavily redacted version?
16     **A.  Yes.**
17     Q.  Have you seen an unredacted version?
18     **A.  I don't recall seeing one.**
19     Q.  So I'm assuming the Foley engagement
20 letter was redacted for purposes of production to
21 us in the M & C case.
22     If you never saw an unredacted version,
23 and the only one you ever saw is the redacted
24 version, is it fair to say you never saw any

1 version of the Foley engagement letter until it
2 was produced to us in this action?
3     **A.  I don't recall seeing it other than the**
4 **redacted one.**
5     Q.  Okay. Did you know before you had the
6 opportunity to see that redacted Foley engagement
7 letter that Anderson & Wanca had agreed to be
8 responsible for and pay all of Foley's attorneys'
9 fees and expenses? Did you know that before you
10 saw the redacted engagement letter?
11     **A.  Yes.**
12     Q.  Did you know that at the time that
13 Anderson & Wanca entered into the engagement
14 letter?
15     **A.  Yes.**
16     Q.  And to the extent that Anderson & Wanca
17 has -- and since I don't get to see the unredacted
18 letter, I don't know.
19     But in the event and to the extent that
20 Anderson & Wanca has any roles, responsibilities,
21 duties, or obligations under that engagement
22 letter with Foley, other than Brian Wanca paying
23 the fees and expenses, am I correct you have been
24 part of the Anderson Wanca group that has

1 participated in fulfilling Anderson & Wanca's
2 responsibility and role?
3     MS. LOEW:  Objection to form.
4     **A.  If there are any, it would be me.**
5     Q.  You said something, it was this
6 afternoon, but it was in response to one of
7 Mr. Blonien's questions. You said something about
8 the preliminary approval class certification in
9 the Technology Training case. And you said,
10 quote, initially, closed quote, class
11 certification was granted in the Technology
12 Training case.
13     **A.  I recall stating that I was aware the**
14 **preliminary approval had been granted. I don't**
15 **recall using the word initially.**
16     Q.  All right. You understand that for
17 purposes -- I'm really having trouble with that
18 word today.
19     MR. BLONIEN:  Purposeseses.
20     MR. COHEN:  Probably a late oncoming
21 lisp.
22 BY MR. COHEN:
23     Q.  You are aware that for purposes of
24 Technology Training's motion for preliminary

1 approval of class settlement, Judge Porcelli
2 certified the class.
3     **A.  I -- yes.**
4     Q.  Okay. And maybe I misheard you, maybe I
5 didn't, when I wrote down initially.
6     You're not operating under some
7 understanding that the order of class
8 certification in the preliminary approval order
9 has been vacated.
10     **A.  Not yet.**
11     Q.  20 percent claims rate.
12     **A.  Was that a question?**
13     Q.  Would you agree that it would be
14 unethical and unprofessional and a breach of
15 fiduciary duty for putative class counsel in a
16 putative class action in negotiating with the
17 opposing party to require an unnecessarily large
18 fund as a settlement fund one which far exceeds a
19 reasonable claim rate such as 5 percent, 10
20 percent, even up to 20 percent claim rate, far
21 exceeds that, and the only benefit therefor that
22 it could possibly serve the class -- well, the
23 only benefit it could possibly serve is class
24 counsel by creating a larger fund and thereby

Thompson Court Reporters, Inc
thompsonreporters.com

1 larger attorneys' fees under a contingent fee?
2     MS. LOEW: Objection to form.
3     **A. I'd like to make sure that I understand**
4 **the question --**
5     Q. Sure.
6     **A. -- before answering the question.**
7     **You're saying, if hypothetically a**
8 **defendant were to offer a class-wide settlement**
9 **that was at 20 percent the claims -- 20 percent**
10 **would be an expected claims rate, so the top-line**
11 **number would be based on that, would it be**
12 **unreasonable to refuse that offer; is that your**
13 **question?**
14     Q. No.
15     **A. Okay. Then please let me know what your**
16 **question is.**
17     Q. A settlement fund that after deduction
18 for attorneys' fees and litigation expenses is
19 sufficient to pay at full value under the terms of
20 the settlement, in other words, whatever the
21 settlement provided as the per claiming class
22 member or per fax compensation, after deduction
23 for attorneys' fees and litigation expenses, the
24 residual fund is enough to cover up to 20 percent

1 full value on claiming class members, you would
2 agree that insisting upon a settlement fund far
3 larger than that serves no purpose or benefit to
4 the class and only increases the fund in order to
5 generate larger attorneys' fees.
6     MS. LOEW: Objection to form.
7     **A. I still do not understand the question.**
8 **Are you saying in this hypothetical -- or what are**
9 **you saying would be the claim -- I'm sorry. Let**
10 **me start over.**
11     **I understand you're saying the claims**
12 **rate would be 20 percent.**
13     Q. No. I didn't say it would be
14 20 percent.
15     **A. Okay.**
16     Q. I'm speaking to what the fund is
17 sufficient to cover.
18     **A. Okay. So a fund that is sufficient to**
19 **cover 20 percent, what would the dollar amount**
20 **that the claimants get?**
21     Q. We'll talk about -- that's a separate
22 issue. The issue of whether the per claimant or
23 per fax compensation is sufficient is separate and
24 distinct from whether the fund is sufficient to

1 cover the provisions of compensation under the
2 settlement.
3     I'm asking you --
4     **A. If I assume that everybody is getting**
5 **the maximum recovery --**
6     Q. Mm-hmm.
7     **A. -- then under that assumption, in most**
8 **circumstances or -- I don't want to say most**
9 **circumstances. Hold on.**
10     **I would have to know more to say whether**
11 **or not it was unreasonable.**
12     Q. What do you need to know more?
13     **A. What are the people getting? What are**
14 **the claimants getting?**
15     Q. What do you want them to get?
16     **A. Maximum relief.**
17     Q. Are you saying 500 or 1,500?
18     **A. 1,500.**
19     Q. Yeah. How many times have you gotten
20 that?
21     **A. Not many.**
22     Q. Yeah. How many?
23     **A. I don't know the specific number.**
24     Q. Give me one. Give me one class

1 settlement where you got --
2     **A. I believe the case is G.M. Sign v. MFG.**
3 **It might instead be G.M. Sign v. 400 Freight. I**
4 **get the two cases confused.**
5     Q. These were class settlements, one or the
6 other --
7     **A. No. We won. They were judgments.**
8     Q. Ah. I'm sorry. You -- and I guess you
9 won on summary judgment?
10     **A. That is correct.**
11     Q. Okay. And you're saying in one of those
12 two cases, the judge trebled the statutory
13 damages.
14     **A. That is also correct.**
15     Q. I -- and I -- I appreciate that. But it
16 ends up, sometimes this happens, we -- there's a
17 segue way away from the focus.
18     I'm talking about settlements.
19     **A. Okay.**
20     Q. You tell me a TCPA class action
21 settlement that Anderson Wanca has been a part of
22 where the settlement terms involved $1,500 trebled
23 per fax.
24     **A. Off the top of my head, I cannot think**

**61 (Pages 238 to 241)**

1  of one.
2      Q.  Can you think of one you've ever read
3  about anywhere in the country where a TCPA class
4  action settlement provided for 1,500 treble
5  damages per fax?
6      **A.  I don't recall.**
7      Q.  So let's say for purposes of trying to
8  fill in the compensation gap you think is
9  important, let's say that it would be $500 --
10     **A.  Okay.**
11     Q.  -- per fax.
12     **A.  Okay.**
13     Q.  Okay.  A settlement, a class settlement
14 in a TCPA context at $500 per fax with no
15 reduction pro rata unless the fund is exhausted,
16 and the fund after deduction for attorneys' fees
17 and litigation expenses is sufficient to cover up
18 to approximately a 20 percent claim rate before
19 any pro rata reduction is necessary, in general,
20 in your experience, is that a sufficient fund for
21 a reasonable settlement?
22     MS. LOEW:  Objection to form.
23     **A.  It could be.**
24     Q.  Okay.  Is there any reason you can think

1  of why a plaintiff's counsel representing that
2  putative class could justify seeking more than
3  four times that size fund and refuse to go below
4  it except his own self interest to generate larger
5  fees off a larger fund?
6      **A.  Yes.**
7      Q.  Do share.
8      **A.  The claims process, the notice process,**
9  **those are the only two reasons I can think of at**
10 **this time.**
11     Q.  And I didn't know what you meant at
12 first. I was going to ask you to explain what you
13 meant. But I -- I think I got it.
14     You mean what we talked about so far
15 could be right and reasonable and it would be hard
16 for class counsel to justify why there's standing
17 on a fund that's more than four times that, except
18 to line their own pockets, unless the reason
19 relates to continuing disagreement between the
20 parties over a reasonable claims process or
21 continuing disagreement between the parties over a
22 reasonable notice process?
23     **A.  That is correct.**
24     Q.  And actually that segue ways to your

1  discussion with Mr. Blonien about reverse auction
2  and what it is proven by or demonstrated by.
3      **A.  Yes.**
4      Q.  And my notes aren't good. But I've got
5  something that seems to say a reverse auction can
6  also be shown through, and I think some of this is
7  my language, a dissuading or unduly burdensome
8  claim form.
9      **A.  That is my understanding is one of the**
10 **ways.**
11     Q.  Okay.  Are you familiar with the
12 proposed settlement and the proposed claim form in
13 the Technology Training case?
14     **A.  Generally, I am.**
15     Q.  Okay.  Based upon your general
16 familiarity with it, do you have a view as to
17 whether that claim form suffers from this reverse
18 auction concern of being excessively dissuading or
19 unduly burdensome?
20     **A.  Yes.**
21     Q.  And what is your assessment or opinion
22 and why?
23     **A.  Is there any chance you'll let me look**
24 **at it and show it to you or just from memory?**

1      Q.  If I have it, I'd probably be happy to
2  do it.
3      **A.  I would appreciate it if that's**
4  **something --**
5      MR. OPPENHEIM:  Got it electronically if
6  you want to let them print it.
7      THE WITNESS:  We can email iprice -- or
8  if she's still here.
9      MS. LOEW:  Yeah.
10     MR. COHEN:  How about this:  We'll segue
11 way to something else.  When Barry comes back
12 because he's got that ability to like yank out
13 some specific pages from a PDF, I don't do that,
14 and then maybe he can email it to you?
15     MS. LOEW:  (Nodding head.)
16     THE WITNESS:  Thank you.
17 BY MR. COHEN:
18     Q.  You testified earlier in response to
19 some of Mr. Blonien's questions that you were the
20 person at Anderson & Wanca that performed the
21 search of Anderson & Wanca's files, its electronic
22 data, its servers to locate documents that M & C
23 was ordered to produce in this action, correct?
24     **A.  Yes.**

1  Q. And as I understood, what you've located
2  that you deemed responsive, you provided to Foley.
3  **A. Everything I located, I provided to**
4  **Foley.**
5  Q. Okay. But when you say everything, it's
6  everything you searched for, correct?
7  **A. Correct.**
8  Q. What did you search for?
9  **A. Whatever -- or I recall some of the**
10 **things I searched for were all emails to and from**
11 **David Oppenheim regarding Buccaneers, Cin-Q,**
12 **Medical & Chiro, Mester, Anderson.**
13 **I also recall producing to them all**
14 **communications between Oppenheim and Phil Bock, to**
15 **and from, I don't recall the time period for that,**
16 **and anything else they would have requested.**
17 Q. Are you aware of Judge McKown's
18 (phonetic) discovery order where he found some
19 at-issue waivers of privilege or work-product
20 protection, he found others still intact, and he
21 ordered M & C's supplementation consistent with
22 his ruling?
23 **A. I'm aware of it. I've never read it.**
24 Q. Even as of today?

1  **A. No.**
2  Q. Okay. And what I'm wondering is: Did
3  somebody tell you what the scope of the ruling was
4  so that you could utilize it in doing your search
5  of Anderson & Wanca's data, or was your search so
6  broad, it would cover anything and everything,
7  even if it's privileged under Judge McKown's
8  order, you're still giving the universe of
9  everything to Foley, and you're letting them make
10 the decisions?
11 **A. It's the second.**
12 Q. Suppose Bock Law Firm never filed a
13 competing case, never settled it. The Cin-Q
14 action proceeded on class certification hearing.
15 **A. Okay.**
16 Q. Class certification was denied.
17 **A. Okay.**
18 Q. And the 11th Circuit on a PLA either
19 denied the PLA or accepted the PLA then upheld
20 the denial of class certification.
21 **A. Mm-hmm.**
22 Q. Would that outcome serve the best
23 interest of the class?
24 MS. LOEW: Objection to form.

1  **A. I would -- it's not over yet, so I**
2  **wouldn't know how to answer that question.**
3  Q. In the scenario I just described, it's
4  over, right?
5  **A. No.**
6  Q. What's left?
7  **A. Summary judgment, and then an appeal of**
8  **the entirety.**
9  Q. Unless they took the PLA and upheld the
10 verdict because that would be law of the case.
11 And by verdict, I mean the noncertification.
12 **A. It would be law of the case. We could**
13 **still appeal the final judgment at the end.**
14 Q. Okay. How far do we have to take it
15 with the class getting nothing before you would
16 agree that's not a good outcome for the class?
17 MS. LOEW: Objection to form.
18 **A. The class getting nothing would be a bad**
19 **outcome for the class.**
20 Q. You agree that's possible?
21 **A. Anything is possible, yes.**
22 Q. But -- strike that.
23 Do you know why the Buccaneers waived
24 the statute of limitations in the Technology

1  Training case?
2  **A. They could not have had a settlement**
3  **even allegedly without one.**
4  Q. Well, no. We've already talked about
5  the fact that intervention would have been an
6  option in the existing Cin-Q case, right?
7  **A. Intervention, I suppose, would have been**
8  **an option; but there's no guarantee that they**
9  **would have been able to intervene.**
10 Q. True. And that just circles back to my
11 original question. And it's kind of one of those
12 where you can't have personal knowledge.
13 But I just want to ask: Do you have
14 personal knowledge as to why the Buccaneers agreed
15 to waive statute of limitations as part of the
16 Technology Training settlement?
17 **A. I do not have personal knowledge.**
18 Q. When did Anderson & Wanca -- strike
19 that.
20 You worked for Anderson & Wanca before
21 you became an attorney, correct?
22 **A. Yes.**
23 Q. How long -- when did you start with
24 Anderson & Wanca, even in an early nonattorney

1    role?
2        A.    I believe September of 2005, give or
3    take one month.
4        Q.    Okay.  As of September 2005 when you
5    started, give or take a month, did you become
6    aware shortly after joining the firm that Phil
7    Bock and Brian Wanca were working TCPA class
8    actions together?
9        A.    Not -- approximately one year.
10       Q.    Later?
11       A.    Yes.
12       Q.    Okay.  And when you say approximately
13   one year later, which would put us fall of 2006, I
14   don't know if you're saying that's when they
15   started doing it or that's when you became aware
16   of it.
17       A.    I can be a little bit more specific.  It
18   was September -- or not September.  It was summer
19   of 2006 that I became aware of it.
20       Q.    And just to clarify, when you became
21   aware of it, did you become aware that it had
22   actually been going on previously, you just then
23   became aware, or was it something that is you
24   understand it actually started right then around

1    summer 2006?
2        A.    I was aware that it had been going --
3    going on for some period of time, but it seemed
4    incredibly short to me.
5        Q.    And were you aware that for some number
6    of years thereafter, Phil Bock's firm and Brian
7    Wanca's firm co-counseled on pretty much all of
8    their TCPA class actions?
9        A.    I was not aware of which cases --
10   actually, I was not aware of which cases the --
11   Mr. Bock's firm was on.  My role had nothing to do
12   with the cases themselves at that time.
13       Q.    What was your role?
14       A.    Researching prior to filing cases.
15       Q.    Okay.  At what point would your
16   involvement have grown, developed, shifted,
17   whatever so that you became more aware of the
18   interrelated or interrelationship and co-counsel
19   relationship between Bock Law Firm and Wanca?
20       A.    I think that would probably be sometime
21   around 2008.
22       Q.    Okay.  And I'm not focusing on any
23   specific day.  I'm not focusing on any specific
24   event that was a revelation to you.

1        I'm just talking about this general time
2    period around 2008 when you by virtue of changing
3    situation, you become more aware of things, at
4    that point in time, did you become aware that, in
5    general, Bock and Wanca were co-counseling on all
6    of their TCPA class actions?
7        A.    No.
8        Q.    What did I say that is inaccurate?  And
9    I understand the no, but in what way was your
10   awareness a no?
11       A.    In approximately 2008, I became involved
12   in researching a large group of cases that was to
13   be filed jointly between Anderson Wanca and Bock
14   Hatch.  And those cases were so numerous, I feel
15   that it answers your question.
16       Q.    Were those the B2B cases?
17       A.    Correct.
18       THE REPORTER:  The what?
19       MR. COHEN:  B2B, capital B, number 2,
20   capital B.
21   BY MR. COHEN:
22       Q.    Was it your understanding that the Bock
23   and Wanca co-counsel arrangement or understanding
24   was limited to the B2B cases?

1        A.    I didn't know the limits.  But as I just
2    said, I knew that for those cases, a hundred
3    percent of them were to be Bock Hatch and Anderson
4    Wanca.
5        Q.    As of 2008, as you became aware of those
6    B2B cases, were you aware of other TCPA class
7    actions that Wanca was working without Bock?
8        A.    I don't know.
9        Q.    What about 2009 and 2010, are you aware
10   of any TCPA class actions that Wanca was working
11   without Bock?
12       A.    I don't know.
13       Q.    2011?
14       A.    I don't know.
15       Q.    When is the first time you became aware
16   that you can recall as you sit here today that
17   Wanca was filing TCPA putative class actions
18   without Bock?
19       A.    I have no knowledge as to that.  Again,
20   before I was an attorney, that wasn't my role.
21       Q.    Has Brian Wanca ever explained to you or
22   shared with you the nature of his arrangement or
23   agreement with Phil Bock relating to co-counseling
24   on TCPA cases, when it started, when it ended, if

**64 (Pages 250 to 253)**

1  it ended, to which cases it did and didn't apply?
2  **A.  I specifically recall being told**
3  **relative to the B2B cases that every single one of**
4  **them would be filed jointly, and I was**
5  **specifically involved with the research and**
6  **preparation for that.**
7  **As to a broader agreement, I do not**
8  **recall any such discussion with Brian Wanca or**
9  **anybody else about such agreement to the extent it**
10  **exists.**
11  Q.  And I want to make sure I understand
12  what you're saying.  To your recollection, other
13  than Brian Wanca specifically communicating to you
14  that all the B2B cases would be jointly
15  prosecuted, he never said or communicated in any
16  way, shape, or form to you anything at all one way
17  or another relating to which cases the two firms
18  would work together, which ones they wouldn't, and
19  why?
20  **A.  Not -- there was no discussion about a**
21  **broad agreement.  I do recall a couple specific**
22  **discussions about specific cases that Bock**
23  **Hatch -- or let me say Bock's firm and Anderson**
24  **Wanca worked on together.**

1  Q.  And what was the way to tell the case
2  that was shared versus the case that were not?
3  **A.  In the filing system, if it had a pound**
4  **sign, that is, the number sign, at the beginning**
5  **of the case name, it was not shared.**
6  Q.  Did anyone at Anderson & Wanca ever
7  explain to you why the not shared cases were not
8  shared?
9  **A.  No.**
10  Q.  You've never asked Brian Wanca ever as
11  to any one case ever that was not shared why Bock
12  wasn't included.
13  **A.  I have actually asked that specific**
14  **question, and I recall one case.**
15  Q.  And what case?
16  **A.  Sandusky v. Wagner Wellness.**
17  Q.  And what was the answer?
18  **A.  The answer was, "We filed it with**
19  **another co-counsel."**
20  Q.  Whose client was Sandusky, yours or the
21  co-counsel?
22  **A.  The co-counsel.**
23  Q.  You're aware in the past of co-counsel
24  bringing the potential named plaintiff to Anderson

1  Q.  You keep answering -- that's the second
2  time you've answered my question by saying
3  something to the effect there was no broad
4  agreement.  My question doesn't ask whether there
5  was a broad agreement.
6  My question seeks any information or
7  understanding you've ever received at any time in
8  any way from Brian Wanca in any way relating to
9  anything about which cases the two firms worked
10  together, which ones they don't, why, why not.
11  **A.  The only discussions I had with Brian**
12  **Wanca were case specific.  There are at least some**
13  **cases where Brian Wanca expressly told me, "Phil**
14  **Bock and his firm were involved on this case."**
15  Q.  Were there cases that Brian Wanca
16  specifically told you, Phil Bock and his firm are
17  not on this case?
18  **A.  I recall being told at some point after**
19  **2010 of the way to tell the difference between**
20  **cases that were shared with Bock Hatch and cases**
21  **that were not.  I do not believe that information**
22  **came from Brian Wanca.**
23  Q.  From whom did it come?
24  **A.  I believe it came from Tina Natally.**

1  & Wanca and Anderson & Wanca including Bock in the
2  case.
3  **A.  I am aware of at least one situation**
4  **where that happened, yes.**
5  Q.  So why was that not done, for example,
6  in Sandusky versus Wagner Wellness?
7  **A.  That was not part of the discussion.**
8  Q.  Outside of the one time you asked Brian
9  Wanca about Sandusky versus Wagner Wellness and
10  him telling you what he told you, you have never
11  at any other time asked, nor have you from Wanca
12  or anyone else ever received, any information in
13  any way relating to why Wanca has not been
14  including Bock in TCPA class actions as co-counsel
15  in the last few years.
16  **A.  As I sit here today, I do not recall any**
17  **discussion with Mr. Wanca or Mr. -- or with**
18  **Mr. Wanca or anybody else regarding prospective**
19  **cases and Mr. Bock's not being involved in them.**
20  Q.  Have you ever asked Brian Wanca why Phil
21  Bock wasn't included in the Buccaneers litigation?
22  **A.  No.**
23  **Actually, I'm sorry, can you restate --**
24  **can you repeat the question?**

**65 (Pages 254 to 257)**

1            **(Whereupon, record was read as**
2            **requested.)**
3        MR. COHEN:  I'm not sure that's
4  accurate.
5        THE REPORTER:  Can you restate it?
6        MR. COHEN:  Sure.
7        **A.   Can you restate the question?  I want to**
8  **make sure I got that one right, and I might have**
9  **gotten it wrong.**
10      Q.   Have you ever asked or have you ever
11  received information from Wanca or anyone else
12  about why Phil Bock was not included in the
13  Buccaneers class action?
14      **A.   I apologize.  That was your last**
15  **question.  The answer to that question is yes.**
16      Q.   And what were you told?
17      **A.   Mike Addison told me he only asked Brian**
18  **to join the case.**
19      Q.   Did you ever ask Brian why he didn't
20  insist that Phil be included?
21      A.   No.
22      MR. COHEN:  Can we take a break?
23      MS. LOEW:  Mm-hmm.
24      THE VIDEOGRAPHER:  Off the record.  The

1  time is 5:21.
2        (Whereupon, a short break was
3        taken.)
4        (Whereupon Deposition Exhibit
5        No. 7 was marked for
6        identification by the court
7        reporter.)
8        THE VIDEOGRAPHER:  We are back on the
9  record.  The time is 5:31.
10  BY MR. COHEN:
11      Q.   So we took a break.  We're back.
12      One of the things we did was with the
13  assistance of Ms. Loew, we got some copies of the
14  proposed claim form for the Technology Training
15  settlement.  We've marked that as Exhibit 7.
16      It's my understanding you have that in
17  front of you, correct?
18      A.   Correct.
19      Q.   We had chatted about this and then segue
20  wayed away because we didn't have a printed copy
21  of it, and you had asked if it would be okay for
22  us to get you one.
23      And what we were talking about at the
24  time was your previous testimony that in your

1  view, a reverse auction can be shown not only
2  through insufficient compensation and insufficient
3  fund but also through an excessively dissuading or
4  unduly burdensome claim form that could impede
5  otherwise reasonable claim rates, correct?
6      **A.   I also said notice, but yes.**
7      Q.   Right.  I didn't mean to exclude that.
8  I was just trying to get us to this claim form.
9      **A.   Then yes, correct.**
10      Q.   So we have the claim form that's been
11  proposed.  Do you take the position that there is
12  anything about this claim form that is excessively
13  dissuading or unduly burdensome within the context
14  that we were discussing?
15      **A.   Yes.**
16      Q.   And please share.
17      **A.   The penalty of perjury statement, I**
18  **don't believe it to be necessary; and it seems**
19  **confusing.**
20      **And in Section 1, the statement, "If you**
21  **believe you received more than one fax to the**
22  **number, parenthesis, S, closed parenthesis, listed**
23  **above, you may indicate how many you believe you**
24  **received at each number in parenthesis next to**

1  **each number."**
2      **And, again, that's just my quick review**
3  **of the document sitting here right now.**
4      Q.   All right.  Well, let's get to the
5  penalty of perjury part last.  Okay?
6      **A.   Okay.**
7      Q.   And where is the thing you said, "If you
8  believe you received more than one?"
9      **A.   (Indicating.)**
10      Q.   Okay.  So let's just start with Number
11  1, fax number with a parenthetical S for plural.
12  And it seeks a ten-digit number, correct?
13      **A.   Yes.**
14      Q.   Presumably an area code and the -- I'll
15  bet there's a specific term for the --
16      **A.   Prefix.**
17      Q.   The area code is the prefix, right?  Oh
18  the prefix is the rest.
19      MR. OPPENHEIM:  The middle three
20  numbers.
21  BY MR. COHEN:
22      Q.   Okay.  So it goes area code and then
23  prefix and then the last four?
24      **A.   Correct.**

1    Q.   Is there a funky term for the last four
2  too?
3    A.   There probably is.
4        MR. BLONIEN:  Suffix.
5        MR. COHEN:  It could be.
6  BY MR. COHEN:
7    Q.   Anything unacceptable, unduly burdensome
8  about expecting a claiming class member to
9  identify their fax number?
10    A.   No.
11    Q.   Okay.  So then below that, it says,
12  "List all numbers on which you may have received
13  faxes sent by or on behalf of BLP.  Attach an
14  additional sheet if necessary."
15        So would you agree that what it's saying
16  is:  Fill in the fax number in the blanks on
17  question Number 1, but if you had maybe more than
18  one fax number that meets that description, attach
19  another page, and list any other fax numbers.
20  That's what it's asking them to do.
21    A.   I understand that.
22    Q.   Okay.  Anything unacceptable, unduly
23  burdensome about saying if there may be other
24  numbers on which you may have received faxes sent

1  by or on behalf of BLP, attach another page, and
2  list those numbers?
3    A.   I -- as I sit here today, no.
4    Q.   Okay.  It says, "The settlement
5  administrator will verify that the fax number,
6  paren, S, appears in the existing records related
7  to the case before approving your claim."
8        Anything inappropriate about a term
9  provision of the claim form, a provision of the
10  settlement administration where the claims
11  administrator or settlement administrator will
12  compare a claimant's identified fax number to the
13  transmission log records to make sure that it's a
14  valid claim?
15    A.   As I sit here right now, no.
16    Q.   "If you believe you received more than
17  one fax to the number, apostrophe, S, listed
18  above -- not apostrophe, S -- paren, S, listed
19  above, you may indicate how many you believe you
20  received at each numbers in parenthesis next to
21  each number."
22        Now, in this case, there are
23  transmission logs for the Buccaneers' broadcast,
24  correct?

1    A.   Yes.
2    Q.   For all of them, right?
3    A.   I think that misstates the discovery I
4  did in this case.
5    Q.   How so?
6    A.   For the records that related to
7  Slingshot, we have transmission logs.
8        For the records related to -- for the
9  records related to 127 High Street, we have the
10  target lists, and then we have the exception
11  reports.  So you have the complete list that was
12  attempted, and then you have the list that failed.
13  So if you subtract one from the other, what you're
14  left with are the ones that were successful.
15        But technically, to the technical term
16  of transmission logs, the answer would still be
17  no.
18    Q.   Fair enough.
19        For the Slingshot, you've got true
20  transmission logs.  For the 127 High Street,
21  you've got the effective equivalent, as long as
22  you do the deduction and subtraction correctly.
23    A.   Correct.
24    Q.   Okay.  So there is a viable means in a

1  settlement of the Buccaneers class action to
2  compare any claiming class member who identifies
3  one or more fax numbers on their claim form to the
4  transmission logs and/or target lists minus
5  exception report and confirm or refute whether
6  their fax number is in the class.
7    A.   Correct.
8    Q.   And if I understand correctly, as to
9  both the Slingshot and the 127 High Street, it
10  will indicate whether that fax number received
11  only one fax transmission or more and if more, how
12  many more.
13    A.   That is also correct.
14    Q.   So although Section 1 provides if you
15  believe you received more than one fax to the
16  numbers listed above, you can indicate how many
17  you believe you received at each number, the
18  objective data is going to allow a settlement
19  administrator to confirm and know how many fax
20  transmissions of Bucs advertising faxes any
21  claiming class member received.
22    A.   Correct.
23    Q.   Section 2, "You must provide your
24  contact information, name, company, address, city,

1    state, zip code."
2        All of that reasonable?
3    **A.   As I sit here today, yes.**
4    Q.   Number 3, "Requested information if the
5    settlement administrator needs to contact you:
6    Daytime phone number and email address."
7        Reasonable?
8    **A.   I don't know why it's necessary, but**
9    **okay.**
10   Q.   Would you as we sit here today express
11   the position that it is unduly burdensome and
12   excessively dissuading to a potentially claiming
13   class member to provide that information?
14   **A.   No.**
15   Q.   Number 4 says, "You must verify
16   ownership of the fax number, parenthesis, S,
17   listed in Number 1 above.  Select A or B and sign
18   your name."
19       Did I read that right?
20   **A.   Yes.**
21   Q.   A, the fax number, parenthesis, S,
22   identified above or attached to this proof of
23   claim was, slash, were registered to me or a
24   company I owned or operated in 2009 or 2010."

1        And there's a place to sign your name,
2    correct?
3    **A.   I see that, yes.**
4    Q.   And it goes on to say, "Or B, the fax
5    number, parenthesis, S, identified in Number 1
6    above or attached to this proof of claim was not,
7    slash, were not registered to me or a company I
8    owned or operated throughout 2009 and 2010,
9    period."
10       And it goes on to say, "Explain when you
11   obtained the fax number, parenthesis, S,
12   identified in Number 1 above and how you received
13   the faxes at issue."
14       And it's got a line for information and
15   then, "Sign your name here."
16       Correct?
17   **A.   I see that, yes.**
18   Q.   And so Section 4 with Subparts A and B
19   is designed to seek clarification or confirmation
20   from a claiming class member that not only is
21   their fax number that they apparently have now or
22   had at some point in the past included in the
23   objective data that the settlement administrator
24   will have of numbers to which faxes were

1    successfully transmitted, but also to confirm one
2    way or another whether the claiming class member
3    owned or operated that fax number in 2009 or 2010,
4    correct?
5    **A.   Section 4 does not make sense to me.**
6    Q.   Why not?
7    **A.   If you look at 4A, it says, "In 2009 or**
8    **2010."**
9    Q.   Mm-hmm.
10   **A.   So in my opinion, it is possible that**
11   **both A and B could be true simultaneously,**
12   **which...**
13       **Can the record reflect that everybody**
14   **agrees with me in the room?**
15       **MR. OPPENHEIM:  No.**
16       THE WITNESS:  Okay.
17   BY MR. COHEN:
18   Q.   Well, let's explore it.
19   **A.   Okay.**
20   Q.   Subparagraph A uses an "or" between
21   2009, 2010, correct?
22   **A.   Correct.**
23   Q.   So to sign for A, the class member is
24   not stating whether it was 2009 versus 2010 versus

1    both.  If the claiming class member owned or
2    operated the fax number in question in either 2009
3    or 2010 or both, the claiming class member could
4    sign A.
5    **A.   Correct.**
6    Q.   Okay.  Subparagraph B says, "The fax
7    number," and I'm just going to go with the
8    singular for the example here, "was not registered
9    to me or a company I owned or operated throughout
10   2009 and 2010."
11       So Subsection B uses an "and" and calls
12   upon the class member to sign -- or at least this
13   is what I'm inferring you're suggesting, calls
14   upon the class member to sign that if they
15   operate -- owned and operated that number in 2009
16   but not 2010, owned and operated that number in
17   2010 but not 2009, or didn't own and operate that
18   number in 2009 or 2010, correct?
19   **A.   Correct.**
20   Q.   And if I'm understanding your
21   interpretation of this language, a class member --
22   a claiming class member who signed Part A because
23   they owned and operated the number in 2009 but not
24   2010 would then also need to sign B because they

Thompson Court Reporters, Inc
thompsonreporters.com

1  didn't own it in 2009 and 2010. They only owned
2  it in 2009.
3      A.   Correct.
4      Q.   And if that claiming class member signed
5  A and B, B says, "Explain when you obtained the
6  fax number and how you received the faxes at
7  issue."
8      A.   I see that.
9      Q.   And the class member could write, I
10  obtained it X date through the end of 2009, which
11  would reflect they didn't own it in 2010.
12      A.   That is something they could write.
13      Q.   I understand you don't think this is
14  clear.
15      A.   Correct.
16      Q.   Do you see a difference between clear
17  versus unduly burdensome?
18      A.   I believe this is unduly burdensome as I
19  am a class action attorney who has done a lot of
20  work in TCPA, and I don't understand it.
21      Q.   Well, is difficulty understanding the
22  same as unduly burdensome?
23      A.   I think for your average class member,
24  me having difficulty understanding might be

1  indicative of a class member being put under an
2  unduly burdensome situation for no reason other
3  than to depress the claims rate.
4      Q.   And I want to make sure I understand.
5  It's your contention then that the phrasing of
6  Section 4, Parts A and B, is intentionally
7  designed to suppress claims rates.
8      A.   No, that is not correct.
9      Q.   And why is it not correct?
10      A.   I don't presume to know why it was
11  designed this way.
12      Q.   You're just speaking of a risk or a
13  potential to depress claims rates.
14      A.   I was referring to a potential effect of
15  it, yes.
16      Q.   Going down to paragraph or Section 5,
17  and I think this is the part where you talked
18  about "under penalty of perjury" is unnecessary
19  and can be confusing. Those are my notes of what
20  you said.
21      A.   Yeah, yes.
22      Q.   Okay. And it reads, "Pursuant to 28
23  U.S.C. Section 1746, I hereby state under penalty
24  of perjury that I, slash, my company owned and,

1  slash, or used the fax number, paren, S, specified
2  above. I further state that the information in
3  this claim form is true and correct."
4      Did I read that correctly?
5      A.   You did.
6      Q.   What part of this is confusing of
7  Paragraph 5?
8      A.   The effect of a class member filling out
9  this form, providing the number of faxes they
10  believe they received, and then being accused of
11  perjury because the objective data used to verify
12  those records says that they are incorrect.
13      Q.   I just want to make certain I understand
14  what you're suggesting is to the extent Section 1
15  uses the term "may have received faxes" and speaks
16  of whether the claiming class member believes he
17  or she received more than one fax, they would be
18  concerned in answering about may and their belief
19  because of a certification under penalty of
20  perjury.
21      A.   Correct.
22      Q.   Do you have any empirical data to
23  support that concept, that -- that assertion?
24      A.   No.

1      Q.   Now, I asked because I was just using
2  your words. You had said that section, the
3  penalty of perjury section, was unnecessary. I
4  haven't asked you about that yet. And you said
5  confusing.
6      A.   Yes.
7      Q.   When I asked about confusing, you talked
8  about your concern that a claiming class member
9  would be concerned about swearing under penalty of
10  perjury to what they were called upon to provide
11  in response to Section 1, correct?
12      A.   That's most of it, yes.
13      Q.   I'm not seeing that -- and I don't mean
14  to argue with you. I want to make sure we're
15  communicating.
16      A.   Mm-hmm.
17      Q.   I don't see that so much as an issue of,
18  quote-unquote, confusion as opposed to -- and
19  while I don't agree with you, I'm still hearing
20  you say it's an issue of intimidation that could
21  depress the claim rate.
22      A.   I do agree with that too.
23      Q.   Okay. But where is -- you used the term
24  confusing.

69 (Pages 270 to 273)

1     **A. Yes.**
2     Q. Were you just meaning the intimidation
3 factor I just put out?
4     **A. No.**
5     Q. What are you saying is confusing?
6     **A. I don't understand why they have to say**
7 **how many faxes they received.**
8     **And, again, as the deponent, I am the**
9 **one that did the work compiling the transmission**
10 **logs, the target list, and the exception reports.**
11 **I got a hundred percent of them. Why is the class**
12 **member being asked to identify how many they**
13 **received under penalty of perjury?**
14     **And if I were a class member, knowing**
15 **that the plaintiff's counsel and defendant's**
16 **counsel and class administrator have that, I**
17 **believe that it would be confusing to the class**
18 **member as to why they are being asked that**
19 **question.**
20     Q. Where are you getting the impression the
21 class member is being told -- so the confusion
22 that you're proffering is that Section 1 seems to
23 tell the class member that the settlement
24 administrator already has fax numbers for the

1 transmissions in existing records. If that's
2 true, why does the class member need to specify
3 how many faxes he may have received or believes he
4 may have received, and then why does the class
5 member need to attest to his belief under penalty
6 of perjury?
7     **A. Correct.**
8     Q. You find that confusing, and you find it
9 intimidating.
10     **A. Yes.**
11     Q. Okay. Why do you find it unnecessary?
12     **A. Because I did a really good job getting**
13 **all the transmission logs and records.**
14     Q. What is the source of proof that you're
15 assuming, not as to whether we know the fax
16 numbers to which the faxes were transmitted in
17 2009 and 2010, but that the person or entity to
18 whom that number has been traced for a hard
19 address look up or the person or entity who owns
20 or operates the number now if fax notice were
21 going to be used, what is the basis for your
22 apparent assumption that the claim form is going
23 to the right person, whether by fax or hard mail?
24     **A. Well, if Section 4 were worded properly,**

1 I believe that would be Section 4A.
2     Q. So they would still be verifying
3 something.
4     **A. Correct.**
5     Q. And assume they -- whatever your concern
6 with 4A and 4B is, I'm assuming -- I'm assuming
7 you would agree that what you view to be confusing
8 or internally inconsistent about 4A and B, you
9 could see a way to rephrase in a way that would
10 get the information even you agree is necessary:
11 Did you own this or operate this fax number at the
12 time of the broadcast in question.
13     **A. I believe it could be worded to not be**
14 **confusing, yes.**
15     Q. And you believe that and you agree that
16 is -- worded properly in your estimation, that
17 information which is appropriate to the claims
18 administration process.
19     **A. If worded properly, yes.**
20     Q. So just assume I'm -- without conceding,
21 I'm taking at face value everything you say about
22 everything before we get to the certification
23 under penalty of perjury, do you think it's
24 unreasonable to expect somebody who is the sole

1 provider of that piece of information, in other
2 words, the claims administrator is not going to
3 know whether this person who is saying, not only
4 is that my fax number today or not only was that
5 my fax number at some point in the past, but it
6 was my fax number in 2009 and 2010, meaning, I got
7 the fax, they are the sole provider or source of
8 that information, do you think it's unreasonable
9 and unduly burdensome and unfairly intimidating to
10 look at a class member who may receive a good bit
11 of money on their claim to say, that's under
12 penalty of perjury?
13     MS. LOEW: Objection to form.
14     **A. I don't think it's necessary to do that.**
15 **But, again, in this case, that's not the only**
16 **thing under penalty of perjury.**
17     Q. That goes back up to your concern about
18 Paragraph 1.
19     **A. Correct.**
20     Q. And I just want to make certain, and I
21 don't mean to divorce A from B from C or 1 from 4
22 from 5 and make you think I'm trying to get you to
23 acknowledge something you see as interrelated.
24     I'm saying, in a situation where you

1  don't have a concern about the other provisions of
2  a claim form, you don't find it unduly burdensome
3  or unacceptably intimidating so as to unfairly
4  depress claims rates to simply require that the
5  claimant sign under penalty of perjury, correct?
6      A.  I don't know.
7      Q.  Have you at Anderson & Wanca utilized
8  claim forms as part of accomplished TCPA class
9  settlements --
10     A.  Yes.
11     Q.  -- that have --
12     A.  Sorry.
13     Q.  -- that have the claiming class members
14 sign under penalty of perjury?
15     A.  I don't recall any.
16     Q.  Are you familiar with Sandusky versus
17 Heel?
18     A.  Yes.
19     Q.  H-e-e-l?
20     A.  I am.
21     Q.  That's a TCPA class settlement, correct?
22     A.  Yes.
23     Q.  Didn't that contain a catch-all penalty
24 of perjury signature that everything on the form

1  was true?
2      A.  I don't recall offhand.  I believe that
3  was several years ago.
4      Q.  Has Mr. Wanca taken the position in any
5  communications with you at any time that under no
6  circumstances will "under penalty of perjury"
7  signatures be agreed to in TCPA class settlement
8  claim forms?
9      A.  I do not recall any such discussion.
10     Q.  You also indicated the notice plan can
11 be a separate and independent or a contributing
12 feature of why a class settlement may be accused
13 of being a reverse auction because of the way it
14 might depress claim rates?
15     A.  Yes.
16     Q.  Do you have a view or a position as to
17 whether the proposed notice plan in this case
18 falls into that category?
19     A.  I don't believe you've provided the
20 notice plan.
21     Q.  To whom?
22     A.  To Judge Porcelli.
23         If I can further answer, I believe it
24 was due the day after the 11th Circuit Court of

1  Appeals decision, maybe two days after, but I
2  think one.
3      Q.  You do understand he issued a stay.
4      A.  Yes, right before it was due.  But I
5  believe it was on that day that it was due, and
6  then the stay was entered.
7      Q.  And you do understand a stay stays any
8  and all things that need to be filed.
9      A.  Yes, I am aware.
10     Q.  What are you aware of about the
11 contemplated notice plan in the Technology
12 Training settlement?
13     A.  I am aware that representations were
14 made to the court regarding the content of
15 databases belonging to some combination of KCC, a
16 company called Pack West, I believe Info USA, and
17 another company called Class Settlements.
18     Q.  Are you familiar with any of those
19 companies?
20     A.  Yes.
21     Q.  Have you used any of them?
22     A.  Yes.
23     Q.  Which ones?
24     A.  KCC, Info USA, and Class Settlements.

1      Q.  You actually consulted with
2  classsettlement.com in regard to a possible notice
3  plan in the Cin-Q case, correct?
4      A.  Yes.
5      Q.  And I appreciate your identification of
6  participating vendors that have been involved in
7  the development of a notice plan in this case.
8         But at a more basic fundamental level,
9  do you have any understanding of the nature or
10 type of notice that is contemplated by the parties
11 in their settlement agreement?
12     A.  I understand representations were made
13 to the court about the databases of the companies
14 I just identified.
15     Q.  So you haven't a clue whether we're
16 talking about fax notice, hard mail notice, purely
17 a publication notice; you don't have a clue.
18     A.  I know that part of it includes hard
19 mail notice and none of it includes fax notice.
20     Q.  See, that's what I was getting at.  I'm
21 not certain why we're pulling teeth at the end of
22 the deposition.
23     A.  The representations made to the court I
24 am aware of.

71 (Pages 278 to 281)

1    Q.   Do you have a position or a view on the
2  sufficiency or adequacy of a hard mail notice with
3  no fax notice but backed up by a publication
4  notice?
5      A.   The representations made to the court
6  about the propriety or the content of the
7  databases is not accurate.  I believe --
8    Q.   How so?
9      A.   I believe that fax notice should be a
10  component of the notice.
11    Q.   What exactly and in particular about the
12  representations to the court about the vendors,
13  the databases, and the work product that can be
14  generated by those vendors for purposes of hard
15  mail notice do you believe to be inaccurate?
16      A.   I believe none of the vendors have
17  information provided from the telephone carrier
18  about who owned the fax number at the time.  And I
19  believe that representation that they did have
20  that information was made to the court when, in
21  fact, those vendors in my experience -- and,
22  again, I do not have experience with Pack West --
23  do not have that information and instead only have
24  information about when it was added and subtracted

1  from their proprietary databases.
2    Q.   Were you on any of the calls when -- was
3  this during telephone conferences with the court?
4      A.   Correct, it was.
5    Q.   Were you on any of those calls?
6      A.   No, I was not.
7    Q.   Have you seen transcripts of any of
8  those calls?
9      A.   Yes.  I ordered and reviewed
10  transcripts.
11    Q.   Are you able to identify which date this
12  representation you're describing was made?
13      A.   I believe it was either the most recent
14  or second two most recent calls.
15    Q.   And do you recall as you're sitting here
16  today who made that representation?
17      A.   I believe you did.
18    Q.   So I'm looking at my notes, and I'm
19  going to need you to help me out.  It was that a
20  representation was made that the vendors have
21  information from telephone --
22      A.   That's not what I said, but the next
23  word would be carriers; but that's not what I
24  said.

1    Q.   Carriers.  Okay.  But you referenced
2  telephone carriers.
3      A.   Correct.  They do not have telephone
4  carriers' records.  They only know when they put
5  it in their database.
6    Q.   So you've had the benefit of not just
7  being on the line but actually carefully reviewing
8  a transcript of a telephonic conference call with
9  the court to allow you to say that I referenced
10  telephone carriers to Judge Porcelli.
11      A.   No.  You referenced that their database
12  was accurate.  It is not.
13    Q.   What's the error rate?
14      A.   Is that the whole question?
15    Q.   Yeah.
16      A.   The error rate of what?
17    Q.   Using the types of databases these
18  vendors have to reverse look up hard mail
19  addresses and utilize the querying methods of when
20  numbers were added to or removed from the database
21  as correlating to a certain owner or operator in
22  order to confirm ownership or operation in
23  2009-2010 or approximate a window around that,
24  what's the error rate in that kind of information?

1      A.   What do you define as error?
2    Q.   Right versus wrong.
3      A.   By right, do you mean the actual
4  subscriber?  Do you mean what the telephone
5  carrier would have versus what the database would
6  have?
7    Q.   Sure.
8      A.   I don't know.  The only way to tell
9  would be to find out from the carrier.
10    Q.   How would utilizing fax notice avoid or
11  cure the problem of the ownership or operation
12  control of a fax number having been transferred
13  after 2009-2010?
14      A.   It would not cure it.
15    Q.   What's the statistical incidence of
16  transfer of fax numbers on an annual basis, 2009
17  through now?
18      A.   I recall seeing a document published by
19  the FCC that estimated that to be, I believe,
20  between two and three percent.
21    Q.   Per year?
22      A.   Yes.
23    Q.   Do you have any more detailed
24  information identifying that FCC document?

1      A.   I do not.
2      Q.   Do you have a copy of that document
3   somewhere at your office or on your computer?
4      A.   Probably at my office.  Definitely not
5   on my computer.
6      Q.   How would you get the telephone carrier
7   information about who owned the numbers at the
8   time?
9      A.   Subpoena.
10     Q.   Subpoena whom?
11     A.   The telephone carriers.
12     Q.   How many are there?
13     A.   In the southwestern Florida area, very
14   few.
15     Q.   Have you ever done that?
16     A.   Yes.
17     Q.   What case?
18     A.   Physicians Healthsource versus Stryker,
19   S-t-r-y-k-e-r.
20     Q.   What was the size of that class?
21     A.   I want to say it was around 20,000, but
22   it was scattered around the entire country; so the
23   quantity of telephone carriers was extremely high.
24     Q.   But you subpoenaed them all?

1      A.   We did.
2      Q.   What did you get?
3      A.   In terms of success?  Well above
4   90 percent.
5      Q.   How far back were you going in time?
6      A.   Several years.
7      Q.   Several.  I learned a couple is two, a
8   few is three, and several is four or more.  What
9   are you talking about?
10     A.   I'm talking about approximately four.
11          And if I can go back and clarify, that's
12   the only case I remember off the top of my head.
13   I know we've done it before, but I remember very
14   clearly in that case because of the quantity of
15   subpoenas to telephone carriers.
16     Q.   Did the carrier -- did any of the
17   carriers object?
18     A.   There were a couple carriers that
19   requested a specific court order allowing them to
20   release the information per their state's privacy
21   statutes, which we did.
22     Q.   Did any of the carriers object to the
23   burden?
24     A.   No.

1          Actually, I had to clarify it.  There
2   was one carrier that asked for more time, and we
3   provided it and notified the court.
4      Q.   Why did you do that in Stryker?
5      A.   The judge asked us to.
6      Q.   How many -- strike that.
7          Let me clarify and make sure I
8   understand something.  In Stryker, you went ahead
9   and issued the notice?
10     A.   After doing the subpoenas and getting
11   the results, we did issue the notice, yes.
12     Q.   And did you issue the notice by fax or
13   by hard mail?
14     A.   I don't recall.
15     Q.   When was that?
16     A.   Well, Mr. Oppenheim handled it; so it
17   was before 2016.  I would like to say early 2015
18   or sometime in 2014.
19     Q.   How about we take a short break.  I'm
20   probably pretty close to done.
21     A.   Great.
22          THE VIDEOGRAPHER:  Off the record.  The
23   time is 6:13.
24          (Whereupon, a short break was

1          taken.)
2          THE VIDEOGRAPHER:  We are back on the
3   record.  The time is 6:17.
4   BY MR. COHEN:
5      Q.   While at Wanca, at Wanca's firm, have
6   any class settlements included a notice plan that
7   did not have a fax component?
8      A.   Off the top of my head, I can't think of
9   any; but it's possible.
10     Q.   And other than the Stryker case that you
11   mentioned, are you aware of any other case in
12   which Wanca's firm subpoenaed the telephone
13   carriers for the purpose of the notice plan?
14     A.   Off the top of my head, I can't think of
15   any others.
16     Q.   Were you involved in the Stryker case as
17   it pertained to how it arose that all these
18   subpoenas would be sent to these telephone
19   carriers?
20     A.   I reviewed the court's order that
21   necessitated that.
22     Q.   And that's kind of what I was getting
23   at.  The court was the participant to the
24   settlement process that insisted that the

Thompson Court Reporters, Inc
thompsonreporters.com

1   telephone carriers be subpoenaed, correct?
2       **A.   No.  It was, my best recollection, not**
3   **part of the settlement process.  We won class**
4   **certification.**
5       Q.   I don't see how that's inconsistent with
6   what I said.
7       **A.   You used the word "settlement."  It was**
8   **after the class had been certified.  There was no**
9   **settlement.  It was contested.**
10      Q.   I understand what you're saying now.  I
11  apologize.  So fully appreciate what you were
12  saying.
13          The court was the participant in the
14  notice process for certification purposes in
15  insisting on the subpoenas to the telephone
16  carriers, correct?
17      **A.   I don't recall what the respective**
18  **positions of the parties was, but I do recall that**
19  **was in the court order.**
20      Q.   Mr. Oppenheim was more involved in that
21  and would have more hands-on knowledge of how and
22  why it came about that the court ended up
23  including in its order the telephone carriers be
24  subpoenaed, correct?

1       **A.   No.**
2       Q.   What do you mean "no?"
3       **A.   My understanding was Mr. Oppenheim's**
4   **involvement in the Stryker matter was limited to**
5   **settlement when he was unable -- I don't want to**
6   **make it sound like Mr. Oppenheim was unable to**
7   **reach settlement.**
8           **A settlement was not happening.  The**
9   **class certification briefing I do not believe**
10  **Mr. Oppenheim had any role in, nor with the**
11  **proposed notice plans.  His role in that case,**
12  **it's my understanding, was limited to attempting**
13  **to bring about a settlement.**
14      Q.   Whatever his knowledge is or isn't, as
15  we sit here today, you don't have detailed
16  recollection of how it came about and why it came
17  about that the court ended up including in its
18  certification order that the notice plan would
19  require subpoenas to the telephone carriers,
20  correct?
21      **A.   It was not part of the class**
22  **certification order, but correct as to everything**
23  **else.  It was a separate order.**
24      Q.   Were you involved in the Clement case

1   that led to obtaining the hard drive?
2       **A.   The hard -- excuse me.**
3       Q.   For the Buccaneers broadcast?
4       **A.   The hard drive was not obtained in the**
5   **Clement case.  It was obtained in the Cin-Q and**
6   **Medical & Chiro v. Buccaneers case.  I was**
7   **involved in obtaining the hard drive.  I was at**
8   **the deposition of the deponent that produced said**
9   **hard drive.**
10      Q.   Which deponent was that?
11      **A.   His name is Gerald Nelson.**
12      Q.   And so this is the Cin-Q case pending in
13  federal court in front of Judge Porcelli?
14      **A.   Correct.**
15      Q.   And this is after Medical & Chiropractic
16  joined?
17      **A.   To the best of my recollection, yes.  I**
18  **know it occurred before October 31st, 2013,**
19  **because I was not yet an attorney.  Actually, it**
20  **might have been after.  I don't know.**
21      **I know it occurred immediately or almost**
22  **immediately after the deposition of Gerald Nelson**
23  **that was conducted in the Ottawa Airport.  I do**
24  **not recall exactly when that deposition took**

1   place.
2       Q.   Did the hard drive that was obtained
3   that we've been talking about, did it contain data
4   including transmission logs for fax broadcasts
5   other than the Buccaneers broadcast?
6       **A.   Again, if we could use another word**
7   **other than transmission logs, like effective**
8   **transmission logs or --**
9       Q.   Transmission logs or the equivalent.
10      **A.   Yes, it did.**
11      Q.   And has the Wanca law firm prosecuted or
12  initiated TCPA class actions that have evidentiary
13  support in the transmission logs or effective
14  equivalents found on that hard drive?
15      **A.   No.**
16      Q.   On the notice plan, based on what you
17  know of it as you sit here today, not ignoring
18  anything you've identified so far, is there
19  anything else you know or think you know about the
20  notice plan that you believe is inadequate,
21  unreasonable, unfair, or fails to meet
22  constitutional due process?
23      **A.   Not doing fax notices done purposeful to**
24  **depress the claims rate.**

**74 (Pages 290 to 293)**

1    Q.   Because you've gotten such a great
2  claims rate with fax notice?
3    **A.   Better than you got addresses in this**
4  **case.**
5    Q.   Wouldn't we know that better after we
6  did it and we got the claims?
7    **A.   Yes.  If you did two different -- you**
8  **know, a control group and an experimental group,**
9  **you could run the scientific method out, correct?**
10   Q.   Have you done that?
11   **A.   Have I run the scientific method on a**
12 **group of unsuspecting putative class members?**
13   Q.   Yeah.
14   **A.   No, I have not.  I believe doing so**
15 **would be highly unethical.**
16   Q.   So you're not suggesting we do it
17 either.
18   **A.   I'm suggesting you should send fax**
19 **notice.**
20   Q.   I know you are.  But you're not
21 suggesting we should do some kind of a test
22 control group with both and compare resulting
23 claim rates, correct?
24   **A.   That is correct.**

1    Q.   Did you think that you were going to get
2  a settlement, a class settlement, of the
3  Buccaneers case?
4    **A.   Yes.**
5    Q.   When, when did you think that?  I'm not
6  asking for details about what you thought it would
7  look like.  I'm just asking: When, over what
8  period of time was that your genuine belief as
9  putative class counsel at Wanca law firm?
10   **A.   The second half of April 2016.**
11   Q.   And I'm not asking about a communication
12 you received from defendant, or if it was, I'm
13 certainly not asking for the content as we sit
14 here today.  And I'm not asking for a number as
15 we -- at least in this question I'm positing to
16 you right now.
17      In general, as of April 2016, why did
18 you genuinely believe you were going to be able to
19 reach a settlement with the Bucs?
20   **A.   Without going into specific detail,**
21 **being broad, there was a communication that gave**
22 **me the optimism you describe.**
23   Q.   And without asking for the content, a
24 communication from whom?

1      MS. LOEW:  You can say that.
2    **A.   The mediator.**
3    Q.   Do you recall if this was early April,
4  mid-April, late April?
5    **A.   I recall it was after Mr. Oppenheim's**
6  **departure.**
7    Q.   Okay.  That tells us April 8th, after
8  April 8th.
9    **A.   It was after April 8th.**
10   Q.   April 15th, April 25th, any ability
11 to...
12   **A.   I don't want to guess.  I believe it was**
13 **approximately April 18th.**
14      **Can we go off the record for a second?**
15   Q.   Sure.
16      THE VIDEOGRAPHER:  Off the record.  The
17 time is 6:28.
18      (Whereupon, a short break was
19      taken.)
20      THE VIDEOGRAPHER:  We are back on the
21 record.  The time is 6:30.
22 BY MR. COHEN:
23   Q.   Assuming that -- strike that.
24      To the extent your prior testimony has

1  been that a notice plan in a settlement with the
2  Buccaneers should have, needs to have, must have a
3  fax component to every number with follow-up for
4  failures, and possibly -- we didn't discuss it,
5  but possibly a publication plan backup, what basis
6  do you have to believe the Buccaneers would ever
7  agree to a settlement that contained that?
8    **A.   I believe answering that question would**
9  **violate the -- or not the -- the mediation**
10 **privilege; and, therefore, I will not answer.**
11   Q.   And I want to be clear what you're
12 essentially communicating is that whatever basis,
13 if any, that you have for believing the Buccaneers
14 would be willing to do fax notice as part of a
15 settlement was communicated in the course of
16 mediation.
17   **A.   That --**
18      MS. LOEW:  That is saying -- he's asking
19 the basis, right, not the specific communication?
20 You can answer.
21   **A.   That is correct.**
22   Q.   And during what period of time did you
23 have this or develop this confidence that the
24 Buccaneers would be willing to do faxing as a

1 component of a notice plan if -- if you were able
2 to reach a settlement with them?
3  **A.  It would be on or after the second**
4 **mediation.**
5  Q.  Which was August 31 of 2015.
6  **A.  Correct.**
7  Q.  I asked you before about you having a
8 genuine belief that you would ever be able to
9 reach a settlement with the Buccaneers.
10  And not holding you to more than you
11 actually said, just trying to get us back to the
12 general gist of it, it was in April.  Did I hear
13 you it was a call from the mediator?
14  **A.  It was an email communication from the**
15 **mediator.**
16  Q.  And I'm not holding you to the date.  So
17 without meaning to say you know for certain it was
18 that day, the day you threw out as an estimate or
19 approximation was April 18th, 2016.
20  **A.  Yes.  I can state I am positive that**
21 **this communication occurred after Mr. Oppenheim's**
22 **departure, and the best recollection I have was it**
23 **was approximately April 18th.**
24  Q.  How do you go from the level of

1 confidence that a call from the mediator gives you
2 to the best of your recollection on or about
3 April 18th, 2016, to insisting the mediator
4 declare an impasse on May 2nd, 2016?
5  **A.  The clarity of that first communication**
6 **relative to the lack of clarity of subsequent**
7 **communications.  I cannot state more than that**
8 **without breaching the mediation privilege.**
9  Q.  Fair enough.
10  The confidence that you had that you
11 could and the confidence you had that you would be
12 able to reach a settlement based upon this
13 communication you received from the mediator on or
14 about April 18th, 2016, in light of what you just
15 said in response to my last question, is it fair
16 to say you didn't have that confidence any longer
17 when the impasse was declared?
18  **A.  I still had that confidence in the**
19 **mediator.  I would describe my feeling at the time**
20 **on the -- the May 2nd, which is the date you**
21 **represent and I accept, as unbelievably**
22 **frustrated, but not with the mediator.**
23  Q.  The amount of the compensation in the
24 settlement in the Technology Training case, you

1 have an understanding of how the compensation is
2 set forth?
3  **A.  I have an understanding as to the top**
4 **line number.**
5  Q.  Which is?
6  **A.  I believe it's 19.5.**
7  Q.  That's the fund, right?
8  **A.  Correct.**
9  Q.  Okay.  What about the compensation for
10 claiming class members, do you have an
11 understanding of whether it's per claimant versus
12 per fax?
13  **A.  I understand it's a certain amount per**
14 **fax and then a lesser amount for subsequent faxes.**
15  Q.  And the first fax?
16  **A.  Off the top of my head, I think it was**
17 **either 250 or $300.  I don't have the -- I don't**
18 **remember exactly.**
19  Q.  Do you have a position that you've
20 reached as to whether the per claimant, per fax
21 compensation set forth in the Technology Training
22 settlement in and of itself, we're not talking
23 about the claim form, we're not talking about the
24 sufficiency of the notice plan, if all of those

1 were fine and if the fund is, in fact, large
2 enough to cover claims without pro rata reduction
3 below that which is set forth for each claiming
4 class member per fax in the settlement, do you
5 have a position you've reached as to whether the
6 per claimant and per fax compensation is
7 reasonable?
8  **A.  I don't know if I can answer that**
9 **question without violating the mediation**
10 **privilege.  I'd like to confer with my counsel to**
11 **determine if I can answer that question.  Is that**
12 **okay?**
13  Q.  Give me one second.
14  **A.  That's fine.**
15  Q.  Go ahead.
16  **A.  Thank you.  This will be very quick.**
17  THE VIDEOGRAPHER:  Off the record.  It
18 is 6:39.
19  (Whereupon, a short break was
20  taken.)
21  THE VIDEOGRAPHER:  We are back on the
22 record.  The time is 6:40.
23 BY MR. COHEN:
24  Q.  Do you recall the question?

1   A.   Yes.
2   Q.   And what is the answer?
3   A.   It is not reasonable.
4   Q.   And what about it is not reasonable?
5   A.   I believe the question related to the
6   compensation and the compensation is not
7   reasonable.
8   Q.   Which aspect of the compensation?
9   A.   I believe answering that question
10  further would require divulgence of mediation
11  privileged communications.
12  Q.   Well, I'm not asking you what you
13  demanded or what somebody else or what the Bucs
14  offered at any point in time in your mediation
15  negotiations.
16       I'm just asking, for example, is it that
17  the first fax for 350 is too low, or maybe that
18  could be reasonable, but the amount for subsequent
19  faxes being lower on a per fax basis you believe
20  to be unreasonable?  And you might hold those
21  beliefs irrespective of anything that was demanded
22  or offered in mediation.  And I'm not, you know,
23  getting quippy with anybody.
24       But the fact that it's hypothetically

1   possible that some aspect of mediation
2   communications informs the reason you think 350 is
3   or isn't enough, maybe depending on what my
4   follow-up questions might be, you would say, I
5   can't answer that because of mediation.
6        But I'm just asking you:  Do you think
7   the -- do you think the 350 is too low?  Do you
8   think that's maybe okay, but the numbers after it
9   are too low?
10  A.   Separate and apart from mediation
11  communications, which I cannot go into, I believe
12  the faxes should be treated equally regardless of
13  whether there's one, more than one, and that the
14  class members should get at least $500 per.
15       And to the extent there is going to be a
16  difference, I think what should be differentiated
17  is faxes sent before the initiation of the Cin-Q
18  lawsuit and faxes sent after the initiation of the
19  Cin-Q lawsuit.
20       And by initiation, I mean when the
21  defendants became aware that they were being sued
22  for violations of the TCPA.
23  Q.   So 500 per fax every fax minimum, and
24  possibly more for some faxes?

1   A.   Correct.
2   Q.   Anything less than that, unreasonable?
3   A.   I think if you're asking me if somebody
4   got $499.99 for everything sent before the
5   initiation of the lawsuit and $1,500 for
6   everything sent after, I -- I would still think
7   that would be a good result.
8        But I think -- I cannot answer more
9   without violating the mediation privilege.
10  Q.   Am I hearing you say that your position
11  is that for faxes sent after the initiation of the
12  first Cin-Q lawsuit that that second year of faxes
13  is 1,500 apiece?
14  A.   No.  What I was saying is to the extent
15  you're going to differentiate one from another and
16  the dollar amount, the only basis that makes sense
17  to me to differentiate them is those sent before
18  the initiation of the lawsuit and those sent
19  after.
20  Q.   Do you think they have to -- to be
21  reasonable, they have to be differentiated with
22  the 2010 wave receiving greater compensation than
23  the 2009 wave?
24  A.   No.

1   Q.   Any other aspect of the proposed
2   Technology Training settlement that you believe
3   indicates or is evidence of a reverse auction that
4   we have not talked about in this lengthy
5   deposition?
6   A.   I believe we've covered everything.
7        MR. COHEN:  I have nothing further.
8        MS. LOEW:  I have no questions.
9        THE REPORTER:  Signature?
10       MS. LOEW:  Yes, please.
11       THE VIDEOGRAPHER:  This concludes
12  today's deposition.  The time is 6:44.
13       THE REPORTER:  Are you ordering?
14       MR. COHEN:  We'll take PTX, full size
15  and mini with exhibits.  Can we get email
16  transmission also?
17       MS. LOEW:  I'll take a copy.
18            (Whereupon the deposition
19             adjourned.)
20
21
22
23
24

1  STATE OF ILLINOIS  )
2                      ) SS
3  COUNTY OF C O O K  )
4
5
6  I,_____,
7  do hereby certify that I have read the foregoing
8  transcript of my deposition consisting of pages
9  ____ through ___, inclusive; and I find it is a
10 true and correct transcript of my deposition so
11 given as aforesaid.
12
13
14 _____
15
16
17 Subscribed and sworn to
18 before me this ____ day
19 of _____, 2017.
20
21 _____
22 Notary Public
23
24

1  IN RE THE CASE OF:  MEDICAL & CHIROPRACTIC CLINIC,
2  INC., vs. DAVID M. OPPENHEIM, et al.
3  taken on:  November 13, 2017
4
5  PAGE    LINE      REASON AND CHANGE
6  _____
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____
24 _____

1  STATE OF ILLINOIS  )
2                      ) SS:
3  COUNTY OF C O O K  )
4
5      I, Layli Phillips, RPR, CRR,
   CSR, in and for the County of Cook and State of
6  Illinois, do hereby certify that ROSS M. GOOD on
   November 13, 2017, was by me first duly sworn to
7  testify to the truth, the whole truth, and nothing
   but the truth, and that the above deposition was
8  recorded stenographically by me and transcribed by
   me.
9      I FURTHER CERTIFY that the foregoing
   transcript of said deposition is a true, correct,
10 and complete transcript of the testimony given by
   the said witness at the time and place specified.
11
      I FURTHER CERTIFY that I am not a
12 relative or employee or attorney or employee of
   such attorney or counsel, or financially
13 interested directly or indirectly in this action.
14     IN WITNESS WHEREOF, I have set my hand.
15
16 _____
17 Layli Phillips
   Registered Professional Reporter
18 Certified Realtime Reporter
   Certified Shorthand Reporter
19 Certificate No. 084.003900
20
21
22
23
24

Thompson Court Reporters, Inc
thompsonreporters.com

**A**

**a.m** 1:18
**abetted** 27:8
**abetting** 41:16
    106:8 141:4
**abide** 225:3
**ability** 31:16 43:16
    150:24 217:24
    220:13 245:12
    296:10
**able** 22:23 35:14
    39:8 62:8 66:16
    66:19 83:24
    103:19 125:6
    170:16 221:19
    227:10 249:9
    283:11 295:18
    298:1,8 299:12
**above** 215:21
    260:23 263:18,19
    265:16 266:17,22
    267:6,12 272:2
    287:3 308:7
**absent** 37:3,13,24
    38:4 48:4 217:3
    217:23 219:15
    220:13
**Abt** 14:9 64:8,10
    68:23
**accept** 159:9 161:13
    161:15 164:19
    177:17 222:6,8
    225:15 299:21
**acceptable** 160:2
**accepted** 247:19
**accepting** 47:16
    159:14 161:12,19
    164:20 220:8
**access** 14:22 66:10
    69:23,24 96:1,3,4
    96:5,8,10 98:23
    125:5
**accidental** 97:15
**accomplished** 278:8
**according** 115:24
    116:9,10 198:20
    198:23
**accordingly** 163:17
**account** 15:15 64:6
    216:18
**accounting** 182:2
**accurate** 96:20
    195:11 224:4
    258:4 282:7
    284:12
**accurately** 170:22

**accusation** 12:2
    13:22 42:9
**accusations** 21:15
**accused** 11:21 13:3
    13:18,19,21
    272:10 279:12
**accusing** 11:22 13:9
    13:12
**acknowledge**
    277:23
**across** 91:3,17
**act** 70:19 211:10,11
    211:20
**acting** 21:6,9 140:2
    141:13
**actions** 35:22
    119:15 127:10
    138:9,16 191:8,17
    191:22,23 218:2
    218:14,17 219:13
    250:8 251:8 252:6
    253:7,10,17
    257:14 293:12
**actively** 180:12
**activities** 124:22
**actual** 39:13 44:17
    92:17 159:1,2
    164:2 195:21
    205:17 207:5
    221:12 228:18,21
    285:3
**Adams** 2:7
**add** 187:4 195:8
    227:9 229:3
**added** 282:24
    284:20
**Addison's** 113:14
    113:15 116:13
**addition** 155:13
    232:14,21
**additional** 77:3,11
    78:2,5,12,21
    95:12 141:18
    224:14,20 262:14
**additionally** 130:18
**address** 6:5 265:24
    266:6 275:19
**addressed** 210:1
**addresses** 284:19
    294:3
**adequacy** 282:2
**adequately** 70:20
    71:17 72:4,6
**adjourned** 305:19
**administration**

    199:3 200:5

**administrative**
    65:10
**administrator** 7:19
    68:19 227:18
    263:5,11,11
    265:19 266:5
    267:23 274:16,24
    277:2
**admissible** 79:7
    80:3
**admit** 28:3,17
**admitted** 28:2,7,12
    30:8
**advance** 132:10
**adverse** 30:15,17,22
    38:11,16
**advertisements**
    199:12
**advertising** 265:20
**advising** 47:14
**advocating** 171:18
**affects** 208:22
**affiliate** 114:6
**affiliation** 114:8
**affirmative** 208:17
    209:23 210:22
    211:23
**aforesaid** 306:11
**afternoon** 236:6
**again** 40:20 43:14
    47:5 63:10 68:19
    69:2,9,10,16
    117:3 131:19
    180:14 195:18
    197:22 199:5
    253:19 261:2
    274:8 277:15
    282:22 293:6
**aggregation** 228:21
**aggressive** 12:24
    13:7,13
**ago** 7:10 8:6 112:5
    185:16 279:3
**agreed** 99:2 111:14
    116:22 131:5
    173:8 181:24
    203:15,18 233:11
    235:7 249:14
    279:7
**agreements** 15:21
    16:1 51:3,4,6 73:4
    73:14 109:7,11,15
    110:2 112:15
    121:19,22,23
    165:15 180:21,23

**agrees** 23:10 114:5
    223:9 268:14
**Ah** 241:8
**ahead** 79:24 102:7
    155:1 194:13
    288:8 301:15
**aided** 27:8
**aiding** 41:15 106:8
    141:4
**Airport** 292:23
**al** 307:2
**allegation** 12:24
    27:23
**allegations** 27:5
    136:5 232:17
**allege** 27:10 37:15
    41:1
**alleged** 34:4 232:16
**allegedly** 37:9 62:3
    77:24 249:3
**allow** 40:23 80:15
    98:22 125:4
    133:23 147:23
    173:8 218:11
    222:7 265:18
    284:9
**allowed** 181:9 209:6
    209:7
**allowing** 186:1
    287:19
**Allscripts** 88:7
**almost** 45:6,12
    46:12 47:9 52:5
    55:12 57:2 103:16
    142:22 154:8
    292:21
**along** 29:18 144:11
    175:22 196:4
**already** 13:2 53:17
    88:10 96:15 144:8
    148:11 198:12
    249:4 274:24
**alter** 90:24
**alternative** 215:5
**although** 56:21
    118:6 210:16
    265:14
**always** 138:9
    228:13
**amazing** 180:9
**among** 23:9 117:9
    117:10 119:21
    122:17
**amounts** 160:16
    162:18,20
**ampersand** 88:22

    263:10 276:18

**analysis** 43:3 230:5
**analyzing** 195:18
**and/or** 265:4
**andersonwanca.c...**
    7:23
**anecdotal** 227:14
**angry** 186:6
**annual** 285:16
**another** 9:13,20
    40:17 53:15 54:17
    58:2 89:2,11
    117:22,22 118:8
    145:6 184:22
    195:1 209:22
    211:10 254:17
    256:19 262:19
    263:1 268:2
    280:17 293:6
    304:15
**answered** 5:23
    11:13,17 13:2
    53:22 72:11,12
    82:16 205:21
    255:2
**answering** 48:3
    148:15 158:7
    167:19 197:19
    212:14 238:6
    255:1 272:18
    297:8 302:9
**answers** 25:14
    26:16,17 30:24
    193:14 252:15
**anticipate** 124:15
    230:14
**anticipated** 123:9
    123:10 221:14
**anybody** 11:18
    12:14 14:2 24:18
    44:22 62:21 95:23
    96:9 254:9 257:18
    302:23
**anyway** 134:9
    225:14
**anywhere** 242:3
**apiece** 304:13
**apologize** 11:16
    17:24 32:10
    132:14 190:5
    258:14 290:11
**apostrophe** 263:17
    263:18
**apparent** 275:22
**apparently** 62:19
    267:21
**appeal** 232:15

248:7,13
**Appeals** 10:6 30:23
143:14 220:5
280:1
**appearance** 21:13
204:3
**APPEARANCES**
2:1
**appears** 182:22
263:6
**applicable** 33:22
208:9 210:10
**applies** 36:7 140:21
**apply** 17:11 107:4
216:23 254:1
**appreciate** 40:17
86:15 92:19 116:2
131:23 241:15
245:3 281:5
290:11
**appropriate** 35:19
35:21 36:5,22
79:8 161:3 165:19
165:23 225:5
276:17
**appropriately** 138:2
211:22
**approval** 89:3
137:16 159:6
209:13 223:12
226:2 236:8,14
237:1,8
**approved** 137:14
219:18 222:8
224:12
**approving** 263:7
**Approx** 24:21
**approximate**
284:23
**approximation** 8:22
144:23 298:19
**arbiter** 140:21
**area** 261:14,17,22
286:13
**aren't** 140:19 244:4
**argue** 273:14
**argument** 134:5
210:12,19
**argumentative**
54:12
**arose** 173:3 289:17
**around** 57:7 68:3
228:6 250:24
251:21 252:2
284:23 286:21,22
**arrangement** 127:3

252:23 253:22
**arrived** 144:14
**Article** 212:1
**aside** 86:17 104:5
153:2
**ask** 5:22 6:2 25:12
54:3 80:8 83:6
129:15,22 150:7
169:3 184:10
187:24 210:5
218:20 243:12
249:13 255:4
258:19
**aspect** 233:8 302:8
303:1 305:1
**assert** 59:5 92:24
210:8
**asserted** 42:2 46:19
**asserting** 56:13,15
56:23 58:14 59:18
74:19 92:3 93:24
94:6 95:11,17
102:15
**assertion** 71:7 72:9
166:19 272:23
**assessment** 200:6
212:17 213:7
244:21
**assigned** 214:21
**assignment** 177:6
**assist** 114:6
**assistance** 259:13
**assistant** 24:17
**associate** 121:1
**associated** 23:11,17
204:3,19
**Associates** 32:7
**assume** 5:22 37:23
108:2,4 191:10
199:2 226:3 240:4
276:5,20
**assumed** 195:5
**assuming** 38:4
234:19 275:15
276:6,6 296:23
**assumption** 191:13
240:7 275:22
**assurances** 186:8
**at-issue** 246:19
**attach** 262:13,18
263:1
**attached** 232:18
266:22 267:6
**attempt** 142:23
**attempted** 194:15
196:21 264:12

**attempting** 291:12
**attempts** 221:5
**attend** 152:5
**attendance** 9:19
18:23 168:13
**attended** 16:6 153:7
155:2,14 168:3
178:18
**attending** 19:6
146:14
**attention** 222:20
223:1
**attest** 275:5
**attorney's** 59:23
60:10 114:9 147:7
148:5 152:22
154:14 160:14
189:14 197:16,20
**attorney-client**
22:16 45:18,21
46:15,19 48:3
49:4 52:19 60:7
92:13 125:15
127:6 128:24
129:18 158:6
166:12
**attorneys** 10:13
22:9 24:4 25:7
43:20 45:1 50:15
93:11 107:17
110:12 114:5
116:7 121:19
124:21 128:19
144:11 181:6
**attorneys'** 18:9,18
18:19,20,24 19:9
20:1,2 22:24
149:22 151:17
203:19 221:12
226:23 233:12
234:2,8 235:8
238:1,18,23 239:5
242:16
**auctions** 31:3
**August** 34:10 122:7
155:10 185:11
190:11 194:19,23
194:24 196:3
199:24 298:5
**authenticated**
159:21 198:13,13
**automatically**
213:17,19
**availabilities** 25:3
**availability** 25:12
**available** 25:5 80:20

81:8,10 161:17,20
186:5
**average** 229:14,14
229:15 270:23
**avert** 185:21
**averted** 185:8,10
190:10
**avoid** 5:17 170:18
171:1 285:10
**AW** 169:14
**award** 133:9,13,14
133:15 149:20,22
**awarded** 207:3
**awareness** 252:10
**away** 97:24 241:17
259:20

_____

**B**

**B** 3:8 252:19,20
266:17 267:4,18
268:11 269:6,11
269:24 270:5,5
271:6 276:8
277:21
**B-o-y** 89:6 97:2
**B2B** 252:16,19,24
253:6 254:3,14
**backed** 282:3
**backup** 7:22 66:14
69:23 70:9 297:5
**bad** 31:3 96:22
248:18
**badgering** 54:13
**bar** 211:5,21 212:3
**barred** 35:11 36:9
36:12
**Barry** 2:7 4:15
79:12 80:9 155:15
245:11
**barry@blonienle...**
2:9
**base** 227:14
**baseball** 83:13
84:19,20 85:3
**based** 22:6 64:17
92:23 151:21
159:19 161:16
163:19 226:21
238:11 244:15
293:16 299:12
**bases** 63:18
**basic** 5:16 27:4
281:8
**basically** 90:23
171:9 232:21
**Bates** 3:17 10:11,13

10:14 101:24
169:14 193:11
196:6,14 222:22
223:1
**bathroom** 215:11
**Bay's** 134:23
135:17
**Beachwood** 88:17
135:17
**bear** 224:24
**beat** 167:1,2
**became** 61:19 86:1
115:19 138:13
205:2 249:21
250:15,19,20,23
251:17 252:11
253:5,15 303:21
**become** 250:5,21
252:3,4
**began** 115:13
**begin** 111:10
125:16,20
**beginning** 218:6
256:4
**begins** 4:1
**behalf** 4:16,19,20
43:17 71:4 92:20
109:1 126:6 131:9
131:12 138:5
206:16 215:7
225:15 262:13
263:1
**behind** 215:4
**belief** 11:5,12 15:1
15:14 44:15,19,21
44:22,24 45:4
50:1 51:10,14,20
272:18 275:5
295:8 298:8
**beliefs** 302:21
**believed** 12:5 52:12
52:22 160:1
161:16 165:22
196:7
**believes** 224:11
225:5,11 272:16
275:3
**believing** 297:13
**bell** 210:6,24 211:7
211:16
**belong** 14:14,16
16:16
**belonged** 7:13 15:1
15:10,23
**belonging** 280:15
**below** 225:10 243:3
262:11 301:3

**Bench** 206:21
**beneficial** 225:24
**benefit** 62:20
148:19,21 149:3
149:17 217:12
218:1 220:15
237:21,23 239:3
284:6
**best** 30:10 34:7 78:9
122:10 144:13
161:18,20 162:19
206:6 247:22
290:2 292:17
298:22 299:2
**bet** 261:15
**better** 294:3,5
**beyond** 9:1 148:12
209:1 226:20
**big** 59:17
**Biggerstaff** 159:23
**billing** 104:23
**billion** 154:8
**binding** 220:5
**bit** 212:13 231:6
250:17 277:10
**Biz** 89:8
**blanks** 262:16
**Blonien's** 208:7
212:14 236:7
245:19
**BLP** 262:13 263:1
**Bob** 32:16 209:1
220:6
**Bobrick** 143:5
**Bock's** 251:6,11
254:23 257:19
**bold** 12:23 13:6,10
**bolded** 223:3
**bonus** 151:6,8,17
**bonuses** 151:21
**books** 16:5
**borrowed** 209:22
**boss** 98:4 164:17
**both** 50:13 90:15,19
108:21,23 113:1
143:11 144:4
160:8 178:7
232:16 265:9
268:11 269:1,3
294:22
**bottom** 114:4 177:1
**bound** 222:7
**Boy** 89:5,6
**breach** 27:8 28:8,13
30:11,16 41:15,16
41:24 106:7 128:7

137:7,9 141:3
150:11 152:13
154:23 180:16
214:15 215:2
221:8 226:16
227:2 232:16,19
237:14
**breached** 27:6,10
27:14,24 28:17
30:8
**breaching** 63:20
299:8
**break** 6:2 49:13,17
134:9,15,22
166:22 192:17,21
193:22 215:10,15
258:22 259:2,11
288:19,24 296:18
301:19
**Bridging** 89:14
**brief** 44:1 85:5
**briefed** 134:1
**briefing** 133:23
135:8 186:13
291:9
**briefings** 209:9
**briefly** 143:8
**briefs** 43:10
**bring** 102:6 217:4
291:13
**bringing** 159:5
224:24 256:24
**broad** 59:18 191:20
247:6 254:21
255:3,5 295:21
**broadcast** 263:23
276:12 292:3
293:5
**broadcasts** 216:19
293:4
**broader** 254:7
**brought** 91:8 128:8
138:1 142:5
**Buccaneers'** 134:5
263:23
**Bucs** 265:20 295:19
302:13
**build** 228:23
**bunch** 60:18 97:1
98:15 102:24
**burden** 287:23
**burdensome** 39:8
244:7,19 260:4,13
262:7,23 266:11
270:17,18,22
271:2 277:9 278:2

**C**

**C's** 26:22 105:3,12
105:22 134:3
140:10 212:18,21
213:3 232:23
233:5 246:21
**C-o-x** 87:12
**cabinet** 67:16 70:7
**calculate** 165:8
**calculations** 95:5
**calendar** 7:17
**call** 53:9 58:19,23
99:5 169:20 172:1
172:4,8,12,14,18
173:1,2 190:10
284:8 298:13
299:1
**call-in** 172:5
**called** 1:12 5:2
50:19,21 83:12
87:11,17 89:4,7
89:14 97:1 99:4
119:6 138:2
183:24 229:10
273:10 280:16,17
**calling** 22:16 181:18
185:14
**calls** 179:17 212:10
269:11,13 283:2,5
283:8,14
**calm** 185:24
**calmed** 185:23
186:2
**came** 8:1 135:24
139:10 153:20
233:15 255:22,24
290:22 291:16,16
**camera** 225:8
**can't** 12:14 20:14
27:20 58:17 73:23
89:13 96:9 137:4
147:12 162:11,12
194:15 205:18
212:24 249:12
289:8,14 303:5
**cannot** 24:18 78:3
78:16 86:7 95:19
105:1 128:3
140:13 166:10
203:1,11 214:10
224:12 241:24
299:7 303:11
304:8
**capacity** 115:8
136:10 223:10
**capital** 167:1,3,6,9

252:19,20
**care** 123:6 137:1
177:21
**carefully** 284:7
**Carolina** 98:15
**carrier** 282:17
285:5,9 286:6
287:16 288:2
**carriers** 283:23
284:1,2,10 286:11
286:23 287:15,17
287:18,22 289:13
289:19 290:1,16
290:23 291:19
**carriers'** 284:4
**cases'** 109:11
**catch-all** 211:4
278:23
**categorized** 77:2
**category** 279:18
**cease** 156:23
**CEH-TBM** 1:6
**cert** 186:13
**certain** 21:23 68:20
73:14 77:7 81:9
93:14 201:17
227:17 272:13
277:20 281:21
284:21 298:17
300:13
**certainly** 92:9
114:20 133:1
189:21 295:13
**Certificate** 308:19
**certification** 133:24
137:14,17 207:21
236:8,11 237:8
247:14,16,20
272:19 276:22
290:4,14 291:9,18
291:22
**certified** 1:15 38:8
138:3 206:17
237:2 290:8
308:18,18
**certify** 306:7 308:5
308:9,11
**cetera** 73:4 186:13
**chain** 3:14 163:10
169:7 172:16
194:21
**chair** 208:4
**chance** 169:2 219:7
244:23
**change** 95:3 190:12
307:5

**changed** 95:7
112:15
**changing** 252:2
**characterization**
13:6 27:2 130:23
182:11
**chatted** 259:19
**check** 40:7 78:7
153:19
**Chicago** 1:17 2:4,13
4:12 143:4 144:3
**Chiro's** 18:20 131:6
232:15
**Chiropractic's**
62:20
**choice** 177:20
**choose** 162:12,14
**chosen** 177:13
**Christopher** 145:8
**Cinque** 153:8
**circles** 249:10
**Circuit** 10:5 30:23
143:14 217:20
220:4,6 247:18
279:24
**circulated** 230:2
**circumstance** 23:16
42:15 73:20,23
**circumstances** 40:2
40:4,15 41:3,4,7
73:1 133:13 240:8
240:9 279:6
**city** 265:24
**civil** 1:13 205:10
208:1 210:20
**claimant** 239:22
278:5 300:11,20
301:6
**claimant's** 263:12
**claimants** 81:1
239:20 240:14
**claimed** 102:11
**claiming** 238:21
239:1 262:8 265:2
265:21 266:12
267:20 268:2
269:1,3,22 270:4
272:16 273:8
278:13 300:10
301:3
**clarification** 131:23
158:16 267:19
**clarified** 218:17
**clarify** 50:11 74:5
85:17 178:3 180:6
218:3 221:3

**clarifying** 86:15 92:19
**clarity** 299:5,6
**Clark** 1:17 2:3
**class-wide** 118:18 238:8
**classsettlement.com** 281:2
**clear** 46:23 80:5 182:6 196:17 222:4 234:5 270:14,16 297:11
**clearer** 49:1
**clearly** 17:6
**Clement** 291:24 292:5
**CLEs** 124:24
**client's** 114:12 117:11 147:6
**clients** 14:17 16:16 76:18 93:12,14,24 103:11,13 118:16 118:17 122:14 123:17 165:16 180:22 181:7 187:16 216:2
**Clinic** 1:3 4:3,21 307:1
**close** 157:2 288:20
**closed** 208:12 223:14 236:10 260:22
**clue** 281:15,17
**co-counsel** 123:14 124:9 180:9 196:14 230:24 251:18 252:23 256:19,21,22,23 257:14
**co-counseled** 251:7
**co-counseling** 252:5 253:23
**co-counsels** 96:6,7
**co-plaintiffs** 115:20
**code** 261:14,17,22 266:1
**collaborate** 90:24
**collaborating** 90:5
**collaborative** 90:15 90:16,18 91:11
**collaboratively** 89:20
**collects** 228:19
**combination** 280:15

**come** 75:6 78:23 159:12 160:1 174:13 218:24 255:23
**comes** 232:9 245:11
**comfortable** 159:5
**coming** 93:2
**common** 199:18
**communicate** 46:11
**communicated** 47:19 49:6 60:5 163:23 254:15 297:15
**communicates** 175:21
**communicating** 254:13 273:15 297:12
**communication** 56:2 57:5,8,9,10 57:11 59:5 159:2 159:3 195:22 295:11,21,24 297:19 298:14,21 299:5,13
**Communities** 89:14
**companies** 280:19 281:13
**company** 137:2 265:24 266:24 267:7 269:9 271:24 280:16,17
**compare** 263:12 265:2 294:22
**compared** 17:12 136:5
**compensation** 124:16 238:22 239:23 240:1 242:8 260:2 299:23 300:1,9,21 301:6 302:6,6,8 304:22
**competing** 8:11 43:21 213:10,13 213:16 247:13
**compiled** 6:15 7:14
**compiling** 274:9
**complain** 185:22
**complaint** 33:9 37:16
**complaints** 91:6,11 91:13
**complete** 40:6 167:4 167:5 221:20 264:11 308:10

**completed** 153:21
**compliance** 233:5
**complicated** 73:10
**component** 69:23 282:10 289:7 297:3 298:1
**comports** 224:1
**compound** 149:13
**computer** 15:3,4,5,8 15:10 69:20 70:5 83:2,3 286:3,5
**computers** 103:8 104:3
**concealed** 180:12
**conceding** 276:20
**concept** 272:23
**concern** 183:18 244:18 273:8 276:5 277:17 278:1
**concerned** 272:18 273:9
**concerns** 204:19
**concluded** 75:11 211:24
**concludes** 305:11
**conclusion** 149:20 212:11
**condition** 208:15 209:19
**conduct** 16:18,23 27:9 73:3 103:4 104:13 130:18,19 212:16
**conducted** 78:20 140:7 153:10 292:23
**confer** 162:6 301:10
**conference** 172:1 284:8
**conferences** 283:3
**confidence** 297:23 299:1,10,11,16,18
**confidential** 79:5 81:2,10 182:4
**configured** 69:19
**confirm** 190:14 265:5,19 268:1 284:22
**confirmation** 267:19
**confirmed** 25:6
**confirms** 190:17
**conflict** 38:21 140:6 143:11 214:15 215:2

**conflicts** 22:10
**confused** 217:9 241:4
**confusing** 260:19 271:19 272:6 273:5,7,24 274:5 274:17 275:8 276:7,14
**confusion** 273:18 274:21
**congratulate** 100:19
**consent** 114:13,19 117:11
**consider** 18:22 44:16 135:3 159:14 162:10 166:6,14
**considered** 165:10 211:22
**consistent** 164:20 197:6 246:21
**consisting** 306:8
**constitute** 39:11 40:19
**constitutes** 30:11,16 210:18
**constitutional** 293:22
**consulted** 281:1
**contact** 106:10 232:22 265:24 266:5
**contacted** 25:11 58:19 118:7
**contain** 129:11 160:7 278:23 293:3
**contained** 67:3 163:10 297:7
**containing** 68:10
**contains** 214:2
**contemplate** 202:17
**contemplated** 227:19 280:11 281:10
**contend** 45:23 78:6 81:11 82:12,18 99:10 210:17
**contending** 19:21
**content** 58:16 61:1 280:14 282:6 295:13,23
**contention** 31:18 33:10 35:17 44:4 74:1 81:17 83:18

**contents** 11:8 86:6
**contested** 290:9
**context** 45:20 211:2 242:14 260:13
**contingent** 187:8 226:24 233:21 238:1
**continue** 58:24 62:12 69:17 123:3 223:9,18
**continued** 33:4 87:5 88:11 98:22 156:3 156:13,15
**continues** 195:13
**continuing** 243:19 243:21
**continuity** 223:8
**contract** 15:18 18:5 18:7 139:17 223:17 226:8 234:12
**contracts** 14:19,23
**contributed** 90:20
**contributing** 279:11
**control** 31:13 220:19 221:21 285:12 294:8,22
**controls** 113:22
**conversations** 25:17 58:10 60:14 105:17 106:13 142:6,12 143:23 146:17,24 147:13 148:9,16 168:10
**convey** 47:6,7 51:14 118:23 165:13 225:2,13,19
**conveyed** 46:24 48:14 51:18,19 59:14 118:11,12 165:12 197:12 203:3
**conveying** 195:21 225:19
**convince** 177:22
**convinced** 177:17
**Cook** 21:2 308:5
**copied** 64:11,16 68:11 70:2 83:20 103:19 182:15,17 182:23 183:2
**copies** 28:6 53:18 259:13
**copy** 7:22 14:10,12 66:14 68:6,24

70:9 75:9,10,16
75:20,24 83:2
106:22 234:12
259:20 286:2
305:17
**copycat** 8:11 30:5
**copying** 70:4
**copyright** 93:3
**core** 91:3
**correctly** 10:19
12:16 57:2,20
114:14 169:22
170:20 180:17
182:8 195:16
197:4,4,24 223:15
264:22 265:8
272:4
**correlating** 284:21
**correspondence**
12:19 28:5 53:18
54:4 58:13 61:10
61:16 62:6,8
63:10 64:18 66:1
**correspondences**
52:8 61:12,14,17
71:20
**costs** 23:11,17
117:10 151:1
203:16 204:2
**couldn't** 35:9 82:6
183:19 191:23
**counsel's** 130:22
226:5
**counsels** 191:9
192:2
**country** 242:3
286:22
**County** 21:2 206:5
306:3 308:2,5
**couple** 153:20 157:1
183:9 185:16
254:21 287:7,18
**coupon** 160:22
166:14
**coupons** 118:22
159:9,14 161:9
164:19,21 165:7,8
165:9
**course** 60:23 297:15
**court's** 289:20
**courts** 1:14 210:21
**cover** 238:24 239:17
239:19 240:1
242:17 247:6
301:2
**covered** 52:18 59:15

92:12 129:17
158:5 166:11
305:6
**covering** 115:1
**covers** 112:11
**Cox** 87:11
**Craig** 153:8
**crashing** 179:20
**create** 209:20
**created** 78:24 79:2
211:9
**creates** 209:24
214:4
**creating** 237:24
**creation** 166:1
**crisis** 185:8,9,21
190:10
**cross-reference**
80:16
**CRR** 1:21 308:4
**CSR** 1:21 308:5
**cure** 285:11,14
**cy** 195:15

**D**

**D** 3:1
**D-e-w-a-r** 89:5
**D-o-u-g-h** 89:6
**d/b/a** 1:8
**Daisy** 89:4
**damages** 207:5,6,7
207:16 241:13
242:5
**Dan** 4:18
**DANIEL** 2:11
**danieljaycohen20...**
2:14
**dark** 56:22
**dash** 97:2,2
**data** 245:22 247:5
265:18 267:23
272:11,22 293:3
**database** 284:5,11
284:20 285:5
**databases** 80:15
280:15 281:13
282:7,13 283:1
298:16 299:20
**dated** 194:19
**dates** 25:5 71:23
156:20

**Dave** 170:15 184:2
184:23
**David** 1:7 2:6,16
4:16 8:10 10:7
30:3 61:19 67:8
118:7 119:3 123:4
153:7 155:3,7,16
158:14 213:20
214:11 246:11
307:2
**day** 11:10 55:22,24
67:24 143:21,21
153:5 155:11
164:10 228:16
251:23 279:24
280:5 298:18,18
306:18
**days** 11:9,17,18
12:18,18 62:2,3
67:12 69:3 99:7
99:12 157:1 183:9
280:1
**days'** 96:23 98:14
**Daytime** 266:6
**deal** 153:3 184:23
**dealings** 170:8
**decide** 233:19
**decided** 173:1
200:22,23 201:5,6
202:18
**decides** 234:1
**decision** 10:6 30:24
67:11 111:13
143:15 176:6
220:5 225:4 280:1
**decisions** 48:3,6
183:8 247:10
**declare** 299:4
**declared** 157:5
299:17
**deduction** 238:17
238:22 242:16
264:22
**deem** 223:21
**deemed** 223:12
224:9 246:2
**defeated** 134:2
**defects** 135:16
**defendant** 2:6,10
27:16 118:11
155:6 170:10
208:18 219:17
222:2 225:9
226:18 229:23
238:8 295:12
**defendant's** 134:2

203:4 205:23
274:15
**defendants** 1:9
18:15 19:22 33:2
87:16,24 160:2
303:21
**defense** 25:20 135:9
155:15 184:14
208:17 209:23
210:23 211:23
217:2
**define** 285:1
**definitely** 50:8
55:20,22 110:10
122:6 144:24
155:19 286:4
**delayed** 61:24 104:7
104:10,16
**demand** 152:16,18
154:9 162:22
163:21,23 164:2
198:16 201:13
**demanded** 61:23
195:14 198:19
302:13,21
**demands** 152:10
**demonstrate** 102:20
**demonstrated** 244:2
**denial** 209:14
247:20
**denied** 96:4 247:16
247:19
**departure** 86:4,19
87:6 88:12 90:1
296:6 298:22
**depend** 40:1,14
41:4 191:16
225:22
**dependent** 216:15
**depending** 229:18
303:3
**depends** 47:22
**deponent** 5:2
154:23 198:11
274:8 292:8,10
**depose** 25:11
**deposed** 5:12 24:8
24:11,13
**depositions** 1:14
21:4,13 25:1,3,22
26:5,8 46:20
107:22 108:9
187:16
**depress** 271:3,13
273:21 278:4
279:14 293:24

**describe** 8:8 26:22
27:4 49:5 77:1
154:20 295:22
299:19
**described** 10:2
96:16 248:3
**describing** 283:12
**description** 3:10
262:18
**designated** 137:21
**designed** 267:19
271:7,11
**desire** 216:15
**desk** 97:15,23
**despite** 180:11
**destroyed** 70:13
**detail** 30:24 295:20
**detailed** 285:23
291:15
**details** 60:14 295:6
**determine** 19:12
41:24 65:5 162:20
195:19 301:11
**determined** 172:19
297:23
**develop** 227:14
297:23
**developed** 251:16
**developing** 231:1
**development** 281:7
**developments**
169:18 170:2
186:10,12
**Dewar** 89:5
**dialogue** 183:11
**Diamond** 83:12
84:19 85:3
**difference** 32:20
39:3 152:2 177:24
208:20 228:16
255:19 270:16
303:16
**different** 109:20
133:18 144:21
151:23 215:5
294:7
**differentiate** 304:15
304:17
**differentiated**
303:16 304:21
**differs** 216:2
**difficult** 70:14
**difficulty** 270:21,24
**Dimensions** 89:8
**directly** 46:23
308:13
**disagree** 53:24

177:10
**disagreed** 171:5
**disagreeing** 220:7
**disagreement**
243:19,21
**disappointed**
176:20
**discern** 103:19
**disclose** 65:24 66:2
70:20 71:17 72:4
72:14,17
**disclosed** 28:21
29:13 72:6 86:6
**disclosing** 28:18
**disclosure** 72:24
**discoverable** 60:3
**discovery** 10:7,8
79:8 95:5,8 123:3
153:20,22 159:20
186:13 233:6
246:18 264:3
**discrepancy** 199:13
**discuss** 25:13,21
105:22 106:7
162:1 165:18,21
187:24 297:4
**discussed** 92:1
105:15 111:13
117:16,18,19,20
117:21 142:18
159:4 160:17,21
201:3,12 221:18
**discussing** 164:6,9
181:19 260:14
**dismissed** 182:3
**disposition** 204:20
**dispute** 37:19,22
71:4 91:23 175:16
**disrespectful**
180:15
**dissuading** 244:7,18
260:3,13 266:12
**distinct** 239:24
**distinction** 142:2
**distinguished**
209:17
**distribution** 187:19
**District** 1:1,1,13
**divide** 229:3
**division** 1:2 90:11
117:9 119:22
121:5 122:17
123:1 173:4
**divorce** 277:21
**divulge** 167:20
**divulgence** 302:10

**doesn't** 159:1 199:3
255:4
**doing** 99:7 155:1
247:4 250:15
288:10 293:23
294:14
**dollar** 39:9 159:19
164:24 165:2,5,8
239:19 304:16
**dollars** 118:22
154:8 161:8 165:9
**done** 95:5 138:15
141:22 257:5
270:19 286:15
287:13 288:20
293:23 294:10
**door** 84:10 97:24
98:19
**doubt** 113:10
**doubtful** 151:19,20
**Dough** 89:5,5
**down** 5:20 72:19
124:5 144:6
185:23,24 186:3
213:2 225:10
237:5 271:16
**download** 8:23
84:19
**downloaded** 8:1
**downloads** 7:21
**draft** 123:7
**drawing** 222:20
223:1
**drive** 292:1,4,7,9
293:2,14
**Dropbox** 84:18
**due** 38:19 197:23
279:24 280:4,5
293:22
**duly** 5:3 308:6
**duration** 64:20
**during** 70:4 167:20
212:14 283:3
297:22
**duties** 130:12,16
131:2 132:17
151:23 214:23
221:23 222:1
235:21

---
**E**

**E** 3:1,8
**each** 5:18,18 73:10
123:22 158:20
160:4 187:18
260:24 261:1

263:20,21 265:17
301:3
**earlier** 49:23 50:11
94:21 101:9 122:8
136:19 205:2
231:7 245:18
**early** 34:8 45:11
46:11 57:21 200:2
208:6 249:24
288:17 296:3
**EClinicalWorks**
136:14
**effect** 231:20 255:3
271:14 272:8
**effective** 171:4
264:21 293:7,13
**effort** 49:1
**efforts** 123:3
**either** 25:22 66:17
102:9 115:14,18
122:5 155:17
157:7,9 172:15
173:1 178:8 189:4
214:3 247:18
269:2 283:13
294:17 300:17
**electronic** 245:21
**electronically** 245:5
**Electronics** 14:9
64:8,10 68:23
**elements** 91:3
**else's** 103:8
**emailed** 102:8
**embarrassed**
103:17,21
**embarrassing** 103:9
**embarrassment**
104:5 105:8
**empirical** 272:22
**employee** 82:3
102:3 120:23
308:12,12
**employer** 82:19
**employment** 15:19
54:22 68:7 70:21
74:3 82:20
**encountered** 228:9
228:10
**end** 7:20 18:12
19:12 23:1 29:24
144:14 155:10
164:10 231:3
234:7 248:13
270:10 281:21
**ended** 190:10
253:24 254:1

290:22 291:17
**endorsement** 177:6
**ends** 241:16
**engage** 213:24
**engagement** 106:22
234:14,19 235:1,6
235:10,13,21
**enough** 65:14
229:21 232:2
238:24 264:18
299:9 301:2 303:3
**Enter** 32:13
**entered** 109:4
123:14 135:9
235:13 280:6
**entire** 80:17 216:12
217:23 220:18
223:11 286:22
**entirety** 248:8
**entitled** 19:1
**entity** 275:17,19
**equally** 303:12
**equitable** 210:11
**equivalent** 264:21
293:9
**equivalents** 293:14
**error** 284:13,16,24
285:1
**essentially** 120:15
297:12
**establish** 39:20
40:13 41:2,10
42:7,13,20 44:7
**established** 212:1
**establishes** 43:23
150:24
**estimate** 125:10
298:18
**estimated** 285:19
**estimation** 136:21
208:8 276:16
**et** 73:4 186:13 307:2
**ethically** 226:2
**ethics** 50:24 51:1
62:19 116:1,2
226:5
**European** 87:24
**evaluate** 39:14
**evaluated** 188:5,7
**even** 60:15 69:3
97:14 99:16 186:4
218:3 225:16
228:14 232:23
237:20 246:24
247:7 249:3,24
276:10

**event** 115:15,21
235:19 251:24
**events** 228:20
**eventually** 55:3
**every** 55:4 59:4
64:2 73:20 78:19
138:17,19 179:19
228:14 254:3
297:3 303:23
**everybody** 25:6
40:7 103:8 240:4
268:13
**everybody's** 25:5
**everyone** 26:19
177:4
**everything** 5:20
15:10 71:5 72:13
200:1 212:8
232:18 246:3,5,6
247:6,9 276:21,22
278:24 291:22
304:4,6 305:6
**evidence** 79:7
227:15 305:3
**evidentiary** 293:12
**Ewing** 32:16 209:1
220:6
**exact** 118:21 156:20
187:6 214:1
**exactly** 69:4 144:20
146:20 187:1
231:8 282:11
292:24 300:18
**examination** 1:12
5:5 204:8
**Examinations** 3:3
**examined** 5:4
**example** 40:16,18
40:20 47:22 68:22
69:1 96:2 126:23
140:6 141:22
225:1 257:5 269:8
302:16
**exceeds** 237:18,21
**Excel** 80:14
**except** 177:4 216:22
219:12 220:11
243:4,17
**Excepting** 51:5
**exception** 73:24
264:10 265:5
274:10
**excessively** 244:18
260:3,12 266:12
**exchange** 175:13
179:13

exchanged 58:6
exclude 260:7
exclusive 220:19
exclusively 138:15
140:15 141:23
142:14
excuse 224:22 292:2
exhausted 226:20
242:15
exhibits 305:15
existed 68:24
existing 35:24
216:24 217:13,22
220:20 249:6
263:6 275:1
exists 16:5 22:3
204:11 254:10
expand 198:6
expect 276:24
expected 123:11,16
186:22 187:3,12
238:10
expecting 186:15
262:8
expects 149:16
expenses 23:11
149:2 150:21
233:12 235:9,23
238:18,23 242:17
experience 47:20
212:7 227:11
242:20 282:21,22
experienced 227:12
experimental 294:8
expert 159:22
expiration 208:21
expired 208:10
209:21 217:4
219:14
explain 14:1 36:14
38:10 39:6 159:21
171:8 191:19
204:18 221:16
243:12 256:7
267:10 270:5
explained 253:21
explains 224:18
explanation 179:18
195:9
explore 231:10
268:18
export 80:17
express 266:10
expressed 214:19
expressly 255:13
extend 126:12

extra 214:23
extraordinarily
226:22
extremely 286:23

_____

**F**

f-a-c-t-s 46:24
F-a-u-l-e-y 77:20
F-l-i-t-e 89:15
face 276:21
facilitate 225:17
facsimiles 163:19
factor 43:23 274:3
factors 151:8
229:19
facts 11:11 13:15
46:10,23 47:5,6,6
47:19 48:9,9,9,14
49:5 58:22 59:13
59:14 60:4,16
63:22 130:9
141:18 147:16,22
148:9
factual 100:21
failed 161:18
173:21 180:10
264:12
fails 293:21
failures 297:4
fair 5:24 65:14 94:2
232:2 234:24
264:18 299:9,15
fall 206:13 250:13
falling 22:5
falls 49:3 279:18
false 10:6,18,22
11:24 12:5,9
49:23 68:12,14,17
102:15 167:13,18
familiar 36:1 80:14
163:9 244:11
278:16 280:18
familiarity 244:16
fantasy 83:14 84:20
85:4
far 60:15 140:5
186:7 225:10
226:20 237:18,20
239:2 243:14
248:14 287:5
293:18
Fauley 77:18,19,22
78:13 80:22 95:15
favor 158:4
favorably 151:16
faxed 216:19

faxing 297:24
FCC 285:19,24
feature 279:12
federal 209:17,22
210:20 292:13
fee 195:15 199:16
199:18 226:24
238:1
feel 103:17,21 149:8
252:14
feeling 299:19
feet 97:24
fell 103:18
felt 96:22
few 96:11 97:24
257:15 286:14
287:8
fiduciary 27:7,11
41:15,24 106:7
128:7 137:7,9
141:3 150:11
214:16 215:2
216:12 221:9
226:17 227:2
232:16,20 237:15
figure 164:6 228:15
229:3 230:6
figures 201:4,6,8
202:17
file 27:16 32:9,12
35:21,22 62:2
67:16 213:10,22
219:16
files 65:17 86:11,17
245:21
filing 57:3 213:13
213:15 251:14
253:17 256:3
filings 209:4
fill 242:8 262:16
filling 272:8
final 89:3 135:10,12
159:6 193:2
248:13
finally 183:5
financial 116:12
financially 308:12
find 171:3 191:2
215:5 224:14,18
275:8,8,11 278:2
285:9 306:9
finding 190:23
fine 106:20 193:19
215:12 301:1,14
finish 17:22 26:1
190:6

firing 170:15
firm's 30:14
firms 90:15,23
114:6 181:7
187:18 254:17
255:9
first-chair 205:11
207:22 208:3
fit 25:9
fits 195:6
Fitzgerald 24:16
50:9
five 87:1 97:20
169:20 230:8
flew 144:9
Flite 89:14,15
floor 2:12 195:15
Florida 1:1 87:8,19
88:9 89:2 130:17
144:4 286:13
fly 144:6
focus 231:8 241:17
focused 231:9
focuses 224:8
focusing 251:22,23
Foley's 233:11
234:8 235:8
follow 22:19 49:9
62:24 160:13
176:12
follow-up 297:3
303:4
following 48:22
59:22 60:10 61:5
62:16 84:18 148:5
152:22 154:14
172:4 189:14
194:9
follows 5:4
forced 38:15
foregoing 306:7
308:9
formally 121:20
former 6:24 38:20
61:21 82:19,20
84:9
formerly 121:1
forms 278:8 279:8
formulas 80:14
formulating 44:15
forth 300:2,21
301:3
forward 84:1
forwarded 56:3
forwarding 84:20
found 113:19

175:10 199:8
246:18,20 293:14
foundation 92:10
93:9 94:3,10
178:16
four 5:15 33:22
34:21 120:17
205:6,9 207:23
208:2 212:6 213:1
243:3,17 261:23
262:1 287:8,10
frame 33:12 89:22
89:23 138:16
178:3
Frankly 176:23
free 149:8
freestanding 117:7
Freight 241:3
frequently 80:21
91:5
Friday 9:16 176:10
friend 174:14,16,18
front 29:21 73:8
145:23 187:22
209:4 232:11
259:17 292:13
frustrated 299:22
frustration 186:1
fulfilling 235:1
full 238:19 239:1
305:14
fully 5:24 228:14
290:11
fund 195:14 221:11
226:19,22 230:8
237:18,18,24
238:17,24 239:2,4
239:16,18,24
242:15,16,20
243:3,5,17 260:3
300:7 301:1
fundamental 281:8
funky 262:1
further 83:16
172:24 187:13
224:17 272:2
279:23 302:10
305:7 308:9,11
future 124:23 186:9

_____

**G**

G.M 206:24 241:2,3
gap 242:8
gathering 233:2,4
gave 40:15 67:15
75:16 81:22 82:1

99:11,12 165:7
187:23 212:15
295:21
**general** 91:16 125:3
152:12 155:1,7,16
166:3 242:19
244:15 252:1,5
295:17 298:12
**generally** 22:22
76:12 91:22,23
162:5 181:1,2
231:16 244:14
**generate** 91:12
239:5 243:4
**generated** 282:14
**Gents** 169:17
**genuine** 295:8 298:8
**genuinely** 295:18
**Gerald** 292:11,22
**gets** 234:2
**getting** 40:5,7 83:1
219:11 240:4,13
240:14 248:15,18
274:20 275:12
281:20 288:10
289:22 302:23
**gist** 298:12
**give** 12:13 15:22
40:20 88:19,23
100:8 101:24
118:6 126:22
134:6 141:21
144:22 169:19
191:20 240:24,24
250:2,5 301:13
**given** 67:13 82:3
204:10,15 227:16
230:8 306:11
308:10
**gives** 10:21 11:4,5
14:24 15:9,13
21:24 51:10 70:18
176:11 177:5
299:1
**giving** 157:18 247:8
**Global** 89:8
**goes** 180:15 222:9
261:22 267:4,10
277:17
**Goethals** 2:15 4:8
**going-away** 99:4
**gone** 125:12
**got** 25:4 74:2 167:4
213:2 214:12
217:8 225:16
241:1 243:13

244:4 245:5,12
258:8 259:13
264:19,21 267:14
274:11 277:6
294:3,6 304:4
**gotten** 89:3 240:19
258:9 294:1
**govern** 73:4
**granted** 137:16,17
236:11,14
**great** 49:14 134:11
288:21 294:1
**greater** 304:22
**greatly** 229:18
**Greg** 24:15
**Griffin** 145:8
**ground** 5:17
**grounds** 201:11
**group** 235:24
252:12 294:8,8,12
294:22
**grown** 251:16
**guarantee** 249:8
**guard** 95:24
**guess** 91:19 121:10
137:4 191:2 241:8
296:12
**guide** 43:4
**guy** 65:13

## H

**H** 3:8
**H-e-e-l** 278:19
**H-e-s-k-a** 77:20
**half** 7:9 8:6 153:4
154:8 228:6,8,16
295:10
**hallway** 145:23
**hand** 204:6 308:14
**handed** 117:1
169:13
**handing** 163:6
**handle** 181:24
**handled** 107:22
288:16
**hands-on** 290:21
**happen** 114:16
217:19
**happened** 11:10
67:20 117:13
146:9 152:7 153:2
154:18,21 173:14
173:20 176:8
178:15 185:2
197:7 199:3,7
257:4

**happening** 183:10
226:7 291:8
**happens** 241:16
**happy** 59:4 190:15
245:1
**hard** 243:15 275:18
275:23 281:16,18
282:2,14 284:18
288:13 292:1,2,4
292:7,9 293:2,14
**harmed** 103:3 104:4
**harmful** 225:24
**hasn't** 137:13
**Hatch** 1:8 2:11 8:11
27:7,15 30:4
38:21 46:6 82:3
102:3 137:16
142:23 252:14
253:3 254:23
255:20
**haven't** 131:11
273:4 281:15
**having** 5:3 17:16
23:7 55:10 95:24
114:17 164:15
189:17 202:19
214:20,21 228:24
236:17 270:24
285:12 298:7
**he'll** 183:24
**he's** 74:2 79:14
172:16 188:19
245:12 297:18
**head** 27:20 43:8
77:6,17 78:3,8
87:4 106:2,5
121:12 142:9
143:16 195:12
228:15 241:24
245:15 287:12
289:8,14 300:16
**heads-up** 169:19
**health** 81:5 95:14
137:1
**Healthsource** 88:6
286:18
**hear** 176:13 298:12
**heard** 10:17 186:2
222:13
**hearing** 135:8 140:6
143:11,12,20
144:7,9,12,16
145:22 146:4,7
247:14 273:19
304:10
**heart** 213:7

**heavily** 129:11
234:14,15
**Heel** 278:17
**help** 5:19 27:15
136:3 141:19
184:23 206:9,12
283:19
**her** 17:22 26:4
97:23 115:1 213:1
**hereby** 271:23
306:7 308:5
**herein** 5:2
**Hernandez** 24:17
50:9
**Heska** 77:18,20,22
78:14 80:22 95:15
**high** 177:5 225:8
229:24 230:10
231:3 264:9,20
265:9 286:23
**higher** 167:6 197:22
198:17 200:15,22
**highest** 228:9 229:5
230:17
**highly** 294:15
**himself** 214:12,13
**hired** 62:19 213:20
**hold** 221:9,16
222:10 240:9
302:20
**holding** 14:11,12
75:12 298:10,16
**hope** 56:19 150:7
**hostage** 221:10,17
222:10 226:13
**hour** 144:24 145:1
**hours** 104:18 105:5
124:3,5,12,16,19
124:20,22 125:2,9
213:1
**however** 149:19
210:13 229:3
230:1
**hundred** 40:11,21
42:16 89:24 145:9
157:19,22 187:5
253:2 274:11
**hundreds** 104:18,18
104:19,19 105:5,5
125:8,9
**hyperbole** 226:12
**hypothetical** 38:2
41:11 221:4
227:10 239:8
**hypothetically** 40:5
191:21 238:7

302:24

## I

**I'd** 55:1 63:22 81:4
193:13 238:3
245:1 301:10
**I'll** 51:23 52:15
53:12,14 54:16
60:20 69:15 91:21
147:4 148:3
152:10 164:2
175:10 176:12
189:12 194:2,8
195:17 196:23
234:5 261:14
305:17
**I've** 16:18 53:17
138:17 142:18
164:23 175:11
213:2 228:13
244:4 246:23
**idea** 39:16 42:23
98:22
**ideas** 144:22
**identical** 152:3
**identification**
111:17 163:3
168:22 175:3
179:4 193:7 259:6
281:5
**identified** 13:17
71:23 90:6 96:11
185:15 196:13
263:12 266:22
267:5,12 281:14
293:18
**identifies** 265:2
**identify** 64:2 65:22
71:5,8 88:15
89:13 96:16
113:13 142:6,9
148:8 158:2 203:2
224:20 262:9
274:12 283:11
**identifying** 87:22
196:5 285:24
**ignoring** 293:17
**Illinois** 1:16,17 2:4
2:13 4:12 16:11
16:13,15,17,20,22
87:8 88:4,10
130:19 144:4
206:5 306:1 308:1
308:5
**immediately** 45:6
45:12,12 46:12

47:9 52:5 55:12
57:2 97:13 99:3
103:16 119:6
142:22 143:13
173:12 292:21,22
impact 141:24
impasse 157:6
299:4,17
impede 260:4
impermissible
213:10,14
important 242:9
impression 11:5
28:22 29:1,7
70:19 101:6
233:20,24 274:20
impressions 102:17
147:3 202:3
imprimatur 137:21
improper 213:9
223:13,22 224:9
inaccurate 252:8
282:15
inadequate 224:19
293:20
inapplicable 210:12
inappropriate
191:13 263:8
inbound 7:22
Inc 1:4 4:21 307:2
incentive 133:14,15
incidence 285:15
include 56:9
included 56:11
75:14 162:22
172:8,13 173:9,12
256:12 257:21
258:12,20 267:22
289:6
includes 23:24
203:21 281:18,19
including 61:20
98:23 150:2,4
151:18 214:22,24
216:13 257:1,14
290:23 291:17
293:4
inclusive 306:9
inconsistent 276:8
290:5
incorporate 209:18
229:23
incorrect 272:12
increases 239:4
incredibly 27:1
213:4 251:4

incumbent 204:17
incurred 233:12
independent 37:17
279:11
indicate 71:16
188:3 210:21
260:23 263:19
265:10,16
indicated 205:2
233:10 279:10
indicates 102:1
211:4 305:3
indicating 58:2
196:9 225:7,10
261:9
indication 10:21
indicative 271:1
indicia 43:5
indirectly 308:13
individual 1:7 32:12
35:16 36:16,18
131:11 132:11
133:24 134:3
135:23 206:17,18
207:19 216:3,16
individualized
135:10 136:4
individually 35:15
138:5,21 181:20
181:21
Industries 32:16
220:6
Industry 209:1
inference 213:18
inferences 212:15
inferring 269:13
inflate 221:11
226:23
influence 214:4
Info 280:16,24
inform 53:10,20
informed 12:8
184:6,19
informs 303:2
initial 5:10 123:7
163:21
initially 137:15
184:8 236:10,15
237:5
initiate 220:13
initiated 180:12
293:12
initiation 68:3,5
303:17,18,20
304:5,11,18
injunction 143:12

143:20 144:7,12
144:16 146:3,7
injured 104:13
input 226:5
inquiry 220:2
inserted 95:4
insist 167:8 226:19
258:20
insisted 289:24
insisting 239:2
290:15 299:3
instance 40:23
74:17,18,20 75:1
75:2 96:16 100:6
101:21 103:18
114:16 117:14
210:9
instances 93:18
96:11,15
instant 142:15
instead 40:21 188:6
241:3 282:23
instruct 79:15
instructed 14:10
124:22
instructing 79:17
79:20,21
instruction 49:10
instructions 111:7
insufficient 260:2,2
intact 246:20
integral 211:12
intellectual 76:2,5
76:14 77:9 78:11
95:11,17
intending 97:16
intention 179:20
intentional 195:20
intentionally 271:6
interest 17:3 22:10
30:15,17,22 31:19
32:1,4 38:22 92:4
92:20,24 93:1,18
93:24 140:6
143:11 214:15
215:2 243:4
247:23
interested 6:23 55:4
308:13
interests 38:17
93:14 94:1,6,7
220:18
internal 158:10,18
159:15 160:17
161:24 163:13
166:17 198:3

203:5 230:5,22
231:1
internally 276:8
interpose 154:22
195:17 196:24
197:10
interpretation
220:9 269:21
interrelated 251:18
277:23
interrelatedness
231:21
interrelationship
251:18
interrupting 5:18
26:24 123:24
intervene 35:23
209:6,7 217:11
218:6 219:2 221:6
224:15 232:19
249:9
interveners 36:7
intervening 115:19
219:6
intervenor 218:12
intervention 36:4
209:14 216:24
217:21 218:11
219:10,12 220:12
220:24 249:5,7
intimidating 275:9
277:9 278:3
intimidation 273:20
274:2
into 25:9 43:20
124:1 151:8 194:3
201:4 229:24
235:13 279:18
295:20 303:11
introduce 4:13
invade 48:14
invoice 150:18,21
invoke 231:19
invoking 231:17
involve 35:5 49:2
214:15
involved 47:13 93:7
94:8 122:21 166:4
168:1 191:18
209:4 241:22
252:11 254:5
255:14 257:19
281:6 289:16
290:20 291:24
292:7
involvement 251:16

291:4
involves 27:23
involving 78:1
126:8
iprice 245:7
irrespective 302:21
Ismael 120:22,23,24
172:13 192:14
isn't 165:2 230:4
231:8 291:14
303:3
issue 13:17 46:21
48:1 58:11 105:24
106:6 181:14
210:1,18 239:22
239:22 267:13
270:7 273:17,20
288:11,12
issued 280:3 288:9
issues 91:24 135:10
173:3
iterations 162:21
its 32:18 34:1 65:18
70:10 93:24
103:11,12 181:6
196:7 209:7
230:24 245:21,22
290:23 291:17
itself 39:19 56:3
132:18 180:11
211:12 300:22

**J**

J 2:7
James 120:20
175:22
Jeff 145:5
Jeffrey 9:13
Jim 120:20 192:11
job 275:12
Joe 118:8,16,17,19
119:6,7,10 120:23
122:14 160:22
165:11,12,13,16
170:3,7,14 171:9
174:6 179:16
185:14
join 35:23 258:18
joined 292:16
joining 250:6
joint 85:8,10,14,21
86:3,11,16,18
91:23
jointly 252:13 254:2
254:14
joke 160:23

**Jorge** 82:4 102:1,3
102:24
**Joseph** 175:22
176:15
**JPA** 180:16,19
**judge's** 87:13
**judges** 133:13
232:11
**judgment** 133:23
134:1,2,5,24
135:11,13,18,21
136:3 148:19,22
151:15 154:3
158:3 167:5 241:9
248:7,13
**judgments** 241:7
**July** 34:10 176:10
176:15
**June** 106:16
**jurisdiction** 137:3
199:19
**jurisdictional**
208:22 210:18
211:5,21 212:3
**jury** 206:19
**justify** 243:2,16

**K**

**K** 306:3 308:2
**K-n-a-c-k** 229:12
**Kate** 155:6
**KCC** 227:18 230:19
280:15,24
**KCC's** 228:3,21
230:2
**keep** 67:11 124:3,20
124:22 179:21
180:10 186:9
255:1
**Kelly** 24:14 26:10
50:5,7 175:23
**kept** 124:13,19
231:13
**Keys** 88:21
**kind** 221:18 225:8
227:21 249:11
284:24 289:22
294:21
**KMH** 136:15
**knew** 57:7 96:23
171:11 253:2
**knowing** 58:17
274:14
**knowledge** 6:22
14:24 37:17 42:8
63:23 64:3 81:19

82:8,10 191:17
226:6 249:12,14
249:17 253:19
290:21 291:14
**known** 103:15
227:18

**L**

**L-a** 97:2
**L-a-r-b-e-v** 87:17
**La-Z-Boy** 97:2
98:16
**Labarga** 82:4 102:1
102:3
**Labarga's** 102:24
**labeled** 10:11,13
101:24
**labels** 10:14
**labor** 90:11 123:1
**lack** 143:9 210:8
299:6
**lacks** 44:11
**laid** 121:22
**Lally** 155:7
**language** 23:8,19
138:8,20 244:7
269:21
**Larbev** 87:17
**Lardner** 2:2 4:12
18:6,8 21:6,9,20
22:3 23:3 25:7
67:21,23 68:6
111:10 129:3
139:12,19 143:24
144:11 146:11
203:22
**Lardner's** 22:22
150:3,4,18 203:19
**large** 23:7 221:11
226:19,22 237:17
252:12 301:1
**largely** 27:22
**larger** 237:24 238:1
239:3,5 243:4,5
**LaSalle** 2:12
**last** 50:16,17 53:22
97:19 157:9
187:22 195:13
205:14 206:8
223:2 226:13
257:15 258:14
261:5,23 262:1
299:15
**lasted** 146:21
**late** 34:8,10,21
122:9 236:20

296:4
**later** 48:19 62:3
84:2 222:9 250:10
250:13
**latter** 6:23
**Lauren** 2:3 4:20 9:6
145:5
**laws** 16:12,14,20
73:3
**lawsuit** 11:9 60:17
62:2 68:4,5 79:6
127:20 303:18,19
304:5,12,18
**lawyer** 59:14,15
73:14 74:1,6,7,10
144:3 208:4
**lawyering** 59:14
**Layli** 1:15,21 4:9
308:4,17
**lead** 80:3 123:5
**leading** 123:3 135:8
143:6
**league** 83:14
**learn** 61:7 173:23
178:12
**learned** 57:13 148:9
287:7
**learning** 57:3
**least** 74:24 82:2
87:8 123:6 255:12
257:3 269:12
295:15 303:14
**leave** 53:6 199:24
215:3,4 224:20
**leaves** 73:5,15 74:2
74:7
**leaving** 53:3 86:12
**led** 292:1
**left** 15:6 53:1,11,21
54:2,6,22 55:7,10
57:21 65:16 83:9
84:4 100:17
214:11 220:19
248:6 264:14
**legally** 33:5 212:9
**lengthy** 305:4
**less** 31:7 144:24
145:1 167:9,12,17
304:2
**lesser** 300:14
**let** 17:22 67:6 69:10
85:17 88:23 99:3
109:20 111:23
134:7 169:3 175:7
175:10 179:9
182:5 185:22

193:11 210:5
215:9 224:23
238:15 239:9
244:23 245:6
254:23 288:7
**let's** 5:16 16:11
49:12 178:9
226:12 242:7,9
261:4,10 268:18
**letter** 11:6 196:4
234:14,20 235:1,7
235:10,14,18,22
**letting** 26:1 71:15
247:9
**level** 281:8 298:24
**leverage** 31:6 38:13
38:16
**Lewis** 1:8 27:8,15
30:4 46:6 102:3
142:23
**Lex** 50:19
**LexisNexis** 229:11
**License** 1:22
**licensed** 144:5
**lie** 12:2 99:18 102:5
**lied** 12:17 13:16,22
51:15,21 52:12,22
62:10 63:7,14
82:12,18,22 83:20
83:22 96:12 99:11
**light** 166:18 299:14
**like** 21:4 32:11 55:1
63:22 81:4 102:4
102:6 118:22
132:5 149:6
180:13 185:6
193:13 194:10,14
198:6 226:13
238:3 245:12
288:17 291:6
293:7 295:7
301:10
**liked** 171:10,11,12
**likelihood** 27:3
**likely** 26:16,17
107:4 113:17
176:7 227:15
230:7,15
**limit** 211:14,14,22
**limitation** 34:24
**limited** 61:21 98:24
126:8 127:6,13
252:24 291:4,12
**limits** 253:1
**line** 7:18 57:20
131:20 163:21

243:18 267:14
284:7 300:4 307:5
**lines** 29:18
**link** 8:23
**links** 84:18
**lisp** 236:21
**listed** 26:20 108:13
108:16 117:1
138:4 139:22
175:17 190:1
260:22 263:17,18
265:16 266:17
**lists** 76:7,9,12 77:10
77:12 78:1,4
95:12,12,21
264:10 265:4
**literally** 40:7
**little** 231:6 250:17
**LLC** 1:8,8 2:10,11
4:19,19
**lloew@foley.com**
2:5
**LLP** 2:2 4:12
**local** 120:9,18
**locate** 70:15 245:22
**located** 113:14
211:3 246:1,3
**locked** 67:16 70:7
**Locks** 84:18
**log** 263:13
**logs** 167:5 263:23
264:7,16,20 265:4
274:10 275:13
293:4,7,8,9,13
**long** 9:17 61:24
69:4 97:18 138:11
144:17,20 146:21
170:9 185:22
217:6 249:23
264:21
**longer** 69:5 70:7
299:16
**looked** 16:22 191:6
228:24
**looking** 7:17 37:17
126:23 159:11
166:22 189:20
283:18
**looks** 163:9 194:10
194:14
**loop** 180:10 186:9
**lost** 207:20
**lot** 94:14 104:6,9
229:20 270:19
**low** 229:24 230:9
302:17 303:7,9

lower 302:19
lowest 228:8
lucky 222:19
lump 188:5,13
lunch 97:14 134:15
lying 13:10,13
  49:24 96:17 100:7

_____

**M**

MA 169:14
Madison 2:8
mail 161:17,20
  275:23 281:16,19
  282:2,15 284:18
  288:13
main 106:10
maintain 86:4
maintained 85:11
  85:15
maintains 66:14
majority 228:19,19
  228:22
makes 56:20 177:23
  222:2 304:16
making 42:8 71:6
  72:8 80:6 218:5
management 125:7
March 210:7
Margulis 96:8
mark 155:6 168:18
  170:6,8,10 171:11
  210:20
marked 10:11
  111:16 163:2,6
  166:1 168:21
  169:13 170:14
  175:2 179:3,7
  193:6,10 194:18
  195:7 259:5,15
marking 111:20
  175:6
marks 177:5
Massachusetts
  88:20
matches 8:2
matching 80:18
material 65:22
  70:14,20 72:4
  83:20 95:16
materials 7:11 16:8
  17:2,5 56:9 64:12
  66:6 71:18 72:18
  73:16 74:3,7,10
  74:11,24 83:9,19
  84:1 91:22 93:20
  98:23

math 229:2
matter 4:3 7:18
  21:11 51:13 73:17
  73:18 79:6 81:3
  89:2 137:6 181:19
  291:4
matters 66:5,7
  105:15 136:13
  232:11
Max 96:8 153:9
  178:7,9,15
maximum 40:8
  240:5,16
maybe 144:21
  149:11,12 191:23
  192:16 237:4,4
  245:14 262:17
  280:1 302:17
  303:3,8
MC 3:15,15,16,16
  3:17 112:18 175:7
  175:7 179:8,8
  193:11
McHenry 206:4
McKesson 81:6
  95:15
McKown's 246:17
  247:7
McMahon 9:21
meaning 274:2
  277:6 298:17
meaningful 93:6
means 31:16 73:19
  161:20 264:24
meant 231:10 234:4
  243:11,13
Measer 184:10,13
median 228:17
  229:4
mediate 142:24
  191:14
mediated 155:9
  177:3
mediation-specific
  189:11
mediations 27:14
  91:20 155:23
  158:20 159:17
  160:5 178:5 182:4
  192:5,8 213:24
mediator 28:22
  29:1,4 57:11
  101:21 153:9
  157:4 160:4
  170:18 171:2,4
  172:20 176:4,21

177:11,23 178:10
  296:2 298:13,15
  299:1,3,13,19,22
mediator's 56:16
  101:6 102:17
  143:4
mediators 175:24
meet 9:7,15 144:10
  293:21
meets 262:18
megabytes 8:24
members 35:5,6,19
  35:21 133:9
  135:15 215:22
  217:4,24 219:21
  220:19 239:1
  278:13 294:12
  300:10 303:14
memo 75:19
memorable 179:24
memorandum 60:2
memory 244:24
mental 147:3 202:3
mention 50:12
mentioned 102:16
  231:3 289:11
mere 213:13,15
merits 204:21
Mester 155:6 170:6
  170:8,10 171:11
  171:16 176:12,17
  176:19,24 183:24
  184:14,15 246:12
met 9:13 145:16,20
  174:21
method 294:9,11
methods 284:19
Meyer 50:19
MFG 241:2
Michael 24:14 45:3
  50:8,10 55:14,16
  56:10 57:5,10,12
  57:13,16 58:1,5,6
  58:19 108:20
  146:16 153:8
  155:3 158:14
  175:21
Michelle 24:14
  109:1 117:19
  118:12 145:14
  153:9 155:4
Michigan 87:7,10
  88:8 89:7,11
mid 205:5
mid-April 296:4
middle 1:1 5:10

15:7 117:6 261:19
might 93:4 136:15
  145:23 155:20
  157:1 164:16
  166:5 217:12
  227:10 231:18
  241:3 258:8
  270:24 279:14
  292:20 302:20
  303:4
Mike 50:9 123:4
  145:16,20 146:2,8
  147:13 148:9
  182:17 183:2
  258:17
million 118:22
  154:7,10 157:15
  157:17 160:22
  161:5 163:22
  164:7 165:9
  167:17 195:14
  198:20,24
mind 31:11 40:24
  43:15 93:3 95:22
  167:14 175:10
  203:9 232:9
Mine 21:8 83:12
  84:19 85:3
mini 305:15
minimum 303:23
minus 265:4
minute 112:5 134:7
  193:13 215:10
minutes 9:18 97:20
  169:21 185:16
misheard 237:4
misplaced 210:13
missed 31:22
misses 210:19
mission 213:1
misstates 264:3
mistake 59:17
mistakenly 174:8
misunderstanding
  46:18
Mm-hmm 114:11
  117:4 126:4 132:2
  136:1 139:15
  240:6 247:21
  258:23 268:9
  273:16
model 91:7 226:24
modified 121:24
moment 111:21
Monday 179:19
monetary 183:6

money 31:7 98:18
  183:16 184:6
  221:13 277:11
monitor 4:7
month 206:10 250:3
  250:5
months 104:8
  196:11
morning 5:7 212:15
most 91:23 155:11
  240:7,8 273:12
  283:13,14
motion 134:2,24
  135:11,12,18,21
  232:18 236:24
much 20:5,8,15
  89:13 95:2,7
  104:15 125:12
  149:23 171:10,11
  177:24 186:14
  201:8 202:22
  203:8 207:3
  212:21 217:22
  230:6 251:7
  273:17
multiple 191:21
must 265:23 266:15
  297:2
myself 94:16 118:6
  119:3 123:4
  146:15 153:7
  155:2

_____

**N**

N 3:1
N-a-c-k 229:13
Nack 229:10
named 9:20 34:14
  204:13 209:7
  214:23,24 215:3,6
  215:23 216:13,15
  256:24
Namely 210:20
names 87:12,18,20
  89:18
narrative 80:7
Natally 84:10 97:22
  255:24
nature 136:3,4
  139:16 204:10,16
  206:3 233:3
  253:22 281:9
necessary 39:18
  40:12 41:8 42:12
  42:15,19,24 44:5
  44:5,8,9 194:9

221:13 242:19
260:18 262:14
266:8 276:10
277:14
**necessitated** 289:21
**need** 6:2 39:12 60:8
134:8 176:12
183:7 187:24
194:3,16 223:7
240:12 269:24
275:2,5 280:8
283:19
**needs** 266:5 297:2
**negotiated** 214:14
**negotiating** 226:18
237:16
**negotiation** 229:22
**negotiations** 230:4
302:15
**Neither** 211:2
**Nelson** 292:11,22
**never** 102:11 175:9
180:13 189:5
213:20 228:13
229:20 234:22,24
246:23 247:12,13
254:15 256:10
257:10
**nevertheless** 213:21
**new** 30:14 38:20
175:9 216:23,23
220:14
**news** 169:21
**next** 37:23 38:3
91:7 97:17 223:2
260:24 263:20
283:22
**nice** 99:9
**night** 143:8
**nine** 201:4,6,8
202:17
**nobody** 11:19,20,21
39:8 221:19
**nodding** 106:2,5
245:15
**non-time** 36:9
**nonattorney** 249:24
**noncertification**
248:11
**none** 208:5 281:19
282:16
**nonparties** 210:16
**nor** 37:17 211:2
257:11 291:10
**North** 1:16 2:3,12
98:15

**Notary** 306:22
**note** 195:17 196:3
**notes** 153:19 244:4
271:19 283:18
**nothing** 15:17 38:24
77:6 123:20
153:12 161:23
166:20 177:5
248:15,18 251:11
305:7 308:6
**notices** 293:23
**notified** 288:3
**notify** 114:7 161:18
**November** 1:18 4:6
205:5 307:3 308:6
**now** 75:11 104:7
176:13 197:23
219:1 234:9 261:3
263:15,22 267:21
273:1 275:20
285:17 290:10
295:16
**nowhere** 113:19
**numbers** 95:6
157:19 162:1
195:7 261:20
262:12,19,24
263:2,20 265:3,16
267:24 274:24
275:16 284:20
285:16 286:7
303:8
**numerous** 210:21
252:14

**O**

**O** 306:3,3 308:2,2
**object** 147:1,18,24
149:12 287:17,22
**objected** 176:3
**objecting** 79:18
**objections** 79:14
80:2,6,7
**objective** 265:18
267:23 272:11
**obligations** 233:6
235:21
**obtain** 66:16 114:12
215:6 217:12,16
**obtained** 159:20
267:11 270:5,10
292:4,5 293:2
**obtaining** 292:1,7
**Obviously** 170:16
**occasion** 185:3
**occur** 84:3 97:12

143:23 185:11
**occurred** 39:15 42:3
97:13 106:14
119:5 122:4
146:18 148:15
176:7 292:18,21
298:21
**occurring** 21:13
**October** 34:16,19
112:15 113:2,7
138:13 205:3
292:18
**offered** 40:17 67:12
98:13,18 99:16
165:11 302:14,22
**offers** 152:10
178:20,22 222:1
**offhand** 279:2
**office** 24:16,17
56:16 62:1 75:9
97:16,23 143:24
145:7,11 153:10
286:3,4
**often** 91:6
**oftentimes** 127:2,5
**Oh** 86:14 99:22
100:9 175:9
261:17
**Ohio** 88:16
**oncoming** 236:20
**ones** 44:3 90:6
254:18 255:10
264:14 280:23
**ongoing** 125:24
**onto** 68:11
**opened** 214:12
**operate** 269:15,17
276:11
**operated** 266:24
267:8 268:3 269:2
269:9,15,16,23
**operates** 211:5
275:20
**operating** 237:6
**operation** 284:22
285:11
**operator** 284:21
**opinion** 177:12
210:4 244:21
268:10
**opinions** 212:16
**OPP** 101:24
**Oppenheim's** 8:10
15:18 38:19 64:5
90:1 101:5 103:4
103:15 104:13

142:23 199:14
291:3 296:5
298:21
**opportunity** 135:3
147:18,24 235:6
**oppose** 219:5 221:1
221:4,5
**opposed** 215:22
219:9 273:18
**opposing** 229:22
237:17
**opposition** 164:20
219:6
**optimism** 295:22
**optimistic** 170:16
**option** 249:6,8
**ordered** 18:16,17
19:24 196:22
245:23 246:21
283:9
**ordering** 305:13
**ordinarily** 133:10
**organized** 7:12
**original** 68:9 69:11
75:20 213:16
249:11
**originally** 94:23
**others** 32:6 78:15
78:17 89:1 95:20
136:15 246:20
289:15
**otherwise** 5:22
219:14 260:5
**Ottawa** 292:23
**our** 25:3 48:17 62:1
125:7 164:20
180:16 181:23
200:1
**ours** 95:24
**outbound** 7:22
**outcome** 247:22
248:16,19
**outside** 34:23 79:7
84:10 97:23
136:10 146:6
168:3 193:14
217:21 257:8
**over** 5:16,18 56:13
56:16 58:15 94:1
94:8 95:11,18
104:8 170:7
202:16 203:3
204:7 205:6,9
225:16 231:2
239:10 243:20,21
248:1,4 295:7

**overall** 186:23
**overboard** 226:9
**overlap** 139:6
**overlapping** 191:9
231:14 232:1,6
233:8
**overpowering**
179:21
**owe** 130:13 131:2,2
**owed** 27:7 132:17
216:1,3 221:24
**owes** 130:17
**own** 7:17 93:5,18
214:12 243:4,18
269:17 270:1,11
276:11
**owned** 266:24 267:8
268:3 269:1,9,15
269:16,23 270:1
271:24 282:18
286:7
**owner** 284:21
**ownership** 266:16
284:22 285:11
**owns** 275:19

**P**

**Pack** 280:16 282:22
**page** 3:3,10 113:13
113:17 117:7
169:17 170:14
172:3 175:20
176:10 181:16,23
190:18 223:2
262:19 263:1
307:5
**pages** 222:22
245:13 306:8
**paid** 20:8,16 182:1
186:15 233:24
**paragraph** 117:5
177:1 180:2,8
195:6 199:12
223:2,4 271:16
272:7 277:18
**paragraphs** 117:5
**paralegal** 24:16
84:9,9
**paraphrasing** 29:19
**paren** 263:6,18
272:1
**parenthesis** 260:22
260:22,24 263:20
266:16,21 267:5
267:11
**parenthetical**

261:11
**participant** 289:23
290:13
**participate** 34:13
86:17 182:4
183:20 184:23
209:3
**participated** 165:24
173:16 236:1
**participating** 84:11
98:2 223:19 281:6
**particular** 71:11,14
71:24 77:13 101:3
115:15 117:20
215:23 225:6
282:11
**particularly** 171:3
196:13
**parties** 29:11,13
43:13 120:15
139:11,14 243:20
243:21 281:10
290:18
**partner** 100:9
**partnership** 98:18
**Parts** 271:6
**party** 31:6,7 74:8
120:24 123:22
210:23 237:17
**party's** 88:17,21
**past** 96:9,10 107:13
170:7 171:4
196:11 230:1
256:23 267:22
277:5
**Pat** 9:21
**pay** 18:16,17 19:19
20:1 22:24 23:11
31:7 182:1 203:15
203:18 221:13
233:11 235:8
238:19
**paying** 18:9 19:9
20:5,7 22:21
149:1,15 233:16
234:9 235:22
**payment** 124:12
**PC** 121:2
**PDF** 245:13
**penalty** 260:17
261:5 271:18,23
272:19 273:3,9
274:13 275:5
276:23 277:12,16
278:5,14,23 279:6
**pending** 21:1 90:3

124:23 191:22
206:4 212:18
213:17 218:14
225:6 292:12
**people** 24:10 25:10
50:14 95:24 96:2
121:20 138:6
168:3 181:20
240:13
**perceive** 214:20
**percentage** 186:17
187:17 199:16
**perform** 8:12
123:12
**performance**
151:12
**performed** 7:24
95:5 110:24
187:20 245:20
**perhaps** 183:19
**period** 69:21 99:1
211:10,11,13
246:15 251:3
252:2 267:9 295:8
297:22
**perjury** 260:17
261:5 271:18,24
272:11,20 273:3
273:10 274:13
275:6 276:23
277:12,16 278:5
278:14,24 279:6
**person** 25:4 67:8,16
97:16 106:10
146:12 155:5
177:4,8 183:7
232:22 233:3
245:20 275:17,19
275:23 277:3
**personal** 63:23 64:3
64:7 82:8,10 83:9
83:13 84:1 85:4
249:12,14,17
**personally** 18:5
44:18 148:18
179:17 181:19
**perspective** 33:13
133:19 135:17
**pertain** 17:7 60:16
**pertained** 289:17
**pertaining** 1:14
**pertains** 140:11
**Phil** 246:14 250:6
251:6 253:23
255:13,16 257:20
258:12,20

**Phillips** 1:15,21 4:9
308:4,17
**phone** 55:19 58:19
146:12,13,14
155:5 266:6
**phonetic** 82:4 84:10
246:18
**phrasing** 271:5
**physically** 179:20
**Physicians** 88:6
286:18
**piece** 277:1
**PLA** 247:18,19,19
248:9
**place** 4:11 42:1
143:3 148:12
194:11 203:7
267:1 293:1
308:10
**plaintiff** 1:5 2:2
117:22 119:16
182:2 191:22
204:13 207:2,3,5
207:11,15,20
214:23 215:6,23
216:16,23,23
221:23 223:8
224:18,20 256:24
**plaintiff's** 114:5
117:8 134:1
178:13 206:1
222:11 223:13
224:9,11,13,19
243:1 274:15
**plaintiffs** 87:24
119:11 181:23
209:7 210:8,8,16
212:1 214:24
215:3,4 216:13,16
217:3 218:23
**plaintiffs'** 210:9
212:2
**plan** 61:5 230:13
279:10,17,20
280:11 281:3,7
289:6,13 291:18
293:16,20 297:1,5
298:1 300:24
**plans** 291:11
**pleadings** 123:7
**plural** 19:22 27:14
77:12 218:2,5
261:11
**plurality** 218:17
**pocket** 234:7
**pockets** 243:18

**pointing** 225:8
**points** 199:10
**police** 10:6,18,22
11:24 12:2,4,6,9
12:17 13:10,13,16
13:23 49:24,24
51:15,21 52:3,13
52:23 62:11 63:7
63:15 82:13
**policy** 125:4
**Pollo** 89:4
**pool** 150:2
**Porcelli** 209:5,16
210:1 211:18
219:3 237:1
279:22 284:10
292:13
**Porcelli's** 209:12
210:6 212:8
**portion** 23:9,14,15
200:9
**positing** 295:15
**position** 29:11,12
31:21 32:7,15
35:10 36:8,11
91:24 96:24 203:5
219:21 222:3
223:8 231:1
260:11 266:11
279:4,16 282:1
300:19 301:5
304:10
**positions** 290:18
**positive** 298:20
**possess** 12:23 14:19
101:12
**possession** 16:8,15
17:1 64:21 65:1,6
65:23 67:18 70:21
71:18
**possibility** 225:23
**possible** 105:9
172:11 200:2
224:17 248:20,21
268:10 281:2
289:9 303:1
**possibly** 226:20
237:22,23 297:4,5
303:24
**Postman** 155:15
170:17
**Postman's** 170:15
**potential** 22:10 77:3
77:11 78:1,5,12
78:21 80:16 81:1
95:12 105:22

176:3 204:18
215:21 224:14
256:24 271:13,14
**potentially** 266:12
**pound** 256:3
**practice** 125:4
**practicing** 138:11
205:6,10 208:2
**precedent** 208:16
209:19
**preceding** 66:18
180:2
**precisely** 36:13
**predict** 229:19
230:18,20
**prefix** 261:16,17,18
261:23
**preliminary** 137:16
143:12,20 144:7
144:12,15 146:3,6
159:5 209:13
226:2 236:8,14,24
237:8
**preparation** 10:2
24:4 107:10,11
144:11,15,18
254:6
**prepare** 9:10,12,24
24:6 76:24
**prepared** 90:14
93:20 94:12,14,19
94:20,23
**preparing** 26:14
169:10
**pres** 195:15
**prescription** 211:3
**present** 2:15 46:20
84:7 97:3,6,21
99:4 146:1,3,7
159:11 212:2
226:2
**preserve** 195:22
197:1
**preserved** 196:1,12
**preserving** 59:19
**presumably** 189:23
261:14
**presume** 271:10
**presumed** 211:11
**pretty** 12:1 80:5
91:2 95:7 217:22
222:4 251:7
288:20
**prevailed** 207:2
**previous** 259:24
**previously** 52:7

250:22
**print** 245:6
**printed** 259:20
**prior** 64:13 70:2
84:5 120:11,13,14
120:14 125:18
133:24 146:11
251:14 296:24
**privacy** 287:20
**privileged** 46:15
73:16 74:6,10,21
74:24 75:10 194:4
195:20 232:4
247:7 302:11
**privileges** 65:10
**pro** 242:15,19 301:2
**probably** 78:19
89:18 183:24
236:20 245:1
251:20 262:3
286:4 288:20
**problem** 18:1 196:9
209:20 219:22
285:11
**procedural** 211:13
211:22
**Procedure** 1:13
210:21
**proceed** 206:7
219:18
**proceeded** 213:22
247:14
**proceeds** 186:23
**process** 8:8 39:7
90:17,18 91:11
161:12,14 180:11
182:7 243:8,8,20
243:22 276:18
289:24 290:3,14
293:22
**produce** 6:16,19
8:18 110:8 121:16
245:23
**produced** 6:13,21
7:12 8:20 10:10
10:11 101:2,20,23
110:5,11 198:12
234:14 235:2
292:8
**producing** 121:18
123:17 187:16
246:13
**product** 91:19
92:13 166:12
200:8 202:3,6
282:13

**production** 56:8
196:10 234:20
**Professional** 16:18
16:23 73:3 130:18
130:19 308:17
**proffering** 274:22
**project** 227:15
**projected** 226:21
**projections** 229:23
**promise** 133:14
**promises** 133:2
**prongs** 43:2,6,11,18
44:2
**proof** 266:22 267:6
275:14
**properly** 275:24
276:16,19
**property** 76:2,5,14
77:9 78:11 95:11
95:18
**proposal** 189:1,3
**propose** 160:2
219:2
**proposed** 3:18
160:7 162:2,21
173:23 175:23
186:11 188:4,20
188:22 214:2
244:12,12 259:14
260:11 279:17
291:11 305:1
**proposing** 202:17
**proprietary** 92:4,20
92:24 93:1 95:21
283:1
**propriety** 282:6
**prosecuted** 254:15
293:11
**prosecuting** 204:12
204:15,20
**prosecution** 233:13
**prospective** 257:18
**protect** 17:4
**protected** 184:11
**protection** 196:1
246:20
**proven** 244:2
**provide** 7:5,8,16
14:19 26:17 49:7
53:12 114:8
126:23 129:19
147:18 152:12
154:24 224:19
265:23 266:13
273:10
**provider** 277:1,7

**provides** 265:14
**providing** 48:20
52:2 59:2 80:7
96:23 97:10
126:17 128:5,12
272:9
**provision** 45:18
47:13 48:16 49:3
51:23 52:1,15,17
54:16 59:7,16
62:14 263:9,9
**provisions** 240:1
278:1
**PTX** 305:14
**public** 81:1 306:22
**publication** 230:2
281:17 282:3
297:5
**publicly** 80:20 81:8
81:10
**published** 43:4
228:11,12 285:18
**publishes** 227:20
**pull** 125:6 185:5
212:24
**pulled** 107:16
**pulling** 281:21
**punt** 130:21
**purchase** 64:7
**purchased** 64:10
**purely** 281:16
**purportedly** 115:13
**purports** 113:11
**purpose** 53:15
54:18 239:3
289:13
**purposeful** 293:23
**purposes** 21:4 61:3
220:7 233:5,5
234:20 236:17,23
242:7 282:14
290:14
**Purposeseses**
236:19
**pursuant** 1:12
271:22
**pursue** 27:16 31:17
35:15 43:16 44:11
126:5 131:5 215:6
217:24
**pursued** 131:8,11
137:18
**pursuing** 35:12
**put** 43:20 59:24
67:16 96:24
103:14 124:1

183:16 184:6,19
194:2 250:13
271:1 274:3 284:4

_____
**Q**
**qualify** 80:6
**quantity** 286:23
287:14
**querying** 284:19
**quick** 261:2 301:16
**quippy** 302:23
**quite** 103:9 212:13
**quote** 208:11,12
213:4 223:14
236:10,10
**quote-unquote**
232:6 273:18
**quoting** 181:16
211:18

_____
**R**
**raise** 80:2 197:12
**raised** 135:17
181:15 183:18
208:17 209:24
**raises** 213:17
**range** 161:2 162:9
166:8 225:6 228:1
228:5,22 229:14
229:15 230:15,18
230:20 231:4
**ranges** 228:4
**rata** 242:15,19
301:2
**rate** 221:14 226:21
227:9 229:5 230:7
230:9,9 231:3
237:11,19,20
238:10 239:12
242:18 271:3
273:21 284:13,16
284:24 293:24
294:2
**rates** 227:15,23
228:1 229:15
230:15 260:5
271:7,13 278:4
279:14 294:23
**rather** 11:8 203:5
211:21
**raw** 95:6
**RE** 307:1
**reach** 170:17
173:21 178:18
213:24 219:16
220:14 291:7

295:19 298:2,9
299:12
**reached** 42:4
300:20 301:5
**reading** 28:16 210:6
**reads** 117:8 271:22
**ready** 69:15 111:23
112:1 175:7 179:9
193:12
**real** 224:24
**really** 89:13 97:15
134:9 141:16
236:17 275:12
**Realtime** 308:18
**reason** 15:9 37:19
37:21 68:13 113:4
113:8,10 175:16
179:18 199:2
218:20,22 219:21
224:13 242:24
243:18 271:2
303:2 307:5
**reasonable** 192:1
202:9,13 203:8
226:21 227:8
237:19 242:21
243:15,20,22
260:5 266:2,7
301:7 302:3,4,7
302:18 304:21
**reasonably** 221:13
230:13
**reasons** 243:9
**receive** 6:7 32:17
123:22 133:10,15
149:3 151:4,6,9
151:17 159:7
186:22 187:3
277:10
**receiving** 52:5 57:8
58:18 110:17
143:14 169:24
304:22
**recent** 169:18 188:3
283:13,14
**recipients** 37:9
188:6
**recognizing** 127:9
**recommend** 226:4
**record-breaking**
167:13
**recordation** 84:15
**recorded** 308:7
**records** 35:9 78:7
84:17 104:24
157:14 159:19

161:17 163:19 198:11 200:2 263:6,13 264:6,8 264:9 272:12 275:1,13 284:4
**recoup** 151:1
**recover** 105:2,7,10
**recovered** 121:6
**recovery** 40:11,22 40:22 42:16 157:19,23 208:16 209:19 240:5
**redacted** 23:10 129:11 234:14,15 234:20,23 235:4,6 235:10
**redaction** 194:10,15 195:20
**redactions** 23:7
**reduction** 242:15,19 301:2
**refer** 80:19 138:6
**referenced** 284:1,9 284:11
**referencing** 196:24
**referred** 12:20 56:10 100:13 108:18
**referring** 16:9 28:11 28:23 53:5 77:10 101:4,8 112:5 139:18 180:20 185:4 188:19 195:4 198:9 220:3 231:24 271:14
**reflect** 170:22 200:5 268:13 270:11
**reflected** 65:7
**reflects** 83:23 127:2 189:21
**refresh** 34:17 163:12 190:12 198:2
**refuse** 54:9 167:21 200:7 201:10,15 238:12 243:3
**refuses** 167:12
**refusing** 52:20 60:17
**refute** 265:5
**regard** 73:12 213:8 281:2
**regarding** 14:20 49:6 143:2 147:14 161:11 163:13 164:18 173:10

186:12 189:24 192:5 212:16 246:11 257:18 280:14
**regardless** 303:12
**regards** 38:14 126:3
**registered** 266:23 267:7 269:8 308:17
**regular** 173:10
**reiterate** 48:12,17
**rejected** 99:8,12,17 100:3,5
**rejection** 176:20
**relate** 60:15 140:4,5 140:15 151:12 181:5
**relates** 137:10,11 141:2 232:19 243:19
**relating** 63:19 83:13 102:22 160:17 253:23 254:17 255:8 257:13
**relation** 20:20 131:19
**relationship** 49:4 50:22 115:12,16 123:23 125:16,20 126:2,11 127:6 128:16,24 129:3 129:18 132:22 139:16 140:10 171:15 182:11 191:12 204:11,16 251:19
**relative** 43:20 91:24 95:4 104:2 159:18 191:17 254:3 299:6 308:12
**relay** 222:1,4
**relayed** 176:19
**release** 287:20
**relevance** 80:3
**relevant** 43:23 229:21
**relief** 40:6 159:7 240:16
**remain** 218:14
**remainder** 187:9
**remains** 90:17 213:17
**remarked** 167:4
**remedy** 211:14
**removed** 284:20
**rep** 204:13

**repeat** 17:9 19:2 33:16 37:4 39:21 41:17 70:23 86:9 101:13 109:19 116:16 119:24 168:5 201:20,22 204:22 216:4 227:4 257:24
**repeatedly** 135:11 208:6
**rephrase** 120:4 276:9
**report** 10:6,18,22 12:1,4,9 49:24 52:3 159:22 176:13 265:5
**reported** 1:21 12:18
**reporter** 1:16 4:9,24 5:19 17:22 18:1 72:19,21 100:4 111:18 163:4 168:23 175:4 179:5 193:8 212:23 252:18 258:5 259:7 305:9 305:13 308:17,18 308:18
**Reporters** 4:10
**reports** 176:16 264:11 274:10
**representations** 280:13 281:12,23 282:5,12
**representative's** 225:4
**representatives** 77:4,11 78:2,5,13 78:22 95:13 119:19 133:13 224:15
**represented** 9:2 109:23 115:23 116:8 119:10,18 121:20 132:3 136:9 137:5 190:21
**representing** 22:11 38:5 127:23 131:17 150:5 181:7 203:22 233:16 243:1
**represents** 21:21 129:13
**reproduced** 10:12
**request** 6:10 68:2 68:23 107:17

109:15 110:14 125:1
**requesting** 46:15 67:24
**require** 167:19 237:17 278:4 291:19 302:10
**required** 74:17
**requires** 72:16,24
**requiring** 221:10
**research** 191:2 254:5
**researching** 251:14 252:12
**residual** 238:24
**resign** 69:2
**resignation** 8:10 64:13 70:3 72:14 72:17 96:19 97:5 152:4
**resigned** 30:3 70:5 97:9
**resigning** 67:9 84:6 100:11
**resigns** 73:6
**resolution** 186:16
**resolve** 160:7
**resolved** 181:17 223:11
**resolves** 182:5
**respect** 16:8,15 17:1 32:8 57:1 64:1 65:10,17 71:10 76:14 91:10 94:18 116:6 125:21 133:2 135:23 147:10 196:2 201:17
**respective** 290:17
**respond** 63:4 158:24 182:21
**responded** 98:21 126:19 181:22 183:23 184:2 196:8
**responding** 109:15 190:11 208:7
**responds** 79:15 188:2
**response** 6:14 10:8 63:16 147:9 182:23 183:3,5 190:13 197:21 199:23 236:6 245:18 273:11 299:15

**responses** 10:7 19:16
**responsibilities** 173:5 235:20
**responsibility** 214:21 236:2
**responsible** 23:17 150:14,15 204:2 235:8
**responsive** 6:17 110:15 126:20 246:2
**rest** 38:17 261:18
**restate** 257:23 258:5,7
**restroom** 134:8
**result** 8:19 104:8 149:17 152:14 155:24 171:24 186:11 207:1 304:7
**resulting** 294:22
**results** 80:18 288:11
**retain** 75:24 86:12
**retained** 51:1 66:6 68:20 69:5,20 70:8 82:20
**retainer** 22:2,6 23:2 51:2,4,10 77:22 114:10 121:19,22 122:11,13 132:24 165:15 180:21 181:8 191:4,6 222:16,21
**retaining** 28:6 146:11
**retains** 7:22
**retention** 3:12 108:1,17 112:4,7 112:10 114:13,19 116:9 127:12 234:13
**retired** 29:6 66:21
**return** 49:22 72:13 73:15 74:2,9,11 74:17,20,23 75:17
**returned** 11:9 73:5 75:8,13,15 97:14
**reveal** 159:1
**revealing** 49:2
**revelation** 251:24
**reviewed** 10:5,18 11:24 16:12,14,17 16:19 61:9 67:2 107:9,12,21 109:10 169:6

175:11 179:11
201:14 283:9
289:20
**reviewing** 14:18
35:9 107:15,18
284:7
**revise** 163:16 194:9
**Rgood@anderson...**
6:6
**ring** 210:24 211:7
211:16
**rings** 210:6
**risk** 271:12
**risks** 158:2 204:19
**Rita** 24:16 50:9
**Robert** 159:22
**robust** 230:13
**Rodney** 153:9
**role** 38:20,20
123:16 129:8,9
187:15 231:24
232:5 236:2 250:1
251:11,13 253:20
291:10,11
**roles** 235:20
**room** 179:22 268:14
**Ross** 1:11 4:2,21 5:1
5:9,10 11:2,12
129:14,23 308:5
**roughly** 187:7,8
**RPR** 1:21 308:4
**rule** 22:24
**rules** 1:12 5:17
16:17,22 17:1,7
17:11 73:3 130:17
130:19 210:20
**ruling** 246:22 247:3
**run** 34:2 173:8
210:11 215:10
294:9,11
**running** 192:16
214:24
**Ryan** 24:14 50:5,6
175:23

---

**S**

**S** 3:8 260:22 261:11
263:6,17,18,18
266:16,21 267:5
267:11 272:1
**S-t-r-y-k-e-r** 286:19
**safe** 230:20
**Salam** 120:22
172:13 175:21
181:10 192:14
**salary** 151:4

**Sandusky** 256:16
256:20 257:6,9
278:16
**save** 60:18
**savvy** 103:18
**saw** 234:22,23,24
235:10
**says** 23:15 113:3
117:6 127:12
179:16 180:8
188:20 198:23
199:1 211:19
223:5 262:11
263:4 266:15
268:7 269:6 270:5
272:12
**scattered** 286:22
**scenario** 248:3
**schedule** 135:9
**scheduled** 58:3
172:1
**scheduling** 24:24
25:1 47:23 105:15
105:20
**school** 16:6
**scientific** 294:9,11
**scope** 20:18 49:3
56:24 64:24 79:7
110:19 113:23
126:2,7,11 127:3
127:5,8 140:10
141:1 247:3
**Scott** 50:12,20
**Scrip** 75:3
**search** 8:16,19 56:8
109:14 110:14,20
110:24 111:8
245:21 246:8
247:4,5
**searched** 65:17
111:4 246:6,10
**searches** 7:24 8:2,4
8:12
**section** 60:1 223:3,4
260:20 265:14,23
267:18 268:5
271:6,16,23
272:14 273:2,3,11
274:22 275:24
276:1
**security** 103:7,9,14
103:22,24 104:1
**seeing** 121:13
234:18 235:3
273:13 285:18
**seek** 19:1 38:8

124:16 150:10
154:9 173:13
218:12 219:17
224:14 267:19
**seeking** 19:3,5,6,8
79:5 91:19 105:2
105:7,10 147:2
152:9 164:2
188:16 189:11
197:11 199:17,21
202:2,4 207:5
226:4 232:3,4
243:2
**seeks** 255:6 261:12
**seemed** 251:3
**seems** 80:5 244:5
260:18 274:22
**seen** 23:2 112:2
163:7 169:7
180:13 229:6,17
230:17 234:15,17
283:7
**segue** 231:6 241:17
243:24 245:10
259:19
**Select** 266:17
**self** 243:4
**send** 213:1 294:18
**sending** 33:5 84:18
**sense** 56:20 69:6
93:6 268:5 304:16
**sent** 8:13 11:6 25:19
33:3 34:6 37:9
55:13,16 61:12
66:17 161:6 169:8
170:10 196:4
262:13,24 289:18
303:17,18 304:4,6
304:11,17,18
**sentence** 117:7
**sentences** 95:8
**separate** 21:1 35:22
66:8 89:12 191:8
211:3 239:21,23
279:11 291:23
303:10
**September** 182:14
185:12 188:1
250:2,4,18,18
**serious** 12:1
**serve** 36:22 129:9
135:10 226:23
237:22,23 247:22
**server** 7:20,21
65:11,18,19 66:12
66:14 69:19 70:10

104:2
**server's** 69:23
**servers** 245:22
**serves** 221:11 239:3
**services** 123:12
126:17 127:1
128:6,12
**session** 10:2 144:18
178:15 197:8
212:15
**sessions** 155:18
**set** 14:7,10 15:3,4,5
15:8,15 64:5,5
103:7 122:18
128:16 167:4
300:2,21 301:3
308:14
**Setting** 86:17
**settle** 29:15,17
161:3 164:11
165:19,23 167:12
167:17 225:9
**settled** 39:4 44:17
89:3 164:16 170:8
247:13
**settlements** 228:2
229:16 241:5,18
278:9 280:17,24
289:6
**settling** 43:19
**several** 95:14
146:19 194:22
279:3 287:6,7,8
**severe** 46:18
**shall** 114:7,8,12
117:10
**shape** 254:16
**shared** 62:23 63:9
100:22 101:16
102:11,17,21
135:16 147:17,22
168:3 174:5
253:22 255:20
256:2,5,7,8,11
**sharing** 60:13 62:6
101:5,20
**she** 5:20 84:11 98:1
98:1 272:17
**she's** 245:8
**sheet** 3:13 94:20,24
95:2 162:21 163:7
262:14
**sheets** 90:14,21 92:5
92:18 93:6 94:1,8
94:13,19 229:24
**shifted** 251:16

**short** 40:10 49:12
49:17 103:18
134:9 144:19,22
183:6 192:21
193:22 206:15
215:15 251:4
259:2 288:19,24
296:18 301:19
**Shorthand** 1:15
308:18
**shortly** 54:22 55:1
111:12 119:2
122:1 165:15
196:8 250:6
**should** 35:11,14
99:2 149:12
173:11 179:18
184:5 188:4
193:17 195:12
198:16 202:16,20
222:6 226:4 282:9
294:18,21 297:2
303:12,14,16
**Shouldn't** 169:20
**show** 122:11 179:7
179:19 190:15
193:3 244:24
**shown** 244:6 260:1
**shows** 200:1
**sic** 169:14
**sign** 23:21 108:22
108:24 168:15
181:8 206:24
241:2,3 256:4,4
266:17 267:1,15
268:23 269:4,12
269:14,24 278:5
278:14
**signature** 112:20,23
113:14,15 278:24
305:9
**signatures** 279:7
**signed** 22:3 25:20
107:7 108:1 109:7
109:12 110:2
112:15 113:1,7,11
113:11,16 114:24
165:16 180:22
181:3,6,7 219:1
269:22 270:4
**significance** 32:21
**significant** 33:5
186:10,12
**significantly** 167:6
216:2
**signing** 18:7

---

similar 80:15 147:3
181:2
similarly 138:5
simply 17:8 59:19
278:4
simultaneously
268:11
since 89:3 107:19
142:19 198:13
235:17
single 75:18 254:3
singular 269:8
Siprut's 118:16,17
120:23 121:4
122:14 165:16
187:15 218:7,13
sir 5:7 185:13
sit 37:21 95:19
104:24 212:6
253:16 257:16
263:3,15 266:3,10
291:15 293:17
295:13
sitting 78:10 89:10
125:9 136:18
141:12 153:24
234:9 261:3
283:15
situated 138:6
situation 161:21
184:24 217:11
220:17 226:6,7
231:18 252:3
257:3 271:2
277:24
six 69:3 119:17
size 243:3 286:20
305:14
skills 54:5
slash 266:23 267:7
271:24 272:1
Slingshot 197:23
198:9,11 264:7,19
265:9
slow 72:19
small 23:9
Smith 50:21
Soble 9:14,15 145:5
sole 220:19 276:24
277:7
solely 51:11 120:10
121:20 151:10
201:14
solves 190:16
somebody 31:12
247:3 276:24

302:13 304:3
someone 13:10,12
36:4 145:11
167:11,16
sometime 34:7
118:5 176:7
251:20 288:18
sometimes 80:21
151:7 229:19
241:16
somewhere 28:7,12
286:3
soon 173:1,2
sorry 26:1,24 33:14
41:17,21 71:15
77:23 79:2 86:8
86:14 101:13
116:16 119:24
123:24 172:24
174:5 201:21
239:9 241:8
257:23 278:12
sort 25:4 49:2 56:22
57:4 65:13 70:14
132:21 133:8
171:7
sought 25:10 34:13
37:2,8 132:6
sound 291:6
sounds 145:9,10
source 275:14 277:7
sources 227:12
southwestern
286:13
speak 22:9 26:15
50:13 97:16
speaking 80:7 162:5
239:16 271:12
speaks 272:15
special 132:22
133:5,18 216:15
specifically 7:20
27:9 28:23 46:22
54:19 55:23 56:7
107:15 143:7
166:11 180:4,24
185:3 233:1 254:2
254:5,13 255:16
specifics 58:12 74:9
83:15,16 135:7
141:11 166:15
specified 69:21
272:1 308:10
specify 275:2
specifying 221:4
speculate 20:14

81:18 82:6,7
speculation 99:23
214:5
spelled 121:11,14
spent 105:5 124:17
125:2,13 150:5
203:22 212:13
split 120:7 149:5,6,8
spoke 46:12 58:5
98:4,9,9,11 174:6
spoken 105:13
sport 85:4
sports 83:14
spring 206:13
SS 306:2 308:1
staff 67:16 104:2
123:6
staff's 70:6
stand 79:13,14
148:18,21
standard 43:22
91:3 94:19
standing 31:9,12,14
31:23 43:13,15
44:11 208:11,23
209:20,24 210:8
212:1 243:16
Star 210:7 211:24
start 16:11 92:9
178:9 183:10
197:22 239:10
249:23 261:10
started 7:17 115:16
138:17,19 148:12
250:5,15,24
253:24
Starting 142:4
state 1:16 4:14 5:7
16:12,15 30:6
45:8,13 46:13
47:10 57:3,7 86:1
86:2 142:5 195:24
199:3 266:1
271:23 272:2
298:20 299:7
306:1 308:1,5
state's 287:20
stated 11:24 53:17
71:20 96:18 97:22
139:10 202:15
208:6
statement 73:20
83:22 96:22
130:23 160:4,6
166:13 167:18
197:4 260:17,20

statements 71:8
states 1:1,13 114:4
176:23 187:23
stating 11:7 12:16
68:16 236:13
268:24
statistical 285:15
status 173:10
statutes 209:17
217:2 287:21
statutory 207:6,7
241:12
stay 67:12 99:6
198:16 200:23
201:6 280:3,6,7
stayed 144:9
stays 280:7
steal 14:8
stealing 11:21,23
13:3 63:19 64:1
stenographically
308:7
Stephanie 50:12,18
Stephen 2:15 4:8
Stewart 50:12,18
sticks 195:12
228:15
still 14:11,11 39:10
67:17 75:9,12
99:18 100:2,5
176:2 192:1 239:7
245:8 246:20
247:8 248:13
264:16 273:19
276:2 299:18
304:6
stole 14:6 17:15
27:12,24 28:6
61:20
stolen 10:24 11:3
12:18 50:1 61:8
62:3
stooge 31:7,10
stop 80:8
stored 70:6
strategy 48:2,6,15
91:15,16
Street 1:17 2:3,7,12
264:9,20 265:9
strength 212:18
strengths 212:21
strike 11:19 24:21
24:23 32:9 50:6
67:6 75:7 81:23
104:22 149:4
172:23 216:10

248:22 249:18
288:6 296:23
strong 27:1 213:4
214:4
Stryker 286:18
288:4,8 289:10,16
291:4
stuff 83:3 84:20
103:16
style 204:14
subject 16:20 36:2
79:6 117:11 162:4
177:12 210:19
211:23 223:11
submission 161:20
201:15
submit 124:16
Subparagraph
268:20 269:6
Subparts 267:18
subpoena 6:7,10,14
6:17 24:22 25:19
109:15 111:12
121:17 286:9,10
subpoenaed 286:24
289:12 290:1,24
subpoenas 110:17
110:21 126:19
287:15 288:10
289:18 290:15
291:19
Subscribed 306:17
subscriber 285:4
Subsection 269:11
subsequent 33:1
45:8 52:10 84:23
143:1,10 158:21
200:19 299:6
300:14 302:18
subsequently 64:10
85:19 98:11
102:10 118:12
121:21
subset 76:21 78:1
subsets 76:20,21,23
77:1
substance 25:13,21
26:4,8 63:15
106:18 158:22
159:6
substantially 98:18
substantive 123:7
146:1 192:4,7,10
192:13 211:14
substitute 215:5
subtract 264:13

subtracted 282:24
subtraction 264:22
success 27:3 229:20
  287:3
successful 186:15
  195:1 264:14
successfully 268:1
Sue 24:16 50:9
sued 127:15 303:21
suffered 105:8
suffers 244:17
sufficiency 282:2
  300:24
sufficient 227:14
  238:19 239:17,18
  239:23,24 242:17
  242:20
Suffix 262:4
suggest 71:16 72:3
  130:9 140:2
suggesting 70:12,17
  222:11 269:13
  272:14 294:16,18
  294:21
suggestions 170:19
suggests 129:12
suit 41:12 211:6,21
  212:3
Suite 1:17 2:3,12
sum 158:22 188:5
  188:13 211:24
summary 61:16
  133:23 134:1,2,5
  134:23 135:11,13
  135:17,21 136:3
  241:9 248:7
summer 34:8,9,10
  34:21 122:8
  206:13 250:18
  251:1
supplementation
  246:21
supplements 10:9
support 7:21 11:12
  12:23 13:16 63:23
  67:15 70:6 104:2
  272:23 293:13
supports 13:21 64:3
suppose 141:21
  232:8 247:12
  249:7
suppress 271:7
surrendered 66:20
surrounding 41:5
suspense 228:23
swear 4:24

swearing 273:9
Swiderski 206:24
sworn 5:3 306:17
  308:6
system 7:21 14:6
  68:18 125:7 256:3

—————————
T
—————————
T 3:8
table 183:16 184:7
  184:20
tactic 91:16
tactics 91:15
taken 1:15 42:1
  49:18 98:19
  103:16 134:16
  159:20 192:22
  193:23 215:16
  259:3 279:4 289:1
  296:19 301:20
  307:3
taking 1:14 4:11
  59:19 78:12 83:5
  83:23 147:6
  148:12,13 170:6
  197:16,20 216:18
  276:21
talk 24:3,7 26:4,7
  53:2 183:9 193:14
  239:21
talked 63:18 138:24
  243:14 249:4
  271:17 273:7
  305:4
talking 5:18 45:18
  45:19 47:12 56:4
  227:21 241:18
  252:1 259:23
  281:16 287:9,10
  293:3 300:22,23
Tape 4:2
target 264:10 265:4
  274:10
tech 103:17
techie 65:13
technical 264:15
technically 264:15
teeth 281:21
telephone 282:17
  283:3,21 284:2,3
  284:10 285:4
  286:6,11,23
  287:15 289:12,18
  290:1,15,23
  291:19
telephonic 284:8

telling 54:19 60:8
  84:5 205:18
  257:10
tells 296:7
template 90:23,24
ten 86:23 230:9
  231:2
ten-digit 261:12
terrible 219:4
test 294:21
testified 5:4 47:8
  65:9 88:10 191:11
  245:18
testify 47:18 82:8
  129:15 166:9
  308:6
testimony 28:7,12
  28:15 30:7 49:23
  112:5 115:24
  116:10 156:24
  208:7 212:7 232:9
  259:24 296:24
  308:10
text 23:10 211:2
Thank 111:22
  134:11 136:8
  175:10 204:7
  245:16 301:16
thanks 17:23 72:21
  192:17
themselves 4:14
  209:18 251:12
theory 40:23
there's 42:15 46:17
  47:24 70:12 78:22
  88:20 89:2,11
  102:5 117:7
  126:15,16 127:2
  150:23 179:14
  196:1 218:7 219:7
  241:16 243:16
  249:8 261:15
  267:1 303:13
thereafter 173:2
  196:8 251:6
thereby 237:24
therefor 237:21
therefore 31:23
  86:7 167:21
  297:10
thereof 143:9
these 14:21 15:1,22
  46:20 83:19
  112:16 122:21
  175:18 176:7
  199:21 241:5

  284:17 289:17,18
thing 85:8 261:7
  277:16
things 83:6 105:20
  139:6 153:20
  164:23 199:6
  233:2 246:10
  252:3 259:12
  280:8
third 143:2,5 208:4
Thomas 120:18,19
  121:21 172:10
  175:22 181:9
  190:21 191:12
  192:11
Thomas's 121:4
Thompson 4:9
though 63:12 69:3
  108:3 162:5
thought 81:4 99:9
  135:5 160:23
  161:3 173:11
  184:5 295:6
thousands 8:3,3
  56:12,12
three 30:2 87:7,9,13
  87:14 88:8 89:12
  120:15 139:11
  142:18 187:4
  218:9,11,18
  233:18 261:19
  285:20 287:8
threw 298:18
through 19:15
  57:13 59:4 66:11
  84:18 89:22,23
  156:19 204:20
  217:1 222:22
  244:6 260:2,3
  270:10 285:17
  306:9
throughout 267:8
  269:9
throw 226:9
thrust 159:13
thus 186:7
tie 79:11
Tile 87:24
timeliness 212:2
timely 216:24
  217:22 219:13
  220:12,20
times 5:14 127:7
  131:17 142:20
  158:18 161:5
  188:6 233:18

  240:19 243:3,17
timing 13:17 32:8
Tina 84:9 97:22
  255:24
today's 4:6,11 6:8
  9:2,8,10 18:23
  19:7,20 20:20
  24:1,4,6,20 26:14
  107:10,11 150:5,6
  169:11 172:3
  305:12
together 90:10
  144:16 187:4,24
  250:8 254:18,24
  255:10
tolling 210:12
  216:22 217:12
too 180:3 182:23
  218:7 262:2
  273:22 302:17
  303:7,9
took 38:14 66:4
  67:14 71:5,15
  75:20,23 76:3,15
  77:8,24 78:6
  81:13,14 82:3
  198:10 203:7
  248:9 259:11
  292:24
top 27:20 39:9 43:8
  77:6,17 78:3,8
  87:4 89:14 102:1
  121:12 142:8
  143:16 163:21
  230:18 241:24
  287:12 289:8,14
  300:3,16
top-line 238:10
total 40:6 195:5
tough 96:24
Tozian 50:13,20,21
traced 275:18
track 124:3
traffic 7:23
Training's 236:24
transcribed 308:7
transcript 28:16
  284:8 306:8,10
  308:9,10
transcripts 283:7
  283:10
transfer 285:16
transferred 285:12
transmission 167:5
  263:13,23 264:7
  264:16,20 265:4

265:11 274:9
275:13 293:4,7,8
293:9,13 305:16
**transmissions**
265:20 275:1
**transmitted** 66:11
268:1 275:16
**transom** 203:4
**treated** 133:18
186:6 303:12
**treatment** 133:6
**treble** 207:9,16
242:4
**trebled** 154:7
241:12,22
**trial** 205:17 206:7
206:15,16,21
207:14,22 208:3
**trials** 205:10 208:1
**tried** 205:11
**tries** 179:21
**triggers** 228:20
**trouble** 236:17
**true** 68:12 73:21
81:5 91:10 95:14
167:18 230:4
249:10 264:19
268:11 272:3
275:2 279:1
306:10 308:9
**truly** 151:22 162:18
**truth** 308:6,6,7
**truthfully** 5:23
**try** 69:9,10,15
207:18 229:19
**trying** 11:23 19:15
36:19 42:7 48:14
56:23 129:7 140:9
140:12,24 142:3
149:6 191:20
230:6 242:7 260:8
277:22 298:11
**TTA** 36:11,16 42:21
44:11 45:7 46:13
47:9 57:3 85:24
86:2 142:5,19,21
142:24 156:23
227:18 232:15
**tune** 234:7
**turn** 8:15
**turned** 67:6,15 70:6
83:4
**two-day** 99:13
**type** 83:13 188:4,20
188:22 281:10
**typed** 124:7

**types** 284:17

**U**

**U.S.C** 271:23
**ultimately** 6:23
46:21 140:20
171:21 177:13
185:8 200:22
201:12 202:18
234:7
**unable** 291:5,6
**unacceptable** 262:7
262:22
**unacceptably** 278:3
**unbelievably** 39:8
299:21
**underlying** 27:17
33:2 41:9 51:12
**understands** 223:5
223:7
**understood** 5:23
158:17 228:14
246:1
**undertaking** 219:15
**unduly** 244:7,19
260:4,13 262:7,22
266:11 270:17,18
270:22 271:2
277:9 278:2
**unethical** 221:8
226:16 227:1
237:14 294:15
**unfair** 293:21
**unfairly** 277:9
278:3
**Unfortunately**
183:7
**Union** 170:11
**uniquely** 94:7
**United** 1:1,13
**universe** 247:8
**unless** 79:15 179:16
242:15 243:18
248:9
**unlikely** 180:14
**unnecessarily**
221:10 226:19
237:17
**unnecessary** 271:18
273:3 275:11
**unprofessional**
180:15 221:8
226:16 227:1
237:14
**unreasonable**
238:12 240:11

276:24 277:8
293:21 302:20
304:2
**unredacted** 234:17
234:22 235:17
**unsolicited** 163:18
199:11
**unsure** 150:2
**unsuspecting**
294:12
**until** 57:8 152:4
156:13,15 223:10
223:20 233:24
235:1
**untimely** 219:19
**unwilling** 166:14
167:17 182:3
**upcoming** 97:1
**updated** 170:15
**updates** 173:10,11
**upheld** 247:19
248:9
**upon** 38:15 173:12
204:17 226:19,21
239:2 244:15
269:12,14 273:10
299:12
**upset** 100:17 173:9
**us** 7:12 60:8 75:16
118:11 122:12
125:4 136:3
165:12 170:13
173:8 180:10
205:18 206:10,12
225:12 234:14,21
235:2 250:13
259:22 260:8
288:5 296:7
298:11
**USA** 280:16,24
**use** 31:14 63:20
94:19 134:8 176:6
177:10 293:6
**user** 80:15
**user's** 69:20
**uses** 268:20 269:11
272:15
**using** 170:18 171:1
172:4 227:19
230:8 236:15
273:1 284:17
**utilize** 247:4 284:19
**utilized** 278:7
**utilizing** 226:23
285:10

**V**

**vacated** 237:9
**valid** 33:13 36:9,16
36:18,20 263:14
**value** 157:12 225:5
238:19 239:1
276:21
**varies** 229:18
**various** 142:19
**vastly** 221:12
**vendors** 281:6
282:12,14,16,21
283:20 284:18
**vent** 186:1
**verbal** 54:5
**verdict** 205:11,17
206:7 207:23
208:2 248:10,11
**verify** 263:5 266:15
272:11
**verifying** 276:2
**version** 234:15,17
234:22,24 235:1
**versus** 4:4 77:22
78:13 80:22 88:6
95:15,15 204:21
209:21 231:22
256:2 257:6,9
268:24,24 270:17
278:16 285:2,5
286:18 300:11
**very** 46:22 61:24
144:19 157:2
163:9 166:11
173:1 185:22
205:17 206:15
225:23,24 286:13
287:13 301:16
**via** 161:19
**viable** 264:24
**video** 4:7
**VIDEOGRAPHER**
2:15 4:1,23 49:15
49:19 134:13,19
192:19,23 193:17
193:20,24 215:13
215:17 258:24
259:8 288:22
289:2 296:16,20
301:17,21 305:11
**videotaped** 1:11 4:2
**violate** 45:21 203:12
297:9
**violating** 301:9
304:9
**violations** 303:22

**virtue** 216:24 252:2
**Volume** 4:2
**vs** 1:6 307:2

**W**

**Wagner** 256:16
257:6,9
**waiting** 233:24
**waive** 60:8 196:21
210:23 249:15
**waived** 196:7,18,20
199:8 208:17
209:24 248:23
**waiver** 210:19
211:23 217:1,17
**waivers** 246:19
**Wanca's** 7:19 80:17
106:24 110:20
112:23 123:6
127:9 141:24
151:22 174:15
182:10 209:4
236:1 245:21
247:5 251:7 289:5
289:12
**wanted** 14:3 50:11
155:13 161:16
167:1,2 170:3
182:7 230:6
**wants** 170:18
217:10 225:15
**wasn't** 13:3,18
62:18 65:7 83:5
83:23 86:13 99:21
113:8 171:10
183:8,19 185:18
220:7 253:20
256:12 257:21
**wave** 304:22,23
**wayed** 259:20
**Wayne** 29:6 155:9
170:18 171:2,10
171:11 176:3
178:24
**ways** 38:10 232:8
232:12 243:24
244:10
**we'll** 195:22 239:21
245:10 305:14
**we're** 56:15 59:5
60:7 172:4 184:10
189:20 190:18
219:5 221:2
259:11 273:14
281:15,21 300:22
300:23

we've 177:3 192:16
 249:4 259:15
 287:13 293:3
 305:6
weak 219:20
weakness 200:2
weaknesses 201:17
 204:19
web 161:19
week 30:4 157:9,10
weeks 7:10 8:6 30:2
 99:11,16
weeks' 96:20 97:10
welcome 48:18
wellbeing 220:17
Wellness 256:16
 257:6,9
went 14:9 64:10
 97:14 144:15
 153:4 155:11
 288:8
weren't 13:19,21
 103:19 120:12
West 280:16 282:22
Western 170:11
what's 10:4 13:4
 31:4 32:23 51:18
 56:18 71:6 96:21
 101:1 102:14
 144:22 163:6
 166:1 168:18
 179:7 195:6 224:2
 224:5 229:5 248:6
 284:13,24 285:15
whatever 6:22
 238:20 246:9
 251:17 276:5
 291:14 297:12
whatsoever 31:6
 75:19,22 81:20
 142:16,17
WHEREOF 308:14
while 192:16 273:19
 289:5
whims 151:10,22
who's 18:9
whoever 120:9
whole 60:18 215:22
 284:14 308:6
whom 4:14 9:5
 30:20 50:4 117:18
 158:13 255:23
 275:18 279:21
 286:10 295:24
whose 118:8 204:14
 256:20

wife 24:17
Wilder 75:3
Williams 24:15 26:7
willing 17:14 47:18
 161:15 162:10
 164:11 166:5,8,18
 167:8 297:14,24
win 18:15
window 284:23
Wines 32:16 209:1
 220:6
wins 234:1
winter 206:12
Wisconsin 2:8
withdraw 226:4
withhold 222:12
within 11:9 45:6
 62:2,18 67:24
 152:10 157:1
 209:18 218:8,9
 260:13
without 17:16 29:21
 31:12 35:8 49:1
 58:17 60:8 155:1
 170:17 180:16
 249:3 253:7,11,18
 276:20 295:20,23
 298:17 299:8
 301:2,9 304:9
witness's 130:23
won 241:7,9 290:3
won't 62:22 71:8
wondering 247:2
word 31:10,11
 92:19 93:2 218:4
 218:17 236:15,18
 283:23 290:7
 293:6
worded 275:24
 276:13,16,19
words 90:20 238:20
 273:2 277:2
work-product 147:2
 148:2 158:6
 246:19
worked 89:20 90:9
 90:11 120:24
 124:6 138:17
 174:18 216:13
 249:20 254:24
 255:9
working 31:8 56:22
 192:3 233:21
 250:7 253:7,10
works 50:18 224:24
world 224:24

worth 8:24 71:20
 153:14,18,24
 154:5,6 225:12
wouldn't 191:15
 212:24 248:2
 254:18 294:5
write 170:14 270:9
 270:12
writes 169:17
 176:11
writing 85:2,18
 117:10,17 121:11
 121:13,16
written 10:7,8 84:15
 84:17 110:2
 114:12,19 117:11
 213:2 223:24
 224:2,4,5
wrong 207:9 212:9
 219:24 228:13
 258:9 285:2
wrote 124:5 182:15
 194:24 237:5

-----X-----

X 3:1,8 270:10

-----Y-----

yank 245:12
yeah 41:6 51:3
 69:10 83:16 89:8
 108:8 131:21
 158:15 171:9
 174:11 183:17
 232:14 240:19,22
 245:9 271:21
 284:15 294:13
year 66:18 71:24
 118:6 122:4
 205:14 206:8
 250:9,13 285:21
 304:12
year's 71:20
years 15:6 31:8
 33:22 34:21
 109:13 205:7,9
 207:23 208:2
 212:7 251:6
 257:15 279:3
 287:6
yesterday 182:19
yet 137:19,23
 198:13 237:10
 248:1 273:4
 292:19
yield 158:3

you'll 129:22
 244:23
you've 96:11,15
 131:8 166:19
 169:2 205:5 229:6
 230:17 242:2
 246:1 255:2,7
 256:10 264:19,21
 279:19 284:6
 293:18 294:1
 300:19 301:5
yours 25:22 50:2
 256:20
yourself 25:2 28:5
 52:9 53:19 61:11
 63:11 71:4 147:13
youth 83:14 84:19

-----Z-----

Z 97:2
Zakzrewski 24:15
 26:3 109:1 114:24
 117:19,23,24
 118:12 145:14
 153:9 155:4
Zakzrewski's
 112:20
zip 266:1

-----0-----

0 230:20
084.003900 1:22
 308:19

-----1-----

1 3:12 4:2,3 111:16
 111:20 160:22
 195:6 199:12
 222:18,20 260:20
 261:11 262:17
 265:14 266:17
 267:5,12 272:14
 273:11 274:22
 277:18,21
1,500 157:16 161:5
 207:9 240:17,18
 241:22 242:4
 304:5,13
10 211:24 237:19
10:03 49:16
10:13 49:20
100 158:1
1000 2:12
101 59:14
10th 2:12 176:10
11:37 134:14

112 3:12
11th 10:5 30:23
 34:16,19 143:14
 217:20 220:4,5
 247:18 279:24
127 264:9,20 265:9
13 1:18 307:3 308:6
131,000 217:23
 220:18
132,351 195:1
134 2:12
13th 4:6
150 90:8
15th 176:15 296:10
16 186:19 187:7
163 3:13
165 154:7,10 157:15
 157:23
169 3:14
17 3:17 104:8
 193:11
1718 2:7
1746 271:23
175 3:15
179 3:16
188 222:22
189 114:4 117:3
 223:2
18th 296:13 298:19
 298:23 299:3,14
19 11:10,17 12:18
 62:3
19.5 300:6
190 112:18
193 3:17
195 222:22
1st 182:14 185:12

-----2-----

2 3:13 163:2,7,11
 166:1 195:7
 199:10 252:19
 265:23
2:30 134:20
20 195:15 237:11,20
 238:9,9,24 239:12
 239:14,19 242:18
20,000 286:21
2005 250:2,4
2006 250:13,19
 251:1
2008 251:21 252:2
 252:11 253:5
2009-2010 284:23
 285:13
2011 253:13

**2012** 115:14
**2013** 34:3,15,17,19
   109:5 113:2
   115:14 138:14
   205:3 292:18
**2014** 15:7,9 118:5
   122:5,9 288:18
**2015** 122:5,7,9
   155:10 182:14
   185:12 190:11
   194:19 199:24
   288:17 298:5
**2016** 29:24 30:9
   45:11 53:8,9
   57:21,23 64:14
   69:1,2 84:5 90:2
   106:16 157:9,10
   206:9 216:18
   288:17 295:10,17
   298:19 299:3,4,14
**2017** 1:18 4:6 196:3
   205:5 210:7
   306:19 307:3
   308:6
**204** 3:6
**206,196** 195:2
**21** 11:9,10,18 12:18
   62:2
**21st** 194:19,23,24
   199:24
**23rd** 196:3
**25** 8:24 195:15
   199:19,21 226:24
**250** 300:17
**259** 3:18
**25th** 296:10
**28** 271:22
**2800** 1:17 2:3
**28th** 185:11 190:11
**2nd** 69:1 188:1
   299:4,20

**3**

**3** 3:14 168:19,21
   212:1 266:4
**3:32** 192:20
**3:40** 192:24 193:21
**3:43** 194:1
**30** 229:8 230:16,21
**300** 157:23 188:5,13
   189:6,8 300:17
**31** 298:5
**312** 2:4,13
**31st** 138:13 205:3
   210:7 292:18
**321** 1:16 2:3

**330,000** 161:6
**335** 169:14 172:3
**338** 170:14
**340** 169:17
**340,000** 188:6
**342** 169:15
**343,122** 163:18
   195:10 199:12
**35** 228:7,9 230:19
**350** 302:17 303:2,7
**350,000** 163:20
**3574** 3:16 179:8
**3577** 181:23
**3578** 181:16
**3579** 3:16 179:8

**4**

**4** 3:15 175:2,6
   266:15 267:18
   268:5 271:6
   275:24 277:21
**4:13** 215:14
**4:16** 215:18
**400** 241:3
**4416** 3:17 193:11
**4784** 3:15 175:7
**4785** 176:10
**4787** 175:20
**4797** 3:15 175:7
**495** 157:16,24 158:1
   161:5
**499.99** 304:4
**4A** 268:7 276:1,6,8
**4B** 276:6

**5**

**5** 3:5,16 179:3,8,11
   187:23 237:19
   271:16 272:7
   277:22
**5:21** 259:1
**5:31** 259:9
**50** 89:24 186:24
   187:8
**50-page** 210:3
**500** 154:6 157:16
   207:9 240:17
   242:9,14 303:14
   303:23
**53711** 2:8
**5500** 2:13

**6**

**6** 3:17 193:6,10
   194:19
**6:13** 288:23

**6:17** 289:3
**6:28** 296:17
**6:30** 296:21
**6:39** 301:18
**6:40** 301:22
**6:44** 305:12
**60602** 2:13
**60654** 2:4
**608** 2:8
**620-5357** 2:8
**658** 2:13

**7**

**7** 3:18 169:14 210:7
   259:5,15
**75** 167:17

**8**

**8:16-cv-01477-C...**
   4:5
**8:16-cv-01477** 1:6
**832-5393** 2:4
**8th** 53:8,9,21 54:3
   57:23 64:14 66:22
   69:2 84:4 85:24
   87:6 97:13 296:7
   296:8,9

**9**

**9,000** 7:7
**9:17** 1:18
**9:18** 4:7
**90** 9:18 287:4
**90-minute** 10:1
**92** 163:22 164:7
**99** 40:22 195:14
   198:20,24
**9th** 112:15 113:2,7